**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MARVIN CHARLES GABRION, II,      ) 1:15-CV-00447

                                  ) 1:99-CR-76

         Movant,            ) Capital §2255 Proceedings

                                  ) Hon. Robert Holmes Bell, Presiding

         v.                 )

                                  )

UNITED STATES OF AMERICA,     ) Movant incarcerated at:

                                  ) USP Terre Haute

         Respondent.      ) Reg. No. 09184-055

**MOTION UNDER 28 U.S.C. §2255 TO VACATE,
SET ASIDE, OR CORRECT SENTENCE BY A PERSON
IN FEDERAL CUSTODY**

Comes now, Movant, Marvin Charles Gabrion II, by and through undersigned counsel, pursuant to 28 U.S.C. §2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence of death imposed in this case.  Through counsel, Mr. Gabrion states the following grounds for granting this Motion:

**I.    Preliminary Matters**

1.    The name and location of the court that entered the judgment of conviction challenged here is the United States District Court for the Western District of Michigan, Southern Division. That Court is located at 399 Federal Building, 110 Michigan St. NW, Grand Rapids, Michigan 49503.  The case number is 1:99-CR-76.

2.    The date of the judgment of conviction is March 5, 2002.  On March 16, 2002, the jury recommended a sentence of death and that sentence was imposed.

3.    The death sentence was imposed.

4.    Mr. Gabrion was convicted of murder.

5.    Mr. Gabrion pled not guilty.

6.    Mr. Gabrion was tried by jury.

7.    Mr. Gabrion testified at trial during both the guilt and penalty phases.

8.    An appeal was taken from the conviction and sentence.

9.    Mr. Gabrion pursued direct appeal.

   a.    Direct appeal was pursued in the United States Court of Appeals for the Sixth Circuit.

   b.    The case number was 02-1386/1461/1570.

   c.    Mr. Gabrion's conviction and sentence were affirmed.

   d.    There were a number of opinions issued on direct appeal.  The first opinion on direct appeal was issued on March 14, 2008 and is reported at United States v. Gabrion, 517 F.3d 839 (6th Cir. 2008).  By a 2-1 vote, the Court affirmed the district court's jurisdiction over this case.  Certiorari was sought and denied on April 6, 2009.  Gabrion v. United States, 556 U.S. 1168 (2009).

   e.    Next, the Panel, by a vote of 2-1, affirmed the conviction, but reversed the death sentence on August 3, 2011.  United States v. Gabrion, 648 F.3d 307 (6th Cir. 2011).

2

f.  Rehearing *en banc* was granted in response to the government's motion.  The *en banc* Court reversed the Panel decision, affirmed the conviction, and reinstated the death penalty on May 28, 2013. United States v. Gabrion, 719 F.3d 511 (6th Cir. 2013).

g.  The grounds raised on direct appeal are:

i.  Whether the indictment is fatally defective because the grand jury failed to find and allege a single statutory aggravating circumstance so as to make Mr. Gabrion eligible for the death penalty.

ii.  Whether there was insufficient evidence that the location where Rachel Timmerman's body was recovered was within the "special maritime and territorial jurisdiction of the United States."  Alternatively, whether there was insufficient evidence proving beyond a reasonable doubt that Timmerman drowned or even that her murder occurred on federally owned land.

iii.  Whether the Court committed reversible error by refusing to permit Mr. Gabrion to represent himself.

iv.  Whether it was error to refuse to relieve Mr. Gabrion's trial counsel and declare a mistrial of the penalty phase after Mr. Gabrion punched one of his lawyers.

v.      Whether the district court's uneven rulings on challenges for cause due to views on punishment were error and in violation of the Sixth Amendment.

vi.     Whether it was reversible error and a denial of due process of law to refuse defense counsel's request for another competency evaluation and a competency hearing after a neurologist testified that Mr. Gabrion was brain damaged and after Mr. Gabrion's mental state deteriorated during the trial to the point that he punched his lawyer in front of the jury during the penalty phase.

vii.    Whether Mr. Gabrion was deprived of his right to be present during critical phases of his trial when his counsel and the court met without him in closed hearings on five occasions to discuss him and issues regarding his testimony, including how it should be presented.

viii.   Whether the district court denied Mr. Gabrion's Fifth and Sixth Amendment rights to due process, to counsel and to confront witness Chrystal Roach by withholding a Department of Justice, Office of Professional Responsibility report finding prosecutorial misconduct and evidence of a vendetta against Mr. Gabrion.

ix.     Whether the district court abused its discretion and denied Mr. Gabrion due process of law by removing a juror prior to

4

guilt phase deliberations who was allegedly sleeping, after twice finding she wasn't sleeping, and by replacing her with an alternate, without providing defense counsel an opportunity to object.

x. Whether it was error for the district court, without a sufficient showing of the witnesses' unavailability, to allow, over defense objection, the videotaped testimony of Linda Coleman and Katherine Westcomb, denying Mr. Gabrion his constitutional right of confrontation.

xi. Whether it was reversible error to permit an untimely and belated psychiatric examination, denying Mr. Gabrion notice and to permit unduly prejudicial and improper rebuttal testimony.

xii. Whether the district court abused its discretion and violated the confrontation clause by refusing to permit defense counsel to examine a government expert's response to an ethics complaint and to permit defense counsel to cross-examine Dr. Ryan regarding allegations of ethical violations involving other federal capital defendants.

xiii. Whether the district court committed reversible error and violated Mr. Gabrion's due process right to present a defense by refusing to instruct the jury regarding Mr. Gabrion's courtroom behavior or to permit argument about it.

xiv.   Whether the district court committed reversible error and denied due process of law by refusing to instruct the penalty jury regarding Bureau of Prison regulations regarding confinement at a high security level and the BOP's ability to prohibit or limit an inmate's ability to communicate.

xv.   Whether the district court denied Mr. Gabrion due process of law in violation of the Fifth and Eighth Amendments, by refusing to instruct the jury that it must unanimously agree, beyond a reasonable doubt, both that the aggravating circumstance(s) sufficiently outweigh the mitigating circumstance(s) and that justice requires that Mr. Gabrion should be sentenced to death.

xvi.   Whether the FDPA is facially unconstitutional, because it specifically dictates that the rules of evidence do not apply.

xvii.   Whether it was error to admit at the penalty phase of the trial the testimony of multiple witnesses of other alleged acts by Mr. Gabrion, at times without notice, which were designed solely to inflame the jury.

xviii.   Whether the failure to allow the jury to consider as a mitigating circumstance the fact that Michigan is not a death penalty jurisdiction when there remained residual doubt about federal jurisdiction violated the Eighth Amendment.

6

xix.     Whether it was reversible error and a denial of due process to introduce evidence that three men with connections to Mr. Gabrion had disappeared.

xx.     Whether the prosecutor's penalty phase argument was designed to incite an unreasonable and retaliatory sentencing decision.

xxi.     Whether it was reversible error and denial of due process for the victim's mother to testify that she wanted Mr. Gabrion to be executed.

xxii.     Whether the district court abused its discretion and denied due process of law by refusing to hold a post-trial evidentiary hearing when the jury foreman stated in a post-trial press interview that "I knew [Gabrion] was off the wall before the trial" after testifying during voir dire that he had no opinion about the case.

xxiii.     Whether Mr. Gabrion was denied due process when the government failed to provide him with exculpatory evidence relevant to witness Lloyd Westcomb.

h.     Certiorari was sought from the *en banc* decision.  It was denied on April 28, 2014. <u>Gabrion v. United States</u>, 134 S.Ct. 1934 (2014). The questions presented were:

i.     Whether, or under what circumstances, the federal government may prosecute someone for committing a

criminal offense on national forest land when the federal criminal statute allegedly violated is neither applicable throughout the nation nor related to the protection of federal property?

ii. When a jurisdiction's capital punishment statute permits imposition of the death penalty only if the jury finds that the aggravating factors outweigh the mitigating factors, do the Fifth and Sixth Amendments require the jury to make that finding beyond a reasonable doubt?

10. Other than the direct appeal listed above, Mr. Gabrion has not previously filed any other motions, petitions, or applications concerning the judgment of conviction or sentence at issue here in any other court.

## II.    GROUNDS FOR RELIEF

### GROUND ONE

**Mr. Gabrion was denied a fair trial and a fair and reliable sentencing hearing when the government presented critical evidence that left a false or misleading impression with the jury in violation of the 5th, 6th and 8th Amendments to the Constitution of the United States as interpreted and applied in Giglio v. United States, 405 U.S. 105 (1972) and Napue v. Illinois, 360 U.S. 264 (1959). Mr. Gabrion was prejudiced in part because the jury sentenced him to death without receiving correct information about Michigan and Newaygo County court procedures that contradicted the government's theory of why Rachel Timmerman was killed, and showed that Chrystal Roach gave false testimony in support of the government's theory.**

The instances of false and misleading evidence include, but are not limited to, the following:

8

A.    <u>Prosecutor Roach testified falsely concerning the facts underlying the government's primary theory about why Mr. Gabrion killed Rachel Timmerman and that false testimony was never corrected.  Mr. Gabrion was prejudiced by the testimony and it is likely that the sentencing decision would have been different if the jury had known the truth.</u>

Newaygo County Prosecuting Attorney Chrystal Roach was a key figure in Mr. Gabrion's case and a key witness at his capital murder trial.  Roach was appointed as the Newaygo County Prosecutor in 1995 and continued to hold that office in 1996 and 1997[1].  She gave crucial testimony during the guilt phase of Mr. Gabrion's trial that was false.  The government knew or should have known that the testimony was false and did not correct it.  In fact, the government repeatedly took advantage of the testimony during its argument to the jury.

1.    **Factual Background**

On or about August 8, 1996, Rachel Timmerman reported she was raped by Marvin Gabrion.  Charges were not filed until October 31, 1996.  At that time, Mr. Gabrion was charged with Third Degree Criminal Sexual Conduct (CSC).

Mr. Gabrion was not arrested until on or about January 21, 1997.  Mr. Gabrion first appeared before the state district court on this charge on January 21, 1997.  His bond was set at $50,000, with a requirement that he post 10% in cash in order to be released.  The prosecuting attorney's office did not object to release on bond, did not request a higher bond and did not mention anything to the court about alleged threats by Mr. Gabrion against Ms. Timmerman, though the allegation that Mr. Gabrion threatened to kill Ms. Timmerman if she reported the rape would become a central

---

[1] When Mr. Gabrion was charged with capital murder, Roach was appointed as a Special Assistant United States Attorney in order to allow her to participate fully in the proceedings.  Shortly thereafter, Roach tainted the proceedings by making public statements that violated several Department of Justice policies.  She was dismissed as a Special AUSA, and a DOJ inquiry found that she committed ethical violations.

theme in the murder case.  The prosecution was authorized to seek Mr. Gabrion's detention pursuant to MCR 6.106 if it chose to do so.

Both Mr. Gabrion and the prosecution had the right to a preliminary examination pursuant to MCR 6.110(A).  On January 30, 1997, both Mr. Gabrion *and the prosecuting attorney's office* waived a preliminary examination and the charge was bound over to the Newaygo County Circuit Court.  At the time both sides waived the preliminary examination, Mr. Gabrion requested a bond reduction to $40,000. He specifically indicated that his family could post $4,000 in cash but not $5,000.  The prosecution did not object to the request, despite the fact that Mr. Gabrion indicated his family would secure his release if bond was reduced.  The district court granted Mr. Gabrion's unopposed request and reduced bond to $40,000, with a requirement that Mr. Gabrion post 10% in cash.  Mr. Gabrion was released on bond.  The standard condition of no contact with the alleged victim was included as a condition of bond. The prosecution did not mention any alleged threat by Mr. Gabrion or anyone else against Ms. Timmerman.

On February 4, 1997, Mr. Gabrion was arraigned on the charge in circuit court and pled not guilty.  Two changes of counsel occurred and, on March 25, 1997, Joel Townsend appeared in circuit court on behalf of Mr. Gabrion.  A pretrial conference was set for April 21, 1997.  The Docket Sheet indicates that the prosecuting attorney's office asked the court to *adjourn* the conference and it was re-scheduled for April 29, 1997.

On April 29, 1997, Mr. Gabrion appeared for the conference with Mr. Townsend. A conference was held in chambers.  Mr. Townsend indicated that he wished to have the cause remanded to the district court for a preliminary examination.  The prosecution

10

did not move for a remand to the district court and did not join in the defense motion, which was granted.  An examination was set in the district court for June 5, 1997.  The prosecution did not comment on Mr. Gabrion's bond, or any condition of the bond.  The prosecution did not mention any violation of bond by Mr. Gabrion or any threat against Rachel Timmerman.  Exs. 1.1 and 1.2.

On May 30, 1997, Mr. Gabrion waived a preliminary examination.  He executed a written waiver of arraignment and entered a written plea of not guilty, which were filed in circuit court on June 2, 1997.  The written waiver was signed by both Mr. Gabrion and his counsel, Joel Townsend.

The effect of Mr. Gabrion's waiver of a preliminary examination, which was unopposed by the prosecution, was to remove the June 5 preliminary examination from the calendar and have the matter set for a pre-trial conference at some later time.  At the pretrial conference, the matter would either be resolved, set for trial scheduled as the circuit court determined to be appropriate.  The case was not set for a jury trial on June 5th.  Further, Mr. Gabrion would have known as of no later than May 30, 1997, that not only was the matter not set for trial on June 5, but that Ms. Timmerman would not be testifying at a preliminary examination or any other proceeding on June 5.

The records reveal that an assistant prosecutor asked that all calendar dates be removed on June 23, 1997, and the charge was dismissed on June 26, 1997.  Ex. 1.1

### 2.    The lies and misrepresentations

The government wasted no time at the guilt phase in describing its theory of the case, telling the jury Mr. Gabrion killed Rachel Timmerman "to keep her from testifying in the upcoming rape trial." [TR 929]  In spite of the fact that there was no rape trial

11

scheduled for June 5, this misconception became part of the fabric of the case.  The Sixth Circuit Court of Appeals, deciding Mr. Gabrion's appeal *en banc*, made the same error twice in the first three sentences of the opinion: "Marvin Gabrion was scheduled to be tried in Michigan state court for a rape charge on June 5, 1997.  But that trial never happened.  Two days before the trial was set to begin, Gabrion abducted Rachel Timmerman – the 19-year old woman he allegedly raped . . ." United States v. Gabrion, 719 F.3d 511, 515 (6th Cir. 2013) (*en banc*).

The government contended at trial that Mr. Gabrion killed Rachel Timmerman because he was no longer able to "manipulate" the proceedings in the state court criminal sexual conduct ("CSC") case in order to keep Ms. Timmerman from testifying.  This occurred without significant opposition from the defense despite the fact that Mr. Gabrion never manipulated the scheduling in the case and did not have the ability to do so.  This alleged manipulation of the state court proceedings was critical to showing Mr. Gabrion's purported motive in the murder case: to eliminate the state's primary witness when he could no longer keep her off the witness stand by manipulating the process in the state case.  The alleged manipulation of the state case was critical to the government's penalty phase theory because it showed the statutory aggravator of substantial planning and the nonstatutory aggravator of obstruction of justice.

In order to advance this factually erroneous theory, the government attempted to establish the court procedures followed in felony cases in Newaygo County in 1996 and 1997, and apply the facts of this case to those procedures.  The government's only witness for this was Chrystal Roach.

12

Roach confirmed that she was the prosecuting attorney in Newaygo County during 1996 and 1997. *She said that she felt "strongly that in cases involving assault, that prelims should occur prior to trial" and that she had "tried to do it everytime"* [TR 1175]. Contrary to her testimony, the prosecution had not demanded a preliminary examination in January of 1997, when Mr. Gabrion first appeared in district court, or on April 29, 1997, when both parties appeared in circuit court but Mr. Gabrion alone requested an examination. Exs. 1.1 and 1.2.

Newaygo County Circuit Court records show that, between January 1, 1996 and August 1, 1997, the prosecution filed at least 105 felony complaints alleging assaultive conduct and that there is no evidence that prosecution actually participated in a preliminary examination in such a case *based on its own motion or demand*. Exs.1.3 and 1.4.

Roach also gave specific testimony about Mr. Gabrion's CSC case. She testified that she was not satisfied with the pace at which the CSC case was proceeding, thinking that it was not moving quickly enough [TR 1165]. Roach educated the jury about the fact that, had she procured Ms. Timmerman's testimony at a preliminary examination, that testimony would have been available for the trial even if Ms. Timmerman later became unavailable [TR 1165]. She did not say that she could have requested an examination and therefore preserved the testimony in January of 1997 when Mr. Gabrion first appeared in district court.

Roach testified that she requested a pre-trial conference in April of 1997 because she thought the case was moving too slow. In truth, Roach requested an adjournment of a pretrial conference that was *already set*. The adjourned conference was

scheduled for April 29, 1997. Roach testified that, at the conference, she moved to have the case remanded to district court for a preliminary examination. Roach emphasized that she wanted to get Rachel Timmerman's testimony under oath. She painted a picture of the necessity of doing this in order to make sure the prosecution of Mr. Gabrion would go forward. But all of it was false.

Roach's testimony is contradicted in several ways by the actual court records in the CSC case. First, Roach's claim that she had a policy of conducting examination in all assaultive cases is false. Her office did not demand and conduct an examination in this case or apparently in more than 100 other assaultive cases brought in 1996 and through the end of July of 1997. Exs. 1.3 and 1.4.

Next, Roach's claim that she requested the circuit court to set a pre-trial conference because she was dissatisfied with the pace of the case is not true. On April 1, 1997, a pretrial conference was set for April 21, 1997. Mr. Gabrion's new attorney, Joel Townsend, was in place and the case was on track. The docket sheet does not indicate that the prosecution requested the conference. Rather, the docket sheet shows that the prosecutor's office asked for rescheduling of the conference, and it was *delayed* by eight (8) days. Roach's testimony in this regard was false.

Roach's claim that she requested a remand for a preliminary examination is also contrary to what she could have done to accelerate the pace of the case and protect her witness. If Roach was in fact intent upon moving the case forward she could have requested a trial date, not a remand for a preliminary examination. In fact, the transcript of proceedings from April 29, 1997, reflects that *the State did not make any type of motion*. The records show that the defense made a motion for remand for preliminary

14

examination, which the Court granted.  Exs. 1.1 and 1.2.  The prosecution made no

motion for examination and did not join the defense motion.  In fact, neither the docket

sheet nor the transcript reflects that Roach was even present for the hearing.  Exs. 1.1

and 1.2.

Roach's false testimony was the lynchpin of the government's argument that Mr.

Gabrion killed Ms. Timmerman in order to prevent her from testifying against him in the

CSC case.  As set forth above, her testimony was false and misleading in several

respects.

In opening statement the prosecutor said: "You will learn that Defendant Marvin

Charles Gabrion killed Rachel Timmerman . . . to keep her from testifying in the

upcoming rape trial" [TR 929].   In its closing argument, the government contended the

timing concerning the rape case was paramount in this scheme:

> Remember, [Roach] said had Rachel Timmerman
> testified in the preliminary examination, I could have used
> that testimony even if she never appeared again.  She
> wasn't able to do that.  *That's why the defendant was
> doing all this with his rape case.  He was trying to delay
> things until Rachel Timmerman got out May 5, 1997,[2]
> and he succeeded in doing that. But by May and June of
> 1997 he'd run out of options.  He was going to have his
> trial in or after June of 1997.  There was nothing else
> that was going to stop it.*
>
> So Rachel Timmerman gets out May 5, 1997.  She
> lives with her father, Tim Timmerman, up until the time she
> disappears June 3rd, 1997.  So she was out less than a
> month before she disappeared.

[TR 1682; emphasis added].

---

[2] Ms. Timmerman was in jail for violating her probation on a drug trafficking case and was released on
May 5, 1997.

15

This argument was patently false. On May 30, 1997, Gabrion, by counsel, waived the preliminary examination, a step towards setting the matter for trial. As of that day, there were no scheduled proceedings at which Rachel Timmerman was scheduled to appear in court and this would have been known to Gabrion.

This error was actually compounded by the government's manipulation of the "preliminary examination theory" at various times in this case. For example, Detective Richard Miller testified at the Grand Jury regarding the state court proceedings in Mr. Gabrion's state court CSC case. Chrystal Roach was present and acting as a Special Assistant United States Attorney at the Grand Jury when Detective Miller testified. He described the Michigan preliminary examination process. He then said, in talking about Mr. Gabrion's CSC case, that "but by motions of the defense they were able to postpone the actual preliminary examination." He went on to testify that the last preliminary examination scheduled for June 5 was cancelled because of an "unexpected motion" by Mr. Gabrion's attorney. He said that Mr. Gabrion would have known that he was not required to appear in court on June 5 because of the action of his attorney. (Ex. 1.5).

At the grand jury, when convenient to paint a picture describing the importance of defense motions to the prosecution theory, Mr. Gabrion's attorney was identified as the movant. By the time of trial, Roach had embraced what we now know was a defense motion as her own and the government had embraced the theory that Mr. Gabrion was required to do something about Rachel Timmerman by June 5 in order to prevent her testimony on that date. There is no explanation for the government's change in position, just as there is no explanation for defense counsel's failure to impeach Miller

16

and Roach with their contradictory positions at trial. There is no explanation for Roach's failure to correct Miller's grand jury testimony if it was inaccurate and no explanation for the government's failure to correct Roach's trial testimony.

At penalty phase, the government returned to this theme. The government argued that the statutory aggravator of substantial planning and premeditation was established because of the proof that Mr. Gabrion "waited, he maneuvered around through the Newaygo County court justice system to keep her from testifying, biding his time until she was out so she wouldn't testify, he wouldn't be on the hook for the crime." [Sentencing V. 5, TR 608]. The government used this false evidence to argue Gabrion was also guilty of the nonstatutory aggravator of obstruction of justice: Gabrion killed Ms. Timmerman "for one reason and one reason only, because he did not want to be brought to justice [on the CSC case]". [Sentencing V. 5, TR 608].

And the government argued the death penalty was required because this was not just a run of the mill murder: "[T[his murder is not just a murder. It's an assault on our system of criminal justice, because he never faced justice on that criminal sexual conduct charge. He successfully carried out that plan." [Sentencing V. 5, TR 608].

The prejudice to Mr. Gabrion was overwhelming. Roach's false testimony tied directly to two of the government's alleged aggravators. The jury found that both had been proven beyond a reasonable doubt. It is now clear that the key testimony establishing these aggravators was false, and the jury returned guilty verdict and recommended a sentence of death based on this false information. Surely, if the jury had known the truth - that Mr. Gabrion could not and did not manipulate the Newaygo County system as alleged by the government – it is likely that one or both of the jury

decisions would have been different. Surely at least one juror would have rejected the death penalty – all that was necessary in order to avoid that sentence.

B. **The government explicitly and falsely told the jury that Marvin Gabrion "forced" Ms. Timmerman to write letters that its own examiners had concluded were written by Ms. Timmerman, that she was not under extreme duress when she penned the letters, and they were not dictated by Mr. Gabrion.**

Around the middle of June, letters from Ms. Timmerman began to arrive. There were letters to her father, and the judge and prosecutor on the state CSC case. The letters were post-marked from Little Rock, Arkansas. The letters to Ms. Timmerman's father indicated she had left town to get married and start a new life.[3] The letters to the judge and prosecutor on the CSC case requested that the charges against Gabrion be dropped and that Ms. Timmerman not be charged with making a false police report. When Prosecutor Chrystal Roach received her letter from Ms. Timmerman, she dismissed the CSC charge. She did not try to contact Ms. Timmerman or her family and she did not ask law enforcement to do so.

At the murder trial, the government told the jury in its opening statement that Mr. Gabrion had forced Ms. Timmerman to write these letters:

> [S]he [Ms. Timmerman] was also made to write other letters to the Newaygo County prosecutor and to a Newaygo County judge" [TR 930].

> \*      \*      \*

> The evidence will demonstrate that Marvin Charles Gabrion not only provided Rachel Timmerman with those envelopes with the pre-printed stamps, but also the false words contained within them which he forced Rachel to write just before he [killer her] [TR 930-31].

