# EXHIBIT 1.5

UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT FOR

WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


IN RE:   GABRION


WITNESS:   RICHARD CHARLES MILLER


PROCEEDINGS BEFORE THE GRAND JURY NUMBER 97-3 before Patricia R. Pritchard, CER, Notary Public in and for the County of Kent, Grand Rapids, Michigan, in the Grand Jury Room, Ford Federal Building, Grand Rapids, MI, on Tuesday, May 5, 1998, commencing at 1:25 p.m.


APPEARANCE:          Mr. Timothy P. VerHey
                     Assistant U.S. Attorney
                     The Law Building - Fifth Floor
                     330 Ionia Avenue, NW
                     Grand Rapids, MI   49503
                     (616) 456-2404


ALSO APPEARING:      Ms. Chrystal Roach
                     Special Assistant US Attorney
                     County Prosecutor
                     Newaygo County

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

**0002209**

007662

Gabrion 062624

31

social encounter.

Information suggests that Ms. Timmerman was very initially unwilling to associate with the fellow. There was something about his personality that she didn't particularly like, so she distanced herself somewhat from Mr. Weeks. Mr. Weeks we are unable to locate also.

Q    So you've attempted to locate him and you cannot?

A    Cannot.

Q    All right. Did the rape case against Ms. Gabrion by Ms. Timmerman go to trial, and was there a conviction or some disposition of that case?

A    It didn't get to that point in the proceedings. There were a series of scheduled court appointments, but by motions of the defense they were able to postpone the actual preliminary examination.

And, that is -- to explain that -- under Michigan law if you're charged with a felony that the prosecution has to provide you, as the defendant, the opportunity to have a preliminary examination. And that examination is to basically show two things, a crime was committed and, secondly, the person who committed the crime is the proper person being charged. So, if those two measures are met, the Court will then bind the case over to trial.

Through a series of waivers and reversals going back to preliminary examination, a preliminary examination was

0002239

007692

Gabrion 062654

32

scheduled to occur on the 5th of June, 1997. Ms. Timmerman failed to show up for that examination, and additional information came to light suggesting that perhaps Ms. Timmerman was out of state. And absent a witness to testify, the prosecution subsequently had to drop the case for lack of a witness.

Q    Let me ask you to elaborate on what you just said about Ms. Timmerman perhaps being out of state. Was there any communication between her and law enforcement authorities in Newaygo County saying that she was out of state or she did not wish to pursue the charges or things of that nature?

A    There were some letters which were received which we were able to show are in the handwriting of Rachel Timmerman, letters written to her father -- two letters to her father -- one letter to the Newaygo County Prosecutor's Office, and one letter to the District Court Judge Kevin Drake of Newaygo County, in which the letters to the Court and the Prosecutor's Office were retractions of her claim of being raped by Marvin Gabrion. Those letters were dated the 14th and 16th of June, and they were postmarked from Little Rock, Arkansas. One letter --

Q    Excuse me. I'm sorry for interrupting, but the letter -- any of these letters explain the Little Rock, Arkansas, postmark or why Ms. Timmerman might have been in Little Rock?

A    One of the letters to her father reflects that she ran off with a man; that they relocated in Little Rock, Arkansas. She

0002240

007693

Gabrion 062855

33

plans to get married and start a family anew, and -- with no return postmark, no contact telephone numbers.

Q    Did the letter to the Newaygo County Prosecutor's Office say anything other than that she did not wish to pursue the charges?  Did it go into detail about why it was she brought the charges or anything of that nature?

A    Forgive me, sir, but I don't remember the entire content of the letter.  There is references to an innocent man, she was in love, and the charges were false.  I'd have to read the letter to be exact on what the contents are.

Q    All right.  Now, did Ms. Timmerman ever relate any perception by her that she might have felt threatened by Mr. Gabrion as the trial -- or the preliminary examination was coming up after she made her charges in Newaygo County?

