# EXHIBIT 1.16

UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT FOR

WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

IN RE:  GABRION

WITNESS:  ROXANNE VANSLYKE

PROCEEDINGS BEFORE THE GRAND JURY NUMBER 97-3 before Patricia R. Pritchard, CER, Notary Public in and for the County of Kent, Grand Rapids, Michigan, in the Grand Jury Room, Ford Federal Building, Grand Rapids, MI, on Wednesday, May 6, 1998, commencing at 9:30 a.m.

APPEARANCE:          Mr. Timothy P. VerHey
                     Assistant U.S. Attorney
                     The Law Building - Fifth Floor
                     330 Ionia Avenue, NW
                     Grand Rapids, MI   49503
                     (616) 456-2404

ALSO PRESENT:        Ms. Chrystal Roach
                     Special Assistant US Attorney
                     County Prosecutor
                     Newaygo County

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003196

Gabrion 049790

2

# I N D E X

WITNESS:                                                          PAGE

ROXANNE VANSLYKE

Grand Jury Testimony  5/6/98
Grand Jury No. 97-3


EXHIBITS                                                          MARKED

None

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003197

Gabrion 049791

3

Grand Rapids, Michigan

Wednesday, May 6, 1998 - 9:30 a.m.

ROXANNE VANSLYKE

called as a witness and sworn by the jury foreperson

testified on her oath as follows:

E X A M I N A T I O N

BY MR. VERHEY:

Q     Ma'am, would you tell us your name and spell your name for the benefit of the court reporter?

A     My name is Roxanne, R-o-x-a-n-n-e.  My last name VanSlyke, V-a-n capital S-l-y-k-e.

Q     Ms. VanSlyke, before we ask you any questions here this morning, I have to tell you what this group of people is and what your rights and responsibilities are.

        This is a federal grand jury.  It's a group of people whose job it is to listen to evidence about possible violations of federal criminal law in the Western District of Michigan. Today the grand jury is investigating whether our federal murder statute has been violated by virtue of the fact that Rachel Timmerman's body was found in Oxford Lake in Newaygo County.  I'm sure you are aware of that.

A     Um-hmm.

Q     As a witness before the grand jury, you have certain rights and responsibilities.  First of all, you should be aware that this is a tribunal of the United States, and you've just taken an

0003198

Gabrion 049792

oath to tell the truth. That's an important thing for you to remember because you are now subject to the perjury statute. If you were to make a false statement here this morning, each and every false statement could be prosecuted as a perjury statement. The federal perjury statute carries a maximum penalty of five years' imprisonment, a fine of $250,000, a period of three years' supervised release and a special assessment of $100. Do you understand that?

A    Yes, I do.

Q    Also, you have the right not to answer any question if a truthful answer could tend to incriminate you. Do you understand that?

A    Yes, I do.

Q    Thirdly, you have the right to the assistance of an attorney if you choose to hire an attorney to assist you in your appearance here today, but let me explain something about that.

This is a secret proceeding, and everyone in this room is bound by an oath of secrecy. If you had an attorney to represent you, he or she could not be in this room with you but would have to remain outside. But if you wanted to consult with your attorney you could just tell us you needed to do that, and we would let you leave the room and consult and then come back. Do you understand your right to an attorney?

A    Yes, I do.

Q    Now, can you tell us where you live?

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003199

Gabrion 049793

5

A    I live at my mom's.

Q    Where is that?

A    In Newaygo.    Want the address?

Q    Yes, ma'am.

A    7875 East 36th Street.

Q    And what type of structure do you live in?  Is it a house? Is it a trailer?  What?

A    It's a trailer.

Q    Now, we've heard already that at least as of June of 1997 there were two trailer-type dwellings at your mother's property, a camp trailer and a regular full-size trailer?

A    No.  There was just a camp trailer.

Q    Just a camp trailer?

A    Yeah.  The full-size trailer is on my grandma's land.

Q    I see.

A    It's right next door.

Q    I see.  So there's only one trailer on the property that your parents own?

A    Yes.

Q    Is that your testimony?

A    Yep.

Q    All right.

A    A trailer and a garage.

Q    A trailer and a garage?

A    Yeah.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003200

Gabrion 049794

6

Q    I see.  Were you living in that trailer last year, approximately June of 1997?

A    Yes, we were.

Q    And you said "we" were.  Now, who was living there with you?

A    My mom, my dad, Tina and Austin.

Q    Tina being who?

A    Tina Kanady.

Q    All right.  And Austin being who?

A    Austin Dubree, her son.

