# EXHIBIT 4.16

FROM : Dr. Jackson & Assoc.          PHONE NO. : 313 971 0111          Jul. 26 2001 07:11AM P2

**NEWTON L.P. JACKSON, JR., Ph.D.**
2170 INDEPENDENCE BOULEVARD
ANN ARBOR, MICHIGAN 48104-6423

MI LIC # - 00864
NC LIC # - 2012
OH LIC # - 2037
CA LIC # - PSY 3143 (Inactive)
GA LIC # - 001406   (Inactive)
SS# - 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

OFFICE 7343) 662-4244
FAX (734) 971-0111
MOBILE (734) 645-9696

FORENSIC AND CLINICAL PSYCHOLOGY
ABPP DIPLOMATE
AMERICAN BOARD OF
FORENSIC PSYCHOLOGY

Mr. Paul L. Mitchell
Attorney at Law
Mitchell & Zambon, PC
Waters Building, Suite 507
161 Ottawa Avenue, NW
Grand Rapids, MI 49503

July 26, 2001

RE: GABRION, Marvin Charles
Subject: Clinical Evaluation

Dear Mr. Mitchell:

This preliminary report concerns your client, Marvin Charles Gabrion, a 47 year old
Caucasian male who was born in Grand Rapids, Michigan, October 18, 1953. You
indicated that you referred Mr. Gabrion to me for a clinical evaluation for further
exploration of possible defenses which may be available to Mr. Gabrion regarding his
current legal situation.

**Background Materials Reviewed**

Prior to the writing of this report, I reviewed copies of a number of documents related to
Mr. Gabrion's legal situation which you forwarded to me. These included:

1.  Social History and Records of Marvin Charles Gabrion II, dated March
    22, 2000, prepared by James F. Crates and David C. Stebbins
2.  Psychological Evaluation of Mr. Gabrion conducted at the Federal
    Medical Center in Ft. Worth, TX, dated May 8, 2000, prepared by
    Emily Fallis, Ph.D.
3.  Letter regarding Mr. Gabrion's prior treatment dated January 30, 2000,
    authored by Theodore F. Mauger, M.D., which includes a copy of a
    letter (undated) sent to Dr. Mauger by Marvin Gabrion
4.  Records from several hospitals and other sources where Mr. Gabrion
    received treatment or evaluation, dated from March, 1993 through
    December, 1995, including Pine Rest Christian Hospital , Hope
    Network, and Hackley Hospital

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 2

## Location of Evaluation

I interviewed Mr. Gabrion at Milan Federal Correctional Institution for a period of one hour and forty-five minutes on June 25, 2001, and for an additional forty-five minutes on July 5, 2001.

## Advisory Regarding Lack of Confidentiality

Prior to the interview, I attempted to inform Mr. Gabrion of the purpose of my contact with him and of the limits on confidentiality which pertained to my examination of him. I was not able to conclude that Mr. Gabrion understood my explanations due to his mental condition at that time.

## Outcome of Interview #1

During my interview with Mr. Gabrion on June 25, 2001, I was not able to obtain a coherent history of his prior background or of his current situation from him. His responses to my questions were rarely related to what I had asked, and repeated phrasings of those questions did not result in any improvement in his answers.

Mr. Gabrion's communications to me were consistently contaminated with statements which appeared to be a mixture of delusional references along with isolated factual items. He said he had been receiving psychiatric care since 1992, that he had experienced a head injury, and that he had been in many hospitals. He stated he had been at FCI Milan "off and on for a few years."

Mr. Gabrion then said he "hears voices a lot" and that they have existed "since I was a kid." With no transition, he stated that " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would come over. My dad was working in a junk yard. We had an outside door to the front, because I would walk into the bedroom and she was in there with Pepe. And my little brother, he's two years younger, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In an attempt to refocus Mr. Gabrion, he was asked about his history of psychiatric treatment. He said "I've always heard voices, different ones. A bunch of people. They are clear and resonant in my head. It is probably God. One is real clear, more than the others."

When asked what he meant when he said he "always" had heard voices, Mr. Gabrion stated "Since I was two or three. At age 4.8 or 5.2, my sister locked me out of the house when my parents would go drinking. My older sister babysat me. I would be locked out in the winter, and I was trying to walk to my cousin's. We used to go to that part of town. I had my left lung cut out and was 30 days in an oxygen tent."

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 3

Mr. Gabrion then said "One of the voices is new. It tells jokes to me. As a little kid, I had one, then not. The voices tell me not to kill. That's the way to light. Then there is only a bright light in my head. The voices say to do stuff in my head."

Mr. Gabrion was asked whether he was sleeping alright, given his commentary about hearing voices. He said "Not really. Antidepressants and Motrin aren't given to me here. I was on Elavil. But they are giving me Haldol, and that only makes me angry. I started in 1986 with psychiatric hospitals. Maybe New England Health. I was drinking and doing drugs in Connecticut." Asked about his appetite, he said "I'm hungry all the time. I had been eating and I got hepatitis C. My body is not right. I've been eating a half a roll of toilet paper a day since I've been here. They won't let you buy food."

Questioned about his energy level, Mr. Gabrion said "It is up and down. Sometimes I'm too tired, like getting depressed, and then I'm real energetic. They call me names. My dad said I was a know-it-all, or Minerva, the goddess of wisdom, and Hypo because I was hyperactive."

