

**U.S. Department of Justice**

*Margaret M. Chiara*
*United States Attorney*
*Western District of Michigan*

---

*5th Floor, The Law Building*
*330 Ionia Avenue, NW*
*Grand Rapids, Michigan 49503*

*Mailing Address:*
*United States Attorney's Office*
*Post Office Box 208*
*Grand Rapids, Michigan 49501-0208*

*Telephone (616) 456-2404*
*Facsimile (616) 456-2408*

**GOVERNMENT EXHIBIT**

**B**

1:15-CV-447

December 18, 2001

Paul Mitchell
507 Waters Building
161 Ottawa NW
Grand Rapids, MI 49504

      Re: <u>United States v. Marvin Gabrion</u>

Dear Mr. Mitchell:

      What follows is the government's summary of penalty phase proof, for your use in connection with the hearing scheduled for January 11, 2002. We are also filing a response to your motion for discovery and evidence in support of aggravating circumstances. This summary details the testimony the government expects to present in support of the imposition of the death penalty. It has not yet identified the exhibits it intends to use at the penalty hearing, but I will provide you with a list of exhibits when they are identified. The summary is organized to correspond to the Aggravating Factors identified in the Amended Notice of Intent to Seek the Death Penalty.

      **a.     Intentional Killing: 18 U.S.C. § 3591(a)(2)**

      As you know, the United States has alleged in its Amended Notice that the defendant intentionally killed the victim, Rachael Timmerman. This is recognized as an aggravating factor in 18 U.S.C. § 3591(a)(2)(A). The United States will not offer additional proof on this factor at sentencing, but will instead rely on the proof admitted at the guilt phase to establish that the murder was intentional. To the extent that proof that bears on this issue is offered and excluded at the guilt phase of the trial, you should expect that we will seek to introduce it at the sentencing phase of the case.

      **b.     Heinous, Cruel, or Depraved Manner of Committing Offense: 18 U.S.C. § 3592(c)**

      The government has also alleged in its Amended Notice that defendant committed the offense in an especially heinous, cruel, and depraved manner as specified in 18 U.S.C. §3592(c)(6). The United States will establish this factor by relying on that evidence offered at the guilt phase of the trial relating to the manner in which Rachael Timmerman was killed. As stated above, in the event that evidence bearing on this issue is not admitted for some reason, it will be offered again at the penalty phase of the case. The United States will also call Dr. Stephen

Page 2
Paul Mitchell
December 18, 2001

_____

Cohle, the forensic pathologist who examined her body, to testify about particular characteristics of death by drowning.

### c.    Substantial Planning and Premeditation: 18 U.S.C. § 3592(c)(9)

The United States has alleged in its Amended Notice that the defendant committed the offense and caused the death of Rachael Timmerman after substantial planning and premeditation.  This is an aggravating factor recognized in 18 U.S.C. § 3592 (c)(9).  The United States will establish this factor by relying on the proof elicited at the guilt phase of the case relating to the nature of the murder and statements by Rachael Timmerman that the defendant threatened to kill her if she accused him of raping her.  In the event that the victim's statements are excluded during the guilt phase of the case, they will be offered again during the sentencing phase of the case.

In addition, the United States proposes to introduce the following information:

**Testimony of Dennis Cartwright**

Cartwright went to school with the defendant.  In the spring of 1997 the defendant came to see Cartwright at a job site where Cartwright was working.  The defendant said he wanted to borrow a grinder, and Cartwright agreed to lend one to him.  The defendant drove Cartwright to his house, but he took back roads because he did not want anyone to know where he lived.  They ended up in Altona at a store where there was an apartment upstairs.  During this same period, the defendant  mentioned that "some fat bitch" accused him of raping her.  He was very upset, and said he was going to kill her.  The defendant also said he was going to sink her and let the turtles eat her.

