UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MARVIN CHARLES GABRION, II,

       Movant,

   v.                                File No. 1:15-CV-447

UNITED STATES OF AMERICA,

       Respondent.
_____/


Hearing re:  Movant's Motion for Discovery

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
March 9, 2016


APPEARANCES


MONICA FOSTER
JOSEPH M. CLEARY
111 Monument Cir., Ste. 2150
Indianapolis, IN 46204
Attorneys for Movant

JENNIFER L. McMANUS
TIMOTHY P. VERHEY
SALLY J. BERENS
Assistant U.S. Attorneys
P.O. Box 208
Grand Rapids, MI 49501
Attorneys for Respondent


SCOTT GRAHAM
1911 West Centre Ave., Ste. C
Portage, MI 49024
Co-Counsel for Movant


Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

```
 1                                   Grand Rapids, Michigan

 2                                   March 9, 2016

 3                                   3:27 p.m.

 4                         -     -     -

 5


 6                      P R O C E E D I N G S

 7


 8           THE COURT:  You may be seated.  Good afternoon.

 9           ALL COUNSEL:  Good afternoon, Your Honor.

10           THE COURT:  This is the matter of Gabrion v. United

11   States.  My long-suffering court reporter who has been with me

12   for some 30-some years told me as we were coming in here that

13   it's been almost 14 years to the day that we were last here in

14   this courtroom on this subject matter, so here we are.

15           Ms. Foster is here, Mr. Graham is here, and Mr.

16   Cleary's here.  Is that right?

17           MR. GRAHAM:  Good afternoon, Your Honor.

18           THE COURT:  Ms. Foster, you will be the primary

19   spokesperson?

20           MS. FOSTER:  Yes, Your Honor.

21           THE COURT:  Okay.  And Ms. McManus, you are the

22   primary spokesperson?

23           MS. McMANUS:  Yes, Your Honor.

24           THE COURT:  And Mr. VerHey will be sitting at your

25   arm to correct you.  And Ms. Berens, you're to keep these two
```

1      in line; is that right?

2                 MS. BERENS:  That's my job, yes, Your Honor.   Thank

3      you.

4                 THE COURT:  All right.  All right.

5                 The issue, I think, is -- there are several issues:

6      whether Gabrion has presented any claim that requires

7      evidentiary development, whether the good cause requirement is

8      present to authorize a party to conduct discovery on this

9      United States Code 2255 under Rule 6.  And I believe this, Ms.

10     Foster, is your motion to conduct discovery in the form of

11     interrogatories, requests for production of documents,

12     requests to admit, and certain requests for limited

13     depositions.  Is that correct?

14                MS. FOSTER:  Yes, Your Honor.

15                THE COURT:  Okay.  You may come to the podium and be

16     heard.

17                MS. FOSTER:  First, Your Honor, I would like to

18     thank the Court for entertaining us this afternoon.  I know

19     that this Court has many matters on its docket and we

20     certainly appreciate the time that you're spending with us

21     this afternoon.

22                What we seek is an orderly and efficient process by

23     which to vindicate Mr. Gabrion's substantial federal claims.

24     What we're asking the Court for is six months to conduct

25     discovery and 21 days after the close of discovery to amend

1   the petition.  We believe that that will provide the most

2   efficient and fair way to conclude this matter.  The

3   government opposes discovery, depositions, and time to amend

4   the petition.

5          At the outset I want to make it clear to the Court

6   that we're not trying to circumvent the rules.  We understand

7   that the rules for amendment do not permit completely new

8   claims, and that's not what we're trying to do.  We understand

9   that claims can be filed at this point only if they relate

10  back to the originally filed petition.

11         Expediency, though, must be tempered with fairness.

12  We did file the petition in a timely manner, and our duty as

13  counsel, as laid out in our motion for discovery, our duty as

14  counsel in this 2255 proceeding is essentially to

15  reinvestigate what has come before.  The 2255 rules and our

16  obligations as counsel means that we need to start from junk.

17  We start as if nothing had been done and we investigate the

18  client and we investigate the case.

19         That is not to say that what has been done is

20  irrelevant.  It most assuredly is not.  But it adds to what we

21  have to do and doesn't subtract.  We're required to question

22  whether the strategic decisions made by counsel were based

23  upon sound policy and an accurate assessment of the facts.

24  Were the proper experts utilized?  Were they provided the

25  proper and necessary information to reach reliable opinions?

