# EXHIBIT 6

78 Judicial District
ORI:
27 Judicial Circuit
ORI:

INFORMATION
FELONY
COURT ADDRESS: Courthouse
WHITE CLOUD, MI 49349
PHONE: 616-689-7249

P.A. 97000335
POLICE: MSP-65-1102-97
DISTRICT:
CIRCUIT:

COPY

PEOPLE OF THE STATE OF MICHIGAN vs.

| DEFENDANT(S) | DOB | CTN NUMBER | SID NUMBER | DLN |
|---|---|---|---|---|
| GREGORY PAUL LEON | 01/05/56 | 62-97000335-01 | | |

WITNESSES:
TPR KEVIN SWEENEY         TPR ROBERT WATSON                    STEVEN T POTTER
WENDY LEON

Complaining Witness:  TPR KEVIN SWEENEY

In the name of the people of the State of Michigan, County of Newaygo, the Prosecuting Attorney appears before the court and informs the court that on or about 04/01/97 in Brooks Township, Newaygo County, Michigan, the defendant:

COUNT 1  Defendant(s) 01 CRIMINAL SEXUAL CONDUCT – THIRD DEGREE (FORCE OR COERCION) did engage in sexual penetration to-wit:  Oral-Vaginal with Wendy Lynne Leon, using force or coercion to accomplish the sexual penetration; contrary to MCL 750.520d(1)(b); MSA 28.788(4)(1)(b).  [750.520D1B]
HIV/STD TESTING NOTICE
    Take notice that pursuant to MCL 333.5129; MSA 14.15(5129), upon bindover to circuit court or recorder's court, the district court judge shall order the defendant to be tested for venereal disease, hepatitis B infection, and for the presence of HIV or an antibody to HIV if the judge determines there is reason to believe the violation involved sexual penetration or exposure to a body fluid of the defendant.  If the district judge determines that testing is not required, upon conviction, the court must order the defendant to be tested.
FELONY:  15 Years; Mandatory AIDS/STD testing.

COUNT 2  Defendant(s) 01 CRIMINAL SEXUAL CONDUCT – THIRD DEGREE (FORCE OR COERCION) did engage in sexual penetration to-wit:  Penile-Vaginal with Wendy Lynne Leon, using force or coercion to accomplish the sexual penetration; contrary to MCL 750.520d(1)(b); MSA 28.788(4)(1)(b).  [750.520D1B]
HIV/STD TESTING NOTICE
    Take notice that pursuant to MCL 333.5129; MSA 14.15(5129), upon bindover to circuit court or recorder's court, the district court judge shall order the defendant to be tested for venereal disease, hepatitis B infection, and for the presence of HIV or an antibody to HIV if the judge determines there is reason to believe the violation involved sexual penetration or exposure to a body fluid of the defendant.  If the district judge determines that testing is not required, upon conviction, the court must order the defendant to be tested.
and against the peace and dignity of the people of the State of Michigan.

DATE: 6.2.97

Eugene C. Zeller

78 Judicial District
ORI:
27 Judicial Circuit
ORI:

INFORMATION
FELONY
COURT ADDRESS: Courthouse
WHITE CLOUD, MI 49349
PHONE: 616-689-7249

P.A. 97000335
POLICE: MSP-65-1102-97
DISTRICT:
CIRCUIT:



PEOPLE OF THE STATE OF MICHIGAN vs.

| DEFENDANT(S) | DOB | CTN NUMBER | SID NUMBER | DLN |
|---|---|---|---|---|
| GREGORY PAUL LEON | 01/05/56 | 62-97000335-01 | | |

WITNESSES:
TPR KEVIN SWEENEY          TPR ROBERT WATSON                    STEVEN T POTTER
WENDY LEON

Complaining Witness:   TPR KEVIN SWEENEY

In the name of the people of the State of Michigan, County of Newaygo, the Prosecuting Attorney appears before the court and informs the court that on or about 04/01/97 in Brooks Township, Newaygo County, Michigan, the defendant:

FELONY:   15 Years; Mandatory AIDS/STD testing.

COUNT 3  Defendant(s) 01 CRIMINAL SEXUAL CONDUCT – THIRD DEGREE (FORCE OR COERCION) did engage in sexual penetration to-wit:  Penile-Vaginal with Wendy Lynne Leon, using force or coercion to accomplish the sexual penetration; contrary to MCL 750.520d(1)(b); MSA 28.788(4)(1)(b).  [750.520D1B]
HIV/STD TESTING NOTICE
   Take notice that pursuant to MCL 333.5129; MSA 14.15(5129), upon bindover to circuit court or recorder's court, the district court judge shall order the defendant to be tested for venereal disease, hepatitis B infection, and for the presence of HIV or an antibody to HIV if the judge determines there is reason to believe the violation involved sexual penetration or exposure to a body fluid of the defendant.  If the district judge determines that testing is not required, upon conviction, the court must order the defendant to be tested.
FELONY:   15 Years; Mandatory AIDS/STD testing.

and against the peace and dignity of the people of the State of Michigan.

DATE: 02.97                          _____
                                     Eugene C. Zeller

78 Judicial District
ORI:
27 Judicial Circuit
ORI:

INFORMATION
FELONY
COURT ADDRESS: Courthouse
WHITE CLOUD, MI 49349
PHONE: 616-689-7249

P.A. 97000335
POLICE: MSP-65-1102-97
DISTRICT:
CIRCUIT:



PEOPLE OF THE STATE OF MICHIGAN vs.

| DEFENDANT(S) | DOB | CTN NUMBER | SID NUMBER | DLN |
|---|---|---|---|---|
| GREGORY PAUL LEON | 01/05/56 | 62-97000335-01 | | |

WITNESSES:
TPR KEVIN SWEENEY          TPR ROBERT WATSON          STEVEN T POTTER
WENDY LEON

97 JUL -7 AM11:17

Complaining Witness: __TPR KEVIN SWEENEY__

In the name of the people of the State of Michigan, County of Newaygo, the Prosecuting Attorney appears before the court and informs the court that on or about 04/01/97 in Brooks Township, Newaygo County, Michigan, the defendant:

COUNT 3  Defendant(s) 01 CRIMINAL SEXUAL CONDUCT - THIRD DEGREE (FORCE OR COERCION) did engage in sexual penetration to-wit:  Penile-Vaginal with Wendy Lynne Leon, using force or coercion to accomplish the sexual penetration; contrary to MCL 750.520d(1)(b); MSA 28.788(4)(1)( [750.520D1B]
HIV/STD TESTING NOTICE
     Take notice that pursuant to MCL 333.5129; MSA 14.15(5129), upon bindover to circuit court recorder's court, the district court judge shall order the defendant to be tested for venereal disease, hepatitis B infection, and for the presence of HIV or an antibody to HIV if the judge determines there is reason to believe the violation involved sexual penetration or exposure to a body fluid of the defendant.  If the district judge determines that testing is not required, upc conviction, the court must order the defendant to be tested.
FELONY:  15 Years; Mandatory AIDS/STD testing.

COUNT 4  Defendant(s) 01
HABITUAL OFFENDER - THIRD OFFENSE NOTICE
     Take notice that the defendant was twice previously convicted of a felony or an attempt to commit a felony in that on or about 10/6/89, he or she was convicted of the offense of Asslt. wi a dangerous weapon in violation of 750.82 in the Grand Rapids Court for Kent County, state of Michigan; and that on or about  11/7/94, he or she was convicted of the offense of Attempted Chi Abuse 2nd Degree in violation of 750.136b3 in the Grand Rapids Court for Kent County, state of Michigan.
     Therefore, defendant is subject to the penalties provided by MCL 769.11; MSA 28.1083. [769.11]
and against the peace and dignity of the people of the State of Michigan.

PENALTY:  Twice the maximum sentence on primary offense or lesser term.

DATE: __7-8-97__                              Eugene C. Zeller

78 Judicial District                INFORMATION                P.A. 97000335
       ORI:                            FELONY                  POLICE: MSP-65-1102-97
27 Judicial Circuit       COURT ADDRESS: Courthouse            DISTRICT:
       ORI:               WHITE CLOUD, MI 49349                CIRCUIT:
                          PHONE: 616-689-7249



PEOPLE OF THE STATE OF MICHIGAN vs.

| DEFENDANT(S) | DOB | CTN NUMBER | SID NUMBER | DLN |
|---|---|---|---|---|
| GREGORY PAUL LEON | 01/05/56 | 62-97000335-01 | | |

WITNESSES:
TPR KEVIN SWEENEY          TPR ROBERT WATSON              STEVEN T POTTER
WENDY LEON

Complaining Witness:  TPR KEVIN SWEENEY

In the name of the people of the State of Michigan, County of Newaygo, the Prosecuting Attorney appears before the court and informs the court that on or about 04/01/97 in Brooks Township, Newaygo County, Michigan, the defendant:

COUNT 5  Defendant(s) 01 CRIMINAL SEXUAL CONDUCT – THIRD DEGREE (FORCE OR COERCION)
did engage in sexual penetration to-wit:  Penile-Vaginal with Wendy Lynne Leon, using force or coercion to accomplish the sexual penetration; contrary to MCL 750.520d(1)(b); MSA 28.788(4)(1)(
[750.520D1B]
HIV/STD TESTING NOTICE
     Take notice that pursuant to MCL 333.5129; MSA 14.15(5129), upon bindover to circuit court recorder's court, the district court judge shall order the defendant to be tested for venereal disease, hepatitis B infection, and for the presence of HIV or an antibody to HIV if the judge determines there is reason to believe the violation involved sexual penetration or exposure to a body fluid of the defendant.  If the district judge determines that testing is not required, upc conviction, the court must order the defendant to be tested.
FELONY:  15 Years; Mandatory AIDS/STD testing.

and against the peace and dignity of the people of the State of Michigan.

