# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARVIN CHARLES GABRION, II,  )
                        )
      Movant,  )
                        )
    v.  ) 1:915-CV-447
                        )
                        )
UNITED STATES OF AMERICA,  )
                        ) HON. ROBERT HOLMES BELL
      Respondent.

## AFFIDAVIT OF JAMES F. CRATES

James F. Crates, after first being sworn, does depose and state as follows:

1. My name is James F. Crates. I am a resident of the State of Ohio.

2. I am self employed as a mitigation specialist. I have been a mitigation specialist since approximately 1989.

3. I graduated from Ohio State University in 1988 with a Bachelors Degree in philosophy.

4. My training to function as a mitigation specialist came from capital defense and sentencing seminars, as well as, on the job training.

5. In approximately September 1999, I was retained by David Stebbins to act a mitigation specialist in the case of United States of America v. Marvin C. Gabrion then pending in the Federal District Court for the Western District of Michigan. Mr. Stebbins, along with Paul Mitchell, had been appointed by the court to represent Mr. Gabrion.

6. Part of my job duties and practice as a mitigation specialist was to create a social history concerning Marvin C. Gabrion. That social history is attached to

1

this Affidavit as Exhibit 1. Exhibit 1 constitutes the sole social history of Marvin C. Gabrion prepared by me in this case.

7. As far as I know, I was the only mitigation specialist working on this case. I would have known had other mitigation specialists been working on this case.

8. In furtherance of performing my duties as a mitigation specialist, I met with Marvin C. Gabrion in various correctional facilities around the State of Michigan during the period of my appointment here. It was my belief then, and it continues to be my belief today, that Mr. Gabrion was seriously mentally ill. It is further my opinion that Mr. Gabrion did not malinger mental illness.

Further affiant sayeth not.

_____
James F. Crates

State of Ohio

County of _LICKING_

This instrument was signed by James F. Crates before me on _NOVEMBER 15, 2016_, 2016 after James F. Crates was duly sworn.

_____
Signature of Notary

Affix seal here

SAMUEL M DODD
Notary Public, State of Ohio
My Comm. Expires Feb. 24, 2021
Recorded in Licking County

_____
SAMUEL DODD
Printed Name of Notary

My commission expires: _02-24-2021_

2

# James F. Crates
## MITIGATION SPECIALIST
P.O. Box 580
Granville, OH 43023
(740) 587 - 0937

## ABRIDGED SOCIAL HISTORY
## MARVIN CHARLES GABRION II
## MARCH 1, 2000

Marvin "Marv" Charles Gabrion, II was born on October 18, 1953 in Grand Rapids, Michigan, the fifth of six children (three male, three female) born to Marvin C. Gabrion and Elaine Althea Jenkins Gabrion. Nine years separate Marvin and his eldest sibling, Yvonne. Thirteen months separate Marvin and his youngest brother, David. Marv is currently unmarried and has no children.

In 1958, the Gabrion family relocated from Grand Rapids to Round Lake Michigan where they remained until 1963. Marvin was described as a relatively well-behaved, "quiet child," who was characterized by his mother as "inquisitive ... a curious little boy ... smart." In approximately 1963 the family relocated from Round Lake to White Cloud, Michigan (Newaygo County). Marvin Sr. and Elaine have lived in the same house on 40th Street in White Cloud since 1963.

Marvin's school records show that he successfully completed elementary school without incident, being annually promoted without repeating any grade. In 1961 (2nd grade), Marvin was given the Weschler Intelligence Scale and found to have an IQ of 110. Marvin's attendance record was quite good throughout his school years with the exception of the 2nd grade when he was absent for 37 days reportedly as the result of a protracted bout with pneumonia.

Gabrion 032320

No significant disciplinary difficulties were reported to the school administration during elementary school. He was never evaluated for learning disabilities (formerly referred to as Slow Learning or Special Education programs) and presented as an average student with the intellectual capacity to perform well above average.

In 1965, Marvin was promoted to middle school where he again earned average and slightly below average grades. In 1967 he was promoted to grade nine at White Cloud High School. Marvin's secondary education was likewise unremarkable for disciplinary contact with the administration.

Marvin was again tested as a freshman (1967-68), yielding a full scale IQ of 121 (112 verbal/130 performance). Records from White Cloud High School indicate average and slightly below average grades. However, on routine national academic tests, Marvin scored in the 90th percentile in areas such as 'Numerical Ability,' 'Mathematical Reasoning,' 'Verbal Reasoning,' and 'Quantitative Thinking.' According to school officials, such high scores on the national testing were consistent with Marvin's tested IQ of 121 in 1967/68.

