# EXHIBIT 12

## DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

*Summary of Opinions*

1.    I was asked by federal habeas corpus counsel for Marvin Charles Gabrion II to summarize the prevailing professional norms in the investigation of mitigation evidence at the time of Mr. Gabrion's prosecution and trial (1999-2002), and then to review the performance of his trial counsel in light of those norms.   I was also asked to address the standard of care in capital mental health assessments, with particular attention to the importance of the social history investigation.

2.    The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly.   Counsel's duty to conduct a thorough mitigation investigation was well established at the time of Mr. Gabrion's prosecution. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel in a 1986 trial "did not fulfill their obligation to conduct a thorough investigation of the defendant's background").   Writing for the Court's majority, Justice Stevens cited the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980) concerning the need to investigate sentencing issues thoroughly.   *Id.* at 396.   Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*"   *Id.* at 4:53 (emphasis added).   In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the

1

commission of the offense itself." *Id*. at 4:55.

3. The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding Georgia's death penalty statute Constitutional in part because it allowed for mercy based on individualized consideration); *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding mandatory statute unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass). Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face, one-on-one interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. A thorough social history investigation also provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. Based on the materials that I have reviewed (summarized *infra*

2

¶ 41), it is my considered professional opinion that Mr. Gabrion's trial counsel failed to conduct the thorough mitigation investigation required by the prevailing norms of 1999-2002, and the resulting penalty-phase presentation fell far below those norms.   Trial counsel had no witnesses to rebut any of the aggravating evidence, other than Mr. Gabrion himself.   The dozen witnesses who testified for the defense (besides Mr. Gabrion) in the sentencing phase reflected the narrow range of sources trial counsel had explored.   There were only three lay witnesses outside Mr. Gabrion's family.

4.    The need to investigate mental illness in the context of mitigating evidence was also well established in 2002.   *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[1]   Without the social history that results from a thorough mitigation investigation, trial counsel could not make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of Mr. Gabrion's possible mental disorders or impairment.   Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation, so consultations without such background information are inevitably futile.   Trial counsel relied in the sentencing phase on a local forensic psychologist whose opinions were at best ambiguous and at worst harmful.   Trial counsel had received multiple advance warnings of the kind of rebuttal testimony they would face, from the competency evaluators to the experts hired by the Government after 12.2 Notice had been filed.   Despite these warnings, trial counsel failed to provide compelling expert testimony supported by credible lay witnesses, and the expert

---

[1] The High Court noted that "[m]any states, as well as the Federal Government currently make psychiatric assistance available to indigent defendants," citing, among other statutes, MICH. COMP. LAWS ANN. § 768.29a(3) (Supp. 1983).   470 U.S. at 78 & n.4.

3

testimony did nothing to humanize Mr. Gabrion.

*Background and Qualifications*

5.   I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, capdefnet.org.   This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[2]   In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

6.   From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel.   The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants.   I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or

---

[2] *See* Jon B. Gould & Lisa Greenman, Report to the Committee on Defender Services, Judicial Conference of the United States, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases, 111-112, September 2010, *available at:* www.uscourts.gov/file/pdfc2010pdf.   (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

8. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of an indigent defense agency. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only

federal death penalty cases are prosecuted.[3]   I have also lectured at over a hundred programs

under the auspices of the Administrative Office of the United States Courts (in connection with

federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation

Workshop of the U.S. Army Trial Defense Service.   Over the past two and a half decades, I

have lectured at over three hundred fifty continuing legal education programs around the

country, as well as dozens of additional programs at law schools and related professional

conferences in the United States, Europe, and Asia.

10.   Since the 1990s, I have lectured on mitigation investigation in death penalty cases at

multiple national training conferences sponsored by the following organizations: the NAACP

Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender

Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers

("Making the Case for Life").   At various times over the past twenty-five years, I have served on

the planning committees for these national conferences, as well as the annual Capital Case

Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the

California Public Defenders Association (CPDA), which is attended by over a thousand

practitioners.   I was a co-chair of the planning committee for this seminar in 2009 and from

2011 to 2015.   I have also taught at the death penalty colleges at the Santa Clara University

School of Law in California and the DePaul University College of Law in Illinois.   I have taught

at more than a dozen capital defense seminars throughout the country under the auspices of the

National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital

brainstorming seminars under the auspices of the National Consortium for Capital Defense

---

[3] At the time I lectured on those subjects in Connecticut, Delaware, Illinois, Maryland, New Jersey, New Mexico, and New York, capital punishment was permissible in those jurisdictions.

Training and its regional counterparts.   I also designed and organized the annual Capital Mitigation Skills Workshop under the auspices of the federal Habeas Assistance and Training Counsel Project, held annually for the past five years.

11.   Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA).   This multi-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s.   In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association.   These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (2003), available at ambar.org/2003guidelines.   At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV. 1157 (2003).   At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008).   At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009).   I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence.   One was written in collaboration with Professor W. Bradley

Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013).   The second, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, appeared in 82 UMKC LAW REVIEW 407 (2014).   The third was written with Aurélie Tabuteau, *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA L. REV. 731 (2015).

12.   I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY (2d ed.) (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press).   I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008).

13.   I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over two hundred times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming.   I have testified as an expert witness twenty-eight times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of Arkansas, the Eastern District of California, the

Northern District of Iowa, the Middle District of Louisiana, the Western District of Missouri, and the District of Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South Carolina, and Wyoming.   I have also testified as an expert witness on mitigation standards in the state and federal trial courts of various states, including pretrial testimony in the United States District Court for the Middle District of Tennessee in 2001.

14.    Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including many federal death penalty cases.

### *Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 2002*

15.    Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases, investigation was already firmly established as an integral part of the criminal defense function generally.   When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of*

9

*conviction.*"  *Id.* at 4:53 (emphasis added).   The Commentary to this Standard noted concisely,

"Facts form the basis of effective representation." *Id.* at 4:54.   In discussing mitigation, the

Commentary continued, "Information concerning the defendant's background, education,

employment record, mental and emotional stability, family relationships, and the like, will be

relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.*

at 4:55.[4]   These ABA Standards were cited by Justice Stevens in reference to counsel's

obligation to conduct a thorough investigation of a capital defendant's background.  *Williams v.*

*Taylor,* 529 U.S. at 396 (2000).

16.    These standards covered criminal defense generally.   Discussions of *capital* defense

provided more specific detail about counsel's duties in investigating mitigating evidence.   As

early as 1979, Dennis Balske (an effective capital litigator then practicing in the South)

emphasized, "Importantly, the life story must be complete."   Dennis N. Balske, *New Strategies*

*for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979).   In 1983, Professor Gary

Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional

and psychological make-up" in capital cases.   He wrote, "There must be inquiry into the client's

childhood, upbringing, education, relationships, friendships, formative and traumatic

experiences, personal psychology and present feelings.   The affirmative case for sparing the

defendant's life will be composed in part of information uncovered in the course of this

investigation.   The importance of this investigation, and the thoroughness and the care with

which it is conducted, cannot be overemphasized."   Gary Goodpaster, *The Trial for Life:*

---

[4] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice,* CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

*Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983).

Writing again in 1984, Mr. Balske advised capital defense counsel that they "must conduct the

most extensive background investigation imaginable. You should look at every aspect of your

client's life from birth to present. Talk to everyone that you can find who has ever had any

contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE

CHAMPION (March 1984), at 40, 42. *See also* Robert R. Bryan, *Death Penalty Trials: Lawyers*

*Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a

comprehensive investigation not only of the facts but also the entire life history of the client.").

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former

*New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey

Fosburgh, had previously written a best-selling book about a murder case she had covered for the

newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her

successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about

the critical role she had played:

> A significant legal blind spot existed between the roles played by the private
> investigator and the psychiatrist, the two standard information-getters in the trial
> process. Neither one was suited to the task at hand here – namely discovering
> and then communicating the complex human reality of the defendant's personality
> in a sympathetic way.
> Significantly, the defendant's personal history and family life, his
> obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence.
> Instead they are both discovered and portrayed through narrative, incident, scene,
> memory, language, style, and even a whole array of intangibles like eye contact,
> body movement, patterns of speech – things that to a jury convey as much
> information, if not more, as any set of facts. But all of this is hard to recognize or
> develop, understand or systematize without someone on the defense team having
> it as his specific function. *This person should have nothing else to do* but work
> with the defendant, his family, friends, enemies, business associates and casual
> acquaintances, perhaps even duplicating some of what the private detective does,
> but going beyond that and looking for more. This takes a lot of time and

patience.[5]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence – ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine FORUM in 1987.[6] The national defense bar magazine, THE CHAMPION, discussed the use of social workers in developing mitigating evidence in 1986.[7] The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[8]

18. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See*, for example, John Hill and Mike Healy, *The Death Penalty and the*

---

[5] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982) (emphasis added). This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982). *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (Nov.-Dec. 1984) at 31-33.

[6] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM (Jan.-Feb. 1987) at 22, 26.

[7] Cessie Alfonso & Katharine Baur, *Enhancing Capital Defense: The Role of the Forensic Social Worker,* CHAMPION (June 1986) at 26, 26-29.

[8] James Hudson et al., *Using the Mitigation Specialist and the Team Approach,* CHAMPION (June 1987)at 33, 36.

*Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases).

19. Beginning in 2000, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried over twenty years ago, in 1993, nearly a decade before Mr. Gabrion's trial. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under

13

the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"  *Id.* at 39 (citation omitted). Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior."  *Id.* at 36.   In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings.   The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ."   561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning.   *Id.* at 946.   Four of these five individuals have subsequently received sentences of less than death, and the fifth case remains in post-conviction litigation as of this writing.   Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[9]   On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[10]   On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[11]   On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be

---

[9]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

[10] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624

[11] *See* Associated Press, *Death Row Inmate Gets New Life Term*, USA TODAY, usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8, 2008).

14

resentenced to life."[12]   All five cases involved mental health evidence, including brain damage or cognitive impairment, that was not discovered and presented at trial.

### The Need for a Qualified Mitigation Specialist

20.   In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves.  *See,* generally, Russell Stetler, *Why Capital Cases Require Mitigation Specialists*, INDIGENT DEFENSE (July-August 1999) at 2.  *See also* ABA Guidelines (rev. 2003), Cmt., 31 HOFSTRA L. REV. at 959; Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated*, THE CHAMPION (March 2007) at 61.  Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct a thorough mitigation investigation because of the other work that is demanded of them in representing a capital client.  Besides, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence.  Competent capital counsel have long retained a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.  The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted in 1998 that mitigation specialists "have extensive training and experience in the defense of capital cases.  They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary

---

[12] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010).

material for them to review."   Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation, Federal Judicial Conference (commonly known as "the Spencer Report") (May 1998) at Sec. I, Analysis and Findings, B.7 (Experts), *available at* americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/Natio nal/federal_judicial_conference_recommendations.authcheckdam.pdf.   The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal."   The Commentary also stated that, as of 1998, the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case."   *Id.* at Sec. II, Recommendations and Commentary, Commentary to 7 (Experts).   As noted *supra*, ¶ 17, even before the term "mitigation specialist" was coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

21.   As revised in 2003,[13] the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation (trial or post-conviction) should assemble a defense team as soon as possible after

---

[13] The American Bar Association House of Delegates voted overwhelmingly to approve the revised edition of its Death Penalty Guidelines on February 10, 2003.   Eric M. Freedman, *Introduction,* 31 HOFSTRA L. REV. 903 (2003); Robin M. Maher, *"The Guiding Hand of Counsel" and the ABA Guidelines*, 31 HOFSTRA L. REV. 1091, 1093 (2003) (revision reflected "two-year effort drawing upon the expertise of a broad group of distinguished and experienced judges, lawyers, and academics").   "The Guidelines, as revised in 2003, did not magically emerge from the word processors of agenda-driven activists or the imagination of elitist academics.   They reflect nothing more than the collective experience and expertise of the public defenders, court-appointed panel lawyers, underfunded nonprofits, and pro bono volunteers who had effectively litigated capital cases in the 1990s."   Russell Stetler & Aurélie Tabuteau, *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA L. REV. 731, 748 (2015).   In short, the standards summarized in the revised Guidelines reflected the prevailing norms at the time of Mr. Gabrion's trial.

designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).   The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence."  (1989 Guideline 11.4.1.C.)   The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation"  (1989 Guideline 11.4.1.D.(7).)   Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered."  (1989 Guideline 11.4.1.C.)[14]

***Evolution of Prevailing Norms***

22.   The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s.   These Guidelines were the

---

[14] The ABA Guidelines have received particular recognition in federal court.   The Defender Services Program has four goals in its strategic plan: timely provision of assigned counsel, delivery of counsel services consistent with the best practices of the legal profession, cost-effective services, and protection of the independence of the defense function.   Among its strategies for achieving the "best practices" goal, the Defender Services Program has adopted a specific strategy for capital representation that states that appointed counsel should comply with the February 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.   *See* GOULD & GREENMAN, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION, *supra* note 2, at 91 and n.90 (citing Defender Services Program Strategic Plan, Goal 2, Quality of Representation, Strategy 16, Capital Representations, "counsel in federal death penalty cases are expected to comply with Guidelines 1.1 and 10.2 et seq." of ABA Guidelines).   *See also* JUDICIAL CONFERENCE OF THE UNITED STATES, GUIDE TO JUDICIARY POLICY, APPX. 2A, MODEL PLAN FOR IMPLEMENTATION AND ADMINISTRATION OF THE CRIMINAL JUSTICE ACT, XIV.B.9, at 28 (2016).

result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense.    NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at

americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985.    With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years.    In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees.    SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards."    Each black-letter guideline was explained by a commentary, with references to supporting authorities.    *See* Introduction to ABA Guidelines, 1989 ed.

23.    Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance.    As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'"    Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, & n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S., at 688, and not

18

'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Padilla,* 559 U.S. at 367. *Accord Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

24. The Commentary to the 2003 edition of the ABA Guidelines explained in detail why mitigation specialists are vital members of the capital defense team:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .
> . . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

31 HOFSTRA L. REV. at 959 (citations omitted). SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, published in 36 HOFSTRA L. REV. 677 (2008), discuss these skills in even more detail.[15] Supplementary Guideline 5.1.B,

_____

[15] Although published after Mr. Gabrion's trial in 2002, the Supplementary Guidelines

for example, specifies the need for someone with

> the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history.   Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

*Id*. at 682.

25.    Supplementary Guideline 5.1.C continues: "Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information.   They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime.   They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures.   They must have the ability to advise counsel on appropriate mental health and other expert assistance." *Id.*   A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability,

---

reflect the long-evolving practice of capital defense teams engaged in the mitigation function. *See* Sean D. O'Brien, *When Life Depends on It*, 36 HOFSTRA L. REV. 693 (2008) (noting how the Supplementary Guidelines were drafted based on a survey of practitioners in every death penalty jurisdiction, including federal death penalty prosecutions).

neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." *Id.* at 683.

26. Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for a juror to choose a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert & David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

27. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to

21

comply with appropriately authorized requests.   Records are sometimes mistakenly presumed destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to visit.   Great diligence is required to ensure compliance with appropriate requests.   Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

28.   The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . .   The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ."   31 HOFSTRA L. REV. at 1024-25.

29.   Records invariably provide valuable background information on clients and their families.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . .   There were several places on the floor where someone had had a bowel movement.   Urine was standing in several places in the bedrooms.   There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . .   The children were all dirty and none of them had on under-pants.   Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them.   . . .   The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

529 U.S. at 395, n.19.   This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story which even the most skilled interviewer could never have elicited simply by talking with family members.   The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory.   Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

30.   Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places.   The frailty of human memory obliges us all to rely on records, and they provide the essential skeletal framework for the social history investigation.   They are helpful in preparing witnesses to testify.

31.   A social history cannot be completed in a matter of hours or days.   In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history.   It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members.   These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture,

23

language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

32. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45. *See also* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143, 1154 (2003) (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation") and David DeMatteo et al., FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

33. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[16] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity.

---

[16] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

24

34.    Mitigation evidence is not developed to provide a defense to the crime.   Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding.   Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life.   In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

35.    For clients who are psychiatrically disordered, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions.   Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently.   It is an objective scientific fact.   Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

36.    Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country.   I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over two hundred cases around the country. *See supra* ¶ 13.   My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.   *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital*

*Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially

mental impairment and mental illness).   *See also* John H. Blume et al., *Competent Capital*

*Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation,*

36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project] studies reveal that many

different types of mitigation resonate with jurors.   Low intelligence, mental illness, child abuse,

extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some

of the categories of mitigation that, in a particular case, can lead jurors to choose life over

death."); *id.* at 1051 ("[E]vidence that the defendant was under the influence of extreme

emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of

all jurors.   Almost a third of jurors found exposure to serious child abuse mitigating, and a like

number found childhood poverty mitigating.").

**Standard of Care in Capital Mental Health Evaluations**

37.   Both anecdotal reports from capital defense practitioners and social science research

indicate that defense experts are viewed with great skepticism and often regarded as "hired guns"

unless their conclusions are supported by abundant, credible evidence from lay witnesses and

historical experts (i.e., the professionals who encountered the capital client long before the

alleged offense).[17]   *See,* for example, Scott Sundby, *The Jury as Critic: An Empirical Look at*

---

[17] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81).   People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999).   In another case, a different school psychologist explained the impact of learning disabilities (at age eleven, reading just above a second grade level; at fourteen, just above fourth grade; and at seventeen, just above fifth grade).   People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000).   In a third case, a psychiatrist had treated the client's

26

*How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.   Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation.   However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.   Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

38.    The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons).   Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing.

