# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARVIN CHARLES GABRION, II,           )
                                      )
                  Movant,             )
                                      )
         v.                           ) 1:15-CV-447
                                      )  HON. ROBERT HOLMES BELL
                                      )
UNITED STATES OF AMERICA,             )
                                      )
                  Respondent.         )


**MOTION FOR EVIDENTIARY HEARING**

Comes now, Marvin Gabrion, by counsel, and moves the court for an evidentiary hearing on his §2255 motion.  In support of this motion, movant would show the court:

1.  On April 27, 2015, movant filed his "Motion Under 28 U.S.C. §2255 To Vacate, Set Aside, or Correct Sentence By a Person In Federal Custody".  (Dkt. #1).  In that motion, movant asserted numerous grounds that he contended required his conviction and death sentence to be vacated and set aside.

2. The government responded on January 25, 2016.  (Dkt. #42).

3. On December 2, 2016, movant filed a Motion for Leave to File a First Amended Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody.  The proposed Amended Motion was attached.

4. A hearing can be denied only if the §2255 motion, the files, and records of the case *conclusively* show that the movant is entitled to no relief.  This is a very high standard and one that cannot be met here.  A hearing is required because the facts which support the claims are outside the record.  A hearing is necessary to

1

resolve these contested evidentiary issues.  These claims are more fully developed in the attached memorandum.

5.  Movant requests a hearing both on the first §2255 motion and the amended §2255 motion that is pending the court's approval for filing.  If the court grants leave to file the amended motion, movant requests a hearing only on that motion.

6.  Mr. Gabrion reasserts his requests for discovery as he contends he has shown good cause for same.  The matters requested in discovery are necessary for a fair presentation of his claims at an evidentiary hearing.

WHEREFORE, Marvin Gabrion, by counsel, moves the court to set a date for an evidentiary hearing and for any and all other relief to which he may be entitled.

Respectfully submitted,

By: /s/ *Monica Foster*
    Monica Foster
    Attorney for Movant
Business Address:
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
(317) 383-3520

By: /s/ *Joseph M. Cleary*
    Joseph M. Cleary
    Attorney for Movant
Business Address:
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
(317) 383-3520

By: /s/ *Scott Graham*
    Scott Graham
    Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327-0585

Date: December 19, 2016

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARVIN CHARLES GABRION, II,     )
          )
        Movant,     )
          )
       v.     ) 1:15-CV-447
        ) HON. ROBERT HOLMES BELL
          )
UNITED STATES OF AMERICA,     )
          )
        Respondent.     )

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR EVIDENTIARY HEARING**

1.     <u>The statutory basis for the requested hearing</u>.

The standard for receiving an evidentiary hearing in a §2255 case is statutorily

defined:

> Unless the motion and the files and records of the case
> conclusively show that the prisoner is entitled to no relief, the
> court shall cause notice thereof to be served upon the United
> States attorney, grant a prompt hearing thereon, determine
> the issues and make findings of fact and conclusions of law
> with respect thereto.

28 U.S.C. §2255(b).

The Rules Governing Section 2255 Proceedings indicate that this language is

intended to incorporate the standard governing evidentiary hearings in habeas corpus

cases that was articulated by the United States Supreme Court in <u>Townsend v. Sain</u>,

372 U.S. 293, 312 (1963).  See Advisory Committee Notes to Rule 8, Rules Governing

1

Section 2255 Proceedings (incorporating Advisory Committee Notes to Rule 8, Rules Governing Section 2254 Cases). In <u>Townsend</u>, <u>supra</u>, 372 U.S. at 312, the Court articulated the following standard for determining when an evidentiary hearing is mandatory: "Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding."

Of course, in §2255 cases, unlike §2254 cases, there is no prior habeas proceeding, in which an evidentiary hearing could have been conducted on the movant's claims. However, the basic principle is the same: an evidentiary hearing is warranted when (1) there are disputed issues of fact that cannot be conclusively resolved on the basis of the extant record alone, and (2) those facts, if true, would entitled the movant to relief.

    2.    <u>Case law articulating when an evidentiary hearing must be held.</u>

The United States Supreme Court addressed the issue of when an evidentiary hearing is required in a §2255 proceeding in <u>Machibroda v. United States</u>, 368 U.S. 487 (1962). There, the Court remanded for an evidentiary hearing to determine whether the movant's plea was involuntary because it was allegedly induced by promises made by the prosecuting attorneys to the length of the sentences that would be imposed. The movant submitted an affidavit that alleged that on three separate occasions, the Assistant United States Attorney ("AUSA") had promised him that if he pled guilty he would receive a sentence of not more than twenty years; that the AUSA cautioned him

not tell his defense lawyer about the offer, and that if he didn't obey, the AUSA would raise two other previously uncharged robberies; and that the movant had sent a letter to both the AUSA and the sentencing court regarding the misrepresentations of the AUSA, to which he received no reply.

In response, the AUSA filed an affidavit denying any promises or coercion with respect to the movant's plea, but admitted to speaking with the movant in the county jail the day before the co-defendant's trial, and telling the movant that this was his last opportunity to tell the truth, and that the sentencing court might well take into consideration the movant's refusal to talk.  The district court decided, without a hearing, that the movant's allegations were false.  The district court noted that it received no letters from the movant mentioning any alleged agreement with the AUSA, nor did the movant timely complain when no request was made by the AUSA for a reduction of sentence.

The Supreme Court held that the district court did not act in conformity with the provisions of §2255.  As it noted:

> This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the "files and records" in the trial court.  The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light.  Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

Marchibroda, supra, 368 U.S. at 494-95.  The Court rejected the government's argument that a hearing in the case would be futile because of the apparent lack of any

3

other witnesses to the alleged occurrences, other than the movant himself and the

AUSA:

> The petitioner's motion and affidavit contain charges which are detailed and specific.  It is not unreasonable to suppose that many of the material allegations can either be corroborated or disproved by the visitors' records of the county jail where the petitioner was confined, the mail records of the penitentiary to which he was sent, and other such sources.  Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge.  The government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.  On this record it is his right to be heard.

Marchibroda, supra, 368 U.S. at 495 (citation and quotation marks omitted).

