**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARVIN CHARLES GABRION  II,               )
                                          )
              Movant,                     )
                                          )
       v.                                 ) 1:15-CV-447
                                          )  HON. ROBERT HOLMES BELL
UNITED STATES OF AMERICA,                 )
                                          )
              Respondent.                 )

---

**BRIEF IN SUPPORT OF MARVIN GABRION'S MOTION FOR A HEARING TO**
**DETERMINE MENTAL COMPETENCE**

---

### A.    INTRODUCTION

Mr. Gabrion requests a stay of proceedings and a hearing to determine his

mental competency in this capital habeas proceeding.  This Court is authorized to grant

this relief.  Rhines v. Weber, 544 U.S. 269, 276, 125 S.Ct. 1528 (2005).  He contends

that the evidence to be presented at a competency hearing will demonstrate that he is

unable to assist his counsel in any meaningful way in this case.  In addition, such

assistance is crucial to outside-the-record claims which are at the heart of his §2255

Motion.  Finally, there is a reasonable probability that Mr. Gabrion's competence could

be restored within a foreseeable period of time.    It would be an abuse of discretion to

deny this request where, as here, this case presents one where the need for reliability is

at its apex and Mr. Gabrion's competence – though the matter of extraordinary judicial

concern throughout these proceedings – was *never* subjected to the adversarial testing

that inures to a hearing.

**B.    FACTS**

Certain key facts are uncontested and all lead to a finding that Mr. Gabrion is not competent to assist his attorneys.  These facts are both old and new, but all lead to the same conclusion: Mr. Gabrion is not presently competent.   Mr. Gabrion's competence was in doubt throughout the trial.  In spite of this, there has never been an adversarial competency hearing at any point during these proceedings.  Mr. Gabrion behaved bizarrely during the run up to trial and during trial itself.  His peculiar conduct has continued unabated in the 15 years since he was sentenced to death.  His mentally ill conduct did not begin with the events described at trial.  Mr. Gabrion behaved erratically for decades prior to Ms. Timmerman's death.  His condition has likely worsened during the 15 years since his trial.

(1)    Odd conduct at trial and during pretrial proceedings

The signs and symptoms of Mr. Gabrion's mental disturbance were so apparent from his communications, *pro se* motions, and behavior in court that the magistrate judge *sua sponte* ordered a competency evaluation in 2000 before the death penalty notice was even filed.  The magistrate judge also expressed concern that "[t]he more you make these claims that don't seem to have any basis in fact, the more I begin to wonder whether you understand the proceedings and you can make rational decisions." He noted that one of these claims that defied reality was Mr. Gabrion's assertion "that I've verbally abused you."  The court correctly noted, "I don't know what you're talking about there either."  The magistrate also raised concerns that Mr. Gabrion was unable to stay on topic.  "You know, I raise one thing and you answer with another . . . . When I

2

raise "A" and you answer with "B" it makes me think that there's not much of a connection."

Dr. Emily Fallis conducted an examination and issued a report finding Mr. Gabrion competent and malingering.  Dr. Fallis defined malingering as "the intentional production of false or grossly exaggerated physical or psychological symptoms.  Such production of symptoms is motivated by external incentives, such as avoiding prosecution in this case."  Dr. Fallis concluded Mr. Gabrion "did not show evidence of a known mental disorder but, rather, seems to be faking a mental illness in order to help in his criminal case."  Fallis Report, pg. 17.  This was inconsistent with other matters she noted, specifically that Mr. Gabrion "wished the judge to rule that [he] is competent to stand trial . . .", a finding that would clear the way for trial.  Mr. Gabrion also spoke to Dr. Fallis about his "interest in going to the 'death chamber' in order to bring attention to the plight of missing children."  Dr. Fallis's report contains factual statements that are now known to be untrue, i.e., that Mr. Gabrion was neither physically nor sexually abused and that he did not demonstrate any strange behavior until after he was indicted for murder.

