UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MARVIN GABRION,

       Movant,

                                       Case No: 1:15-CV-447

v.

                                       Hon.  Robert J. Jonker

UNITED STATES OF AMERICA,               Chief U.S. District Judge

       Respondent.

_____/

**GOVERNMENT'S RESPONSE TO GABRION'S MOTION
FOR A HEARING TO DETERMINE MENTAL COMPETENCE**

Gabrion has filed a motion asking this Court to enter a stay of proceedings and to conduct a mental competency hearing. (PageID.4714.) But there is no federal right to competency during habeas proceedings, and the grounds for obtaining a temporary stay are exceedingly narrow. Gabrion's motion does not set forth an adequate factual basis to support such extraordinary relief. His conduct before and during the trial caused the district court to order three competency evaluations. Each time he was found not only competent, but a malingerer; five other mental health professionals would later agree. Gabrion's motion asserts merely that he is exhibiting the same type of erratic behavior; it does not identify a diagnosis, a course of proposed treatment, or attach a declaration of a mental health professional. Moreover, Gabrion's current counsel have not shown his claims could substantially benefit from his assistance. The motion should be denied.

## BACKGROUND

There is no question that Gabrion—at the time of trial, before his trial, and after his trial—has exhibited bizarre behavior. For example, he sent numerous letters to the Court and others involved in the case in which he claimed to be a divine or alien being, and he sometimes had symbols written on his face with ink. This conduct caused Gabrion to be assessed for mental competency on three separate occasions. (R.63: 1/31/00 Order Committing Def. for Competency Examination; R.93: 5/25/2001 Order Requiring Def. to Undergo Psychiatric Examination to Determine Competency; R.270: 8/9/01 Order of Commitment for Examination.)[1]

### 1.  Three Competency Examinations

In each examination, he was determined to be competent. (R.268: 5/8/00 E. Fallis, FMC Fort Worth Psychological Evaluation (sealed) ("Fallis Report"); R.476: 6/18/01 C. Frank, Henry Ford Behavioral Center (sealed) ("Frank Report"); R.314: 10/22/01 DeMier, FMC Springfield Psychological Evaluation (sealed) ("DeMier Report").) The magistrate judge and this Court (Judge Bell) issued orders so finding on two separate occasions. (R.89: 7/7/00 Op. Finding Defendant Competent; R.90: Order; R.353: 12/14/2001 Order Finding Defendant Competent to Stand Trial.) Each of the examiners also determined that Gabrion was feigning or "malingering" mental illness. (R.268: Fallis Report, at 17; R.476: Frank Report, at 8; R.314: DeMier Report, at 19.)

---

[1] Record numbers refer to docket entries in the criminal case, No. 1:99-cr-76.  PageID numbers are not available for documents before R.647 in that docket.

It was initially contemplated that the examining mental health professionals would be "present and available to testify" at a hearing following the third examination, which was conducted at defense counsel's request. (R.304: 8/9/01 Hr'g re Def. Counsel's Mot. for Competency Evaluation, 14-15.) Ultimately, however, the parties stipulated that if called to testify, the examining psychologist, Dr. Richard DeMier, would testify consistently with his report. (R.384: 12/14/01 Hr'g re Def.'s Mot. to Suppress and Mot. in Limine to Exclude Evidence, 2.) Nonetheless, the defense made a record of their continuing concerns about Gabrion's competency, while explaining that they were not challenging the competency finding because they had "no evidence to support a determination at this time that he may be incompetent." (*Id.* at 6.) Thus, Gabrion's current counsel's repeated assertions that Gabrion's competency was never the subject of an "adversarial hearing" is true only in the sense that his experienced trial team made a strategic decision to forgo a contested hearing.

