UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
- - - - - - -

MARVIN CHARLES GABRION, II

     Movant,       No. 1:15-cv-447
              (Criminal Case 1:99-CR-76)

   vs.

              Hon. Robert J. Jonker
UNITED STATES OF AMERICA,   Chief U.S. District Judge

     Respondent.

_____/

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO MOVANT'S AMENDED MOTION
<u>TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE</u>**

TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 1

A.    Procedural Overview ................................................................................. 1

B.    Summary of Facts Relevant to Issues Raised in the § 2255 Motion ................ 3

    1.    Evidence of Guilt ................................................................................. 3

    2.    Gabrion's Mental State .......................................................................11

    3.    The Government's Penalty Phase Evidence ..........................................12

    4.    The Defense—Guilt Phase ..................................................................18

    5.    The Defense—Penalty Phase ...............................................................22

    6.    Penalty Phase—The Government's Rebuttal .........................................31

    7.    Gabrion's Allocution .........................................................................34

    8.    The Verdict .......................................................................................34

    9.    Appeals ............................................................................................35

LEGAL STANDARDS ..........................................................................................41

I.    General Standards Governing Motions under 28 U.S.C. § 2255 ....................41

II.   Standards Governing Ineffective Assistance of Counsel Claims ...................49

GABRION'S CLAIMS ..........................................................................................51

    GROUND ONE: The Government Did Not Present False or Misleading
        Evidence   ....................................................................................51

    A.    The Government Did Not Present False Testimony from Chrystal
        Roach Concerning the Pending Rape Case ..........................................52

    B.    The Government Properly Argued that Gabrion Forced Rachel to Write
        the Letters Recanting the Rape Allegations ........................................60

    C.    The Government Properly Argued that Rachel Timmerman
        Disappeared on June 3rd and Was Never Seen Alive Again ..............64

i

D.    The Government Did Not Mislead the Jury Regarding BOP's Ability to Control Gabrion ..............................................................................67

E.    There Was No "Pervasive Pattern" of Government Witnesses Testifying Falsely ...............................................................................69

GROUND TWO:  Attorney Christopher Yates's Minimal Involvement in the Case Did Not Violate Gabrion's Right to Conflict-Free Counsel..........75

A.    There Was No Actual Conflict Because Yates Did Not Represent Gabrion in the Murder Case. ...............................................................79

B.    Gabrion Cannot Demonstrate Any Adverse Effect on His Trial Counsel's Performance. .........................................................................82

C.    Gabrion Was Not Prejudiced by the Court's Failure to Inquire As to a Conflict...........................................................................................88

GROUND THREE: Gabrion's Trial Counsel Provided Effective Representation during the Guilt Phase ...............................................89

A.    Trial Counsel's Alleged Failure to Demonstrate that Gabrion Was Incompetent.......................................................................................92

B.    Trial Counsel's Alleged Failure to Seek Proper Medication For Gabrion ..................................................................................................95

C.    Trial Counsel Thoroughly Investigated and Tested Proof of Gabrion's Guilt .........................................................................................97

D.    Trial Counsel Obtained Adequate Investigative Assistance................98

E.    Trial Counsel Secured Adequate Funding to Defend the Case..........100

F.    Trial Counsel Was Not Ineffective for Not Seeking Continuances....101

G.    There Was No Basis for Trial Counsel to Move for Disqualification of the Trial Judge ..............................................................................102

H.    Trial Counsel's Alleged Failure to Object to the Government's "False" Claim that Gabrion Forced Timmerman to Write Letters Exonerating Him ..................................................................................................103

I.    Trial Counsel's Failure to Produce Evidence that Timmerman Left Her Father's Home for Other Reasons .....................................................104

J.    Trial Counsel's Failure to Put on Proof That Timmerman Was Seen

After She Left Her Father's Home ................................................... 106

K.  Trial Counsel Wisely Did Not Attempt to Argue that Gabrion Had "Nothing to Do With" the Letters Timmerman Supposedly Sent after Her Death ..................................................................................... 107

L.  Trial Counsel's Failure to Contradict Chrystal Roach's "False" Testimony ................................................................................. 107

M.  Trial Counsel's Alleged Failure to Suggest that Others Might Have Murdered Timmerman ........................................................... 108

N.  Trial Counsel's Failure to Object to the Removal of a Juror for Sleeping During Trial .................................................................... 112

O.  Trial Counsel's Alleged Failure to Challenge the Pathologist's Cause of Death Determination ...................................................... 113

P.  Trial Counsel's Alleged Failure to Seek and Retain Its Own Pathologist ..................................................................................... 116

Q.  Defense Counsel Was Not Ineffective For Failing to Further Impeach Lloyd Westcomb ............................................................... 116

R.  Attorney Mitchell Did Not Act Ineffectively by Failing to Withdraw from the Case ................................................................. 118

S.  Gabrion's Trial Counsel Were Not Ineffective for Failing to Put on Proof that He Was at a Nearby Lake on June 25, 1997 .................... 119

T.  Gabrion's Trial Attorneys' Decision to Not Call Witnesses Who Would Have Confirmed that John Weeks Helped Gabrion Murder Rachel Timmerman Was Sound Trial Strategy ............................................. 120

U.  Gabrion's Trial Counsel Were Not Ineffective for Not Further Discrediting Witness Linda Coleman ................................................ 122

V.  Cumulative error did not occur ......................................................... 123

GROUND FOUR: Gabrion's Trial Counsel Provided Effective Representation During the Penalty Phase ................................................................. 123

A.  Trial Counsel Directed and Oversaw a Proper Investigation into the Penalty Phase Presentation; and ...................................................... 127

B.  Trial Counsel Prepared an Adequate History of Gabrion's Family that Included Gabrion's Social History ...................................................... 127

iii

C.  Trial Counsel Obtained Relevant Records and Were Not Ineffective for Failing to Obtain Additional, Cumulative Records ........................... 147

D.  Trial Counsel Selected Appropriate Experts and Provided Them with Adequate Information to Render Reliable Opinions.......................... 149

E.  Trial Counsel's Concession that Gabrion Murdered Timmerman to Obstruct Justice Was a Reasonable Strategic Decision .................... 157

F.  Trial Counsel Secured Adequate Funding to Prepare for the Penalty Phase.................................................................................................... 158

G.  Neither Trial Nor Appellate Counsel Was Ineffective in Connection with the Government's Presentation of Future Dangerousness Evidence............................................................................................... 159

    1.  Trial Counsel Attempted to Limit Introduction of Future Dangerousness Evidence, and Made a Reasonable Strategic Judgment Not to Make Further Futile Objections .................. 159

    2.  Gabrion Cannot Show Prejudice Because the Sixth Circuit Found No Error in the Introduction of the Future Dangerousness Evidence in the Penalty Phase ....................... 165

    3.  Gabrion's Counsel Provided Effective Representation ............ 166

H.  Trial Counsel Was Not Ineffective in Failing to Move to Suppress Evidence Seized in Violation of the Fourth Amendment as there Was No Seizure and No Fourth Amendment Violation.............................. 170

I.  Trial Counsel Adequately Investigated, Prepared, and Presented Admissible Evidence regarding BOP's Ability to Control Gabrion in Prison ................................................................................................... 174

J.  Trial Counsel Did Not "Give Up" after the Punch ............................. 175

K.  Gabrion Was Not Prejudiced by His Prison Records Not Being Presented ............................................................................................. 176

L.  Trial Counsel Was Not Ineffective for Not Presenting Evidence that Gabrion Required a Payee for His SSI Benefits ................................ 177

M.  Trial Counsel Fully Investigated Gabrion's Alleged Head Injuries and Its Presentation of that Evidence Reflected Reasonable Trial Strategy ............................................................................................... 179

N.  Trial Counsel Acted Reasonably in Acquiescing to Gabrion's Lack of

Presence in the Courtroom Following the Punch ............................... 183

O.    Trial Counsel Was Not Ineffective for Failing to Intervene During
      Cross-Examination Relating to Gabrion's § 501(c)(3) Organization .. 183

P.    Trial Counsel Adequately Cross-Examined Witness Jason Cross ..... 185

Q.    Trial Counsel Conducted a Reasonable Investigation of Witnesses and
      Themes.......................................................................................... 188

R.    Trial Counsel Was Not Ineffective for Failing to Object to Comments
      Made During Closing Argument....................................................... 191

S.    Neither Trial nor Appellate Counsel Were Ineffective for Failing to
      Object to the Substitution of an Alternate Juror for the Penalty Phase
      when Medical Issues Prevented a Guilt Phase Juror from Continuing
      to Serve ........................................................................................ 199

T.    Trial Counsel Was Not Ineffective for Failing to Challenge the
      Constitutionality of the FDPA or Raise a *Ring* Objection.................. 202

U.    Cumulative Error ........................................................................... 205

GROUND FIVE: Gabrion Was Competent During His Trial and Sentencing
      Hearing      ................................................................................... 205

GROUND SIX:  The Government Did Not Violate *Brady*. .......................... 206

GROUND SEVEN: Appellate Counsel Was Not Ineffective for Not Raising a
      Non-Meritorious Suppression Argument ........................................... 209

GROUND EIGHT: Gabrion Has Not Shown a Violation of the Fifth and
      Eighth Amendments Because his Victim Was Caucasian ................. 212

GROUND NINE: Gabrion May Not Relitigate His *Ring* Argument, Which the
      Court of Appeals Rejected ............................................................... 214

GROUND TEN: Counsel Was Not Ineffective in Connection with the Motion
      for a New Trial Based on Alleged Juror Misconduct ......................... 215

GROUND ELEVEN:   Gabrion's Execution Would Not Violate the Eighth
      Amendment     ............................................................................... 218

1.    This claim is procedurally barred..................................................... 219

2.    There is no national consensus in favor of a blanket exemption to
      capital punishment for the mentally ill............................................. 220

3.   The rationale underlying *Atkins* and *Roper* does not apply to the mentally ill.................................................................................224

4.   Other remedies are available.............................................................226

CONCLUSION.................................................................................................228

**INTRODUCTION**

Marvin Gabrion has filed an amended motion under 28 U.S.C. § 2255 asking this Court to vacate the criminal judgment against him, vacate his death sentence, and/or grant him a new trial.   In his amended motion, as in his original motion, Gabrion mostly argues that his counsel rendered ineffective assistance of counsel, though he also asserts a potpourri of allegations of prosecutorial misconduct and various claims of alleged constitutional infirmity.   Many of those claims are procedurally barred because they were either already resolved during the extensive appellate review of this case, or they are defaulted.   In any event, none of the claims has merit: Marvin Gabrion was ably represented by experienced, diligent, and conscientious counsel.   He had a fair trial, and this Court should not cast aside the conscientious verdict reached, and sentence imposed, by a jury of his peers.

**BACKGROUND**

**A.  Procedural Overview**

In June 1999, a grand jury in the Western District of Michigan charged Gabrion in a one-count indictment alleging that he "did after deliberation, premeditation and malice aforethought, willfully kill Rachel Timmerman within the special maritime and territorial jurisdiction of the United States by drowning her in Oxford Lake, which lies within the Manistee National Forest in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 7."   (R.1: Indictment.)

In February 2001, the government gave notice it would seek the death penalty.   In July 2001, the government filed an amended notice.   The statutory

1

aggravating factors alleged were: (1) Gabrion murdered Timmerman in an especially heinous, cruel and depraved manner; and (2) Gabrion murdered Timmerman after substantial planning and premeditation.    The non-statutory aggravating factors alleged were: (1) Gabrion is likely to be dangerous in the future; (2) Timmerman was a unique and individual human being whose loss has and will impact her family; (3) Gabrion caused the disappearance or death of eleven month-old Shannon VerHage (Timmerman's baby); and (4) Gabrion murdered Timmerman to obstruct justice and retaliate against her in regard to another offense.    (R.220: Am. Notice.)

In February 2002, the grand jury issued a superseding indictment charging that Gabrion "did after deliberation, premeditation and malice aforethought, willfully kill Rachel Timmerman within the special maritime and territorial jurisdiction of the United States specifically in the Manistee National Forest in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 7." (R.429: Superseding Indictment.)

Trial began on February 25, 2002.    At the close of the evidence, the jury found Gabrion guilty of first degree murder.    (R.592: Verdict, TR8 at 1776; R.468: Sealed Verdict.)    The Court then conducted a penalty hearing and the jury imposed a sentence of death.    (R.526: Penalty Phase Verdict.)

Gabrion appealed his conviction and sentence.    (R.547: Notice of Appeal.) The Sixth Circuit solicited additional briefing concerning a jurisdictional issue and the matter was remanded for further development of the record.    (R.672: Order.) This Court decided the jurisdictional issue in the government's favor (R.713: Op.;

2

R.714: Order), and the Sixth Circuit affirmed.   *United States v. Gabrion*, 517 F.3d 839 (6th Cir. 2007) (*Gabrion I*).   In August 2011, a divided panel of the Sixth Circuit determined that the death sentence should be vacated; the panel rejected all of Gabrion's other arguments and affirmed his conviction.   *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2011) (*Gabrion II*).   The Sixth Circuit reheard the case en banc and in May 2013 issued an opinion affirming Gabrion's conviction and reinstating the death sentence.   *United States v. Gabrion,* 719 F.3d 511 (6th Cir. 2013) (*Gabrion III*).

In October 2013, Gabrion applied for a writ of certiorari from the Supreme Court, which was denied on April 28, 2014.   (R.731: Letter from Supreme Court Denying Writ.)   On April 27, 2015, Gabrion filed his § 2255 motion.

**B.  Summary of Facts Relevant to Issues Raised in the § 2255 Motion**

**1.      Evidence of Guilt**

Gabrion was indicted for murdering Rachel Timmerman after her body was discovered in July 1997 in Oxford Lake, Michigan, federal property within the Manistee National Forest.   Proof of the murder consisted of direct and circumstantial evidence, which included forensic evidence.

***The forensic evidence***

Timmerman's body was found chained to two cinderblocks secured by two padlocks.   (R.588: Miller, TR4 at 998, 1002, 1008; Trial Exs. 11, 14, 17, 18-20.)[1]

---

[1] In this response, "TR_ at __" refers to the trial transcript volume and page indicated.   "ETR" refers to a trial transcript "excerpt" that was transcribed separately.   Similarly, "STR_ at __ refers to the sentencing (penalty phase)

3

The composition of the blocks was determined to be indistinguishable from blocks found at Gabrion's house in Altona, Michigan.   (R.588: Miller, TR4 at 1027-31; Trial Exs. 30-32, 44-45; R.591: Hall, TR7 at 1493-1511.)   In addition, paint and adhesive on the blocks attached to the body was chemically indistinguishable from that on blocks found on Gabrion's property.   Spray paint in cans found at Gabrion's house was chemically indistinguishable from the paint on the blocks used to commit the murder.   (R.588: Miller, TR4 at 1043-45, Exs. 40-41; R.591: Menold, TR7 at 1557-67; Ex. 80.)   Finally, a key found at Gabrion's house fit the padlock used to attach the blocks to the body via a length of chain.   (R.588: Miller, TR4 at 1032-38, 1040-42; Exs. 36-37, 39.)   This forensic evidence comprised the bulk of the circumstantial case, which the Sixth Circuit described in the panel opinion as "overwhelming" proof of his guilt.   *Gabrion II*, 648 F.3d at 317. Gabrion's motion does not challenge this evidence.

### *Evidence of motive*

Circumstantial evidence also established Gabrion's motive: Timmerman had accused Gabrion of sexually assaulting her, and the matter was proceeding to trial. She was initially reluctant to report the rape because Gabrion had threatened to kill her if she did.   (R.473: Shane Timmerman, 2/26/02 ETR at 17; R.471: Sarah Timmerman, 2/27/02 ETR at 34; R.589: Malsom, TR5 at 1218-19.)   He also said he

---

transcript volume number and page indicated, and "ESTR" refers to a separately transcribed sentencing transcript "excerpt."   Due to the age of the case, PageID numbers are not readily available for many record documents, and therefore internal pagination is referenced.   Where PageID numbers are available, they are cited in accordance with Administrative Order 16-MS-017.

would kill her baby daughter, Shannon, and make her watch.   (R.589: Malsom, TR5 at 1219.)   After Timmerman left her home for the last time in June 1997, letters purportedly written by Timmerman came in the mail to the prosecutor and the judge presiding over the rape case, as well as to Timmerman's father, retracting the rape allegations and stating that Timmerman had moved to Arkansas with a man named Delbert, whom none of her family or friends had heard of, to start a new life.   (R.589: Drake, TR5 at 1238-40; Trial Ex. 66; Roach, TR5 at 1168-69; Trial Ex. 62; R.472: L. Timmerman, 2/25/02 ETR at 13-19; Trial Exs. 64 & 65.)   The letters came in the same unusual envelopes imprinted with a holographic stamp with a NASA spaceship design that Gabrion used in his own correspondence. (R.589: Weinbarger, TR5 at 1245-46; Trial Ex. 69; D. Gabrion, TR5 at 1255-57; Trial Exs. 67, 68.)

### *Additional physical evidence*

Additional physical evidence linked Gabrion to the murder.   The last time Timmerman's family saw her, she was carrying her infant daughter, who was bottle-fed.   (R.472: L. Timmerman, 2/25/02 ETR at 4.)   Gabrion, a childless bachelor, maintained a campsite at Hungerford Lake, a location approximately 6.5 miles from the scene of the murder.   (R.588: Miller, TR4 at 997.)   Police found chain, duct tape, and bolt cutters at the site.   Also found in the campfire pit were a package of silicone baby nipples and a woman's hair clip, similar to the kind worn

by Timmerman.    (R.588: Babcock, TR4 at 1098-1108; Trial Exs. 47, 55, 57; R.472: L. Timmerman, 2/25/02 ETR at 9.)

### *Rachel Timmerman's fear of Gabrion*

In addition, witnesses testified that in the weeks preceding her disappearance, Timmerman was afraid of Gabrion because she believed he would kill her rather than allow her to testify at the rape trial.    (R.589: Hyrns, TR5 at 1207-10; Wilson, TR5 at 1224-27.) For example, in May 1997, the Newaygo County Sheriff's Office received two hysterical calls from Timmerman after she had encountered Gabrion; she told the receptionist that she needed to establish "a trail" in case Gabrion followed through with his threat to kill her.    (R.589: Hyrns, TR5 at 1207-10.)    On Memorial Day 1997, Rachel went to a friend's house, shut all the blinds and curtains and began pacing.    Rachel told her friend that Gabrion intended to kill her.    She repeatedly said that he had raped her the summer before and that the court case was coming up and he was going to kill her for it.    (R.589: Wilson, TR5 at 1224-27.)

### *Witnesses who placed Gabrion at the scene*

Despite Timmerman's fear of Gabrion, in early June 1997, witnesses saw a blond woman who looked like Timmerman with Gabrion at the shore of Oxford Lake shortly before her body was found in it.    They were in a black pickup truck with a boat in the back end.    (R.670: Coleman Dep. 5-16; R.591: Kirk, TR7 at 1575-82.) Two of them, a husband and wife, were nearly run off the two-track road to Oxford

6

Lake by Gabrion, who was "glaring like he was mad." (R.590: P. Hall, TR6 at 1306-09, 1320; R. Hall, TR6 at 1329-33.)

### *Witnesses who placed Gabrion with the boat*

Others testified that Gabrion had a small boat of the kind seen in the pickup truck.   During the predawn hours of June 6, 1997, Gabrion was observed unloading a boat from a pickup truck at his home in Altona, Michigan.   Once it was out, he removed blocks and chains from the boat, rinsed it out, and used a grinder on it. (R.590: Zylstra, TR6 at 1406-15.)   Then he reloaded the blocks and chain into the boat, put the boat in his pickup truck and drove away.   (*Id.*)   Later, neighbors and a passerby remembered that Gabrion had a small aluminum fishing boat for sale with its registration numbers ground off.   (R.471: D. Bacon, 2/27/02 ETR at 57; R.590: J. Bacon, TR6 at 1398; R. Harb, TR6 at 1426-28; C. Harb, TR6 at 1432-35.) When the passerby asked Gabrion why the numbers had been removed, he responded "it's none of your fucking business."   (R.590: R. Harb, TR6 at 1428-29; C. Harb, TR6 at 1434.)

Some people who had been camping on Little Manistee River testified that in early June 1997, Gabrion had introduced himself as "Lance," told them a story about where he was camping with his family that the campers later realized was a lie, and asked them to keep his aluminum fishing boat for him.   (R.589: Bassett, TR5 at 1196-1204; R.590: Kenyon, TR6 at 1445, 1448, 1451-52.)   They noticed that Gabrion often wore gloves, even though it was summertime.   (R.590: Kenyon, TR6 at 1455-56; R.589: Bassett, TR5 at 1201.)   He said it was for chopping wood but

7

they never saw any chopped wood at his campsite.  (R.590: Kenyon, TR6 at 1455-56.)  In the evening on June 6, Gabrion showed up with bruises on his face and delivered the boat with a man later identified as Gabrion's friend, John Weeks. (*Id.* at 1451-53; R.588: Miller, TR4 at 1053-54.)  Gabrion later returned, angry about the campers having taken his motorcycle; when they returned to the site the boat was gone and the campsite was torn up.  (R.590: Kenyon, TR6 at 1451-55; R.589: Bassett, TR5 at 1201-03; R.588: Miller, TR4 at 1053-54.)

### *Gabrion's flight and capture*

In summer 1997, Gabrion contacted a real estate broker because he wanted to sell his Altona store.  (R.589: Weinbarger, TR5 at 1244.)  Gabrion said he was unavailable to meet and mailed the broker a key in an envelope with a holographic imprinted stamp with a "NASA/space ship" design.  (*Id.* at 1245-46; Trial Ex. 69.) In July, Gabrion's mother asked his brother David to "remove some items" from the store.  (R.589: D. Gabrion, TR5 at 1258.)  David had just been released from jail, where he had received two letters from Gabrion, both in envelopes post-marked with the same holographic imprints with a "NASA/spaceship" design. (*Id.* at 1255-57; Trial Exs. 67 & 68.)  Though Gabrion knew he was wanted for questioning (R.471: Wismar, 2/27/02 ETR at 17-21; Trial Ex. 72), he did not show up in Michigan again voluntarily.

Before Labor Day in 1997, Gabrion met a man named Robert Strevels at a truck stop in Indiana to interview him for a position as a carpenter.  Gabrion made him fill out a job application and asked him for the names of his mother and father,

8

his social security number, and his driver's license.   (R.590: Strevels, TR6 at 1462-65.)   Gabrion called Strevels right before he was to start and said he was not needed.   (*Id.* at 1465-66.)   Gabrion later used this information to obtain a Virginia driver's license in Strevels's name.   (*Id.* at 1467; Trial Ex. 74.)

In 1997, Gabrion responded to an ad for the sale of a car. (R.590: Roddy, TR6 at 1436.)   Gabrion, who identified himself as "Lance," wanted to know if the car could make it to Arkansas.   (*Id.* at 1438.)   The same year, a man named Edward Broome encountered Gabrion in West Virginia. Gabrion identified himself as Robert Strevels.   Gabrion, who was wearing a beard (in contrast to his clean-shaven appearance in Michigan prior to his departure), inquired about buying a five-acre tract of property in a remote area up a creek.   Gabrion told Broome that his wife had died in a carjacking and that he wanted to get away from it all.   (R.591: Broome, TR7 at 1545-47.)

Gabrion was finally located and arrested in Sherman, New York, in October 1997.   He was using a post office box there in the name of Robert Allen.   (R.591: Ferri, TR7 at 1476-77.)   At the time of his arrest, he was carrying the Robert Strevels false identification.   (*Id.* at 1476-78.)   An FBI agent served a subpoena for hair samples on Gabrion the following week, when Gabrion had a full head of hair. (*Id.* at 1480-81.)   Analysts initially could not compare a pubic hair found in Timmerman's jeans with Gabrion, however, because after his arrest and his receipt of the subpoena, he shaved off all of his hair, including his pubic area.   (R.591: Deedrick, TR7 at 1536-39.)

9

*Gabrion's admissions*

Gabrion's nephew testified at trial that in June 1997, Gabrion told him that if he were to kill someone, he would wrap them in chicken wire and chains with bricks and put them in a muddy lake.   (R.471: Michael Gabrion, 2/27/02 ETR at 41-42.) That same month, Gabrion told a friend, "it is not hard to get rid of somebody; you just weigh them down and throw 'em in the lake."   (R.471: Wismar, 2/27/02 ETR at 14.)   Gabrion told Lloyd Westcomb, a paranoid schizophrenic who takes medication and has known Gabrion since childhood, that he "got rid of " his girlfriend "permanently" by binding her with chains and blocks and throwing her over a boat. (R.590: Westcomb, TR6 at 1354-55.)   Upset by the conversation, Westcomb went home and relayed it to his mother, who testified via deposition at the trial.   (*Id.* at 1354-55; R.669: K. Westcomb Dep. 7-10.)

While awaiting trial, Gabrion was held in local county jails. In the Newaygo County Jail, Gabrion offered a fellow inmate $500 to buy land on Oxford Lake so the property would be private, not federal, land.   He gave the inmate a hand-drawn map of Oxford Lake that had markings showing "Body Found 1 of 3."   (R.589: McTaggert, TR5 at 1276-85; Trial Ex. 70.)   Gabrion talked to a newspaper reporter in March 2001 at a local jail, drew another map of the lake, and said that the baby items found at the campsite were for his dog.   (R.589: Grossenbacher-Petry, TR5 at 1292.)   Gabrion wanted the reporter to help him determine the boundary lines of Oxford Lake between the private and federal property.   (*Id.* at 1296-97.)

10

While at another jail, Gabrion told another inmate that he killed Timmerman because she screamed rape and he "had to take care of business."   (R.594: Brewster, STR2 at 355-56.)   He also said there was another body in the lake.   (*Id.*)

### 2.   Gabrion's Mental State

After he was charged, Gabrion exhibited bizarre behavior.   He sent numerous letters to the Court and others involved in the case in which he claimed to be a divine or alien being, and he sometimes had symbols written on his face with ink.   This conduct caused Gabrion to be assessed for mental competency on three separate occasions.   (R.63: 1/31/00 Order Committing Defendant for Competency Examination; R.93: 5/25/2001 Order Requiring Defendant to Undergo Psychiatric Examination to Determine Competency; R.270: 8/9/01 Order of Commitment for Examination.)

In each examination, he was determined to be competent.   (R.268: 5/8/00 E. Fallis, FMC Fort Worth Psychological Evaluation (sealed) ("Fallis Report"); R.476: 6/18/01 C. Frank, Henry Ford Behavioral Center (sealed) ("Frank Report"); R.314: 10/22/01 DeMier, FMC Springfield Psychological Evaluation (sealed) ("DeMier Report").)   The magistrate judge and this Court issued orders so finding on two separate occasions.   (R.89: 7/7/00 Op. Finding Defendant Competent; R.90: Order; R.353: 12/14/2001 Order Finding Defendant Competent to Stand Trial.)   Each of the examiners also determined that Gabrion was feigning or "malingering" mental illness.   (R.268: Fallis Report, at 17; R.476: Frank Report, at 8; R.314: DeMier Report, at 19.)

11

It was initially contemplated that the examining mental health professionals would be "present and available to testify" at a hearing following the third examination, which was conducted at defense counsel's request.   (R.304: 8/9/01 Hr'g re Defense Counsel's Mot. for Competency Evaluation, 14-15.)   Ultimately, however, the parties stipulated that if called to testify, the examining psychologist, Dr. Richard DeMier, would testify consistently with his report.   (R.384: 12/14/01 Hr'g re Def.'s Mot. to Suppress and Mot. in Limine to Exclude Evidence, 2.) Nonetheless, the defense made a record of their continuing concerns about Gabrion's competency, while explaining that they were not challenging the competency finding because they had "no evidence to support a determination at this time that he may be incompetent."   (*Id*. at 6.)

### 3.    The Government's Penalty Phase Evidence

Prior to trial, the government provided the defense with a 13-page outline identifying all penalty phase witnesses and summarizing their testimony.   (R.385: 1/11/02 Pretrial Hr'g Tr., 83-85.)   Most of the aggravating factors identified in the Death Penalty Notice were established via the proof presented during the guilt phase of the case.   For example, the substantial planning and premeditation factor was proven by the method used to murder Timmerman.   The obstruction of justice aggravating factor was also proven by evidence that Gabrion's motive for murdering Timmerman was to prevent her from testifying against him at the rape trial.   An additional aggravating factor identified in the Notice was that Gabrion was responsible for the death of Rachel Timmerman's infant daughter, Shannon

VerHage.   This was largely established during the guilt phase by the fact that the baby disappeared with Timmerman.   Further proof was offered during the penalty phase by witnesses who testified that Gabrion admitted to killing Shannon because he did not know what to do with her. (R.593: Cross, STR1 at 150-53; Love, at 197-98; R.594: Lunsford, STR2 at 313.)

A small portion of the government's penalty phase case dealt with establishing that Gabrion's crime met the definition of a "heinous, cruel or depraved" murder under Section 3592(c)(6).   The government recalled Dr. Cohle, the forensic pathologist, at the sentencing phase to establish this.   Dr. Cohle advised the jury that death by drowning is a drawn out process, accompanied by panic, pain and fear.   (R.593: Cohle, STR1 at 58-64.)   The final portion of the government's penalty phase evidence addressed the meaning of the murder to Timmerman's loved ones.   Five of Rachel Timmerman's family members testified about the impact of her death on her family in support of that aggravating factor. (R.595: V. Robinson, STR3 at 463-85; Shane Timmerman, STR3 at 485-87; Sarah Timmerman, STR3 at 487-493; VerHage, STR3 at 493-98; L. Timmerman, STR3 at 498-505.)

The government also presented evidence of Gabrion's other crimes to show that he remained a danger to the community, and to rebut the defense claim that he suffered from mental deficiencies.   This evidence consisted of Gabrion's prior crimes and other dangerous conduct both inside and outside custodial settings. Evidence of Gabrion's violent acts outside of prison included sexual assaults of

13

women and girls.   (R.593: Goller, STR1 at 106-13; McGraw, STR1 at 113-23; Niewiek, STR1 at 132-50.)   The jury also heard testimony about Gabrion's assaults on his neighbors, the Casses and the Bacons.   (R.594: C. Cass, STR2 at 241-46; R.593: P. Bacon, STR1 at 93-99; D. Bacon, STR1 at 100-03.)   After Gabrion's encounter with the Casses, which included Gabrion threatening to "dust the bitch (Mrs. Cass)" and kill Mr. Cass, they called the police.   (R.594: C. Cass, STR2, at 244-45; J. Cass, STR2 at 263-64.)   As the police approached Gabrion's house they heard shots fired from the second floor of the residence.   When the police went inside, they found Gabrion and secured him downstairs.   Gabrion said the gun was upstairs, but was unwilling to accompany the officers to show them where it was. When the police went upstairs to retrieve the gun, they found a mattress with a bullfrog and an unclothed Barbie doll positioned beside each other.   (R.594: Workman, STR2 at 271-280.)

Evidence was also introduced regarding several violent assaults against people living in Gabrion's community.   During one incident, Gabrion was visiting with the Lilly family and began playing cards with them.   He became irritated at the delay caused when Dennis Lilly had to get up to give heart medicine to his uncle.   This escalated into a full-blown fight: Gabrion beat and kicked Dennis Lilly; he punched Lilly's wife, Sherry, in the face, grabbed her by the hair and slammed her head onto the floor three times; he beat their ten year-old son Shane, and threw him across a room onto the floor; and he threw the family dog against the wall. (R.593: D. Lilly, STR1 at 209-218; Sherry Lilly, at 218-21; Shane Lilly, at 221-24).

14

Two neighbors, Pam Bacon and Wilma Babcock, had their homes intentionally set on fire after conflicts with Gabrion.   (R.593: Babcock, STR1 at 71-75, 85-87; Bacon, at 93-99.)   Gabrion fired rifle shots at another neighbor's home after being asked to leave a party.   (R.593: Terwilliger, STR1 at 174-86; Brooks, at 186-89.)   On another occasion, Lorri Sturdivant, Gabrion's neighbor, noticed him aiming a rifle at her from his upstairs window as she helped her child climb into the back seat of the family car.   She quickly drove off, but Gabrion got in his own car and followed her for a few miles before driving off.   (R.594: Sturdivant, STR2 at 287-91.)   Thomas Niewieck rented an apartment to Gabrion.   After his pre-teen stepdaughter reported that Gabrion was peeking through her bedroom window and had grabbed her genital area, Niewieck went looking for Gabrion and caught him watching the girl while masturbating.   When Niewieck told Gabrion he was being thrown out, Gabrion grabbed a knife and threatened Niewieck and his wife with it, saying he would kill them and no one would ever find their bodies.   (R.593: Niewiek, STR1 at 132-50.)

Finally, Gabrion was linked to the disappearance of three other individuals in addition to Timmerman and her daughter.   Robert Allen was a homeless man receiving Social Security disability benefits as his sole source of income when he disappeared in 1996.   Gabrion assumed his identity at that time, and also arranged for Allen's federal benefits to be deposited into a bank account controlled by Gabrion.   In 1998, Gabrion was convicted of wrongfully misappropriating Allen's benefits, but Allen was never seen again.   (R.594: Gilligan, STR2 at 441-48;

15

Kuharevicz, STR2 at 449-54; Lunsford. STR2 at 318; Smith, STR2 at 438; Exs. 107, 112.)

Wayne Davis was a witness to the Timmerman rape case.   (R.594: Wilk, STR2 at 418; Lentz, STR2 at 390-92.)   After Gabrion was released on bond, Davis went missing.   Davis asked Darlene Lazo to give him a ride to court on February 13, 1997, so that he could plead guilty to a drunk driving charge.   He expected to serve 90 days in jail and bought cigarettes and puzzles to keep him occupied during the jail stay.   (R.594: Lazo, STR2 at 397-98.)   Lazo saw Davis and Gabrion together at Davis's home on February 12, 1997; Davis never mentioned any plans about leaving the state and Lazo was scheduled to give him a ride to court the next morning.   (*Id.* at 399; Wilk, STR2 at 419.)   When she and her husband arrived to take Davis to the courthouse, he was gone.   On the door was a note purportedly from Davis stating that he had gone to California because he was scared to go to jail.   Lazo did not believe it.   (R.594: Lazo, STR2 at 399-401.)   Lazo noticed that even though it was winter, the army jacket that Davis always wore when he went outside was still in his home.   (*Id.* at 404-05.)   The police were called to investigate his disappearance and discovered that in March 1997 Gabrion had brought Davis's property (with the serial numbers scratched off) to a consignment shop to sell it. (R.594: Ray, STR2 at 406-12; Granzo, STR2 at 412-14; Lentz, STR2 at 391-94; Wilk, STR2 at 416-17.)   As of the date of the trial, no member of Davis's family had heard from him.   (R.594: Lazo, STR2 at 399; Wilk, STR2 at 415.)[2]

---

[2] After the trial, Davis's body was found in a lake located near Gabrion's family

16

John Weeks worked for Gabrion.   In May or June 1997, Gabrion asked him to call a woman named Rachel to set him up, and Weeks did so.   (R.594: A. Wolf, STR2 at 423-27.)   On June 22, 1997, Weeks told his girlfriend, A'lliene Wolf that he was going on a "dope run" to Texas with Gabrion and would be gone for a week to ten days.   (*Id.* at 427.)   That same day, Gabrion confirmed the trip to Wolf, but claimed it was to pick up Christian books.   (*Id.* at 429.)   About two weeks later, Gabrion resurfaced and told Wolf that he had dropped Weeks off in Arizona.   No one has seen Weeks since June 22, 1997.   (*Id.* at at 420-431; Weeks, STR2 at 435-437.)

Another category of dangerousness evidence was tied to Gabrion's conduct while in custody.   He was caught with weapons in his cell, which included metal shards and razors.   (R.594: Hammersley, STR2 at 377-80; Hooker, STR2 at 324-29.)   He was also hiding nail clippers, which can be used to unlock handcuffs. (R.594: Alwood, STR2 at 307-09.)   While housed at a Milan-FCI, Gabrion, who has Hepititis C, threw urine and feces at prison employees and started a fire in his cell. (Rodriguez, STR2 at 310-13.)   Gabrion also made a fake gun from bars of soap. (R.594: Lucas, STR2 at 367-72; Carney, STR2 at 385-89.)   Gabrion attempted to bribe jail trustees to open cell doors for him.   (R.594: McTaggert, STR2 at 336-41.) He also managed to pose as the Clerk of the U.S. District Court and attempted to arrange his transfer out of Milan Prison.   (R.593: Weston, STR1 at 91; R.594: Cook, STR2 at 293; Ex. 89.)

---

home.

17

When housed at a county jail in a super-maximum security cell, Gabrion befriended an inmate who testified that Gabrion talked about escaping many times. (R.594: Brewster, STR2 at 35-54.)   He tried to kick the metal sheeting in his cell to loosen it to make a weapon.   He kept chicken bones to make shanks (weapons). (*Id.*)   He made threatening remarks about female guards, saying that he would kill them.   He threatened to cut himself and throw his blood on the jail deputies because he had Hepatitis C.   (*Id.*)

### 4.    The Defense—Guilt Phase

Gabrion was represented by appointed counsel Paul L. Mitchell, a criminal defense attorney in Grand Rapids, Michigan, who had been practicing for over 18 years and was frequently appointed to federal criminal cases in the Western District of Michigan.   Because the case was death-eligible, David C. Stebbins was also appointed to the case as learned counsel.   Stebbins, a criminal defense attorney practicing in Columbus, Ohio, was appointed because of his experience in other capital cases.   Defense counsel requested funds to hire investigators to assist the defense, and the Court granted the request.   (R. 44-1, Ex. A: 5/23/02 Am. Budget Cert.)

During pre-trial proceedings, the defense team challenged the government's case in several ways.   They filed a motion to dismiss the indictment for lack of federal jurisdiction, arguing that Oxford Lake is not within the exclusive maritime jurisdiction of the United States, required for jurisdiction under 18 U.S.C. § 7(1). (R.177: Mot. to Dismiss.)   The Court conducted a hearing on this motion, receiving

18

testimony from witnesses, including a law school professor the defense team had retained as an expert to address property, title, and navigability issues underlying its argument.   (R.214: 5/23/01 Hr'g on Substantive Mots. at 4.)   The Court ultimately denied the motion in a written opinion.   (R.200: 6/11/01 Op. & R.201: Order.)

The defense also filed a motion to suppress the cement blocks seized from Gabrion's Altona residence for alleged Fourth Amendment violations (R.223: Def.'s Mot. to Suppress), and several motions in limine to exclude parts of the government's evidence.   These included motions to exclude the testimony of a reporter who discussed the case with Gabrion after his arrest and the "Body 1 of 3" map Gabrion had drawn of Oxford Lake (R.226: Mot. in Limine to Exclude Certain Evidence) and an objection to the superseding indictment returned on February 14, 2002.   (R.438: Objection to Superseding Indictment).   The Court held evidentiary hearings on the motions and ultimately denied them.   (R.384: 12/14/01 Hr'g Tr. at 65-75, 84-88; R.385: 1/11/02 Hr'g Tr. at 60-66; R.618: 2/22/02 Hr'g Tr. at 11-13.)

During the guilt phase of the trial, Gabrion's defense team attacked several parts of the government's case including the credibility of government witnesses, the absence of physical evidence directly linking Gabrion to the murder, and jurisdiction.   The principal attack was on jurisdiction.   During his opening statement, Attorney Mitchell advised the jury that there would be insufficient evidence to conclude that the murder occurred on federal land because the cause of death was not definitely drowning.   (R.588: TR4 at 937-39.)   This point was

19

exhaustively explored during the testimony of the forensic pathologist, Dr. Stephen Cohle, who told the jury that the cause of death was "most likely" drowning. (R.459: Cohle, 2/26/02 ETR at 26.)   During cross examination, Dr. Cohle conceded that the features he saw during the autopsy were also consistent with smothering. Dr. Cohle also conceded that if Timmerman had been breathing when she entered Oxford Lake, he should have found mud or dirt in her nasal passages, but he found none.   (*Id.* at 29-33.)   During closing argument, Mitchell argued to the jury that a finding that the cause of death was "most likely" drowning was not the same as a finding that drowning was the cause of death beyond a reasonable doubt.   (R.592: TR8 at 1739.)

The defense team also emphasized the absence of proof directly linking Gabrion to the murder.   For example, the investigation determined that a human hair was found inside the jeans Timmerman was wearing at the time of her death. The defense team called an FBI lab examiner to establish that DNA relating to the hair revealed that it did not match Timmerman or Gabrion.   (R.592: Stewart, TR8 at 1669-70.)   The defense team also cross-examined the government's hair and fibers expert and got him to admit that he found no hair or fiber evidence linking Timmerman to Gabrion's campsite, residence, or vehicle.   (R.591: Deedrick, TR7 at 1541-43.)   Gabrion's attorneys were also able to establish that none of the duct tape associated with the murder matched any duct tape linked to Gabrion.   (R.592: Menold, TR7 at 1570.)   The defense team introduced a stipulation that the chains around Timmerman's body and the chain taken from Gabrion's Altona residence did

20

not originate from the same length of chain or the same manufacturing process equipment.   (R.592: Stipulation, TR8 1672.)   The defense also made efforts to blunt the impact of the evidence that Gabrion's keys fit the locks chaining the body to the cement blocks by calling a representative of the Master Lock company to explain that the keys were not unique.   He testified that the locks attached to Timmerman's body were two of the 13 million locks it manufactured for that model. The company created 40 separate keys for those locks, meaning that Gabrion's keys would open roughly 350,000 Master Locks.   (R.592: Hartmann, TR8 at 1654-63.)

Gabrion's defense also attacked the credibility of government witnesses. Linda Coleman, who placed Gabrion, Timmerman, and a boat at Oxford Lake at the approximate time of the murder was cross-examined about why she did not immediately notify police about what she saw after the murder became known to the public, and it was suggested that she fabricated the testimony after seeing news accounts of the murder.   (R.670: Coleman Dep. at 21-35.)   Kathy Kirk, Linda Coleman's daughter, supported her mother's account of what occurred at Oxford Lake.   Gabrion's counsel cross-examined her about not revealing that she was with her mother at the lake until the trial was underway, despite having been interviewed by the police about the murder, and having testified before the grand jury.   (R.591: Kirk, TR7 at 1587-1605.)   Lloyd Westcomb, who testified that Gabrion admitted to him that he had gotten rid of his girlfriend by putting chains on her and throwing her out of a boat into a lake, was cross-examined about being a paranoid schizophrenic and the medications he took for that affliction.   (R.590:

21

Westcomb, TR6 at 1359-83.)   This was used to argue that these witnesses were not credible and should not be believed.   (R.592: TR8 at 1726-33.)

Gabrion testified on his own behalf during the guilt phase of the trial. (R.461: 3/1/02 ETR at 4.)   This was against the strong, repeated advice of his attorneys.   (E.g., R.608: 2/28/02 Chambers Conf. Tr. at 2-4 (sealed); R.610: 3/1/02 Chambers Conf. Tr. at 3-4 (sealed).)   During his testimony, Gabrion said Timmerman had authored a "goodbye note," and that John Weeks and a man named Eddie Start had assisted her in committing suicide, with Start "finish[ing] Rachel off" at his cabin and the pair leaving physical evidence such as bolt cutters at Gabrion's campsite.   (R.461: 3/1/02 ETR at 10-12.)   The defense was forced to concede that it had not seen any such note.   (*Id.* at 11.)

### 5.    The Defense—Penalty Phase

*Defense Motions*

The defense also attacked the prosecution's penalty phase proof before and during the trial.   The defense filed a motion to dismiss the death penalty notice, which argued that the FDPA was unconstitutional on a variety of grounds, both facially and as applied to Gabrion's case.   (R.178: Mot. to Dismiss Death Penalty Notice.)   The district court heard argument on this motion and issued a 39-page written opinion denying it.   (R.214: 5/23/01 Hr'g on Substantive Mots. Tr. at 133; R.212: 6/29/01 Op.)

In addition, prior to the trial, the defense filed a motion requesting discovery of all of the aggravating evidence the government intended to introduce during the

22

penalty phase.   (R. 264: Motion for Discovery.)   The government acceded to this request by providing the defense with a 13-page letter identifying all penalty phase witnesses and summarizing their testimony.   (R. 42-1, Ex. B: 12/18/01 Ltr from T. VerHey to P. Mitchell; R.385: 1/11/02 Pretrial Hr'g Tr. at 84.)[3]   The defense also requested the Court to limit or prohibit penalty phase evidence, and detailed the statutory framework allowing the Court to do so.   (R. 263: Mot. in Limine Re: Govt's Penalty Phase Evidence.)   As part of this motion, the defense argued that evidence of future dangerousness should be limited to evidence that Gabrion posed a continuing danger to others while serving a sentence of life imprisonment.   (*Id.*)   The defense also filed a motion to exclude or limit victim impact evidence.   (R.490: Mot. in Limine for Limitation and Exclusion of Victim Impact Evidence.)   The government indicated that it would call no more than five witnesses to testify regarding victim impact, primarily Rachel Timmerman's immediate family members and Shannon VerHage's paternal grandmother, which the Court permitted.   (R.593: STR1 at 14.)

At a pretrial hearing on the penalty phase evidence, the defense acknowledged having received a detailed summary of all of the prosecution's

---

[3] This Court previously denied the government's motion to supplement the record with the letter.   (R. 659: Order Denying Mot.)   However, this Court is permitted to consider documents outside the record in connection with a Section 2255 motion. See Rule 7 of the Rules Governing 2255 Proceedings.   Given defense counsel's acknowledgment of having received "a 13-page list of evidence they plan to introduce at the penalty phase" (R.385: 1/11/02 Pretrial Hr'g Tr. at 84), the government respectfully submits that the letter is sufficiently authenticated to satisfy Rule 7(b).

penalty phase evidence.   The defense stated that it would not object to proof

relating to the statutory aggravating factors if the government relied only on

evidence already introduced during the guilt phase of the case; that is, proof that

the crime was committed intentionally, after substantial planning and

premeditation, and was heinous in nature, would be established through proof of

how Rachel Timmerman was murdered.   (R.385: 1/11/02 Pretrial Hr'g Tr. at 86-88.)

However, the defense objected to the plan to introduce the grand jury testimony of

Dennis Cartwright, who testified that before the murder Gabrion told him he hated

Timmerman and planned to drown her.   Cartwright was not going to be a trial

witness because he died after testifying before the grand jury.   (*Id.* at 86-88, 95.)

Gabrion's trial team also objected to the government's future dangerousness

evidence, which was based on witness testimony relating a multitude of additional

violent acts by the defendant.   The defense argued that the 21 witnesses the

government had on this aggravating factor was so large a group that it threatened

to skew the jury's consideration of all of the factors equally.   In accordance with its

pretrial motion, the defense also argued that proof of Gabrion's actions outside of

the prison setting was irrelevant because the jury would either have to sentence

him to death, or to life in prison, so conduct that occurred outside that setting did

not predict future dangerousness. (R.385: 1/11/02 Pretrial Hr'g Tr. at 88-92.)

Gabrion's attorneys also requested that the Court limit the amount of victim impact

evidence offered at sentencing, for the reason that it would be unduly inflammatory.

The defense further argued against the government's ability to argue that the

24

murder's effect on the pending rape case did not constitute an aggravating factor. Finally, Gabrion's lawyers requested that he be allowed to give allocution to the jury without being subject to cross examination.   (*Id.* at 92-95.)

This Court granted the motion to allow allocution without cross examination. (R.395: 1/25/02 Op. at 1-5.)   The Court granted the defense motion to exclude the grand jury testimony of Dennis Cartwright.   (*Id.* at 14.)   The Court found that his testimony had "some indicia of reliability in that it was made under oath and ha[d] been corroborated" but concluded that it did not meet "the heightened standard of reliability that must be applied to evidence in capital cases."   (*Id.*)   The Court denied the motion to limit future dangerousness to evidence of violent behavior while in custody. (R.212: 6/29/01 Op. Denying Mot. to Dismiss Death Penalty Notice at 33; R. 213: Order; R.395: 1/25/02 Op. on Death Penalty Evidence at 5-9.)

The defense also argued that Michigan's status as a non-death penalty state should be presented to the jury as a mitigating factor, but this motion was denied on the basis that it was not related to the defendant or the offense.   (R.593: STR1 at 7-12.)

### *The Mitigation Case*

Gabrion's trial counsel put on a mitigation case that included evidence concerning BOP's ability to house him securely and thereby minimize any future dangerousness, evidence relating to Gabrion's mental health, and evidence relating to his childhood, including his difficult upbringing, his relatively normal behavior through high school, his substance abuse, and his car accidents, which defense

25

suggested, aided by expert testimony, might have affected his brain functioning. The defense initially proposed 32 mitigating factors for the district court to instruct the jury, but the Court revised and grouped them into 12 factors that it determined would provide more cogent organization for the jury (to which the defense agreed). (R.596: STR4 at 589-97.)

The defense's penalty phase opening statement reflected trial counsel's strategy: Counsel had to acknowledge that based on the jury's own observations of Gabrion during the trial, including his testimony and his frequent outbursts, that Gabrion was not "a good person."   (R.593: STR1 at 46.)   For example, in addition to Gabrion's outbursts and his inflammatory statements during his own testimony and allocution, the jury also witnessed Gabrion punch his own attorney, Mr. Stebbins. (*Id.* at 75.)   Counsel explained that this was not "a case where you have a saintly person who suddenly goes wrong."   (*Id.*, noting also, "You've seen it.   You've been here.   You can hear him at the table.")

**Dangerousness in a Prison Setting.**   Dr. Mark Cunningham, a forensic psychologist who had toured high security prison facilities and conducted research on disciplinary infractions and reviewed regulations, testified about what the Bureau of Prisons can do to control prisoners who may pose a danger to those inside and outside of the prison system.   (R.574: Cunningham, 3/13/02 ESTR at 3-5.) Prior to Dr. Cunningham's testimony, the government had filed a motion in limine to exclude his testimony.   (R.510: Gov't Mot. in Limine; R.595: STR3 at 470-74.) The Court denied the government's motion, stating that although a prison's ability

26

to maintain security is not a mitigating factor, such evidence is appropriate rebuttal to the government's future dangerousness evidence.   (R.515: 3/13/02 Mem. Op. & Order, at 3.)   Additionally, the defense purposely limited the scope of Dr. Cunningham's testimony to avoid the issue of whether Gabrion would pose a danger in a prison setting.   (R.466: Gabrion's Mem. in Opp. to Govt's Mot. for Two Additional Mental Health Exams.)   As a result, the Court denied the government's request for an additional examination and rebuttal testimony from an expert on that issue.   (R.469: Op. at 2 ("Defendant advises that contrary to the government's assertions, Dr. Cunningham will not testify that Defendant 'will not pose a danger in a prison setting.' . . . In light of Defendant's representation as to the scope of Dr. Cunningham's testimony, it appears that . . . .[a]n examination by [the government's proposed expert] does not appear necessary, and accordingly will not be permitted.").)

Cunningham described the inside of the cells and the conditions at the super maximum federal prison ADX Florence and other secure facilities such as Marion. (R.574: Cunningham, 3/13/02 ESTR at 9-15.).   He also testified about the prison's ability to reclassify inmates who caused a disturbance and to control inmates' communications. (*Id.* at 15-20.)

**Mental Health.**   Dr. Douglas Scharre reviewed Gabrion's social and medical records and concluded that Gabrion had experienced a change in personality because the frontal and temporal lobes of his brain had been damaged.   (R.539: Scharre, 3/13/02 ESTR at 9.)   He was unable to examine Gabrion because Gabrion

27

would not meet with him.   (*Id.* at 12.)   Dr. Scharre opined that Gabrion's

persistent personality change was based on frontal lobe dysfunction and Geschwind

Syndrome, possibly resulting from multiple motor vehicle accidents. (*Id.* at 12-13.)

Dr. Scharre stated that these maladies are characterized by self-absorption, blame,

and dysinhibition.   (*Id.* at 20-21.)   He also stated that these syndromes are

characterized by poor planning and disorganization.   (*Id.* at 23.)   Dr. Scharre said

that Gabrion's Geschwind condition was also evidenced by hypergraphia, or

repetitive writing, and hyperreligiosity.   (*Id.* at 29-31.)   Dr. Scharre testified that

Gabrion was not malingering, though he said it was possible that Gabrion had given

false answers to questions administered by other mental health professional that

might have been interpreted as malingering.   (*Id.* at 68-74, 79-80.)

Dr. Scharre identified an irregularity in Gabrion's PET scan, in that one side

of the brain was darker than the other. (R.539: 3/13/02 ESTR at 39.)   Gabrion's

CAT scans were normal, which Dr. Scharre said leant support to his opinion that

the cause of the PET asymmetry was a head injury, rather than a structural lesion

such as a cyst. (*Id.* at 41-45.)   In cross-examination, Dr. Scharre admitted that the

only evidence he had of any accident was Gabrion's self-report of the 1992 car

accident, and that the CAT scans taken at the time were normal.   (*Id.* at 52-55.)

Dr. Newton Jackson testified that he reviewed medical and social records and

conducted three interviews of Gabrion.   (R.541: Jackson, 3/14/02 ESTR at 6-10, 13.)

He concluded that Gabrion was delusional, that his behaviors were consistent with

a possible mental illness (*id.* at 8), and that Gabrion suffered from psychological

28

deficits (*id.* at 29) though he did not view Gabrion as "mentally ill" (*id.*).   Dr. Jackson nonetheless concluded that several adverse influences on Gabrion during his developmental years may have had "a serious adverse effect upon him as a functioning individual."   (*Id.* at 17.)   These included a childhood illness resulting in hospitalization and surgery, parental abandonment and neglect, substance abuse by Gabrion and his parents, family dysfuction and abuse, and automobile accidents. (*Id.* at 15-19.)   After considering all of this, Dr. Jackson determined that Gabrion suffered from "a number of disorders" which, while not "coalesce[ing] together to arrive . . . at a single diagnosis" reflected that Gabrion had features of multiple personality disorders: histrionic, antisocial, and narcissistic.   (*Id.* at 24-26.)   He saw some evidence of malingering, but he did not think all of Gabrion's presentation was a result of malingering.   (*Id.* at 11-13, 29.)   Dr. Jackson's attempts to conduct a thorough examination were thwarted by Gabrion, who refused to cooperate in the third and final interview and refused to participate in testing.   (*Id.* at 13-16.)

**Childhood, Family Dysfunction, Substance Abuse, Car Accidents.**   A number of defense witnesses testified that when Gabrion was a child he did not exhibit any unusual or violent behavior.   (R.595: Thorington, STR3 at 515, 520; Robinson, STR3 at 521-23; R.560: 3/14/02 ESTR, Wilkinson at 52; Hermann at 72-83.)   His family testified that when the six Gabrion children were growing up, Gabrion's parents drank and fought.   (R.560: 3/14/02 ESTR E. Gabrion at 6, 10, 19; Michael Gabrion Sr. at 31-33; Wilkinson at 55-60.)   They said that Gabrion became mean after a number of vehicle accidents.   (R.560: E. Gabrion, 3/14/02 ESTR at 23-

29

24; Michael Gabrion Sr. at 42-44.)   One of his former girlfriends, who left her husband for Gabrion and lived with him for three years in various places said that he had been involved in a car accident in Arizona and a motorcycle accident in Seattle.   (R.595: Canavan, STR3 at 526-29,531-32.)

In 1993, when Gabrion was referred to a rehabilitation center for a purported brain injury caused by a 1992 car accident, doctors concluded he had a neurological impairment: he was verbose, argumentative, and did not fit in with other patients. He was not accepted into the program.   This made him eligible for disability payments, which he subsequently applied for and received.   (R.540: Waalkes, 3/13/02 ESTR at 6, 19-24,27-28; R.596: Kuharevicz, STR4 at 581-82.)

**Gabrion's Testimony.** Gabrion testified in the penalty phase.   Prior to his testimony, his counsel made repeated efforts to persuade him not to testify.   (E.g., R.596: STR4 at 561-65; R.613: 3/14/02 Chambers Conf. Tr. at 2-3 (sealed).)   During his testimony, Gabrion claimed that some of the government witnesses were pedophiles.   (R.542: Marvin Gabrion, 3/14/02 ESTR at 5.)   He said that his childhood was no worse than that of the average poor white man in Northern Michigan, and that he had contracted Hepatitis C and expected to die in five years anyway.   (*Id.* at 6.)   He claimed that he had acted as Robert Allen's personal representative. (*Id.* at 8-9.)   He also said he set up a charitable trust for missing children.   (*Id.* at 11-13.)   He told the jury that Rachel Timmerman said her father abused her, but that "it was just hearsay as far as [he] was concerned."   (*Id.* at 13.) He admitted using another identity while traveling in California.   (*Id.* at 14.)

About Timmerman's family, Gabrion said, "[s]ome of them people really don't have the right to feel grief kind of like, but I mean, if it was my daughter, I would certainly feel some damn grief too."   (*Id.* at 17-18.)

### 6.    Penalty Phase—The Government's Rebuttal

**The 1992 Car Accident.**   In rebuttal, the government presented evidence tending to show that Gabrion staged his 1992 car accident.   Scott Vanderveen met Gabrion in 1992. (R.543: Vanderveen, 3/14/02 ESTR at 4-5.)   One day, while driving together, Gabrion asked Vanderveen if he had insurance on his car, and Vanderveen said yes. (*Id.* at 8-9.)   Gabrion grabbed the wheel of the car and ran them off the road.   Gabrion was not injured. (*Id.* at 11-12.)   Vanderveen had some unpaid tickets, so he started to leave the scene of the accident.   As he walked away, he noticed that Gabrion was banging himself against some trees.   When the police found the pair, Gabrion requested an ambulance.   (*Id.* at 14.)   Later, Gabrion asked Vanderveen if he would "go along" with the filing of an insurance claim for the accident.   But Vanderveen had not been telling the truth: he was uninsured, so Gabrion filed a claim with the uninsured motorist fund and received a judgment of $38,000. (*Id.* at 16-18.)

**Mental Health Rebuttal.**   Dr. David Griesemer, a neurologist, testified that he reviewed Gabrion's medical records to determine if he had any neurological impairment.   (R.544: Griesemer, 3/14/02 ESTR at 6.)   Dr. Griesemer reviewed the PET, CAT, and EEG records and found no evidence of brain injury.   (*Id.* at 9.)   Dr. Griesemer testified that in automobile accidents, victims tend to experience

31

acceleration-deceleration injuries where the head jerks forward and back.    There would be evidence of contusions or blood on the brain if that occurred, and Gabrion's 1992 CAT scan taken at the time of the purported accident did not show the injury. (*Id.* at 15-17.)    Griesemer testified that a PET scan is not a diagnostic tool used to evaluate brain injury, and Gabrion's PET scan did not show trauma.    (*Id.* at 20, 36.)    He concluded that Gabrion's testing as severely-impaired in functioning was not explained by traumatic brain injury.    Gabrion showed complex functioning in obtaining false identification, banking transactions, and the planning of the murder. (*Id.* at 11-12, 22-24.)

Dr. Thomas Ryan, a clinical psychologist, reviewed records, interviewed and tested Gabrion.    (R.546: Ryan, 3/15/02 ESTR at 2-7.)    Dr. Ryan found Gabrion to be a malingerer.    He testified that if Gabrion had suffered a traumatic brain injury, he would have started with a severe impairment which would have improved over time, but Gabrion's purported illness had actually worsened.    Gabrion's tests showed him to be severely impaired; however, his real-life activities showed that he has a much higher level of functioning.    The testing data made no clinical sense when compared to Gabrion's everyday behavior.    (*Id.* at 10-22.)    During cross-examination, defense counsel got Dr. Ryan to confirm that Dr. Waalkes had found that Gabrion suffered from some neurological deficits (*id.* at 21), that he had no actual evidence that Gabrion was malingering in his 1993 evaluation by Dr. Waalkes, and that he had been paid by the government to serve as an expert (*id.* at 26).

32

Dr. Gregory Saathoff, a psychiatrist, also interviewed Gabrion.   Gabrion's trial counsel had filed a motion opposing the government's request for additional mental health examinations, including by Dr. Saathoff.   (R.466: Gabrion's Mem. in Opp. to Gov't Mot.)   Gabrion's trial counsel moved to exclude Dr. Saathoff's testimony, citing timeliness and reliability concerns.   (R.487: Mot. in Limine to Exclude Rebuttal Testimony of Dr. Gregory Saathoff.)   The Court denied the motion as to Dr. Saathoff, finding that the motion was not untimely given the circumstances and that Dr. Saathoff's examination was necessary for the government to rebut the defense's proposed mental health evidence.   (R.469: 3/5/02 Op. at 3-4; R.511: 3/12/02 Op.) Dr. Saathoff testified that he is a consultant to maximum security prisons and has interviewed hundreds of prisoners.   (R.546: Saathoff, 3/15/02 ESTR at 28.)   He reviewed records and interviewed Gabrion. (*Id.* at 30-33.)   Dr. Saathoff stated that he had examined the same CAT and PET scans as had Dr. Scharre, and disagreed that they showed any indication of brain injury. (*Id.* at 34.) Dr. Saathoff also disagreed that Gabrion suffered from frontal lobe injury or Geschwind Syndrome.

For example, Saathoff stated that Gabrion's claim that the FBI had moved Rachel Timmerman's body was not an example of "confabulation" but was a shrewd recognition that he could defeat a federal conviction if he could persuade the jury that she had been killed at the north end of Oxford Lake.   (R.546: Saathoff, 3/15/02 ESTR at 45-48.)   He likewise parted company with Scharre's conclusions that Gabrion's writings were proof of a brain injury.   Saathoff agreed that some writings

33

could be relied on for that conclusion, but there were many writings that were very coherent, particularly when Gabrion needed services from the jail.   This suggested to Dr. Saathoff that Gabrion was malingering. (*Id.* at 52-58.)

### 7.    Gabrion's Allocution

Gabrion also insisted, against his counsel's advice, on giving an allocution. (R.545: 3/15/02 ESTR.)   Gabrion told the jury that Rachel Timmerman's mother wanted to sell Timmerman's daughter Shannon for $10,000.   (*Id.* at 2.)   Gabrion said that Shannon was murdered by abortion "to feed the greedy, corrupt American legal and economic community, which you are a part of."   (*Id.*)   He told them that "irregardless of your earthling choice as to my punishment, I am returning to heaven, which can be likened to a continuous, happy erotic dream that I control … So in summary, don't feel guilty because you will live with your choice for all eternity, all eternity."   (*Id.* at 3.)

### 8.   The Verdict

The jury returned a verdict imposing the death sentence.   They found that two statutory aggravating factors were present beyond a reasonable doubt by unanimous verdict: (l) Gabrion committed the murder of the victim in an especially heinous, cruel and depraved manner; and (2) Gabrion committed the offense of murder after substantial planning and premeditation.   They also found the following non-statutory aggravating factors proven beyond a reasonable doubt by unanimous verdict: (1) future dangerousness, (2) the death of the victim caused injury and loss to her family and society; (3) Gabrion caused the death or

34

disappearance of Shannon VerHage; and (4) Gabrion obstructed justice by murdering the victim. (R.597: STR5 at 677-80.)

The jurors determined that the following mitigating factors were present: impoverished and abusive childhood (12 jurors); lack of parental guidance (3 jurors); upbringing contributed to his criminal conduct (6 jurors); no school disciplinary history (12 jurors); substance abuse (9 jurors); personality disorder (4 jurors); Gabrion possessed features of several personality disorders (12 jurors); Gabrion's capacity to appreciate wrongfulness of his conduct, regardless of whether this constituted a defense (2 jurors).   In addition, the jurors independently identified an additional mitigating factor, found by all 12 jurors: that the loss of Gabrion's life would be significant to his family (12 jurors).   (R.597: STR5 at 680-82.) After weighing these factors, the jury unanimously recommended that Gabrion be sentenced to death.   (*Id.* at 683.)   At the end of the proceedings, Gabrion asked if he should contact the Court about an appeal.   (*Id.* at 686.)

### 9. Appeals

On direct appeal, Gabrion's appellate counsel, Judy Clarke, Kevin McNally, and Margaret O'Donnell raised more than 20 issues.   *Gabrion II*, 648 F.3d at 318 n.1 (addressing what the panel combined into 21 arguments); *Gabrion III*, 719 F.3d at 533 (addressing three additional arguments purportedly overlooked by the panel).   This included an argument that the federal government lacked jurisdiction to prosecute the case; that issue was the subject of supplemental briefing and an evidentiary hearing, and was conclusively resolved in *Gabrion I*, 517 F.3d at 857.

35

Gabrion's appellate counsel sought rehearing en banc and certiorari, but those petitions were denied. *United States v. Gabrion*, Nos. 02-1386/1461/1570 (6th Cir. Aug. 26, 2008); *Gabrion v. United States*, 129 S. Ct. 1905 (2009).

The Sixth Circuit panel then resolved 21 issues.   Prior to addressing the legal issues, the court summarized the circumstantial evidence of Gabrion's guilt, which it characterized as "overwhelming."   648 F.3d at 317.   In the course of addressing the issues, the court stated three additional times that the evidence of Gabrion's guilt was "overwhelming."   *Id.* at 337, 338, 345 n.16.

**First**, the court rejected the claim that Gabrion was incompetent to stand trial, including during the sentencing phase after he punched Attorney Stebbins in front of the jury.   648 F.3d at 318.   The court noted that nine mental health experts had evaluated Gabrion, all of whom except one (Dr. Scharre, who did not examine him) had found that he was malingering (feigning) mental illness, and agreed that the records demonstrated that Gabrion "knew what he was doing."   *Id.* at 320.   **Second**, the panel found that the district court erred in not instructing the jury that Michigan's abolition of the death penalty is a "mitigating factor" that the jury may consider.   *Id.* at 323-24.   **Third**, the panel found that the district court erred in not instructing the jury that it needed to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.   *Id.* at 328.

**Fourth**, the panel held that the failure of the indictment to allege statutory aggravating factors was not harmful error because Gabrion had actual notice of the aggravating factors a year before the trial and because no rational grand jury could

36

fail to find that the prosecution lacked probable cause on any of the aggravating factors due to the strength of the evidence. *Id.* at 330. **Fifth**, the panel rejected Gabrion's remaining jurisdictional arguments. *Id.* **Sixth**, the panel rejected Gabrion's argument that he was denied his Sixth Amendment right to self-representation, citing Gabrion's "persistently disruptive and deeply disrespectful" conduct in court as a proper basis for denying his request. *Id.* at 331-32.

**Seventh**, the panel rejected Gabrion's argument that the district court erred in not granting Attorney Stebbins's request to withdraw as counsel or grant a mistrial after Gabrion punched him. The court observed that permitting Stebbins to withdraw would have either significantly delayed the proceedings if new counsel was appointed or "undermined the public interest by permitting a psychopathic defendant to manipulate the proceedings so that he would represent himself, rather than be represented by trained and conscientious counsel," *id.* at 333, and that granting a mistrial would have been tantamount to "allow[ing] a manipulative defendant like Gabrion to delay his own sentencing through dangerous conduct," *id.* **Eighth**, the panel held that a handful of conferences held without Gabrion's presence did not violate his due process rights, observing that, "[r]ather than being disloyal, defense counsel showed great dedication to Gabrion, even after he punched one of them in the face." *Id.*

**Ninth**, the panel held that failure to disclose a report by the Department of Justice's Office of Professional Responsibility concerning conduct by Chrystal Roach, the Michigan prosecutor who had handled the rape case against Gabrion and

briefly served as a Special Assistant U.S. Attorney for pretrial proceedings and testified at the trial, did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), or Gabrion's Confrontation Clause rights.   *Id.* at 336.   The panel reiterated that "[t]he evidence that Gabrion had murdered Rachel Timmerman was "simply overwhelming" and characterized Roach's testimony as relating only to "peripheral" facts.   *Id.*

**Tenth**, the panel held that this Court did not abuse its discretion in removing a sleeping juror.   *Id.* at 339.   **Eleventh**, the panel held that this Court had properly admitted videotaped testimony of Linda Coleman and Kathryn Westcomb, who were too ill to attend the trial.   *Id.* at 340.   **Twelfth**, the panel held that admission of Dr. Saathoff's testimony in rebuttal was proper, *id.* at 341; and **thirteenth**, the panel held that the district court did not violate Gabrion's confrontation rights when it refused to allow the defense to cross-examine a government rebuttal expert about an unresolved, unrelated ethics complaint, against Dr. Ryan, *id.* at 342.   **Fourteenth**, the panel majority stated it was troubled by what it perceived as uneven treatment of pro-death penalty and anti-death penalty jurors during voir dire, but declined to reach the issue.   *Id.* at 344-45.

**Fifteenth**, the panel rejected Gabrion's argument that the FDPA is facially unconstitutional because it provides that the Federal Rules of Evidence do not apply during the penalty phase of a death penalty trial.   Though the panel noted it was reviewing this issue for plain error due to the lack of objection during trial, it found

38

no error, *id.* at 347 ("Congress's decision to relax the evidentiary standard . . . is no

constitutional defect"), and did not address the other prongs of the plain error

standard.    **Sixteenth**, the panel rejected Gabrion's argument that the Court erred

in admitting evidence of Gabrion's unadjudicated acts during the penalty phase,

noting again that Congress in enacting the FDPA justifiably adopted a "loose

evidentiary standard"   to maximize the information available to the jury in making

its penalty determination.   *Id.* at 348.   The panel also rejected Gabrion's argument

that the evidence should have been limited to that which related to Gabrion's future

dangerousness in a prison setting, noting that appellate counsel had not indicated

which evidence was relevant only outside the prison context and that it was

"unclear" to the court which evidence that would be.   *Id.* at 349.

Seventeenth, the panel rejected a claim challenging certain remarks the

prosecutor had made during the penalty phase closing argument, finding "no

impropriety" in the remarks, *id.*, and **eighteenth**, the panel held that any error in

an isolated remark from Timmerman's mother was harmless, *id*.

Nineteenth, the panel held that the Court did not abuse its discretion in

declining to conduct a hearing concerning a statement the jury foreperson made to

the media after the trial indicating that he knew Gabrion was "off the wall" prior to

the trial, as the juror had disclosed his familiarity with the case from media

coverage during voir dire.   *Id.* at 351.   **Twentieth**, the panel rejected a claim that

the Court should have ordered a new trial on the basis that the government had not

disclosed that Lloyd Westcomb had submitted to a competency evaluation in

39

connection with a state court proceeding, where Westcomb had disclosed during his trial testimony both the pending charge and the fact that he had been diagnosed a paranoid schizophrenic and thus the "new information" was "plainly not material." *Id.* at 351. And **twenty-first**, the panel held that the Court did not abuse its discretion in declining to give two jury instructions requested by the defense: an instruction stating it could consider Gabrion's courtroom behavior as an indication of his inability to control his conduct, which the panel found was adequately covered in other instructions; and an instruction regarding BOP's administrative regulations, which the panel held was adequately covered by the instruction that the jury could consider that Gabrion would "not be a danger in the future if he is confined in a highly structured and secure federal prison" and Cunningham's testimony, which outlined the security restrictions available to the BOP. *Id.* at 353.

As a result of the panel's ruling on the second and third issues, it vacated Gabrion's death sentence. Judge Batchelder dissented from the panel's ruling on those issues, and the panel's dicta concerning the voir dire issue, and concurred in its ruling on the remaining issues. *Id.* at 353-54, (Batchelder, J., concurring in part and dissenting in part.)

The government sought rehearing en banc, and the Sixth Circuit reheard the case en banc and reinstated the death sentence. *Gabrion III*, 719 F.3d at 535. In the course of rejecting Gabrion's claim that the jury should have been instructed that it may consider the fact that Michigan is a non-death-penalty state, the court

40

observed that "[w]hether Gabrion killed Timmerman inside the Forest (as opposed to killing her outside the Forest and then moving her body inside) was an issue extensively litigated during the guilt phase of Gabrion's trial."  *Id.* at 511.   The court held that any error in not permitting Gabrion's trial counsel to argue "residual doubt" on that point was harmless beyond a reasonable doubt, stating that the "government's case for aggravation was overwhelming."  *Id.*

The en banc court also rejected Gabrion's argument relating to the allegedly uneven treatment of pro- and anti-death penalty jurors, and rejected three claims that Gabrion argued the panel had overlooked: that the court of appeals should order a competency examination, noting that the district court had ordered "no fewer than three" such evaluations, each of which concluded that Gabrion was competent and malingering; that Gabrion should not have been excluded during a portion of the penalty phase after he punched Attorney Stebbins, an argument that the court of appeals characterized as "def[ying] common sense"; and that Dr. Saathoff's testimony exceeded the proper scope of rebuttal.  *Id.* at 530-31, 533-35.

## LEGAL STANDARDS

### I.     General Standards Governing Motions under 28 U.S.C. § 2255

The Supreme Court has cautioned, "it must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception."  *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Thus, when the process of direct review, including the right to seek certiorari, comes to an end, "a presumption of finality and legality attaches to the conviction and

41

sentence." *Id.* Accordingly, while "[t]he role of federal habeas proceedings . . . [is] important in assuring that constitutional rights are observed," that role "is secondary and limited." *Id.*

To obtain relief under 28 U.S.C. § 2255, a movant must show that "the sentence was imposed in violation of the Constitution or laws of the United States, the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Section 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979). Rather, it provides an avenue of redress for only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Reed v. Farley*, 512 U.S. 339, 340 (1994) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962). *See also United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) ("Relief under § 2255 is reserved for fundamental defects which inherently result in a complete miscarriage of justice, or errors so egregious that they amount to violation of due process") (quoting *Hill*, 368 U.S. at 428); *Talley v. United States*, 573 F. App'x 410, 412 (6th Cir. 2014) (same).

**Untimely claims.** A Section 2255 motion must be filed within one year of the latest of (1) the date the movant's conviction became final; (2) the date on which an impediment to making the motion was removed; (3) the date on which the right was initially recognized by the Supreme Court; or (4) the date on which the facts

supporting the claims could have been discovered with due diligence. 28 U.S.C.

§ 2255(f). Gabrion's conviction became final on April 28, 2014, when the Supreme

Court denied certioarari (R.731); post-conviction counsel were appointed the

following day (R.730); and the original Section 2255 motion was filed 363 days later,

on April 27, 2015. The original motion was filed within one year of Gabrion's

conviction becoming final, but the amended motion, filed well after the one-year

deadline contains many untimely claims.

Amendments to § 2255 motions are governed by Fed. R. Civ. P. 15, *United

States v. Clark,* 637 F. App'x 206, 208 (6th Cir. 2016), and are subject to the one-

year statute of limitations for § 2255 claims, *Howard v. United States,* 533 F.3d 472,

475 (6th Cir. 2008).   Amendments filed after the statute of limitations has expired

are time-barred unless they "relate back" to the original, timely motion.   *Mayle v.

Felix,* 545 U.S. 644 (2005). "An amendment to a pleading relates back to the date of

the original pleading when … the amendment asserts a claim or defense that arose

out of the conduct, transaction, or occurrence set out – or attempted to be set out –

in the original pleading."   Fed. R. Civ. P. 15(c)(1)(B).

In *Mayle,* the Supreme Court rejected a broad reading of "conduct,

transaction, or occurrence" in Rule 15 and held that "[a]n amended habeas petition

… does not relate back (and thereby escape AEDPA's one-year time limit) when it

asserts a new ground for relief supported by facts that differ in both time and type

from those the original pleading set forth."   545 U.S. at 650.   "Each separate

congeries of facts supporting the grounds for relief … would delineate an

43

'occurrence.'"   *Id*. at 661.   Relation back applies only where "the original and amended petitions state claims that are tied to a common core of operative facts." *Id*. at 664.   Applying these principles, the Court held that an amended claim challenging the voluntariness of the defendant's pre-trial statements did not relate back to a claim of the admission of videotaped witness testimony at trial.

Rule 2(b) of the Rules Governing Section 2255 Proceedings (hereafter § 2255 Rules) provides, among other things, that a § 2255 motion must (1) specify all the grounds for relief available to the moving party; and (2) state the facts supporting each ground.   § 2255 Rule 2(b)(1) and (2).   This is a form of fact pleading rather than notice pleading.   *See Mayle,* 545 U.S. at 655; *Borden v. Allen,* 646 F.3d 785, 810 (11th Cir. 2016).   "The facts alleged must be specific enough to put the opposing party on notice of the factual basis for the claim."   *Dodd v. United States,* 614 F.3d 512, 515 (8th Cir. 2010).   "[T]he liberal pleading requirements of Rule 8 (of the Federal Rules of Civil Procedure) do not extend to a § 2255 motion and cannot be used to bootstrap 'new,' factually specific claims in an amended motion to vague or broad claims in an original motion."   *Johnson v. United States,* 860 F. Supp. 2d 663, 716 (N.D. Iowa 2012).   If the facts pled in the original motion do not reasonably put the respondent on notice of claims sought to be raised in an amended motion, those claims do not relate back to the original motion.   *Id.* at 717 (citing *United States v. Hernandez,* 436 F.3d 851, 858 (8th Cir. 2006)).   The

44

timeliness of the amended claims is addressed in each argument section below, as appropriate.[4]

**Procedurally defaulted claims.**   As a general rule, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the petitioner shows either 1) "cause" and "actual prejudice"; or 2) "actual innocence."   *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982).   This rule applies to death penalty cases just as it does to other criminal cases. *E.g.*, *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005).   Courts have construed the two exceptions narrowly.   Cause exists only if a factor external to the defense prevented counsel from raising the defaulted claim at an appropriate juncture.   *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Rayner v. Mills*, 685 F.3d 631, 644 (6th Cir. 2012) (quoting *Murray*, 477 U.S. at 488).   To establish actual prejudice, a defendant must show not only that the claimed errors amount to more than the mere possibility of prejudice, but also that they "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional

---

[4] In support of the motion for leave to amend the original petition, Gabrion's counsel did not describe the proposed amendments or how the proposed amendments related back to the original motion.   The motion merely made the conclusory statement that "[a]ll information, and all amendments, relate back to the original claims offered by Mr. Gabrion, as required by *Mayle v. Felix*, 545 U.S. 644, 664 (2005).   New facts are offered to support previously plead claims.   No new claims are offered."   (PageID.2698.) In granting the motion to amend, this Court stated that "the Court is not making a determination regarding the merits of any amended claims or their timeliness."   (PageID.3884.)   *See also Cazarez v. United States*, 2017 WL 663141, *4 n. 12 (E.D. Tenn. Feb. 16, 2017) (grant of motion to amend "did not constitute a finding that the claim raised in it was timely asserted").

dimension."  *Frady*, 456 U.S. at 170.  *See also Jalowiec v. Bradshaw*, 657 F.3d 293, 305 (6th Cir. 2011) (citing *Beuke v. Houk,* 537 F.3d 618, 633 (6th Cir. 2008)).  A defendant who files a Section 2255 motion thus bears a greater burden than he would under the plain error standard applicable to forfeited claims on direct review. *See Frady*, 456 U.S. at 166.  An ineffective assistance of counsel claim, however, is not subject to the procedural default rule and therefore may be raised in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal.  *Massaro*, 538 U.S. at 504.

**Previously litigated claims.**  "A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances," *DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (internal citations and quotation marks omitted), or "an intervening change in the case law." *Wright v. United States*, 182 F.3d 458, 467 (6th Cir.1999).  Federal prisoners rarely succeed in persuading the court that extraordinary circumstances justify relitigation of an issue.  *See, e.g., United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000) (per curiam).  Indeed, the only recurring extraordinary circumstance is an intervening change in the law, which usually results from a judicial decision that narrowly construes the statute of conviction.  *See Davis v. United States*, 417 U.S. 333 (1974).

**Claims based on new rules.**  Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, a defendant ordinarily may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review.  *See Teague*, 489 U.S. at

46

310.   A "new rule" is one that "breaks new ground or imposes new obligation on the States or the Federal Government" and was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Id.* (plurality opinion, emphasis in original); *see also Graham v. Collins*, 506 U.S. 461, 466-67 (1993).   Subject to two narrow exceptions, if the rule is "new," it is unavailable to the defendant on collateral review.   *O'Dell v. Netherland*, 521 U.S. 151, 156-57 (1977).   The first is "for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 157 (alterations and internal quotations omitted). The second is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.*   This is reserved for "bedrock" rules that are essential to basic fairness.   *Id.* at 167.

**Harmless Error.**   To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings.   *Reed v. Farley*, 512 U.S. 339, 353, (1994); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (§ 2254 case); *Hill v. United States*, 368 U.S. 424, 428 (1962); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994); *see also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir.1994) (applying *Brecht* to a § 2255 motion).   In other words, "[o]n collateral review, a trial error is deemed harmless unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.'"   *Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998) (quoting *Brecht v. Abrahamson*, 507 U.S. at 637).

47

To warrant relief for a nonconstitutional error, however, a movant must demonstrate that a fundamental defect in the proceedings resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure occurred during the criminal proceedings. *Reed v. Farley*, 512 U.S. at 354; *Grant v. United* States, 72 F.3d 503, 506 (6th Cir. 1996).

**Evidentiary hearing standard.**   In an action to vacate or correct the sentence, a court is generally required to grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ."  28 U.S.C. § 2255.   The statute "does not require a full blown evidentiary hearing in every instance. . . . Rather, the hearing conducted by the court, if any, must be tailored to the specific needs of the case, with due regard for the origin and complexity of the issues of fact and the thoroughness of the record on which (or perhaps, against which) the section 2255 motion is made."  *Wright v. United States*, 320 F. App'x 421, 427 (6th Cir. 2009) (quoting *Smith v. United States*, 348 F.3d 545, 550-51 (6th Cir. 2003)) (internal quotation marks and citation omitted).   No evidentiary hearing is required if the petitioner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."  *Amr v. United States*, 280 F. App'x 480, 485 (6th Cir. 2008) (citing *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007)).   This rule is no less true in a capital case.   *See, e.g., United States v. Fields*, 761 F.3d 443, 483 (5th Cir. 2014) (reasonable jurists would not debate the

48

district court's decision not to conduct an evidentiary hearing where the record and capital defendant's § 2255 motion were adequate to dispose of each of the defendant's claims), *cert. denied*, 235 S. Ct. 2803 (2015).

## II.    Standards Governing Ineffective Assistance of Counsel Claims

Generally, to establish a claim of ineffective assistance of counsel, the petitioner must prove that his counsel's performance was deficient and that the deficiency prejudiced him.    *Strickland v. Washington*, 466 U.S. 668, 687 (1984).    To show deficient performance, the petitioner must establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of those errors a reasonable probability exists that "the result of the proceeding would have been different."    *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (finding that petitioner must show that counsel's performance fell below prevailing professional norms).    The same standard applies to death penalty cases.    *E.g., Newland v. Hall,* 527 F.3d 1162, 1184 (11th Cir. 2008).    In fact, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697.

In evaluating counsel's performance, the Court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."    *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Strickland*, 466 U.S. at 690); *see also Docherty v. United States*, 536 F. App'x 547, 551 (6th Cir. 2013) (same). "Judicial scrutiny of counsel's performance

49

must be highly deferential." *Id.* Courts generally accord great deference to counsel's tactical decisions at trial, "such as refraining from cross-examining a particular witness or from asking a particular line of questions." *Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015) (quoting *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000)). By the same token, courts rarely hold counsel ineffective for failing to foresee a change in the law. *See Henley v. Brunsman*, 379 F. App'x 479, 482 (6th Cir. 2010) (counsel will not be held ineffective for failing to anticipate a change in the law unless the change was "clearly foreshadowed" at the time of trial) (quoting *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999)). *Accord Shaw v. Wilson*, 721 F.3d 908, 916-17 (7th Cir. 2013); *Toledo v. United States*, 581 F.3d 678, 681 (8th Cir. 2009) ("Counsel is not accountable for unknown future changes in the law"); *United States v. Davies*, 394 F.3d 182, 189-90 (3d Cir. 2005) ("there is no general duty on the part of defense counsel to anticipate changes in the law"); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) (rejecting claim that counsel was ineffective for failing to anticipate a decision that came nine years after trial).

Regarding the scope of an attorney's duty to investigate, "[i]t is well-established that '[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Sutton v. Carpenter*, 617 F. App'x 434, 446-47 (6th Cir. June 2015) (quoting *Strickland*, 466 U.S. at 691). The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman*

50

*v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland*, 466 U.S. at 690).   This

duty includes the obligation to investigate all witnesses who may have information

concerning his or her client's guilt or innocence.   *Foster v. Wolfenbarger*, 687 F.3d

702, 708 (6th Cir. 2012) (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)).

"In any ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances, applying a heavy measure of

deference to counsel's judgments."   *Strickland*, 466 U.S. at 691.

## GABRION'S CLAIMS[5]

**GROUND ONE:   The Government Did Not Present False or Misleading Evidence**

Gabrion argues that false and misleading information was presented against

him at trial, causing him to be denied a fair and reliable sentencing hearing.

(PageID.3895.)   His claims are procedurally defaulted and without merit.

The claims Gabrion asserts in this section are procedurally defaulted because

he did not raise them at trial or on appeal.   The defense either had the documents

he cites at the time of the trial (e.g., the "CASKU" report discussing the

handwriting examination of Rachel Timmerman's letters, the grand jury testimony

---

[5] Gabrion's trial attorneys, Attorneys Mitchell and Stebbins and mitigation
specialist James Crates met with the government and Gabrion's post-conviction
counsel in 2015 to discuss the claims in Gabrion's original § 2255 motion.
Gabrion's post-conviction counsel, Mitchell, and Stebbins declined to make available
trial counsel's original files.   Because, in the government's view, all of Gabrion's
claims may be resolved as a matter of law without an evidentiary hearing, the
government has not moved for an order requiring disclosure of the files, but the
government reserves the right to seek such an order in the event the Court
determines that a hearing is necessary.

of various witnesses), or they were available at the time (e.g., the Newaygo County

Court documents).   Gabrion offers no basis for this Court to conclude that he has

"cause" or "prejudice" to excuse his failure to raise these issues earlier; and this

information certainly does not establish his "actual innocence."   Indeed, to the

contrary, each of the claims is devoid of merit and should be rejected as

procedurally barred.

> **A.    The Government Did Not Present False Testimony from Chrystal Roach Concerning the Pending Rape Case**

Under the inflammatory heading "the Lies and Misrepresentations," Gabrion

argues that the government put on false evidence about the motive for him to

murder Rachel Timmerman.   He cites Newaygo County Prosecutor Chrystal

Roach's testimony that she requested a preliminary examination in Timmerman's

rape case and that she tries to have such examinations in assault cases before trial,

and a transcript showing that Gabrion's attorney requested the examination, and

urges the Court to draw various speculative inferences to conclude that this was

knowingly false, material testimony that the government failed to correct and used

to "mislead" the jury.   (PageID.3895-3909.)   This argument is baseless.

"The knowing use of false or perjured testimony constitutes a denial of due

process if there is any reasonable likelihood that the false testimony could have

affected the judgment of the jury."   *Melville v. United States*, 457 F. App'x 522, 528

(6th Cir. 2012) (quoting *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)) (internal

quotation marks omitted).   To succeed on such a claim, a defendant must show (1)

the statement was actually false; (2) the statement was material; and (3) the

52

prosecution knew it was false.  *Id.*  To show falsity, the defendant must demonstrate that the testimony was "actually perjured"; "mere inconsistencies" are not sufficient to establish knowing use of false testimony.  *Id.* (internal quotation marks omitted); *see also Akrawi*, 572 F.3d 252, 265 (6th Cir. 2009) ("The subject statement must be 'indisputably false' rather than 'merely misleading.'") (quoting *Abdus–Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005)).  In turn, "[a] false statement is material ... and '[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury."  *Brooks*, 626 F.3d at 895 (second and third alterations in original) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

Gabrion fails on every prong of this analysis.  First, he does not point to any statement that was "indisputably false."  The government's position at trial was that Gabrion murdered Timmerman because she had accused him of raping her and the trial was pending.  As part of that argument, the government alleged that Gabrion delayed the rape trial so that he could get access to Timmerman.  (R.588: TR4 at 929; R.592: TR8 at 1682.)  Roach testified that she filed the complaint against Gabrion on October 31, 1996, and Gabrion made his first court appearance on January 21, 1997.  (R.588: Roach, TR5 at 1161.)  Roach also testified that Timmerman herself was in jail between January 8 and May 5, 1997.  (*Id.* at 1166.)  The case against Gabrion was delayed because he switched attorneys twice.  Gabrion waived his first chance at a preliminary examination, on January 30, 1997.  (*Id.* at 1163-64.)  Roach testified that the case languished in circuit court without

53

making any progress toward trial, so she requested that it be remanded back to district court for a preliminary examination.   (*Id.* at 1165.)   A preliminary examination was scheduled for June 5, 1997, and Roach explained that she planned for Timmerman to testify to preserve her testimony.   (*Id.*)   But Roach learned during the week of June 2, 1997, that Gabrion had waived the preliminary examination without her knowledge.   (*Id.* at 1165-67.)   This meant that when Roach received Timmerman's letter in mid-June 1997 exonerating Gabrion, the case had to be dismissed.   (*Id.* at 1167-69.)   During cross-examination, Roach agreed that preliminary examinations were commonly waived; however, she asserted that in assault cases she felt strongly that preliminary examinations should be held, and that she tried to conduct them in every case before trial.   (*Id.* at 1174-75.)

Gabrion asserts that Roach's testimony was "false" in "several ways."

First, he argues that court records contradict Roach's claim that she always tries to have preliminary examinations in assault cases.   (PageID.3905 & Exs. 1.3, 1.4; 5.)   But those records do not establish that Roach's testimony is "indisputably false."   Preliminarily, it is unclear whether Roach was referring to all cases involving "assaultive conduct" or whether she was referring to sexual assault cases and/or domestic assault type cases (i.e., cases that prosecutors often have difficulty bringing due to high victim recantation rates).   Indeed, some of the cases listed in Gabrion's exhibits do not involve assaultive conduct at all (see, e.g., Ex. 5, PageID.4040 (carrying concealed weapon charge); and many are not the type of assault cases she likely had in mind (see, e.g., PageID.4103 ("resist & obstruct

54

officer" and "malic destr fire/police").   Some of the records reflect that a preliminary

examination was conducted, without identifying at which party's request.   E.g., Ex.

1.3 (96-006281-FH, indicating "Prelim: Held 09/19/96."). The records are often

ambiguous as to who requested a remand for a preliminary examination (compare,

e.g., PageID.4094 (indicating remand to district court

for preliminary examination; per request of *dfndt atty*") with PageID.4129

(indicating remand to district court for preliminary examination; per request of

*atty*).   At least one record appears to involve a request for a remand to district court

made by Roach, though the purpose is unclear. (PageID.2929.)   More significantly,

most of the records involve cases that were resolved without a trial—Roach testified

that she "tried" to conduct preliminary examinations in assault cases prior *to trial*.

(R.588: Roach, TR5 at 1175.)   Most cases (95 percent, according to the trial

testimony, 1173) are resolved via a plea, and there would be no need for an

examination in such cases.   Further, the records do not show, for example, whether

Roach ever joined defense motions to remand for a preliminary examination, or

whether she suggested such a course to defense counsel.   And that Roach "tried" to

have preliminary examinations every time does not mean she succeeded in having

them occur—typically a preliminary examination is conducted for the defendant's

benefit, to ensure that there is probable cause to support the charge against him,

and the prosecutor may have a difficult time persuading a court to conduct one even

when the defense has waived it.

Second, Gabrion argues that Roach testified falsely when she said that she requested that the Timmerman rape matter be remanded back to the district court; in fact, Gabrion says, court records show that on April 29, 1997, it was Gabrion's counsel, not the prosecution, who requested a preliminary examination.   Am. Mot PageID.3900, 3904-3905 & Ex. 1.2.   This amounts to semantics—as Gabrion's exhibit (Mot. Ex. 1.2) demonstrates, the prosecutor *raised the issue* of a preliminary examination.   (PageID.1031.)   The prosecutor advised the court that it was her "understanding" that Gabrion "seeks to remand this matter" for a preliminary examination and stated, "the People do not oppose."   *Id.*   The court asked defense counsel to confirm, and he said, "Yes, your honor."   *Id.*   Thus it is possible that Roach suggested this course to defense counsel and then brought the matter to the court's attention; or it is possible that it was the defense attorney's idea but when Roach testified that she requested the examination she meant that she raised the issue.   Either of these reasonable inferences defeats Gabrion's claim that the testimony was indisputably false.

In any event, the challenged testimony was plainly not material.   As the court of appeals observed on direct review, Roach's entire testimony was "peripheral"; indeed, as that court put it, given the "overwhelming" evidence that Gabrion murdered Timmerman, "Roach's testimony was far from critical in establishing Gabrion's guilt."   *Gabrion II*, 648 F.3d at 336.   The broader argument that Roach's testimony supported was that Gabrion attempted to delay the rape trial, particularly while Timmerman was still in jail (January to May 1997).   As to

56

that argument, the exhibits on which Gabrion relies to challenge Roach's testimony actually support the government's position in every important respect.    Exhibit 1.1, the docket sheet for the Timmerman rape case, confirms that Gabrion was represented by three different attorneys: Greer, Rominger, and Townsend. Gabrion's attorney waived the first preliminary examination, scheduled for February 4, 1997.    On that date, he stood mute and a not guilty plea was entered. Mot. Ex. 1.1, PageID.1025.    On April 29, 1997, Townsend, Gabrion's third attorney, requested that the case be remanded to district court.    *Id.* at PageID.1026, "Num" 23.    On May 30, 1997, the district court accepted the remand, and set the matter for re-arraignment because the day before, the defense had again waived its right to a preliminary examination—without Roach's knowledge, according to her testimony (R.589: TR5 at 1166-67), as confirmed by the district court judge's testimony at trial (Drake, TR5 at 1241-42).    That same day, May 30, Gabrion posted bond and was released.    Mot. Ex. 1.1, "Num" 26.    On June 2, 1997, a second arraignment was held and Gabrion again stood mute, and a not guilty plea was entered. PageID.1026, "Num" 28.

Put another way, on June 2, 1997, Gabrion's case was in precisely the same position as it was on February 4, 1997.    The only difference was the passage of four months, during which Timmerman completed her jail sentence and was released, as was Gabrion.    Several witnesses testified that Timmerman said Gabrion threatened her in this time frame.    (R.589: Hyrns, TR5 at 1207-10; Wilson, TR5 at

1224-27.)   She told one friend, for example, that Gabrion was going to kill her because the rape case was coming up.   (Wilson, TR5 at 1224-27.)

These facts easily support the government's argument that Gabrion attempted to delay the trial by, for example, switching attorneys multiple times and repeatedly requesting and then waiving a preliminary examination.   The critical facts underlying the government's argument were that: 1) Timmerman had reported the rape; 2) Gabrion had been charged with the rape; 3) Gabrion had threatened to kill Timmerman if she told anyone about the rape—both at the time of the rape and upon her release from jail; 4) the rape trial was going to occur at some point; and 5) Timmerman disappeared less than a month after her release from jail, and only a few days after the last event in the rape case—when Gabrion's attorney waived the preliminary examination that might have "locked in" her testimony and permitted the case to go forward.   Nothing Gabrion says now undermines any of those core facts.   Indeed, Gabrion's testimony at trial supported the government's argument that he killed Timmerman to keep her from testifying against him in the rape trial.   When asked during cross-examination whether he thought what he did to Timmerman was justified and not murder, he responded: "No, I don't think what you did to her is justifiable at all.   I think what you did is you forced her to testify in a case against a person lying in a case which forced her to become a victim to a crime, you and these prosecutors and the police.   You know what you did."   (R.461: 3/1/01 ETR at 73.)

58

Gabrion also fails to show that the government was aware of any false testimony by Roach.   Even if Roach made a mistake, for example, when she said that she requested the preliminary examination in April 1997 (though, as set forth above, that is not the only explanation), there is no evidence that the government *knew* that the testimony was false.   For that reason too, Gabrion's claim fails.

In his amended motion, Gabrion asserts that the government "hoodwinked" the jury and the court of appeals into believing that Timmerman's trial was scheduled for June 5, when in fact, it was only a preliminary examination that had been scheduled for that date (and ultimately waived by Gabrion on May 29, the day before his release on bond). (PageID.3901-02.)   The government did not "hoodwink" anyone.   Some lay witnesses had the impression that the June 5 court appearance that Rachel was scheduled to appear at and testify at was the trial.   E.g., R.472: L. Timmerman (Rachel's father), 2/25/02 ETR at 13.)   The court of appeals likely mistook reference to this testimony to mean that the trial was, in fact, scheduled for June 5.   But it hardly matters.   As set out more fully above, the relevant facts are: Rachel was scheduled to testify against Gabrion in court on June 5; despite having asked for the hearing to occur, he waived it (for the second time) on May 29; five days later, after a period in which she had encountered Gabrion and was so terrified of him she felt she needed to "leave a trail" (Hyrns, 1210), she disappeared; a couple weeks later, letters in envelopes bearing a signature Gabrion stamp arrived at the prosecutor's office and the court exonerating him, written in Rachel's hand, but in terms that largely tracked the account of the rape that Gabrion had previously

given; shortly thereafter, Rachel's body was discovered. Whether it was a trial or a preliminary examination hearing scheduled for June 5 makes no difference: the rape case was pending, and would eventually occur.   All of the government's arguments were made in good faith.

### B.    The Government Properly Argued that Gabrion Forced Rachel to Write the Letters Recanting the Rape Allegations

Gabrion argues that the government "falsely" told the jury that he forced Rachel Timmerman to write letters to her father, the prosecutor handling her rape case, and the judge presiding over the case, which recanted the rape allegations and suggested that Timmerman had moved to Arkansas.   (PageID.3909.)   Gabrion's sole basis for this assertion is a one-page FBI report summarizing a conversation with communications examiners, *which was turned over to the defense at the time of trial*.   The report states that FBI communications examiners said Timmerman was "probably" not under "extreme" duress when she wrote the letters, and that, based on reviewing other Gabrion writings, Gabrion "probably" did not "dictate" the letters to her.   (Mot. Ex. 1.8, PageID.1332.)

This claim is procedurally defaulted, and Gabrion has not shown cause and prejudice or actual innocence so as to excuse the default.   For several reasons, the claim lacks merit and therefore Gabrion cannot overcome this procedural bar. First, the report is not exculpatory.   The report was written by FBI Special Agent Stephen T. Kives of the Child Abduction and Serial Killer Unit relatively early in the investigation, December 19, 1997.   (Mot. Ex. 1.8, PageID.1332.)   Agent Kives relays the preliminary review by two examiners with the FBI's Law Enforcement

60

Communications Unit who were given letters known to be written by Gabrion and the letters that investigators suspected Timmerman wrote but at Gabrion's direction.   There is no indication that the examiners were given any other information relating to the letters or the case; rather, it appears that they were drawing conclusions from the "four corners" of the letters, looking at things such as "sentence structure."   *Id.*   Apparently based on those factors alone, the examiners opined that the letters known to be written by Gabrion, which lacked "any type of consistency" as he appeared to "reduce to paper anything that comes in to mind" were different from the ones purportedly authored by Timmerman, which "contained the same sentence structure, consistency, and thought processes throughout the writings."   *Id.*   Therefore, they opined that Timmerman "was probably not under extreme duress when she penned the letters and Gabrion probably did not dictate the letters to her."   *Id.*   Notably, both opinions were qualified ("probably"), reflecting the narrow scope of the examiners' inquiry. Further, the examiners said Timmerman was probably not under "extreme" duress, with no explanation as to what "extreme" meant.   Moreover, in the very next paragraph of the report, Agent Kives notes that what the examiners found "most glaring" was "Gabrion's inability to address Tim Timmerman's (Rachel's father[ 's]) claim in his letter to Gabrion that Gabrion killed both Rachel and her daughter, Shannon VerHage.   *Id.*   The report concludes:   "The examiners felt that while Gabrion can probably somehow justify Rachel's death, he cannot justify taking Shannon's life."   *Id.*   Thus, the examiners themselves did not view their findings

61

as exculpatory.   Given this—and the fact that the only use trial counsel could have made of the report is to call the examiners to the stand at trial—the report offered little strategic advantage to Gabrion.

Moreover, abundant other evidence (not before the examiners) supported the government's argument that Gabrion was responsible for the letters.   **First**, the letters arrived in the same unusual envelopes imprinted with a holographic stamp with a NASA spaceship design (R.589: Drake, TR5 at 1238-40; Trial Ex. 66; Roach, TR5 at 1168-69; Trial Ex. 62; R.472: L. Timmerman, 2/25/02 ETR at 13-19; Trial Exs. 64 & 65) that Gabrion used in his own correspondence (R.589: Weinbarger, TR5 at 1245-46; Trial Ex. 69; R.589: D. Gabrion, TR5 at 1255-57; Trial Exs. 67, 68). **Second**, though the handwriting appeared to be Timmerman's, certain aspects of the content of the letters made it highly doubtful that she composed the letters of her own volition.   For example, the letters to Timmerman's father said she had run off to Arkansas with a man named "Delbert," who had asked her to marry him. (Exs. 64 & 65.)   Timmerman's father, with whom she was living at the time she disappeared, testified that his daughter had never mentioned a man named Delbert, never mentioned going to Arkansas or wanting to live there, and never mentioned intending to marry anyone.   (R.472: L. Timmerman, 2/25/02 ETR at 18-19.)   **Third**, the letters to the prosecutor and the judge retracting the rape allegations, which had substantially the same content, appeared even less authentic.   The letters claimed that Timmerman had "made up" the rape charge against Gabrion because she was "mad at him" for calling her mother and sister

62

"prostitutes" at a card party.   (Trial Exs. 62, 66.)   They said further that Timmerman had performed oral sex on Gabrion, and then: "When he wouldn't have intercourse with me I decided to teach him a lesson.   The final straw was when his puppy bit my nose.   I pushed the come up my vagina with my finger and pinched myself so I'd be bruised[,] something I learned when Sara went through rape charges."   (*Id.*)   Though an unlikely, even preposterous story, it conveniently accounted for what Gabrion would know were certain details of the rape: explanations for any evidence of semen, bruising of her vagina, the injury caused to her nose when he bit her, and it essentially tracked the story he had given to the police at the time of the rape.   (R.588: Babcock, TR4 at 1088-94; Trial Ex. 46.) Further, each letter closed by saying that Timmerman was in love with an "honest Christian man" and that she couldn't "bear the thought of trying to lock up an innocent man."   (*Id.*)   Timmerman did not generally refer to people's religious affiliations when describing them.   (R.472: L. Timmerman, 2/25/02 ETR at 18-19.) Gabrion, however, frequently attempted to portray himself as a "Christian" man, telling people that he operated a "Christian book store" and exhibiting such hyper-religiosity that the defense tried to portray it as symptomatic of an underlying mental malady.   (R.589: Drake, TR5 at 1237; R.471: Wolf, 2/27/02 ETR at 28; R.461: Marvin Gabrion, 3/1/02 ETR at 28, 46; R.493: STR1 at 56 (defense penalty phase opening statement); R.539: Scharre, 3/13/02 ESTR at 30-31, 34; R.542: Marvin Gabrion, 3/14/02 ESTR at 6.)   And, of course, though the letters to Timmerman's father said he would hear from her soon, he never saw or heard from

63

her again.    Finally, all but the first letter to her father were postmarked June 14 or later—at a time when Timmerman was already dead in Oxford Lake.    (R.459: Cohle, 2/26/02 ETR at 16.)    Only Gabrion had an incentive to mail those letters exonerating him.

Given this mountain of evidence indicating that Gabrion did "force" Timmerman to write the letters at the time of her disappearance, shortly before her death, the government did not present "false" or "misleading" argument to that effect.    In the broader context of all this evidence, the summary reporting the communication examiners' initial analysis is meaningless.    Moreover, the government turned that summary over to the defense at the time of trial; Gabrion does not contend otherwise.    Because the government disclosed the report, Gabrion's "prosecutorial misconduct" claim is wholly without merit.    Thus, any effort by Gabrion to establish cause and prejudice for failing to raise this issue on appeal—which he has not even attempted to do—would be futile.

### C.    The Government Properly Argued that Rachel Timmerman Disappeared on June 3rd and Was Never Seen Alive Again

Gabrion alleges that the government "falsely" claimed that Timmerman disappeared on June 3, when it knew she "had been seen by numerous friends and acquaintances in the area after that date."    (PageID.3912.)    But the "evidence" Gabrion cites does not support the proposition that "numerous friends and acquaintances" saw her in the area *after* June 3rd.    Accordingly, Gabrion has not

64

come close to showing that the government misled the jury.   The claim is procedurally defaulted and wholly lacking in merit.

Indeed, Gabrion does not cite one scintilla of evidence supporting his claim that Timmerman was seen *after* June 3.   He cites grand jury testimony of Detective Richard Miller and through selective quotation suggests that the detective testified that friends and acquaintances saw her on June 3 "and possibly . . . a day or two later."   (PageID.3913 & Ex. 1.13.)   In fact, Detective Miller testified that the last known "positive date" he was able to confirm was June 3rd, which is when "her stepmother, her stepsister and a family friend" last saw her at her house at approximately 5:00 p.m.   Mot. Ex. 1.13, at PageID.1385.   He does say, "other people had seen her later *on that same day* and *possibly* have seen her a day or two later in the company of different people."   (*Id.*)   This is not inconsistent with the government's argument—after all, the government's theory was that Gabrion murdered Timmerman on June 6 (e.g., TR8 at 1692, Gov't closing).   And people did place Timmerman, or at least someone who looked an awful lot like her, *with Gabrion*, near Oxford Lake in early June 1997.   It was immaterial to the government's case whether it was June 3, 4, or 5th, and the government never claimed otherwise.

None of the other cited evidence supports Gabrion's claim.   He cites grand jury testimony of two of Timmerman's acquaintances, Tina Kanady and Roxanne VanSlyke, to the effect that they saw her the evening of June 3 and she told them she was going to a party that night.   (Exs. 1.15 & 1.16.)   The cited testimony

65

reveals its own unreliability (e.g., VanSlyke told police Timmerman had her baby when she stopped by, but she denied that in her testimony; VanSlyke admits that she had lied about who was with Timmerman that night), but even setting that aside, neither woman testified that she saw Timmerman *after* June 3.    Gabrion cites still other reports and grand jury testimony that he says supports the notion that other people "may" have seen Timmerman "on and after June 3" but none of it actually establishes that people saw her after June 3.    Some of it contradicts that claim—for example, Danny Holmes told the FBI that the last time he saw Timmerman was "approximately two weeks before she went missing" (Mot. Ex. 1.18 at PageID.1440); he told the grand jury that the last time he saw her was "the beginning of June somewhere right around the 2nd, 3rd. . . ." (Mot. Ex. 1.19 at PageID.1457.)

In short, Gabrion fails to establish any "false" or "misleading" claims made by the government.    He attempts to take isolated, insignificant facts—for example, that Timmerman was wearing different clothes when her body was discovered—and weave them into some intricate plot to mislead the jury.    But there is no evidence that this far-fetched plot occurred.    All of the evidence pointed to Timmerman disappearing June 3rd, and being murdered shortly thereafter.    (*See, e.g.*, R.459: 2/26/02 ETR at 15-16, Cohle, forensic pathologist, testifying that when Timmerman's body was discovered on July 7, she had been dead for "some three to four weeks" based on her body's decomposition.)    This claim is wholly without support and procedurally defaulted.

66

**D.    The Government Did Not Mislead the Jury Regarding BOP's Ability to Control Gabrion**

Gabrion's post-conviction counsel claim that Gabrion "has never been a danger in a BOP setting and never will be."   (PageID.3915.)   This is demonstrably false.   While in a custodial setting, Gabrion was caught with weapons in his cell, which included metal shards and razors (Hammersley, R.594: STR2 at 377-80; Hooker, STR2 at 324-29); hid nail clippers, which can be used to unlock handcuffs (Alwood, STR2 at 307-09); knowing he has Hepititis C, threw urine and feces at prison employees and started a fire in his cell (Rodriguez, STR2 at 310-313); made a fake gun from bars of soap (Lucas, STR2 at 367-372; Carney, STR2 at 385-389); attempted to bribe jail trustees to open cell doors for him (McTaggert, STR2 at 336-341); posed as the Clerk of the U.S. District Court and attempted to arrange his transfer out of Milan Prison (R.493: Weston, STR1 at 91; R.594: Cook, STR2 at 293; Ex. 89); talked about escaping many times (Brewster, STR2 at 35-54); tried to kick the metal sheeting in his cell to loosen it to make a weapon, and kept chicken bones to make shanks (weapons) (*id.*); made threatening remarks about female guards, saying that he would kill them; and threatened to cut himself and throw his blood on the jail deputies because he had Hepatitis C (*id.*).[6]

---

[6] According to a BOP incident report form that Gabrion attached to a motion he filed in the court of appeals, even after being sentenced to death, subject to BOP's security restrictions for death row inmates, Gabrion attacked his own appellate counsel.   (Sixth Cir. No. 02-1386, 6/5/09 Pro Se Mot. & Br., Doc. 367, Incident Report, Attached at 2 (reporting incident in which Gabrion "jump[ed] on the table and tackled the attorney to the floor" while yelling, "I will fucking kill her" and causing guard to suffer a cut to his left hand from Gabrion's "homemade weapon identified as an ink pen").

67

Current counsel claims, however, that the government "misled" the jury into thinking that he would be a danger in the future because it objected to the defense's request for the district court to instruct the jury as to a specific regulation, 28 C.F.R. § 501.3, pertaining to security classifications and restrictions, and to testimony regarding that regulation by the defense's retained expert, Mark Cunningham.   (PageID.3914-20.)   But the court of appeals already rejected the crux of this argument: that Gabrion's defense was "impaired" by the district court's refusal to give the instruction, or by the restricted scope of Cunningham's testimony.   *Gabrion II*, 648 F.3d at 353.   The court of appeals noted that despite the government's objection to Cunningham's testimony, "Cunningham was allowed to testify as to the different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous."   *Id.*   The court of appeals also held that this Court gave the jury an instruction that encompassed Gabrion's concerns when it instructed the jury that it could consider the possibility that Gabrion would not be a danger in the future if confined in a highly structured and secure federal prison.   *Id.*   This, combined with Cunningham's testimony "outlining the restrictions available to the Bureau of Prisons to secure a dangerous inmate" assured the court of appeals that Gabrion's defense was not impaired by not having the specific regulation incorporated into an instruction.   *Id.*

Accordingly, the government did not "mislead" the jury in any respect relating to BOP's ability to house Gabrion securely.   Indeed, as the court of appeals

68

observed, had this Court given the instruction Gabrion wanted, the government likely would have requested a countervailing instruction telling the jury that no prison is totally secure and confinement in a maximum security federal prison is not a guarantee that Gabrion will never threaten or harm anyone in the future.   *Id.* Given the abundant evidence of Gabrion's infliction of harm to others while housed in secure facilities and of his desire to escape, such an instruction would surely have been justified.   Gabrion cannot repackage this already-adjudicated claim as a "prosecutorial misconduct" claim—particularly where he has shown no misconduct by the government.

> **E.   There Was No "Pervasive Pattern" of Government Witnesses Testifying Falsely**

Citing the testimony of three of over 100 government witnesses who testified at his trial, Gabrion's motion alleges that there was a "pervasive pattern" of government witnesses who testified in a false or misleading fashion.   But Gabrion fails to show that the witnesses offered any materially false testimony, or that the government knew of any falsity.

**Linda Coleman.**   Coleman testified that she saw Gabrion with two others, one of whom was a blond woman who resembled Rachel Timmerman, in a pickup truck with a silver boat near Oxford Lake in early June 1997.   (R.670: 2/5/02 Dep. Tr. 5-16.)   Coleman initially said that she had arrived at the location near the lake where she saw the trio in a Geo Metro, but on being refreshed with her grand jury testimony during cross-examination she said, consistent with that testimony, that she had driven a truck there.   (*Id.* at 34-35.)   Gabrion now attempts to discredit

69

her testimony by attaching DMV records purportedly showing that Coleman's husband did not own a truck until two months later, and a Geo Metro car was not registered to her until a few months after that. (PageID.3921 & Ex. 1.11.) Gabrion has failed to show that Coleman's testimony was "indisputably" false. Coleman did not testify about *whose* vehicle she was driving that day; she could have been driving her husband's truck even if it had not yet been registered; or Coleman could have been simply mistaken about which vehicle she had been driving that day, some five years before she testified about it. Coleman was a 61-year-old woman who suffered from advanced chronic lung disease with hypoxia requiring oxygen therapy; she testified by deposition. (R.588: TR4 at 1129-31.) In any event, Coleman's testimony as to which vehicle she was in is plainly not material. As Gabrion concedes, Coleman was impeached about which car she was driving, and admitted she did not "remember a lot of it." (R.670: 2/5/02 Dep. at 35.) Defense counsel also effectively cross-examined her on other subjects, including that she did not initially tell the police what she had seen, either on her own accord or when questioned by the Newaygo County Sheriff's Office a few months later. (*Id.* at 35-38.) To the extent there were questions about her credibility, that was all before the jury. Moreover, Coleman's daughter, Kathy Kirk, testified at trial and corroborated all the material portions of Coleman's testimony: she was with her mother that day and she too saw Gabrion, along with another man and Rachel Timmerman. (R.591:TR7 at 1575-79.) Kirk testified that she and her mother arrived in a truck, and she (Kirk) was driving it. (*Id.* at 1575-76.) She did not

70

initially tell the police about the encounter, and actually lied about it in the grand jury, because she was scared of Gabrion and his family. (*Id.* at 1585-87.)

**Gregory Leon.** Leon testified during the penalty phase of Gabrion's trial. (R.592: STR1 at 123.) He said he first met Gabrion in April 1995 when Gabrion responded to a bulletin board notice about space being available at a homeless shelter operated by Leon's family called the Leon Christian Home. (*Id.* at 123-24.) He said he rented a room to Gabrion from April to October 1995 and that, while there, Gabrion bragged about owning surveillance equipment, tapped into his phone line, and stalked a girl at a nearby laundromat. (*Id.* at 124-30.) Gabrion now asserts Leon "lied" when he said he rented the room to Gabrion from April to October 1995 because a corporate record he found indicates that the Leon Home dissolved in October 1994. (PageID.3921.) Gabrion has not shown that the testimony was "indisputably false"—in the space for listing the year of the most recent annual report with officers and directors, the record states that the status is "automatic dissolution" and a date of 10-1-1994. (Mot. Ex. 1.12, PageID.1382.) It does not list the date when the Leon Home actually closed its doors. All the record shows was that the home was not recognized by the State as a business after October 1, 1994, having not filed annual reports for three years and thus being deemed automatically dissolved. In fact, real estate records reflect that Leon continued to own the Roos Street home until October 1995, when he unsuccessfully attempted to sell it before taking it back the next month and ultimately losing it to the bank. (Ex. C, Quitclaim deeds, PageID.2186-2188.) This is consistent with

71

Leon's testimony that he operated the home until October 1995.   But even if Leon got the date wrong, that does not mean that he testified "falsely," versus merely being mistaken; nor does Gabrion provide any basis for asserting that the government knew Leon was lying.

Gabrion's amended motion asserts a new allegation relating to Leon:   In April 1997, Leon was charged with sexual assaulting his wife, he was released on bond in November 1997 due to the trial not having commenced within 180 days; in July 1998 he pleaded nolo contendre to an aggravated stalking charge and in October 1998, he was sentenced to time served (223 days). (PageID.3992-3924.) Because Leon voluntarily appeared for an FBI interview concerning Gabrion in November 1997, Gabrion asserts that his plea to the stalking charge, which carried a lesser penalty than the original rape-related charges, was "undoubtedly" connected to his willingness to testify against Gabrion.   (PageID.3924.)   This amounts to a new claim that is untimely.   *See* Section I, above.   It is also entirely baseless.   No "quid pro quo" deal was made in exchange for Leon's testimony. Gabrion offers no evidence in support of his speculative inference, and there is none; at the time of the 1997 interview, the FBI was not even aware of the recent charges against Leon.   The notion that the government made a quid pro quo arrangement with Leon in exchange for his extremely minor testimony, and then Leon testified falsely under oath at the penalty phase more than three years after he was sentenced to time served out of some sort of allegiance to the government (nothing was pending against him at the time of trial), strains credulity.

72

In any event, Leon's testimony is plainly immaterial: the jury did not impose the death penalty based on Leon's testimony. As the court of appeals observed in its en banc opinion, the government's case for aggravation was "overwhelming": "Gabrion killed Timmerman in an indisputably horrific manner, killed her infant daughter, likely killed three other people who witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path." *Gabrion III*, 719 F.3d at 525. The jury did not choose death because of Leon's testimony.

**Nathan Brewster.** Gabrion's amended motion attacks the testimony of Nathan Brewster. This is a new claim and it is untimely. See Section I above. Just as a defendant cannot make a general allegation of "ineffective assistance of counsel" and preserve all type of ineffectiveness arguments based on all possible facts, *e.g., United States v. Ciampi*, 419 F.3d 20, 22 (1st Cir. 2005), a defendant cannot allege a general "pattern" of witnesses lying, and later identify new witnesses who supposedly testified falsely. In any event, Gabrion fails to show that Brewster testified falsely as to any material issue, or that the government was aware of any such false testimony. He says Brewster lied when he said that Gabrion threatened guards and that the guards did not provoke him. (PageID.3924-3925.) But he offers no factual support for the claim that this was false testimony. Further, numerous other witnesses testified about Gabrion threatening or assaulting guards. (*E.g.*, Rodriguez, R.594, STR2 at 311 (Gabrion threw feces and urine on staff, then started a fire).) The government did not

73

promise Brewster that it would help him obtain the services of a private investigator, a strange and untrue allegation.   And Gabrion concedes that Brewster told the jury that he had been convicted of "[f]elony murder, criminal sexual conduct in the first degree, and an arson of a dwelling." (PageID.3925, citing Tr. at 349.) Gabrion contends that this was "false" because he did not list the following additional crimes: "escape awaiting trial on a felony, assault with a dangerous weapon, delivery or manufacture of marijuana and unlawfully driving away an automobile" (*Id.*)   But Brewster's testimony was not false – he was, in fact, convicted of the crimes he listed, which were likely the ones deemed most serious, and were the ones for which he was serving a sentence at the time of his penalty phase testimony (Tr. 349).   Indeed, on cross-examination, Gabrion's trial counsel got him to admit that he was serving a life sentence for sexually assaulting an infant, killing the infant, then setting fire to the house in an effort to cover up the crimes.   (Tr. 357-58)   His criminal history was disclosed to the defense, and they could have asked him questions about, say, his unlawful driving away.   But it is easy to see why they did not—plainly, Brewster's admission of being a convicted infant rapist-murderer was enough impeachment.   There was no materially false testimony to correct.

In sum, Gabrion does not come close to satisfying the standard for overturning a conviction on the basis of "false testimony."   He does not show any of the challenged testimony was false, let alone that the government knew it to be so or that it was material.   The argument is procedurally defaulted and lacks merit.

74

**GROUND TWO:    Attorney Christopher Yates's Minimal Involvement in the Case Did Not Violate Gabrion's Right to Conflict-Free Counsel**

Gabrion's amended motion reasserts his original claim that he was denied his Sixth Amendment right to conflict-free counsel because former Federal Public Defender Christopher Yates provided some minimal assistance to Gabrion's defense team, and had also represented Joseph Lunsford, who testified against Gabrion in the penalty phase.   (PageID.3925-3929.)   Gabrion also includes a new claim, based on a declaration from Lunsford dated September 8, 2016, in which Lunsford recants his testimony about Gabrion masturbating to a photo of Baby Shannon, and accuses Yates of suborning perjury.   (PageID.4700.)   This outlandish claim lacks merit because Yates never represented Gabrion in the murder case; and Gabrion has failed to demonstrate any adverse effect arising from any minimal involvement he had.

***Background.***    In June 1997, Lunsford was charged with making threats against the President.   Newly-appointed Assistant Federal Public Defender Christopher Yates was assigned to represent Lunsford in that case (1:97-cr-81).   (Ex. J, ¶ 3.)   Lunsford pled guilty on August 27, 1997, and was sentenced on January 28, 1998, to 36 months in prison.   He appealed and Yates also represented him on appeal.   Lunsford's conviction was affirmed on April 30, 1999.

Meanwhile, in October 1997, Gabrion was charged with misusing the social security number of a mentally disabled man to fraudulently obtain the man's social security benefits (1:97-cr-145).   Gabrion was also under investigation at that time

in connection with the disappearance of Rachel Timmerman, whose body had been found on July 5, 1997.   Gabrion was represented at his initial proceedings by Asst. Federal Public Defender Sharon Turek, but attorney Jeffrey Balgooyen was quickly substituted as counsel for Gabrion.   In December 1997, attorney David Kaczor replaced Balgooyen as counsel for Gabrion.   Kaczor represented Gabrion through his trial (March 1998) and sentencing (July 6, 1998).   Attorney Yates never represented Gabrion in the district court in that case.

On March 30, 1998, after Lunsford had been sentenced, and after Gabrion had been convicted in the social security case, Yates represented Lunsford in connection with a proffer interview with investigators who were investigating the death of Rachel Timmerman.   (Ex. J, ¶ 4.)   Lunsford had been incarcerated in proximity to Gabrion at the Newaygo County Jail.   Lunsford told investigators during the proffer interview about incriminating statements Gabrion had made about Rachel Timmerman and her baby, Shannon VerHage.   Lunsford said Gabrion had a photo of baby Shannon in his cell, and on one occasion he saw Gabrion looking at the picture of Shannon while masturbating.   (Gabrion Ex. 2.2, PageID.1496.)   Lunsford said Gabrion also made statements about killing people. (PageID.1499.)

On July 6, 1998, Gabrion was sentenced to 60 months in the social security case, and he filed a notice of appeal.   He was initially represented on appeal by his trial attorney, David Kaczor, but in August 1998, Yates was substituted as counsel on appeal.   Yates represented Gabrion through the remainder of that appeal.

76

Yates was promoted to Federal Public Defender for the Western District of Michigan on September 18, 1998.   (Ex. J, ¶ 1.)   One of his responsibilities as Federal Public Defender was to provide assistance to CJA panel attorneys.   (*Id.* ¶ 8.)

On April 30, 1999, Lunsford's appeal was denied.   On May 6, 1999, Lunsford testified before a federal grand jury that was investigating "the murder and disappearance of a number of people in and around Newaygo, Michigan, approximately June of 1997."   (PageID.1504.)    Yates was present outside the grand jury room in case Lunsford needed to consult with him.   (PageID.1504-05.) At the time of his grand jury testimony, Lunsford was serving "a two-to-six and a two-to-30-year consecutive sentences … for felonious assault and indecent exposure."   (Gabrion Ex. 2.3, PageID.1505.)   Lunsford testified consistent with his proffer.   (Gov't Ex. I, PageID.2465-66.)

Shortly thereafter, in June 1999, Gabrion was indicted for Rachel Timmerman's murder.   (1:99-cr-76).   Yates was still representing Gabrion in his appeal in the social security case at that time.   However, Gabrion concedes that he was told at his initial appearance on June 29, 1999, that Yates could not represent him on the murder case because Yates had a conflict of interest.   (Am. Mot., PageID.3928.)   Attorneys Mitchell and Stebbins were appointed to represent Gabrion in the murder case.

On March 10, 2000, Yates argued Gabrion's social security case in the Sixth Circuit.   Gabrion's conviction and sentence were affirmed on July 27, 2000.

*United States v. Gabrion,* No. 98-1822, 225 F.3d 660 (6th Cir. 2000) (unpublished). Yates did not represent Gabrion in connection with his murder case although, in his capacity as Federal Public Defender, he did provide some minor assistance to Gabrion's counsel.   (Ex. J, ¶¶ 5-7.)

Following Gabrion's conviction in the murder case, Lunsford was called as a government witness during the penalty phase.   Lunsford testified on March 12, 2002, that Gabrion told him they were never going to find baby Shannon, and that Rachel's mother "sold the baby on the black market to get money."   (R.594: STR2, at 316.)   Lunsford also testified that Gabrion had two photos of baby Shannon in his cell, and one night Lunsford saw Gabrion "masturbating to the picture of the baby, Shannon."   (*Id.* at 316-18.)   He also testified that Gabrion admitted defrauding a man of his social security checks.   (*Id.* at 318.)   Lunsford said that he had not received any benefit for his proffer, and was not promised any time off for his testimony.   (*Id.* at 321-22; 319-20.)   At the time of his testimony, Lunsford was still serving his state sentence, and had yet to begin his federal one.   (*Id.* at 319.)

In a declaration dated September 8, 2016, Lunsford now claims that his testimony about Gabrion masturbating to a photo of Baby Shannon was not true, and that it was Yates who suggested the testimony about the photo of Baby Shannon.    (Am. Mot. Ex. 7, PageID.4700.)   Lunsford further claims that when he attempted to recant that testimony before testifying at the penalty phase, "Mr. Yates told me it was too late to back out and if I did, I would have to serve my entire 30 year indeterminate state sentence before serving the federal time."   (*Id.*)

78

*Standard.*   Criminal defendants enjoy a Sixth Amendment right to conflict-free representation by their counsel.   *Smith v. Anderson*, 689 F.2d 59, 62-63 (6th Cir. 1982).   Where, as here, a defendant seeks habeas relief based on a claim of alleged conflict of interest, the defendant must show that "an actual conflict of interest adversely affected his lawyer's performance."   *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980).   "An 'actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."   *Mickens v. Taylor,* 535 U.S. 162, 172 n. 5 (2002).   The possibility of a conflict of interest is not enough; there must be an actual conflict of interest.   *Cuyler,* 446 U.S. at 350.   The mere fact of multiple representation does not establish a conflict.   *Id.* at 348-49.   "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.*   If a defendant can show an actual conflict of interest which actually affected the adequacy of his representation, then prejudice is presumed.   *Id.* at 349-50. Even if the trial court fails to make inquiry as to a possible conflict, the defendant must still show "that the conflict of interest adversely affected his counsel's performance."   *Mickens,* 535 U.S. at 173-74.

### A. There Was No Actual Conflict Because Yates Did Not Represent Gabrion in the Murder Case.

To have a conflict of interest, the attorney must actually represent the defendant.   *See United States v. Martini,* 31 F.3d 781 (9th Cir. 1994).   The Sixth Amendment right to effective assistance of counsel applies only to "the counsel who represents the criminal defendant and helps to prepare his defense."   *Id.* at 782.

79

Although Yates represented Gabrion in his social security appeal, Yates has submitted a declaration stating that he "never represented Mr. Gabrion in connection with his murder case" and "never appeared on Mr. Gabrion's behalf in court."   (Ex. J ¶ 5.)   That is confirmed by the record.   Gabrion was represented in the murder case by attorneys Mitchell and Stebbins.   Yates never filed an appearance in the murder case, and never represented Gabrion in court in the murder case.   Although the filing of an appearance is not dispositive, a defendant's right to effective assistance of counsel does not extend to non-appearing attorneys who merely give a defendant legal advice or do not affect the conduct of the defense at trial.   *Stoia v. United States,* 22 F.3d 766, 769 (7th Cir. 1994) (*Stoia I*).[7]   *See also Martini,* 31 F.3d at 782 (right to effective assistance of counsel did not extend to second attorney defendant consulted who advised defendant not to accept plea offer) (citing *Stoia*); *Santouosso v. United States,* No. 95-3146, 74 F.3d 1240 (6th Cir. 1996) (table), 1996 WL 15631 (no ineffective assistance claim because allegedly erroneous advice did not come from defendant's counsel of record) (citing *Martini*); *United States v. Bertram*, 209 F. Supp. 3d 243, 258-60 (D.D.C. 2016) (no actual conflict of interest where allegedly conflicted attorney was not counsel of

---

[7] Although the allegedly "conflicted" attorney in *Stoia* had not filed an appearance, he had entered into a retainer agreement with the defendant to "undertake the preparation and structuring of the cross-examination of certain government witnesses and that he would develop various motions prior to trial."   *See Stoia v. United States,* 109 F.3d 392, 394 (7th Cir. 1997) (*Stoia II*).   That was not the situation here.   In addition, Stoia expected the attorney to assist at trial, and the attorney convinced Stoia not to testify, contrary to his counsel's recommendation. Nonetheless, the Seventh Circuit concluded that even if the attorney had an actual conflict, he "did not impair Stoia's overall defense."   *Id.* at 397.

80

record); *United States v. Otsibah*, 2014 WL 1514992, at *2 (D. Md. Apr. 16, 2014) (rejecting the defendant's ineffective assistance of counsel claim based on advice to reject a plea agreement from retained counsel who never appeared on the defendant's behalf or influenced counsel who did appear on the defendant's behalf); *United States v. Ubani*, 2013 WL 3357690, at *1 (S.D. Tex. July 3, 2013) (dismissing ineffective assistance claim where the defendant received effective assistance from his counsel of record and the "ineffective" counsel was never counsel of record for the defendant); *Stevens v. Lee*, 2011 WL 8203860, at *10 (S.D.N.Y. Dec. 19, 2011) ("Because there is no constitutional right to consult with a second attorney, while represented in a criminal proceeding by another attorney who is unquestionably competent, the consulting attorney's conduct does not implicate the Sixth Amendment right to effective assistance of counsel").

Gabrion has not shown how attorney Yates had an actual conflict of interest in Gabrion's case, since Yates did not actually represent Gabrion in the murder case.   Gabrion's claim that "Yates became heavily involved in Gabrion's representation" in the murder case (PageID.3926) is a considerable exaggeration. Gabrion alleges that Yates consulted with Gabrion's counsel regarding motions strategy, was asked by the Court to assist Mr. Mitchell (without specifics), visited with Gabrion and consulted with him about his case, offered to write motions and do research, offered advice on where Gabrion should be housed and how counsel should approach the Court on scheduling matters, consulted with Mr. Mitchell regarding whether to appeal the jurisdiction issue, and was asked to help search for

81

Gabrion's social security disability records.   (PageID.3926-3927.)   There is no

claim that Yates affected the conduct of the defense at trial.   In his declaration,

Yates states that, in his role as Federal Public Defender, he was asked by the Court

to "review and provide input into the defense fee and expense requests" and "to

assist as a conduit between Mr. Gabrion and his attorneys," and "conducted legal

research regarding the theory of federal jurisdiction over Mr. Gabrion based upon

the location of his alleged crime."   (Ex. J at ¶¶ 6, 8.)   He also states that he visited

with Gabrion from time to time, and advocated to move Gabrion to the federal

prison at Milan.   (*Id.* at ¶ 7.)   That hardly constitutes Sixth Amendment

representation of Gabrion.     Accordingly, since Yates did not actually represent

Gabrion in the murder case, there was no conflict of interest.

### B. Gabrion Cannot Demonstrate Any Adverse Effect on His Trial Counsel's Performance.

Even if Gabrion could show that Yates had an actual conflict of interest,

Gabrion must also show that it adversely affected his trial lawyers' performance.

*Cuyler,* 446 U.S. at 348.   Gabrion does not even attempt to show how Yates's

actions had an adverse impact on his trial counsel.   He merely alleges that "[t]he

existence of a conflict of interest rendered the assistance ineffective."

(PageID.3929.)   That is legally and factually insufficient.

In *Stoia v. United States,* 109 F.3d 392 (7th Cir. 1997) (*Stoia II*), the Seventh

Circuit held, after remand, that a "behind the scenes" attorney who may have had

an actual conflict of interest, based on his own plea agreement with the

government, and who had agreed to develop various pre-trial motions, undertake

the preparation and cross-examination of certain government witnesses, and who influenced the defendant to take certain actions in his case, including not testifying at trial which was contrary to his trial lawyer's recommendation, did not adversely affect the defendant's overall defense. "[W]here a defendant is adequately represented by several lawyers and the defendant's overall representation is not impaired by any actual conflict, we will not reverse a defendant's conviction based upon ineffective assistance of counsel." *Id.* at 388. "To hold otherwise would allow defendants represented by multiple lawyers to take two bites at the apple simply by showing that one of the lawyers was somehow conflicted in his presentation." *Id.* at 399. Where the defendant is represented by other conflict-free counsel, and it cannot be shown that another lawyer's conduct adversely affected the counsel of record's performance, no Sixth Amendment violation occurs.

Here, Gabrion does not make any showing that Yates's alleged participation in his case had any adverse impact on his trial counsel's performance or overall defense. Specifically, he does not claim that any of Yates's alleged assistance to his trial counsel or visits to Gabrion had any adverse impact on his defense. He seems to base his conflict argument entirely on the fact that Yates represented Lunsford, who gave adverse testimony against Gabrion during the penalty phase. First, as discussed above, because Yates did not also represent Gabrion in the murder case, there was no conflict of interest. Second, the fact that Yates had previously represented Gabrion in his social security appeal, while still representing

83

Lunsford on appeal, does not establish a conflict.   *See Cuyler,* 446 U.S. at 348-49

(mere fact of multiple representation does not establish a conflict).

The new allegations and declaration from Lunsford recanting his testimony

about Gabrion masturbating to a photo of Baby Shannon, and alleging that Yates

suborned Lunsford's perjury in the grand jury and at the penalty phase

(PageID.4700), amount to a new claim that was not contained in Gabrion's original

§ 2255 motion.   The claim is related to the original claim attacking Yates but it is

of a sufficiently different nature that it should not be deemed to relate back to the

original motion under the standard set forth in *Mayle v. Felix*, 545 U.S. 644 (2005).

But even if the claim is not barred by the statute of limitations, it is without

merit.   To begin with, Lunsford's declaration is inherently unreliable.   "Recanting

affidavits and witnesses are viewed with extreme suspicion."   *United States v.*

*Chambers,* 944 F.2d 1253, 1264 (6th Cir. 1991), superseded by statute on other

grounds, as recognized in *United States v. Avery*, 128 F.3d 966, 972 (6th Cir. 1997).

*See also Brooks v. Tennessee,* 626 F.3d 878, 897 (6th Cir. 2010) (the Sixth Circuit

"views with great suspicion the recantation testimony of trial witnesses in

postconviction proceedings").   That is especially true where, as here, the

recantation comes many years after trial.   *See Lewis v. Smith,* 100 F. App'x 351,

355 (6th Cir. 2004) (district court properly rejected as suspicious a witness's

recanting affidavit made two years after trial); *Olson v. United States,* 989 F.2d 229,

231 (7th Cir. 1993) (recantation made more than four years after trial); *Bates v.*

*Metrish,* 2010 WL 1286413, *11 (E.D. Mich. 2010) (recantation made over ten years

84

after trial).    Lunsford's recantation comes more than 14 years after Gabrion's trial, and after Gabrion filed his original § 2255 motion.    Further, "[t]here is no evidence concerning the authenticity of the affidavit, the motivation of the affiant, the circumstances of the affidavit's execution, the timing of its submission, or its consistency with other evidence in the trial record."    *Giles v. Wolfenbarger,* 239 F. App'x 145, 148 (6th Cir. 2007).    As the Supreme Court has stated in another death penalty case, "the court may consider how the timing of the submission and the likely credibility of the affiant[ ] bear[s] on the probable reliability of that evidence." *Schlup v. Delo,* 513 U.S. 298, 332 (1995).    The Sixth Circuit has held that "[e]ven if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error."    *Welsh v. Lafler,* 444 F. App'x 844, 850 (6th Cir. 2011) (quoting *Bower v. Curtis,* 118 F. App'x 901, 908 (6th Cir. 2004)).

Second, Lunsford's recantation is incredible on its face.    He accuses Yates, a well-respected attorney and now judge, of making up the story about Gabrion masturbating to a photo of Baby Shannon, and then basically coercing Lunsford to testify about it during the penalty phase.    No hearing is required as to allegations that are "inherently incredible."    *Huff v. United States,* 734 F.3d 600, 607 (6th Cir. 2013); *Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007).    Lunsford's recent declaration not only contradicts his testimony at the penalty phase, but also what he said at the proffer interview in 1998 and what he told the grand jury under oath in 1999.

85

Third, Yates has filed a declaration refuting Lunsford's new claims.

Paragraph 9 of Yates' declaration states that:

> I have reviewed Movant's Exhibit 7, an affidavit from Joseph Lunsford.   The allegations pertaining to me in paragraphs 6 through 8 are completely false.   I never directed or even suggested how Mr. Lunsford should testify against Mr. Gabrion.   I simply facilitated the contact between Mr. Lunsford and the federal agents and prosecutors who considered calling Mr. Lunsford as a witness against Mr. Gabrion. I never told Mr. Lunsford to lie to anyone.   To the contrary, I made clear to Mr. Lunsford – as I always did to every one of my cooperating clients – that his ability to obtain any benefit from his proffer statements and testimony depended upon his truthfulness.

(Ex. J at ¶ 9.)

Where, as here, a habeas court is faced with self-serving defense allegations that are contradicted by a credible affidavit from the accused counsel, "it may choose to credit the attorney and dismiss the ineffective assistance of counsel claim without further hearings."   *Castrillo v. Breslin,* 2005 WL 2792399, *14 (S.D.N.Y. 2005) (citing cases).   *See also Lamb v. United States,* 2007 WL 2402992, *7 (E.D. Tenn. 2007) ("a petitioner's self-serving statements in an affidavit that are contradicted by a credible version of events in an affidavit from his … counsel may be incredible as a matter of law") (citing cases).   *But see Pola v. United States,* 778 F.3d 525, 533-34 (6th Cir. 2015); *MacLloyd v. United States,* 2017 WL 1242126, *4-5 (6th Cir. April 4, 2017) (citing *Pola*).   In *Pola,* the Sixth Circuit held that the district court abused its discretion in not holding an evidentiary hearing to resolve conflicting affidavits as to whether the defendant requested his attorney to file an appeal, but that case did not involve an "extremely suspect" recantation that was inherently incredible.   *See* 778 F.3d at 535 (Pola was entitled to an evidentiary

86

hearing to develop his claim because "his factual narrative is not 'inherently

incredible'").

Finally, even if Lunsford's new allegations are taken as true, they do not

affect the outcome of this case.   *See Freeman v. Trombley,* 483 F. App'x 51, 64 (6th

Cir. 2012) (even if jailhouse informant's recantation was taken as true, defendant

cannot show that it affected murder verdict).   Lunsford's testimony that Gabrion

masturbated to a photo of Baby Shannon pales in comparison to the much more

serious aggravating evidence that the court of appeals characterized as

"overwhelming"—the evidence that he "killed Timmerman in an indisputably

horrific manner, killed her infant daughter, likely killed three other people who

witnessed his crimes or whose death was otherwise useful to him, and terrorized

countless people who crossed his path."   *Gabrion III*, 719 F.3d at 525.      Gabrion's

claim that "Joseph Lunsford was a primary government witness against Mr.

Gabrion at sentencing" (PageID.3927) is simply not supported by the record.

Lunsford was one of 58 government witnesses at the penalty phase.   His testimony

covers 12 of nearly 500 transcript pages of the government's penalty phase

evidence.   The only substantial testimony he gave was about the photo, which was

among the least damaging evidence against Gabrion.   The government made only a

one-sentence reference to Lunsford's testimony during its sentencing argument to

the jury.   (R.597: STR5 at at 618.)   Gabrion cannot show any reasonable

probability that Lunsford's testimony about Gabrion masturbating to a photo of

Baby Shannon tipped the jury in favor of the death penalty, in light of the overwhelming other aggravating evidence against Gabrion.

## C. Gabrion Was Not Prejudiced by the Court's Failure to Inquire As to a Conflict.

Gabrion also seems to suggest that the Court had a duty to inquire as to any conflict of interest with Yates, and that he was prejudiced by the Court's failure to do so.    (PageID.3929.)    In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), cited by Gabrion, the Supreme Court held that the Sixth Amendment requires the court to inquire as to possible conflicts of interest only when "the trial court knows or reasonably should know that a particular conflict exists."    *Id.* at 347.    Rule 44(c)(2) of the Federal Rules of Criminal Procedure provides that "[t]he court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation.    Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel."    That rule applies only in a case of "joint representation" where two or more defendants are jointly charged or have been joined for trial and are represented by the same counsel or counsel who are associated in the practice of law.    Fed. R. Crim. P. 44(c)(1).    There was no "joint" representation here.    Lunsford and Gabrion were not co-defendants, nor were they

88

represented by the same attorney in the same case.   The Court therefore had no duty to inquire about a potential conflict of interest.

Further, the Court had no reason to do so.   Gabrion acknowledges that he was informed at his initial appearance that Yates could not represent him in the murder case because Yates had a conflict of interest.   (PageID.3928.)   The Court had no reason to think that Yates was or would be representing Gabrion in the murder case.   In the absence of joint representation, there was no potential conflict of interest, and the Court had no duty to inquire.   In *Mickens v. Taylor,* 535 U.S. 162 (2000), the Supreme Court held that even if a court had a duty to inquire about a potential conflict of interest, and failed to do so, the defendant must still "establish that the conflict of interest adversely affected his counsel's performance" to obtain relief.   535 U.S. at 173-74.   For the reasons stated above, Gabrion is unable to do that.   "[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation."   *Id.* at 166.

**GROUND THREE:        Gabrion's Trial Counsel Provided Effective Representation during the Guilt Phase**

Gabrion attacks the performance of his trial defense team on a number of grounds.   They are faulted for allegedly failing to demonstrate that he was incompetent to stand trial, adequately attack the government's evidence of guilt, and rebut the government's sentencing phase evidence.   Much of the attack is based on the allegation that the defense team did not adequately investigate the case and develop mitigating or exculpatory evidence.

89

When addressing these issues, it is important to remember the relevant standards. Courts indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and a defendant must overcome the presumption that the challenged action may be sound trial strategy. *Strickland*, 466 U.S. at 669. Thus, courts must be mindful that "[t]here are countless ways to provide effective assistance in any given case." *Id.* "The purpose of ineffectiveness review is not to grade counsel's performance"; "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc). Finally, mere conclusory allegations of ineffective assistance are insufficient to state a claim. *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013); *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012).

With regard to a failure-to-investigate claim, merely showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).

In the end, Gabrion's attempts to undermine his trial team's efforts as to his guilt run into an insurmountable obstacle: even today, he does not attempt to refute

the physical evidence demonstrating that he murdered Rachel Timmerman.   The

paint, block, and padlock evidence, which the Sixth Circuit described as

"overwhelming" evidence of his guilt, ultimately dooms his efforts to show that his

lawyers' alleged deficiencies run afoul of *Strickland*.   Even assuming for the sake of

argument that mistakes were made, he cannot plausibly claim that the outcome

would have been different.

Moreover, in evaluating counsel's performance, the Court must consider how

the overwhelming amount of evidence against Gabrion likely impacted his counsel's

trial strategy.   It is a common strategy in capital cases to refrain from fighting

"tooth and nail" on every issue during the guilt phase in order to preserve counsel's

credibility for the most "winnable" aspects of the case—often, the penalty phase.

*See, e.g.*, Eric M. Freedman, Law Professor, Hosftra University (discussing the

Tsarnaev case in *The New York Times*,"[i]n a capital case, a competent lawyer keeps

his or her eye on the big picture, even if that means engaging in some well-planned

strategic retreats").[8]   *See also, e.g.*, Gary Goodpaster, *The Trial for Life: Effective

Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 328-34, (May

1983) (discussing strategic considerations involved in handling the guilt phase of

capital trial where there is overwhelming evidence of guilt).

---

[8] Available at http://www.nytimes.com/2015/03/14/us/dzhokhar-tsarnaev-boston-marathon-bombing-defense-strategy.html?_r=0

### A.  Trial Counsel's Alleged Failure to Demonstrate that Gabrion Was Incompetent

Gabrion alleges that his trial counsel were ineffective because they did not contest the three competency determinations that were made during the pendency of the criminal case.   (PageID.3929.)   This claim runs afoul of the rule that conclusory statements cannot support a Section 2255 motion because, even now, Gabrion does not present evidence that he was at any time incompetent to stand trial.   He simply asks this Court to draw that conclusion based on the assertion that some members of his extended family have had mental health issues.   This claim falls far short of the standard set by *Strickland*.

Further, the three competency examinations that were performed on Gabrion were very thorough and it is highly improbable that the Court would have found Gabrion incompetent after conducting a contested hearing—and such a hearing likely would have generated further damaging information about Gabrion.   Indeed, when Gabrion's lawyer argued on appeal that the district court committed error by "fail[ing] to hold an adversary, evidentiary hearing" (Sixth Cir. No. 02-1385, Def.'s 12/14/02 Supp. Br. at 18), the Sixth Circuit resoundingly rejected that argument, noting that there was "an extensive record consisting of evaluations, reports, and testimony of 9 mental health experts" establishing that Gabrion was not incompetent at the time of his trial; rather, he "was faking incompetence in order to disrupt the trial."   *Gabrion II*, 648 F.3d at 320 & n.3.

Indeed, all three competency reports concluded that Gabrion not only was competent, but was malingering.   The first assessment was reported on May 8,

92

2000, and was performed by Emily Fallis, a licensed psychologist.   She reported that "[t]he primary diagnosis in Mr. Gabrion's case is that of Malingering, the essential feature of which is the intentional production of false or grossly exaggerated physical or psychological symptoms."   (R. 268: Fallis Report at 15.)   Dr. Fallis also noted that Gabrion may fit the profile for Antisocial Personality Disorder and an unspecified cognitive disorder, but a valid diagnosis would require a valid test result, which was a problem given Gabrion's exaggeration of his symptoms on psychological tests.   No medication or therapy was recommended to treat mental disorders.   (*Id.* at 15-17.)   A second report was prepared on June 18, 2001, by Dr. Cathy Frank, the Director of Forensic Psychiatry at the Henry Ford Behavioral Health Center.   She detailed a psychological test indicating that Gabrion was feigning mental illness.   (R.476: Frank Report at 6.)   This and other information outlined in the report caused Dr. Frank to conclude that Gabrion had no mental illnesses and was malingering, although antisocial personality disorder could not be ruled out. No treatment or medication was recommended.   (*Id.* at 7-9.)   The third report, completed on October 22, 2001, was authored by Richard DeMier, a Clinical Psychologist employed by the Bureau of Prisons.   (R. 314: DeMier Report.)   After a two-month assessment, Dr. DeMier determined Gabrion to be competent, and no mental health treatment was recommended.   (*Id.* at 23.)   Dr. DeMier noted that Gabrion "offered no credible evidence of psychotic symptoms," and that there was "clear evidence that his claims of psychotic symptoms and cognitive impairment are feigned."   (*Id.*)   Dr. DeMier also cautioned the court that

Gabrion might escalate his bizarre behavior in order "to convince others that his psychopathology is genuine."   (*Id.*)

Further, the evidence introduced during the trial demonstrated that Gabrion was capable of performing complex criminal schemes, which is diametrically at odds with the standard for legal competency.   For example, the jury heard about the events leading up to Gabrion assuming the identity of Ronald Strevels, an identity he had when arrested by the FBI.   Gabrion came into contact with Strevels after Gabrion lost the ability to use the identity of Robert Allen following a traffic stop in Frankfort, Kentucky.   Gabrion came into contact with Strevels by placing an employment advertisement in an Indiana newspaper.   Strevels responded to the ad, and met Gabrion at a truck stop, where Gabrion pretended to conduct an interview for a construction job.   During the "interview" Gabrion obtained Strevels's full name, date of birth and social security number on the pretense that this would be needed to process his application.   The interview concluded and Strevels never heard from Gabrion again.   Gabrion converted this information into a Virginia driver's license bearing Strevels's information but Gabrion's photograph. (R.590: Strevels, TR6 at 1462-68; Ferri, TR6 at 1477-78; Ex. 74.)

It is against this backdrop that Gabrion claims his counsel were ineffective in failing to establish that he was incompetent.   This claim falls far short of meeting the *Strickland* standard.   Gabrion's current legal team faults his trial attorneys for failing to show he was incompetent, claiming that none of the mental health professionals who examined him had a "complete" family history (beyond the social

94

history and other records they were given).   (PageID.3930)   But they do not

themselves offer any opinion that, in light of such additional information, Gabrion

was or is incompetent.   Nor could they, as any opinion offered today—14 years

after Gabrion's trial—would not be reliable, particularly as it would be contrary to

every one of the many contemporaneous mental assessments performed when the

trial proceedings were pending.   *See, e.g., Johnson* , 860 F. Supp. 2d at 810 ("the

fact that, in 2010, five years after her trial, Johnson was able to obtain a

psychiatrist . . . who was willing to testify that Johnson was incompetent to stand

trial does not make trial counsel's conduct in failing to seek a competency hearing

unreasonable"); *United States v. Fields*, 761 F.3d 443, 468 (5th Cir. 2014), *as revised*

(Sept. 2, 2014), *cert. denied*, 135 S. Ct. 2803 (2015) (denying certificate of

appealability where district court denied capital defendant's 2255 motion without

holding an evidentiary hearing, noting, expert's "declaration, executed in 2010, six

years after Fields's trial, is not sufficient to establish that the district court's careful

and reasoned decision that Fields was competent to waive counsel is debatable").

There was no deficient performance under these circumstances, and there is no

prejudice.

### B.    Trial Counsel's Alleged Failure to Seek Proper Medication For Gabrion

Gabrion also faults his trial counsel for failing to take steps to medicate him

in light of "his many psychological issues and clear evidence of brain damage."

(PageID.3938-39.)   But, as with the claim above, Gabrion fails to show deficient

95

performance or prejudice: he neither offers proof of a medical malady to treat, nor identifies the treatment that should have been given.

None of the physicians who examined Gabrion for competency recommended treatment or medication, as each of them concluded that Gabrion was malingering. (R.268: Fallis Report at 17; R.476: Frank Report at 9; R.314: DeMier Report at 23.) The defense-side experts believed he might be helped by some medication—and he was given the only medication identified.   Dr. Mauger, the Hope Network psychiatrist who saw Gabrion in 1993 in connection with Gabrion's 1992 auto "accident," suspected that Gabrion had suffered a frontal lobe injury and prescribed Valproate.   (Ex. D, 2/18/02 Letter to Stebbins from Mauger, at PageID.2394.)   Dr. DeMier describes this as an anticonvulsive drug, and it appears to be an acceptable way to treat certain mental health problems.   (R.314: DeMier Report at 8.)   Dr. Jackson, the forensic psychologist retained by the defense concluded that undocumented vehicle accidents in 1978 and 1992 had caused Gabrion to suffer brain injury affecting his mental state.   This report offered no recommendations regarding medications.   (Ex. E, 2/21/02, Jackson Report at PageID.2403.)   Dr. Scharre, the neurologist retained by the defense, opined that Gabrion suffered from mental health problems due to closed head injuries traceable to vehicle accidents that had been reported to the defense team.   Dr. Scharre stated that "Gabrion may be helped clinically with treatment of his neuropsychiatric syndrome.   Valproic acid or an antipsychotic may be useful for some of his symptoms."   (Ex. F, 2/17/02 Scharre Letter at PageID.2411-2412.)

As Gabrion concedes (PageID.3938-39, citing R.587: TR3 at 1639), he was given that medication daily during the trial (Depakene is a brand name for valproic acid, also known as valproate, or its derivative, divalproex).   The "auto accident" that Dr. Mauger was concerned may have led to brain damage, and was also the principal basis for Dr. Scharre's speculation that Gabrion might have a head injury, was proven to be an insurance swindle.   (R.543: Vanderveen, 3/14/02 ESTR at 4-14.)   However, Dr. Mauger took the accident at face value and prescribed Gabrion with Valproate and saw improved behavior.   (Ex. D, 2/18/02 Letter to Stebbins from Mauger, at PageID.2394.)

The record before the Court therefore indicates that the only medical treatments ever proposed by the few medical professionals willing to believe that Gabrion had mental health issues was a form of valproic acid.   Gabrion fails to identify any medication or treatment that he should have been given that he was not.   Accordingly, his claim that his attorneys were ineffective fails both *Strickland*'s performance and prejudice prongs.

## C.    Trial Counsel Thoroughly Investigated and Tested Proof of Gabrion's Guilt

Gabrion makes a two-paragraph argument that his trial counsel failed to investigate and test the government's guilt case.   (PageID.3939-40.)   He incorporates by reference his earlier claims in Ground One (A-E) and conclusorily states that counsel was deficient in failing to impeach witnesses Linda Coleman, Douglas Deedrick, Lloyd Westcomb, Tim Timmerman, Richard Miller, Chrystal Roach and David Gabrion.   The government incorporates by reference its

97

substantive responses to Ground One (A-E).   With respect to the alleged bias or impeachment evidence referenced there, Gabrion has failed to show that his trial counsel performed deficiently; again, merely showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness.   *Burger*, 483 U.S. at 794.   Further, counsel's choices as to which topics to address on cross-examination are accorded particular deference. *See, e.g., Hurley v. United States*, 10 F. App'x 257, 260 (6th Cir. 2001) (counsel's decisions about whether and to what extent to conduct cross-examination are necessarily strategic and thus "effectively insulated" from ineffectiveness review). Moreover, for the reasons given in Ground One (A-E), Gabrion has failed to establish that his attorneys' conduct in not pursuing the alleged impeachment prejudiced him.

As to any other alleged failure to explore impeachment material, the claim fails because it is conclusory and unsupported by any actual facts related to the alleged "impeachment material" that Gabrion claims existed.   It is therefore insufficiently pled under Rule 2(c) of the Rules Governing Section 2255 proceedings and should be denied on that basis.

### D.    Trial Counsel Obtained Adequate Investigative Assistance

Gabrion attacks his trial team for failing to obtain sufficient investigative resources to investigate the government's case.   (PageID.3940.)   In connection with this attack he opines that "[t]here was simply no way that one person could possibly conduct the necessary investigation required to meaningfully test the

98

government's case," and asserts that there were no defense experts to contradict the government's experts.   (PageID.3941.)

This claim misses the mark for several reasons.   First, Gabrion's opinion that the defense investigators could not have done enough investigation to contest the government's case is precisely the kind of conclusory allegation that should be ignored when the effectiveness of counsel is attacked.   *Jefferson,* 730 F.3d at 547; *Wogenstahl*, 668 F.3d at 335.   Further, the billing records submitted to the Court for the work performed by investigators Crates and Hubbard reflect that they did a lot of work: between 1999 and 2002, Hubbard, the primary guilt phase investigator, billed the Court over $42,000 for her services, while Crates, the mitigation specialist, received compensation of over $94,000.   (R. 44-1, Ex. A, Am. Budget Cert.)   The Court also provided ample opportunity for the defense to prepare. Gabrion was indicted on June 3, 1999, and his trial did not begin until February 14, 2002.   There is no reason to suppose that Gabrion's investigators had insufficient time to prepare a mitigation case or to marshal information to mount a defense. Gabrion asserts that Hubbard's payments were delayed but he identifies nothing that she failed to discover that would have made a difference in the trial. Likewise, while Gabrion criticizes his trial attorneys for failing to call defense witnesses to rebut the government's experts, he does not now identify anything that should have been done that was not.   Further, he fails to come forward with any evidence that was not discovered which would create a reasonable probability of an acquittal.   Therefore, he fails to demonstrate prejudice.

In his amended motion, Gabrion alleges that lack of funding prevented him from retaining an expert on the cause of death. This claim lacks merit because, as argued further in Section O below, the proposed expert testimony would have done nothing to put the defense in a better position, and had the real potential to make matters worse for the defense.

**E.    Trial Counsel Secured Adequate Funding to Defend the Case**

Gabrion claims that the defense failed to secure adequate funding to provide him an adequate defense. (PageID.3942.) As support, he points to two letters written by Attorney Stebbins during June 2000 and March 2001, and he argues that the defense had a disincentive to hire appropriate experts because the Court trimmed the fee charged by one defense expert and Attorney Mitchell paid the balance himself. (PageID.3943.)

As noted *infra*, the Court authorized funds in this case that exceed by more than $100,000 the average amount expended for the defense of a federal death penalty case at the time. In addition to paying for two defense attorneys, the Court expended over $130,000 for a defense investigator and a mitigation specialist to scour Gabrion's history for defensive and mitigating information to show the jury. The defense also hired and called two mental health experts (and consulted with at least two more) in an effort to show that Gabrion's actions were the result of mental conditions. (R.539: Scharre, 3/13/02 ESTR at 9; R.541: Jackson, 3/14/02 ESTR at 6-10, 13.) The defense also called Dr. Mark Cunningham to testify about BOP facilities and security classifications. (R.574: Cunningham, 3/13/02 ESTR at 3-5.)

100

Cunningham was a defense expert in several other federal capital cases.   (*Id.* at 6; R.595: STR3 at 472.)   Other experts were consulted and paid for.   (R. 44-1, Ex. A, Am. Budget Cert.)   Gabrion concedes that his trial team retained a law professor specializing in Michigan riparian law, and called him during a pretrial hearing in an effort to dismiss the federal charges for lack of subject matter jurisdiction. (Mot. at 3942; R.214: 5/23/01 Hr'g on Substantive Mots., at 4.)

This argument, like many others raised in the motion, is improperly based on speculation.   *Jefferson*, 730 F.3d at 547; *Wogenstahl*, 668 F.3d at 335.   Letters complaining about funding sent by his defense team 12 and 18 months before the trial do not demonstrate that the defense team lacked funds by the time trial began in February 2002.   There are no motions or letters within the months leading up to the trial demonstrating such lack of funding.   Even more conclusory is the suggestion that because Mr. Mitchell allegedly paid the balance of an expert's bill he did not pursue other avenues of defense.   (PageID.3943.)   There is no proof offered by Gabrion that his attorneys abandoned him in this manner.   This claim falls far short of satisfying the *Strickland* ineffectiveness standard.

### F.   Trial Counsel Was Not Ineffective for Not Seeking Continuances

Gabrion claims that his defense team should have moved for a continuance after the indictment was superseded to better prepare for the case. (PageID.3943.) This claim is meritless.   When the indictment was superseded, this Court demanded an explanation from the government about how the new language in the indictment would change the government's proofs.   The government advised the

101

Court that "our proofs are not going to change."  (R.618: 2/22/02 Hr'g re Def.'s Obj. to Superseding Indictment Tr. at 4.)  The government went on to state that the indictment was changed to avoid causing the jury confusion over whether drowning was an element of the charge, or whether murder on federal property was the proper focus.  (*Id.* at 5.)  Because it is clear that the government's proof did not change on this issue, there was no need for a continuance.  Consequently, Gabrion's counsel did not perform deficiently by not requesting one; nor was he prejudiced in not obtaining one.

In the amended motion, Gabrion claims that the trial team rendered ineffective assistance by failing to seek a continuance to obtain a defense expert on the cause of death. (PageID.3943.)  However, for the reasons more fully explained in Section O below, the failure to delay the trial for this reason does not satisfy the *Strickland* standard.  The affidavit of Dr. Spitz does not add any facts that were not already comprehensively developed during the testimony of Dr. Cohle, so a delay would not have changed anything.  Further, by supplying a defense expert on the cause of death, Gabrion would have given the prosecution an opportunity to develop, through cross examination, all of the reasons pointing to drowning as the cause of death aside from the medical evidence.

### G.  There Was No Basis for Trial Counsel to Move for Disqualification of the Trial Judge

In a claim consisting of six sentences and no case authority, Gabrion argues that his trial counsel were ineffective for failing to move for disqualification of the trial judge (Judge Bell) on the supposed bases that Judge Bell failed to provide

adequate funding for the case and was likely "offended" by Gabrion's insulting letters.   (PageID.3944.)

Gabrion's bare-bones claim is unsupported by law or fact.   A federal judge must recuse him or herself whenever there is bias or prejudice against or towards a party, or where the Court's impartiality might reasonably be questioned.   28 U.S.C. § 144; 28 U.S.C. § 455.   Gabrion makes no effort to show that the Court's funding decisions were based on personal hostility towards him.   Further, his claim that the Court refused to authorize adequate funding lacks substantive merit; as set forth above in response to Ground 3.E., Judge Bell did authorize adequate funding. Gabrion's claim that his personal attacks on Judge Bell required recusal is based on the conclusory assertion that "any reasonable person would have been offended by such letters."   (PageID.3944.)   But this does not itself afford a basis to question the Court's impartiality.   Moreover, Gabrion points to no instance where an allegedly unbiased judge would have ruled in a way that changed the outcome of the verdict and sentence.   Consequently, this claim fails to satisfy either prong of the *Strickland* standard.

H.   **Trial Counsel's Alleged Failure to Object to the Government's "False" Claim that Gabrion Forced Timmerman to Write Letters Exonerating Him**

Gabrion claims that his attorneys were ineffective because they failed to challenge the "false" claim argued by the prosecution that Gabrion forced Timmerman to write exculpatory letters after she disappeared.   (PageID.3944.) This argument misapprehends basic trial technique and the proper role of expert

103

testimony during a criminal trial.   While the government did assert that Gabrion compelled Timmerman to write letters that exonerated him from the rape charge, that argument was entirely appropriate given the proof.

Prosecutors must be given leeway to argue reasonable inferences from the evidence.   *United States v. Emuebunam*, 268 F.3d 377, 405 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 534 (6th Cir. 2000).   During the guilt phase of the trial, as set forth above, *see supra* response to Ground 1.B, the prosecution produced evidence clearly permitting the inference that the allegedly exculpatory letters, written in Rachel Timmerman's hand, were written at Gabrion's direction.   Under these circumstances, if Gabrion's trial team had objected to this argument, they would have lost all credibility, jeopardizing their client's prospects during the penalty phase.   The claim does not satisfy *Strickland*.

## I.    Trial Counsel's Failure to Produce Evidence that Timmerman Left Her Father's Home for Other Reasons

Gabrion argues that his trial attorneys were ineffective because they did not put on evidence that Rachel Timmerman had allegedly been ordered into a group home for violating her release conditions.   The prejudice alleged is that the jury should have been told that Timmerman "had an independent motive to disappear" and that this theory in some unexplained way undercuts the position that "Marvin Gabrion was the only person with a motive to kill Ms. Timmerman." (PageID.3945.)

This argument does not satisfy the *Strickland* standard for finding defense counsel ineffective.   First, the theory lacks coherence, given that shortly after she left, Timmerman was murdered under circumstances that point directly to Gabrion.

104

The forensic pathologist who examined Timmerman's body provided a rough estimate that Timmerman had died three to four weeks prior to his July 7, 1997 autopsy.   (R.459: Cohle, 2/26/02 ETR at 16.)   As noted above, the discovery at Gabrion's campsite of a hair clip consistent with the style Timmerman wore and a baby bottle nipple gave some indication that he kept them there for some period of time.   *See supra* at 6.   Linda Coleman and her daughter Kathy Kirk testified that they saw Gabrion with Timmerman at Oxford Lake during June 1997.   They were in a black pickup truck with a boat in the back.   (R.670: Coleman Dep. at 6-16; R.591: Kirk, TR7 at 1576-78.)    Pearl Hall recalled seeing Gabrion leaving the lake at a high rate of speed on June 4, 1997.   He was driving a pickup truck with a boat rattling in the back.   (R.590: Hall, TR6 at 1307-08.)   The campers and witnesses at his house who saw Gabrion with a boat in the middle of the night in this same early June time frame, *see supra* 7-8, all point to Timmerman disappearing June 3, 1997, and being murdered by Gabrion shortly thereafter.

Defense counsel would have gained very little and risked much by arguing that Timmerman had other motives to disappear on June 3, 1997.   The problem with this theory is that it does nothing to help Gabrion because no other suspect becomes more plausible as a result of it.   On the other hand, there was a real danger that proof of Timmerman's alleged problems would be taken as an attack on the character of the murder victim and alienate the jury against the defense.   The jury heard that after her disappearance and before her death, Timmerman had the time to write letters exonerating Gabrion after her disappearance.   These were

105

postmarked on June 4 and June 14, 1997, respectively.   *See supra* response to

Ground 1.B.   She was seen at the Oxford Lake with Gabrion and a boat at a time

when she was mortally afraid of him and assumed he would kill her.   The tools

used to commit the murder were linked to Gabrion through forensic evidence.   All

this demonstrates that it did not matter *why* Rachel Timmerman left her home

because whatever the reason, she was murdered by him shortly thereafter.   Any

sensible trial attorney would avoid making such an argument under these

circumstances.

In any event, it is impossible to conclude that the theory, if it had been

developed during trial, would have pointed the finger of guilt at anyone else.   Thus,

the prejudice prong of *Strickland* is also not met.

### J.    Trial Counsel's Failure to Put on Proof That Timmerman Was Seen After She Left Her Father's Home

Gabrion has previously argued that the government put on false evidence

that Rachel Timmerman was never seen alive after leaving her father's home on

June 3, 1997.   He recycles this claim a second time to allege that his trial

attorneys' performance fell below the *Strickland* standard because they did not call

witnesses to rebut the government's claim.   (PageID.3946.)

The government incorporates its response to Ground 1.C.   As competent trial

attorneys attempting to put on a persuasive case, Mr. Mitchell and Mr. Stebbins

made the strategic decision to refrain from putting on evidence of this theory, which

ultimately could not rebut the evidence linking Gabrion to Timmerman's murder.

As stated previously, tactical decisions such as this should be given great deference.

106

*Elmore*, 781 F.3d at 1171; *Dows*, 211 F.3d at 487. The record in this case demonstrates that Gabrion's strategy was to attack proof of his guilt on the relatively promising grounds of cause of death other than drowning, and to attack the credibility of witnesses who saw the crime or heard him make admissions about it; essentially, a "reasonable doubt" defense. No competent attorney would risk sacrificing his credibility in front of the jury by pursuing doomed theories such as this which, even if believed, would not achieve an acquittal. Further, Gabrion has not shown prejudice.

### K. Trial Counsel Wisely Did Not Attempt to Argue that Gabrion Had "Nothing to Do With" the Letters Timmerman Supposedly Sent after Her Death

This claim lacks merit for the reasons set forth in the responses to Grounds 1.B. and 3.H., above. For the reasons set forth in those sections, Gabrion has not shown that his trial counsel performed below an objective standard of reasonableness in not calling the examiners to the stand, nor was Gabrion prejudiced.

### L. Trial Counsel's Failure to Contradict Chrystal Roach's "False" Testimony

Gabrion resurrects his Ground One claim that the government put on perjured testimony when witness Chrystal Roach testified about the progress of Gabrion's rape case through the Newaygo County court system. This time, he claims that his trial attorneys were ineffective for failing to object to the "false" testimony by Roach. (PageID.3947-48.) This argument fails both *Strickland* prongs.

107

First, as detailed earlier in this response, Gabrion's claim that Roach's testimony is demonstrably false is farfetched.   The evidence supports the government's theory that Gabrion was able to delay his case's progress towards trial long enough to get access to the victim.   *See supra* response to Ground 1.A. Common sense indicates that Gabrion's trial attorneys would be reluctant to sacrifice their credibility before the jury by pursuing such a line of questioning. Therefore, it cannot be said that this violated their duty to be effective advocates.

Further, even in the unlikely event that Roach could have been impeached by such a tactic, Gabrion was not prejudiced.   The Sixth Circuit addressed the impact of Roach's testimony on direct appeal, when Gabrion claimed that he should have been allowed to impeach her with other materials.   The court determined that Roach's testimony was "peripheral"; indeed, as that court put it, given the "overwhelming" evidence that Gabrion murdered Timmerman, "Roach's testimony was far from critical in establishing Gabrion's guilt."   *Gabrion II*, 648 F.3d at 336. Thus, Gabrion was not prejudiced by any lack of impeachment.

## M. Trial Counsel's Alleged Failure to Suggest that Others Might Have Murdered Timmerman

Gabrion also faults his counsel for failing to develop theories that others had a motive to kill Rachel Timmerman.   (PageID.3949.)   This claim lacks merit.

**David Gabrion as a Suspect.**   Gabrion believes his trial attorneys should have developed the theory that his brother, David Gabrion, murdered Rachel Timmerman.   That would have required them to call Linda Byrnes as a witness. Mot. Ex. 3.7.   Byrnes, a drug trafficking inmate at the time she was interviewed,

talked to authorities in the hopes that her sentence for drug trafficking might be reduced.    She told law enforcement that she had shared a cell with Rachel Timmerman while both were inmates in the Newaygo County Jail.    Timmerman allegedly told Byrnes that she and her mother had sold marijuana for David Gabrion, and that they got their supply from him at Oxford Lake.    While incarcerated, Timmerman had received a letter from David Gabrion warning her not to talk about their drug trafficking.    During the same conversations, however, Timmerman told Byrnes how she had been raped by Marvin Gabrion and was sure he would kill her.    Thus, calling Byrnes as a witness presented the defense with a two-edged sword: her testimony, if believed, provided the defense with some support for the argument that David Gabrion killed Timmerman.    However, the same witness was also on record as saying it was Marvin Gabrion she feared would kill her.    Given the independent evidence already proving that the murderer was Marvin Gabrion, it was prudent for the defense to avoid exacerbating the situation by calling Byrnes.

Gabrion also notes that Rachel's father, Tim Timmerman, suspected David Gabrion might be involved because Mr. Timmerman wrote a letter indicating that he had heard that pieces of a blue Ford pickup truck had been found at Oxford Lake, and Mr. Timmerman also somehow heard that David Gabrion owned a similar truck.    (PageID.3950, Ex. 3.9.)    The roadblocks to introducing such information are obvious to any trial lawyer: Mr. Timmerman had no demonstrable basis for testifying that David Gabrion owned a similar truck, so there was no basis

109

for introducing such speculative evidence.   There is no chance, given all of the other evidence against Marvin Gabrion, that such speculative testimony, even if allowed to be elicited, would have changed the jury's guilty verdict.

Gabrion also suggests that his trial attorneys should have used the information provided by Velda Timmerman, Rachel's mother.   (PageID.3950.) Velda admitted to doing drugs with David Gabrion.   Velda was informed about Rachel's murder when she called the Michigan State Police while driving her commercial truck route.   When Velda learned from the police that her daughter had been found murdered, she told the police that she was concerned about her personal safety because she had informed the police about David and Michael Gabrion's drug trafficking.   Velda told the police that she had told Rachel this, and feared that Rachel might have divulged this information before her murder.   Mot. Exs. 3.8, 3.10.   The reasons for not developing this information are also abundantly clear: Velda Timmerman perhaps had reasons to fear retaliation from David Gabrion, because she had told the police about his drug activity.   This is not proof that David had reason to murder Rachel.

Gabrion also points to the fact that the police found David Gabrion loading suspicious materials into his truck from 11415 Five Mile Road, in Morley, Michigan. (PageID.4950; Mot. Ex. 3.12.)   This argument elides the most important fact: Exhibit 3.12 plainly demonstrates that the home being emptied out was *Marvin Gabrion's* home, and David Gabrion had been asked by Elaine Gabrion, their mother, to remove items from the house after the police had visited Elaine while

110

searching for Marvin.   Further, the police had a search warrant for the home demonstrating that it was Marvin Gabrion's residence and incriminating evidence was likely to be found there.   David Gabrion's presence at the house did little to establish him as Rachel's murderer, and the defense trial team did not act ineffectively when it declined to pursue such a theory.

In sum, there was no credible evidence to support a theory that David Gabrion murdered Timmerman.   This claim does not establish a violation of *Strickland's* deficient performance standard.   Also, in light of the overwhelming evidence that linked Marvin Gabrion to the murder, the argument also fails to establish prejudice.

**Eddie Start as a Suspect.**   Gabrion also contends that he was unfairly prejudiced when his trial attorneys did not advance the theory that Rachel Timmerman was murdered by Eddie Start.   (PageID.3951.)   This argument also fails to establish a *Strickland* violation.

Investigators initially heard from witness Roxanne VanSlyke that Timmerman was with Eddie Start on June 3, after leaving her father's home. According to VanSlyke, the next day Start said that he had fought with Timmerman and that she would "never be coming back."   (Mot. Ex. 1.16, PageID.1410-11.) Both Start and VanSlyke were put under oath about the matter.   Start did not recall seeing Timmerman that day and denied giving her a ride or attending a party with her that day, and VanSlyke admitted to lying about seeing Timmerman with Start on June 3, and said she could not recall ever saying that Start said

Timmerman would never be coming back. (Mot. Ex. 1.16, VanSlyke Grand Jury Tr., at 11-12, 15-16; Ex.G, Start Grand Jury Tr., at 5-10.) Another witness, Danny Holmes, volunteered to investigators that he knew that Start was violent towards women and so believed that he had killed Timmerman. (Mot. Ex. 1.18, FBI 302 report at 4 (Gabrion 000126).) All of this was disclosed to the defense.

However, one can easily see why Gabrion's trial team declined to pursue this theory. There was ultimately no reliable evidence to support the claim that Start was with Timmerman on the date of her disappearance or killed her. Given the overwhelming evidence demonstrating that Gabrion murdered her, it made more sense to attack the government's case where it was more vulnerable, such as the location of the murder. For these reasons, Gabrion's trial attorneys were not ineffective and their performance did not violate the *Strickland* standard.

### N. Trial Counsel's Failure to Object to the Removal of a Juror for Sleeping During Trial

Gabrion claims his attorneys were ineffective because they did not object to this Court's removal of a juror at the conclusion of the case because she was sleeping. (PageID.3951-52.) This claim cannot withstand review under the *Strickland* standard because on direct appeal the Sixth Circuit determined that the Court acted within its discretion under Rule 24(c). *Gabrion I*, 648 F.3d at 338; *Gabrion III*, 719 F.3d at 535 (en banc) (adopting panel's decision on sleeping juror issue). In light of these findings, it is apparent that any alleged error by defense counsel did not prejudice Gabrion.

112

### O.    Trial Counsel's Alleged Failure to Challenge the Pathologist's Cause of Death Determination

Gabrion also finds fault with his trial team's alleged failure to challenge testimony and argument that the cause of Rachel Timmerman's death was drowning and its decision not to call an expert witness of its own.   (PageID.3952-54.)   This claim should be rejected because Gabrion's counsel appropriately and effectively challenged the government's cause of death expert.   Indeed, Attorney Mitchell's cross-examination was so effective that it was clear there was nothing to be gained for the defense by calling a counter-expert.

As noted above, the cross examination of the forensic pathologist, Dr. Cohle, established what the defense needed to argue that the cause of death, and therefore jurisdiction, was not proven beyond a reasonable doubt.   Dr. Cohle testified that the cause of death was "most likely" drowning.   (R.459: Cohle, 2/26/02 ETR at 26.) During cross examination, Dr. Cohle conceded that the findings of the autopsy were just as consistent with asphyxiation as with drowning.   Dr. Cohle was also asked to concede that if Timmerman had been breathing when she entered Oxford Lake, he should have found mud or dirt in her nasal passages, but he found none.   (*Id.* at 29-33.)   During closing argument, Mitchell reminded the jury that a conclusion that Timmerman "most likely" drowned was not the same as finding drowning to be the cause of death beyond a reasonable doubt.   (R.587: TR3 at 1739.)   It is hard to imagine another forensic pathologist putting the defense in any better position than Dr. Cohle's concessions during cross examination.   Moreover, the prosecutor did not commit misconduct in stating during closing that Dr. Cohle ruled out every other

113

manner of death – Cohle in fact testified that "drowning is a diagnosis of exclusion" (R.459: 2/26/02 ETR at 13) and exhaustively explained why he excluded all other causes of death in concluding that Timmerman "most likely" drowned (*id*. at 26). Further, Attorney Mitchell directly addressed the issue during his closing and, as noted above, made a very persuasive argument, even if it did not carry the day. (R.596: STR4 at 1739-40.)   No violation of the *Strickland* standard for adequate performance has been shown here.

It is also true that no prejudice resulted from the defense conduct on this issue.   The proof established that Gabrion murdered Timmerman by drowning her. The Sixth Circuit reviewed this issue on direct appeal and found that the jury was justified in reaching this conclusion.   Significant evidence on this issue included Dr. Cohle's opinion that drowning was the most likely cause of death, proof that Timmerman's body was found handcuffed and duct taped, Gabrion's admissions to others that he threw Timmerman into the lake alive, and Gabrion's statements that this method was in general the way he would kill someone.   *Gabrion I*, 517 F.3d at 872 (Moore, J. concurring); *Gabrion III*, 719 F.3d at 535 (en banc) (affirming panel decision on jurisdiction).   Given this, it is not possible to conclude that calling a defense expert would have tipped the scale in Gabrion's favor.

In his amended motion, Gabrion relies on an affidavit from Dr. Daniel Spitz, a forensic pathologist practicing in Macomb County, Michigan, to argue that trial counsel were ineffective for not adequately developing the theory that Rachael was murdered vis asphyxia rather than drowning.  (PageID.3954-55.)  Spitz states in

114

his affidavit that the evidence developed during the autopsy were as consistent with asphyxia as with drowning, and he would not have ruled it out as a cause of death.  (Am. Mot., Attachment 13, PageID.4989.)  Dr. Spitz faults Dr. Cohle for testifying that the cause of death was most likely drowning after finding no signs of asphyxia, because those signs are subtle and could have been lost because of decomposition.  (*Id.*; Am. Mot., PageID.3955.)

The addition of this affidavit does not change anything, as all of the points Spitz raises were conceded by Cohle and argued to the jury by the defense.  During direct and cross examination, Dr. Cohle acknowledged that "there are no definitive pathologic tests to prove drowning."  (R. 459: Cohle, 2/26/02 ETR at 13.)  He also conceded that, when comparing medical evidence of drowning to asphyxiation "sometimes it's impossible to separate the two." (*Id.* at 19.)  While noting that he found no damage to the throat, cartilage or bones consistent with strangulation, Dr. Cohle noted that none of those signs would have been present if a plastic bag had been placed over the victim's head.  (*Id.*)  During cross examination, Cohle acknowledged that burst blood vessels in the eyes (a sign of asphyxia that he did not discover) could have been lost because of decomposition. (*Id.* at 29.)  Calling a witness like Spitz would not have put the defense in any better position than it was already in, and very likely could have made things worse.  During cross examination, Spitz would have had to concede that drowning was just as plausible as asphyxia, and that he agreed that Timmerman's death was undeniably homicide.  (PageID.4988.)  The government would have then had the opportunity

115

to review via cross examination all of the abundant surrounding circumstances pointing towards drowning at the lake rather than asphyxia elsewhere and ask if any of it would change his opinion. In light of this, it is clear that the decision not to call a defense expert on the cause of death was a wise one.   Neither prong of the *Strickland* standard has been met here.

> **P.      Trial Counsel's Alleged Failure to Seek and Retain Its Own Pathologist**

This issue is addressed above, in the response to Ground 3.O.

> **Q.      Defense Counsel Was Not Ineffective For Failing to Further Impeach Lloyd Westcomb.**

Gabrion claims his trial attorneys were ineffective because they allegedly failed to effectively impeach government witness Lloyd Westcomb with testimony from witnesses who purportedly would have said he had no reputation for honesty. (PageID.3957.)   Gabrion's amended motion adds that counsel was ineffective for failing to use medical records to impeach Westcomb.   This is a new claim that does not relate bac k, but in any event, both claims lack merit.

First, Westcomb admitted in his direct examination that he was a paranoid schizophrenic and had a pending charge against him.   Moreover, Attorney Mitchell effectively cross-examined Westcomb.   He was able to elicit that, in connection with his schizophrenia, Westcomb heard voices and saw visions.   Mitchell got Westcomb to admit that he had been taking antipsychotic medication for 15 years.   (R.590: TR6 at 1359-60.)   He also admitted that he had trouble remembering things.   (*Id.* at 1362.)   Westcomb also admitted during cross-examination that he did not talk to

116

the police until after he saw a story about Gabrion on a television show called

*America's Most Wanted.* (*Id.* at 1364.) Mitchell proceeded to demonstrate that

Westcomb's testimony before the jury was at odds with what he told the police

earlier, particularly whether he had talked to Gabrion before the television show or

after it. (*Id.* at 1376-82.) During a break, this Court told Mitchell that he was

conducting a very effective cross examination of Westcomb. (*Id.* at 1373.) Mitchell

made much of Westcomb's impairments and shortcomings during his closing

argument: he characterized it as outrageous and completely lacking credibility.

(R.592: TR8 at 1730-31.)

This record demonstrates that Gabrion's trial attorneys were not ineffective

for not calling the impeachment witnesses or using the medical records he cites.

Significantly, the only witness statement he provides, relating to Edward Doering,

does not prove that Westcomb is a liar; Doering only gives his opinion that he

doubts many of Westcomb's stories. Mot. Ex. 3.16. Because there is no indication

that Doering can establish a foundation for knowing Westcomb's reputation in the

community for honesty, the admissibility of this evidence is doubtful, as that is

what Rule 608 requires. *United States v. Reid*, 625 F.3d 977, 987 (6th Cir. 2010).

Moreover, the witness statement reflects that Westcomb told Doering the same

information to which he testified: that he was in a jail cell with Marvin Gabrion,

and Gabrion talked about the murder. Mot. Ex. 3.16. The consistency of

Westcomb's account might have leant additional credibility to Westcomb's

testimony. The more important point is that further attacks on Westcomb's

117

credibility were unnecessary as he had been as discredited as it was possible for a witness to be.   Finally, even assuming that there was more to be gained by calling bad character witnesses or piling on with the medical records, it would not have undermined the other overwhelming proof of Gabrion's guilt.   *Gabrion*, 648 F.3d at 351-52.   This argument cannot survive *Strickland* analysis.

## R.      Attorney Mitchell Did Not Act Ineffectively by Failing to Withdraw from the Case

Gabrion claims that Mr. Mitchell was ineffective because Mitchell was involved in a physical altercation with him during 1999 or 2000 and had a conflict of interest.   Gabrion claims that this "created a conflict with Mitchell that was never surmounted" but does not provide any specific actions or inaction arising from the alleged confrontation.   (PageID.3959.) Indeed, the entire argument is only four sentences long.    This claim should be dismissed because it is the kind of conclusory, speculative argument that has been rejected by cases such as *Jefferson*, 730 F.3d at 547, and *Wogenstahl,* 668 F.3d at 335.

Further, the entire record in this case is a testament to Mitchell's zealous advocacy of Gabrion, both before and during trial, under trying conditions.   It is obvious from the record that Gabrion was a difficult client, but he could not represent himself because of his refusal to act with the minimum amount of courtroom decorum.   *Gabrion II*, 648 F.3d at 331-32.   While Gabrion periodically sought to represent himself, on at least one occasion he withdrew the request, indicating that he was on relatively good terms with his attorneys.   (R.600: 11/1/99 Mot. Hr'g Tr., at 10-18.)

118

This Court and the Sixth Circuit have already considered the issue of whether a motion to withdraw as counsel should have been granted after Gabrion punched Mr. Stebbins during the sentencing proceedings.   That motion was properly denied in part based on this Court's factual finding that Mitchell and Stebbins had been conscientious and diligent throughout the case. *Gabrion II*, 648 F.3d at 331-32.   Gabrion now claims that a motion to withdraw should have been made at the beginning of the case, but it is hard to see why such a motion would have been granted.   A motion to withdraw should only be granted when a court is satisfied that there has been a complete breakdown in communication between the attorney and the client.   *United States v. Vasquez,* 560 F.3d 461, 467-68 (6th Cir. 2009); *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).   Gabrion has never made such a showing.

**S.      Gabrion's Trial Counsel Were Not Ineffective for Failing to Put on Proof that He Was at a Nearby Lake on June 25, 1997**

Gabrion claims that his trial attorneys were ineffective because they did not introduce testimony from David Knapp that he was at Toogood Lake on June 25, 1997.   This evidence, Gabrion maintains, would have undercut the theory that he murdered Timmerman at Oxford Lake.   (PageID.3959, Ex. 3.17.)   This argument lacks merit and does not satisfy the *Strickland* standard.

The main problem with this argument is that it does not help Gabrion's case. Toogood Lake is approximately ten miles from Oxford Lake.   As noted above, the government's witnesses put Gabrion at Oxford Lake with Rachel Timmerman and a boat in early June 1997.   For example, Pearl Hall recalled seeing Gabrion leaving

the lake at a high rate of speed on June 4, 1997.   (R.590: Hall, TR6 at 1307-08.)

The fact that Gabrion was seen at a nearby lake late in June therefore would have

hurt, rather than helped, Gabrion's case by further establishing that he was in the

general vicinity of the lake at the approximate time of the murder.   Further, the

person Knapp saw had cuts and bruises around his eyes and acted in a belligerent

manner.   Mot. Ex 3.17, PageID.1582.   If the jury was asked to conclude that this

person was Gabrion, a reasonable attorney would quickly conclude that the

testimony would do far more harm than good for the defense.   Gabrion again has

failed to show that his attorneys acted deficiently, or that their performance

prejudiced him.

> **T.    Gabrion's Trial Attorneys' Decision to Not Call Witnesses Who Would Have Confirmed that John Weeks Helped Gabrion Murder Rachel Timmerman Was Sound Trial Strategy**

Gabrion says his trial attorneys were rendered ineffective because they did

not call witnesses Christopher Dragun and Theodore Braun.   Gabrion claims that

had the defense called these witnesses, he could have demonstrated that the

murder did not happen on federal land.   (PageID.3960, Ex. 3.19.)   This argument

does not warrant relief under Section 2255.

As revealed by Gabrion's Motion Exhibit 3.19, these witnesses provided

information largely helpful to the prosecution, not Gabrion.   Both Dragun and

Braun were drug associates of John Weeks.   They reported that normally Weeks

had very little money, but during June 1997, they saw him with approximately

$2,000 in cash.   When they asked Weeks where the money came from, he said he

had earned it by delivering a female to a man he variously referred to as a "hit man" or his boss, whose name was Marvin.   According to this account, the woman was killed at a house and then Weeks helped dispose of the body.   These conversations occurred in June 1997.   Dragun and Braun last saw Weeks just after July 4, 1997. This is approximately seven days after Weeks told his girlfriend that he was going to buy drugs with Gabrion in Texas.   (R.594: Wolf, STR2 at 429.)

There are a number of reasons why Gabrion's trial counsel likely decided not to use this information.   The first is that it is hearsay, consisting entirely of out-of-court statements made by Weeks.   The government was permitted to employ Rule 804(b)(6) to introduce Weeks's statements in its case based on the argument that Gabrion was responsible for his disappearance.   Gabrion could not use this rule and so the admissibility of the statements is doubtful.

Even assuming that a way could have been contrived to put the statements before the jury, it would have been devastating evidence against Gabrion.   It basically confirmed the government's theory that Weeks had been used to lure Timmerman to Gabrion, and had assisted in her murder.   The only advantage to putting such evidence on would be the hope that the jury would construe Weeks's statement to mean that Timmerman was killed somewhere other than Oxford Lake. This would have been a foolhardy gamble because the statement gives no details about where the murder actually occurred, and there is no reason to believe that Weeks would have been truthful to Dragun and Braun about the details.   Further, this strategy would have required the jury to completely discount the testimony of

121

Hall, Coleman, and Kirk, who together put Rachel Timmerman alive at Oxford Lake while in the custody of Gabrion and a second man.

No competent defense attorney would put such evidence before a jury; in fact, a strong 2255 claim could be made against any defense counsel who did take such a gamble.   This claim does not establish a violation of *Strickland*.

**U.    Gabrion's Trial Counsel Were Not Ineffective for Not Further Discrediting Witness Linda Coleman**

Gabrion claims that Coleman should have been impeached by the testimony of Walter Hamilton, who allegedly would have said that Coleman never told him he saw two men and a woman at Oxford Lake.   (PageID.3960-61.)

The record demonstrates that it would have been improper for Gabrion to call Hamilton to impeach Coleman.   Attorney Mitchell got Coleman to admit that Timmerman's murder was big news in Coleman's neighborhood.   (R.670: 2/5/02 Excerpt, Coleman Dep., at 22.)   Despite seeing Timmerman at Oxford Lake with Gabrion and another man, she did not tell the police about it until much later.   (*Id.* at 25-26, 36-37.)   Coleman was impeached about whether she had driven a truck to the lake that day or had arrived in a Geo Metro.   (*Id.* at 35.)   Coleman acknowledged that she had talked to Hamilton about seeing a strange man in the neighborhood, but admitted she did not tell him about seeing Gabrion and Timmerman at Oxford Lake.   (*Id.* at 43.)   Since Coleman admitted she did not tell Hamilton about seeing Gabrion and Timmerman at Oxford Lake, the point had been made and it would have been a waste of time to call Hamilton to confirm it.

To the extent that this admission impeached Coleman, she was impeached. Therefore, neither prong of *Strickland* has been satisfied.

## V.    Cumulative error did not occur.

Assuming that a claim based on the impact of "cumulative errors" is even viable, it affords no basis for relief where a petitioner does not establish any errors by counsel that could be accumulated.   *E.g., Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (assuming, without deciding, that cumulative error could provide the basis for a § 2254 claim, but finding no relief warranted where "there are simply no errors to cumulate"); *accord United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors").   As Gabrion has not shown error in the form of ineffective assistance of his counsel, there are no errors to accumulate and this claim fails.

## GROUND FOUR: Gabrion's Trial Counsel Provided Effective Representation During the Penalty Phase

Gabrion's post-conviction attack on his trial attorneys' performance in connection with the penalty phase of the trial is also without merit.   Gabrion's counsel presented 13 witnesses to testify in support of its mitigation case, including multiple experts, reflecting a comprehensive investigation.   Indeed, as the Sixth Circuit observed in the panel opinion, "Gabrion presented numerous mitigation witnesses, including four mental health experts. . . .[T]he mitigation evidence was designed to demonstrate Gabrion's poor upbringing, lack of appreciation for the

123

wrongfulness of his conduct, and the existence of mental health issues due to injuries sustained in car accidents. . . ."  *Gabrion II*, 648 F.3d at 341-42.

An experienced mitigation specialist, James Crates (Ex. H, Crates resume, PageID.2189), was appointed, and he collected records, interviewed witnesses, and met with counsel and experts to develop the mitigation case.   This is not a case where counsel failed to recognize the importance of preparing for the penalty phase of a capital case.   To the contrary, the learned counsel appointed in this case, Mr. Stebbins, was a pioneer in the capital case arena, writing on the importance of developing a full and complete social history and beginning early to investigate penalty evidence.   Mr. Crates was paid nearly $100,000 for his work on the case, reflecting at least 1,000 hours of work, upon information and belief as to the hourly compensation rate for mitigation specialists at the time.

Gabrion cites a string of Supreme Court cases addressing the failure of counsel to research and introduce mitigating evidence at trial under the *Strickland* standard.   (PageID.3962-63.)   But those cases, culminating in *Rompilla v. Beard*, are distinguishable from this one.   Those cases dealt with counsel who failed to discover whole areas of a defendant's past that could have been used as mitigation such as a prior conviction, a social history report, or history regarding a troubled background. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

Here, Gabrion's counsel *did* conduct an investigation into all the areas cited in Gabrion's motion, and they introduced evidence relating to the areas he discusses

124

in this section.   And, to a large extent, they succeeded in persuading the jury that there were mitigating factors to consider.   As to mental health, Gabrion's defense team put on a significant case.   After all, even though eight of nine experts agreed that Gabrion was malingering mental illness, all 12 jurors still found as a mitigating factor that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder."   (R.526: Verdict Form, at 7.)   Nine jurors found as a mitigating factor that Gabrion's "abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct."   (*Id.*)   And all 12 found that Gabrion "grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child."   (*Id.* at 6.)

On this record, Gabrion has not shown that his counsel's performance was deficient.   Significantly, "[t]he Supreme Court . . . has not laid down a requirement that counsel must uncover every available piece of mitigating information about a defendant."   *Jackson v. United States*, No. 1:04-cv-251, 2010 WL 2775402, at *6 (W.D.N.C. July 13, 2010).   Thus, merely showing "that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness."   *Burger*, 483 U.S. at 794.   "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998)

(citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).   Moreover, "[i]t is always possible to discover additional records or new witnesses, the more time that is available."   *Nelson v. United States*, 97 F. Supp. 3d 1131, 1144 (W.D. Mo. 2015). *See also Williams v. Nix*, 751 F.2d 956, 962 (8th Cir. 1985) ("Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial").

Nor has Gabrion demonstrated prejudice.   The information in the "mutigenerational social history" Gabrion attaches to his amended motion does not shift the balance of factors.   Even assuming that these folks could have been identified 15 years ago *and* would have revealed their respective issues at that time *and* would have testified consistent with Gabrion's claims, Gabrion still has made no showing whatsoever that there is a reasonable probability that the information would have caused the jury to select a life sentence.   Where, as here, a defendant's claim is based on his trial counsel's alleged failure to offer certain evidence in mitigation, a court assessing prejudice must "'consider 'the totality of the available mitigation evidence—both that adduced at trial and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation.'"   *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).   It is not always necessary to conduct an evidentiary hearing to facilitate this reweighing, even when the defendant submits purported evidentiary support in the form of affidavits.   *See, e.g., Fields*, 761 F.3d at 468-69.   Here, as in

126

*Fields*, even considering and reweighing the "new" mitigation evidence against the aggravating evidence, there is no reasonable probability that the jury would have reached a different result.

> **A.    Trial Counsel Directed and Oversaw a Proper Investigation into the Penalty Phase Presentation; and**
> **B.    Trial Counsel Prepared an Adequate History of Gabrion's Family that Included Gabrion's Social History**

In two overlapping subsections (Grounds 4A, PageID.3963, and 4B, PageID.3969), Gabrion's amended motion alleges that his trial counsel failed to investigate and prepare an adequate multigenerational social history regarding familial mental health, substance abuse, family dysfunction, and various other social issues.   These claims lack merit because Gabrion's trial counsel conducted a years-long, nationwide, mitigation investigation, overseen by Stebbins, an experienced capital litigator with particular expertise in investigating and presenting mitigation evidence, that easily satisfied the duty of counsel at the time. Moreover, there is no reasonable likelihood that the jury would not have imposed a death sentence based on the social history information Gabrion's current counsel has provided.

Gabrion's current attorneys acknowledge that his trial defense team hired a mitigation specialist who compiled a social history, but they argue he could have done *more,* such as uncovering every mental health issue for every relative in four generations and every substance abuse or instance of "unscrupulous behavior" among various of his extended family members.   This is not constitutionally required.   The question is not what else counsel and their hired experts *could have*

127

done, but whether what they *did* was reasonable.   *See, e.g., Murray v. Schriro*, 745

F.3d 984, 1011 (9th Cir. 2014) ("[T]he relevant inquiry ... is not what defense

counsel could have pursued, but rather whether the choices made by defense

counsel were reasonable.") (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th

Cir. 1998)).   The mitigation investigation conducted here, conducted by an

experienced mitigation specialist who spent over 1,000 hours investigating

Gabrion's social history, overseen by a learned counsel who was one of the pioneers

of capital defense, was well within the range of reasonable performance.

In support of his claim that his trial counsel conducted an inadequate

mitigation presentation, Gabrion offers the opinion of a non-lawyer, Russell Stetler,

on the applicable standard for evaluating deficient performance.   The Court should

reject this opinion.   First, the Court does not need it.   The *Strickland* standard is a

legal one, and one with which this Court is well-familiar.   Further, the standard

must be applied on a case-by-case basis.   "There are countless ways to provide

effective assistance in any given case.   Even the best criminal defense attorneys

would not defend a particular client in the same way."   *Strickland*, 466 U.S. at 689.

And, as noted elsewhere, "[i]n any ineffectiveness case, a particular decision not to

investigate must be directly assessed for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgments."   *Id.* at 691.   Thus,

a federal habeas court does not abuse its discretion by excluding expert testimony

regarding the standards of attorney performance in the penalty phase of a capital

case.   *Heishman v. Ayers*, 621 F.3d 1030, 1042 (9th Cir. 2010) (per curiam) ("A

federal court may determine that it does not require expert assistance 'to understand the legal analysis required by *Strickland*.'") (quoting *Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995)); *Hovey v. Ayers*, 458 F.3d 892, 910-11 (9th Cir. 2006) (upholding exclusion of petitioner's four *Strickland* experts as to trial counsel's penalty phase effectiveness); *Riggs v. Kirkegard*, No. CV 11-80-BU-SEH-RKS, 2013 WL 395245, at *7 (D. Mont. Jan. 11, 2013), *report and recommendation adopted*, No. CV 11-80-BU-SEH, 2013 WL 395277 (D. Mont. Jan. 31, 2013) ("Expert testimony on attorney ineffectiveness is not required because judges generally understand what attorneys should and should not do.") (citing *Heishman*).

The question under the *Daubert* standard is not whether a layperson would find the testimony helpful, but instead, whether a learned judge with years of experience adjudicating exactly this type of issue would need the advice of a non-attorney to assist him or her in making a legal decision.  *See, e.g., Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013); *United States v. Garcia*, 994 F.2d 1499, 1507 (10th Cir. 1993) (comparing admissibility of expert opinion regarding "jargon" in drug trade versus reference to "your old man"); *United States v. Curry*, 977 F.2d 1042, 1050-51 (7th Cir. 1992) (upholding exclusion of expert testimony regarding reliability of identification); *N.V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp.*, 590 F.2d 415, 421 (2d Cir. 1978) ("[T]his disagreement was on a point of law, which could be argued separately to the judge, and which was not a proper subject for witness testimony.").    Though he discusses the legal standards set forth in various cases, Stetler does not purport to be a lawyer, or possess legal

129

analysis skills superior to this Court's.   Drawing on these authorities, one district court recently refused to consider a declaration by Stetler on the *Strickland* standard.   *Garza v. Ryan*, No. CV-14-01901-PHX-SRB, 2017 WL 1152814, at *8 (D. Ariz. Mar. 28, 2017) ("The Court will deny expansion of the record to include the Stetler declaration. The Court is familiar with the legal standards involved in evaluating ineffective assistance of counsel claims.")

Second, Stetler's opinion is not persuasive.   Stetler is with the Capital Defense Network, an organization dedicated to "[s]upporting the Capital Defense Lawyer." http://capdefnet.org/. He is hardly a neutral arbiter.   Further, his legal analysis is flawed.   Both Stetler and Gabrion cite the *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, History of Guideline 1.1, 31 Hofstra L.R. 913, 920 (2003), and note that the Guidelines say they are "not aspirational" and represent "the existing norms and constitutional requirements" (PageID.3964, n.5), but for at least two reasons, the 2003 ABA Guidelines are not definitive as to what constitutes an objectively reasonable performance here.

First, the Supreme Court says so.   In *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam), the Court criticized the Sixth Circuit for treating the ABA's 2003 Guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel "'must fully comply.'" *Id.* at 8 (citations omitted).   The Court explained that "*Strickland* stressed . . . that 'American Bar Association standards and the like' are "only

guides" to what reasonableness means, not its definition." *Id.* (quoting *Strickland,*

466 U.S. at 688.)   "We have since regarded them as such," the Court concluded.

*Id.*

Second, the 2003 ABA Guidelines were not even approved until February

2003, a year after Gabrion was sentenced to death and more than three years after

the mitigation investigation began in 1999.   The ABA Guidelines in place at the

time this case was investigated and tried were the 1989 Guidelines, which were

similar in overarching themes but less detailed and specific.   The Supreme Court

has reserved judgment as to whether the 2003 Guidelines are "so detailed that they

would 'interfere with the constitutionally protected independence of counsel and

restrict the wide latitude counsel must have in making tactical decisions.'"   *Van*

*Hook*, 558 U.S. at 8 & n.1.   *See also id.* at 13-14 (Alito, J., concurring to emphasize

his understanding that "the opinion in no way suggests that . . . 2003 Guidelines . . .

have special relevance in determining whether an attorney's performance meets the

standard required by the Sixth Amendment").

In any event, counsel in this case was at the forefront of these developing

professional norms.   The 1989 ABA Guidelines provide that the defense should

conduct a sentencing phase investigation that "should comprise efforts to discover

all reasonably available mitigating evidence and evidence to rebut any aggravating

evidence that may be introduced by the prosecutor."   Guideline 11.4.1

("Investigation.")[9]    The Guideline states that potential witnesses should be

---

[9]  Available at

131

interviewed, which include witnesses familiar with the client's life history who might testify about "mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death."   (*Id.*)   It states that counsel should consider presenting evidence on "family and social history (including physical, sexual or emotional abuse, neighborhood surrounding and peer influence)."   Guideline 11.8.6 ("The Defense Case at the Sentencing Phase.")   It does not speak in terms of having to conduct a multigenerational historical study that identifies any mental health or substance abuse issues for any relative, no matter how far removed.

That counsel was familiar with the need to conduct a thorough investigation and create a social history is evident from the fact that Stebbins co-authored an article *cited* in the 1989 ABA Guidelines on that very topic.   *See* Stebbins and Kenny, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, The Champion (Aug 1986), reprinted in *California Death Penalty Defense Manual*, Vol. 11, p. 87H-37 et seq. (1987 Supp.) (attached as Ex. K), cited in 1989 ABA Guidelines, Guideline 11.8.6 n.4.   Indeed, Stetler has previously quoted Stebbins on the subject: "A social investigation or social history is a creature of capital litigation . . . and is key to a successful mitigation . . . . Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are

---

http://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_representation/1989guidelines.authcheckdam.pdf.

subject to severe scrutiny."   Russell Stetler & Aurelie Tabuteau, *The ABA Guidelines: A Historical Perspective*, 43 Hofstra Law Review, 731, 738 (2015) (quoting Stebbins & Kenney, at 16-17).[10]  *See also* 10/24/00 Hr'g on Gov't Mot. for Psychological Evaluation, at 9 (Stebbins, "I've done this a long time but I also read the case law addressing what counsel has to do in death penalty cases to prepare for mitigation phase, and they clearly state that you've got to do a complete, thorough investigation even to make the kind of determination as to what should be presented in mitigation.")

Thus, Gabrion's conclusory assertion that, "[t]here can be little doubt the failure to fully investigate Mr. Gabrion's social history . . . fell below the prevailing professional norms of reasonably competent counsel" (PageID.3966) is far from the mark.   In fact, Gabrion's counsel easily satisfied the relevant standards—looking to the 1989 ABA Guidelines, together with the relevant case law.   Mitigation specialist James Crates was appointed early in the case; by the time Gabrion was first evaluated for competency in March 2000, Crates and Gabrion's attorneys had already put together 174 pages of a social history and records.   (R.268: Fallis Report, at 2.)   Crates was paid nearly $100,000, reflecting, upon information and belief as to the rate of compensation for mitigation specialists at the time, at least

---

[10] Stetler attempts to use this article against Stebbins, suggesting that he focused too much on the need to "explain" the crime. (PageID.4941-42 n.21.)   In at least one other declaration, Stetler cited Stebbins's article favorably, without criticizing it. *See* R. Stetler Affidavit, *Lopez v. Ryan*, 2012 WL 6056334, ¶ (D.Ariz. Feb. 10, 2012). *See also id.* at ¶¶ 17, 33 & n.5 (quoting Stebbins's articles).

1,000 hours of work dedicated to the mitigation investigation.   (R. 44-1, Ex. A: 5/23/02 Am. Budget Cert, PageID.2393.)   Gabrion's characterization of the defense team as neglectful or inept is false.   *See, e.g., Nelson*, 97 F. Supp. 3d at 1144 ("with over 400 hours devoted to the case, the Court finds the mitigation evidence which was discovered and the mitigation case which was initially presented to the jury was sufficient").   In fact, looking to what counsel and the mitigation specialist actually *did*—as the Court must do—it is clear that they easily cleared the threshold for a reasonable mitigation investigation; indeed, they did commendable job, under difficult circumstances.   This case is like *Van Hook*, where the Supreme Court observed, "given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents."   *Van Hook*, 558 U.S. at 11.   Listed below is some of the evidence that Gabrion's trial counsel presented as part of the mitigation case.

**Mental health evidence.**   As the court of appeals observed on direct appeal, nine mental health professionals evaluated Gabrion at the time of his trial—eight of whom determined that Gabrion was a malingerer and not actually mentally ill.   *Gabrion II*, 648 F.3d at 320 n.3.   The only one to offer a contrary opinion (Dr. Scharre) did not examine Gabrion and was effectively discredited by the government's rebuttal witnesses (Dr. Griesemer, Dr. Saathoff, and Dr. Ryan).   Against this, Gabrion now argues that he was prejudiced because the jury did not

hear that some members of his family have had varying degrees of mental health problems.   (PageID.3965-68.)   Gabrion says this would have changed the outcome because it likely would have "changed the way the jury viewed the government's claims that Mr. Gabrion was malingering mental illness" and would have given all the mental health professionals "a different lens" through which to view the mental health evidence.   But Gabrion produces no new expert opinion that, based on this additional evidence, Gabrion was mentally ill.   This is fatal to his claim.   And even if he does find an expert, some 16 years later, to opine that this additional information would have made a difference, that would still be insufficient to establish deficient performance or prejudice.

First, any new opinion, many years later, would be cumulative and would have to be balanced against all the other mental health evidence, including mental health professionals who examined him and administered tests.   *Cf. Johnson*, 860 F. Supp. 2d at 810 (fact that several years after trial defendant was able to find a psychiatrist willing to testify that defendant was incompetent did not establish that counsel was ineffective for failing to seek a competency examination); *Fields*, 761 F.3d at 468 (expert's "declaration, executed in 2010, six years after Fields's trial, is not sufficient to establish that the district court's careful and reasoned decision that Fields was competent to waive counsel is debatable").

Second, additional mental health evidence would not necessarily be considered "mitigating."   Courts have observed that mental health evidence is often a "double-edged sword" that might as easily condemn a defendant to death as

excuse his actions.   *Truesdale v. Moore*, 142 F.3d 749, 754-55 (4th Cir. 1998).   *See also Fields*, 761 F.3d at 459 (noting that "[e]vidence of mental illness can be mitigating, in that it can influence a jury's appraisal of a defendant's moral culpability" but that "such evidence can also be 'double-edged,' . . . since it can lead a jury to conclude that a defendant poses a future risk of violence"); *Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997) (trial counsel not ineffective for not presenting mental health testimony where experts found no psychiatric or neurological disorders, but found that the defendant had an antisocial personality disorder that might make him a future danger).   There is no guarantee that additional evidence of a potential hereditary predisposition to mental health problems would have been non-cumulative and mitigating.

Third, Gabrion has made no showing that there is a reasonable probability that this additional evidence concerning his extended family members would have caused the jury to impose a life sentence.   In *Fields*, for example, a capital defendant submitted with his post-conviction motion a declaration of a physician specializing in psychiatry and neuropsychiatry who had interviewed the defendant six years after his trial and opined that at the time he committed his offense he suffered from bipolar disorder and post-traumatic stress disorder.   761 F.3d at 458. This new opinion did not establish prejudice—or even warrant an evidentiary hearing—because even assuming that counsel had rendered deficient performance by failing to adduce additional evidence on mental illness and possible brain damage, "the government had presented compelling aggravating evidence regarding

136

[the defendant's] future dangerousness." *Id.*   There, as here, the government had presented evidence concerning the defendant's prior crimes, unadjudicated bad acts, escape attempts, and threats against prison staff and others while incarcerated. *Id.* at 459-60.   Likewise, here, "the government's case for aggravation was overwhelming." *Gabrion III*, 719 F.3d at 525.

**Substance abuse.**   It is likewise difficult to see how there is a reasonable probability that the proffered additional mitigating information about Gabrion's family members' substance abuse would have changed the outcome in the case. Ample evidence of Gabrion's own substance abuse was presented, and nine jurors found as a mitigating factor that his substance abuse contributed to his criminal conduct, but it did not make a difference in the final calculus.   Further, members of Gabrion's immediate family testified about substance abuse problems.   For example, Gabrion's brother Mike Gabrion testified during the penalty phase that he had a tattoo of a cannabis leaf and he had been into drugs "for a long, long time." (R.593: 3/11/02 STR1 at 38.)   Additional testimony of more distant relatives who also had varying degrees of substance abuse problems would have been cumulative and would not reasonably have affected the jury's decision making process in selecting the penalty.

**Family dysfunction.**   Though Gabrion's trial counsel presented a great deal of evidence demonstrating that his family was dysfunctional in many respects, Gabrion argues that his counsel was constitutionally deficient for failing to investigate and present additional evidence that some members of his extended

137

family also grew up in dysfunctional home environments.   (PageID.3971-78, Gabrion Ex. 9)   Many of the allegations are unsupported by actual evidence and many of them appear to be founded on little more than gossip and innuendo.   In any event, none of it is revelatory.   Even Gabrion begrudgingly admits that his trial counsel presented "some" evidence on some of the topics he raises (e.g., that Gabrion "was a smart and unremarkable boy until early adulthood," PageID.3977). Gabrion's siblings testified about their mother's adultery and periods of abandonment (R.560: Michael Gabrion, 3/14/02 ESTR at 31; Wilkinson, at 56; Hermann at 73), as did Dr. Jackson (R.541: 3/14/02 ESTR at 18 ("There's evidence of extramarital affairs, and not alone that, but actual absences from the home of the primary caretakers").   Dr. Jackson gave additional testimony about "a number of very dysfunctional things that happened in [Gabrion's] family while he was growing up, including "abuse of alcohol from both parents' side" and its effect on a child; the fact that "alcoholism has a very high association with domestic violence" and that there was evidence of such abuse in the household; and a medical illness Gabrion suffered as a young child and associated "themes of abandonment" that may have developed from that situation.   (*Id.* at 17-19.)   Gabrion's counsel did not perform deficiently by not presenting additional, cumulative evidence along the same lines. *See, e.g., Sutton v. Carpenter*, 617 F. App'x 434, 447 (6th Cir. 2015), *cert. denied sub nom. Sutton v. Westbrooks*, 136 S. Ct. 1494 (2016) (counsel not ineffective where they "presented mitigating evidence on a variety of subjects" such as the defendant's employment history, previous conduct as a prisoner, reputation as a

138

family man, family background, his parents' divorce, his childhood abuse, his "least favored" child status, his limited education and IQ, his alcoholism, and his tendency to follow others" and where proposed detailed evidence of abuse would have been "largely cumulative"); *Carter*, 443 F.3d at 530 (counsel not ineffective for not presenting a testimony of additional family members that would have been cumulative and/or "hardly . . . mitigating").

Indeed, that Gabrion's trial counsel presented evidence on these topics is reflected in the jury's findings—all 12 jurors found, for example, both that Gabrion did not have disciplinary problems in school or criminal conduct before age 23, and that he grew up "in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child." (R.526: Penalty Phase Verdict Form, at 6.)   They also unanimously wrote in as an additional mitigating factor that loss of Gabrion's life would be significant to his family.   (*Id.* at 8.)   Given these findings, Gabrion has not only failed to substantiate many of his allegations, he has completely failed to show how they would have made any difference to the jury.   *See, e.g., Jackson v. United States*, 638 F. Supp. 2d 514, 549 (W.D.N.C. 2009) (fact that defense counsel might have discovered and presented "testimony of extended family and fellow co-workers" and defendant's biological mother "would have been cumulative" where defense counsel "presented substantial evidence of the Petitioner's early childhood upbringing and young adulthood").

139

Gabrion's amended motion contains some additional allegations, but none demonstrates his trial counsel were ineffective.   For example, the amended motion asserts: "Marvin was sexually victimized in his youth."   (PageID.3973.)   But the entire factual basis for this assertion appears to be a rumor, recounted by an unnamed relative, that a neighbor was once caught in bed "with one of the Gabrion boys"—i.e., either Marvin Gabrion or his brother Mike Gabrion. (Am. Mot. Ex. 9, PageID.4738.)   The entire incident (whatever actually occurred) was put to an end by an unnamed family friend who had "raced over there." (*Id.*)   Even crediting the unnamed sources as having actual knowledge (which is far from established), it is unclear whether any abuse actually occurred, let alone that it was Marvin Gabrion who was abused.   Gabrion's social history conclusorily asserts that whichever brother was not molested "was probably also physically molested." (*Id.*)   It is hard to imagine that any of this information would have been reliable enough to get before the jury; it would not supply a foundation for a sex abuse expert.   And even if it did, there is no reasonable probability that it would have moved the jury to select a life sentence.

Indeed, the social history that Gabrion attaches to his amended motion (Ex. 9, PageID.4732), while lengthy, does not establish that the social history prepared by Crates, or the mitigation investigation in general, were deficient.   Much of it relates to the dysfunction of distant relatives, with no showing that Gabrion had contact with those relatives or was aware of the dysfunction.   *See, e.g., Quintero v. Westbrooks*, No. 3:09-CV-00106, 2017 WL 1196520, at *54 (M.D. Tenn. Mar. 31,

140

2017) ("'transgenerational' facts, about dysfunction in Petitioner's family that he did not personally experience, would not have succeeded with the jury where his own abuse and neglect did not").

Some of it relates to events that occurred well after the trial in this case. E.g., PageID.4864-70 (discussing issues relating to "Grandchildren of Marvin's First Cousins (First cousin twice removed)" occurring after 2002)). Much of the social history relates details that are unlikely to have moved any juror or to have affected any expert's view.   *E.g.*, PageID.4800 (describing Gabrion's uncle as "a very controlling, volatile man" and noting that "[w]hen he died, his wife Marrilla said she was going to paint her cabinets any color she wanted now that he was dead").

The social history devotes nine pages to Gabrion's alleged head injuries, but this does not advance Gabrion's claim.   First, much of it appears unreliable.   For example, the section begins with "Brain insult / traumatic accident #1" that consists of an accident that "apparently" occurred in 1971, when he drove his car off the road into a cemetery, an anecdote relayed by an unnamed sibling. (PageID.4756.)   There is nothing to indicate how severe the accident was, or how likely it was that he suffered any actual brain injury as a result of it.   Many of the other alleged "brain insults" suffer from the same lack of reliability.   The most obvious example is "Brain insult / traumatic accident #13" (PageID.4759)—over five pages address this "accident" that allegedly occurred on March 28, 1992.   This is, of course, the "accident" in Cedar Springs that Gabrion faked in an effort to obtain insurance benefits.   (R.543: Vanderveen, 3/14/02 ESTR at 4-18.)   Moreover, all of the

141

information pertaining to the alleged accident, and Gabrion's efforts to dupe the medical providers at Hope Network into finding that he suffered from conditions entitling him to disability benefits, was before the jury and provided to all the mental health professionals who examined Gabrion.   Indeed, Gabrion's trial counsel presented Dr. Waalkes's testimony on that very subject during the penalty phase of the trial.   (R.540: 3/13/02 ESTR at 6-7, 23-24.)   Further, as discussed below in Section M, both the jury and the experts were aware that Gabrion had been involved in a number of car accidents.   Despite this, aside from ultimately discredited Dr. Scharre, no expert was able to opine that Gabrion suffered from organic brain damage; and several experts said he did not, as conclusively demonstrated by the medical diagnostic testing.   And, once again, Gabrion has offered no opinion to contradict this, which is fatal to his claim. *Carter*, 443 F.3d at 529 (ineffective assistance claim failed where "habeas counsel did not find evidence of organic brain damage").

Likewise, Gabrion's listing of every mental health issue that affected family members, no matter how distant the relative or how severe the malady, does not demonstrate that his trial counsel conducted an inadequate investigation.   First, as discussed above, there is no per se duty to conduct such a multi-generational investigation.   The Court must assess the reasonableness of the investigation based on what was actually done, not by what could have been done.   As the Supreme Court observed in *Van Hook*, "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the

142

search for it distractive from more important duties."   *Van Hook,* 558 U.S. at 11.

Second, though Gabrion's amended motion speaks in hyperbolic terms about the

mental health issues afflicting various members of Gabrion's family (e.g.,

PageID.3965 ("an extraordinary family history, spanning at least four generations,

of the most severe mental health illnesses known to the medical profession"), much

of the social history relates mental health problems that are commonly understood

to afflict many Americans.   For example, the history lists "mental illness" for

several members of Gabrion's "immediate family" (including nieces and nephews):

- Elaine Gabrion, his mother was described as "crazy that's for sure" by one of her daughters. (PageID.4790.)   This is hardly a medical diagnosis.   Moreover, Elaine Gabrion testified during the penalty phase that she had a nervous breakdown, so the issue of her mental health was already before the jury. (3/14/02 ETR at 12.)

- Gabrion's sister Gloria was treated by a psychiatrist and psychologist and is considered by the family to be "emotionally fragile." (PageID.4790.)   No diagnosis is given.

- Gabrion's sister Yvonne "believes she has been depressed for years" and treats her condition with "health foods."   As noted below, depression is a serious commonly occurring disorder.   (PageID.4791.)

- Gabrion's brother David is prescribed an anti-depressant and an antipsychotic drug that he uses as a sleep aid. It appears unlikely he was taking these medications or diagnosed with any mental impairment in 2002, when Gabrion's trial occurred; he says he began going to a mental health center in 2009, after his mother died. (PageID.4792.)

- Gabrion's niece Lanie is listed as suffering from mental illness on the basis that "some . . . believe that Lanie is mentally ill." No diagnosis or evidence of any mental illness is identified. (PageID.4793.)

- When Gabrion's nephew Tom was a child, Child Protective Services ordered a psychiatric evaluation of him.   No further information

143

concerning his mental health is listed (a meth addiction is noted). (PageID.4794.)

- Another niece "suffers from depression and spends much of her time in bed or drinking" and has purportedly twice attempted suicide. (PageID.4794.)   No time frame is given for these incidents, or any indication that they had occurred at the time of Gabrion's 2002 trial.

Beyond Gabrion's immediate family members, the social history relates that many of his extended family members suffered from anxiety disorders, depression, or similar conditions.   Without minimizing the significance of these disorders, unfortunately, they are not uncommon.   Anxiety disorders are the most common mental illness in the United States, affecting 40 million adults, or 18 percent of the population.   See https://www.adaa.org/about-adaa/press-room/facts-statistics. Major depression is one of the most common mental disorders in the United States; in 2015, an estimated 16.1 million adults had at least one major depressive episode in the past year.   https://www.nimh.nih.gov/health/statistics/prevalence/major-depression-among-adults.shtml.   To be sure, Gabrion's social history reports that a handful of his relatives have suffered from severe mental health issues that required hospitalization or other treatment. (E.g., Uncle George, PageID.4796, cousin Johnny, PageID.4809, cousin Mary, PageID.4822.)   But Gabrion submits no opinion from a mental health professional indicting that, if provided this information, all eight experts who examined Gabrion at the time of trial would change their minds and find that, contrary to all diagnostic testing and his undisputed ability to function at a high cognitive level, Gabrion himself is mentally ill.   Indeed, the fact that no one in Gabrion's immediate family has suffered the

144

kinds of debilitating mental illness afflicting some of these extended relatives suggests that there is no immutable predisposition.   In any event, as noted earlier, the mental health evidence that Gabrion's counsel presented persuaded the jury that he "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder."   (R.526: Verdict Form, at 7.)   This was not sufficiently mitigating to cause the jury to select a life sentence, and there is no indication that any further diagnosis would sway the jury.

In sum, given all the mitigation evidence that was presented, and Gabrion's failure to identify any new "powerful" mitigating evidence, Gabrion has failed to show that his counsel's performance was deficient, or that their performance prejudiced him.   In *Nelson*, as in this case, post-conviction counsel argued that a capital defendant's trial counsel should have done more mitigation investigation. They presented testimony of a social worker at an evidentiary hearing who said she had "discovered a multigenerational history of mental illness, a history of alcoholism, substance abuse on both sides of the family, domestic abuse on both sides of the family, inappropriate sexual behavior and criminal sexual misconduct." 97 F. Supp. 3d at 1140.   She also said she had uncovered evidence of "poverty," additional medical records of family members showing mental health issues and other records that the trial team had failed to uncover.   *Id.*   The district court rejected the claim that the trial team's failure to identify this additional evidence and present it demonstrated ineffective assistance of counsel.   The court contrasted

the case with *Wiggins*, where counsel had "completely abandoned" investigation into the defendant's background. *Id.* at 1143. Rather, in *Nelson*, the court held that counsel had "conducted a thorough mitigation investigation and presented a comprehensive mitigation case to the jury." *Id.* The court observed that "[a] mitigation specialist was hired and a social history report produced." *Id.* Even though, there, the mitigation specialist had only visited the defendant twice and admitted that she had "dropped the ball" in certain respects, the court found that the mitigation case, while "not perfect," was "more than adequate." *Id.* at 1143-44. The mitigation case was presented over the course of two days, with 17 witnesses testifying, including the defendant's "mother, aunts, siblings, a former teacher, principal, family friends, prison guards, an employer, former babysitter and her daughter and an expert forensic psychologist." *Id.* at 1143. The witnesses had testified about abuse suffered by the defendant, his chaotic home life, and his difficulties in school. *Id.* Given this evidence that was presented, the court rejected the defendant's claim that the mitigation investigation was inadequate. The court observed, "[i]t is always possible to discover additional records or new evidence, the more time that is available." *Id.* at 1144. But habeas counsel had failed to identify any "powerful" new evidence. *Id.* Further, the court observed, "[n]o amount of mental health evidence or testimony relating to brain damage and a difficult upbringing could overcome the fact that [the defendant] kidnapped a ten-year old girl who had roller skated to the store to buy cookies, sexually assaulted her, strangled her and left her naked body in the woods." *Id.* at 1157.

146

Likewise, here, Gabrion's counsel presented an extensive mitigation case, over the course of two days, with testimony of 13 witnesses, including his mother, two sisters, former girlfriends, a school principal, and several expert witnesses.   As in *Nelson*, post-conviction counsel have not identified any "powerful" new evidence. And there is not even the slightest possibility that the issues they raise would have overcome the fact that Gabrion murdered Rachel Timmerman in a cruel and heinous manner, murdered her infant daughter Shannon, as well as three other people, and committed many acts of violence and terror against neighbors, acquaintances, and jail staff.   Significantly, as noted above, many of the issues Gabrion claims were inadequately presented were actually found by the jury to be mitigating factors.   For instance, as noted above, 12 jurors found that he had an impoverished and abusive childhood.   (R.597: STR5 at 680-82.)   Thus, the jury was not left with the impression that Gabrion grew up in "a somewhat idyllic lakeside home" (PageID.3972) and Gabrion has not shown that there is a reasonable probability the jury would have chosen a life sentence on the basis of information such as that his mother "was a terrible housekeeper" (PageID.3971).

**C.    Trial Counsel Obtained Relevant Records and Were Not Ineffective for Failing to Obtain Additional, Cumulative Records**

Gabrion argues that his trial counsel was ineffective for allegedly failing to obtain records supporting mitigation.   (PageID.3979.)   He refers to records of family members with mental health conditions, records relating to his alleged brain injuries, his high temperature once in his youth and his substance abuse—some of

147

which are referenced in the new social history (Ex. 9).   This argument lacks merit for the same reasons the arguments above do—Gabrion has shown neither deficient performance nor prejudice in not presenting such evidence.   Further, the record demonstrates that Gabrion's trial counsel undertook significant efforts to obtain relevant records in the case.   For example, the defense team secured releases from Gabrion to obtain records "in the very beginning."   (R.214: 5/23/01 In Camera Hr'g Tr. at 16.)   The fact that Gabrion had pneumonia as a child and his alcohol abuse is noted in Crates's social history and was considered by the many mental health experts who examined him.   (Crates History, PageID.4707; Fallis Report at 3, 8; Frank Report at 4, DeMier Report, at 23; Ex. D, Mauger Report, PageID.2394; Ex. E, Jackson Report, PageID.2397, 2402; Ex. F, Scharre Report, PageID.2404.)

The notion that Gabrion had brain injuries at the time he committed the murder was refuted by medical diagnostic evidence and the testimony of qualified experts.   Dr. Griesemer testified that he reviewed Gabrion's PET, CAT, and EEG records and found no evidence of brain injury.   (R.544: Griesemer, 3/14/02 ESTR at 6, 9.)   (R.546: Ryan, 3/15/02 ESTR at 2-7.)   Dr. Ryan testified that if Gabrion had suffered a traumatic brain injury, he would have started with a severe impairment which would have improved over time, but Gabrion's purported illness had actually worsened, and he demonstrated a much higher level of functioning than his testing, a tell-tale sign of malingering.   ((R.546: Ryan, 3/15/02 ESTR at 10-22.)   And much of the "records" that Gabrion's new social history cites are of dubious value—for example, there are five pages discussing the "accident" that allegedly occurred on

148

March 28, 1992, even though there was testimony that Gabrion faked that accident in an effort to obtain insurance benefits, and even though all of the records relating to that incident and the follow-on care at Hope Network were considered by the experts in the case and testified about by Dr. Waalkes.

Gabrion fails to show how the factfinder "would have had a much different view of the government's malingering themes and his own mental illness" if the records relating to distant family members had been presented.

**D.    Trial Counsel Selected Appropriate Experts and Provided Them with Adequate Information to Render Reliable Opinions**

Without identifying a single alternative expert of their own, Gabrion's post-conviction counsel criticize Gabrion's trial counsel for calling Drs. Jackson, Scharre, and Cunningham as experts, and criticizes them for not calling other experts.   All of those claims—some of which are asserted for the first time in the amended motion and are untimely—lack merit.

As even Gabrion's "*Strickland*" expert concedes (PageID.4934), Gabrion's trial counsel retained numerous experts, including psychiatrist Theodore Mauger, M.D., neurologist Douglas Scharre, M.D., Dr. Jackson, neuropsychologist Ronald Lewis, Ph.D., and forensic psychologist Mark Cunningham, Ph.D.[11]  Three of them (Jackson, Scharre, and Cunningham) testified during the penalty phase.   In addition, Dr. Waalkes, the psychologist who had treated Gabrion at Hope Network

---

[11] There were almost certainly more.   Because the government has not yet been given access to trial counsel's files, and experts were retained ex parte, the government lists here only the experts that the defense identified in public filings.

in 1993 testified that he believed that Gabrion suffered from some neurological impairment.   (3/13/02 ETR at 24.)   Attorney Stebbins was keenly aware of the importance of retaining experts, particularly mental health experts.   *See* David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, The Champion (April 1988) (attached as Ex. L) ("Just as a prosecutor would not consider investigating and proving the case without the assistance of experts, the defense attorney also should not consider investigating and proving the case for life without the assistance of experts.").

Gabrion's claim that his trial counsel should have hired *better* experts is without merit.   Significantly, the Sixth Circuit "has never held that a defendant is entitled to a particular type of expert."   *Carter v. Mitchell*, 443 F.3d 517, 526 (6th Cir. 2006).   And counsel is under no duty to "shop" for experts: counsel are not required to shop for experts who will testify exactly as counsel prescribes.   *See, e.g., Benge v. Johnson*, 312 F. Supp. 2d 978, 1020 (S.D. Ohio 2004), *aff'd*, 474 F.3d 236 (6th Cir. 2007) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) ("Under the circumstances, trial counsel was not deficient by not canvassing the field to find a more favorable defense expert.").   *See also McClain v. Hall*, 552 F.3d 1245, 1253 (11th Cir. 2008) ("That McClain later secured a more favorable opinion of an expert than the opinion of Dr. Maish does not mean that trial counsel's failure to obtain that expert testimony constituted deficient performance."); *Marcrum v. Luebbers*, 509 F.3d 489, 505 (8th Cir. 2007) ("the law is well-established that a lawyer who hires a qualified mental health expert is not ineffective in relying on

150

that expert's opinion unless the lawyer has reason to doubt the expert's competence"); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation."); *Stokley v. Ryan*, 659 F.3d 802, 813 n.8 (9th Cir. 2011) (same).

Moreover, because Gabrion's post-conviction counsel has not set forth any basis for asserting that there are experts who would testify in Gabrion's favor on these subjects, his claim fails.   *See, e.g., Carter v. Mitchell*, 443 F.3d 517, 529 (6th Cir. 2006) ("Trial counsel 'cannot be deemed ineffective since, even at this late date, there is no medical *proof* of a [mental] condition.'") (quoting *Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002)) (emphasis in original).   In any event, the criticisms of counsel for calling Drs. Cunningham, Jackson, and Scharre are unwarranted.

**Dr. Cunningham**.   Gabrion's amended motion asserts a new,untimely claim: that trial counsel performed deficiently by not asking Cunningham "to conduct an individual threat assessment"—a "critical omission" according to Gabrion's current counsel.   (PageID.3981.)   The court should not consider this claim, as it was asserted beyond the one-year statute of limitations and it does not relate back to a claim in the original motion.   Although Gabrion's original motion mentioned Dr. Cunningham in the context of attacking the government for objecting to his proposed testimony as to the text of the regulations governing conditions of confinement (Ground 1.D., PageID.906); Gabrion did not argue that counsel was

151

ineffective for failing to elicit a future dangerousness opinion.   Under the standards governing amendment of claims (*see supra Section I*), this new claim does not relate back to the filing of the original motion.   *See, e.g., United States v. Crawford*, No. 1:02-CV-06498 OWW, 2009 WL 453049, at *5 (E.D. Cal. Feb. 22, 2009) (where original motion alleged ineffectiveness for failing to call a particular witness, amended claim that counsel was ineffective for failing to call three other witnesses did not relate back); *see also Mandacina v. United States*, 328 F.3d 995, 1003 (8th Cir. 2003) (amended claim that counsel was ineffective in cross-examining one witness did not relate back to similar allegations as to cross of other witnesses).

Moreover, the record demonstrates that Gabrion's trial counsel's decision not to elicit a future dangerousness opinion from Dr. Cunningham was strategic.   In opposing the government's request for a mental health examination of Gabrion to assess his future dangerousness and rebut Dr. Cunningham's testimony, Gabrion's trial counsel specifically asserted: "Contrary to the government's assertions, Dr. Cunningham will not testify that Mr. Gabrion 'will not pose a danger in a prison setting.'"   (R.469: Gabrion's Mem. in Opp. to Gov'ts Mot. for Two Additional Mental Health Exams, at 5.)   The tactic succeeded: on the strength of counsel's representation as to the limited scope of Dr. Cunningham's testimony, the Court denied the government's request. (R.469: Op. at 2 ("In light of Defendant's representation as to the scope of Dr. Cunningham's testimony, it appears that . . . .[a]n examination by [the government's proposed expert] does not appear necessary, and accordingly will not be permitted.").)   Given Gabrion's record, this was a

manifestly reasonable strategy.    Indeed, by walking this line, Gabrion's trial counsel was able to essentially "have its cake and eat it too"—avoid what was certain to be a devastating rebuttal witness on the issue of future dangerousness in a prison setting (even assuming Dr. Cunningham or any defense expert would have offered an opinion that Gabrion did *not* present a danger in a prison setting), while getting before the jury an instruction and considerable testimony on the issue.    The court of appeals noted that despite the government's objection to Cunningham's testimony, "Cunningham was allowed to testify as to the different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous."    *Gabrion II*, 648 F.3d at 353.[12]

In any event, current counsel provide no such individual threat assessment assuring that Gabrion is not a threat in a prison setting.    Such an opinion would be hard to come by, given the many instances in which he threatened and assaulted fellow inmates and guards and created weapons and contraband designed to facilitate escapes.    *See supra* Response to Ground 1.D.

**Jackson.** Gabrion's attack on his trial counsel for calling Dr. Jackson is equally unfounded.    Jackson provided testimony that was helpful to the defense: he

---

[12] Gabrion's reliance on *United States v. Johnson*, No. 02 C 6998, 2010 U.S. Dist. LEXIS 133727 (N.D. Ill. Dec. 13, 2010) (PageID.3982), is misplaced.    There, the government's expert's testimony had affirmatively misadvised the jury as to BOP's ability to impose conditions of confinement that would minimize the danger the defendant posed in a prison setting.    *Id*. at *4-5.    Thus, the government conceded that defense counsel's failure to impeach the witness constituted deficient performance.    *Id*. at *7-8.    Gabrion does not allege that Cunningham's testimony was inconsistent with the applicable regulations.

153

said he did not think that all of Gabrion's behavior could be explained as malingering (R.541: 3/14/02 ESTR at 27); he said the presence of malingering does not necessarily defeat a claim of mental illness (*id.* at 27); and he said that Gabrion has features of personality dysfunction (*id.* at 24-25), features of "a number of types of personality disorders" (*id.* at 25), some "histrionic personality features" (*id.*), "antisocial features" (*id.*) and as having disordered thinking (*id.*), and narcissistic qualities (*id.* at 26.).   Because of the overwhelming evidence of malingering, Dr. Jackson's testimony on that issue was critical for the defense: "He's not malingering the kinds of deficits that I've seen in terms of his history and his actual performance.   The Mr. Gabrion I observed and tried to evaluate seems to me to have some genuine deficits that go far beyond anything he might embellish and malinger about."   (*Id.* at 27.)   He agreed that despite Gabrion's "embellishing," Gabrion had "some serious underlying psychological problems. . . ."   (*Id.* at 28.) Though he stopped short of agreeing that Gabrion was "mentally ill," Dr. Jackson stood by his assessment that Gabrion had "psychological deficits."   (*Id.*)

Whether Gabrion's trial counsel anticipated Dr. Jackson's testimony as to whether he was mentally ill or not, counsel was not ineffective for presenting it. "A defense counsel's elicitation of damaging testimony does not of itself rise to the level of ineffective assistance."   *Galloway v. United States*, 187 F. App'x 507, 510 (6th Cir. 2006) (internal citation omitted).   Moreover, even with the most comprehensive preparation, attorneys are sometimes surprised by witness testimony; that is the nature of trials.   But where an attorney reasonably believes

154

that an expert witness's testimony will, on balance, be helpful to the defense, he is not constitutionally ineffective when the testimony turns out less favorable than he had expected.  *See, e.g., Willoughby v. Simpson*, No. CIV.A. 08-179-DLB, 2014 WL 4269115, at *50 (E.D. Ky. Aug. 29, 2014) ("Although [psychiatrist's] testimony was not as strong as [the defendant] hoped, counsel had good reason to call the doctor . . . and the doctor did provide some favorable testimony. . . .").

**Scharre.**   Gabrion's attack on counsel for calling Dr. Scharre is another new, untimely claim.   The original motion does not once reference Dr. Scharre or his diagnosis of Geschwind syndrome.   Accordingly, the claim does not relate back to the date of the original motion and should not be considered.   In any event, Gabrion cannot establish that the decision to call Dr. Scharre was unreasonable; as noted above, counsel is not under a duty to "shop" for experts.   *E.g., Johnson*, 312 F. Supp. 2d at 1020.   Gabrion's counsel cannot be faulted for Gabrion's refusal to meet with Dr. Scharre.   And once again, Gabrion's current counsel has not produced a single expert opinion more favorable to Gabrion than Dr. Scharre's.   Dr. Scharre at least provided an opinion for the jury to consider that Gabrion *might* have some brain damage and *might* not be malingering.   Gabrion's current counsel have not produced *any* opinion to support their repeated bald assertions that Gabrion is mentally ill.   They have shown neither deficient performance nor prejudice relating to the decision to present Scharre's testimony.

Gabrion's trial counsel presented several mental health experts and managed to elicit from them testimony to the effect that Gabrion had significant mental

155

health issues—even though multiple mental health professionals had examined him and concluded that he was not mentally ill and was a malingerer.[13]   This was no easy task and Gabrion's trial counsel succeeded in persuading all 12 jurors that Gabrion "has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder."   (R.586: Penalty Phase Verdict, at 7.)   Gabrion's current counsel does not offer an alternative expert opinion, and even if they do later, they will not be able to show prejudice in light of the overwhelming countervailing evidence presented at trial that Gabrion is not mentally ill.

Finally, as to the experts that Gabrion contends his trial counsel should have called but did not: a chronic trauma expert, an expert on the impact of a high fever as a child, an expert on the significance of a Hepatitis C diagnosis, a substance abuse expert, a sex abuse expert, and a malingering expert, Gabrion has failed to show how any of this proposed testimony would be noncumulative and would have made a difference to the jury.   As noted earlier, much of this information was presented to the experts who testified, such as Gabrion's substance abuse, the fact that he had a high fever once as a child, and his Hepatitis C diagnosis.   Gabrion's counsel could reasonably rely on trained experts to determine the significance of these factors and incorporate them into their opinions.   And, as noted, both Dr.

---

[13] Indeed, as noted above, Gabrion's trial counsel retained at least two additional mental health experts, psychiatrist Theodore F. Mauger, M.D., and neuropsychologist Ronald L. Lewis, Ph.D.   (R.410: Second Am. Notice of Intent to Raise Mental Health Evidence.)   A reasonable inference can be made that these experts would not have testified favorably for Gabrion.

156

Jackson and Dr. Scharre addressed the issue of malingering.   Regarding the proposed sex abuse expert, as stated earlier (see response to Ground 4.A. & 4.B.), Gabrion has failed to establish an adequate foundation for such an expert. Moreover, ultimately fatal to these failure-to-call experts claim is Gabrion's current failure to supply any opinions from any such experts.   In the absence of such opinions, he cannot begin to show that his trial counsel was unreasonable for failing to present them, or that he was prejudiced as a result.

### E.    Trial Counsel's Concession that Gabrion Murdered Timmerman to Obstruct Justice Was a Reasonable Strategic Decision

Gabrion argues that his trial counsel was ineffective for admitting during the opening statement that he murdered Timmerman in order to obstruct justice, when, according to his current counsel, "[n]othing could be more inaccurate." (PageID.3991-92.)   This argument largely recycles the one set forth in Ground 1.A.—that Chrystal Roach testified "falsely" about having requested a preliminary examination in Gabrion's cases and in most assaultive cases.   For the reasons set forth in response to Ground 1.A, that argument lacks merit.   Gabrion does not show that the challenged testimony was indisputably false and he says nothing about the other abundant evidence that he was trying to manipulate the system (for example, by changing lawyers three times, by requesting a preliminary examination and then waiving it), while at the same time terrorizing Timmerman once she was released from jail in May 1997.   Nor does he mention in this section how the letters in Timmerman's handwriting retracting the rape allegations mysteriously appeared

in the prosecutor's office and court chambers in mid-June 1997—most likely, after she was already dead—in the same unique envelopes that Gabrion used for his own correspondence.   The jury had already accepted the government's theory of the case and found based on that evidence that Gabrion murdered Timmerman to prevent her from testifying against him at the rape trial.

Counsel made a reasoned strategic decision not to challenge that aggravating factor, which inured to Gabrion's benefit because the government agreed not to put on additional evidence relating to that factor during the penalty phase.   (R.385: 1/11/02 Pretrial Mot. Hr'g Tr. 94 (Mr. Stebbins, noting that government had agreed during pretrial discussions to rely on evidence presented at the trial phase)).) There is no basis to second-guess the soundness of that decision, given the evidence. Nor, given the jury's findings, did the concession prejudice Gabrion.

### F.    Trial Counsel Secured Adequate Funding to Prepare for the Penalty Phase

The district court authorized funding for the defense of this case that exceeded the median cost of a federal death penalty case at the time.   A 2010 report prepared for the Judicial Conference of the United States found that between 1989 and 1997 the average (mean) cost of a federal death penalty case that went to trial was $269,139; between 1998 and 2004 it had grown to $620,932.   *See* John B. Gould & Lisa Greenman, *Report to the Committee on Defender Services, Judicial Conference of the United States; Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at 27, available at http://www.uscourts.gov/services-forms/defender-services/publications/update-cost-

and-quality-defense-representation-federal.   As of May 2002, $730,168.52 had been certified by the Court to the defense team.   (R.44-1, Ex. A, 5/23/02 Am. Budget Cert.)   Funds were authorized for the attorneys, the fact investigator, nearly $100,000 to the mitigation specialist alone, and many additional tens of thousands to experts and potential experts.   (*Id.*)   Gabrion fails to identify a specific funding request that should have been made that was not which would have resulted in a reasonable probability of a different outcome.

G.    **Neither Trial Nor Appellate Counsel Was Ineffective in Connection with the Government's Presentation of Future Dangerousness Evidence**

Gabrion claims that his trial and appellate counsel were constitutionally ineffective in connection with how they handled the government's evidence of Gabrion's future dangerousness.   Because counsel acted reasonably and competently, and because admission of the evidence was not error, this claim is likewise meritless.

1.    **Trial Counsel Attempted to Limit Introduction of Future Dangerousness Evidence, and Made a Reasonable Strategic Judgment Not to Make Further Futile Objections**

Gabrion claims that his trial counsel failed to object to the admission of evidence of prior bad acts that were "not relevant to any aggravator, w[ere] not reliable and w[ere] unfairly prejudicial."   (PageID.3993.)   But counsel did object to future dangerousness evidence in several pretrial motions and arguments, and did seek to limit the government's penalty phase evidence prior to trial.   (*See* R.178: 5/1/01 Mot. to Dismiss the Govt's Death Penalty Notice); R.263: Gabrion's 8/7/01

159

Mot. *in Limine* Re: Govt's Penalty Phase Evidence; R.385: 1/11/02 Pretrial Mots. Hr'g Tr. at 89-92, 104.)   The Court denied the motion to dismiss in an opinion filed June 29, 2001 (R.212), and granted in part and denied in part the motion *in limine* in an opinion dated January 25, 2002 (R.395).

In the May 2001 motion to dismiss, among several arguments challenging the constitutionality of the FDPA and of the non-statutory aggravators, including future dangerousness, counsel specifically requested that the Court limit introduction of future dangerousness evidence to evidence of Gabrion's danger while in a prison, and requested a pretrial hearing "to determine the sufficiency of the proffered evidence, insure the necessary heightened reliability and to offset the risk of undue prejudice."   (R.178: Mot. to Dismiss, at 26-27, 36.)   In its June 2001 opinion, among other rulings, the Court upheld the constitutionality of the FDPA and the non-statutory aggravators, denied Gabrion's request to limit the introduction of evidence of future dangerousness to his behavior inside a prison, and ruled that the Court would determine the admissibility of future dangerousness evidence "under the Court's traditional gate-keeping powers, as well as the FDPA's rules on admissibility of evidence."   (R.212: 6/29/01 Op. at 30-33.)[14]

---

[14] This Court (Judge Bell) wrote:

> Reliance on future dangerousness as an aggravating factor is not rendered meaningless merely because it may be used as an aggravating factor in numerous cases.   A defendant's future dangerousness to society and to prison officials and other inmates during incarceration is relevant to the jury's determination of whether a death sentence should be imposed.   *Allen,* 247 F.3d at 788.   Moreover, evidence that a defendant is likely to commit criminal acts of violence in the future which would be a continuing and

In the motion *in limine* filed in August 2001, Gabrion's trial counsel again sought to limit penalty phase evidence, including evidence the government proposed to introduce to show Gabrion's future dangerousness.  Counsel moved for discovery of the specific evidence the government would introduce to support that aggravator, and argued that the government "must limit its evidence and argument (and the jury must be so instructed) to evidence actually demonstrating that Gabrion poses a continuing danger to the lives and safety of others *while serving a sentence of life*

_____

serious threat to the lives and safety of others sufficiently narrows the class of defendants eligible for the death penalty.   If no person besides the victim is likely to be at risk of violence at the hands of the defendant, this aggravating factor would not come into play.   *See Allen,* 247 F.3d at 786-87.

Defendant contends, in the alternative, that the evidence on future dangerousness should be restricted to the issue of whether the defendant poses a danger to others while serving a sentence of life imprisonment.

This Court is aware that at least one district court has limited the evidence of future dangerousness to the context of serving a life sentence in the custody of the Bureau of Prisons.   *Cooper,* 91 F. Supp. 2d at 111.   The Eighth Circuit, however, observed that even though a life sentence without the possibility of parole greatly reduces the future danger to society from a particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence.   *Allen,* 247 F.3d at 788.   Accordingly, the Eighth Circuit concluded that it is not improper for a jury to consider the risk to others outside of the prison system as long as the Defendant is given an opportunity to inform the jury, pursuant to *Simmons v. South Carolina,* 512 U.S. 154,178 (1994), the that a life sentence does not carry a possibility of parole.

This Court will not set forth a *per se* rule prohibiting evidence of future dangerousness outside the prison setting.   The admissibility of such evidence will be determined under the Court's traditional gate-keeping powers; as well as the FDPA's rules on the admissibility of evidence.   *See* 18 U.S.C. § 3593(c).

(R.212: 6/29/01 Op. at 32-33.)

*imprisonment.*   Otherwise this aggravating factor violates the rule of *Simmons v. South Carolina,* 512 U.S. 154 (1994); *Shafer v. South Carolina,* __ U.S. __, 121 S. Ct. 1263 (2001)."   (R.263: Mot. *In Limine,* at 8 (emphasis in original)).   Counsel went on to argue that "any evidence in support of continuing acts of violence, continuing threats of violence, or claims and admissions relating to acts of violence are irrelevant to the issue of whether he will be a continuing threat to the safety of others while serving a life sentence in the custody of the Bureau of Prisons."   (*Id.* at 10.)   Counsel also filed a separate motion for discovery, requesting a list of witnesses that the government intended to call in the penalty phase as well as their contact information and any prior statements.    (R.264: Gabrion's 8/7/01 Mot. for Discovery and of Evidence in Support of Aggravating Circumstances at 2.)

Thereafter, on December 18, 2001, the government provided defense counsel a 13-page letter detailing the evidence expected to be introduced in the penalty phase, including the names of witnesses and a summary of their testimony.   (R.42-1, Ex. B, Letter, PageID.2173.)   At the pretrial motions hearing held on January 11, 2002, Gabrion's trial counsel argued the motion *in limine,* and sought a limitation on the evidence to be introduced at the penalty phase, in particular with respect to unadjudicated bad acts and any evidence not relevant to Gabrion's danger in a prison setting.   (R.385: 1/11/02 Pretrial Hr'g Tr. at 89-92, 104.)   Counsel argued to limit the number of witnesses and argued that the proposed evidence of prior bad acts was more in the vein of bad character evidence, and not evidence relevant to future danger in a prison setting.   (*Id.* at 90-91.)   The court

162

considered the motion and, with respect to the issue of future dangerousness, denied it.   (R.395: 1/25/02 Op. at 9.)[15]

Contrary to the claims made in his motion, Gabrion's trial counsel's pleadings and arguments demonstrated their understanding of the law controlling admissibility of evidence at the penalty phase.   There is no evidence supporting Gabrion's claim that his counsel "operated under a fundamental misunderstanding regarding what evidence would be admissible" or that his counsel "felt they had no right to stop the government from presenting evidence at sentencing, regardless of how irrelevant, unreliable or prejudicial."   (PageID.3993.)   In fact, during the sentencing hearing, Attorney Mitchell was accused of violating the rules of evidence by cross-examining a witness regarding a past misdemeanor conviction and he responded, "Your Honor, I do know the rules, and the rules don't apply to this case. We've gotten a ton of hearsay to which I've not objected because the rules do not apply to this hearing."   (R.593: STR1 at 148.)

---

[15]  This Court wrote:

> The jury will be instructed that a sentence of life imprisonment will be without the possibility of release. Accordingly, the concerns raised in *Simmons v. South Carolina,* 512 U.S. 154 (1994), and *Shafer v. South Carolina,* 121 S. Ct. 1263 (2001), will be avoided. The government also intends to present evidence that Defendant poses a risk of escaping from custody. A history of past violence is undoubtedly relevant to the issue of future dangerousness, whether within or outside the prison setting. Defendant's request for a *per se* ruling excluding evidence of Defendant's history of violent conduct must accordingly be denied.

(R.395: 1/25/02 Op. at 9.)

Counsel and this Court were also keenly aware of the "heightened reliability" standard applicable to evidence presented in the sentencing phase of a capital trial. (*See, e.g.*, R.178: Def.'s Mot. to Dismiss, Mem. in Support, at 9, 12, 27, 35 (referencing "heightened" reliability standard four times); R.263: Gabrion's Mot. in Limine re Govt's Penalty Phase Evidence, at 3, 4, 5, 12 (referencing standard seven times); R.395: 1/25/02 Op. at 14 (granting defense motion to exclude grand jury testimony of witness on basis that it did not meet "the heightened standard of reliability that must be applied in capital cases"). But they understood that, despite the district court's gatekeeping function, evidence is not subject to exclusion merely because it is unadjudicated. *See Gabrion II*, 648 F.3d 348-49; *see also United States v. Runyon*, 707 F.3d 475, 506 (4th Cir. 2013), *cert. denied*, 135 S. Ct. 46 (2014) ("it is the jury, not the judge, that determines whether the evidence offered by the prosecution is sufficiently reliable to support an aggravating factor").

Indeed, Gabrion's current claims rest on arguments specifically rejected by the Sixth Circuit in this case. *See, e.g.,* PageID.3994. Having obtained unfavorable rulings on the future dangerousness issue pretrial, trial counsel made a reasonable strategic judgment not to raise repeated objections before the jury that would have been overruled. As evidenced by the defense opening statement in the penalty phase, counsel made a strategic decision to place those bad acts into context, inform the jurors how to use them, and use them to support the defense theory of mental impairment. (R.593: STR1 at 42-58.) Moreover, throughout the penalty phase, counsel made strategic use of cross-examination to challenge

164

government evidence where appropriate and highlight that evidence which supported the defense theory.   Counsel also made strategic judgments about objections so as not to highlight damaging evidence.   Counsel made reasonable, strategic choices that cannot be second-guessed at this stage.   *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence ....   [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'") (citations omitted).

Accordingly, Gabrion cannot establish ineffective assistance at the penalty phase.

### 2.  Gabrion Cannot Show Prejudice Because the Sixth Circuit Found No Error in the Introduction of the Future Dangerousness Evidence in the Penalty Phase

Even assuming, arguendo, that trial counsel should have interposed more objections to the penalty phase evidence, Gabrion cannot establish prejudice under *Strickland* given the Sixth Circuit's finding of no error with respect to the admission of that evidence.   To demonstrate the existence of prejudicial ineffectiveness, Gabrion must establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 687.   Because Gabrion cannot make out the prejudice prong of *Strickland*, this claim is without merit and should be summarily denied.

The Sixth Circuit wrote in the panel opinion:

> During the penalty phase of Gabrion's trial, the Government introduced, primarily through testimony, information concerning a wide array of acts committed by Gabrion demonstrating his future dangerousness, which the Government sought to prove was an aggravating factor tending to make the death penalty a more appropriate sentence. Uncharged conduct allegedly committed by Gabrion discussed during the penalty phase included: acts of animal cruelty, prior acts of assault and sexual misconduct, and even three uncharged homicides concerning individuals whose disappearance the Government sought to link to Gabrion.   Finding no error in the admission of this information, we reject this argument.

*Gabrion II*, 648 F.3d at 347.

The en banc court upheld that finding.   *Gabrion III*, 719 F.3d at 535 ("Gabrion also presents more than a dozen other arguments that the original panel unanimously rejected . . . . We have reviewed those arguments, but do not think it worthwhile to address them again here. It is enough for our purposes to state that we reject all of Gabrion's remaining arguments.").

### 3.  Gabrion's Counsel Provided Effective Representation

Gabrion also claims that appellate counsel's performance fell below professional standards by "fail[ing] to identify the evidence that was not relevant to the question of future dangerousness in the BOP, causing the Court of Appeals to find that it could not evaluate the claim."   PageID.3994.   This claim is without merit.

In its panel opinion, the Circuit noted that appellate counsel "d[id] not indicate which of the unadjudicated acts alleged would be relevant *only* outside the prison context," and noted it was not apparent "which acts would fall outside of this limitation."   *Gabrion II*, 648 F.3d at 349 (emphasis added).   But appellate counsel

was not constitutionally ineffective for arguing that all of the evidence cited in its brief did not relate to Gabrion's behavior while in a prison setting and was therefore irrelevant, unreliable, and inflammatory, and that introduction of that evidence, alone and in combination, caused unfair prejudice to Gabrion (Appellate Brief at 111-118).   Such arguments are standard in criminal defense practice as well as among experienced death penalty counsel, as evidenced by the motion before this Court.   *Compare* Appellate Brief at 111-118 with Mot. at PageID.3994-4002.   Like current counsel and the vast majority of the capital defense bar, appellate counsel argued the broadest possible limitation on penalty phase evidence, in a circuit where many of those issues were ones of first impression.   Although counsel was ultimately unsuccessful, they were not constitutionally deficient.   Counsel's argument, routinely made throughout the country but ultimately rejected by the Sixth Circuit, sought a ruling that would have held all prior unadjudicated acts unreliable and inadmissible, and sought to elevate the Federal Rules of Evidence at the penalty phase in capital cases to a constitutional right.   The panel rejected those arguments made on appeal -- and the arguments which Gabrion now seeks to relitigate -- writing, in part:

### B. Unadjudicated Prior Acts and Future Dangerousness

Gabrion on appeal does not appear to contest the proposition that future dangerousness is sufficiently relevant to the decision making of the penalty phase jury to qualify as a non-statutory aggravating factor under 18 U.S.C. § 3292(c). Instead, Gabrion's core argument appears to be that information concerning unadjudicated prior acts of convicted capital defendants should not be admissible during the penalty phase of a capital trial to prove future dangerousness, solely by virtue of the fact that those acts were unadjudicated.   Much like his claim arguing for the application of the

167

Federal Rules of Evidence during the penalty phase, the primary reason Gabrion offers for imposing this limitation, which he would have us elevate to a constitutional requirement, is reliability: he argues that reliability would be best guaranteed by limiting the acts concerning which information may be presented to acts for which the capital defendant has already been tried and convicted.

But, as already discussed, the penalty phase presents a different context for addressing reliability than the guilt phase, which requires the jury to make a determination of considerably narrower scope. The Act's loose evidentiary standard and its broad definition of aggravating factors (balanced with, as Section II of this opinion demonstrates, a correspondingly broad definition of mitigating factors) represent a preference by Congress for maximizing the information about a capital defendant available to the jury during the penalty phase, a policy decision that is consistent with Supreme Court precedent in this area, as demonstrated by cases already cited above rejecting Gabrion's argument about the Rules of Evidence.  *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 204, 96 S. Ct. 2909, 49 L.Ed.2d 859 (1976); *Williams v. New York*, 337 U.S. 241, 246, 69 S. Ct. 1079, 93 L.Ed. 1337 (1949).

We are hesitant, especially under the limited review under the circumstances of this case, to craft a constitutional rule limiting the introduction of other acts information to acts for which the defendant has been adjudicated criminally guilty. *We join every other circuit that has decided the issue in holding that there is no such constitutional barrier.  See United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) (allowing introduction of unadjudicated homicides during penalty phase); *United States v. Basham*, 561 F.3d 302, 331–32 (4th Cir. 2009) (unadjudicated sexual misconduct); *United States v. Corley*, 519 F.3d 716, 723–25 (7th Cir. 2008) (unadjudicated homicide); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) (unadjudicated assaults, burglary, and arson).

*Accordingly, the District Court did not plainly err in admitting information concerning unadjudicated acts committed by Gabrion.*

## C. Limitation of Future Dangerousness Evidence to Dangerousness in the Prison Setting

Finally, Gabrion argues that we should follow the limitation imposed by some District Courts and restrict the introduction of future dangerousness information to the danger the defendant would present under life without the possibility of parole, the only other possible result of a capital sentencing hearing under the Act.   *See, e.g., United States v. Peoples*, 74 F. Supp. 2d 930, 932–33 (W.D. Mo. 1999) (finding that "dangerousness should not be measured in the same manner as if a defendant were to be 'uncaged'" and declining to permit the introduction of unadjudicated burglaries during penalty phase).   However, we need not decide this issue here, as Gabrion does not indicate which of the unadjudicated acts alleged would be relevant *only* outside the prison context, and it is unclear to us which acts would fall outside of this limitation, were we to impose it.

*Gabrion II*, 648 F.3d at 348-49 (emphasis added).

Like current counsel and the capital defense bar, Gabrion's appellate counsel argued *all* the evidence which it deemed prejudicial should have been excluded. Counsel's argument, though ultimately unsuccessful, was competent.   Counsel's argument relied on several propositions ultimately rejected by the Sixth Circuit, but which are nevertheless a staple of capital defense practice: that the FDPA is unconstitutional because, among other things, it allows the admission of evidence at the penalty phase without regard to the evidence rules; that prior unadjudicated acts are, by definition, unreliable and should be excluded; and that prior bad acts committed outside a prison setting are not relevant to the issue of whether a defendant will be dangerous in prison in the future.   However, in the panel decision on these issues, which was upheld by the en banc court, the Sixth Circuit noted the issue was of first impression and rejected each proposition, aligning itself, instead, with those circuits that found prior unadjudicated crimes relevant to the future

169

dangerousness aggravator, that found the FDPA constitutional, and that found prior unadjudicated acts relevant to the issue of danger in a prison setting.  *See Gabrion II*, 648 F.3d at 345-349; *Gabrion III*, 719 F.3d at 535.

Counsel's failure to more thoroughly raise a futile issue on appeal does not constitute deficient performance.  *See United States v. Challoner*, 583 F.3d at 749. Further, on the prejudice prong, Gabrion's claim also fails because he does not articulate which evidence was so unreliable or so irrelevant to future dangerousness in a prison setting that, if identified by appellate counsel on direct appeal, would have resulted in reversal.   Gabrion identifies no evidence that, if laid out in a particularized fashion, would have caused the court of appeals to reverse and order a new sentencing proceeding.   The only evidence Gabrion points to specifically in his amended motion is the frog and doll incident.   As noted below, the testimony concerning this incident was extremely brief and inconsequential in the overall scheme.   There is no chance the court of appeals would have vacated the death sentence if that evidence had been specifically challenged.

### H.   Trial Counsel Was Not Ineffective in Failing to Move to Suppress Evidence Seized in Violation of the Fourth Amendment as there Was No Seizure and No Fourth Amendment Violation

Gabrion claims that trial counsel was constitutionally ineffective because they failed to move to suppress evidence seized and used at trial related to Gabrion's arrest for firing a weapon at the home of Charles Cass.   (PageID.4003.) ("Defense counsel's conduct fell below the prevailing professional norms of reasonably competent counsel when they failed to challenge the warrantless search

of the Altona residence and the seizure and use of this evidence."). Because there was no meritorious motion to suppress available for the evidence about which counsel now complains, and because counsel did file appropriate motions to suppress where there was a colorable Fourth Amendment claim (see R.223: Gabrion's 7/12/01 Mot. to Suppress), there is no valid claim of deficient performance or prejudicial ineffectiveness. Accordingly, this claim is likewise without merit.

Although Gabrion's entire argument revolves around a police officer's observation of items in plain view inside Gabrion's residence, the only physical evidence admitted at the penalty phase that had been seized from Gabrion's residence was the shotgun Gabrion used to fire at the Cass house. Gabrion does not claim any violation related to the admission of that evidence. Rather, Gabrion's entire argument rests on the observation made by Officer Lance Workman immediately upon looking inside the residence portion of the building. (PageID.4003-4005.) With respect to that observation, Gabrion argues the police did not have exigent circumstances to enter the residence, but he cites no authority in support of that proposition. Indeed, the only authority cited by Gabrion with respect to this issue is *Kimmelman v. Morrison*, 477 U.S. 365 (1986). Mot. at 100. *Kimmelman*, however, is not on point.

The Supreme Court held in *Kimmelman* that a defendant could collaterally attack a conviction where his attorney failed to file a meritorious motion to suppress evidence. In that case, Kimmelman's attorney failed to request discovery and learn that police had seized a bed sheet from his home in his absence without a warrant.

171

Of significance to the Court was the trial court's *contemporaneous observation made during cross-examination of a government witness* that "counsel had 'br[ought] about a very valid basis ... for suppression'" *that the court would have considered "'if [it] had been brought and timely made,'* [but] he refused 'to entertain a motion to suppress in the middle of the trial.'" *Kimmelman*, 477 U.S. at 369 (emphasis added). That is not this case. Nowhere in the record is there any support for a Fourth Amendment motion. Gabrion does not cite any case law that would support suppression of evidence under the circumstances the police confronted in this case, or any basis in the record to conclude the entry into the building, and the plain view observation of items at the entryway of the residence was without legal justification.

In this case, the government presented evidence that police were advised of a complaint that Gabrion had threatened his neighbors, and then fired at their occupied residence. (R.593: C. Cass, 3/11/02 STR1 at 244-45, 247-50; R.594: Workman, 3/12/02 STR2 at 271-77.) While police were investigating that complaint, officers heard music and activity inside Gabrion's residence, and then heard a window open and a shotgun discharge. Officer Workman testified that he and other officers believed the shot came from Gabrion's residence, which was located on the second floor of a building that had a store on the ground floor. Shortly after hearing the shot, Gabrion emerged from the front door of the building carrying an object. Gabrion was detained and the object was determined to be a flashlight. Officers did not know whether Gabrion was alone or if someone else

172

was inside the residence, and had not yet recovered a weapon.   (Workman, STR2 at 277.)   When Officers asked Gabrion to accompany them upstairs and he refused, this increased their concern that someone else could be inside the residence.   (*Id.* at 277-78.)   Under those circumstances, the officers had exigent circumstances to conduct a protective sweep of the residence and recover the weapon.   *Maryland v. Buie*, 494 U.S. 325, 327 (1990) (protective sweep justified under exigent circumstances); *United States v. Biggs*, 70 F.3d 913, 915-16 (6th Cir. 1995) (warrantless search of motel room upheld where defendant arrested 20-75 feet from motel room, but door had been left open, officers had reason to believe defendant would be meeting another person at the motel, and door had been left open); *United States v. Rigsby*, 943 F.2d 631, 637 (6th Cir. 1991) (search upheld where totality of the circumstances, including the firing of a gun in the distance, led officers to believe that a zipped tent on the property might pose a threat to their safety).

Thus, unlike *Kimmelman*, there is no basis in the record or case authority that would have supported a motion to suppress.   Trial counsel had no obligation to file a futile motion or raise a futile objection.   *Brown v. McKee*, 231 F. App'x 469, 475 (6th Cir. 2007) ("failure to bring a meritless suppression motion cannot constitute ineffective assistance") (quoting *United States v. Tisdale*, 195 F.3d 70, 73-74 (2d Cir. 1999)); *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ("by definition, ... counsel cannot be ineffective for a failure to raise an issue that lacks merit"); *Goff v. Bagley*, 601 F.3d 445, 469 (6th Cir. 2010) (same); *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.

173

1990); *see Scott v. Romero*, No. 04-2262, 2005 WL 2865173, at \*2 (10th Cir. Nov. 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument.").[16]

Finally, there is no reasonable probability that the jury would have imposed a life sentence instead of the death penalty if they did not hear the testimony about the frog and the doll—which comprised a half page of the more than 1,000 pages of penalty phase transcript.   Accordingly, because there is no constitutional deficiency and no prejudice, this claim should be summarily denied.

## I.   Trial Counsel Adequately Investigated, Prepared, and Presented Admissible Evidence regarding BOP's Ability to Control Gabrion in Prison

Though Gabrion's counsel did present a witness (Dr. Cunningham) to testify about BOP's ability to control inmate behaviors through the exercise of various security measures (R.574: 3/13/02 ESTR at 3), Gabrion's current counsel says they should have secured a present or former BOP official to testify that Gabrion "would not be a threat to staff or inmates in prison. . . ."   (PageID.4006.)   This argument fails on both *Strickland* prongs.   First, the defense made effective use of Dr. Cunningham, who the court of appeals observed, "was allowed to testify as to the

---

[16] Even if there were a viable Fourth Amendment argument to make—which there was not—the officer's testimony about his observations would not necessarily have been excluded.   Generally, "the exclusionary rule does not bar the introduction of the fruits of illegal searches and seizures during sentencing proceedings."   *United States v. Ryan*, 236 F.3d 1268, 1271-72 (10th Cir. 2001) (citing cases, including *United States v. Jenkins*, 4 F.3d 1338, 1344-45 (6th Cir. 1993)).   *See also Johnston v. Bowersox*, 119 F. Supp. 2d 971, 990 (E.D. Mo. 2000), *aff'd sub nom. Johnston v. Luebbers*, 288 F.3d 1048 (8th Cir. 2002) (reciting general rule and noting that holding rule inapplicable in capital context would violate *Teague* retroactivity principles).

different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous." *Gabrion II*, 648 F.3d at 353.   Dr. Cunningham was familiar with BOP regulations and had himself heard testimony addressing BOP's security classification system.   (R.574: 3/13/02 ESTR at 8-9.)   Current counsel fails to identify any such official who was available at the time and willing to testify in Gabrion's favor.   Accordingly, Gabrion has shown neither deficient performance nor prejudice.   Moreover, given Gabrion's actual history while in custody—in which he threatened and assaulted fellow inmates and guards and created weapons and contraband designed to facilitate escapes—it is highly improbable that the jury would be swayed by a claim by anyone that Gabrion posed no danger in a BOP setting.

## J.    Trial Counsel Did Not "Give Up" after the Punch

Gabrion's post-conviction counsel assert that "[t]rial counsel essentially abandoned [him] after he punched Mr. Stebbins during the government's presentation of aggravation evidence."   (PageID.4007.)   The record refutes that claim.

Following the punch, far from "abandoning" Gabrion, trial counsel moved to withdraw, moved for a mistrial, and moved for a competency examination.   The Court denied the motions, but emphasized that both Mitchell and Stebbins had exhibited conscientious and diligent representation, despite the many obstacles that Gabrion placed in their way.   (R.593: 3/11/02 STR1 at 82.)   The court of appeals

175

agreed: "Rather than being disloyal, defense counsel showed great dedication to Gabrion, even after he punched one of them in the face."   *Gabrion II*, 648 F.3d at 336.

Current counsel alleges, with no basis in the record or in common sense, that it is reasonably probable that the jury would have selected a life sentence if only trial counsel had requested a "brief recess" which would have permitted Gabrion "to decompress and be present without further incident. . . ."   (PageID.4007.)   But trial counsel met with Gabrion at the time and assessed the situation differently; the fact that Gabrion was so agitated the following morning that he could not collect himself (3/12/02 Chambers Conf. Tr. at 4) suggests that his trial counsel more accurately read the situation.   Further, as current counsel acknowledges, Gabrion was able to observe all 25 witnesses testify live on closed circuit television and had access to counsel during that time.   The court of appeals found that Gabrion's constitutional rights were not violated by the sensible procedure employed by the Court, *Gabrion III*, 719 F.3d at 534, and current counsel fail to identify any basis for finding that trial counsel performed deficiently by making a reasoned assessment that it was in Gabrion's best interest not to have him present before the jury in a volatile condition, nor any basis for finding that Gabrion was prejudiced by not being present during that portion of the penalty phase hearing.

## K.    Gabrion Was Not Prejudiced by His Prison Records Not Being Presented

Gabrion's post-conviction counsel fault him for not presenting the jury with a handful of prison records that characterized him as presenting a "low" to "moderate"

176

risk to harm others.    (PageID.4010, and Mot.Ex. 4.18.)    These records would not have aided Gabrion in securing a life sentence.    First, they are of limited value. All of them contain the caveat: "Precise prediction of dangerousness is difficult and should be modified over time as individual circumstances change."    The first couple finding "low" risk are from before and just after he had been charged with murder. One of them refers to Gabrion "threatening" a doctor in a written note (PageID.1709); another says Gabrion "threw water" on an officer and might escalate his misconduct (PageID.1710); all of them state that Gabrion was not suffering from any "significant mental health problems," with the final one submitted stating that Gabrion was doing his best to "act" like someone who was "crazy" (PageID.1711). At best, the reports are a mixed bag.    Moreover, as set forth above, there was plenty of evidence reflecting the danger Gabrion presented in a custodial setting to countervail any sliver of value in these records.    Nor does Gabrion's provisional eligibility for RDAP or a solitary positive BOP work report present any reasonable probability of a different sentencing outcome.    Accordingly, counsel was not deficient for not presenting these records.

> ### L.    Trial Counsel Was Not Ineffective for Not Presenting Evidence that Gabrion Required a Payee for His SSI Benefits

In a single bare-bones paragraph, Gabrion's post-conviction counsel assert that the fact that Gabrion had a payee for his SSI benefits, which began in 1993 after Gabrion faked the car accident in an effort to fraudulently obtain such benefits (and insurance benefits), "could have resulted in information that was positive to

177

Mr. Gabrion."   (PageID.4011.)   This claim lacks sufficient specificity under Rule 2 of the Special Rules Governing 2255 Motions.

Rule 2(c) of the Rules Governing Section 2255 Proceedings requires that "[t]he motion must: (1) specify all the grounds for relief available to the moving party; (2) state the facts supporting each ground; [and] (3) state the relief requested...."   A pleading is insufficient if it "[d]oes not state any facts or present any arguments in support of [the defendant's] . . . claims to which the government could respond, the attorneys who represented [the defendant] could address, or [a] court could even attempt to resolve." *United States v. Domenech*, 2014 WL 2711962, at *2 (W.D. Mich. June 16, 2014).

Indeed, the Sixth Circuit has held that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived [because] [i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Barany-Snyder v. Weiner*, 539 F.3d 327, 331 (6th Cir. 2008) (citing *McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997); *see also Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988) ("a litigant has an obligation 'to spell out its argument squarely and distinctly,' or else forever hold its peace") (quoting *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990 (1st Cir. 1988) (internal citation omitted)); *United States v. Mobley*, 618 F.3d 539, 550 (6th Cir. 2010).   This claim is insufficiently pled and should be summarily dismissed.

**M.    Trial Counsel Fully Investigated Gabrion's Alleged Head Injuries and Its Presentation of that Evidence Reflected Reasonable Trial Strategy**

Gabrion's trial counsel went to great lengths to try to persuade the jury that Gabrion might have suffered head injuries that caused brain damage or otherwise might tend to explain his aberrant behavior and, perhaps, be viewed as mitigating evidence: they presented the testimony of Dr. Waalkes, a psychologist at Hope Network responsible for evaluating and treating people with brain injuries who testified that he conducted clinical psychological and neuropsychological assessments of Gabrion and that there was evidence of "some neurological impairment, some brain damage."   (R.540: 3/13/02 ESTR at 6-7, 23-24.) They presented the testimony of Dr. Scharre, who testified extensively about what he perceived as frontal lobe dysfunction, which he contended was reflected in PET scan asymmetry and was most likely attributable to a head injury.   (*Id.* at 39, 41-42 (noting that CT scan was normal, but interpreting that as "very consistent with the idea that either a head injury, which would be most likely to cause an asymmetry because you get twisted one way the other, or . . . some drug abuse or a combination thereof would be a very likely cause of causing that injury. . . .").)   Counsel was able to work with Dr. Scharre and present his opinion via testimony even though Gabrion refused to meet with him.   (*Id.* at 12.)   Dr. Scharre's direct examination testimony spans 50 transcript pages.   (*Id.* at 1-50.)

Gabrion's counsel also presented the testimony of Gabrion's former girlfriend, Rebekah Canavan, who testified that she had been in accidents with Gabrion in the

179

1970s; including a motorcycle accident in Seattle that was serious enough that she was hospitalized for weeks (and resulted in a "big lump" in the middle of Gabrion's head).   (STR4 at 527-28, 531-34.)   Canavan testified that Gabrion's personality changed after the motorcycle accident, becoming "more violent" and "more argumentative."   (*Id.* at 534-34.)   Other family members testified about alleged accidents: his mother testified that he had been in a motorcycle accident with Canavan and that his personality changed after the accident (R.560: 3/14/02 ESTR at 23-24); his brother confirmed that he had "a lot of accidents" including at least one that he witnessed in the 1980s (Michael Gabrion, *id.* at 42-43), and that "he's hit his head many times in accidents" with "the worst one" being "when he was out West" (*id.* at 44); both his sisters testified that he had been in a motorcycle accident (R.560: 3/14/02 ESTR, Y. Wilkinson, at 64; Hermann, at 88), and one of them testified that Gabrion was "a whole lot different after that accident" (Wilkinson, *id.* at 64).

Ultimately the jury was not persuaded that Gabrion suffered sustained brain damage, but this was not the result of lack of effort by his trial counsel.   The jury was likely persuaded by the multiple experts who testified for the government that there was no such brain damage, and the actual CAT scans and other testing that did not show any such damage (at least, according to the government's experts).

Nonetheless, Gabrion's current counsel suggests that the jury would have come around on this point if only they had heard about a number of purported accidents, allegedly occurring in the 1970s and 80s, are listed anecdotally, as told by

various family members (PageID.4012-4015.)   Given that in 1992 and 2001,

Gabrion's CAT scan did not reflect brain injury, it is hard to see how this

information, or evidence that Bill House may have hit Gabrion in the head with a

wrench in 1997 (PageID.4015), would have made any difference to the jury.

Likewise, knowledge of the 1985 accident that is mentioned in Ex. 4.20 would not

have resulted in a different outcome.   Additionally, the list of alleged accidents in

Gabrion's amended motion presented "upon information and belief" (PageID.4011-

12), is not reliable.   For example, it includes the March 28, 1992, alleged car

accident in Cedar Springs—the one that Gabrion faked to get insurance benefits.

Gabrion has not demonstrated based on this information that his counsel acted

unreasonably in not presenting more of this unverified, speculative information to

the experts.   Nor has Gabrion provided an expert opinion to contradict the

government's strong evidence of lack of brain injury nearer in time to Gabrion's

murder of Timmerman.   This evidence included detailed discussion of how auto

accidents typically affect the brain, and why neither the films of Gabrion's brain nor

his behavior reflected any organic brain damage.   (R.544: Griesemer, 3/14/02 ESTR

at 10-11, 16, 20; R.546: Ryan, 3/15/02 ESTR at 18.)

Moreover, nearly all of these alleged incidents occurred after Gabrion fled to

Colorado with Canavan in the mid-1970s, when he assumed a false identity, acted

secretive, and physically abused Canavan.   (Canavan, STR3 at 539, 542.)   These

behaviors were thus already occurring prior to most of the alleged head injuries.

Further, trial counsel does not render deficient performance by failing to uncover

every possible piece of mitigating evidence.   *See, e.g., Nelson*, 97 F. Supp. 3d at 1144 (noting that "[i]t is always possible to discover additional records or new witnesses, the more time that is available").   It was well-established in this case that counsel and the mitigation specialist were essentially working "in the dark" – Gabrion did not assist them in identifying mitigating evidence.   (R.267: Mot. Ex. A, Stebbins Aff. ¶¶ 3, 4 (sealed); R.593: Stebbins, 3/11/02 STR1 at 47 (opening statement, telling jury how Gabrion's secretiveness "made it very difficult to really discover all of the facts, all of the life history of Marvin Gabrion").)   Given the breadth and depth of the evidence of accidents and alleged brain injury that Gabrion's counsel presented, it is clear that they undertook extensive investigation in this area, even unaided by Gabrion.   Accordingly, Gabrion has not shown deficient performance.   Nor has he shown prejudice, given that the cited evidence does not overcome the expert evidence presented at trial; Gabrion supplies no expert opinion of his own based on this new evidence.   This is fatal to his claim. *See, e.g., Carter v. Mitchell*, 443 F.3d 517, 529 (6th Cir. 2006) (state court did not act unreasonably in finding that petitioner failed to establish ineffective assistance of trial counsel, where "habeas counsel did not find evidence of organic brain damage").   Further, even if it were established that Gabrion suffered some kind of brain injury, there is no reasonable likelihood that it would have been deemed so mitigating that the jury would have imposed a life sentence instead of death.

**N.    Trial Counsel Acted Reasonably in Acquiescing to Gabrion's Lack of Presence in the Courtroom Following the Punch**

Gabrion recycles an argument he made on direct appeal, arguing that his trial counsel were ineffective for failing to ensure his presence in the courtroom after he punched Attorney Stebbins in the face.   (PageID.4015.)   The court of appeals did not think much of the underlying argument, stating, in response to Gabrion's argument that he should have been returned to the court earlier, "The argument defies common sense."   (En banc Op. at 32.)   As the court of appeals observed, even if Gabrion could have been physically restrained, there was no indication that he would not have been verbally disruptive, given his pattern of conduct.   (*Id.*)   Moreover, the court of appeals also found that Gabrion's constitutional rights were not violated when this matter was addressed in his absence; in fact, the court characterized his counsel's efforts as "admirable" in difficult circumstances: "Rather than being disloyal, defense counsel showed great dedication to Gabrion, even after he punched one of them in the face."   *Gabrion II*, 648 F.3d at 336-36.   Trial counsel was not ineffective for walking the "ethical tightrope" that Gabrion forced them to walk.

**O.    Trial Counsel Was Not Ineffective for Failing to Intervene During Cross-Examination Relating to Gabrion's § 501(c)(3) Organization**

Gabrion's post-conviction counsel argue that his trial counsel were ineffective for failing to intervene when the government was cross-examining Gabrion about Gabrion having set up a "charitable" organization to point out that trial counsel assisted with some of the technical aspects of it.   (PageID.4017.)   This, they claim,

183

would have affected the jury's perception of him because they would have realized he was not sophisticated enough to start a 501(c)(3) organization.   This claim fails for several reasons.   First Gabrion himself pointed out his attorney's assistance. (R.542: 3/14/02 ESTR at 12.)   Second, even assuming that counsel aided Gabrion to the extent alleged, there was plenty of other evidence of Gabrion's ability to carry out schemes requiring complex thinking.   For example, after he murdered Timmerman—which, itself, took substantial planning involving complex, sequential steps—he placed an ad in a newspaper posing as someone in the construction trade, interviewed Robert Strevels at a truck stop, obtained his personal information, traveled to Virginia and obtained a driver's license in Strevels's name.   The jury heard expert testimony that this demonstrated skill in memory, attention, and organizational areas.   (R.544: Greisemer, 3/14/02 ESTR at 23.)   This was similar to other schemes Gabrion had engaged in, such as using the name "Lance," assuming a false identity in Colorado in the 1970s with Canavan, assuming the identify of Robert Allen, faking the vehicle accident in 1992 in an effort to obtain insurance and disability benefits, etc.   Third, once again, the other aggravating evidence was "overwhelming"—however sophisticated Gabrion was, he murdered an innocent woman in a cruel and depraved manner, along with her infant daughter and multiple others, he did all this to obstruct justice, and he also terrorized virtually everyone who came in contact with him in his adult life.   Gabrion has not shown that his trial counsel was deficient in failing to object to the cross-

184

examination or otherwise intervene with the questioning on this issue, and he has failed to show prejudice.

### P.    Trial Counsel Adequately Cross-Examined Witness Jason Cross

Gabrion argues that his trial counsel was ineffective for not cross-examining Jason Cross, the inmate who testified that Gabrion told him he killed Shannon VerHage because he did not know what to do with "it."   Gabrion argues his trial counsel performed deficiently by failing to cross-exam the witness about a mental health report performed at the request of Cross's counsel to explore a possible diminished capacity defense to a bank robbery charge.   (PageID.4018-4020.)   This claim lacks merit and should be rejected.

Gabrion's current counsel makes the report sound very damning:   "The report reveals that Cross suffered brain damage, of "mild to moderate" severity, that caused him to be confused, and indulge in fantasies."   (*Id.* at 111.)   But the report does not reasonably give rise to any inference that Cross had compromised mental health that could have led him to "make up" what Gabrion said to him.   In fact, the report would be helpful to the *prosecution* in establishing Cross's credibility: "All indications are that Jason is basically a truthful individual, non-deceptive and even somewhat naive in being unguarded in making statements about himself and others."   Mot. Ex. 4.21 at PageID.1726.   The reference to "fantasies" in the report relate to Cross's "fantasies about how to get his money back and to pay off . . . [his gambling] debts."   (*Id.* at PageID.1727.)   That is, "fantasies" is used as a lay term, to describe Cross's anxiety and concern over repaying money

185

he had borrowed from his father and subsequently lost gambling, which ultimately led him to commit a bank robbery.   The report discusses some prior head injuries and findings of "mild to moderate" left-hemisphere difficulties, which caused impaired impulse control and made him prone to "acting out" behaviors.   (*Id.* at PageID.1730.)   The report concluded Cross had "neurological, not psychiatric" problems, which it likened to "[h]yperactive children" who have "attention deficit disorder."   (*Id.* at PageID.1731.)   Ultimately, this was not enough impairment to provide a defense to the bank robbery.   (R.593: Cross, STR1 at 157.)

Attorney Mitchell was aware of the evaluation (*id.*, question referring to defense "getting an evaluation") and chose not to cross-examine Cross about it. This was obviously a strategic decision—and a good one, given that it would have opened the door to the "truthfulness" part of the evaluation on redirect.   But even if different counsel would make a different choice, this is exactly the kind of trial tactical decision that is protected from hindsight second-guessing on post-conviction review.   *See, e.g.*, *Moss v. Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002) (counsel's decision not to cross-examine witness at all was "virtually unchallengeable" because she made it after considering the relevant law and facts) (citing *Strickland*, 466 U.S. at 690); *Hurley v. United States*, 10 F. App'x 257, 260 (6th Cir. 2001) (counsel's decisions about whether and to what extent to conduct cross-examination are necessarily strategic and thus "effectively insulated" from ineffectiveness review); *Elmore v. Sinclair*, 799 F.3d at 1250 (courts generally accord great deference to

186

counsel's tactical decisions at trial, "such as refraining from cross-examining a particular witness or from asking a particular line of questions").

Finally, Gabrion acknowledges that his trial counsel cross-examined Cross on his prior receipt of sentence reductions in exchange for testifying against other defendants in other cases.   In fact, Attorney Mitchell thoroughly explored this topic, effectively eliciting testimony about two prior reductions, Cross's extensive knowledge of the federal sentencing guidelines and his proactive, successful efforts to reduce his sentence.   (R. 593: Cross, STR1 at 157-64.)   Though Gabrion's current counsel speculate that "it appears very possible that Cross received consideration for his testimony" and argue that trial counsel should have done more to explore that, they provide no support whatever for this claim.   It is pure speculation, particularly since no sentence reduction motions or anything that could be construed as such appear on the docket sheet for Cross's federal case.   See E.D. Mich. No. 5:99-cr-11.   In any event, Cross testified that he had not received consideration for his testimony against Gabrion at the time he testified (R.593: STR1 at 165), and Gabrion points to nothing to contradict that testimony.

Finally, Gabrion cannot show prejudice because another inmate, Martin Alexander Love, was present for the conversation and corroborated Jason Cross's account:   "And [Cross] said, So what did you do with the baby?   And [Gabrion] said he killed the baby because he – he didn't know where to put it or what to do with it." (R.593: STR1 at 198.)   Even if Cross had received consideration for his testimony, and the jury heard about it, that testimony would have been largely cumulative

187

and, given Love's corroboration, it would not have affected the jury's sentencing decision.

### Q.    Trial Counsel Conducted a Reasonable Investigation of Witnesses and Themes

Gabrion alleges a potpourri of failures to investigate various "witnesses and themes." (PageID.4020.) This claim is largely cumulative; therefore, the government incorporates by reference its responses to Ground One, A-E, above, as well as its response to Gabrion's baseless claim under *Brady v. Maryland*, Ground Six, below.

Briefly, he argues that his trial counsel was deficient for failing to investigate Greg Leon. As set forth in response to Ground 1, Leon was a relatively minor witness and there was overwhelming other evidence supporting the aggravating factors. *See supra* Response to Ground 1.E. (discussing Leon's role vs. the other aggravating evidence presented during the penalty phase). Given this, Gabrion has not established—and cannot establish—that he suffered any prejudice in connection with his attorneys' performance relating to Leon.

Gabrion says he was prejudiced because his counsel failed to "explore" the fact that a few of the letters Gabrion sent to Rachel Timmerman's father were sent after Tim Timmerman and the FBI sent responses to Gabrion designed to encourage a response in an effort to elicit information about Shannon's whereabouts. Any attempt to explore such a fact would surely have been unwise strategy: Gabrion was a prolific letter writer and his hurtful prose could not reasonably be characterized as "provoked." Gabrion wrote not only to Tim

188

Timmerman (Exs. 93, 94, 97, 98) but to other family members, including Rachel's mother, Velda Timmerman (e.g., Ex. 96, "why don't you get Shannon from wherever and whoever you sold her too [sic]"); Rachel's sister, Sarah Timmerman (e.g., Ex. 99, "I purposilly [sic] sent map to get poilicia [sic] to too [sic] empty Oxford lake so they and you can regain the very realistic hope of getting Shannon back ALIVE!"); and Shannon's paternal grandmother, Kim VerHage (e.g., Ex. 100 ("I want very much to see Shannon as a poster child"), Ex. 101 (accusing her of "trying to take Shannon away from her mother" and warning "if you or your stepson don't have Shannon right now start by being honest about your part").   *See also* R.595: Kim VerHage, STR3 at 496-97, referring to "dozens" of letters that Gabrion sent her.   The jury would not have responded well to such a tactic.

Gabrion says his counsel was ineffective for not investigating Joseph Lunsford's competency as a witness and cross-examining him on the fact that he said in grand jury that he had short term memory loss due to a cyst on his brain.[17] In context, Lunsford's mention of the cyst is not significant:

> Q     Did [Gabrion] ever make a statement to you like he got rid of Rachel Timmerman to close her mouth?
>
> A     No, not to my recollection.
>
> Q     Well, you would have remembered something like that, wouldn't you?
>
> A     Yeah, I would.   I've been having a short term memory loss because I have a cyst on the side of my brain right now.

---

[17] Nonetheless, Gabrion has submitted an affidavit from Lunsford in support of his amended §2255 motion.   (Am. Mot. Ex. 7, PageID.4700.)

189

> Q    Oh.    *Do you have any problems remembering what we're talking about here today?*
>
> A    *No.*

(R.44-6, Ex. I: 5/6/99 Grand Jury Testimony of Joseph Lunsford at 13, emphasis added.)    Lunsford gave detailed and specific testimony about Gabrion's admissions and conduct, and there is nothing to suggest that what he *did* remember and testify about was affected by any cyst on his brain.

Gabrion again faults his counsel for not obtaining more information about Jason Cross's alleged mental health issues—this time for failing to obtain the "raw data" referenced in the report that said he was a truthful person, almost to a fault. For the reasons set forth in the response to Ground 4.P., above, failure to pursue this information was neither deficient performance nor prejudicial to Gabrion.

Gabrion suggests that his trial counsel should have worked harder to suggest that Shannon VerHage might be alive.    This is another tactic that would not have been received favorably by the jury.    The jury was aware that some family members initially held hope that Shannon was alive.    E.g., Ex. 96, Letter from Kim VerHage.    But when Shannon, last seen in her mother's arms on June 3, 1997, was never found, when her mother's body, murdered by Gabrion, was recovered from Oxford Lake, and when Gabrion admitted to several people (Lunsford, Cross, Love) that he killed Shannon, after having told Rachel that he would kill her, it eventually became clear that Shannon was dead.    Trying to suggest to the jury that it was otherwise would not have been sound strategy.

In sum, this claim is largely unsubstantiated and even if additional documentation is supplied, for the reasons set forth above, Gabrion's counsel did not perform deficiently by failing to pursue the lines of inquiry Gabrion outlines in this section.   Moreover, Gabrion has not shown that any of the alleged failures to investigate prejudiced him.   Given the abundant evidence supporting the aggravating factors, there is no reasonable probability that any information discussed in this section would have affected the jury's sentencing decision.

### R.      Trial Counsel Was Not Ineffective for Failing to Object to Comments Made During Closing Argument

Gabrion argues that his trial counsel was ineffective for failing to object to various categories of comments made during the government's closing argument: 1) a comment that "the law, the facts, and your sense of justice tell you what decision you now have to make"; 2) a comment that the defense had conceded that Gabrion had intentionally killed Timmerman; 3) comments allegedly appealing to the jury's sense of "civic duty"; 4) comments summarizing the future dangerousness evidence; and 5) comments relating to Gabrion's failure to show mercy to his victims. (PageID.4024.)   This claim fails because the challenged comments were not improper and even if they were, the failure of defense counsel to object did not prejudice Gabrion to the degree required by *Strickland*.

"A failure to object to a prosecutor's comments or to raise the issue on direct appeal does not fall below an objective standard of reasonableness unless the comments constituted prosecutorial misconduct."   *Reed v. United States*, 133 F. App'x 204, 208 (6th Cir. 2005).   If a court determines that comments are improper,

191

it considers four factors to determine if they rise to the level of prosecutorial misconduct requiring reversal: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.   *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).

In addition, the Sixth Circuit has observed, in evaluating a claim of ineffective assistance of counsel predicated on a failure-to-object to allegedly improper closing argument comments, that "not drawing attention to [a] statement may be perfectly sound from a tactical standpoint."   *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010) (quoting *United States v. Caver,* 470 F.3d 220, 244 (6th Cir. 2006)).   To breach the unreasonableness threshold, "defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."   *Lundgren v. Mitchell,* 440 F.3d 754, 774-75 (6th Cir. 2006).   Conversely, "any single failure to object [to closing arguments] usually cannot be said to have been error."   *Id.* at 774; *see also Smith v. Bradshaw,* 591 F.3d 517, 522 (6th Cir. 2010) (finding that defense counsel's failure to object to one instance of alleged prosecutorial misconduct was not deficient).   A defendant alleging ineffective assistance must also show that the failure to object created a reasonable probability that the result of the proceedings would have been different.

192

*Wallace v. Sexton*, 570 F. App'x 443, 456 (6th Cir. 2014) (citing *Strickland*, 466 U.S. at 694).

**First, the comments were not improper.**   Generally, "a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors."   *Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012) (quoting *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006)) (internal quotation marks omitted). "Closing arguments that encourage juror identification with crime victims are improper."   *Johnson*, 525 F.3d at 484.   At the same time, "[n]othing prevents the government from appealing to the jurors' sense of justice or from connecting the point to the victims of the case."   *Bedford*, 567 F.3d at 234 (internal citations omitted).   None of the comments the defense challenges runs afoul of any of the prohibited categories.

The prosecutor's argument that the jury were members of the community who had a duty to consider the safety of the community in rendering its sentencing decision did not constitute an impermissible plea to the jurors' "civic duty." "Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible."   *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001); *Durr v. Mitchell*, 487 F.3d 423, 441 (6th Cir. 2007); *Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000) (holding on habeas review that prosecutor's argument to jurors that they should impose the death sentence to fulfill their societal duty was not clearly improper, and did not result in a fundamentally unfair trial).   The prosecutor's remarks here were not

akin to the type of "civic duty" comments condemned by the Sixth Circuit—for example, that the jury should find the defendant guilty to "send a message" to other potential criminals in the community.   *E.g., United States v. Ghazaleh*, 58 F.3d 240, 246 (6th Cir. 1995); *Solivan*, 937 F.2d at 1148 (holding that prosecutorial misconduct constituted error when in closing the prosecutor asked the jury to "tell [defendant] and all of the other drug dealers like her ... that we don't want that stuff in Northern Kentucky....").   Rather, here, in this death penalty case, the jury was charged with the responsibility of evaluating the defendant's future danger to the community, and it was not improper for the prosecutor to reference the jurors' status as members of the community in that context.

The cases Gabrion cites are not to the contrary.   In *Ward v. Dretke*, 420 F.3d 479, 497-98 (5th Cir. 2005), the court held that a prosecutor did *not* impermissibly appeal to civic duty when he asked the jury to consider whether it wanted its community to stand firm against crime or instead wanted to apply more lax standards of a neighboring community.   Noting that "[a]rgument by counsel 'constitutes a proper plea for law enforcement if it urges the jury to be the voice of the community, rather than asking the jury to lend its ear to the community,'" the court found no impropriety in the argument, as the prosecutor "did not state that the people of [their community] were expecting or demanding a particular sentence."   *Id.* at 498.   Likewise, here, as the court of appeals found in rejecting on direct appeal other challenges to the prosecutor's closing argument, "the prosecution never argued that the jury had a 'duty' to impose death . . . ."   *Gabrion II*, 648 F.3d

194

at 349.   Rather, the prosecutor told the jury that it had a responsibility to "consider" the safety of other citizens in the community and that as citizens they had "a" duty to carry out.   (R.596: STR4 at 610, 623-24.)   Thus, the prosecutor did not, as in the other case Gabrion cites, *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002), tell the jury that it could only do justice "by bringing in a verdict of death."[18]

For the same reason, the prosecutor's comment that "[t]he facts, the law, and your sense of justice tell you what you have to do" (STR4 at 604) was also not improper.   This was permissible argument, urging the jury to make its decision based on the "facts," the "law," and the jurors' own sense of justice.   *See, e.g., Glenn v. Prelesnik*, 2012 WL 4464296, at *18 (W.D. Mich. Feb. 14, 2012) (prosecutor's argument not improper where "prosecutor asked the jurors to reach a fair verdict 'according to the facts and the law'").   Consistent with the case Gabrion cites, *Jones v. United States*, 527 U.S. 373, 384 (1999), the Court instructed the jury in Gabrion's case, "you are never required to impose a sentence of death."   (R.596: STR4 at 673.)

Also entirely proper were the prosecutor's comments that the defense had conceded, for purposes of the penalty phase, that Gabrion intentionally killed

---

[18] In *Le*, the Tenth Circuit found on habeas review that the state courts had reasonably determined that even though the comment was improper, it did not render the defendant's trial fundamentally unfair, given the "overwhelming evidence" of the defendant's guilt, and the evidence of aggravating factors supporting the death sentence.   *Id.*   As discussed *infra*, even if any of the prosecutor's comments here were improper and trial counsel's failure to object to them deemed deficient performance, for the same reasons, Gabrion cannot show prejudice under *Strickland*.

195

Timmerman, and comments summarizing the future dangerousness evidence. Gabrion's argument on these points is unclear.    With respect to the former set of comments, Gabrion's trial counsel had in fact conceded that by its guilt phase verdict, the jury had already found that Gabrion intentionally killed Timmerman. (R.593: STR1 at 42, Defense Opening Statement.)    And a prosecutor does not commit misconduct by summarizing the evidence, which is all the prosecutor did with respect to the future dangerousness evidence.

The prosecutor also did not err when he argued that Gabrion failed to show any mercy to his victims and should not expect any mercy from the jury.    He did not actually argue that the jury should show the "same" degree of mercy that Gabrion showed his victims; rather, he simply pointed out that Gabrion did not show mercy and therefore he should not expect it.    The phrasing is similar to the kind of "same mercy" argument—that the jury should show the "same mercy" the defendant showed his victims—condemned in some jurisdictions, notably in Florida, as reflected in Gabrion's case citations.    *E.g., Urbina v. State*, 714 So.2d 411, 421 (Fla. 1998).    But the manner in which the "mercy" comment was expressed here was not calculated to "appeal to vengeance" as in the Florida cases and in *Lesko v. Lehman*, 925 F.2d 1527, 1540-41, 1545 (3d Cir. 1991).

Moreover, other jurisdictions hold that the "same mercy" type of argument is proper.    *See, e.g., People v. Gamache*, 48 Cal. 4th 347, 389 (Cal. 2010) ("We have repeatedly approved prosecutors arguing that a defendant is not entitled to mercy, and in particular arguing that whether the defendant was merciful during the

196

crimes should affect the jury's decision."); *People v. Ochoa*, 19 Cal. 4th 353, 464-65 (Cal. 1998) (prosecutor's comment urging the jury "to 'show [defendant] the same mercy he showed [the victim]'—presumably none" was "proper argument," noting disagreement with other jurisdictions such as Florida); *Vieira v. Chappell*, No. 1:05-cv-01492-AWI, 2015 WL 641433, at *100 (E.D. Cal. Feb. 5, 2015) (stating "[t]here was nothing objectionable about prosecutor's argument: "I'd be happy if you show [defendant] that exact same mercy and sympathy that he showed those people on Elm Street that night.   It's absolutely none.")   Further, even in Florida, "a mercy argument standing alone does not constitute reversible error."   *Merck v. State*, 975 So. 2d 1054 (Fla. 2007) (citing *Reed v. State*, 875 So. 2d 415 (Fla. 2004)).   Given the isolated nature of the comment here, counsel cannot be said to have performed deficiently in declining to object to it.

In sum, the challenged comments were not improper, and therefore any objection to them would have been futile.   For that reason, Gabrion's trial counsel did not render deficient performance by failing to object, as counsel has no duty to make meritless objections.   *E.g., Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).   Further, even if some of the comments were objectionable, counsel did not perform deficiently because there is no duty to object to each and every objectionable comment.   As set forth above, competent counsel may properly exercise restraint in choosing which objections to lodge; counsel's performance is only deficient if he consistently fails to use objections, despite "numerous and clear reasons for doing so" and thus the failure "cannot reasonably have been said to have

been part of a trial strategy or tactical choice." *Lundgren*, 440 F.3d at 774-75. That did not occur here.

**Second, Gabrion cannot show prejudice.** Even accepting Gabrion's claims that the closing arguments he enumerates were improper – and that the failure to object was not the product of reasonable trial strategy – Gabrion cannot establish that he was prejudiced because there is no reasonable probability that the result of the trial would have been different had his lawyers objected. Gabrion cannot establish that the jury's verdict would have changed absent these comments. *See, e.g., Shacks v. Tessmer*, 9 F. App'x 344, 354 (6th Cir. 2001) (finding that defendant's counsel "should have objected to the prosecutor's remarks during closing argument" but the deficient performance did not prejudice the defendant where there was no reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different").

Finally, Gabrion also complains about a comment even though his counsel *did* object to it: "Even if he pays with his life, he hasn't paid enough. His life is only one life. He owes for five." (PageID.4027.) He says that his counsel did not do *enough* because they did not ask for a mistrial or request a cautionary instruction. Though the Court sustained the objection, it is not even clear that the remarks were improper. Examining similar comments challenged on direct appeal, the court of appeals held that remarks to the effect that Gabrion owed a debt he could "never repay" and that the mitigating factors did not "balance the ledger book" were not improper because the crux of the argument was that "the debt could

198

not ever be repaid, no matter the result of their sentencing deliberations." 648 F.3d at 349.    The same is true as to the newly challenged remark—the point was that even imposing the death penalty would not achieve "balance" when considering the victims.    Further, the remark was not sufficiently prejudicial to warrant either a mistrial or a special cautionary instruction, which would have cast even more attention on the remark.    *See United States v. Moore*, 917 F.2d 215, 220 (6th Cir.1990) ("A defendant may move for a mistrial where there is a claim of *seriously prejudicial* error.") (emphasis added).

**S.      Neither Trial nor Appellate Counsel Were Ineffective for Failing to Object to the Substitution of an Alternate Juror for the Penalty Phase when Medical Issues Prevented a Guilt Phase Juror from Continuing to Serve**

Gabrion argues that trial and appellate counsel were constitutionally deficient for failing to object to or raise on appeal the substitution of an alternate juror to sit for the penalty phase when a juror who had deliberated on the issue of guilt developed medical issues before the penalty phase began which prevented her continued service.    (PageID.4028.)    The claim is also without merit.

At the conclusion of the evidence, the Court invited counsel's input regarding an instruction it proposed to give the alternate jurors, advising them that they were not released from service, and would be retained during deliberations until their service was no longer needed.    (R.591: TR7 at 1607-10.)    Mr. Stebbins voiced his agreement with the Court, noting the same procedure had been adopted in Ohio, where he had extensive experience litigating capital cases.    (*Id.* at 1606-08.)    Thus, with counsel's approval, the Court had the alternates retained in a separate room

with instructions not to discuss the case with anyone until advised their service was no longer needed by the Court.   (*Id.* at 1769-70, 1773-74.)   When the need arose after the verdict had been taken, but before the penalty phase began, the Court, without objection, replaced the excused juror with an alternate.   (R.593: STR1 at 2-3.)

On direct appeal, counsel for Gabrion did not complain about this procedure. Counsel did claim error, however, with respect to this Court's decision to substitute an alternate juror for a "sleeping juror" before guilt deliberations began.   Appellate Br. at 78-79.   That issue was addressed by the Sixth Circuit panel, which unanimously found no error.   *Gabrion II*, 648 F.3d at 339.   In so ruling, the Sixth Circuit adopted the Third Circuit's reasoning in *United States v. Cameron*, 464 F.2d 333, 335 (3d Cir. 1972), holding that, "the trial court's exercise of … discretion [to remove a juror and replace him with an alternate] is not to be disturbed absent a showing of bias or prejudice to the defendant."   *Gabrion II*, 648 F.3d at 338.

Gabrion does not now allege any bias or prejudice with respect to the replacement of a juror who was unable to continue in deliberations due to illness, but relies simply on the language of FDPA section 3593(b)(1),[19] claiming it forecloses judicial discretion under any circumstances.   Gabrion cites no authority

---

[19] Although Gabrion cites 21 U.S.C. § 848(i)(1) in his motion (PageID.4028.), this case was actually governed by 18 U.S.C. § 3593, because it was brought under the Federal Death Penalty Act, 18 U.S.C. § 3591, and not the Continuing Criminal Enterprise provisions of the Anti-Drug Abuse Act, 21 U.S.C. § 848(e)-(r).   However, the relevant sections are the same.

that supports his interpretation of the relevant section of the FDPA, and he fails to cite opinions from the Seventh and Eleventh Circuits that specifically reject his interpretation. *See Battle*, 419 F.3d at 1301-02 (11th Cir. 2005); *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000).[20] Gabrion asserts simply that the alternate juror did not have the benefit of guilt-phase deliberations, and might have had difficulty deliberating on a penalty when s/he did not take part in the deliberations for guilt. But as the Seventh Circuit wrote in *Johnson*:

---

[20] In *Battle*, the Eleventh Circuit wrote:

> We agree with the Seventh Circuit. Section 3593(b) guarantees capital defendants a bifurcated proceeding: a guilt phase and a penalty phase. The section does *not,* however, guarantee that the penalty decision will necessarily be made-as a matter of right-by the same jury that determined the defendant's guilt. *See* 18 U.S.C. § 3593(b)(2)(C) (providing for sentencing hearing before different, newly-impaneled jury if guilt-phase jury has been discharged for good cause). The trial court's retention of alternates was a wise decision and proved its worth by allowing the court to avoid possibly declaring a mistrial after a complex capital case had been ably presented by both parties over the course of several weeks.

*Battle*, 419 F.3d at 1301-02.

In *Johnson*, the Seventh Circuit wrote:

> *In any event we do not think that the procedure that was employed violates the statute. The statute makes no provision for the situation that occurred here, leaving it to the good sense of the judges to deal with.* We find guidance to the proper resolution in the 1999 amendment to Rule 24 of the Federal Rules of Criminal Procedure, which, altering the previous practice (to which we made reference earlier), allows the trial judge to replace a regular juror with an alternate *during* deliberations, which must then recommence. Fed.R.Crim.P. 24(c)(3).

*Johnson*, 223 F.3d at 669 (emphasis added).

[T]he fact that the alternate missed some of the deliberations is no longer regarded as a fatal objection, or indeed as any objection, to his participating in the jury's decision. Compare *United States v. Josefik, supra*, 753 F.2d at 587. The analogy to the procedure employed here is close. The deliberations that eventuated in the sentence of death were in two stages, a guilt stage and a sentencing stage. The alternate missed the first stage but participated in the second. True, the *entire* deliberations did not recommence; but the issues of guilt and of punishment are sufficiently distinct that the alternate didn't have to hear the deliberations on the former issue in order to be able to participate meaningfully in the deliberations on the latter issue. He had sat through the entire trial, which is the important thing.

*Johnson*, 223 F.3d at 669-70 (emphasis added).

Because Gabrion cannot establish – and does not even allege – bias or prejudice, or deficiency and prejudice on the part of counsel, this claim is meritless.

### T.    Trial Counsel Was Not Ineffective for Failing to Challenge the Constitutionality of the FDPA or Raise a *Ring* Objection

Gabrion argues that his trial counsel was ineffective for failing to challenge at trial the constitutionality of the FDPA on the basis that it does not require application of the Federal Rules of Evidence during the penalty phase.[21]   Gabrion further contends that failure prejudiced him because the court of appeals therefore reviewed the issue only for plain error.  (PageID.4030.)   Gabrion's ineffective

---

[21] As noted earlier, trial counsel did file a motion to dismiss the government's death penalty notice asserting that the FDPA was unconstitutional on several grounds. (R.178: 5/1/01 Mot. to Dismiss the Govt's Death Penalty Notice.)   However, counsel did not include this claim in that motion.   Rather, in his motion *in limine*, counsel asserted that the rules of evidence applied to the government's presentation of evidence, but not the defendant's, because of the heightened reliability requirement in death penalty cases.   (R.263: Gabrion's 8/7/01 Mot. *in Limine* Re: Govt's Penalty Phase Evidence, at 3-6.)   The court ruled that the evidence rules did not apply at the penalty phase.   (R.212: 6/29/01 Op. at 32-33; R.395: 1/25/02 Op. at 6-8.)

assistance claim fails because he cannot show either constitutional deficiency or prejudice.

Although the Sixth Circuit indicated its review was for plain error, 648 F.3d at 345, it did not resolve the issue on the basis that any error was not "clear or obvious."   Rather, when the court reviewed the FDPA challenge it found no error.   In analyzing the issue, the court noted that every circuit had rejected Gabrion's argument, and it "join[ed] those circuits" that rejected Gabrion's claimed error.   Accordingly, Gabrion cannot establish prejudice.   *Id.* at 345.[22]

In his motion, Gabrion's sole source of support for his argument continues to be *United States v. Fell*, 217 F. Supp. 2d 469 (D. Vt. 2002), which the Second Circuit reversed, 360 F.3d 135 (2d Cir. 2004).   He also cites *Ring v. Arizona*, 536 U.S. 584 (2002), a case decided *after* his trial, and raises the same argument appellate counsel raised—that *Ring*'s holding should be extended to require aggravating facts be proven to the jury using evidence admissible under the

---

[22]  The Circuit panel wrote:

> Gabrion next asserts that the Federal Death Penalty Act is facially unconstitutional, because it provides that the Federal Rules of Evidence ("the Rules") do not apply to material presented by the parties during the penalty phase of a death penalty trial.   This issue is one of first impression in this Circuit, but every other circuit which has confronted it has rejected this argument and upheld the Act.   *See United States v. Fulks*, 454 F.3d 410, 437 (4th Cir.2006); *United States v. Lee*, 374 F.3d 637, 648–49 (8th Cir. 2004); *United States v. Fell*, 360 F.3d 135, 140–46 (2d Cir. 2004); *United States v. Jones*, 132 F.3d 232, 241–42 (5th Cir. 1998).   We join those circuits, reject Gabrion's argument, and decline to find the Act unconstitutional on this basis.

*Gabrion II*, 648 F.3d at 345.

Rules.   Trial counsel was not deficient for failing to argue for an extension of law that had not yet been decided.   *See Henley v. Brunsman*, 379 F. App'x 479, 482 (6th Cir. 2010) (counsel will not be held ineffective for failing to anticipate a change in the law unless the change was "clearly foreshadowed" at the time of trial) (quoting *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999)); *Benning v. Warden, Lebanon Corr. Inst.*, 345 F. App'x 149, 157 (6th Cir. 2009) ("[a]s in *Lucas*, Ohio courts 'continued to grapple with the problem,' and thus resolution of the issue was "not clearly foreshadowed" at the time of trial") (discussing inconsistent application of *Blakely v. Washington*, 542 U.S. 296 (2004)).   Counsel is not ineffective in failing to forecast changes or advances in the law.   *Larrea v. Bennett*, 368 F.3d 179 (2d Cir. 2004) (failure to anticipate change in state law not ineffective, rejecting at 184 n.2 that an attorney should be familiar with cases from other jurisdictions); *Sherrill v. Hargett*, 184 F.3d 1172 (10th Cir. 1999); *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993); *Moore v. Deputy Commissioners, Sci-Huntington*, 946 F.2d 236, 245, n.6 (3d Cir. 1991); *Johnson v. Armontrout*, 923 F.2d 107, 108 (8th Cir. 1991); *Sistrunk v. Vaughn*, 96 F.3d 666, 672 (3d Cir. 1996) (not ineffectiveness to fail to anticipate *Batson*).

Further, insofar as Gabrion's collateral review claim is premised on an extension of existing law, that legal extension is barred on collateral review by *Teague v. Lane*, 489 U.S. 288, 310 (1989), non-retroactivity doctrine, as neither of the two exceptions to non-retroactivity apply.   In any event, as set forth above, Gabrion cannot show that his trial counsel's failure to make a *Ring*-based

204

argument in connection with this claim was deficient or prejudiced him on appeal, as no authority supports his argument and the Sixth Circuit considered and rejected the claim on the merits.

### U.  Cumulative Error

As in the case of the alleged trial errors, Gabrion has failed to show that, even if a "cumulative error" theory is viable in the § 2255 context, there was no such error here because Gabrion's counsel's performance in connection with the penalty phase did not fall below professional norms or cause him to suffer prejudice warranting collateral relief.

**GROUND FIVE:  Gabrion Was Competent During His Trial and Sentencing Hearing**

Gabrion claims that he was denied a fair trial because he was incompetent during the trial and sentencing hearing.   (PageID.4032.)   As noted above, Gabrion's antics before and during trial prompted this Court to order extensive mental health testing for competency, and all results indicated that Gabrion is not mentally ill, but was attempting to appear that way.   *See supra* Background Section B.2.

Further, this claim was considered and rejected by the Sixth Circuit on direct appeal.   The panel noted that nine mental health experts had examined Gabrion before and during the trial, and all but one concluded that he was feigning mental illness.   The sole exception was defense expert Dr. Scharre, who did not examine him.   *Gabrion II*, 648 F.3d at 318-320; *Gabrion III*, 719 F.3d at 533-34.   Gabrion has not offered a contrary opinion for the Court to consider in connection with his

205

motion.    Moreover, as set forth above, any opinion he offered at this late date could not establish his incompetency 13 year ago, in any event.    *See supra* response to Ground 3.A. (citing *Johnson*, 860 F. Supp. 2d at 810; *Fields*, 761 F.3d at 468 (5th Cir. 2014)).    This issue has been decided and therefore cannot be relitigated.

**GROUND SIX:    The Government Did Not Violate *Brady*.**

Gabrion claims that his trial and sentencing were rendered unfair because the government allegedly failed to disclose impeachment material relating to witnesses Linda Coleman, Gregory Leon and Lonnie Overton.    (PageID.4033.)[23] Part of this claim re-asserts claims made in Ground One of his motion, which relates to his claim that government witnesses generally testified falsely or in a misleading fashion.    (PageID.3895.)    The government is under a duty to make reasonable efforts to disclose evidence favorable to a defendant, including evidence bearing on witness credibility.    *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (non-disclosure of evidence pertaining to witness credibility falls under *Brady* rule).    A *Brady* violation has three components: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; 2) the evidence was suppressed by the prosecution, either intentionally or inadvertently, and 3) prejudice resulted from the failure to disclose.    *Strickler v. Greene*, 527 U.S. 263,

---

[23] Gabrion's amended motion refers to Lonnie Overton in this section; however, there are no factual allegations pertaining to him.    Gabrion's original motion made allegations concerning Overton in Ground One, which were incorporated by reference into Ground Six.    (Mot. at 28-29, 126.)    Given the absence of facts pertaining to Overton, the government does not address any claim relating to him.

281-82 (1999).   Prejudice requires a showing that the suppressed information was material, meaning that its absence raises a reasonable probability that a different result would have occurred had the information been disclosed.   *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Robinson v. Mill*s, 592 F.3d 730, 735 (6th Cir. 2010). However, *Brady* does not impose a strict liability test on the prosecution; it is not obligated to turn over exculpatory evidence the existence of which it or its agents were unaware.   *United States v. Boyd*, 208 F.3d 638, 644 (7th Cir. 2000), *vacated on other grounds, Boyd v. United States*, 531 U.S. 1135 (2001).

In Ground 1.E. of his motion, Gabrion claims that Coleman, Leon and Nathan Brewster testified falsely.   (PageID.3920.)   He uses this same allegation again as a *Brady* claim for purposes of this claim of error.   The government has already demonstrated that these witnesses did not testify falsely, and incorporates by reference its arguments refuting that claim.   *See supra* response to Ground 1.E. This claim of error should be rejected for the same reasons.

In his amended motion, Gabrion has added the allegation that the government failed to disclose that Leon "had a pending criminal case in Newaygo County at the time he testified in Gabrion's case." (PageID.4034.).   It is unclear what Gabrion is referencing here, as the only case he discusses in his amended motion is the case involving his wife, Wendy, which concluded with his plea to the aggravated stalking charge in 1998, which was not still "pending" when he testified at Gabrion's trial in 2002.   (See Am. Mot. at PageID.2734-36 & Gabrion Ex. 6, PageID.3508-09.)   Leon testified during the penalty phase that in 1995, his family

207

operated the Leon Christian Home in Grand Rapids.   (R.593: STR1 at 124.)

Gabrion was a resident of the home at that time.   He told Leon at various times

that he used surveillance equipment to steal from drug dealers.   Leon caught

Gabrion engaging in two episodes of illegal conduct, including illegally tapping into

his telephone line to make long distance telephone calls that would not be billed to

him and stalking a woman he admired at a local laundromat.   Leon confirmed that

Lonnie Overton was another person who stayed at the Leon Christian Home

between 1991 and 1995.   (*Id.* at 125-30.)

Leon's testimony was thus limited to demonstrating that Gabrion was

capable of developing an elaborate scheme to avoid paying for long distance

telephone calls.   This was relevant to blunt the defense claim that Gabrion was so

mentally damaged that he should be spared the death penalty.   But there was

ample other evidence of Gabrion's complex scheming, including his obtaining and

use of Robert Strevels's identity and his theft of Robert Allen's social security

benefits.    This claim of error should be rejected.

Finally, Gabrion claims that *Brady* was violated because impeachment

information about witness Lloyd Westcomb was not disclosed.   (PageID.4035.)

This should not be considered at this stage because the Sixth Circuit has already

considered and rejected this argument.   *United States v. Gabrion*, 648 F.3d 339,

351-52 (6th Cir. 2008).    This issue cannot be relitigated.   *E.g., DuPont*, 76 F.3d at

110.

208

**GROUND SEVEN:**     **Appellate Counsel Was Not Ineffective for Not Raising a Non-Meritorious Suppression Argument**

Gabrion argues that his appellate counsel were ineffective because they did not challenge this Court's denial of his motion to suppress the cinder blocks seized from his residence.   (PageID.4035.)   Gabrion's appellate counsel did not render deficient performance—and Gabrion was not prejudiced—because the suppression claim lacked merit.

A criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal.   *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)).   Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *Williams v. Lafler*, 494 F. App'x 526, 533 (6th Cir. 2012) (quoting *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990)). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome."   *Besser v. United States*, 2013 WL 308951, at *27 (W.D. Mich. Jan. 25, 2013) (quoting *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002)).   Here, appellate counsel raised over 20 arguments on direct appeal, managing to persuade the initial panel to vacate the death sentence on two grounds.   They did not perform deficiently by failing to

challenge this Court's ruling denying Gabrion's motion to suppress the cinder block evidence as that argument was not clearly stronger than the arguments raised.

Prior to trial, Gabrion's trial counsel moved to suppress the cinder blocks that officers observed in his open backyard while executing his arrest warrant for an unrelated assault charge and attempting to question Gabrion regarding the suspected homicide of Rachel Timmerman.    (R.223: Def. Mot. to Suppress.)    The officers had reason to believe that Gabrion was present at the house because of smoke coming from a chimney in the garage, so the officers walked around the house to see if Gabrion was around the back of the house, and then the officers proceeded to approach neighbors to inquire of Gabrion's whereabouts. (R.384: Tr. of Hr'g re: Def.'s Mot. to Suppress & Mot. in Limine, 66-67.)    While looking for Gabrion, one officer saw a portion of the yard that had not been mowed recently, with a cleared area that contained the cinder blocks that were later seized.    (*Id.* at 68-69.)

The Court (Judge Bell) noted that resolution of the motion to suppress the cinder blocks required a fact-intensive inquiry.  (*Id.* at 65-74.)    The Court agreed with the government that the blocks fell into the open field exception and that Gabrion did not have a reasonable expectation of privacy in the area within his backyard where the cinder blocks were found, a clearing surrounded by tall grass. (*Id.* at 72.)    The Court relied on *United States v. Groce*, 1999 U.S. App. Lexis 3546 (6th Cir. 1999), which held that an area surrounded with tall grass is an open field

210

for purposes of the plain view exception to the Fourth Amendment warrant requirement.  (*Id.* at 73.)

Because the Court's decision rested on a factual determination, the appellate court would review the factual findings only for clear error.  *Ornelas v. United States*, 517 U.S. 690, 699 (1996).  Gabrion identifies no basis on which the court of appeals could find that this Court's findings were clearly erroneous; indeed, he does not even identify what facts were allegedly erroneous.  His motion states in a conclusory fashion that "the record indicates that the motion was well taken," but he states no factual or legal basis for that assertion.  (PageID.4036.)  Conclusory allegations are insufficient to warrant relief on collateral review.  *Blackledge v. Allison*, 431 U.S. 63, 74 (U.S. 1977) ("The subsequent presentation of conclusory allegations [in a collateral attack] unsupported by specifics is subject to summary dismissal").  Moreover, the Court's ruling was plainly correct.  *See Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005) (holding that a mowed and cleared area immediately surrounding a house constituted curtilage, but uncleared areas did not).

Given the weakness of the suppression claim, Gabrion's counsel was not ineffective for declining to raise it.  As set forth above, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  Appellate counsel properly omitted the non-meritorious suppression issue.  Further, because it was

211

non-meritorious, and in light of all of the other evidence against Gabrion, Gabrion cannot show prejudice under *Strickland*.

### GROUND EIGHT: Gabrion Has Not Shown a Violation of the Fifth and Eighth Amendments Because his Victim Was Caucasian

Citing statistical studies, Gabrion argues that his Fifth and Eighth Amendment rights were violated because he claims a "significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims" and that the defendant in cases where the victim is white is more likely to be sentenced to death.   (PageID.4038.)   He also claims that his counsel's failure to challenge the government's decision to seek the death penalty or raise the issue on appeal was deficient performance.   Gabrion cannot obtain relief on his claim of racial bias, having premised it on bare statistical data.

If a prosecutor has probable cause to believe a defendant has committed a crime, "the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).   The law presumes, in the absence of clear evidence to the contrary, that prosecutors exercise their discretion in good faith and constitutional compliance. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994).

To prevail on a claim of selective prosecution, a defendant must demonstrate that the government acted with "discriminatory purpose" and that this purposeful discrimination had a "discriminatory effect" on him.   *See McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).   To demonstrate "discriminatory purpose" in a capital case,

212

the defendant must show that the decision to seek the death penalty was motivated at least partially by race.   *See McCleskey*, 481 U.S. at 298 ("It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

To establish "discriminatory effect," the defendant must show that the government did not seek the death penalty against similarly situated individuals of a different race.   *See Armstrong*, 517 U.S. at 465.   To satisfy *McCleskey*'s two-prong test, the defendant must present "evidence specific to" the case at bar. *McCleskey*, 481 U.S. at 292.   In *McCleskey*, the defendant relied solely upon a statistical study in attempting to establish that the prosecutors in his case had acted with discriminatory purpose.   The Supreme Court rejected this assertion, deeming statistical studies "clearly insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose." *McCleskey*, 481 U.S. at 297 (requiring "exceptionally clear proof" to infer an abuse of discretion).

Like *McCleskey*, Gabrion relies entirely on studies and statistics as a basis for his claim of constitutional error.   Gabrion cites no case law and makes no attempt to meet his burden with evidence specific to his case.   Gabrion's claim—which lacks any basis in facts specific to the case—must fail for lack of any factual support. Precisely the same flaw has led to the repeated rejection of similar arguments in federal courts throughout the country.   *See, e.g., United States v. Sampson*, 486

213

F.3d 13, 26-27 (1st Cir. 2007); *United States v. Sampson*, No. 01-10384-MLW, 2015 WL 7962394, at *12 (D. Mass. Dec. 2, 2015); *United States v. Barnes*, 532 F. Supp. 2d 625, 635-36 (S.D.N.Y. 2008); *United States v. Edelin*, 134 F. Supp. 2d 59, 89 (D.D.C. 2001); *United States v. Lee*, 2008 WL 4079315, at *58 (E.D. Ark. 2008).

Gabrion concedes some of the statistical studies were based in part on periods after his trial, but he nonetheless claims that his counsel should have procured evidence of the "developing pattern" from the Federal Death Penalty Resource Counsel.    Mot. at 131.    He argues that failing to obtain the data and challenge the government's "racially discriminatory actions was deficient performance."    *Id.* However, he has not demonstrated that his counsel was aware of the "developing pattern" and ignored it.    Thus, he cannot show deficient performance.

**GROUND NINE:  Gabrion May Not Relitigate His *Ring* Argument, Which the Court of Appeals Rejected**

Relying on *Ring v. Arizona*, 536 U.S. 584, 600 (2002), Gabrion argues that he was denied numerous constitutional rights because the indictment did not reference the federal death penalty or charge the aggravating factors other than those required for a capital offense under 18 U.S.C. § 3592(c) or any of the additional non-statutory aggravating factors raised in the penalty phase.    (PageID.4040.)    The argument fails because Gabrion raised the same issue on direct appeal.

"A § 2255 motion may not be used to relitigate an issue that was raised on [direct] appeal absent highly exceptional circumstances." *Dupont v. United States*, 76 F.3d 108, 110-11 (6th Cir. 1996) (quoting *United States v. Brown*, 62 F.3d 1418 (6th Cir. 1995) (unpub.)); *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996)

214

("because the issue was fully and fairly presented on direct appeal, petitioner could not now use a § 2255 petition to relitigate it, absent an intervening change in the law"); *Myers v. United States,* 198 F.3d 615, 619-20 (6th Cir. 1999) (same).   Gabrion does not argue that his case constitutes an exceptional circumstance, and he raised the precise same issue on appeal before the Sixth Circuit that he now forwards in this Court.   *Gabrion II*, 648 F.3d at 329-30; Appellant's Br. at 17-20.   The Sixth Circuit rejected his claim.   *See Gabrion II*, 648 F.3d at 330; *Gabrion III*, 719 F.3d at 535 (en banc).   Because this claim was previously litigated, the government asks that Gabrion's motion be denied on this ground.

Gabrion's amended motion adds another already-litigated claim, contending that the court of appeals "erred when it found the weighing factor to the FDPA was not an element of the offense that must be proven beyond a reasonable doubt. (PageID.4041.)   This claim is thus doubly barred: it is untimely and it may not be relitigated.

**GROUND TEN:    Counsel Was Not Ineffective in Connection with the Motion for a New Trial Based on Alleged Juror Misconduct**

In a Grand Rapids Press article on March 26, 2002, one of the jurors was quoted as saying, "I read your paper religiously.   I knew he was off the wall [before trial]."   (R.548: Supp. to Def.'s Mot. for New Trial, Attachment (3/26/92 Grand Rapids Press Article, at 4.)   Gabrion argues that his counsel was ineffective in the manner in which they requested a new trial based on that post trial statement. Gabrion argues that counsel should have alleged that the juror lied in voir dire.

215

Gabrion argues that framing the argument in those terms would have resulted in a new trial. But Gabrion can show neither deficient performance nor prejudice.

First, counsel did not perform deficiently. In the Supplement to Defendant's Motion for a New Trial, counsel alleged that, based on the post-trial newspaper article, the juror did, contrary to his voir dire testimony, "carry preconceptions about Mr. Gabrion into both the trial and the penalty phase." (R.548: Supp. to Def.'s Mot. for New Trial, at 1.) On that basis, counsel requested a *Remmer* hearing to investigate juror misconduct. (*Id.* at 1-2.) Thus, counsel clearly raised the concern that, contrary to his voir dire testimony, the juror had preconceptions that he was unable to set aside in considering the case.

Moreover, there was no basis for concluding that the juror had lied in voir dire. And counsel cannot be found to have performed ineffectively by failing to raise issues that have no merit. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999); *see also Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010) (counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel); *O'Hara v. Brigano,* 499 F.3d 492, 506 (6th Cir. 2007) (same). The juror's remark was an isolated comment about his opinion prior to trial, which did not go to the guilt or innocence of the defendant, but only to the defendant's undisputedly bizarre pre-trial behavior. The statement was not facially inconsistent with any statement the juror made in voir dire, in which he indicated that he had not formed an opinion of the case and could disregard what he had heard from the media and evaluate the case on a "clean slate." (R.549: 2/1/02 ETR

216

(Voir Dire of Prospective Juror).)   "I knew he was off the wall," is simply not the same as "I knew he did it." or even, "I can't be fair and impartial."   The Court recognized as much in its Opinion denying the motion for a new trial.   (R.572: 4/24/02 Op. at 5, 7.)   The Court specifically found that "[t]here is nothing in the record to lead this Court to believe that this juror lied during voir dire or that he violated his oath during deliberations."   (*Id.* at 7.)

Gabrion cites *McCoy v. Goldston*, 652 F.2d 654 (6th Cir. 1981), for the proposition that an evidentiary hearing on a juror's alleged failure to disclose will be held only if the movant has presented a sufficient evidentiary basis to raise a fact issue.   PageID.4043 (citing *McCoy*, 652 F.2d at 659).   He then notes that the allegations in the moving papers must be "specific, detailed, and nonconjectural." *Id.* (citing *McCoy*, 652 F.2d at 659 n.9).   From there, he argues that, had his lawyers only stated more clearly that the juror lied, a Sixth Amendment violation would have been established.   However, because the juror's comments did not establish "a prima facie case of impropriety" that the juror was not honest in voir dire, the premise of his argument is flawed.   *McCoy*, 652 F.2d at 657.

Second, there is no prejudice where the Court considered the precise issue that Gabrion says his counsel should have raised—whether the juror lied—and rejected it.   (R.572: 4/24/02 Op. at 5, 7.)   In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court held that, to obtain a new trial, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have

217

provided a valid basis for a challenge for cause." *Id*. at 556.   This Court rejected Gabrion's claim because nothing in the newspaper article provided a basis for a finding that the juror had lied during voir dire.   (R.572: 4/24/02 Op. at 7.)   The Sixth Circuit also heard and rejected this claim.   *See Gabrion*, 648 F.3d at 330.   If Gabrion's lawyers had alleged that the juror had lied—which would not have been consistent with the record—his claim would nonetheless have been denied.

**GROUND ELEVEN:      Gabrion's Execution Would Not Violate the Eighth Amendment**

Finally, relying on an American Bar Association Report and stretching the bounds of the Supreme Court's reasoning in *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), Gabrion asserts that this Court should promulgate a constitutional rule of law barring the execution of individuals displaying severe mental illness at the time they committed a capital offense.   In short, he reasons that such persons are less morally culpable because they are incapable of understanding the nature and consequences of their actions and conforming their actions to the rule of law because of their mental illness.   *See* PageID.4044-4046.   Gabrion thus asks this Court to declare him constitutionally ineligible for a sentence of death.

This claim fails for multiple reasons.   To begin with, Gabrion is not mentally ill.   Post-conviction counsel's conclusory, unsupported assertion that he is contradicts the vast evidence amassed in this case demonstrating that he was not mentally ill at the time he murdered Rachel Timmerman or at the time of trial. Moreover, this claim is procedurally defaulted and premised on an extension of

218

*Atkins* and *Roper* that is without support.   First, the Supreme Court has not established a *per se* exemption to capital prosecution for the mentally ill, and there is no trace of a national consensus in favor of such a rule.   This Court would be ill-advised, therefore, to create such a blanket exemption, particularly in light of the weak arguments Gabrion sets forth to support such a rule and the confusion that would result from courts conferring upon themselves the power to determine what constitutes mental illness.   Second, to the extent Gabrion's claim is premised on the notion that a mentally ill offender is incapable of forming a culpable criminal state of mind, Gabrion ignores the time-tested defense of insanity, which not only protects a qualified individual from capital punishment, but also reduces outright such a person's criminal responsibility.   Thus, it is wholly unnecessary for this Court to create an entirely new, but redundant prophylactic shield.   Finally, where, as here, any mental health issues Gabrion may have had did not, under any expert's view (save, perhaps, Scharre's), constitute "mental illness" and certainly did not rise to the level to excuse his criminal liability, he was free under the FDPA to present evidence of those issues in support of mitigating factors, and he did so in this case. Thus, the jury had all available information before it regarding Gabrion's claimed impairment before passing sentence.

### 1.    This claim is procedurally barred

This claim is procedurally defaulted because Gabrion did not raise it at trial or on appeal, and Gabrion makes no effort to show "cause" and "prejudice" so as to excuse the default.   *United States v. Frady*, 456 U.S. 152, 170 (1982).   The cause

and prejudice standard requires Gabrion to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Id.* at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1993); *Frady*, 456 U.S. at 166. The only other exception—actual innocence—does not apply to this claim because it does not purport to establish that he is innocent of the crime.

Gabrion cannot show that a factor external to the defense prevented trial counsel from raising this claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 347, 336).

## 2. There is no national consensus in favor of a blanket exemption to capital punishment for the mentally ill

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental illness as a *per se* bar to execution. *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme Court's

exemptions from execution for the mentally retarded and minors, but that "it has not yet ruled out the execution of persons who kill under a mental illness").[24] Indeed, in *Atkins*, the Supreme Court expressly limited its holding to the mentally retarded.   *Atkins*, 536 U.S. at 320 ("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue to face the threat of execution.").

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate those with mental illness from capital punishment.   *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, *23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded persons and minors to person with mental health issues based on 'evolving standards of decency'" ).   Indeed, Gabrion points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution.

The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.   *Atkins*, 536 U.S. at 312.   For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending.   *Id*. at 315; *see also id*. ("It is not so

---

[24] Albeit in a much different context, the Supreme Court has recognized that the differences between the mentally retarded and the mentally ill permit states to treat them differently.   *See Heller v. Doe*, 509 U.S. 312, 321-22 (1993).

221

much the number of these States that is significant, but the consistency of the direction of change.").   Here, however, Gabrion has not cited a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, those who satisfy the time-tested defense of insanity.

Likewise, several state high courts have refused to recognize a constitutional bar to imposing capital punishment upon mentally ill individuals.   In fact, the wave of post-*Atkins* authority from state courts demonstrates that the national consensus is *against* an absolute bar to capital punishment for the mentally ill. *See People v. Mendoza*, 365 P.3d 297, 336-37 (Cal. 2016) (observing that court had previously rejected argument "that persons who are 'severely' mentally ill may not constitutionally be subject to the death penalty by analogy to *Akins* and *Roper*"); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity. . . .   and this Court will not extend or expand the

constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), *abrogated in part on other grounds by Darling v. State*, 45 So.3d 444 (Fla. 2010);[25]  *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006)(en banc) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations");   *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes

---

[25] The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the time of their crimes.   *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E.2d 454 (Ind. 2005).

a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).

Recognizing there is no national consensus in favor of abolishing the death penalty for mentally ill offenders, this Court's inquiry should stop here. While the Supreme Court has stated that it must also bring its independent judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment, *Atkins*, 536 U.S. at 312, the Court has never expressed its independent judgment regarding the propriety of imposing capital punishment on the mentally ill. Thus, this Court would exercise an extraordinary and unprecedented assumption of power to do so in this case. Instead, this Court should leave to Congress the duty of creating new laws. *Atkins*, 536 U.S. at 324 (Rehnquist, C.J., dissenting) (stating it is undeniable that "the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluat[e] and giv[e] effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments").

### 3.    The rationale underlying *Atkins* and *Roper* does not apply to the mentally ill

Even ignoring the legal deficiencies in Gabrion's motion, he has not set forth a sufficient basis for this Court to "disagree with the judgment reached by the citizenry and its legislators," *Atkins*, 536 U.S. at 313, as well as the several courts cited above, who have refused to establish a categorical bar to the imposition of

224

capital punishment upon mentally ill individuals who do not meet the criteria of an insanity defense.

In *Atkins* and *Roper*, the Supreme Court held that the justifications for the death penalty (retribution and deterrence) did not apply to the mentally retarded or juveniles because they were generally less morally culpable and less susceptible to deterrence. *See id*. at 319-20; *Roper*, 543 U.S. at 569-70. The *Atkins* Court also stated that the reduced mental capacity of the mentally retarded impermissibly enhanced the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. *Id*. at 320-21. Those rationales do not come to bear in the present context. The justifications for capital punishment, to wit: retribution and deterrence, apply with full force to mentally ill persons who do not meet insanity standards. Short of the legally insane, legislatures, courts, and the general public have not recognized the mentally ill to be "categorically less culpable than the average criminal." *See Atkins*, 536 U.S. at 316. Nor have they recognized the mentally ill to lack the capacity to be deterred. The facts of this case certainly bear on these points. Assuming, *arguendo* (and against all of the evidence), Gabrion displayed any form of mental illness at the time of the Timmerman murder, its manner of execution, as found by the jury, required substantial planning and premeditation, and was not impulsive or the product of some diminished ability to understand or process the situation. This is precisely the type of conduct and thinking that deserves the ultimate punishment and is intended to be deterred with the federal death penalty.

What is more, classifying a person as mentally ill for the purpose of providing a blanket exemption to capital punishment is fundamentally different from so classifying juveniles or the mentally retarded.   A person is either under the age of 18 or he is not.   He is either mentally retarded or he is not.   Mental illness, on the other hand, is subject to varying types and degrees of illness.   Even if mental illness is present, there must also be a question of how that illness affected the offender's ability to understand the wrongfulness of his actions or to conform his conduct to the law.    Further, mental illness is, in most instances, treatable through medications and/or counseling therapy.

The differences between mentally ill and non-mentally ill offenders, unlike the differences between juvenile and adult offenders, are not "too marked and well understood" to allow a mentally ill person to be sentenced to death despite purportedly reduced culpability.   *Roper*, 543 U.S. at 572-73.   Further, given the need for individualization in capital sentencing, it would be arbitrary and unnecessary to adopt a categorical rule barring imposition of the death penalty upon the mentally ill.

### 4.    Other remedies are available

None of this is to say that individuals with severe mental illness are without recourse.   Congress has clearly defined and federal courts have for years applied a defense for the legally insane.   It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or

226

the wrongfulness of his acts.    18 U.S.C. § 17(a).    Mental disease or defect does not otherwise constitute a defense.    *Id*.    The defendant bears the burden of proving the defense of insanity by clear and convincing evidence.    18 U.S.C. § 17(b).    Should a capital defendant satisfy the elements of the insanity defense, he/she may not only avoid capital punishment, but criminal responsibility altogether.    *See* 18 U.S.C. § 4242.    Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.[26]

In sum, neither *Atkins*, nor *Roper* shield mentally ill individuals from capital punishment.    Nor does the Constitution or any statute.

---

[26] In a different context, the Supreme Court has held that the Eighth Amendment prohibits the government from carrying out a sentence of death upon a prisoner who is insane.    *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).    *See also* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.").    This prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it.    *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007).    But the lower federal courts   have refused to extend this rule to mentally ill individuals who do not satisfy the strict competency to be executed standard set forth in *Ford*.    *See, e.g., Ferguson v. Sec'y, Fla. Dept. of Corrections*, 716 F.3d 1315 (11th Cir. 2013); *Green v. Thaler*, 2012 WL 4800431 (5th Cir. 2012); *Bedford v Bobby*, 645 F.3d 372 (6th Cir. 2011).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that

Gabrion's amended motion to vacate, set aside, or correct his sentence be denied.


Respectfully submitted,

Dated: May 22, 2017

ANDREW BYERLY BIRGE
United States Attorney

/s/ Jennifer L. McManus
TIMOTHY P. VERHEY
JENNIFER L. McMANUS
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404