Case 1:15-cv-00447-RJJ    ECF No. 119-2, PageID.5295    Filed 05/22/17    Page 1 of 5



# the CHAMPION

### OFFICIAL JOURNAL OF THE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS

AUGUST 1986        VOL. X, NO. 7

# Search & Seizure Law



To solve the puzzle, see page 5

GOVERNMENT EXHIBIT

K

1:15-cv-447

# CAPITAL CASES

# Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial

### by David C. Stebbins and Scott P. Kenney

## Introduction

When we were first approached by Dennis Balske to write an artical on the use of expert witnesses in the penalty phase of a capital trial, our initial response was, "How can we impress the world with an erudite analysis of *The Law*?" Our approach to this topic was to present more practice and procedure and less traditional legal analysis. Therefore, any mention of case law is an accidental spill-over from some brief in the memory of the computer we are using to write this article.

## What Is Mitigation?

Webster's Dictionary defines *mitigate* in terms of making something become less intense, severe, or painful. Applying Webster's definition in the context of a capital case means, obviously, that the goal is to make the sentence less intense, less severe, or less painful, *i.e.*, to obtain a life verdict from the jury. (Since judges seldom overturn death verdicts, this article is written in terms of convincing the *jury* that life is appropriate.)

The question remains, however, how does defense counsel get this life verdict? *Lockett* says that the history, character, and background of the defendant, as well as the nature and circumstances surrounding the incident itself, must be considered in mitigation. *Eddings* says that the youth of the defendant must be considered. Most state statutes and/or jury instructions do not give even a rudimentary definition of what mitigation is. Most state statutes have a non-exclusive list of factors that *must* be permitted as mitigating as well as a catch-all clause that permits the presentation of virtually any relevant evidence on the question of mitigation. None of these things, however, spell out the meaning of mitiga-

tion or give any indication of what will convince the jury in any particular case that a life sentence is the appropriate punishment. Because there are innumerable variables between cases, there can be no easy answer on winning any particular case, but the primary goal of defense counsel in mitigation must be to offer to the jury an explanation of the crime. The jury will want to know how this murder could have occurred—how this defendant came to such a position that he or she could have committed such a heinous act. The explanation is not an excuse. The explanation has to be an honest (although interpreted) history of how the client grew into the "heartless monster" that the prosecutor proved him to be in the guilt phase.

At first blush, criminal defense attorneys generally have two initial ideas for mitigation: a) to humanize the client; and b) to compile all of the nice things the client has done in his life which will necessarily outweigh the facts surrounding this one unfortunate incident (the murder). While the importance of portraying the client as a loving, breathing, caring, thinking, feeling human being with family connections cannot be overstressed, that is only the first step of any successful mitigation. It is axiomatic in capital defense literature that "it is much easier to kill a sack of cement than a human being." However, with 1500 people presently on death row, it seems fairly easy for a jury to kill a human being, too.

The problem with planning mitigation as a compilation of a mass of good deeds that far outweigh the one incident of aberrant behavior is that most people facing the death penalty are not choir boys with paper routes who took care of their mothers, obeyed their fathers, and placed flags on graves on Memorial Day. There is, of course, the rare client who has previously

lead an exemplary life, but even evidence that the murder was truly an aberration is not always enough to overcome the facts of the crime. Juries tend to wonder whether it might just not happen again. Painting a picture of the client's good deeds generally is impossible; even if possible, it is usually insufficient to overcome the jurors' revulsion over the facts of the crime.

The realities of mitigation are that jurors can kill human beings *and* choir boys when they cannot identify with the client and when they cannot understand why the crime occurred. Jurors need to identify with the client as a human being, if not as a social entity. They need to be able to identify with, or at least appreciate, the feelings and motivations that led up to the killing.

To mitigate a death sentence, the attorney must prove his client is not evil (or at least that he was not born evil). The facts of the crime and the arguments of the prosecutor at the guilt phase will cause this knee-jerk conclusion of the jury unless a credible explanation is given to explain the client's actions. Many prosecutors argue, and apparently believe, that some people are just born evil and that their whole lives have been a calculated plan to arrive at this one incident. Much of the prosecutor's case may be devoted to showing this evil and eliciting other opinions about this evilness. Defense counsel in mitigation must overcome this archaic notion of inherent evil and explain to the jury about the life of the defendant and the forces that shaped him into the person who could have taken the life of another. It is important to remember that the taking of another human life is beyond the conception of most jurors (except, of course, in the context of capital punishment). Jurors are likely to "buy" the

Capital Cases ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

inherent evil argument solely because they cannot conceive of ever taking another human life. Thus, an explanation of the crime and the life events leading up to it is essential to giving the jurors some insight into how this could have happened.

