**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| MARVIN CHARLES GABRION II, | ) 1:15-CV-00447 |
| | ) 1:99-CR-76 |
| Movant, | ) Capital §2255 Proceedings |
| | ) Hon. Robert J. Jonker |
| v. | ) Chief U.S. District Judge |
| | ) |
| UNITED STATES OF AMERICA, | ) Movant incarcerated at: |
| | ) USP Terre Haute |
| Respondent. | ) Reg. No. 09184-055 |

**MARVIN GABRION'S REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO MOVANT'S AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCE**

**INTRODUCTION**

Mr. Gabrion has moved the Court to vacate the judgment of guilt entered against him, vacate the death sentence and/or grant him a new trial. The government has responded to Mr. Gabrion's Amended Motion, arguing both procedural defenses and substantive points. Although each of the points presented merits relief, the claims discussing the use of false testimony, evidence of future dangerousness, the failure to prepare a proper mitigation case and the failure to deal with competency issues, are not refuted in any meaningful way and drive the motion. The government's argument that the seriousness of the crime should preclude the requested relief is facile. Section 2255 relief is granted in equally or more serious cases and this motion requires that the Court give statutory deference to the facts pled here. At a minimum, discovery and a hearing are warranted on the claims that Mr. Gabrion presents. (See: *MacLloyd v. United States*, No. 14-2555, (6th Cir., 4-4-17)).

## GROUND ONE

**A.    *The government has failed to refute Mr. Gabrion's claim that Chrystal Roach lied to the jury about material issues of fact.***

The government incorrectly argues that this case is ready for decision in the government's favor on the pleadings.  This argument is based on repeated speculation about the meaning of facts that are properly pled by Mr. Gabrion and that support his claims.  For example, the evidence presented to the Court regarding Chrystal Roach's false testimony provides a basis for both guilt and penalty phase relief.  At a minimum, contested facts exist requiring an evidentiary hearing and expansion of the record.  Mr. Gabrion has met his "light" burden in establishing that a hearing is necessary.  *MacLloyd*, *supra*, at 11. The government has failed to meet its heavy burden of establishing that case records "conclusively show" that relief is inappropriate. *Id*.

28 U.S.C. § 2255(b) requires that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). The Supreme Court has recognized controverted issues should not be decided without a hearing and that a hearing can be crucial to the function of § 2255. *Machibroda v. United States,* 368 U.S.  487, 494 (1962).  The Court there affirmed that a hearing must be granted unless the claims in the motion can be "conclusively determined either by the motion itself or by the ' files and records'  in the trial court." *Id.* The  *Machibroda* Court also held that a district court could neither rely on the

2

files and records of the trial court (nor the personal knowledge or recollection of the district judge in an appropriate case) where the factual allegations at issue "relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light."  *Id.* at 494-95.

The Sixth Circuit has set forth the standard for an evidentiary hearing in even stronger terms, holding that a district court may forego a hearing only where "the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" *Arrendondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Englen v. United States,* 68 F.3d 238, 240 (8th Cir. 1995)); *see also Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007). In fact, the Sixth Circuit has described "[t]he burden on the petitioner in a *habeas* case for establishing an entitlement to an evidentiary hearing [a]s relatively light." *Valentine,* 488 F.3d at 333 (quoting *Turner v. United States,* 183 F.3d 474, 477 (6th Cir. 1999)). Although "[t]he statute does not *require* a full blown evidentiary hearing in every instance[,] . . . *where there is a factual dispute, the habeas court must hold an evidentiary hearing* to determine the truth of the petitioner's claims."  *Smith  v. United States,* 348 F.3d 545, 550-51 (6th Cir. 2003) (emphasis added).

Mr. Gabrion contends that Newaygo County Prosecuting Attorney Chrystal Roach repeatedly lied to the jury about the facts supporting the most important government theory in the case: that Mr. Gabrion killed Rachel Timmerman in order to prevent her from testifying against him in a Newaygo County CSC case.  This provided motive at the guilt phase of the trial and evidence of key statutory and non-statutory

aggravating factors at sentencing.  It drove the government's venomous effort to paint

Mr. Gabrion in the worst possible light as a master manipulator of the criminal justice

system.  Now that record documents from Newaygo County have been identified for the

Court, it is indisputable that Roach repeatedly lied to the jury in order to provide a

factual basis for this theory. The government does nothing in its response to undercut

either this claim, or the evidence that supports it.

First, Roach indicated that Mr. Gabrion controlled the preliminary examination

system when she knew that he had no such control.  An accurate picture of the

examination system alone would have altered the dynamics of the case.  Next, Roach's

testimony regarding her supposed policies for conducting preliminary examinations in

assaultive cases was false.  This testimony made it appear that Mr. Gabrion somehow

thwarted the application of Roach's policy when no such thing occurred.  In addition,

Roach failed to describe what she could have done to keep Mr. Gabrion jailed pending

trial, especially after learning of his alleged threats directed toward Rachel Timmerman.

Finally, Roach's specific testimony that she sought a preliminary examination in this

case in order to move the case forward was false.

Reviewing these claims together shows that the theory that Mr. Gabrion

manipulated the court system was completely manufactured.  The government knew or

should have known that the theory was unsupported by the facts because its lead

investigator heard that same conclusion from the Honorable Kevin Drake, the state

district court judge presiding over the case when it moved through his court. Judge

Drake reviewed the docket from the case, applied his recollection, and told the

investigator that he could not say that it appeared Mr. Gabrion manipulated the court

system (Ex. 15). The jury never heard Judge Drake's opinion. If the jury had known the truth, it is likely that the outcome of the proceedings would have been different because the government's most important theory of the case would have been discredited in multiple ways.

The government responds that Roach's testimony was not false, that her discussion of certain subjects was ambiguous and that the government did not know or have reason to know that problems existed with the truthfulness of her story. In addition, the government claims that Roach's testimony was "peripheral", not material, at both phases of the trial. The government's position is contradicted by the record, Michigan law and common sense. The documents supporting Mr. Gabrion's claim, consisting of case records from his CSC case, other assaultive cases, a transcript of proceedings and a police report revealing the opinion of a state district court judge, are sufficient to support relief. If there is any doubt about the facts underlying Mr. Gabrion's claims, an evidentiary hearing is required in order to resolve the question of whether Roach lied to the jury. As Mr. Gabrion discusses later, if the Court determines that trial counsel should have identified this issue and raised in during the cross-examination of Roach, counsel was ineffective and *Strickland* prejudice occurred, again requiring at least a hearing.

### 1. Mr. Gabrion has established the importance of Roach's testimony.

The government admits that its position at trial was that, "Gabrion delayed the rape trial so that he could get access to Timmerman." (Page ID 5116). This position was supported exclusively by Roach's false testimony which was all the more compelling because she was not challenged during cross-examination regarding crucial

points.  The government's position on Mr. Gabrion's motive was especially important at the penalty phase of the trial.  The government should not be allowed to emphasize the false testimony in order to obtain a sentence of death and then dismiss it as a minor factor in the case – such a claim is not supported by the record.

> **2.    *The government created a false impression about Mr. Gabrion's actions, causing extreme prejudice to him, when it refused to acknowledge that the prosecution in state court was entitled to conduct a preliminary examination from the beginning of the state court case.***

In its response, the government argues that Roach diligently tried to preserve Ms. Timmerman's testimony so that it could be used in a prosecution of Mr. Gabrion.  Roach claimed that she specifically sought a remand of proceedings in this case for a preliminary examination in order preserve Ms. Timmerman testimony.  The government fails to acknowledge that Roach could have sought a preliminary examination at any time during the state court proceedings – not just at the end when Roach claimed she became concerned about delay occurring in the case.  Beginning on January 31, 1997, when Mr. Gabrion first appeared before Judge Drake on the state court CSC charge, the prosecution had the right to preserve Ms. Timmerman's testimony whenever it wished.  The prosecution was required only to demand a preliminary examination.  The government now ignores this fact and Roach's disingenuous explanation about seeking to preserve Ms. Timmerman's testimony.

In fact, an examination was scheduled for February 4, 1997.  Ms. Timmerman was available to testify.  The prosecution could have insisted on and conducted an examination that day.  At the very least, the prosecution could have preserved Ms. Timmerman's testimony about the CSC, even if a hearing could not be completed on

that date.  Ms. Timmerman would have testified – she would undoubtedly have been the first prosecution witness - and all issues regarding the preservation of Ms. Timmerman's testimony would have ended.  Once Ms. Timmerman was cross-examined by Mr. Gabrion's counsel, her testimony would have been fully preserved under Michigan law.  The prosecution *chose* not to conduct the examination on February 4.  The jury never heard this crucial fact that the prosecutors had an opportunity to preserve Ms. Timmerman's testimony, because Roach sought to promote the narrative that Mr. Gabrion was in control of whether an examination occurred on February 4, when in fact, both sides had equal control of the situation. This fact so undermines the government's "manipulation" theory, that the government now distorts the facts in an effort to bolster Roach's testimony.

For example, the government states, "Gabrion waived his first chance at a preliminary examination, on January 30, 1997."  (Page ID 5116).  The government fails to acknowledge that the prosecution waived its right to an examination at the same time.  The government admits that Roach testified that the case then "languished" in circuit court.  But the government leaves out that Roach could have demanded an examination at any time during that period.  Despite rampant speculation in its response, the government offers no explanation why Roach did not take Timmerman's testimony on February 4 or thereafter.  Roach's deception was more extensive, and the government fails to acknowledge that the prosecution did not oppose bail for Mr. Gabrion and did not claim any bond violations based on the alleged threats by Mr. Gabrion toward Timmerman.

The government neglects in its response another key aspect of Mr. Gabrion's claim:  Roach could have requested a trial date at any point.  She did not.  Having failed to promptly pursue a trial, she was forced to falsify her testimony to the jury to avoid her responsibility for the remand.  She sought to take advantage of the remand that she had not requested by indicating that it was her idea.  A better idea to expedite the case would have been to set a trial date to move the case to conclusion.  If Roach was concerned about Ms. Timmerman's safety in the interim, she could have sought Mr. Gabrion's detention pending trial.

The state court record is uncontrovertable, and Mr. Gabrion is entitled to relief based on it.  At a minimum, this issue should be the subject of an evidentiary hearing so that these facts, apparently controverted by the government despite the lack of record evidence, may be developed further, and the credibility of witness evaluated, by the Court.

### 3.  *Roach lied about her policy to request preliminary examinations in assaultive cases.*

Mr. Gabrion has attached documents from 310 cases covering the time period from the alleged CSC case and extending through the time Roach testified in this case showing that Chrystal Roach's office did not conduct preliminary exams in assaultive cases.  The government criticizes the claim because one docket sheet in the 310 total is for the charge of carrying a concealed weapon (Page ID 5117) and other assaultive charges, which are "not the type [Roach] likely had in mind."  (Page ID 5117).

The government argues that Roach "might" have been referring to CSC cases. There is nothing ambiguous in Roach's testimony about the type of cases involved – she identified "assaultive cases."  The government is not entitled at this point to argue

what she might have meant that was different than what she said. The jury certainly acted based on Roach's clear and unambiguous testimony. The jury saw a prosecutor who painted herself as being dedicated to protecting all victims of assaultive conduct, including Rachel Timmerman. Mr. Gabrion has proved that the picture is untrue. Regardless, Roach did not request exams in CSC cases.

The government claims that some of the docket entries in the 310 relevant cases are ambiguous regarding which side of the case requested an examination. However, the example used: "per request of *dfndt atty"* is not ambiguous. (Page ID 5118). If there is any ambiguity, then an evidentiary hearing is required so that the Court will have a full understanding about what the notation "*dfndt atty"* means in Newaygo County. More important, an evidentiary hearing is appropriate in order allow the Court to resolve the larger question of whether Roach lied about her alleged "policy" regarding examinations in assaultive cases.

### 4. *Roach compounded the impact of her lie about her examination "policy" when she falsely testified that she specifically requested a preliminary examination in this case.*

The government admits that Roach testified that, eventually, "she requested" a remand to the district court for a preliminary examination. The transcript of proceedings shows the opposite, and the government's attempt to cloud the facts fails.

On March 25, 1997, after the prosecution waived a preliminary exam, Joel Townsend filed an appearance in circuit court on behalf of Mr. Gabrion. The circuit court set a pretrial conference for April 21, 1997. The prosecution did not request the circuit court to set a pretrial hearing. The prosecution did not do anything to move the case forward. Rather, the court scheduled the conference and provided notice to both

parties.  In fact, the Docket Sheet indicates that the prosecuting attorney's office asked the court to adjourn the conference and it was re-scheduled for April 29, 1997.

On April 29, 1997, Mr. Gabrion appeared for the adjourned pretrial conference along with his attorney, Joel Townsend.  It is unclear who appeared on behalf of the prosecution – it is not even clear whether it was Roach.  The parties appeared on the record.  Mr. Townsend indicated that he wished to have the cause remanded to the district court for a preliminary examination.  The prosecution did not object to this request, did not move for a remand to the district court and did not join in the defense motion, which was granted.  (Page ID 1031).   Based solely on the defense motion, the matter was remanded to the district court.  Neither Roach nor anyone else from her office took any step to cause a preliminary exam to occur.

The government now argues that it is unclear what happened at the pretrial conference.  This claim has no support in the record of proceedings in Newaygo County.  The only reasonable conclusion to be drawn from the record is that the defense alone requested an examination (and the prosecution never made such a request).   Roach's contrary testimony was a lie and its impact on the jury was crucial.

### 5.    *The government repeatedly took advantage of Roach's false testimony in its presentation to the jury at both the guilt and penalty phases.*

The government described to the jury its theory of the case during the guilt phase, telling them that Mr. Gabrion killed Rachel Timmerman "to keep her from testifying in the upcoming rape trial."  (TR 929).  In closing argument at the guilt phase of the trial, the government described in detail how Mr. Gabrion alone prevented a preliminary examination.  The government said, "and instead of having a preliminary

examination, which is when Rachel Timmerman would have had her side of the story placed under oath, instead of doing that, the defendant waived that and it went over to circuit court." The government went on to argue that Mr. Gabrion caused the case to "flip flop" between circuit court and district court in order prevent the prosecution from getting Rachel Timmerman's testimony about the alleged sexual assault under oath. The government admitted that having the testimony under oath was crucial because, as Roach testified, "I could have used that testimony even if she never appeared again." (TR 1682).

Mr. Gabrion's alleged manipulation of the state case was critical to the government's penalty phase theory because it showed the statutory aggravator of substantial planning and the nonstatutory aggravator of obstruction of justice. The government advanced the manipulation argument despite the fact that its lead investigator had interviewed Judge Kevin Drake, who reviewed court records and said that he could not say that Mr. Gabrion manipulated the preliminary examination system. In its closing argument at the penalty phase, the government specifically addressed evidence supporting the aggravating factor that Mr. Gabrion committed obstruction of justice. It argued, "He waited, he maneuvered around through the Newaygo County court justice system to keep her from testifying, biding his time until she was out so she wouldn't testify, he wouldn't be on the hook for this crime." (TR 609) The government continued – "It's an assault on our system of criminal justice, because he never faced justice on that criminal sexual assault charge. He successfully carried out that plan. That aggravating factor has been proven beyond any doubt." (TR 607-08).

11

The government contended the preliminary examination timing concerning the

rape case was paramount in this scheme:

> Remember, [Roach] said had Rachel Timmerman testified in the preliminary examination, I could have used that testimony even if she never appeared again.  She wasn't able to do that.  That's why the defendant was doing all this with his rape case.  He was trying to delay things until Rachel Timmerman got out May 5, 1997, and he succeeded in doing that. But by May and June of 1997 he'd run out of options.  He was going to have his trial in or after June of 1997.  There was nothing else that was going to stop it.
>
> So Rachel Timmerman gets out May 5, 1997.  She lives with her father, Tim Timmerman, up until the time she disappears June 3rd, 1997.  So she was out less than a month before she disappeared.

(TR 1682; emphasis added).

Over and over, at every opportunity, the government hammered this false theory

of manipulation.  The impact on the jury was obvious.  The resulting miscarriage of

justice is equally obvious, as the government persists in relying on the false theory to

execute Mr. Gabrion.

### 6.    *Mr. Gabrion has established that Roach's testimony was "indisputably false" based on both transcript references and other court-generated documents.*

Based on extensive speculation about the underlying facts in the state court

case, the government disputes the claim that Chrystal Roach told the jury numerous

lies.  However, in identifying these lies, Mr. Gabrion has shown that her testimony was

"indisputably false."

Roach gave clear testimony on a number of key points.  First, she said that she

felt "strongly that in cases involving assault, that prelims should occur prior to trial" and

that she had "tried to do it every time" (TR 1175).  The government argues that it is

unclear what Roach really meant in this testimony – that she might have been talking about all assaultive cases and she might have been talking only about CSC cases.

This argument has no evidentiary support.  Roach's words were clear and should not be undone by argument.  The facts here directly contradict the government's response. But even if Roach meant that she tried to conduct examinations in CSC cases, her testimony was a lie.  No examinations were conducted in those cases, either.

The government incorrectly argues that a preliminary examination in Michigan is primarily for the benefit of a defendant.  Both Mr. Gabrion and the prosecution had the right to a preliminary examination pursuant to MCR 6.110(A).  The government claims that the purpose of the examination was to determine whether probable cause existed to believe: (1) that a crime occurred, and (2) that Mr. Gabrion committed that crime. There are important reasons, however, why the rule grants prosecutors the right to conduct preliminary examinations, as well.  Such proceedings allow the prosecution to preserve testimony in case a witness becomes unavailable later.  In addition, if the evidence presented at a preliminary examination establishes that other crimes occurred, such as a more serious form of CSC, the district court has the authority to bind the defendant over to the circuit court on those more serious charges.  Any claim in this §2255 proceeding that the preliminary examination process existed primarily for Mr. Gabrion's benefit is incorrect.  If not rejected, it should be the subject of an evidentiary hearing.

As noted above, the government fails to address Mr. Gabrion's claim that other important facts show that Roach was not as concerned about the progress of the case as she claimed at trial.  At that time both sides waived the preliminary examination and

Mr. Gabrion requested a bond reduction from $50,000 to $40,000. He specifically indicated that his family could post $4,000 in cash but not $5,000.  Again, the prosecution did not object to this request, did not seek detention, did not move for a higher bond or mention to the court alleged threats by Mr. Gabrion against Ms. Timmerman.  In fact, the prosecution did not object in any way to Mr. Gabrion's request for a reduced bond.  The prosecution sat silent despite the fact that Mr. Gabrion told the court that his family would secure his release if his bond was reduced.  The district court granted Mr. Gabrion's unopposed request and reduced his bond.  The bond was posted and Mr. Gabrion was released on bond.  The standard condition of no contact with the alleged victim was included as a condition of bond.

During the pendency of the case, the prosecution never attempted to change the conditions of bond – it never indicated any concern regarding Mr. Gabrion's alleged threatening conduct.  Even when the prosecution was in court for the remand of proceedings that led to the examination scheduled for June 5, 1997, the prosecution said nothing.  According to Roach's testimony, she was concerned about the pace of the proceedings, about threats from Mr. Gabrion and about preservation of the Timmerman testimony.  Her concerns could have been alleviated if Mr. Gabrion was not on bond.  However, the prosecution did not comment on Mr. Gabrion's bond, or any condition of the bond.  The prosecution did not mention any violation of bond by Mr. Gabrion or any threat against Rachel Timmerman.  The prosecution said and did nothing to alter the progress of the case based on Mr. Gabrion's motion.  (Ex. 1.1, Page ID 1025-2027; Ex. 1.2, Page ID 1029-1031).  The prosecution found nothing unusual

14

about this process until it became advantageous to find it manipulative in the capital prosecution.

Roach failed to act in this regard despite the fact that Velda Timmerman, Rachel's mother, told the FBI that she had repeatedly called the prosecutor's office in an effort to get Mr. Gabrion "back into jail" (Ex. 16).  Velda claimed that the office told her to "write the Circuit Judge" (Ex. 16).

The government claims that Mr. Gabrion was bonded out of custody on May 30. (Page ID 5120).   Actually, he posted bond on February 3, 1997.  In fact, before this, Mr. Gabrion sought a reduction in bond that Chrystal Roach's office did not oppose.

### 7. *The factual posture of this claim is unique based on Roach's tenure as a Special Assistant United States Attorney and the failure to grant relief would result in a miscarriage of justice.*

The government argues that consideration of this claim is barred because Mr. Gabrion did not raise it at trial or on direct appeal.  But this claim is based on a unique set of facts that undermines the government's position.  Roach was appointed as a Special Assistant United States Attorney in this case until she was dismissed because of acts of misconduct in this case.  She was involved in the case long enough to assist in the presentation of evidence to the grand jury.  In fact, she was present when Sergeant Miller gave false and misleading testimony to the grand jury about the preliminary examination system in Newaygo County.  Roach did not correct the testimony. (Page ID 1317-18).  Roach knew that the government considered the "manipulation" theory to be crucial.

The key to this claim is the irrefutable fact that Roach lied to the jury about this crucial issue and that the government knew that her testimony was false.  In light of the

15

government's knowledge about the situation, there is no procedural default here because the record should be expanded if the Court does not grant the requested relief. It should be noted that these facts are alternatively pled as support for an ineffective assistance of counsel claim at both the guilt and penalty phases of the trial.  An evidentiary hearing is required in order to allow the Court to consider the merits of these claims.

**B.      *The government's attempt to undermine the credibility of its agents in evaluating the handwriting from the alleged Timmerman letters creates, at best, a controverted issue of fact.  Again, the government's speculation about what certain uncontroverted evidence actually meant should be rejected.***

Mr. Gabrion has challenged in his Amended Motion the manner in which the government handled the report from its experts regarding Mr. Gabrion's alleged coercion of Rachel Timmerman to write letters and whether she was under extreme duress when the letters were written. (Page ID 3909).

This component of the government's case, if true, was devastating to Mr. Gabrion.  The letters provided evidence advancing the government's primary theme: that Mr. Gabrion killed Ms. Timmerman to prevent her testimony in the Newaygo County CSC case.  Once the letter to the Newaygo County prosecutor was received, the prosecution did, in fact, dismiss the CSC case against Mr. Gabrion.  His bond was returned in full.  According to the government's theory of the case, Mr. Gabrion's plan was then complete.  The government was explicit, arguing the "letters in Rachel Timmerman's handwriting show you all by themselves that the defendant killed Rachel Timmerman" (TR 1687).  The government went on, "[t]he fact she followed the script

that the defendant gave her of what happened on the rape shows you that he had her in his clutches" (TR 1687).

Mr. Gabrion has demonstrated that the government's position, as presented to the jury, was false because it was undermined by a report prepared by the government's experts. On or before December 19, 1997, a series of letters was presented to CASKU SSA Steven T. Kives. Agent Kives did various things with the letters. He met with two examiners, SSA Sue Adams and SSA Chris Whitcomb. The examiners considered all of the letters that Kives gave them. The examiners determined that four (4) letters were "written in Rachel Timmerman's hand[.]" The letters "contained the same sentence structure, consistency and thought processes throughout the writings." Ex. 1.8, Page ID 1332. The structure was very different than letters allegedly written by Mr. Gabrion. The examiners "further opined that Timmerman was probably not under extreme duress when she penned the letters and GABRION probably did not dictate the letters to her." (*Id.*) The Kives report also discusses communications between Tim Timmerman and a person believed to be Mr. Gabrion. Certain strategy was discussed for future communications between the men.

The distinction between the government's position at trial and crucial portions of the FBI report is dramatic. The government accused Mr. Gabrion of forcing Ms. Timmerman to write the letters and of telling her what to write. The language contained in the Kives report demonstrates the inaccuracy in the government's theory at trial.

> The examiners opined that the total of four letters written in Rachel Timmerman's hand contained the same sentence structure, consistency and thought processes throughout the writings. They were markedly different from the letters allegedly written by GABRION which lack any type of consistency as he appears to reduce to paper anything that

17

comes in to mind and there appears to be no rhyme or
reason for when he says anything.  The examiners further
opined that Timmerman was probably not under extreme
duress when she penned the letters and GABRION probably
did not dictate the letters to her.  Ex. 1.8., Page ID 1332.

The government intentionally created the impression that Mr. Gabrion controlled every aspect of what Rachel Timmerman did in writing four (4) letters.  The inferences to be drawn from the government's theory were ominous and incredibly damaging to Mr. Gabrion's position.  The government now justifies its conduct at trial by arguing that . additional evidence showed that Mr. Gabrion was responsible for the letters.  (Page ID 5125).  This does not alter the question of whether Mr. Gabrion received a fair trial and a fair sentencing hearing where the government left a false impression that was contradicted by government experts. That impression was never corrected and Mr. Gabrion was sentenced to death by a jury that never knew that trained government analysts who had conducted a forensic analysis of the evidence held an opinion contradicting the government theory.  At a minimum, the claim presents a disputed issue of fact that should be the subject of discovery and an evidentiary hearing.

**C.**    ***The government's attempts to undermine the information provided that Ms. Timmerman was seen in the area after June 3rd is based on speculation and, at best, establish the existence of a controverted fact.***

Mr. Gabrion's Amended Motion specifically attacks the government's trial theory that Ms. Timmerman was lured from her home on June 3, 1997 by a man named John who had asked her out on a date and asked her to bring her daughter, Shannon, because he was interested in her and liked children.  (Page ID 3912).  The government also took the position that other than perhaps being seen in the company of Mr. Gabrion

18

in a truck near Oxford Lake, Ms. Timmerman was never seen alive after she left her father's home on June 3rd.

The government claims both that there is no credible evidence that Ms. Timmerman was seen after June 3rd and that Mr. Gabrion's claim should be rejected outright.  (Page ID 5127-5130).  This argument ignores controverted facts which should be the subject of an evidentiary hearing.  Essentially, the government seeks a credibility determination from this Court regarding the many witnesses who support the defense theory.  (Page ID 5128).

Contrary to the government's argument, many friends and acquaintances of Ms. Timmerman saw her in the area after June 3rd.  Det. Miller testified to the grand jury that "we have other people that have told us that they have seen her later on that same day and possibly have seen her a day or two later…."  Ex. 1.13, Page ID 1384-1386.  See, for example, news article in which Tim Timmerman says that "Rachel left here on June 3 and she was seen, in town, on the fourth."  Ex. 1.14, Page ID 1388-1389.  But that information was never conveyed to the jury.

The government challenges the information provided by Tina Kanady and Roxanne Vanslyke.  Vanslyke was acquainted with Ms. Timmerman.  On the evening of June 3rd  (hours after she supposedly left home with "John"), Ms. Timmerman came by the trailer where Kanady was staying and Vanslyke was apparently visiting and invited them to a party at Pig's Point.  Timmerman told them that she was going to the party. See: Ex. 1.15, Page ID 1391-1394, grand jury excerpt of Kanady; Ex. 1.16, Page ID 1396-1433 grand jury testimony of Vanslyke;  Ex. 1.17, Page ID 1435-1437 Vanslyke

19

302.   Kanady testified that she did not go because she did not have a babysitter for her son, who often played with Shannon VerHage when Rachel and Shannon visited.

Other people who may have seen Ms. Timmerman on and after June 3rd, include Danny Holmes (Ex. 1.18, Page ID 1439-1443 and Ex. 1.19, Page ID 1445-1461) and Teresa Start (Ex. 1.20, Page ID 1463-1477), among others.  This evidence was not presented to the jury.

This is not simply some mistake by a few people.  The initial FBI field memos said that when Ms. Timmerman left home she told others that she would be gone for a few days and took a change of clothes.   See Ex. 1.21, Page ID 1479-1484. It is undisputed that when Ms. Timmerman's body was found on July 5, she was wearing different clothes than what she was wearing when she left home on June 3rd.

The last people to see Ms. Timmerman before she left home on June 3rd were Minda Armstrong, and Susannah Schmaltz.  Ms. Timmerman's father, Tim, testified that he was home that day as well and saw her leave.  However, the girls' statements do not mention Tim being present and Ms. Timmerman's step-mother said that Tim was not home when Ms. Timmerman left.   See Ex. 1.22, Page ID 1486-1488.  Det. Miller testified to the grand jury that she was last seen by "her step-mother, her step sister, and a family friend."  Ex. 1.13, Page ID 1384-1386. That discrepancy went unexplored at trial.

Ms. Timmerman was not reported missing for several weeks, which lends some credence to the theory that she may have originally left home of her own volition.

The false impression left with the jury was that Ms. Timmerman was abducted on June 3rd, a mere two days before she was to testify in the CSC case.  This is not true;

she was seen by numerous people after that date.  This false impression allowed the government to advance its primary theme at both guilt and penalty phases – that Mr. Gabrion killed Ms. Timmerman to prevent her from testifying in the CSC case.

A number of people provided credible accounts that they had seen Ms. Timmerman around the area in the days following when the Government alleged she disappeared forever.  Similarly, Ms. Timmerman had her own motives for wanting to leave town as she was in violation of her probation and would soon have to go to a group home in Grand Rapids.

In that same vein, her family did not report her as missing for weeks and the prosecutor unquestioningly dismissed the rape case when a letter from Ms. Timmerman arrived recanting her allegations and saying she had moved.  The Government argued falsely to the jury that the letters sent by Ms. Timmerman had been coerced or dictated by Mr. Gabrion.  They did so with the full knowledge that this argument was false and that their own investigators had determined to the contrary.