---

[3] Even after receiving these letters Tim Timmerman did not contact the police.

18

\* \* \*

> [W]e will prove that this defendant Marvin Charles Gabrion . . . . tried to cover up Rachel Timmerman's murder and her disappearance with letters that he forced her to write . . . ."
> [TR 935].

The government made a similar argument in closing, contending that Ms. Timmerman was merely following Mr. Gabrion's "script" [TR 1686]. They also told the jury "the defendant was writing these letters himself" [TR 1686].

This component of the government's case, if true, was devastating to Mr. Gabrion. The letters provided potent evidence advancing the government's primary theme, that Mr. Gabrion killed Ms. Timmerman to prevent her testimony in the rape case. Once the letter to the Newaygo County prosecutor was received, the State did, in fact, dismiss the CSC case against Mr. Gabrion. According to the government the plot hatched by Mr. Gabrion was complete. The letter to Ms. Timmerman's father had the effect of causing Mr. Timmerman not to search for his daughter. This too, advanced Mr. Gabrion's scheme according to the government. According to the government the "letters in Rachel Timmerman's handwriting show you all by themselves that the defendant killed Rachel Timmerman" [TR 1687]. The government went on, "[t]he fact she followed the script that the defendant gave her of what happened on the rape shows you that he had her in his clutches" [TR 1687].

The problem is that the government's position, as presented to the jury, was false. The FBI examined those letters and its experts found that each letter was written by Ms. Timmerman, that Ms. Timmerman was not under extreme duress and that Gabrion probably did not dictate the letters to her:

> The examiners opined that the total of four letters written in
> Rachel Timmerman's hand contained the same sentence

19

> structure, consistency and thought processes throughout the writings.  They were markedly different from the letters allegedly written by GABRION which lack any type of consistency as he appears to reduce to paper anything that comes in to mind and there appears to be no rhyme or reason for when he says anything.  The examiners further opined that Timmerman was probably not under extreme duress when she penned the letters and GABRION probably did not dictate the letters to her.  Ex. 1.8.

The government left a false impression that Mr. Gabrion dictated or forced Ms. Timmerman to write the letters to her father, the CSC prosecutor and the CSC judge. That impression was never corrected.

C.    The government falsely claimed that Ms. Timmerman disappeared on June 3rd never to be seen alive again when it knew Ms. Timmerman had been seen by numerous friends and acquaintances in the area after that date.

The government's theory at trial was that Ms. Timmerman was lured from her home on June 3, 1997 by a man named John who had asked her out on a date and asked her to bring her daughter, Shannon, with her.   According to the government, Ms. Timmerman believed this was to be a date for dinner with a young man who was interested in her and liked children.  The government's theory further posited that other than perhaps being seen in the company of Gabrion in a truck near Oxford Lake, Ms. Timmerman was never seen alive after she left her father's home on June 3rd.  As noted above, the date Ms. Timmerman disappeared was important to the government's theory because the government falsely contended Mr. Gabrion expected Ms. Timmerman to testify against him on June 5th in the CSC case.

However, there were many friends and acquaintances of Ms. Timmerman who saw her in the area after June 3rd.  Det. Miller testified to the grand jury that "we have other people that have told us that they have seen her later on that same day and

possibly have seen her a day or two later...." Ex. 1.13. See, for example, news article in which Tim Timmerman says that "Rachel left here on June 3 and she was seen, in town, on the fourth." Ex. 1.14. But that information was never conveyed to the jury.

Tina Kanady and Roxanne Vanslyke were friends. Vanslyke was acquainted with Ms. Timmerman. On the evening of June 3rd (hours after she supposedly left home with "John"), Ms. Timmerman came by the trailer where Kanady and Vanslyke were and invited them to a party at Pig's Point. She told them that she was going to the party. See: Ex. 1.15, grand jury excerpt of Kanady; Ex. 1.16, grand jury testimony of Vanslyke; Ex. 1.17, Vanslyke 302. Other people who may have seen Ms. Timmerman on and after June 3rd, include Danny Holmes (Exs. 1.18 and 1.19) and Teresa Start (Ex. 1.20), among others. This evidence was not presented to the jury.

This is not simply some mistake by a few people. The initial FBI field memos said that when Ms. Timmerman left home she told others that she would be gone for a few days and took a change of clothes. See Ex. 1.21. It is undisputed that when Ms. Timmerman's body was found on July 5, she was wearing different clothes than what she was wearing when she left home on June 3rd.

The last people to see Ms. Timmerman before she left home on June 3rd were Minda Armstrong, and Susannah Schmaltz. Ms. Timmerman's father, Tim, testified that he was home that day as well and saw her leave. However, the girls' statements do not mention Tim being present and Ms. Timmerman's step-mother said that Tim was not home when Ms. Timmerman left. See Ex. 1.22. Det. Miller testified to the grand jury that she was last seen by "her step-mother, her step sister, and a family friend." Ex. 1.13. That discrepancy went unexplored at trial.

Ms. Timmerman was not reported missing for several weeks, which lends some credence to the theory that she may have originally left home of her own volition.

The false impression left with the jury was that Ms. Timmerman was abducted on June 3rd, a mere two days before she was to testify in the CSC case. This false impression allowed the government to advance its primary theme at both guilt and penalty phases – that Mr. Gabrion killed Ms. Timmerman to prevent her from testifying in the CSC case.

D. <u>The government misled the jury by not permitting evidence indicating that the BOP could impose all necessary conditions of confinement to protect the public from Mr. Gabrion and has imposed the strictest security measures for lengthy periods of time against a number of inmates in order to provide such protection.</u>

Mr. Gabrion has never been a danger in a BOP setting and never will be. His sentence of death is based in part on the fact that the government intentionally misled the jury by disrupting the presentation of evidence about BOP authority over Mr. Gabrion. The government took this approach throughout the entire sentencing hearing, including its opening statement, the attempted testimony of a defense witness, the jury instruction process and its closing argument. The jury's finding on Mr. Gabrion's proposed mitigating factor regarding a lessened danger, which did not receive a single juror vote, demonstrates that the government was effective in presenting a false picture to the jury.

Control of BOP inmates is governed by a series of regulations and statutes, just as it was at the time of at Mr. Gabrion's trial. 28 CFR Section 501.3 was adopted in 1996, and specifically authorizes the BOP to implement special administrative procedures (SAMs) in order to protect against the risk of death or seriously bodily harm.

22

Section 501.3 provides, in part, that the United States Attorney General, among others, is authorized to implement SAMs relating to the incarceration of BOP inmates. Possible SAMs include, in part, "administrative detention" and limitations on correspondence and telephone use.

28 C.F.R. Sec. 501.3 is no secret. The United States Attorney's Manual ("USAM") Sec. 9-24.000 is entitled "Requests for Special Confinement Conditions 28 C.F.R. Sec. 501.3." This Chapter of the USAM provided instruction to AUSAs regarding requests for special confinement. Read with Section 501.3, federal prosecutors are instructed explicitly regarding SAM availability.

The prosecutors in this case were well aware of their right to request conditions of special confinement for Mr. Gabrion. They never acknowledged this to the jury, the court or the defense. In fact, they prevented the jury from hearing the truth regarding the availability of SAMs by objecting to defense efforts to show the jury that Mr. Gabrion would not be a serious threat to others in the BOP.

In addition, the government was aware that the district court could order restrictions on communication and association as part of a sentence pursuant to 18 U.S.C. §3582(d).

The jury in this case was entitled to know the truth about BOP security measures. The information was improperly withheld from the jury. This undermines the validity of the death sentence in this case in violation of the 5th and 8th Amendments.

Empirical data shows that future dangerousness is likely the most significant issue for juries deciding whether or not to sentence a defendant to death. (United States v. Johnson, 2010 Lexis 133727 (N.D. ILL. 2010) (Ex. 1.9). Future

dangerousness was the first non-statutory aggravating factor that the government identified in this case.

Mr. Gabrion moved unsuccessfully prior to trial to strike the non-statutory aggravating factor. Not surprisingly, future dangerousness was the key non-statutory aggravator in this case. The government hammered this factor, and also used it as a gateway to introduce hours of irrelevant, unreliable, and prejudicial evidence.

The government emphasized future dangerousness in its opening statement at the penalty phase. The government used the future dangerousness non-statutory aggravating factor as its excuse to introduce significant evidence that generally painted MG as a bad person.

The government presented evidence of unadjudicated bad acts, including, in part, three murders, two arsons, allegations of fondling, stalking, weapons discharges and other irrelevant bad acts. The government called some 55 witnesses to establish these bad acts.

The defense called Mark Cunningham to rebut the government's future dangerousness evidence. Dr. Cunningham testified about some of the security measures that were available to the BOP in managing inmates. Dr. Cunningham was questioned about BOP policies. He attempted to describe the authority mentioned above.

Instead of agreeing that the jury should have an accurate picture of the BOP's authority, the government objected to testimony about policy – specifically the policy that is described in 501.3. Dr. Cunningham was not allowed to testify about the details of 501.3.

24

The government was aware that Dr. Cunningham's description of the security measures at FDX-Florence and USP Marion were correct as far as he was allowed to testify. A full description of such measures, if combined with the appropriate regulations and statutes, would have shown the jury that Mr. Gabrion was not a threat to harm anyone in prison.

It was not enough for the government to hide the truth about BOP procedures. The government cross-examined Dr. Cunningham by attempting to show that he was a paid witness who was on a "mission" to prevent the death penalty in this case and other cases. The government sought to discredit Dr. Cunningham regarding his entire testimony, when the government knew or should have known that the testimony was accurate.

Since Dr. Cunningham was not allowed to testify about the relevant BOP regulations or practices, the defense tendered an instruction that described the key provisions of 501.3. This was especially important in light of the fact that the future dangerousness instruction included language telling the jury to consider "the risk that the defendant will escape from custody." The government objected and made it clear that the conditions inside the BOP were irrelevant, arguing that the jury decision was either life or death. The district court sustained the government's objection and the 501.3 instruction was not given.

The government spent more time in its penalty closing argument talking about future dangerousness than any other subject. Defense counsel admitted during closing argument that Mr. Gabrion was dangerous (Ex. 1.10). Defense counsel described

25

generally the fact that the BOP would control Mr. Gabrion, but provided no meaningful details.

The jury unanimously found that Mr. Gabrion would present a future danger. The district court provided a mitigating factor, No. 12, stating, "Defendant will not be a danger in the future if he is confined in a highly structured and secure federal prison." No juror found this mitigating factor.

Defense counsel did not provide a more detailed mitigating factor in the special verdict form, such as one saying "Any concern respecting future dangerousness is significantly reduced since the Federal BOP is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society." (Exs. 1.6 and 1.7).

Through other capital cases, Mr. Gabrion has learned that the BOP possessed information indicating that, at the time of Mr. Gabrion's trial, the BOP confined inmates in "highly restrictive conditions of confinement whenever it was necessary and for as long as the BOP determined it was necessary.  (United States v. Johnson, *supra*).

The government's conduct in misleading the jury as to the truth regarding BOP control over inmates, and in hiding its own authority, deprived Mr. Gabrion of fair sentencing hearing.

E.    <u>There was a pervasive pattern of government witnesses testifying in a false and/or misleading fashion.</u>

Linda Coleman testified by deposition at the guilt phase of Gabrion's trial. Coleman's testimony was critical to the government's case against Gabrion.  According to Coleman, in June 1997 she saw Gabrion and two other people at Oxford Lake in a black pick-up truck.  She testified that the truck had a boat in the back.  Coleman deposition at 9.   She testified that one of those people was woman who resembled Rachel Timmerman.  Coleman deposition at 16.   The government used this testimony to argue Coleman was the last person to see Ms. Timmerman alive.  Coleman claimed to have exchanged greetings with Gabrion.  Deposition at 19.   She also claimed to have seen Gabrion standing along 12 Mile road which is five or six miles from Oxford Lake.   Deposition at 18.

Coleman testified that she arrived at Oxford Lake in her "car".   Deposition at 16. On cross-examination, she testified that she was driving a Geo Metro.  She was impeached by counsel with her grand jury testimony which indicated she was driving a truck.  She changed her testimony to indicate that she was in the truck. Deposition at 34-35.  She further testified that when she later saw Gabrion along 12 Mile road she was in her truck.  Deposition at 40.

In the grand jury, Coleman testified she drove to Oxford Lake in a 1985 full size Ford pick-up.

Coleman testified falsely.  She never owned a Ford pick-up.  Her husband, John, registered a 1985 red Ford pick-up for the first time on August 21, 1997, according to Michigan DMV records.  This was after Coleman claimed to see Marvin at Oxford Lake.

Further, she could not have been in the Geo Metro as that car was not registered to her until October 1987.   See Ex. 1.11.

The court expressed doubt about Coleman's veracity and directed the government to make a record of why it believed she was telling the truth.  In response, the government vouched for her, claiming that her story had been "thoroughly investigated".  TR 1299-1300.

Gregory Leon testified at penalty that he and his family owned the Leon House in Wyoming, Michigan, which opened in 1991 and closed in October 1995.  He testified to meeting Gabrion in April 1995 at an AA meeting and that thereafter Gabrion rented a room at the Leon House.  According to Leon, Gabrion was there until October 1995, when the Leon House closed.

Leon's testimony was damaging to Gabrion.  He claimed that Gabrion bragged of using sophisticated surveillance equipment to rip off drug dealers.  He testified that Gabrion had "tapped" into a personal phone line of someone else at the house.  Leon claimed that Gabrion had admitted to stalking a woman who worked at a nearby laundromat. R. 129.

In addition to the other credibility problems with Leon set forth below, Leon testified falsely.  Records show that the Leon Christian Home/Project Homeless was founded in 1991 and dissolved in October 1994.  Records show that Leon was only associated with the property through October 1994. Thus, Gabrion could not have lived there from April to October 1995.  See Ex. 1.12.

Lonnie Overton's testimony is similarly suspect as he testified that he met Gabrion at that same house.  According to Overton, Gabrion bought guns from Overton

and fronted Overton marijuana.  Overton testified that Gabrion discussed changing identities and disposal of bodies.  Overton's testimony suggested that Gabrion had become threatening when Overton's mother flushed marijuana down the toilet and thus Overton was unable to pay Gabrion.  Upon information and belief, Overton never lived at the Leon house.

Interestingly, Leon and Overton were two of the 25 witnesses that Gabrion was not present for at the sentencing hearing.  See Ground Four below.

## GROUND TWO

**Mr. Gabrion was denied his 5th, 6th and 8th Amendment right to conflict free counsel when the attorney for key government witnesses Joseph Lunsford assisted trial counsel in the preparation of the defense in this case.**

Gabrion was indicted in June 1999.  Obviously, the government's investigation into Gabrion began sometime after Ms. Timmerman's body was discovered on July 5, 1997.  On March 30, 1998, Christopher Yates represented Joseph Lunsford in negotiations with the government for testimony against Gabrion.  See Ex. 2.1, proffer letter.  On March 31, 1998, Lunsford was interviewed by the government regarding his information against Gabrion.  Yates was present for that interview.  See Ex. 2.2, 302.  On May 6, 1999, Lunsford testified to the grand jury regarding Gabrion.  Yates was present outside the room.  "[F]or the record, you do have an attorney with you today.  Chris Yates from the Federal Public Defender's Office is outside in the hallway, and I've told you that before you came in here that if you want to consult with him before answering questions, just tell us and we'll give you a chance to go to talk to him. . . "  See Ex. 2.3, grand jury excerpt.

Further, Lunsford had been charged in federal court for making threats against the president.  That indictment was returned on June 5, 1997.  Yates was appointed to represent Lunsford on that matter and remained on the case until his sentencing in January 1998 and perhaps thereafter on appeal.  See Ex. 2.4.

Joseph Lunsford was one of the key government witnesses against Mr. Gabrion at sentencing.  He testified that he saw Mr. Gabrion masturbate while looking at a picture of Rachel Timmerman's daughter, Shannon VerHage.   Lunsford was a sentencing witness who was offered by the government in furtherance of the crucial non-statutory aggravator of future dangerousness.

After Gabrion was indicted in this case, Yates became heavily involved in Gabrion's representation.  He consulted with Gabrion's lawyers regarding motions strategy.  See Ex. 2.5 Stebbins letter to Yates, April 6, 2001.  Earlier, Gabrion wrote the court expressing frustration with his attorneys.  The court responded with a letter to Gabrion in which it stated "I have also spoken with the Federal Public Defender, Christopher Yates, and asked him to assist Mr. Mitchell.  You will find Mr. Yates, in addition to being a fine lawyer, also an individual of unquestioned integrity."  See Ex. 2.6, letter from Judge Bell to Gabrion, dated February 21, 2001.  Yates also visited with Gabrion and consulted with him about his case.

Lunsford testified against Gabrion at the penalty phase of Gabrion's trial.  The government argued to the jury regarding Lunsford, "And you know from Joseph Lunsford exactly what unspeakably vile things the defendant did with that picture in cell 8-A of the Newaygo County Jail." [TR 618].

At the June 29, 1999, first appearance Gabrion inquired about having Yates as his attorney and was told that he had a conflict of interest. No further discussion of Yates was had except that Mr. Mitchell informed the court that he would consult with Yates as to the appointment of second counsel.

On May 23, 2001, Gabrion was in court on hearing on various motions. Gabrion addressed the court regarding his dissatisfaction with his attorneys and told the court that "I tried to say I'm pro-se, I tried to fire him, to say give me Chris Yates as a backup, because he said that you were a friend of his. . ." Later, at the May 23rd hearing, Mitchell told the court that "myself, Yates, and Stebbins have lobbied to get him [Gabrion] moved."

Other than the June 29th reference to Yates having a conflict, there is no record of Gabrion being informed of the extent of Yates's conflict of interest and there is no record that Gabrion consented to or waived that conflict. Lunsford's federal case was pending in the same court as Gabrion and thus the court was aware of Yates's conflict yet it did not inquire on the record and continued to suggest to Gabrion that Yates would be assisting in his representation. The court was duty bound to inquire into the conflict because it knew or should have known a conflict existed. Cuyler v. Sullivan, 446 U.S. 335 (1980).

Mr. Gabrion was entitled under the 6th Amendment to representation by counsel free of any conflict of interest. The existence of a conflict of interest rendered the assistance ineffective. The imposition of a death sentence following this representation violates the 8th Amendment because it is unreliable. Further, the court was aware of the potential conflict and had a duty to inquire about the conflict and it failed to do so.

31

## GROUND THREE

**Trial counsel's conduct, through both acts and omissions, both individually and cumulative, fell below the prevailing professional norms of reasonably competent counsel which served to prejudice Mr. Gabrion in violation of the 5th, 6th and 8th Amendments as interpreted in <u>Strickland v. Washington,</u> 474 U.S. 52 (1984), Counsel failed to investigate, prepare and present a constitutionally adequate defense at the guilt phase of Mr. Gabrion's capital trial.**

A.      <u>Trial counsel was ineffective in the investigation and presentation of issues relating to Mr. Gabrion's competence to stand trial where counsel failed to investigate Mr. Gabrion's family and personal history, failed to fully present competency concerns and repeatedly waived competency hearings at which experts opining that Mr. Gabrion was competent could have been cross-examined.  Mr. Gabrion was prejudiced when the failure to comply with the norms of reasonably competent counsel resulted in the conviction and imposition of a death sentence without a fair examination of his competence at any stage of the proceedings.</u>

Marvin Gabrion revealed serious signs of mental illness and incompetence from the beginning of this case.  Serious questions about competency, based on objective evidence, have always existed and have never been fully resolved. The court never conducted a competency hearing where Mr. Gabrion had the opportunity to confront and cross-examine experts who found him to be competent.  His counsel, rather than taking the opportunity to question these experts, waived the right to do so and agreed to let the court consider reports in lieu of testimony.  Counsel never provided their experts with a thorough personal or family history for Mr. Gabrion.  Reasonably competent counsel would have insisted that the question of competence should be decided based on reliable information, including detailed personal and family histories, including multi-generational information.  It is likely that the presentation of this information to experts would have resulted in more informed testimony and reliable findings that Mr. Gabrion was incompetent at various times during the trial and sentencing proceedings.

32

Mr. Gabrion's counsel never conducted a complete personal, family or social history investigation. The closest they came was the preparation of an "abridged" social history which was completed in March 2000 and never updated. No expert evaluating competency had the benefit of knowing the staggering amount of mental illness, substance abuse, and dysfunction in Mr. Gabrion's immediate and extended family. No expert knew what life was like in the Gabrion house when Mr. Gabrion was a child. No expert fully understood Mr. Gabrion's personal history or had information from friends and classmates who knew him growing up. In short, despite counsel's expression of concern about Mr. Gabrion's competence, counsel never took steps to investigate, gather and present objective evidence supporting their concern. That evidence was available.

Early in the case, the court, *sua sponte* ordered Mr. Gabrion to undergo a competency evaluation, and Mr. Gabrion was transferred to the Federal Medical Center at Ft. Worth, Texas for evaluation. Following receipt of the May 8, 2000 report of the competency evaluation which concluded Gabrion was competent to stand trial [TR 268, Report], on July 7, 2000 the court made a finding that Gabrion was competent to stand trial. [R. 89, Opinion].

In June 2001, after a series of complaints about counsel, the court appointed Dr. Cathy Frank, Director of Forensic Psychiatry at Henry Ford Hospital to do a complete medical examination to ensure Gabrion was competent and able to assist his counsel. [TR 5/23/01, 161-63]. Dr. Frank's report was returned to the court on June 29, 2001, with the conclusion that Gabrion was malingering and was competent and able to assist

counsel. [R. 210, Order; R. 211, Sealed Report].  No finding was made by the court on that report.  No hearing was held.  No social history was presented.

On August 8, 2001, defense counsel filed a sealed motion for a competency examination, supported by a sealed affidavit of defense counsel. [R. 267, Sealed motion]. Defense counsel described in detail their problems in dealing with Mr. Gabrion, but failed to support their claims with any additional evidence.  Counsel stated:

> Throughout our representation of Mr. Gabrion, we have had exceptional difficulty communicating with him, exceptional difficulty obtaining information from him, and exceptional difficulty in visiting with him.  The attorney-client relationship has at all times been strained.  I have had more difficulty communicating with Gabrion than with any other client I have had. ... This lack of cooperation has included ... an ongoing suspicion that we are actually working for the government, an ongoing hypervigilance of our activities, an ongoing refusal to sign releases and waivers to obtain information, and an ongoing refusal to provide information about his past and/or his family, as well as ongoing verbal and written attacks on our professional abilities ... Gabrion has also displayed bizarre, antagonistic, and even violent behavior towards us and towards other members of the defense team as well as experts who have examined him...His activities and behavior...display an... unreasoned and self-destructive paranoia that prevents him from rationally discussing his defense...Gabrion's paranoid and self-destructive behavior includes communicating and attempting to communicate by letter and by telephone with the court, the court's staff and family, the United States Attorney's office, the government's experts, the media, counsel's staff, defense experts and the victim's family ...Communications often are vituperative and hateful.  They are generally about subjects that have nothing to do with his defense... they are often lacking any basis in reality. Gabrion, on one day, called attorney Mitchell's office in excess of eighty times...The communications ... often ... suggest courses of action that are absurd ... These communications have provided additional evidence to the government...In recent months ... his bizarre and paranoid behavior have intensified...Since the beginning of 2001, Gabrion's behavior and ability to assist in his own defense have deteriorated significantly ... On at least five occasions, Gabrion refused to leave his cell to meet with counsel ... During... meetings, Gabrion was at best distracted.  He could not discuss the case.  He could not discuss the social history and

or mental health history that are critical to the development of mitigation ... [H]e refused to meet with one of the defense experts sent to MCI to interview him, having previously agreed to meet with the expert... Counsel has obtained the services of a forensic psychologist...the psychologist is of the opinion that Gabrion suffers from a mental illness that causes him to behave the way he does and that because of the mental illness he is unable to cooperate and assist counsel. The psychologist also acknowledges that there is some degree of malingering on Gabrion's part, but that there is an underlying mental illness that makes him unable to fully cooperate with or assist with his own defense. According to the psychologist, Gabrion is incapable of fully cooperating in the investigation of his social history. His apparent malingering is a result of his mental illness not necessarily the result of an intent to deceive or malinger...According to the psychologist, Gabrion's mental health structure and problems prohibit him from being able to communicate with and assist counsel in his own defense...The neurologist has been unable to see Gabrion to date, due to Gabrion's refusal to meet with him. ... The neurologist likewise is of the opinion, based on what he knows at the moment, that in his present condition Gabrion is incapable of assisting counsel and in cooperating with anyone attempting to evaluate his mental condition...I am of the opinion that Gabrion is suffering, from a mental disease, is brain damaged and is not presently capable of assisting counsel in his own defense and is therefore not competent to stand trial. [R. 267, Motion, Affidavit of David C. Stebbins].