A    Yes, sir.  We located several people, friends and family, who told us that she had expressed fear for her life and that she had been threatened by Marvin and members of his family and that she expressly stated she believed that he was going to kill her and she feared for the safety of her baby.

Q    Now, pending this case being concluded, was he out on bond or was he incarcerated?

A    Mr. Gabrion was arrested in January of '97, and after a couple weeks in jail family members posted bond for him.  And he was out on bond when Mr. Wayne Davis disappeared, and he remained on bond until which point the Court released him from bond in

0002241

007694

Gabrion 062656

34

June of '97, that, of course, being the charges were dropped. He was released from bond.

Q     All right.  Now, we're going to get into more detailed testimony from other witnesses on this, but through your investigation were you able to come up with a last known date that Rachel Timmerman was seen alive?

A     The last known positive date we can confirm is June 3rd, and that is based upon the sighting of her stepmother, her stepsister and a family friend that approximately five o'clock in the evening a man came to the house in Cedar Springs, who the rest of the family did not know, and she left with that subject taking her child with her and she had not been seen since then nor any telephone conversations with her.

We have other people that have told us that they have seen her later on that same day and possibly have seen her a day or two later in the company of different people.

Q     All right.  And you're talking about June 3rd, 1997?

A     That's correct.

Q     You mention that the body floating in the lake had two cinder blocks attached to it, correct?

A     That's correct.

Q     And you pointed out that there were some distinguishing characteristics on the cinder blocks, a stripe marking on one side and a red coloring on the opposite side?

A     That's correct.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0002242
007695
Gabrion 062657

54

GRAND JUROR:  As far as the child is concerned, was there ever a reward offered for information then, now?  Did anyone ever offer any type of reward for any type of information as far as the child was concerned?

THE WITNESS:  Yeah.

GRAND JUROR:  Nothing?

THE WITNESS:  The Silent Observer program in Kent County, the Silent Observer program in Newaygo County and family members of the VerHage family have all posted monetary amounts for a reward.

GRAND JUROR:  Couple questions.  Did Mr. Gabrion appear -- or did he have to appear at the preliminary examination, the rape examination?  Was he there when she did not show up, the day she was not -- the day she was scheduled to show up, she didn't show?  Was he present?

THE WITNESS:  Was he physically present?

GRAND JUROR:  Yes.

THE WITNESS:  No.  I was not into that.  I wasn't there.  I wasn't involved in that case.  But my information is in talking to other people that there was an unexpected motion made on the part of Mr. Gabrion's defense attorney to, once again, waive his right to that preliminary examination.  And that was done without the knowledge of the Prosecutor's Office; they were not informed.  And all their witnesses were scheduled and did make their appearance for that date with the exception of Rachel

**0002262**

007715

Gabrion 062677

55

Timmerman and obviously Mr. Davis.  But because of Mr. Gabrion's defense attorney's motion just a couple days prior, Mr. Gabrion knew and had no reason to expect that he had to be present in the courtroom that day.

GRAND JUROR:  Okay.  Then you also mentioned fingerprints.  There were no fingerprints on the duct tape you found on the two-track trail, correct?

THE WITNESS:  That's correct.

GRAND JUROR:  And also no fingerprints on the so-called boat of Mr. Gabrion?

THE WITNESS:  On the boat?  The boat was recovered, I believe, third week of February of this year.  That boat has not been fingerprinted for fingerprints.  It's an aluminum boat, a 12-foot, flat bottom with a square bow.  I don't have anything at this time that could positively show that Mr. Gabrion had control of that boat.

BY MR. VERHEY:

Q    Or any boat, for that matter, on a permanent basis.  I think you've alluded to the fact that some people have said that they saw him with a boat, but you have not found anything that links him to a particular boat other than what people have told you; is that true?

A    No.  We find nothing by boat registration records or ownership papers.  We have people physically telling us that they physically saw him with a boat on or about June 6th, 7th, 8th,

0002263

007716

Gabrion 062678