Q    Now, you were asked a number of questions by FBI agents and Michigan State Police detectives in or around June of 1997.  Do you remember talking to Michigan State Police detectives or FBI agents?

A    Yeah, I do.

Q    And they were investigating the death of Rachel Timmerman, weren't they?

A    Yeah.

Q    I should remind you that the court reporter is trying to type up everything we say, so you have to remember to answer with a yes or no or some other words.  All right?

A    All right.

Q    And you told them that in or around June 3rd of 1997 you were in the trailer with Tina Kanady and her baby, correct?

A    Yep.

0003201

Gabrion 049795

7

Q    And someone by the name of Rachel Timmerman came over to visit you?

A    Correct.

Q    Can you tell us what you recall about that visit?

A    Well, I know it was that night, and it was really dark. Rachel parked over in her ma's driveway because her ma lives right next door to my grandma. And then Rachel walked over and she knocked on the door and we let her in, and she was like, "Well, you guys want to come to a party?" I was like, "No. We can't. We ain't got a baby-sitter for Austin." And she was like, "Well, if you get a baby-sitter" -- and she wrote down the directions. She was like, "Here's the party." She was like, "If you get a baby-sitter, stop on down."

Q    Where was the party going to be?

A    I don't remember.

Q    Could it have been at a place called Pig's Point?

A    I believe that's where it was. I'm not for sure.

Q    Do you know what Pig's Point is?

A    No. I know it's a spot where a lot of people party.

Q    All right. Is it a --

A    I've never been there.

Q    I'm sorry?

A    I've never been there.

Q    So, as far as you know, is it a building like a bar or is it a -- just a vacant spot where people go party outside?

0003202
Gabrion 049796

8

A   I think it's just like a vacant spot.

Q   I see.  How long did Rachel Timmerman stay and talk to you?

A   I don't know.  Between ten and fifteen minutes, I think.

Q   So what else did you talk about because you just told us what she said, and it didn't take very long.  I only took about a minute for you to tell us what she said, so there must have been some other conversation.

A   I don't remember.  That was a long time ago.

Q   I understand.  Now, Rachel Timmerman had a baby, didn't she?

A   Yes, she did.

Q   And you know the baby's name?

A   Yes.

Q   What was the baby's name?

A   Shannon Dale.

Q   Did she have her baby with you -- with her when she came over?

A   No.

Q   She didn't?

A   No, I don't believe so.

Q   Now, when you talked to the police earlier, you were sure that she did have her baby and, in fact, said that she laid the baby on your bed and talked about the baby at some length, didn't you?

A   I don't remember.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003203

Gabrion 049797

Q    You don't remember saying that?

A    No.

Q    So you're sure today that she did not have her baby?

A    No.  I'm not positive.

Q    You're not sure --

A    No.

Q    -- one way or the other?

A    No.

Q    Have you been talking to anybody between when you were interviewed by the FBI or the State Police and now that might have swayed your opinion about whether Rachel Timmerman had her baby when she came to visit you?

A    No.

Q    Do you remember what Rachel Timmerman was wearing when she came over?

A    No.  I believe it was just jeans and a T-shirt.

Q    All right.  And you mentioned that it was at night --

A    Yeah.

Q    -- when she came over?

A    It was probably around 9:30, ten.

Q    So it was dark out?

A    Yeah.

Q    And you said that the vehicle that Ms. Timmerman drove up in or came in was parked in front of her mother's house.

A    Yeah.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003204

Gabrion 049798

Q    Now, did she say that she was with anybody when she talked to you?

A    No.  Well, she said there's somebody out in a truck waiting for her.

Q    Did she say who it was?

A    No, she didn't.

Q    Did you see anybody in the vehicle?

A    No, I didn't.  I didn't even go outside.

Q    You did not go outside?

A    No.

Q    And what is it she said again, that there was somebody waiting --

A    In the truck for her.

Q    In the truck.  Do you know if she came up in a truck?

A    I believe so.

Q    Based on what she said?

A    Yeah.

Q    Did you see the vehicle?

A    No.

Q    All right.  Did you hear the vehicle?

A    Yeah.  It was --

Q    How is it that you heard it?  Was it loud?

A    No.

Q    You just heard a typical sound of the vehicle driving up?

A    Um-hmm, because it's so quiet out there, you can hear

0003205

Gabrion 049799

11

anything.

Q    I see.

A    Well, just about anything.

Q    I see.  And she didn't mention who she was going to this party with?

A    No.

Q    Do you know who she was seeing at that time?

A    No.  She wanted to start going out with my Uncle Eddie.