Mr. Gabrion described his mood as "I feel happy, but better on antidepressants. Sometimes I'm down, but not sad. I got Elavil from Dr. Adams, a psychiatrist at the Oklahoma federal prison for a suicidal act, hanging. I tried it here, too." Asked about any current suicidal ideas, Mr. Gabrion said "I don't have any conscious plans now, but two weeks ago I was planning it. I'm moody." Mr. Gabrion then laughed briefly.

Asked about his housing arrangement in the prison, Mr. Gabrion said "I'm in a single cell, a cage, a special cage to torture you. The one watching me is ok, but they have hidden t.v. cameras. That cell was made in 1890 and it stinks. They spy on me particularly. The U.S. government is run by the Chinese or by Satan. I used to work for the CIA. In Vietnam I was trying to save the POWs in 1972 to 1973, and I did spy on the Chinese and Vietnamese. I was an operative. In 1996 I helped catch the people who blew up the PanAm jet." Mr. Gabrion continue to ramble about his involvement in Arab intrigues, and about how he helped "a French guy get out" of Vietnam. He mentioned receiving "a Rembrandt" for his help but somehow the painting "got stolen but they left a letter from the museum."

As this interview progressed, Mr. Gabrion's responses became increasingly irrelevant and his successive topics of conversation became only tangentially connected to one another. His ideas and remarks were only loosely associated, and his attention span declined progressively. He mentioned that he has had "sparks across my brain and Dr. Ted gave me an EEG. The sparks are worse when I sleep and have apnea. Two children were killed by abortion. ██████████████████████ ██████ She wants to make sure I stay in prison. My mother has stolen forty thousand dollars of my money because in 1992 I was incompetent and it was my social security money." Mr. Gabrion's remarks then went to a memory of having been "blackmailed" by his mother, and he began to laugh more often as his thoughts became ever more disorganized and chaotic.

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 4

Mr. Gabrion mentioned his continuing experience of "electric jolts in my fingers," skin diseases, dandruff, burning sensations in his feet, and bugs on his legs and body. An attempt to draw his attention back to a discussion of his current legal jeopardy resulted in him saying that he was charged with being critical of the government and of attorneys "who are immoral, dishonest, and greedy. I was raising the threat of truth in Altoma. I was building a camp for underprivileged kids. ███████████████████████ ███████████████████████████████, My younger brother would sell coke and sex to them, like her. That judge was caught putting drugs down an 8 year old's crotch, and the prosecutor let him off. I threatened to sue." Mr. Gabrion then began raving about sexual abuse of minors and illicit drug activity by attorneys, prosecutors and judges. At the end of this interview, Mr. Gabrion excitedly asked for the examiner's business card. He exhibited racing thoughts and bizarre thought content as he eagerly drew for the examiner a symbolic picture of a face with three eyes, a reference to a passage in the Bible, and the name AZZA on it. Mr. Gabrion then looked intensely and knowingly at the examiner as if this picture would clarify everything.

**Outcome of Interview #2**

Prior to my second interview of Mr. Gabrion, I received an angry letter from him in the mail. In the letter, he mentioned his continuing discomfort related to thoughts about "the loss of my daughter AZLA by abortion," his need for treatment of headaches and depression, and his ongoing suicidal ideas. He also asked if his attorneys had requested me to kill him.

During my interview with Mr. Gabrion on July 5, 2001, he stated that he did not recall our previous meeting. I told him I wanted to ask him questions about his Texas evaluation regarding competency to stand trial, his most recent evaluation for that same issue conducted by Henry Ford Hospital staff, what he knew about the possible penalties he was facing in his current legal situation; and how he intended to defend himself in a court of law.

Mr. Gabrion asked me if I was an attorney, and when I reminded him of our meeting on June 25th, he did not appear to recall it and said "I forget my mother and sisters. What kind of psychologist are you? Do you focus on male children's sex abuse? Women do it to boys and it gets ignored."

Mr. Gabrion's attention was again drawn to having him speak about his present legal circumstances. He said "I am in prison because I hate corrupt people. Stebbins was here last week. They play games. He says it says one thing, and I can't read. They say it is supposed to be a release, but he never dated it or nothing."

Mr. Gabrion said he did not recall anything about his evaluation in Texas, "but they had cigarettes there. They had a forensic, not a psychologist, not licensed. Lots of people can call themselves forensics. Forensic means evil. She said if I didn't cooperate she

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 5

would have time to kill me and beat me up. I remember wrap around chairs and cuffs. She began to suck my dick, and I had blood and saliva samples. I mailed them to my attorney and the court. They said they lost it. Saliva carries your DNA. They accepted her appraisal of me. I was only seen for five minutes."

When asked about his recollection of his Henry Ford Hospital evaluation, Mr. Gabrion said "I am not charged with murder. Your whole goal is to be an expert who says I am not competent. You are here to kill me." Mr. Gabrion was asked what he thought the phrase "competent to stand trial" meant. He said "When I swear, it doesn't mean I'm angry. I'm supposed to get two ice creams and a pop. It's a deal with Dave Stebbins. Loan me $2.50 and I'll send it to you."

Mr. Gabrion was again directed to discuss his pending legal situation. He said "The charges? Ask these God-like attorneys. They will ask the prosecutor to murder me. I have been trying to fire my attorneys for three years. But the judge is corrupt also. I can tell by the forensic in front of your name that you would like to believe you do good. I was on antidepressants. They know that. It helps me sleep. I have headaches. I can't read law books, and Mitchell and Stebbins like that. They asked the psychiatrists not to give me meds. They said they don't want my mental disability cloaked at this time. A prosecutor let this sex coked brother of mine off. I told them, this is the fifth false charge." In an attempt to focus Mr. Gabrion, he was asked to clarify what charge he was talking about. He said "Nothing is truthful. The judge should be in hell. Paul Mitchell, I told him about Crystal Roach. He said she's good to attorneys at night. The same married man as Crystal Roach and he's bisexual. Paul Mitchell's purpose is to fire me. He ignores blood and saliva off my dick. As for you, I see the memory banks in your mind. He said he wanted to murder me, to make sure I am executed. He wants to torture me, and make me weaker. I can't get anyone to do stuff for me."