### d.    Future Dangerousness of the Defendant.

The United  States has also alleged that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others.  As noted in more detail in the sentencing phase instructions, the law permits this to be argued as an aggravating factor.  See, e.g., United States v. Allen, 247 F.3d 741, 788 (8th Cir. 2001)(future dangerousness is a valid aggravating factor); See also, Simmons v. South Carolina, 512 U.S. 154, 162-63 (1994); Jurek v. Texas, 428 U.S. 262, 272-73 (1976).

The information the prosecution will seek to introduce as to this factor has been separated into four components, discussed below:

Page 3
Paul Mitchell
December 18, 2001

_____

### 1.    A continuing pattern of violent conduct against others.

This component will be supported by the following information:

**Testimony of Wilma Katherine Babcock**

Babcock is the mother of the defendant's nephew, Bobby Babcock, and the former girlfriend of David Gabrion. In the spring of 1996, while David Gabrion was in jail, the defendant asked Babcock if he could take Bobby to visit David at the jail. Ms. Babcock denied his request, causing the defendant to become upset. He subsequently made a harassing telephone call to her. The morning after Babcock told the defendant he could not take her son Bobby, Babcock's house was set on fire with charcoal fluid. The fire started at the rear of the house, and the back door was opened so that air could feed the fire. Babcock strongly believes that the defendant started the fire because he was upset with Babcock.

**Testimony of Dennis Bacon**

Mr. Bacon lives near the defendant's house in Altona, Michigan. Mr. Bacon stated that the defendant caused many problems in the neighborhood once he moved there. During June 27, 1997, Bacon was mowing the grass on his property when the defendant unexpectedly came over to Bacon, grabbed his shirt and pulled him off the lawn tractor. Bacon fell to the ground, hurting his shoulder. The defendant then stood up, raised his arms in the air, and said, "You want to die mother fucker, come on." Bacon got up off of the ground and punched the defendant in the eye, and they both started to wrestle, until the defendant said he had enough.

**Testimony of Lawrence Campbell**

Campbell rented a room with the defendant in Wyoming in 1995 or 1996. The defendant allegedly supported himself by stealing items from stores and returning the items for a refund. The defendant also had a shotgun and possibly a pistol. The defendant had offered Campbell and Graham each $80 to assault a man, but they declined. Campbell never knew the identity of the man or why the defendant wanted him assaulted.

Page 4
Paul Mitchell
December 18, 2001

---

**Testimony of Charles and Jennifer Cass**

The Casses were neighbors of Marvin Gabrion in Altona. Cass contacted the Mecosta County Sheriff's Department about threats by the defendant against Cass and his wife. On August, 25 1996, the defendant came over to the Cass residence. During the conversation the defendant became upset and stated "I should dust off your wife," and "I'll kill you too." Cass then ordered the defendant off of his property. The defendant was upset and drove off in his car. Cass called the police to report the threat.

Hours later, the defendant fired a shotgun from his home at the Cass's home. Mecosta County Deputies Workman and Chamberlain were called, and saw the defendant fire a weapon in the direction of the Cass home. They arrested the defendant, and seized a number of expended shotgun shells, and a short barreled 12 gauge shotgun. The defendant was arrested and taken to Mecosta County Jail. He was convicted of a misdemeanor charge in connection with this incident.

**Testimony of Diane Marie Goller**

Goller met the defendant in 1995 or 1996. One day during the summer of 1996, the defendant approached Mrs. Goller and made crude statements about wanting to perform sex acts upon her. The defendant groped Mrs. Goller in her groin area and then grabbed her by the arm as though he was going to take her somewhere. At that point, Mr. Goller interceded and threw the defendant from the home.

**Testimony of Gary Leon**

Leon rented a room to the defendant in late 1994 to early1995 in Grand Rapids, Michigan. The defendant told Leon he had stalked a girl. He also claimed to have robbed a number of drug dealers after watching them engage in drug transactions.