1    Did the government witnesses tell the truth?  If not, what

2    are the potential reasons for that failure?  Is there more to

3    the story than was presented at trial?  Was the jury

4    improperly impacted by extraneous information?

5          All of these are things that we must look into as

6    2255 counsel, and we have taken that duty and obligation

7    seriously.  Our file currently is large.  It's -- I stopped

8    counting when our file reached 100,000 pages.  In many ways

9    our task is larger than -- much larger, in fact, than even

10   trial counsel.

11         When we got this case, we started reviewing the

12   transcript.  We met with our client.  We reviewed the direct

13   appeal records.  We secured and reviewed trial counsel's files

14   and many of the expert files.  We interviewed trial counsel,

15   direct appeal counsel, the mitigation investigator, the fact

16   investigator, and a plethora of the witnesses called and not

17   called at trial.  We consulted our own experts.

18         As I'm sure this Court is aware, our client is

19   difficult, to say the least.  That has certainly not changed

20   in the 14 years since you were last in this court with him.

21   That puts additional strain on counsel.  We see him regularly.

22   Generally we try to see him twice a month.  Either Mr. Cleary

23   or I will travel to the United States Penitentiary at Terre

24   Haute which is in our district to visit in person with him.

25   Someone from our office speaks with him every single day.

1    It took the government nine months to respond to the

2    petition, and I am not suggesting that they did not require

3    that nine months.  I'm sure, I'm certain that they did.  But

4    this was in spite of the fact that the government counsel was

5    both trial counsel and direct appeal counsel.  All three of

6    the 2255 lawyers assigned on behalf of Mr. Gabrion are new to

7    this case, and so everything was new.

8    Our prep time at this point is shorter than it took

9    the trial lawyers to prepare for trial, and it's most

10   assuredly infinitely shorter than the 13 years that the case

11   was on direct appeal.  Again, I don't mean to suggest that

12   that time was not necessary and required.  In fact, I think

13   that it stands as testament to the fact that the Sixth Circuit

14   took its obligations in this case very seriously.

15   Finally, this is not our only case.  Mr. Graham is

16   in private practice.  Mr. Cleary and I, I'm the Chief Federal

17   Defender for the Southern District of Indiana.  Mr. Cleary is

18   one of my assistants.  We obviously have other cases.  In

19   addition to that, we have another death penalty case in spite

20   of the fact that our office is very small.  We have 5.5

21   lawyers.  I'm the .5 because I'm required to do administrative

22   work as well.

23   Contrary to the government's contention that this

24   case can be resolved via summary judgment, I think that Mr.

25   Gabrion presents very significant issues that should cause

1   this Court pause.  I was interested in reading an article by

2   a district court judge, Judge Bennett.  I don't know if you're

3   acquainted with him.

4          THE COURT:  Oh, I am.  I am.

5          MS. FOSTER:  Okay.  He wrote an article that I

6   thought was interesting from the judge's perspective about how

7   the judge appoints counsel and believes that he has appointed

8   counsel that is carrying out their obligations under the

9   Constitution and under all available guidelines, but that

10  sometimes what happens is when you look underneath, that all

11  the judge sees is the tip of the iceberg and that underneath

12  there's serious things that should cause the Court pause.  I

13  believe that this is that case.

14         The defense mental health presentation fell well

15  short of the prevailing professional norms of reasonably

16  competent counsel.  The defense called an expert that they

17  have admitted to the government and to us when we interviewed

18  that they were surprised when their own expert testified that

19  Mr. Gabrion was not mentally ill.  They abandoned an expert

20  who had treated Mr. Gabrion prior to the offense and would

21  have testified that he was treated with -- it was either

22  lithium or a lithium substitute.  That has relevance because

23  Mr. Gabrion responding well to that treatment is a clear

24  indication that Mr. Gabrion suffers from bipolar disorder.  In

25  fact, that is a method that medical professionals use to

1   diagnose bipolar disorder.

2           Trial counsel wholly failed to conduct a full social

3   history investigation.  Their social history was nine pages

4   long.  This is our social history as it currently stands.  It

5   is a hundred and -- I'm sorry, 81 pages, single-spaced.  It is

6   supported by 5,500 pages of documents relating to medical

7   records, criminal records that support the factual statements

8   that are contained in our social history.  Clearly all of that

9   would have been crucially important in a case where the

10  government argued very effectively that Mr. Gabrion was

11  malingering mental illness.