DATE:  7-8-97                              Eugene C. Zeller

DATE   7/03/97                        REGISTER OF ACTIONS

State of MICHIGAN                                      Case Number
78TH DISTRICT COURT                                    97-   5024-1-FY
ORI:  MI620015J

----------------------------------------------------------------------------
    Date      Code    Proceedings                                        User
              Code         Fee                       Judge
----------------------------------------------------------------------------

   4/11/97            ARR. - GREER APPT. (NOT WORKING NOW) - P.E.         DMR
   4/11/97            CONFERENCE SET 04/17/97 AT 10:00 AM - BOND          DMR
   4/11/97            $50,000 CASH W/CONDITION TO HAVE NO CONTACT WITH    DMR
   4/11/97            VICTIM                                              DMR
   4/11/97     MF     MITTIMUS FILED                                      BSW
   4/11/97     CMJ    COPY OF MITTIMUS TO JAIL                            BSW
   4/11/97            AIC FORM TO DEF, PROS ATTY, DEF ATTY & JAIL         BSW
   4/11/97            NLE BOND CONDITION ORDER TO NCSD DISP FOR ENTRY     BSW
   4/11/97     FPF    FINGERPRINTS FILED                                  BSW
   4/14/97            WARRANT RETURNED                                    BSW
   4/15/97     AAF    ATTORNEY APPEARANCE FILED                           TOV
   4/17/97            MACAYEAL FOR GREER & DEF. PRESENT - P.E. SET        DMR
   4/17/97            04/25/97 AT 1:00 PM (DO NOTICE) - BOND CONT.        DMR
   4/17/97     CMJ    COPY OF MITTIMUS TO JAIL                            MAR
   4/17/97     NPE    NOTICE PRELIMINARY EXAM          4/25/97  1:00 PM   MAR
                                                       D
   4/24/97            SUB RET ON WENDY L LEON                             MNM
   4/18/97            SUB ISSUED ON WENDY L LEON                          MNM
   4/18/97            SUB ISSUED ON ROBERT WATSON                         MNM
   4/25/97            ZELLER, GREER & DEF. PRESENT - WAIVE 14 DAY RULE -  DMR
   4/25/97            P.E. SET 05/29/97 AT 1:00 PM - BOND CONT.           DMR
   4/25/97     NPE    NOTICE PRELIMINARY EXAM          5/29/97  1:00 PM   BSW
                                                       D
   4/25/97            COPY OF MITTIMUS TO JAIL W/NEXT COURT DATE & BOND   BSW
   4/25/97            CONTINUED                                           BSW
   4/29/97            SUB ISSUED ON ROBERT L WATSON                       MNM
   4/29/97            SUB ISSUED ON WENDY L LEON                          MNM
   5/05/97            SUB RET ON WENDY L LEON                             MNM
   5/29/97            GREER & DEF. PRESENT - P.E. WAIVED - BOCC TO        DMR
   5/29/97            APPEAR MON. 06/02/97 AT 1:00 PM (THOMAS) - BOND     DMR
   5/29/97            CONT.                                               DMR
   5/29/97     CMJ    COPY OF MITTIMUS TO JAIL                            MAR
   5/29/97     BOC    BOUND OVER TO CIR.CT                                MAR
   5/29/97     DCR    DISPO TO CENTRAL RECORDS                            MAR
   6/18/97            CASE REMANDED FROM CC-SET FOR P.E.                  MAR
   6/20/97     NPE    NOTICE PRELIMINARY EXAM          7/03/97  2:30 PM   MAR
                                                       D
   6/23/97            SUB ISSUED ON ROBERT WATSON & WENDY L LEON          MNM
   6/25/97            SUB RET ON WENDY L LEON                             MNM
   7/03/97            DUQUETTE, GREER & DEF. PRESENT - P.E. HELD - DEF.   DMR
   7/03/97            BOCC ON ALL THREE COUNTS PLUS ADDITIONAL CT. 4 OF   DMR
   7/03/97            CSC 3RD TO APPEAR TUES. 07/08/97 AT 10:00 AM        DMR
   7/03/97            (THOMAS) - BOND RAISED TO $100,000 CASH WITH CON-   DMR
   7/03/97            DITION TO HAVE NO CONTACT W/VICTIM OR RESIDENCE     DMR
   7/03/97     CMJ    COPY OF MITTIMUS TO JAIL                            MAR
   7/03/97     DCR    DISPO TO CENTRAL RECORDS                            MAR
   7/03/97     BOC    BOUND OVER TO CIR.CT                                MAR
   7/03/97            TX TO JAIL W/BOND INCREASE INFORMATION              MAR

```
DATE   7/03/97                    REGISTER OF ACTIONS

State of MICHIGAN                                          COPY        Case Number
78TH DISTRICT COURT                                                    97-   5024-1-FY
ORI:  MI620015J
-------------------------------------------------------------------------------
LEON, GREGORY PAUL                      Assigned to:   CASE CLOSED
725 CROSBY NW                           Police Agency: MI STATE POLICE NEWAYGO
GRAND RAPIDS          MI 49507          Date of Complaint:  4/10/97
Date of Birth:  1/05/56                 ---------------------------------------
SID:                                    Defense Attorney:
CTN: 629700033501                       GREER, JOHN M.                        P-   33732
Lic.No:                                 40 W. SHERIDAN  PO BOX 69
                                        FREMONT               MI 49412

                                                                      616-924-3760
-------------------------------------------------------------------------------
Bond History:        Date        Date                  Amount
                     Set         Posted    Type        Posted    Memo
                     4/11/97     0/00/00   C           50000.00  NO CONTACT W/VICTIMS
                     7/03/97     0/00/00   C           100000.00 BOND INCREASED
-------------------------------------------------------------------------------
                     Date        Prelim. Plea              Judge
Prelim. Exam: 0/00/00
Arraignment:  4/11/97                              HONORABLE H.  KEVIN DRAKE
Adjudication: 7/03/97                              HONORABLE H.  KEVIN DRAKE

P.A.C.C.        Conviction Flag    Arraignment Plea           Adjudication Finding
750.520D1B
CSC 3RD-FORCE OR COERCION      BOUND OVER TO CIR.CT      BOUND OVER TO CIR.CT
750.520D1B
CSC 3RD-FORCE OR COERCION      BOUND OVER TO CIR.CT      BOUND OVER TO CIR.CT
750.520D1B
CSC 3RD-FORCE OR COERCION      BOUND OVER TO CIR.CT      BOUND OVER TO CIR.CT
750.520D1B
CSC 3RD-FORCE OR COERCION      BOUND OVER TO CIR.CT      BOUND OVER TO CIR.CT
-------------------------------------------------------------------------------
Prosecuting Attorney:    ROACH, CHRYSTAL R                            P-   32244
                         1092 NEWELL ST
                         WHITE CLOUD          MI 49349

                                                                     616-689-7285
Investigating Officers: (1) S589   SWEENEY            (2)
-------------------------------------------------------------------------------
Conditions :

Special Conditions:
Days Sentenced To:  JAIL - 000  /  PROBATION - 000  /  COMMUNITY SERVICE - 000
Probation Officer Assigned :
-------------------------------------------------------------------------------
                    ** PAYMENT  HISTORY **
      Receipt No.        Date            Amount     Payment Description
           NO PAYMENTS FOR THIS RECORD
-------------------------------------------------------------------------------
 Date     Code    Proceedings                                              User
          Code         Fee                    Judge
-------------------------------------------------------------------------------
 4/10/97    CF      COMPLAINT FILED                                         MAR
 4/11/97            PER MSP-THEY HAVE WARRANTS AT POST-WILL RETURN          MAR
 4/11/97            THEM TO COURT ON MONDAY 4/14/97                         MAR
 4/11/97    NLE     NTC LEIN ENTRY BOND COND.           0/00/00            MAR
                                                          D
```

STATE OF MICHIGAN

IN THE 78TH JUDICIAL DISTRICT COURT FOR THE COUNTY OF NEWAYGO

THE PEOPLE OF THE STATE OF MICHIGAN,

                    -v-                         File No. 97-5024-1-FY

GREGORY PAUL LEON,

                         Defendant.
_____/

PRELIMINARY EXAMINATION

BEFORE THE HONORABLE H. KEVIN DRAKE, DISTRICT JUDGE

White Cloud, Michigan - Thursday, July 3, 1997

APPEARANCES:

For the People:              MS. PATRICIA DUQUETTE (P25678)
                             Assistant Prosecuting Attorney
                             1092 Newell Street
                             White Cloud, MI 49349
                             (616) 689-7350

For the Defendant:           MR. JOHN M. GREER (P33732)
                             Attorney at Law
                             40 W. Sheridan Street
                             Fremont, MI 49412
                             (616) 924-3760

                REPORTED BY:  DIANE M. REINKE CER-0644
                             Certified Electronic Reporter
                             (616) 689-7228

1

TABLE OF CONTENTS

PAGE

WITNESS: PEOPLE:

WENDY LYNN LEON

Direct Examination by Ms. Duquette                     07
Cross-Examination by Mr. Greer                          14
Redirect Examination by Ms. Duquette                    24
Recross-Examination by Mr. Greer                        26
Recross-Examination Continued by Mr. Greer              31
Examination by The Court                                34
Examination Continued by The Court                      40

EXHIBITS:

    None.