Academic informants reported that Marvin was a rather quiet young man who was "unremarkable" in the classroom setting. He caused no disciplinary problems for the administration and was involved in Track and Field during his senior year. While certain peer informants reported that Marvin was "weird" and "argumentative" during his high school years they also indicated that he was "the smartest person they knew ... always had all the answers." Family informants characterized Marvin as " ... the smart one ... he knew everything ... we would go ask Marvin." Marvin graduated from White Cloud High School on June 2, 1971 with a cumulative grade point average of 2.8+/-.

Gabrion 032321

Sometime after graduating from high school, Marvin was reportedly involved in a serious automobile accident (resulting in serious injury) at the intersection of Michigan Rt. 37 and 40th Street, near his family's home in White Cloud. Little is known, at this time, of the precise magnitude of the injuries he sustained. All reports, however, indicate that the accident was serious as were the injuries Marvin sustained.

In 1972, Marvin relocated to Ludington, Michigan where he worked with his brother-in-law as a roofer. He also worked for a short while in the auto industry. Marvin remained in the Ludington area until 1973 when he moved to Arizona where he remained in the Phoenix and Tucson areas for approximately one year. Little is known of Marvin's activities in Arizona at this time.

Marvin returned to Ludington, Michigan in 1974 and obtained employment with Great Lakes Die-Casting for a brief period. Eventually he obtained training as a Journeyman electrician, working primarily as a high wire technician with the International Brotherhood of Electrical Workers. Marvin was employed off and on throughout 1975 and 1976 with Hydaker-Wheatlake in Reed City, Michigan and in a number of other areas around the country for the next fifteen years. The nature of high wire electrical work is reportedly quite sporadic, "not knowing where you're going to work next ... [or] if your going to work at all."

Marvin's position as a journeyman electrician resulted in extensive travel. His whereabouts during the years 1977/78 are somewhat unclear but most informants (family and peer) agree that he was not in West Michigan for any protracted period of time.

Several family informants have reported that in the late 1970s Marvin was involved in another serious traffic accident involving head trauma, this time involving a motorcycle that Marvin was driving. One family informant remembered seeing a newspaper article about the

Gabrion 032322

accident recalling that it was " ... a pretty bad wreck." Informants have reported that the accident occurred in Colorado but were unable to recall the exact location, the medical facility that treated him, or the year of the accident.

The motorcycle accident seemed to be common knowledge among members of the Gabrion family. Several family informants reported that Marvin exhibited "changes" when he returned to White Cloud in early 1979. Family members described him as much more prone to "suspiciousness" and "acting paranoid" when he returned in 1979. One family informant described Marvin making "strange claims ... even when [we] knew they were not true ... one time he told us he was a Vietnam vet ... [we] knew he had never been in Vietnam ...." It was also reported that he became much more verbally combative and confrontational; this was especially true if he had been drinking, which he did frequently. Dates provided by family informants should be viewed somewhat skeptically. All members of the family have demonstrated some degree of difficulty in recalling precise dates of most events.

In April of 1979, Marvin returned to work for Hydaker-Wheatlake, where he remained until December of the same year, when he was discharged due to "chronic unexcused lateness and inability to perform duties efficiently." Marvin continued working sporadically through the IBEW doing line work around the country. According to family informants, Marvin traveled to the Orlando area with an acquaintance from White Cloud to "pick oranges" in 1981. He returned to Grand Rapids at the end of 1982. In 1983 he returned to work for Hydaker-Wheatlake. In July of 1983, Marvin was terminated from Hydaker-Wheatlake due to a "reduction in the workforce." Little more is known of Marvin's activities during this period of time.

In 1983, Marvin again moved west, spending a brief period of time in Texas before proceeding once again to Arizona. Marvin reportedly married in 1983 in Tucson, AZ. He and his

Gabrion 032323

wife (Melanie) apparently began experiencing difficulties within the first several months of marriage and ultimately separated after approximately one year. Reportedly Marvin was again employed as a "highwire lineman" during his 18 months in Texas/Arizona. Again, little is known yet of Marvin's activities during this time.

Marvin reportedly remained in Arizona until the latter portion of 1985 when he returned to Michigan for a brief time before returning to the West Coast. Marvin remained in the electrical service industry while on the West Coast. On September 9, 1987, the President of Hydaker-Wheatlake drafted a letter of recommendation for Marvin, characterizing his work record as "satisfactory." Little is known yet of his activities during his 12-18 (1986/87) months in California.

In 1988, Marvin relocated from California and worked in New York, New Jersey and Pennsylvania remaining on the East Coast until the end of 1989. On May 6, 1991, he returned to the employ of Hydaker-Wheatlake. In June of the same year, he received a letter of appreciation from the President of Hydaker-Wheatlake for his service following a "devastating storm" that struck Michigan. One month later Marvin was terminated due to a "workforce reduction."