---

mother after her suicide attempt when the client was nine – thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking.   From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001).   *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

39.    Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts.  Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert.  Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development.  The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few.  To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

40.    The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s.  A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis."  H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).  The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members."  *Id.* at 488.  Thus, "retrospective falsification, in which the patient changes

28

the reporting of past events or is selective in what is able to be remembered, is a constant hazard

of which the psychiatrist must be aware." *Id.*   This problem is particularly acute in the forensic

context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense
> and data on the subject's previous antisocial behavior, together with general "historical"
> information on the defendant, relevant medical and psychiatric history, and pertinent
> information in the clinical and criminological literature.   To verify what the defendant
> tells him about these subjects and to obtain information unknown to the defendant, the
> clinician must consult, and rely upon, sources other than the defendant.

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the*

*Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980).


### Review of the Marvin Charles Gabrion II Case

41.   At the request of federal habeas corpus counsel for Mr. Gabrion, I have reviewed the

following materials: the direct appeal opinion affirming Mr. Gabrion's conviction and sentence

of death, *United States v. Marvin Charles Gabrion, II*, 719 F.3d 511 (6th Cir. 2013); the trial

docket and various accompanying documents and transcripts in the United States District Court

for the Western District of Michigan (Southern Division), Case No. 1:99-CR-76, before the Hon.

Robert Holmes Bell, District Judge; the transcripts of the sentencing hearing, volumes 38-55,

March 11-15, 2002, including opening and closing statements; the Penalty Phase Special Verdict

Form signed by the jurors on March 16, 2002, and unsealed on March 25, 2002; billing records

of trial counsel; mitigation work product and communication of trial counsel and mitigation

specialist James F. Crates; the affidavit of Mr. Crates (November 15, 2016); and numerous

mental health records and reports.   The main mental health reports can be grouped as follows:

(1) initial pretrial competency evaluations in Texas and Michigan: Psychological Evaluation by

Emily Fallis, Ph.D., May 8, 2000, ordered by the Hon. Joseph G. Scoville, Magistrate Judge, and

29

Competency Evaluation by Cathy Frank, M.D., June 18, 2001, ordered by Judge Bell; (2) reports from the competency evaluation at the U.S. Medical Center for Federal Prisoners, Springfield, Missouri: History and Physical by Physician's Assistant Zafar A. Khan and Mahmood H. Choudhury, M.D., Staff Physician, August 28, 2001; Neurology Consultation by Steven M. Otto, M.D., September 18, 2001; Neuropsychology Consultation by Robert L. Denney, Psy. D., October 10, 2001; and Forensic Psychological Report of Richart L. DeMier, Ph.D., October 22, 2001; (3) evaluations by the defense expert Newton L. P. Jackson, Jr., Ph.D., Clinical Evaluations July 26, and December 11, 2001, for "exploration of possible defenses"; Report of Dr. Jackson, February 21, 2002, concerning mitigation issues; Interview of Michael Lee Gabrion, Sr., by Dr. Jackson, February 25, 2002; and (4) evaluations requested by the United States Attorney's Office: Forensic Neuropsychological Evaluation by Thomas Ryan, Ph.D., March 5, 2002; Report of David A. Griesemer, M.D., March 12, 2002; and Psychiatric Evaluation by Gregory B. Saathoff, M.D., March 13, 2002, "in preparation for the penalty phase."

42.    According to the Sixth Circuit opinion affirming Mr. Gabrion's conviction and death sentence, *United States v. Marvin Charles Gabrion, II,* 719 F3d 511, Mr. Gabrion was scheduled to be tried for a rape charge on June 5, 1997, but the complaining witness, nineteen-year-old Rachel Timmerman, and her infant daughter disappeared two days before the scheduled trial. *Id.* at 515.  Mr. Gabrion had been arrested for the rape charge but released on bail.  *Id.* Ms. Timmerman's body was found floating in a lake on July 5, 1997.  *Id.* at 517.  The infant's body was never found.  *Id.*  The police promptly began investigating Mr. Gabrion as a suspect, searched his residence, but could not find him.  *Id.*  On October 14 1997, Mr. Gabrion was arrested in upstate New York in connection with the theft of social security benefits of Robert

30

Allen, a mentally disabled man who had disappeared from Grand Rapids, Michigan, in 1995 and was presumed dead. *Id.* Mr. Gabrion was also suspected in the disappearance of two other individuals whose bodies were never found: Wayne Davis, an associate who witnessed the alleged rape (*id.* at 515), and John Weeks, who was likely the only witness to Ms. Timmerman's murder (*id.* at 518).

*Pretrial Preparation*

43.  Mr. Gabrion was returned to Michigan in early 1998 to face murder charges in Newaygo County.   Federal prosecutors ultimately took over the case, designating the local prosecutor as a Special Acting U.S. Attorney, and Mr. Gabrion was indicted federally in June 1999.   A local attorney, Paul Mitchell, was appointed to represent him, and at Mr. Gabrion's first court appearance (on June 29, 1999) the Federal Public Defender, Christopher Yates, declared a conflict.   Mr. Mitchell indicated that he would nonetheless consult the Federal Public Defender about appointment of second counsel.   On July 27, 1999, attorney David Stebbins of Columbus, Ohio, was appointed.   Very early in the case, it was evident that the critical factual dispute in the domain of mitigation was quite simple: Was Mr. Gabrion so mentally disabled as a result of a damaged brain and untreated mental illness that he merited empathy and mercy, or were all his multiple signs, symptoms, and behaviors nothing but the malingered performance of an evil monster?

44.  In the early months of Mr. Gabrion's representation, the defense team gathered the information that suggested a damaged brain and untreated mental illness, all summarized in a ten-page report prepared by mitigation specialist James Crates and titled, "Abridged Social

31

History," dated March 1, 2000.[18]   It is unclear why this document was called an "abridged"

social history, since habeas corpus counsel have identified no "unabridged" version in the trial

file.   One hypothesis is that Mr. Crates merely meant to convey that the social history was

unfinished.   Indeed, the last sentence reads, "Additional relevant information, especially

relevant to Marvin' [sic] mental disorders and brain injuries will be provided as it is discovered."

Crates, Abridged Social History, at 10.[19]   According to the Abridged Social History, school

records indicated that Mr. Gabrion had an average to above average IQ (full scale IQ 110 in

second grade, full scale IQ 121 as a high school freshman).   *Id*. 1-2.   Mr. Gabrion scored in the

90th percentile on "routine national academic tests" in areas including numerical ability,

mathematical reasoning, verbal reasoning, and quantitative thinking.   *Id*. at 2.   His academic

performance was below potential, as indicated by a cumulative grade point average of 2.8+/-

[sic] when he graduated from high school.   *Id*.

45.   According to the Abridged Social History, Mr. Gabrion was involved in a serious

automobile accident near his family's home in White Cloud, Michigan, after graduating from

high school, but little was known "of the precise magnitude of the injuries" although everyone

had reported that they were "serious."   *Id*. at 3.   Family informants also reported that Mr.

Gabrion had been in a motorcycle accident in Colorado in the late 1970s, but they were "unable

to recall the exact location, the medical facility that treated him, or the year of the accident."   *Id*.

---

[18] Both Dr. Fallis and later Dr. Jackson gave the date of this report as March 22, 2000, the date of transmittal to Dr. Fallis.   Dr. Jackson described it as "prepared by James F. Crates and David C. Stebbins."   Jackson Clinical Evaluation, July 26, 2001.

[19] The ten-page report (dated March 1, 2000) is attached to Mr. Crates's affidavit (Nov. 15, 2016).   He describes it as "the sole social history prepared by me in this case."   Crates Aff. at ¶ 6.   Mr. Crates also states that he was the only mitigation specialist working on Mr. Gabrion's case, and he "would have known had other mitigation specialists been working on the case."   *Id*. at ¶ 7.

at 3-4.   Records did document an automobile accident near Cedar Springs Michigan on March 28, 1992.  *Id.* at 5.   Mr. Gabrion was then followed at various hospital and rehabilitation facilities, which documented "a significant personality adjustment" and "a rather dysfunctional current existence" a year after the accident.  *Id.* at 7.   A psychiatrist with expertise in head injuries, Theodore Mauger, M.D., saw Mr. Gabrion from March 1993 to June 1995.  *Id.* at 8.

46.   According to the Abridged Social History, "Dr. Mauger found a serious underlying mental problem with Marvin that pre-dated the accident," "bipolar disorder or some other major mental illness."[20]  *Id.*   Brain damage "arising solely from the 1992 accident or as a result of a number of accidents" resulted in "the temporal limbic syndrome that Dr. Mauger treated."  *Id.* The psychiatrist prescribed Tegratol and Depakote.  *Id.* at 9.   Post-arrest letters from Mr. Gabrion to Dr. Mauger reflected "hypergraphia, consistent with his illness, and indeed, diagnostic of his illness," and a "somewhat organized paranoid/delusional system involving the legal system."  *Id.* at 10.

47.   The signs and symptoms of Mr. Gabrion's mental disturbance were so apparent from his communications, *pro se* motions, and behavior in court that on January 31, 2000, Magistrate Judge Joseph G. Scoville *sua sponte* ordered a competency evaluation.   Mr. Gabrion arrived at the Federal Medical Center in Fort Worth, Texas, on March 23.   Trial counsel transmitted the Abridged Social History, along with supporting documentation, to the federal

---

[20] Despite the reference to "bipolar disorder or some other major mental illness," there was no investigation of familial patterns of mental illness reflected in the Abridged Social History.  *See* American Psychiatric Association's, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., 1994; text revision, 2000) (DSM-IV-TR) at 386 (noting that twin and adoption studies provide strong evidence of a genetic influence for bipolar disorder).   First-degree biological relatives of individuals with schizophrenia were known to have a risk for that disorder that is about ten times greater than that of the general population.  *Id.* at 309.   In any event, the importance of a multigenerational social history was widely recognized in the capital defense community at the time of Mr. Gabrion's prosecution.

33

facility the day before Mr. Gabrion arrived.   Emily Fallis, Ph.D., a psychologist and Forensic

Study Specialist, provided a written report to the Court on May 8, 2000.   Fallis Psychological

Evaluation.   She saw Mr. Gabrion on seven separate days: March 23 and 27, and April 10, 14,

16, 18, and 21, 2000, for a total of 3.5 hours of clinical interviews.   *Id.* at 1.   Dr. Fallis also

contacted Dominick Oliverio, Ph.D., the Chief Psychologist at the federal facility in Milan,

Michigan, where Mr. Gabrion was being held at the time of her evaluation.   *Id.* at 1, 8.   Dr.

Oliverio reported a suicide gesture by Mr. Gabrion but deemed it "manipulative," and said Mr.

Gabrion had an "aggressive, antisocial flavor."   *Id* at 8.   Dr. Fallis spoke to Mr. Mitchell for

fifteen minutes on March 27, 2000, and to Mr. Stebbins for half an hour on April 18, 2000.   *Id.*

at 1.   She summarized what she gleaned from those interviews in passive voice, without specific

attribution to either lawyer:

> His attorneys reported he seemed suspicious and preoccupied with peripheral
> issues, such as his complaints about medical treatment.   He apparently has
> referred to Mr. Mitchell as "Satanic."   Nevertheless, this examiner was told the
> defendant called Mr. Mitchell virtually daily, even hourly on some days.   He also
> was reported to have significant memory problems which interfere with preparing
> a defense.   He apparently has discussed "historical facts around the time of the
> crime [which are] just plain wrong."   Mr. Gabrion was said to show poor
> judgment in things he says in court, as well as to be agitated and "given to racing
> thoughts."   On the other hand, his attorneys admitted his apparent symptoms
> have appeared and worsened in a very short time.   Mr. Gabrion was said to
> provide a "nugget of truth, or more, in all he says, [although] he tends to
> exaggerate."

*Id.*. at 14.

48.   Dr. Fallis concluded that Mr. Gabrion "did not show evidence of a known mental

disorder but, rather, seems to be faking a mental illness in order to help in his criminal case."

*Id.* at 17.   Dr. Fallis also concluded that Mr. Gabrion was likely to behave disruptively in court,

but did not suffer from a mental disease or defect that would render him unable to understand the

nature or consequences of the proceedings against him or to assist in his defense.   *Id.*

34

49.   Based on Dr. Fallis's report, the Court found Mr. Gabrion competent to proceed on July 7, 2000.   There was no hearing.   The defense at that point had no experts to rebut Dr. Fallis's conclusions, and it had no opportunity even to subject her findings to adversarial testing through cross-examination.   However, Dr. Fallis's report provided trial counsel with a detailed outline of how prosecution experts might attempt to rebut any evidence of Mr. Gabrion's mental condition that the defense offered at trial.   Trial counsel were on notice about what would be required if they were to offer credible, convincing mental health evidence.

50.   On May 22, 2000, trial counsel made an Initial Submission to the United States Attorney for the Western District of Michigan in an attempt to avoid a Notice of Intent to Seek the Death Penalty.   Their primary argument was jurisdictional: "There is no justification for the United States to prosecute this case as a federal case, let alone seek the death penalty."   Initial Submission at 2.   The submission also argued a lack of federal interest (*id.* at 3), evidentiary weakness that would make a successful prosecution unlikely (*id.* at 4), and an absence of statutory aggravating factors (*id.* at 13).   Although a final section of the submission was headed, "The presence of compelling evidence in mitigation makes the death penalty inappropriate," little such evidence was adduced.   *Id.* at 19-20.

51.   Trial counsel's submission explained how limited their mitigation investigation had been:

> Uncovering the entire social history of Marvin Gabrion has been difficult. Counsel anticipate that it will continue to require expenditure of a significant amount of time and money, due to the complexity of the social history, the difficulty of communicating with Mr. Gabrion and his family, and the fact that Mr. Gabrion has lived all over the country in the last twenty-five years.   In addition, Mr. Gabrion's relations with counsel have been antagonistic on occasion, making the gathering of information substantially more difficult. Nevertheless, the history that has been uncovered to date suggests the existence of compelling evidence in mitigation.

*Id.* at 19.   The "brief summary" paragraph mentioned "a somewhat chaotic upbringing" that produced criminal convictions "on the part of Gabrion and both of his brothers," and "numerous head traumas" that impaired Mr. Gabrion's ability to reason, care for himself, and "refrain from engaging in certain types of behavior."   *Id.* at 20.   Trial counsel mentioned the competency evaluation and then reiterated, "The investigation into Gabrion's social history and mental state is far from complete."   *Id.*

52.   Following the election of President George W. Bush in 2000, John Ashcroft was sworn in as the Attorney General on February 2, 2001.   Three weeks later, on February 23, 2001, Attorney General Ashcroft authorized the U.S. Attorney to seek the death penalty against Mr. Gabrion.   The Government filed its Death Penalty Notice on February 26, 2001.

53.   That summer, District Judge Robert Holmes Bell ordered another competency evaluation, this time by a local forensic psychiatrist, Cathy Frank, M.D., from the Henry Ford Behavioral Health Center in Detroit.   Dr. Frank performed her evaluation on June 15, 2001, and wrote a report dated June 18, 2001.   Frank Competency Report at 1.   Dr. Frank noted that the Court ordered this evaluation based upon Mr. Gabrion's "vituperative and mean spirited letters, his restlessness and angry outbursts in the court room, his inability to show respect to the court, and his apparent inability to cooperate with his counsel."   *Id.*   Her evaluation relied in part on Dr. Fallis's report, and reached similar conclusions.   *Id.* at 5.   In addition, Dr. Frank conducted a clinical interview for two and a half hours and administered two psychological tests.   *Id.* at 2. On the Structured Inventory of Reported Symptoms (SIRS test), Mr. Gabrion scored high on all five individual scales, which Dr. Frank said happened rarely when clients responded truthfully, and thus indicated that he was feigning a mental disorder.   *Id.* at 6.   On the MMPI-2 (designed to diagnose specific forms of psychopathology and to detect honest or feigned responses), Mr.

Gabrion took a very long time to complete the test, left some answers blank, and answered others according to pattern (seven marked true then five marked false, five marked true then five marked false).  *Id.* at 7.   According to Dr. Frank, although the inventory was invalid because of blank answers, Mr. Gabrion's responses were suggestive of malingering.  *Id.*  She concluded that Mr. Gabrion did not suffer from any psychiatric disorders, was malingering, and was competent to stand trial.  *Id.* at 8.   Dr. Frank's report was filed with the Court under seal, and no hearing was held.   Once again, Mr. Gabrion's defense team was presented with a template of the rebuttal evidence they would face if they introduced mental health testimony.

54.   Meanwhile, the defense had engaged the services of its own forensic psychologist, Newton L. P. Jackson, Jr., Ph.D., for "further exploration of possible defenses."   Jackson Clinical Evaluation (July 25, 2001) at 1.   His report said nothing about possible defenses. However, Dr. Jackson instead concluded that "[d]espite the likelihood of a certain degree of malingering," he did not think that Mr. Gabrion was competent to participate in further legal proceedings.  *Id.* at 7.   Dr. Jackson saw Mr. Gabrion at FCI Milan for one hour and forty-five minutes on June 25 and an additional forty-five minutes on July 5, 2001.  *Id.* at 2.   Dr. Jackson was based in Ann Arbor and appears to have been originally retained by Mr. Mitchell (to whom he addressed his initial report).  *Id.* at 1.   Trial counsel provided Dr. Jackson with little background information – the same "social history" that was transmitted to Dr. Fallis a year earlier, Dr. Fallis's report, a letter from Dr. Theodore Mauger dated January 30, 2000, and "[r]ecords from several hospitals and other sources where Mr. Gabrion received treatment or evaluation, dated March 1993 through December 1995, including Pine Rest Christian Hospital, Hope Network, and Hackley Hospital."