The Court was careful to note that its decision was not meant "to imply that a

movant must always be allowed to appear in a district court for a full hearing if the

record does not conclusively and expressly belie his claim, no matter how vague,

conclusory, or palpably incredible his allegations may be.  The language of the statute

does not strip the district courts of all discretion to exercise their common sense."

Machibroda, supra, 368 U.S. at 495.  That said, the Court held the specific and detailed

factual assertions by the movant, "while improbable, cannot at this juncture be said to

be incredible.  If the allegations are true, the [movant] is clearly entitled to relief.

Accordingly, we think the function of [§2255] can be served in this case only by

affording the hearing which its provisions require."  Machibroda, supra, 368 U.S. at 496.

See also, Arredondo v. United States, 178 F.3d 778 (6th Cir. 1999) (evidentiary hearing

4

required unless the record conclusively shows that the petitioner is entitled to no relief;

failure to grant evidentiary hearing reversed).

In Sanders v. United States, 373 U.S. 1 (1963), the Court dealt with the question

of whether to grant a hearing on a successive §2255 motion.  The movant's first motion

alleged no facts but merely the conclusions that (1) the indictment was invalid, (2) the

movant "was denied adequate assistance of Counsel as guaranteed by the Sixth

Amendment," and (3) the sentencing court has "allowed the [movant] to be intimidated

and coerced into intering (sic) a plea without Counsel, and any knowledge of the

charges lodged against the [movant]."  In denying the motion, the district court

explained that the motion lacked any supporting facts for the allegations, and that, in

any case, the allegations were completely refuted by the files and records of the case.

Sanders, supra, 373 U.S. at 5.

Several months later, the movant filed a second §2255 motion, this time alleging

that at the time of his trial and sentence he was mentally incompetent as a result of

narcotics administered to him while he was held in the county jail pending trial.  He

stated in a supporting affidavit that while he was confined in the jail before and during

trial he had been intermittently under the influence of narcotics; and that he had been

administered narcotics by the medical authorities in attendance at the jail because he

was a known addict.  The district court again denied the motion without a hearing,

stating that the movant should have raised these issues at the time that he had filed the

first motion, and also that the claims were meritless.  The Ninth Circuit affirmed.

5

In reversing and remanding for an evidentiary hearing, the Court noted that the district court's ruling that the "files and records of the case" refuted the movant's allegations was erroneous, as movant's allegations concerned facts which were necessarily outside the extant record:

> But the "files and records of the case," including the transcript could not "conclusively show" that the claim alleged in the second motion entitled the petitioner to no relief.  The crucial allegations of the second motion was that petitioner's alleged mental incompetency was the result of administration of narcotic drugs during the period petitioner was held at the . . . jail pending trial in the instant case.  However regular the proceedings at which he signed a waiver of indictment, declined assistance of counsel, and pleaded guilty might appear from the transcript, it might still be the case that petitioner did not make an intelligent and understanding waiver of his constitutional rights.  For the facts on which petitioner's claim in his second application is predicated are outside the record.  This is so even though the judge who passed on the two motions was the same judge who presided at the hearing at which petitioner made the waivers, and the later hearing at which he was sentenced.  Whether or not petitioner was under the influence of narcotics would not necessarily have been apparent to the trial judge.  Petitioner appeared before him without counsel and but briefly.  That the judge may have thought that he acted with intelligence and understanding in responding to the judge's inquiries cannot "conclusively show," as the statute requires, that there is no merit in his present claim.

Sanders, supra, 373 U.S. at 19-20 (internal citations omitted).

In Fontaine v. United States, 411 U.S. 213 (1973), the movant filed a §2255 motion to vacate his prior plea to federal robbery charge on the grounds that his plea had been induced by a combination of fear, coercive police tactics, and illness, including mental illness.  The district court denied the motion without a hearing, reasoning that

6

since the plea colloquy conformed with the requirements of Fed. R. Crim. Pro. 11, the movant could not now collaterally attack the record and deny his prior statements on the record attesting to the knowing, voluntary and intelligent nature of his plea.  The movant appealed the ruling, arguing that under the plain wording of §2255 and the Machibroda decision, he was entitled to an evidentiary hearing on his claims.

In reversing and remanding for an evidentiary hearing, the Supreme Court began by noting that the movant's §2255 motion "set out detailed factual allegations regarding alleged circumstances occurring after his arrest and before his appearance in court." Fontaine, supra, 411 U.S. at 214.  The motions described "physical abuse and illness from a recent gunshot wound that required hospitalization which was documented by records tendered in support of his petition.  The records also show that a month following his plea he was again hospitalized for heroin addiction, for aggravation of the earlier gunshot wound and for other severe illnesses." Id.  The movant also alleged in his motion that he was subjected to a prolonged interrogation during the period preceding his plea, and that the sum total of these circumstances resulted in a coerced confession, waiver of counsel, and the uncounseled plea of guilty. Id.  Referring to the statutory standard, the Court stated:  "On this record, we cannot conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under §2255[.]" Id.

These cases, in tandem with the statutory authority cited above, express a liberal standard that requires hearings in cases where (1) the movant has plead facts with specificity that, even if unlikely, are not palpably incredible; and (2) factual disputes exist

7

which would benefit by an adversary proceeding where the movant has the opportunity to present his case from extra record evidence.  The fact that the court has previously sat through the trial is not a sufficient reason to deny an evidentiary hearing if the movant has extra record evidence to support his claims.  Where the facts supporting the claim occurred outside of the courtroom, and therefore, outside the purview of the judge and court reporter, hearings are required.  <u>Scott v. United States</u>, 349 F.2d 641 (6th Cir. 1965).  Movant will demonstrate below that he meets this standard and an evidentiary hearing is required.