In spite of these false factual statements and seemingly contrary conclusions, no competency hearing was held.  There was no adversary process engaged to test the reliability of these findings and no opportunity to correct the inaccuracies.

Around this same time counsel was involved in the authorization process for the death penalty.  Counsel complained of "difficulty communicating with Mr. Gabrion," a refrain that would haunt this case to its conclusion.   Though trial counsel repeatedly complained about communication problems with Mr. Gabrion throughout the trial, they

3

never insisted upon an adversarial hearing to test the reliability of the government's experts' conclusions.

In the summer of 2001, the Court ordered another competency evaluation based upon Mr. Gabrion's "vituperative and mean spirited letters, his restlessness and angry outbursts in the courtroom, his inability to show respect to the court, and his apparent inability to cooperate with his counsel." Dr. Frank evaluated Mr. Gabrion. Her report relied in part upon Dr. Fallis' report, and reached similar conclusions. No hearing was held. There was no adversary process engaged to test the reliability of these conclusions.

On August 8, 2001, defense counsel filed a request for a competency evaluation and suggested a lengthy period of inpatient evaluation. Counsel averred that during their representation, "we have had exceptional difficulty communicating with [Mr. Gabrion], exceptional difficulty obtaining information from him, and exceptional difficulty in visiting with him." Counsel alleged he had more difficulties communicating with Mr. Gabrion than any other client in twenty years of criminal defense practice. Counsel said Mr. Gabrion engaged in bizarre and paranoid behavior. This request for a competency examination was based, in part, upon his own expert's conclusion that Mr. Gabrion was incompetent, though also malingering.

The court ordered a full competency evaluation. A physician's assistant did a physical examination and took a history which relied upon Mr. Gabrion's unreliable self-reporting, and indeed contained false information. A neuropsychologist and a clinical/forensic psychologist evaluated Mr. Gabrion and concluded he was competent and malingering even though some bizarre behavior was noted, most notably that Mr.

Gabrion had smeared his face with feces and refused to talk about it.  Once again, there was no hearing on competency and no opportunity to challenge the doctors or present defense evidence.

Mr. Gabrion's bizarre behavior continued during trial.  On the fourth day of trial, the Court noted that for the past 3 ½ days "there have been numerous times when [Mr. Gabrion] has become very agitated and has whispered loudly, leaving aside the loud burping and other personal noises he has made, when he has whispered and sometimes talked very loudly."  The Court reflected that defense counsel had on 25 to 30 occasions attempted to keep his client quiet.  The Court noted that approximately 6 times he personally had "used the zipping of the mouth nonverbal expression to him to try and get [him] to quiet down so that the jury doesn't hear the actual words he's saying."

The following day, against the advice of counsel and his clear best interest, Mr. Gabrion testified in narrative form.  He told the jury he had "no choice but to offend some of you, as I am the speaker of the truth."  He noted that he was trying to stay within "certain decent boundaries" but then rambled off into irrelevant tangents which, predictably, drew objections for relevance that were sustained.

On the first day of the penalty phase, Mr. Gabrion punched his lawyer in the face in front of the jury.  He was removed from the courtroom.  Counsel requested a competency examination which was denied even though the court acknowledged that "the area of competency has been one of great concern to this Court."

Trial continued in Mr. Gabrion's absence.  The bulk of the penalty phase was conducted in Mr. Gabrion's absence.  Twenty-five penalty phase witnesses were called by the government before Mr. Gabrion was returned to the courtroom.

When Mr. Gabrion was returned to court, he said he did not have a clear memory of what had occurred the day he hit his lawyer.  He asked for permission to speak, which was granted.  He then said: "I'm sorry to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion.  And I'll be quiet because I'm being forced to just as if I was in Nazi Germany.  Thank you."