### 2.  Penalty Phase Testimony

Dr. Douglas Scharre testified for the defense during the penalty phase. He had reviewed Gabrion's social and medical records and concluded that Gabrion had experienced a change in personality because the frontal and temporal lobes of his brain had been damaged. (R.539: Scharre, 3/13/02 ESTR at 9.)  He was unable to examine Gabrion because Gabrion would not meet with him. (*Id.* at 12.) Dr. Scharre opined that Gabrion' s persistent personality change was based on frontal lobe dysfunction and Geschwind Syndrome, possibly resulting from multiple motor vehicle accidents. (*Id.* at 12-13.) Dr. Scharre stated that these maladies are characterized by self-absorption, blame, and

3

dysinhibition. (*Id.* at 20-21.) He also stated that these syndromes are characterized by poor planning and disorganization. (*Id.* at 23.) Dr. Scharre said that Gabrion's Geschwind condition was also evidenced by hypergraphia, or repetitive writing, and hyperreligiosity. (*Id.* at 29-31.) Dr. Scharre testified that Gabrion was not malingering, though he said it was possible that Gabrion had given false answers to questions administered by other mental health professionals that might have been interpreted as malingering. (*Id.* at 68-74, 79-80.) Dr. Scharre identified an irregularity in Gabrion's PET scan, in that one side of the brain was darker than the other. (R.539: 3/13/02 ESTR at 39.) Gabrion's CAT scans were normal, which Dr. Scharre said lent support to his opinion that the cause of the PET asymmetry was a head injury, rather than a structural lesion such as a cyst. (*Id.* at 41-45.) In cross-examination, Dr. Scharre admitted that the only evidence he had of any accident was Gabrion's self-report of the 1992 car accident, and that the CAT scans taken at the time were normal. (*Id.* at 52-55.)[2]

Dr. Newton Jackson also testified for the defense. He said that he reviewed medical and social records and conducted three interviews of Gabrion. (R.541: Jackson, 3/14/02 ESTR at 6-10, 13.)  He concluded that Gabrion was delusional, that his behaviors were consistent with a possible mental illness (*id.* at 8), and that Gabrion suffered from psychological deficits (*id.* at 29) though he did not view Gabrion as "mentally ill" (*id.*). Dr. Jackson nonetheless concluded that several adverse influences on Gabrion during his

---

[2] During its rebuttal, the government presented evidence tending to show that Gabrion staged his 1992 car accident. See Gov't Resp. to Initial § 2255 Mot. (discussing testimony of Scott Vanderveen, R.543, 3/14/02 ESTR at 4-18.)

developmental years may have had "a serious adverse effect upon him as a functioning individual." (*Id.* at 17.) These included a childhood illness resulting in hospitalization and surgery, parental abandonment and neglect, substance abuse by Gabrion and his parents, family dysfuction and abuse, and automobile accidents. (*Id.* at 15-19.) After considering all of this, Dr. Jackson determined that Gabrion suffered from "a number of disorders" which, while not "coalesce[ing] together to arrive . . . at a single diagnosis" reflected that Gabrion had features of multiple personality disorders: histrionic, antisocial, and narcissistic. (*Id.* at 24-26.) He saw some evidence of malingering, but he did not think all of Gabrion's presentation was a result of malingering. (*Id.* at 11-13, 29.) Dr. Jackson's attempts to conduct a thorough examination were thwarted by Gabrion, who refused to cooperate in the third and final interview and refused to participate in testing. (*Id.* at 13-16.)

During the government's penalty phase rebuttal, several additional mental health professionals testified. Dr. David Griesemer, a neurologist, testified that he reviewed Gabrion's medical records to determine if he had any neurological impairment. (R.544: Griesemer, 3/14/02 ESTR at 6.) Dr. Griesemer reviewed the PET, CAT, and EEG records and found no evidence of brain injury. (*Id.* at 9.) Dr. Griesemer testified that in automobile accidents, victims tend to experience acceleration-deceleration injuries where the head jerks forward and back. There would be evidence of contusions or blood on the brain if that occurred, and Gabrion's 1992 CAT scan taken at the time of the purported accident did not show the injury. (*Id.* at 15-17.) Griesemer testified that a PET scan is not a diagnostic tool used to evaluate brain injury, and Gabrion's PET scan did not show trauma.