---

*In mitigation, it is the defense attorney who must gather and present the evidence and who must affirmatively prove the case.*

---

Prosecutors get a lot of mileage out of the "inherent evil" argument. It is always surprising to hear college-educated men and women arguing that evil people are never sorry, they never show remorse, they can never be rehabilitated, and they are likely to commit the same crime again if not executed. Nevertheless, this is an attractive, simplistic argument that jurors will accept if the defense team does not offer any equally acceptable explanation.

### The Roles of Defense Counsel
#### The Go-Forward Advocate

A second axiom of the literature on death penalty defense is "Death is Different." Among the myriad reasons why this is true is the role that defense counsel must play in a capital case—especially in mitigation. It is defense counsel's role to go forward in mitigation with evidence to convince the jury not to kill the client.[1] This is an affirmative obligation to present evidence—to go forward. Criminal defense attorneys are more accustomed to reacting to what the state does, reacting to evidence the state presents, reacting to theories the state has.

---

1.  This article is written from the perspective of the laws of Ohio. Under the Ohio statutes, aggravating circumstances are proven at the guilt phase. Thus, the penalty phase deals solely with the presentation of mitigation and rebuttal to that mitigation. Aggravating circumstances are not reproven at the penalty phase. Nevertheless, in other states defense counsel still has the obligation of proving that his client does not deserve to die.

In mitigation, it is the defense attorney who must gather and present the evidence, who must create and present the theories of mitigation, who must explain his client's life and actions, and who must affirmatively prove the case for life.

This is often an unusual role for defense attorneys. Investigating, theorizing, and presenting an affirmative case for life is something that most attorneys are neither trained to do nor particularly well-suited to do. Criminal defense attorneys are generally lacking in the experience of "going forward." The prosecutor normally has the burden to prove things in a criminal case. The defense attorney generally operates in reaction to moves of the prosecutor.

Not only are criminal defense attorneys placed in a different posture in mitigation, they are faced with a field of expertise in which they have little or no training. Mitigation involves fields of expertise that are not part of the law school curriculum. There is also virtually no equivalent in most attorneys' experiences. In law school and general criminal law experience, the important factors to worry about are the subtleties of the law, the courtroom skills of direct and cross-examination, and the art of persuading the jury that the client was not there. These are also important in capital litigation.

#### The Team Player

What attorneys are not trained in, however, and generally have no experience in, is dealing with the psycho-social problems of their clients and explaining these to the jury. Because of this, it is necessary for attorneys in capital cases to recognize at the beginning that they do not have the skills to accomplish the goals of mitigation and to go out and seek the assistance of psycho-social professionals who are skilled in these fields. For all practical purposes, the effective use of social workers, psychologists, and psychiatrists is necessary for the effective representation of a capitally-charged defendant. Attorneys went to law school, whereas psychologists and psychiatrists and social workers spent an equal number of years specifically studying personal, family, and group dynamics. The ideal approach to capital litigation is a team of professionals including, at least, the attorneys, a criminal

investigator, a social investigator, a psychological expert, and the client.

Sucessful mitigation is a blame-shifting procedure where the jury is presented with evidence to demonstrate that the defendant was not born evil, but rather was the product of up-bringing, social environment, and physical and mental limitations. These are the kind of factors that are not totally subject to individual free-will and choice. Blame-shifting is a technique of evidence presentation and organization rather than a specific topic for argument; it is a counter to the prosecutor's argument of inherent "evil" that at the same time explains how the defendant found himself in a situation to take a life. Excuses and defenses are proper for the guilt phase; *explanations* control the mitigation phase.

---

*It is necessary for attorneys in capital cases to seek the assistance of psycho-social professionals.*

---

Criminal attorneys are very comfortable attributing a client's behavior to his bad upbringing, depressed social environment, or substance abuse, because, from experience, there is a general feeling that these conditions do, indeed, contribute to shaping people. Juries, however, do not have the same experiences. To simply allege these conditions as explanatory factors does not *prove* anything. The jury must be told *how and why* these forces helped create this person who killed another. This is why psychologists and social workers are invaluable to the presentation of capital mitigation. Friends, family members, neighbors, teachers, prison personnel, etc., can testify to *facts*, but cannot render *opinions* as to how the family background, life experiences, physical and psychological conditions bear on the creation of the person whose life or death is to be decided.