A police report says that Rachel, Shannon, and Eddie Start were at Theresa Start's house in Grand Rapids at 6:00 p.m. This was after the time when Rachel and Shannon allegedly left with "John" for her date.   On June 4, 1997, the Halls saw a truck with a boat in the back.  However, this is the same day that a letter from Rachel first appears with a Cedar Springs post mark. Rachel reportedly was seen near Cedar Springs on June 4 making it unlikely she was seen by the Halls on June 4.

On June 6, 1997, a party was held at Mike Vaivada's house.  A number of people claimed to have seen Rachel there.  They include Mike Vaivada, Green, and Scheidel.

21

See Ex. 21.  On June 7, 1997, there was a party at the Burke's and people recall seeing Rachel there with Shannon.   See Ex. 18.

The evidence contradicts the government's narrative in that Mr. Gabrion was seen in and around the White Cloud area for weeks after Ms. Timmerman was supposedly last seen.  Mr. Gabrion repeatedly interacted with officials and businesses. There is nothing to suggest he was seen anywhere near Arkansas.  There are no bank receipts, gas receipts, hotel registers that put Mr. Gabrion anywhere but in the Michigan area during the month of June 1997.

On June 7 or 10, 1997, Mike Gabrion Jr., Mr. Gabrion's nephew, was released from a step program to live with Mr. Gabrion. See Ex. 22, grand jury testimony of Mike Gabrion Jr.   On June 13, 1997, Mr. Gabrion sold the Altona Property to his father, Marvin Sr., the deed is recorded in Miami County Indiana.  See Ex. 23.  As set forth above, on or about June 16, Rachel's dad received a letter from her post marked June 14 from Little Rock, Arkansas.  At around the same time, the Newaygo County prosecutor and Judge Drake, the judge on the rape case, received letters from Rachel recanting her allegations against Mr. Gabrion.   See Ex. 24, grand jury testimony of Roberta Gilligan.  On June 22, 1997, John Weeks spoke to his girlfriend and told her he is going to Texas.  See Ex. 25.

On June 25, 1997, David Knapp was camping at Toogood Lake in Newaygo County. Marvin Gabrion pulled into Knapp's campsite in a Chrysler New Yorker. Gabrion was acting "bizarre" and Knapp noticed that he had two women in the car. Due

to Gabrion's bizarre behavior, Knapp noted the license plate number. Knapp called the Newaygo County Sheriff with this information on July 9, after Ms. Timmerman's body was discovered. Ex. 3.17, Page ID 1582-1583.

The license plate reflected that the car was registered to Linda Allen. On July 13, 1997, Gabrion, as Robert Allen, sold a Chrysler New Yorker to Lester Ebright in Fort Wayne. That car was registered to Linda Allen. Ex. 3.18, Page ID 1585-1590.

Also on June 25, 1997, Mr. Gabrion executed a receipt for his bond. Page ID 1027.  On June 26, 1997, Mr. Gabrion did business at a bank in Big Rapids and made a purchase at Farm & Fleet.  See Ex. 26.   On June 27, 1997, Mr. Gabrion and his neighbor Dennis Bacon got in a fight over Mr. Bacon's mowing. The police were called. See Ex. 27.  On June 30, 1997, Mr. Gabrion went to Butterworth Hospital due to the injuries he suffered in his fight with Mr. Bacon.

On July, 1, 1997, Mr. Gabrion brought a soil sample from his property for testing into Bio Chemical.  See Ex. 28.    On the same day, he also went to an eye doctor in Grand Rapids for treatment of the injuries he suffered in the Bacon fight.  See Ex. 29. On July 4, 1997, Mr. Gabrion called Jeffery Bassett about his motorcycle.   See Ex. 30.

Much of this contradicts the government's narrative in that Mr. Gabrion was seen in and around the White Cloud area for weeks after Ms. Timmerman was supposedly last seen, in contravention of the government's claims that he was mailing letters from Arkansas allegedly authored by Ms. Timmerman.  Mr. Gabrion repeatedly interacted with officials and businesses.  There is nothing to suggest he was seen anywhere near Arkansas.  There are no bank receipts, gas receipts, hotel registers that put Mr. Gabrion anywhere but in the Michigan area during the month of June, 1997.  The overwhelming

amount of evidence contradicting the government theory regarding Ms. Timmerman's location establishes, at the very least, a controverted fact that makes discovery and an evidentiary hearing appropriate.

### D. The government has failed to show that the jury understood the extent of the BOP's ability to control Mr. Gabrion.

The question of future dangerousness loomed large at sentencing. If the government's theory of "manipulation" of the court system was the primary focus at trial, the question of future dangerousness assumed a parallel position at sentencing. (Page ID 3902). It was crucial for the jury to have a full and accurate picture of Mr. Gabrion's actual dangerousness, and the government's ability to protect against it. It is well understood that "it takes only one juror to nix a death sentence." *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000). The testimony presented here left the jury with an inaccurate understanding of this crucial situation and deprived Mr. Gabrion of a fair sentencing hearing.

Mr. Gabrion's sentence of death is based in part on the fact that the government intentionally misled the jury by disrupting the presentation of evidence about BOP authority over Mr. Gabrion. The government took this approach throughout the entire sentencing hearing, including its opening statement, the attempted testimony of a defense witness, the jury instruction process and its closing argument. The jury's finding on Mr. Gabrion's proposed mitigating factor regarding a lessened danger, which did not receive a single juror vote, demonstrates that the government was effective in presenting a false picture to the jury.

The government defends its action at trial by describing a series of bad acts allegedly committed by Mr. Gabrion. It further asserts that the Sixth Circuit has decided

24

this issue.  Neither argument defeats the Mr. Gabrion's claim.  Control of BOP inmates is governed by a series of regulations and statutes, just as it was at the time of at Mr. Gabrion's trial.  28 CFR § 501.3 was adopted in 1996, and specifically authorizes the BOP to implement special administrative procedures (SAMs) in order to protect against the risk of death or seriously bodily harm.  Section 501.3 provides, in part, that the United States Attorney General, among others, is authorized to implement SAMs relating to the incarceration of BOP inmates.  Possible SAMs include, in part, "administrative detention" and limitations on correspondence and telephone use. SAMs are utilized to control the unconstitutional behavior of some of the world's most cunning and dangerous terrorists.

Mr. Gabrion has previously shown that 28 C.F.R. § 501.3 was well-known.  The United States Attorney's Manual ("USAM") Sec. 9-24.000 is entitled "Requests for Special Confinement Conditions 28 C.F.R. § 501.3."  This Chapter of the USAM provided instruction to AUSAs regarding requests for special confinement.  Read with Section 501.3, federal prosecutors are instructed explicitly regarding SAM availability.

The prosecutors in this case were well aware of their right to request conditions of special confinement for Mr. Gabrion.  They never acknowledged this to the jury, the court or the defense.  In fact, they prevented the jury from hearing the truth regarding the availability of SAMs by objecting to defense efforts to show the jury that Mr. Gabrion would not be a serious threat to others in the BOP.

In addition, the government was aware that the district court could order restrictions on communication and association as part of a sentence pursuant to 18

U.S.C. §3582(d).  The BOP could restrict letters and calls so that people associated with this case were not harassed.

The jury in this case was entitled to know the truth about BOP security measures. The information was improperly withheld from the jury.  This undermines the validity of the death sentence in this case in violation of the 5th and 8th Amendments.

Empirical data shows that future dangerousness is likely the most significant issue for juries deciding whether or not to sentence a defendant to death.  (*United States v. Johnson*, 2010 Lexis 133727 (N.D. ILL. 2010) (Ex. 1.9, Page ID 1334-1337)). Future dangerousness was the first non-statutory aggravating factor that the government identified in this case and was unanimously found by the jury.

The government emphasized future dangerousness in its opening statement at the penalty phase.  The government used the future dangerousness non-statutory aggravating factor as its excuse to introduce significant evidence that generally painted Mr. Gabrion as a bad person.

The government presented evidence of unadjudicated bad acts, including, in part, three murders, two arsons, allegations of fondling, unseemly party behavior, stalking, weapons discharges and other irrelevant bad acts.  The government called some 55 witnesses to establish these bad acts.

The defense called Mark Cunningham to rebut the government's future dangerousness evidence.  Dr. Cunningham testified about some of the security measures that were available to the BOP in managing inmates.  Dr. Cunningham was questioned about BOP policies.  He attempted to describe the authority mentioned above.

Instead of agreeing that the jury should have an accurate picture of the BOP's authority, the government objected to testimony about policy – specifically the policy that is described in Section 501.3.  Dr. Cunningham was not allowed to testify about the details of Section 501.3, though that is a primary tool for control of difficult inmates.

The government was aware that Dr. Cunningham's description of the security measures at ADX-Florence and USP Marion were correct as far as he was allowed to testify.  A full description of such measures, if combined with the appropriate regulations and statutes, would have shown the jury that Mr. Gabrion would not be a threat to harm anyone in prison.

It was not enough for the government to hide the truth about BOP procedures. The government cross-examined Dr. Cunningham by attempting to show that he was a paid witness who was on a "mission" to prevent the death penalty in this case and other cases.  The government sought to discredit Dr. Cunningham regarding his entire testimony, claiming he was unqualified because he never worked for the BOP, when the government knew or should have known that the testimony was accurate.

Since Dr. Cunningham was not allowed to testify about the relevant BOP regulations or practices, the defense tendered an instruction that described the key provisions of Section 501.3.  This was especially important in light of the fact that the future dangerousness instruction included language telling the jury to consider "the risk that the defendant will escape from custody."  The government objected and made it clear that the conditions inside the BOP were irrelevant, arguing that the jury decision was either for life or death.  The district court sustained the government's objection and the Section 501.3 instruction was not given.

The government spent more time in its penalty closing argument talking about future dangerousness than any other subject.  Defense counsel admitted during closing argument that Mr. Gabrion was dangerous.  Defense counsel described generally the fact that the BOP would control Mr. Gabrion, but provided no meaningful details.

The jury unanimously found that Mr. Gabrion would present a future danger.  The district court provided a mitigating factor for consideration, No. 12, stating, "Defendant will not be a danger in the future if he is confined in a highly structured and secure federal prison."  No juror found this mitigating factor.

Defense counsel did not provide a more detailed mitigating factor in the special verdict form, such as one saying "Any concern respecting future dangerousness is significantly reduced since the Federal BOP is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level federal prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society."  Such an instruction has been very important elsewhere.  In *United States v. Jones*, No. CR-96-458-WMN (D.Md. 2000), the defendant was convicted of ordering the murders of federal witnesses.  The following mitigating factor was submitted for consideration by the jury and accepted by seven (7) jurors:

> Any concern respecting future dangerousness of Anthony Jones is significantly reduced since the Federal Bureau of Prisons is empowered to classify a prisoner serving a life sentence without possibility of release to the highest security level prison, under conditions of confinement that eliminate any reasonable probability that the prisoner will be a continuing and serious threat to society."  *Id.* at 10-11.

The jury recommended against a death sentence for Mr. Jones.

28

Through other capital cases, Mr. Gabrion has learned that the BOP possessed information indicating that, at the time of Mr. Gabrion's trial, the BOP confined inmates in "highly restrictive conditions of confinement whenever it was necessary and for as long as the BOP determined it was necessary. *United States v. Johnson*, *supra*.

The government argues that this claim fails because it was fully considered by the Sixth Circuit on direct appeal.  Actually, the court was able to consider only part of the argument, because the government's conduct in misleading the jury as to the truth regarding BOP control over inmates, and in hiding its own authority, deprived Mr. Gabrion of a fair sentencing hearing.

**E.      *There was a pervasive pattern of government witnesses testifying in a false and/or misleading fashion.***

Linda Coleman gave crucial testimony at the guilt phase and Mr. Gabrion has demonstrated that the testimony was false. (Page ID 3920) According to Coleman, in June of 1997 she saw Mr. Gabrion and two other people at Oxford Lake in a black pick-up truck.  She testified that the truck had a boat in the back.  Coleman deposition at 9. Coleman testified that one of those people was a woman who resembled Rachel Timmerman.  Coleman deposition at 16.   The government used this testimony to argue Coleman was the last person to see Ms. Timmerman alive.  Coleman claimed to have exchanged greetings with Mr. Gabrion that day.  Deposition at 19.   Critically, she also claimed to have seen Mr. Gabrion standing along 12 Mile road which is five or six miles from Oxford Lake.   Deposition at 18.

Mr. Gabrion identified in his amended motion reasons why Coleman's testimony was false.  Specifically, he pointed out and supported with documents crucial vehicle registration information about the different vehicles Coleman identified.  The

29

government does not challenge the accuracy of the registration documents.  Rather, it responds with speculative arguments explaining possible reasons for Coleman's false statements.  This type of speculation establishes the need for an evidentiary hearing regarding the Coleman claim.  Mr. Gabrion has pled facts showing that Coleman lied and the government has failed to establish that the facts could not be true.

This is especially true in light of the fact that the government vouched for Coleman as a witness, claiming that her story had been "thoroughly investigated".  TR 1299-1300. In fact, as Mr. Gabrion has alleged, such an investigation could not have occurred because Coleman's false statement would have been immediately discovered with even a cursory investigation.

The government seeks to diminish the importance of the Coleman testimony. However, she was the most damaging government witness regarding the subject of seeing Mr. Gabrion and a woman who looked like Rachel Timmerman at Oxford Lake. False testimony from Coleman was not harmless.

Another example is seen in the testimony of Gregory Leon. The government claims that Leon's testimony was "minor".  Actually, it provided a crucial connection between specific bad acts and the time period in question.  Leon testified at the penalty phase that he and his family owned a house in Wyoming, Michigan, which opened in 1991 and closed in October 1995.  He testified to meeting Mr. Gabrion in April 1995 at an AA meeting and that thereafter Gabrion rented a room at the "Leon Christian Home." According to Leon, Mr. Gabrion remained there until October 1995, when the Leon Christian Home closed.  He claimed that Mr. Gabrion bragged of using sophisticated surveillance equipment to rip off drug dealers.  He testified that Mr. Gabrion had

30

"tapped" into a personal phone line of someone else at the house.  Leon claimed that

Mr. Gabrion had admitted to stalking a woman who worked at a nearby laundromat.

In addition to the other credibility problems with Leon set forth below, Leon

testified falsely about key issues.  Records show that the Leon Christian Home/Project

Homeless was founded in 1991 and dissolved in October 1994.  Records show that

Leon was only associated with the property through October 1994. Thus, Mr. Gabrion

could not have lived there from April to October 1995.  The government contends that it

is unclear when operations at the Leon Christian Home ceased.  Ambiguity in the facts

requires an evidentiary hearing and potential expansion of the record.  It does not

establish a basis for dismissal of the claim.

The correct facts regarding Greg Leon's situation are very disturbing.  Leon pled

guilty in 1994 to the offense of child abuse, occurring in Kent County.  He was

sentenced to a 48-month term of probation.  He remained on probation for that offense

throughout events relevant to this motion.  This was not Leon's first felony conviction.

He was convicted of felonious assault relating to an attack against a girlfriend.

Leon married Wendy Fitzgerald in 1995 and she took his surname.  Wendy had

two children, Danielle and Angela.  In 1997, a probation violation petition was filed

against Greg Leon alleging that he acted inappropriately toward Angela in a sexual

manner.  He stuck his tongue in her ear, licked her face and otherwise assaulted her.  In

March of 1997, Leon and Wendy, were separated.  Based on Leon's conduct toward

Angela, Wendy had been instructed by CPS to keep Leon away from Danielle and

Angela.  She lived in a house with her daughters.  Leon was not allowed in the house.

31

On April 1, 1997, Greg Leon broke into Wendy Leon's home and sexually assaulted her.  Wendy was forced to testify about the incident in court proceedings. She described the attack as a vicious rape.  Leon entered the house through an unlocked window.  He stuffed a rag in Wendy's mouth and had forcible intercourse with her a number of times, over an extended period.  He was so rough with her that she could not breath.  He called Wendy his "little whore" and told her he could do this any time he wanted.  He placed his hands around her neck during the attack.  Ex. 6, Page ID 4644-4698.

Wendy reported the attack to police.  Leon was arrested and charged with CSC, Third Degree, on April 11 and held in custody on a $50,000 bond.  A preliminary examination was held at Leon's request on July 3, 1997.  Wendy Leon testified and the court found evidence to support four counts of CSC 3d.  Each charge against him was punishable by a mandatory prison term of 1-15 years.  Leon was also charged as a habitual offender based on his prior felony convictions.  Upon conviction, his mandatory prison sentence could be increased.  In the meantime, on or about April 6, 1997, seeking additional protection and uncertain about whether Greg would be released, Wendy Leon and her daughters filed petitions for personal protection orders (PPO) with the Circuit Court of Newaygo County directed at Greg Leon.  PPO's were granted. Leon did not post bond and remained in custody in Newaygo County.

On November 17, 1997, Leon was released pursuant to Michigan law because prosecutor Chrystal Roach failed to bring him to trial within a period of 180 days. Wendy Leon was present when the court ordered Greg Leon's release.  She vigorously objected, as did the prosecutor.  Wendy stated in open court, "[h]e is a danger to every

32

woman and child in this state."  After Leon's release was granted, Wendy said, "[y]ou just signed somebody's death certificate…[.]" Ex. 6, Page ID 4644-4698.

One week later, Leon voluntarily appeared at FBI offices and talked with Roberta Gilligan.  The Gabrion grand jury was active, gathering evidence.

Time passed and Leon continued to have contact with law enforcement regarding Mr. Gabrion.  Eventually, on July 16, 1998, Leon pled guilty in Newaygo County to a reduced charge of aggravated stalking, an offense with no mandatory prison sentence.  He was sentenced on October 19, 1998 to "time served", 223 days. Wendy Leon appeared at the sentencing hearing and objected to the sentence imposed.

In the meantime, Leon's probation officer in Kent County reported that Leon had completed all conditions of probation on the 1993 Child Abuse charge and Leon was discharged from probation. Ex. 6, Page ID 4644-4698.  Kent County could have, but did not, seek violation of probation based upon the new rape charges involving Wendy.

The undisputed facts show that Leon quickly went from facing a long prison term for a brutal rape to a "time served" plea agreement that was undoubtedly connected to his willingness to testify against Mr. Gabrion, but only after he visited the FBI and cooperated in the present investigation.  This arrangement was not disclosed to the defense so that Leon could be investigated and confronted with these damaging facts. Rather, the government took full advantage of Leon's testimony about Mr. Gabrion.

Nathan Brewster also gave false testimony at trial.  He was housed with Mr. Gabrion in a "supermax" section of the Calhoun County Jail.  He was interviewed by law enforcement after he was no longer housed with Mr. Gabrion.  The government

33

promised him that they would help him get the services of a private investigator to help with his own case if he would testify against Mr. Gabrion. (Ex. 17). There is no indication that this was disclosed to the defense. Brewster gave false testimony about his own criminal record. He also lied when he said that Mr. Gabrion threatened guards. He testified the guards did not provoke Mr. Gabrion, but this was not true. Guards constantly harassed and provoked Mr. Gabrion. He told law enforcement personnel the truth about this when he was interviewed just before trial. They told him not to go into it. (Ex. 17).

The government argues that this claim is not true, but Brewster's declaration refutes that claim. (Ex. 17). The government also argues that the Brewster lies should not be added to the other claims regarding false testimony. However, Mr. Gabrion has diligently gathered information about the false information provided to the jury and has included it in his pleading at the first available opportunity.

Brewster testified falsely about his criminal record. He indicated he had been convicted of "felony murder, criminal sexual conduct in the first degree, and an arson of a dwelling." (TR 349). In fact, as the government knew, Brewster had also been convicted of "escape awaiting trial on a felony, assault with a dangerous weapon, delivery or manufacture of marijuana and unlawfully driving away an automobile." (Ex. 14, Page ID 4992-5000). The government did not correct this false testimony.

The government's pattern of repeated presentation of false evidence deprived Mr. Gabrion of a fair trial and a fair sentencing hearing. At a minimum, a controverted issue of fact exists in this regard and a hearing should be ordered.

34

## GROUND TWO

**A.    *Mr. Gabrion did not receive the constitutionally guaranteed benefit of conflict-free counsel where the Federal Defender represented both Mr. Gabrion and a key witness against him.  The error was not cured by the fact that the Defender worked with Mr. Gabrion in an attempt to make the case proceedings move forward in an orderly manner.***

In this Ground Mr. Gabrion has alleged his Sixth Amendment right to conflict free counsel was denied.  The government has conceded most of the operative facts set forth in Mr. Gabrion's amended motion.  Those facts are essentially that Christopher Yates, the then Federal Defender for the Western District of Michigan, simultaneously represented Mr. Gabrion on a prior matter and also represented an important witness against him in the capital case.  Further, and more importantly, Mr. Yates continued to involve himself in Mr. Gabrion's capital case while continuing to represent a key witness against Mr. Gabrion.

While conceding that Mr. Yates was involved in Mr. Gabrion's defense of the capital case, it characterizes that involvement as "minor".  Page ID 5141.  That characterization is wildly inaccurate and unsupported by the record.  Mr. Yates's involvement in this matter is set forth in detail in Mr. Gabrion's amended petition at Page ID 3926-27.

In support of its response the government tendered an affidavit from Mr. Yates. In large part, that affidavit supports Mr. Gabrion's claims.  Mr. Yates admits under oath that he consulted with Mr. Gabrion during the capital case.  Page ID 5293 ¶ 7.   Mr. Yates admits that he was involved by the Court in the budget process in this case and in reviewing and providing input on defense requests and fees. Page ID 5293 ¶ 6.  As set forth in Mr. Gabrion's amended petition, the defense was hampered by insufficient and

35

inconsistent funding.  The extent of Mr. Yates "input" in these matters, especially while he was advising Mr. Gabrion and his attorneys, is a factual matter to be resolved after a hearing.

At various points in his affidavit, Mr. Yates claims that he did not sign any pleadings or appear in court in Mr. Gabrion's capital case.  This is a straw man as Mr. Gabrion has not alleged that Mr. Yates did either of these things.  Mr. Yates claims that he did not "direct any strategy" nor was he present at any "defense strategy meetings".  This too is a straw man.

Mr. Yates was directly involved in Mr. Gabrion's defense strategy.  In any capital case, the defendant's conduct prior to trial and his conditions of confinement are matters of strategic concern.  Mr. Yates admits that he was directly involved in these matters.  Similarly, Mr. Yates was involved in the research of motions, the decisions on whether to appeal decisions of the Court, and inserted himself into the relationship between Mr. Gabrion and his defense counsel.  He did all of this while representing a critical witness against Mr. Gabrion.

All of the above matters are strategic in in nature, particularly the relationship between Mr. Gabrion and his lawyers.  Mr. Gabrion made repeated efforts to dismiss his counsel and to proceed pro-se.  The content and appropriateness of Mr. Yates's advice and consultation with Mr. Gabrion on this important topic is a factual matter that must resolved after a hearing.

The government relies on *United States v. Martini*, 31 F.3d 781 (9th Cir. 1994). The facts of *Martini* are much different than those presented here.  Martini sought a second opinion as to his counsel's advice.  The second lawyer had no knowledge of the

36

facts or legal issues presented in Martini's case.  Under these facts the court found that there was no 6th Amendment right owed Martini by the second lawyer.  Mr. Gabrion's case is profoundly different.  Yates was involved in consultation with both the client (whom he had previously represented) and his counsel.  He was consulted by and consulted with Mr. Gabrion and his lawyers on matters of substance.

The *Stoia* case cited by the government is much more relevant to Mr. Gabrion's case.  *Stoia v. United States*, 22 F.3d 766, 769 (7th Cir. 1994).  Stoia alleged a conflict of interest against one his attorneys – Takiff – who did not file an appearance or appear in court. Takiff was retained by Stoia, who retained other counsel as well.  Takiff was intimately involved in Stoia's defense.  The Seventh Circuit held that,

> An attorney's constitutional ineffectiveness can manifest itself at trial even though the attorney never appears in court. For example, a defendant may hire more than one attorney to work on his criminal case, but only one of them may actually enter an appearance and represent him in court. If a non-appearing attorney is burdened by a conflict of interest, the conflict may, nonetheless, adversely impact the defendant's trial because of that attorney's ability to influence how the defendant's trial attorney conducts the case. Also, an attorney hired to do "behind the scenes" work may, through deficient performance, negatively impact the trial counsel's ability to give the defendant an adequate defense.

*Id.*, at 769

*Stoia* demonstrates quite clearly that whether Yates ever appeared in court during Mr. Gabrion's capital case is immaterial to whether he functioned as counsel.

The *Santosusso* opinion cited by the government is of questionable value. *Santosusso v. United States*, No. 95-3146, 74 F.3d 1240 (6th Cir. 1996).  It is an unpublished decision.  Even if the Court were to rely on that case, the facts are completely dissimilar to this case.  *Santosusso* is similar to *Martini* in that it is a case in which a defendant sought a second opinion.  The only difference is that Santosusso

37

ultimately hired the lawyers who provided the second opinion.  The ineffectiveness claim is however limited to the period of time before they were actually representing him and merely providing a second opinion.  Mr. Yates far exceeded providing a second opinion to Mr. Gabrion.

The government misrepresents this holding of *United States v. Bertram*, 209 F. Supp. 23d 243, 258-60 (D. D.C. 2016) by summarizing it as holding "no actual conflict of interest where allegedly conflicted attorney was not counsel of record".  Page ID 5143-44.  However, the court ruled upon Mr. Bertram's conflict of interest claim on the merits and found that the facts did not support an actual conflict of interest.  The claim was not denied because that counsel was not counsel of record.  The government's parenthetical is a complete misrepresentation of the holding of *Bertram.*  In fact, that counsel was not counsel of record for Mr. Bertram seemed to play little to no role in the Court's decision.

The government argues that Mr. Gabrion's description of Mr. Yates being "heavily involved" in Mr. Gabrion's defense is a considerable exaggeration yet Mr. Yates's own sworn affidavit supports each of Mr. Gabrion's factual allegations as to Mr. Yates's involvement.  He consulted with Mr. Gabrion and Mr. Gabrion's defense team.  He was involved in the controversial budgeting process used in this case and gave input on defense expenditures.  He provided input and guidance as to where Mr. Gabrion should be incarcerated.  Ultimately the government would call seventeen witnesses from facilities in which Mr. Gabrion was held pre-trial.  Mr. Yates did all of that while simultaneously representing a critical witness against Mr. Gabrion.

38

That Mr. Yates did not file an appearance or appear in court is not dispositive of this claim.  His simultaneous representation of Mr. Lunsford and Mr. Gabrion was an actual conflict of interest.

Mr. Gabrion's defense was adversely affected by Mr. Yates's participation.  Mr. Yates actively advocated for Mr. Gabrion to be transferred to a federal correctional facility at Milan, Michigan.  Ultimately, five witnesses would testify for the government at Mr. Gabrion's penalty phase about his conduct at Milan.  Mr. Yates's affidavit admits that he took this action.  However, he claims he did so at Mr. Gabrion's insistence.  Again, this would be a matter that need factual development at an evidentiary hearing.  And, this further demonstrates, Mr. Yates's involvement in Mr. Gabrion's case.

Another interesting twist is that there were several inmates from Milan who would ultimately be witnesses against Mr. Gabrion for things Mr. Gabrion allegedly said while at Milan.  Mr. Yates was actively representing another inmate informant against Mr. Gabrion.  Mr. Yates's affidavit does not state that he advised Mr. Gabrion of his representation of Mr. Lunsford and of the potential dangers of discussing his case or other matters with inmates.

Mr. Yates alleges that all the parties in the case and specifically the judge, defense counsel and Mr. Gabrion were aware of Mr. Yates's representation of Mr. Lunsford and of the conflict that created.  However, he does not say how they were aware of that, when they became aware of that, if that was ever discussed, and most importantly if he ever personally advised Mr. Gabrion of this conflict.  Again, Mr. Yates's affidavit only further establishes the need for further factual development through discovery and a hearing.

Additionally, Mr. Gabrion has alleged that it was Mr. Yates who suggested to Mr. Lunsford the story of Mr. Gabrion masturbating to the picture of Shannon Verhage.  This is based upon Mr. Lunsford's sworn declaration.  The government first alleges that this claim is barred by the statute of limitations.   In order for an amended claim to be considered timely, one of two conditions must apply: (1) the claim must be filed within one year of one of the four triggering dates set out in § 2255(f); or (2) the amendment must "relate back" to a claim filed in the original, timely-filed § 2255 motion. The Supreme Court has held that an amendment relates back to the original motion if the two share a "common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). See also Civil Rule 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out -- or attempted to be set out -- in the original pleading").

The allegation that Lunsford perjured himself at the suggestion of Mr. Yates clearly shares the same common core of operative facts as the larger conflict claim regarding Mr. Yates.  Each of the claims arises out of the fact, not denied by Mr. Yates, that at the same time he represented Mr. Lunsford in the case against Mr. Gabrion, he was participating in Mr. Gabrion's defense.  Again, Mr. Yates's own affidavit supports the deep involvement he had in Mr. Gabrion's defense.  The government's statute of limitations argument should fail.