At a hearing the next day, Gabrion, unaware that this motion had been filed, accused Mitchell of "destroying evidence that Charles Cass murdered Rachel ...." [TR 8/9/01, 3]. He called the judge an "evil Hitler" and accused him of having "sex with a 14 year old girl last week and got another 13 year old pregnant ...." He was removed from the courtroom. Gabrion was in a "greatly disheveled state ... dirty ... a black mark on his lower forehead ... the letters AZZA ..." written on his head [TR 8/9/01]. Defense counsel advised the court that Gabrion had deteriorated, and refused to come out of his cell to meet with them. "Attorney Stebbins is firmly convinced that Mr. Gabrion is not presently competent to stand trial." [R. 267, Motion]. The court ordered a "full competency

examination." [TR 8/9/01, 13; R. 270, Order].  The judge said "we will have to come back and conduct ... *a full competency hearing ... the psychiatrists who will be conducting that examination will be required to appear in person rather than just give us a report.* I think we need that person here and a record made ...." [TR 8/9/01, 14].  This was not done and counsel did not object to the use of a report in lieu of testimony.  At this point, when the issue of competency was highlighted and the court was clearly concerned about the situation, counsel took no steps to support their position with objective facts.  These facts would have supported the claim in a way that was far different than the mere claims of those interacting with Mr. Gabrion.

Gabrion's bizarre conduct continued at trial.

> THE COURT: ... numerous times when Mr. Gabrion has
> become very agitated and has whispered loudly, leaving
> aside the loud burping and other personal noises he has
> made, ... 25, 30 times, turned to Mr. Gabrion and attempted
> to keep him quiet.  On probably a half a dozen occasions the
> Court has used the zipping of the mouth nonverbal
> expression to him to try and get Mr. Gabrion to quiet down.
> ... [TR 2/28/02, 2:56 p.m., sealed record, in chambers, 13].

After Mr. Gabrion punched David Stebbins during sentencing, defense counsel immediately moved for "another competency evaluation" and a hearing [TR 3/11/02, 78, JA 1519].  The court stated that while "competency has been [an issue] of great concern," the motion was denied [TR 3/11/02, 82-83].

That morning, at an *ex parte* hearing without Gabrion, the court had been informed by defense counsel that Gabrion was "exhibiting completely inappropriate behavior, laughing ... almost as agitated as yesterday ...." [TR 3/12/02, 4]. The court considered and rejected another examination.

36

THE COURT: Does he need to be examined?

MR. STEBBINS: I think so...I think there's something seriously wrong with him ...

THE COURT: I've got a clinical psychologist who is in my opinion one of the best in the state ... I could prevail on him to drop everything and come and examine him.... the threat to my son yesterday you saw

\* \* \*

... a manifestation of what was kind of boiling underneath anyway....

MR. STEBBINS: There is a clear increase in his agitation and a deterioration in his behavior since last week [TR 3/12/02, 8:35 a.m., sealed record, in chambers, 6-7].

Later, in open court the judge asked defense counsel whether Gabrion should be returned to the courtroom. Counsel advised that Gabrion wanted to be present but, in his opinion, he was too agitated. [TR 3/12/02, 232]. Defense counsel agreed that if he was to be returned, he be required to wear a stun belt and sit between two Marshals. [TR 3/12/02, 233].

When brought back into the courtroom later in the morning Gabrion, shackled sitting between two marshals, denied any memory of what happened the day before [TR 3/12/02, 302]. Gabrion stated for the record: "I'm sorry to be forced to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion. And I'll be quiet because I'm being forced to just as if I were in Nazi Germany. Thank you." [TR 3/12/02, 303].

The next morning, counsel advised the court that they had filed a renewed motion for a competency evaluation. The court observed that yesterday Gabrion seemed highly agitated, at other times angry, and at one point grinned at the marshals.

37

MR. MITCHELL: We were watching him yesterday and he did not behave well in the afternoon.

THE COURT: He just seems highly agitated.

\* \* \*

MR. STEBBINS: With the exception of the time he was sleeping...[TR 3/13/02, 8:45 a.m., sealed record, in chambers, 7].

The same day, March 13, counsel renewed the "motion for a competency

hearing" (emphasis supplied) [R. 513, Opposition]. Counsel argued:

> It is also true that the latest incident of assault, as serious as it is, is only one in a long line of verbal and physical attacks the defendant has made against counsel in a relationship that from the beginning has been permeated by paranoid suspicion and mistrust. See, e.g., May 8, 2000 Competency Report of Dr. Emily Fallis, p. 14 ("His attorneys reported he seemed suspicious and preoccupied with peripheral issues, such as his complaints about his medical treatment. He apparently has referred to Mr. Mitchell as "Satanic"); Order of May 30, 2001 ("Based upon Defendant's vituperative and mean-spirited letters, his restlessness and angry outbursts in the courtroom, his inability to show respect to the Court, and his apparent inability to cooperate with his counsel, this Court has sua sponte found reasonable cause to believe that Defendant may presently be suffering from a mental disease or defect that may be impairing his ability to understand the nature and consequences of the proceedings and to assist properly in his defense."); June 18, 2001 Competency Report of Dr. Cathy Frank, p. 2 ("Mr. Gabrion has written multiple letters to Judge Bell and Chief Judge Enslen. The letters include tirades about his treatment by the court, judges, and especially his attorneys. The letters are often rambling with accusations that he is being tortured and prosecuted. The letters often also contain 'legal briefs' presenting rationale for dismissal of his case, dismissal of his attorney, as well as other legal matter. The nature of his comments are quite bizarre and appear psychotic at times.") ...August 9, 2001 Hearing Regarding Defense Counsel's Motion for Competency Evaluation,... 14 ("This Court as well makes the same observations, that clearly Mr. Gabrion is exhibiting increasingly unusual behavior both in the numerous letters and scandalous allegations he makes both about this judge and about the lawyers and everyone involved in it."); October 22, 2201 Competency Report of Dr. Richard Demier, p. 22 ("Mr. Gabrion was asked about his relationship with his defense lawyers. He referred to them as 'creepy, Satanic attorneys' who sent him to this facility to be tortured and murdered. He insists that he had 'fired' his attorneys. He refused to

38

communicate with them during the present evaluation, despite the fact they traveled from Michigan and Ohio in an attempt to meet with him.")(emphasis supplied)[R. 513, Opposition].

On March 14, 2002, defense counsel orally renewed the motion for a competency evaluation and hearing. "We believe his condition continues to deteriorate as this week has progressed." Gabrion was unable "to communicate adequately with us ... having ... a difficult time being able to assist counsel ...." The motion for a competency hearing was denied again [R. 518, Opinion; TR 3/14/02, 565]. It is firmly established that "the criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996). "The test for incompetence is also well settled. A defendant may not be put to trial unless he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *Id.* By the time of the penalty phase, Gabrion did not possess, if he ever did, "'sufficient present ability to consult with his lawyer[s] with a reasonable degree of rational understanding.'" [R. 267, Motion, 1]. United States v. Branham, 97 F.3d 835, 855 (6th Cir. 1996). 18 U.S.C. §4241(d) defines incompetence as a finding that:

> The defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him *or to assist properly in his defense* . . . (Emphasis added).

The statute, which was enacted in 1984, does not define "mental disease or defect."

After the statute was enacted, the Supreme Court reiterated its earlier test for competency in Godinez v. Moran, 509 U.S. 389, 396 (1993):

> In Dusky v. United States, 362 U.S. 402 (1960 (*per curiam*), we held that the standard for competence to stand trial is whether the defendant has "*sufficient present ability to consult with his lawyer* with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him" *Ibid.*, (internal quotation

39

marks omitted). *Accord*, <u>Drope v. Missouri</u>, 420 U.S. 162, 171 (1975) ("*[A] person whose mental condition is such that he lacks the capacity* to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense may not be subjected to a trial*"). (Emphasis added).

Due process mandates a competency hearing be held if the trial court has substantial doubt concerning a defendant's competency to stand trial. <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966). Pursuant to 18 U.S.C. §4241(a), the defense is entitled *at any point* during the course of criminal proceedings to "file a motion for a hearing to determine the mental competency of the defendant." When such a motion is filed by the defense, "[t]he court *shall* grant the motion ... if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable ... to assist properly in his defense." 18 U.S.C. §4241(a) (Emphasis added).

On appeal, the court's failure to conduct a competency hearing was raised and rejected. However, the Court was hampered in its evaluation of the issue by the lack of independent evidence supporting hearing requests. The failure to investigate, acquire and present evidence made it nearly impossible for any expert to fully evaluate competency. Reasonably competent counsel would have investigated the competency issue thoroughly, provided relevant evidence both to the court and to the mental health experts examining Gabrion, and conducted cross-examination of experts who provided reports but were never required to support their conclusions in open court in an adversarial setting. The failure to engage in the sort of advocacy required by the Sixth Amendment prejudiced Gabrion. Counsel's failures resulted in an unreliable determination by the court and the trial of a person who was in fact incompetent.

40

B. <u>Mr. Gabrion was not evaluated and treated for needed medications, despite his many psychological issues and clear evidence of brain damage. Trial counsel was ineffective in failing to take steps to guarantee that Mr. Gabrion was properly medicated during trial, or that Mr. Gabrion's medication did not hinder in any way his ability to understand the proceedings, behave appropriately or assist counsel. Mr. Gabrion was prejudiced because reasonable competent counsel in a capital proceeding would have taken steps to guarantee that Mr. Gabrion was properly medicated.</u>

Not only was Mr. Gabrion incompetent to stand trial for Rachel Timmerman's murder, he was medically mismanaged during the trial and sentencing phase of his trial. The trial record reflects that Mr. Gabrion was prescribed and was taking Depakene, 250 mg. per day in pill form [TR 1639].

On information and belief, counsel did not request any testing or evaluation of the Mr. Gabrion's medication status during or immediately prior to trial. Because there were no adversarial competency hearings, this issue was never explored on the record. Mr. Gabrion required proper medication at this extremely stressful time. His medication needs were ignored. Trial counsel was responsible to guarantee that their client was properly medicated for many reasons. Improper medication was bound to lead to problems, and this proceeding was certainly plagued with them.

Reasonably competent counsel in a capital case, with a client acting as Mr. Gabrion did, would have taken steps to make sure that his medication was proper. Counsel's failure to do this deprived Mr. Gabrion of his 5th, 6th and 8th Amendment rights.

C. <u>Mr. Gabrion was denied effective assistance of counsel where his trial counsel failed to investigate and test the government's case</u>.

Trial counsel were ineffective and their performance was deficient based on prevailing professional norms for capital defense practice where they unreasonably failed to investigate the government's case in chief against Mr. Gabrion. There were a

41

multitude of failures including but not limited to a failure to investigate matters relating to the bias and credibility of witnesses and failure to investigate and prepare full and appropriate cross examine of the government's witnesses.

Mr. Gabrion incorporates by reference the facts set forth in Ground One, Subsections A-E above as they related to the guilt phase and information that might have been readily available to counsel that counsel failed to make reasonable efforts to uncover.  Mr. Gabrion also incorporates by reference the facts of his Brady v. Maryland claim as those facts relate to the guilt phase and information that might have been readily available to counsel that counsel failed to make reasonable efforts to uncover.

Mr. Gabrion also reasserts the subsections above in Ground Three as a failure by counsel to investigate the government's case against Mr. Gabrion and subject it to meaningful adversarial testing.   Mr. Gabrion asserts that impeachment material existed against many of the government's witnesses that counsel failed to investigate and use. Those government witnesses include, but are not limited to: Linda Coleman, Douglas Deedrick, Lloyd Westcomb, Tim Timmerman, Detective Richard Miller, Chrystal Roach and David Gabrion.

> D.    Trial counsel failed to retain adequate investigative assistance for the purpose of preparing appropriate defenses at the guilt phase and to subject the government's case to meaningful adversarial testing.

Paul Mitchell and David Stebbins were trial counsel for Marvin Gabrion at all times throughout the proceedings.  They retained two investigators who provided only limited support in preparing and investigating the case.  Those investigators were Trish Hubbard of Grand Rapids, Michigan and James Crates of Columbus, Ohio.  Hubbard dealt primarily with issues and facts pertinent to the guilt phase and Crates was

primarily responsible for the penalty phase.  The defense enlisted the help of an investigator in California and in Arizona for some limited work in those states.

Marvin Gabrion lived and worked in every geographical area of the country.  Ms. Timmerman's body was discovered on July 5, 1997, and Mr. Gabrion was arrested on October 14, 1997.  In just those three months, Gabrion was in at least the states of Michigan, Indiana, Kentucky, Virginia, and New York.  The government's theory was that in addition to the murder that was the subject of this prosecution, Mr. Gabrion had also killed Robert Allen as part of a social security fraud, Wayne Davis because he was a state's witness to the rape case, John Weeks because he was a witness in this case, and Ms. Timmerman's daughter, Shannon VerHage.  There was simply no way that one person could possibly conduct the necessary investigation required to meaningfully test the government's case.

Similarly, the government had experts in pathology, hair analysis, chemistry, concrete blocks, locks, forensic entomology, fingerprints, and DNA.  The defense did not retain a single expert to help them prepare for Mr. Gabrion's guilt phase defense.

The failure to engage sufficient investigative and expert resources was deficient performance that hampered the defense and prevented a constitutionally adequate defense.

E.     Trial counsel failed to secure adequate funding to defend the case.

In addition to failing to retain sufficient expert and investigative resources, counsel failed to secure the necessary funding to provide Mr. Gabrion constitutionally adequate defense.  Mr. Gabrion was indicted in June 1999, and the death penalty was authorized in February 2001.  His trial commenced in February 2002.  However, much

valuable preparation time in 1999- 2001 was wasted by the lack of consistent funding. See, Ex. 3.1, letter from David Stebbins to Judge Scoville, June 26, 2000, "Because we do not have approval from the Sixth Circuit our investigators and experts have not been paid, and consequently not working on this case because of a lack of funding.  This appears to be an usually [sic] cumbersome process that prevents us from investigating the case and preparing for trial. . . We are finding it impossible to investigate and prepare the case without the assistance of investigators and experts.  See also, Ex. 3.2 letter from Stebbins and Mitchell to Judge Enslen, March 9, 2001, "we are concerned that once again our investigators are not being compensated and understandably are not willing to continue to devote the time necessary to complete the investigation in this case."

There were also funding issues with an expert on jurisdiction, Chris Shafer. Shafer's bill for his report and testimony was $8,682.27.  However, when his bill was submitted, the court cut his voucher by $3,682.27.  See Exs. 3.3 and 3.4.  Counsel Mitchell paid the remainder of the expert's bill personally.  This created a conflict of interest and disincentive to retain additional experts throughout the pendency of the case.

F.    <u>Trial counsel failed to seek continuances to properly prepare all appropriate defenses at the guilt phase and to subject the government's case to meaningful adversarial testing.</u>

In the original indictment, Gabrion was charged with murdering Rachel Timmerman by "drowning her in Oxford Lake".  Immediately prior to trial the government superseded the indictment to read that she was murdered on federal land.  The defense

objected to this but claimed that it did not change their approach and thus, the defense did not request the continuance to which it was entitled.

The indictment permitted the government to change its theory from Mr. Gabrion having drowned Ms. Timmerman in Oxford Lake to include that Ms. Timmerman was killed somewhere else on federal land and dumped in the lake. This only served to highlight the need for a defense pathologist who could have further expanded on when Ms. Timmerman might have been asphyxiated which would have shown reasonable doubt that it occurred on federal land.

Upon information and belief, Mr. Gabrion believes that the government disclosed only shortly before trial critical witnesses that placed Mr. Gabrion at Oxford Lake. The defense was left without adequate time to investigate and prepare for these witnesses. This was only compounded by the problems set forth in subclaims A and B above. Additionally, the preparation time for the defense was further compromised by the haphazard and disorganized way in which the government discovery (over 10,000 pages) was disclosed to counsel. This forced counsel to consume valuable time and resources to simply organize the discovery materials.

G.    Trial counsel failed to move for the disqualification of the District Court when trial counsel could not secure adequate funding to prepare.

As set forth in subclaim B, insufficient funding was provided in this case. Gabrion was indigent and thus had to seek funding from the court. The court failed to provide him with the appropriate tools for his defense. In order to ensure that Gabrion did have the resources necessary for a fair trial, reasonably competent counsel would have sought to recuse the court.

45

Moreover, as the case progressed Mr. Gabrion sent rude and impertinent letters to the court, insulting the court and accusing the court's family members of vile and criminal activities.  These letters were a byproduct of Mr. Gabrion's substantial mental health diseases and cannot be considered voluntarily produced in any meaningful way. Nevertheless, any reasonable person would have been offended by such letters.  This too constituted grounds to seek recusal.

H.    Trial counsel was ineffective in failing to object to the government's improper opening and failed to present evidence either directly or through cross examination to rebut the false impression left by the government's misleading argument.

As set forth above in Ground One, subsection B, the government claimed in its opening statement that Gabrion forced Ms. Timmerman to write the letters that were mailed to her family, the judge and prosecutor.  In fact, the government knew that claim was false.  The evidence showing this to be false had also been disclosed to the defense, yet no objection was made to the government's false and prejudicial opening statement.  Counsel wholly failed to inform the jury in any way that the government's own experts concluded their claims were false.

I.    The government presented false and misleading evidence regarding Rachel Timmerman's motive to disappear which trial counsel failed to rebut with readily available evidence, including in part, the fact that Ms. Timmerman had been ordered from her father's home to a group home and that Ms. Timmerman took a change of clothes with her and said that she would be "gone for a few days" despite the government theory that she left only for a dinner date.

The government presented evidence that following her release from jail, Rachel Timmerman had started "a new life."  Unfortunately, that was not the case.  Many witnesses saw Ms. Timmerman drink and attend parties where drugs were used in the weeks after her release.  This evidence ought to have been offered by trial counsel not

46

as character evidence but rather to show that Ms. Timmerman had an independent motive to disappear.   Ms. Timmerman's probation officer had concluded that Ms. Timmerman was not performing adequately on probation and had ordered her to leave her father's home and live in a group home (Liz's House).  Her step-mother had taken her to a meeting at Liz's House on May 30, 1997. Ex. 3.5   None of this evidence was presented.

At trial, counsel cross-examined Ms. Timmerman's father and sister about Liz's House but they denied knowledge.  Counsel failed to call Ms. Timmerman's step-mother, probation officer, or anyone from Liz's House who could have provided information to show Ms. Timmerman had reasons to disappear that were wholly unrelated to Marvin Gabrion.  Velda Timmerman told the FBI that Ms. Timmerman had been "acting crazy the week before she disappeared." Ex. 3.6.

The initial FBI field memos said that when Ms. Timmerman left home she told others that she would be gone for a few days and took a change of clothes.   It is undisputed that when Ms. Timmerman's body was found on July 5th, she was wearing different clothes than what she left home in on June 3rd.

So while the jury was led to believe that Ms. Timmerman had gotten a job and was doing well on probation, the fact is that she was not doing well and was going to have live in a more structured setting which might have given her a reason to leave her father's house on her own. Counsel's failures prejudiced Mr. Gabrion because they allowed the jury to believe Marvin Gabrion was the only person with a motive to kill Ms. Timmerman.

J.  <u>Trial counsel failed to challenge the government's claim that Ms. Timmerman disappeared on June 3, 1997 never to be seen alive again when readily available evidence existed establishing, in part, that Ms. Timmerman was seen in a number of locations in the days that immediately followed the alleged abduction.</u>

The government's theory at trial was that Ms. Timmerman was lured from her home on June 3rd by a man named "John" who had asked her out on a date and asked her to bring her daughter, Shannon with her.  Their theory further posited than other than perhaps being seen in the company of Gabrion in a truck near Oxford Lake, Ms. Timmerman was never seen alive after she left home on June 3rd.

The facts of this claim are set forth in Ground One, subsection C above.  Those facts are incorporated herein.  Trial counsel unreasonably failed to use those facts which would have further contradicted the government's theory that Gabrion tricked Ms. Timmerman into leaving the house on June 3rd, never to be seen again. Mr. Gabrion was prejudiced because the unrebutted "facts" provided strong reason to believe Mr. Gabrion abducted Ms. Timmerman on June 3rd to prevent her testimony two days later in the CSC case.

K.  <u>Trial counsel failed to present evidence that FBI analysts concluded Mr. Gabrion had nothing to do with letters allegedly sent by Ms. Timmerman after her death; that Ms. Timmerman was not coerce to write the letters and Mr. Gabrion did not dictate the content of the letters to her.</u>

Above in Ground One, subsection B, Mr. Gabrion contends the government falsely argued Mr. Gabrion forced Ms. Timmerman to write the letters that began arriving around the middle of June addressed to her father, and the judge and prosecutor on the state CSC case.  Gabrion incorporates the facts of Ground One, subsection B herein. These letters were an integral part of the government's claim that Mr. Gabrion was guilty of Ms. Timmerman's murder.  It appears that defense counsel

48

was provided the government memo evidencing the government's own experts

concluded that Ms. Timmerman wrote the letters, that she was not under extreme

duress and that Mr. Gabrion likely did not dictate the letters to her.  Though this memo

would have persuasively rebutted the government's claims, defense counsel

inexplicably never utilized it in any way.  The jury was left with the false impression that

Mr. Gabrion dictated the content of the letters.  This was prejudicial and extremely

damaging to Gabrion.

L.      <u>Trial counsel failed to contradict the government's theory of motive in part by failing to use readily available evidence to show that Chrystal Roach gave false testimony supporting the theory.</u>

The government's theory further posited that the motive for Ms. Timmerman's

murder was that Mr. Gabrion was trying to keep her from testifying against him in the

CSC case.  According to the government, when he ran out of procedural machinations

in that case to prevent her testimony, he had to kill her.   See Ground 1, subsection A.

Those facts are incorporated here.

But we now know the actual facts reflected in the court records show that there

was no manipulation of the CSC case.  And we know that Prosecutor Roach falsely

informed the jury about the CSC case and her habits in all CSC cases.

Trial counsel failed to conduct a modicum of investigation into the CSC case and

as a result they were unprepared to rebut the government's false testimony and

argument – false evidence that formed the centerpiece of their claim that Mr. Gabrion

was guilty and deserved the death penalty.  Review of the CSC case documents,

including the transcript of proceedings from April 29, 1997, were not obtained by

defense counsel.

Simple review of those documents would have revealed numerous avenues to impeach Prosecutor Roach's testimony and to rebut the government's primary arguments during the murder case concerning motive and the presence of aggravating factors (substantial planning and obstruction of justice).  Review of the CSC file would have allowed the defense to rebut the government's penalty phase theory that Mr. Gabrion had to be killed because this was no run of the mill murder case, but rather "an assault against our system of criminal justice" [Sentencing V. 5, TR 608].

Had defense counsel procured the court file from the CSC case they would have had the ammunition to attack Roach's credibility and the government's arguments based upon her false testimony.  Any one of these would have materially altered the jury's assessment of Roach's testimony and credibility, and ultimately the existence of the government's theory regarding motive: 1) Roach was not impeached with her false testimony about the alleged Circuit Court motion for remand for a preliminary examination;  2) She was not cross-examined about her office's failure to request an examination in this case at any time, including at the time of Mr. Gabrion's initial appearance and on April 29, 1997, and its specific waivers of examination; 3) She was not questioned about the fact that her office did not request examinations in all assaultive cases, and 4) she was not questioned about her office's failure to complain in any way about Mr. Gabrion's bond or Ms. Timmerman's alleged claims that Mr. Gabrion had threatened her.