Q    Who's that?

A    Edward Start.

Q    Oh, all right.  Do you know if she had started going out with him by that time?

A    No.  He was going out with someone else, Kim Phillips, I think.

Q    All right.  So, as far as you know, was she dating anybody or seeing anyone --

A    No.

Q    -- at that time?  She wasn't, as far as you knew?

A    Yeah.  As far as I know, no, she wasn't.

Q    All right.  It's true, isn't it, that you have told people that it was your uncle, Eddie Start, out in the vehicle that night?

A    Yeah, but I was lying because --

Q    Why would you do something like that?

A    I don't know the exact reason why I did it.  I was

0003206

Gabrion 049800

12

confused.  He was trying to -- it's a -- it was a big family dispute.

Q  Well, what?  What happened?

A  Well, my Aunt Teresa came up to our house, and she was going to stay the weekend, and --

Q  Wait a minute.  We need to get the names straight.  Aunt Teresa is who?

A  Teresa Lawe.

Q  L-a-w?

A  E.

Q  L-a-w-e.  All right.  I'm sorry for interrupting.  Go ahead.

A  All right.  And he tried to take her baby, Edward Start, III.

Q  "He" being your uncle, Edward Start?

A  Yes.  Edward Start.

Q  All right.

A  And then me and my -- well, my Aunt Teresa got into a fight with Eddie, and then a whole bunch of stuff happened.  And then I ended up moving out of my parents' house and moving down with Teresa.

Q  All right.  I don't follow how that would lead you to lie about Eddie Start being in the vehicle that Rachel Timmerman arrived in that night?

A  Also, Kim Phillips, she was like, "Yeah, Eddie was in the

0003207

Gabrion 049801

13

vehicle, and Eddie was with Rachel, and everything else is just hearsay from what Kim Phillips was saying.

Q    So Kim Phillips was telling you she knew or she thought Eddie Start was with Rachel Timmerman?

A    Yeah, so I was telling the detective.

Q    So you were just passing that on?

A    Yeah.

Q    Why would you do something like that about your uncle?

A    I don't know.

Q    So now that you're here and under oath and you've sworn an oath to tell the truth, do you know who was in that vehicle?

A    No, I don't.

Q    Did Rachel Timmerman mention who was in the vehicle with her?

A    I can't remember.  I don't believe she did.

Q    That would be a normal thing for her to talk about during this ten or fifteen minutes that she's in your house, though, isn't it, she's going to a party, who she's going with?

A    Yeah, but that is over a year ago.  I can't remember -- I don't remember every conversation I had within the past two years or within the past year.

Q    How many times have you talked with someone the last time they were seen before they were found dead in a lake?

A    That's the first time.

Q    So it's not a typical conversation, is it?

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003208

Gabrion 049802

14

A    No, but if I knew she was going to be found dead, I would have remembered the conversation.  I mean, like I'm going to remember every conversation just in case they're found dead the next day or the next week.  It's not normal.

Q    All right.  Did she ever mention to you that she was planning to move to Arkansas?

A    No, she didn't.

Q    Did she ever mention to you that she was going to go to Arkansas with a man named Delbert or anything else?

A    No.

Q    Now, for the benefit of the grand jurors here, you mentioned your Aunt Teresa, Teresa Lawe.  Is her name also Teresa Start?

A    Yeah.

Q    All right.

A    She was married to my Uncle Eddie, but they're divorced now, so I don't know if she goes by her maiden name or what.

Q    But that's the same person?

A    Yeah.

Q    All right.  Now, you also told Michigan State Police Detective Schuman that the day after you saw Rachel Timmerman you went out to Oxbow Lake to go swimming?

A    No.  We went --

Q    You didn't?

A    No.  We went down to the Hardy Dam Lake.

0003209

Gabrion 049803

15.

Q    So you didn't make the statement that the next day you and several other people went swimming at Oxbow Campground?

A    No.

Q    All right.  You're saying -- where did you go swimming?

A    In Hardy Dam, the river.  It's kind of like -- Oxbow is like around the corner from Oxbow probably like five miles, but instead of walking all the way down to Oxbow, there's like a different swimming part we go to.

Q    Is it a campground area?

A    No.

Q    All right.

A    Just like a little trail off the road.

Q    Who went with you?

A    Tina Kanady and two guys.  One was named Shawn Cole, and I don't remember the other one's name.  Shawn was my boyfriend at the time.

Q    You told Detective Schuman, according to what he wrote down for us here, that the other people were Eddie Start, Everett Embry, and then you did mention Shawn Cole.  Does that help you remember who was there?