Mr. Gabrion was asked whether he was aware of any upcoming court dates and the purpose of them. He said "I don't know. But one more word. The last time I talked in the court room the judge said I would be on camera for the rest of my life and that he would have me electrified with stun guns. Two of them because that is what will kill you."

When the examiner informed Mr. Gabrion that the time available for this interview had ended, his mental condition appeared to worsen. He seemed to withdraw in a paranoid, self-protective way, and made several disjointed comments about knowing the examiner's true purpose to simply make money and participate in the plan to make sure that Mr. Gabrion will be killed.

### Mental Status Examination

**Appearance, Behavior and Attitude:** Mental status examination was conducted on June 25, 2001. Mr. Gabrion presented as a Caucasian male who looked to be his reported age of 47 years old. He made good eye contact, but he was not able to remain

FROM : Dr. Jackson & Assoc.          PHONE NO. : 313 971 0111          Jul. 26 2001 07:14AM P7

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 6

focused on topics being discussed during this evaluation. Mr. Gabrion exhibited no abnormal or bizarre mannerisms but he expressed continuing doubts and suspicions about the examiner's true motives in evaluating him. Mr. Gabrion did not appear able to respond in any relevant or coherent manner to standardized psychological testing due to his inability to relate in a rational manner to test content.

**Speech and Form of Thought:** Mr. Gabrion was not able to establish adequate rapport with the examiner and to answer questions appropriately. He exhibited no speech impediment during this examination. He could not answer questions pertinent to his developmental years and adult life. His thoughts were generally illogical, disorganized, and lacking in focus. He exhibited symptoms of thought disorder involving tangentiality, circumstantiality and loosening of associations. Mr. Gabrion was only able to tolerate relatively brief interview sessions before his agitation and mental condition progressively deteriorated. His concentration and ability to stay on task was impaired. Mr. Gabrion claimed to be experiencing auditory hallucinations, but he did not exhibit behavioral evidence of such symptoms during interviews conducted with him. He claimed that Haldol (an antipsychotic medication) was being given to him at FCI Milan, but this examiner has no independent confirmation that his statement is accurate.

**Mood and Affect (Emotional State):** Mr. Gabrion described his mood as "up and down." He demonstrated a labile affect and said that he has experienced depression both currently and in the past. He said that his appetite is good but he can't buy food and has eaten a half a roll of toilet paper a day since being at FCI Milan. He said he is "not really" sleeping and that he experiences suicidal ideation from time to time.

**Thought Content and Perceptions:** There was evidence of loose associations (scattered thoughts) during the evaluation. Paranoid thought content and delusional ideas were expressed by Mr. Gabrion, particularly toward the end of interviews conducted with him.

**Cognitive Functioning:** Mr. Gabrion was alert and generally oriented to person, place and time. He demonstrated a low fund of knowledge and had difficulty with immediate and delayed recall. He had difficulty with concentration and attention. He was not able to provide the common meaning for proverbs offered to him, and his ability to respond appropriately to questions involving social judgment was impaired.

**Opinion Regarding Mr. Gabrion's Mental Condition**

During both of my interviews with Mr. Gabrion, his ability to respond to my questioning was better initially than it was later on, although he was never entirely coherent or relevant when responding.

Mr. Gabrion's presentation also appeared to include some exaggeration, malingering or feigning. His repeated return to themes of believing that his attorneys, this examiner,

GABRION, Marvin Charles
Clinical Evaluation
July 26, 2001
Page 7

and others were intending to kill him had a practiced manner, as if this presentation is a familiar pattern for him to assert. The same quality of rehearsal seemed evident in his description of auditory hallucinations and other assertions he made. Also, his presentation of some symptoms was inconsistent.    -

However, apart from the thread of malingering which was woven through this examiner's interviews with Mr. Gabrion, he also demonstrated some symptoms of a disorder of both thought and mood which appeared to be genuine. He demonstrated racing thoughts, elation and depression during the interviews. His impaired judgment and lack of insight was plain. He exhibited progressive tangentiality, loose associations, circumstantiality, ideas of reference, and other indications of thought disorder.

A person who is experiencing genuine symptoms of mental illness may also, at the same time, exhibit malingering or exaggeration of symptoms. Also, mentally ill people do not always present symptoms in a reliable and predictable manner. In my opinion, Marvin Gabrion's clinical presentation in part reflects malingering, and in part reflects symptoms of mental illness.

Although I made repeated attempts to communicate with Mr. Gabrion about issues critical to his present legal situation, I was not successful in doing so. I was therefore not able to obtain information from Mr. Gabrion which I would need in order to formulate an opinion about whether I can assist you further in this case regarding possible defenses which may be available to Mr. Gabrion.

Despite the likelihood of a certain degree of malingering on Mr. Gabrion's part, I do not think that Mr. Gabrion is currently competent to participate in further legal proceedings. In my opinion, deterioration in his mental condition associated with symptoms of both a thought and mood disorder prevents him from relating in a rational manner to his legal situation and to the tasks he would need to perform in assisting his attorneys to prepare a defense for himself.