**Testimony of Dennis and Cheryl Lilly**

Mr. Lilly and his wife were at their home with the defendant (known to them as "Lance") on January 16, 1997. During this visit, the defendant suddenly and without provocation became verbally abusive toward Lilly and his family. At one point Lance grabbed Lilly by the throat, threw him on the ground, and struck him with a closed fist around the left eye area. Lance then struck Lilly in the left side near the ribs with his knee, while holding him down by the throat. When Cheryl Lilly attempted to pull the defendant off, he threw her on the ground and assaulted her. As Mrs. Lilly was lying on her back, the defendant

Page 5
Paul Mitchell
December 18, 2001

---

hit her about the face several times and held her down while slamming her head backwards onto the floor. When 10-year old Shane Lilly tried to intercede, the defendant threw him on the ground and struck him with a closed fist about the face and neck area. During the attack, he said "I could kill the whole family and I wouldn't care a bit."

**Testimony of Thomas Niewiek**

Mr. Niewiek owns rooms to rent on Division Street in Grand Rapids, Michigan. He rented a room to the defendant in March, 1996. During this time, the defendant asked Niewiek's 13-year old daughter which room was hers, and said he was coming over to "visit her." Niewieck's daughter reported this to Niewieck, who had already been told by other tenants that the defendant had been peeking though their windows and walking into their rooms unannounced. Niewieck decided to evict the defendant when he observed him masturbating while watching Niewiek's wife walk across a parking lot.

When Niewiek told the defendant he was being evicted, the defendant pulled a knife and threatened to kill Niewiek and his wife. The defendant stated "I know how to hide a body" during this confrontation. Niewiek subdued the defendant, took his knife, and evicted him. While emptying the defendant's room, Niewiek found pornography depicting adult women. Taped to these photographs were catalogue photographs of toddlers wearing underwear. After the defendant was evicted, Niewiek received letters from the defendant threatening to kill him.

**Testimony of John Terwilliger**

On July 28, 1991 the defendant (using the name "Lance") lived near Terwilliger's residence in Lucas, Michigan. On that date, Terwilliger threw the defendant out of his residence during a party. The defendant went home and retrieved a high-powered rifle, leaned over his vehicle and shot back over Terwilliger's house. Terwilliger called the Missaukee County Sheriff's Department and the Michigan State Police. Terwilliger called the police and the defendant was arrested and charged with assault. (See Missaukee County incident #2044-91, dated 7/28/91).

**Disappearance of Wayne Davis**

Wayne Davis was a resident of Newaygo County last seen in February, 1997. At that time he was named as a witness in the criminal sexual conduct charge brought against the defendant by Rachael Timmerman.

Page 6
Paul Mitchell
December 18, 2001

In February, 1997 Davis was facing a drunk driving offense. The day before he was scheduled to plead guilty to the charge, he went shopping with two friends named John and Darlene Lazlo. The Lazlos picked up Davis from his home, and noticed that the defendant was at Davis's house talking with him. During the trip, Davis told them that he was sure he would be sent to jail when he appeared in court the following day. Davis appeared reconciled to going to jail, and even purchased a puzzle to while away the time while incarcerated. When the Lazlos took Davis home, he asked them to give him a ride to the courthouse the following morning. They agreed to pick him up at 7am.

The Lazlos returned to Davis's home the next day, but could not find him. They went into the house to look for him, and saw that all of his personal property was still in the house--particularly the coat that Davis never left the house without wearing. Days later, they returned to the house and found a note stating that Davis had gone to California to avoid jail--a sentiment contrary to Davis's attitude the day before his court appearance. Investigation of Davis's disappearance has revealed that no funds available to Davis have been accessed since February, 1997. No one in Davis's family has heard from him as of the date of this writing.

**Disappearance of John Weeks**

John Weeks was a resident of Newaygo County last seen in June, 1997. Weeks was an associate of the defendant, whom he occasionally hired to clean his home and do other tasks. One task the defendant asked Weeks to perform for him in May and early June, 1997 was to call Rachael Timmerman and ask her to meet him.

On June 22, 1997, Weeks told his girlfriend, Alene Wolfe, that he was going to accompany the defendant to Texas that day. A few hours after Weeks left, the defendant contacted Wolfe, looking for Weeks so they could begin the trip to Texas. Wolfe never saw or heard from Weeks after that day. Neither has any member of Weeks's family.