12          THE COURT:  Tell me, is he being treated now?

13          MS. FOSTER:  No.  In the Bureau of Prisons, no.

14          THE COURT:  Why not?

15          MS. FOSTER:  I'm trying to think of how I can say

16  this diplomatically.

17          THE COURT:  Don't you have habeas abilities?

18          MS. FOSTER:  I'm sorry?

19          THE COURT:  Don't you have habeas abilities to go to

20  court in southern Indiana on this issue?

21          MS. FOSTER:  To see that he's treated?

22          THE COURT:  Right.

23          MS. FOSTER:  I suppose I might.

24          THE COURT:  So you're arguing that he is -- he was

25  untreated then and he is untreated now?

1          MS. FOSTER:  That is correct, and that he was

2     mentally ill then and he is mentally ill now and that his

3     mental illness has not abated in the past 13 or 14 years.  In

4     fact, it has been consistent, and we'll have witnesses to that

5     effect.

6          THE COURT:  That makes your argument harder, though,

7     doesn't it?

8          MS. FOSTER:  No, sir.

9          THE COURT:  Because had he been treated and was he

10    doing fine now, you --

11         MS. FOSTER:  I'm sorry, this was before trial.

12    Before trial he was taking a lithium -- not before trial.

13    This was before the crime occurred when he was on the

14    streets.  There was a doctor on the street that the defense

15    consulted that they abandoned.  That doctor was treating him

16    with lithium or a lithium substitute.  I can't -- it was

17    Depakote, so it was a lithium substitute, and he responded to

18    it, but he didn't want to take it.

19         THE COURT:  So?

20         MS. FOSTER:  So he is mentally ill, and people with

21    mental illness frequently don't want to take their

22    medication.  I think that the importance of that piece of

23    information is that it is a piece of information that shows

24    that Mr. Gabrion had mental illness at the time that this

25    crime was committed that persists to this day.

1              THE COURT:  A totally separate issue from the

2    sanity-insanity question.

3              MS. FOSTER:  I'm not sure that I would say it's a

4    totally separate question.  I'm also not sure that I would say

5    that because he has mental illness, that that necessarily

6    rendered him insane.

7              THE COURT:  Right.

8              MS. FOSTER:  Yes.

9              THE COURT:  Right.

10             MS. FOSTER:  Correct.

11             THE COURT:  You answered my question correctly.

12             MS. FOSTER:  Okay.  Our social history contains an

13   extraordinary, extraordinary amount of mental -- major mental

14   illness in Mr. Gabrion's family.  I've been practicing law for

15   33 years and I've never seen anything like this.

16             Why is that relevant?  That makes a difference

17   because, as we know from psychiatric literature and the DSM-5

18   itself, having just one relative with major mental illness

19   increases the person's likelihood of also having major mental

20   illness ten times.  This social history is chock full of major

21   mental illness in Mr. Gabrion's immediate family that resulted

22   in criminal interventions, that resulted in inpatient

23   treatments, inpatient commitments by courts, you name it.

24   The --

25             THE COURT:  Did you get to the part where the mother

1    beat the father and broke his bones and the father broke the

2    mother's bones?

3                    MS. FOSTER:  I'm sorry, please?

4                    THE COURT:  Did you get to the part where his father

5    broke his mother's bones and his mother broke his father's

6    bones?

7                    MS. FOSTER:  I know that there was a lot of

8    dysfunction and abuse in that family, yes.

9                    THE COURT:  Yeah.

10                   MS. FOSTER:  Probably or perhaps due in major part

11   to the mental illness that runs rampant through that family.

12                   The trial counsel also failed to document the

13   plethora of head injuries, and many of these head injuries are

14   contained in some of the documentation that we have gotten,

15   black ink on a white page.  At trial counsel focused on two,

16   maybe three head injuries, and the government very effectively

17   was able to contest that.  In fact, I think that we have

18   documented ten or eleven separate head injuries, many of which

19   are documented by records.

20                   Another important piece of evidence in this case

21   that I think should cause the Court concern is that trial

22   counsel allowed argument and evidence that Mr. Gabrion

23   manipulated the timing of the state rape case.  The Court will

24   recall that the government's theory with regard to motive in

25   this case was that Mr. Gabrion was at the time of the homicide

1    charged with rape in state court where Ms. Timmerman was the

2    victim and Mr. Gabrion was the alleged assailant.  In that

3    case -- in the federal case, the government quite effectively

4    argued that Mr. Gabrion manipulated the timing of the rape

5    case, and that having manipulated the timing of that, that he

6    manipulated it in order to wait for Ms. Timmerman to be

7    released from jail; having manipulated the timing of that case

8    and Ms. Timmerman eventually being released from jail, that he

9    then killed her.