White Cloud, Michigan

Thursday, July 3, 1997 - 2:32 p.m.

THE COURT: Okay, we'll take up the matter of the People versus Gregory Paul Leon.  And Mr. Leon is represented by Mr. Greer, who is present here today.  The People are represented by Ms. Duquette.  Ms. Duquette, if you want to have the law enforcement officer with you, you can do that.

MS. DUQUETTE: Yes, thank you, I would like that.

THE COURT: Officer Watson, you can sit up here with the prosecutor.

MS. DUQUETTE: Judge, when--when I'm questioning my witness here, could I please have another chair and have her support people here at the table too, so she can focus on that?

MR. GREER: I object, your Honor.

THE COURT: Okay, all right.  This is file number 97-5024-FY, the People versus Gregory Paul Leon.  Mr. Leon, you're charged with the following; that on or about April 1, 1997, Brooks Township, Newaygo County, count one, that you did engage in a sexual penetration, to-wit: oral/vaginal with Wendy Lynn Leon using force or coercion to accomplish the sexual penetration.

Count two, that you did engage in a sexual penetration, to-wit: penile/vaginal with Wendy Lynn Leon using force or coercion to accomplish the sexual penetration.

3

Count three, that you did engage in sexual penetration, to-wit: penile/vaginal with Wendy Lynn Leon using force or coercion to accomplish the sexual penetration.

These are all felonies with--carry a maximum term of 15 years in prison.  Mr. Greer, are you ready to proceed?

MR. GREER: Yes, your Honor.

THE COURT: And Ms. Duquette, are you ready to proceed?

MS. DUQUETTE: Yes, your Honor.

THE COURT: All right, are there any preliminary matters, Mr. Greer?

MR. GREER: No, your Honor.

THE COURT: Ms. Duquette?

MS. DUQUETTE: Other than moving two chairs over here.

THE COURT: Okay, you can go ahead and do that if you want.

MR. GREER: Your Honor, where does she want to move the chairs?

MS. DUQUETTE: To the table.

MR. GREER: Who's going to sit at the table?

MS. DUQUETTE: Wendy's support people.

MR. GREER: Her support people are going to cross the bar?  I don't think they have the right to.

THE COURT: Well--

MS. DUQUETTE: Is that possible, your Honor?

THE COURT: Well--

4

MR. GREER: Her support people don't have a right to cross the bar, your Honor.

THE COURT: Okay, how old is Wendy?

MS. DUQUETTE: Wendy is 39, your Honor.

THE COURT: Wendy's 39?

MS. DUQUETTE: But she's still sort of in--in a emotional state and rather shocking.

THE COURT: Okay, but I think the statute though dealing with support persons applies to someone who is 16 years of age or younger on this type of a case for them to come up and sit with that person.

MS. DUQUETTE: Just to sit at counsel's table, your Honor.

MR. GREER: Your Honor, I don't believe she can cross the bar unless she's a party to the suit.

THE COURT: Okay.

MR. GREER: Or the attorney.  I'd object to that, your Honor.

THE COURT: All right.  Well, under--under--under--there is a statute that covers this, okay, and the statute does indicate that if--that you can have a support person sit right next to that individual on this kind of a case but the person has to be 16 years of age or younger.

MS. DUQUETTE: All right, your Honor.

THE COURT: So we can't do that.  So he's objecting to

5

it, so I'd have to sustain the objection on that point.

Okay, are you ready to proceed, Ms. Duquette?

MS. DUQUETTE: Yes, your Honor.

THE COURT: All right.  Why don't you go ahead.

MS. DUQUETTE: I'd like to call Wendy Leon to the stand, please.

THE COURT: All right, ma'am, why don't you come on up.

THE COURT REPORTER: Raise your right hand.  Do you solemnly swear or affirm the testimony you're about to give in this cause pending shall be the truth, the whole truth, and nothing but the truth, so help you God?

MS. LEON: Yes.

THE COURT REPORTER: Please have a seat on the witness stand.

THE COURT: Sit right up here.  (Indicating)

WENDY LYNN LEON

called by the People at 2:35 p.m., sworn by the Court Reporter, testified:

THE COURT: Ma'am, at any time you need to take a break, you just let me know, all right?

THE WITNESS: Thank you.

THE COURT: Okay.  You just relax and the prosecutor is going to ask you a series of questions and then the--Mr. Greer will have an opportunity to ask you some questions, and then it will be all over.

6

THE WITNESS: Okay.

THE COURT:  Why don't you go ahead, Ms. Duquette.

DIRECT EXAMINATION

BY MS. DUQUETTE:

Q.   Would you please state your name for the record?

A.   Wendy Lynn Leon.

Q.   Where do you live?

A.   4120 East 82nd, Newaygo.

Q.   That's in Brooks Township?

A.   Yes.

Q.   That's in the County of Newaygo?

A.   Yes.

Q.   Thank you.  On March 31st of this year, were you living at that house?

A.   Yes.

Q.   Were you married at that time to the defendant, Mr. Leon?

A.   Yes, I was.

Q.   Is the defendant here and present in the courtroom?

A.   Yes.

MS. DUQUETTE: Let the record reflect that she's identified her husband.

THE COURT: Okay.

BY MS. DUQUETTE:

Q.   Was he living with you at that time?

A.   No, he was not.

7

Q.  What is the reason for that?

A.  I had reason to believe that he was a threat to my daughters and so weeks prior to the 31st he had been removed from the home.

Q.  Did you ever on March 31st agree to let him come back to the house?

A.  No, I did not.

Q.  Did you ever agree to let him come back to the house after you had him removed from the home when you believed he might assault your children?

MR. GREER: Objection, your Honor.  She's asserting facts that have not been testified to and it's a compound question.

MS. DUQUETTE: Your Honor, she just testified--

MR. GREER: She's stating that--that he--that he might, you know, assault the children.  I don't remember that ever being asked.

THE COURT: Could you--could you ask the question again?

BY MS. DUQUETTE:

Q.  Did you ever give him permission to return to the home after you had thrown him out?

A.  On one occasion he was given permission to pick up some of his personal items from the pole barn but he was told not to come to the house itself.

Q.  Okay.  And this was prior to March 31st, is that correct?

8

A.  Yes.

Q.  All right.  On March 31st, you did not give the defendant any reason to understand he could come to the house?

A.  No.

Q.  Would you tell the Court what happened, please, the night of March 31st, after--well as it pertains to the rapes?

MR. GREER: Your--

BY MS. DUQUETTE:

Q.  Were you in the house on March 31st?

A.  Yes, I was.

Q.  What time of the evening was that?

A.  I was home all day that day except for I met him for approximately an hour for coffee.

Q.  Did you give him permission to come to the house at that time?

A.  No, I did not.

Q.  Did you specifically tell him he could not?

A.  When he called later, shortly after I got home, I told him specifically twice no.

Q.  About what time was that, do you remember?

A.  He had called probably around eight fifteen.

Q.  All right, what happened after you received the phone calls?

A.  I--

MR. GREER: Your Honor, may I inquire?  She said phone calls.  I'm not aware that more than one phone call has been

9

testified to.  How many phone calls?  Maybe the Court can ask?

THE COURT: Okay, ma'am, you said you received--did you call him or did he call you?

THE WITNESS: He called the house.

THE COURT: He called the house and you said eight fifteen, would that be p.m.?

THE WITNESS: In the evening.

THE COURT: In the evening.  Okay, did he call you more than once, to your recollection?

THE WITNESS: Yeah, because I had hung up on him and he recalled.

THE COURT: Okay, apparently two calls at least, Mr. Greer.  Go ahead, Ms. Duquette.

BY MS. DUQUETTE:

Q.   What time did you go to bed that evening?

A.   Around nine fifteen.

Q.   All right.  Did you ever--did there ever come a time that night when you woke up to find the defendant in your bedroom?

A.   Yes.

Q.   What--would you please explain?

A.   It was approximately twelve thirty-five and I was aware of his presence.  He was talking to me but for some reason I couldn't become fully awake, I couldn't become alert, and so

10

I'm not sure what he was saying but--

Q. You did not let him into the house?

A. No.

Q. Had you locked the door?

A. Yes.

Q. All right, what happened then?

A. He got into the bed with me and I was laying on my side facing away from him, kind of curled up, and I had a three quarter length cotton nightgown on and he started pulling it up and I kept trying to pull it back down and I told him I wanted him to go away and leave me alone.