On March 28, 1992, Marvin was involved in an automobile accident near Cedar Springs, Michigan. He was treated at Butterworth Hospital in Grand Rapids. Marvin began to experience difficulty with memory/recall, speech, and mood swings during the days following the accident. Dr. Gary Gurden (White Cloud Medical Center) referred him the Hackley Hospital Neuroscience Center/Alzheimer's Screening in Muskegon, Michigan suspecting possible brain injury. Marvin was evaluated by several medical professionals at the Neuroscience Center including Susan A. Johnson, MA, L.L.P. who reported in the 'Summary of Test Data' component of her 10-22-92 Psychological Evaluation that:

Gabrion 032324

> "... [the] evaluation indicate[s] that the patient is partially oriented yet alert. His score on the standard mental Status Examination is 24 out of 30 which is the borderline range. This indicates an organic mental disorder/or mood disorder. The patient shows evidence of short-term memory loss. He gives evidence of a slowed speed of mentation and a slowing of performance speed for visual motor coordination tests...He gives evidence of inconsistent losses of learned behavior. He shows indication of uninformed and/or inappropriate social judgment. The patient gives evidence of paranoid ideation and a tendency toward lack of impulse control relative to violence."

Her diagnosis impressions were: "AXIS I-310.10 Organic Personality Disorder; AXIS II-Deferred AXIS III - Head Trauma..."

Records received from Hackley Hospital/Neuroscience Center of West Michigan are replete with references to Marvin's need for supervision and his having lost the ability to independently and effectively deal with his daily affairs. (The Hackley Hospital Records are include with this package as part of the Records of the White Cloud Medical Center) In a December 15, 1992 letter to Marvin's primary care physician at the White Cloud Medical Center (Dr. Gunnell), Dr. Gurden indicated that "I think he needs supervision for medications, meals and finances and his family is going to try to insure this. I suggested that a close family member obtain a durable Power of Attorney."

Although Marvin was resistant to contact with an inpatient brain injury program, he was referred to Sojourners (Hope Network) by Michigan Rehabilitation Services. He participated in an inpatient (two week) evaluation. The 4-1-93 Social Work Summary performed by Barbara Barton, MSW, reported that:

> "Marv presents with some clinically hysterical features: he is verbally excessive, grandiose and unfocused. He has a strong mistrust of the clinical value of professionals..."

Gabrion 032325

In conjunction with evaluations conducted by professionals from several disciplines, Martin Waalkes, Ph.D. conducted an extensive psychological evaluation of Marvin wherein he determined that his IQ estimates:

> "place Marv's current verbal abilities in the low-average range at about the 12th percentile. This is significantly reduced from the moderately pre-injury estimated abilities. The estimate of performance IQ is 90, consistent with the 25th percentile, and is at the very low end of the average range.

The aforementioned Wechsler result(s) are some 40 +/- points below Marvin's tested performance range in high school.

Waalkes went on to report that:

> "Marvin … is one year post injury … a significant personality adjustment challenge laid the groundwork for a rather dysfunctional current existence. The result of this combination of problems finds Marv unable to emotionally or cognitively manage complex rehabilitative interventions. His management, social accuracy, and lifestyle problem solving, is all reduced. He will require significant assistance in establishing and sustaining an adequate style of living which keep him free from crime, substance abuse, and from becoming a victim of unhealthful relationships.
>
> Previous assessments have begun to appreciate the extent to which a preexisting personality syndrome, likely a combination of histrionic, narcissistic, and borderline character disorder traits, has contributed to his current adjustment and problems. It seems likely, given the extent to which he was able to manage adequate vocational adjustment and was able to even sustain some relationship sufficient to be married for a period of time, that previous marginal abilities have been further undermined making his present ideational, emotional and social adjustment untenable." (Pages 9-10).

The breadth of Marvin's clinical contact with Sojourner professionals and the magnitude of his impairment(s) are summarized in a letter drafted by Hope Network's Client Services Coordinator, Carrie A. Coster (6-14-93) which was forwarded to Marvin's personal injury attorney. Ms Coster indicated that:

> " … it is our honest suspicion that many of the features which make it difficult for [Marvin] to lead a stable existence were evident before the automobile accident … However, it is also quite reasonable to assume that many of these features have

Gabrion 032326

worsened or that at a minimum the client's ability to manage them has worsened. This worsening may have compromised his ability to manage even an adequate or marginal lifestyle which leave him at significant risk to victimization or exposure to circumstances which might lead him to show poor control over his actions . . .