55.   Dr. Jackson's opinions reflected profound ambivalence.   He found a "thread of

37

malingering" throughout his interviews, as well as genuine symptoms of thought and mood disorders. *Id.* at 7. According to Dr. Jackson, Mr. Gabrion "demonstrated racing thoughts, elation and depression," had impaired judgment and poor insight, and exhibited "progressive tangentiality, loose associations, circumstantiality, ideas of reference, and other indications of thought disorder." *Id.* Mr. Gabrion's overall clinical presentation "in part reflects malingering, and in part reflects symptoms of mental illness." *Id.*

56. Mr. Stebbins filed a detailed affidavit on August 8, 2001, in connection with a sealed competency motion. Trial counsel advised the Court that Mr. Gabrion's ability to assist in his own defense had deteriorated significantly since the beginning of the year. He noted that the defense psychologist had acknowledged "some degree of malingering," but found that Mr. Gabrion's "apparent malingering" was the result of his mental illness. Stebbins Aff., August 8, 2001, ¶ 27. Trial counsel also endorsed their psychologist's recommendation of lengthy in-patient evaluation:

> The psychologist is of the opinion that any evaluation of Gabrion's mental state that is done outside of a residential facility with lengthy observations to discover and treat his underlying mental illnesses will be invalid. The psychologist is of the opinion that, given Gabrion's present mental state, there is no way to accurately determine whether or not Gabrion is capable of assisting counsel in his own defense.
>
> The psychologist recommended that Gabrion be placed in a residential facility for full time observation for a period of sixty to ninety days to more fully evaluate his competency to stand trial and more importantly to assess his ability to assist counsel in his own defense.

*Id.* at ¶¶ 28-29.

57. On August 9, 2001, Mr. Gabrion was removed from the courtroom after calling the judge an "evil Hitler" and accusing Mr. Mitchell of destroying evidence. The Court ordered a full competency examination. Mr. Gabrion was transferred to the U.S. Medical Center for

Federal Prisoners in Springfield, Missouri, where he remained from August 15 through October

15, 2001.   The downsides of sending capital clients to state and federal forensic facilities are

numerous:

> The trick in these situations, however, is invariably played on the client.   First,
> sending a client to a state hospital or federal medical center to be evaluated for
> competency may interfere with the development of trust and rapport that is
> essential to competent representation.   Second, the client may well be held and
> observed for an extended period of time during which the defense has restricted
> access to the client.   Third, competence to stand trial is not a substitute
> assessment for mitigation development as the questions being clinically assessed
> are vastly different.   Fourth, such a practice puts the client at risk for rebuttal
> evidence which, although limited in scope, can be used by the prosecution.   Fifth,
> such evaluations will inevitably be based on less information, and thereby be less
> reliable, than can be accomplished when the defense investigation is thorough and
> competently undertaken.   Sixth, state hospital opinions are biased towards law
> enforcement and prosecution.   Finally, state hospital doctors are typically not
> specialists, carry extensive caseloads and are underfunded. They therefore
> conduct assessments not particular to the symptoms and impairments of a
> particular client but rather conduct surface assessments without pursuing depth or
> nuance.

David Freedman, *When Is a Capitally Charged Defendant Incompetent to Stand Trial?*, 32

INTERNATIONAL JOURNAL OF LAW AND PSYCHIATRY 127, 129 (2009).   It is not surprising that

the defense psychologist, Dr. Jackson, did not appreciate these numerous risks: he was the

Evaluation Services director at the Michigan Center for Forensic Psychiatry and routinely

evaluated defendants in that facility.   *See infra* ¶ 104.

58.   On August 28, 2001, Zafar A. Khan, a Physician's Assistant at Springfield, took

down Mr. Gabrion's history and performed a physical examination.   Staff Physician Mahmood

Choudhury, M.D., also signed the History and Physical, which relied on Mr. Gabrion's

unreliable self-reporting and included his claims of a six-month psychiatric hospitalization in

Connecticut in the 1980s and currently having a wife and five children.   History and Physical at

1.   The report noted that Mr. Gabrion suffered serious childhood illnesses: at age five, his

39

parents locked him out of the house and he developed pneumonia resulting in a left lung lobectomy and was in coma for thirty days.  *Id.* at 2.   Mr. Gabrion reported "a history of a broken nasal bone related to a car accident," but there appeared to be no follow-up (either at Springfield or later by trial counsel) to use X rays to investigate any healed nasal fracture.  *Id.* The history also noted that Mr. Gabrion had made multiple suicide attempts, including "self-inflicted lacerations by chainsaw" and an attempt to cut off his leg with a chainsaw.  *Id.* at 1, 2. Mr. Gabrion was described as a talkative white male who seemed psychotic but was cooperative. *Id.* at 3.   There was a reported history of paranoid schizophrenia, bipolar disorder and antisocial personality diagnoses.  *Id.* at 4.

59.   Robert Denney, Ph.D., a staff neuropsychologist at Springfield, evaluated Mr. Gabrion on October 5, 2001, and his report was dated October 10, 2001.   His evaluation was requested to address the legitimacy of Mr. Gabrion's clinical symptoms and complaints in light of his past head injuries.   Dr. Denney concluded that Mr. Gabrion's behaviors were not consistent with the natural course of brain injury, which included a gradual improvement in memory and cognition post-injury, in contrast to the deterioration in function described by Mr. Gabrion.   Denney Neuropsychological Consultation at 7.   According to Dr. Denney, Mr. Gabrion's head injury was mild (caused by his 1992 car accident) and not consistent with neurocognitive deficits demonstrated in past neuropsychological evaluations.   Mr. Gabrion's performance during past evaluations (the SIRS and MMPI-2, *supra* ¶ 53, and current ones (Validity Indicator Profile and Test Of Memory Malingering) revealed that he intentionally presented himself in a disingenuous manner.  *Id.*   The neuropsychologist concluded that Mr. Gabrion was exaggerating his psychotic presentations and his neurocognitive complaints including memory, attention, and concentration, as well as executive reasoning skill deficits.  *Id.*

60. Dr. Richart DeMier, Ph.D., a clinical and forensic psychologist, completed the evaluation. Dr. DeMier performed his competency evaluation of Mr. Gabrion from August 15 through October 12, 2001. DeMier Forensic Psychological Report (October 22, 2001) at 1. Among the materials reviewed was, once again, the Abridged Social History prepared by James F. Crates, dated March 1, 2000, with school records for the years 1960 through 1965. *Id.* at 3. Dr. DeMier spoke with the U.S. Attorney and both defense counsel; Mr. Stebbins called periodically to inquire about the progress of the evaluation. *Id.* Dr. DeMier was also provided with Dr. Jackson's preliminary report to Mr. Mitchell dated July 26, 2001. *Id.* Dr. DeMier concluded that Mr. Gabrion was competent to stand trial or make other decisions regarding his legal case and to assist in his defense. *Id.* at 23. In addition, Dr. DeMier found that Mr. Gabrion had no mental illness that would preclude his ability to understand the nature of the charges against him. *Id.* Dr. DeMier noted that Mr. Gabrion had a car accident in March 1992, and subsequently reported memory difficulties, but Dr. DeMier opined that those seemed "suspect in nature." *Id.* at 6-7. Dr. DeMier also noted that upon admission to the federal prison medical center Mr. Gabrion's "clinical presentation lacked credibility" (for example, he claimed not to be able to pronounce his own name), and the initial impression was that he was malingering psychotic symptoms (partly based on the fact that he described contradictory symptoms). *Id.* at 11-12. Dr. DeMier noted that Mr. Gabrion's "speech became much more reasonable and goal-directed when he addressed things which were of more immediate concern" such as not wanting to schedule an interview during commissary hours. *Id.* at 13. At one point Mr. Gabrion smeared feces on his face but refused to speak about it. *Id.* When he did speak, Mr. Gabrion's comments seemed rehearsed, and his suicide attempts were staged. *Id.* at 13-14. Dr. DeMier concluded that Mr. Gabrion was currently malingering psychotic symptoms and

41

cognitive impairment and that psychological testing, as well as the results of neurological and neuropsychological consultations, supported the malingering finding. *Id.* at 16-17. Dr. DeMier also found that Mr. Gabrion did not meet the criteria for any psychotic disorder, mood disorder, anxiety disorder or dissociative disorder. *Id.* at 20. The psychologist expressed the opinion that Mr. Gabrion probably met the criteria for antisocial personality disorder, but he refrained from offering that diagnosis because of the lack of reliable information. *Id.*

61. Once again, the Court held no hearing on the competency issue, and trial counsel had neither an opportunity to cross-examine the Springfield experts nor to offer rebuttal opinions, even though (as noted *supra* ¶ 54) the defense expert, Dr. Jackson, had opined that Mr. Gabrion was not competent to proceed. Dr. Jackson reviewed additional material "related to Mr. Gabrion's past contacts with the Bureau of Prisons" and other unspecified information, and then interviewed Mr. Gabrion for a half hour on December 11, 2001. Jackson Letter to Stebbins (December 11, 2001) at 1. Dr. Jackson wrote a four and a half page summary of the interview on the same date.

62. Dr. Jackson's summary included a couple of pages of what he described as Mr. Gabrion's continuing to "ramble disjointedly." *Id.* at 3. Although he seemed to capture much of the rambling more or less verbatim and to describe Mr. Gabrion's increasing agitation, Dr. Jackson offered no insight into the symptomatological significance of Mr. Gabrion's verbal outpouring and behaviors. Much of what Mr. Gabrion displayed reflected the signs and symptoms of mental disorders that capital defense teams were being trained to observe and document, such as:

1. Reality confusion (hallucinations, illusions, phobias, disorientation, delusions)
2. Speech and language (incoherence, neologisms, poverty of speech and thought, distractibility, tangentiality, derailment, circumstantiality, loss of goal,

perseveration, pressured speech, blocking, paraphasia, slurring, monotone, stilted speech, micrographia, hypergraphia, dyslexia)

3.  Memory and attention (amnesia, confabulation, hypermnesia, limited attention span, selective inattention)

4.  Medical complaints (hypochondria, self-mutilation, insomnia, hypersomnia, anorexia, ringing ears, dizziness)

5.  Emotional tone (anxiety, suspicion, depression, hostility, irritability, excitement, flat affect, emotional lability)

6.  Personal insight and problem solving (self-esteem [too high or too low], frustration, denial of mental problems)

7.  Physical ability (agitation, hypervigilance, psychomotor retardation, clumsiness, tension)

8.  Social interaction (isolation/estrangement, difficulty perceiving social cues, suggestibility, disinhibition)

See Deana Dorman Logan, *Learning to Observe Signs of Mental Impairment*, FORUM, v. 19, n. 5-6 (1992) at 40-49.

63.  Dr. Jackson blamed Mr. Gabrion for wanting to be in control.   Jackson Letter to Stebbins at 4.   However, despite the fact that Mr. Gabrion was in belly chains, leg irons, and handcuffs (*id*. at 1) and there were deputies "adjacent to the interview room" who made a "show of force" when Mr. Gabrion was loud and angry (*id*. at 4), Dr. Jackson found Mr. Gabrion's body language and language increasingly threatening: "It was evident that his behavioral controls were marginal and that he might become assaultive.   The interview was terminated at that point, both for safety reasons and also because Mr. Gabrion was very clearly indicating he would say no more and would no longer tolerate the interview environment."   *Id*. at 4.

64.  Dr. Jackson remained ambivalent about whether Mr. Gabrion was exhibiting "genuine disorders of both thought and mood" or just malingering, but he had given up trying to resolve the crucial question:

> I was completely unable to obtain relevant information from Mr. Gabrion which would enable me to evaluate possible mitigating factors which might be presented on his behalf in a trial setting.

43

I doubt that further attempts by me to interview Mr. Gabrion will be fruitful in terms of obtaining information directly from him regarding his past history or any other aspect of his life. . . .

*Id.* 4-5.

65. Nonetheless, trial counsel filed a one-sentence Notice of Intent to Raise Mental Health Evidence pursuant to Fed. R. Crim. P. 12.2 on January 2, 2002. An Amended Notice was filed on February 4. A Second Amended Notice provided more details, specifying that the defense planned to introduce no mental health evidence at the guilt-innocence determination, but planned to call five experts at the penalty phase: psychiatrist Thedore F. Mauger, M.D. (treating psychiatrist with Hope Network to whom Mr. Gabrion was referred from 1993 to 1995); neurologist Douglas W. Scharre, M.D., Director of Cognitive Neurology at Ohio State University Medical Center (who would not interview Mr. Gabrion, but testify based on his review of records); Dr. Jackson (who would testify about "the developmental and psychological effect" of Mr. Gabrio's upbringing and how this left him "peculiarly unfit to accurately assess and cope with the traumas of his later life, primarily head trauma and substance abuse"); neuropsychologist Ronald L. Lewis, Ph.D. (an Ann Arbor-based expert with forensic experience who would testify based on review of records, if he testified); and forensic psychologist Mark Cunningham, Ph.D. (who would testify about future dangerousness). Dr. Jackson produced one more summary report for trial counsel on February 21, 2002, and interviewed Mr. Gabrion's older brother Michael Gabrion, Sr., at a jail in Adrian, Michigan, on February 25, 2002, the day the trial began.

66. Over defense objection, the Court permitted the Government to have three experts examine Mr. Gabrion: David A. Griesemer, M.D., chair of the Neurology Department at the Medical University of South Carolina; Thomas V. Ryan, Ph.D., a neuropsychologist from

44

Lexington, Virginia; and Gregory B. Saathoff, M.D., a psychiatrist from Park Dietz & Associates, a multispecialty forensic group that often worked for the Government in capital cases.   All three produced detailed reports: Dr. Ryan on March 5, 2002; Dr. Griesemer on March 12, 2002; and Dr. Saathoff on March 13, 2002.

*Overview of the Capital Trial, the Aggravating Evidence, and Mr. Gabrion's Removal*

67.   Trial commenced on February 25, 2002.   *United States v. Gabrion*, 719 F.3d at 518. The jury convicted Mr. Gabrion of first-degree murder on March 5, 2002.   *Id.*   The trial then entered the penalty phase, in which a total of fifty-eight witnesses testified in support of the Government's allegations.   *Id.*   That testimony covered the terror of the capital offense itself, the likelihood that Mr. Gabrion killed the missing infant and the three adult males who had disappeared, his character and propensity for violence, and future dangerousness (including carving a fake gun from soap).   *Id.*   The defense offered no rebuttal witnesses other than Mr. Gabrion himself, who allocuted against the advice of counsel and in spite of the fact that he had testified at the penalty phase (also against his counsel's advice), and an expert who opined generally that the Bureau of Prisons is equipped to manage dangerous prisoners effectively.   On the first day of the penalty phase, during the testimony of the prosecution's second penalty phase witness,, Mr. Gabrion "punched defense counsel David Stebbins in the face and was immediately restrained on top of counsel table by court security personnel.   Tr., March 11, 2002, at 75. Defense counsel's oral motions for a mistrial, to withdraw as counsel, and for a competency evaluation were all denied.   *Id.* 78-80.   There was no request for a continuance or a brief trial recess.   Mr. Gabrion was not present for much of his capital sentencing proceedings.   He was absent for the testimony of twenty-four of the Government's penalty phase witnesses.   When he

45

returned, trial counsel agreed that he should be required to wear a stun belt and sit between two Marshals.   Tr., March 12, 2002, at 233.   When he was present, Mr. Gabrion told the Court, "I'm sorry to be forced to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion.   And I'll be quiet because I'm being forced to just as if I were in Nazi Germany."   *Id.* at 303.

*The Penalty Phase Opening Statements*

68.   The prosecutor began his penalty phase opening statement by reminding the jury that they had just convicted Mr. Gabrion of a cold-blooded murder and demanded death for the defendant.   Tr., March 11, 2002, at 27.   The Government had to prove two statutory aggravating factors: that the killing was especially heinous, cruel and depraved; and that it was done after substantial planning and premeditation.   *Id.* at 28.   There were four additional, nonstatutory aggravating factors: Mr. Gabrion's future dangerousness; the impact of the victim's death on her family; that Mr. Gabrion caused the death or disappearance of baby Shannon; and that Mr. Gabrion killed the victim in order to obstruct justice and to retaliate.   *Id.* at 30.   The prosecutor explained that he would prove future dangerousness by presenting evidence of Mr. Gabrion's long, sordid history of violence, and he then detailed the testimony of several witnesses.   *Id.* at 31-33.   While the prosecution talked about the four people who saw Mr. Gabrion with Rachel Timmerman the night that he raped her, Mr. Gabrion exclaimed, "Why do you just let him stand up there and lie like that and never do anything about it? It's bullshit." After the judge told him to be quiet, Mr. Gabrion continued, "It's a costly defense.   It's bullshit. Fucking liar asshole."   *Id.* at 33.   The prosecutor then told the jury that Mr. Gabrion had killed Wayne Davis, one of the people who had seen him with Ms. Timmerman (*id.* at 35), as well as

46

John Weeks (*id.*), Robert Allen (*id.* at 36), and Ms. Timmerman's baby, Shannon VerHage (*id.* at 36).    The prosecutor told the jury that Mr. Gabrion was also a dangerous man inside prison and that his escape remained a constant fear: Mr. Gabrion had been found with weapons and tools, including a claw, hypodermic needles, razor blades, paperclips, and a fake gun.  *Id.* at 37.  In addition, Mr. Gabrion tried to impersonate officers in order to be transferred.  *Id.*  The prosecutor told the jury that friends and family of the victim would testify about the impact of her murder and about how Mr. Gabrion first raped the victim and then threatened to kill her and her baby.  *Id.*

69.    During the recess after the prosecutor's opening statement, Mr. Gabrion told the judge that he had diarrhea and his stomach was killing him. The judge was impatient and told Mr. Gabrion that he was hurting his case, "Now, I can either put a stun belt on you and we can zap you . . ."  Mr. Gabrion said that he would try to keep quiet, but complained that the prosecutor could say anything he wanted and did not have to follow rules of honesty.  He added that it looked bad to treat American citizens "in that way" and that the prosecutor will "face the true judgment."  *Id.* at 39-40.  After he went upstairs to the use the bathroom, Mr. Gabrion told the judge that he felt a little better, and the trial continued with the defense opening statement. *Id.* at 41.