      3.     <u>Claim-by-claim discussion of why an evidentiary hearing is required here.</u>

**<u>Ground 1</u>:**  In this Ground, movant alleges the government presented numerous witnesses and argument that left a false or misleading impression with the jury which the government failed to correct.  In each instance, the government knew these claims were false.  These include:  (a) false testimony presented by Chrystal Roach and argument regarding movant's alleged motivation to kill Ms. Timmerman; (2) argument that movant "forced" Ms. Timmerman to write certain letters that supported the government's false motive theory; (3) argument that Ms. Timmerman was last seen alive on June 3 which supported its false motivation theory but was itself not true; and (4) penalty phase argument urging the jury to kill movant because he could not be contained by the Bureau of Prisons (BOP) when the government prevented the jury from hearing accurate evidence and receiving an instruction indicating BOP could impose all necessary conditions of confinement to protect the public from movant.

These claims have each been plead with exacting specificity.  Moreover, each of them requires the court to hear and consider evidence not contained in the extant record.  In each instance, the falsity of the evidence/argument requires proof outside the record.  The government's knowledge of the falsity of its claims also requires proof outside the record.

(a)  The false evidence of motive.

Ms. Roach's testimony was the centerpiece of the government's theory regarding motive, i.e. that movant manipulated the CSC case in order to delay it and prevent Ms. Timmerman's testimony until she was released from jail so he could kill her.

In support of the government's theory, Ms. Roach testified that had there been a preliminary hearing in the CSC case, Ms. Timmerman's testimony could have been preserved for its use at trial even if she became unavailable; that she tried to have preliminary hearings in every sexual assault case for these reasons; and that there was no preliminary hearing in movant's case.  She also testified she believed movant's CSC case was moving too slowly so she asked for a pretrial conference in April 1997.  Roach testified she asked for a preliminary examination in order to get Ms. Timmerman's testimony under oath.  With the exception of the legal standard for introduction of the prior recorded testimony of an unavailable witness, all of this was false.  Her false testimony was not corrected by the government, and was not challenged the defense.

Proof of what actually occurred in movant's CSC case which contradicts Roach's testimony and the government's argument is not in the record of his murder case and must be proven by evidence outside the record.  Proof that Ms. Roach in fact never

9

asked for preliminary hearings in CSC cases also must be and can be proven by evidence outside the record of the murder case.  Proof that the government knew or should have known all of this also can and must be proven by extra record evidence.

The government's claimed motive was important to its presentation at the guilt phase but it was also critical at penalty phase because it supported the statutory aggravating factor of "substantial planning and premeditation" and the nonstatutory aggravating factor of "obstruction of justice."

> (b)  The false evidence that movant "forced" Ms. Timmerman to write various letters that supported the false motive theory.

At trial, the government presented evidence and argument that movant "forced" Ms. Timmerman to write letters to her family and various officials involved in the CSC case.  According to the government, these letters were an attempt by movant to cover up his involvement in Ms. Timmerman's murder and also supported the government's theory that movant killed Ms. Timmerman to silence her in the CSC case.  These theories too, were false and the government knew it.

The government's contention that movant "forced" Ms. Timmerman to write these letters according to his "script" is refuted by three (3) FBI agents: Steven Kives, Sue Adams and Chris Whitcomb, who will testify that the FBI conducted a forensic analysis of these letters and concluded that the letters were written by Ms. Timmerman, that they were markedly different from movant's writings, that Ms. Timmerman was probably not under extreme duress when she wrote the letters, and that movant probably did not dictate them.  The jury did not hear this evidence.  The evidence of the forensic analysis is not contained in the record of the murder case.

10

An evidentiary hearing is necessary so that movant can show the falsity of the evidence and argument offered by the government at trial and government's knowledge of those falsities.

(c)  The false evidence that Ms. Timmerman was last seen alive on June 3rd .

The government contended that Ms. Timmerman and her daughter Shannon were lured out of their home by movant, or a man acting on his behalf, on June 3rd, two days before the government falsely contended she was to testify against movant on the CSC case.  This time line is integral to the government's motive theory.  If Ms. Timmerman's freedom of movement was impeded only *after* June 5th, the day the government contended she was supposed to testify against movant, its motive theory would not work.  So, the government contended Ms. Timmerman was never seen alive after June 3rd.

This, too, turns out not to be true.  Movant has identified a number of people who saw Ms. Timmerman alive after June 3, 1997 in his §2255 motion and the amended motion.  Additional evidence supports movant's claims.  It is undisputed that the clothes Ms. Timmerman wore when she left home on June 3rd were not the clothes she was wearing when she surfaced in Oxford Lake.  No missing persons report was made until weeks after June 3rd.  The testimony of these persons – who were not presented at trial and whose versions are not contained in the record – is required for a fair review of this claim.  Movant is also prepared to present evidence to establish the government knew its contentions that Ms. Timmerman was never seen after June 3rd were false.

11

The false evidence of motive contained in a, b, and c above was a centerpiece in the government's prosecution of movant.  It was unquestionably considered by the jury when it returned its guilty verdict.  This false evidence of motive was also used to argue in the penalty phase the gateway factor of substantial planning and the nonstatutory aggravator of obstruction of justice.  This evidence left a false and misleading impression on the jury in both the guilt and penalty phases which was never corrected by the government.

(d)    A crucial issue of fact exists relating to the government's claim that movant would be a danger to other persons in the Bureau of Prisons (BOP).  The government convinced each of the jurors that movant would be a danger, and this theme was one of the most important ones to the government's penalty phase argument.  The problem here, which should be resolved following an evidentiary hearing, is that the jury received incomplete and inaccurate information regarding the manner in which the BOP would be able to control movant to guarantee he was not a danger to inmates or staff.  Movant has pled, and would prove at a hearing, that he would not be a danger and he should have the opportunity to prove his position at a hearing.  He should have been able to present such evidence at trial, but was prevented by government objections and his own counsel's lack of preparation.  Movant would show at a hearing that the BOP and the government had at their disposal many methods of progressive discipline and control designed to maintain safety in BOP facilities.  These are identified in the Claim One D of the Amended Motion.

In this regard, it would be a travesty if the incomplete proof presented at trial stands when another capital movant was granted relief on precisely the same issue based on facts far less compelling than movant will present at an evidentiary hearing. Movant's motion repeatedly cites United States v. Johnson, a case originating in the Northern District of Illinois and proceeding through the Seventh Circuit, as authority for the proposition that a jury is entitled to know the very things about security that were not presented here, whether the failing was the result of government misconduct or ineffective assistance of counsel.  This is particularly true in light of the evidence presented at penalty phase concerning movant's failure to follow the rules in the various places he was incarcerated pretrial and his §2255 evidence will account for that evidence.