On the final day of the penalty phase, defense counsel noted that Mr. Gabrion had been sleeping with his head on the table throughout most of the afternoon of the preceding day while the defense penalty phase case was being presented.  Mr. Gabrion again testified against the advice of counsel and his own best interests.  In a hearing held prior to that testimony, Mr. Gabrion claimed one of the marshals was calling himself Theodore Bundy, an apparent reference to serial killer Ted Bundy.  Mr. Gabrion inexplicably expressed a preference to go straight to cross examination without any direct examination.  Under questioning by the court, Mr. Gabrion was wholly unable to explain to the court the definition of "truth" though he repeatedly expressed a desire to testify in order to "get the truth out."

When Mr. Gabrion took the witness stand against his lawyers' advice, he told the jury he used to work for the CIA,[1] and that he was willing to submit to the drug sodium pentothal to prove he was telling the truth.  He admitted that he had lied about witnesses called by the government during penalty phase in order to bring attention to

---

[1] He did not.

them "because they are members of the Davidian church which is based in Waco, Texas, and they believe in pedophiling children."  He accused another government witness of having her two-year-old son removed from her and placed with yet another government witness because she was doing inappropriate things to her son.

Mr. Gabrion testified that his childhood was "no worse than the average poor white person in rural Michigan.  And there was a lot of love and a lot of hate."  He again accused his counsel of destroying evidence.  On cross examination, he claimed Ms. Timmerman's father abused her.  He claimed his lawyers wanted to put him away somewhere so he could not "get the truth out about abortion, you know, the fact that everybody's murdering off all these boys because they're too hard to raise through abortion."

For no apparent rational reason, Mr. Gabrion also chose to allocute, again against the advice of his counsel and his own best interests.  There, he expressed remorse "because you have been presented with a complete false version of these events by these evil shysters resulting in you with your supposedly bloodless hands counting me guilty."  He then went on a rant regarding his daughter who "was murdered by abortion basically to feed the greedy, corrupt American legal and economic community, which you are part of."  He claimed he had been incarcerated for four years by the "evil beast" that murdered his daughter whose name he said was Azla.  He accused the jury of being half filled with "bloody-handed pro-choice supporters."

Mr. Gabrion wrapped it up by again expressing ambivalence about his sentence and telling the jury not to worry about what happens to him because he would be "fine."

7

"After September 11th I really don't care if I live or die, period.  I've been in very much depression over what happened to our nation and I really don't care, period, okay?"

    (2)    <u>Mr. Gabrion's behavior was odd for decades prior to Ms. Timmerman's death</u>

For decades prior to Ms. Timmerman's death, Mr. Gabrion had been acting bizarrely.  Much of this evidence was presented by the government during the penalty phase of Mr. Gabrion's trial.

A number of witnesses described Mr. Gabrion's severe mood swings. Sometimes he was very pleasant and other times he would be unkind with no explanation.  Witnesses explained one never knew which Marvin one would get and they were very different.  A government witness testified he referred to Mr. Gabrion as "crazy Marv."

Mr. Gabrion entered people's homes uninvited.  He was frequently drunk.  He was loud and obnoxious.  He became physically abusive for no reason and then would apologize.  He behaved boorishly to the spouses of his male acquaintances.  He was alleged to have had a dead bull frog and a naked female doll on his bed containing dried and wet bodily fluids.  He engaged in overt religiosity.  He lived on the roof of a house during one period of homelessness.  He falsely told people, including his family who knew better, that he had been in Vietnam and the CIA.  As an adult, he once kept putting his hands in wet concrete.  The person who was laying the concrete asked him to stop but he kept doing it.

    (3)    <u>Mr. Gabrion's current functioning has not improved</u>

Mr. Gabrion's current counsel have represented him approximately 2 ½ years. Undersigned counsel are in regular contact with him.  He speaks to someone at the

Indiana Federal Community Defender nearly every day, sometimes multiple times a day.  These calls are never about his case.  Efforts to discuss his case are met with derision and anger.  Defense counsel Foster and Cleary attempt to visit Mr. Gabrion twice monthly.  These visits are similar in content to the aforedescribed phone calls.  Mr. Gabrion shows no ability to discuss his case or the events surrounding it.  He is unable to engage in discussions of his social history or strategy for his habeas corpus litigation.  He is consumed with topics having nothing to do with his litigation and that is all he will discuss with counsel.  He is actively delusional.