(*Id.* at 20, 36.) He concluded that Gabrion's testing as severely-impaired in functioning was not explained by traumatic brain injury. Gabrion showed complex functioning in obtaining false identification, banking transactions, and the planning of the murder. (*Id.* at 11-12, 22-24.)

Dr. Thomas Ryan, a clinical psychologist, reviewed records, interviewed and tested Gabrion. (R.546: Ryan, 3/15/02 ESTR at 2-7.) Dr. Ryan found Gabrion to be a malingerer. He testified that if Gabrion had suffered a traumatic brain injury, he would have started with a severe impairment which would have improved over time, but Gabrion's purported illness had actually worsened. Gabrion's tests showed him to be severely impaired; however, his real-life activities showed that he has a much higher level of functioning. The testing data made no clinical sense when compared to Gabrion's everyday behavior. (*Id.* at 10-22.)

Dr. Gregory Saathoff, a psychiatrist, also interviewed Gabrion. Dr. Saathoff testified that he was a consultant to maximum security prisons and has interviewed hundreds of prisoners. (R.546: Saathoff, 3/15/02 ESTR at 28.) He reviewed records and interviewed Gabrion. (*Id.* at 30-33.) Dr. Saathoff stated that he had examined the same CAT and PET scans as had Dr. Scharre, and disagreed that they showed any indication of brain injury. (*Id.* at 34.) Dr. Saathoff also disagreed that Gabrion suffered from frontal lobe injury or Geschwind Syndrome. For example, Saathoff stated that Gabrion's claim that the FBI had moved Rachel Timmerman's body was not an example of "confabulation" but was a shrewd recognition that he could defeat a federal conviction if he could persuade the jury that she had been killed at the north end of Oxford Lake. (R.546: Saathoff, 3/15/02 ESTR

6

at 45-48.) He likewise parted company with Scharre's conclusions that Gabrion's writings were proof of a brain injury. Saathoff agreed that some writings could be relied on for that conclusion, but there were many writings that were very coherent, particularly when Gabrion needed services from the jail. This suggested to Dr. Saathoff that Gabrion was malingering. (*Id.* at 52-58.)

When the jury returned its penalty phase verdict, they indicated that they had found several mitigating factors proven. All twelve jurors found as a mitigating factor that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder." (R.526: Verdict Form, at 7.) Ultimately, however, the jury found that the aggravating factors outweighed the mitigating factors so as to warrant a sentence of death. (*Id.* at 9.)

### 3. Appeal

On direct appeal, the court of appeals rejected the claim that Gabrion was incompetent to stand trial, including during the sentencing phase after he punched Attorney Stebbins in front of the jury. *United States v. Gabrion*, 648 F.3d 307, 320 (6th Cir. 2011), *reh'g en banc granted, opinion vacated* (Nov. 17, 2011), *on reh'g en banc*, 719 F.3d 511 (6th Cir. 2013). The court noted that nine mental health experts had evaluated Gabrion, all of whom except one (Dr. Scharre, who did not examine him) had found that he was malingering (feigning) mental illness, and agreed that the records demonstrated that Gabrion "knew what he was doing." *Id.* at 320 & n.3.[3]

---

[3] Gabrion's current counsel assert that "[t]he Court of Appeals concluded that Mr. Gabrion was severely mentally ill, though not incompetent." (PageID.4726.) Though the

## ARGUMENT

**There Is No Freestanding Right to Competency During Federal Habeas Proceedings and Gabrion Has Not Shown that a Limited Temporary Stay Is Warranted.**

There is no statutory or constitutional right to competency during federal habeas proceedings. *Ryan v. Gonzales*, __ U.S. __, 133 S. Ct. 696, 706 (2013). In *Gonzales*, the Court held that neither 18 U.S.C. § 3599(a)(2), which guarantees federal habeas petitioners on death row the right to federally funded counsel, nor 18 U.S.C. § 4241, which sets forth procedures for determining a defendant's competency during trial proceedings, affords

---

panel did refer to Gabrion as having mental disabilities, it explained that any such disabilities did not give rise to reasonable cause to question Gabrion's competence:

> [T]he psychiatric and mental health records in the case convince us, as they did the District Court, that Gabrion knew what he was doing. He was "malingering"—defined in psychiatric literature as "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives," as explained in the Diagnostic and Statistical Manual of Mental Disorders (DSM–IV). He was faking incompetence in order to disrupt the trial.[3] Malingering, faking incompetence, trying to deceive the court, pathological lying and murder are signs of a mental illness that thankfully affects only a small part of the population; but it is not the same as the mental illness that gives rise to "incompetence to stand trial." Incompetence is described as a mental illness causing the defendant to be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The District Court must order a competency hearing only when it has "reasonable cause" to believe the defendant is incompetent. *Id.* Given the outcome of all of Gabrion's previous evaluations and the persistent finding of his malingering, no such reasonable cause existed. The deliberate refusal of an actor to assist counsel in order to appear crazy—like playing the role of an idiot in a play—makes the actor incompetent on the stage but not in a real court of law. Gabrion retained his memory and sought to create the appearance of idiocy, imbecility, and loss of memory

*Gabrion*, 648 F.3d at 320.

such a right, overruling Ninth and Sixth Circuit precedent, respectively. *Id.* In rejecting these arguments, the Court observed that, "[g]iven the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence." *Id.* at 704.

Nonetheless, "[d]istrict courts ... ordinarily have authority to issue stays, where such a stay would be a proper exercise of discretion." *Id.* at 708 (quoting *Rhines v. Weber,* 544 U.S. 269, 276 (2005)). And "AEDPA does not deprive district courts of [this] authority." *Id.* (quoting *Rhines,* 544 at 276). In *Gonzales*, the Court declined to give district courts "unsolicited advice" on "how to manage their dockets," reaffirming that "the decision to grant a stay, like the decision to grant an evidentiary hearing, is "generally left to the sound discretion of district courts." *Id.* (quoting *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007)). The Court did not define the "precise contours of the district court's discretion to issue stays," addressing instead only "its outer limits." *Id.* As one of the petitioners' claims were "record based or resolvable as a matter of law," the district court did not abuse its discretion in declining to grant a stay; three of the other petitioner's claims were likewise record based, but it was unclear whether a fourth claim (ineffective assistance of appellate counsel for not raising trial counsel's failure to pursue a claim that the petitioner was incompetent at trial) had been exhausted and therefore the Court remanded for further proceedings on that issue. *Id.* at 708-09 & n.16.

The Court cautioned that any stay must be compatible with "AEDPA's acknowledged purpose," which is to "'reduc[e] delays in the execution of state and federal criminal sentences.'" *Id.* at 709 (quoting *Schriro*, 550 U.S. at 475) (internal citations omitted).

"Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings." *Id.* (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). In *Gonzales*, the Court noted that it had earlier observed that "not all petitioners have an incentive to obtain federal relief as quickly as possible. In particular, capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death. Without time limits [on stays], petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review." *Id.* (quoting *Rhines*, 544 U.S. at 277–78). Thus, an indefinite stay may not be granted, and courts evaluating requests for temporary stays may take into account whether the request appears to amount to a dilatory tactic. *See id.*

### A. Gabrion's Counsel Have Not Set Forth Factual Support for Their Claim that Gabrion Is Presently Incompetent.

As set forth above, *Gonzales* "severely restricted" a petitioner's ability to obtain an incompetency stay. *Mulder v. Baker*, No. 3:09-cv-610-PMP-WGC, 2013 WL 5758061, at *1 (D. Nev. Oct. 23, 2013). A court should not grant a stay and order a competency hearing where, as here, the movant sets forth no factual support for the proposition that the petitioner is presently incompetent. Gabrion's current counsel offer only their own (non-expert) opinions, and a vague reference to an unnamed expert who will supposedly opine that Gabrion is incompetent. They do not identify the mental illness that has purportedly rendered Gabrion incompetent, much less attach a declaration from the expert stating the diagnosis, the basis for his or her opinion, and the specific medical course of treatment that is likely to restore Gabrion to competency as required to justify a temporary stay

10

under *Gonzales*. Thus Gabrion's current counsel has established at most that Gabrion's condition is the same as it was at trial—which has been exhaustively and conclusively shown to be competent. Without more, this Court should not order a stay and competency evaluation, which will further delay adjudication of Gabrion's claims, now pending for nearly two years, some 15 years after his conviction. As noted above, stays must not undermine AEDPA's goal of finality by dragging out their federal habeas review.