### The Team Roles
#### The Social History

Upon appointment to a capital case, two concurrent investigations should be begun by separate and distinct investigatory per-

sonnel. The criminal investigation is self-explanatory. A social investigation or social history is a creature of capital litigation, however, and is a key to a successful mitigation. A social history is a complete chronicle of every event of any significance in the life of the client from birth, or even before, to the present.[2] The two investigations clearly overlap in many areas and many attorneys use the same investigators to do both the criminal and social investigations. The important distinction is that the social investigation has a separate goal: a detailed history of the client to assist a psychological expert and the rest of the defense team in understanding the client so that his actions can be explained to the jury. Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny.

A complete social history is necessary for psychological experts to gain a full understanding of the patient. In the criminal defense field (especially with indigent representation), however, evaluations are generally done solely for competency and insanity and are done on a lowest-bidder basis. The use of a social history helps prevent the familiar prosecutorial refrain during cross-examination of defense psychologists: "Doctor, isn't it a fact that all the information on the background of this defendant you received from his own mouth...?" A complete and professional social history is a necessity if psychological or psychiatric testimony is contemplated by the defense; this is true not only for mitigation, but any phase of any criminal trial.

The ability to conduct a social investigation and prepare a social history is a skill that is often possessed by people who have had training in clinical social work. This is not exclusive, however. Psychologists also often possess these skills, but the cost factor of having psychologists do this kind of "legwork" is generally prohibitive. Social workers are generally trained in the

interviewing process and possess the necessary skills to bring out often painful memories about the client's life from the client himself and from his family, friends, and acquaintances.

Sometimes people with little or no prior training or experience in this type of interviewing turn out to possess excellent interviewing and report writing skills. The important point is that it is essential to a successful mitigation that all of the significant events of the client's life are identified

---

*Some type of psychological expert should be made part of the defense team.*

---

and a complete and accurate picture of the client's life is drawn. Armed with this, the defense team can explain the client's life to the jury and show what forces shaped the client into the person who committed this crime.

### The Psychological Expert

The psychological expert is also a keystone to a successful mitigation presentation to a jury. This is true not only where there is an attempt to show a recognized mental disease or defect, but also where lay witnesses have testified about the client's background and developmental history. The psychologist's explanation of the client's development is evidence, not merely argument of counsel.

Traditionally, psychological experts are used in criminal cases to show that the client is, or was, suffering from some mental disease or defect and that he either is incapable of assisting in his own defense, or was insane at the time the crime was committed. Attorneys sometimes conclude after meeting their clients and doing a brief social history that the client is not "crazy" and there is no reason to look into the use of a psychological expert. In virtually every capital case, some type of psychological expert should be made part of the defense team. The fact that it is increasingly difficult to win an insanity case should tell defense attorneys that it is going to be increasingly difficult for juries to be able to return life verdicts based on

the defendant's mental status or diminished capacity. This does not mean, however, that the use of psychological experts should be ignored. It means that the use of these experts needs to be expanded and refined.

The traditional use of psychological experts in mitigation has been similar to the use of psychological experts in insanity proceedings, *i.e.*, to have a battery of tests performed on the client; to have the psychological expert diagnose the disease or defect (or lack thereof); and to have the expert give his or her opinion on whether this affected the client's ability to control behavior. While there are many cases where there is a valid mental disease or defect and it does affect the defendant's behavior, it is difficult in the post-*Hinkley* era to win on this issue. In a far greater number of cases, this traditional approval will result in either a questionable diagnosis of a disease or defect, an opinion that it did not affect the client's behavior, or an opinion that the client is a sociopath. In all such instances, the presentation of this testimony in mitigation is more likely to result in a death verdict than a life verdict.

The use of a psychologist by the defense team goes beyond testing and diagnosis and the giving of opinions at trial. The psychologist is a valuable resource to the defense team. Not only can the psychol-

---

2. For further discussion of this, see Blum, *Investigation in a Capital Case: Telling the Client's Story*, THE CHAMPION, August 1985, at 27; Alfonso & Baur, *Capital Cases—Enhancing Capital Defense: the Role of the Forensic Social Worker*, THE CHAMPION, June 1986, at 26.

---

## JURY SELECTION
### Sciences

- Profiles
- Voir Dire Questions
- Surveys
- Consultation

*Excellent References*

P.O. Box 556
E. Sandwich, Mass. 02537
(617) 428-8537

## Capital Cases

ogist provide the necessary expertise to determine if there is a mental disorder or defect and some analysis of its chances of success, but also can lead the defense team to other possible areas of inquiry (such as organic brain damage or post-traumatic stress disorder) and to various specialists who can possibly assist the defense team in preparing for mitigation. Many of these areas may be totally out of the realm of knowledge of the attorney.