As to the merits of the allegation by Mr. Lunsford, the government makes conclusory allegations that Mr. Lunsford's affidavit should not be credited.  Citing *Giles*

40

*v. Wolfenbarger*, 239 F.App'x 145, 148 (6th Cir. 2007) the government claims "[t]here is no evidence concerning the authenticity of the affidavit, the motivation of the affiant, the circumstances of the affidavit's execution, the timing of its submission, or its consistency with other evidence in the trial record."   To begin with, the government has been in possession of this affidavit for nearly two years.  During all of that time Mr. Lunsford has been incarcerated in the State of Michigan.  The government clearly could have spoken to him and sought a counter-affidavit if Mr. Lunsford denied the allegations in his affidavit.  Similarly, had he made contrary statements to an investigator and yet refused to sign a counter-affidavit the government could have submitted an affidavit from an investigator or other witness to those statements.  The government's failure to do so speaks volumes as to Mr. Lunsford's current allegations.

The government cites a litany of cases cautioning about recanting witnesses. However, one thing has become clear in recent years and that is that jailhouse informant testimony is equally unreliable and has been the subject of a number of wrongful convictions.

The government also refers to Mr. Lunsford's affidavit as self-serving and cites a series of cases on why the self-serving allegations of petitioners should not be credited. There are several obvious flaws in the government's argument.  The first is that Mr. Lunsford's affidavit is not self-serving.  In fact, he admits to committing perjury in a federal capital trial.[1]  There is nothing self-serving in Mr. Lunsford's affidavit.  Quite tellingly, the government fails to specifically say why it is that Mr. Lunsford's affidavit is

---

[1] It should be noted that undersigned counsel sought to get counsel appointed for Mr. Lunsford.  This Court denied counsels' request. See R. 70, Page ID 2626-29; R. 72, Page ID 2631.

41

self-serving.  The other flaw is that Mr. Lunsford is not the petitioner.  If his affidavit is credited he will get no relief.

The passage of time is also irrelevant to the credibility to be given Mr. Lunsford's affidavit.  The government notes that this affidavit comes some 14 years after Mr. Gabrion's conviction.  Mr. Gabrion's case was on direct appeal for approximately 12 of those 14 years.  To the best of counsel's knowledge, they were the first people to speak to Mr. Lunsford since Mr. Gabrion's trial.  This is also Mr. Gabrion's first – and only – chance to develop facts outside the record.   The passage of time in no way relates to anything that was in Mr. Lunsford's control or to Mr. Gabrion's failure to develop these facts earlier.  This was simply the first available opportunity.

The government solicited an affidavit from Mr. Yates in which he denies the substance of Mr. Lunsford's affidavit.  This creates a factual dispute necessitating factual development through discovery and a hearing.  Interestingly, Mr. Yates's affidavit creates an additional factual dispute.  In its response, the government stated "Lunsford said that he had not received any benefit for his proffer, and was not promised any time off for his testimony. (*Id.* at 321-22; 319-20.)" Page ID 5141.  However, in Mr. Yates's affidavit he stated that he advised Lunsford there would be a benefit to his testimony.  Mr. Yates stated that "I made clear to Mr. Lunsford – as I always did to every one of my co-operating clients – that his ability to obtain any benefit from his proffer statements and testimony depended upon his truthfulness."  Page ID 5294, ¶ 9.

Mr. Yates's statement directly contradicts the government's response that Lunsford was not promised anything and expected no benefit.  Mr. Yates's statement

42

indicates that he discussed with Mr. Lunsford receiving a benefit from his proffer statements and testimony.  This further necessitates additional factual development through discovery and a hearing.

The government takes the position, relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980) that the trial court had no duty to inquire about the conflict in this case because the duty is only triggered by joint representation of co-defendants.  It is notable that some courts have found that joint representation of a defendant and a prosecution witness – as is the case here – presents a more significant danger.  See *People v. Solomon*, 980 N.E.,2d 505, 508 (N.Y. App. 2012).

*Cuyler* states "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." 446 U.S. at 347. The circumstances under which the trial court must initiate an inquiry were demonstrated in the latter case of *Wood v. Georgia*, 450 U.S. 261, (1981). In *Wood,* the defendants had been convicted of distributing obscene materials while employed at an "adult" theatre and bookstore. 450 U.S. at 263. An attorney retained by their employer represented them at subsequent probation revocation hearings.  *Id.* at 266.  Despite the defendants' failure to object to the representation provided to them, the Supreme Court considered on appeal whether their attorney had a conflict of interest that necessitated some relief.  *Id.* at 265 n.5.

The Court stated that although it could not determine on the record "whether an actual conflict of interest was present, "the record does demonstrate that the possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the [trial] court a duty to inquire further." *Id.* at 272.  Accordingly, the Court

43

vacated the judgment rendered at the revocation hearing and remanded the case for a hearing to determine whether an actual conflict of interest existed. *Id.* at 273. The Court stated that if the court on remand finds that an actual conflict existed that the defendant did not waive, a new revocation hearing would be required. *Id.* at 273-74.

Courts considering conflict-of-interest claims have disagreed on when the *Cuyler* test, which requires a showing that counsel's performance was adversely affected by the conflict, applies. Some courts have held that the *Cuyler* standard applies whenever the defendant has failed to object to counsel's representation at trial. See, e.g*., Atley v. Ault*, 191 F.3d 865, 869 (8th Cir. 1999) (stating that "*Cuyler* applies, however, only to those cases in which a defendant raises no objection to his counsel's representation at or before trial"); *State v. James*, 111 N.C. App. 785, 433 S.E.2d 755, 757 (N.C. Ct. App. 1993) (citing *Cuyler* for the proposition that "a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected the performance of his lawyer").

Other courts have concluded that the *Cuyler* standard governs only when the trial court is reasonably unaware of the particular conflict. See, e.g., *Cabello v. United States*, 188 F.3d 871, 875 (7th Cir. 1999) (noting that *Cuyler* standard does not apply "if the defendant or her attorney alerted the trial judge to a possible conflict of interest or the judge otherwise knew or reasonably should have known that such a possibility existed" (emphasis added)); *United States v. Fish*, 34 F.3d 488, 492 (7th Cir. 1994) (stating *Holloway* automatic reversal rule applies where trial court fails to inquire when the defendant raises the issue or the trial judge otherwise knows or reasonably should know of the possibility of a conflict of interest" (emphasis added)); *State v. Jenkins*, 257

44

Kan. 1074, 898 P.2d 1121, 1129 (Kan. 1995) (holding that where "trial court was presented with information that established an actual conflict--defense counsel represented the key prosecution witness," the defendant need not show that the conflict adversely affected his lawyer's performance, even though the defendant made no objection at trial). Under the latter line of cases, the application of *Cuyler* does not turn on whether the defendant objected, but rather turns on whether the conflict of interest was brought to the trial court's attention in some way.

It is beyond dispute in Mr. Gabrion's case that the trial court was aware of the conflict.  Mr. Gabrion argues that because trial court was aware of the conflict and failed to make any inquiry with Mr. Gabrion reversal is required without a showing that the conflict adversely affected counsel's performance, even though no objection was made at trial. This conclusion is consistent with the Supreme Court's interpretation of *Cuyler* in *Wood*, where it said that *Cuyler* "mandates a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood*, 450 U.S. at 273 n.18.

However, even if there was no duty by the court to inquire into the conflict, Mr. Gabrion has shown above that there was an actual conflict of interest that adversely effected his defense.

## GROUND THREE

### *Ineffective Assistance of Counsel at The Guilt Phase – Introduction and Standard of Review*

Mr. Gabrion has raised several specifications of ineffective assistance of counsel as it relates to his representation at the guilt phase portion of his capital trial.  The test for evaluating claims of ineffective assistance of trial counsel is well known. Specifically,

petitioner must establish that counsel's performance was deficient and that the acts or omissions of counsel prejudiced petitioner.  Prejudice has been held to be present when there is a reasonable probability that but for counsel's errors the result of the proceeding would have been different. See, *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Williams (Terry) v. Taylor*, 120 S.Ct. 1495 (2000).   The petitioner bears the burden of establishing both prongs of this test by a preponderance of the evidence.

A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Strickland* at 694.  Petitioner does not need to establish that the deficient performance more likely than not altered the outcome of the case.  This was explicitly rejected in *Strickland*. *Id.* at 693.  Courts have analyzed the prejudice prong by holding that the reasonable probability need only be something more than a negligible chance of a different outcome.  See, *Miller v. Anderson*, 255 F.3d 455 (7th Cir. 2002) ("we think that the chance of an acquittal would still have been significantly less than 50 percent; but it would not have been a negligible chance and that is enough to require us to conclude that the lawyer's errors of representation were, in the aggregate, prejudicial.")

In essence, the government contends that Mr. Gabrion could never establish prejudice from any acts of deficient performance due to the overwhelming evidence of his guilt, citing the paint, blocks, and padlocks evidence.

The reality of course is much different and Mr. Gabrion incorporates below in each of his subclaims the following facts and argument regarding the evidence against him.[2]   This narrative shows that contrary to the government's assertions the evidence against him at the guilt phase was not overwhelming and that if effective counsel had

---

[2] Mr. Gabrion would incorporate herein the facts set forth in Ground One as to the false testimony procured by the Government.

investigated this case, as it should have been, there is a reasonable probability of a different outcome.

Though not required to provide evidence of motive, the government presented a motive theory and argued it effectively, that was simply untrue.  The government presented evidence, through Newaygo County prosecutor Chrystal Roach, that Mr. Gabrion had taken unprecedented steps to manipulate the judicial process and avoid having Ms. Timmerman testify under oath.   According to the government, in spite of Mr. Gabrion's efforts, by the weekend of June 3, 1997, he was out of time.  The trial was to start that Monday and thus he had to kidnap and ultimately murder Ms. Timmerman so that she could not testify against him.  The government argued this theory to the jury throughout the trial and it was so pervasive that it was adopted as fact by the Sixth Circuit.

Mr. Gabrion has now shown this was all a fabrication.  Chrystal Roach's testimony was perjured.  There was ample and available evidence that Mr. Gabrion did not manipulate the judicial process.  Further, there was available evidence that not only was there no trial set for that Monday, Mr. Gabrion knew there was no trial – or anything – set for that Monday.  In his interview with reporter Dawn Grossenbacher he told her "you know they had jury trial [sic], it was set for jury trial about six months later, right. . . [a]fter they put in the paper that she a hearing to go in another week or so.  It was just total bull-shit.  It was set for jury trial like a lot longer."  See transcript and notes of Grossenbacher interview with Mr. Gabrion.  Ex. 31.

There was another body of evidence that contradicted the government's theory that Ms. Timmerman was last seen on June 3, 1997.  Mr. Gabrion has pled these facts

47

above but they bear repeating. A number of people provided credible accounts that they had seen Ms. Timmerman around the area in the days following when the Government alleged she disappeared forever. Similarly, Ms. Timmerman had her own motives for wanting to leave town as she was in violation of her probation and would soon be required to go to a group home in Grand Rapids.

In that same vein, her family did not report her as missing for weeks and the prosecutor unquestioningly dismissed the rape case when a letter from Ms. Timmerman arrived recanting her allegations and saying she had moved. The Government argued falsely to the jury that the letters sent by Ms. Timmerman had been coerced or dictated by Mr. Gabrion. They did so with the full knowledge that this argument was false and that their own forensic experts had determined to the contrary.

A police report says that Rachel, Shannon, and Eddie Start were at Theresa Start's house in Grand Rapids at 6:00 p.m. See Ex. 18. This was after the time when Rachel and Shannon allegedly left with "John" for her date. On June 4, 1997, the Halls saw a truck with a boat in the back. See Ex. 19. However, this is the same day that a letter from Rachel first appeared with a Cedar Springs post mark. Ex. 20. Rachel reportedly was seen near Cedar Springs on June 4 making it unlikely she was seen by the Halls on June 4.

On June 6, 1997, a party was held at Mike Vaivada's house. A number of people claimed to have seen Rachel there. They include Mike Vaivada, Green, and Scheidel. See Ex. 21. On June 7, 1997, there was a party at the Burke's and people recall seeing Rachel there with Shannon. See Ex. 18.

48

The evidence contradicts the government's narrative in that Mr. Gabrion was seen in and around the White Cloud area for weeks after Ms. Timmerman was supposedly last seen.  Mr. Gabrion repeatedly interacted with officials and businesses. There is nothing to suggest he was seen anywhere near Arkansas.  There are no bank receipts, gas receipts, hotel registers that put Mr. Gabrion anywhere but in the Michigan area during the month of June 1997.

On June 7 or 10, 1997, Mike Gabrion Jr., Mr. Gabrion's nephew, was released from a step program to live with Mr. Gabrion. See Ex. 22, grand jury testimony of Mike Gabrion Jr.   On June 13, 1997, Mr. Gabrion sold the Altona Property to his father, Marvin Sr., the deed is recorded in Miami County Indiana.  See Ex. 23.  As set forth above, on or about June 16, Rachel's dad received a letter from her post marked June 14 from Little Rock, Arkansas.  At around the same time, the Newaygo County prosecutor and Judge Drake, the judge on the rape case, received letters from Rachel recanting her allegations against Mr. Gabrion.   See Ex. 24, grand jury testimony of Roberta Gilligan.  On June 22, 1997, John Weeks spoke to his girlfriend and told her he is going to Texas.  See Ex. 25.

On June 25, 1997, David Knapp was camping at Toogood Lake in Newaygo County. Marvin Gabrion pulled into Knapp's campsite in a Chrysler New Yorker. Gabrion was acting "bizarre" and Knapp noticed that he had two women in the car. Due to Gabrion's bizarre behavior, Knapp noted the license plate number. Knapp called the Newaygo County Sheriff with this information on July 9, after Ms. Timmerman's body was discovered. Ex. 3.17, Page ID 1582-1583.

49

The license plate reflected that the car was registered to Linda Allen. On July 13, 1997, Gabrion, as Robert Allen, sold a Chrysler New Yorker to Lester Ebright in Fort Wayne. That car was registered to Linda Allen. Ex. 3.18, Page ID 1585-1590.

Also on June 25, 1997, Mr. Gabrion executed a receipt for his bond. Page ID 1027.  On June 26, 1997, Mr. Gabrion did business at a bank in Big Rapids and made a purchase at Farm & Fleet.  See Ex. 26.   On June 27, 1997, Mr. Gabrion and his neighbor Dennis Bacon got in a fight over Mr. Bacon's mowing. The police were called. See Ex. 27.  On June 30, 1997, Mr. Gabrion went to Butterworth Hospital due to the injuries he suffered in his fight with Mr. Bacon.

On July, 1, 1997, Mr. Gabrion brought a soil sample from his property for testing into Bio Chemical.  See Ex. 28.    On the same day, he also went to an eye doctor in Grand Rapids for treatment of the injuries he suffered in the Bacon fight.  See Ex. 29. On July 4, 1997, Mr. Gabrion called Jeffery Bassett about his motorcycle.   See Ex. 30.

Lastly, there remains a significant gap in the Government's case.  The government's theory as to why the federal government had jurisdiction over this case relied on the location that Ms. Timmerman was found – the federally controlled part of Oxford Lake.  It is truly only speculation that Ms. Timmerman was murdered on federal property.  There is no proof that Ms. Timmerman was alive when she went into Oxford Lake, bound and gagged.  If she was killed elsewhere, and dumped into Oxford Lake then this case should have been tried in the Michigan state courts.

In addition to the above, an unknown hair was found on Ms. Timmerman's body. That hair was not Mr. Gabrion's.  The evidence cited by the government - paint, blocks and padlocks – is evidence which was tied as much to Mr. Gabrion's property in Altona

50

as to Mr. Gabrion himself.  Other people had access to this property.  When police arrived to serve a search warrant on July 1997, David Gabrion was there moving things out.

Without any evidence whatsoever, the government attributes strategic decisions by Mr. Gabrion's trial counsel to not fight hard on every issue so as to preserve credibility.  This only further highlights the need for further factual development through discovery and a hearing.  The existing record shows that trial counsel failed to either concede guilt or present a thorough defense based on evidence available to them or evidence that they should have discovered.  Counsel left Mr. Gabrion in the worst of all possible situations – arguing that he was not guilty, but improperly supporting such a theory.  There is nothing strategic about this type of approach – it shows counsel "going through the motions" of presenting a defense while actually running the risk of antagonizing the jury.

Unlike state prisoners who get to collaterally attack their convictions in state **and** federal court, Mr. Gabrion gets but one opportunity to establish facts outside the record which are needed to prove his claims of ineffective assistance of counsel.  The government's repeated invocations of "strategy" are based entirely on speculation.  Based upon the record before this court, it cannot be said that any particular decision was strategic.  Moreover, the government's assertions of strategy completely ignore those times when the defense did challenge the government's case.[3]  If maintaining credibility was in fact counsel's strategy, they would have been consistent.  But they were not.

---

[3] See, for instance, questioning witnesses about Ms. Timmerman having to go to Liz's House but not following up when those witnesses denied knowledge.

51

Finally, merely calling a decision strategic does not insulate it from review. Deference is owed to strategic decisions only to the extent that those decisions were based upon a sound and thorough investigation. "Strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91.

## A.  *Mr. Gabrion's trial counsel were ineffective because their failure to investigate his social history and to critically assess the Bureau of Prisons' competency evaluations in the context of such investigation resulted in an unreliable competency determination at odds with Mr. Gabrion's presentation during trial and for decades before.*

In opposition to Mr. Gabrion's competency claims, the government submits that the "overwhelming evidence" against Mr. Gabrion excused trial counsel's failures. We have addressed this elsewhere; in short, both aspects of that contention are incorrect: the evidence was not overwhelming, and – even if it had been – that does not excuse counsel from providing effective assistance at trial. There is simply no connection between competency and the amount of proof supporting the charges. Moreover, a competent defendant may have been able to assist counsel in challenging some of that evidence.

On the merits, the government primarily argues that this Court may rely on the competency evaluations performed at trial. This misses the point of Mr. Gabrion's claim, which is that the competency evaluations were fundamentally flawed, because they were conducted without the benefit of information that is foundational to a reliable assessment. *See* Page ID 4911.[4]  Discovery and a hearing are required so that the

---

[4] *Citing* Richard G. Dudley, Jr. & Pamela Blume Leonard, Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert

52

Court may assess the validity of the trial competency evaluations, given the newly discovered social history, which directly bears on the question of malingering.  *See* Richard Rogers, Clinical Assessment of Malingering and Deception 64 (3d ed. 2008) (hereinafter "Rogers").

The government does not contest the following important points, which establish ineffective assistance of trial counsel, or at least Mr. Gabrion's entitlement to a hearing:

- Mr. Gabrion exhibited such sustained and extreme behavior during the pretrial and trial periods in prison and in his interactions with the court that the magistrate judge and the trial judge sua sponte ordered a competency evaluation.

- Mr. Gabrion exhibited similar behavior with trial counsel, prompting an additional competency evaluation on counsel's representation that Mr. Gabrion was unable to understand the proceedings or assist in his defense.  (R. 267, Motion, Affidavit of David C. Stebbins).

- Social history was available at the time of trial – as recounted in Ex. 9 to Mr. Gabrion's amended petition, Page ID 4732 – that would have established that Mr. Gabrion's unusual behavior predated this case and therefore any motivation to malinger symptoms.  *See, e.g.,* Amended Petition, Ex. 9 at Page ID 4757, 4759-63, 4765-70.

- Social history was also available at the time of trial to demonstrate that Mr. Gabrion's family has a multi-generational history of mental illness and substance abuse that would have undermined any malingering diagnosis and provided

---

& David Foster, The Mental Health Evaluation in Capital Cases: Standards of Practice, 15:4 Am. J. FORENSIC PSYCHIATRY 43 (1994); George W. Woods et al., Neurobehavioral Assessment in Forensic Practice, 35 INTI J. OF L. & PSYCHIATRY 432 (2012).

support for a diagnosis of mental disease or defect and a finding of incompetence.  *See, e.g.*, Amended Petition, Ex. 9, Page ID 4779-88.

- Mr. Gabrion was medicated both before the offense and during trial, but with insufficient effect. *See* Gov't Response to Petition, Page ID 5159-60 (acknowledging that Mr. Gabrion was medicated).

- Mr. Gabrion's appellate counsel apparently experienced Mr. Gabrion similarly to the way trial counsel experienced him.  They asked the appellate court to "order a determination of his competency for purposes of his appeal." *United States v. Gabrion*, 719 F. 3rd 511, 533 (6th Cir. 2013) (en banc).  Relying upon the trial examinations, the court declined to do so. *Id.*

As we have noted elsewhere, *see*  Page ID 5305-5318, malingering is notoriously difficult to diagnose.  *See* Rogers at 12 (noting "singular challenges" of malingering).  Experts recognize not only that malingering is very difficult to identify, but that "[f]eigned and genuine symptoms are often present in the same individuals." *Id.* at 39, 49, 51.  There are "a variety of reasons" individuals feign or exaggerate symptoms, many of which are not reprobate.  Even assuming – which counsel do not – that the malingering findings at trial were correct, "[c]linical evaluation of mental disorders should continue even in the presence of malingering and deception." *Id.* at 50.  Because it is very difficult to maintain feigned symptoms over time, *see* Rogers at 62-63, the persistence of Mr. Gabrion's symptoms for years prior to and throughout the proceedings in this case is itself significant evidence of his mental disease or defect.  Here, reasonably competent counsel would have fully investigated Mr. Gabrion's social

54

history to permit full and fair consideration by experts and the trial court of Mr. Gabrion's competency.

The government does not dispute that social history is fundamental to a reliable mental health diagnosis (and therefore to a competency evaluation).  At the time of Mr. Gabrion's trial, experts in the field agreed, and courts acknowledged, that the standard of care for a competent mental health evaluation requires a complete and accurate medical and social history.  *See* Amended Petition, Ex. 12, pp. 19, 40.  The government's suggestion that the "abridged" version prepared for trial could substitute is obviously wrong.  That version contained neither the intergenerational history of mental illness, the lengthy record of head trauma, nor the evidence of Mr. Gabrion's prior erratic behavior that a more thorough investigation would have revealed.  *Compare* (Abridged Social History) and Amended Petition, Ex. 9.  This is exactly the sort of information on which experts rely and that the Supreme Court has emphasized in its decisions on sufficiency of investigation.  See Amended Petition, Ex. 12, pp. 19, 40.

Mr. Stetler's declaration provides one example how this information would have bolstered Mr. Gabrion's case against malingering and in favor of incompetence.  The abridged social history noted that, in 1993, a psychiatrist found that Mr. Gabrion suffered a serious mental health problem that predated an accident for which he was then under treatment – probably bipolar disorder or some other major mental illness. The psychiatrist prescribed Tegratol and Depakote, to which Mr. Gabrion responded well.  *See* Amended Petition, Ex. 12, p. 46.  As Mr. Stetler explains, the research shows that many major mental illnesses, including bipolar disorder, may be traced through families.  *Id.* at P 46 n.20 (citing studies).  The fulsome investigation now available in

fact demonstrates a significant history of bipolar disorder in Mr. Gabrion's family, *see* Amended Petition, Ex. 9, which – if it had been provided to evaluators at trial – likely would have influenced their view of his presentation.  Indeed, family members reported that Mr. Gabrion himself had been treated for bipolar disorder.  *Id.*  Page ID 4766.

The government's reliance on the facial thoroughness of the evaluations, and the Sixth Circuit's acceptance of them, misses the point.  The question is whether the new social history and head trauma evidence undermine confidence in the initial competency conclusion.  Given the centrality of this information to the diagnosis of mental disease or defect and of malingering, there can be no question that it does.  At a minimum, it warrants discovery and a hearing to ascertain the experts' views on the effect of the new information on their prior conclusions.[5]

The cases cited by the government on this point are inapposite because neither involved the degree of trial-level doubt regarding the defendant's competence present here.  In *United States v. Fields*, the court noted Fields's rational behavior during pretrial and trial proceedings. 761 F.3d 443, 468-69 (5th Cir. 2014) ("[T]he district court reached its conclusion after considering Fields's pro se oral motion for access to a law library and his motion to change venue, questioning Fields about his decision to waive counsel, speaking with Fields's counsel about his competency, arranging for Fields's psychiatric evaluation . . . , and considering the results.").  Similarly, in *Johnson*, 860 F. Supp. 2d 663, 810-11 (W.D. Ark. 2012), the court emphasized that neither counsel nor the court had observed any reason to question Johnson's competence.  In contrast, in

---

[5] In a separate pleading addressing Mr. Gabrion's current competency, counsel have identified various other concerns with the integrity of the trial competency proceedings and made discovery requests related to those concerns.  These concerns and discovery requests add to those discussed here.  *See* Competency Reply, Page ID 5313-14.

Mr. Gabrion's case, the Court sua sponte ordered a competency evaluation and trial counsel made multiple requests.

Nor is the government's assertion that Mr. Gabrion was involved in "complex criminal schemes" dispositive.  A person's competence may vary over time.  *Cf. Ryan v. Gonzales*, 133 S. Ct. 696, 703 n. 4 (2013) (quoting 4 W. Blackstone, Commentaries on the Laws of England 24–25 (1769)); *see also Indiana v. Edwards*, 554 U.S. 164, 175 (2008) ("Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways.").  If a defendant becomes incompetent at any point of the trial for any period of time, the ensuing conviction violates due process. *See Ryan, supra. Cf. Pate v. Robinson*, 383 U.S. 375, 384 (1966) (finding that defendant's demeanor at trial did not justify ignoring evidence of incompetence).  Thus, Mr. Gabrion's ability at some point able to engage in a complex scheme does not preclude his having been incompetent at trial.  More to the point, Mr. Gabrion's competence should not be assessed by his functioning in the world, but by the legal standard for competency – whether he had sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, *Godinez v. Moran*, 509 U.S. 389, 396 (1993).  *Cf. Moore v. Texas*, -- U.S. --, 137 S. Ct. 1039, 1050 (2017) (limiting assessment for intellectual disability to adaptive deficits, not skills).

The Sixth Circuit has emphasized the importance of a fulsome social history investigation to all stages of capital litigation, including the competency determination. *See Dickerson v. Bagley*, 453 F.3d 690, 694 (6th Cir. 2006) ("Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency

to make such decisions unless counsel has first conducted a thorough investigation with respect to both phases of the case."). Since the Due Process Clause prohibits trial of an incompetent defendant, if the Court accepts that the social history might have influenced the experts' or court's findings, prejudice may be presumed.

**B.      Mr. Gabrion's trial counsel were ineffective in failing to pursue a full course of medication for their obviously impaired client, despite having a record of at least two medications that had been effective for him in the past.**

The government is correct that Mr. Gabrion was provided Depakene, a form of valproic acid, during trial, but it ignores the fact that the medication was obviously ineffective in controlling Mr. Gabrion's symptoms. This cannot simply be attributed to "malingering" in light of Mr. Gabrion's history of success with valproic acid and Tegretol – another drug often prescribed to address the same symptoms (described by his treating physician at the time as a variety of cognitive and mood dysfunctions).[6] Trial counsel were aware of Mr. Gabrion's medication history, and should have assured that their client was properly medicated for his death penalty trial.

Valproic acid is available in many forms, and its effectiveness may depend both on the dose and the delivery mechanism. The medical records obtained by trial counsel reflected that Mr. Gabrion's dosage required adjusting. In fact, a close reading of the records reflects that inappropriate dosing actually triggered anger in Mr. Gabrion at one point during his treatment. The fact that Mr. Gabrion was medicated therefore is not dispositive of the question here.

Given their documented struggles with Mr. Gabrion, and his behavior in court, reasonably competent counsel would have advocated for appropriate medication of

---

[6] Mr. Gabrion switched from Tegretol to valproic acid, due to an allergic reaction to the Tegretol.

58

their client.  Record evidence suggests that this was achievable.  Moreover, had

counsel conducted the required social history investigation, a wealth of information

about Mr. Gabrion's family's history of successful medication for mental illness would

have been available, as well, from which counsel and providers could have drawn in

treating Mr. Gabrion during trial.  *See* Amended Petition, Ex. 9.  At a minimum,

discovery and a hearing are necessary to explore the material issue of fact raised by

Mr. Gabrion's apparent past history of success on medication.

The prejudice from failure to properly medicate Mr. Gabrion at trial is broad and

manifest, ranging from its effect on his competence and ability to understand the nature

of the proceedings and to assist counsel, to its effect on the jury, which witnessed his

assault on his attorney and which could have been reassured by proper treatment of his

lack of future danger in a correctional setting.

## C.    *Trial counsel did not engage in meaningful adversarial testing.*

As set forth in Ground One, there were numerous incidents of government

misconduct in this case.  This includes but is not limited to: the false testimony and

argument surrounding the rape case against Mr. Gabrion and the judicial process

regarding that case; the false argument regarding Mr. Gabrion dictating or coercing Ms.

Timmerman into writing the letters sent to her family, the prosecutor and the court; the

government's false evidence and argument regarding Ms. Timmerman's alleged

disappearance on June 3, 1997; the pervasive pattern of witnesses who testified in false

or misleading manner (Linda Coleman, Greg Leon, Nathan Brewster).

Mr. Gabrion asserts that the above facts in Ground One amount to government

misconduct and cites the appropriate legal standards for that claim.  He alternatively

claims that his counsel unreasonably failed to discover the above facts and that Mr. Gabrion was prejudiced as a result.  Counsel has a duty to conduct an independent investigation of his client's case or to articulate a strategic reason for his failure to do so. *See Montgomery v. Petersen,* 846 F.2d 407, 412 (7th Cir. 1988); *Nealy v. Cabana,* 764 F.2d 1173, 1177-78 (5th Cir. 1985).