M.    Trial counsel failed to present credible evidence of other suspects, including David Gabrion and Eddie Start, despite readily available evidence.

There were other plausible suspects for the murder of Rachel Timmerman. Among those was David Gabrion, defendant's brother. The discovery provided by the government was replete with evidence that showed that Ms. Timmerman's mother, Velda Timmerman, and Ms. Timmerman had a relationship with David through the use and sale of illegal narcotics.

It was a well-known fact that David sold marijuana and likely used other drugs, such as crack cocaine. David was a suspect from the outset. He was in a photo array shown to Minda Armstrong, who was with Ms. Timmerman when she left home on June 3, 1997. Witnesses provided statements to the police that indicated Velda and Ms. Timmerman had sold marijuana for David and that Velda smoked crack with David. See Exs. 3.7 and 3.8. One witness indicated that Velda and Ms. Timmerman would pick up drugs from David at Oxford Lake. Ex. 3.7. This would have been important because the government argued that Oxford Lake's isolation was known to Marvin and thus selected by Marvin. Tim Timmerman had written to the government and claimed that David knew facts about the homicide that were not released to the general public and that there was blue pick-up truck abandoned at Oxford Lake and that David had owned a blue pick-up truck. Ex. 3.9.

Velda had also snitched on David concerning a drug deal. Ex. 3.10. There was available evidence tending to show Velda was very concerned about this and worried that David would discover she had cooperated with the government to have him jailed.

51

After Marvin was arrested, David placed a call to Edward Risk in Frankfort, Kentucky. Ex. 3.11.   David was unable to provide an explanation for the call but the FBI had previously linked Risk's phone number to a closed kidnapping that was drug related.  On July 18, 1997, Gabrion's neighbors called police because two men were loading items into a truck.  One of those men was David Gabrion.   At that point, a full load of items had been taken out of the house and placed in the truck. Ex. 3.12.  At trial, Det. Miller testified that they "had the pair under surveillance and knew they were loading things out of the house and putting them into the truck." TR 1033.  Among the items in David's truck were exhibits introduced at trial and argued by the government to be probative of Gabrion's guilt.  This included a book, "The Perfect Victim" TR 1038. Also included were keys which fit the locks found on Ms. Timmerman's body and cans of spray paint.  TR 1039-44.

In short, there was credible evidence that would have established that the Gabrion family member who had a relationship with Velda and Ms. Timmerman was David Gabrion and that he also had a motive to harm Ms. Timmerman.

Besides David, there were other credible suspects.  In one of Tim Timmerman's first statements to the media he said that the family believed that Ms. Timmerman had left home with Eddie Start.  Velda believed that Eddie Start had picked up Ms. Timmerman on June 3rd.  Ex. 3.13.  Eddie Start was considered a suspect from the outset.  He was also in a photo array shown to Minda Armstrong.  Ex. 3.14.

Start was considered a suspect by the police. He initially gave a fake name when questioned by Det. Miller.  He admitted he might have given Ms. Timmerman a ride on June 3rd.   Start was given a polygraph examination and failed. Ex. 3.15.   His ex-wife,

52

Teresa, saw him in Grand Rapids with Ms. Timmerman on June 2nd or June 3rd. She had seen Eddie, Ms. Timmerman, and Shannon together on another occasion. None of this was presented to the jury in either guilt or penalty phase.

The failure to present credible evidence of other viable suspects is obviously prejudicial.

N.    <u>Trial counsel was ineffective for failing to object to the court's decision to excuse a juror for sleeping. Mr. Gabrion was prejudiced by this action at trial, and on appeal, where the Court relied on the lack of an objection to find that any challenge was waived.</u>

On February 27, 2002, an AUSA mentioned that one of the jurors had been "visibly nodding off all day ..." and suggested replacing her with one of the alternates [TR 2/27/02, 1468-69]. The defense disagreed that it's "severe enough ... to be removed as a juror." So did the court. "I think she's with us. I think she's probably resting her eyes" [TR 2/27/02, 1470].

The government raised the issue again the next day [TR 2/28/02, 1574]. AUSA: "[S]he was visibly nodding off ...." [TR 2/28/02, 1606]. The defense again disagreed. The court was "not sure that this is grounds for excusal." The court: "She closed her eyes and leaned back a couple of times ... it wasn't for more than 10, 20 seconds at a time ... she was watching ..." The judge said that: "If she is excused at all, I plan to surreptitiously excuse her as one of the alternates." [TR 2/28/02, 1607].

At the conclusion of the guilt phase, the court separated the four alternates [TR 3/5/02, 1769]. Defense counsel indicated the court had chosen the wrong alternates. The court announced he had selected "Number 84" as an alternate. "She was allegedly snoozing. I found she was ... I found her again glassy eyed and inattentive." [TR 3/5/02,

1770]. In a capital case, this is an abuse of discretion and a denial of due process and the right to counsel. Constitution of the United States of America, Amendments V & VI.

Mr. Gabrion raised this issue on appeal. However, the Sixth Circuit rejected the claim because trial counsel did not object to the district court's proposed procedure, or to the dismissal. Trial counsel was ineffective in failing to preserve the record of this constitutional violation, thereby causing the waiver. This failure prejudiced Mr. Gabrion because the argument would have prevailed on appeal if properly preserved.

O.    <u>Trial counsel failed to thoroughly investigate the cause of death and failed to object to prejudicial closing argument about same.</u>

The government's theory as to Ms. Timmerman's cause of death was that she drowned in Oxford Lake, more or less in the same position she was found on July 5, 1997. In support of that theory the government called Dr. Stephen Cohle, the pathologist who conducted Ms. Timmerman's autopsy. If it could be shown that Ms. Timmerman did not drown, there was likely reasonable doubt that she was killed on federal land. However, the defense, in spite of requesting, and receiving, approval for funding, never retained a pathologist.

Dr. Cohle testified that there are no reliable anatomic findings for drowning; it is a diagnosis of exclusion. TR 13, 19. Dr. Cohle admitted that if a plastic bag had been secured over Ms. Timmerman's head there would be no way to tell if she had drowned or been asphyxiated. TR 19. His conclusion was that the "most likely cause of death in this scenario is drowning." TR 26.

Dr. Cohle admitted that asphyxiation does not require evidence of manual strangulation such as an injury to the neck area (TR 18) and that due to petechiae may not have been visible due to decomposition (TR 28). Oxford Lake was a very muddy

54

and mucky lake and the testimony was that the weights attached to Ms. Timmerman would have caused her to sink into the mud.  Yet, Dr. Cohle found that there was no mud in her body. TR 31.  Dr. Cohle further admitted that because Ms. Timmerman only had her two nasal passages to breathe through (her mouth was taped shut) that it would not have been difficult to asphyxiate her with a pillow or a rag that would not leave marks.  TR 33-34.

At the conclusion of cross-examination, Dr. Cohle testified that "if that's all I have is that she is recovered from the lake, admittedly drowning is a possibility.  But based upon these things that I've described so far, if that's all I have, I can't rule out that she was asphyxiated, for example, at some other time, and then dumped into the lake."  TR 35.

On closing, the government argued that "Dr. Cohle came into court last Tuesday and told you his opinion.  His opinion when he came into court as a forensic pathologist was that she drowned.  **He ruled out every other possible manner of death.**"  TR 1713.  As to asphyxia, the government noted the evidence of manual asphyxia that was not found by Dr. Cohle but did not mention his conclusion that there were methods of asphyxia that would not leave a mark and that he could not rule out asphyxia.  There was no objection to his argument.

Reasonably competent counsel would have objected to argument that attributed opinions to an expert that went farther than the expert's actual testimony.  This is particularly true when, as here, that argument concerned an element of the offense and prerequisite for imposition of the death penalty.

P.    <u>Counsel failed to seek and retain a defense pathologist to assist in cross-examination and the preparation of defense evidence</u>.

Counsel reasserts the facts immediately above as well as those in subsections A and B in this Ground as well.

It is safe to say that the facts and circumstances surrounding Ms. Timmerman's death were perhaps the most important part of the entire case. The federal jurisdiction for the prosecution of Mr. Gabrion rested entirely on the government's allegation that she was murdered on federal property. That property was either that part of Oxford Lake that was in federal jurisdiction or some other unspecified federal land. The indictment originally charged Mr. Gabrion with murder by drowning Ms. Timmerman in Oxford Lake. The indictment was superseded and thus changed to allege only that she was murdered on federal land. However, at trial the government appeared to rely solely on their claim that she was drowned in Oxford Lake. There was no evidence presented that she was killed somewhere else that was on federal land, and then dumped in Oxford Lake.

As set forth above, Dr. Cohle admitted that he could not rule out asphyxia. That means he could not rule out that Ms. Timmerman had been killed somewhere else and dumped in Oxford Lake. Upon information and belief, Mr. Gabrion asserts that his counsel had no independent training or education in forensic pathology. Counsel's failure to retain a defense expert in forensic pathology was an omission that greatly harmed the ability of the defense to meaningfully challenge Dr. Cohle and to present their own evidence that Ms. Timmerman did not drown in Oxford Lake.

The case against Mr. Gabrion was circumstantial. Some of this circumstantial evidence consisted of Mr. Gabrion allegedly discussing with people how to dispose of

bodies, i.e., by weighting them down and dropping them in a lake.  Under those facts Mr. Gabrion likely could not have been prosecuted in federal court and would have only been subject to prosecution in the Michigan state courts. Reasonably competent counsel would have retained a defense pathologist who could have been utilized pre-trial to challenge the government's prosecution of Gabrion and their argument in closing: "Was she alive when she was put in Oxford Lake, when the defendant put her there?  And the answer to that question is yes." [TR 1713].

An independent pathologist would have greatly strengthened the defense argument that there was reasonable doubt that Ms. Timmerman drowned in Oxford Lake and that alone would have resulted in an acquittal or dismissal.

Q.    Trial counsel failed to impeach a key prosecution witness with his reputation for truthfulness.

The government argued that Lloyd Westcomb's testimony "all by itself proves to you the defendant is the killer" [TR 1700].  Westcomb testified he saw Mr. Gabrion at a convenience store after Ms. Timmerman went missing and that Gabrion told Westcomb that he had gotten rid of his girlfriend permanently by binding her with chains, locks and blocks and throwing her in a lake.

Counsel's investigation revealed witnesses who could have testified to Lloyd Westcomb's reputation for honesty, specifically, that he had no such reputation.  These witnesses include Edward Doering, Ray Armstrong, and Patricia Bienasz.  Ex. 3.16. These witnesses would have undermined Westcomb's credibility but they were never called.

Failure to present these witnesses prejudiced Mr. Gabrion as those witnesses would have thoroughly undermined Westcomb's credibility.

57

**R.**     Trial counsel failed to move to withdraw before the start of trial for a number of reasons, including physical contact between counsel and Mr. Gabrion.

Long before trial, in 1999 or 2000, Gabrion assaulted counsel Paul Mitchell in various ways including by vomiting on him.  Gabrion was and is infected with Hepatitis C, a communicable disease.  Gabrion's actions created a conflict with Mitchell that was never surmounted.   Mitchell should have moved to withdraw from this matter.

**S.**     Trial counsel was ineffective in failing to present evidence establishing that Mr. Gabrion was at a campground on June 25, 1997 with two women and a baby in a stroller, directly contradicting a crucial aspect of the government's case.

On June 25, 1997, David Knapp was camping at Toogood Lake in Newaygo County.  Marvin Gabrion pulled into Knapp's campsite in a Chrysler New Yorker. Gabrion was acting "bizarre" and Knapp noticed that he had two women in the car.  Due to Gabrion's bizarre behavior, Knapp noted the license plate number.  Knapp called the Newaygo County Sheriff with this information on July 9, after Ms. Timmerman's body was discovered.  Ex. 3.17.

The license plate reflected that the car was registered to Linda Allen.  On July 13, 1997, Gabrion, as Robert Allen, sold a Chrysler New Yorker to Lester Ebright in Fort Wayne.  That car was registered to Linda Allen. Ex. 3.18.

The government's theory was that Ms. Timmerman had been killed certainly no later than mid-June when the letters began arriving from Arkansas and Weeks was last seen alive.   This evidence would have undermined the government's theory.  Counsel unreasonably failed to investigate and present this evidence. This prejudiced Mr. Gabrion in that this evidence would have further undermined the government's timeline and theory of Mr. Gabrion's guilt.

T.    <u>Trial counsel failed to investigate and present evidence that would have cast doubt on the John Weeks aspect of the case.</u>

The government's theory was that John Weeks had been used by Gabrion to lure Ms. Timmerman from her home and that he likely participated in her killing and then he was killed by Gabrion.  Weeks was allegedly last seen in mid-June of 1997.  However, there were witnesses (Christopher Dragun and Theodore Braun) who saw Weeks after that.  See Ex. 3.19.  More importantly, these witnesses would have testified that Weeks told them he had helped to get rid of a body.  This would further corroborate a defense that if Gabrion did kill Ms. Timmerman, he did not do so on federal land.

U.    <u>Trial counsel was ineffective in failing to impeach Linda Coleman with the testimony of Walter Hamilton.</u>

Walter D. Hamilton lived on Lincoln Avenue, very near the Colemans.  He was in the area when reporters came to the area in an effort to find Oxford Lake.

He was interviewed by government agents on or about February 27, 2002.  He was a neighbor of Linda Coleman and her husband, James.  Hamilton told agents that he talked often with the Colemans and fished Oxford Lake with James Coleman.  They discussed at some length a stranger who they saw in the area.

Hamilton spoke with Trish Hubbard, the defense private investigator.  Hamilton told Hubbard that he had no recollection of Linda Coleman ever saying that she saw two men and a woman down at the lake with a truck and a boat.  He believed that he would have recalled her saying something like this.

He told Hubbard that he was advised by government agents that his information contradicted Mrs. Coleman and the government could not use him as a witness.  The

government therefore "let him go." There is no indication in the record that the

government disclosed this contradiction to the defense.

 V. <u>Mr. Gabrion was prejudiced by the cumulative effects of the individual acts and omissions of counsel such that but for those acts and omissions Mr. Gabrion would have received a different verdict at the guilt phase of his capital trial.</u>

Mr. Gabrion separately claims that his Sixth Amendment right to effective

assistance of counsel was violated due to the cumulative effects of the individual acts

and omissions referred to above. Mr. Gabrion incorporates all factual assertions made

elsewhere in this petition in support. The net effect of counsel's deficient performance

was such that there was a reasonable probability of a different verdict but for the totality

of the deficient performance. This also resulted in a unreliable sentence of death due

to the fact that the jury that sentenced Mr. Gabrion to death was tainted by the

ineffective assistance of counsel he received at the guilt phase.

## GROUND FOUR

**Trial counsel's conduct throughout the sentencing process, through both acts and omissions, individually and cumulatively fell below the prevailing professional norms of reasonably competent counsel which served to prejudice Mr. Gabrion in violation of the 5th, 6[th,] and 8th Amendments to the Constitution of the United States as described in <u>Strickland v. Washington</u>, 474 U.S. 52 (1984) and applied in cases such as <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005), <u>Wiggins v. Smith</u>, 539 U.S. 510, 536 (2003) and <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986). Counsel failed to investigate, evaluate, prepare and present a constitutionally adequate defense at the penalty phase of Mr. Gabrion's capital trial and a reasonable probability exists that the presentation of an adequate defense would have changed the outcome at sentencing.**

Trial counsel provided ineffective assistance at the penalty phase of Mr.

Gabrion's trial based on the two-part set forth in <u>Strickland v. Washington</u>, 466 U.S. 668

(1984). First, in each instance described below, counsel's performance was deficient

because counsel's acts and omissions fell below prevailing professional norms for capital defense practice. (See: <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005), <u>Wiggins v. Smith</u>, 539 U.S. 510, 536 (2003) and <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986).) In addition, in each instance, counsel's deficient performance prejudiced Mr. Gabrion's defense because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In the context of a capital sentencing hearing, a reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the penalty phase of Mr. Gabrion's trial. *Id.* The standard is lower than a "preponderance of the evidence" standard. *Id.* Prejudice is established where there is a "reasonable probability that at least one juror would have struck a different balance." <u>Wiggins v. Smith</u>, 539 U.S. 510, 536 (2003). A reasonable probability is established when consideration of all the evidence is "sufficient to undermine confidence in the outcome." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).

The acts and omissions which form the basis of this claim include, but are not limited to, the following:

A. <u>Trial counsel was ineffective in failing to prepare and present a multi-generational history of Mr. Gabrion's family.</u>

The prevailing professional norms of reasonably competent counsel dictate that counsel investigate and prepare a multi-generational history of a capital client's family, both to provide context for the life events that have shaped a client's functioning and behavior and to provide objective evidence of familial mental illness or defect, should that be available. Nowhere could the need for this be more apparent than in this case. Here, Mr. Gabrion presented with disruptive and bizarre behavior throughout the trial and indeed, through the last decades of his life. The penalty phase was replete with

government evidence of Mr. Gabrion's bad conduct.  Much of it was bizarre.  But, if Mr. Gabrion suffered mental health related problems, this would clearly be a mitigating factor and would help explain the conduct presented by the government in penalty phase.  The government said Mr. Gabrion was not mentally ill.  Rather, it contended he was malingering, a theme that a majority of the jurors appears to have accepted.

A proper investigation would have revealed, *inter alia*, a family history of the most severe mental health illnesses known to the medical profession.  Many of Mr. Gabrion's extended family members have been so disabled they have required inpatient treatment.  (Ex. 4.1).  The DSM-5 teaches (as did the DSM-III and IV) that there is a very strong correlation between a history of mental illness in one's family and the likelihood that person will also suffer from mental illness:

> A family history of bipolar disorder is one of the strongest and most consistent risk factors for bipolar disorders. There is an average 10-fold increased risk among adult relatives of individuals with bipolar I and bipolar II disorders. Magnitude of risk increases with degree of kinship. Schizophrenia and bipolar disorder likely share a genetic origin, reflected in familial co-aggregation of schizophrenia and bipolar disorder.

American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, pg. 130.

A thorough investigation into Mr. Gabrion's background would have revealed that numerous family members suffer from the most serious mental illnesses known to the medical profession.  A complete investigation at a minimum would have revealed the following:

1.    ▮▮▮▮▮▮▮▮▮▮▮▮ is Mr. Gabrion's ▮▮▮▮▮▮▮▮▮▮▮▮.  In 1975, ▮▮ suffered what was referred to in the records as a "psychotic break".  In

1980, ▇ was placed in the psych unit of Allegan General Hospital. In 1987, ▇ was diagnosed with chronic undifferentiated schizophrenia and bipolar disorder, mixed with psychotic features. ▇ was again hospitalized inpatient in 1995, this time at Kent Oaks Hospital. ▇ has also been diagnosed with developmental disability and paranoid thought disorder. (Ex. 4.1).

2.	▇ is Mr. Gabrion's ▇. In ▇ ▇ had a breakdown while in prison and was transferred to inpatient care at Ionia State Hospital. ▇ suffered another breakdown in ▇ and was again admitted to Ionia State Hospital. In 1972, ▇ was diagnosed with a major depressive illness. ▇ was diagnosed with manic depressive psychosis in 1973. Bipolar disorder was previously known as manic depressive illness. In 1980, it was noted that ▇ had been admitted 7 times to Forest View Psychiatric Hospital. In 1985, ▇ was diagnosed with bipolar disorder. In 1995, ▇ was diagnosed with bipolar disorder and substance abuse, including marijuana and alcohol. In 1998 ▇ was diagnosed with bipolar disorder I, severe. ▇ records reflect that there is a "[h]istory of manic-depressive illness in the family and people have had treatments." (Ex. 4.2).

3.	▇ is Mr. Gabrion's ▇. In 1998 ▇ was reported to be suffering from bipolar disorder. (Ex. 4.3).

4. ███████████ is Mr. Gabrion's███████████████. In 1998 it was reported ███ had been suffering from bipolar disorder and had been psychiatrically hospitalized twice. (Ex. 4.4).

5. ██████████ is Mr. Gabrion's████████████. ██ was first psychiatrically hospitalized during████████████. At that time ██ was diagnosed as psychoneurotic. ███ continued with this diagnosis through the 1970's. In 1978, ██ was diagnosed with anxiety neurosis – depression. ███ was psychiatrically hospitalized six times. (Ex. 4.5).

6. ███████████ is Mr. Gabrion's███████████████. In 2000 ███ records note ███ had a history of depression and had been prescribed Prozac. (Ex. 4.6).

7. ██████████ is Mr. Gabrion's███████████████. ██ was diagnosed with depressive disorder, bulimia nervosa, obsessive compulsive disorder, alcohol dependency, and substance abuse. ███ was inpatient for alcohol abuse 4 times from 1993-1999. In██████, ██ committed suicide. (Ex. 4.7).

8. ██████████ is Mr. Gabrion's███████████████. Records reflect███ has suffered for many years with major depressive disorder and anxiety. ███ records reflect: "The patient has a genetic predisposition to mental illness and substance abuse" presumably based upon the fact that "bipolar may run in █████ family". (Ex. 4.8).

An appropriate investigation would also have revealed mental health issues for many other relatives, including in part: ██████████ (Defendant's██████), ██



████ (Defendant's ████████), ████████ (Defendant's ████████), ████████ (Defendant's ████████), ████████ (Defendant's ████ ████), ████████ (Defendant's ████████), ████████ (Defendant's ████ ████), ████████ (Defendant's ████████), ████████ (Defendant's ████ ████), ████████ (Defendant's ████████) and ████████ (Defendant's ████████).

There is a reasonable likelihood of a different result had this evidence been presented because this evidence would likely have changed the way the jury viewed the government's claims that Mr. Gabrion was malingering mental illness. It also would have provided all the mental health professionals (including government experts) a different lens from which to view all the other mental health related evidence, testing and material.

A constitutionally acceptable multi-generational investigation and presentation also would have revealed evidence that Mr. Gabrion's family and extended family suffered a generational predisposition to substance abuse. That evidence includes, but is not limited to:

1. ████████, Mr. Gabrion's ████████ was a heavy drinker who hid vodka around the house.

2. ████████, Mr. Gabrion's ████████, drank heavily. ████████ locked ██ out of the house one time and he reported the only reason ██ did not freeze to death was because of the level of alcohol in ██ system. Another time, a relative went to ████████ home and told everyone they should not be drinking so much. As a response ████████ told that relative

 was no longer welcome in ▆ home. ▆▆▆▆▆▆ refused to stay at ▆▆▆▆▆ home when ▆▆▆▆▆ got drunk and would leave when ▆▆ started drinking.

3.      ▆▆▆▆▆▆▆ Mr. Gabrion's ▆▆▆▆▆, drank all day, every day. It was not uncommon for ▆▆ to drink a case of beer in one day.

4.      ▆▆▆▆, Mr. Gabrion's ▆▆▆▆▆, is an alcoholic who drinks daily. ▆▆ has developed ulcers as a result of his drinking and has been arrested numerous times for drunk driving, drunken disorder, and disturbing the peace.

5.      ▆▆▆▆▆, Mr. Gabrion's ▆▆▆▆, was an alcoholic who always had a beer in ▆▆ hand.

6.      ▆▆▆▆▆▆, Mr. Gabrion's ▆▆▆▆, drank from the time ▆▆ was 19 years old. ▆▆ and ▆▆▆▆▆ locked their children inside the house and went to a bar.  Their house caught on fire and the children, who were home alone, would have died in the fire had the neighbors not rescued them.  On ▆▆▆▆▆▆, ▆▆▆▆ driving privileges were denied for having accumulated two convictions of operating under the influence of liquor in a seven year period.  ▆▆▆ reports at least four of ▆▆ children have or had drinking problems that have interfered with their lives, including arrests and marriage problems. (Ex. 4.9).

7.      ▆▆▆▆▆▆, Mr. Gabrion's ▆▆▆▆▆, drank until 1957.  At least one night a month ▆▆ would spend his entire paycheck on booze if ▆▆▆▆▆

did not show up at the bar to stop ███. ███ stopped drinking when ███

███ who was then dying of cancer told ███ that life was too short.