A    I don't know.  I don't know.  I went swimming a lot last summer, so --

Q    All right.  Let me ask you about a conversation that might have stuck in your mind.  You told Detective Schuman that Eddie Start was talking to you about a party he had gone to the night

0003210

Gabrion 049804

16

before and he said that he had been drinking, everybody had been drinking and using drugs, and he told you that he thought Rachel Timmerman would never be coming back again, and he told you that he and Rachel had gotten into an argument at the party the night before.

A    No.  I don't remember that conversation.  I don't remember saying that.

Q    You remember telling Detective Schuman that?

A    No.

Q    You don't?

A    No.  I might have, but I don't know.  I can't remember every conversation I had.  I mean I don't know.

Q    Let me get this straight.  You don't remember telling Detective Schuman that you told him about this conversation?

A    No.  I remember telling him that Eddie did go to a party. I don't know if it was the night before or a couple nights before, but I remember him saying he was drinking.  And I don't know if he was doing drugs, but I know other people at the party were doing drugs.  But I do not remember him saying or me saying to the detective that him and Rachel got into an argument and Rachel would never come back again or whatever.  I don't remember.

Q    Now, it turns out that's kind of an important thing to remember, isn't it --

A    Yeah.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003211

Gabrion 049805

17

Q    -- given the fact that Rachel Timmerman is dead?

A    Yeah, but I had a lot of other things going on in my life at that time, and it's hard to remember everything.

Q    I realize that, but the fact that the woman is dead is kind of important in the grand scheme of things, isn't it?

A    Yes, it is.

Q    All right.  Now, you can't walk to this place where you went swimming, can you?  It's too far to walk --

A    No.

Q    -- from where you live?

A    You can walk.

Q    You can walk?

A    Yeah.

Q    Did you walk that day to go swimming?

A    I don't remember.

Q    Do you typically walk to this place to go swimming?

A    I did before.  I mean it's like down the corner and like around the bend probably like not even a mile walk.  It's not even a mile.  It takes probably like ten minutes to walk there.

Q    All right.  Eddie Start is your uncle?

A    Yes, he is.

Q    How many times have you spoken to him about what's going on in this case between the time that you talked to the detectives and your appearance here today?

A    Not -- I haven't really talked to my Uncle Eddie in a long

0003212

Gabrion 049806

18

time except for -- let's see.  I think it was Sunday.  I talked to him a little bit because he was up at my mom's with his kids, and I was talking to him about when I went to Washington and Florida.

Q    You saw him this morning?

A    Yeah.

Q    Did you talk to him then?

A    No, not about the case, talked to him about Tina and about her baby.

Q    So it's your testimony that he's never talked to you about Rachel Timmerman or the investigation or anything like that?

A    No.

Q    Has anybody ever talked to you about what you told the detectives?

A    No.  Well, me and my mom talk about it, but I mean we talk about how stupid it is.

Q    How stupid what is?

A    That Rachel is found and the baby is not and everything else.

Q    Well, what's stupid about that?

A    Well, they were together.  Well, they were supposedly together and now only Rachel can be found.  Where's the baby?

Q    Well, how do you know they were together?  You said you couldn't remember.

A    I said they were supposedly together.

0003213

Gabrion 049807

19

Q    I see.  Did your mom ever talk to you about whether or not you should be telling anybody about Eddie Start's statements to you?

A    No.

Q    Now, you mentioned that there was a time where you moved out of your mother's place and moved in where?

A    With my Aunt Teresa Start.

Q    All right.  Now, what caused that?

A    A fight.

Q    What kind of fight?

A    Well, it started out with Teresa and Eddie and then my dad got involved and then me and my dad and Teresa all started fighting.  Well, me and Teresa against my dad, and then my dad got mad and told me to get out, so I did.

Q    Was it all over this -- did it all start with this fight between Eddie Start and Teresa Start?

A    Yeah.

Q    And I think you already mentioned that Eddie Start wanted his child --

A    Yes.

Q    -- who Teresa Start had custody of?

A    Yes.

Q    And, in fact, he took the child, didn't he?

A    Yes, for a while.  They were over in my grandma's yard, Eddie and the baby, and my dad and -- I don't know if Eddie was

0003214

Gabrion 049808

20

drinking, but I know my dad was drinking.  My dad was pretty wasted.  And my dad, he gets involved in anything that has to do with the family.  And Teresa was arguing with Eddie and then my dad start arguing with Teresa.  And I had to stick up for Teresa.  Well, I didn't have to, I decided to stick up for Teresa.  And my dad started arguing with me and then it just got into a big old fight.