I hope that this report will be useful to you. Should you have any questions about it, please let me know and I shall respond promptly.

Respectfully Submitted,

Newton L.P. Jackson, Jr., Ph.D.
Licensed Psychologist
ABPP Diplomate
American Board of Forensic Psychology

FROM : Dr. Jackson & Assoc.          PHONE NO. : 313 971 0111          Dec. 11 2001 04:55PM P2

## NEWTON L.P. JACKSON, JR., Ph.D.
### 2170 INDEPENDENCE BOULEVARD
### ANN ARBOR, MICHIGAN 48104-6423

MI LIC # - 00864
NC LIC # - 2012
OH LIC # - 2837
CA LIC # - PSY 3143 (Inactive)
GA LIC # - 001406     (Inactive)
SSP - 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

OFFICE (734) 602-4244
FAX (734) 971-0111
MOBILE (734) 645-9696

FORENSIC AND CLINICAL PSYCHOLOGY
ABPP DIPLOMATE
AMERICAN BOARD OF
FORENSIC PSYCHOLOGY

David C. Stebbins
Attorney at Law
330 South High Street
Columbus, OH · 43215

December 11, 2001

RE: GABRION, Marvin Charles.
Subject: Clinical Evaluation

Dear Mr. Stebbins:

This report concerns my most recent contact with your client, Marvin Gabrion.

### Background Materials Reviewed:

Prior to seeing Mr. Gabrion on this occasion, I reviewed the material and documents related to Mr. Gabrion's past contacts with the Bureau of Prisons, and other information, which you recently forwarded to me.

### Location of Evaluation

I interviewed Mr. Gabrion at the Calhoun County Jail in Battle Creek, Michigan, for a period of one-half hour on December 11, 2001.

### Outcome of Interview

When Mr. Gabrion appeared for the interview, he was in belly chains, leg irons, and handcuffs. Lt. Isham, whom I had telephoned the previous day, had advised me that this situation would be in effect for security reasons.

Mr. Gabrion appeared to have lost weight compared to how he looked when I last evaluated him in July this year. He also had grown about a two inch beard. His manner upon entering the interview room was cordial, and he spontaneously offered to shake my hand, despite his handcuffs.

FROM : Dr. Jackson & Assoc.          PHONE NO. : 313 971 0111          Dec. 11 2001 04:55PM P3

GABRION, Marvin Charles
Clinical Evaluation
December 11, 2001
Page 2

Mr. Gabrion had brought with him what appeared to be a variety of legal documents, but he never referred to them. He immediately began to speak once he was seated in the room, and commented that "it is worse here now and I have already contacted witnesses and proved my innocence, but they want to murder me. You and all the attorneys."

He complained that "I can't contact no one, or communicate with anyone, these evil bastards want to murder me." His style of speech was rambling and angry in tone. He spoke of a time when he was "two years old and I was locked in a closet, and ████████ laughed at me. From age 2-8 I was locked in a closet."

When I tried to engage him in conversation related to his pending legal proceedings, he glared at me and angrily stated that he was going to talk for ten minutes, and I could either listen to him or leave right now. He then continued to ramble, stating that his ████████ locked him out of doors "on purpose" during the winter, and were laughing at him. He said he "had a fever and got pneumonia, and my Dad took me to Herkimer (sp?) Bar where there are stuffed animals on the wall, and ████ ████████████████████████████████████████████████████"

He then said something about "when you get through murdering me, you're all evil." Then he said he was tied to a tree because ████████████████████ ████████████, and there was a police report but the mitigators lost it. Then we moved North so they could tie me to trees and control us, they were too lazy to watch us. I started drinking at age 14 and drank alcohol heavy for 15-18 years. I had a head injury when I was 10 or 11 because my brothers tried to smash my brains in. The hospital took x-rays and it was cracked, but they left it alone."

Mr. Gabrion said he "had a bunch of head injuries, cars and cycles, and in 1984 my wife I was with had a little girl. She was 7½ months along, and me and my step-son were playing religious tapes to her. She decided to get an abortion, she murdered the baby. That was the last time I took any chance of getting any woman pregnant again.

"The dumb ass court said I had sex with a woman but the rape kit said no. I was told the Prosecuting Attorney was going to get fired. My brother was dealing drugs to the judge and the judge let him go scott free. He got caught red-handed selling to kids, and he should have at least got some time. She (the prosecutor) sleeps with the court appointed counselor. They's always get him because she's sleeping with him, and he's supposed to represent the man accused of crimes against women. That woman Barb Gino is a cocaine addict too, just like everyone in the whole world. They are dishonest, mean, and immoral.

FROM : Dr. Jackson & Assoc.          PHONE NO. : 313 971 0111          Dec. 11 2001 04:56PM P4

GABRION, Marvin Charles
Clinical Evaluation
December 11, 2001
Page 3

When the jail is done murdering me, and several guards have come into my cell to threaten me, they are starving me with rotten food and making me puke. I want you to know that you are going to get nothing out of this. You murdered my daughter because you are part of the system. The jail people are getting too much money and it should go to the poor people; you're all murderers. You know I am totally innocent."

Mr. Gabrion then asked if I had heard of Dr. Mauger. I responded by asking him why he brought Dr. Mauger's name up. He said it was because "me and Dr. Mauger are like that (showing two fingers held up close together, inseparable). Stebbins ain't bad as earthly beings go, he's in the top 20%, but you are all murderers. My Mom sold my Christian bookstore and stole my social security checks. Stebbins said it in plain English, if I get some other attorney; that one would be even worse (laughs). All the people here are totally evil, for psychological reasons."