Several days after seeing Weeks for the last time, Wolfe gave the defendant a bag of Weeks's clothes and other personal belongings. After having the bag a few days, the defendant called Wolfe to ask if she had given him all of Week's personal property.

**Disappearance of Robert Allen**

Robert Allen was a resident of Kent County, Michigan last seen in May, 1995. He was mentally disabled and receiving monthly benefits from the Social Security Administration. With the exception of weekly donations to a plasma bank, these benefits were his sole source of income. Although Allen was mentally disabled, he was very conscious of the amount of money available to him and had contacted the Social Security

Page 7
Paul Mitchell
December 18, 2001

Administration about issues relating to his monthly benefits when he had questions or concerns.

The investigation done by the Federal Bureau of Investigation and the Social Security Administration has concluded that the last time Robert Allen was seen was in August, 1995. That same month, the defendant, posing as Allen, went to a Social Security Office and requested that Allen's monthly benefits be directly deposited into a bank account controlled by the defendant. The defendant also obtained personal identification, in the form of Social Security cards and drivers licenses, in Allen's name. From May, 1995 through December, 1997, when the Social Security Administration stopped the payments, Allen's sole source of income went directly to the defendant. The defendant stated that he was acting as Allen's "unofficial representative" and was giving Allen the funds, but when the defendant was arrested in Sherman, New York Allen was nowhere to be found. To date, Allen has never contacted the Social Security Administration to ask about his benefits.

### 2.    A continuing pattern of threatening violent conduct against others.

**Testimony of Phillip Baumgartner**

Mr. Baumgartner is the brother of Rebecca Canavan, who was once romantically involved with the defendant. As a result of hard feelings following the defendant's breakup, the defendant has threatened Baumgartner and other members of the family.

**Testimony of Charles and Jennifer Cass**

The Casses were neighbors of the defendant in Altona, Michigan. Cass contacted the Mecosta County Sheriff's Department about threats by the defendant against Cass and his wife. On August 25, 1996, the defendant came over to the Cass residence. During the conversation the defendant became upset and stated "I should dust off your wife," and "I'll kill you too." Cass then ordered the defendant off of his property. The defendant was upset and drove off in his car. Cass called the police to report the threat.

Hours later, the defendant fired a shotgun from his home at the Cass's home. Mecosta County Deputies Workman and Chamberlain were called, and saw the defendant fire a weapon in the direction of the Cass home. They arrested the defendant, and seized a number of expended shotgun shells, and a short barreled 12 gauge shotgun. The defendant was arrested and taken to Mecosta County Jail. He was convicted of a misdemeanor charge in connection with this incident.

Page 8
Paul Mitchell
December 18, 2001

_____

### Testimony of Jason Cross

Cross was incarcerated at Milan federal penitentiary with the defendant. On or about January 4, 2000, the defendant learned of a rumor that Cross might testify against another inmate named Karr. The defendant told Cross that if he testified against Karr, the defendant would harm or kill Cross's wife, Shannon Cross. Later, three telephone calls were made to Shannon Cross's place of employment from Milan FCI. The calls were made using Jason Cross's prison ID number, but Cross had already left Milan by the time the calls were made. Shannon Cross answered one of the calls. The caller identified himself as "Charles" and told Shannon that her husband was removed from Milan and would be in Detroit. Another call to the business was answered by Shannon Cross's brother. The caller purported to be a potential customer, and elicited the address of the company. The calls were reviewed by Milan officials, who are of the opinion that the voice of the caller is that of the defendant.

### Testimony of Martin Alexander Love

Love was incarcerated at Milan FCI with the defendant in December 1999. While having a conversation with the defendant, the defendant said that Jason Cross was "running his mouth." The defendant also stated that Jason was going to testify against Gary Karr.

Days later, Love heard the defendant threaten Jason Cross by saying that "You better hide your pretty little wife and kids because they're going to be killed." The defendant also stated that since Cross's family was rich and in the concrete business, they would be easy to find.