10            But the manipulation aspect of the government's case

11   simply is not true.  And that was an important piece because

12   it went to the statutory aggravator of premeditation and

13   planning, and it also went to the statutory -- or

14   non-statutory aggravator of obstruction of justice.  It

15   painted Mr. Gabrion as sinister and evil and cunning.

16            What we have discovered, however, is that -- and we

17   discovered this from both grand jury testimony that was in

18   counsel's file from one of the trial judges that was on the

19   rape case wherein that judge testified that indeed he did not

20   believe that Mr. Gabrion had manipulated the process, and we

21   also simply pulled the docket of the rape case.  And you'll

22   recall that Ms. Roach, the -- she was a SAUSA in this case

23   until she was removed by the Department of Justice for

24   misconduct in this case, and what the government then did is

25   they replaced her, took her off from being an assistant, but

1   made her a witness.

2          She testified about a number of things to support

3   this manipulation of the state rape case theory of the

4   government, and one of the things that she testified to is

5   that in all cases, in every case, every state rape case, that

6   she would try and have a preliminary hearing.  That was

7   important because it fed into the government's manipulation

8   theory.  We've pulled the docket sheets for I think four years

9   of state rape cases in Newaygo County and we can find maybe --

10  zero, is that right?  Zero where a preliminary hearing was

11  held at the state's request.  All of that was available to

12  defense counsel, but none of it was used.

13         Another important piece of evidence at trial were

14  the letters written by Rachel Timmerman to her father, to the

15  prosecutor and the judge in the state rape case.  At trial the

16  government forcefully argued that Mr. Gabrion wrote those

17  letters or forced Ms. Timmerman to write them.  Again, this

18  was a very effective strategy on behalf of the government in

19  putting forth the claim that Mr. Gabrion premeditated,

20  preplanned, that he was cunning, that he was sinister.  In

21  fact, in counsel's file in the discovery in this case was the

22  report of the FBI forensic agents who looked at those letters

23  and compared them to writings of Mr. Gabrion and concluded in

24  fact that it was likely that Mr. Gabrion neither wrote nor

25  dictated those letters and that Ms. Timmerman was not under

1    duress at the time that she wrote them.  All of these facts

2    and more should give this Court pause with regard to this

3    case.

4         The government contends that discovery could --

5    should be denied because we're on a fishing expedition.  The

6    cases that are cited by the government at their submission on

7    Page 4, if one looks at those cases, they don't support the

8    government's position.  So the Lynott case, for example, isn't

9    a 2255 at all, but it's a 2241 from a parole revocation.  In

10   the Cornell case that's cited by the government, the defendant

11   got discovery with regard to a dirty cop, and the client in

12   that case was pro se.  Finally, in United States v. Black,

13   that was truly a fishing expedition because this again was a

14   pro se client who had not even filed a petition.  There was no

15   petition filed when the petitioner in that case sought

16   discovery.  That was the true definition of a fishing

17   expedition.

18        With regard to the depositions that we have

19   requested, what we are requesting is the opportunity for both

20   sides to question a limited number of witnesses.  We believe

21   that we're entitled to a hearing.  If we get -- we've not

22   filed a request for a hearing at this point, but we would

23   expect that we would file that at such time as the amendment

24   is filed.

25        Depositions in this cases would streamline courtroom

1    proceedings.  They would make the presentation of the

2    witnesses go more quickly, be more relevant.  There would be

3    less fumbling.  We may determine from these depositions that

4    these particular witnesses aren't even needed, and so we would

5    be able to take what may have been a 65-witness hearing and

6    narrow it down to 20.  We might be able to read stipulations

7    with the government so that we don't have to bring people in,

8    all of which I think that the deposition request truly would

9    streamline.

10         And it's not -- it's not a windfall to one side or

11   the other.  I would think that in the event that Your Honor

12   issues an order for a hearing, the government's going to want

13   to depose many of these people.  Stebbins and Mitchell were

14   obviously counsel.  Judge Yates was the defender at the time.