Q. Were you afraid of him at that time?

A. Yes.

Q. What happened next, did he go away?

A. No.

Q. What did he do?

A. He rolled me over onto my back and put a cotton cloth of some type in my mouth and he started to perform oral sex.

Q. When you say that, you mean he put his penis in your mouth?

A. No.  He started to perform oral sex on me and--

Q. Did he put his mouth on your vagina?

A. Yes.

Q. Thank you.  What happened then?

A. He was talking very loud and very dramatically and he was saying things like, isn't this why you wanted me here; isn't

11

this what you wanted and I couldn't talk. All I could do is make noises and cry.

THE COURT: Ma'am, do you need to take a few minutes?

THE WITNESS: I'm okay.

THE COURT: All right.

BY MS. DUQUETTE:

Q.   Okay, Wendy, what happened next?

A.   When he was done with the oral sex, then he started vaginal --vaginal intercourse and he was still saying the same kind of things.

Q.   Were you frightened?

A.   I was very frightened.

Q.   After he performed vaginal sex with you, what happened then?

A.   He took the rag out of my mouth and he was still being-- talking loudly and my girls' room isn't very far down the hall from my room and I asked him to please be quiet so he wouldn't wake 'em up, and I just--I rolled back over on my side way on the other side of the bed.  He told me that he had a tape recorder, which I had known he had for a long time before this, and he said, as long as I have this tape, you can tell anybody and they'll never believe you, and so I can do this any time, any place.

After awhile, he told me to get on my knees and he started vaginal intercourse again.

12

Q. Did you at any time give him permission to do that?

A. No. No. He had the rag in my mouth again and he was so violent, it was knocking the wind out of me, I couldn't breathe. And he told me when--when he was done, he told me that I got it because I had been molested when I was very young. He said, you were a whore when you were a little girl and you're a whore now, only now you're my whore.

I had tr--when he was done, I--I could hear this rattling noise like when a tape comes to the end, and I asked him to turn it off, and I asked him why he was doing that to me. And he fumbled around for a few minutes and he said, there's no tape in the tape player and he took my hand and put my finger where the tape goes in and he said to me, there's no tape in there. I just wanted you to know that if I--if I didn't love you so much, I could do some-thing like that.

I curled up on my side again and I tried to pretend like I was sleeping and after awhile, I think I dozed off a little bit and after awhile, he was behind me and he put his hands around my neck and he started vaginal intercourse again and he kept saying, sometimes I just have to take it, you know, I just have to take it. He was--when he said I, he was referring to himself, not to me. And that was the last time.

Q. At no time did you ever indicate in any way that he had per-

13

mission to resume husband and wife relations, is that correct?

A.    That's correct.

MS. DUQUETTE: I'm through with the witness, your Honor.

THE COURT: Very well.  Mr. Greer.

CROSS-EXAMINATION

BY MR. GREER:

Q.    Ms. Leon, do you--do you drink alcohol?

A.    No, I don't.

Q.    Okay, so you were not drinking on the night in question?

A.    No, I was not.

Q.    Are you on any medications?

A.    No.

Q.    You were not on any medications on the night in question?

A.    No, I was not.

Q.    Are you on any now?

A.    No, I'm not.

Q.    Is it true you testified that he called you on March 31st in the evening, is that correct?

A.    Yes, it is.

Q.    And your testimony here today is that he--that he--you told him not to come over?

A.    Yes.

Q.    And isn't it true that he asked to come over?

A.    Yes, he did, repetitively.

14

Q.    And that he asked permission to see you?

A.    Yes, he did.

Q.    Did he ever tell you that--that if you didn't want him to come over, he wouldn't come over?

A.    I don't recall the exact context of the whole conversation.

Q.    But the gist of the conversation was, was that he was asking permission to come over?

A.    Repetitively.

Q.    And you repeatedly told him no?

A.    Yes.

Q.    Did you firmly tell him no?

A.    Yes.

Q.    And you made it very clear to him he was not to come over?

        MS. DUQUETTE: Asked and answered, your Honor.

        THE COURT: I think she's answered that a couple times, Mr. Greer.  So I'll--I'll sustain the objection.

BY MR. GREER:

Q.    So your testimony is, is that you were firm when you told him not to come over?

A.    Define firm.

Q.    Well, I mean, that there would be no misunderstanding.

A.    I don't think that you can misunderstand no.

Q.    And you said words to the effect, no, I don't want you over?

        MS. DUQUETTE: Badgering the witness, your Honor.

15

THE COURT: Well--

MR. GREER: Your Honor, I'm not--I'm asking questions.

THE COURT: All right.

MR. GREER: I mean, this is important, your Honor.  I mean, the gentleman called, she testified that he asked permission to come over, and I guess I want to make sure there weren't any misunderstandings that she--that she--that she meant it and that, you know, in the tone of voice that he would know not to come over.

THE COURT: Okay.  Well--but I think she did testify that--that she repeatedly said no.

MR. GREER: All right.

THE COURT: And that she didn't want him to come over, and so I think--I think that's been asked and answered, so--

MR. GREER: Can I ask what--did she recall what she said?

THE COURT: Certainly you can ask that.

BY MR. GREER:

Q.  Ma'am, what did you say?  What words do you use, if you recall?

A.  It would have been something to the effect of no, given the circumstances, I don't think that's a good idea.

Q.  But you don't recall the exact words, I mean, that's--

A.  No, I don't recall the exact words.

Q.  Did you ever tell him that you didn't think it was a good

16

idea because you didn't want to wake up the kids?

A. The kids were awake.  No, I didn't tell him that.

Q. Did you--did you tell him that you would leave the door open?

A. No.

Q. So you--and you told him you changed the locks, is that what I recall?  He knew you changed the locks on the house?

A. He knew the day he was removed from the house that we changed not only the locks but the entire front door.

Q. How was he removed from the house?

A. My oldest daughter took his clothes down to the Newaygo store and left them there for him.  The individual who is also a counselor to me called up and asked me if I wanted him to inform Greg and I said, yes, if you don't mind.  And apparently he did because Greg called not long after very angry.

Q. Did he come back?

A. No, he did not.

Q. So when you say he was removed, he wasn't removed by any force, he was asked not to come back and he didn't come back, would that be fair?

A. He was told that he was not wanted there at all.

Q. And he did not come back?

A. No, he did not.

Q. So the--so--so the police didn't remove him?

17

A. No.

Q. And a lawyer didn't remove him?

A. No.

Q. And court papers didn't remove him?

A. No.

Q. A friend of--a mutual friend asked him not to come back and he didn't come back?

A. Yes.

Q. So it's really not a fair statement to say he was removed from the premises.

A. I guess it depends on how you view the term.

Q. You state in your report that you weren't sure how he got into the home.

A. I didn't see him enter the home, so I can only draw my own conclusions.

Q. And that would be?

A. We have a sliding glass door. There is no lock or latch on it and in order for the cats to go in and out in good weather, we leave it open about that far (Indicating) and we jam a piece of heavy dowel at an angle in between the frame and the sliding glass door so you can't open it.

Q. Was that done that evening?

A. While we were doing it, it was a permanent situation, unless for some reason somebody opened the sliding glass door. It wasn't taken in and out, in and out, it pretty much was just

18

that way all the time.

Q. Was it done that evening?

A. The stick was in, yes.

Q. So he would have--if he were to enter through that door, he would have entered through, you indicated less than 12 inches, that would have been his only method of entry?

A. The other alternative would be to completely close the sliding glass door and thus dislodge the dowel and thus be able to open the sliding glass door however far you choose to.

Q. Was that dowel in place the next morning?

A. No, it was not.

Q. Were there any doors that were unlocked or left unlocked?

A. There's only one other entrance and that was locked, both locks.

Q. And you went to bed and you claim that was locked, right?

A. Yes, it was.

Q. And you didn't tell him that the door would be open on the phone conversation?

A. No.

Q. And when he called you on the phone, he wasn't insisting that he come over, correct?

A. Insisting meaning?

Q. I am coming over. I will be there. That's sort of--

A. No.

19

Q.   That sort of--it was more of a asking?

A.   Yes.

Q.   Permission to come over?

A.   Yes.

Q.   And that while he was there, he set the alarm for four thirty in the morning, do you recall that, whether the alarm was set?

A.   No, I don't recall.

Q.   Do you recall, did he sleep there that evening?

A.   I was aware of a few times that he was snoring.

Q.   So what--between the time the act, the last act that you testified here to of intercourse, and the time that he left, what did you do?  You slept, didn't you?