. . . . he will most likely need a comprehensive residential rehabilitation program which can treat both his brain injury and his mental illness and provide adequate supervision for safety and judgment."

Following the two week evaluation Sojourner's determined that Marvin was ineligible for in patient placement. All reports indicate, however, that Marvin was significantly impaired and suffering from traumatic brain injury and in need of rehabilitation, but that Sojourners was not the proper program.

While at Sojourners, Marvin began psychiatric consultations with Theodore Mauger, M.D., a consulting staff psychiatrist under contract from Pine Rest Christian Hospital in Grand Rapids. Dr. Mauger's first meeting with Marvin was March 31, 1993 during the two week assessment and continued for another two years until June of 1995. Dr. Mauger was called in because of his interest and expertise in head injuries.

Dr. Mauger found a serious underlying mental problem with Marvin that pre-dated the accident. According to Dr. Mauger, Marvin probably suffered (and continues to suffer) from bipolar disorder or some other major mental illness. Dr. Mauger did not have a substantial enough history of Marvin to make a definite diagnosis of this underlying disorder. However, Dr. Mauger did have sufficient information to conclude that in addition to the underlying mental disorder, Marvin had a significant amount of brain damage either arising solely from the 1992 accident or as a result of a number of accidents. In either event, there was significant brain trauma which resulted in the temporal lymbic syndrome that Dr. Mauger treated.

Gabrion 032327

In reaching these conclusions, he relied on the EEG administered at Sojourners (a copy of which is included with this package) that indicates there is some abnormal brain electrical function. At first appearance, the EEG report indicates this to be a relatively minor irregularity that would not lead to seizures. These irregularities, however, occur in the front temporal lobe and create a very serious problem, described professionally as temporal lymbic syndrome. Dr. Mauger described the electrical activity as a continuing irritation of the temporal lobe. While this is the result of a brain injury, it is likewise described and treated as a mental disease. While the disturbances are not regular, and are not so severe as to cause seizures of any kind, they do cause sleep disorders because they occur during periods of drowsiness or when falling asleep.

One of the symptoms of this irregular electrical activity would be the sparking in his head and feeling of being under water that Marvin reported to Dr. Mauger. The sparking may cause a reaction much like a flashback or a recurring nightmare.

Dr. Mauger originally prescribed Tegratol and later Depakote (Valproate) to moderate the seizure activity. The Depakote smoothed out the seizure activity and reduced the effect of the disorder on the frontal lobes and consequently on his behavior. Marvin improved significantly while taking the prescribed medication during 1993-1995: "Marvin continues to improve and stabilize in life function and medication use;" "Marvin continues to make gains in dress and grooming . . . taking care of basic self care." – May, 1994; Marvin was "able to contain more affect in this session and begin to face the realities of his long term disability." – June, 1994; Marvin "continu[ing] to make significant gains in grooming and attention and concentration." – October, 1994.

Marvin continued treatment with Dr. Mauger until June of 1995, after which there was no further contact until recently. Dr. Mauger closed his file in December 1995, concluding that while

Gabrion 032328

Marvin suffered from a significant brain injury (as well as a probable underlying mental illness), that he had benefited substantially from the administration of Depakote and that further improvement would continue with continued medication. Without the continued medication, however, Marvin would continue to suffer substantial disability arising from these brain injuries and mental illnesses.(Dr. Mauger's Reports and Records from Pine Rest Christian Hospital are included with this package.)

Dr. Mauger recently received correspondence from Marvin while incarcerated on these charges. Dr. Mauger describes the letters as indicating hypergraphia, consistent with his illness, and indeed, diagnostic of his illness. Dr. Mauger describes Marvin's thoughts as: "disorganized and show[ing] the same type of loose associations I noted in 1993. He may be formicating again as he described being bitten by snakes. He has also developed a somewhat organized paranoid/delusional system involving the legal system." (Mauger letter to Counsel 1/31/00)

Marvin remains extremely suspicious (indeed paranoid) about the legal system in general and all the participants therein, and in particular his legal defense team. He consistently questions the motives of all of the participants in the legal system as well as virtually all other professionals, guards, and administrators that he has contact with. Because of this Marvin has been extremely reluctant to discuss substantive psychosocial history issues. His family is likewise concerned that information provided will get back to Marvin and that he will berate them for being disloyal to him. Thus, family history has been equally difficult to uncover. This combined with Marvin's somewhat nomadic lifestyle and his frequent long absences from West Michigan and his family have made compilation of this social history problematical. The research is ongoing. Additional relevant information, especially relevant to Marvin' mental disorders and brain injuries will be provided as it is discovered.

Gabrion 032329