70.    Trial counsel David Stebbins began by saying that "unfortunately" the jury must now decide the sentence for Mr. Gabrion.  *Id.* at 41-42.  Mr. Stebbins conceded that Mr. Gabrion was over eighteen years of age and that he intentionally killed Rachel Timmerman.  *Id.* at 42.  Trial counsel also conceded that the defense would not be challenging the heinous, cruel and depraved, and substantial planning and premeditation aggravating factors.  *Id.* at 42.  The defense would also not contest evidence of Mr. Gabrion's past dangerousness, but trial counsel

47

did advise the jury that the disappearances of Wayne Davis, John Weeks, and Robert Allen were not separate aggravating factors but only served as evidence of the one future dangerousness aggravating factor. *Id.* at 43. Another factor which the defense would not contest was the impact of the victim's death on her family. *Id.* Trial counsel explained that even though the jury had found Mr. Gabrion guilty, they must now start with a clean slate and decide the appropriate sentence. *Id.* at 44. Regardless of their decision, Mr. Gabrion would spend the rest of his life in prison; there would be no parole. *Id.* Trial counsel told the jury that despite the evidence that they would hear of Mr. Gabrion being a danger in prison, they instinctively knew, and the defense would present evidence, that prisons are able to control people like him. *Id.* Prisons can impose stricter and stricter limitations and more confinement so that Mr. Gabrion could not be a danger to anyone. *Id.*

71. Trial counsel introduced the discussion of mitigation factors by telling the jury that the defense would present "good things about Mr. Gabrion," his background, his life history, and circumstances that might suggest that death was not the appropriate sentence in this case. *Id.* at 45-46. Defense counsel conceded that Mr. Gabrion's case "is not a pretty picture" or that of "a saintly person who suddenly goes wrong." *Id.* at 46. He allowed that Mr. Gabrion made threats, fabricated stories, schemes in and out of prison, talked about assaulting people, flew off the handle easily, and overall "is a strange guy." *Id.* Trial counsel said the defense would prove how Mr. Gabrion developed into the person he was, through a series of events in his lifetime. *Id.* at 46. In addition to the bad behavior just mentioned, Mr. Gabrion was paranoid, secretive and did not trust anyone. *Id.* His distrust of his attorneys made it difficult for them to discover all the facts and history of his life. *Id.* at 48. Trial counsel promised the jury that a brief history of Mr. Gabrion's life would be presented, but that there would be no smoking guns.

48

*Id.*

72.    Trial counsel then gave a quick summary of Mr. Gabrion's biography.   Mr. Gabrion grew up in a family of six children.   The family looked normal, but they had a lot of problems, including a lot of marital infidelity.   The mother left to be with her lovers.   She was sometimes gone for weeks or months at a time, and the kids were packed off to relatives.   *Id.* at 48.   The parents fought with each other.   *Id.*   Marvin had health problems in his childhood, including one long hospitalization for pneumonia, and another for a serious illness with a 106 degree fever. *Id.* at 49.   By the time Mr. Gabrion was in junior high school his three older sisters had gotten married and moved out; Marvin and his two brothers were then home without much supervision. *Id.* at 49.   Despite his home life, Mr. Gabrion did "fairly well in school" and was "a real smart guy" with an IQ in the 120s.   *Id.*   Despite his high IQ and trial counsel's initial assertion that he did well in school, trial counsel soon conceded that Mr. Gabrion earned barely passing grades. *Id.* at 50.   However, Marvin did not get into trouble in high school, was a nice kid who had two different girlfriends, went to the senior prom, and graduated from high school.   *Id.*   The problem was that, because of his impoverished background and underlying psychological problems, he was psychologically unprepared to deal with the world and its adult problems.   *Id.* He worked as an electrical lineman and traveled around the country building high-tension power lines.   *Id.*

73.    Mr. Gabrion still did not have problems in his early twenties, but started drinking a lot and huffing glue, paint fumes, and automobile exhaust.   *Id.* at 51.   He got into his first real legal trouble in 1976 when he was twenty-three years old and was accused of stealing a welding rig.   He had a "bizarre" response to it.   Instead of facing up to the charges, Mr. Gabrion left with a friend's wife who was being beaten by her husband.   *Id.*   They went to Colorado where

49

Mr. Gabrion wanted to take a new identity.   In Arizona they were in a car accident in which they broke the windshield with their heads.   *Id.* at 52.   In Seattle they were in another accident: while riding a motorcycle they plowed into a car, lost consciousness, and were hospitalized; both suffered brain damage.   *Id.*   After the accident, according to Mr. Gabrion's friend, he was different – stranger, more aggressive, argumentative, paranoid and suspicious.   *Id.* at 52-53.   He became abusive to the young woman.   *Id.* at 53.   Mr. Gabrion returned to Michigan in the early eighties and his family noticed that he was different; he was paranoid, accused everyone of having ulterior motives, found conspiracies in everything, fabricated stories such as having served in Vietnam.   *Id.*   He drank a lot all the time.   After two to three beers, he was a mess and got into fights.   *Id.* at 53.   Trial counsel admitted that "the period of the eighties is a little sketchy," and that what Mr. Gabrion was doing was a "little unclear," but they knew he had more accidents, including running his motorcycle into a telephone pole, and kept "banging his head around."   *Id.*   Mr. Gabrion became increasingly brittle, sticky and confrontational.   *Id* at 53-54. His aberrant behavior escalated; he continued to act bizarrely, suddenly flying off the handle. He became involved in scams, and by 1989 he was no longer working as a lineman.   *Id.* at 54. In 1992 he was in another car accident and was taken to the hospital.   There was a lot of controversy about whether he caused the accident.   *Id.*   Later he went to rehab in an attempt to get disability benefits.   *Id.*   During the two-week analysis in rehab, some brain damage was found.   *Id* at 55.   The psychiatrist found irregular electrical activity in his frontal lobe (indicating some type of epilepsy).   Mr. Gabrion took Depakene for a couple of years and was better able to control himself, but still ran scams.   *Id*   Then he quit treatment in 1994 or 1995 and his behavior deteriorated.   Trial counsel then said, "[a]nd then you've heard about his activities in 1996 and 1997 involving Rachel Timmerman, involving these other people that

50

you've heard about." *Id.*

74. Trial counsel explained that Mr. Gabrion's brain damage was subtle, but the type that causes people to act the way he did: confrontational, suspicious, paranoid, flying off the handle, aggressive, overly moral, overly religious and sexually inappropriate. A neurologist and a psychiatrist would testify that his type of brain damage was consistent with that sort of behavior. *Id.* Further testing had been done since the case started, and the experts would testify that Mr. Gabrion had not always been cooperative, but there was some brain damage in the area which controls restraints and caused Mr. Gabrion to get tunnel vision about how to resolve problems. *Id.* at 56-57. Trial counsel concluded by assuring the jury that the history, brain damage, and problems were not meant to excuse Mr. Gabrion's behavior, but to explain it and to explain that a lot of it can be controlled with medication. *Id.* at 57. He implored them to listen carefully to the small factors which explained Mr. Gabrion's bad behavior. Mr. Stebbins concluded that "in these circumstances a life sentence is really the appropriate sentence." *Id.* at 57-58.

*The Mitigation Witnesses Presented in the Penalty Phase Proceedings*

75. What trial counsel actually presented at Mr. Gabrion's sentencing proceedings in 2002 reflects both the limited and random range of witnesses that they had discovered or retained, and the belief that they had only to *explain*, rather than rebut or mitigate, what had made Mr. Gabrion the evil monster alleged by the Government, which had called nearly sixty witnesses to create a picture of a violent man involved in myriad scams.[21] There was no

---

[21] Trial counsel David C. Stebbins endorsed this belief explicitly in an article that he wrote many years before with Scott P. Kenney. The article began with the uncontroversial statement that "the primary goal of defense counsel in mitigation must be to offer to the jury an

51

recognition of the need to humanize the client, to explain the crime, but to demonstrate the client's capacity for change, including the capacity to respond to medication and treatment, and to function responsibly in a structured, drug-free environment. Trial counsel offered no witnesses to rebut the dozens of witnesses who supported the many aggravating factors. They presented the testimony of only thirteen witnesses in the sentencing phase of Mr. Gabrion's trial, including three experts and Mr. Gabrion himself. Four brief witnesses were members of Mr. Gabrion's immediate family. Three lay witnesses outside the family knew Mr. Gabrion only years before the capital offense: a high school teacher, Mr. Gabrion's high school prom date, and a woman who had been traveling with him out West when he was in an accident. *This woman was also the only actual witness to any of the various accidents reported by Mr. Gabrion and relied on by defense experts as a basis for head injuries leading to brain damage.* Two other witnesses were from a rehabilitation center that had found him eligible for disability: the intake coordinator and a staff psychologist. The Government essentially asked the jury to disregard these last two as unwitting dupes of another of Mr. Gabrion's scams.

76. The first defense witness was an expert whose testimony did nothing to humanize Mr. Gabrion, but simply educated the jury about the ability of the Bureau of Prisons to house dangerous individuals with minimum risk to staff and to deny them any means to harass the general public. The expert's failure to say anything at all about Mr. Gabrion was conspicuous. Mark Cunningham, Ph.D., a clinical and forensic psychologist in private practice, testified about

---

explanation of the crime." It also noted, indisputably, that the "explanation is not an excuse." However, it then claimed, "The explanation has to be an honest (although interpreted) history of how the client grew into the 'heartless monster' that the prosecutor proved him to be in the guilt phase. Stebbins & Kenney, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, CHAMPION (Aug. 1986) at 14, 14. Mitigation that helps to explain why the crime (or crimes) happened is important, but merely one component of an effective mitigation presentation.

the federal prison ADX Florence, about high-security custody options available in the Bureau of Prisons, and about the types of mechanisms or restraints available in the Bureau of Prisons to limit an inmate's communications. Tr., March 13, 2002, Excerpt 43, at 4.[22] Dr. Cunningham's research on these subjects included touring ADX Florence, the super-maximum custody prison operated by the federal Bureau of Prisons and reviewing instructions for the control unit, or "prison within a prison," at ADX Florence. Dr. Cunningham had also reviewed the assaultive disciplinary infractions at ADX Florence from 1994 to early 2000 (with the exception of 1999). *Id.* at 5. Dr. Cunningham testified that he knew of twenty-five federal capital inmates with sentences of life in prison without the possibility of parole and all were in at least the penitentiary level. *Id.* at 10. He testified that at the Florence penitentiary inmates were double-celled (*id.* at 11) and allowed out of their cells for programming during the day (*id.* at 12). If a prisoner has difficulty at the penitentiary level, his security level could be increased to Marion (midlevel facility between US Penitentiary and ADX Florence) or ADX Florence. *Id.* Dr. Cunningham described an ADX Florence prison cell and explained that an inmate would be confined to his cell twenty-three hours a day, with the last hour in an exercise room by himself. *Id.* at 14. Inmates were allowed two fifteen-minute phone calls per month and visits were only behind glass. All mail was X-rayed, opened and read. *Id.* at 15. Dr. Cunningham described the control unit as imposing more serious control than the penitentiary, including triple-escorts

---

[22] The transcripts of the Sentencing Hearing from March 11 through 15, 2002, are not consecutively paginated, but instead are collected in excerpts numbered 38 through 55. The proceedings on March 14, 2002, for example, are designated excerpts 46 through 52, with each file individually paginated. In some cases, the testimony of one witness is transcribed in a separate excerpt from the one containing proceedings that both preceded and followed the witness. (The testimony of Drs. Cunningham and Scharre, for example, are designated Excerpts 43 and 44, but the witnesses who immediately followed them will be found in Excerpt 42.) The transcripts ("Tr.") will be cited by date, excerpt number, and page number. Thus, on any given date the same page numbers may recur in multiple excerpts.

for inmates outside their cells rather than double-escorts. *Id.* at 16. Side pocket cells at ADX Florence allowed for even higher security; doors could be opened to allow inmate access to recreation and visitation without any contact with guards. *Id.* at 17-18.

77. On cross-examination, the prosecutor challenged the relevance of Dr. Cunningham's doctorate to his qualifications to testify about the Bureau of Prisons: Dr. Cunningham had not studied the BOP regulations as part of his graduate course work or done his doctoral thesis on them, he was not employed by the BOP, and he had never done any consulting for the agency. *Id.* at 21-22. Dr. Cunningham repeated that he had studied BOP regulations as well as other information provided by the Bureau of Prisons. *Id.* at 22. The prosecutor then emphasized how much Dr. Cunningham earned for his testimony, and Dr. Cunningham agreed that he was well paid. *Id.* at 23. The prosecutor listed several cases in which Dr. Cunningham's bills had ranged from $21,000 to $34,000. *Id.* Dr. Cunningham testified that he was not asked to do an individual threat assessment on Mr. Gabrion, and he knew about Mr. Gabrion's case in only the most general way. *Id.* at 25. On redirect examination, Dr. Cunningham clarified that in the cases in which he billed $20,000 to $30,000, he worked significantly more hours than on this one. *Id.* at 27.

78. The next witness, Dr. Douglas Scharre, was the director of cognitive neurology at Ohio State University medical school. Tr., March 13, 2002, Excerpt 44, at 4. He had reviewed Mr. Gabrion's records and was asked by defense counsel to testify about a possible relationship between Mr. Gabrion's behaviors and any kind of brain dysfunction. *Id.* at 7. Dr. Scharre said he had reviewed a selection of Mr. Gabrion's medical records from adulthood; reports by psychologists Emily Fallis, Ph.D., Richart L. DeMier, Ph.D., and Thomas Ryan, Ph.D.; Mr. Gabrion's prior testimony; and samples of Mr. Gabrion's letters written from jail. *Id.* at 8. Dr.

Scharre concluded that there had been a clear change in Mr. Gabrion's personality from "youth time" to the early 1990s that seemed to be "very temporally related to some series of head injuries." *Id.* Mr. Gabrion had refused to meet with Dr. Scharre. *Id.* at 12. Nonetheless, Dr. Scharre had made initial diagnoses of acquired persistent personality change consistent with damage most likely due to frontal and temporal lobe dysfunction, related to frontal lobe personality syndrome, and "Geschwind syndrome," which affected the temporal lobe.

79. There is an adage in medical education that warns students to "think horses, not zebras" when they hear hoofbeats. In other words, they should look for the common disorders and diseases with which we are all familiar, as opposed to the rare and exotic ones seen in esoteric research journals. This common-sense advice applies in the realm of mental disorders as well – particularly when the diagnostician has the burden of convincing skeptical jurors and adversarial experts that a rare and exotic condition even exists. In Mr. Gabrion's case, trial counsel's decision to allow an expert who had not even met with Mr. Gabrion to offer the speculative and controversial diagnosis of "Geschwind syndrome" was inexplicable.[23] The results were predictably catastrophic, and at odds with trial counsel David Stebbins's own prudent advice in a 1988 article warning about psychological testimony "that sounds like it comes out of a textbook" and is "incomprehensible to a lay juror." He noted that it makes little sense to offer humanizing testimony that will be offset by the testimony of a mental health expert

---

[23] *See* D. F. Benson, *The Geschwind Syndrome*, 55 ADV. NEUROL. 411 (1991). According to the PubMed abstract, "Support for, and criticism against, the existence of this syndrome as a specific personality disorder has produced more fire than substance, but the presence of an unsettled, ongoing controversy has been acknowledged." PMID: 2003418, *available at:* https://www.ncbi.nlm.nih.gov/pubmed/2003418. The term "Geschwind Syndrome" does not appear in the index of the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., 1994; text revision, 2000; or 5th ed., 2013) or the standard neuropsychological textbook, MURIEL D. LEZAK ET AL., NEUROPSYCHOLOGICAL ASSESSMENT (4th ed. 2004)

who makes "the person sound like a casebook study out of some obscure and arcane psychological textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 38.

80. Dr. Scharre testified that Mr. Gabrion's neurological dysfunction was most likely related to multiple motor vehicle accidents, and substance abuse was another possible cause of some brain injury. *Id.* He said that Mr. Gabrion had been in a motorcycle accident in the late 1970s. The many reports of significant personality changes after the accident were very suggestive that the changes were temporally related. *Id.* at 13. Mr. Gabrion had another accident in 1992; it was followed by a change in his personality and maybe even a change in his cognitive functioning. *Id.* Dr. Scharre explained that there is a well-known association between car accidents and frontal and temporal lobe injuries. *Id.* at 14. Dr. Scharre testified that in reviewing Gabrion's records he found several traits of frontal lobe personality syndrome: self-absorption, disinhibition, impulsivity, and sexual inappropriateness (*id.* at 27), as well as poor planning, poor insight, abrasive personality, and confabulation (from failure of self-monitoring rather than deliberate attempt to mislead) (*id.* at 28). All of these traits were suggestive of frontal lobe damage. *Id.* at 29. Dr. Scharre listed the features of Geschwind syndrome: hypergraphia (*id.* at 29), hyperreligiosity and aggressiveness (*id.* at 31), stickiness (lack of flexibility in exchange of ideas), grandiosity and hypermoralism (*id.* at 32), personalization of events (*id.* at 33), and paranoia (*id.* at 34). He explained that Mr. Gabrion exhibited many of the Geschwind features. *Id.* at 35.

81. Dr. Scharre then interpreted Mr. Gabrion's neuroimaging. According to Dr. Scharre, PET scans of Mr. Gabrion's brain showed an asymmetry between the halves of the brain, with the right side showing increased uptake particularly in the frontal and temporal areas.