(e)    Additional False Testimony.

A material issue of fact exists regarding the question of whether relief is appropriate based on the repeated presentation of false testimony of key witnesses. Mr. Gabrion has identified a number of these witnesses, such as Linda Coleman, Gregory Leon and Nathan Brewster, and has described what those witnesses said that was false.  Coleman lied about the timing of her ownership of specific vehicles, Leon failed to disclose an extremely advantageous arrangement with the authorities disposing of a rape case against him and Brewster lied about his criminal record.  A hearing should be conducted on this material issue so that the court is in a position to evaluate both the individuals involved and the pattern of false testimony.

13

**Ground 2:**    In this Ground, movant alleged that he was denied his right to conflict free representation when Chris Yates, an attorney who represented a key witness against movant, consulted with movant personally, as well as, his attorneys.  As to this conflict claim, the Government argues movant has not shown that Mr. Yates provided any advice to counsel or movant nor has he shown that there was any adverse effect on counsel's performance.

This is a factual dispute that can only be resolved via an evidentiary hearing.  In his amended petition movant alleges that Mr. Yates consulted in person with movant and consulted with his lawyers regarding a number of matters, including, but not limited to: where movant should be incarcerated pre-trial, how counsel should deal with Judge Bell, whether or not to appeal the court's ruling on jurisdiction, and in apparently unsuccessful efforts to find movant's social security disability records.   The extent of Mr. Yates' involvement in movant's defense was not something which was a matter of record at trial and is a factual dispute that would benefit from an adversarial proceeding where movant could present his case with evidence from outside the record.

More importantly, in his amended motion movant has alleged that at the same time he was providing advice to movant and his counsel, Mr. Yates was representing Joseph Lunsford, a key witness against movant.  Mr. Lunsford has testified by affidavit that one of the key facts he testified to at trial was actually suggested to him by Mr. Yates and is false.  This is a critical factual dispute that cannot be fairly determined without an evidentiary hearing.

14

Based upon the facts that movant has pled in his amended motion, which include a recent affidavit and documents from the time of trial, movant asserts that at an evidentiary hearing movant will be able to present evidence and prove that Mr. Yates substantively consulted with counsel and with movant and that this adversely effected counsel's performance.  Moreover, had the conflict been acknowledged at trial, it is likely Mr. Yates would have been removed from both cases given the severity of movant's situation.  Had he been removed, replacement counsel for Mr. Yates would not have permitted Mr. Lunsford to falsely testify he had witnessed movant masturbating to a photo of baby Shannon.  This false fact was uniquely compelling in the case for death due to its abject depravity and perversity.

**Ground 3:**  In his amended petition movant has alleged that he was denied the effective assistance of counsel at the guilt phase of his trial.  Movant has made very specific allegations as to counsel's deficient performance and supported those allegations with documents and affidavits.   The Government has disputed most, if not all, of the factual allegations made by movant.  Those facts, if proven, entitle him to relief and an evidentiary hearing is warranted.

The defense team for guilt phase consisted of three people; trial counsel and investigator Trish Hubbard.   Trial counsel was unable to secure consistent funding for Hubbard and this resulted in an interruption in service for most of 2000.  Consistent payment was not established until 2001, nearly two years after indictment and less than one year prior to trial. This negatively impacted counsel's ability to effectively represent

15

movant.  The impact of the funding difficulties is outside the records and requires an evidentiary hearing.

Movant has also alleged in his amended petition that counsel were ineffective in failing to retain a pathologist.  The Government has responded to movant's allegations in his original petition by claiming "it is hard to imagine another forensic pathologist putting the defense in any better position than Dr. Cohle's concessions during cross-examination."

A hearing would render pointless the need to "imagine" the benefit of another forensic pathologist.   Movant's counsel have consulted with Dr. Daniel Spitz, a forensic pathologist and medical examiner of Macomb County, Michigan.  Dr. Spitz's affidavit is attached to the amended petition and is incorporated here.  Dr. Spitz reviewed Dr. Cohle's autopsy report, autopsy photos, Dr. Cohle's guilt phase testimony, and Dr. Cohle's penalty phase testimony.

Dr. Spitz agrees with Dr. Cohle's conclusion in the autopsy report that Rachel Timmerman's cause of death was homicidal means. Based upon his review of the above items it is his opinion that there is nothing in the available forensic evidence from which a competent medical examiner can conclude that Ms. Timmerman drowned.

Dr. Cohle's testimony at movant's trial was that her likely cause of death was drowning.  Dr. Spitz noted that this was not Dr. Cohle's conclusion in the autopsy report. At trial, Dr. Cohle did not testify as to any additional facts that he learned that would have changed his opinion.  The only facts upon which Dr. Cohle could have based his trial opinion on appear to come from a hypothetical question asked by the Government

16

at trial which assumed that Ms. Timmerman was seen alive and unbound on the shore of Oxford Lake.

Dr. Spitz testified in his affidavit that it cannot be determined from the available forensic evidence whether or not Ms. Timmerman died before or after she entered the waters of Oxford Lake. Based upon the available forensic evidence it cannot be excluded that Ms. Timmerman died of asphyxia before she entered the waters of Oxford Lake.  The signs of asphyxia can be subtle and there was too much decomposition of Ms. Timmerman's body to be able to tell if she was asphyxiated.

An evidentiary hearing is warranted as there is a factual dispute as to the cause of Rachel Timmerman's death and more importantly whether or not it was established that she was murdered on federal property.  It can be conclusively shown that trial counsel sought and received funds to retain a pathologist though this is not in the trial record.  An evidentiary hearing at which a pathologist would testify would establish both the defective performance and prejudice prongs of Strickland v. Washington, 466 U.S. 668 (1984).