Counsel have spoken with the lawyers who represented him on direct appeal for over a decade and their experiences with Mr. Gabrion are similar.

(4)    Mr. Gabrion's behavior was not always odd

One of the compelling things about Mr. Gabrion's character is that he was not always like this.  As a child, he was described as tenderhearted.  He helped care for a mentally retarded cousin that other family members scorned.  He had a normal to normal high IQ though he performed poorly in school, likely the result of the poverty and chaos in his home and extended family.

In high school, he ran track and played chess.  He was respectful.  He took up for kids who were being bullied but he was never violent.  He took his young niece and nephew fishing and camping; they adored him.  He bought gifts for the less favored children in his family.  These children remember these gestures and gifts to this day.

Shortly after graduating from high school, Mr. Gabrion began behaving very differently.  His behavior became odd.  Early adulthood is a common time for the onset of mental illness.  Marvin's behavioral changes may have resulted from a developing

9

mental illness, or from brain damage resulting from the multitude of head traumas he suffered around this time. It certainly was not helped by his by-then chronic substance abuse or from the culmination of abuse and neglect he suffered.

Mr. Gabrion began being regularly kicked out of bars for boorish behavior.  He walked into the homes of relatives without knocking or being invited in.  He became suspicious and paranoid.   Mr. Gabrion did strange things like stop in the middle of the highway for no reason.  He mixed water with electricity.  He had a lot of accidents.  Once he ran into a former classmate and falsely told her that her husband was a narc.  He tried to cash a forged check with his own cousin who knew he was not the person to whom the check was made out.  His behavior was so diametrically opposed to how he had been in his younger years that those who had known him previously assumed he was doing drugs.

### C.     RECOGNITION BY THE COURT OF APPEALS

The Court of Appeals concluded that Mr. Gabrion was severely mentally ill, though not incompetent.  On appeal the court noted, that in order to address his competency questions, the court had to "determine the nature of Gabrion's *severe mental and emotional disabilities*."  United States v. Gabrion, 648 F.3d 307, 316 (6th Cir. 2011) [emphasis added], vacated on other grounds, United States v. Gabrion, 719 F.3d 511 (6th Cir. 2013) (en banc).  The court later referred to Gabrion's "severe psychopathic madness."  Ibid. at 317.  In spite of this, there has never been an adversarial competency hearing.

10

### D.    MR. GABRION WILL PRESENT EXPERT TESTIMONY ESTABLISHING PRESENT INCOMPETENCE

These observations were on a record made some fifteen years ago.  Since that time, Mr. Gabrion's mental condition has not improved, and has likely deteriorated.  In short, no one's mental health improves on death row.  This claim is supported by the observations of Mr. Gabrion's highly experienced appellate counsel and the opinion of an expert.  Mr. Gabrion would present the testimony of an experienced forensic psychiatrist who has met with Mr. Gabrion repeatedly and has reviewed numerous records relevant to the competency question.  This expert would opine that Mr. Gabrion is currently incompetent to assist his counsel in his §2255 litigation.

### E.    MR. GABRION'S ASSISTANCE IS NECESSARY TO THE PROPER PRESENTATION OF HIS OUTSIDE-THE-RECORD HABEAS CLAIMS

The process that leads to the execution of a citizen by the government must bear the hallmarks of due process. The procedure that results in execution must produce a reliable outcome.  Mr. Gabrion's competence was questioned throughout his pretrial proceedings and his trial though no hearing was ever held on that question.  Mr. Gabrion's trial conduct was bizarre.  Though the government claimed he was malingering mental illness for the purpose of influencing these proceedings, Mr. Gabrion did nothing to try to save his own life and much to destroy any chance of a life sentence. Indeed, Mr. Gabrion told the jury he did not care whether they killed him.  Trial counsel was unaware of the significant evidence of mental illness existing in Mr. Gabrion's immediate and extended family and its impact on the likelihood that Mr. Gabrion suffered similarly.