Under § 4241, the statute governing competency to stand trial—which does not even apply to federal habeas petitioners, *Gonzales*, 133 S. Ct. at 707—before ordering a competency hearing, a district court must find "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).[4] And though competency may be re-examined "at any time" under § 4241,

---

[4] One court has found that "[w]hile *Gonzales* found that section 4241 does not guarantee a right to competence, it still provides the relevant framework for evaluating competence." *Lafferty v. Bigelow*, No. 2:07-cv-322, 2014 WL 104038, at *3 (D. Utah Jan. 9, 2014). In *Lafferty*, however, the decision to grant a stay and hold a competency hearing was made prior to *Gonzales*, and therefore the court did not address the threshold showing that a habeas petitioner must make, after *Gonzales*, to obtain a stay for the purpose of conducting a competency hearing. Given that it took more than four years for the district court in *Lafferty* to consider competency evaluations, conduct a hearing, and ultimately render an opinion that the petitioner was competent, the decision demonstrates why such proceedings may run afoul of AEDPA's purpose of reducing delays in the execution of sentences. In other settings, a more exacting standard is applied. To obtain a hearing on a substantive claim of incompetency at trial, for example, a petitioner "must present 'clear and convincing evidence' that creates a 'real, substantial, and legitimate doubt' as to his competence." *Faulkner v. Jones*, No. 3:14-cv-373/MCR/CJK, 2016 WL 5019198, at *14 (N.D. Fla. May 24, 2016), *report and recommendation adopted*, 2016 WL 5024200 (N.D. Fla. Sept. 16, 2016) (quoting *Lawrence v. Sec'y, Fla. Dep't of Corr.*, 700 F.3d 464, 481 n.5 (11th Cir. 2012))

courts have recognized there are limits: "The ability to reconsider the issue of competency 'at any time' does not mean that the court must hold a hearing any time the defense asks for one. Especially where the court has already considered the issue in depth, it is not necessary to hold another hearing unless the defense comes forward with genuinely new evidence indicating a need for another hearing. *United States v. Diaz-Gaudarama*, No. 4:07cr-0703-DFH-WGH, 2009 WL 673997, at *2 (S.D. Ind. Mar. 13, 2009).

In *Diaz-Gaudarama*, the district court denied a motion to reconsider the defendant's competency to stand trial where the defendant had previously been determined to be malingering mental illness. 2009 WL 673997, at *2. The court acknowledged there were circumstances where "a defendant is genuinely mentally ill" such that "his mental status and competency could change with the passage of time." *Id.* But the court viewed the case before it "very differently" because there, the issue was "not the severity or progression of a genuine illness but whether the defendant's psychotic behavior is all a deliberate act." *Id.* Because the defendant's behavior was consistent with his prior behavior, which was found to be malingering, the court denied the motion for another competency evaluation. *Id. See also United States v. Donaldson*, No. 4:05-CR-38, 2007 WL 708603, at *2 (E.D. Tenn. Mar. 6, 2007) ("While defendant may be suffering from some form of psychological

---

(internal citation omitted); *Wade v. Romanowski*, No. 2:12-CV-14713, 2016 WL 1573261, at *8 (E.D. Mich. Apr. 19, 2016), *certificate of appealability denied sub nom. Dione Wade v. Dewayne Burton* (May 20, 2016) ("A habeas petitioner is entitled to an evidentiary hearing on the issue of his competency to stand trial 'if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court.'") (quoting *Thirkield v. Pitcher*, 199 F. Supp. 2d 637, 653 (E.D. Mich. 2002)). Gabrion should be required to make a similar showing here.

problem, it does not interfere with his present ability to assist in his defense, especially in light of evidence demonstrating he is malingering and exaggerating the severity of his difficulties.") Likewise, here, Gabrion has come forward with nothing to suggest that his "mental illness" is anything more than what the court of appeals characterized as deliberate malingering that does not give rise to "reasonable cause" to question his competence. *Gabrion*, 648 F.3d at 320.