If the psychologist sees some type of real mental disease or disorder and is of the opinion that it definitely affected the client's behavior (i.e., insanity or some type of diminished capacity), then the defense team may want to consider pursuing the more traditional psychological defense for mitigation. At that point, it may well be best to bring in another professional, perhaps a psychiatrist, to buttress the opinions of the psychologist.

If the tests and interviews reveal no serious mental disease or defect, then the defense team needs to look to the social history for clues to explaining the client's behavior. A psychologist, in conjunction with the social investigator, can often develop a theory from the social history to explain the client's lack of control or the situation at the time of the crime. Unless one accepts the theory of inherent evil, most cases will reveal an explanation for the client's personality and actions. In some cases this explanation will not be sufficient to mitigate the crime for the jury. Without the explanation, however, the jury will not comprehend the crime, and the reaction will be to kill the client.

---

### *Without the explanation, however, the jury will not comprehend the crime.*

---

Explaining the client's life, personality, and involvement in the crime goes beyond the diagnosis of a personality disorder to discover and show to the jury why this client acts the way s/he does—how all of the factors of his or her life added up to create the person who, at the time of the crime, could commit such a heinous act. There is more to the explanation than presenting evidence of a "bad childhood,"

sexual abuse, or unstable family relationships. Many jurors' reactions to such evidence is that a great number of people (often including themselves) have suffered through "bad childhoods" and do not go around killing people. What is needed in mitigation is, after all of the direct testimony from family, friends, school teachers, acquaintances, juvenile authorities, prison officials, medical personnel, and anyone else who had significant contact with the client, the testimony of a psychological expert who can interpret all of these varying factors and tell the jury how all of the myriad factors in the client's life gathered together to form the person who committed this murder. Without this focus, the jury is left to speculate on why any of these individual factors make any difference in whether death is the appropriate punishment.

The use of a psychological expert this way gives the defense team essentially two opportunities for closing argument; one, through the testimony of the expert, and two, through a repetition of the explanation in the attorney's closing argument. If an expert is unavailable, the attorney must make the same explanation in closing argument. If there is an expert available, having the explanation in testimony and reinforced by argument strengthens the presentation to the jury dramatically.

Once the psychological expert has been made part of the defense team, preferrably very early on in the proceedings, defense counsel must work closely with him or her throughout, not only to gain as much possible insight into the client and how to present the case, but also to prepare the expert for testimony. Serious preparation for expert testimony is always essential. In mitigation, the client's life may depend on it. All defense attorneys have been in courtrooms where the dialogue between counsel and the expert on the stand is punctuated with five syllable words and is totally unintelligible to the jury. If a jury is going to believe an explanation of a defendant's life so that it will not return a death verdict, it must first understand the explanation. Perhaps more in mitigation than anywhere else, clear, simple, understandable language is essential to bringing across the explanation. Testimony that sounds like a doctoral dissertation is clearly out of place when explaining a client's life history. This will help to meet the first goal

of mitigation—humanizing the client rather than making him/her sound like a page out of textbook.

The expert's testimony is the glue that cements all the factors of the defendant's

---

### *The use of social workers and psychologists as part of the defense team is a necessity—not a luxury.*

---

life into one cohesive picture; the explanation of how accident of birth, injury, family and environmental background, accident, chance, disease, or substance abuse put him/her in a position to commit the murder on the day in question. These are not defenses, they are the identification and explanation of the factors beyond the client's control that may give the jury a reason to keep the client alive. The psychologist will be able to explain how the many significant life factors placed the defendant in a position to intentionally kill another. This explanation hopefully, at the same time, shifts moral blame to external sources and counteracts the prosecutor's inevitable argument of "evil."

### Conclusion

In death penalty defense, an attorney must treat each case as the most important, possibly last, case s/he may ever handle, and use the most sophisticated tools available. Public opinion in favor of the death penalty is continuing to grow. There appears to be no sign that this trend is going to reverse itself in the near future. Therefore, it is unreasonable, as a criminal defense bar, to expect *Furman-* or *Lockett-* type decisions. The capital defense attorney must recognize that the profession demands a higher standard of practice in capital cases than that required by *Strickland v. Washington*. The use of social workers and psychologists as part of the defense team for mitigation in a capital case is a necessity—not a luxury. Before the courts and legislatures recognize this fact, the practicing defense attorney must recognize this and demand their assistance as a necessity to effective representation.