As to the rape case, counsel failed to interview Mr. Gabrion's counsel in the rape case, Joel Townsend.  All of the documents refuting and showing Ms. Roach's testimony to be false were readily available as they were in the public domain.  Judge Drake testified to the Grand Jury that Mr. Gabrion had not tried to manipulate the judicial process.  As set forth above, Mr. Gabrion's comments to reporter Dawn Grossenbacher showed that he knew that there was no trial - or any other proceeding - set for June 5, 1997.  In short, it was deficient performance for trial counsel to completely fail to investigate these matters.  Had they done so, counsel would have been able to counter the government's theory of motive.  This would have been very important in this case in which the evidence was largely circumstantial.

The government argued to the jury that Mr. Gabrion had coerced or dictated the letters sent by Ms. Timmerman to her family, the prosecutor and the court.  Defense counsel had in its files reports that proved this argument was false and without merit. Counsel failed to object or call as witnesses the authors of these reports.  This omission was inexplicable and without justification.  Mr. Gabrion was prejudiced as the government was permitted to make a false argument to the jury as to the letters.  The government's suggestion that this was a strategic decision to maintain credibility must fail because these statements were used to effectively argue in the penalty phase that

60

this case was particularly aggravated and death was warranted because Mr. Gabrion obstructed justice.

Provided in discovery (and cited in Ground One and elsewhere) were police reports from numerous people who purported to see Ms. Timmerman in the days following June 3, 1997.  This was completely contrary to the government's theory of the case which was essentially that Mr. Gabrion had used John Weeks to lure Ms. Timmerman and Shannon from her home on June 3 and that she was never seen alive again.   Had these witnesses been investigated and their testimony presented to the jury, there would have been powerful evidence (along with the other facts) to refute the government's narrative as to what happened and when.  Additionally, the government was later permitted to argue without objection that Mr. Gabrion had killed Mr. Weeks. The people who saw Ms. Timmerman alive after June 3 would have helped refute this as well as it would have cast doubt on Mr. Weeks' involvement.

Linda Coleman was an important witness against Mr. Gabrion at the guilt phase of his trial.  Her testimony was false in a number of key respects as set forth in Ground One.  Much of the evidence showing her testimony was false were publicly available documents.  Trial counsel's failure to uncover and use these documents was unreasonable and Mr. Gabrion was prejudiced as a result.

Mr. Gabrion was also prejudiced by the cumulative effect of these unreasonable omissions.  The above provide powerful evidence contradicting the government's theory of the case.

The government's assertion that this claim was not adequately pled under Rule 2 of the Rules governing 2255 petitions is without merit.  The government asserts,

as to any other alleged failure to explore impeachment material, the claim fails because it is conclusory and unsupported by any actual facts related to the alleged "impeachment material" that Gabrion claims existed. It is therefore insufficiently pled under Rule 2(c) of the Rules Governing Section 2255 proceedings and should be denied on that basis. Page ID 5161

Rule 2© states, "[t]he motion must substantially follow either the form appended to these rules or a form prescribed by a local district-court rule. The clerk must make forms available to moving parties without charge." Mr. Gabrion's allegations are in his Amended Petition are in substantial compliance with the rules and the government's position is incorrect.

## D.    *Trial counsel failed to secure adequate investigative assistance.*

In support of its argument that trial counsel did secure adequate investigative sources it cites counsel's engagement of Jim Crates. It was well known, both then and now, that Mr. Crates' services were employed for penalty phase of this trial and not for the guilt phase of the trial. Elsewhere in this petition Mr. Gabrion discusses the inadequacies of Mr. Crate's efforts in investigating mitigating evidence for the penalty phase. In any event, Mr. Crates' actions are completely irrelevant to this claim with the exception of bolstering the claim that a single, underfunded investigator had full responsibility for handling the guilt phase of the trial.

On February 2, 2000, (attached as Ex. 32) Ms. Hubbard noted to Mr. Mitchell that she had several unpaid invoices.

> Enclosed please find my original interim invoice number 5, with a copy attached for you. Please sign as needed and forward to the Court clerk as necessary. Interim invoice number 1 has been paid, however, invoices numbered 2, 3, 4, and 5 are outstanding at this time. Thank you for your assistance in this matter.

In March 2001, Ms. Hubbard wrote to trial counsel about the continual problem with the lack of funding.

62

> I would be willing to make time to "catch up" in these areas but I hesitate now to do so because of *my* outstanding invoices. I'd been assured by David [Stebbins] at our last meeting that nonpayment was the result of an error that would be resolved quickly. However, this was more than a month ago. These are invoices from December of **2000** and February of this year. I am financially unable to continue to front costs and expend time without prompt compensation. You're aware that this is a small office. This business has several times experienced financial difficulties which were the direct result of nonpayment in this case matter. I have even had to cover costs, and when this was difficult, requested Paul's office to so, as with the weather data costs. I had no response, and eventually paid the costs myself rather than ruin the good relationship I have with service vendors. Funds that should have been available for other cases have been consumed by this case. This has jeopardized my ability to provide quality services, and at times has caused me to turn away new cases that might require substantial out of pocket costs. During the prior period when I had gone many months without payment in this case, even "normal" costs became a strain.
>
> I have heard nothing in regard to this payment problem since last we met. I would expect at this point to be given some assurance in writing regarding compensation before I spend additional time on this case including the work set forth above.

See Letter from Hubbard, March 19, 2001 (attached as Ex. 33) (emphasis in the

original).

On April 16, 2001, Hubbard again raised with Mr. Mitchell the problem of lack of

adequate funding.

> I am unsure whether or not you understood my letter to you and David Stebbins. It is not just that I have not yet been paid for invoices outstanding for four months, or even that it has happened throughout this case since 1999. It is primarily that I had finally asked for written assurances from you and David Stebbins that I would be paid, by your firms, within a certain amount of time if not paid by the government. I received a very pleasant letter from David Stebbins, but it did not contain these assurances nor address the issue directly. Given that my hourly rate in the Gabrion matter is less than half that of the lowest compensated person on the team, I can't see why that would be a problem. As I told you, excessive delays in remuneration are causing problems in my business in terms of being able to front costs in other cases. If I am not able to work other cases, I would be out of business given the erratic payments in this matter.

See Letter of Patricia Hubbard to Paul Mitchell dated April 16, 2001 (attached as Ex. 34).

There was but one investigator, Patricia Hubbard.  Arrayed against the defense was the federal government and the Michigan State Police.  The government claims that the defense had ample time to investigate and prepare.  But, as alleged in 3.E and incorporated herein, insufficient and inconsistent funding meant that much of that time was in fact not spent working on this case because of payment issues.

Additionally, there were problems with the one investigator the defense did have. In early September 1999, Ms. Hubbard had indicated to Mr. Mitchell that she had concerns about a lack of communication.

> I am not comfortable with my lack of understanding of the anticipated investigative function in this case. I am concerned because we have not spoken regularly and because at this time I am uncertain how to proceed. I would ask that you arrange for us to spend an hour to two hours going over the items I have noted on the attached pages so that I can effectively continue work in this matter. I am willing to meet early, late, or on the weekend to accomplish this.

> I would also like to obtain a complete copy of the file in this matter so that, at times when I am unable to reach you or your secretary, I will be able to review pertinent aspects of the case. I find myself in need of particulars and it is not only burdensome and expensive to travel to the office to obtain small details; it also occurs that I need such details many times when I am working but your office is not open. I think it would benefit the case for me to have a complete copy of the file, and to continue to be copied as additional information becomes available.

September 1999 letter from Patricia Hubbard (attached as Ex. 35).

In the April 16, 2001 letter referred to above, Ms. Hubbard again expressed her concern regarding the dysfunction on the team.

> I had expected that my letter to you and David Stebbins would be taken as seriously by you both as I was when writing to you. If you have not discussed my request, please do so before you and I meet. If you or David believe that this is not a workable situation, or that differences in personalities preclude team work, I would be happy to withdraw from working on the case. I have no idea what the

current status is, what our timeframe is, or any number of other pertinent facts. As I said, I have not received this type of information all along. If you would like to bring in another investigator and have the time to bring that person up to speed, please advise me of this. I would of course complete the projects currently assigned so as to not further confuse or complicate the matter. Otherwise, I have to repeat that I will need some assurances that I will receive remuneration every sixty days, at very least; that I will be kept up to date by a call or note as to what we are aiming toward, and that we will attempt to work professionally to overcome small obstacles in order to further the actual case work. I am and have been interested in working as a team to do the best possible job in this matter; if I did not wish to work on this case or be fully involved I would have withdrawn from the matter last year.

See Hubbard letter, April 16, 2001.

Based on the above it can be seen that much of the government's response misses the mark. While the time from indictment to trial might have been enough for investigative preparation with consistent funding, the combination of just one investigator and the fact she was not able to work regularly on the case because she wasn't getting paid and the lack of communication and support for her from trial counsel was simply insufficient. The government alleges that Mr. Gabrion was not prejudiced. Mr. Gabrion would assert here the facts set forth in the introduction regarding the prejudice that accrued to Mr. Gabrion's' guilt phase defense from the lack of a proper investigation.

Mr. Gabrion would also incorporate the facts in E below as to the funding problems in this case as well as the problems in funding regarding the jurisdictional expert.

Mr. Gabrion has also alleged that his failure to retain a forensic pathologist was ineffective assistance of counsel. Mr. Gabrion has separately alleged that failure in Ground III. O and would incorporate by reference those facts herein.

65

**E.**    ***Trial counsel failed to secure adequate funding to defend this case.***

In his amended petition, Mr. Gabrion set forth the documentary evidence regarding the lack of sufficient and consistent funding.  This was especially true during the early years of the case when a comprehensive investigation should have been undertaken.   This is documented by the letters sent by trial counsel in 2000 and 2001. The government plays down this evidence by claiming "Letters complaining about funding sent by his defense team 12 and 18 months before the trial do not demonstrate that the defense team lacked funds by the time trial began in February 2002." Page ID 5164.

The government ignores the content of those letters. In the June 2000 letter to Judge Scoville, trial counsel noted that due to lack of payment "our investigators and experts. . . are not working on this case."   Page ID 1524. Trial counsel noted that "we are finding it impossible to investigate and prepare the case without the assistance of investigators and experts."  Page ID 1524.

Nine months after the letter referenced above, trial counsel wrote Judge Enslen, informing him, "we continue to have problems obtaining payment for our primary fact and mitigation investigators.  As a consequence of our inability to insure prompt payment for their time and reimbursement for their expense, both our primary fact and mitigation investigators are reluctant to commit the substantial amount of time and expense this case requires." March 2001 letter to Judge Enslen.  Page ID 1527-28

That letter further notes that these investigators went without payment from "early 2000 to October 2000" and "[c]onsequently, they could not and did not devote the substantial amount of time necessary to complete the investigation."    While that work

resumed in October of 2000 problems arose, four months later, in February 2001 when payments were suspended.  The March 2001 letter notes that counsel "are concerned that once again our investigators are not being compensated and understandably are not willing to continue to devote the time necessary to complete the investigation in this case."  March 2001 letter to Judge Enlsen.  Page ID 1527-28.

This was not simply a few letters well before trial complaining about funding. This is a record that much of the pre-trial preparation time was compromised, meaningless, and wasted because the investigator could not be paid and suspended work on the case.

That same record was made to Judge Bell.  In their Ex Parte Memorandum Re: Funding and Payment for Investigative Expert and Other Necessary Services (attached as Ex. 36) trial counsel noted that their investigators declined to continue working on the case until the authorization process was completed.   Thus, neither Crates nor Hubbard performed any significant amount of work on Gabrion's case until they actually received compensation and reimbursement in October of 2000. Ex. 36.

Counsel went on to note that vouchers that were paid in October of 2000 were for services that dated as far back as October of 1999.  They described the loss of valuable investigative time for the investigators.  Ex. 36.  During this crucial time, it is clear that government investigators, overwhelming in number and bolstered by virtually unlimited resources, continued full-scale investigative efforts.

When funding was again shutoff, the investigators again stopped work.   In this same Ex Parte memo to Judge Bell, counsel noted that when the vouchers were again denied in 2001, both Crates and Hubbard had indicated that they are again unwilling to

67

commit substantial time to the case absent assurances of timely payment.  Counsel complained that the payment situation resulted in a situation in which the investigators had again stopped working.  Ex. 36.

The government's response is disingenuous in that it discusses the many experts that trial counsel retained for the penalty phase of Mr. Gabrion's trial (Dr. Scharre, Dr. Jackson, Mark Cunningham) and cites the Amended Certification of Budget Expenditures.  First, the retention of penalty phase experts is irrelevant to this particular claim which has been specifically tied to the investigation into and preparation for Mr. Gabrion's guilt phase defense.

Second, that budget document in large part proves Mr. Gabrion's allegations. That document indicates that $730,168.52 was expended.  As to services for the guilt phase, excluding attorneys, there was $49,382.53 (the fees for Hubbard, Shafer, and Doorbos).  That amount to just 6.7% of the funds expended.

Additionally, the only expert retained for anything related to the guilt phase had funding problems. The expert on jurisdiction was Chris Shafer. Shafer's bill for his report and testimony was $8,682.27. However, when his bill was submitted, the court cut his voucher by $3,682.27. See Ex. 3.3, Page ID 1530 and Ex. 3.4, Page ID 1532. Counsel Mitchell paid the remainder of the expert's bill personally.

This claim is entitled to further factual development and an evidentiary hearing. Mr. Gabrion was entitled to a full and independent investigation into his case.  Mr. Gabrion has set forth above in Ground One that there was available evidence that would have assisted his defense that his counsel and their investigator did not get.  See Ground 1.A.  Mr. Gabrion has also set forth in Ground 1. C and E that there were

investigative shortcomings that prejudiced him.  Additionally, as set forth in this Ground, there were many investigative shortcomings that prejudiced Mr. Gabrion, See Ground 3. A., B., C., H., I., J., K., L., M., O., P., Q., S., T., and U.  Mr. Gabrion incorporates the facts of those sections here.

**F.    *Trial counsel were ineffective in failing to seek a continuance in this case.***

There were many reasons why trial counsel should have sought a continuance at the guilt phase of the trial.  First and foremost was a late amended indictment that affected the most contested issue in the case – the federal jurisdictional element.

In the original indictment, Gabrion was charged with murdering Ms. Timmerman by "drowning her in Oxford Lake". Immediately prior to trial the government superseded the indictment to read that she was murdered on federal land. The defense objected to this but claimed that it did not change their approach and thus, the defense did not request the continuance to which it was entitled.

The indictment permitted the government to change its theory from Mr. Gabrion having drowned Ms. Timmerman in Oxford Lake to include that Ms. Timmerman was killed somewhere else on federal land and dumped in the lake.  This presented the defense with a game-changing theory that should have triggered a significant new analysis of all of the evidence.  But that did not happen – the defense had apparently stopped developing potential guilt-phase theories and defenses at that time. Specifically, this only served to highlight the need for a defense pathologist who could have further expanded on when Ms. Timmerman might have been asphyxiated which would have shown reasonable doubt that it occurred on federal land. (See Affidavit of

69

Dr. Spitz, Ex. 13). Mr. Gabrion would incorporate the facts set forth in Sec. O below including the affidavit of Dr. Spitz.

The government alleges that because its proofs did not change as a result of the indictment there was neither deficient performance nor prejudice. The government speculates that it would have been a bad thing to have a defense pathology expert because that person would have been subject to cross examination by the government. Page ID 5165. This again highlights the need for further factual development and an evidentiary hearing.

Mr. Gabrion also incorporated the facts regarding the inconsistent and inadequate funding. Those facts are set forth above and incorporated herein. Additionally, upon information and belief Mr. Gabrion pled that there was late disclosure by the government of key witnesses. The government did not address either of these concerns. Both of these problems could have been mitigated or alleviated by a continuance. The failure to seek a continuance was deficient performance that prejudiced Mr. Gabrion.

### G.      Trial counsel were ineffective in failing to move to disqualify the trial court.

In his amended motion Mr. Gabrion relied principally on the facts set forth above regarding the inconsistent and inadequate fundings as well as the rude and bizarre letters sent by Mr. Gabrion to the Court. It appears that the trial court communicated directly with the Government and not defense counsel when a potential witness wrote the court with incriminating evidence on Mr. Gabrion. In January 2000, a Milan prisoner wrote the court attempting to provide incriminating evidence on Mr. Gabrion.  The trial court provided that letter to the government but not the defense.  See attached Ex. 37.

70

On January 24, 2000, staff for Judge Bell forwarded to the government a lengthy letter written by an inmate to the judge purporting to have evidence against Mr. Gabrion. The letter was written by Edward Van Horn who was a prisoner with Mr. Gabrion at the federal BOP facility in Milan, Michigan.[7]  Staff forwarded the Van Horn letter to the government with a memo that said the following "Judge Bell received the enclosed letter today from a prisoner who had contact with Marvin Gabrion.  He felt that this should be directed to you for your attention."

Mr. Van Horn did not testify and his letter and the Court's memo were provided to the defense in discovery.  The fact that the Court communicated only with the government regarding this is some evidence of bias against Mr. Gabrion and in favor of the government.  Trial counsel should have used this as part of a motion to recuse the trial court.

Since the Amended Motion was filed Mr. Gabrion learned of comments made by the trial court regarding this case.  Mr. Gabrion set those forth in his Motion for Recusal, Page ID 3847-3856. Those comments were not available to Mr. Gabrion at the time of the filing of his amended petition but they illustrate exactly why the trial court should have been recused.

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might be questioned." 28 USC § 455(a). The fair trial guarantees of the Due Process Clause of the Fifth Amendment encompass a litigant's right to have a "neutral and detached judge" preside over judicial

---

[7] As noted in Ground Two it was Mr. Yates who intervened to get Mr. Gabrion housed at Milan.

71

proceedings. *Ward v. Village of Monroe*, 409 U.S. 57, 62 (1972); *In re Murchison*, 349 U.S. 133 (1959). The denial of this constitutional guarantee is not subject to harmless error analysis. *Tumey v. Ohio*, 273 U.S. 510 (1927); *Bracy v. Schomig*, 286 F.3d 406, 414 (7th Cir. 2002).

The trial court failed to ensure that Mr. Gabrion received conflict free counsel. The trial court failed to inquire as to the conflict and if Mr. Gabrion knowingly waived the conflict.  The trial court failed to make sure that Mr. Gabrion's defense was consistently and adequately funded in this capital case.  The trial court approved funding for an expert on jurisdiction and then refused to pay the total bill of that expert, forcing counsel to privately fund that portion of the defense.  The trial court communicated incriminating evidence against Mr. Gabrion to the government without notice to Trial counsel was ineffective in failing to move to recuse the trial court.

### H.      Trial counsel were ineffective when they failed to object to false or misleading argument in the government's opening statement.

In Ground One, subsection B, Mr. Gabrion set forth the facts regarding the letters written by Ms. Timmerman.  The Government in its opening statement claimed that Mr. Gabrion had forced Ms. Timmerman to write these letters.  This claim was demonstrably false as proven above.  In this subsection, Mr. Gabrion alleges that trial counsel was ineffective for failing to object to this argument.

The government claims that its argument was completely appropriate and was a reasonable inference based upon the facts.  The Government further speculates that there was some strategy behind trial counsel's failure to object as an objection would have cost counsel its credibility.

72

In his Petition Mr. Gabrion attached the documents upon which this claim is based.  Those documents demonstrate that the Government is wrong in its claim that its opening statement was an appropriate inference and they demonstrate that trial counsel received these documents in discovery.  There was simply no defensible reason for trial counsel's failure to object.  To the extent that the government is relying upon a strategic reason not to object – to save credibility, for example – a hearing or other factual development is necessary for this to be considered a strategic decision.  There is no support for this being strategic based upon this record.

Further, the prejudice to Mr. Gabrion must be assessed through the prism of facts as they understood now.  Mr. Gabion had no motive to kidnap and murder Ms. Timmerman on the weekend of June 3, 1997.  At trial, the government insisted that the rape case was going to trial on June 5 and that Mr. Gabrion had been engaged in a manipulation of the judicial system. According to the government the time had run out on that manipulation.  That claim was false then and is false now.  Mr. Gabrion had not manipulated the system, his case had progressed in a reasonably normal fashion and it was never set for trial on June 5.  Though there had been a hearing set on that date, it had been continued and Mr. Gabrion knew it.   See Mr. Gabrion's interview with Dawn Grossenbacher.   That there was government evidence that he had not forced Ms. Timmerman to write these letters would have been powerful evidence in his favor that the governments' theory of the case was incorrect.

In addition to failing to object, trial counsel failed to correct this misleading argument through the presentation of this evidence.    There were no alternative theories presented by the Government for what took place in June and July 1997.  The

73

government repeatedly claimed, through evidence and argument in both guilt and penalty phase, that Mr. Gabrion kidnapped and murdered Ms. Timmerman to prevent her from testifying against him.  Part and parcel of that theory was that he had forced her to write letters to her family and the court system explaining her absence and recanting her story.  That she had not been forced by Mr. Gabrion to write these letters would have been a serious blow to that theory.  There was simply no reason not to use this evidence to assist Mr. Gabrion.

**I.      Trial counsel were ineffective when they failed to contradict the government's motive theory.**

This claim is similar to and should be considered in context with subsection H above and subsection J below.   Another part of the government's theory of the case was that it was only Mr. Gabrion who had a reason to see Ms. Timmerman disappear.  According to the Government, Ms. Timmerman had turned her life around and was doing well in her current circumstances.  Unfortunately, and quite apart from Mr. Gabrion, this, too, was not true.

Ms. Timmerman's probation officer had concluded that Ms. Timmerman was not performing adequately on probation and had ordered her to leave her father's home and live in a group home (Liz's House).   See Ex. 38.  Her step-mother had taken her to a meeting at Liz's House on May 30, 1997. Ex. 3.5, Page ID 1534-1535. None of this evidence was presented.

At trial, counsel cross-examined Ms. Timmerman's father and sister about Liz's House but they denied knowledge. Counsel failed to call Ms. Timmerman's stepmother, probation officer, or anyone from Liz's House who could have provided information to show Ms. Timmerman had reasons to disappear that were wholly unrelated to Marvin

74

Gabrion.  Ms. Timmerman's mother told the FBI that Ms. Timmerman had been "acting crazy the week before she disappeared." Ex. 3.6, Page ID 1537-1538.

The initial FBI field memos said that when Ms. Timmerman left home she told others that she would be gone for a few days and took a change of clothes. It is undisputed that when Ms. Timmerman's body was found on July 5th, she was wearing different clothes than what she left home in on June 3rd. Ms. Timmerman's failure to return home on June or the days following was not considered by family members to be suspect enough to notify the police.  Even when the letter was received by Mr. Timmerman this was not considered suspect enough to notify the police.

All of this establishes an independent reason why Ms. Timmerman might have left home.  That she left home appeared to have come as no surprise to her family, which did not report her missing for nearly two weeks.  The Government's response is that none of this matters because all of the evidence still points to Mr. Gabrion.

The government again speculates that strategy was behind the decision not to pursue this as it would have been perceived as an attack on Ms. Timmerman's character.  As with the other government claims of strategy, this is unsubstantiated and demonstrates the need for a hearing and additional factual development.  Further, the record establishes that trial counsel did open this door by asking about Ms. Timmerman's family about her placement at Liz's House.  This establishes that the decision was not strategic.  It also further demonstrates that is was a lack of investigation that prevented counsel from following up.  Why bring it up at all if it was strategy?

75

Contrary to the government's assertions, this evidence coupled with the other evidence discussed above and below would have at least pointed away from Mr. Gabrion as being responsible for Ms. Timmerman's disappearance and death.  While it might not have pointed directly to another suspect, it would not have had to.  By pointing away from Mr. Gabrion it would have helped create reasonable doubt as to Mr. Gabrion's involvement in this matter.  As set forth above, Mr. Gabrion need only establish that there was even a negligible chance for a different outcome to meet his burden as to prejudice.

**J.     Trial counsel were ineffective when they failed to present evidence that Ms. Timmerman was seen after she purportedly left home.**

The factual basis for this claim was presented in Ground One, subsection C above and Mr. Gabrion incorporates those facts here.  The government relies on its response to Ground One, subsection C.   As Mr. Gabrion has alternatively argued that counsel was ineffective in failing to use this readily available evidence, the government has countered with an unsupported allegation that counsel's decision was strategic.  Simply calling a decision strategic is not the end of the inquiry.  "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91.

The government's claims of strategy are simply further proof that a hearing and further factual development are needed to resolve Mr. Gabrion's claims.  Without a hearing and discovery trial counsel's guilt phase strategy cannot be determined.  The government speculates about a strategy employed by trial counsel and why that shows

they were not ineffective. But, the government's hypothesis is without support in the record.

The government claims that trial counsel could not rebut the evidence linking Mr. Gabrion to Ms. Timmerman's murder. This is not true. While there might remain damaging evidence against Mr. Gabrion, much of the evidence of motive and other things that were taken as true (e.g. Ms. Timmerman being forced to write the letters, and Ms. Timmerman's reasons for leaving home) have been shown not to be true.

In support of its claims of strategy, the government cites *Elmore v. Sinclair*, 799 F.3d 1238 (9th Cir. 2015). Reliance on *Elmore* is curious as that case shows why this Court cannot rely upon claims of strategy to deny Mr. Gabrion's claims without a hearing. Mr. Elmore, who was facing death, pled guilty in a Washington state court. Under Washington state law Mr. Elmore was apparently entitled to a jury at the sentencing phase. Mr. Elmore ultimately received the death penalty. Following his direct appeal, Mr. Elmore was granted a hearing in state court on his personal restraint petition collaterally attacking his conviction and sentence.

Trial counsel testified at that hearing and among other things it established that he retained a trial consulting firm and conducted two mock trials testing his theory of defense. The Ninth Circuit was thus well positioned to dispose of Mr. Elmore's federal habeas claims on strategy as there was a lengthy post-trial record establishing just what the strategy was and the investigation behind that decision. This Court has no such record at this time.

Again, Mr. Gabrion urges this Court to assess the prejudice to Mr. Gabrion in the context of the other evidence that was readily available to trial counsel and that could

77

have cast doubt on the government's version of the events of June 3-6, 1997.  Counsel was ineffective in failing to investigate and present this evidence and Mr. Gabrion was prejudiced.

### K.    Trial counsel were ineffective when they failed to present evidence that Mr. Gabrion did not force Ms. Timmerman to write the letters.

The factual predicate for this claim is set forth in 1.B and 3.H above.  Mr. Gabrion incorporates those facts here.  Similarly, the government relies on its response to 1.B and 3.H above.   As previously argued, the jury was left with the false impression that it was undisputed that Mr. Gabrion dictated or forced Ms. Timmerman to write letters to her family, the judge and the prosecutor.  Trial counsel had in its possession evidence generated by the government showing this was not true and that Mr. Gabrion had not forced Ms. Timmerman to write these letters.  No plausible reason exists for trial counsel's failure to present evidence and testimony showing that Mr. Gabrion did not force Ms. Timmerman to write these letters.  This was deficient performance that prejudiced Mr. Gabrion.

### L.    Trial counsel were ineffective when they failed to counter Chrystal Roach's false testimony.

The factual predicate for this claim is presented in great detail in 1.A above and Mr. Gabrion incorporates the facts of that claim here.  The government's response relies on its answer to Ground 1.A – that is that Ms. Roach's testimony was not false and thus counsel was not deficient.  In fact, the government goes as far as to state "Common sense indicates that Gabrion's trial attorneys would be reluctant to

78

sacrifice their credibility before the jury by pursuing such a line of questioning." Page ID 5171.   The government clings to its argument that Mr. Gabrion manipulated the system "to gain access to the victim".

This was not true then and is not true now.  Even at the time of the trial, Judge Drake advised the government of his opinion that he could not conclude that Mr. Gabrion manipulated the Newaygo County pre-trial process.  Further, counsel has set forth a very comprehensive study of Ms. Roach's testimony and the actual facts of how she conducted the Newaygo County Prosecutors office at the time.  That evidence shows Ms. Roach's testimony to be demonstrably false.

In fact, common sense indicates that if a government witness presented false testimony about a central issue in the case – Mr. Gabrion's motive – defense counsel should challenge that testimony.  Nothing indicates that trial counsel would have sacrificed credibility by showing Ms. Roach was not truthful and that the government's primary trial theory was unsupported by the evidence.  This is particularly true because this false evidence was also relied upon in the penalty phase to argue that Mr. Gabrion should be executed.  Competent counsel would have challenged it when it was first introduced.  This also indicates the need for an evidentiary hearing as the government makes baseless allegations of strategy as to why counsel failed to take critical actions.

The government also claims that Mr. Gabrion was not prejudiced and cites the Sixth Circuit opinion which referred to Roach's testimony as "peripheral".  "Roach's testimony was far from critical in establishing Gabrion's guilt." *Gabrion II*, 648 F.3d at 336.

Some context is required here.  The Sixth Circuit was reviewing a claim about whether the defense should have been able to impeach Ms. Roach with certain materials.   However, the Sixth Circuit took as true – because there was no reason not to -  Ms. Roach's testimony and the "facts" that Mr. Gabrion had manipulated the process.  The court stated that Ms. Roach testified to uncontested facts – "the progress of the rape trial in state court".  *Id.*, at 337.

This Court is now aware that these facts should have been uncontested and more specifically, had these facts been contested it would have been shown that Roach's testimony about the progress of Mr. Gabrion's rape trial was not true in a number of ways.  When one honestly looks at what the Sixth Circuit held about Ms. Roach and why, it can hardly be said that her testimony would still be considered by the court to be "peripheral".