8.  ██████████, Mr. Gabrion's ████████, became addicted to heroin in

███████.

9.  ██████████████, Mr. Gabrion's ████████, reports that four of ███

brothers have addictive personalities and got addicted to alcohol early in

life. ███ reports they like substances that make them feel better.

10.  ████████████, Mr. Gabrion's ██████████, was involved in a car

accident while ██ was driving drunk.  One person, ██████████, was

killed. ██████████ was convicted of a crime for this and went to prison.

(Ex. 4.10).

11.  Mr. Gabrion's ████████████████████████████████████████,

have been drug addicts since they were teenagers

Many of the witnesses who testified during the penalty phase regarding bad acts

committed by Mr. Gabrion contended that he was drunk when he acted out.  Evidence

of a genetic predisposition to substance abuse and alcoholism would have assisted in

reducing his level of moral culpability.  Substance abuse is frequently a form of self-

medication which could have been used to explain Mr. Gabrion's abuse of substances

in a way that would make him less morally culpable.  Alcohol and substance abuse

frequently exist in conjunction with mental illness.  Reasonably competent counsel

would have discovered this history of substance and alcohol abuse in Mr. Gabrion's

family, documented it, presented it at penalty phase, and provided it to relevant experts

(including government experts) to assist them in forming their opinions.

There is also a generational history of family dysfunction in Mr. Gabrion's immediate and extended family that includes, but is not limited to, the following:



1.  ███████, Mr. Gabrion's ███████, had ██ child in a bar with ██ while ██ fed the child spoiled milk. As a consequence ██ child was removed by social services. ███ was not able to take care of ██ baby and ultimately gave the child away. ███████████, has never known the identity of ███████ and does not know why ███████ would never tell ██. One night ██████ walked in on ███████ being fondled by ███████████. ██████ does not think it was consensual but ███ also knows ███████ was doing nothing to resist. When ███████ died, ███████ told ██████ would have to step in to take ██ place as ██ ██.



2.  ███████ is Mr. Gabrion's ███████. ██ was a hoarder. There were paths throughout ██ house with junk on all sides. When ██ died it took over a month to clean out ██ house. It smelled of cat urine and was full of old newspapers, roaches, and other bugs. It required many dumpsters to completely clean out. There were cockroaches in ██ coffee pot. ██ would just shake them off and offer guests coffee. Once ██ and ███████ went to visit ███████. They were both "drunk as skunks". ███████ tried to have sex with ███████. but ██ evaded ██.

3.  ███████ is Mr. Gabrion's ███████. ██ lost all of his children to social services because ██ beat them with boards that had nails sticking out of them. ███████ drank a lot and ██ mostly beat ██ children when ██



was drunk. ▮ beat them brutally with a board or a belt or whatever was handy. If ▮ ▮, ▮, interfered ▮ would be beaten too. ▮ frequently had black eyes and busted lips. ▮ was constantly groping ▮ sexually and they would fight over who had to sit next to ▮ in the car. ▮ also molested ▮, one of whom subsequently became a prostitute. ▮ caught ▮ forcing ▮ on ▮ ▮. One time they called the police and ▮ was put in jail for a short period of time.

4. ▮ is Mr. Gabrion's ▮. ▮ physically fought ▮ ▮ about four times a year. These fights were described as "knock down drag outs." As ▮ aged, ▮ also hit ▮ with ▮ cane. ▮ eventually stopped driving because ▮ would grab the steering wheel and this frightened ▮.

5. ▮. is Mr. Gabrion's ▮. ▮ was committed to prison for armed robbery at the age of 18. (Ex. 4.11).

6. ▮ is Mr. Gabrion's ▮. ▮, ▮ (Mr. Gabrion's ▮), was molested by ▮. ▮ was in trouble with the law most of ▮ juvenile and early adult life. (Ex. 4.12).

7. ▮, was also molested by ▮ ▮ from ages 12-14. (Ex. 4.13).

8. ▮ is Mr. Gabrion's ▮. ▮ was physically abusive with ▮. ▮ got pregnant with their twins



while they were separated. ▆ did not tell ▆ ▆ was pregnant, delivered the twins, and gave them up for adoption without his knowledge. ▆ was also sentenced to prison for breaking and entering a commercial building in ▆. (Ex. 4.14).

9. ▆ is Mr. Gabrion's ▆. ▆ had a ▆, ▆, but ▆ really did not have any interest in being a parent. ▆ consistently sent ▆ to anyone who would take ▆. ▆ recalls crying whenever ▆ had to go home because ▆ parents fought all the time. ▆ is now a hoarder. At one time ▆ had 6 different dining room sets. ▆ believes ▆ drove ▆, ▆, to commit suicide because of ▆ dependency on ▆ and the fact ▆ would not allow ▆ to have close relationships with anyone but ▆.

10. ▆ is Mr. Gabrion's ▆. ▆ was abusive and violent and a very volatile ▆. ▆ was very religious and would not allow any work to be done on Sunday, no matter how minimal. Once ▆ ▆ was caught dying stockings on Sunday and ▆ knocked ▆ into and out of the bath tub and then knocked ▆ down the stairs and beat ▆.

The influence of the family environment on a child's social development lasts a lifetime. Children whose families fail to provide adequate supervision are more likely to have bad outcomes as they age. Lacking proper role models, children develop their own norms based largely on their undisciplined desires. Cantelon, S.L. (1994). *Family*

*strengthening for high-risk youth.* Washington DC: Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Fact sheet #8.

The failure to investigate and present this evidence prejudiced Mr. Gabrion because it would have put the government's malingering claims in an entirely different light. Reasonably competent counsel would have provided this evidence to all of the mental health professionals. The failure to discover this evidence casts doubt t on the jury's death penalty decision.

B.    Trial counsel failed to direct and oversee a proper investigation into the penalty phase presentation and failed to secure a thorough social history that met minimal constitutional standards.

A jury must be able to hear and consider mitigating evidence before it decides whether an offender should be sentenced to death. Relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke, 542 U.S. 274, 284 (2004) [citation omitted]. "Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Id.* at 285.

Because of the breadth of admissible evidence at penalty phase it is incumbent upon counsel to conduct a broad investigation into potential mitigating factors. "It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case worker, doctors, correctional, probation or parole officers, and others." ABA Guidelines for the

Appointment and Performance of Defense Counsel in Death Penalty Cases,

Commentary to Guideline 10.7, 31 Hofstra L.R. 913, 1024 (2003).[4]

A constitutionally adequate social history would have revealed the following

themes in addition to the multi-generational history of mental illness, substance abuse,

and family dysfunction noted above. A fully informed mental health expert could have

described how all of these factors not only existed, but fractured the trajectory of Mr.

Gabrion's life in a pathological manner and adversely impacted his ability to function.

**Environmental Depravation:** Numerous extended family members and friends

report that the Gabrion home was stark. It was built by ███████ who was not much of

a carpenter. One of their houses was basically a cabin. It had a dirt floor. The █████

did not have separate rooms. Rather, the front room was open and had three sets of

bunk beds which were pushed up against the wall.

A family friend reports that at some point there was running water only in the

kitchen. They had to use a bucket of water to flush the toilet. It was not possible to take

a shower. The neighbor was told that a pipe burst or was broken and was apparently

never fixed. The Gabrions went to Texas for the winters and if something broke they

just did not bother to get it fixed.

The Gabrions kept chickens and the house reeked. A █████describes how you

could smell it before you even reached the house. The odor was apparent and

overwhelming from the time you pulled into the long driveway. A lot of junk and old cars

were strewn across the yard.

---

[4] The ABA Guidelines represent the existing norms and constitutional requirements. They are not aspirational. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, History of Guideline 1.1, 31 Hofstra L.R. 913, 920 (2003)

, was not much of a housekeeper.  Friends describe the stench and the filth that pervaded the house.  There were frequently plates of old food strewn around the home.  Although invited to stay for dinner, family friend ███ ████, reports he never wanted to eat there because the house was so dirty.  ███ reports he did not think any of this bothered ████

The children were always dirty.  They frequently seemed like they had not bathed and appeared to wear the same clothing day after day.  Marvin wore shoes that were too big for him and were split down the back.  There were holes in the heels of his socks.  Other children noticed and made fun of him.

Poverty actually shrinks the brain.

http://www.scientificamerican.com/article/poverty-shrinks-brains-from-birth1/?WT.mc_id=SA_DD_20150331

At trial, there was evidence only that the family lived in a cabin at Round Lake.  One is left with the impression that it was a somewhat idyllic lakeside home.  The true facts described above were not provided to the jury.

**Lack of Appropriate Parental Involvement and Guidance:**  The Gabrions lived outside town and were isolated.  They did not attend their ██████████████.



████ was described by relatives as more of a best friend to ██████ than a █████.  ███ provided no structure and no role model.  ███████████████ ████████████████ ███ was described by one relative as like ████████: ███ didn't just help ██████ get away with things, ████████████████.  One of Marvin's ██████ recalls ██████ taking ██ ██████████, to the store and getting ███ to steal

for ██. This was witnessed by family. The ██ now believes ██ was fortunate that ████████████ ignored ██

One of Marvin's ████ recalls their ██████████, leaving them on a bench so ██ could go to a bar. ████ knew ██ ████████ kept drugs at ██ house and did not care. ██████████ cared but this did not bother ██. In fact, ██████████████ with ██ ████. ████ smuggled drugs into the jail for ██████ ██████ ██ allowed ████ to smoke crack at ██ house; indeed, ██ even smoked it in front of ████.

One of the ██████ describes a time when ██ stayed for two weeks with ██████ and ████████. ██ and ██████ happened upon an old abandoned schoolhouse with no trespassing signs clearly posted. ██████ ignored the signs and walked right in. Inside there were stools that ██ liked so ██ stole them. ████ made ██████████ carry the stools out and drag them home. ████ knew what ██ was doing was wrong. When a car passed them on the road, ██ would hide in a ditch.

At trial there was no evidence offered that ██████ encouraged criminality in ██ ██████. There was no evidence offered that ██ sometimes even taught ██████ left in ██ care to commit crimes.

**Marvin was sexually victimized in his youth:** Mr. Gabrion was sexually victimized by a neighbor who claimed to need help working on his house about 5-8 miles from Mr. Gabrion's childhood home in Round Lake. He also witnessed ████████ molested by this same man. Upon being informed of this, Mr. Gabrion's ██████ told him to forget the molestation ever occurred and not to say anything about it.

No evidence was presented concerning this at trial. Mr. Gabrion's victimization is important to his development but so is his witness to the sexual abuse of ██████████.

74

Sexual abuse constitutes a major risk factor for a variety of problems in adult life. Chronic anxiety, depression, and problems with anger are often reported by adult survivors of child sexual abuse. Survivors of childhood sexual abuse are 5 times more likely to be diagnosed with at least one anxiety disorder than their non-abused peers. Berliner, Lucy & Elliott, Diana M. (2002) Sexual Abuse of Children. In John E Myers & Lucy Berliner (Eds.), The APSAC *Handbook on Child Maltreatment 2nd edition* (pp. 55-78). Thousand Oaks, California: Sage Publications.

An adequate penalty phase investigation would have revealed this information. Counsel failed Mr. Gabrion when they failed to conduct an investigation that revealed all important aspects of his developmental years.  Counsel could not present what they did not know.  Reasonably competent counsel would have conducted an investigation that revealed this information and then they would have presented it to the jury via both fact witnesses and expert witnesses who could have explained its significance and the significance of Mr. Gabrion's ███████ telling him to just forget it ever happened.

**Marvin grew up in a family where ███████ was commonplace and accepted:** Marvin's family of origin was plagued with personality disturbances.  Marvin was raised in a milieu of ███████.  ███████ had a juvenile record for car theft. ███████ was a deer poacher and all ██ guns were taken away.  But this did not dissuade ███.  ██ continued to poach with a bow and arrow.  After Marvin was arrested, ██ wanted to pay for a private attorney.  ██ asked a ███████ to put siding on two sides of ██ tar paper house so ██ could photograph it and get a mortgage.

███████ used pills and snuck drugs into the jail for ███████.  Later in life, ███████ lived apart solely so ███████ could collect welfare.

Marvin's ███████████████████, were both drug dealers and competed for business. ████ turned ████ in for selling drugs. ████ frequently talked about receiving oral sex from ██████. A family friend believed this was true because ████ took ██████ out to smoke crack regularly. ████ and ████ were also thieves. ████ was the type who would take something from you when ██ came to visit. ████ would just come back later and take all your possessions. Once, a family friend cut 10 cords of wood for ██ father. ██████ then came over and stole it all.

The trial record contains evidence only that ████ and ███████████ dealt drugs.

███████████ **had inappropriate**████████████**:** According to family members, ██████████ was a person who always needed ██████ attention. It was important to ██ to always be the center of attention. Some in the family have questioned ██ relationship with ██████, suggesting it may have been ██████. A family friend reports ██████ would kiss ██████ on the lips as ███ left the house. ██████ was encouraged by ██████ to grope ███. The ██████ can recall hearing ███████████ have loud sex, after which they fought, and ██████ told the ███ "don't you ever [perform oral sex on a man]."

It is believed in the family that ██████ had sexual liaisons with ███████████. Once, ███████████ went on a double-date with ███████. ███████ date was ███████████████. ██████ and ██████ left the car in a remote area and walked into the woods where it was assumed they had sex.

The trial record contains only evidence that ███████████. had ██████. It contains no evidence concerning ███████████████ with ███████████.

**Disrupted Parent-Child Bonding:** . questioned ▮ own paternity as a youth. ▮ reports that the name on ▮ birth certificate is ▮▮▮▮. ▮▮▮▮. recalls ▮▮▮▮▮ walking ▮ to school and the teacher asking what ▮ name was. ▮▮ responded that ▮ supposed it was ▮▮▮▮. That is how ▮ went from being ▮▮▮▮▮ to being ▮▮▮▮. For the longest time ▮▮▮▮. believed ▮▮ was ▮▮▮▮ but ▮ ▮▮▮ told ▮▮ ▮▮ ▮▮▮ was ▮▮▮▮. ▮▮▮▮ ▮▮▮▮ divorced ▮▮▮▮▮ for desertion. (Ex. 4.15).

Similarly, ▮▮▮▮ questioned the ▮▮▮▮ of ▮▮▮; ▮ did not think ▮▮▮▮ ▮▮▮▮▮. To outsiders, it did not appear that ▮▮▮▮ liked ▮▮ ▮▮▮ One of the ▮▮ recalls sitting at the dinner table one night and ▮ was complaining about a bill. ▮▮ looked at ▮▮▮▮ and said we should have sold ▮▮▮

At trial there was no evidence about ▮▮▮▮▮▮ and the issues surrounding it.

**▮▮▮▮ charismatic influence:** ▮▮▮▮ was someone everyone wanted to be around. ▮▮ made everything a good time. ▮▮ was euphoric and happy-go-lucky. ▮▮ was a ▮▮▮▮ who did what ▮▮ wanted when ▮▮ wanted to do it. ▮▮ wore a lot of makeup when other ▮▮▮▮ in the area did not. ▮▮ cussed a lot. ▮▮ drank a lot. ▮▮ had a reputation for ▮▮▮▮. There were rumors that ▮▮▮▮ moved north hoping to get ▮▮▮▮ away from other ▮▮▮▮ ▮▮ was often everyone's favorite ▮▮▮

While there was evidence of ▮▮▮▮ ▮▮▮▮▮ at trial, there was no contextualization of it. There was no demonstration that in spite of ▮ troubles ▮ ▮▮▮▮ would be drawn to ▮▮. That fact exacerbates the impact of ▮ less desirable characteristics and conduct. It would also be valuable information for a mental health

77

professional to know looking at the dynamics of this family and attempting to interpret its impact on Marvin.

**Marvin was a smart and unremarkable boy until early adulthood:** School teachers, classmates and coaches remember Marvin as a young boy who was respectful and did not cause trouble. Marvin was the most well-behaved of the three Gabrion brothers. He was shy and reserved. He did not have many friends. He was on the track team. He was not a great athlete but he was respectful. He played chess during lunch. He was not a known trouble maker. Classmates do not recall him getting in fights or being violent in any way. One classmate recalls Marvin supporting a child who was being picked on. And this in spite of the fact that Marvin was also picked on at school for his lack of good hygiene and shabby dress.

Although there was some evidence of this at trial, it came from Marvin's siblings, a teacher who did not remember him, and a prom date. Presentation of better quality and a greater quantity of witnesses in this critical area could have helped in the presentation that Marvin's head trauma was to blame for his changes in personality. Reasonably competent counsel would have presented a larger number of witnesses with a broader range of contact with Marvin had they been available. Failure to present them impacted on the jury's assessment of Mr. Gabrion's mental health defenses at penalty phase and upon his general worth as a human being.



**Family Conflict:** ▮▮▮ resented ▮▮▮▮▮▮▮▮▮. ▮▮▮ thought ▮▮▮ looked down on ▮▮ ▮▮▮ told ▮▮▮▮ that they were ▮▮▮ least favorite ▮▮▮▮▮▮. This evidence was critical because some of the ▮▮▮▮, including Marvin, were sent to stay with ▮▮ on those occasions when ▮▮▮abandoned the

family.  When ████████ walked into ████ house ███ would count them off 1 through 6.  ████ thought this was ████ way of implying that ██████ had too many children and that ██ was a breeder.  When ███ got Alzheimer's disease, ██████ cared for ██.  ██████ made a tape recording of ██████ counting off ██ children and saying their names and then put the recorder under █████ bed to get back at ███.

Outsiders thought the ████████ did not like each other.  They never said anything nice about each other.  They got upset over ██████████ paying more attention to one than the other.  Because of that they cussed about each other and threatened to kill each other.

The only evidence of family conflict presented at trial was that amongst immediate family members. The conflict between ████████ was not linked to their impressions of their ██████ relative love for them.

**Marvin was a loved and supportive family member:**  Extended family members recall Mr. Gabrion as loving, supportive, and generous with his time and his resources.  Many relatives describe him as a "sweet boy", including his first cousin, Bertha Kolwalki, who chose Marvin to be the ring bearer in her wedding when he was about 5 years old.  His nieces and nephews recall him being supportive; they adored him.  His niece, Chelsea Gabrion, has many fond memories of Marvin.  She recalls him teaching her about gravity, encouraging her to work hard, and to be wary of boys.  She was very comfortable with him and felt like she could talk with him about anything.  Marvin took the kids camping.  He would do the cooking.  They made fires and he would tell them ghost stories.  Chelsea knew ████████████████, and ██████████████,

were selling marijuana but Marvin never exposed her to that sort of illegal activity. He did not smoke marijuana around her, or for that matter, even cigarettes.

Competent counsel would use these witnesses to humanize Mr. Gabrion. They would use such witness to further support the theme that Mr. Gabrion did not have a criminal orientation in his youth and that something must have happened that caused him to present as he currently presents. Competent counsel knows that a single witness who testifies lovingly and articulately about a capital defendant can sway a verdict in favor of life. Mr. Gabrion's niece is just such a witness. At trial there was only the vaguest reference to Mr. Gabrion taking his nieces and nephews fishing.

C.    Trial counsel was ineffective in failing to obtain records supporting mitigation.

Historical records are extraordinarily important in capital cases. Reasonably competent counsel knows they can be the difference between a life sentence and a death sentence. This is so because records created prior to the offense at issue or involving other persons are inherently credible. They were frequently created at a time when there was no reason to falsify by persons with "no horse in the race". For these reasons, reasonably competent counsel collects every record that could possibly bear upon a client's penalty phase presentation and presents them on those issues that are determined to be important to the case for life.

This was particularly important here because the government argued Mr. Gabrion was malingering mental illness and it was known this would be the government's position early on in this case. This was an argument that appeared to have some traction with the jury. Had counsel properly investigated Mr. Gabrion's multi-generational history of serious mental illness, they would have had strong proof with

80

which to rebut the government's malingering themes.  The records of family members suffering from severe mental illness, some requiring inpatient care, were created by people with no motive to falsify and prior to the time Mr. Gabrion was arrested in this case.  These records would have provided relevant and strong corroboration for Mr. Gabrion's claims that he too suffered from serious mental health conditions that reduced his moral culpability and supported a life sentence.

Similarly, records documenting a familial predisposition to substance and alcohol abuse would have been useful to demonstrate that Mr. Gabrion's drug and alcohol abuse came from vulnerability to such disabilities and not as a "choice".

But none of these records, and more, were collected and used by counsel.  This conduct fell below the prevailing professional norms of reasonably competent counsel.  As demonstrated above this failure prejudiced Mr. Gabrion in that the fact finder would have had a much different view of the government's malingering themes and his own mental illness had counsel done as counsel is required to do.

D.    <u>Trial counsel failed to select appropriate experts, provide the experts they did select with appropriate information to render reliable opinions, and failed to properly prepare the experts called at trial.</u>

The primary defense theory of mitigation at sentencing was that Mr. Gabrion suffered from mental illness based on a variety of circumstances, including organic brain damage.  The defense tendered for jury consideration a specific non-statutory mitigating factor asking the jury to determine that he was "unable to appreciate the wrongfulness of his conduct or conform his conduct to the law."  In order to succeed in proving this mitigating factor, the defense was required to prove that any damage to Mr. Gabrion's brain and any other relevant circumstances resulted in mental illness, leading

to the inability to appreciate the wrongfulness of his conduct. The defense told the jury in its opening statement at the penalty phase that its theory of the case was based on a number of facts and circumstances, but the starting point was that Mr. Gabrion was mentally ill. Defense counsel knew that they would work toward the goal of proving this point, submitting the following specific mitigating factor for consideration by the jury:

Mitigating Factor No. 11

Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

Two jurors found that this factor was proven by a preponderance of the evidence.

Dr. Newton Jackson was retained as a defense expert in this case for the purpose of evaluating whether Mr. Gabrion was mentally ill. He was the Director of the Evaluation Services Division of the State of Michigan Center for Forensic Psychiatry. He originally took the position in 1969, when the Center was created. The Center received referrals from throughout Michigan regarding the mental condition of defendants facing criminal charges. Dr. Jackson was also engaged in private practice as a forensic psychologist. He had testified "many hundreds of times in state court" and it appears that he had testified some 10-15 times in federal court.

Dr. Jackson wrote three (3) reports in this matter (Ex. 4.16). The first report was prepared after Dr. Jackson met twice with Mr. Gabrion and reviewed certain records. He wrote, in part, "In my opinion, Marvin Gabrion's clinical presentation in part reflects malingering, *and in part reflects symptoms of mental illness.*" (Ex. 4.16).

Dr. Jackson wrote a second report dated December 11, 2001, which did not include an opinion regarding Mr. Gabrion's mental health. A third report was dated

82

February 21, 2002, and again did not include any opinion regarding Mr. Gabrion's mental condition. In fact, the last letter said it was impossible for Dr. Jackson to offer any opinion on this subject.

Dr. Jackson was called to testify as a defense witness at sentencing. He described his work as follows: Dr. Jackson met with Mr. Gabrion on June 25 and July 5, 2001. Before the second meeting, he reviewed social history documents, including "a social history which had been prepared by Mr. James Crates [ ]."

During the first meeting, which lasted approximately an hour and forty minutes and was dominated by Mr. Gabrion talking, Mr. Gabrion made reference to "delusional ideas" and "appeared to exhibit a number of behaviors which were consistent with a possible mental illness." Dr. Jackson thought that Mr. Gabrion might have a "thought disorder and a mood disorder." He was unable to do any psychological testing of Mr. Gabrion.

During the second meeting, which lasted 45 minutes, Dr. Jackson noticed that, "although some of his behavior seemed practiced and had a malingered tone as if he were trying to feign symptoms of mental illness, at the same time the quality of his thinking" and other factors showed "that there may well have been symptoms also of an underlying thought and mood disorder."

Dr. Jackson testified, "[m]alingering means deliberately not telling the truth. It means saying something that is intended to deceive, usually to obtain some objective that is unrelated to the actual question that has been asked of you." He thought that, to some extent, Mr. Gabrion was attempting to create the impression "that he was mentally ill." He did not think Mr. Gabrion's "presentation was entirely the result of malingering."