Q    So is it fair to say that your dad was more on Eddie Start's side than on Teresa's side in this fight?

A    Yeah.

Q    And you were on Teresa Start's side?

A    Yeah.

Q    And I take it that the fight was over who should keep the child?

A    Yeah, because Eddie only wanted the son, his son.  He didn't want his other two girls.

Q    All right.  And you thought that was wrong?

A    Yeah.

Q    Did you think he shouldn't have any of them under the circumstances?

A    Yeah, because, one, he don't have a job.  Well, I don't know about now, but he didn't have a job.  He didn't have a steady roof over his head.  He couldn't take care of the kids.

Q    Why did he want the kids -- or his son?

A    Because he knew it would hurt Teresa.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003215

Gabrion 049809

21

Q    And he was trying to do it to get back at Teresa somehow?

A    Yeah, I believe so.

Q    Well, what was all that about? I mean why was he trying to hurt Teresa?

A    I don't know.

Q    All right.

A    That was with them.

Q    You didn't -- nobody explained that to you?

A    No.

Q    So, as a result, you're saying your father was mad at you for sticking up for Teresa Start?

A    Um-hmm, yes.

Q    And as a result of that, you moved out?

A    Yes.

Q    And how long did you stay with Teresa Start?

A    For just about a whole summer.

Q    And there came a point that you moved back in with your family?

A    Yeah.

Q    About when was that?

A    Just before school started.

Q    So fall of 1997?

A    Yeah.

Q    Is that around August or September?

A    Yeah.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003216
Gabrion 049810

22

Q   Is that when school usually starts?

A   Yeah.  Well, school started the end of August.

Q   So maybe around the end of August?

A   Yeah.

Q   So this fight occurred right around the time that Rachel came to visit you, didn't it, because --

A   I don't know.  I don't remember.

Q   Well, you came back around the time school started in August.

A   Um-hmm.

Q   End of August, correct?  I'm sorry.

A   Correct.

Q   You have to answer yes or no.  And you said that you were there a couple of months with Teresa Start?

A   Correct.

Q   So working backwards, that puts you end of June, doesn't it?

A   Yeah.

Q   All right.

A   Around there.

Q   So you moved out around June anyway of 1997 over this fight?

A   Yeah.

Q   And once you moved down to Teresa Start's place in Grand Rapids, right --

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003217
Gabrion 049811

23

A    Yeah.

Q    -- you weren't swimming anymore up in Newaygo County, were you?

A    No.

Q    So this swimming trip that you were asked about by the detectives was probably one of the last times you went, wasn't it?

A    Yeah.

Q    So we know that it was shortly after Rachel Timmerman came to see you for the last time?

A    Yeah.  I believe it was Memorial weekend we went swimming.

Q    Memorial weekend?

A    Yeah, or Labor Day weekend, whichever one is the beginning of summer.

Q    Well, Labor Day is the later one, so you're saying it's Memorial Day weekend --

A    Yeah.

Q    -- you think?

A    I'm pretty sure.

BY MS. ROACH:

Q    Roxanne, you went swimming Memorial Day weekend.  Who went?

A    I believe it was just the family, my mom, my dad, my Uncle Eddie, Everett.  I don't know if Everett was there actually. Teresa was there, Teresa's four kids, Tina and Tina's baby.

Q    Okay.  And that's Memorial Day weekend, and that was a

0003218

Gabrion 049812

24

couple of weeks before you last saw Rachel; is that right?

A    I believe so.

Q    Because Memorial weekend was early that year like it's going to be this year; is that your recollection?

A    Yeah.

Q    Okay.  Now, do you recall -- when did you get out of school last year?  What was the last day of school?

A    I wasn't in school last year.

Q    You didn't go to school last year?

A    No.  I went for the first couple of weeks.

Q    So you didn't -- so what grade are you in now?

A    I'm in ninth.

Q    Okay.  And you're how old?

A    Seventeen.  I'm not in school right now.

Q    You did start school in the fall this past --

A    Yes, I did.

Q    Okay.  Because when you came back from Teresa's place to live with your family, you came just before school started?

A    Yes.

Q    Okay.  Now, when you spent the summer with Teresa then or several -- couple of months in the summer, what did you do?  Did you work?

A    No.  Well, I baby-sat for Teresa every once in a while, and I would baby-sit for people on the street.

Q    Okay.  Now, going back to Memorial Day weekend, the family

0003219

Gabrion 049813

25

went -- did you have a cookout or something to celebrate the holiday or was it just kind of any old regular weekend?