Mr. Gabrion continued to ramble disjointedly about the Bureau of Prisons, how he was being given poisonous food, about his rights to newspapers which he doesn't receive, and about medications he should be getting but isn't. I took that opportunity to ask if he is receiving any medications in the Calhoun County Jail, and Mr. Gabrion stated that he is not, and that "Stebbins doesn't want my mentality cloaked, and you are all murderous, evil, scum. That's how most people are, they are immoral, dishonest, lazy, and 5 or 6 other things, all humans are like that."

I asked Mr. Gabrion how he saw himself, and he responded by saying that "I am Jesus and John Lennon, and I am going to heaven. That evil ass David Stebbins said he was going to file a motion to move me to Kent County so I could get access to television and the other information I need, it's completely illegal, and I could have a day room too."

At this point, Mr. Gabrion's manner became much more agitated and he began speaking much more loudly. He stated that "they know I was locked in that closet so they torture me. I own the Church of Truth. They got the DNA of another mother fucker in that girl and I'm here instead." Mr. Gabrion was asked to speak more about this, but he refused and said "Don't write that down." When told the examiner would be writing down everything said in the interview, Mr. Gabrion became even more angry and said that "then they'll use it to show that I use profanity and that's only because they won't give me the medications I need." Mr. Gabrion then said "I apologize to you for putting you through this, but I'm trying to survive. If they move me to Kent County then I'd do whatever you want me to do,

FROM : Dr. Jackson & Assoc.        PHONE NO. : 313 971 0111        Dec. 11 2001 04:57PM P5

GABRION, Marvin Charles
Clinical Evaluation
December 11, 2001
Page 4

When Mr. Gabrion saw that I would not be moving him to Kent County, he stated that I "could just leave then" and he stood up while still speaking very loudly and in an angry manner. Deputies adjacent to the interviewing room then made an entrance, and Mr. Gabrion was told to sit down and that they, not he, would decide when the interview was over.

Although Mr. Gabrion did sit down when confronted with this show of force, as soon as the deputies left the room he became even more agitated and both his body language and his words became increasingly threatening toward me. It was evident that his behavioral controls were marginal and that he might become assaultive. The interview was terminated at that point, both for safety reasons and also because Mr. Gabrion was very clearly indicating he would say no more and would no longer tolerate the interview environment.

**Opinion Regarding Mr. Gabrion's Mental Condition**

During my interview with Mr. Gabrion, he displayed some of the same inconsistencies which he demonstrated during my prior contacts with him. His demeanor varied from cordial to hostile. His thought patterns rarely were entirely coherent or relevant when he spoke.

Mr. Gabrion's repeated return to themes of believing that his attorneys, this examiner, and others were intending to kill him again had a practiced manner. However, he did not mention experiencing any hallucinations (auditory or of some other nature), and he also never mentioned "Azza," a theme which was quite prevalent during my previous interviews with him. In contrast with the last time I saw him, he did not claim he didn't know who I was and he even remembered that I was a psychologist.

One consistent aspect of Mr. Gabrion's presentation over time appears to be an intense focus on being in control of a situation. He seemed to want to control the content and progress of this interview, and his manipulative behavior in other settings also highlights this aspect of his personality style. He has exhibited behaviors which can appear to be genuine symptoms of a disorder of both thought and mood. Yet, it is possible that his manifestations of impaired judgment and lack of insight may be deliberately malingered so that he can remain "the stage director" who compels others to act in response to the roles he adopts.

I made repeated attempts to communicate with Mr. Gabrion about issues critical to his present legal situation, but I was not successful in interrupting him or gaining his attention. I was completely unable to obtain relevant information from Mr.

GABRION, Marvin Charles
Clinical Evaluation
December 11, 2001
Page 5

Gabrion which would enable me to evaluate possible mitigating factors which might be presented on his behalf in a trial setting.

I doubt that further attempts by me to interview Mr. Gabrion will be fruitful in terms of obtaining information directly from him regarding his past history or about any other aspect of his life. Whatever formulation I might be able to construct in order to present an understanding of how Mr. Gabrion's life experiences have impacted negatively upon him in terms of psychological pressures and maladaptive outcomes will likely have to be derived from other sources.

I hope that this report will be useful to you. Should you have any questions about it, please let me know and I shall respond promptly.

Respectfully Submitted,

Newton L.P. Jackson, Jr., Ph.D.
Licensed Psychologist
ABPP Diplomate
American Board of Forensic Psychology

FROM : Dr. Jackson & Assoc.          PHONE NO. : 734 971 0111          Feb. 21 2022 03:22PM P1

**NEWTON L.P. JACKSON, JR., Ph.D.**
2170 INDEPENDENCE BOULEVARD
ANN ARBOR, MICHIGAN 48104-6423

MI LIC # - 00564
NC LIC # - 2012
OH LIC # - 2837
CA LIC # - PSY 3143 (Inactive)
GA LIC # - 001406    (Inactive)
SS# - 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

OFFICE 7343) 662-4244
FAX (734) 971-0111
MOBILE (734) 645-9696

FORENSIC AND CLINICAL PSYCHOLOGY
ABPP DIPLOMATE
AMERICAN BOARD OF
YORENSIC PSYCHOLOGY

Mr. Paul L. Mitchell
Attorney at Law
Mitchell & Zambon, PC
Waters Building, Suite 507
161 Ottawa Avenue, NW
Grand Rapids, MI 49503

and

David C. Stebbins
Attorney at Law
330 South High Street
Columbus, OH   43215

February 21, 2002

RE: GABRION, Marvin Charles
Subject: Mitigation Issues

Dear Attorneys:

This report concerns your client, Marvin Charles Gabrion, a 48 year old Caucasian male who was born in Grand Rapids, Michigan, October 18, 1953. Initially, you referred Mr. Gabrion to me for a clinical evaluation to further explore certain defenses which might be available to him regarding his current legal situation. Subsequently, you asked me to evaluate possible mitigating factors which would have significantly impacted upon him at the time of the offenses with which he is charged.