### Testimony of Kori Lynn Thomas

Thomas briefly lived with Lora Gabrion, the defendant's sister-in-law. During that time, in the summer of 1996, the defendant came to the home during the middle of the night and got into bed with her. She forced him out of the bed and he spent the rest of the night on the couch. After this event, the defendant began stalking her and making telephone threats in which he stated he would kill her, "get rid" of her and that "she would get what she deserved."

Page 9
Paul Mitchell
December 18, 2001

---

### 3. Claims and admissions by the defendant relating to violent acts committed by him in the past, and violent acts planned in the future..

**Testimony of  Michael Gabrion Jr.**

Michael Gabrion Jr. is the nephew of the defendant.  During 1996, the defendant told him of  a plan he had to ambush and kill a criminal defense attorney named Charles Rominger, who had represented the defendant and other family members in the past.  The defendant related that he knew Rominger went horseback riding in the Newaygo County area.  His plan was to wait for Rominger as he rode by a remote portion of a trail and kill him.

**Testimony of  Jay Manny Ginsberg**

Ginsberg has known the defendant since 1965.  In approximately 1992, the defendant told Ginsberg that he had beaten a man in Grand Rapids and had thrown him into the river. Also in 1992, the defendant told Ginsberg that he had been at another individual's house, and had become concerned that this person was about to attack him.  The defendant stated he had choked this person to death.  The defendant said he would kill virtually anyone for $1,000 and had done it in the past.  The defendant threatened to kill Ginsberg.  In 1995, while driving in an area of Newaygo County, the defendant claimed that  the area in which they were located was where he buried bodies in the past.  In addition, the defendant frequently discussed dumping bodies into the water. The defendant also related that he had offered rides to women in the Grand Rapids, then had driven them to a wilderness area, where he told them they would either have to engage in sexual relations with him, or find their own way home.

During one occasion in 1992, the defendant and Ginsberg were riding in a car when the defendant flew into a rage and began choking Ginsberg.  Ginsberg was able to free himself and fled the vehicle.

**Testimony of  Lonnie Dale Overton**

During 1996, Overton live at an apartment where the defendant also lived.  The defendant was eventually evicted from the apartment complex for tapping the phone lines and charging his phone calls to other numbers.  Overton initially knew the defendant as Mark Gabrion until one day Overton saw a vehicle registration in the name of Marvin Gabrion. When Overton questioned the defendant about the name, the defendant admitted that he was Marvin Gabrion.  The defendant explained that to avoid capture and to avoid leaving

Page 10
Paul Mitchell
December 18, 2001

---

a trail behind, never use the same name, make all transactions in cash, and use other people's names.

Overton claims he sold the defendant two guns, which Overton suspected were stolen.

Overton claimed he purchased approximately two ounces of marijuana from the defendant for approximately $150. On another occasion, the defendant had suggested they travel "down south" to pick up some marijuana, since the price would be better. Overton declined the offer.

The defendant had stored a motor home at Overton's mother's house. Overton's mother, Betty Overton, had found marijuana at the house and flushed it down the toilet. Overton was supposed to sell the marijuana and repay the defendant. The defendant became very upset when he learned that the marijuana had been disposed of. The defendant started acting bizarre, and left with his vehicle and Overton's tent. The defendant was not seen for approximately two weeks. The defendant had also made overtures to Betty Overton, attempting to take her out and have coffee with her. Overton warned his mother to stay away from the defendant.

The defendant often spoke of methods of disposing of bodies. The defendant allegedly stated that it was best to get rid of bodies in a swampy area. The defendant allegedly pointed out good disposal sites on a state map, and Overton specifically recalled the defendant mentioning Saginaw, Michigan. The defendant also spoke about how to obtain social security benefits and false identification.

### 4. The risk that the defendant will escape from custody.

**Testimony of Clyde Lincomfeld**

Sgt. Lincomfeld provided reports regarding three separate incidents involving the defendant. The defendant was caught with a shank in his cell and two home-made handcuff keys. These items were confiscated from the defendant who was being held in the Newaygo County Jail's maximum security cell. The defendant had also taken the blade out of his razor and tried to hide it.