15   It appears that he represented a number of the witnesses, the

16   government witnesses in this case.  We're not even sure at

17   this point the full scope of that.  There's discovery that

18   we've requested with regard to that.

19         Mr. Crates was the mitigation investigator.  Ms.

20   Hubbard was the fact investigator.  Chrystal Roach was the

21   SAUSA for a time in this case and then was a witness that we

22   contend misrepresented -- that her testimony contained

23   numerous and critical misrepresentations.  Sue Adams and Chris

24   Whitcomb are the forensic examiners that did the examination

25   for the government of the letters that I talked about earlier

1  where the examiners concluded that Mr. Gabrion neither wrote

2  nor dictated those letters.

3         We would withdraw the request to depose Mr.

4  Scharre.   We would also withdraw the request to depose Mr.

5  Chamberlain.

6         Many of the other witnesses that we've listed there

7  are doctors that worked on this case.   Dr. Jackson was the

8  defense expert who testified that Mr. Gabrion was not mentally

9  ill, and trial counsel has told us and the government that

10 that was a surprise to them.   Dr. Griesemer, Ryan and Saathoff

11 were government experts.   As you can see from our discovery

12 requests, there are questions with regard to what information

13 they had at their disposal when they reached their opinions.

14 That is a big piece of why we want to depose them.   Stephen

15 Cohle was the pathologist, the government's pathologist.   The

16 pathology here was and continues to be important in this case.

17         Lance Workman was the police officer.   The Court

18 will recall that there was testimony from two police officers

19 that when they -- that Mr. Gabrion at one time -- this was

20 admitted during the penalty phase as part of the future

21 dangerousness presentation.   The Court will recall that there

22 were police officers that were investigating Mr. Gabrion's

23 alleged shooting a firearm in a neighborhood, that they

24 confronted Mr. Gabrion outside his residence, that they then

25 went inside the residence to retrieve the gun that they

1    believed he was using to do the shooting, and that upon

2    reaching the second floor, they saw on the bed a nude doll and

3    a bullfrog in -- that contained bodily fluids.

4            Mr. Workman is important because, again, that

5    testimony made Mr. -- it was admitted as part of the future

6    dangerousness argument, and it obviously made Mr. Gabrion seem

7    evil.  I'll leave it at that.  Mr. Workman, however, when he

8    wrote his police report, the incident with the bullfrog is not

9    contained in the police report.  The government provided a

10   roadmap, if you will, to counsel prior to trial listing all of

11   their witnesses and their anticipated testimony, and with

12   regard to Mr. Workman there was no reference with regard to

13   the bullfrog.

14           Richard Miller is the lead detective in the case.

15   Again, I think that if we could take these depositions, as the

16   Court is fond of saying to the jury when the jury goes in the

17   back and we're out here in trial talking about, you know, this

18   or that instruction or whatever, I don't know if it's this

19   Court's general procedure, but I know in Indianapolis the

20   judges are very careful to tell the jury while you're back

21   there, we're working.  And of course that is true, and I think

22   that the same holds true with depositions, Your Honor.  I

23   think that we can do a lot of the work that is necessary to do

24   in this case outside the presence of the Court in a way that

25   would streamline these proceedings.

 1            With regard to the discovery requests, I don't know

 2     if you want me to go through each of these requests.  I do

 3     think that we're entitled to them.  We're entitled to

 4     discovery if good cause is shown.  I believe that we have

 5     shown good cause for each of our requests.

 6            All we're asking for is six months to complete

 7     discovery plus 21 days to file the amendment.  If the Court

 8     were to look at just a smattering, just pick any 2255 capital

 9     case, what you will see is repeated amendments.  You know,

10     you've got to seek permission of the Court, of course, but

11     there are repeated amendments, and that is what we are trying

12     to avoid in this case.  We're not trying to do anything to

13     circumvent the rules.  We understand what the rules are.  We

14     think six months to conduct discovery, we file one amendment,

15     one amendment only, and we move on.

16            I don't think six months is a lot of time to ask

17     for.  There are 62 people currently on federal death row.  The

18     death penalty, the federal death penalty was reinstated

19     sometime in the early to mid '90s.  We've had three executions

20     since then.  The last one was over 13 months ago -- or 13

21     years ago.  I just think that delaying this case so that we

22     can work it up for the next six months is not an unreasonable

23     request.  I think it in fact will make this case more

24     streamlined, will go more smoothly, and we will not see the

25     repeated requests to amend that we see in most of the cases.