A.   Part of the time, yes, I did.  I didn't go to sleep immediately.

Q.   What did he do?  He slept, didn't he?

A.   At one point he got up and went in the kitchen and got something to eat.

Q.   And do you recall him waking up?

A.   Waking up when?

Q.   To leave.

A.   I'm not 100 percent positive that he was ever asleep.

Q.   Do you recall him getting up out of the bed to leave?

A.   Yes.

Q.   What drew your attention to that?

20

A.    It's a water bed, it moved quite a bit.   He's a large man.

Q.    Did he take a shower?

A.    No, we have no shower.

Q.    Did he collect some belongings?

A.    Yes, he did.

Q.    Personal belongings?

A.    And then some, yes.

Q.    And that was okay with you?

A.    Yes, it was.

Q.    And did he ask if he could take some of these belongings?

A.    No, he didn't.

Q.    Was he forceful when he took them?

A.    (No verbal response)

Q.    He wasn't, was he?

A.    Forceful. He was--

Q.    Was he?

A.    No, he was sneaking around in the dark believing that I was asleep.

Q.    How do you know he was sneaking?

A.    Because that was the only time that entire night that he was quiet.

Q.    And then he--what time did he leave, do you recall?

A.    I'm not sure what time he left the house, no.

Q.    And then he was gone, he never came back?

A.    No.

21

Q. You stated that at one time he knocked the wind out of you when he was performing this sexual, a sexual act, is that correct?

A. Yes.

Q. And who's the first person you told that to, do you recall? Was it ever mentioned to the trooper, Trooper Watson?

A. No.

Q. You didn't mention that to him?

A. No.

Q. You didn't mention that he grabbed you around the throat either, did you?

A. No.

Q. When did you recall this happening?

A. When I spoke to Trooper Watson, I told him that I believed it was three times vaginal intercourse but I could only re-member two.

Q. Uh-huh.

A. Given that the whole incident--

Q. But you didn't tell him--you didn't tell him what--my ques-tion was, did you tell him that he grabbed you around the throat?

A. No.

Q. Okay.  How long have you two been married?

A. Approximately a year and a half.

Q. Is it true that during this approximate year and a half

22

there was never any physical abuse by Mr. Leon to you?

A.   Physical abuse meaning?

Q.   Pushing, hitting, shoving, physical abuse?

A.   There was no pushing, hitting, shoving, no.

Q.   This--this cloth in your mouth, has--during the course of your marriage, has that ever occurred before?

MS. DUQUETTE: Your Honor, rape shield, whatever, you know, we're here for specific acts that occurred on the night of or the morning of April 1st.  We've proved that. This is not a fishing expedition license, your Honor.

MR. GREER: It is a fishing expedition.

THE COURT: Well, we have an objection.  Mr. Greer, your response?

MR. GREER: Your Honor, it's a--it's a--it's a reasonable question.  She's testified that he put a cloth in her mouth and I'm asking if it had ever happened before during their marriage.

THE COURT: Okay, that's a legitimate question perhaps to explore whether or not what the cloth item is and perhaps if it was located.  Why don't you go ahead and ask that. That's all right.

THE WITNESS: Never.

BY MR. GREER:

Q.   That had never happened before?

A.   Never.

23

Q.   It never--you never put a cloth in your mouth or any other object in your mouth during intercourse?

A.   Never.

MR. GREER: I have nothing further.

THE COURT: All right, Ms. Duquette, any further questions?

REDIRECT EXAMINATION

BY MS. DUQUETTE:

Q.   Wendy, do you recall what you did in terms of counseling or any services you got after you reported--

MR. GREER: Your Honor, I'm going to object.  That is totally inappropriate.

THE COURT: I haven't heard the question, so why don't you go ahead and ask the question but don't answer it yet.

MS. DUQUETTE: All right.

BY MS. DUQUETTE:

Q.   I'm trying to find out, Wendy, when you finally remembered this last count when he had his hands around your throat, was that--

THE COURT: Do you--do you still have an objection to that, Mr. Greer?

MR. GREER: No, I don't.

THE COURT: Okay.

THE WITNESS: I remembered it when--the day I found multiple copies of the assault tape and I couldn't figure

24

out why somebody would make so many copies of something like that and I just had a memory--it just came flooding to me.

BY MS. DUQUETTE:

Q. Did he do anything else to you, other than to put his hands around your neck?  Did he hold you down in any fashion?

A. There were times because my arms were down at my side and his hands were on each side of my arms that I couldn't move them but he did not pin me down.

Q. Were you still afraid at that point?

A. Very.

Q. Were there any weapons in your bedroom?

A. Yeah, there were a couple--

MR. GREER: Your Honor, I'm going to object.  I mean, there's been no testimony of any weapon was ever used.

THE COURT: Well, no, that's a relevant question.  In fact, I was going to ask that question if whether or not a weapon was brought into the--into the bedroom or if there was one there prior to, so I'm going to allow you to ask that, Ms. Duquette.

THE WITNESS: There were a couple of knives right next to the bed in a file cabinet drawer.

BY MS. DUQUETTE:

Q. Were they the defendant's knives?

A. Yes, they were.

Q. And had he placed them there before?

A.    They had been there for a considerable amount of time, yes.

MS. DUQUETTE: Thank you.  No further questions, your Honor.

THE COURT: All right, Mr. Greer, anything else?

RECROSS-EXAMINATION

BY MR. GREER:

Q.    When you say that he put his hands on your--on your neck, he wasn't choking you?

A.    No, he wasn't choking me.

Q.    It was more of a caressing?

A.    No, it was more of a--I interpreted it as a don't move or you will be choked.

Q.    But he didn't restrain you?

MS. DUQUETTE: Your Honor, hands on one's neck while performing intercourse--

MR. GREER: Your Honor, is there an objection?

MS. DUQUETTE:  --is a restraint.

THE COURT: Okay.  Mr. Greer, there's an--

MR. GREER: She's testifying, your Honor.

THE COURT: Well, there's an objection.  She's already answered the question, so we'll just let the answer go in. Anything else, Mr. Greer?

MR. GREER: No, your Honor.

THE COURT: All right, I have a few questions for you, ma'am, if I may.

26

THE WITNESS: Yes.

THE COURT: Now, do you need any kleenexes?

THE WITNESS: No, I'm fine.

THE COURT: All right.  I want to talk about your house for a minute.  What--what type of house is it?

THE WITNESS: It's a single story, cement block.

THE COURT: All right, and you said there's two ways in and out, is that correct?

THE WITNESS: Yes.

THE COURT: One's a front door and you indicated you be-lieved that that was locked?

THE WITNESS: I know it was.

THE COURT: You know it was locked.  And the back door is a slider door?

THE WITNESS: It's not a back door, it goes off the kitchen in the front.

THE COURT: Okay.  But be as--be as--as it may, the other way in and out is a slider door?

THE WITNESS: Yes.

THE COURT: Okay, and you indicate that you do leave that open, slightly ajar for your animals to get in and out?

THE WITNESS: Yes.

THE COURT: All right.  For a person to get into that-- into the house that way, would--would they have to move the door open further?

27

THE WITNESS: Yes.

THE COURT: Okay.  When Mr. Leon left the premises, finally left the premises, could you determine if the front door was open or closed?

THE WITNESS: It was closed when I went out to make sure he was gone from the house.

THE COURT: All right, and in the slider door, did that seem to be open more than you recall, or was it closed, or was it the same?

THE WITNESS: It was partially opened.  I don't know that I paid attention to more or less.

THE COURT: Okay.  From your observation of the doors, you couldn't determine if he had gained entry through the do--either door, is that fair?

THE WITNESS: The front door has a chain lock and the chain lock was still in place.

THE COURT: Okay, all right.  Were any of the windows open?

THE WITNESS: No.

THE COURT: Okay.  All right.  Who was the first per-- did you contact the police?

THE WITNESS: No, I didn't.

THE COURT: When did you--who was the first person you told this to?

THE WITNESS: I told it to Steven Potter.  He is native

28

American.  He had been counseling me and I told him because I believed with that tape, no one would believe me and I also believed that Greg would come back and I wanted--

THE COURT: When did you tell Mr.--Mr. Potter that?

THE WITNESS: As soon as I could get a hold of him that morning.

THE COURT: So that morning you contacted somebody?

THE WITNESS: Yes.

THE COURT: All right.  And did--was he the one that eventually contacted law enforcement?

THE WITNESS: No, he contacted Pastor Fry and Pastor Fry came over and they told me that I had to report it to someone and I said that I had to call Kim Barlow at two. That was--

THE COURT: Okay, do you know Kim Barlow?

THE WITNESS: Yes, I had been working with her.

THE COURT: And that's the probation/parole agent for Circuit Court here?

THE WITNESS: Yes.

THE COURT: All right.

THE WITNESS: I had been working with her.

THE COURT: And did you call her?

THE WITNESS: Yes.  And she called law enforcement.

THE COURT: Okay.  All right.  Now you indicated that-- that you had put new locks on the door, is that right?

29

THE WITNESS: Yes.

THE COURT: Did--did you provide him with any way, a key to get into that--with the new lock?

THE WITNESS: No.

THE COURT: You didn't do that?

THE WITNESS: No.

THE COURT: All right.  Can you give me an estimate to how long he was in your home that evening?

THE WITNESS: I would say somewhere between five and six hours I would guess.