*Id.* at 39.   Mr. Gabrion's CAT scan did not show any visible injury, but this did not mean there was no brain injury.   *Id.* at 44.   The crux of the case was that Mr. Gabrion was behaving very differently before his motor vehicle accidents, and his hospital records all described the traits that Dr. Scharre found significant: impulsivity, tangentiality, sexual preoccupation, self-absorption, and disinhibition.   *Id.* at 46.

82.   On cross-examination, the prosecutor suggested that Dr. Scharre was unable to verify facts about Mr. Gabrion, but relied on them nonetheless in reaching his conclusions.   *Id.* at 52.   Dr. Scharre testified that he believed that the 1992 car accident actually happened because the contemporaneous CT scan showed soft tissue swelling on the right frontal bone and this was likely caused by trauma.   *Id.* at 53.   To challenge Dr. Scharre's assertion that Mr. Gabrion's writing showed disorganized thinking, the prosecutor asked about the jail forms in which Mr. Gabrion made requests.   Dr. Scharre responded that the forms showed problems with writing skills and grammar (*id.* at 59) and that the coherent nature of the writing was still consistent with frontal lobe impairment.   *Id.* at 61.   The extreme amount of writing was typical for frontal lobe syndrome.   *Id.*   The prosecutor also questioned the veracity of the 1992 car accident by suggesting that people get better, not worse, following a head injury.   Dr. Scharre responded that theoretically there would be an improvement, but not if nerve cells had been so sheared or stressed that they were broken or dead.   *Id.* at 63.   The prosecutor challenged Dr. Scharre's diagnosis of frontal lobe syndrome, which included poor planning abilities, disorganized thinking, and impaired organizational skills, by providing examples of what the prosecutor said reflected extensive planning and organized behavior by Mr. Gabrion.   *Id.* at 64-66.   Dr. Scharre testified that having some planning and organizational skills was not inconsistent with frontal lobe syndrome.   *Id.* at 67.   On the question of whether Mr. Gabrion

had been faking mental illness, Dr. Scharre testified that there was no way anyone could feign the type of personality change that Mr. Gabrion had shown for such a length of time. *Id.* at 74. Mr. Gabrion answered some questions on the personality tests as a comatose person would. *Id.* at 75. Dr. Scharre also testified that not much value could be placed on the tests when Mr. Gabrion is giving "all these strange responses." *Id.* at 76. Dr. Scharre insisted that Mr. Gabrion had failed the malingering tests because of his personality disorder. *Id.* at 77. The prosecutor, however, suggested that Mr. Gabrion was faking mental illness in order to convince the jury not to impose a punishment that he did not want to receive. *Id.* at 78.

83. On redirect examination Dr. Scharre stressed that it is possible for someone with Mr. Gabrion's brain dysfunction to malinger and to provide false answers on a psychological test, but that being uncooperative is not something someone feigning mental illness would want to do. *Id.* at 80. He also stressed that frontal lobe injury might cause someone to be overfocused and not think about the consequences of his actions. *Id.* at 82. Dr. Scharre concluded by saying that he believed that it was possible to be very complex and that what Mr. Gabrion had done did not really dissuade him from inferring that those parts of his brain were injured. *Id.* at 83.

84. The first lay witness called by the defense was Alan Thorington, Mr. Gabrion's high school math teacher and a school administrator. Tr, March 13, 2002, Excerpt 42, at 515. Mr. Thorington testified that he did not remember Mr. Gabrion having any disciplinary problems, but he noted that Mr. Gabrion was absent for fifteen and a half days as a high school senior, a number which Mr. Thorington characterized as excessive. *Id.* at 516-17. Mr. Gabrion's IQ on school records was 121, but he graduated with a grade point average between D and D+. *Id.* at 519.

85. Wilma Robinson testified that she and Mr. Gabrion dated in their junior and senior years of high school, and went to the junior prom together. *Id.* at 522. Ms. Robinson said that Mr. Gabrion was a nice, fun-loving, sweet guy. He did not cause any problems with her and was not argumentative. *Id.* Mr. Gabrion was on the track team. They drifted apart at the end of their senior year. Ms. Robinson recalled that friends drank during high school, but she did not recall Mr. Gabrion drinking. *Id.* at 523. Ms. Robinson also did not recall him using any drugs in high school. *Id.* at 524.

86. Rebekah Canavan testified that she was sixteen when she came to know Mr. Gabrion. He was a friend of her husband. *Id.* at 525. Mr. Gabrion and her husband drank a little and sniffed glue together. *Id.* at 526. Mr. Gabrion helped Ms. Canavan leave her abusive husband. While in Tucson together, she and Mr. Gabrion were in a car accident in which they both hit the windshield and broke it, but were not hospitalized. *Id.* at 531. In Seattle they were in a motorcycle accident together; he was driving and she was riding on the back. They hit a car that drove out in front of them. They were not wearing helmets. *Id.* at 533. After the accident, Ms. Canavan noted changes in Mr. Gabrion's behavior. He became more violent and argumentative, he had a shorter temper and flew off the handle, and he behaved totally differently from the way he had behaved before the accident. *Id.* at 535. He became abusive and she left him. *Id.* at 536. As a result of her own injuries from the accident, Ms. Canavan had psychiatric treatment for a while and had rehabilitation to learn to walk and talk again. *Id.* at 537. On cross-examination, Ms. Canavan testified that before the accidents Mr. Gabrion slapped her a few times. She also said that they had to leave Arizona suddenly after Mr. Gabrion accidentally set a car on fire in their driveway. *Id.* at 542. She reiterated that she left him after the accident in Seattle because he was more violent and she got scared. *Id.* at 544.

87. The defense then turned to witnesses who had known Mr. Gabrion professionally in connection with his head injuries.   Thomas Strands testified that he was the intake coordinator at the Hope Network in 1993 and met with Mr. Gabrion when he first came in.   He told Mr. Gabrion what to expect and filled out paperwork with him.   *Id.* At 546.   On cross-examination, Mr. Strands explained that the Hope Network is asked to assess whether a brain-injured person can be rehabilitated enough to get a job, and if he cannot, whether he can be considered disabled and eligible for benefits.   *Id.* At 553.   Part of the intake interview involves getting a social and medical history from the patient.   *Id.*   According to the records, Mr. Gabrion told the Hope Network that his car accident was on March 28, 1992, and that he was not violent prior to the accident.   *Id.* At 555.

88. Dr. Martin Waalkes, a psychologist at Hope Network Rehabilitation Services, saw Mr. Gabrion in 1993 for clinical assessment interviews after he was admitted as a resident at Hope Network.   Tr., March 13, 2002, Excerpt 45, at 6.   His assessment relied on information from Mr. Gabrion and from records, but he was unable to speak to family members because Mr. Gabrion refused to grant access to them.   *Id.* at 8.   Dr. Waalkes did a psychological evaluation and administered some neuropsychological batteries.   *Ids.* at 10.   Mr. Gabrion's mental state at the time included an awareness of his reason for admission (wanting assistance for injuries from 1992 accident), as well as being frequently agitated and having an intrusive, controlling and argumentative social manner, while sometimes being cooperative and participating in requested procedures.   *Id.* at 19.   On the tests that Dr. Waalkes administered there was every indication that Mr. Gabrion was putting forth his best effort.   *Id.* at 21.   Hope Network concluded that Mr. Gabrion would not be able to be employed even after rehabilitation interventions.   His behavior deteriorated during the two weeks he was there.   Hope Network decided not to keep Mr.

Gabrion in the program because his continued participation would have resulted in continued deterioration of his mental status, and he was unable to function with other people. *Id.* at 23. Dr. Waalkes believed that there was some neurological impairment that interfered with Mr. Gabrion's ability to have solid, consistent thinking in terms of good concentration, mental control and attention, and good quality of thought. *Id.* at 24.

89. On cross-examination, Dr. Waalkes testified that he had reviewed two CT scans, and his recollection was that they were normal. *Id.* at 28. Dr. Waalkes wrote in his 1993 report that Mr. Gabrion had "a significant personality adjustment challenge" which had laid the groundwork for a "rather dysfunctional current existence." He explained that it made him think that Mr. Gabrion had trouble with relationships and with controlling impulses prior to the 1992 accident. *Id.* at 29. Dr. Waalkes agreed with the prosecutor that if someone were motivated to collect a Social Security check rather than be accepted into the program for rehabilitation he might purposefully do poorly on the test. *Id.* at 30. Dr. Waalkes explained that he did not perform tests specifically designed for evaluating effort (*id.* at 31), and he was not focused on whether Mr. Gabrion was malingering (*id.* at 32). The Hope Network evaluation concluded that Mr. Gabrion was a risk of danger and recommended that his brother seek guardianship on Mr. Gabrion's behalf and a residential or supportive mental health treatment. *Id.* On redirect, Dr. Waalkes confirmed that there were no reports from the psychometrist that Mr. Gabrion was *not* giving his full effort. At the time of testing, it was not Dr. Waalkes's impression that Mr. Gabrion intentionally performed poorly on the tests. *Id.* at 33.

90. On the second day of mitigation testimony, Elaine Gabrion, Marvin's mother, was the first witness. Tr., March 14, 2002, Excerpt 48, at 4. She testified that she had been married to Marvin Sr. for fifty-eight years. After they were married, they lived for ten years in Grand

61

Rapids on property subsidized by her parents. *Id.* at 5. Marvin was the fifth of their six children. Elaine had no problems with Marvin's birth. As a baby, she said, he "[n]ever was bad." *Id.* at 6. As a child Marvin had the flu, but his father would not let Elaine take him to the doctor because he did not believe in doctors. When Marvin's temperature reached 106 to 108 degrees, he was rushed to the hospital and placed in an oxygen tent. Surgery was performed to remove "leather stuff" from his lung, and Marvin spent some time in the hospital. *Id.* at 8-9. Marvin Sr. did not get along with the younger Marvin. *Id.* at 9. They argued a lot and Marvin Sr. made fun of his son. One day Marvin Jr. was talking about his day at the dinner table and his father said, "Just shut up." *Id.* at 10.

91. According to Mr. Gabrion's mother, she and his father disagreed and fought about disciplining the boys. Marvin Sr. wanted to punish the boys, but Elaine did not think they needed to be punished. *Id.* at 11. Elaine denied that she and her husband had extramarital affairs. *Id.* Elaine testified that when the boys were young, she had a nervous breakdown. "They had to take all the kids away. They made me stay right in the house." *Id.* at 12. She testified that Marvin Sr. would not let her see the children until she was better. *Id.* at 13. She said that Marvin Sr. drank at work at his lunch hour and after work, and came home "pretty well loopered." *Id.* One day Marvin Sr. and Elaine came home to find fire trucks at their house. Marvin Jr. confessed that he had been trying to burn garbage. Marvin Sr. banged his son's head against a two-by-four six or seven times very hard. *Id.* at 19. Elaine testified that one thing she will always remember is that Marvin Sr. treated Marvin badly. *Id.* She said that Marvin was a good student until his senior year. *Id.* at 20.

92. Elaine testified that after he graduated from high school, Marvin started traveling and working. *Id.* at 22. Elaine received a letter from a doctor saying that Marvin and Becky

62

(Rebekah Canavan, the witness who testified previously, *supra* ¶ 86) had been in a motorcycle accident and were getting psychiatric treatment, and that Marvin should never drink alcohol again because doing so would trigger something related to his head injury. *Id.* at 23.   After Marvin returned to Michigan he drank a lot; this was the first time Elaine remembered him drinking a lot.   He became ornery and argumentative.   *Id.* at 24.   On cross-examination Elaine testified that she did not believe that Marvin murdered the victim.   She said, "I don't believe he has that much violence.   Marvin was never a violent person in all the time I've been with him unless he was drunk."   *Id.* at 27.

93.   The next witness was Marvin's brother, Michael Gabrion, Sr., who was in prison for receiving and concealing stolen property at the time of his testimony.   *Id.* at 28.   This was not his first time in prison.   Michael testified that he is the fourth of the six Gabrion children.   The oldest three are the girls, and the youngest three are the boys.   The family lived in Grand Rapids in the early years, but moved to Round Lake and then to White Cloud after Mike was hit by a car in Grand Rapids when he was around eight or nine years old.   *Id.* at 29.   The parents had marital problems after moving to Round Lake, and the mother left for a while.   *Id.* at 31.   Mike moved to White Cloud to build a house with his parents and go to school while Marv and David stayed in Round Lake with their sisters.   *Id.* at 32.   Michael testified that the parents only fought when they were drunk.   *Id.* at 33.   Mike quit school several times and started living on his own at a very early age.   While in school, Mike stayed in a cabin with neighborhood kids. He has been in trouble since the age of thirteen or fourteen.   *Id.* at 34.   Marv never got into trouble while in school.   *Id.* at 35.

94.   Contrary to Elaine's testimony (*see supra* ¶ 91), Michael testified that when the boys were in high school, their mother had an affair, and their parents had a fight about it.   Their

63

father worked long hours, rising at 3:30 A.M. getting home and 6:30 P.M., and falling asleep in his armchair.   He drank at work every day.   *Id.* at 36.   After high school graduation, Michael testified that he found Marv and Becky (Canavan) sniffing glue with plastic bags over their heads.   He threw them out the front door, telling them that they would kill themselves.   *Id.* at 39.   According to Michael, after Marv returned from Arizona and Washington, he said "off the wall" things, including the claim that he had been in Vietnam.   *Id.* at 40.   Marvin also drank more heavily.   *Id.* at 41.   Marv had a motorcycle accident.   He hit a telephone pole, broke the pole and cracked his helmet, but did not go to the hospital.   *Id.* at 43.   Marv also was in a car accident; he hit the windshield and Mike took him to Hackley Hospital.   He did not act differently after that accident.   When Mike went to Marvin's house, "there weren't many times when he wasn't drinking."   *Id.* at 44.   Mike and Marvin did not see each other much because Mike worked a lot.   *Id.* at 45.

95.   On cross-examination Michael testified that he believed that Marvin's worst [motor vehicle] accident was the one out West when Marv hit the side of a car, flew over the hood and hit the door of a truck.   *Id.* at 45.   Michael testified that Marvin told him that he was not wearing a helmet in that accident.   The prosecutor pointed out that Elaine had just testified that Marvin told her his helmet was shredded to pieces in that accident.   *Id.* at 46.   When Mike's son Mikey was fourteen years old, he spent a lot of time with Marv.   Mike did not know that Marv told Mikey how to get rid of bodies by wrapping them in chicken wire and disposing of them in lakes.   *Id.*   Mike agreed with the prosecutor that when he met Dr. Jackson he might have told him that when Marvin was not drinking he was just an average person.   Mike insisted that he also said about Marvin, on direct examination, that when Marvin was not drinking "he come up with off-the-wall shit out of his mouth."   *Id.* at 48.

96. The next witness was Yvonne Wilkinson, Mr. Gabrion's oldest sister. *Id.* at 51. She testified that when he was a child, Marvin was "real good, sweet, didn't know he was around most of the time, just happy all the time, got along with everybody." The family had good times and went picnicking in the woods. *Id.* at 52. Marvin had pneumonia as a young child and was hospitalized for between two weeks and one month. He had tubes coming out of his chest. *Id.* at 53. Another time Marvin had a high fever and deliriously walked outside and lay down in a snowbank. *Id* at 54. Yvonne testified that their parents had "jealousy arguments" a lot. *Id.* One time their mother called all the numbers in their father's wallet looking for his girlfriend. *Id.* Another time their mother threw a butcher knife at their father when they were at the supper table. *Id.* at 55. At times their parents argued when their Marvin Sr. wanted to "lick" one of the boys but Elaine did not want him to. *Id.* at 55. There was one particular man with whom Elaine had a relationship. The man took all the kids out somewhere one time. *Id.* at 57. Marvin Sr. got into a physical fight with the man one time when he encountered the man walking out of their house. *Id.* at 58. It was common knowledge that Elaine was having an affair. *Id.* at 59. The parents drank, and that was when they fought. *Id.* at 60. Marvin Sr. said that Elaine was having affairs. *Id.* at 61. However, he cried a lot when she left. *Id.* at 62. Yvonne saw her brother Marvin after his motorcycle accident in Washington. He told her he did not remember her. *Id.* at 63. He was very different after the accident. *Id.* at 64. He accused Yvonne of having ulterior motives and was argumentative. *Id.* He heard voices, and claimed to know Bible verses and specifically to know where there were contradictory Bible passages. *Id.* at 65.

97. On cross-examination Yvonne testified that after the accident Mr. Gabrion was different when he was drinking. She conceded that when Marvin was not drinking, he was

normal.  *Id.* at 66.

98.  Christine Hermann testified that she was the youngest of Mr. Gabrion's three sisters, all of whom were older than the boys.  *Id.* at 69.  Their father worked as a crane operator on the day shift, and their mother worked "here and there" on the evening shift.  *Id.* at 71.  Their parents had a rocky marriage with lots of separations and physical fights.  Their uncles and their mother's boyfriend were in on the fights.  Their mother Elaine had a steady boyfriend for a number of years, and there were fistfights between Elaine and Marvin Sr. because of the affair. *Id.* at 72.  Christine testified that their mother was gone a lot, starting when Marvin Jr. was a toddler or preschooler.  Their father took the boys out of the home, and the girls did not know where they were.  The girls also took care of the boys a lot themselves.  There was some talk of the boys being adopted.  Sometimes when Elaine left, Marvin Sr. took two boys to his mother, and sometimes Elaine took some of the children with her.  Sometimes Elaine would be gone for months.  *Id.* at 73.  All the children knew Elaine's boyfriend fairly well.  *Id.* at 74.  One time when Elaine was gone their father had another woman in his bedroom, and he introduced her to the kids.  Their father had a very bad temper.  After one episode in which he angrily threw Michael up against the wall, Elaine stopped telling Marvin Sr. what the boys did.  *Id.* at 77. Christine testified that Elaine stopped telling Marvin Sr. what the boys did when they were young, and this continued until she concealed from him that the boys were serving time in jail. *Id.* at 78.  After the family moved to Round Lake and then to White Cloud, Marvin Sr. commuted from Grand Rapids on weekends.  Elaine continued her affair but at some point it ended.  Christine got married at age nineteen.  *Id.* at 79.  If any of the children cried, their father hollered at them.  He would also mock them and say they were crying "crocodile tears." Their father called Marvin stupid and told him he did not know what he was talking about.