In a similar vein there was further evidence that would have undermined the government's theory as to Ms. Timmerman's disappearance.  First, the government presented evidence that Ms. Timmerman, who was on probation at the time she disappeared, was thriving on probation and had turned her life around.  In fact, she was not thriving on probation and it had been recommended that she leave her father's house and go into a more structured at setting at a residential center in Grand Rapids – Liz's House.  This would have meant that Ms. Timmerman might have had her own

17

reasons for disappearing. In spite of the fact that this evidence was available to counsel, counsel did not effectively present it to the jury.

Additionally, evidence that Ms. Timmerman might have had her own reasons for leaving her father's house on June 3, 1997, and not returning would have been consistent with the numerous accounts of family and friends who saw Ms. Timmerman alive in the days after June 3.  This was, of course, a time that the Government alleged she had been kidnapped by movant.  The above evidence – Roach's deceptions and additional facts as to Ms. Timmerman's disappearance – were not presented at trial and warrant and evidentiary hearing as to counsel's failure to present this to the jury.

Counsel also failed to contest the false evidence and arguments posited in Ground 1, much of which was known to the defense through discovery.  For example, the defense should have known that the government's theory that movant manipulated the process in the CSC case was false based upon the grand jury testimony of the judge in that case.  Judge Drake testified he had reviewed the docket sheets and concluded movant did not manipulate the process.  Defense review of the docket sheet and transcripts in the CSC case would reveal that much of Ms. Roach's testimony was false.  The FBI forensic analysts' report opining that movant neither wrote nor dictated the letters from Ms. Timmerman was produced in discovery. The failure to present this evidence and the failure to object to the government's false arguments is inexplicable. Much of the evidence that Ms. Timmerman had been seen alive after June 3rd was produced in discovery.  Discovery is not part of the extant record.  At a hearing, the court would also hear from trial counsel about their investigation and strategies and how

18

that might impact an assessment of whether their conduct fell below prevailing professional norms and whether movant was prejudiced. A hearing is necessary for the court to fairly review this claim because it cannot be conclusively said that movant is entitled to no relief.

**Ground 4:** Among counsel's omissions was their failure to direct a thorough investigation into movant's family history. The social history produced by the trial team was a mere ten pages long. It provided a cursory review of movant's life influences and relied upon a limited number of sources. One area that went completely unexplored was movant's extended family's history of severe mental illness, alcoholism, substance abuse, and criminogenic conduct. The records attached to the trial social history were overwhelmingly from a single car accident in 1992, and resulting medical treatment. The social history such as it was, was completed nearly two years prior to trial and never updated. What was presented at the penalty phase of movant's trial tracks the social history. Experts asked about movant's family history of mental illness prior to trial and were told the team had not discovered any such history.

Attached to the amended §2255 is the Declaration of Russell Stetler, the nation's foremost expert on capital penalty phase defense norms. That Declaration is incorporated herein in its entirety. Mr. Stetler avers that at the time of movant's trial, it was common practice and constitutionally required for capital defense counsel to conduct an extensive and complete social history investigation. Moreover, "whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to

19

trauma and toxins, environmental exposures, head injuries etc." Stetler Declaration, ¶ 18. Counsel did neither. As a consequence, mental health experts called by both parties were uninformed about the extraordinarily severe mental illness that includes in-patient hospitalizations that runs through movant's immediate and extended family. This is a critical omission because there is a genetic link to the sorts of mental illnesses suffered by the Gabrion family, making it dramatically more likely movant suffers mental illness.

Also, attached to the amended §2255 motion is the social history prepared by current counsel's investigation which is incorporated here, as well as, the affidavits by the authors of the social history, Danielle Waller and Betsy Wilson. Ms. Waller and Ms. Wilson aver that each fact contained in their social history is supported by a document or witness. This exhibit, extensively corroborated by records created well before Ms. Timmerman's death and by persons with no motive to falsify or exaggerate, demonstrates the multi-generational mental illness and substance abuse issues that existed in movant's family. Had this document been provided to the experts who examined movant for competency, there is a reasonable probability that he would have been found incompetent to stand trial.

As argued in Ground One, an evidentiary hearing is necessary for the fair resolution of claims surrounding the numerous false impressions the government left uncorrected with the jury, including Ms. Roach's false testimony concerning movant's motive to kill Ms. Timmerman, the government's arguments that movant forced Ms. Timmerman to write the letters received by her father and officials involved with the

20

CSC case, and the government's arguments that Ms. Timmerman was last seen alive on June 3rd.  These claims are relevant to the ineffective assistance of counsel at the penalty phase claim because of counsel's various failures to correct this false evidence and argument.  An evidentiary hearing is necessary for a fair resolution of those claims for the same reasons it is necessary for the Ground One claims.

As noted in Ground One and Ground Three, counsel was ineffective in failing to present evidence indicating that movant was not a danger to others in the BOP, and in failing to rebut the government's extensive claims establishing dangerousness. Solely because of counsel's deficient performance, the jury received incomplete and inaccurate information regarding the manner in which the BOP would be able to control movant to guarantee he was not a danger to inmates or staff.  Movant has pled, and would prove at a hearing, that he would not be a danger and he should have the opportunity to prove his position at a hearing.  His counsel should have gathered evidence establishing this fact and failed to do so.  Movant would show at a hearing that the BOP and the government had at their disposal many methods of progressive discipline and control designed to maintain safety in BOP facilities.  These are identified in the Claim One D of the Amended Motion.  Movant would show that this proof was available to trial counsel, as it was available to and used by other counsel working contemporaneously in other capital cases.

Movant has identified a material issue of fact relating to the repeated presentation of false testimony of key penalty phase witnesses such as Linda Coleman, Gregory Leon and Nathan Brewster (Claim One E).  Trial counsel rendered deficient

21

representation by failing to investigate and then prove that Coleman lied about the timing of her ownership of specific vehicles, Leon failed to disclose an extremely advantageous arrangement with the authorities disposing of a rape case against him and Brewster lied about his criminal record.  A hearing should be conducted on is material issue so that the Court is in a position to evaluate both the individuals involved, the pattern of false testimony, and the reasons why counsel failed to investigate these crucial issues.  Again, the material issue of fact goes to both Claim One and Claim Three, as well as this claim (Four) alleging ineffective assistance of counsel at the penalty phase.