Mr. Gabrion's assistance in these proceedings is critical.  There are many claims that would benefit substantially by his competent, nondelusional input.  Without his assistance, the result of these proceedings will not be reliable.  For example, Mr. Gabrion claims in Ground One that the government kept key evidence that he has discovered out of the record at trial by not disclosing it to the defense.  This claim is based on a state court criminal case.  Mr. Gabrion needs to assist his counsel in discussing each aspect of the underlying state case and in proving how the government misrepresented what occurred there.  He further claims that trial counsel was ineffective in failing to uncover this evidence.  Counsel require his participation in identifying his communication with trial counsel about the state case and what could have been learned and presented.  Almost none of the key facts regarding these claims are in the record and Mr. Gabrion's participation in developing these facts is crucial.

Mr. Gabrion has alleged in Ground One that government witnesses repeatedly provided false and/or misleading testimony.  Counsel require Mr. Gabrion's assistance in order to fully expose crucial facts and present this claim.

Mr. Gabrion repeatedly alleges in his petition claims of ineffective assistance at the guilt phase of his trial.  For example, his trial counsel took no steps to guarantee that Mr. Gabrion was properly medicated at trial.  Mr. Gabrion's assistance in advising about his interaction with counsel on this point is crucial.  In addition, his assistance is crucial in presenting claims that trial counsel failed to adequately test the government's theories establishing guilt.  Several errors occurred at that phase of the trial.  Counsel have the right to Mr. Gabrion's competent input regarding his discussions with counsel regarding this issue.  This input consists entirely outside-the-record evidence.

The guilt phase was also impacted by trial counsel's failure to present credible evidence regarding other suspects.  Habeas counsel is entitled to Mr. Gabrion's competent input about his discussions with counsel on this issue.  Mr. Gabrion presents other claims about the guilt phase based on acts and omissions not found in the record.  He alleges an incomplete investigation into future dangerousness.  He alleges several failures to fully prepare trial defenses, in part because counsel did not take the time to consult with him.  These issues require his competent assistance.

The key to Claim Four of Mr. Gabrion's motion, alleging ineffective assistance at sentencing, is based on outside the record evidence.  The Claim starts with counsel's failure to prepare a multi-generational social history of Mr. Gabrion's family. Page ID #3528.  Mr. Gabrion's input is crucial to that claim.  Habeas counsel has prepared a multi-generational history that is as complete as possible, but competent input from Mr. Gabrion would be a valuable addition to this aspect of the case.

It is reasonably foreseeable that Mr. Gabrion can be restored to competence. His medical history indicates that he has responded well in the past to psychiatric medications.  The goal of the Special Confinement Unit at USP Terre Haute, where Mr. Gabrion is housed, is not competence restoration.  While in the BOP, Mr. Gabrion has not received the benefit of efforts to restore his competence or treat his substantial mental illness.

Mr. Gabrion is mentally incompetent to assist his counsel in this proceeding.  His assistance is crucial to the development of the many outside-the-record claims in this case.  Because of these facts, as well as the likelihood that his competence can be

13

restored, it would be appropriate for the court to stay the present proceedings and order

a competency hearing.

## CONCLUSION

**WHEREFORE**, Mr. Gabrion requests the Court to enter a stay of proceedings

and order a competency hearing in this case.

**Date:  January 25, 2017**                        **Respectfully submitted,**

By: /s/ Monica Foster                                By: /s/ Joseph M. Cleary
    Monica Foster                                          Joseph M. Cleary
    Attorney for Movant                                    Attorney for Movant
Business Address:                                    Business Address:
Indiana Federal Community Defenders                  Indiana Federal Community Defenders
111 Monument Circle, Suite 3200                      111 Monument Circle, Suite 3200
Indianapolis, IN 46204                               Indianapolis, IN 46204
(317) 383-3520                                       (317) 383-3520


By:  /s/ Scott Graham
    Scott Graham
    Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, MI 49024
(269) 327-0585