Indeed, because after *Gonzales*, the circumstances that will justify a stay and mental competency hearing are now "severely restricted," and any stay must be compatible with AEDPA's purpose of reducing delays in the execution of sentences, this Court should require even a greater factual showing of present incompetence than the § 4241 "reasonable cause" standard. Gabrion's current counsel has not made such a showing. They seek a stay and competency evaluation nearly two years after filing Gabrion's Section 2255 motion—nearly three years after their appointment to represent Gabrion in this habeas proceeding. They do not cite a sudden deterioration in his condition, but rather, they assert—with no factual support—he must be incompetent because his behavior is erratic like it was at the time of his trial and his condition "has not improved." In similar circumstances, courts have looked skeptically at a request for a stay to facilitate a competency evaluation. *See Gonzales*, 133 S. Ct. at 704 (noting that one of the petitioners had moved for a stay more than six years after initiating his habeas petition, which "was certainly ample time for his attorney to research and present the claims"); *Connor v. Sec'y, Fla. Dept. of Corrections*, 713 F.3d 609, 624 (11th Cir. 2013) (district court did not abuse its discretion in denying habeas petitioner's request for stay and competency hearing, noting, as part

13

of its reasoning, that "like [the petitioners in *Gonzales*], Mr. Connor's request came long after he filed his federal petition"). *Cf. Mines v. Dretke*, 118 F. App'x 806, 813 (5th Cir. 2004) (district court did not abuse its discretion in denying request for stay when petitioner had not requested a competency hearing and "the allegations and evidence [he] offered . . . do not substantially differ from the allegations and evidence upon which a Texas jury originally found him to be competent to stand trial"). To avoid infringing AEDPA's goal, this Court should require more before granting a hearing.

## B. Gabrion's Claims Are Resolvable as a Matter of Law Regardless of His Present Competency.

Moreover, Gabrion's current counsel have not established that his claims could "substantially benefit" from his assistance. *Gonzales*, 133 S. Ct. at 709. Gabrion's claims are "backward looking" and "resolvable as a matter of law." *Id.* at 704, 708. Though *Gonzales* involved state prisoner habeas petitions under 28 U.S.C. § 2254, which stand on a different procedural footing in that the question before the federal district court is whether the decision of the state habeas court was contrary to, or involved an unreasonable application of, clearly established federal law, *id.* at 704-05 (citing § 2254(d)(1)), the basic principle that a stay and competency hearing are unnecessary absent a showing that the petitioner's claims stand to benefit "substantial[ly]" applies equally here.

Gabrion's counsel asserts that his assistance is needed to expose "crucial facts" underlying the claim presented in Ground One of his Section 2255 motion, which states that "government witnesses repeatedly provided false and/or misleading testimony."

14

(PageID.4728.) But how could Gabrion's assistance be "crucial" as to whether the *govern-ment* presented false or misleading testimony? Ground One asserts several claims—that the government allowed certain witnesses to testify "falsely" without correction, and that it made certain arguments to the jury based on "false" premises (see Am. Mot. at PageID.3895-PageID.3925). As the government explained in its response to Gabrion's initial Section 2255 motion (PageID.2250-69), all of those allegations (which appear in substantially the same form in the amended motion) lack merit, and, further, the claim may be resolved on the basis of the existing record because Gabrion has failed to identify any materially false testimony and the claim is procedurally defaulted. Gabrion's current counsel fail to demonstrate why his assistance is "crucial" to developing this claim, which is fundamentally premised on the *government's* conduct.