## M.    *Trial counsel were ineffective because they failed to present evidence as to other suspects.*

In his amended petition Mr. Gabrion alleged that trial counsel was ineffective in failing to present evidence of other credible suspects, including David Gabrion and Eddie Start.  In support of this claim, Mr. Gabrion attached several exhibits which had been disclosed in discovery and which supported his claim that both of these men were credible suspects.

As to David Gabrion, the government seems to acknowledge the veracity of the evidence that Mr. Gabrion brought forth in his amended petition.  The government appears instead to argue that this evidence, for a variety of reasons, does not establish David Gabrion as a credible suspect.  This amounts to a factual dispute.  It also turns on

trial counsel's investigation and theory of defense. This further establishes the need for an evidentiary hearing and factual development.

As to Eddie Start, the government again appears to acknowledge the veracity of the exhibits brought forth by Mr. Gabrion. The government argues that "There was ultimately no reliable evidence to support the claim that Start was with Timmerman on the date of her disappearance or killed her." Page ID 5175.

There is evidence, which Mr. Gabrion has brought forth in 1.C and in the introduction to this section which establishes that Start was with Ms. Timmerman on the date or after the date she disappeared. The question of reliability is an interesting one as all of this is evidence that was discovered by the government. This too establishes the need for an evidentiary hearing to determine the reliability of this evidence.

Mr. Gabrion was prejudiced by his counsel's failure to investigate and present this evidence and he was prejudiced as a result.

## N. Trial counsel were ineffective when they failed to object to the removal of a sleeping juror.

In this claim Mr. Gabrion alleged that trial counsel were ineffective for not objecting when the trial court removed a juror it thought had been sleeping. The government's response is simply to cite the opinion of the Sixth Circuit in this matter which relied in part on Federal Rule of Criminal Procedure 24(c). However, the government failed to note that the Sixth Circuit reviewed this claim under plain error because trial counsel failed to object. This is the gravamen of Mr. Gabrion's claim – that his trial counsel's failure to object meant that the issue was not properly preserved for appellate review. Had this issue been properly preserved Mr. Gabrion would have prevailed on appeal as he would not have been under the plain error standard and the

record – set forth in the amended petition – did not establish cause for the trial court's removal of the juror.

It was deficient performance to fail to object and properly preserve this matter for appeal and Mr. Gabrion was prejudiced as a result.

### O. Trial counsel were ineffective when they failed to investigate the cause of death and failed to object to prejudicial arguments about same.

In this subsection Mr. Gabrion asserts that trial counsel was ineffective for failing to investigate the cause of Ms. Timmerman's death and by failing to object to the government's argument as to cause of death. In his Amended Petition Mr. Gabrion attached the affidavit of an expert pathologist, Dr. Daniel Spitz. Page ID 4988-90.

The government argues that there was no need for a defense expert, at least in part due to trial counsel's cross-examination. Of course, by the time that trial counsel conducted that cross-examination there was no time to engage or consult with an expert pathologist. This is simply reasoning backwards to suggest justification for a decision that had already been made – not to retain a defense pathologist.

Similarly, the government suggests that somehow retaining a defense expert would have made the Mr. Gabrion's defense worse because he would have been subject to cross-examination. Notably, the government does not suggest anything Dr. Spitz testified to by affidavit was incorrect. It does highlight the areas of agreement he has with Dr. Cohle but that hardly proves that a defense pathologist would have backfired.

Under the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ["ABA Guidelines"] counsel have an obligation to "conduct thorough and independent investigations relating to issues of both guilt and penalty."

82

ABA Guidelines 10.7(A), reprinted in 31 Hofstra L. Rev. 913, 1015 (emphasis added). When the evidence is forensic, this obligation dictates the following: "With the assistance of appropriate experts, counsel should aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." *Id.* at 1020 (emphasis added).

In *Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015), the Court held the state court unreasonably applied *Strickland* where trial counsel failed to retain and consult a forensic pathologist on time of death. The State expert had changed his opinion about the time of death of the victim prior to trial. Instead, of retaining and consulting with a defense expert on the issue of time of death, Rivas's counsel simply proceeded to trial on the premise that Rivas's "uncorroborated and incomplete" alibi defense. *Id.*

The Second Circuit found the state court's application of *Strickland* was unreasonable given the circumstances of Rivas's case. The prosecution's case against Rivas "turned on" linking the newly opined time of death the hole in Rivas's alibi. *Id.* According to the Second Circuit, Rivas's trial counsel had a "constitutional duty to make reasonable investigations" by retaining and consulting with a competent expert to counter the prosecution's expert. *Id.* As the *Rivas* Court notes, "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Id.* at n. 31.

The decision to abandon investigation is reasonable if the information known to counsel at the time makes such investigation unnecessary. See, *Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2005) (Defense counsel's decision not to investigate forensics of fatal bullet with expert assistance unreasonable because counsel

83

recognized during their investigation that this evidence was "the factual predicate" for prosecution's contention that defendant intended to kill).

Further, Dr. Cohle cannot be considered an independent expert. Independent as used in this context means an expert who is not aligned with the prosecution in the case to be tried.  See, *Ard v. Catoe*, 372 S.C. 318, 642 S.E.2d 590, (2007) (Defense retained expert who formerly supervised prosecution expert and had reviewed that expert's report in the case before leaving employment at the State lab "was not independent." Questioning prosecution expert's findings would require defense expert to Acast doubt on his own oversight of that very same analysis).

**P.     Trial counsel were ineffective when they failed to seek and retain a defense pathologist to assist in cross-examination and preparation of the defense.**

The government relied on its response to Section O above.  Mr. Gabrion incorporates the facts and reasoning set forth in Section O above and in the Amended Petition as to this claim.

**Q.     Trial counsel were ineffective when they failed to impeach Lloyd Westcomb.**

The government argued that Lloyd Westcomb's testimony "all by itself proves to you the defendant is the killer" (TR 1700).   Trial counsel had evidence that would have impeached Westcomb and failed to use it.  In his amended petition Mr. Gabrion discussed Mr. Westcomb's medical records and the use that could have been made of those.

As to the witnesses who could have testified that Mr. Westcomb did not have a reputation for honesty the government suggests that those witnesses could have further bolstered Westcomb's credibility.  Page ID 5180.  Again, this establishes the need for

an evidentiary hearing at which this court could judge Westcomb's credibility and the opposing witness's credibility rather than relying on the government's assessment.   The government takes different approaches to Mr. Westcomb's importance, arguing at trial he proved the case all by himself and arguing now that he really does not matter due to other evidence against Mr. Gabrion.   The fact is that Mr. Westcomb was very important in the case against Mr. Gabrion as set forth at length in the amended petition.

The government argues that Mr. Gabrion's claim in the amended petition that the medical records issue does not relate back.  It cites no reason or authority for this position.  The operative set of facts has to do with counsel's failure to use existing evidence to impeach Mr. Westcomb's credibility.  The existing mental health documents fall squarely within that set of facts.

The government argues at some length that trial counsel effectively cross-examined Westcomb.  Page ID 5179-80.  However, the reality of the situation was that Westcomb's mental and intellectual frailties made an effective cross-examination impossible.  At one point, trial counsel told the court,

> This witness is possibly the worst witness I've ever had to cross-examine.  I can't get him to agree to anything.  I can't get him to talk about anything without rambling off on something else.  Cross-examining him on his previous statement is a morass. (TR 6 at 1370).

This is why Mr. Gabrion was prejudiced by counsel's above failures.  An effective cross-examination of Westcomb was not possible.  He needed to be impeached through collateral and independent witnesses.

85

**R. Trial counsel was ineffective because he should have moved to withdraw in this case.**

In his amended petition, Mr. Gabrion, alleged that there was a conflict between him and trial counsel Mitchell brought about in part by Mr. Gabrion's physical confrontation with Mr. Mitchell. Upon information and belief, counsel believe that there was an incident in which Mr. Gabrion vomited on Mr. Mitchell. Additionally, there was at least one other physical confrontation which was documented at the time and apparently made available to the government.

Attached are reports indicating that on either June 2, 2000 or June 12, 2000, Mr. Gabrion may have head-butted Mr. Mitchell. The attached reports appear to describe the same incident but have different dates. See Ex. 39.

It is apparent that Mr. Mitchell quickly came to avoid contact with Mr. Gabrion. Mr. Mitchell's vouchers show that in the 32 months he represented Mr. Gabrion he spent just 48.9 hours consulting with Mr. Gabrion. See Ex. 40, vouchers of Paul Mitchell. Almost 31 hours, or 63%, of those hours were in the first six months of the case. In the remaining 26 months, he met with Mr. Gabrion for just 18 hours. In those 26 months, there were 18 in which he reported **zero** contact with Mr. Gabrion.

This created an irreconcilable conflict such that Mr. Mitchell should have moved to withdraw. See, for example, *United States v. Moore*, 159 F.3d 1154, 1159-60 (9th Cir. 1998). Mr. Gabrion was prejudiced by counsel's failure to move to withdraw in the face of an irreconcilable conflict of interest.

**S.** *Trial counsel were ineffective in failing to present evidence that Mr. Gabrion was seen with two women and a stroller on June 25, 1997.*

On June 25, 1997, David Knapp was camping at Toogood Lake in Newaygo County. Marvin Gabrion pulled into Knapp's campsite in a Chrysler New Yorker. Gabrion was acting "bizarre" and Knapp noticed that he had two women in the car. Due to Gabrion's bizarre behavior, Knapp noted the license plate number. Knapp called the Newaygo County Sheriff with this information on July 9, after Ms. Timmerman's body was discovered. Ex. 3.17, Page ID 1582-1583.

The license plate reflected that the car was registered to Linda Allen. On July 13, 1997, Gabrion, as Robert Allen, sold a Chrysler New Yorker to Lester Ebright in Fort Wayne, Indiana.  That car was registered to Linda Allen. Ex. 3.18, Page ID 1585-1590. The government's theory was that Ms. Timmerman had been killed certainly no later than mid-June when the letters began arriving from Arkansas and Weeks was last seen alive. This evidence would have undermined the government's theory.

The government contends that this would have hurt Mr. Gabrion more than it would have helped.  In support, it cites to testimony regarding matters from early June. Page ID 5182-83.  This is irrelevant to a determination of this claim.  As is clearly set forth, this report dealt with June 25, 1997.  It cast doubt on the time of death determination of the pathologist.  More importantly, is cast doubt on whether or not Shannon was dead.  At the penalty phase the government argued that Shannon was dead and that this was an aggravating circumstance.

The information from David Knapp regarding what he saw on June 25 was important information that undermined the government's theory of the case.  There was

87

no downside to this information – especially given what the jury already knew and would find out about Mr. Gabrion.

**T.     Trial counsel were ineffective in not presenting evidence casting doubt on the John Weeks aspect of the case.**

In his amended petition Mr. Gabrion argued that there was evidence that would have cast doubt on the government's theory as it relates to John Weeks's participation in this matter.  This should also be considered in the context of the above claims that also show there was ample evidence which would have discredited the government's theory of the case.

The government speculates this evidence would have hurt Mr. Gabrion more than it helped.  The government argued;

> It basically confirmed the government's theory that Weeks had been used to lure Timmerman to Gabrion, and had assisted in her murder. The only advantage to putting such evidence on would be the hope that the jury would construe Weeks's statement to mean that Timmerman was killed somewhere other than Oxford Lake. This would have been a foolhardy gamble because the statement gives no details about where the murder actually occurred, and there is no reason to believe that Weeks would have been truthful to Dragun and Braun about the details.

Page ID 5184

This too establishes the need for an evidentiary hearing   Nothing in what Mr. Gabrion attached states that these witnesses would say anything about Weeks being used to lure Ms. Timmerman to Mr. Gabrion.  What these statements do reflect is that they would say Weeks said that he helped dispose of a body.  Again, the government's argument for federal jurisdiction was far from overwhelming.  Evidence that Ms. Timmerman was killed somewhere – anywhere – other than in the Oxford Lake area where her body was found would have been helpful to Mr. Gabrion.   This evidence

88

could have created a reasonable doubt as to whether Ms. Timmerman was killed on federal property which would be a complete bar to conviction.

**U.      Trial counsel were ineffective in failing to impeach Linda Coleman with the Walter Hamilton information.**

Walter D. Hamilton lived on Lincoln Avenue, very near the Colemans. He was in the area when reporters came to the area in an effort to find Oxford Lake. He was interviewed by government agents on or about February 27, 2002. He was a neighbor of Linda Coleman and her husband, James. Hamilton told agents that he talked often with the Colemans and fished Oxford Lake with James Coleman. They discussed at some length a stranger who they saw in the area.

Prior to trial, Hamilton spoke with Trish Hubbard, the defense private investigator. Hamilton told Hubbard that he had no recollection of Linda Coleman ever saying that she saw two men and a woman down at the lake with a truck and a boat. He believed that he would have recalled her saying something like this. He told Hubbard that he was advised by government agents that his information contradicted Mrs. Coleman and the government could not use him as a witness. The government therefore "let him go." There is no indication in the record that the government disclosed this contradiction to the defense.

The government acknowledges that Coleman testified that she did not tell Hamilton about this.  Using Hamilton would have been important because this would have further emphasized the problems with Hamilton's testimony.  Hamilton was a critical witness against Mr. Gabrion and it was ineffective not to use all evidence possible to impeach her.

89

*V.    Cumulative error.*

Mr. Gabrion has alleged that the cumulative effect of the above errors and omissions prejudiced him such that but for those errors there is a reasonable probability that the result of his trial would have been different.  The government's response is basically that there were no errors and thus, no cumulative error.  Page ID 5186.

In *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003) the Ninth Circuit held "Even if no single error were [sufficiently] prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996).

Mr. Gabrion has demonstrated above that there was numerous examples of deficient performance by his trial counsel.  In addition to the cumulative effect on the outcome of his guilt phase, he was also prejudiced as to the penalty phase.   While the phases of the trial were separate, one jury heard all the evidence.  Because of the acts and omissions described above, Mr. Gabrion's penalty phase was tainted as well and his sentence of death is unreliable and unconstitutional.

## GROUND FOUR

### I.    The Proper Standard of Review

The government says Mr. Gabrion has failed to show his counsel's conduct fell below the prevailing professional norms of reasonably competent counsel.  According to the government, because mitigation witnesses were presented, including experts, and the jury found some mitigating factors, there can be no deficient performance.  The government also relies upon its dual premises that (1) counsel was a "pioneer" in the

area of penalty phase investigation and presentation and, (2) counsel hired an experienced mitigation investigator who was paid "$100,000 on this case, reflecting at least 1,000 hours of work . . . ."  The government seeks to limit the sources upon which this Court can rely to make its findings, arguing that neither Mr. Stetler, nor the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003) may be utilized by the Court in resolving these issues.  The government also says Mr. Gabrion has failed to show prejudice.

First, Mr. Gabrion argues the government has failed to apply the proper standard of review and has culled information it deems relevant to the Court's analysis which is not.  Second, he disputes the government's putative limitations upon the sources this Court may consider in resolving his claims.  Third, he addresses each of the claims made by the government on the merits.  Finally, Mr. Gabrion shows he was prejudiced by counsel's failures by contrasting the argument for life that was actually made compared to the one that could have been made had counsel performed up to constitutional standards.

A.    Proper Application of the Two-Prong *Strickland* Test

Simply, the government is wrong.  Counsel's performance has often been found deficient and prejudicial even though mitigation was investigated and evidence was presented at trial.  See, *Sears v. Upton*, 561 U.S. 945 (2010) (counsel's performance was deficient in spite of presenting 7 witnesses at penalty phase); *Wiggins v. Smith*, 539 U.S. 510 (2003) (counsel's performance deficient even though counsel had client evaluated by a psychologist pretrial and presented mitigation witnesses because they failed to conduct a complete social history); *Rompilla v. Beard*, 545 U.S. 374 (2005)

91

(counsel found ineffective despite consulting three mental health experts).  "We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant."  *Sears v. Upton*, *supra*, 561 U.S. at 955 [emphasis original].  Similarly, the Supreme Court has "never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented." *Id.* at 954 [internal quote and citation omitted].

      (1)     Performance Prong

Two elements are required in all claims of ineffective assistance of counsel and that is true whether counsel presented a case in mitigation or wholly failed to do so. First, the petitioner must show that "his counsel's conduct fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1983).  This first requirement is generally referred to as the "performance prong".

The touchstone of counsel's performance under the Sixth Amendment is reasonableness.  *Strickland*, *supra* at 688.  Counsel must "play[] the role necessary to ensure that the trial is fair'"  *Id.* at 685.  Deficient performance is shown when there has been a failure to meet the prevailing professional norms of reasonably competent counsel.

Constitutional deficiency "is necessarily linked to the practice and expectations of the legal community:  'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.  We long have recognized that prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .'"  *Padilla v. Kentucky*, 559

92

U.S. 356, 366 (2010); see also, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("We have long referred to these ABA Standards as guides to determining what is reasonable."); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred as 'guides to determining what is reasonable.'"). The ABA Guidelines are not "inexorable commands" but they can be important guides to what is reasonable if they reflect the prevailing norms when the representation took place. *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009).

In *Sears v Upton*, *supra*, the Court noted that it has "found deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase". *Sears v. Upton*, *supra*, 561 U.S. at 954 [emphasis original]. For this proposition, the Court cited three cases: *Williams v. Taylor*, *supra* at 398 (penalty phase presentation included evidence that defendant "turned himself in, alerting police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with police after that"); *Rompilla v. Beard*, 545 U.S. 374, 378 (2005) (penalty phase presentation included evidence of residual doubt); *Porter v. McCollum*, 558 U.S. 30, 32 (2009) (per curiam) (the penalty phase presentation included evidence of intoxication).

A theory that might "be reasonable in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory" was prejudicial. *Sears*, *supra* at 953. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence

would lead a reasonable attorney to investigate further." *Wiggins*, *supra* at 527.  The inquiry is necessarily driven by the facts of the individual case.  This "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time'".  *Id.*

When the government says things like, "[t]he Court must assess the reasonableness of the investigation based on what was actually done, not by what could have been done" (Page ID 5205), they are simply wrong.  "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins v. Smith*, *supra*, 539 U.S. at 527.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland v. Washington*, *supra*, 466 U.S. at 690-91.  This is the appropriate test for each of Mr. Gabrion's claims of inadequate investigation.

(2)     Prejudice Prong

The second prong of any ineffective assistance claim is the "prejudice prong".  The petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Wiggins*, 539 U.S. at 534 [citation omitted].  The government properly says the Court must "consider the totality of the mitigation evidence – both that adduced at trial and the evidence adduced in the habeas proceeding – and reweigh it against the

94

evidence in aggravation".  Page ID 5189, citing *Porter v. McCollum*, 558 U.S. at 41 [citation omitted].

In applying the standard for prejudice, it must be remembered that at trial Mr. Gabrion had to convince only a single juror in order for a life sentence to be returned. 18 U.S.C. § 3593 (e).  "Consequently, the standard for establishing prejudice is simply whether a single juror might have struck a different balance".  *Wiggins v. Smith*, *supra*, 539 U.S. at 537; see also, *Phillips v. Bradshaw*, 607 F. 3d 199, 217 (6th Cir. 2010) (same).

The Court must also be mindful that it takes very little to convince a single person of a different result.  A case from earlier this summer provides the most stark example of this truth.  Jessie Con-Ui was serving a life sentence at the time he killed a guard at a USP in Pennsylvania.  Mr. Con-Ui stomped on the victim's head and neck with such force he shattered his larynx and hyoid bone.  He stabbed the guard 203 times, taking a break during the stabbing to wipe his brow, remove his shirt, and shower before continuing.  Mr. Con-Ui stole chewing gum from the victim, unwrapped it, and placed it in his mouth during the assault.  All of this was on video.  All of this was viewed by the jury.  Unsurprisingly, the jury unanimously found the murder was "especially cruel or depraved in that it involved torture or serious physical abuse" to the victim, and that the murder involved substantial planning and premeditation.  The jury also unanimously found that Mr. Con-Ui had previously threatened to harm a federal correctional officer and had assaulted and stabbed other inmates.  In spite of all of this, the jury returned a life sentence.

Lest one think the Con-Ui verdict is a one off, one need only recall the verdicts in Terry Nichols case or Zacharias Moussaui's case.  Mr. Nichols, it will be recalled was Mr. McVeigh's codefendant in the Oklahoma City Bombing case. One hundred sixty-eight (168) victims.  Life sentence.  Mr. Moussaui was the 20th hijacker responsible for the 911 terror attacks. Two thousand nine hundred and seventy-seven (2,977) victims. Life sentence.  Scores of similar cases could be referenced to support this truth.[8] Jurors gravitate toward life for obvious reasons.  The Court is required to consider the mitigation evidence presented at trial and in habeas proceedings and determine whether there is a "whether a single juror might have struck a different balance".

---

[8] *See e.g. United States v. Bass*, 460 F.3d 830, 833 (6th Cir. 2006) (imposing life sentence on defendant for four drug-related murders); *United States v. Beckford*, No. 97-4924, 211 F.3d 1266, at *4 (4th Cir. 2000) (per curiam) (Westlaw) (imposing life sentence on defendant for six drug-related murders); *United States v. Johnson*, 219 F.3d 349, 351 (4th Cir. 2000) (imposing life sentence on defendant for five drug-related murders); *United States v. Pitera*, 5 F.3d 624, 625 (2d Cir. 1993) (imposing life sentence on defendant for seven drug-related murders in which the victims were tortured and their bodies dismembered); *United States v. Williams*, No. 00 Cr. 1008, 2011 WL 3296101, at *1 (S.D.N.Y. July 28, 2011) (imposing life sentence on defendant for execution-style triple murder); *United States v. Kehoe*, No. 4:97-CR-00243-(1), 2008 WL 4079316, at *2 (E.D. Ark. Aug. 28, 2008) (imposing life sentence on defendant for murdering two adults and a small child); *United States v. Moore*, No. 00-157-2, 2005 WL 6797098, at *1 (D.D.C. Mar. 9, 2005) (imposing life sentence on defendant for thirty-one drug related murders); *United States v. Edelin*, 134 F. Supp. 2d 59, 63 (D.D.C. 2004) (imposing life sentence on defendant for fourteen drug-related murders); Carol D. Leonnig, *2 Top Bosses of 'Murder Inc.' Get Life Terms*, WASH. POST, Mar. 10, 2005, at B1; Carol D. Leonnig, *D.C. Gang Leader Blames System for Crime*, WASH. POST, Dec. 18, 2004, at B4; *see also United States v. Gilbert*, 92 F. Supp. 2d 1, 2-3 (D. Mass Mar. 26, 2001) (imposing life sentence on a Virginia nurse who murdered four patients and attempted to murder three others); *United States v. Al-'Owhali*, 691 F. Supp. 2d 441, 441 (S.D.N.Y. 2010) (imposing life sentence on defendant for involvement in the terrorist bombing at American embassies that killed 224 people); Phil Hirschkorn, *Four Embassy Bombers Get Life*, CNN (Oct. 21, 2001), http://www.edition.cnn.com/2001/LAW/10/19/embassy.bombings; *see, e.g.*, U.S. DEP'T OF JUSTICE, CRIMINAL CALLS: A REVIEW OF THE BUREAU OF PRISONS' MANAGEMENT OF INMATE TELEPHONE PRIVILEGES, (1999), *available at* http://www.justice.gov/oig/special/9908/callsp51.htm (reporting on the case of Anthony Jones, who was sentenced for life for six drug-related murders);  *cf. United States v. Alexis Candelario Santana*, Crim. No. 09-427, 2013 WL 101615, at *2 (D.P.R. Jan. 8, 2013) (imposing life sentence on defendant for "La Tombola Massacre" in which eight people were killed; defendant previously convicted of killing or ordering others to kill thirteen others he viewed as threats or disloyal); *No Death Penalty for P.R. Mass Killer*, UPI (Mar. 25, 2013, 8:04 PM), http://www.upi.com/Top_News/World-News/2013/03/25/No-death-penalty-for-PR-mass-killer/UPI-14261364256284/.

*Wiggins v. Smith*, *supra*, 539 U.S. at 537.  Put another way, the question is whether the new evidence undermines confidence in the outcome reached by the jury.  *Id.*

> B.   <u>That trial counsel had written about proper mitigation investigation does not mean he followed his own advice in this case and his writings are legally irrelevant to the application of Strickland in any event.</u>

The government describes trial counsel as a "pioneer in the capital case arena" who wrote about the importance of developing a full and complete social history and beginning a penalty phase investigation early in the proceedings. Page ID 5187.  Even if true, this fact does not alter the standard of review in any way.

The two articles referenced by the government were written in 1986 and 1987, fifteen years before Mr. Gabrion's case went to trial.  Much of what counsel wrote about at that time fell below prevailing professional norms fifteen years later.  But one area counsel wrote about – the need to secure a professional and complete social history – was the norm in the 1980s and continues to be the norm today.  Unfortunately, counsel failed to heed his own advice in this case.  The failures of counsel to prepare an adequate social history are described in further detail below, but this is a primary area where counsel failed to follow his own advice.

Counsel defined the required social history:

> A complete social history consists of a life history that explores in detail *every event of any significance* in the client's life and every relationship that the client has had with virtually anyone throughout his life.

Stebbins, D., *Psychologists and Mitigation: Diagnosis to Explanation*, The Champion (April 1988); Page ID 5301 [emphasis original].

He told his audience why it was important:

> A complete social history is necessary for psychological experts to gain a full understanding of the patient. . . .

Stebbins, D. & Kenney, S., *Zen and the Art of Mitigation Presentation*, The Champion (August 1986), Page ID 5298.

And he told his audience, prophetically for purposes here, the result of an incomplete social history:

> Without a complete social history, any psychological examination is incomplete and the resulting opinions, conclusions, or diagnoses are subject to severe scrutiny.

*Id.*

Mr. Gabrion was 48-years old at the time of trial.  A 10-page, double spaced social history could not possibly have "explore[d] in detail every event of any significance in the client's life" and it did not.  Counsel's writings reflect he knew what was required of him but here he failed to follow the good advice he offered others.

In short, counsel's writings fifteen years prior to trial and his purported status in the capital defense community simply do not establish trial counsel performed up to snuff here.  Mr. Gabrion has made no claim that counsel was unaware of their obligations in this penalty phase. This Court must review what actually happened in this case in assessing the competence of counsel.   "[A] court deciding an actual ineffectiveness claim *must* judge the reasonableness of counsel's challenged conduct *on the facts of the particular case*, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690 [emphasis added].  The analysis is "context dependent." *Wiggins*, 539 U.S. at 523.

If Mr. Gabrion were contending counsel was ignorant of his obligations, counsel's writings might bear some relevance to the analysis here but no such claim is made. The Court must assess the allegations based upon what was done and not done in this

case and not some hypothetical advice given more than a decade before counsel even met Mr. Gabrion.

> C.    The mitigation investigator did not spend 1,000 hours investigating this case.

That the mitigation investigator had experience handling capital case penalty phase investigations in other cases is of limited value in assessing whether his work here met minimal, constitutionally required norms.  The question is what he did – and failed to do - *in this case*.  Again, the standard of review is not altered in any way by the number of hours the investigator put in to this case.  The question remains whether the "known evidence would lead a reasonable attorney to investigate further." *Wiggins*, *supra*, 539 U.S. at 527.

Moreover, the government's estimates are not accurate.  There were factors at play here that were unique.  First, because Michigan has no death penalty, it had no trained mitigation investigators to employ in this case.  Travel to Michigan from the mitigation investigator's home in Ohio was significant.  This time alone accounts for 10 hours *each time* the mitigation investigator left his home *en route* to Michigan and returned to his residence.  This increased travel time just to get started renders any comparison to "normal" hours in other cases of limited value.

What undersigned counsel has learned from conducting its mitigation investigation is that the travel time on this case *within* the State of Michigan is also uniquely substantial.  This was not the sort of urban investigation frequently encountered in death penalty cases where witnesses and records are located in a fairly confined area.  The State of Michigan is large – the largest state east of the Mississippi

99

and 11th largest state overall.[9]  The investigation in this case spanned the entirety of it –

from the Upper Peninsula, to Detroit, to Grand Rapids, and White Cloud.  Much of the

investigation required travel by dirt roads and two-tracks.  This does not account for the

investigation occurring in the states of Arizona, Washington, Texas, California, and

Colorado.

Second, the government's speculation about the time spent investigating this

case is incorrect.  The mitigation investigator's itemized timesheets were not retained by

the court, the investigator, counsel, or the Federal Defender's Office.[10]  All that is

available are the face sheets for the vouchers which reflect the mitigation investigator's

hourly rate and number of hours by month.  The government apparently arrived at its

estimate of 1,000 hours by taking the amount paid divided by the hourly rate.  The

government fails to consider that approximately 28% of the mitigation investigator's

voucher is for witness-coordinating tasks done *during trial* in 2002 – work assembling

witnesses, including experts, waiting, and sitting through trial.  This was not

investigation.  In fact, the 10-page social history prepared by the mitigation investigator

reflects it was completed in 2000, nearly two years before trial.  There are no additional

reports or records regarding follow-up investigation.