Much of this had to do with "racing thoughts" and "the very bizarre quality of the way he connected ideas." He said, "I felt that there was sufficient reason to believe that there was something more going on of a disturbance within him than could be accounted for simply by malingering alone."

During a third visit at the Calhoun County Jail in Battle Creek, Dr. Jackson was unable to discuss "relevant, important matters" with Mr. Gabrion because Mr. Gabrion was too agitated. Dr. Jackson did not think Mr. Gabrion was malingering during this visit. No psychological testing occurred.

Dr. Jackson attempted to gather some additional social history regarding Mr. Gabrion. He obtained evidence of substance abuse, domestic violence, periods of parental absence and automobile accidents. He testified that, these things, "if they occurred, would reduce a person's capacity to respond appropriately and in a socialized way."

Counsel asked Dr. Jackson if he was able to reach any "clinical conclusions" based on his review of records and discussions with Mr. Gabrion. Dr. Jackson identified a number of disorders, including alcohol abuse, substance abuse, and personality dysfunction. He testified, "He has features of a number of types of personality disorders including some borderline features where there is an intense conflict over interpersonal relationships and also his own identity." Dr. Jackson identified "antisocial features" and "a lack of empathy for others." He testified that Mr. Gabrion was a "disordered individual" who had a "disordered pattern of thinking."

Dr. Jackson testified that Mr. Gabrion misrepresented the truth, but that this trait did not "eliminate the possibility or the probability, even, of some underlying mental

84

problems."  He went on, "[h]e's not malingering the kinds of deficits that I've seen in terms of his history and his actual performance.  The Mr. Gabrion that I observed and tried to evaluate seems to me to have some genuine deficits that go far beyond anything he might embellish and malinger about."

Counsel then sought to establish that Mr. Gabrion suffered from mental illness that was separate from his acts of malingering.  Counsel asked, "[a]nd this would be one of those occasions; is that correct?  Dr. Jackson replied, *"No, I think that probably in this case, as far as I'm concerned, I don't view Mr. Gabrion as mentally ill."* Rather, Jackson saw "psychological deficits" and "malingering."

During cross-examination, Dr. Jackson repeated that he did not view Mr. Gabrion as mentally ill.  At some point, he said, "I can only say that Mr. Gabrion's behavior in many respects remains a mystery to me."  He also testified that he did not know what effect external factors had on Mr. Gabrion.

Dr. Jackson admitted that he wrote, regarding Mr. Gabrion, "[h]e has exhibited behaviors which can appear to be genuine symptoms of a disorder of both thought and mood, yet it is possible that his manifestations of impaired judgment and lack of insight may be deliberate, deliberately malingered so that he can remain the stage director who compels others to act in response to roles he adopts."

Dr. Jackson received little in the way of social history.  He would have used such information in order to properly evaluate Mr. Gabrion.  He did not receive a multi-generational history.  Again, he would have put such information to good use.

The defense decision to call Dr. Jackson as a witness defies all reasonable and appropriate professional judgment.  Dr. Jackson was obviously not prepared to testify

that Mr. Gabrion was mentally ill.  He was thwarted in reaching meaningful conclusions. Yet he was called as a witness and his testimony was devastating to Mr. Gabrion.

Moreover, counsel presented fleeting evidence about Mr. Gabrion's substance abuse history but failed to utilize an expert to explain how abuse of alcohol and drugs can be a form of self-medication as a response to the sort of upbringing endured by Mr. Gabrion.  An expert could have educated the jury about how vulnerability to abuse of intoxicants increases when there is a family history of such abuse.  An expert in this area could have educated the jury about the connection between brain damage and drug abuse, particularly the sort of glue sniffing Mr. Gabrion favored.

Other failures of counsel include the failure to present expert testimony concerning family dynamics and the difficulties encountered by children raised in environments similar to Mr. Gabrion's, failure to consult with an expert in assessing malingering though it was apparent early on in this litigation that malingering would be the government's primary attack on defense mental health evidence, failure to present expert testimony concerning drug and alcohol dependence and its connection with mental illness, and experts who could testify concerning Mr. Gabrion's mental illness and brain damage in an effective manner.

Expert testimony was necessary in each of these areas to help the jury understand the impact of Mr. Gabrion's life experiences, including early life experiences, on his current functioning.  The failure to present such evidence in a case like this which presented so much underlying data rendered the result unreliable.

E.    <u>Trial counsel was ineffective in admitting during their opening statement at the penalty phase that the Mr. Gabrion was guilty of a specific non-statutory aggravating factor (No. 4) by murdering Rachel Timmerman in order to obstruct justice because she had accused him of criminal sexual conduct.</u>

The government's primary theory of the case was that Mr. Gabrion killed Rachel Timmerman in order to prevent her from testifying at the CSC trial.  Mr. Gabrion has previously described a number of facts that refute that theory, including false testimony by Chrystal Roach.  Mr. Gabrion adopts here by reference all factual allegations contained elsewhere in this Motion.  Trial counsel failed to investigate and present crucial facts relating to the allegation of obstruction of justice.  In this claim, Mr. Gabrion contends that counsel was ineffective in admitting in their opening statement that "obstruction of justice" had been proven to the jury.  Nothing could be more inaccurate. The admission underscores the fact that counsel did not investigate the facts and circumstances surrounding the state court case and the government's alleged reason for the murder.  Counsel did not gather enough facts to even understand that the factor should be contested.

A review of the opening statement at the penalty phase raises concern about precisely what counsel sought to offer to the jury.  By admitting obstruction, counsel accepted the most damaging evidence and theory against Mr. Gabrion as true when in fact the evidence supporting the theory was largely false.  The prejudice to Mr. Gabrion is clear: if the jury disagreed with the claim of obstruction, it is likely that at least one juror would have opposed the imposition of the death penalty.  Counsel made the path to a death verdict easy by admitting the false evidence of obstruction.  This action only

exacerbated the deficient performance in failing to investigate the false testimony offered by Chrystal Roach and relied upon by the government.

F.    Trial counsel failed to secure adequate funding to prepare for the penalty phase of the trial.

Mr. Gabrion has argued in Ground 3 of this Motion that trial counsel was ineffective in failing to secure funding that would have allowed him to prepare the type of defense which is appropriate and expected in a capital murder case.  The same failing occurred at the penalty phase.  Counsel failed to prepare a constitutionally adequate social history, multi-generational family history and personal history.  It is unclear why these things were not done.  What is clear, for the purpose of this argument, is that counsel failed to secure funding to do the investigative work or present the expert testimony necessary to present a constitutionally adequate defense.

The actions and inactions of trial counsel denied Mr. Gabrion a fair trial under conditions required or routinely provided to similarly situated defendants pursuant to 18 U.S.C. §§ 3005, 3006A, and 3599, the Judicial Conference's Guidelines for implementation of the Criminal Justice Act, prevailing professional norms of criminal defense practice, and the Fifth, Sixth and Eighth Amendments to the United States Constitution.

G.    Trial counsel was ineffective in failing to object to the introduction of irrelevant, unreliable and prejudicial evidence at the sentencing hearing. Appellate counsel was ineffective in failing to identify for the Court of Appeals the evidence that was not relevant to future dangerousness in a BOP facility, thereby preventing the Court from deciding the underlying issue.

Defense counsel's conduct fell below the prevailing professional norms of reasonably competent counsel in failing to object to specific "bad acts" evidence that

was not relevant to any aggravator, was not reliable and was unfairly prejudicial to Mr. Gabrion. Throughout the sentencing hearing, the government introduced, without objection, evidence showing that Mr. Gabrion was violent and generally an obnoxious person. The bad acts involved were generally described through speculation and hearsay. They were unadjudicated and were not subjected to any standard of proof before admission at sentencing. This is not surprising in light of the fact that trial counsel felt they had no right to stop the government from presenting evidence at sentencing, regardless of how irrelevant, unreliable or prejudicial. Professional norms required counsel to evaluate each piece of evidence offered by the government in order to prepare and offer appropriate objections. This process did not occur.

Mr. Gabrion was prejudiced at the sentencing hearing in violation of the 5th, 6th and 8th Amendments. He was denied due process and the effective assistance of counsel. His death sentence is based on unreliable evidence and information in violation of the 8th Amendment. The problem was compounded when appellate counsel failed to identify the evidence that was not relevant to the question of future dangerousness in the BOP, causing the Court of Appeals to find that it could not evaluate the claim.

Prior to trial, the defense moved to limit evidence relating to future dangerousness to conduct that might occur in a BOP setting. Since the only sentencing options were death and life without the possibility of release. The motion was denied. This was the last time that counsel sought to prevent the admission of irrelevant, unreliable and unduly inflammatory evidence. The motion lacked any connection to the anticipated evidence at sentencing. This would prove to be a problem on appeal.

89

Defense counsel operated under a fundamental misunderstanding regarding what evidence would be admissible at Mr. Gabrion's sentencing hearing. Admissible evidence was evidence that was relevant to one of the properly noticed aggravators, was constitutionally obtained, was reliable and was not unduly prejudicial. The government used the future dangerousness non-statutory aggravator to introduce evidence that was not relevant. In addition, much of the evidence was not evaluated for reliability. Much of the evidence was unduly prejudicial. Some if it was obtained in violation of the Constitution.

The government introduced evidence implying that Mr. Gabrion killed Robert Allen, Wayne Davis and John Weeks. These claims were not included in any government notice. The allegations were not subjected to any pre-trial reliability analysis by the court. Counsel did not seek a hearing, did not argue relevance or reliability, and did not specifically argue how these allegations did not advance the government's position that Mr. Gabrion would be a danger in prison. The fact that these men disappeared and had some alleged connection to Mr. Gabrion was irrelevant to the question of future dangerousness in prison. Trial counsel was ineffective in failing to object based on relevancy and in failing to insist on a showing of reliability. Appellate counsel was ineffective when they raised the issue but failed to specifically identify which evidence was irrelevant to future dangerousness in the BOP.

In fact, counsel rarely even asked questions of witnesses produced to prove that Mr. Gabrion was responsible for the disappearance of these men. Rather, counsel seemed to want the testimony over as quickly as possible. The government would have no part of that strategy. The government argued repeatedly that Mr. Gabrion killed

90

these three men, and that the killings were relevant to show future dangerousness. This "evidence" supporting these alleged killings was so speculative, the government did not produce evidence that their bodies had been recovered, or when or how they were allegedly killed.

At sentencing, the government took full advantage of its uncontested ability to argue about any factor it wished, despite questions of relevance, reliability and prejudice. At Volume V of the sentencing hearing the government argued:

"There's not any chance he would have let Shannon VerHage live." (p.610). "Robert Allen is dead. The defendant killed him." (p.620). Regarding John Weeks: "He's disappeared. The defendant killed him to make sure there was no link to his rape charge." (p. 621). Regarding Wayne Davis: "The defendant wasn't satisfied just to kill Wayne Davis. He went back and pawned Wayne Davis's property." (p.621). Finally, regarding Shannon VerHage again: "His murder of Shannon VerHage, an innocent child, shows that he is not worthy of your mercy and shouldn't expect it." (p. 623).

Reasonably competent counsel would have objected to each piece of this inherently unreliable and irrelevant evidence. When that did not happen, the jury was allowed to use the claims to establish a general "feeling" that Mr. Gabrion deserved to die simply because all of the bad act evidence, considered together, showed that he did not deserve to live. The problem is that the Constitution and the FDPA require more. They require that aggravating evidence actually relate to one of the gateway or aggravating factors noticed in the case. Here, the government mentioned "future dangerousness" and the sentencing hearing became a free for all designed to show that

Mr. Gabrion was an unsavory person.  Counsel did not fulfill their duty to stop this or make a record of efforts to do so.

The uncontrolled "bad acts" evidence went well beyond the speculation that Mr. Gabrion killed Allen, Davis and Weeks.  The government offered evidence showing that Mr. Gabrion committed arsons or attempted arsons.  This evidence consisted of pure speculation and hearsay by witnesses such as Wilma Babcock. She said that, after a disagreement with Mr. Gabrion "that weekend, my house was on fire and it was arson." [TR 3/11/02, 72].  This evidence and other similar evidence was not relevant to the question of whether Mr. Gabrion would be a danger in prison.  It was not reliable.  There was no forensic evidence offered to show the fire was indeed arson.  Other than Ms. Babcock's speculative beliefs, there was no evidence presented to show Mr. Gabrion was responsible.  Mr. Gabrion was never charged with arson.  The government did not demonstrate in any way why he would be a danger in prison.  Yet counsel did not object and did not even insist on a showing of reliability before the evidence was admitted.

Counsel offered no objection to any of this testimony despite the fact that the alleged arson attempt was not established by any evidentiary standard and any potential relevance was outweighed by prejudice.  The only person on the defense side of the room who seemed bothered by the irrelevant speculation was Mr. Gabrion.  He asked his attorney why he allowed the testimony.  There was no reply.  At that point, Mr. Gabrion punched one of his attorneys, David Stebbins, in the face.  The jury was excused and Mr. Gabrion was removed to the lockup area of the courthouse, where he remained while the jury heard from 25 more aggravation witnesses.

92

Again, Mr. Gabrion was prejudiced when appellate counsel failed to identify this evidence as being inappropriate at sentencing.

From that point forward, the adversarial aspect in the sentencing hearing evaporated. Pamela Jo Bacon gave hearsay and speculative testimony that Mr. Gabrion attempted to burn down her house after a dispute. [TR 3/11/02, 95-96]. Mr. Gabrion was never prosecuted for that fire. Again, counsel did not object to her testimony and did not ask for a hearing to establish reliability in any form. There was no evidence linking Mr. Gabrion to either the Babcock or Bacon fires, yet the evidence was admitted.

Dennis Bacon testified that Mr. Gabrion entering his home drunk and uninvited after being asked to leave. He returned the next day to apologize for his behavior. [TR 3/11/02, 103]. Then later that afternoon, while Bacon was mowing his son's yard, a drunken Gabrion pulled him off the lawnmower. [TR 3/11/02, 101, 104-105]. Counsel did not object to this testimony, which was irrelevant to any aggravator. Appellate counsel did not specify that this evidence was irrelevant and unreliable.

Diane Goller testified that Mr. Gabrion was in her home drinking and grabbed her breast and crotch. Mr. Gabrion refused to leave until her husband pointed a gun at him. [TR 3/11/02, 103, 108-109, 112-113]. Mr. Gabrion was never charged with a crime for these alleged acts. The testimony was introduced without objection. Appellate counsel failed to identify the evidence in connection with Mr. Gabrion's argument.

Kori McGraw, Gabrion's sister-in-law's niece, testified about Mr. Gabrion's attempt to get in bed with her. When asked to leave, he did. The next morning, Gabrion was gone and so was her dog. McGraw also testified about Mr. Gabrion's

threat that "he could do something to [her] and put [her] somewhere where nobody could ever find [her]." She also testified she felt she was being followed by someone in a "little red beat-up...Escort." [TR 3/11/02, 116-123]. Gabrion was never charged. No objection was made. Appellate counsel did not connect this irrelevant evidence to its future dangerousness claim.

Greg Leon, who operated a homeless shelter, testified that in 1995, Gabrion rented a room. Gabrion told him he had surveillance equipment he had ripped off from drug dealers. Leon caught Gabrion "tapping" into the facility's telephone line. Gabrion later installed a telephone line in someone else's name. Leon also related observing Gabrion watching a young woman through the windows of a laundromat. [TR 3/11/02, 124-130]. No objection was made. It is impossible to discern what this evidence tends to show other than that Mr. Gabrion is a bad man. Trial counsel failed to object to the evidence and appellate counsel failed to link it to the future dangerousness in prison argument. Mr. Gabrion would incorporate his earlier factual assertions regarding the lack of factual basis for Leon's testimony.

Several witnesses testified that Mr. Gabrion had been inappropriate to them. Some testified that he was sexually inappropriate. None of the witnesses offered evidence that was relevant to one of the aggravators in this case, but counsel did not object. Counsel did not request an evidentiary hearing before any of the evidence was introduced in order to determine some level of reliability. [TR 3/11/02, 134-145]. Mr. Gabrion was never prosecuted for any of the acts described in the testimony. Again, the lack of objection and specificity on appeal prejudiced Mr. Gabrion.

Jason Cross, who served time with Gabrion at FCI Milan, testified that Gabrion allegedly threatened to kill his wife and family if he testified in the Gary Karr trial (an unrelated case). [TR 3/11/02, 150-158]. Another inmate at FCI Milan, Martin Love, testified that Gabrion allegedly made remarks about Cross running his mouth too much and that he needed to keep his mouth shut or something could happen to his wife. [TR 3/11/02, 197-198]. Despite significant issues of credibility, defense counsel did not challenge the reliability or admissibility of this evidence before it was offered.

Mr. Gabrion's neighbor, John Terwilliger, testified about drinking with Gabrion after pouring some concrete in 1991, and how Gabrion kept aggravating him by putting his hands in the newly poured concrete. On another occasion, Gabrion threatened Terwilliger and his friends. "You're fucking dead. Every one of you are fucking dead." Later that evening, shots were fired over Terwilliger's house. [TR 3/11/02, 176-182]. The government described this conduct as Mr. Gabrion "making a nuisance of himself at a party" [TR 613]. The evidence was admitted without objection and was not specified on appeal.

Lawrence Campbell testified that Gabrion allegedly asked Campbell and a friend to beat someone up for him. [TR, 3/11/02, 192-193]. Lonnie Overton testified that Gabrion bought two guns he had stolen. Gabrion also sold and used marijuana while Overton was around him. He offered Overton advice about how to cover his tracks and not get caught. [TR 3/11/02, 197-198 200-207]. Dennis Lilly testified about an occasion when Gabrion threw Lilly's dog against the wall, grabbed and choked Lilly and told him that he could kill him if wanted to. [TR 3/11/02, 210-215]. Again, the evidence was irrelevant and was not linked to the future dangerousness issue on appeal.

The Cass family testified about general concerns regarding Mr. Gabrion. He made them feel "uneasy." When law enforcement officials responded to the Cass' complaint of shots being fired from Gabrion's residence, upon apprehending Gabrion and entering his home, they were shocked to see a large bullfrog lying on its back on a mattress, 12 inches away from a 14 inch doll wearing only little girl panties. Both the frog and the doll were spread eagled and had what appeared to be dried bodily fluids on them. [TR 3/12/02, 270-285]. The testimony that alleged substance was "bodily fluid" was not offered by a forensic scientist following testing. It was merely the conclusion of a beat cop. Mr. Gabrion has raised an issue regarding the search of his residence and the discovery of this evidence. However, all of the "bullfrog" related evidence was irrelevant and prejudicial. It was admitted without objection. The evidence had nothing to do with future dangerousness in prison. It was not specified on appeal.

The government was not satisfied with the impact of its evidence about the bullfrog. During the testimony of Dr. Saathoff, the government elicited highly prejudicial testimony about a frog. On rebuttal testimony, Saathoff reported that Gabrion mentioned frogs during his examination. Those references were clearly beyond the scope of any defense testimony. The reference to frogs was simply to permit the inference Gabrion was perverse and should be despised. [TR 3/15/02, 38, 39-40]. No attempt is ever made to link this evidence to one of the charged aggravators. The import of the testimony was simply to inflame and unduly prejudice the jury against Mr. Gabrion.

Joseph Lunsford, testified that while he was in the Newaygo County Jail with Gabrion, he saw Gabrion masturbating to a picture of Shannon VerHage. [TR 3/12/02,

313-319]. Again, there was no objection. The evidence was irrelevant to any proper sentencing issue and was not specified on appeal in the future dangerousness argument.

In its closing argument, the government recounted each bit of improper evidence for the jury. This happened without objection.

Professional norms required defense counsel to protect against the imposition of a death sentence based on improper evidence. Here, the most serious non-noticed evidence consisted of the alleged homicides of Allen, Davis and Weeks. The most absurdly irrelevant and generally prejudicial evidence probably consisted of the "bullfrog" and plastic doll incident. Counsel fulfilled no function on behalf of Mr. Gabrion in failing to demand a showing of relevance and reliability regarding this evidence or any of the other irrelevant evidence. The evidence was not relevant to future dangerousness in the BOP. The failure to challenge reliability showed deficient performance in light of cases such as Gardner v. Florida, 430 U.S. 349, 360 (1977) Other evidence, such as the alleged arsons, were unsupported by any appropriate evidence. The claims of sexual misconduct do not meet the standard of heightened reliability required in capital cases. Lockett v. Ohio, 438 U.S. 586, 604 (1978); Gregg v. Georgia, 428 U.S. 153, 187 (1976); Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

The government also offered inadmissible, unreliable evidence without objection concerning the heinous, cruel, or depraved aggravator. Dr. Steven Cohle returned to the witness stand in the penalty phase for this purpose. He was permitted to testify, without objection, to his beliefs that Ms. Timmerman would have struggled in an attempt

97

to extricate herself from being bound (there was no forensic evidence supporting this opinion), that Ms. Timmerman would have felt the rocking of the boat and known where she was, and that she would have felt helpless and desperate.  He testified that after she was placed in the water she would eventually come to the conclusion that her situation was utterly hopeless.  These are not medical opinions.  They are prejudicial and inflammatory.  Reasonably competent counsel would have objected to this testimony.

Mr. Gabrion was denied effective assistance of counsel and a fair sentencing hearing when this evidence was admitted without objection.  He was denied a fair appeal, and effective assistance at that stage of this capital proceeding, when the objectionable evidence was not specified on appeal.

H.    Trial counsel was ineffective in failing to move to suppress evidence used at the penalty phase that was seized in violation of Mr. Gabrion's 4th Amendment rights.

Charles Cass testified that in 1996 and 1997 he lived just east of the Altona general store along with his wife, Jennifer, and his son and daughter.  Mr. Gabrion moved into the store.

One evening, Cass was inside the house hanging drywall with a friend and his wife when he heard a gunshot.  He saw a muzzle flash from the Altona store.  He heard three shots in all.  When he heard the third, he saw a deputy in the yard.  Mr. Gabrion was arrested.

On August 26th, Ms. Cass heard shots fired and saw the police.  She took the children inside the house and saw the police arrive.

Lance Workman testified that he was a Mecosta County Sheriff's Deputy in August of 1996. He responded with his partner to a call from the Cass house. Mr. Cass said that a man who was upset left in a black Nissan pickup truck.

Workman later heard that the man was at his address and drove there. He called for a backup unit. He was advised that the man had a firearm and was discharging it. Workman saw a black Nissan pickup at the store and heard music "blaring out."

The lights and music went off and Workman heard the discharge of a shotgun from the second floor of the store. Deputy Chamberlain saw a man leave the store and he carried a flashlight. Deputies ordered the man to put his hands up and he complied. That man was Marvin Gabrion.

Deputies said they were going to go to the upstairs bedroom and asked Mr. Gabrion to accompany them. He refused. Nevertheless, deputies entered Mr. Gabrion's residence to retrieve the firearm. According to Workman, once inside, they went up the stairs and saw a mattress on the floor: "at the bottom of the mattress was a sheet, and at the top end of the mattress where the head would be, there was a bullfrog laying on its back spread-eagled."

Workman testified that, about 12 inches from the bullfrog, he saw a small doll dressed in a small child's "girl-style panties." He said, "it was laying on its back, arms and legs open." Workman said that both the frog and doll appeared to have "dried and nondried bodily fluids around them."

Defense counsel's conduct fell below the prevailing professional norms of reasonably competent counsel when they failed to challenge the warrantless search of

99

the Altona residence and the seizure and use of this evidence. When law enforcement entered the house, Mr. Gabrion had already been arrested outside the house. There was no reason to believe that anyone else was in the house. Exigent circumstances did not exist requiring an immediate search. The property could have been secured and a warrant could have been requested without prejudice to the investigation and without creating a safety risk. The search occurred in violation of Mr. Gabrion's 4th Amendment rights. The failure to challenge the search violated Mr. Gabrion's 6th Amendment right to effective assistance of counsel. Kimmelman v. Morrison, 477 U.S. 365 (1986). Though the rules of evidence do not apply to a capital sentencing proceeding, the Constitution has not been suspended.

Counsel also failed to object and move for a mistrial when the evidence of the bullfrog was admitted in this capital penalty phase for the reason that counsel had no idea such evidence was to be proffered and they were unprepared to confront it. Moreover, it bore absolutely no relevance to any fact in issue in this sentencing hearing.