A    Just -- I don't know. My dad and Eddie and them, they had beer. And my mom went down and bought some potato chips and some pop for the kids, and we just ate potato chips and pop.

Q    So was that unusual?

A    No.

Q    Okay. And you all -- did you all then walk down to go swimming at the dam or --

A    No. I believe we drove my dad's van.

Q    Did you all fit in your dad's van, all those folks?

A    Yeah.

Q    With the four kids as well?

A    Um-hmm.

Q    Okay. And that's a yes?

A    Yes.

Q    Do you remember going swimming then again before you saw Rachel between Memorial Day and the last time you saw Rachel?

A    I don't remember.

Q    How often did you go swimming?

A    I don't know. We used to try to go every day because it was hot.

Q    And who's "we"?

A    Me and Tina Kanady and her son.

Q    Okay. And did you go every day, as far as you recall?

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003330

Gabrion 049814

26

A    Just about every day.

Q    And it was usually just you and Tina?

A    Yeah.

Q    Okay.

A    Well, sometimes Shawn and his friend or his cousin or brother or something would go down with us.

Q    Okay. And his -- name his brother and friend for the record, please?

A    I don't know.

Q    You don't recall their names?

A    No, I don't. I haven't really talked to them.

Q    Do you recall going swimming and having your Uncle Eddie Start be there after Memorial Day?

A    No. Only that one time when the family went.

Q    Memorial Day? So now it's your recollection that that was the only time he went swimming?

A    Um-hmm.

Q    That's a yes?

A    Yes.

Q    Did you ever have a conversation with him about Rachel's disappearance?

A    No.

Q    Never?

A    Never.

Q    Have a conversation with Teresa about Rachel's

0003221
Gabrion 049815

27

disappearance?

A    Yeah.   We talked about it a lot when I moved down there.

Q    Did Teresa ever make any statements to you about whether or not Rachel would be coming back?

A    No.

Q    Did anyone make any statements to you about whether or not Rachel would be coming back?

A    No.

Q    And it's right now your testimony under oath that you don't recall telling the officer, Officer Schuman from the State Police, that Eddie Start told you Rachel wouldn't be coming back?

A    No.  I don't remember.

Q    Are you familiar with anyone in -- living in Newaygo County or who has lived in Newaygo County by the last name of Gabrion?

A    No.

Q    In terms of Velda Timmerman's place, that's next to --

A    My grandma's.

Q    -- Marilyn Burke's, right?

A    Yes.

Q    And that's your grandma.  Marilyn Burke is your grandma. How would you describe the number of folks that come and go?  I mean is there like nobody hardly ever there?  Are there lots of people?  Does it vary?

A    I don't know.  I'm not really at my mom's that much but I live there; I'm usually over at my boyfriend's house.  But when I

0003222

Gabrion 049816

28.

was -- like last summer, there was usually a lot of people there, like five or six cars.

Q    Okay.   What's your boyfriend's name?

A    Robert Strickfaden.

Q    And where does he live?

A    In Howard City.

Q    How do you manage to get back and forth?

A    He comes and picks me up.

Q    Have any conversations with Velda Timmerman about Rachel's disappearance?

A    Not that I can remember.  I don't really talk to Velda.

Q    Talk to your grandma about it?

A    No.  I don't really -- I don't know.  The detective told me to not talk to anybody about the case, to try to keep it solo so the stories don't get mixed up like they already did.

Q    Do you recall telling the officer that when Rachel left on or about June 3rd late in the evening when you'd been invited to a party by her that she left in a vehicle that had a loud exhaust?

A    No.

Q    What kind of car was Eddie Start driving back June 3rd of '97; if you recall?

A    I don't remember.  I do remember that when Rachel came over that she said she was on acid, that she had tooken like a couple hits of acid, I believe.  I believe it was a couple hits, but I

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

**0003223**

Gabrion 049817

29

remember her saying that she was on acid.

Q    How did she appear at that time emotionally?

A    She seemed happy.  She was smiley.

Q    Didn't seem fearful or --

A    Unh-unh.

Q    That's a yes or a no?

A    No.

Q    And did she make any statements about what her plans were other than to go to this party?

A    No.

Q    Did she tell you whether or not she'd already been at a party?

A    Yeah.  She said she just came from the party and she's going back.  She wanted to come and get me and Tina.

Q    Is there any reason why you didn't go?  I mean it's not your child that needed baby-sitting.