**Background Materials Reviewed**

Prior to the writing of this report, I reviewed copies of a number of documents related to Mr. Gabrion's legal situation which you forwarded to me. These included:

1.    Records from several hospitals and other sources where Mr. Gabrion received treatment or evaluation, dated from March, 1993 through December, 1995, including Pine Rest Christian Hospital , Hope Network, and Hackley Hospital

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 2

2. Pre-Sentence Investigation Report authored by Jon Street, U.S. Probation Officer, as amended and dated July 10, 1998

3. Letter regarding Mr. Gabrion's prior treatment dated January 30, 2000, authored by Theodore F. Mauger, M.D., which includes a copy of a letter (undated) sent to Dr. Mauger by Marvin Gabrion

4. Social History and Records of Marvin Charles Gabrion II, dated March 22, 2000, prepared by James F. Crates and David C. Stebbins

5. Psychological Evaluation of Mr. Gabrion conducted at the Federal Medical Center in Ft. Worth, TX, dated May 8, 2000, prepared by Emily Fallis, Ph.D.

6. Psychological Evaluation of Mr. Gabrion conducted at the Federal Medical Center in Springfield, MO, dated October 22, 2001, prepared by Richart L. DeMier, Ph.D.

7. Additional Bureau of Prisons records concerning Mr. Gabrion's past history of incarceration

8. Record of Investigator contact with Rebekah Canavan, dated 09/23/1997, supplied by James Crates on January 24, 2002

## Brief Social History of Mr. Gabrion

Previously gathered information concerning Mr. Gabrion indicates he was born in Grand Rapids, Michigan, on October 18, 1953. He is the fifth of six children born to his parents. Besides his younger brother David, he has an older brother, Michael, and older sisters Yvonne, Gloria, and Christine. Mr. Gabrion's family moved to Round Lake, Michigan, for about five years when he was five years old. The family then relocated to White Cloud, Michigan.

Mr. Gabrion's only apparent health problem during his early years occurred when he was in second grade. At that time, he was diagnosed with pneumonia and eventually underwent surgery related to that illness. Reports from his schools have indicated good attendance, no disciplinary problems, and average to slightly below average grades, although intellectual testing revealed average to above average scores. He participated in school activities such as Track and Field during his Senior year, and was known to school staff as a quiet young man whose behavior in class was unremarkable.

After graduating from high school in 1971, Mr. Gabrion was apparently involved in a serious automobile accident, although details of his reportedly serious injuries have not been located. In 1972, he moved to Ludington, Michigan, where he worked awhile as a roofer and briefly in the auto industry. Around 1973, he evidently moved to Arizona and lived in the Phoenix and Tuscon areas. After returning to Ludington, Michigan, in 1974, Mr. Gabrion worked briefly at Great Lakes Die-Casting, and then he was trained as a Journeyman electrician, working mainly as a high wire technician with the International Brotherhood of

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 3

Electrical Workers. During 1975 and 1976, he worked periodically for Hydaker-Wheatlake in Reed City, Michigan, and for several other firms for the next fifteen years, as the nature of his high wire electrical work was sporadic and often required him to travel widely. Apparently, during 1977 and 1978, Mr. Gabrion was largely not residing in Michigan.

Family members have reported that sometime in the late 1970s, Mr. Gabrion experienced a motorcycle accident involving head trauma. This incident reportedly occurred in Colorado, but efforts to obtain records of it have not been successful. In any event, family members related that subsequent to this accident, Mr. Gabrion seemed to have "changed" and much more likely to exhibit "suspiciousness" and "acting paranoid" when he returned to White Cloud, Michigan, in 1979. They also noted at that time an increase in excessive consumption of alcohol on his part, as well as much more frequent verbally combative and confrontational behaviors.

When Mr. Gabrion subsequently returned to work at Hydaker-Wheatlake, he reportedly began to exhibit problems in the work environment involving frequent unexcused absences and inability to perform his duties effectively. He continued to sporadically work through the International Brotherhood of Electrical Workers in a variety of States. In 1981 he evidently traveled to Orlando, Florida, to work at seasonal fruit picking, returning to White Cloud in 1982. After working briefly for Hydaker-Wheatlake, he apparently again began traveling, moving to Texas briefly before again moving to Arizona.

In 1983, Mr. Gabrion was married for the first and only time. No children resulted from this union, and the couple was divorced after a couple of years. He remained in Arizona until 1985, then returned briefly to Michigan before traveling to California, where he once more worked in the electrical service industry until 1988. He then moved to the East Coast, working in New York, New Jersey, and Pennsylvania before returning to Michigan in 1991, at which time he resumed working for Hydaker-Wheatlake.

In 1992, Mr. Gabrion was involved in another automobile accident near Cedar Springs, Michigan. Although he did not report any serious injuries, soon thereafter he went to Butterworth Hospital complaining of experiencing symptoms such as difficulty with memory and recall, speech, and mood swings. He received evaluation and treatment Hackley Hospital in Muskegon, Michigan, and was later referred to Sojourners (Hope Network) by Michigan Rehabilitation Services. After a two-week evaluative stay, he was determined to be unsuitable for inclusion in that program. Mr. Gabrion began treatment with Theodore Mauger, M.D., who prescribed several psychiatric medications for him. He continued receiving such treatment until 1995.