Page 11
Paul Mitchell
December 18, 2001

---

**Impersonation of District Court Clerk  Ronald Weston**

In March, 2001, the defendant impersonated Ronald Weston and requested a transfer from the Calhoun County jail to Milan Federal Penitentiary.  The government will present the facts and circumstances of this impersonation.

### e.        Victim Impact Evidence.

The United States has also alleged in its Amended Notice that the defendant caused injury and loss to the victim, Rachael Timmerman, and her family within the meaning of 18 U.S.C. §3593 (a) (2), Payne v. Tennessee, 501 U.S. 808 (1991) and decisions following that authority. In this regard, the United States intends to call family members of Rachael Timmerman to discuss her life, and how it touched theirs.  These witnesses will also be asked to relate how Rachael Timmerman's death has affected them.

### f.        Death or Disappearance of Shannon VerHage.

The United States has further alleged in its Amended Notice that in addition to causing the death of Rachael Timmerman, the defendant caused the death or disappearance of Rachael Timmerman's infant daughter, Shannon VerHage.  As explained more fully in the government's proposed penalty phase instructions, this aggravating factor is supported by 18 U.S.C. § 3593(c); Barclay v. Florida, 463 U.S. 939, 966-67 (1983) and United States v. Bin Laden, 126 F. Supp. 2d 290, 302 (S.D.N.Y. 2001).

The prosecution proposes to establish this fact by relying on guilt-phase evidence demonstrating that Rachael Timmerman was last seen alive with Shannon VerHage in her arms, that physical evidence relating to the care and feeding of an infant was found at the defendant's camping site, that the defendant has no known children to explain the presence of such items, and that Shannon VerHage has neither been located by police nor seen by family members since June, 1997.  In addition, the government intends to call the following witnesses:

**Testimony of  Martin Alexander Love**

Love was incarcerated with the defendant during 1999.  Love overheard the defendant and  Jason Cross having a conversation.  Cross asked the defendant if he  had killed some people somewhere in Western Michigan.  Cross asked the defendant about a woman, a

Page 12
Paul Mitchell
December 18, 2001

man and a child that had been killed.  The defendant at first did not respond to Cross, but when further questioned by Cross, the defendant said he killed the baby because there was no place to put it.

**Testimony of Joseph Lunsford**

Lunsford shared a cell with the defendant while both were incarcerated in the Newaygo County Jail.  While there, Lunsford observed the defendant masturbating while staring at a photograph of Shannon VerHage.

**Testimony of Thomas Niewiek**

Niewiek reported seeing photographs of toddlers wearing underwear attached to pornographic photographs of adult women in the defendant's apartment.

g.        **Obstruction of Justice.**

The United States also alleges in its Amended Notice that the defendant committed the offense with the intent to prevent Rachael Timmerman from, and retaliate against her for, providing assistance to law enforcement authorities in regard to the investigation and prosecution of another offense.  At issue here is the proposition that the defendant killed Timmerman so that she could not testify against him in the criminal sexual conduct charge she made against him. Legal support for this as an aggravating factor is found in such cases as United States v. Edelin, 134 F. Supp. 2d 59, 76-77 (D.D.C. 2001) and United States v. Friend, 92 F. Supp. 2d 534 (E.D. Va. 2000).

The United States will prove this factor through the guilt phase with evidence relating to the fact that the defendant was accused with raping Rachael Timmerman at the time he murdered her, and testimony elicited during the guilt phase relating to the defendant's motive for committing the murder. In the event that such evidence is not admitted during the guilt phase of the case, it will be offered again during the sentencing phase.

Page 13
Paul Mitchell
December 18, 2001

------

The summary above constitutes all of the evidence I intend to introduce at this stage of the case. You have previously been provided all of the statements of these witnesses. If any new information comes to my attention that will be pertinent to the sentencing phase, I will of course let you know immediately. If you have any questions or comments, please feel free to call.

Sincerely,

MARGARET M. CHIARA
United States Attorney

TIMOTHY P. VERHEY
Assistant United States Attorney

TPV:klt