1    Thank you.

2              THE COURT:  So your motion is multifaceted:  to

3    vacate the conviction, to set aside the conviction, or correct

4    the sentence.  Is that right?

5              MS. FOSTER:  Yes, Your Honor.

6              THE COURT:  Either of those three?

7              MS. FOSTER:  Yes.

8              THE COURT:  Okay.  Anything else?

9              MS. FOSTER:  No, thank you.

10             THE COURT:  Thank you.  Thank you.  Thank you.  Very

11   good.  Very good.

12             Ms. McManus, would you wish to respond?

13             MS. McMANUS:  Thank you, Your Honor.

14             To a large degree we actually agree with Ms. Foster

15   at least in the sense that we likewise would like an orderly

16   and efficient process to bring this motion to resolution.  We

17   just disagree about, you know, how to get there, and the Court

18   will, of course, have to decide what the best method is.

19             From our perspective the rules are all set up with

20   the idea in mind that the claims are set out and that's the

21   opening salvo, and the defendant is required to set forth in

22   the initial motion and certainly in any amended motion that's

23   filed specific allegations of fact that would lead the Court

24   to believe that federal habeas relief is appropriate, and that

25   discovery is only appropriate and an evidentiary hearing is

1   only appropriate to the extent that further factual support

2   would lead the Court to that conclusion.  And for the reasons

3   that we set out in our response, we do not believe that

4   Gabrion's current counsel has met that burden at this time.

5          In fact, what we've just been listening to almost

6   sounds like an argument on the motion, the substantive motion,

7   but we haven't seen a lot of the support that already has been

8   gathered, the hundred-plus-page social history report, the

9   supposed information from experts, nothing.  We haven't seen

10  it and they've already pulled all that together.  So it's our

11  position that that should be filed if they're going to file it

12  in connection with an amended claim, an amended motion, sooner

13  rather than later to get the ball rolling to determine then --

14  to whittle those claims down.

15         There's over 50 claims that have been asserted.  The

16  claims range in subject matter.  A few of them have been

17  highlighted here today, but none of them have been supported.

18  For example, there's no mental health professional who's

19  provided an affidavit that would lead this Court to believe

20  that there's any reason that habeas relief would be

21  appropriate.  Until that happens, we really aren't in a

22  position to talk about the merits or to talk about whether

23  discovery -- further discovery is needed.

24         As of now it's our position that all of the claims

25  can be resolved without further evidentiary development, and

1      so we respectfully request that the Court consider proceeding

2      in that fashion; that is, setting a time for the filing of any

3      amended motion, a time, a deadline for the government to

4      provide any supplemental response, and then take up at that

5      time whether there are any claims that have survived that

6      require further evidentiary development or discovery.

7              I can go through some of the requests if the Court

8      would like or --

9              THE COURT:  Flesh them out a little bit so I

10     don't -- you're very conclusory, and maybe that's the way you

11     have to argue, but flesh it out a little bit so I see where

12     you're coming from.

13             MS. McMANUS:  Okay.  So, for example, some of the --

14     we've talked -- heard a lot about, as I said, the mental

15     health.  We've heard, I think I heard that there might have

16     been some experts that they've been consulting with that might

17     have provided some information that would lead to some

18     question about whether additional mental health evidence, were

19     it before the Court, would suggest that habeas relief is

20     appropriate.

21             As it stands now, we have the testimony and we have

22     eight mental health professionals having provided an opinion

23     that Gabrion was not mentally ill at the time of trial, and

24     there's nothing in the record to suggest otherwise.  So until

25     there's some sort of claim or some affidavit supporting the

1    notion that there's some question about that, then we would

2    suggest that discovery is not appropriate.

3            As to some of the specific claims, you know, the

4    requests are -- some of the requests are wholly untethered to

5    any specific claim.  For example, they'd like to depose Dr.

6    Cohle, the forensic pathologist.  The reason given is that

7    information has come to light that might impact his opinions,

8    but there's no information given to the Court or to us as to

9    what that information would be or how it might impact his

10   opinions.  And before we have a dep -- before they're entitled

11   to depose a witness, they have to show good cause.  They have

12   to show this Court good cause to believe that there's some

13   reason to believe that Mr. Gabrion would be entitled to habeas

14   relief.

15           THE COURT:  So you're saying that good cause should

16   be tethered to some factual historical background piece of

17   evidence?