THE COURT: Okay.  How many other people were in the home when he arrived or when you first found out that he was in the home?

THE WITNESS: My two daughters.

THE COURT: Okay, are they also his daughters?

THE WITNESS: No, they're not.

THE COURT: Okay.  All right.  Now one other issue is the--you said that there were knives in your bedroom.

THE WITNESS: Yes.

THE COURT: Would he have known that those knives were there?

THE WITNESS: Yes.

THE COURT: When these sexual assaults occurred, were you conscious of those knives being in the bedroom?

THE WITNESS: Yes.

30

THE COURT: Were they in a drawer--were the--were the knives visible at the time?

THE WITNESS: No, they were in a drawer.

THE COURT: In a drawer. So the door--drawer was closed?

THE WITNESS: Yes.

THE COURT: Did he ever mention or did you ever mention anything about the knives that evening?

THE WITNESS: No.

THE COURT: Okay.  All right, ma'am, you can step down. Thank you.

MR. GREER: Your Honor, I have one question.

RECROSS-EXAMINATION CONTINUED

BY MR. GREER:

Q.   The capacity of Kim Barlow, is she a friend of yours, is that how you know her?

A.   No.

Q.   You're not on probation or parole?

A.   No.

MR. GREER: All right.  Thank you.

THE COURT: You can step down, ma'am.  Thank you.

(At 3:16 p.m. witness excused)

THE COURT: Ms. Duquette.

MS. DUQUETTE: Your Honor, I--I believe that we have provided the Court with enough evidence to bind over, but at this time, I would move to add a count four.

31

THE COURT: Uh-huh.

MS. DUQUETTE: Of criminal sexual conduct third degree force or coercion.

THE COURT: Okay, anything else?

MR. GREER: For which act, which one are we talking about?

MS. DUQUETTE: One that she remembered where he put his hands around her neck.

MR. GREER: Well that's already been a count one.

MS. DUQUETTE: No.

MR. GREER: There was three acts.

MS. DUQUETTE: There were three acts reported to the state police.  There was another act that she remembered after having spoken with the state--state troopers.

MR. GREER: Well I think that was one of the acts.

MS. DUQUETTE: Your Honor,--

THE COURT: Why don't you--let her--let Ms. Duquette make her argument, Mr. Greer, and then you can argue what-ever you want but go ahead, ma'am.

MS. DUQUETTE: Your Honor, Wendy testified that at first Mr. Leon put the gag in her mouth and then performed cunnilingus, if you will, that was act number one.  Act number two, he entered the victim's vagina with his penis and performed a sexual act.  And act number three, we had that twice, both in succession, your Honor.  Then we have

her testifying that he throttled her or at least put his hands around her neck and again commenced penile/vaginal sexual intercourse.  That's four acts that I count, your Honor.

THE COURT: Okay.  Thank you, ma'am.  Mr. Greer.

MR. GREER: Your Honor, I--I would object to the adding of count four because as I recall the testimony, there were the two acts, the two sex acts, I mean the two penis/vagina acts and then the--the oral/vagina act.  Those are the only three that I heard testimony of.  Maybe I missed something, your Honor.

THE COURT: All right.  Any further argument, Ms. Duquette?

MS. DUQUETTE: No, your Honor.

THE COURT: Okay.

MR. GREER: You know, if the Court is clear that there were those--that there was three acts, then, you know, I mean, I didn't hear it.

THE COURT: All right, what I'm going to do is I'm going to take about five minutes.  I would ask that the parties remain in the courtroom.  I want to look--look up a statute and I'll be out in about five minutes.

(At 3:18 p.m. recess)

(At 3:25 p.m. proceedings reconvened)

THE COURT: I'm going to call Wendy Leon back to the

33

stand.  Would you please come back up here, ma'am, for a few questions?  And you're still under oath.,

WENDY LYNN LEON

recalled by the Court at 3:26 p.m., previously sworn by the Court Reporter, testified:

EXAMINATION

BY THE COURT:

Q.  I want to make sure that I--I--this has been kind of a long time that you've been testifying, so I want to make sure that I'm clear on your testimony, okay.  And the Court did review its notes and the Court got down to you had indicated initially oral, an oral sexual assault, then you had indicated a vaginal assault, and then another vaginal assault, and then you described later on that he had put his hands around your neck, and you indicated that he said, some times I just have to take it.

A.  Yes, so--

Q.  Okay, but at that point, the Court did not hear anything further.  Did something else occur at that point and time?

A.  He proceeded to have vaginal intercourse.

Q.  At that time as well?

A.  Yes.

Q.  All right.

THE COURT: Do you have any other questions relative to that issue, Ms. Duquette?

MS. DUQUETTE: No, your Honor.

THE COURT: Okay, Mr. Greer?

MR. GREER: No, your Honor.

THE COURT: All right, you can step down, ma'am.  Thank you.

THE WITNESS: Thank you.

(At 3:26 p.m. witness excused)

THE COURT: We're back on the record.  The Court has reviewed the testimony, and the Court would make the following findings; one, that Wendy Leon testified that she lives in Brooks Township, Newaygo County, and that she was married to the defendant, who she identified, and prior to December 31st of this year, she--she was married to the defendant but he had left the home and on that particular day she had contact with the defendant, and she had told him on--on more than one occasion to stay away.

The defendant made calls at approximately eight fifteen p.m. and he was told he was not welcomed in the home.

At twelve thirty-five a.m., which would have been on April 1st, 1997, the defendant, she--at that time, Wendy Leon first was aware of the defendant's presence in her home but she was not fully awake at the time.  The defendant --she is not certain how the defendant got into the home but that her front door was locked and the other door was partially ajar so an animal could get in and out of the

35

home.

The defendant got into bed with her.  She was lying in the bed with a three quarter length cotton nightgown. She indicated she wanted him to go away.  She was afraid of the defendant.  She was cognizant that there were knives in the room.  The defendant refused to go away.

The defendant at some point put a cotton cloth into her mouth.  He had put his mouth on her vagina.  He was talking loud, indicated, isn't this what you wanted.  She indicated that she couldn't talk because of the item in her mouth.

Later in the evening, the defendant sexually assaulted her, vaginal intercourse, placing his penis into her vagina. She--he then took the rag out of her mouth.  She asked him not to wake the children up and he had told her that he had a tape recorder and that I can do--do any--I can do this any number of times to you at any place.

The defendant then got on--committed--got on her knees and was forced into vaginal intercourse again.  He then placed this cotton rag or item in her mouth again and she was having difficulty breathing.  He indicated the words, you were a whore when you were a little girl and you're a whore now.

And then Ms. Leon testified that he put his hands around her neck and he stated the words, sometimes I just have to take it and then commenced sexually assaulting her

vaginal--penile/vaginal intercourse with her.

He stayed in the home for a period of time, five hours or so and left.  They had been married approximately one and a half years.

And so the Court would make the following findings; one, the Court does find the defendant did engage in four counts of criminal sexual conduct in the third degree; that on or about April 1st, 1997, in Brooks Township, that the defendant did engage in sexual penetration and that will be three counts of penile/vaginal intercourse with Wendy Leon using force or coercion to accomplish the penetration, three counts.

Also, one count of oral/vaginal penetration with Wendy Leon using force or coercion to accomplish the sexual pene-tration.

The Court is also going to add a fifth count of home invasion first degree; that the defendant did enter a dwell-ing located at Wendy Leon's home without permission with the intent to commit criminal sexual conduct in the third degree therein while Wendy Leon was lawfully present in her dwell-ing, and that is a felony with a maximum term of 20 years in prison and/or a 5,000 dollar fine.

So I'm adding two additional counts to the--to the three that have already been listed.

And the Court does find that there is probable cause to

believe that these five offenses occurred and that there is probable cause to believe the defendant committed these offenses.

MR. GREER: Your Honor.

THE COURT: Yes.

MR. GREER: The Court--the Court is aware there was no testimony but the Court must be aware that my client also owned that home and there was no court order or personal protection order or anything prohibiting him from going into that home, and I guess--I'm questioning count five, your Honor.

THE COURT: Yes.

MR. GREER: Just because she locks the door to his--to his home, he has equal access to it. He has every right to go into that home, your Honor. As I stated, there was--it was testified that no divorce proceedings had been filed and he was merely, like she stated, he was removed from the home but later it was--he was asked not to come back and he didn't come back until that time. I believe that there has to be some--I mean, he has an ownership interest in this home. He has every right to be in this home until the Court determines that he doesn't or somebody, other than--other than, you know, the spouse determines that he doesn't.

So I guess, you know, you know, I'm not--I guess I'm questioning the Court's interpretation of the statute. I

believe that--that he does have every right to be in that home and therefore, I don't think it would fit the statute, your Honor.

THE COURT: Very--

MR. GREER: Unless, your Honor, you know, maybe it's-- as I recall the testimony, she hadn't filed papers and there was nothing prohibiting him, other than she said that she didn't want him back in the home.  That's--

THE COURT: Maybe I'll ask Ms. Duquette.  Was--was there any, to your knowledge, and we can call the witness back up but was there any legal papers filed, or separation papers filed, or perhaps a personal protection order filed in this matter prior to the date of this incident to your knowledge?