When Marvin had pneumonia, he made faces at himself in the mirror, and his father told him to "go back to bed, foolish." *Id.* at 81. Marvin had a temperature of 106 and almost died. His father would not take him to the doctor. Their father treated his children like they were not worth anything. *Id.* at 82. Both parents have had their front teeth broken by the other parent. *Id.* at 83. The kids put pillow over their heads trying to get some sleep. *Id.* at 84. Each sister had different responsibilities for raising the boys. *Id.* at 85. Marvin was clumsy, and this was probably related to his lung surgery. *Id.* at 86. After Christine married, she still saw her family, but Marvin stayed away because his father always said, "you don't know what you're talking about." *Id.*

99. On cross-examination, Christine agreed with the prosecutor that she had spent nineteen years in the Gabrion household; witnessed the fights between her parents, the infidelity, the drinking, the yelling at the kids; and yet married at age nineteen, raised one child, and worked at her job. *Id.* at 92. During her time with Marvin, she did not see any behavior that caused her to think that he would rape and murder the victim. *Id.* at 93.

100. On redirect examination, Christine testified that she had had a fairly successful life, but that her brothers had made of wreck of their lives. Mike has been in prison for most of his adult life. David spent time in jail, did not have a home, and paid child support for two children who did not have his name. *Id.* David usually did not have a job. Christine moved out of the Gabrion house as soon as she could. *Id.* at 94.

101. Marvin Gabrion testified in the afternoon following the testimony of his family members. Rather than responding to questions posed by defense counsel, Mr. Gabrion read a prepared statement. Mr. Gabrion began by saying that he was going to make a statement of facts. He claimed that he had worked for the CIA and said he is willing to take sodium

67

pentothal to prove that all that he said was the truth.   Tr., March 14, 2002, Excerpt 49, at 4.   Mr. Gabrion said that he had heard his friend Wayne Davis reporting to Child Protection Services that one of the government witnesses, Ms. Lazo, had done inappropriate things with her children. *Id.* at 4.   He stated that the stereo belonged in part to his brother David, and the amp belonged to Marvin Gabrion himself.   Mr. Gabrion next claimed that no one ever questioned him about the dead frog or the doll with bodily fluids on it.   *Id.* at 5.   Mr. Gabrion stated that the Casses were members of the Davidian church, based in Waco, Texas, and were pedophiles, and that their friend Ms. Sturdivant was also a pedophile.   *Id.*   Mr. Gabrion testified that he was called "Minerva" and "It" in his childhood, but his childhood was "no worse than the average poor white person in rural Michigan."   He conceded that there was "a lot of love and a lot of hate," but said that "[i]t was just growing up."   *Id.* at 6.   He concluded by stating that he was going to die of noncontagious hepatitis C within five years, and that it would cost taxpayers at least two million dollars to have him executed.   *Id.*

102.   On cross-examination, Mr. Gabrion was asked about a letter he wrote to the *Buffalo News* after he was arrested in Buffalo.   He stated in the letter that he unofficially acted as Robert Allen's payee representative for Social Security checks.   Mr. Gabrion said that he wanted to publicize the situation between himself and Mr. Allen.   *Id.* at 7-8.   He pointed out that he was arrested for drunk driving in New York, but then the federal government decided to charge him with Social Security fraud.   *Id.* at 9.   Mr. Gabrion and Mr. Allen met in 1993 or 1994 when both lived in Grand Rapids.   *Id.*   They went into the bank together and had Mr. Allen's Social Security funds deposited into his account with Mr. Gabrion as his personal representative.   *Id.* at 10.   Mr. Gabrion testified that he also spoke to a *Newaygo County Today* reporter who published a story which included his statement "about the campsite and other

68

things." *Id.* at 10-11.   With the assistance of his attorney David Stebbins, Mr. Gabrion had obtained IRS approval to establish a charitable trust called "No More Missing Children." *Id.* at 12.   The prosecutor asked whether Mr. Gabrion had told Tim Timmerman about the charitable trust when he wrote to ask for a picture of his missing granddaughter, Shannon.   Mr. Gabrion said he thought he got the picture from Kim VerHage.   He then denied doing what Joseph Lunsford said he had done with the picture of Shannon.   *Id.* at 14.   Mr. Gabrion admitted that he was arrested for assault with a deadly weapon other than a gun in 1987, but said that he and the other person were both quite drunk and he did not intentionally drive his car into the other person.   *Id.* at 15.   The prosecutor concluded by asking Mr. Gabrion about the quality of life he would have if sentenced to prison.   Regarding "three square meals a day," Mr. Gabrion retorted that "[y]ou get European little chunks of food, man.   You don't get no food.   You get little tiny European portions.   I'm starving." *Id.* at 16.   The prosecutor also pointed out that he would have a roof over his head, would get to live his life, and would receive visits from his family. *Id.*   Finally, the prosecutor stated, "Rachel Timmerman and Shannon VerHage will never get visits from their family ever again, will they?"   Mr. Gabrion responded, "And you'll never get a visit from God for what you just said." *Id.* at 17.

103. Mr. Gabrion was provided an opportunity for redirect testimony, but he said that it was controversial and related to the victim's family's grief, which he said they had every right to feel, "[w]hether you want to believe that I did it or not." *Id.*   Defense counsel Paul Mitchell then objected and said that Mr. Gabrion's testimony went beyond the scope of cross-examination, and Mr. Gabrion said he was finished. *Id.* at 18.

104.   Dr. Newton Jackson was the final defense witness.   Tr., March 14, 2002, Excerpt 50, at 3.   Dr. Jackson was the Evaluation Services director at the Michigan Center for Forensic

69

Psychiatry and had a private practice as a forensic psychiatrist.   At the state facility, he routinely evaluated criminal defendants for insanity and competency to stand trial.   *Id.* at 4.   Prior to his testimony in this case he had testified ten to fifteen times.   He met with Mr. Gabrion on June 25 and July 5, 2001.   *Id.* at 6.   He also reviewed medical, jail, Bureau of Prisons, school and employment records as well as the social history prepared by the defense mitigation investigator. *Id.* at 7.   Based on their first meeting Dr. Jackson concluded that Mr. Gabrion had delusional ideas, impaired ability to concentrate and maintain attention, and both thought disorder and mood disorder (based on his racing thoughts, history of some depression, and bizarre quality of some material he presented during the interview).   *Id.* at 8.   Given that their first interview included no back and forth conversation and consisted only of a one-sided monologue by Mr. Gabrion with bizarre and tangential thoughts, Dr. Jackson concluded that it was not "remotely possible" that Mr. Gabrion could provide valid information in response to standard psychological tests.   *Id.* at 9-10.

105.   In his second interview, Dr. Jackson thought that Mr. Gabrion was presenting exaggerated symptoms, but that there were also symptoms of an underlying thought and mood disorder.   *Id.* at 11.   As with his first interview, there was no dialogue, and it was impossible for Dr. Jackson to conduct an adequate interview or to perform any psychological testing.   *Id.*   This second interview lasted only forty-five minutes.   *Id.*   Dr. Jackson ended the interview after Mr. Gabrion became more hostile and demanding, and less communicative.   *Id.*   Dr. Jackson again concluded that although it seemed that some of Mr. Gabrion's responses were malingered, there may still have been some underlying problems or disability.   *Id.* at 12.   He believed the symptoms included the quality of his language, his racing thoughts, and the "very bizarre quality of the way he connected ideas."   *Id.* at 12-13.   Dr. Jackson was not able to make a

70

determination as to what his disorder might be.  *Id*. at 13.

106.   Dr. Jackson testified that his third visit with Mr. Gabrion took place on December 11, 2001.   Mr. Gabrion knew that Dr. Jackson was a psychologist and started the interview by telling Dr. Jackson that he was being treated unfairly at the jail.   He seemed very angry at his attorneys and the criminal justice system.  *Id*. at 13-14.   When Mr. Gabrion understood that Dr. Jackson would not be able to have him transferred to a different jail, he became so angry and threatening that Dr. Jackson terminated the interview.  *Id.* at 14.   Dr. Jackson believed that Mr. Gabrion's anger was genuine, but it was impossible to conduct a typical psychological test.  *Id*. at 15.

107.   Dr. Jackson testified that he had interviewed a few family members in the first three months of 2002.  *Id*. at 16.   Based on his review of the records and the ten-page Abridged Social History as well as his limited contacts with Mr. Gabrion, Dr. Jackson concluded that adverse influences present during his developmental years and in his adulthood may have seriously affected Mr. Gabrion.  *Id*. at 17.   Mr. Gabrion's hospitalization as a young child, which involved being taken away from his parents, could have also had serious effects.  *Id*. at 17.   There may have also been adverse effects from witnessing the frequent domestic violence and alcohol abuse by both parents.  *Id*. at 18.   In addition, Dr. Jackson testified, there was physical violence to the children, extramarital affairs, and absence of the primary caretakers, all of which were negative influences.  *Id*. at 19.   Dr. Jackson testified that the degree to which these influences impacted Mr. Gabrion's ability to establish an adequate foundation for adulthood was not known, but it was well known that such factors can have a serious effect on a child's development.  *Id*.   Mr. Gabrion's mother was sometimes gone for months.   The father worked long hours and drank heavily.  *Id*. at 20.   According to Dr. Jackson, another factor,

71

though not necessarily "drastic," was that Mr. Gabrion was not the child preferred by his mother. *Id.* at 21.   As a young person, Mr. Gabrion did not exhibit problems such as crime, violence or drinking, but instead was described as sweet and caring.   He ran from fights and had no behavioral problems in school.   The puzzle, Dr. Jackson testified, was how such a young person could have transformed to an adult with very profound disturbances in his functioning.   *Id.* at 21-22.

108.   Dr. Jackson testified that he suspected that although Mr. Gabrion presented as an adequate child, "the underpinnings for the future simply had not been created."   *Id.* at 22. Within a couple of years of high school Mr. Gabrion began to drink heavily and abuse other substances.   He managed to get a job and obtain training, but the layering of his substance abuse on the inadequate foundation led to grave outcomes.   *Id.* at 23.   These outcomes included multiple motorcycle accidents resulting in head injuries.   *Id.* at 23-24.   Although there were few records for the accidents, Dr. Jackson opined that he had to consider the possibility that the brain injuries or organic damage caused by the accidents, combined with alcohol and substance abuse and inadequate socialization during his developmental years, would worsen Mr. Gabrion's potential.   *Id.* at 24.   In other words, Dr. Jackson explained, all of these things combined would "reduce a person's capacity to respond appropriately and in a socialized way."   *Id.*

109.   In conclusion, trial counsel elicited Dr. Jackson's opinion that Mr. Gabrion had several features of personality dysfunction, including impulsivity, exaggeration, and a desire to be the center of attention.   Dr. Jackson said that although his symptoms did not amount to one single diagnosis, Mr. Gabrion had the features of several types of personality disorders, including some borderline, some histrionic personality, and some antisocial features.   *Id.* at 25.   In addition, Mr. Gabrion had a disordered pattern of thinking, resulting from his inadequate

socialization, his history of alcohol and substance abuse, and his head injuries.   *Id.* at 25-26.
Trial counsel continued to elicit harmful descriptions of Mr. Gabrion as narcissistic, egocentric, unconcerned for others, and untruthful.   Dr. Jackson testified that Mr. Gabrion had narcissistic qualities, such as wanting to be the center of attention and the person who is admired and looked to for the answers.   Dr. Jackson said that such a person is egocentric, unable to see others as deserving of concern and consideration.   *Id.* at 26.   Dr. Jackson reiterated that Mr. Gabrion had misrepresented the truth at times, but claimed that these misrepresentations did not mean that Mr. Gabrion had no underlying mental problems.   Dr. Jackson explained that Mr. Gabrion had genuine deficits that "go far beyond anything he might embellish and malinger about."   *Id.* at 27.   Dr. Jackson testified that malingering is one of the primary things he looks for in his psychology practice.   *Id.* at 28.   Any positive conclusions from Dr. Jackson were tentative and qualified at best.   Dr. Jackson clarified that he did *not* see Mr. Gabrion as mentally ill, but only as someone who had some psychological difficulties.   *Id.* at 29.   He said it was possible to view these as individual parts of a puzzle or as an accumulation of factors that influenced Mr. Gabrion's psychological development.   An individual piece might not be significant, and "much more extensive" dialogue with Mr. Gabrion would be necessary to determine the impact of the pieces on the whole person.   *Id.* at 30.

110.   On cross-examination, the Government's first question to Dr. Jackson was whether he viewed Mr. Gabrion as mentally ill.   Dr. Jackson replied that Mr. Gabrion was *not* mentally ill.   *Id.* at 31.   Dr. Jackson also conceded that Mr. Gabrion had adult antisocial behaviors, was reckless, and displayed lack of empathy for others.   *Id.* at 31-32.   Dr. Jackson wrote a report dated February 21, 2002, but some of his interviews with family members did not take place until March 2002.   The prosecutor cited several examples of what he called Mr. Gabrion's

sophisticated knowledge – such as his understanding of the legal term hearsay, his involvement in establishing a 501(c)(3) tax-exempt nonprofit, and his appreciation of the jurisdictional issues between state and federal government.  *Id.* at 34-35.

111.    On the crucial question of whether Mr. Gabrion had actually been involved in motor vehicle accidents, the prosecutor pointed out that Dr. Jackson's report said "if those events occurred" and "[d]etails of these reportedly serious injuries have not been located."  *Id.* at 36. The prosecutor also pointed out that Dr. Jackson's report mentioned that parts of Mr. Gabrion's presentation had a practiced manner.  *Id.* at 37-38.   The prosecutor concluded by reading part of Dr. Jackson's report which said that while Mr. Gabrion had exhibited behaviors which "appear to be genuine symptoms" of thought and mood disorders, it is possible that his manifestations of impaired judgment and lack of insight may be "deliberately malingered" in order to compel others to act responsively to his different roles.  *Id.* at 39.

112.    On redirect examination, trial counsel elicited Dr. Jackson's clarification that he did not mean to suggest that Mr. Gabrion had any cognitive deficits.  *Id.*   However, Dr. Jackson did testify that because of the consistency in reports from records, social histories and family member interviews, he had no reason to doubt that Mr. Gabrion had been in motor vehicle accidents.  *Id.* at 40.   Overall, Dr. Jackson had frequently rebutted himself, but the Government was not content to leave even a shred of Dr. Jackson's ambivalent, self-contradictory, but occasionally sympathetic testimony unrefuted.   A devastating series of rebuttal witnesses followed.

*The Government's Rebuttal of the Defense Mental Health Evidence*

113.    The Government began its rebuttal with a lay witness, Scott VanderVeen.   Tr.,

74

March 14, 2002, Excerpt 51, at 3.   This witness gave his version of a bizarre motor vehicle accident that he portrayed as an insurance scam organized by Mr. Gabrion.   Mr. VanderVeen testified that when he first met Mr. Gabrion in 1992, Mr. Gabrion offered to pay Mr. VanderVeen forty dollars to drive him to Indiana.   *Id*. at 4-5.   In Indiana Mr. Gabrion retrieved two briefcases from a postal box.   Mr. VanderVeen did not know what they contained.   *Id*. at 6. Mr. Gabrion wanted to make sure that the witness had insurance coverage for his car.   *Id*.   Mr. VanderVeen told Mr. Gabrion that he was receiving Social Security disability benefits.   *Id*.   At some point after returning from Indiana, Mr. VanderVeen saw Mr. Gabrion at the home of Dennis and Mary Cartwright.   Mr. Cartwright and Mr. Gabrion were drinking, and Mr. VanderVeen drove Mr. Gabrion to buy more alcohol.   *Id*. at 8.   Although there was a liquor store nearby, Mr. Gabrion asked Mr. VanderVeen to drive to another one twice as far away. During the drive Mr. Gabrion asked Mr. VanderVeen again whether he had insurance coverage for his car, and Mr. VanderVeen told him that he did.   *Id*. at 9.   Mr. VanderVeen also told Mr. Gabrion that he was about to receive his Social Security money.   *Id*. at 10.   Mr. Gabrion purchased a lot of alcohol and then directed Mr. VanderVeen to take a very circuitous route back to the Cartwright house.   *Id*.   When they came to an open field, Mr. Gabrion grabbed the steering wheel and drove the car off the road.   *Id*. at 11.   The car did not hit anything, and neither Mr. Gabrion nor Mr. VanderVeen was injured.   Mr. Gabrion wanted to stay in the car. *Id*. at 12.   However, Mr. VanderVeen took off running, and Mr. Gabrion went with him.   *Id*. at 13.   As they ran in the woods, Mr. Gabrion rammed his shoulder and banged himself on "every big tree he could see in the woods."   *Id*. at 14.   The police eventually found them in the woods, and Mr. Gabrion requested an ambulance.   This took place on March 28, 1992.   *Id*. at 14.