Movant has alleged that he suffered many head injuries that a reasonably competent investigation would have revealed.  Some of the corroboration of these head injuries was contained in documents possessed by trial counsel but inexplicably not utilized by them.  But much of the support for these head injuries was unknown to trial counsel.  Failure to utilize what they had and failure to discover movant's other head injuries through a competent investigation both constitute professional conduct that falls below the prevailing professional norms of reasonably competent counsel.  Because none of this evidence is in the record, the court must hold an evidentiary hearing.

At trial, the government contended movant was malingering not only mental illness but that he was malingering as to the effects of his car accident and head injury in 1992.  It should have been apparent that malingering was going to be an issue because it was contained in various reports generate pretrial regarding movant's competency.

22

Questions about movant's brain and its functioning, as well as, whether he was malingering were relevant to the jury's decision. A thorough investigation into the head injuries suffered by movant was essential and constitutionally required. An evidentiary hearing is warranted as movant has pled facts supporting that he had suffered many more head injuries than the jury was aware of and that a reasonably competent investigation would have uncovered these head injuries. Moreover, the documents supporting some of these head injuries were readily available to counsel and may have even been in their possession. Fair review of this claim requires an evidentiary hearing.

Trial counsel failed to select appropriate experts and failed to provide the experts they did present with appropriate and required information to make reliable judgements. Specifically, the facts generated by a thorough and constitutionally adequate investigation reveal the need for numerous additional experts including the following:

(a) An expert on substance abuse and alcoholism who could draw the necessary parallels between movant's family history and his vulnerability to such disease as well as its connection to mental illness.

(b) An expert in chronic trauma who could explain to the jury why a childhood such as movant's impacts that child into adulthood and makes him vulnerable for developing substance abuse problems and mental illness.

(c) A properly qualified expert concerning the BOP and future dangerousness who could testify competently about the security differences between BOP facilities and some of the local facilities where movant was housed pretrial, as well as, the restrictions BOP could impose upon difficult inmates to reduce

23

security concerns. Given the difficulties with movant's pretrial detention, it is imperative for such an expert to actually meet movant and rebut each of the security concerns raised by the government. This expert would also have reviewed evidence of movant's positive reports contained in his BOP file and offered insights into those and how they impact his potential to be a future danger.

(d) A competent mental health professional who could testify about movant's mental health difficulties in a manner that was actually mitigating. Such an expert would draw upon the investigation conducted by §2255 counsel and explain why movant's family history of mental illness bears upon his vulnerability to develop similar illness and how that history rebuts the government's malingering theory. The expert presented by trial counsel was ill advised about movant's background, and presented movant's mental health vulnerabilities in an incorrect, incomplete, and unsympathetic manner. Indeed, he testified movant was not suffer from mental illness when in fact movant is quite mentally ill and has been for decades.

(e) An expert in neurology who could testify about the impact of movant's numerous head injuries and what one would expect to see in neuroimaging as a consequence of those injuries. Such an expert would correct the false testimony offered by the government neurologist that head injuries require loss of consciousness to cause damage and that head injuries are expected to get better and not worse over time. A constitutionally competent presentation

24

requires that such an expert must have *actually met and examined movant*.  The neurologist presented by trial counsel never met movant and testified that movant suffered from a controversial disease for which there was little support.  This was constitutionally deficient conduct.

Mr. Stetler has testified via affidavit that this case presents a "classic example of how not to work with a mental health expert in a capital case."  Stetler Declaration, ¶150.  The court has not heard the mitigation presentation that was constitutionally required.  All of the above evidence is outside the existing record and requires an evidentiary hearing.

Another portion of this claim relates to trial counsel's failure to contest or rebut the penalty phase evidence presented by the government.  Some of these deficiencies are failures to argue the evidence was irrelevant and/or that its prejudicial impact exceeded its probative value.  In those instances, no evidentiary hearing is necessary or requested.

But other parts of counsel's failures in the penalty phase involve failure to challenge evidence illegally seized (the bullfrog evidence) or failures to impeach critical witnesses with prior convictions, mental health histories, failure to report shocking details at times one would expect, or deals they received for testifying.  These include Linda Coleman, Greg Leon, Lonnie Overton, Jason Cross, Ailene Wolf, and Nathan Brewster.  The government presented evidence that movant established a 501 (c )(3) corporation and argued this was proof he was malingering.  The truth is that his counsel was instrumental in handling this matter on his behalf.   The government claimed in the

25

penalty phase that movant killed baby Shannon as well as Ms. Timmerman.  But there was a plethora of unpresented evidence that baby Shannon was still alive and may have been sold on the black market.  Because none of this evidence is in the record, and is critical to a fair determination of the claim, an evidentiary hearing is required.

**Ground 5:**  Movant alleges he was tried while he was incompetent.  This claim focuses on the failure to assist counsel prong of incompetence.  Movant behaved bizarrely during the run up to trial and during trial itself.  The signs and symptoms of movant's mental disturbance were so apparent from his communications, *pro se* motions, and behavior in court that the magistrate judge *sua sponte* ordered a competency evaluation in 2000 before the death penalty was even filed.

As early as 1999. The magistrate remarked:

> I am beginning to worry about your competence because of the things you say in your letters to me and because of the decisions you seem to want to make because I can't believe anybody in their right mind would want to do this . . . .I'm beginning to worry that you really don't understand what's going on here when you say that your lawyers are Satanic, when you say that your lawyers are conspiring with Janet Reno to frame you.

The magistrate also expressed concern that "[t]he more you make these claims that don't seem to have any basis in fact, the more I begin to wonder whether you understand the proceedings and you can make rational decisions."  He noted that one of these claims that defied reality was movant's assertion "that I've verbally abused you".  The court correctly noted, "I don't know what you're talking about there either."  The magistrate raised concerns that movant was unable to stay on topic.  "You know, I

26

raise one thing and you answer with another . . . . When I raise "A" and you answer with "B" it makes me think that there's not much of a connection."

Later that month, on November 30, 1999, the magistrate issued an order directing movant to submit to a competency evaluation. It is unclear what happened as a result of that order because there appears to be no evaluation conducted nor report generated. On January 31, 2000, the magistrate issued another order committing movant for a competency examination.