Gabrion's current counsel also assert that his assistance is "crucial" to his claims that "trial counsel took no steps to guarantee that Mr. Gabrion was properly medicated at trial" and that "trial counsel failed to adequately test the government's theories establishing guilt." (PageID.4728.) But the record refutes the claim as to medication—as current counsel have acknowledged (Am. Mot., PageID.3938-39; see also Gov't Resp. to Initial § 2255 Mot., PageID.2279-81), Gabrion was given the only medication a mental health professional had identified as helpful.[5] And as for Gabrion's guilt, his current counsel fail

---

[5] None of the physicians who examined Gabrion for competency recommended treatment or medication, as each of them concluded that Gabrion was malingering. Only one of the defense experts who had taken Gabrion's report of a head injury from an auto accident at face value, recommended a specific medication, and that is what he was given. In fact, as noted earlier, there was evidence that Gabrion faked the accident and related

to identify any particular aspects of the case for which Gabrion's input would be "crucial." It is hard to imagine any, given that, as the court of appeals stated four times, the evidence of Gabrion's guilt was "overwhelming." 648 F.3d at 317, 337, 338, 345 n.16. Permitting a stay and requiring a competency hearing on the basis of such vague assertions would turn the restrictive standard on its head and essentially mandate that a stay be granted in any habeas proceedings, as it could always be argued that the petitioner's assistance would be helpful to counsel.

Likewise, as to Ground Four, which alleges that Gabrion's counsel was ineffective for failing to conduct a more thorough social history, current counsel claim only that Gabrion's assistance would be "a valuable addition." (PageID.4729.) But the question is whether the claim would "substantially benefit" from Gabrion's assistance. Given that current counsel has submitted a 167-page social history addressing social history and mental health issues of numerous members of Gabrion's extended family (Ex. 9, PageID.3526-3678), along with a separate 96-page declaration addressing the prevailing professional norms in mitigation investigation, there is no doubt that this claim can be fully adjudicated without Gabrion's assistance. In *Cole v. Workman*, No. 08-cv-0328-CVE-PJC, 2011 WL 3862143, at *17 (N.D. Okla. Sept. 1, 2011), a Section 2254 petitioner who had been diagnosed with paranoid schizophrenia argued that his habeas motion should be stayed pending competency restoration proceedings because "several of the claims in his petition would be more compelling if he were competent to assist." *Id.* at *17. The court

---

head injury as part of an insurance scam. (See Gov't Resp. to Initial § 2255 Mot., PageID.2280-81.)

16

denied the motion, noting that the ability to expand the state court record was very limited and that the lengthy Section 2255 motion and attachments, which included affidavits from investigators "delving into [the petitioner's] mental health as well as his social and family history" afforded an adequate basis for the court to resolve his claims, regardless of his present competency. *See also Morva v. Davis*, No. 7:13-cv-283, 2014 WL 4546056, at *11 (W.D. Va. Sept. 12, 2014) (denying stay pending restoration proceedings on the basis that all claims, including a claim that § 2254 petitioner's trial counsel were ineffective in failing to conduct an adequate mitigation investigation relating to the petitioner's family history and mental health condition, could be resolved based on the extensive information on the issue in the state court record).

Similarly, here, post-conviction counsel have submitted a 161-page amended motion, with hundreds of pages of attachments, including a lengthy social history. Further, as set forth in the government's response to the initial motion (PageID.2305-16), the government maintains that Gabrion's trial counsel conducted a reasonable and thorough investigation into Gabrion's social and mental health history in accordance with the prevailing standards, and that, in any event, Gabrion has not shown—and cannot show— prejudice arising from the mitigation investigation trial counsel conducted. The claim is thus resolvable as a matter of law.

In sum, Gabrion has not supplied a factual basis for the assertion that he is presently incompetent and likely to be restored to competency in a reasonable time frame, and he has not shown that his assistance is needed for counsel to present his habeas

17

claims to this Court. Accordingly, his motion to stay proceedings and for a competency

hearing should be denied.

Respectfully submitted,

ANDREW BYERLY BIRGE
Acting United States Attorney

Date:  March 22, 2017                 */s/ Jennifer L. McManus*
JENNIFER L. McMANUS
TIMOTHY P. VERHEY
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI  49501-0208
(616) 456-2404