Finally, there were payment problems not encountered in similar cases that

necessitated the cessation of work in this case for extended periods of time.  See

Ground 3E above.  Indeed, this may be the reason why the abridged social history – the

only one prepared in this case – was labeled "abridged" and was completed two years

---

[9] http://en.wikipedia.org/wiki/Geography_of_Michigan (last visited August 7, 2017).
[10] 2255 counsel has checked with each of these potential sources, without success.

prior to trial.  Because itemized time sheets were not retained, discovery and a hearing are necessary to flesh out exactly what was done and not done in this case.

## II.    Sources the Court May Consult to Determine the Standard of Care in Capital Penalty Phases When this Case was Tried in 2002.

The government finds flaw with Mr. Gabrion's reliance upon a nationally renowned mitigation consultant and the ABA Guidelines enacted in 2003, one year after Mr. Gabrion's trial, to elucidate the standard of care that existed at the time of Mr. Gabrion's trial.  He will deal with each of these claims in turn.

### A.    A nationally renowned mitigation consultant with decades of experience across the United States and relied upon by other federal judges is qualified to give an opinion on the standard of care.

The government argues Mr. Stetler's opinions regarding the standard of care in the investigation, preparation, and presentation of mitigating evidence should not be considered because he is not a lawyer.[11]   The standard of care in death penalty cases "is not fixed but evolves as new knowledge emerges from experience and study." Freedman, E., *Introduction to the Tenth Anniversary of the ABA Capital Defense Guidelines: The Road Travelled and the Road to Be Traveled*, 41 Hofstra L.R. 587, 588 (2013).  Expert testimony is admissible when "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702 (a).  Expert testimony here will assist the factfinder divine where the standard of care existed on the evolutionary arc in 2002 when this case was tried.

The government says this court has years of legal experience adjudicating this type of claim and thus, does not require the "advice of a nonlawyer to assist him or her

---

[11] No less authority than the United States Supreme Court has considered his expert opinions.  Mr. Stetler was one of the amici in the NACDL brief filed on behalf of the petitioner in *McWilliams v. Dunn*,

in making a legal decision".  Page ID 5192.  This is incorrect in that questions surrounding the effectiveness of counsel are mixed questions of law and *fact*. *Strickland v. Washington*, supra (both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact).

Capital cases are unique and particularly so with the mitigation investigation, preparation, and presentation.  Undersigned counsel acknowledges this Court's tenure, perspicacity, and likely extensive experience adjudicating noncapital ineffective assistance of counsel claims.  Even so, specialized knowledge regarding these unique cases from a person who has handled precisely these kinds of cases over a period of decades will be helpful. The Court, of course, will not abandon its decision-making power to Mr. Stetler but what he has to say will be helpful to the factfinder and that is all that is required.  Given the evolutionary arc of prevailing professional norms described above, expert testimony, subject to cross examination, is the most effective and efficient way to establish the standards of care for capital mitigation investigation and presentation in effect in 2002.

Even in courts that handle high volumes of capital cases  Mr. Stetler's opinions have been admitted and relied upon in rendering decisions concerning the standard of care in the development and presentation of capital case mitigation.[12]  See, e.g.,

---

137 S. Ct. 1790 (2017). The brief was explicitly referenced favorably in the majority opinion.  *Id.* at 1800.  Mr. Stetler's affidavit is attached to the brief as Appendix X.

[12] The sole case cited by the government where Mr. Stetler's opinions were rejected is *Garza v. Ryan*, 2017 U.S. Dist. LEXIS 45483 (D. Az. 2017).  It is noteworthy that the Garza case arose in state court and was in the district court pursuant to 28 U.S.C. § 2254.  Thus, Mr. Garza, unlike Mr. Gabrion, had a full opportunity in state court to fully develop the record.  This is significant in § 2254 cases because review by the federal courts is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  In Garza's § 2254 proceedings, a number of affidavits were rejected specifically for failure to establish diligence.  While the court did state that Mr. Stetler's opinions concerned matters known to the court, it is unclear what role the *Pinholster* doctrine and

*Thomas v. Wong*, 2009 U.S. Dist. LEXIS 131945, pp. 12, 13 (N.D. Cal. 2009) (court reverses death sentence and twice chastises the state court for ignoring Mr. Stetler's testimony); see also, *Eaton v. Wilson*, 2014 U.S. Dist. LEXIS 163567 (D.Ct. Wyoming 2014) (Mr. Stetler's testimony concerning standard of care in capital penalty phases was referenced 34 times in this opinion reversing Eaton's death sentence).

Judge Mark Bennett, a 25-year veteran of the Federal District Court of Iowa, has written about his experiences at both the trial level and subsequent § 2255 review of death penalty cases.  Bennett, M., *Sudden Death:  A Federal Trial Judge's Reflections on the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 42 Hofstra L.R. 391 (2013).  He cautions that it is "critically important for those judges who do not have experience in capital cases to fully appreciate the magnitude of the 'death is different' phenomena . . . ."  *Id.* at 400.  Judge Bennett notes his substantial reliance upon the ABA Guidelines, and particularly Guideline 10.1 (the Defense Case Concerning Penalty), to "assist [him] in determining whether trial counsel's alleged failure to investigate and present mitigation evidence of [the defendant's] mental health at the time of the five murders rose to the level of ineffective assistance of counsel."  *Id.* at 410.  Judge Bennett references his reliance upon Mr. Stetler's testimony in Angela Johnson's § 2255 review of her death sentence.

---

the lack of diligence may also have played in the court's opinion.  It is also significant that the author of the opinion, Judge Susan Ritchie Bolton, presides in Arizona where a high volume of state death penalty cases reach the federal courts.  Judge Bolton has served not only on the district court for 17 years but was also a Superior Court Judge in Maricopa County for 11 years (1989-2000). https://www.fjc.gov/history/judges/bolton-susan-ritchie (last visited August 8, 2017). There are currently 118 persons on death row in Arizona; 79 of those cases arose from Maricopa County. https://corrections.az.gov/public-resources/death-row/death-row-sentences-county-breakdown (last visited August 8, 2017).  And she was a state court judge when Arizona employed judge sentencing in the pre-*Ring* era.  Thus, she not only presided on capital cases but she had personally determined sentence after aggravation/mitigation hearings.

*Id.* at 410, n. 78, citing, *Johnson v. United States*, 860 F. Supp. 2d 663, 681, 783 (D. Iowa 2012). Judge Bennett also lauded scholarship authored by Mr. Stetler. *Ibid.* at 410, n. 76, referencing Stetler & Wendel*, The ABA Guidelines and the Norms of Capital Defense Representation*, 41 Hofstra L.R. 635 (2013).

Though defense counsel is ultimately responsible for shortcomings in the penalty phase presentation, it is the mitigation investigator who is the boots on the ground and actually conducts the investigation. While a capital lawyer with years of experience supervising the work of mitigation specialists could qualify to testify about the standard of care in mitigation investigations, so too, can a mitigation specialist. Mr. Stetler has witnessed the evolution of mitigation practices first-hand throughout the last four decades. He has personally worked penalty phase investigations and presentations literally from New York to California and many places in between.

Mr. Stetler has taught *lawyers* and mitigation investigators throughout the country, including at national seminars focusing on the federal death penalty and in Ohio where trial defense counsel and his mitigation investigator call home. Mr. Stetler has written about mitigation work in law reviews and law journals. In addition to the publications cited in Mr. Stetler's declaration, he is the co-author of *Mitigation Matters*, the first chapter of Tell the Client's Story: Mitigation in Criminal and Death Penalty Cases (Edward Monahan & James Clark, eds), a 463-page treatise published this spring by the American Bar Association. Mr. Stetler has been recognized as a national

expert in numerous state and federal courts throughout the country.[13]  He is qualified to offer an opinion on this topic.

The government also criticizes Mr. Stetler because he is with an organization whose goal is to support the capital defense lawyer.  Page ID 5193.  This goes not to the admissibility of his opinion but rather the weight to be given to it.  *Cruz-Vazquez v. Mennonite Gen. Hosp.*, 613 F.3d 54, 59 (1st Cir. 2010) (court abused its discretion in excluding testimony because questions of potential bias of an expert witness are properly dealt with in cross-examination and do not impact admissibility of witness's testimony, but rather, the weight to be given to it).  It underscores why discovery and an evidentiary hearing are necessary here.

Capital mitigation is one of the myriad areas where "death is different".  Government lawyers and criminal defense lawyers in general practice do not conduct the type of mitigation investigation required in capital cases.  Only persons with extensive experience and training in this discrete area of capital litigation would be qualified to offer opinions about the standard of care.  Only persons with a historical perspective would be able to offer opinions about the standard of care in 2002.  Because this is a task unique to capital defense, it should surprise no one that the persons qualified to offer such opinions are persons who work with the capital defense bar.  Mr. Stetler is uniquely qualified for this task.

A jurist who has seen both well-prepared and poorly prepared mitigation presentations still can be assisted by one who has actually prepared those

---

[13]   Mr. Stetler has now been qualified as an expert witness in live testimony concerning this issue in 31 cases, including the federal district courts of Arizona (twice), Arkansas, California-Eastern, Idaho, Iowa-Northern, Louisiana, Missouri-Western (three times), Tennessee, Texas-Northern, and Wyoming.

presentations and seen where things can and do go wrong.  It is akin to the diner who has eaten meals that were either well-prepared or poorly prepared:  they know the difference between the two, but they do not know what went on in the kitchen.  Mr. Stetler does.

B.    The 2003 ABA Guidelines Are an Appropriate Guideline for the Court's Review.

The government does not want the Court to consider the 2003 ABA Guidelines to assess the standard of care either and they criticize Mr. Stetler for reliance upon them because Mr. Gabrion's case went to trial in 2002.  Page ID 5193.  The government says the 2003 Guidelines are "not definitive as to what constitutes an objectively reasonable performance here".  *Id.*  But to say the 2003 Guidelines should not be considered by the Court because they were not enacted until a year before the case went to trial is to ignore the ratification process and what the Guidelines actually reflect.

The 2003 Guidelines are "not aspirational".  Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (revised 2003), 31 Hofstra L. Rev. 913, 920 (2003).  Rather, they "embody the current consensus about what is required to provide effective defense representation in capital cases."  *Id.*  Numerous experts were consulted and some were retained as consultants.  *Id.*, 31 Hofstra L. Rev. at 916.  The national consensus of the standard of care did not spring into existence on the day the Guidelines were enacted.  Those norms evolved over time.

It took years for the 2003 Guidelines to be vetted through all the ABA subcommittees before they could even be voted upon in the House of Delegates.  "The revision of the Guidelines in 2003 *reflected the evolution of national capital defense practice in the 1990's*."  *The Road Traveled*, *supra*, 41 Hofstra L.Rev. at 675.

To suggest, as the government does, that the 1989 Guidelines, enacted 13 years before the 2002 trial, are more reflective of national norms than the ones enacted the year after trial is simply wrong and ignores the significant time it took to ratify the 2003 Guidelines.  There is no seismic event between Mr. Gabrion's 2002 trial and the enactment of the 2003 Guidelines that dramatically altered the progression of professional norms.  Rather, the norms changed gradually.  And, Mr. Stetler can certainly explain this at a hearing where the government would have the opportunity to cross examine him.

The government also contends the 2003 Guidelines are "not definitive" because "the Supreme Court says so."  Page ID 5193.  *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam) is cited by the government for the fairly unremarkable position that the 2003 ABA Guidelines are not "inexorable commands with which all capital defense counsel must fully comply".  Page ID 5193.  The holding in *Van Hook* is less remarkable still when one considers the lower court had applied ABA Guidelines that were enacted 18 years *after* Van Hook's capital trial.

Mr. Gabrion has never contended the 2003 ABA Guidelines are "inexorable commands" that must be followed no matter the facts.  But "[p]revailing norms of practice reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable."  *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), quoting *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984); see also *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (applying then existing ABA Guidelines as support for the conclusion that a "thorough investigation of the defendant's background" was constitutionally required); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("We long have

referred to these ABA Standards as guides to determining what is reasonable.")
(citations and internal quote omitted).

Interestingly, Justice O'Connor, writing for the Court in *Strickland*, cited the ABA
Criminal Justice Standards for the Defense Function which had not even been
published at the time of Washington's trial in 1979.  *Strickland*, *supra*, 466 U.S. at 688.
Similarly, in Wiggins, Justice O'Connor cited the 1989 ABA Death Penalty Guidelines in
her critique of Mr. Wiggins' 1989 trial.  *Wiggins*, *supra*, 539 U.S. at 524.

As Judge Bennett noted, "the ABA Guidelines are continually regarded as the
single most authoritative summary of the prevailing professional norms of capital
defense practice."  Bennett, *Sudden Death*, *supra*, 41 Hofstra L. Rev. at 410.  This
Court should consider the ABA Guidelines as the Supreme Court directs:  as guidance
for determining what is reasonable.  Guided by the 2003 ABA Guidelines, in conjunction
the facts of this case, and the testimony of Mr. Stetler, the Court will be well positioned
to make the life and death decisions before it.

The reason the government picks this fight is because it believes the 1989
Guidelines are less specific than those enacted in 2003.  The 2003 Guidelines and
Commentary tell counsel that reasonable attorneys conduct a multi-generational
investigation into the client's family:  "Records should be requested concerning not only
the client but also his parents, grandparents, siblings, cousins, and children." ABA
Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1025.  The 1989 Guidelines state
that investigations into mitigating evidence "should comprise efforts to discover all
reasonably available mitigating evidence and evidence to rebut any aggravating

evidence that may be introduced by the prosecutor." The government's position is unavailing for two reasons.

First, regardless of the Guidelines, in 2002, when this case was tried, counsel's "obligation to conduct a thorough investigation of the defendant's background" was well established.  See, generally, *Porter v. McCollum*, *supra* at 39 (death sentence reversed for counsel's insufficient investigation; Porter was tried in 1988); see also, *Williams v. Taylor*, *supra* at 394 (death sentence reversed for counsel's failure to conduct sufficient investigation; Williams was tried in 1986); *Wiggins v. Smith*, *supra* at (death sentence reversed for counsel's failure to prepare a social history report; Wiggins was tried in 1989); *Rompilla v. Beard*, *supra* at 387 (death sentence reversed for counsel's failure to investigate defendant's prior conviction; Rompilla was tried in 1988); *Sears v. Upton*, *supra* (death sentence reversed for failure to conduct complete investigation; Sears was tried in 1993).

Second, and as importantly, the defense was on notice in this case of a heightened need to conduct a complete and thorough penalty phase investigation. When the court assesses the reasonableness of an attorney's investigation, "a court must consider not only the quantum of evidence already known to counsel, but whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins*, *supra* at 527.  This is discussed in further detail below.

### III.    The Individual Claims

"A central – indeed, arguably *the* central - duty of counsel in a capital case is to humanize the client in the eyes of those who will decide his fate."  Freedman, E., *Re-Stating the Standard of Practice for Death Penalty Counsel:  The Supplementary*

*Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L.Rev. 663, 664 (2008).  In other words, counsel's primary obligation is to present a mitigating theme that will resonate with the jury and present the client not as the soulless monster the government portrays, but rather, as a person with qualities that can inspire compassion, empathy, and understanding.  This case was not made for Mr. Gabrion, but it could and should have been.

### GROUNDS FOUR A & B.  Trial counsel were ineffective in failing to conduct a thorough investigation of Mr. Gabrion's social history.

The red flags present in Mr. Gabrion's case, combined with what counsel knew or should have known would be the government's theme for death, would have caused a reasonably prudent capital attorney to conduct a thorough penalty phase investigation and presentation that included a multi-generational history and documents to support counsel's claims.  So, what did counsel know that should have caused them to investigate Mr. Gabrion's family history of mental illness, alcoholism, and family dysfunction?

First, they knew almost immediately upon entering the case that Mr. Gabrion was behaving very erratically.  He sent bizarre letters to the court, filed crazy *pro se* motions, and generally behaved abnormally when he was in court, as well as, when he met with his lawyers.  His conduct was so unusual the magistrate judge *sua sponte* ordered a competency examination.

Mr. Gabrion was evaluated by Dr. Emily Fallis at the Federal Medical Facility at Fort Worth, Texas.  Dr. Fallis noted that "reportedly" Mr. Gabrion had been receiving Social Security Disability benefits since April of 1993.  The prosecutor indicated he

believed these payments were for a "mental impairment" though Mr. Gabrion reported they were for a back problem.[14]  Fallis Evaluation, Ex. 42, p. 6.

Dr. Fallis was apparently also interested in whether there was a history of mental illness in Mr. Gabrion's extended family.  She wrote: "Records indicate no family history of mental illness."  *Id.* at 3.  Medical interest in family history of disease is nothing new. We all have visited physicians who require us to fill out lengthy forms requiring not just our own experience with illness, but also our family and extended family's experience with illness.  Mental health specialists are no different than general medical professionals.  Professional interest in family history of mental illness was, and remains, consistent with the standard of care for mental health professionals.

The standard of care in the mental health field and the capital defense community in 2002 was similar:  family history of mental illness was important for diagnosing the patient/client because of the identified genetic link to major mental illness.  See, American Psychiatric Association's, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994; text revision, 2000) at 386 (noting that twin and adoption studies provide strong evidence of a genetic influence for bipolar disorder).  First-degree relatives of individuals with schizophrenia were known to have a risk for that disorder that is about ten times greater than that of the general population.  *Id.* at 309.

When Dr. Fallis indicated records revealed no history of mental illness in Mr. Gabrion's family it is unclear to what she refers.  Was she referring to the 10-page Abridged Social History prepared by the defense and provided to her during her

---

[14] Memoranda in trial counsel's file attests to the importance of obtaining these social security disability records and the difficulty counsel experienced procuring them.  Nevertheless, it appears counsel never secured them as the records do not appear in trial counsel's file.  Section 2255 counsel have also attempted unsuccessfully to locate them.  Discovery requests for them in these proceedings are pending.

111

evaluation?  It contained no history of familial mental illness.  Only a hearing and discovery will assist the Court in determining this.  It is now clear, however, that there was in fact a pervasive history of mental illness running deep through Mr. Gabrion's extended family that Dr. Fallis rightly would have been interested to know that.  Page ID 4733-4889.

Dr. Fallis concluded: "[H]e does not fit the criteria of any known mental illness and evidence indicates he is malingering in order to prevent his prosecution."  *Id.* at 14. Dr. Fallis listed Mr. Gabrion's primary diagnosis as "malingering", which she defined as the production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives, such as avoiding prosecution in this case.  *Id.* at 15. Dr. Fallis was never asked how this conclusion squared with other aspects of her report, including that Mr. Gabrion had asked the court to find him competent to stand trial and expressed a desire to be executed so he could bring attention to the plight of missing children.  She was never asked how her conclusion that Mr. Gabrion was malingering mental illness squared with Mr. Gabrion's self-report that he received social security disability payments for back problems when the prosecutor indicated they were for a "mental impairment."  She was never asked these things because defense counsel did not request a hearing.[15]

In any event, by May of 2000, Dr. Fallis' report provided a preview of what the government would do were Mr. Gabrion to present evidence of mental illness; the government would claim he was malingering.  That prognostication became cast in

---

[15] Nor was she asked about factual representations in her report that were just false.  For example, she stated that Mr. Gabrion never demonstrated any strange behavior until after he was indicted (*Id.* pp. 8, 3) that he was never subjected to physical or sexual abuse.

stone as Dr. Fallis's report was relied upon by the subsequent evaluators who also found Mr. Gabrion was malingering.

Reasonable capital attorneys with knowledge of their client's bizarre conduct, coupled with the evaluations finding he was malingering, would double down on their investigation if they intended to present mental health evidence.  Reasonable capital defense lawyers would have done what ABA Guideline 10.7 and Commentary say reasonable lawyers do:

> Records should be requested concerning not only the client but also his parents, grandparents, siblings, cousins, and children.  A multigenerational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.

The now-known family history of mental illness is supported by both lay accounts and records.

The government claims these allegations are insufficient in part because Mr. Gabrion has offered no new opinion about his mental health.  We are currently at the pleading stage of these proceedings.  What the government seeks is discovery of Mr. Gabrion's witnesses, something this court has yet to authorize.  The government also claims any new opinion would have to be balanced against the testimony at trial.  While this is in part true, the testimony at trial is susceptible to credibility challenges based upon the lack of information known to the examiners and outright falsities relied upon by them in reaching their conclusions.[16]  This is the fault of trial counsel who failed to

---

[16] For example, Dr. Fallis states in her report that Mr. Gabrion was subject to neither physical nor sexual abuse.  Ex. 42, p. 3. She also says Mr. Gabrion did not demonstrate any strange behavior until after he was indicted.  *Id.* pg. 8.  Both of these representations are false.

discover and make this information known to the examiners and the jury.  The previously unknown evidence is certainly relevant to their conclusions and Mr. Gabrion is entitled to discovery and a hearing to further flesh these claims out.

Moreover, many of the Supreme Court's cases finding capital counsel ineffective over the years have relied upon counsel's failure to properly investigate and present evidence of mental health maladies many years after trial.  *See*, *Sears v. Upton*, 130 S. Ct. 3259, 3261-62 (2010) (per curiam) (quoting an expert's opinion that "Sears performs at or below the bottom first percentile in several measures of cognitive functioning and reasoning" partly due to "significant frontal lobe brain damage," and explaining that Sears had "problems with planning, sequencing and impulse control".  Sears was tried in 1993); *Porter v. McCollum*, 558 U.S. 30, 36 (2009) (per curiam) (explaining that Porter had "substantial difficulties with reading, writing, and memory," along with "cognitive defects," and that state experts could not "rule out a brain abnormality." Porter was tried in 1988); *Rompilla v. Beard*, 545 U.S. 374, 390-93 (2005) (noting that Rompilla had a "third grade level of cognition after nine years of schooling," suffered from "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions," and that Rompilla's "IQ was in the mentally retarded range."  Rompilla was tried in 1988); *Wiggins v. Smith*, 539 U.S. 510, 518, 523 (2003) (noting that social service records documented "borderline retardation" and that testing determined Wiggins to have "an IQ of 79 [and] difficulty coping with demanding situations."  Wiggins was tried in 1989); *Williams v. Taylor*, 529 U.S. 362, 370 (1999) (noting that Williams was "borderline mentally retarded," with "mental impairments"

possibly "organic in origin."); all contained in *The Road Traveled*, 41 Hofstra L. Rev. at 646, fn. 59.

The government further claims that evidence of Mr. Gabrion's "predisposition to mental health problems" may have been a double-edged sword in that mental health problems could cause the jury to conclude Mr. Gabrion posed a risk of future danger as a consequence of those problems.  Page ID 5199.  Similar claims have been rejected by the Supreme Court.  In *Williams v. Taylor*, *supra*, 529 U.S. at 397, the Court granted penalty phase relief on an ineffective assistance of counsel claim.  The dissent described Williams' offense as "just one act in a crime spree that lasted most of William's life", cataloguing all the bad acts a thorough investigation would have revealed.  *Id.* at 418 (Rehnquist, concurring and dissenting).  These bad acts included that in the months following the murder for which Williams was sentenced to death, he "savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow inmate's jaw."  *Id.*  The majority conceded, "[o]f course, not all the additional evidence was favorable to Williams", but concluded that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty".  *Id.* at 396, 398.  In light of the government's extensive future dangerousness case – much of it irrelevant and inflammatory – the double-edged sword claim here is not persuasive.

More importantly, evidence of Mr. Gabrion's major mental illness was not a double-edged sword.  There was readily available information that prior to his arrest here, Mr. Gabrion had been treated successfully with Depakote.  Specifically, in May of

115

1993, Mr. Gabrion was placed on a course of Depakote apparently to treat head injuries.  See Ex. 43 (Medical Psychotherapy Note dated May 3, 1993).  But Depakote is more frequently used to treat "manic episodes associated with bipolar disorder". www.depakote.com (last visited August 27, 2017).  "Depakote is very effective for acute mania, and rapidly so, usually quelling manic symptoms within a week, and this is what Depakote is FDA-approved for."  pro.psychcentral.com/the-lowdown-on-depakote/001618.html (last visited August 27, 2017).

Mr. Gabrion showed marked improvement over the course of his treatment.  In January 1994, Mr. Gabrion reported he had made significant gains, his memory had subjectively improved, and he was living in his own apartment, and appropriately attending to self-care.  Ex. 43 (Medical Psychotherapy Note dated January 20, 1994). In June of 1994, he was reported to have "stabilized in life style significantly" and was "able to contain more affect in this session and begin to face the realities of his long-term disability".  Ex. 43 (Medical Psychotherapy Note dated June 29, 1994).  In October 1994, he was noted to be focusing his therapy on "shame regarding inappropriate behaviors including sensitivity to criticism".  Ex. 43 (Medical Psychotherapy Note dated October 7, 1994).   His treatment was effectively discontinued in June of 1995 when he stopped appearing for consultations and his prescription would have run out.  Dr. Mauger, Mr. Gabrion's treating physician at the time, attributed this to "erratic lifestyle and no family or support system to work with him."  Ex.43 (Medical Psychotherapy Note dated December 29, 1995).

Had counsel pursued this line of investigation, they would have been able to forcefully argue to the jury that, whatever the source of Mr. Gabrion's mental problems,

116

he could be effectively medically managed in prison where he would have more structure than he had on the streets.  Any concerns about future dangerousness would have been ameliorated, and perhaps, totally eliminated.  There simply was no double edge to the mitigation counsel was constitutionally obligated to present.  And the fact that Mr. Gabrion's symptoms began to abate when on a course of Depakote would have alerted reasonable counsel to look more closely at a differential diagnosis or additional diagnosis of bipolar disorder which was consistent with his family history.

Throughout its response, the government seeks to isolate each individual act or omission alleged by Mr. Gabrion at the penalty phase in order to support his claim of ineffective assistance of counsel, and argue that each does not establish the prejudice prong under *Strickland, supra*.  The government's approach is flawed.  Prejudice is not assessed point-by-point in a piecemeal fashion.  Rather, this Court is required to "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation.").  *Williams v. Taylor, supra*, 529 U.S. at 397-98.  The difference here between the mitigation presented and what was available is immense.

The government further contends Mr. Gabrion cannot show prejudice because the government's case in aggravation was overwhelming.  There might be some truth to this statement, but it would be based solely upon counsel's anemic penalty phase representation both in terms of presenting an affirmative case of mitigation and attacking the aggravation presented by the government.  Mr. Gabrion relies here on the startling admission by trial counsel that objections were not made at the penalty phase because the "rules" did not apply.  As a result of this misunderstanding, the case that

the government presented differs markedly from the one that should have been allowed. As we have seen time and time again, a highly aggravated case does not render a death sentence a foregone conclusion.

Defense counsel's closing argument at the penalty phase reflects the reality that what was presented in an attempt to save Mr. Gabrion's life was not remotely compelling, and in many instances, it was harmful to Mr. Gabrion.  Counsel described Mr. Gabrion as "a pretty unpleasant person to be around" and "not a person that anyone wanted to be around at any time."  Sentencing Tr. V, pg. 632.  When he moved into a small town for a time, it became "hell" for the other residents.  *Id.*  Counsel said, it was a "terrible, terrible mess, and he was a very abrasive, obnoxious person".  *Id.* at 632-33.

Counsel blamed Mr. Gabrion for the difficulties "finding out why this happened." *Id.* Counsel told the jury he was "suspicious", "non-cooperative", and "misleading."  *Id.* Counsel said they "put on the history as best we could."  *Id* .at 633.

Counsel described Mr. Gabrion's early upbringing as "somewhat dysfunctional" but assured the jury "this is not a terrible family" and "not the worst thing."  *Id.* at 634. Counsel referenced the testimony of their mental health expert who he said "didn't draw any conclusions because he couldn't, because he couldn't get any cooperation from Mr. Gabrion" *Id.* at 635.  Counsel conceded he "may not know the details" and "we may not have the psychological explanations for it."  *Id.*

Counsel touched on Mr. Gabrion's "drinking a lot, huffing, sniffing glue, sniffing all kinds of inhalants, doing drugs, driving badly because he's drunk, because he's drunk, because he's on drugs . . . ."  *Id.* at 636.  He concluded only by saying it was not "the behavior of a responsible adult."  *Id.*

118

Regarding head injuries, counsel admitted "[t]here are some questions about it." *Id.* at 637. He conceded the 1992 accident was "not a serious accident." *Id.* And then he told the jury "there's some evidence that Mr. Gabrion has spent his life scamming people, including trying to get disability." *Id.* He described the change from Mr. Gabrion's youth and the change his family witnessed between that time and when he became a young adult. *Id.* at 637-38. Counsel returned to a catalogue of Mr. Gabrion's personality characteristics:

> And then you heard a whole lot of testimony primarily from the government, about his behavior in the '80's and the '90s, mostly in the '90s. About how abrasive he is, how argumentative. He walks into people's houses, he assaults people, he threatens people, he plans all kinds of scams on the government and everybody else. He's in their face. He argues. He gets after people. Nobody wants to be around him. Nobody wants to be anywhere near him.

*Id.* at 638.

Because counsel had prepared little of the available evidence upon which to hang his hat, he resorted to a plea for "common sense": "Common sense, common sense tells you that something happened here. Something went wrong." *Id.* He told the jury this was "not normal behavior." *Id.*

Because the government had done an effective job of portraying the 1992 accident as an attempt to falsely secure social security benefits, counsel was forced to tell the jury, [w]e do not contest that. Mr. Gabrion has been dangerous in the past. He has threatened people the jury the "1992 accident is not the issue." *Id.* at 639. He conceded Mr. Gabrion was faking mental health anomalies:

> You should not be surprised, having heard everything else you've heard about Mr. Gabrion this week and during the trial, that he would do this; that he would lie to examiners,

119

that he would fake mental illness, that he tried to pull
something over on them.  He's done it his whole life.