The police report concerning this incident made no reference to the bullfrog. (Ex. 4.17). Reasonably competent counsel would have confronted the officer with the fact that this fact was important enough to make its way into a death penalty sentencing proceeding but not important enough to be included in a police report created contemporaneously with the incident for the purpose of documenting the incident. Moreover, the police officer was permitted, without objection, to testify that the bullfrog contained bodily fluids. There was no testimony suggesting the officer was qualified to make this determination or that the fluid had been subjected to scientific testing.

100

The prejudicial impact of this evidence vastly exceeded its probative value. Indeed, there was no probative value because it was not material to any fact in issue. The Constitution required counsel to do more than stand idly by while this damning unconstitutionally obtained and irrelevant evidence was offered in this capital sentencing phase.

I.      <u>Trial counsel's conduct fell below the prevailing professional norms of reasonably competent counsel in failing to investigate, prepare, and present admissible evidence that would have countered the government's evidence of future dangerousness.</u>

The jury in this case should have known how the BOP could control Mr. Gabrion if he proved to be a disciplinary problem or threat in prison. Yet, defense counsel failed to secure witnesses and evidence that would have shown precisely how Mr. Gabrion could be handled in prison. Counsel could have proceeded in a variety of ways in doing this. There were a variety of means to accomplish this goal and no one single method was constitutionally required. But clearly when future dangerousness was to occupy center stage in the government's presentation for death, reasonably competent counsel would have selected on these means to ensure the jury received accurate information concerning management of offenders.

The defense could have retained experts such as former BOP staff who could describe the use of disciplinary procedures and communication limitations within the BOP. This would have eliminated any allegation that a defense witness was merely reading a BOP regulation. They could have contacted current BOP employees and, if necessary, secured their attendance by subpoena. Such witnesses would have described the procedures available to the BOP and the procedures that had been implemented. A clear picture was available showing that Mr. Gabrion would not be a

threat to staff or inmates in prison, and what would be done to eliminate any potential threat. Counsel did not secure any such witnesses or evidence though such testimony was widely available and used in capital cases around the time of Mr. Gabrion's trial.

Mr. Gabrion was prejudiced by counsel's failure in this regard. If the jury was convinced that there was a reasonable probability Mr. Gabrion could not harm staff or inmates, and could not write or call persons outside the prison, a different sentencing result was likely.

J.     Trial counsel's conduct dealing with the aftermath of Mr. Gabrion's assault on trial counsel fell below the prevailing professional norms of reasonably competent counsel and prejudiced Mr. Gabrion.

Trial counsel essentially abandoned Mr. Gabrion after he punched Mr. Stebbins during the government's presentation of aggravation evidence. Counsels' conduct following this episode and in response to it fell below the prevailing professional norms of reasonably competent counsel. Mr. Gabrion assaulted counsel Stebbins during the penalty phase testimony of government witness Wilma Babcock, who gave speculative and unreliable testimony about a fire the government claimed was an arson or attempted arson. The court noted Mr. Gabrion's conduct was preceded by him telling his lawyer that this witness was telling lies [Sentencing V1 TR 83], and exhorting counsel to do something.

Following this event and the uproar that followed as Mr. Gabrion was subdued, the jury was rushed from the courtroom and all present tried to consider what happened, the court placed counsel in an untenable position by directing them to determine what was in their (counsel's) best interests. This occurred over a lunch

break; counsel did not request the rest of the day to regroup or think about the situation, but rather processed the events over a single break.

When counsel returned after this break, they requested a number of things including a mistrial, leave to withdraw as counsel, and a competency examination. Counsel noted:

> I think the Court has seen even prior to the events immediately before lunchtime that Mr. Gabrion was, at best, agitated all morning. As far as I know he is still on the medication that was prescribed to him earlier. He seems to have deteriorated significantly from last week when I was — when he was in court and when I met with him. I think there are some serious questions about his competency. [Sentencing V1 TR 78].

Mr. Gabrion was not present for these requests. All of the requests were denied. Counsel did not ask for a continuance though it appears a brief respite would have permitted Mr. Gabrion to decompress and be present without further incident during his capital penalty phase. A continuance would also have allowed counsel to consider how to deal with the situation in a thorough and careful manner. The ultimate result was that some 25 penalty phase witnesses testified outside Mr. Gabrion's presence. And although the competency examination was denied, a brief delay would have allowed time for counsel to have Mr. Gabrion consult with a mental health professional. At a minimum, such consultation would have been useful to assist Mr. Gabrion in dealing with the stressors that contributed to his outburst. But with or without mental health intervention, a brief recess would have sufficed to allow Mr. Gabrion to return without incident and be present for the testimony of some 25 witnesses. We know that because that is ultimately what happened.

Without bringing Mr. Gabrion back outside the jury's presence, to inquire as to whether he could and would comport himself with the rules of courtroom etiquette, the court determined he would be absent the remainder of the day and invited back the following morning. Without telling the jury anything about Mr. Gabrion's absence, the proceedings continued. Ms. Babcock's testimony was completed and the government called an additional 18 witnesses that day in Mr. Gabrion's absence. A closed circuit television was set up so Mr. Gabrion could watch the proceedings and a phone line were established so he could talk to his counsel. This was a constitutionally inadequate substitute for Mr. Gabrion's presence.

The following day, defense counsel made the decision for Mr. Gabrion that he was too agitated to return to court. Again there was no request for a continuance. The court said it would bring him down later that day to talk with him about conforming to decorum. Counsel informed the court that Mr. Gabrion desired to be present.

The government asked that Mr. Gabrion be questioned immediately given his stated desire to be present [Sentencing V2 TR 236-37]. According to the government, the trial was moving so much more quickly than they anticipated that there was a possibility they could conclude the case that day [Sentencing V2 TR 237]. The court opined that those who have worked with Mr. Gabrion for many months were better positioned than the court to assess the validity of his presence in the courtroom and denied the government's motion [Sentencing V2 TR 239].

Reasonably competent counsel would have insisted on a hearing before the court decided to move forward with a capital sentencing hearing in the absence of a defendant who desired to be present. Counsel failed to request a hearing concerning

104

the restraints the court indicated would be utilized (and ultimately were utilized) when Mr. Gabrion returned. Instead, counsel agreed such restraints were a reasonable response to Mr. Gabrion's conduct.

Six additional witnesses were called in Mr. Gabrion's absence. The jury was told nothing regarding Mr. Gabrion's whereabouts. Later that morning Mr. Gabrion was returned to court and assured the court, outside the jury's presence, that he would conduct himself politely. In all, Mr. Gabrion was absent for the testimony of 25 witnesses. The court noted these witnesses offered the sorts of testimony for which it would be beneficial to have the input of the client. All of these witnesses were fact witnesses who testified to alleged events in Mr. Gabrion's life for which he may have been able to provide context or evidence of the untruthfulness of the witnesses' allegations.

At the very least, a continuance of sufficient length to allow everyone involved in this situation to consider and act upon all options was necessary. The most crucial aspects of what was to happen were getting Mr. Gabrion to act appropriately in court and allowing him to be present when the next 25 witnesses testified against him with his life in the balance. Instead of focusing on these crucial aspects of the sentencing process and requesting additional time, counsel allowed the sentencing hearing to proceed without Mr. Gabrion in the courtroom, and without even requesting that he be brought into the courtroom outside the jury's presence while decisions were made about him. There was no reason to rush the proceedings at this point but that is exactly what happened, and counsel did not try to slow things down with a request for a brief

105

continuance. Reasonably competent counsel would have done so. The result is that the outcome of the sentencing hearing is unreliable.

K. **Mr. Gabrion was denied effective assistance of counsel when trial counsel failed to present evidence to counter the government's future dangerousness argument with positive evaluations of him conducted in a variety of settings.**

Despite the government's attacks on Mr. Gabrion as a danger in the future, objective evidence existed to the contrary. For example, Mr. Gabrion was evaluated in Milan on a number of occasions for traits like future dangerousness. On four occasions, his potential for harm to others was judged to be "LOW." Ex. 4.18. On one occasion his potential for harm to others was judged to be "MODERATE." Ex.4.18. None of these records were submitted to the jury.

Mr. Gabrion was evaluated and found to be provisionally eligible for the Residential Drug Abuse Treatment Program. Ex. 4.18.

Mr. Gabrion had a satisfactory BOP Work report. Ex. 4.18.

The defense presented none of these positive reports. The reports would have been very important to the sentencing jury because they occurred in the precise setting to which Mr. Gabrion would be going if not sentenced to death, and they would have directly contradicted the strenuous government argument that Mr. Gabrion was extremely dangerous and unruly in any setting.

Competent counsel would have produced these records and argued just as strenuously that objective evidence existed showing that Mr. Gabrion could adjust to life in the BOP. When this did not occur, his 5th, 6th and 8th Amendment rights were violated by the conduct of his counsel.

L.   <u>Trial counsel was ineffective in failing to present evidence indicating that Mr. Gabrion required a payee for his SSI benefits.  This prejudiced Mr. Gabrion because it would have demonstrated further and independently his psychological deficits.</u>

Mr. Gabrion received SSI benefits beginning in 1993.  Prior to trial, defense counsel learned that Mr. Gabrion was required to have a payee for his benefits.  His first payees were Ann Waterway and Vicky Bykirk.  Later, his mother, Elaine, became his payee.  This issue was never investigated.  It certainly could have resulted in information that was positive to Mr. Gabrion. (Ex. 4.19).

M.   <u>Trial counsel was ineffective in failing to fully investigate and present to their experts independent evidence showing that Mr. Gabrion had several significant head injuries that were unaccounted for in Mr. Gabrion's psychological evaluation.  This failing greatly prejudiced Mr. Gabrion because this was the precise type of information that both experts and jurors needed to hear in order to properly evaluate Mr. Gabrion.</u>

Mr. Gabrion had many significant head injuries. (Ex. 4.20).  But the experts in this case and the jury heard about only a portion of them.  Evidence from several independent sources showed that Mr. Gabrion sustained additional injuries.  For example, Keith McHenry told investigators that he hit Mr. Gabrion hard with a "ball bat."  Bill House reported to the media in 1997, that he hit Mr. Gabrion in the head with a wrench.  Counsel did not fully investigate what Larry Graham knew about the 1993 accident in which Mr. Gabrion sustained a head injury.  In a 1985 accident, Mr. Gabrion sustained injuries that were independently documented and he reported blackouts the same year.

N.    Trial counsel was ineffective in failing to protect Mr. Gabrion's right to be present at crucial stages of the proceedings when counsel did not insist that Mr. Gabrion be involved in discussions with the Court and when counsel failed to pursue Mr. Gabrion's wish to be present during the testimony of some 25 witnesses in aggravation.

The Constitution grants to a criminal defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." Snyder v. Massachusetts, 291 U.S. 97, 106-08 (1934); United States v. Brown, 571 F.2d 980, 986-987 (6th Cir. 1978) (quoting Faretta). In addition, Fed. R. Crim. P. 43(a), mandates that "[t]he defendant shall be present ... at every stage of the trial including the impaneling of the jury and the return of the verdict." Although this Rule stems from the Constitution, it includes common-law rights and is broader than the protection provided in the Fifth and Sixth Amendments. United States v. Gibbs, 182 F.3d 408, 436-37 (6th Cir. 1999) (en banc); United States v. Brown, 571 F.2d at 986. Mr. Gabrion was removed from the courtroom for the testimony of some 25 witnesses in aggravation against his wishes, and without a chance to be present while the court made the decision to exclude him. He was not allowed to be present and observe the process leading to his exclusion. He was not allowed to interact with the Court so that the Court could make sure that Mr. Gabrion understood his rights and the consequences of any inappropriate conduct.

Mr. Gabrion's exclusion was the culmination of multiple occasions during the sentencing hearing, when the court and defense counsel met in closed sessions without Mr. Gabrion present. They met essentially to collectively figure out how to "manage" Mr. Gabrion.

The Constitutional violation here starts with the fact that Mr. Gabrion wished to be present during the presentation of evidence at sentencing and was excluded from the courtroom during crucial testimony.  If such an exclusion was to occur, it should have followed a hearing.  At that hearing, all of the parties could have advocated their positions regarding Mr. Gabrion's presence.  Reasonably competent counsel would have advanced his client's wishes.  The Court could have addressed Mr. Gabrion regarding the circumstances under which he would have been allowed back into the courtroom.  Yet none of these things happened.  Instead, discussions occurred outside the presence of Mr. Gabrion that led to his exclusion from the courtroom.  This exclusion violated Mr. Gabrion's 5th, 6th and 8th Amendment rights.  Mr. Gabrion wanted to be present and could have assisted his attorneys as witnesses who knew Mr. Gabrion said negative things about him.  His attorneys needed Mr. Gabrion's assistance.  They had little cross-examination and did almost nothing to undermine the testimony, no matter how speculative or irrelevant.

Reasonably competent counsel ensures that his client is present for all proceedings, particularly in a capital trial.  That did not happen here.  If counsel felt at any stage of this proceeding that they could not advocate for Mr. Gabrion in the manner proscribed by the Constitution, they should have sought the appointment of conflict free counsel.

O. **Trial counsel was ineffective in failing to correct the government's theory that Mr. Gabrion established a section 501(c)(3) entity when defense counsel was instrumental in the process.**

Mr. Gabrion testified at the sentencing hearing. During cross-examination, the government repeatedly emphasized that Mr. Gabrion successfully established a Section 501(c)(3) charitable organization. The government did so in part to show that a level of sophistication in Mr. Gabrion's thinking and knowledge. Mr. Gabrion repeatedly told the government that the relevant documents were filed by his attorney, David Stebbins. Mr. Gabrion was correct. However, counsel did nothing to support Mr. Gabrion's claim or refute the government's contrary position. The result was that the jury likely believed that Mr. Gabrion had the ability to create a 501(c)(3) organization. Such a belief was very helpful to the government's position at trial and harmful to Mr. Gabrion.

Reasonably competent counsel takes all necessary steps to make sure the jury does not hear false testimony that is harmful to the client. Inexplicably, counsel did nothing to make sure the jury knew that counsel in fact was the person who took all the steps necessary to create the 501(c)(3) entity. This would have proven to be very helpful to Mr. Gabrion. When counsel made the decision to assist Mr. Gabrion in establishing the non-profit, he took on the responsibility of making sure nothing about his actions would harm his client. Counsel abandoned Mr. Gabrion when the government used counsel's actions directly against his client.

Counsel's failure to correct any misconception about the non-profit prejudiced Mr. Gabrion. The government's theory at sentencing was that Mr. Gabrion was shrewd and manipulative, an evil genius. The ability to navigate all appropriate regulations in establishing a 501(c)(3) non-profit provided significant support to the government's

110

position.  If counsel had demonstrated that Mr. Gabrion was incapable of establishing

the non-profit, but rather required counsel to do it, the jury would have viewed Mr.

Gabrion differently and the sentencing result would probably have been different.

P.    <u>Trial counsel rendered ineffective assistance of counsel when they failed to cross-examine</u> ██████████, <u>a critical penalty phase witness for the government, regarding his psychological history and failed to investigate the question of whether</u> █████ <u>was to receive consideration for his testimony</u>.

██████████ was a ██████████, and ██████████ who was called as

a government witness.  In addition to testifying against Mr. Gabrion, he had also

cooperated with law enforcement in ██ other cases.  Though he received consideration

in those other ██ cases in terms of Rule 35 time cuts, he claimed to have received no

benefit for his testimony against Mr. Gabrion.  He claimed to have had a conversation

with Mr. Gabrion while the ████████████████████████████████.  During

that conversation, ██████ averred Mr. Gabrion told him ██████████ because

███████████████████

Counsel attacked ██████ on cross-examination primarily ██████████ he

had received in the other cases and concern that those time cuts were in danger if he

failed to deliver for the government in Mr. Gabrion's case.  The government contended

counsel had no good faith basis for the inquiry.

The government provided a mental health report on ██████ conducted by Dr.

Michael Abramsky in ██████'██████ case.  Counsel failed to cross exam ██

██████ with Dr. Abramsky's report.  The report reveals that ██████ suffered brain damage,

of "mild to moderate" severity, that caused him to be confused, and indulge in fantasies.

The report indicates that ██████ becomes rash and confused when he is desperate,

to the extent of committing ▮▮▮▮▮ of his own ▮▮▮▮▮ without a ▮▮▮. Counsel could have impeached with this evidence to show that when desperate, ▮▮ ▮▮ will say and do all manner of rash things (Ex. 4.21).

▮▮▮▮ testimony was damning because, if believed, it established Mr. Gabrion had ▮▮▮▮▮▮. The government relied upon his testimony in closing to establish that ▮▮▮▮▮ and Mr. Gabrion ▮▮▮. As importantly, ▮▮▮ testified that Mr. Gabrion referred to ▮▮▮▮ which provided the government with the ammunition to contend Mr. Gabrion not only ▮▮▮ but also that he was cold blooded and remorseless. Without cross examining about ▮▮ brain damage, the defense really did not have much to cause the jury to reject his testimony. He denied receiving any benefit for his testimony in this case. He had made no prior statements from which he could be cross examined. ▮▮▮ examination as described above would have given the jury a reason to reject Mr. ▮▮▮ testimony in total or at least that portion where he claimed Mr. Gabrion referred to ▮▮▮▮

Counsel also failed to investigate the question of whether ▮▮ received consideration for his testimony. The BOP apparently does not publish records regarding the date of release of ▮▮. The reason is unclear. However, based on the information available, the apparent date of ▮▮ discharge indicates, upon the best available information and belief, it appears very possible that ▮▮ received consideration for his testimony. Counsel's failure to investigate this issue fell below professional norms. If ▮▮ lied about any consideration for his testimony, then issues exist based on Brady, Napue, Giglio and the 5th, 6th and 8th Amendments.

112

Q.     <u>Trial counsel failed to conduct a thorough and proper investigation of the witnesses and themes presented by the government in penalty phase. These omissions by counsel included failures of basic investigation, failure to adequately cross examine witnesses, and failure to request discovery necessary to properly defend Mr. Gabrion's life.</u>

Trial counsel unreasonably failed to investigate the government's case in aggravation against Gabrion.  There were a multitude of failures including but not limited to a failure to investigate the witnesses and failure to cross examine the witnesses against Gabrion including but not limited to, Jason Cross, Shannon Cross, Greg Leon, Tim Timmerman and Ailene Wolf.

Gabrion would incorporate the facts of Ground One, Subsections A-E above as they related to the penalty phase and information that might have been readily available to counsel that counsel failed to make reasonable efforts to uncover.  Gabrion would also incorporate the facts of his claim based on <u>Brady v. Maryland</u> as it relates to the penalty phase and information that might have been readily available to counsel that counsel failed to make reasonable efforts to uncover.

Greg Leon testified against Gabrion at the penalty phase. Counsel failed to thoroughly investigate Leon and thus failed to properly cross-examine him.   Gabrion would incorporate the facts as to Leon as set forth above in Ground One, subsection E and in his claim based on <u>Brady v. Maryland</u>.  Leon had a pending rape case in Newaygo County (where Chrystal Roach was the then-prosecutor) which gave him in incentive to testify for the government and against Gabrion.  The details of Leon's testimony were false and could have been impeached after an investigation.

Tim Timmerman was Ms. Timmerman's father.  At the penalty phase he testified as to letters he received from Gabrion.  Several of these letters were admitted as

113

exhibits. At a press conference after the trial, jurors cited as a reason to give Gabrion the death penalty the need to protect the Timmerman family from Gabrion contacting them in letters. Counsel failed to investigate the circumstances of these letters and to cross-examine on this. Timmerman had turned over Gabrion's letters to the FBI. The FBI encouraged Timmerman to continue to correspond with Gabrion in order to entice Gabrion to continue to write back and perhaps provide information as to Shannon's whereabouts. Thus, the correspondence, at least in part, was encouraged and furthered by the government's own actions. This went unexplored.

Ailene Wolf testified that she was John Weeks's girlfriend. She testified that she saw John make a phone call in which he dialed 696, which is the exchange for Cedar Springs, and ask for a woman named "Rachel". When she got upset that he was calling another woman, he explained that he was doing it for Lance (Gabrion). Wolf testified before the grand jury and made absolutely no mention of this call. Counsel failed to investigate this matter and cross-examine Wolf as to this.

Joseph Lunsford provided very damaging testimony against Gabrion. See Ground Two above, incorporated herein. Lunsford testified to the grand jury that he had short term memory problems due to a cyst on the side of his brain. Counsel did not investigate Lunsford's competency as a witness and failed to cross-examine on this key point.

Jason and Shannon Cross testified at the penalty phase for the government. Jason testified as to things he heard Gabrion say while the two were incarcerated at the Milan Federal Correctional Facility, including that he killed Shannon VerHage because he did not know what to do with her. Shannon Cross testified as to a phone call that

114

Gabrion made to her that she considered to be threatening. Counsel failed to thoroughly investigate the background of Jason Cross and failed to cross-examine Jason and Shannon Cross. Gabrion would incorporate the facts as set forth above.

██████ had brain damage which was not presented to the jury. The report of ██████ mental health provider was disclosed in discovery. In that report is reference to a neuropsychologist report conducted by ████████████. It was ████ who actually diagnosed ██████ brain damage. His report was never requested in discovery. The raw data for his conclusions should have been requested. Inquiry should have been made regarding ████████████ evaluation. It appears he may have administered some psychometric testing. Reasonably competent counsel would have requested all medical reports concerning ██████████ along with the raw data associated with any psychological testing and then provided that information to an independent examiner to determine the extent of ██████████ disabilities and whether they impacted his ability or inclination to tell the truth.

Additionally, the government told the jury that Shannon VerHage was dead and that Gabrion had killed her. No body was ever recovered. There was evidence that Shannon was still alive that counsel failed to investigate and utilize. Velda Timmerman repeatedly told people that Shannon was alive and that she knew where she was. Chrystal Roach told the media that she had evidence that Shannon left the state alive. Tim Timmerman told the media that he believed Shannon was alive. A news article dated August 8, 1997, said "investigators have evidence the baby was alive after the mother was killed and quotes Det. Miller that "they believe people know the whereabouts of Shannon." This should have been investigated further and used, at a

115

minimum, to limit the government's argument that Shannon had been murdered by Gabrion.

That Shannon could have been sold was also a topic that recurs. Velda Timmerman told the media that Shannon had been sold on the black market; she herself told police that she had been charged with selling a baby in the 1970's. It was also a fact that Velda Timmerman had tried to convince Rachel Timmerman to get pregnant by various other men who would pay them for the baby. All of this would create some doubt as to the question of whether or not Shannon was dead as the government unequivocally told the jury.

R.   <u>Trial counsel failed to make objections to the government's misconduct during closing argument. This conduct fell below the prevailing professional norms of reasonably competent counsel and allowed the government to persist in its misconduct. Reasonable counsel objects when the prosecutor steps outside the lines of fair play. Counsel's failures also prevented any meaningful review of this claim on direct appeal.</u>

The government came out of the box suggesting the death penalty was required in light of the facts, the law, and the jurors' sense of justice: "The facts, the law, and your sense of justice tell you what you *have* to do. The law, the facts, and your sense of justice tell you what decision you now *have* to make." [TR 604] The problem with this argument is that the law never requires the death penalty. See e.g. <u>United States v. Jones</u>, 527 U.S. 373, 384 (1999) (jury instructed that "regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence.").

The government then launched into a discussion of gateway factors which the government claimed *were not in dispute* or had been *conceded*. Reasonably

116

competent counsel would not stand by and say nothing while the government made

these false statements that tear at the bedrock of our adversarial justice system.

> Did the defendant intentionally kill Rachel Timmerman?
> Again, something you have to find, but it's ***not in dispute***
> here. You've already found through your verdict already that
> the defendant tracked down and killed Rachel Timmerman
> during a several-month period. He deliberately and in cold
> blood killed Rachel Timmerman. It wasn't a mistake, it
> wasn't a sudden impulsive action. ***The defense has***
> ***conceded that.*** You know it's true. That's not in any doubt
> at all.