A    I don't like going to parties that I don't know people at plus -- I don't know -- I don't like going to parties anyways because I'm not that kind.  I don't like to drink and do drugs and everything else.

MR. VERHEY:  I think those are all the questions we have for this witness unless somebody on the grand jury has questions for her.  Yes, sir?

GRAND JUROR:  How is Eddie your uncle?  Through what?

THE WITNESS:  Through my dad.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003224

Gabrion 049818

30

GRAND JUROR: Your dad's brother?

THE WITNESS: Yes. He's my dad's brother.

GRAND JUROR: You also said that Rachel had a T -- you thought she had a T-shirt on that night she came over. Do you remember what color that T-shirt was?

THE WITNESS: No, I don't.

GRAND JUROR: Did you hang around with Rachel much?

THE WITNESS: I used to when Shannon was just a baby, a couple weeks old, when she was going out with Dale Lawe. I was staying up with my aunt Teresa at Marilyn's house when her and Eddie were still going together, and I would go over to Rachel's house because that's when Rachel lived in Velda's trailer. And I used to go over there and talk with Rachel and play with Shannon.

GRAND JUROR: Did you go out partying with her at all?

THE WITNESS: No.

GRAND JUROR: Did you know who she was dating then at that time?

THE WITNESS: At that time she was dating Dale Lawe.

MR. VERHEY: Yes, sir.

GRAND JUROR: I'm trying to sort this out. Are Eric and Mary your parents?

THE WITNESS: Yes, they are.

GRAND JUROR: Then Duane Eric is your brother?

THE WITNESS: Well, my dad's name is Duane Eric, and

0003225

Gabrion 049819

31

my brother's name is Duane Eric, Jr.

GRAND JUROR:  Okay.

MR. VERHEY:  Any other questions for this witness?

GRAND JUROR:  Now, we've heard about some letters. Did you hear anything about the letters that came from Rachel?

THE WITNESS:  I heard that my grandma had gotten letters.  I haven't seen them.  Well, I seen one, and it was like -- I don't know.  It was written in two different handwritings.  It was like she started writing.  Then she stopped, and then she started writing again, but I didn't read it.  She just showed it to me.

GRAND JUROR:  Okay.  And it was your grandmother that you first heard about the letters from?

THE WITNESS:  Yeah.

BY MR. VERHEY:

Q      And your grandmother is who?

A      Marilyn Burke.

Q      All right.  When did you see it?

A      I don't remember exactly when.  I believe it was towards the end of the summer like after I moved back up to my mom's.

Q      Do you remember if it had a date on it or anything like that?

A      No.  I don't remember.

Q      Do you remember what it said?

A      No.  I didn't read it.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003226

Gabrion 049820

32

Q    Oh, you didn't?

A    No.

Q    How about -- did your grandmother tell you what it said --

A    No.

Q    -- or summarize it for you?

A    Well, I don't remember.  I don't believe she did.

Q    What happened to that letter?  Do you know?

A    No, I don't.

Q    Now, you must have been told that it was from Rachel --

A    Yeah.

Q    -- because you just said it was?

A    Yeah.

Q    So your grandmother told you it was from Rachel?

A    Yeah.

Q    Did your grandmother tell you where it came from --

A    No.

Q    -- like where Rachel had sent it from?

A    No.  Well, I believe she said that the letter was about Rachel had moved out of state and that she was getting married, and that's all I can remember about the letter.

Q    All right.  Did she ever say -- did Rachel ever say anything to you about moving out of state or --

A    No.

Q    -- getting married?

        MR. VERHEY:  Just to catch up, did you have a

0003227

Gabrion 049821

33

question, sir?

GRAND JUROR:   Are you afraid to be here?   Has anybody made any threats or --

THE WITNESS:   No.

GRAND JUROR:   Nothing like that?   Okay.

MR. VERHEY:   Yeah.

GRAND JUROR:   You mentioned that the letter had two different handwritings like she started and stopped.   Did you mean it had two different handwritings or maybe two different color inks?

THE WITNESS:   Like two different handwritings.   Like one was like slanted a little, and the other one was like up straight.

GRAND JUROR:   So it may have been written by two different people?

THE WITNESS:   Yeah, it could have been, but I don't think it was.

BY MR. VERHEY:

Q   So you saw the letter?

A   Yeah.

Q   But you didn't read it?

A   No.

Q   Why not?

A   It wasn't addressed to me.

Q   Well, I know, but wasn't it of interest to you?

0003228

Gabrion 049822

34

A     No.

Q     All right.  Is this before you learned that she was dead?