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 4

**Past History of Examiner Contacts with Mr. Gabrion**

In conducting an evaluation related to mitigation issues, the willing participation of the defendant is crucial in order to obtain relevant information which can serve to establish a foundation for opinions in this area. Mr. Gabrion, however, has not been willing to participate meaningfully in providing such information. In order to provide a perspective concerning efforts made to engage Mr. Gabrion in dialogue related to mitigation issues, some information provided to you in my previous reports will be reiterated in this report.

I first interviewed Mr. Gabrion at Milan Federal Correctional Institution for a period of one hour and forty-five minutes on June 25, 2001, and for an additional forty-five minutes on July 5, 2001. Subsequently, I interviewed him for approximately one-half hour at the Calhoun County Jail in Battle Creek, Michigan, on December 11, 2002. As you know, I have continued to remain available for additional contact with Mr. Gabrion, but he has consistently declined to participate in further interviews with me.

**Information Obtained from Mr. Gabrion**

Prior to my interview with Mr. Gabrion on June 25, 2001, I had not had the opportunity to review a substantial number of records which were later made available to me. Despite my efforts, I was not able to obtain from him a coherent history of his prior background, nor any information from him concerning his mental condition at the time of the charges he is facing, nor even any consistent factual information about his current condition at that time. During my first interview with Mr. Gabrion, he appeared to be presenting me with statements suggesting a mixture of delusional references along with isolated factual items. He complained of auditory and tactile hallucinations, and also expressed delusional beliefs and other ideas which were not credible. As this interview progressed, Mr. Gabrion's responses became increasingly irrelevant and his successive topics of conversation became only tangentially connected to one another. His ideas and remarks appeared to be only loosely associated, and his attention span seemed to decline progressively. Mr. Gabrion mentioned his continuing experience of "electric jolts in my fingers," skin diseases, dandruff, burning sensations in his feet, and bugs on his legs and body. An attempt to draw his attention back to a discussion of his current legal jeopardy resulted a torrent of bizarre statements from him involving sexual abuse of minors and illicit drug activity by attorneys, prosecutors and judges.

During my interview with Mr. Gabrion on July 5, 2001, he stated that he did not recall our previous meeting. I told him I wanted to ask him questions about his Texas evaluation regarding competency to stand trial, his most recent evaluation for that same issue conducted by Henry Ford Hospital staff, what he knew about the possible penalties he was facing in his current legal situation, and how he intended to defend himself in a court of law. Mr. Gabrion was not cooperative in answering these kinds of questions. He asked me if I was an attorney, and when I reminded him of our meeting on June 25th, he denied recalling it and said "I forget my mother and sisters. What kind

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 5

of psychologist are you? Do you focus on male children's sex abuse? Women do it to boys and it gets ignored." When Mr. Gabrion's attention was again drawn to having him speak about his present legal circumstances, he said he did not recall anything about his evaluation in Texas. When asked about his recollection of his Henry Ford Hospital evaluation, Mr. Gabrion did not provide responses to that question. When again directed to discuss his pending legal situation, he continued to avoid answering questions related to that issue. When asked whether he was aware of any upcoming court dates and the purpose of them, he said "I don't know."

Mr. Gabrion's presentation appeared to include some exaggeration, malingering or feigning. His repeated return to themes of believing that his attorneys, this examiner, and others were intending to kill him had a practiced manner, as if this presentation is a familiar pattern for him to assert. The same quality of rehearsal seemed evident in his description of auditory hallucinations and other assertions he made. Also, his presentation of some symptoms was inconsistent.

Although I made repeated attempts to communicate with Mr. Gabrion about issues critical to his present legal situation, I was not successful in doing so. I was therefore unable to obtain information from Mr. Gabrion which might be used to formulate an opinion about whether certain defenses might be available to him.

My third interview with Mr. Gabrion occurred at the Calhoun County Jail in Battle Creek, Michigan, for a period of one-half hour on December 11, 2001. When Mr. Gabrion appeared for the interview, he was in belly chains, leg irons, and handcuffs. I had been advised by jail staff on the previous day that this situation would be in effect for security reasons.

Mr. Gabrion had brought with him what appeared to be a variety of legal documents, but he never referred to them. When I tried to engage him in conversation related to his pending legal proceedings, he glared at me and angrily stated that he was going to talk for ten minutes, and I could either listen to him or leave right now. Mr. Gabrion said he "had a bunch of head injuries, cars and cycles." Mr. Gabrion continued to ramble disjointedly about the Bureau of Prisons, how he was being given poisonous food, about his rights to newspapers which he doesn't receive, and about medications he should be getting but isn't. I took that opportunity to ask if he is receiving any medications in the Calhoun County Jail, and Mr. Gabrion stated that he was not. Eventually, Mr. Gabrion's manner became much more agitated and when he found out that I would not be moving him to Kent County, he stated that I "could just leave then" and he stood up while still speaking very loudly and in an angry manner. Mr. Gabrion clearly indicated he would say no more and would no longer tolerate the interview environment. During my interview with Mr. Gabrion, he displayed some of the same inconsistencies which he demonstrated during my prior contacts with him. His demeanor varied from cordial to hostile. His thought patterns rarely appeared entirely coherent or relevant when he spoke.