18           MS. McMANUS:  That's correct, Your Honor.  I think

19   the cases say, and all the cases are different because they

20   arise in different contexts, but all the cases say that the

21   good cause standard requires that there be specific

22   allegations that would lead the Court to believe that federal

23   habeas relief is appropriate if further facts are developed.

24           Now, in our response to the 2255 motion we've

25   explained why all of the claims that have been asserted to

1   date can be resolved without further factual development; for

2   example, the ineffective assistance of counsel claims.  We

3   have alleged there's not a showing of prejudice as to all of

4   those claims.

5           So unless there can -- there is a showing that there

6   is good cause, that there are specific -- for example, if this

7   was a case where no mental health evidence had been presented

8   at trial or during the penalty phase and then <u>habeas</u> counsel

9   consulted with a mental health professional and provided an

10  affidavit that says there appears to be, you know, serious

11  mental illness present in this defendant and counsel and I

12  believe it would have -- it would have been present at the

13  time this case was tried and none of that was presented, then

14  there might be an issue there about whether there needs to be

15  some further development of that issue to present it to the

16  Court.  Here we have, you know, a vast record of review of Mr.

17  Gabrion's mental health, three competency examinations,

18  additional witnesses who testified at trial, and we have

19  nothing from the other side to suggest to undermine any of

20  those conclusions.

21          If you go through the other requests, many of them

22  do seem like they're designed -- they fall in that category of

23  a fishing expedition.  So, you know, just to take a couple of

24  examples, I don't know that the Court wants me to go through

25  all of them, but request number 8 is all evidence in the

1    government's possession regarding the whereabouts of Shannon

2    VerHage, Rachel Timmerman's baby who disappeared, and of

3    course it's our theory that Mr. Gabrion murdered her.  There's

4    no -- there's no tethering to a claim as to, you know, what

5    they think might exist, how that might lead one to believe

6    that Mr. Gabrion's entitled to <u>habeas</u> relief.

7              Another, request number 17, is any information

8    identifying Matt Singerman, who withdrew Mr. Gabrion's Newaygo

9    County Court file in the case charging Mr. Gabrion with CSC

10   involving Rachel Timmerman.  But I don't know who Matt

11   Singerman is.  I don't know -- and it would be unduly

12   burdensome to require the government to go through all of its

13   files or to try to otherwise figure out who this individual is

14   when there's no showing as to how that would bear on Mr.

15   Gabrion's claims for relief.

16              THE COURT:  Thank you.

17              MS. McMANUS:  Thank you.

18              THE COURT:  Thank you.  Thank you.

19              Response, Ms. Foster?

20              MS. FOSTER:  Just very briefly, Your Honor.

21              I think there's no question that if we engage in

22   discovery, we're going to find facts that support the claims

23   that we have pled.  If we didn't, this would be the first case

24   in my 33 years practicing law that that would be true.

25              But to address the government's specific claims,

1    when the government says that we've got eight mental health

2    professionals who have said that Mr. Gabrion is not mentally

3    ill, the foundation for a proper mental health examination,

4    and I think even the government's experts might say this and

5    this is part of why we'd like to depose them, is that they

6    need to know a proper social history of the defendant.  Mental

7    health professionals are very, very interested in knowing

8    whether other members of the family suffer from major mental

9    illness.  I really think that the government's experts would

10   even agree with that.

11          THE COURT:  Is it your position that there was

12   nothing on the record on that?

13          MS. FOSTER:  Nine pages was their full social

14   history, and it is our position that there was zero with --

15   zero regarding family mental illness.  Zero.  Nothing.  They

16   had no idea.  In fact, one of their experts asked them does

17   the defendant have a history of bipolar in his family, and

18   their response was we have not uncovered any evidence that

19   would indicate that that was true.  Mr. Gabrion's family,

20   extended family is so remarkably mentally ill.

21          THE COURT:  Oh, I -- pardon the years that have gone

22   by since I tried it, but wasn't there a considerable amount of

23   testimony at the trial that related to that, family members

24   that took the witness stand and testimony about the

25   contentious home he grew up in?

1          MS. FOSTER:  Yes, Your Honor.  There was testimony

2     with regard to family dysfunction.  There was some testimony

3     with regard to abuse.  But none of that was tied to mental

4     illness.  In fact, many members of Mr. Gabrion's family have

5     been committed for inpatient treatment and many, many of them

6     have been diagnosed with major mental illness.