MS. DUQUETTE: I think not--not on Wendy, your Honor.

THE COURT: Okay.

MS. DUQUETTE: There may have been orders filed because of her children.

THE COURT: All right.

MS. DUQUETTE: At that point and time.

MR. GREER: Well, yes or no, was there?

THE COURT: Well--

MS. DUQUETTE: If you would like to recall the witness to the stand.

THE COURT: I'm going to recall her one more time. Ma'am--ma'am, would you please come back up and I remind

39

you you're still under oath. The impression that the Court had was that there was some type of legal document or--or-- or prohibiting him from--to be at the home.

WENDY LYNN LEON

recalled by the Court at 3:34 p.m., previously sworn by the Court Reporter, testified:

EXAMINATION CONTINUED

BY THE COURT:

Q.    Ma'am, to your recollection, was there any type of legal document prohibiting him from being at the home?

A.    I'm not sure.  CPS told me that I was not to have him back in the home under any circumstances.  What they filed or I don't know, I don't know all their procedure.

Q.    Okay.  To your knowledge, a personal protection order was not filed against him at that time?

A.    No.

Q.    All right.  And to your knowledge, there wasn't a court order prohibiting him from being in the home, is that correct?

A.    I don't--

Q.    To your knowledge?

A.    Not that I--

Q.    All right.

A.    --was shown.

        THE COURT: Okay, thank you.  You may--you can step

40

down.

(At 3:35 p.m. witness excused)

THE COURT: Thank you, Mr. Greer, for bringing that to my attention.

MR. GREER: Thank you, your Honor.

THE COURT: The Court is going to withdraw that count five at this point because it appears that there wasn't an order prohibiting him from entering the premises, but Mr. Greer, the Court would note that this isn't an issue of possession.  It's an issue of occupancy. But--but since there wasn't an order prohibiting him from occupying, then --then the Court is going to dismiss that--is not going to add that count five.

So there'll be four counts of criminal sexual conduct third degree.  And the Court is going to bind the defendant over to Circuit Court to stand trial and for Circuit Court arraignment on--

THE COURT REPORTER: It'd be Tuesday, July 8th at ten before Thomas.

MR. GREER: Your Honor, we'll file a written waiver of that--

THE COURT: Okay.

MR. GREER:  --document 'cause I'll be out of town.

THE COURT: The Court is going to address the issue of bond.  The Court would note that the bond is currently set

41

at 50,000 dollars cash and the Court has heard testimony that--that this Court believes to be a much more serious situation where an item was placed into her mouth to prohibit her from talking.  The Court would note that an additional count of criminal sexual conduct occurred in this matter.  So the Court is raising the bond to 100,000 dollars cash.  We're adjourned.  Thank you.

MR. GREER: Thank you, your Honor.

THE COURT: You indicated that you're filing a written waiver of arraignment?

MR. GREER: I am, your Honor.

THE COURT: All right, for the--for the People's understanding and for Mrs. Leon's understanding, the defendant will not be present in the courtroom on July 8th.  He filed a written waiver of arraignment. So the next time he'll be in court, you can discuss that with the prosecutor. They'll let you know.  It'll be in a couple weeks.

And likewise for you, Mr. Leon, your attorney will write you and advise you when you have to be in court next but it'll be next door Circuit Court.

MR. GREER: Thank you, your Honor.

MS. DUQUETTE: Your Honor.

THE COURT: Yes.

MS. DUQUETTE: Could I also ask as a condition of bond should the defendant be able to post it, that he stay away

from Mrs. Leon, and his house, and her children?

THE COURT: That has already been done.

MS. DUQUETTE: Thank you.

THE COURT: All right, we are adjourned.

MR. GREER: Thank you, your Honor.

(At 3:37 p.m. proceedings concluded

STATE OF MICHIGAN    )
                     ) SS.
COUNTY OF NEWAYGO    )

I certify that this transcript, consisting of 43 pages, is a complete, true, and correct transcript of the proceedings and testimony taken in this case on Thursday, July 3, 1997.

July 21, 1997

Diane M. Reinke CER-0644
Certified Electronic Reporter
P.O. Box 8365
White Cloud, MI 49349

43

Case 1:15-cv-00447-RJJ    ECF No. 83-4, PageID.3505    Filed 12/02/16    Page 51 of 56

Page 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF NEWAYGO

PEOPLE OF THE STATE OF MICHIGAN

vs            File # 97-6442-FH

GREGORY PAUL LEON,

     Defendant.

_____

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE TERRENCE R. THOMAS CIRCUIT JUDGE

White Cloud, Michigan - Monday, 11-17-97

APPEARANCES:

For the People:    Chrystal R. Roach P-32244
                 Prosecuting Attorney
                 Newaygo County Circuit Court
                 1092 Newell Street
                 White Cloud, MI   49349
                 (616) 689-7285

For the Defendant:    John M. Greer P-33732
                 40 West Sheridan, Box 69
                 Fremont, MI   49412
                 (616) 924-4230

Page 2

TABLE OF CONTENTS

WITNESSES:                          PAGE

   (None)

EXHIBITS:

   (None)

COPY

ORiginal

Page 3

(White Cloud, MI)

(Monday, 11-17-97)

(Commenced at 4:25 PM)

MS. ROACH: Your Honor, in the matter of People v Leon, I believe counsel filed a motion, filed several motions, one of which we are considering today.

We have discussed this matter in chambers, and I would ask that we place our arguments on the record, and the Court's ruling as well.

I do note that the victim in this matter has been present in the courtroom all afternoon, essentially waiting for this to matter to be heard.

MR. GREER: Your Honor, John Greer on behalf of Mr. Leon. I filed a motion for the Court under the 180-day rule which essentially requests that the Court grant Mr. Leon a PR bond since he has been in jail for how many days?

THE DEFENDANT: 220.

MR. GREER: 220 days to this date, your Honor. He is unable to post the bond. He has a place where he can live, your Honor. We will agree to any conditions that the Court imposes upon Mr. Leon, but the new trial date is not scheduled until January sometime, I was informed today. And, so, as the Court is well aware, he has been in jail for over some seven months

Page 4

and the trial was scheduled for last Thursday. It was adjourned on the Court's order, so I would ask for a PR.

MS. ROACH: Under .004, there are exceptions to the rule regarding release at six months. Those exceptions include periods of delay resulting from other proceedings concerning the defendant, including but not limited to competency and criminal responsibility.

The People assert that there were two delays in this matter excluding the docket control delay that caused this matter to be adjourned from last week to January, and that the periods attributable to those delays were 63 days, and that under sub-sections 1, 3 and 6 to 6.004, the speedy trial issue really has not -- or I'm sorry -- the pretrial release issue really has not risen to the point where this defendant has been held 180 days simply waiting for trial, but in fact sought other -- we had a polygraph. We had, I believe, a remand for pretrial. We've had motions.

This is a complicated case, your Honor. We've had other matters involved. 6.004 indicates that we cannot consider docket congestion to be a reason to allow a defendant to remain incarcerated; however, it is the People's position that proceedings attributable to the defendant or consented to by the defendant as set forth in the court rule do not allow the defendant to

Page 5

then be released on a PR bond at the six-month period of time.

Your Honor, this is very serious case. It's the People's position this is a dangerous defendant. We oppose his release on a PR bond.

MR. GREER: Your Honor, I don't quite know what the prosecutor is attributing the 63 days to, but it's an unwritten policy that we generally waive the prelim, and we bring it up, and if we can't work something out, we remand it. Now, that's my fault? I mean, fine. I'll set everything for prelim if I'm going to be held to it.

This man has been in jail 220 days. He has asserted his innocence. We've even assured the Court we have a place to live. We've assured the Court that there will be no violations. There is a personal protection order. My client has never once contacted her since that was placed in effect. And there are ways to contact people from jail and he hasn't done so.

Every time I asked him to do something, he listened. He is going to be living in Rockford at Ruth Groll's house.

THE COURT: Is that a relation?

MR. GREER: Close personal friend. Her and her husband.

Page 6

THE DEFENDANT: Friend. They have power of attorney over me.

THE COURT: Why is that? How did they get that?

MR. GREER: I prepared one for him while he has been in jail.

THE COURT: Oh, just recently?

MR. GREER: Yeah. It's to take care of his needs while he is incarcerated.

THE COURT: How long were you married to this woman --

THE DEFENDANT: A year and-a-half.

THE COURT: -- that accuses you. Do you have any children by her?

THE DEFENDANT: No, sir.

THE COURT: You've got a criminal record otherwise?

THE DEFENDANT: Yes, sir.

THE COURT: For what?

THE DEFENDANT: I have an assault charge and some other charges, your Honor. I have never absconded on bond. I was on probation when this came up. It was a personal protection order concerning that case, your Honor, and I've gone three years without violating that personal protection order.

Page 7

MR. GREER: Plus, your Honor, he has -- the reason -- apparently, there is a claim that he has violated conditions of that probation, and that would be because this offense arose and he posted bond on this offense.

THE DEFENDANT: I think they have since dropped that warrant. Court Officer Greer checked on that last Friday.