114.   Mr. VanderVeen testified that during the next month following the accident, he

75

was hospitalized in a diabetic coma.  *Id.* at 15.   After Mr. VanderVeen regained consciousness, Mr. Gabrion came to his hospital room and proposed a scheme in which Mr. Gabrion would sue Mr. VanderVeen's insurance company and split the proceeds of the claim.  *Id.* at 16.   Mr. VanderVeen had Mr. Gabrion removed from the room.  *Id.* at 17.   A judgment was ultimately entered against Mr. VanderVeen, and at the time of his testimony he had been paying twenty-five dollars a month.  *Id.*   On cross-examination, Mr. VanderVeen admitted that his insurance had lapsed, and that the judgment against him was from the Uninsured Motorist Fund.  *Id.* at 18. Mr. VanderVeen said that Mr. Gabrion had been drinking heavily the night of the accident and that he did tell a police officer at the scene that Mr. Gabrion had pulled the car off the road.  *Id.* at 19.

115.   Following brief testimony by Patricia Kuharevicz confirming that Mr. Gabrion had applied for and received Social Security disability benefits after he was rejected from the Hope Network program, the Government called its first rebuttal expert.   Dr. David Griesemer, the chair of the Neurology Department at the University of South Carolina, was the Government's first rebuttal expert.  Tr., March 14, 2002, Excerpt 52, at 3.   At the time of his testimony, the focus of Dr. Griesemer's clinical practice was epilepsy.  *Id.* at 5.   The Government had asked Dr. Griesemer to review records pertaining to Mr. Gabrion's case and provide an opinion about whether there was evidence of neurologic impairment.  *Id.* at 6.   Dr. Griesemer had testified in three prior criminal cases; this was his first time testifying for the prosecution.  *Id.*   Prior to his testimony, he reviewed hospital records, including CT and PET scans and an EEG report, police reports, and interview transcripts, but he did not interview Mr. Gabrion.  *Id.* at 7.

116.   Dr. Griesemer explained the functions of CT scans, EEGs and PET scans.  *Id.* at 8-9.   Dr. Griesemer testified that he did not see any objective evidence of brain injury in Mr.

76

Gabrion. *Id.* at 9.   He explained that the level of brain function is fairly constant over time, but that there is continued improvement in function for up to two years following initial injury-related impairment.   *Id.* at 9-10.   By contrast, however, Mr. Gabrion's psychological and neuropsychological test results showed a substantial loss of functioning over a ten-year period. *Id.* at 10.   Dr. Griesemer testified that these results cannot be explained by traumatic brain injury.   *Id.* at 11.   According to the psychological test results, Mr. Gabrion's level of functioning was so low that he would be unable to care for himself or plan his day.   *Id.*   The test results were inconsistent with Mr. Gabrion's actual level of functioning, including his ability to travel, apply for a passport, obtain a false driver's license and baptismal certificate, engage in complex banking transactions, and falsify his identity to receive someone else's Social Security benefits.   *Id.* at 11-12.

117.   Dr. Griesemer testified that the clearest suggestion of low-level brain functioning was from psychological or neuropsychological evaluations of Mr. Gabrion.   *Id.* at 12.   After discussing frontal lobe syndrome and the acceleration-deceleration type injuries which commonly result from car accidents, Dr. Griesemer testified that he did not see evidence of that type of brain injury in reviewing Mr. Gabrion's records.   *Id.* at 16.   The PET scan of Mr. Gabrion's brain had 190 images.   *Id.* at 17.   Dr. Griesemer testified that even though there was subtle asymmetry present, it was not clearly an abnormal study.   *Id.* at 19.   He explained that PET scans were not typically used to evaluate head-injury patients except in research studies. *Id.* at 20.   He stated that he did not believe there was any evidence of brain injury demonstrated by the scans.

118.   The prosecutor reviewed Mr. Gabrion's actions in planning and carrying out the murder of Rachel Timmerman and the disappearances of John Weeks and Wayne Davis, and Dr.

77

Griesemer agreed that Mr. Gabrion's actions demonstrated an "extraordinary capacity to plan and to sequence and to anticipate problems," contrary to the abilities of someone with temporal lobe dysfunction with its attendant memory, attention, and organization problems. *Id.* at 21-22. Dr. Griesemer also agreed that getting the Social Security Administration to issue a new card and opening a bank account in upstate New York would be beyond the capabilities of someone with Mr. Gabrion's test results. *Id.* at 23. The Government expert testified that Mr. Gabrion had some features that were suggestive of Geschwind or frontal lobe syndrome, but that he "falls far short of meeting criteria for making either diagnosis." *Id.* at 24. Dr. Griesemer concluded by stating that a frontal lobe syndrome patient would be very impulsive and prone to temper outbursts. Mr. Gabrion's actions, as described by the prosecutor, however, were thoughtful, organized, and carried out over several months, and therefore they were inconsistent with either Geschwind or frontal lobe syndrome. *Id.* at 24.

119.    Trial counsel David Stebbins cross-examined Dr. Griesemer. He began by establishing that there are cognitive and behavioral specialties within the field of neurology. *Id.* at 25. Dr. Griesemer testified that he reviewed neuropsychological testing conducted on Mr. Gabrion on the following dates: March 24 to 30, 1993; March 23 to 31, 1993 [sic]; October 5, 2001; February 20, 2002; May 8, 2000; and August 15 to October 12, 2001. *Id.* at 26. In some areas there were changes from 1993 to 2001. However, Dr. Griesemer had reviewed Dr. Ryan's report and noted in conclusion that Mr. Gabrion was malingering and the results of the neuropsychological tests were invalid. *Id.* at 27. Dr. Griesemer agreed that the doctors who examined Dr. Gabrion in 1993 believed that the results of the neuropsychological tests that they administered were valid. *Id.* at 28-29. Based on the test results and also their observations of Mr. Gabrion's behavior and social interactions, they concluded that Mr. Gabrion had

78

neuropsychological deficits and could not be rehabilitated. *Id.* at 29.   However, Dr. Griesemer testified that there was increasing malingering with each subsequent exam; the overall neuropsychological reports in 2000, 2001 and 2002 were considered invalid by the examiners. *Id.* at 30.   He said it was not useful to compare valid results with invalid ones, and the invalid test results only serve to show that Mr. Gabrion was "unwilling or unable to participate in even elementary tests used to evaluate brain-injured patients of all degrees of severity." *Id.*

120.   Dr. Griesemer agreed with defense counsel's assessment that Mr. Gabrion may have been malingering, but the neuropsychological tests were not valid and cannot be used for any real purpose other than showing Mr. Gabrion's unwillingness or inability to participate. *Id.* Of the 190 PET scan images, Dr. Griesemer saw an asymmetry in metabolic uptake between the two brain hemispheres in two images. *Id.* at 32.   He did not think it had specific diagnostic significance because brain injuries that result from head trauma are typically symmetric, subfrontal, and anterior temporal, and because the asymmetry is not in an area that "would be selectively affected by traumatic brain injury." *Id.* at 33-34.   There was no sign of extensive injury on just one side of Mr. Gabrion's brain (as might occur if a car accident caused the person to hit the windshield at an angle). *Id.* at 34.

121.   Dr. Griesemer reiterated on cross-examination that PET scans are not typically used as diagnostic tools in the management of head injury, but are most commonly used in the area of epilepsy, epilepsy surgery, and brain tumors. *Id.* at 35-36.   Other ways to diagnose possible brain damage include reviewing the clinical history, specifically looking for periods of unconsciousness, performing a neurologic examination and performing neurological testing. *Id.* at 36.   A PET scan is not normally used as a diagnostic tool, but is appropriately used in conjunction with a review of records, history and behavior. *Id.* at 37.   Dr. Griesemer testified

79

that in this case there was a lack of objective evidence of unconsciousness, but there were two normal neurologic examinations, three CT scans with normal findings, and two unremarkable EEGs, and then a decision to obtain a PET scan looking for some evidence of abnormality. *Id.* at 39. Defense counsel pointed out that there was also a neuropsychological examination showing some brain deficits and unusual behavior suggestive of brain damage and asked whether Mr. Gabrion's unusual behavior was valid information in diagnosing brain damage. *Id.* Dr. Griesemer agreed that a history of bizarre behavior was useful information, but stressed that someone's real-life performance was a more appropriate indicator of their neuropsychological function than their performance in an artificial test setting. *Id.* at 39-40.

122. The next day, March 15, 2002, the Government called its last two rebuttal experts, Drs. Thomas Ryan and Gregory Saathoff. Thomas Ryan, Ph.D., had a private practice in clinical neuropsychology and was an assistant clinical professor of psychiatric medicine at the University of Virginia. Tr., March, 15, 2002, Excerpt 54, at 3. Dr. Ryan had examined Mr. Gabrion twice: on February 20 for two hours and on February 21 for four hours, including administration of malingering tests. *Id.* at 8. Dr. Ryan explained in his testimony that as a result of research in the field of neuropsychology there were now good malingering measures. *Id.* He testified that he was 95 percent sure that Mr. Gabrion was malingering, or intentionally fabricating symptoms that do not exist. *Id.* at 9. Dr. Ryan compared the malingering measures on the test he administered in 2002 with the exact same malingering measures administered by Dr. Waalkes in 1992. *Id.* People with traumatic brain injuries, even severe ones, get better over time, typically in a twenty-four-month post-injury period. *Id.* at 10. According to Dr. Waalkes's 1992 data, Mr. Gabrion performed within the mild or moderate range, but according to the tests administered by Dr. Ryan, Mr. Gabrion performed within the profoundly impaired

80

range.  *Id.*   The severe decline over a ten-year period did not make any clinical sense, according to Dr. Ryan.  *Id.* at 11.

123.   Dr. Ryan described the Rey 15-item Memory Test as a test which is typically administered to brain-injured people because memory problems are their primary complaint.  *Id.* The Rey 15-item test involves showing fifteen different items for ten seconds.  *Id.* at 12. According to Dr. Ryan, severely mentally retarded people can earn scores of eight, so a lower score indicates the person is intentionally giving the wrong information.  *Id.* at 13.   Mr. Gabrion scored six out of thirteen.   The pattern and process by which he reproduced the items also indicated malingering.  *Id.* at 14.

124.   Dr. Ryan administered two additional malingering tests, including three trials of the forced choice measure.   On all three trials Mr. Gabrion scored worse than the results obtained from known brain-injured individuals.  *Id.* at 15.   Dr. Ryan explained that Dr. DeMier had administered the same test of memory malingering in 2001, and Dr. DeMier indicated that Mr. Gabrion was malingering.  *Id.* at 16.   The concept of ecological validity compares the value of test performance to real-world functioning.  *Id.*   Dr. Ryan testified that the difference between Mr. Gabrion's test scores and his real-world functioning made no sense from a clinical standpoint.   Mr. Gabrion would need assistance with daily living if he were as impaired as his neuropsychological test scores indicated.   Instead, he was engaging in complex activities, such as traveling and opening bank accounts.  *Id.* at 17.   Dr. Ryan concluded his direct examination by stating emphatically that, based on all the tests he performed and his review of the records, he saw no evidence of significant traumatic brain injury, and that Mr. Gabrion was malingering. *Id.* at 18.

125.   On cross-examination, Dr. Ryan agreed that he would not administer malingering

81

tests with patients in a clinical setting.  *Id.* at 19.   Dr. Ryan agreed that Dr. Waalkes had indicated in his 1993 report that there were questions about the validity of the MMPI and that while the neuropsychological tests had many inconsistencies, Dr. Waalkes was able to find some neuropsychological deficits.  *Id.* at 20-21.   To conclude that Mr. Gabrion was malingering, Dr. Ryan looked at three sources: performance on malingering measures, comparison of data over time (1993 to 2002), and real-world functioning.  *Id.* at 22.   If Mr. Gabrion were as profoundly impaired as test scores indicated, he would have extreme difficulties even in a structured jail setting.  *Id.*

126.   Dr. Ryan explained that even though the three sources indicated that Mr. Gabrion malingered on the neuropsychological tests, he could still conclude that there was no traumatic brain injury, and that Mr. Gabrion was actually functioning at a higher level than exhibited in the testing situation.  *Id.* at 23-24.   Dr. Ryan suspected that Mr. Gabrion was malingering in the 1993 evaluation based on his review of the test data.  *Id.* at 24.   On the Rey Complex Figure Test in 1993, Mr. Gabrion fabricated details that were not on the original figure, while memory-impaired people will remember the outline but not the details.  *Id.* at 24-25.   Trial counsel pointed out that Dr. Waalkes did not make the same determination that Mr. Gabrion was malingering, but Dr. Ryan countered that Dr. Waalkes was treating patients in a rehabilitation facility and did not consider the possibility of malingering at that time.  *Id.* at 25.   The cross-examination concluded with Dr. Ryan and trial counsel agreeing that experts on both sides were paid for their work, as Dr. Ryan was in this case.  *Id.* at 26.

127.   The final prosecution witness was Dr. Gregory Saathoff, M.D., an associate professor of clinical psychology at the University of Virginia, a consulting doctor at two Virginia state prisons, an attending physician at Western State Hospital psychiatry teaching program, and

82

a conflict resolution specialist.  *Id.* at 27-29.   Dr. Saathoff reviewed a large box of Gabrion materials, including the testimony that Mr. Gabrion gave during the week before Dr. Saathoff's evaluation.  *Id.* at 30.   Dr. Saathoff met with Mr. Gabrion on March 8, 2002, at Kent County Jail for three hours and forty-five minutes.  *Id.* at 31.   During the interview, Mr. Gabrion became irritable when talking about women.   He did not deny having a psychiatric condition or disability.  *Id.* at 33.   Dr. Saathoff's focus during the interview was on Mr. Gabrion's claimed impairment.  *Id.* at 34.   Dr. Saathoff wrote in his report that Mr. Gabrion reported being abused by his sisters and his father as a child and that his childhood overall was traumatic.  *Id.* at 35. He quoted from his report: "I had a sister who seduced me over the years, then had a baby by me and then aborted it. My sister was always in command. She ordered me into it slowly but surely." *Id.*   Dr. Saathoff said that Mr. Gabrion had commented about female guards and employees. *Id.* at 36.   Dr. Saathoff noted that Mr. Gabrion reportedly spat at a female officer and called her a "motherfucking black nigger racist bitch."  *Id.* at 37.   Records also indicated that Mr. Gabrion called the Newaygo County state court prosecutor, Chrystal Roach, "the dishonest baby killer." *Id.*

128.   Dr. Saathoff testified that he found Mr. Gabrion's speech to be fluent and articulate.   Dr. Saathoff also recounted a story that Mr. Gabrion told him during the interview: when he was in the fifth grade, an older woman teacher tortured a bullfrog by paralyzing its brain with a needle, prompting a classmate to stand up with a gun and shout, "Die, bitch," a phrase which Mr. Gabrion loudly repeated three times.  *Id.* at 38-39.   Mr. Gabrion also told a story about witnessing a fellow lineman have his legs cut off by a falling metal object, saying, "His legs bled like a frog's and blood started squirting fifteen feet."  *Id.* at 39.   At another point in his interview with Dr. Saathoff, Mr. Gabrion referred to a prison guard as "that blonde bitch."

83

*Id.* at 40.   Dr. Saathoff continued recounting comments Mr. Gabrion had made about women during the interview: women are idiots, should not be trusted, and all belong to the American Witch Society (*id.* at 41); the four guilt phase witnesses are just "nasty assed bitches" (*id.* at 44); his own mother was "a bitch mother who stole my Christian bookstore and one year of disability checks" (*id.* at 45); and about Rachel Timmerman, he said, "Now she is happy.   Rachel was a sensitive, intelligent, decent girl."   *Id.*   Dr. Saathoff testified that he thought that Mr. Gabrion's suggestion – on the stand during his guilt phase testimony – that the Government had transported the victim's body from the privately-owned north side of the lake to the Government-owned south side of the lake showed that he understood a complex jurisdictional issue.   *Id.* at 47-48. Mr. Gabrion told Dr. Saathoff that he was in Vietnam and still had part of a land mine embedded in his foot, but Dr. Saathoff did not believe that Mr. Gabrion was actually in Vietnam.   *Id.* at 49. Mr. Gabrion did not apply for disability benefits for his claimed land mine injury.   *Id.* at 50.

129.   Dr. Saathoff administered three simple memory tests.   The first required Mr. Gabrion to say three words and then repeat them five minutes later.   Mr. Gabrion jokingly answered, "paper, rock, scissors."   *Id.* at 50-51.   Dr. Saathoff testified that Mr. Gabrion incorrectly stated the year as 2003, but according to Dr. Saathoff's review of his jail file, Mr. Gabrion always dated his requests with the correct month and year.   *Id.* at 52.

130.   Dr. Saathoff noted striking inconsistencies in the materials he reviewed: Mr. Gabrion's communications were different based on whether he wanted something or whether he wanted to appear impaired (some documents were possibly written with feces); there were inconsistencies on his recollection of what day it was, "striking inconsistencies compared with what Dr. Scharre told us to expect in his claims on being mentally ill," and inconsistencies between his tests and his observed level of function and between his religious views and his

84

activities concerning religion.  *Id.* at 56.  He noted additional inconsistencies: the materials that Dr. Saathoff reviewed suggested that Mr. Gabrion could not interact socially, but he was able to interact for almost four hours "when he thought it might be in his interest" to do so; there were inconsistencies between his claimed mental impairment and his actual ability to defraud people for Social Security benefits and to commit the murder in this case; and his claim that he was deprived of seeing movies in his childhood was inconsistent with the statement that he had seen the film *Deliverance* (which was produced in 1972 when Mr. Gabrion was nineteen years old). *Id.* at 57-58.

131.    On cross-examination Dr. Saathoff agreed that the final two sentences of his report read: "Mr. Gabrion's decision to malinger mental and cognitive impairment prevents an accurate neuropsychological assessment.  And without such an assessment, I am unable to discern whether he may have subtle deficits secondary to substance abuse or prior brain trauma." *Id.* at 59.  Dr. Saathoff confirmed that he was aware that Mr. Gabrion told Dr. Ryan that he does not feel that he has a mental disorder and this was the opposite of what he said to Dr. Saathoff.  *Id.* at 60.