Dr. Fallis conducted an examination and issued a report finding movant competent and malingering. Dr. Fallis defined malingering as "the intentional production of false or grossly exaggerated physical or psychological symptoms. Such production of symptoms is motivated by external incentives, such as avoiding prosecution in this case." Dr. Fallis concluded movant "did not show evidence of a known mental disorder but, rather, seems to be faking a mental illness in order to help in his criminal case." Fallis Report, pg. 17. She noted movant "wished the judge to rule that [he] is competent to stand trial . . . .", a finding that would clear the way for trial. Movant also spoke to Dr. Fallis about his "interest in going to the 'death chamber' in order to bring attention to the plight of missing children." Dr. Fallis's report contains factual statement that are now known to be untrue, i.e., that movant was neither physically nor sexually abused and that he did not demonstrate any strange behavior until after he was indicted for murder.

In spite of these false factual statements and seemingly contrary conclusions, no hearing was held. There was no adversary process engaged to test the reliability of these conclusions.

27

Around this same time counsel was involved in the authorization process for the death penalty.  Counsel complained of "difficulty communicating with Mr. Gabrion", a refrain that would haunt this case to its conclusion.

In the summer of 2001, Judge Bell ordered another competency evaluation, this time by a local examiner.  The court ordered this evaluation based upon movant's "vituperative and mean spirited letters, his restlessness and angry outbursts in the courtroom, his inability to show respect to the court, and his apparent inability to cooperate with his counsel."  Dr. Frank evaluated movant.  Her report relied in part upon Dr. Fallis' report, and reached similar conclusions.  No hearing was held. There was no adversary process engaged to test the reliability of these conclusions.

On August 8, 2001, defense counsel filed a request for a competency evaluation and suggested a lengthy period of inpatient evaluation.  Counsel averred that during their representation, "we have had exceptional difficulty communicating with [movant], exceptional difficulty obtaining information from him, and exceptional difficulty in visiting with him."  Counsel alleged he had more difficulties communicating with movant than any other client in twenty years of criminal defense practice.  Counsel described movant as engaging in bizarre and paranoid behavior.  This request for a competency examination was based, in part, upon his own expert's conclusion that movant was incompetent, though also malingering.

The next day, movant was removed from the courtroom after calling Judge Bell an "evil Hitler" and accusing his counsel of "being satanic" and destroying evidence. Counsel confessed they did not speak with their client about this important development

28

in his death penalty case: "When we went last week to see him, we had no intention of discussing it with him because it tends to get him angry.  I shouldn't perhaps say that, but he does – we're having a difficult time having anybody see him."

The court ordered a full competency evaluation.  A physician's assistant did a physical examination and took a history which relied upon movant's unreliable self-reporting, and indeed contained false information.  A neuropsychologist and a clinical/forensic psychologist evaluated movant and concluded he was competent and malingering even though some bizarre behavior was noted, most notably movant had smeared his face with feces and refused to talk about it.

Once again, there was no hearing on competency and no opportunity to challenge the doctors or present defense evidence.

Movant's bizarre behavior continued during trial.  On the fourth day of trial, Judge Bell conducted a chambers conference outside movant's presence.  Judge Bell noted that for the past 3 ½ days "there have been numerous times when [movant] has become very agitated and has whispered loudly, leaving aside the loud burping and other personal noises he has made, when he has whispered and sometimes talked very loudly."  Judge Bell reflected that counsel Stebbins had on 25 to 30 occasions attempted to keep movant quiet.  Judge Bell noted that approximately 6 times he personally had "used the zipping of the mouth nonverbal expression to him to try and get [him] to quiet down so that the jury doesn't hear the actual words he's saying." Under questioning from the court, both of movant's trial lawyers agreed that was accurate.

29

The following day, against the advice of counsel, movant testified in narrative form.  He told the jury he had "no choice but to offend some of you, as I am the speaker of the truth."  He noted that he was trying to stay within "certain decent boundaries" but then rambled off into irrelevant tangents which, predictably, drew objections for relevance that were sustained.  The cross examination devolved into a shouting match between movant and the government prosecutor.

On the first day of the penalty phase, movant punched his lawyer in the face in front of the jury.  He was removed from the courtroom.  Counsel requested a competency examination which was denied even though the court acknowledged that "the area of competency has been one of great concern to this Court."

Trial continued in movant's absence. Though the government asked that movant be returned to court for an assessment of his mood, that request was denied.  Twenty-five penalty phase witnesses were called by the government before movant was returned to the courtroom.

When movant was returned to open court the following day, he said he did not have a clear memory of what had occurred the previous day.  He asked for permission to speak, which was granted.  He then said:  "I'm sorry to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion.  And I'll be quiet because I'm being forced to just as if I was in Nazi Germany. Thank you."  The court instructed that he could remain as long as he was quiet.

On the final day of the penalty phase, defense counsel noted that movant had been sleeping with his head on the table throughout most of the afternoon of the

30

preceding day while his penalty phase case was being presented.  This confirmed what the prosecutor had already acknowledged during the testimony of Dr. Jackson.  The court agreed that movant's head was down on the table for most of the afternoon.

Movant testified against the advice of counsel.  In a hearing held prior to that testimony, movant claimed one of the marshals was calling himself Theodore Bundy, an apparent reference to serial killer Ted Bundy.  Movant expressed a preference to go straight to cross examination without a prefatory statement (narrative direct examination).  Movant was wholly unable to explain to the court the definition of truth though he repeatedly expressed a desire to testify in order to get the truth out.

Counsel expressed their frustration with movant.  "We do not seem to be able to communicate our concerns about [not testifying] to him." Counsel reiterated their concerns about movant's competency.  Counsel was concerned movant was unable to communicate with them and that his condition had continued to deteriorate.  That motion was denied.

Movant did in fact testify against counsel's advice in the penalty phase.  He told the jury he used to work for the CIA, and that he was willing to submit to the drug sodium pentothal to prove he was telling the truth.  He admitted that he had lied about witnesses called by the government during penalty phase because he wanted to bring attention to them "because they are members of the Davidian church which is based in Waco, Texas, and they believe in pedophiling (sic) children."  He accused another government witness, Ms. Sturdivant, of having her two year old son removed from her

31

and placed with yet another government witness because she was doing inappropriate things with son.