*Id.* at 643.

Counsel continued on the malingering theme:

He's malingering.  There's no question about it.  There is no
question in anybody's mind in this room that he misled those
examiners, and every one of them stood up there and said
that, and we agree with it.

*Id.* at 644.

Counsel acknowledged "I don't have the full answers of how Mr. Gabrion got to

where he is.  We have presented to you what we know."  *Id.* at 644.  He admitted that

there were some things in Mr. Gabrion's history that may have contributed to his

conduct, "but we can't tie it up."  *Id.* at 645.  He repeatedly described his client as

"damaged."  *Id.* at 645, 646.  He told the jury Mr. Gabrion was "dangerous" and

"strange".  *Id.* at 646.

All of this came on the heels of defense opening statement where counsel

discussed the heinous, cruel, and depraved aggravator and told the jury:  "Certainly it's

an unusual and very unpleasant manner of death."  Sentencing Tr. I, p. 42.  Counsel

conceded the substantial planning and premeditation aggravator, telling the jury they

had already found that by their verdict.  *Id.*

Regarding the future dangerousness aggravator, counsel told the jury:

The nonstatutory aggravating factors, the government has
spent a lot of time talking about.  They will present a great
deal of evidence demonstrating that Mr. Gabrion is likely to
danger in the future.  They'll put on a great deal of evidence
to show that he has been dangerous in the past, that he has
been involved in assaults, involved in criminal activity,
involved in threats of assaults, things like this.  They will also
put on a substantial amount of information about his

120

> behavior in the prison, that he has threatened to escape, that he's had contraband, that he is a danger in the prison.

*Id.* at 42-43.

The defense conceded these facts and this aggravator[17]:  "We do not contest that.  Mr. Gabrion has been dangerous in the past.  He has threatened people."  *Id.* at 43.  Perhaps most surprisingly, the defense conceded the obstruction of justice aggravator, telling the jury erroneously that they had already found that "this killing was to obstruct justice, to prevent Rachel Timmerman from prosecuting Mr. Gabrion for the crime of rape."  *Id.* at 44.

This performance simply cannot be what the founders intended when they drafted the Sixth Amendment.  Counsel completely abandoned their mentally ill client who was on trial for his life.  Mr. Gabrion has demonstrated that the case that could have been presented had counsel been performing as counsel within the meaning of the Sixth Amendment would have been very different.

First, the evidence available to rebut the government's primary and false motive theory would have refuted the only evidence supporting the obstruction of justice aggravator.  Had counsel done a modicum of investigation into files that were public record, they would have known this.  At a bare minimum, they would have known that Chrystal Roach lied when she said she had a policy of conducting preliminary examinations and that she wanted to move this case forward.  Counsel knew that Mr. Gabrion had been on bond – something inconsistent with the core of Roach's testimony.  Had counsel performed as counsel, it is unlikely the government would have persisted

---

[17] Inexplicably in light of this concession, the defense tendered a mitigating factor at the close of trial that asked the jury to find Mr. Gabrion would not be dangerous in the future.  Not surprisingly, zero jurors found this mitigator.

121

in presenting the perjured testimony of Chrystal Roach, who had already been disciplined and removed from this case because of her misconduct in this case.  But that did not happen, and Roach was allowed to tell an incredible false tale supporting Mr. Gabrion's alleged manipulation of the court system.

Second, counsel would have challenged and prevailed on keeping out much of the evidence offered under the guise of future dangerousness.  As described earlier in this brief, much of that evidence was irrelevant, prejudicial, and inflammatory.  We even know why this was allowed to happen – counsel misunderstood the standard of admissibility of evidence at the penalty phase.

Competent counsel would have presented the evidence of Mr. Gabrion's early upbringing.  He was raised in a home filled with poverty, violence, and neglect.  His mother was sexually inappropriate with the children, having loud sex in the small home, and telling the children sexual things that were simply not proper.  She had numerous affairs and left the family, abandoning her children, in order to continue them.  She had sex with her daughter's boyfriend.  She encouraged one of her sons to grope her breasts and other family members believed there was more than a mother-son relationship between the two.

Mr. Gabrion's father was physically violent with the children, including Marvin. When he was four years old, Marvin was forced to box with his older brothers for the entertainment of the family.  Mr. Gabrion's father had to be restrained from beating Marvin's head against a wall.  Mr. Gabrion's father consistently told the family when money was tight that he should have sold Mr. Gabrion.  Mr. Gabrion, Sr. was also violent with his wife.  The children had to protect her.

The home the Gabrions lived in was small and squalid. Extended family members complained it smelled of chickens and for good reason.  Turkeys and chickens were allowed free roam in the house.  Mr. Gabrion was mocked in school for his dirty, ill-fitting clothing.  Plates with caked on food were common.  A friend of the family recalls not wanting to eat there because the table was so disgusting and full of dirty dishes.  In short, Mr. Gabrion's upbringing was chaotic and traumatic.

In spite of the chaos in his home, Mr. Gabrion was not a discipline problem in school.  His brothers were known trouble makers, but he was not.  He was on the track team.  He played chess at lunch.  His IQ was estimated to be 121 and his classmates thought he was very smart, though his grades did not reflect his high IQ.  He was known to walk away from fights.

Mr. Gabrion was tenderhearted.  He was kind to others. Mr. Gabrion routinely helped elderly family and community members.  He helped care for a mentally retarded cousin that other family members shunned.  He brought Christmas gifts for children in the family he thought would be overlooked.  In general, he made the children in his extended family feel special.

After high school graduation, all of this began to change.  He began drinking and abusing illegal substances.  There is a long, long line of alcoholism and substance abuse in Mr. Gabrion's extended family.  This can be proven by witness accounts, court and police records, and hospital records.  Scientists who study addiction tell us there is a known genetic link to alcoholism and substance abuse.   As a consequence of the family he was born into, Mr. Gabrion was predisposed to develop problems with alcohol and substance abuse.

Major mental illness also runs in Mr. Gabrion's family.  Witness accounts support this.  So do hospital, court and police records.  Mental health professionals teach us that this too, is an unfortunate consequence of a person's genetic makeup.  So, Mr. Gabrion faced a double whammy in regard to his DNA.

Around the same time Mr. Gabrion began abusing substances, he also began to act bizarrely.  Early adulthood is the time when most major mental illness begins to emerge.  Mr. Gabrion told people he had served in Vietnam; he had not.  He told people he was in the CIA; he was not.  He was regularly thrown out of bars for acting weird.  He told a high school friend that her husband was a narc even though he was not.  He bought a welder and without explanation, buried it.  Mr. Gabrion's mother recalled he was treated for manic depressive disorder (now bipolar disorder).  People said he "seemed crazy".

Whether the substance abuse was the consequence of his genes, or a self-medicating response to the trauma he suffered as a child or the emergence of mental illness cannot be known.  Perhaps it was the confluence of these things.  But it is clear, that whatever the cause, he began getting in car accidents and fights while he was drinking.  Lay witnesses know about these head injuries.  Many of them are documented in police reports or hospital records.  These reports were generated by people who do not know Mr. Gabrion.  They were created at a time when there was no motive to falsify.

Neuroscientists teach us that repeated head trauma can be very debilitating even if a person does not lose consciousness, particularly if another trauma occurs before the last has healed.  Frequently, this sort of brain damage does not show up on brain

imaging studies.  Mr. Gabrion's personality changed dramatically after high school.  We can corroborate that through witnesses who do not currently have contact with Mr. Gabrion and also through records.

Some might think Mr. Gabrion cannot be contained in prison but his past demonstrates the fallacy of this thinking.  Mr. Gabrion was successfully treated with Depakote prior to the crime here.  He did progressively better the longer he maintained his medication regiment.  Unfortunately, because he had no family support, he eventually discontinued his medication and deteriorated.  In prison, the BOP has rules to contain him, but as importantly, proper management of his pharmaceuticals in a highly structured environment like prison will prevent him from acting out in an aggressive manner.

Short of being allowed to conduct discovery and an evidentiary hearing, we will never know why trial counsel abandoned Mr. Gabrion when he needed them most. Regardless of whether he was a difficult client, Mr. Gabrion was entitled to representation by those who would stand up to the government and do everything imaginable to muster all available mitigation.  Mr. Gabrion was sentenced to death by a jury that knew little about the good found in him.

Regarding counsel's failure to investigate evidence of Mr. Gabrion's extended family's history of alcoholism and substance abuse, the government makes no performance argument.  It contends only that Mr. Gabrion cannot show prejudice regarding counsel's failure to advance the substance abuse investigation past Mr. Gabrion to his family members.  In support of this, it argues that "nine jurors found as a mitigating factor that his substance abuse contributed to his criminal conduct, but it did

125

not make a difference in the final calculus." Page ID 5200.  Counsel knew Mr. Gabrion suffered from substance abuse disorders but failed to put that evidence in context.  It was their failure to put the evidence in context that contributed to the jury's failure to find the penalty phase package as a whole, sufficient to extend mercy.

Substance abuse is not inherently mitigating.  Jurors tend to believe that voluntary drunkenness or drug abuse is simply not a reason to extend mercy. Rather, it is a moral failing and "choice" the defendant makes.  Indeed, many a juror would consider this evidence aggravating, rather than mitigating. Reasonable capital defense counsel knows this and works to put evidence of substance abuse *in context*.

The context here is simply this:  Mr. Gabrion comes from a family full of alcoholics and substance abusers.  We know, and knew at the time this case was tried, that alcoholism and substance abuse have a strong genetic component. So, the fact that so many of Mr. Gabrion's relatives suffered similarly is not to criticize them, but it is to say that Mr. Gabrion was genetically vulnerable to alcoholism and substance abuse. Moreover, an expert in addictions could also have testified that Mr. Gabrion's alcohol and drug abuse was likely a coping mechanism used to help him escape his miserable and violent home, as well as, his emerging mental illness.[18]

The connection between alcohol/substance abuse and mental illness was well known at the time of trial:

> Poor people with limited access to mental health treatment often use alcohol or drugs as a means of self-medication to treat disturbing symptoms of mental disease.

---

[18]  There is a high incidence of substance abuse among persons suffering from bipolar disorder.  Cassidy, F. et.al., *Substance Abuse in Bipolar Disorder*, Bipolar Disorders 2001: 3: 181-88.  "One reason for this phenomenon is that a large percentage of individuals attempt to self-medicate with drugs and alcohol in an effort to numb the painful symptoms of their bipolar disorder." http://www.dualdiagnosis.org/bipolar-disorder-and-addiction/ (last visited August 28, 2017).

> However, it is important to remember that intoxication often occurs because of, and in conjunction with, other mental illnesses.  We have represented such people.  This type of defendant is likely to be inaccurately labeled as a drug addict with a disagreeable and mistrustful personality, rather than a paranoid schizophrenic who has tried to control intolerable auditory hallucinations with drugs and alcohol.  Never assume that substance abuse rules out additional mental illness . . . .They often coexist.

Blume, J. and Leonard P., *Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, 24 Champion 63, 66 (2000).

In short, Mr. Gabrion's alcohol and substance abuse was not the completely "free choice" many jurors attach to these disorders.  This context would have had a much greater likelihood of impacting the ultimate decision, particularly when combined with the other mitigation available but not presented.  But to present this in a compelling manner required more investigation than counsel did here.

Finally, the dysfunction and strangeness of Mr. Gabrion's extended family members supports the findings that many of them suffered from serious mental illness.  It also shows a pattern of acceptance for criminal conduct and generally aberrant behavior.  It would have been admissible at trial and given context to Mr. Gabrion's early upbringing.

## C.    Trial counsel were ineffective in failing to secure records.

The government contends the failure to secure records that would support mitigation was not deficient performance and did not prejudice Mr. Gabrion.  Page ID 5210-5212.  The government's argument fails to address the ABA Guidelines and Commentary (rev. 2003) which note that reasonable counsel collects exactly the records Mr. Gabrion has alleged his counsel failed to collect.  That is, records of family members that suffered from major mental illness, alcoholism, substance abuse, and

127

family dysfunction.  Counsel also failed to collect and present records establishing Mr. Gabrion's substantial history of head injuries.

The standard of care in capital cases in 2002 when this case was tried was to collect records from family members, particularly when mental illness was suspected. An article written in 2000, about investigating mental health evidence not just in capital cases, but in any criminal case, noted the importance of record collection from family members when mental health issues are suspected:

> In our experience it is common to find evidence of mental illness dating back several generations.  The investigative net necessarily widens when interviews or documents reveal that earlier generations or members of the larger family have exhibited signs of mental disorder. Continue to expand the investigation exhaustively so long as you find family members who have documented mental health issues.  Such records shed invaluable light on your client's mental health history and demonstrate that the mental condition was a significant factor in your client's life long before the offense that brought him into the criminal justice system.

Blume, J. and Leonard P., *Principles of Developing and Presenting Mental Health Evidence in Criminal Cases*, 24 Champion 63, 64 (2000).

In the immediately preceding argument, Mr. Gabrion has established that mental illness, alcoholism and substance abuse have genetic components.  Counsel knew Mr. Gabrion was acting bizarrely.  They knew the government would claim malingering if they offered any evidence of mental illness.  Because of all of this, they were constitutionally obligated to collect these important records.

The reason records are so critically important in a situation like the trial attorneys faced is that they are largely accounts of persons with no pony in the race who created the documents at a time when no one had a reason to exaggerate or falsify.  They can

128

help corroborate lay accounts and support witness credibility.  Records are also important because they can prove important issues that witnesses simply do not recall.

The available, but undiscovered and unpresented, records in Mr. Gabrion's case establish a rich patina of major mental health disorders that plagued his family. Because these records of family members' mental health disorders, alcoholism, substance abuse, and family dysfunction were created at a time and by persons with no motive to falsify or exaggerate, they are uniquely and inherently trustworthy.  They also establish Mr. Gabrion's predisposition to developing major mental health disorders. Because of this, they could have been a powerful rebuttal to the government's claims of malingering in that would not have relied upon the accounts of the person said to be exaggerating.  These records also show a genetic vulnerability to alcoholism and substance abuse which would tend to rebut the natural human tendency to find these factors not mitigating but, rather, a moral failing

Mr. Gabrion also asserts counsel's conduct fell short when they failed to collect and present records documenting Mr. Gabrion's numerous head injuries.  At trial, counsel contended Mr. Gabrion had some form of brain damage and the likely cause was one of two vehicular accidents he was involved in.  One in 1978 and, the other, in 1992.  No records were introduced proving these accidents even occurred.  As one would expect, the government pounced on this fact:  "And there's no, none, no proof of any accidents in terms of hospital records or police reports.  All we have is stories from the defendant . . . ."  Sentencing Tr. V, pg. 648.

129

The failure to collect and present the records of Mr. Gabrion's head injuries is even more inexplicable.  There is no question that the standard of care in 2002 was to collect all records concerning the client:

> In all criminal cases, any document potentially bearing social history information about the client may be significant.  *That is why you need to get them all.*  It's like panning for gold – you gather all available material, then meticulously sift through it for the valuable parts.  Important clues may be found in records regarding birth, death, school, marriage, social services, military service, employment, and medical treatment, among others.

*Id.* at 64 [emphasis added].

The government contends Mr. Gabrion cannot prevail on this claim because its expert testified at trial to a number of "facts" it claims rebut the possibility that Mr. Gabrion suffered brain injuries.  First, the government says his diagnostic imaging did not show damage.  Page ID 5211.  But "mild TBI's do not show up on standard imaging studies, such as a CT scan or MRI, since the injuries are typically not structural injuries to the brain, but rather, are functional problems caused by swelling or bruising."  Grey, B. & Marchant, G, *Biomarkers, Concussions, and the Duty of Care*, 2015 Mich. St. L. Rev. 1911, 1923.  "There is nothing truly 'mild' about mild TBI."  *Id.*

Mr. Gabrion's repeated head injuries are medically significant.  "Second-impact syndrome" occurs when a person suffers a second concussion before fully recovering from a prior concussion.  *Id.* at 1913.  These people are more susceptible to serious brain injury.  *Id.*  One type of brain injury, CTE [chronic traumatic encephalopathy] , is a "progressive chronic neurodegenerative disease associated with a person sustaining repeated blows to the head."  *Id.*  It can take years or even decades to develop.  *Id.*  It is diagnosed definitely *only* through autopsy.  *Id.* [emphasis added].

"[T]here can be cumulative effects of even relatively minor blows to the head with symptoms increasing in severity and persistence with each additional injury."  Wood, Stacey, PhD. & Agharkar, Bhushan, M.D., *Traumatic Brain Injury in Criminal Litigation*, 84 UMKC L. Rev. 373, 414 (2015).  And although the government's expert testified at trial that loss of consciousness is required, this is simply not true.  Tr. Excerpt of Dr. Griesemer, pg. 38 ("What we lack here is objective evidence of loss of consciousness.).  The scientific truth is that "a person can incur a concussive injury and potentially serious long-term consequences even without losing consciousness, so consciousness is not a requirement for diagnosing an mTBI."  Grey, B. & Marchant, G, Biomarkers, Concussions, and the Duty of Care, 2015 Mich. St. L. Rev. 1911, 1923.  Loss of consciousness is not required for mild traumatic brain injury to occur.  *Id.*

The failure to collect and present the records of Mr. Gabrion's head injuries is even more inexplicable both because these injuries concerned Mr. Gabrion personally and because counsel had decided to embark down the road of neurological deficits.  Capitally charged clientele suffer disproportionately from brain injury.[19]  Consequently, the scientific facts described above were well known to the capital defense community at the time this case was tried because:

> [I]t is widely accepted that damage to the brain can be the
> result of prenatal trauma, disease, exposure to neurotoxins,
> or head injury, among other factors.  Always search diligently
> for causal factors of brain damage.  Remember that in the
> absence of severe head injury or an illness known to
> damage the central nervous system, an accumulation of
> small insults to the brain can result in serious neurological
> impairment and account for organic brain damage.

---

[19] "Research has established that persons accused of criminal behavior are at a very high risk of traumatic brain injuries that predate the offense with which they are charged."  O'Brien, S. & Ferguson, K., *Introduction:  Traumatic Brain Injury and the Law*, 84 UMKC L. Rev. 287, 297 (2015).

*Principles of Developing and Presenting Mental Health Evidence in Criminal Cases, supra* at 65.

Counsel's failures to investigate and present Mr. Gabrion's documented history of brain injuries allowed the government to very effectively argue that he suffered no brain trauma and was malingering neuropsychological deficits.  The truth would have presented a wholly different picture of this extraordinarily damaged man to both the experts who evaluated him (prosecution and defense) and the jury who decided his fate.  All of this is further support for the requested discovery, including the PET scan that was conducted prior to trial and is now missing, and an evidentiary hearing.

## D.     Trial counsel were ineffective in the selection of experts.

The government asserts Gabrion's claim is that he should have had *better* experts.  Page ID 5213.  This is not correct; this is not Gabrion's claim.  The claim is a full investigation as described elsewhere in this document, would have revealed the need for various experts.  For example, a full social history investigation would have revealed Mr. Gabrion's extended family has a storied history of major mental health illnesses and alcoholism/substance abuse.

Reasonably competent counsel would have been aware of this evidence.  And reasonable counsel, aware of this evidence, would have retained experts to testify about the genetic link between mental illness, alcoholism, and substance abuse.  Such testimony would have rebutted the malingering arguments posited so effectively by the government.  And they would have established that Mr. Gabrion's abuse of substances was not entirely a free choice.

The government also claims the decision not to use Dr. Cunningham to offer an opinion about Mr. Gabrion's future dangerousness was strategic.  Page ID 5215.  This is

132

speculation; there is no evidence of this.  The government contends the failure to ask Dr. Cunningham to opine about Mr. Gabrion's dangerousness resulted in the government not being permitted to offer expert testimony on this topic.  The government's argument is illusory.  The government presented witness after witness after witness who testified about Mr. Gabrion's propensity to be a danger in the future.  In rebuttal, the defense offered nothing.  They were not even able to secure testimony about the special measures that could be taken to control Mr. Gabrion.  The government seriously undervalues the control these measures are able to effectuate over problem inmates.  And it drastically over estimates Mr. Gabrion's abilities to wreak havoc inside prison walls.

Due process requires discovery and an evidentiary hearing in order for Mr. Gabrion to fully and fairly present this claim.

## E.     Trial Counsel were ineffective in failing to challenge the obstruction of justice aggravator.

The government's claim that trial counsel's failure to challenge the obstruction of justice aggravator was a strategic decision is pure speculation by the government.  The argument is also preposterous.  There is nothing in the record that supports the government's conclusion.

In other places in his petition, Mr. Gabrion has asserted the government's motive theory (upon which the obstruction aggravator was based) was false and based upon the perjured testimony of Chrystal Roach and he incorporates those arguments here.  The government claims Mr. Gabrion does not show that the challenged testimony was "indisputably false" citing no authority for the high standard the government has concocted.  Page ID 5220.  Mr. Gabrion does not have to show the government's theory

133

was "indisputably false"; the government, and the government alone, bore the burden of proof at trial.

In any event, Gabrion contends he has indeed shown the government's motive theory was indisputably false, based upon perjured testimony, and governmental misconduct.  It is hard to imagine the government would have persisted in this "theory" had trial counsel done even a modicum of investigation to determine whether it was true or not. Simply, the government got away with one because defense counsel was not performing as defense counsel.

The government's claim that it was to Gabrion's benefit to concede an aggravator in the case because the government decided not to present additional evidence during the penalty phase on this point is equally unavailing.  Page ID 5221.  The transcript cited by the government does not evince any *quid pro quo* and even if it did, it would be a fool's bargain because there was nothing in it for the defense.

Defense counsel's obligations are very clear in this regard.  "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," though it certainly is a matter of common sense and advocacy at its most primitive level.  *Rompilla v. Beard*, *supra* at 387.  Looking at the case file of the prior conviction in *Rompilla*, was also required by the ABA Guidelines, old and new.  *Id.*

The facts of *Rompilla* are very similar to what Mr. Gabrion alleges here.  There, defense counsel failed to secure the court file of a prior conviction counsel knew would be part of the government's case in aggravation.  Because counsel was on notice the government would use this information, and because the case file was public record,

134

the standard of care required him to secure the information.  *Id.* at 384.  The Court was quite blunt:

> It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking. . . . [L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.

*Id.* at 389.

The defense was on notice at the time the Death Penalty Notice was filed that the government intended to rely upon Mr. Gabrion's alleged conduct in the state rape case to prove the nonstatutory obstruction of justice aggravator. (Ex. 44) (R.220).  Yet, trial counsel did nothing to investigate the truth of the allegations of obstruction of justice.  Such an investigation would have revealed that Mr. Gabrion was not manipulating the state court proceedings as falsely alleged by the government.  The government also contends Mr. Gabrion has offered no explanation for how the letters retracting the rape allegations made their way to the prosecutor's office and judge's chambers.  Page ID 5220.  It is not Mr. Gabrion's job to solve these mysteries for the government though he would point out that at the time the letters were received, prosecutor Roach found them credible enough to dismiss the charges against Mr. Gabrion and return his bail money.  And the government's own forensic evaluators concluded Mr. Gabrion did not force Ms. Timmerman to write them. Discovery and a hearing is necessary.

**F.    Trial counsel were ineffective in failing to obtain adequate funding to be used in defending this case.**

The government contends the funding in Mr. Gabrion's case fell within the median range for cases tried in and around the time this case was tried.  The government fails to account for the fact that this case was not within the norm at the time it was tried.  It involved five separate murders allegedly committed in four or five different locations.  The bodies of four of the alleged victims had not been located at the time of trial.  It also involved a seriously ill client who was extraordinarily difficult to deal with because of his mental condition.  This was not a run of the mill capital case and run of the mill funding was inadequate.  Finally, none of what the government says accounts for the repeated and substantial delays in the payment of independent contractors causing a cessation of work during significant periods during the investigatory stage of these proceedings.

**G.    Trial counsel were ineffective in failing to object to the introduction of unadjudicated bad act evidence.**

Mr. Gabrion has argued that Defense counsel's conduct fell below the prevailing professional norms of reasonably competent counsel in failing to object to specific "bad acts" evidence that was not relevant to any aggravator, was not reliable and was unfairly prejudicial to Mr. Gabrion. The government responds that the evidence was properly admitted and that trial counsel understood the law that applied to the admission of future dangerousness evidence.  The government points specifically to pre-hearing motions and arguments seeking to limit future dangerousness evidence and argues that trial counsel made strategic decisions not to object in order to limit the harm caused by the evidence.

136

The key to Mr. Gabrion's argument is seen in what happened after his pre-hearing motions were denied.  It was then that trial counsel surrendered their role in the adversarial process by failing to object to the government's irrelevant character assassination evidence.  Regardless of the content of pre-hearing motions, throughout the sentencing hearing, the government introduced, without objection, evidence showing that Mr. Gabrion was violent and generally an obnoxious person.  The bad acts involved were generally described through speculation and hearsay.  They were unadjudicated and were not subjected to any standard of proof before admission at sentencing.

Trial counsel revealed their misunderstanding of the situation early in the sentencing phase of the case.  After an objection, trial counsel stated, "Your Honor, I do know the rules, and the rules don't apply to this case.  We've gotten a ton of hearsay to which I've not objected because the ruled do not apply to this hearing."  (Page ID 5226, R.593. STR 1 at 148).

The government's position is based on the assumption that all of the inadmissible evidence was properly admitted at sentencing.  It ignores the fact that the trial court ruled that it would consider each instance on an individual basis and rule on admissibility accordingly.  The trial court was never called on to exercise that function because trial counsel did nothing to trigger the court's "gatekeeping" function.  It was that abdication of the need to make the adversarial function meaningful that shows that counsel was ineffective.

Mr. Gabrion has argued that this state of events is not surprising in light of the fact that trial counsel felt they had no right to stop the government from presenting

evidence at sentencing, regardless of how irrelevant, unreliable or prejudicial.  The government claims that the situation shows that counsel understood the law.  This argument defies common sense.

Professional norms required counsel to evaluate each piece of evidence offered by the government in order to prepare and offer appropriate objections.  This process did not occur.  See generally, ABA Guideline 10.8 (rev. 2003).  The need to fully litigate all potential claims and to preserve them for subsequent review was well-known in the capital community at the time this case was tried.  And capital litigators have never accepted the notion that objections alienate jurors in cases where the client's life is on the line:

> Failure to make an objection for fear of alienating the judge or jury may be a valid consideration in a case in which there is a good chance of acquittal or the length of sentence will be so short that appellate review will be irrelevant to the client.  But in a capital case, it may deprive the client of life-saving reversal on direct appeal or in habeas corpus proceedings.

Bright, S*., Preserving Error at Capital Trials*, The Champion, Apr. 1997, pg. 43; see also, Freedman, M., *The Professional Obligation to Raise Frivolous Issues in Death Penalty Cases,* 31 Hofstra L. Rev. 1167 (2003) (noting lawyer's obligations to raise issues that call for change in the law in part because Supreme Court has regularly changed its death penalty doctrine over short periods of time).

In this case Mr. Gabrion was disrupting the proceedings regularly, including punching his lawyer in the face in front of the jury.  All manner of inflammatory evidence was being admitted.  A respectful objection by counsel would not have been noticed in light of everything else going on in this courtroom.

Mr. Gabrion has catalogued the specific instances in which improper and prejudicial evidence was admitted at the penalty phase in violation of the 5th, 6th and 8th Amendments.  He was denied due process and the effective assistance of counsel when some 55 witnesses testified while trial counsel felt they had no right to stop what was happening, regarding of how relevant, speculative or improper the evidence.  His death sentence is based on unreliable evidence and information in violation of the 8th Amendment.  The problem was compounded when appellate counsel failed to identify the evidence that was not relevant to the question of future dangerousness in the BOP, causing the Court of Appeals to find that it could not evaluate the claim.

Admissible evidence was evidence that was relevant to one of the properly noticed aggravators, was constitutionally obtained, was reliable, and was not unduly prejudicial.  The government used the future dangerousness non-statutory aggravator to introduce evidence that was not relevant.  In addition, much of the evidence was not evaluated for reliability.  Much of the evidence was unduly prejudicial. Some if it was obtained in violation of the Constitution

The most shocking error occurred when law enforcement officials testified, in responding to the Cass' complaint of shots being fired from Gabrion's residence, upon apprehending Gabrion and entering his home, they were shocked to see a large bullfrog lying on its back on a mattress, 12 inches away from a 14-inch doll wearing only little girl panties.  Both the frog and the doll were spread eagled and had what appeared to be dried bodily fluids on them.  (TR 3/12/02, 270-285).  The testimony that the substance was "bodily fluid" was not offered by a forensic scientist following testing.  It was merely the conclusion of a beat cop.  Mr. Gabrion has raised an issue regarding the search of

139

his residence and the discovery of this evidence.  However, all of the "bullfrog" related evidence was irrelevant and prejudicial.  It was admitted without objection.  The evidence had nothing to do with future dangerousness in prison.  Moreover, it was never disclosed to the defense prior to trial. It is perhaps the most significant example of evidence designed solely to inflame the jury against Mr. Gabrion based on irrelevant acts unrelated to Rachel Timmerman.