[TR 605] [emphasis added].

Throughout its argument the government implored the jury to do its civic duty and

sentence Mr. Gabrion to death. Reasonably competent counsel would object to such

argument but counsel here did not.

> Well, that factor [future dangerousness] is there to remind
> you as the people that have been chosen to apply this law
> that you have a responsibility to the community. In deciding
> what sentence is the right sentence here, life or death, you
> have a responsibility to consider the safety of other citizens
> in our community. [TR 610]
> "And you owe a responsibility to other citizens in this
> community not to let anybody else get hurt or killed. [TR 622]
> You are the only people as a jury in this case who stand
> between this person and your community. [TR 623]
> But you are citizens of this community, and you now have a
> duty to carry out. [623-24]

Arguments such as these are improper because jurors are to decide life or death

based upon a dispassionate review of the evidence, not demands to look to what it is

perceived the community desires. See, Ward v. Dretke, 420 F.3d 479, 498 (5th Cir.

2005) (it is improper for prosecutor to urge jurors to sentence on the basis of community

expectations); Le v. Mullin, 311 F.3d 1002, 1022 (10th Cir. 2002) (error to exhort a jury

to impose a death sentence on grounds of civic duty).

117

Reasonably competent counsel would have objected to the six transcribed pages of argument based upon wholly irrelevant but prejudicial evidence that was offered purportedly to show future dangerousness [TR 610-16], but counsel here sat quietly. The prevailing professional norms require counsel to object when the government compared Mr. Gabrion's exercise of his Fifth Amendment right to testify to torture of the survivors but counsel here was silent. [TR 618]. No objection was offered when the government referred to a life sentence as a "privilege" though reasonable counsel would have objected [TR 619].

The government was able to circumvent the rules of evidence and constitutional safeguards when it chose to plead four separate murders as aggravating factors rather than charging Gabrion. Though the government did not prove beyond a reasonable doubt that Mr. Gabrion was responsible for these homicides, or that the alleged victims were even dead, this did not stop the government from arguing that the subjects were dead and that they had been killed at Mr. Gabrion's hand:

> There's not a chance he would have let Shannon VerHage live because that could have linked him to this terrible crime. I would like to be able to tell you that there is some hope that Shannon VerHage is alive, but there's no reasonable doubt about this element. [TR 610]

> Robert Allen is dead. The defendant killed him. [TR 620]

> The defendant killed [John Weeks] to make sure there was no link to this rape charge. [TR 621]

> You know Wayne Davis isn't coming back . . . . Nobody's ever going to see him again. [TR 622]

It is "blatantly impermissible to ask the jury to "show [a capital defendant] the same amount of mercy . . . that he showed" the victim. Urbin v. State, 714 So.2d 411, 421 (Fla. 1998) (reversing death sentence for such "unnecessary appeal to the

118

sympathies of the jurors"). The Third Circuit has observed, that by "imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendants", and the prosecutor improperly "directed" the jury to "passion and prejudice rather than to an understanding of the facts and the law." Lesko v. Lehman, 925 F.2d 1527, 1545 (3rd Cir. 1991); see also Ferrell v. State, 29 So.2d 959 (Fla. 2010) (improper to argue, "I'll leave you with one final thought, I'm going to ask you to show this Defendant the same sympathy, the same mercy he showed [the victim] and that was none."); Rhodes v. State, 547 So.2d 1201, 1206 (Fla. 1989). Competent counsel would not sit idly by while the government committed precisely this sort of misconduct but that is what happened here:

> He lacks any shred of mercy for the helpless, and he shouldn't expect it from you. His murder of Shannon VerHage, an innocent infant child, shows that he is not worthy of your mercy and he shouldn't expect it. He didn't show any. Don't you give him any. [622-23]

It is also improper to compare the defendant's life with the victims' lives for similar reasons. See generally, Hall v. Catoe, 601 S.E.2d 335 (S.C. 2004) (improper to ask jury to put value on victims lives); State v. Rizzo, 833 A.2d 363, 419-20 (Conn. 2003); Wheeler v. State, 4 So.3d 599, 610-11 (Fla. 2009). Nevertheless, the government here argued: "Even if he pays with his life, he hasn't paid enough. His life is only one life. He owes for five." [TR 623]. Here, at least there was an objection. It was sustained, but counsel did not ask for remediation in the form of a mistrial or a cautionary instruction. Reasonably competent counsel not only objects but also asks for corrective action when misconduct occurs.

And the government returned to this form of misconduct in rebuttal when it argued: "It can't be just to allow him to live out his life, to grow old, to be visited by his

119

family, when Rachel Timmerman and Shannon VerHage will never get visits from their family. Neither will Wayne Davis, John Weeks, or Robert Allen." [TR 652]. It is "prosecutorial misconduct to compare the plight of the victim with the life of the defendant in prison" because such appeals "make light of the penalty of life in prison", and "constitute an impermissible appeal to sympathy for the victim, encouraging the jury to fail to consider mitigation evidence. Le v. Mullins, *supra.*

The government ended its closing argument as it began, by telling the jury the law required them to return a death sentence: "What the law requires here is clear." [TR 624]. With the one exception noted above there were no objections to any of the aforementioned arguments. Reasonably competent counsel would have sought to limit the government's misconduct by filing a motion in limine prior to argument and by objecting at all times when the government stepped over the line of fair play.

S. **When a guilt phase juror was unable to participate in the penalty phase, the jury should have been dismissed and a new jury empanelled. No other option was allowed by the relevant statute. Trial counsel's failure to object to the procedure used was deficient because counsel's acts and omissions fell below prevailing professional norms for capital defense practice. Appellate counsel's failure to raise the issue was deficient for the same reason. Mr. Gabrion was prejudiced because the procedure used resulted in a penalty decided in violation of the controlling statutory language.**

After the guilt phase, one of the jurors had health problems. On March 7, 2002, the district court entered an order excusing juror 03-0009 and replacing her with juror 03-0019. On March 11, 2002, the court stated that "[a] mammogram came up requiring immediate biopsies and surgery, and so she was excused." (Vol. V. Sentencing Hearing, p.2).

120

The death penalty proceedings here are governed by 21 U.S.C. §848 which, at the time of trial, provided: "A person shall be subjected to the penalty of death for any offense under this section *only* if a hearing is held in accordance with this section." 21 U.S.C. §848(g)(repealed 2006)[emphasis added]. The critical portion of that statute requires the same jury that determined guilt to determine penalty: "The hearing shall be conducted before the jury which determined the defendant's guilt". 21 U.S.C. §848(i)(1)

This Court must give effect to this portion of the statute, vacate Mr. Gabrion's sentence of death, and order a new sentencing hearing.  The Court must "presume that the legislature says in a statute what it means and means in a statute what it says there." Dodd v. United States, 545 U.S. 353, 357 (2005). "Because Congress has clearly spoken on this issue, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." Chevron v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984); *see also* Desert Palace v. Costa, 539 U.S. 90, 98 (2003) ("where . . . the words of the statute are unambiguous, the judicial inquiry is complete")(internal quotation marks and citation omitted).

Moreover, because the alternate did not deliberate with the others during the guilt phase, that verdict was not hers. *See generally,* United States v. Quiroz-Cortez, 960 F.2d 418, 420 (5th Cir. 1992) ("[t]here is a danger that the other jurors will have already formulated positions or viewpoints or opinions in the absence of the alternate juror and then pressure the newcomer into possibly ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case by 12 jurors."). The alternate did not have the benefit of the views of the discharged juror, although the others did. And

121

more importantly, the alternate did not have the benefit of the views of the other jurors at a time when she could accept or reject those views through the deliberative process.

The procedure followed by the court deprived Mr. Gabrion of a fair sentencing hearing. The result of the hearing is unreliable in violation of the 5th, 6th and 8th Amendments. The failure of trial and appellate counsel to raise the issue deprived Mr. Gabrion of effective assistance of counsel because the performance at each stage was deficient and caused the unreliable sentencing verdict to occur and to stand.

T.     <u>Mr. Gabrion was denied effective assistance of counsel at the sentencing hearing when trial counsel failed to challenge the facial constitutionality of the FDPA because the Act provides that the rules of evidence do not apply.</u>

On appeal, Mr. Gabrion raised for the first time the claim that the FDPA was facially unconstitutional because the Act provides that the rules of evidence do not apply at a capital sentencing hearing. The Sixth Circuit noted that the issue was not raised below and that the claim would be evaluated under the "plain error" standard of review. Mr. Gabrion was denied effective assistance of counsel at the penalty phase of his trial when counsel failed to challenge the FDPA on this basis, thereby allowing the sentencing hearing to occur without a ruling on this question by the district court. In addition, the failure to raise the issue restricted appellate review of the issue by causing the appellate court to apply the "plain error" standard of review. Mr. Gabrion renews his claim that the FDPA is unconstitutional for the reasons described below, and adds that proper preservation by trial counsel would have resulted in a different result at trial or on appeal because a ruling would have occurred at trial and a different standard of review would have been applied.

The Sixth Circuit, applying a plain error standard of review, rejected Mr. Gabrion's challenge to the FDPA based on the specific evidentiary standard involved. The Court noted Mr. Gabrion's reliance on the reasoning included in the district court opinion in United States v. Fell, 217 F. Supp.2d 469 (D. VT 2002), rev'd, 360 F.3d 135 (2nd Cir. 2004) stated, "[t]hat the death-eligibility factors are the functional equivalents of elements, which must be proven to a jury beyond a reasonable doubt, begs the question, what of other fair trial guarantees?" Id. at 485. "Does this relaxed evidentiary standard withstand due process and Sixth Amendment scrutiny, given the Supreme Court's concern for heightened reliability and procedural safeguards in capital cases?" Id. The court answered its own questions: "Every crime set forth in the United States Code is defined in terms of elements, and every element must not only be proven to a jury beyond a reasonable doubt, but be *proven by evidence found to be reliable* by application of the Federal Rules of Evidence." Id. at 488.  Notwithstanding the contrary view of the Second Circuit, the district court was correct.  The nature of the evidence presented to the jury in the sentencing trial below is a perfect example of the problem identified by Judge Sessions.

Ring -- Ring v. Arizona, 536 U.S. 584, 600 (2002), which concerns the definition of what elements constitute a particular (greater or lesser) offense -- is a decision of substantive constitutional criminal law.  It is not simply a case about rules of procedure. Ring holds that a fact-finding which increases the maximum punishment applicable to a crime is an *element* of a distinct and *greater* offense.  Ring, 536 U.S. at 609 ("Arizona's enumerated aggravating factors operate as the functional equivalent of an *element of a greater offense*. . . .") (emphasis added).  Here, that "greater offense" (which, for the

123

sake of convenience, we denote as "federal capital murder") has not yet been created by Congress, which alone can establish and define federal criminal offenses and the penalties which attach to them. <u>Bousley v. United States</u>, 523 U.S. 614, 620-21 (1998) ("[O]nly Congress, and not the courts, [can] make conduct criminal"). While Congress no doubt intended to create such a death-eligible offense, the plain import of *Ring* is that it failed to do so.

The doctrine of separation of powers, combined with the non-delegation doctrine and the long-established constitutional principle forbidding judge-made "common law" criminal offenses, compel the conclusion that the FDPA cannot, after *Ring*, be judicially "construed" to create an offense and associated procedures which comply with constitutional mandates. <u>United States v. Jackson</u>, 390 U.S. 570, 572-582 (1968) (rejecting efforts to save a comparably flawed federal death penalty statute).

Trial counsel's failure to raise this caused the sentencing hearing to unfold without a ruling from the trial court, when the correct ruling would have been to find the FDPA unconstitutional. The failure to raise the issue prevented the Sixth Circuit from granting the relief requested on appeal. Counsel was ineffective in failing to raise the issue in both instances.

U.    <u>Mr. Gabrion was prejudiced by the cumulative effects of the individual acts and omissions of counsel such that but for those acts and omissions Mr. Gabrion would have received a sentence less than death.</u>

Mr. Gabrion separately claims that his Sixth Amendment right to effective assistance of counsel was violated due to the cumulative effects of the individual acts and omissions referred to above. Mr. Gabrion incorporates all factual assertions made elsewhere in this petition in support. The net effect of counsel's deficient performance

124

was such that there was a reasonable probability of a sentence of less than death but for the totality of the deficient performance.

## GROUND FIVE

**Mr. Gabrion was deprived of his right to a fair trial and a reliable sentencing hearing when he was tried and sentenced while he was incompetent**

Mr. Gabrion was not competent to stand trial at the time he stood trial for the murder of Ms. Timmerman and when he proceeded to a penalty phase before a jury. The Supreme Court reiterated its earlier test for competency in Godinez v. Moran, 509 U.S. 389, 396 (1993):

> In Dusky v. United States, 362 U.S. 402 (1960 (*per curiam*), we held that the standard for competence to stand trial is whether the defendant has "*sufficient present ability to consult with his lawyer* with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him" *Ibid.*, (internal quotation marks omitted). *Accord*, Drope v. Missouri, 420 U.S. 162, 171 (1975) ("*[A] person whose mental condition is such that he lacks the capacity* to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense may not be subjected to a trial*"). (Emphasis added).

Mr. Gabrion asserts that he was tried without a  sufficient present  ability to consult with his counsel and lacked a reasonable degree of rational and factual understanding of the proceedings against him at both phases of his capital trial.  The issue of competency cannot be waived.  Pate v. Robinson, 385 U.S. 375 (1966).  Mr. Gabrion incorporates the facts as set forth above in Ground Three, subsection A.  The facts show that Mr. Gabrion was incompetent at trial and at sentencing.  He was prejudiced when he was forced to proceed to the conclusion of a capital murder trial while he was incompetent.  His 5th, 6th and 8th Amendment rights were violated when this occurred.  He should be retried only after it is clear that he is competent.

125

## GROUND SIX

**Mr. Gabrion's rights under the Fifth, Sixth and Eighth Amendments were violated by the government's suppression of and/or failure to disclose evidence which was exculpatory and material in violation of <u>Brady v. Maryland,</u> 379 U.S. 742 (1970). This failure by the government prejudiced Mr. Gabrion in that but for the government's actions there is a reasonable probability of a different verdict at the guilt and penalty phases of Mr. Gabrion's trial.**

The government suppressed and or failed to disclose material exculpatory evidence as to several government witnesses including but not limited to Linda Coleman, Gregory Leon, and Lonnie Overton. This includes the suppression of and/or failure to disclose accurate and updated criminal histories on government witnesses. Gabrion would incorporate the facts as set forth in Ground One, subsection E.

In addition to the Leon allegations set forth above, Leon had a pending criminal case in Newaygo County at the time he testified in Gabrion's case. The government failed to disclose this to counsel for Gabrion.

Additionally, Gabrion would assert that the facts in support of Grounds One, subsections A, B, C and D, independently constitute <u>Brady</u> violations which prejudiced Gabrion.

The Department of Justice recently announced that FBI analysts have routinely falsified and/or exaggerated their findings in favor of the government as it relates to hair and fiber analysis. Gabrion would argue that this is exculpatory evidence which was suppressed and/or withheld from his counsel. This was material to Gabrion as Douglas Deedrick testified that hairs on duct tape found near Oxford Lake had the same microscopic characteristics as Ms. Timmerman's hair. TR 1539-40

The government also had information regarding the competency of witness Lloyd Westcomb that it failed to disclose to counsel. Westcomb's competency was being questioned in Newaygo County at the time of Gabrion's case. This evidence was known to the government and not disclosed to counsel.

## GROUND SEVEN

**The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Gabrion's Due Process Right to Effective Assistance of Appellate Counsel.**

Mr. Gabrion incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.

The Due Process Clause of the 5th Amendment and the 6th Amendment guarantee to a defendant in a criminal case the effective assistance of counsel on appeal. Evitts v. Lucey, 469 U.S. 387, 396 (1985); United States v. Cook, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of Strickland v. Washington, 466 U.S. 668 (1984). Roe v. Flores-Ortega, 528 U.S. 470 (2000). Here, Petitioner shows his counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues or failed to properly raise such issues.

Prior to trial, Mr. Gabrion challenged the warrantless search that resulted in the seizure of evidence admitted at trial, including specific concrete blocks. These blocks were a crucial part of the government's case against Mr. Gabrion. Undersheriff David Babcock testified that, as part of the investigation in this case, he went to the Altona store. Officers knocked on the front door and received no response. They walked to

127

the back door and knocked, again without a response.  Officers walked toward other residences near the store.  As Babcock walked through the yard he saw some cement blocks near a brush pile.  Some had red paint and some had tar striping similar to the appearance of the blocks "recovered from the body of Rachel Timmerman." (p.15) Officers were advised to obtain a search warrant before seizing anything and did so.

Babcock testified that he saw the blocks in a brush pile.  He was on Mr. Gabrion's property at the time.  He had no reason to walk across the property when he could have used the streets.

Defendant argued that the search of the property violated the fourth amendment because the police searched the curtilage of Mr. Gabrion's property without a warrant. The Court denied the motion, finding that the "cinder blocks" were in plain view. (p.74)

Appellate counsel did not raise any issue relating to the motion.  However, the record indicates that the motion was well taken, as factual findings supporting the Court's ruling were clearly erroneous.  The issue should have been raised on appeal. The suppression of the cinder blocks would have dramatically altered the government's case at trial.  Suppression would likely have changed the outcome of the proceeding.

In addition, appellate counsel was ineffective in failing to specify on appeal why specific items of evidence were not identified as being irrelevant to the sentencing process.  Because no designation was made, the appellate court declined to evaluate the argument, which was meritorious.  Those points have been identified above in Ground Four.

128

Appellate counsel also failed to raise appropriate statutory challenges to the FDPA. Those challenges are discussed below.

The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. Parker v. Dugger, 498 U.S. 308, 321 (1991). As demonstrated *infra*, the record of this case presented multiple grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed.

## GROUND EIGHT

**Mr. Gabrion Was Denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as Administered, Is Disproportionately and Unconstitutionally Applied According to the Race of the Victim, and Trial and Appellate Counsel Made No Objection Based on this Fact.**

Over twenty years ago, the federal death penalty was reintroduced; since then it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the

129

victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995, and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[5]

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white

---

[5] Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales

victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."

More recently, Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is *three times more likely* to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."

While some of the statistics above are based in part on periods after Mr. Gabrion's trial, evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the government's racially discriminatory actions was deficient performance. Had counsel performed effectively, it is reasonably likely that the government would have been precluded from seeking death.

Alternatively, the statistics regarding the application of the federal death penalty since Mr. Gabrion's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing

alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the government's authorization process and plea bargaining decisions.

Mr. Gabrion has proffered evidence that shows that the racial discrepancy present in the administration of the Federal Death Penalty Act is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mr. Gabrion's death sentence because the government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments. Mr. Gabrion was denied effective assistance of counsel when trial counsel failed this issue and effective assistance of counsel when appellate counsel failed to raise the issue.

## GROUND NINE

**Mr. Gabrion's Rights Under the Fifth, Sixth and Eighth Amendments were Violated due to the Government's Failure to Include Necessary Charges in the Indictment.**

Mr. Gabrion was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors other than those required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors relied upon by the government during the penalty phase.

132

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

Ring v. Arizona, 536 U.S. 584, 600 (2002) *quoting* Jones v. United States, 526 U.S. 227, 243 n. 6 (1999). In direct contravention of these principles, the government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Gabrion's death sentence in the indictment. This structural defect in Mr. Gabrion's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. Brecht v. Abrahamson, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Gabrion's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

**GROUND TEN**

**Trial counsel was ineffective in failing to properly plead post-trial error based on the Jury Foreman's admission that he knew from reading the newspaper that Mr. Gabrion was "off the wall before trial", after testifying during voir dire that he had no opinion about the case.**

On March 29, 2002, Mr. Gabrion filed a supplement to his new trial motion, attaching a newspaper article from March 26, 2002, in which the jury foreman stated that: "I read your paper religiously. I knew he was off the wall before the trial." [R. 548, Motion]. White, E., "Juror Gives Details About Deliberations in Death Penalty Case," *The Grand Rapids Press* (March 26, 2002), 2002 WL 4769023. During voir dire, jury foreman Scherff was asked by the court: "Okay. Have you formed an opinion of this case at this point?" Scherff replied: "No, I have not." [R. 564, 2] Based on the contradictory statement contained in the newspaper article, Mr. Gabrion requested the district court to conduct a hearing pursuant to Remmer v. United States, 347 U.S. 227 (1954) and *Herndon, supra,* (denial of request for a hearing on juror bias was an abuse of discretion) [R. 548, Motion, 2]. The request was denied as part of a ruling denying the motion.

In denying the motion, this Court found, "to establish actual bias warranting a new trial for improprieties in voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984). [R. 572, Order, 4, JA 100]. The Court's opinion states that: "The defendant does not allege that the juror was not sincere or truthful during voir dire." [R. 572, Order]. The court also stated that:

134

> None of the quotations attributed to him in the newspaper article at the conclusion of the case were inconsistent with this juror's statements during voir dire. There is nothing in the record to lead this Court to believe that this juror lied during voir dire ... [R. 572, Order, 7].

Finding no Sixth Amendment violation, the court denied relief. [R. 572, Order, 7]. The Sixth Circuit affirmed on this point.

In McCoy v. Goldston, 652 F.2d 654, 659-660 (6th Cir.1981) (remanding a case after the jury reached a verdict for further proceedings to determine if defendant was prejudiced as a result of a juror's omission of relevant information during voir dire), this Court stated that an evidentiary hearing on a juror's alleged failure to disclose information during voir dire will be held only if the movant "has presented a sufficient evidentiary basis to raise a fact issue of prejudice," Id. at 659, and that "the allegations in the moving papers must be sufficiently specific, detailed, and nonconjectural so that fact issues are raised." Id. at 659, n. 9 (emphasis added).

Mr. Gabrion was denied effective assistance of counsel by the manner in which this constitutional violation was presented to the district court. The foreman did not tell the truth during voir dire. He was asked if he had an opinion about the case. He testified that he did not have an opinion. If his statement to a reporter is accurate, then he lied during voir dire. Counsel's failure to present the claim in those simple terms caused the court to find that there was no allegation that the foreman lied. Proper presentation of the claim would have established the 6th Amendment violation that counsel attempted to present. The failure to properly plead the claim deprived Mr. Gabrion of effective assistance of counsel in violation of the 6th Amendment. He was prejudiced because the claim would have succeeded if properly presented.

135

## GROUND ELEVEN

**Due to Gabrion's Chronic and Severe Mental Illness and Organic Brain Impairments, His Execution Would Violate the Eighth Amendment.**

Mr. Gabrion is 61 years old. For at least 40 years, and perhaps longer, he has struggled with mental illness, as well as organic brain disease and neurological impairments. The fact that this was not presented at trial in the detail expected of competent counsel does not diminish the fact that it is true. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Gabrion. Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In Atkins v. Virginia, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In Roper v. Simmons, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not

136

proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins'* and *Roper's* bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Gabrion, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with germane expertise." Atkins, 536 U.S. at 312, 316 n.21. Here, the leading legal

137

professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented. Moreover, just as in *Atkins* and *Roper*, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion weigh against the execution of the mentally ill.

### PRAYER FOR RELIEF

**WHEREFORE**, Movant Marvin Charles Gabrion II asks that this Court provide the following relief: (1) recuse himself and have all proceedings regarding this Petition reassigned randomly to another judge; (2) conduct an evidentiary hearing to

resolve factual disputes; (3) vacate Petitioner's conviction and/or sentence and order that appropriate retrial and/or resentencing proceedings be conducted; and (4) grant such further and additional relief as may be just.

DATED: May 29, 2015                              Respectfully submitted,

By: _/s/ Monica Foster_                          By: _/s/ Joseph M. Cleary_
        Monica Foster                                    Joseph M. Cleary
        Attorney for Movant                              Attorney for Movant
Business Address:                                Business Address:
Indiana Federal Community Defenders, Inc.        Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 2150                  111 Monument Circle, Suite 2150
Indianapolis, Indiana 46204                      Indianapolis, Indiana 46204
(317) 383-3520                                   (317) 383-3520


By: _/s/ Scott Graham_
        Scott Graham
        Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585