A     No.  It was after.

Q     So it didn't interest you at all what a dead woman had sent to your grandmother?

A     No.

Q     All right.

          MR. VERHEY:  Yes, ma'am.

          GRAND JUROR:  What is the connection between Rachel and her grandma?  Why would Rachel send her grandma a letter?

          MR. VERHEY:  Yeah.

BY MR. VERHEY:

Q     Can you explain that?

A     Rachel has always been close to my grandma.  Rachel would go over to my grandma's and talk to my grandma for a while, and then if Rachel was having any problems she would go and talk to my grandma.  I mean Velda, she was not around for Rachel, and I guess my grandma was like another mom to Rachel.  She was like --

Q     So they were pretty close?

A     Yeah.  She'd comfort her.

Q     All right.

          MR. VERHEY:  Yes, ma'am.

          GRAND JUROR:  And you don't remember ever talking to Eddie about the letters?

          THE WITNESS:  No.

Patricia R. Pritcherd, Certified Electronic Reporter
(616) 364-4943

0003229
Gabrion 049823

35

MR. VERHEY:  Yes, sir.

GRAND JUROR:  Are you close to your Uncle Ed?  Do you love him?

THE WITNESS:  Yeah, I love him, but I don't know.  We don't talk that much.  I hardly ever see him.  He's always in Grand Rapids with his -- God knows how many girlfriends.

BY MR. VERHEY:

Q    Do you know who else might have seen the letter besides your grandmother and you?

A    I believe Eddie and Vernie did.

Q    How do you know that?

A    I don't.  I just --

Q    I mean why would you say that?  What makes you conclude that?

A    I don't know.  Well, Eddie was staying with my grandma at the time, and so was Vernie, so --

Q    So, because your grandmother was talking about the letter and they were staying with your grandmother, you're assuming that they must have seen it also or heard about it?

A    Yeah.  Well, they were there when my grandma was telling me about it.  Well, she wasn't telling me; I believe she was telling Eddie about the letter --

Q    I see.

A    -- and I was just there, so I heard about it.

Q    Yeah.  Somebody must have had some reaction to this letter.

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

**0003230**

Gabrion 049824

36

Did you recall anybody being surprised or --

A      They were like -- they were -- I don't know how to explain it, but they were like, "Is this really Rachel's handwriting?" and everything else.  I don't know.  The letter might even have been from when she was in jail.  I don't recall from -- if it was -- I don't remember.

Q      Did they read the letter?

A      Yeah.

MR. VERHEY:  Anybody else have any questions for this witness?

BY MR. VERHEY:

Q      Well, I should remind you, Ms. VanSlyke, that everything you've said here is subject to the penalty of perjury.

A      Yes.

Q      And I'd like you to think about your answers here today, and please change any answer right now if you wish to without worrying about being prosecuted for perjury, but once you walk out the door you can't change your answers.  Is there anything you want to change about what you've said here today?

A      No.

Q      Anything else about Rachel Timmerman's death that you know of that nobody has asked you here today?

A      No.  I know about -- because I read it in the paper or seen it on the news or something that Gabrion -- I think his name is Gabrion -- raped Rachel and that she was trying to get him for --

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

**0003231**

Gabrion 049825

57

press charges against him or something.

Q      But that's because you saw it on TV or --

A      Yeah.

Q      -- read it the paper, correct?

A      Yes.

Q      You don't know anything based on --

A      No.

Q      -- personal knowledge?

A      No.  She hasn't talked to me about it or anything else.

Q      So she never talked to you about the rape charges against --

A      No.

Q      -- Marvin Gabrion?

A      No.  I didn't even know she got raped until after I seen it on the news.

Q      All right.

       MR. VERHEY:  Any other questions?  Ma'am, thank you. You're excused.

       (At 10:10 a.m., testimony concluded.)

       -- -- -- --

Patricia R. Pritchard, Certified Electronic Reporter
(616) 364-4943

0003232

Gabrion 049826

38

STATE OF MICHIGAN )
                  ) ss
COUNTY OF KENT    )


    I, Patricia R. Pritchard, CER 3752, Certified Electronic

Court Reporter for the State of Michigan, do hereby certify that

the foregoing pages, 1 through 38, inclusive, comprise a full,

true and correct transcript, to the best of my ability, of the

proceedings and testimony recorded in the above-entitled cause.


                              _____
                              Patricia R. Pritchard, CER 3752


May 26, 1998


                Patricia R. Pritchard, Certified Electronic Reporter
                              (616) 364-4943


                                                    0003233
Gabrion 049827