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 6

One consistent aspect of Mr. Gabrion's presentation over time appears to be an intense focus on being in control of a situation. He seemed to want to control the content and progress of this interview, and his manipulative behavior in other settings also highlights this aspect of his personality style. He has exhibited behaviors which can appear to be genuine symptoms of a disorder of both thought and mood. Yet, it is possible that his manifestations of impaired judgment and lack of insight may be deliberately malingered so that he can remain "the stage director" who compels others to act in response to the roles he adopts.

I have made repeated attempts to communicate with Mr. Gabrion about issues critical to his present legal situation, but I have not been successful in interrupting him or gaining his attention. I was completely unable to obtain relevant information from Mr. Gabrion which would enable me to evaluate possible mitigating factors which might be presented on his behalf in a trial setting.

It has been evident to me that whatever formulation I might be able to construct regarding mitigation issues, in order to present an understanding of how Mr. Gabrion's life experiences have impacted negatively upon him in terms of psychological pressures and maladaptive outcomes, would likely have to be derived from other sources.

## Information Obtained From Family Members

On January 23, 2002, I conducted separate interviews (each lasting approximately 2 hours) with members of Mr. Gabrion's family to further obtain information which might be relevant to mitigation issues. Those interviewed included his mother (Elaine Gabrion), his father (Marvin Charles Gabrion), and a sister (Yvonne Wilkinson). An attempt was also made to interview Rebekah Canavan, a woman who had spent time with him prior to his trip to the State of Washington (and his subsequently reported head injury due to a motorcycle accident). That attempt was not successful.

These interviews resulted in information which indicated that during a part of Mr. Gabrion's formative years, he was exposed to some family interaction patterns which may have resulted in damage to his developing personality, although the effects of that damage may not have become apparent until much later in his life. Prior to graduation from high school, Mr. Gabrion was noted by family members interviewed not to have exhibited any particular problem areas. He was described as a sweet and happy little boy during his developmental years, and as a gentle and kind individual during his teenage years. However, family members reported that after graduating from high school, and as he grew older, Mr. Gabrion began to abuse both alcohol and other forms of intoxicants. Family members agreed that when thus intoxicated, Mr. Gabrion was "not himself." They also reported learning of Mr. Gabrion being involved in a variety of traffic accidents. They were uncertain about the nature and extent of the injuries he suffered as a consequence. However, they recalled that after Mr. Gabrion experienced

FROM : Dr. Jackson & Assoc.          PHONE NO. : 734 971 0111          Feb. 21 2002 03:25PM P7

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 7

a motorcycle accident a few years after graduating from high school, "he changed, because he wasn't mean before that."

The family members whom I have interviewed thus far were not able to provide many details of Mr. Gabrion's life after he began to live in other states. They knew that he would periodically return to White Cloud to visit them at home, but they could not recall those dates precisely, or the dates at which many of the incidents which they recalled had occurred.

## Possible Mitigating Factors In Mr. Gabrion's Case

As Mr. Gabrion has declined to provide information directly to me concerning his background and mental condition at the time of the alleged offenses, it is not possible for me to form an opinion within the bounds of reasonable psychological certainty about mitigating factors which would apply to his current legal situation.

However, based upon my review of documents supplied and upon information gathered through interviews with his family members, there are several important areas which may provide a basis for the assertion of mitigating circumstances in his case. These areas are listed below. It should be noted that even at this time, further information related to possible mitigating factors is in the process of being obtained.

1. **Alcohol Abuse.** Mr. Gabrion is reported by family members to have heavily engaged in alcohol abuse subsequent to graduating from high school. No precise amounts related to his alcohol consumption were offered. However, he was described in negative terms by family members as "a different person" when he was drinking, compared to when he was not.

2. **Substance Abuse.** Mr. Gabrion has been described by some people who knew him when he was in his very late teens and early twenties as engaging in the abuse of a variety of illegal drugs. It is not possible to develop information which would specify the exact times and dates when such drug abuse occurred, nor the types of illicit drugs which he consumed. However, he has been reported to have a history which is not only significant for ingesting illegal or controlled substances, but also for inhaling intoxicating vapors ("huffing") as well.

3. **Brain Injury.** Mr. Gabrion has a reported history of having received head injuries from being involved in traffic accidents on multiple occasions. While documentation of the number and extent of such injuries is unavailable, it is possible that head injury and deficits associated with such a condition could be an important mitigating factor in Mr. Gabrion's background.

4. **Destructive Family Influences.** Interviews with some members of Mr. Gabrion's family suggested that during Mr. Gabrion's formative years, he was exposed to

FROM : Dr. Jackson & Assoc.          PHONE NO. : 734 971 0111          Feb. 21 2002 03:26PM P8

GABRION, Marvin Charles
Mitigation Issues
February 21, 2002
Page 8

some maladaptive and dysfunctional behaviors within his family. The negative influence of these experiences in adversely affecting Mr. Gabrion's personality in his later years cannot directly be assessed. However, it is certainly possible that Mr. Gabrion's ability to develop a healthy adult personality was weakened and compromised by events he experienced within his family setting during his younger years.

## Conclusions

Mr. Gabrion was not cooperative with this examiner in providing information relevant to either his background history or to his current mental condition. Therefore, it was not possible for this examiner to form any firm or specific conclusions regarding how his mental condition at this time or at the time of the charged offenses might be important in terms of issues concerning mitigation which should be brought forward in his defense.

I hope that this report will be useful to you. Should you have any questions about it, please let me know and I shall respond promptly.

Respectfully Submitted,

Newton L.P. Jackson, Jr., Ph.D.
Licensed Psychologist
ABPP Diplomate
American Board of Forensic Psychology