7          With regard to the fact development that the

8     government responded to with regard to Paragraph 8 where we

9     seek discovery of evidence in the government's possession

10    regarding the whereabouts of Shannon VerHage, Rachel

11    Timmerman's infant child, the Court will see that we have

12    tethered that to a claim, specifically claim 4-G, where we

13    allege that counsel was ineffective for failing to object to

14    inadmissible and prejudicial testimony and argument at the

15    penalty phase that would specifically go to Ms. -- to the

16    infant.

17         I would also refer the Court to ground 4-Q where we

18    allege counsel ineffective for failure to -- specifically for

19    failure to investigate evidence that Shannon was still alive.

20    There's news articles from August 8th of 1997 where Mr.

21    Timmerman, Rachel Timmerman, the victim in this case, her

22    father said that he believed that the child was still alive.

23    Chrystal Roach --

24         THE COURT:  He hoped they were alive, didn't he

25    say?

1          MS. FOSTER:  He believed that -- I've got more.  He

2     said he believed that she was still alive, and if that was all

3     there was, then maybe you could just write that off to wishful

4     thinking on behalf of a grieving family member.  But Ms. Roach

5     is also quoted in the paper saying that the government has

6     evidence that she's still alive.

7          Detective Miller was quoted in this news article of

8     August 8, 1997, saying, quote, "They believe people know the

9     whereabouts of Shannon."  The newspaper article indicated

10    that, quote, "Investigators have evidence the baby was still

11    alive after the mother was killed."  So that is not a fishing

12    expedition.

13          With regard to Paragraph 17, disclosure of

14    information identifying Matt Singerman, if the government

15    doesn't know who he is, the government doesn't know who he

16    is.  What we were searching there, that request supports our

17    claim 1-A and would show that the government was aware if

18    Mr. -- we suspected that Mr. Singerman might be an agent with

19    the FBI.  If he was, it would support our claim 1-A and would

20    show that the government was aware of Roach's false testimony

21    because Mr. Singerman -- what we're interested in is Mr.

22    Singerman checked out or had access to that state court rape

23    case, the docket, the file itself, and what we were interested

24    in knowing is if Mr. Singerman was working on behalf of the

25    government.  So that's what that claim is tied to.

 1          In short, I would just say that -- you know, I'd

 2     just reiterate that further discovery, taking depositions and

 3     things like that are going to produce more facts than we

 4     currently know to support the claims that are already pled.

 5     Again, we understand what the amendment rules are.  We

 6     understand that we can't come forward with completely new

 7     claims.  But we are permitted to come forward with facts that

 8     support the claims that we've pled.

 9          In the event that the Court is not inclined to grant

10     our request for the six months' discovery and the amendment to

11     follow, we would request at least 60 days to amend this

12     petition with the information that we currently have in our

13     possession.  Thank you.

14          THE COURT:  Thank you.  Thank you.  Thank you, both

15     of you.  Not only has this been interesting, you've both done

16     a fine job of arguing, but you've uncovered some memories back

17     there that I thought I'd forgotten about completely.

18          MS. FOSTER:  You probably preferred that, actually.

19          THE COURT:  Anyway, you've done a fine job, both of

20     you, and you've presented me with something.  I've gone

21     through this and I have a lot of questions on my own, some of

22     which you've answered for me here, but I will spend some more

23     time on this and I'll get back with you.

24          Thank you so much.  Thank you.

25          MS. FOSTER:  Thank you, Your Honor.

1          MS. McMANUS:   Thank you.

2               (Proceedings concluded at 4:06 p.m.)

3

4                    *     *     *

5

6                CERTIFICATE OF REPORTER

7

8          I, Kevin W. Gaugier, Official Court Reporter for the

9    United States District Court for the Western District of

10   Michigan, appointed pursuant to the provisions of Title 28,

11   United States Code, Section 753, do hereby certify that the

12   foregoing is a true and correct transcript of the proceedings

13   had in the within-entitled and numbered cause on the date

14   hereinbefore set forth.

15          I do further certify that the foregoing transcript

16   was prepared by me.

17

18

19

20   /s/  Kevin W. Gaugier

21   Kevin W. Gaugier, CSR-3065
     U.S. District Court Reporter
22   110 Michigan N.W.
     622 Federal Building
23   Grand Rapids, MI 49503

24

25