MR. GREER: My brother?

THE DEFENDANT: Yeah.

THE DEFENDANT: Also, your Honor, during the preliminary hearing, my wife testified that during that year and-a-half, I was not physically abusive to her.

MR. GREER: That's correct, your Honor. I neglected that. That is in the transcript.

THE DEFENDANT: I have that transcript here.

THE COURT: Where is she living now?

THE DEFENDANT: Newaygo. I will be living in a different county.

THE COURT: Who are you, ma'am?

UNIDENTIFIED SPEAKER: I'm his wife and most recent victim, and there have been threats from former inmates. There have been anonymous death threats on the phone. And as far as -- no, there was no physical abuse. There was mental abuse. There was emotional

Page 8

abuse. There was sexual abuse on both my daughters, as substantiated by Children's Protective Services. He's a threat.

MR. GREER: I don't know anything about that.

ALLEGED VICTIM: He is a danger to every woman and child in this state.

THE COURT: He has to be convicted of that, and then we'll handle it. But, given the circumstances, I will allow the personal recognizance. A condition of that is that you are not to visit those people. Do not go anywhere near Newaygo or where she is.

THE DEFENDANT: Yes, sir.

THE COURT: That trial is in January, so.

THE DEFENDANT: January 23rd, your Honor. Thank you, sir.

MR. GREER: Thank you, your Honor. (4: 32 P

ALLEGED VICTIM: You just signed somebody's death certificate, Mr. Greer.

(Concluded at 4:32 PM)

Page 9

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF NEWAYGO)

       I certify that this transcript, consisting of 9 pages, is a complete, true, and correct transcript of the proceedings and testimony taken in this case on 11-17-97.

Dated:  12-12-97

*Lisa Briggs-Ostrander*

Lisa Briggs-Ostrander, CSR #3447
Newaygo County Circuit Court
1092 Newell Street
White Cloud, MI  49349
(616) 689-7222

COPY

```
                              Original-Court
                              1st copy-Jail                 3rd copy-Defendant
Approved,SCAO                 2nd copy-State Police          4th copy-Prosecuto
---------------------------------------------------------------------------------
STATE OF MICHIGAN             JUDGMENT OF SENTENCE           CASE NO.
27TH JUDICIAL CIRCUIT COURT   X COMMITMENT TO JAIL           97-006442-FH-T
---------------------------------------------------------------------------------
ORI 620025J                                                 PAGE    1
COURT ADDRESS                                               COURT TELEPHONE NC
1092 NEWELL STREET            WHITE CLOUD     MI  49349 -0885    616-689-725

Police Report No.

                                          Defendant

                                     LEON,GREGORY,PAUL
THE PEOPLE OF STATE OF MICHIGAN       725 CROSBY NW
                                  V   GRAND RAPIDS         MI 49504
                                     CTN:629700033501 SID:      DOB: 1/05/5
---------------------------------------------------------------------------------
```

THE COURT FINDS:
1. The defendant was found guilty on  7/16/98 of the crime(s) as stated below:

```
        CONVICTED BY                              CHARGE CODE(S)
CNT PLEA COURT JURY         CRIME            MCL CITATION/PACC CODE
 5   NC    _    _   STALKING-AGGRAVATED          750.411I
    Plea:insert G for guilty plea; NC for nolo contendere; MI for mentally ill
```

2. Defendant X was represented by an attorney: BAYNTON,THOMAS,B
            _ was advised of the right to counsel and/or appointed counsel and
              knowingly, intelligently, and voluntarily waived that right.
_  3. Conviction reportable to Secretary of State.  Defendant's driver license
       number is: _____
_  4. Licensing sanction reportable to State Police.     _ Revoked
       _ Suspended _____ Days    _ Restricted _____ Days
_  5. HIV testing was ordered on _____. Confidential test results are
       on file.

IT IS ORDERED:
X  6. Defendant is sentenced to jail as follows: _   Report at ____ _M

```
    DATE    SENTENCE  CREDIT   SERVE       Release Authorized      Release Perio
CNT BEGINS    MO  DA  MO  DA  MO  DA       for the following:     From      To
 5 10/19/98 ___ 223 ___ 223 __  _ Upon payment of fine/cost
                                  _ To work or seek work.....
                                  _ For attendance at school.
                                  _ For medical treatment....
                                  _ OTHER:_____
```

7. Defendant shall pay as follows:

```
CNT     FINE      COSTS  RESTITUTION    CVR      OTHER     TOTAL    DUE DATE
ALL    $.00      $.00      $.00       $60.00    $.00     $60.00    0/00/00
```

_ Jail for failure to pay on time beginning _____ serve ____ days.

Fine, costs, and fees not paid within 56 days of the due date are subject to
20% late penalty on the amount owed. If a cash bond/bail was personally
deposited by defendant, payment toward the total is to first be collected out

COPY

```
                                 Original-Court
                                 1st copy-Jail                    3rd copy-Defendant
Approved,SCAO                    2nd copy-State Police             4th copy-Prosecuto
-------------------------------------------------------------------------------------
STATE OF MICHIGAN                JUDGMENT OF SENTENCE         CASE NO.
27TH JUDICIAL CIRCUIT COURT      X COMMITMENT TO JAIL         97-006442-FH-T
-------------------------------------------------------------------------------------
ORI 620025J                                                  PAGE    2
COURT ADDRESS                                                COURT TELEPHONE NC
1092 NEWELL STREET               WHITE CLOUD      MI  49349 -0885   616-689-725

Police Report No.
                                         Defendant

                                 LEON,GREGORY,PAUL
THE PEOPLE OF STATE OF MICHIGAN          725 CROSBY NW
                                 V       GRAND RAPIDS         MI 49504
                                 CTN:629700033501 SID:              DOB: 1/05/5
-------------------------------------------------------------------------------------
```

of that bond/bail.

   _   8. Defendant shall be placed on probation for ___ months and abide by the terms of probation. (See separate order.)

   _   9. Defendant shall complete the following rehabilitative services:
      _ Alcohol Highway Safety Education
      _ Treatment (_ outpatient, _ inpatient, _ residential, _ mental health.)
      Specify: _____

X 10. Other:
   IT IS ORDERED THE DEFENDANT SHALL SERVE 223 DAYS WITH CREDIT FOR 223 DAYS.


      (SEAL)

Date: 10-20-98_____    Judge: _____    Bar No: 21388
                 TERRENCE R THOMAS
Under MCL 769.16a the clerk of the court shall send a copy of this order to th Michigan State Police Central Records Division to create a criminal history record.
MC 219 (6/95)   JUDGMENT OF SENTENCE/COMMITMENT TO JAIL

Approved, SCAO

Original - Court
1st copy - Probation Department

2nd copy - Defendant
3rd copy - Prosecutor

4835-6149
CFJ-149 6/97

| STATE OF MICHIGAN JUDICIAL DISTRICT | PETITION AND ORDER FOR DISCHARGE FROM PROBATION | CASE NO. |
|---|---|---|
| 17th **JUDICIAL CIRCUIT** | | 93-64216-FH |

ORI
MI- 410013G Court address 320 Ottawa NW Grand Rapids, MI 49503     Court telephone no. (616)-336-3667

| | Defendant's name, address, and telephone no. |
|---|---|
| ☐ The State of Michigan | LEON, Gregory Paul |
| THE PEOPLE OF [X] Kent County     V | |

CTN 41 93 160128 01     SID 753981J     DOB 1-5-56

| Date of probation 11-7-94 | Offense | Att. Child Abuse |
|---|---|---|
| Term of probation 48 months | | |

I respectfully petition this court to discharge the defendant from probation for the following reasons:

It is respectfully recommended that this probationer be discharged with moderate improvement.

All conditions of probation have been met.

July 30, 1998
Date
JL/kf

Probation officer     John LUther

**ORDER OF PROBATION DISCHARGE**

IT IS ORDERED:

1. Defendant is discharged from probation supervision, and any unfulfilled obligations or conditions of the sentence imposed by this court are suspended, except that collection for unpaid probation oversight fees may be pursued according to law [MCL 791.225A(6)].

☐ 2. The plea or finding of guilt under the:
   ☐ Controlled Substance Act (MCL 333.7411)
   ☐ Spouse Abuse Act (MCL 769.4a)
   ☐ Parental Kidnapping Act (MCL 750.350a)
   is set aside and the case is dismissed. The records of arrest and discharge or dismissal in this case shall be retained as a nonpublic record according to law.

☐ 3. The status of Youthful Trainee is terminated under the Holmes Youthful Trainee Act (MCL 762.14) and the case is dismissed. The record of arrest and discharge or dismissal in this case shall be retained as a nonpublic record according to law.

8/5/98
Date

Judge Paul J. Sullivan     P24139     Bar no.

If item 2 or 3 is checked, the clerk of the court shall send a photocopy of this order to the Michigan State Police Central Records Division to create a criminal history record as required under MCL 769.16a
MC 245 (6/96) PETITION AND ORDER FOR DISCHARGE FROM PROBATION     MCL 771.5; MSA 28.1135