*Closing Arguments at Sentencing*

132.    Assistant United States Attorney Timothy P. Verhey presented the Government's closing argument.  Tr., March 15 and 16, 2002, at 603-624.  He began by reminding the jury that they had convicted Mr. Gabrion of committing a shocking murder of a young mother who had just started her life with her baby daughter.  *Id.* at 603.  The prosecutor argued that this murder was just one chapter in the "horror story that is the life" of Marvin Gabrion because he had murdered five people, had shot at his neighbors, had physically beaten men, women and

children, and had sexually assaulted women and children. *Id.* In addition, according to the prosecutor, while in prison Mr. Gabrion had assaulted, threatened, made weapons, and tried to escape. *Id.* at 604.

133. The prosecutor reviewed with the jury what it must consider in order to reach its decision. First, the defendant was over eighteen years old when he committed the crime, and this was undisputed by the defense. Second, there was no dispute that the defendant intentionally killed Rachel Timmerman. *Id.* at 604-5. Several statutory aggravating factors had been established: a heinous, cruel or depraved killing (*id.* at 606); substantial planning and premeditation (*id.* at 607-8); obstruction of justice (*id.* at 608); victim impact (*id.* at 610); and future dangerousness (proved by past bad acts, *id.* at 611-16).

134. The prosecutor argued that Mr. Gabrion had been a menace even while incarcerated: Mr. Gabrion had impersonated the clerk of the court and tried to arrange his transfer from the Calhoun County Jail to the Milan federal prison. *Id.* at 616. Mr. Gabrion had been on his best behavior since he faced a possible death sentence, yet he had written harassing letters to the victim's family members. *Id.* at 617. The victim's father had taken a chance that sending a photo of his baby granddaughter to the defendant might help locate her, but Mr. Gabrion instead used the photo to do "unspeakable vile things." *Id.* at 618. While in jail Mr. Gabrion talked about escape, making soap guns, getting paperclips and fingernail clippers, and making plans to escape. *Id.* at 618–619. Guards and other inmates were in danger from Mr. Gabrion. According to the prosecutor Mr. Gabrion made a metal claw in the Newaygo County jail. *Id.* at 619. At the Milan federal prison he threw his urine and feces at a correctional officer, a deadly act because Mr. Gabrion had Hepatitis C. *Id.*

135. The prosecutor then discussed three people who he said were innocent bystanders

86

to Mr. Gabrion's plan to escape justice.    Robert Allen was used by Mr. Gabrion for his Social Security checks, and now is nowhere to be found, presumably killed by Mr. Gabrion.    *Id.* at 620. John Weeks connected the victim, Rachel Timmerman, with Mr. Gabrion, and disappeared after Mr. Gabrion said he had dropped him off in Arizona.    *Id.* at 620-621.    Wayne Davis was going to be a witness in the rape case against Mr. Gabrion, but Mr. Gabrion killed him and pawned his property.    *Id.* at 621-622.    The prosecutor summarized his discussion of the aggravating factors by reiterating to the jury that Mr. Gabrion had been and always would be a danger.    He argued that it was their civic responsibility not to let anybody else get hurt or killed.    *Id.* at 622.    The prosecutor dismissed the mitigating factors, saying that none were legitimate, and all were based on Mr. Gabrion's scams and feigned mental illness.    He concluded by arguing that the jurors were the only people who stood between "this person and your community."    *Id.* at 623.

136.    Trial counsel David Stebbins told the jury that Mr. Gabrion's actions in court that week had made his lawyers' situation more difficult.    Nonetheless, it was his duty as defense counsel to present factors which would suggest to the jury that life imprisonment is the appropriate sentence in this case.    *Id.* at 626.    Trial counsel acknowledged the terrible crime and the tragic set of events.    *Id.* at 627.    He told the jury that it was up to them to determine whether the aggravating circumstances had been proved beyond a reasonable doubt, but added: "We did not challenge many of them; we don't challenge them now."    *Id.* at 628.    However, trial counsel explained that since the government had presented two days of testimony on Gabrion's future dangerousness (his past assaults, threats of assaults, disappearance of three men, verbal and physical sexual assaults, his being out of control, his possession of prison contraband, his talk of escape, his dislike of jail, and his threats to guards). the defense would also discuss future dangerousness.    *Id.*

137.    Trial counsel's argument did not dispute Mr. Gabrion's dangerousness, but simply stressed that the Bureau of Prisons was capable of managing dangerous inmates: if sentenced to life in prison Mr. Gabrion would be confined in at least the penitentiary level.    The Bureau of Prisons was charged with keeping prisoners away from the community and with protecting employees and other inmates from harm.    In prison, Mr. Gabrion would have his communications with the outside world cut off.    *Id.* at 629.    The defense stressed that each example of Mr. Gabrion's previous bad behavior must only be considered to prove the one aggravating circumstance of future dangerousness.    *Id.* at 630.

138.    Trial counsel next argued that the jury must consider mitigation as an explanation of Mr. Gabrion's life, his history, how he got to this situation and why it happened.    *Id.* at 632. Trial counsel again stated that Mr. Gabrion himself had made the mitigation presentation difficult.    However, the defense had presented an honest explanation of what happened to him. *Id.* at 633.    The first area involved the psychological problems arising out of his upbringing and childhood.    Family members testified; they were the historians.    Professionals also testified; they said to look to the family, the patient and the records.    *Id.*

139.    Discussing the incoherent mitigation evidence, trial counsel said that the jury had heard some unpleasant evidence about a somewhat dysfunctional family, but not a terrible family: "It's not the worst thing, it's not wild accusations of constant child abuse or anything like that.    As one sister said, you know, a lot of times we had a good time."    *Id.* at 634.    On the other hand, trial counsel argued, there had been evidence about parents who were not home when they should have been, parents having affairs, parents who disappeared, leaving home for months at a time, alcohol abuse, violence between the parents and directed at the kids, not much support when the kids got older, not much guidance, not much in the way of parenting, and the family's

88

isolated settings.  *Id.*   Specifically, Dr. Jackson had testified about the factors of alcohol, violence, and abandonment, and what influences they might have on a person.  *Id.*

140.   Blaming Mr. Gabrion once again, trial counsel told the jury that Dr. Jackson had not drawn any conclusions because he could not get cooperation from Mr. Gabrion and could not test him.   Nonetheless, the psychologist testified that the factors cited by trial counsel would cause psychological problems.  *Id.* at 635.   Moreover, according to trial counsel, the jury knew such factors would cause psychological problems because "none of us" raise our children that way.   Trial counsel continued:

> We don't raise our children by fighting with our spouses in front of them.  We don't hit our children, we don't have violence in front of our children, and we don't abandon them.  We don't leave them for months at a time without explanation.  Because instinctively we know as human beings, as parents, and as people who have grown out of childhood that this is not a good thing.

*Id.*

141.   Without further explanation, trial counsel moved on to remind the jurors of the testimony of the high school principal and the girlfriend who described Mr. Gabrion as a normal guy in high school in spite of his home environment.  *Id.*   Trial counsel provided no explanation of how Mr. Gabrion had developed the psychological deficits that left him without the tools to face adult problems.   Absent expert testimony on the developmental issues, trial counsel was left to argue, "Instinctively I think you know that this kind of a childhood is going to have some kind of effect on you.   This may be the effect."  *Id.* at 636.

142.   Trial counsel reminded the jury that they had presented evidence about Mr. Gabrion's behavior as a young adult: he was irresponsible, drank a lot, sniffed inhalants, did drugs, drove drunk and high, and had a lot of accidents.  *Id.*   The jury had heard about brain injuries and whether Mr. Gabrion had motor vehicle accidents which might have caused them.

89

*Id.* Trial counsel conceded that he would be the "first to admit" that there were some questions about the existence of some of the accidents, and that the 1992 accident was not a serious accident. *Id.* at 637. Trial counsel also conceded that there is evidence that "Mr. Gabrion has spent his life scamming people." *Id.* He asked the jury to compare the evidence about Mr. Gabrion in his later years with his high school years. His family had described a significant change in his personality from 1971 to the early 1980s. *Id.* at 637-638. The Government presented evidence about Mr. Gabrion's abrasive and argumentative behavior in the eighties and nineties. Trial counsel argued that the jury needed to ask who would intentionally make himself so unpleasant as to drive people away, but expressed the hope that common sense would provide the answer that the defense evidence had failed to supply, besides the empty conclusion: "something went wrong." *Id.* at 638.

143. Trial counsel argued to the jury that Mr. Gabrion's behavior was not feigned. According to Dr. Scharre, nobody could pretend to act that way or sustain such inappropriate behavior for so long. *Id.* Since Mr. Gabrion had nothing to gain from acting inappropriately, the change must be attributed to the accidents about which his family testified. *Id.* at 639. The psychological testing done in 1993 showed that there were some neuropsychological deficits, and Dr. Waalkes testified that Mr. Gabrion was genuinely seeking help and not malingering. *Id.* The Hope Network did not let Mr. Gabrion in because he was "such a jerk," even though they believed that he needed rehabilitation. *Id.* at 640. Trial counsel urged the jurors to use their common sense to resolve the experts' disagreement about the PET scans. *Id.* at 641. He commented, "I don't think you malinger yourself into having everybody in the world hate you. That's not a positive outcome of feigned behavior." *Id.*

144. Nearing the end of his presentation, trial counsel reminded the jurors that they had

90

heard evidence of Mr. Gabrion's anger towards women, and asked them to provide an explanation that the Government expert had failed to seek:

> His mother, is that the source of it?   Maybe.   We haven't been able to find that
> out.   But your common sense can tell you that there may be; that being
> abandoned on a regular basis and having a somewhat unusual relationship with
> your mother because she's not there half the time may be a factor in this.

*Id.* at 642-43.   Counsel also reminded the jurors that they had heard a lot of expert testimony about malingering and presenting symptoms that could not be true or Mr. Gabrion would be in a vegetative state.   Trial counsel offered no explanation, but argued that the jury should not be surprised that Mr. Gabrion would lie and fake mental illness because he is secretive and paranoid about what he is hiding underneath.   *Id.*   Trial counsel posed questions to the jurors about why Mr. Gabrion might lie: "Is this a result of what's wrong with him or is he trying to get something from it?"   "Why does he malinger in such a way that nobody could possibly believe it because the person would have to be virtually comatose, incompetent, unable to speak?"   *Id.* at 644.   To try to answer these questions, trial counsel argued, the defense presented what it knew: his early psychological problems, his later bad behavior, and information about his psychological condition and his neuropsychological deficits.   *Id.* at 645.   In doing so, the defense had shown the jurors a very damaged individual, and the jurors did not need an expert to tell them that "[p]eople who are normal do not behave this way."   *Id.*   Defense counsel then posed two more questions: "Does that mean that the only appropriate sentence for him is to have him executed? The fact that he is damaged by factors that may not have been under his control?"   His answer offered no guidance to the jurors.   Trial counsel asked the questions, and then told the jurors simply, "I don't know."   Trial counsel concluded by summarizing that they had presented a strange, dangerous, damaged individual, and that the damage was caused by many factors, but did not excuse Mr. Gabrion's actions.   *Id.* at 646.   Defense counsel told the jury that the

91

mitigation to consider was how this damaged person was created, and that the mitigation should compel a life sentence.  *Id.*

145.  The Government's rebuttal argument, by AUSA VerHey, was brief, but effective. The prosecutor pointed out that Mr. Gabrion was in a federal penitentiary when he threw feces and urine at the correctional officer, raising the risk of infecting the officer with hepatitis C.  *Id.* at 647.  He asserted that there was no evidence of any accidents that resulted in brain injury. *Id.*  Moreover, the witness who testified about accidents out West said that Mr. Gabrion was already using a false identify before any accidents.  *Id.*  He emphasized that there was no proof in terms of hospital records or police reports, only "stories from the defendant."  *Id.* at 648.  He termed the 1992 accident "a scam, start to finish."  *Id.*  He portrayed the treating expert in the rehabilitation context as simply taking Mr. Gabrion's self-reports "at face value," whereas Dr. Ryan found he was "a huge malingerer" who was faking in 1992 and 2002.  *Id.* at 649.  Dr. Giesemer had told the jurors that the best indicator of impairment is what people do in real life, rather than in tests.  *Id.* at 650.

146.  The Government seized on the defense assertion that it had offered an explanation of what made Mr. Gabrion "the evil man he is":

> What's the point of all these mitigating factors?   Should you consider them?
> Well, if you're curious about why this man turned into the evil man he is, sure,
> you can think about it.   But that's not the issue here.   The issue here is whether
> any of these things should cause you to have mercy on this defendant.   And you
> shouldn't.   You shouldn't.

*Id.*  The prosecutor argued that the mitigating factors "don't balance the ledger book" (*id.* at 651) and Mr. Gabrion, in the three times he had addressed the jury, "not once told you he was sorry" (*id.* at 652).   He concluded, "If you let Marvin Gabrion walk out of here with his life, that will not be justice."  *Id.*

92

147.  Following jury instructions, the jury began deliberating on Friday afternoon and worked until after eight o'clock that night.  *Id.* at 675.  They returned at 9:00 A.M. on Saturday and within an hour and a half had reached unanimity on a verdict of death.  *Id.* at 677.  The defense proffered twelve mitigating factors.   All twelve jurors found that Mr. Gabrion had features of several personality disorders, but whether they found personality disorders mitigating is questionable, since they rejected any other factors relating to mental condition.   Only four found that Mr. Gabrion suffered from an "organically acquired" personality disorder.   Two jurors found the broad statutory factor of impaired capacity, but none found brain dysfunction, traumatic brain injury and neurological impairments, or severe mental or emotional disturbance. None accepted the proposition that Mr. Gabrion would not be a danger in the future if confined in a highly structured and secure federal prison.   Penalty Phase Special Verdict Form, filed March 18, 2002; unsealed March 25, 2002.

*What Went Wrong*

148.   It was obvious from the start that Mr. Gabrion's mental health was at the heart of the case.   As soon as the case was in federal court, both the magistrate judge and, shortly thereafter, the district court judge ordered competency evaluations.   These evaluations occurred before defense counsel had had an opportunity to investigate Mr. Gabrion's social history thoroughly, select confidential experts thoughtfully, and frame referral questions accordingly. When the competency evaluations began, trial counsel could only provide the experts with a ten-page summary of Mr. Gabrion's "Abridged Social History" reflecting only rudimentary knowledge from a narrow set of sources.   However, even when the Court's skeptical evaluators provided counsel with a preview of how Government experts might attack any mental health

93

evidence proffered by the defense, trial counsel failed to complete the thorough multigenerational social history investigation that was essential to reliable and credible mental health evidence.   The investigation needed to expand beyond Mr. Gabrion's immediate family to identify friends, neighbors, aunts, uncles, cousin, teachers, classmates, and co-workers who could provide insights into the family's dysfunction, Marvin's poor academic performance in spite of high intellectual potential, and every aspect of parental maltreatment and neglect. Numerous "red flags" should have prompted specific areas of investigation: the mother's "nervous breakdown," the parents' promiscuity and interpersonal violence, familial alcoholism and substance abuse, and the medical neglect of Marvin in childhood.   All the etiologies of potential brain damage needed to be investigated thoroughly: not just the traumatic head injuries, but the childhood fever, abuse of alcohol, inhalants and street drugs, and potential exposure *in utero* and in early childhood to neurotoxins.   The jury needed to hear from an expert who could explain in concrete terms the impact of all the developmental factors that put Mr. Gabrion at risk – an expert with firm opinions based on independently corroborated evidence, and a clear understanding of how mitigation evidence differs from traditional forensic questions of competency and sanity. Instead, trial counsel relied on an expert who showed no specialized understanding of mitigation and was dependent on the ten-page Abridged Social History that was somehow never revised to reflect more thorough investigation.   The expert was ambivalent about most of his own conclusions, and certain about only those that were harmful.

## Conclusions

149.   It is my considered professional opinion that trial counsel's duty to conduct a thorough and expansive multigenerational mitigation investigation was well-established at the

94

time of Mr. Gabrion's prosecution in 1999-2002.   As noted supra ¶ 148, there were numerous "red flags" in Mr. Gabrion's case that should have prompted further investigation by trial counsel.   "The many red flags noted above would have prompted a reasonable attorney to conduct additional investigation."   *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008). Accord *Rompilla*, 545 U.S. at 391 (Counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected.").   See also *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (Trial counsel "failed to act while potentially powerful mitigating evidence stared [him] in the face" and ignored evidence that "would have been apparent from documents any reasonable attorney would have obtained.").

150.   Trial counsel failed to conduct the thorough social history investigation necessary for an informed decision about what kind of mental health experts to consult and what issues the experts should address.   This case represents a classic example of how not to work with a mental health expert in a capital case.   See Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407, 424 (2014) (discussing how multiple appellate courts have recognized trial counsel's specific duty to investigate signs of mental health issues thoroughly, to choose experts wisely, and to provide experts with the appropriate background information that will enable them to render trustworthy opinions).

151.   The harm in this case is not just to Mr. Gabrion, whose life is in jeopardy, but to the jurors who rendered a life-and-death decision with insufficient information to produce a morally reliable result and to the justice system itself, which holds the public's trust only to the extent that its proceedings are fair and "appear fair to all who observe them."[24]

---

[24] This is Chief Justice Rehnquist's language in a case where he noted "the institutional interest in the rendition of just verdicts" as being just as important as the rights of the criminally accused.  *Wheat v. United States*, 486 U.S. 153, 160 (1988).  *See also* Justice Marshall's

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the States of California and Michigan, that the foregoing is true and correct and was executed this 2 day of December 2016 at Oakland, California.

RUSSELL STETLER

comment in *Ake v. Oklahoma*, 470 U.S. at 79: "The State's interest in prevailing at trial – unlike that of a private litigant – is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases."

96