Movant testified that his childhood was "no worse than the average poor white person in rural Michigan.  And there was a lot of love and a lot of hate."  He again accused counsel Mitchell of destroying evidence.  On cross examination he claimed Ms. Timmerman's father abused her.  He claimed his lawyers want to put him away somewhere so he could not "get the truth out about abortion, you know, the fact that everybody's murdering off all these boys because they're too hard to raise through abortion."

For no apparent rational reason, movant also chose to allocute.  There, he expressed remorse "because you have been presented with a complete false version of these events by these evil shysters resulting in you with your supposedly bloodless hands counting me guilty."  He then went on a rant regarding his daughter who "was murdered by abortion basically to feed the greedy, corrupt American legal and economic community, which you are part of."  He claimed he had been incarcerated for four years by the "evil beast" that murdered his daughter whose name he claimed was Azla.  He accused the jury of being half filled with "bloody-handed pro-choice supporters".

He expressed ambivalence about what sentence the jury should return:

> Irregardless – this is pretty important for me that you remember this.  Irregardless of your earthling choice as to my punishment, I am returning to heaven, which can be likened to a continuous, happy erotic dream that I control. No matter where you send me, I will be in heaven.  Whether

32

> it's at that table, whether it's in Terre Haute death row getting
> a joy needle or wherever, it don't matter.

Movant wrapped it up by again expressing ambivalence about his sentence and telling the jury not to worry about what happens to him because he would be "fine". "After September 11th I really don't care if I live or die, period.  I've been in very much depression over what happened to our nation and I really don't care, period, okay?"

In closing argument, counsel argued movant was "out of control", "suspicious", and "noncoopertive with his defense team" and defense experts.

It is against this backdrop that movant alleges he was incompetent at trial.  The adversary process completely broke down at trial.  Defense counsel *never* asked for a hearing on competency.  Defense counsel was ill informed about movant's social history and thus, could not and did not, provide relevant social history documentation to the trial experts.  Defense counsel complained about difficulties they were having with movant but never presented those difficulties to the court.

A defendant is incompetent to stand trial if he suffers from a mental disease or defect which:  (1) impairs his "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or (2) leaves him lacking a "rational as well as factual understanding" or both the charges against him and the nature of the judicial proceedings.  <u>Dusky v. United States</u>, 362 U.S. 402 (1960) (*per curiam*).  At a hearing, movant will establish both prongs of the <u>Dusky</u> test for competence.  Movant was never afforded a hearing on competency before or during his trial proceedings. There was no adversarial opportunity to prior to trial to test the conclusions of the

doctors who said he was malingering.  We now know those doctors relied upon false and grossly incomplete data.

A man on trial for his life is entitled to an adversarial hearing to determine if he was so mentally compromised as to be incompetent to stand trial.  Convicting an incompetent person violates due process.  Pate v. Robinson, 383 U.S. 375, 378 (1966).  "No trial can be fair that leave he defense to a man who is insane . . . and who by reason of his mental condition stands helpless and alone before the court."  Massey v. Moore, 348 U.S. 105, 108-09 (1954).

A hearing is required to fairly resolve this issue because evidence outside the record is required.

**Ground 6:**  In Ground 6, movant alleges the government suppressed exculpatory evidence in violation of Brady v. Maryland, 379 U.S. 742 (1970).  The suppression of evidence includes pending cases various witnesses had at the time they testified, the impossibility of some witnesses' testimony, and other impeachment evidence concerning the mental illness suffered by some of the government's witnesses.

Brady evidence by its nature requires a hearing because the crux of the claim is that the government suppressed material that was exculpatory.  Suppressed evidence is clearly outside the record.  A hearing is required to fairly resolve this claim.

**Ground 7:**  No hearing is necessary to resolve this claim.

**Ground 8:**  In Ground 8, movant alleges he was denied various constitutional rights because he was prosecuted under the Federal Death Penalty Act which is

34

administered in a disproportionate and unconstitutional manner according to the race of the victim.  Ms. Timmerman was a white woman.

At a hearing movant would demonstrate that the killers of whites are disproportionately selected for prosecutions that include the death penalty as a possible sentence and once selected, are disproportionately more likely to be sentenced to death.  This evidence is not in the record but if afforded a hearing, movant will demonstrate the truth of these allegations.  These allegations are more fully set out in the amended petition and those facts are incorporated here by reference as if set forth fully.

**Ground 9:**  No hearing is necessary to resolve this claim.

**Ground 10:**  In Ground 10, movant alleges his trial counsel was ineffective when they failed to properly present a claim regarding juror bias.  The claim concerns the foreman and a newspaper article quoting him published after trial.  The newspaper article quotes the foreman as stating that the foreman knew movant was "off the wall" before the trial.  The foreman stated in *voir dire* that he had formed no opinions of the case at that point.  Both of these statement cannot be true.  Counsel failed to direct the court's attention to the *voir dire* statement of the foreman and the claim was denied for failure to show contradictory *voir dire* testimony.

Evidence is required on this ground.  Specifically, trial counsel must be called to establish there was no strategic reason for this failure.  The foreman must be called to establish that he was accurately quoted in the newspaper.

35

**Ground 11:**  In Ground 11, movant asserts it violates the 8th Amendment to execute a person who suffers from severe mental illness and organic brain damage. This claim requires movant to prove that he indeed suffers from severe mental illness and organic brain damage.  Movant is prepared to do this at an evidentiary hearing.

WHEREFORE, Marvin Gabrion, by counsel, moves the court for an evidentiary hearing on his §2255 and amended §2255 motions as requested above and for any and all other relief to which he may be entitled.

Respectfully submitted,

By: /s/ *Monica Foster*
    Monica Foster
    Attorney for Movant
Business Address:
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
(317) 383-3520

By: /s/ *Joseph M. Cleary*
    Joseph M. Cleary
    Attorney for Movant
Business Address:
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
(317) 383-3520

By: /s/ *Scott Graham*
    Scott Graham
    Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, MI 49024
(269) 327-0585

Dated:  December 19, 2016

36