Mr. Gabrion has noted and the government has not refuted the argument that the government was not satisfied with the impact of its evidence about the bullfrog.  During the testimony of Dr. Saathoff, the government elicited highly prejudicial testimony about a frog.  On rebuttal testimony, Saathoff reported that Gabrion mentioned frogs during his examination.  Those references were clearly beyond the scope of any defense testimony.  The reference to frogs was simply to permit the inference Gabrion was perverse and should be despised. (TR 3/15/02, 38, 39-40). No attempt is ever made to link this evidence to one of the charged aggravators.  The import of the testimony was simply to inflame and unduly prejudice the jury against Mr. Gabrion.

Also in the inexplicable vein, Joseph Lunsford, testified that while he was in the Newaygo County Jail with Gabrion, he saw Gabrion masturbating to a picture of Shannon VerHage. Again, there was no objection.  The evidence was irrelevant to any proper sentencing issue.  Moreover, this evidence turns out to be false.

In its closing argument, the government recounted each bit of improper evidence for the jury.  This happened without objection.

Professional norms required defense counsel to protect against the imposition of a death sentence based on improper evidence. Here, the most serious non-noticed

140

evidence consisted of the alleged homicides of Allen, Davis and Weeks.  The most absurdly irrelevant and generally prejudicial evidence probably consisted of the "bullfrog" and plastic doll incident.  Again, when pre-hearing motions were denied, trial counsel essentially surrendered to the tidal wave of irrelevant and prejudicial evidence.  The failure to challenge reliability showed deficient performance in light of cases such as *Gardner v. Florida*, 430 U.S. 349, 360 (1977).  Other evidence, such as the alleged arsons, were unsupported by any appropriate evidence.  The claims of sexual misconduct do not meet the standard of heightened reliability required in capital cases.  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  Appellate counsel failed to present this as an argument on appeal.  Had they done so, Mr. Gabrion's death sentence would have been reversed.

The government also offered inadmissible, unreliable evidence without objection concerning the heinous, cruel, or depraved aggravator.  Dr. Steven Cohle returned to the witness stand in the penalty phase for this purpose.  He was permitted to testify, without objection, to his beliefs that Ms. Timmerman would have struggled in an attempt to extricate herself from being bound (there was no forensic evidence supporting this opinion), that Ms. Timmerman would have felt the rocking of the boat and known where she was, and that she would have felt helpless and desperate.  He testified that after she was placed in the water she would eventually come to the conclusion that her situation was utterly hopeless.  These are not medical opinions.  They are prejudicial and inflammatory.  Reasonably competent counsel would have objected to this testimony.

141

The government incorrectly argues that this claim has been decided by the Sixth Circuit.  On direct appeal, counsel did not argue to the court the precise reasons why each allegation of misconduct was improperly admitted.  Rather, counsel made a blanket argument regarding the admission of unadjudicated bad act evidence.  This claim is different – each instance is detailed and the prejudice flowing from the acts is explained.

Mr. Gabrion was denied effective assistance of counsel and a fair sentencing hearing when this evidence was admitted without objection.  He was denied a fair appeal, and effective assistance at that stage of this capital proceeding, when the objectionable evidence was not specified on appeal.

### H.     Trial counsel were ineffective in failing to move to suppress items seized in violation of the Fourth Amendment.

In this Ground Mr. Gabrion alleged counsel ineffective for their failure to object to items and evidence that were introduced at his penalty phase and that were seized in violation of the Fourth Amendment.  This included a shotgun that was seized from Mr. Gabrion's residence and damaging testimony about a bull frog and a child's doll.

The focus of this claim is the testimony of Deputy Lance Workman.   As set forth in Mr. Gabrion's amended motion, Deputy Workman responded to a call by one of Mr. Gabrion's neighbors that Mr. Gabrion was discharging a firearm.  His detailed police report sets forth many of the relevant facts.  Page ID 1700-05.   When Deputy Workman and the other officers arrived, they took up positions and observed the Gabrion residence.   They could see *a single* subject walking around.   They observed Mr. Gabrion "peeking" out of the upstairs window.   Mr. Gabrion later exited the residence with a flashlight.

142

Mr. Gabrion was patted down for weapons and was unarmed.  He was visibly intoxicated.  Deputy Workman asked Mr. Gabrion if he was alone.  Mr. Gabrion told him, "he lived in the apartment alone and there was no one up there at the present time and that no one had been there during the entire evening."   Mr. Gabrion then admitted to firing a shotgun twice from inside the residence.  See Ex. 4.17, Page ID 1700-05.

Mr. Gabrion was placed under arrest and was handcuffed.   Mr. Gabrion told the officers he would not go with them back inside to retrieve the shotgun.  Without a warrant and despite an unambiguous lack of consent from Mr. Gabrion, the officers entered Mr. Gabrion's residence and went upstairs and retrieved the shotgun.

At the penalty phase of Mr. Gabrion's trial, the government introduced the shotgun into evidence without objection through Deputy Workman.  The government also introduced very damaging testimony about what Deputy Workman observed upstairs in Mr. Gabrion's bedroom.  According to Workman, once inside, they went up the stairs and saw a mattress on the floor: "at the bottom of the mattress was a sheet, and at the top end of the mattress where the head would be, there was a bullfrog laying on its back spread-eagled." Workman testified that, about 12 inches from the bullfrog, he saw a small doll dressed in a small child's "girl-style panties." He said, "it was laying on its back, arms and legs open." Workman said that both the frog and doll appeared to have "dried and non dried bodily fluids around them." (STR 2, at 278).

The government's principal contention in response is that there was no Fourth Amendment violation so there could be no deficient performance as any Fourth Amendment objection or argument would have been frivolous.

It is undisputed that the officers who entered Mr. Gabrion's home did so without a warrant. They also did so without Mr. Gabrion's consent. It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004), quoting *Payton v. New York*, 445 U.S. 573, 586 (1980). Thus, the government must establish that there was a valid exception to the warrant requirement in order for the shot gun and the bull frog testimony to have been admissible. No such exception exists.

The government states several times that the items seized were in "plain view". Page ID 5234, 5235. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if (1) its incriminating character is immediately apparent, and (2) if the officers have a lawful right of access to the object, they may seize it without a warning." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Standing alone, the plain view doctrine does not apply here as the officers were clearly not lawfully in a position to view anything. They were inside Mr. Gabrion's home – on the second floor – without a warrant or consent.

The government also urges the protective sweep doctrines as allowing officers access to Mr. Gabrion's home. The protective sweep doctrine is clearly not applicable. Pursuant to *Maryland v. Buie*, 494 U.S. 325, 334 (1990), police can conduct a protective sweep of a building incident to the arrest of persons in the building. Mr. Gabrion was arrested outside his residence, not inside. The scope of such a sweep is limited to "closets, and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.*

144

Mr. Gabrion was arrested outside of his home.  The second floor of his house was not an area "immediately adjoining his place of arrest."  There were no grounds for a protective sweep of the house, let alone a sweep of the second floor.

Finally, the government relies on the exigent circumstances doctrine as a reason to allow the officer to enter Mr. Gabrion's home without a warrant or consent.  This too is unavailing.  The exigency doctrine does not apply when there is enough time to get a warrant.  *Missouri v. McNeely*, 133 S.Ct. 1552, 1572 (2013).  There was clearly time to get a warrant here.  Mr. Gabrion had been arrested, unarmed, and was outside the residence.  The residence had been under observation for at least several minutes and no one else was observed inside.  Mr. Gabrion informed the officers he was alone and had been so all night.

Further, the police report clearly indicated that the officers entered his home to retrieve the shotgun and not to search for additional suspects.   There was no exigency in retrieving the shotgun.  It was not going to dissipate.  Mr. Gabrion was arrested and unable to dispose of it.  The residence was under the control of law enforcement so no one could enter and dispose of the shotgun.  There was ample time to get a warrant to lawfully search Mr. Gabrion's home and seize the weapon.

There was nothing suggesting that officers needed to render emergency aid to anyone inside.  See, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403-04 (2006), *Michigan v. Fisher*, 558 U.S. 45, 48 (2009).  There was no hot pursuit of a fleeing suspect.  Mr. Gabrion was in custody.  *Kentucky v. King*, 131 S.Ct. 1849, 1856 (2011).

The burden is on the government to establish the existence of an exigency. *United States v. Robinson*, 414 U.S. 218, 243 (1973).   At a minimum, this creates a

145

factual issue that can only be resolved through discovery and an evidentiary hearing. The record in front of this Court is clearly insufficient to establish an exigency.

In support of this ground in the Amended Petition, Mr. Gabrion cited *Kimmelman v. Morrison*, 477 U.S. 365 (1986). Pursuant to *Kimmelman* a petitioner may make an ineffective assistance claim based upon the failure to object to or move to suppress evidence seized in violation of the Fourth Amendment. The government appears to suggest that such ineffective assistance claims should be limited to the facts of *Kimmelman* in which the trial court *sua sponte* observed that a valid basis for suppression existed. Page ID 5234-35.

Such a limitation would essentially make *Kimmelman* meaningless. It is not. See, for example, *Joshua v. DeWitt*, 341 F. 3d 430 (6th Cir. 2003)(reversing denial of habeas relief as *Kimmelman* required consideration of counsel's failure to move to suppress pursuant to *United States v. Hensley*, 469 U.S. 221(1985)).

Additionally, as to the shotgun, the government argues that, Mr. Gabrion did not claim any violation as to the admission of that. Mr. Gabrion clearly stated in this argument that he was objecting to evidence seized in violation of the Fourth Amendment (Page ID 4003) and argued at length about the events surrounding the incident with the Cass family and the testimony of Deputy Workman. Page ID 4003-05. This issue is properly and adequately before the Court.

Lastly, the government argues that there was no prejudice from the "bullfrog" testimony. This is part of a larger pattern by the government to defend its individual acts of misconduct by saying they do not matter. The fact is that in a trial that had many disturbing images and testimony, the bullfrog testimony stood out for its suggestion of

146

depravity by Mr. Gabrion.  It suggested both bestiality and a sexual interest in children.

It was highly inflammatory and not relevant to any statutory or non-statutory aggravator.

Mr. Gabrion was prejudiced by the admission (without notice) of this testimony.

## I.      Trial counsel were ineffective in failing to present evidence of the BOP's ability and power to control problem inmates.

Mr. Gabrion has presented claims alleging that the jury in his case was denied

the opportunity to make fair assessment of his future dangerousness because it was not

informed of crucial tools available to the BOP and the trial court to confine, monitor and

discipline him.  The government argues that the jury received all relevant information

and was able to fairly evaluate future dangerousness. A simple comparison of this case

to matters like *United States v. Johnson*, 2010 Lexis 133727 (N.D. ILL. 2010) (Ex. 1.9,

Page ID 1334-1337) shows why the government is wrong.

Dr. Mark Cunningham testified in this case and in *Johnson*. (See Ex. 41).  In both

cases, Dr. Cunningham testified generally about BOP security measures in United

States Prison facilities.  However, he did not testify about special measures available to

BOP and the Court for the purpose of keeping others safe from an inmate.  He did not

testify about requests for special confinement conditions.  He did not testify about the

full scope of available restrictions on communications.  As a result, the jury in each case

found unanimously that the defendant was a danger in the future.

Mr. Gabrion has previously shown that 28 C.F.R. § 501.3 was well-known to all

at trial.  The United States Attorney's Manual ("USAM") Sec. 9-24.000 is entitled

"Requests for Special Confinement Conditions 28 C.F.R. § 501.3."  This Chapter of the

USAM provided instruction to AUSAs regarding requests for special confinement.  Read

147

with Section 501.3, federal prosecutors are instructed explicitly regarding SAM availability.

The prosecutors in this case were well aware of their right to request conditions of special confinement for Mr. Gabrion.  They never acknowledged this to the jury, the Court, or the defense.  In fact, they prevented the jury from hearing the truth regarding the availability of SAMs by objecting to defense efforts to show the jury that Mr. Gabrion would not be a serious threat to others in the BOP.

In addition, the government was aware that the district court could order restrictions on communication and association as part of a sentence pursuant to 18 U.S.C. §3582(d).  The BOP could restrict letters and calls so that people associated with this case were not harassed.  This was particularly important here because Mr. Gabrion was a prodigious letter writer, including writing letters to Ms. Timmerman's family members.

The jury in this case was entitled to know the truth about BOP security measures. The information was improperly withheld from the jury.  This undermines the validity of the death sentence in this case in violation of the 5th and 8th Amendments.

In *Johnson*, based on the limited information provided to the jury, the government, at the certiorari stage, confessed error on the question of whether trial counsel's representation was deficient.  The government admitted that the jury should have known about special confinement procedures, the Court's statutory authority and what happened in the case of *United States v. Felipe*, 148 F.3d 101 (2d Cir. 1998), where the court approved a decision by the BOP to hold an inmate "incommunicado from the entire world, with the exception of his attorneys and a few family members."

The matter was remanded for further proceedings and the trial court found *Strickland* prejudice based on the same facts that led to the government's prior confession of error.

Here, trial counsel was content to let the jury evaluate future dangerousness based on the precise type of evidence that the Johnson court found to be "incomplete". Dr. Cunningham's testimony was in fact incomplete – he mentioned none of the three things that proved to be so important to the *Johnson* court.

The government should not be allowed at this point to claim that the defense had a fair opportunity to educate the jury regarding BOP procedures. The government emphasized future dangerousness in its opening statement at the penalty phase. The government used the future dangerousness non-statutory aggravating factor as its excuse to introduce significant, irrelevant, and inflammatory evidence that generally painted Mr. Gabrion as a bad person. The government ridiculed Dr. Cunningham and called his testimony "irrelevant." As on many other points at sentencing, trial counsel surrendered on this issue. Counsel's conduct fell below the prevailing professional norms of reasonably competent counsel to the prejudice of Mr. Gabrion. Both *Strickland* prongs have been met. The imposition of this death sentence did not comport with due process and it violates prohibitions against cruel and unusual punishment. (U.S. Const. amends V, VI and VIII).

## J. Trial counsel were ineffective in dealing with the aftermath of Mr. Gabrion's assault on trial counsel.

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**K.     Trial counsel were ineffective in failing to introduce into evidence positive reports of Mr. Gabrion's adjustment to incarceration.**

The government argues that the positive reports generated while Mr. Gabrion was confined are meaningless in light of the overall circumstances of the case.  This argument ignores the fact that these reports offered what might have been the only real offset to the government's future dangerousness position as it related to confinement. Counsel needed to present this evidence in order to provide the jury with a full picture of Mr. Gabrion.  There was no downside to establishing that, despite the government's attacks on Mr. Gabrion as a danger in the future, objective evidence existed to the contrary.

Mr. Gabrion has identified all of the records that should have been introduced. Competent counsel would have produced these records and argued just as strenuously that objective evidence existed showing that Mr. Gabrion could adjust to life in the BOP. When this did not occur, his 5th, 6th and 8th Amendment rights were violated by the conduct of his counsel.

**L.     Trial counsel were ineffective in failing to present evidence that Mr. Gabrion required a payee for social security payments.**

The government contends Mr. Gabrion has inadequately plead this claim because it purportedly lacks sufficient specificity.  To the extent the claim lacks specificity it is because Mr. Gabrion's current counsel do not have access to Mr. Gabrion's records evincing that he was assessed and granted social security disability benefits.  In an early evaluation, Dr. Fallis referenced that Mr. Gabrion was receiving benefits that the government told her were for "mental impairment".  Ex. 42, p. 6.

150

Counsel has sought these records unsuccessfully from trial counsel, from the mitigation investigator, and from the fact investigator.  There is a memo in trial counsel's file indicating they tried unsuccessfully to secure them and noting the importance of them but the records themselves are not contained in trial counsel's files.  Undersigned counsel has sought them unsuccessfully from the Social Security Administration, the probation department on the social security fraud case, from defense counsel in the social security fraud case, and from the government.  Mr. Gabrion sought discovery on these records and sought that discovery before he was required to file his amended petition of right.  The request for pre-amendment discovery was denied.  The discovery request remains outstanding.

It appears the government has these records.  To the extent the claim is not plead with adequate specificity it is the fault of the government, not Mr. Gabrion.

 **M.     Trial counsel were ineffective in failing to fully investigate and present to their experts independent evidence showing that Mr. Gabrion had several significant head injuries that were unaccounted for in Mr. Gabrion's psychological evaluation.  This failing greatly prejudiced Mr. Gabrion because this was the precise type of information that both experts and jurors needed to hear in order to properly evaluate Mr. Gabrion.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**N.     Trial counsel were ineffective in failing to protect Mr. Gabrion's right to be present at crucial stages of the proceedings when counsel did not insist that Mr. Gabrion be involved in discussions with the court and when counsel failed to pursue Mr. Gabrion's wish to be present during the testimony of some 25 witnesses in aggravation.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**O.    Trial counsel were ineffective in failing to establish the truth about the 501(c)(3) corporation.**

The government contends this claim has no merit for a number of reasons, including that Mr. Gabrion interrupted the proceedings and said his trial counsel prepared the not-for-profit paperwork and thus, the truth was before the jury.  Mr. Gabrion's trial behavior and various testimonies was bizarre to say the least.  To suggest that he personally remedied his counsel's failure to properly cross-examine the witness is cannot be accurate because there is virtually no possibility the jury credited anything he said in that regard.  Moreover, the notion that a mentally ill client can correct the mistakes of counsel under these circumstances is simply not correct. Counsel was obligated to correct the misimpression left with the jury from the testimony.

Moreover, the government denigrates the importance of this testimony because it claims there was a plethora of other evidence admitted that demonstrated Mr. Gabrion had reasoning powers.  Mr. Gabrion in these proceedings challenges much of that evidence, most particularly the notion that he substantially planned the killing of Ms. Timmerman in order to prevent her testimony in the state rape case.  As importantly, it was the government that felt this evidence was important enough to raise it with numerous experts and in argument.  The government cannot distance itself from the decisions it made during trial.

Finally, the government suggests that perhaps trial counsel's involvement in setting up the not-for-profit corporation was not as extensive as current counsel now claims.  Page ID 5247 ("even assuming that counsel aided Gabrion to the extent alleged . . . ").  Due process requires discovery and an evidentiary hearing to determine the

152

extent of trial counsel's involvement in the evidence the government relied so heavily upon in the prior proceedings.

**P.    Trial counsel rendered ineffective assistance of counsel when they failed to cross-examine Jason Cross, a critical penalty phase witness for the government, regarding his psychological history and failed to investigate the question of whether Cross was to receive consideration for his testimony.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**Q.    Trial counsel failed to conduct a thorough and proper investigation of the witnesses and themes presented by the government in penalty phase. These omissions by counsel included failures of basic investigation, failure to adequately cross examine witnesses, and failure to request discovery necessary to properly defend Mr. Gabrion's life.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**R.    Trial counsel were ineffective in failing to make objections to the government's misconduct during closing argument.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**S.     When a guilt phase juror was unable to participate in the penalty phase, the jury should have been dismissed and a new jury empaneled.  No other option was allowed by the relevant statute.  Trial counsel were ineffective in failing to object to the procedure used.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings *and the need for discovery and an evidentiary hearing is established.*

**T.    Mr. Gabrion was denied effective assistance of counsel at the sentencing hearing when trial counsel failed to challenge the facial constitutionality of the FDPA because the act provides that the rules of evidence do not apply.**

153

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

**U.**    **Mr. Gabrion was prejudiced by the cumulative effects of the individual acts and omissions of counsel such that but for those acts and omissions Mr. Gabrion would have received a sentence less than death.**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

## GROUND FIVE

**A.**    **A material issue exists regarding Mr. Gabrion's competence at trial.**

For all the reasons discussed in his reply on Ground IV, Mr. Gabrion maintains that there is a material issue of fact regarding whether he was tried while incompetent, requiring discovery and a hearing.  The prior findings by the trial court and Sixth Circuit cited by the government should not persuade this Court otherwise, because Mr. Gabrion challenges their reliability due to trial counsel's failure to investigate, to challenge the government's experts, and to advocate for their client, consistent with the standard of care established by the Supreme Court's jurisprudence and the ethical and professional guidelines.

## GROUND SIX

**A.**    **Mr. Gabrion's rights under the Fifth, Sixth and Eighth Amendments were violated by the government's suppression of and/or failure to disclose evidence which was exculpatory and material in violation of Brady v. Maryland, 379 U.S. 742 (1970).  This failure by the government prejudiced Mr. Gabrion in that, but for the government's actions, there is a reasonable probability of a different verdict at the guilt and penalty phases of Mr. Gabrion's trial.**

Mr. Gabrion contends that the government suppressed and or failed to disclose material exculpatory evidence as to several government witnesses including but not

154

limited to Linda Coleman, Gregory Leon, Nathan Brewster and Lonnie Overton.  This includes the suppression of and/or failure to disclose accurate and updated criminal histories on government witnesses.   Mr. Gabrion incorporates by reference the facts as set forth in Ground One and Ground Two.

The government essentially repeats its claims that Mr. Gabrion misconstrues the evidence – it really adds nothing new to its previous arguments. Mr. Gabrion contends that his factual assertions establish a controverted issue of fact that requires discovery and a hearing.  A sentence of death should not follow the government's failure to present the evidence that Mr. Gabrion has identified.

### GROUND SEVEN

**A.**     ***The failure of counsel to raise or effectively argue on appeal claims which are of record violated Mr. Gabrion's Due Process right to effective assistance of appellate counsel.***

Relying on the Due Process Clause of the 5th Amendment and the 6th Amendment, Mr. Gabrion argues that he did not receive effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *United States v. Cook*, 45 F. 3d 388, 392 (10th Cir. 1995). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Here, Mr. Gabrion has shown his counsel's performance on appeal fell below prevailing professional norms in that counsel either failed to recognize meritorious issues or failed to properly raise such issues.

The government claims that the issue Mr. Gabrion identifies is not meritorious. Mr. Gabrion disagrees.  Prior to trial, Mr. Gabrion challenged the warrantless search that

155

resulted in the seizure of evidence admitted at trial, including specific concrete blocks. These blocks were a crucial part of the government's case against Mr. Gabrion. Undersheriff David Babcock testified that, as part of the investigation in this case, he went to the Altona store.  Officers knocked on the front door and received no response. They walked to the back door and knocked, again without a response.  Officers walked toward other residences near the store.  As Babcock walked through the yard he saw some cement blocks near a brush pile.  Some had red paint and some had tar striping similar to the appearance of the blocks "recovered from the body of Rachel Timmerman." (p.15)  Officers were advised to obtain a search warrant before seizing anything and did so.

Babcock testified that he saw the blocks in a brush pile.  He was on Mr. Gabrion's property at the time.  He had no reason to walk across the property when he could have used the streets.

Defendant argued that the search of the property violated the fourth amendment because the police searched the curtilage of Mr. Gabrion's property without a warrant. The Court denied the motion, finding that the "cinder blocks" were in plain view. (p.74) But the plain view doctrine applies only if police are in a place they have a right to be and police had no right to be on Mr. Gabrion's property.

Appellate counsel did not raise any issue relating to the motion.  However, the record indicates that the motion was well taken, as factual findings supporting the Court's ruling were clearly erroneous.  The issue should have been raised on appeal.

The suppression of the cinder blocks would have dramatically altered the government's case at trial.  Suppression would likely have changed the outcome of the proceeding.

In addition, appellate counsel was ineffective in failing to specify on appeal why specific testimony was admitted even though it was irrelevant and inflammatory. Because no designation was made, the appellate court declined to evaluate the argument, which was meritorious.  Those points have been identified above in Ground Four.

Appellate counsel also failed to raise appropriate statutory challenges to the FDPA.  Those challenges are discussed below.

The outcome of the appeal is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger,* 498 U.S. 308, 321 (1991).  The government's attempt to argue that meaningful review occurred here does nothing more than establish a controverted issue of fact.

## GROUND EIGHT

**A.** **_Mr. Gabrion was denied Due Process of Law, Equal Protection of the Law, the Right to Be Free of Cruel and Unusual Punishment, and Effective Assistance of Counsel Because the Federal Death Penalty, as administered, is disproportionately and unconstitutionally applied according to the race of the victim, and trial and appellate counsel made no objection based on this fact._**

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

## GROUND NINE

**A.**    ***Mr. Gabrion's rights under the Fifth, Sixth and Eighth Amendments were violated due to the government's failure to include necessary charges in the Indictment.***

Mr. Gabrion contends that this claim is adequately briefed in the prior pleadings and the need for discovery and an evidentiary hearing is established.

## GROUND TEN

**A.**    ***Trial counsel was ineffective in failing to properly plead post-trial error based on the Jury Foreman's admission that he knew from reading the newspaper that Mr. Gabrion was "off the wall before trial", after testifying during voir dire that he had no opinion about the case.***

The government argues that Claim Ten should fail because it was properly pled by trial counsel and because the juror in question did not lie.  (Page ID 5729).  This argument ignores the facts.  During voir dire, jury foreman Scherff was asked by the court: "Okay.  Have you formed an opinion of this case at this point?"  Scherff replied: "No, I have not." (R. 564, 2).

Mr. Gabrion was denied effective assistance of counsel by the manner in which this constitutional violation was presented to the district court.  The foreman did not tell the truth during voir dire.  He was asked if he had an opinion about the case.  He testified that he did not have an opinion.  If his statement to a reporter is accurate, then he lied during voir dire.  Counsel's failure to present the claim in those simple terms caused the court to find that there was no allegation that the foreman lied.  Proper presentation of the claim would have established the 6th Amendment violation that counsel attempted to present.  The failure to properly plead the claim deprived Mr. Gabrion of effective assistance of counsel in violation of the 6th Amendment.  He was prejudiced because the claim would have succeeded if properly presented.

158

At the least, the facts pled here demonstrate a controverted issue of fact that should be the subject of discovery and an evidentiary hearing.

## GROUND ELEVEN

**A.** ***Due to Mr. Gabrion's chronic and severe mental illness and organic brain impairments, his execution would violate the Eighth Amendment.***

Mr. Gabrion is 63-years old. For at least 40 years, and perhaps longer, he has struggled with mental illness, as well as organic brain disease and neurological impairments. The fact that this was not presented at trial in the detail expected of competent counsel does not diminish the fact that it is true. The Eighth Amendment's prohibition of the execution of the mentally retarded and underage offenders should be expanded to preclude the execution of severely mentally ill individuals such as Gabrion. Similar to people with mental retardation and juveniles, the execution of the mentally ill serves no retributive or deterrent function and offends "evolving standards of decency."

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with mental retardation. The Court reasoned that a person with mental retardation is both less culpable and less able to be deterred because of his "diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318.

In *Roper v. Simmons*, 543 U.S. 304 (2005), the Court held that the execution of juveniles who commit crimes while under age eighteen also violates the Eighth

159

Amendment. Analogous to *Atkins*, the Court reasoned, "[r]etribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . [T]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* at 571-72 (internal quotations omitted).

Although neither *Atkins* nor *Roper* explicitly addresses a categorical exception for persons who are severely mentally ill, the reasoning of the decisions makes necessary an expansion of Eighth Amendment protection to the mentally ill. *Atkins'* and *Roper'*s bar on the death penalty for the mentally retarded and underage offenders was levied to remedy those very wrongs inherent in the execution of the mentally ill.

People with mental illness, like Mr. Gabrion, share the characteristics that make the execution of mentally retarded and underage individuals inconsistent with the retributive and deterrence functions of the death penalty, such as a diminished capacity for understanding, impulse control, and ability to engage in meaningful cost-benefit analysis. ABA, *Special Feature: Recommendation and Report on the Death Penalty and Persons with Mental Disabilities*, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R 668, 670 (2006).

Moreover, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. That amendment's analysis is "informed by objective factors," such as the views of professional "organizations with

160

germane expertise." <u>Atkins</u>, 536 U.S. at 312, 316 n.21. Here, the leading legal professional organization in the country, the American Bar Association, unequivocally express the view that "[d]efendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law." American Bar Resolution 122A, unanimously passed on August 8, 2006; ABA, 30 MENTAL & PHYSICAL DISABILITY LAW RPT'R at 668. In addition, nearly every major mental health association in the United States has published a policy statement addressing the issue of the execution of mentally ill offenders, and all of those organizations advocate either an outright ban on executing *all* mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented. Moreover, just as in *Atkins* and *Roper*, where international law and opinion weighed against the execution of persons with mental retardation, international law and opinion weigh against the execution of the mentally ill.

## PRAYER FOR RELIEF

**WHEREFORE**, Movant Marvin Charles Gabrion II asks that this Court provide

the following relief:  Vacate Petitioner's conviction and/or sentence and order that

appropriate retrial and/or resentencing proceedings be conducted; or, in the

alternative, conduct an evidentiary hearing to resolve factual disputes. Finally, Mr.

Gabrion requests the Court to grant such further and additional relief as may be just.

**Date:  August 31, 2017**                                   **Respectfully submitted,**

By: /s/ Monica Foster                                          By: /s/ Joseph M. Cleary
     Monica Foster                                                   Joseph M. Cleary
     Attorney for Movant                                           Attorney for Movant
Business Address:                                              Business Address:
Indiana Federal Community Defenders          Indiana Federal Community Defenders
111 Monument Circle, Suite 3200                 111 Monument Circle, Suite 3200
Indianapolis, IN 46204                                    Indianapolis, IN 46204
(317) 383-3520                                                  (317) 383-3520


By:  /s/ Scott Graham
     Scott Graham
     Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, MI 49024
(269) 327-0585