# EXHIBIT 41

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                           File No. 1:99-CR-76

MARVIN CHARLES GABRION, II,

      Defendant.

_____/

Excerpt of Sentencing Hearing
Testimony of Mark D. Cunningham

Before

THE HONORABLE ROBERT HOLMES BELL
Chief United States District Judge
March 13, 2002

APPEARANCES

TIMOTHY P. VERHEY
DONALD A. DAVIS
Assistant U.S. Attorneys
P.O. Box 208
Grand Rapids, MI 49501
Attorneys for Plaintiff

PAUL L. MITCHELL
616 Ottawa Ave., NW
507 Waters Building
Grand Rapids, MI 49503
Attorney for Defendant

DAVID C. STEBBINS
330 S. High Street
Columbus, OH 43215
Co-Counsel for Defendant

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

I N D E X

Witness:                                                          Page


MARK D. CUNNINGHAM


     Direct Examination by Mr. Stebbins                  3


     Cross-Examination by Mr. Davis                    20


     Redirect Examination by Mr. Stebbins              26

                                    Grand Rapids, Michigan

                                    March 13, 2002

                                    10:38 a.m.

                              -     -      -


                        P R O C E E D I N G S

                              *      *      *

                        MARK D. CUNNINGHAM,

     A witness called at 10:38 a.m. by the defendant, sworn by

     the Court, testified:

                        DIRECT EXAMINATION

BY MR. STEBBINS:

Q     Would you state your name, please?

A     Mark Douglas Cunningham.

Q     And what is your occupation?

A     I'm a clinical and forensic psychologist in private
practice.

Q     Okay.  And how long have you done this?

A     Over twenty years.

Q     Could you explain to the jury what exactly clinical
forensic psychology is?

A     Clinical psychology is evaluation and treatment of
psychological disorders.  Forensic psychology is the
application of psychological research and techniques to legal
issues, all the way from child custody evaluations through

competency to stand trial to sentencing determinations, any way that psychological research or techniques can inform the Court.

Q    Now, have you previously testified in court?

A    Yes, I have.

Q    Okay.  What has been generally the subject of your testimony in previous court appearances?

MR. DAVIS:  Objection, irrelevant.

MR. STEBBINS:  It's a basis for how he has his knowledge of this particular subject, Your Honor.

MR. DAVIS:  I don't mind that question.  I don't care how he's testified in other cases, though.

THE COURT:  Sustained.  You may ask that question.

BY MR. STEBBINS:

Q    Okay.  Dr. Cunningham, you have been asked to testify today on a specific subject; is that correct?

A    That's correct.

Q    And what is the subject you've been asked to testify about?

A    I've been asked to testify about ADX Florence, about custody options that are available within the Bureau of Prisons to hold someone at extraordinarily high levels of security in terms of facilities, and also to testify about what mechanisms or restraints can be brought to bear to limit an inmate's communications within the Federal Bureau of

Prisons.

Q    And have you done research on this subject?

A    Yes, sir.

Q    And how have you been able to research this subject?

A    Well, in 1997 I toured ADX Florence, which is the supermaximum custody facility that the Bureau of Prisons operates.  I've also reviewed instructions associated with ADX Florence in operation of what's called a control unit, which is a prison within a prison there in supermaximum custody.  I have reviewed the disciplinary infractions of all the assaultive disciplinaries that have taken place at ADX Florence from 1994 up to early 2000, with the exception of 1999.  Those documents were not provided to me.  I have --

Q    Have you reviewed any regulations?

A    Oh, yes, sir.

Q    Regulations concerning the Bureau of Prisons?

A    Yes, sir.

Q    Okay.  Have there been any other matters that you researched?  Where were you able to get access to these documents and this information?

A    My tour of ADX Florence was ordered by a federal judge. The documents that I've reviewed, many of them were ordered as part of discovery in other federal capital cases.  Some information about the Bureau of Prisons and regulations, you can -- they're in the public domain.  You can download those

from Web sites operated by the Bureau of Prisons.

Q    Okay.  And you have done some of these things?

A    Yes, sir.

Q    And you have done this as part of your research for this and other cases; is that correct?

A    That's correct.

Q    Now, have you prepared some demonstrative exhibits for the jury in this case?

A    Yes, I have.

Q    Okay.  And is it hooked up to this machine we see in front of us?

A    Yes, sir.

Q    Can you turn it on?

A    Yes, sir.

Q    Now, Dr. Cunningham, have you reviewed the -- excuse me.

THE COURT:  Can you see it okay, ladies and gentlemen?

MR. STEBBINS:  I'm in the way.

THE COURT:  Mr. Stebbins, why don't you just back up just a little bit there.

MR. STEBBINS:  Okay.  Can I bring this with me?  Can you see now?  Can everybody see?

THE COURT:  Okay.  Everybody sees okay?  Okay.

BY MR. STEBBINS:

Q    Dr. Cunningham, can you describe this first document you

have on the screen?

A    Yes, sir.  There are -- there is a range of custody that inmates may be held at within the Bureau of Prisons and those range all the way from a minimum security prison up through special security arrangements, and so there's a spectrum of different custody levels, different levels of security.  These vary in terms of the extent of the perimeters around the facility, how many fences and what degree of security those fences entail, by the intensity of the staffing, concentric layers of security within the prison itself, by whether there are gun towers and those sorts of things that as you move up this continuum become steadily more intensive both in the supervision that the inmate is confronted with as well as the degree of security and control over that inmate.

Q    Okay.  Now, are these classifications done by the Bureau of Prisons when a prisoner arrives in the prison, in the prison system?

A    Yes, they are.

Q    And they're based on primarily security risk as viewed by the Bureau of Prisons?

A    That's correct, and those are reviewed periodically, those classifications are.

Q    Okay.  So somebody could be at one level and then move up or down depending on this review; is that correct?

A    That's correct, with some limits.  A federal capital

inmate will not drop below a U.S. penitentiary level, but he may move up from that standpoint.  But this is as low as he will be held during his term of confinement.

Q    And why is that?

A    That's simply what the regulations call for.

Q    The regulations say that a capitally charged defendant who gets a life sentence will --

A    Yes, sir.

MR. DAVIS:  Objection to this witness testifying about a law or a regulation.  That's for the Court to instruct if it's even relevant.

THE COURT:  Well, I think there was a part of a question here that sounded like a statement.  Rephrase the question.  I think the question called for a legal response, so rephrase the question.

MR. STEBBINS:  All right, Your Honor.  We'll move on.

BY MR. STEBBINS:

Q    Now, you have read the regulations; is that correct?

A    That's correct.

Q    And in the regulations -- well, we'll move on from that, I'm sorry.  Have you reviewed the testimony of Bureau of Prisons personnel in other cases?

A    Yes, I have.

Q    And have you heard this testimony that addresses this

classification system?

A    Yes, sir.

Q    And are you familiar with the custody level of the other inmates who have been sentenced to life imprisonment in capital cases?

A    Many of them.

Q    Okay.  And can you describe the information you have about those?

MR. DAVIS:  Objection.  That's about double hearsay, has he heard somebody else testify about somebody else and would he tell us, please, about that.  I object.  It's absolutely irrelevant.

THE COURT:  Sustained.

BY MR. STEBBINS:

Q    Have you obtained information from the Bureau of Prisons about the sentences received by other persons sentenced to life imprisonment?

MR. DAVIS:  Objection, irrelevant.  Your Honor, the question was has he received information about other sentences imposed.

MR. STEBBINS:  It's relevant to other people being sentenced to life imprisonment.  The question is where are they assigned in the prison.  I'm just laying a basis for where they're assigned in the prison system.

MR. DAVIS:  That too is irrelevant.

THE COURT:  I'll permit the answer subject to cross-examination.

THE WITNESS:  Yes, sir.  I have been provided by the Justice Department, the Bureau of Prisons, with follow-up, as I recall, on approximately 25 federal capital inmates who rather than being sentenced to death were sentenced to life without parole at their capital trials.  All of those individuals were held at at least a USP level or U.S. penitentiary level facility.

BY MR. STEBBINS:

Q    Okay.  And some of them higher?

A    Yes, sir.  In the information provided to me by the Bureau of Prisons --

MR. DAVIS:  No question.  I object.

THE COURT:  Next question.

BY MR. STEBBINS:

Q    Okay.  Now, in addition to having reviewed this evidence from the Bureau of Prisons that all of these people are assigned to a U.S. penitentiary level or higher, have you been able to review or view the different security levels at these institutions?

Let me rephrase that question because I don't think that made any sense.  Have you also -- are you familiar with the security levels at the U.S. penitentiary level and higher in the Bureau of Prisons?

Cunningham – Direct Examination                    11

A    Yes, sir, I have a general familiarity with that.

Q    Okay.  Have you been able to observe the security levels?

A    Yes, sir.

Q    At the prisons themselves?

A    At USP Marion and at ADX Florence.

Q    And have you reviewed the security levels or are you familiar from other sources with the security levels at the U.S. penitentiary level?

A    Yes, sir.

Q    Excuse me a moment.  Can you describe to us a typical custody level or typical cell in a U.S. penitentiary --

A    Yes, sir.

Q    -- at the U.S. penitentiary level?  Do you have a slide on that?

A    This is a typical cell at a U.S. penitentiary.  This is USP Florence.  There is both a U.S. penitentiary at Florence and also in that same prison compound there is the supermaximum prison, ADX Florence.  The inmates are double-celled.  There is a bunk bed; a unit, shelf unit; a toilet, sink, stainless steel; a mirror, small table.  This is a pipe chase that allows access to change the lights or work on the plumbing of the cell without actually entering the cell itself.

Q    Okay.  And this is at the penitentiary level; is that correct?

A     That's correct.

Q     Are the inmates in their cells, are they locked in their cells most of the day?

A     No, sir.  They are locked down periodically and are locked down overnight, but much of the day they're involved in programming of one sort or another.

Q     And they are allowed out of their cells to engage in other programs with other inmates; is that correct?

A     That's correct.

Q     Okay.  Now, should a prisoner be assigned to this level, the penitentiary level, and have encountered some difficulties, can the Bureau of Prisons reclassify them?

A     Yes, sir.

Q     And what would that be based on?

A     That would be based on their behavior and evaluation of what level of security they required.

Q     Okay.  And they could raise it up, then, to say Marion or the ADX at Florence; is that correct?

A     That's correct.  USP Marion is a midlevel facility between a standard U.S. penitentiary and ADX Florence.

Q     Can we skip to -- have you been to ADX Florence?  You said you had?

A     Yes, sir, I have.

Q     Do you have a slide on ADX Florence?

A     Yes, I do.

Q    Okay.  Can you describe the cell conditions at Florence at this facility?

A    Yes, sir.  The cells there are vestibule or also called boxcar cells.  There is an outer steel door that slides that's the first entrance into the cell.  You then step into a vestibule that's about three feet wide, and inside the vestibule is another grate or bar door that slides as well.  That blocks the inmate's -- much of the inmate's viewing access to the hall and allows an officer to step into the vestibule area to interact with the inmate while the inmate is still behind bars.

The cell is about seven feet wide by about twelve feet long.  It's between eighty and ninety square feet.  There is a stainless steel shower here in the back.  The window in the back of the cell, this vertical slit window, faces into an inner courtyard so that the inmate never has an observation of the outside perimeter of the facility or how the security or rounds work outside the walls.  It's possible to see the sky if you crane your head and look up through that slit.

This is the -- this is the bunk and it is concrete, and the fixtures in the cell are poured into the -- they're poured into the floor and into the walls.  It isn't that they were then -- it isn't that you had a concrete cell and then you brought the bed in, but instead it's been poured into the structure of the floor.  What that means is that there are no

crevasses in the corners where something could be slid in and hidden.

There's a small shelf here, a recessed area that's concrete.  There's a pad that goes on top of it.  This is the stool that's in the cell.  It's a poured -- it's a concrete cylinder that's poured into the floor.  There's a small concrete table there that is also poured into the wall.

The sink-toilet is a one-piece, a sink, a toilet, water fountain.  It's stainless steel.  There's no toilet seat, so there's nothing to rip off and use as a weapon.  The toilet paper is kept in a cylindrical cavity on the side of this arrangement.  It doesn't have a toilet paper axle in it that, again, might be fashioned into something.

The inmates are -- at the first level of general population at ADX, they're in their cells about 23 hours a day and also are kept in that setting in the control unit as well.  They take their meals in the cell.  Those are passed through a slot in this grate door.

When the inmate is taken out to exercise, if he's in the control unit, he's taken to another room where he exercises by himself; or if he is in the first level of the stepdown program, then he may exercise with two or three other inmates.  When he's taken out of his cell, he backs up to this grate door with his hands behind his back and is handcuffed behind his back before the door is opened.  Feet are shackled

and he's double-escorted by staff members that are carrying a steel-tipped baton.

He's allowed one or two 15-minute phone calls monthly that are monitored.  There are no contact visits. There are no visits where someone else is allowed to touch you.  Instead, the contact visits are through a thick glass talking over the phone.  The glass has a high hammer rating, which means that you can beat on it with a hammer for a period of time before you produce even a small hole.  And the mail is x-rayed, opened and read.

Q    That includes all mail coming in and going out?

A    Yes, sir.

Q    Okay.  Now, is this the most serious control they have at Florence?

A    No, sir.  There is a prison within a prison there as well.  That's the control unit.

Q    Okay.  Can you describe that, please?

A    Yes, sir.  This is simply a view of the same cells from above and the range that they're on.  There are no cells across the hall from these.  Do you want me to skip these pictures?

Q    Yes, please.  We'll come back to some of these matters.

A    In the control unit the inmate is in his cell by himself 23 hours a day.  There is that same sliding outer steel door and sliding inner bar door.  His legs are shackled and he's

handcuffed behind his back before he's removed from the cell. From the control unit he's triple-escorted rather than double-escorted when he's out of his cell. He has seven hours of out-of-cell solitary exercise weekly, and he takes his meals in the cell as well. The duration of that is until he's able to function in a less restrictive environment without posing a threat to others.

Q    And the regulations require that the Bureau of Prisons review these classifications on a regular basis?

A    Yes, sir. There is a monthly meeting that is held on the unit with some of those staff people from the unit. Then every 60 to 90 days there is a review by the regional director. There's an executive committee that consists of the regional director of the region where the control unit is and also the assistant director for correctional services out of Washington, and they every 60 to 90 days review paperwork regarding the inmate and the status and whether confinement on a control unit continues to be required.

Q    And the -- if you know, the determination is based on the inmate's behavior?

A    That's correct.

Q    During the previous period of time?

A    And concern -- as well as what brought them to the control unit in the first place.

Q    Could you explain that?

A    Yes, sir.  Well, for example, if an inmate kills another inmate in the Bureau of Prisons, the policy in recent years has been for them to be confined on the control unit for a minimum of seven years and then evaluate where things are from there.  So from that standpoint, if an inmate had committed that sort of offense and had really good behavior on the control unit for six months, his behavior is not having an immediate effect on that extended confinement there.

Q    But beyond special circumstances such as that, it's reviewed based on the inmate's behavior while in control unit?

A    And continued need.  What brought him there and his behavior while he is there, yes, sir.

Q    Dr. Cunningham, in your studies have you found that -- is the control unit the maximum security that they have in this institution?

A    No, sir.  There is a level that is higher than this.

Q    Can you describe that, please?

A    There are what are described as side pocket cells at ADX that have not yet been utilized to my understanding, and these are cells that allow for the confinement of an inmate with a minimal amount of contact with the staff.  You can see the -- let me maximize this a little bit more.

        There is an inner cell here, again with a double entrance off of the hall.  If an inmate then is sent to outside recreation, then this door right here can be popped.

He comes into this area.  Then this door is opened and he comes into outside recreation.  The door closes behind him. If you want to send him to inside recreation, you would open this door, then this door, then this door, and he would come to an inside recreation area.  If going to visitation, this door would be opened, this door would be opened, and he would come to right here and the visitor would come down the hall and enter this closet area in this fashion.  These cells, these four cells in this area provide then a capability for someone to move between recreation and visitation without that shackling procedure being implemented.

My understanding is these cells have never actually -- there have been no inmates that have occupied these cells.  They exist at ADX but have not been utilized.

Q    And I gather from your testimony that essentially the inmate would be able to do all of these things, recreation, visiting, without having any contact with guards; is that correct?

A    That's correct, without them having to physically handle him, shackle him, and participate in his movement.

Q    Now, Dr. Cunningham, are you aware of the ability of the Bureau of Prisons to take steps to limit communications?

A    Yes, sir.

Q    Okay.  And can you describe those?

A    Yes, sir.

MR. DAVIS:  Objection.  That seems to refer to a statute or a law.  I don't see any -- this is not a legal expert.  I object to displaying it to the jury if he's going to comment about what the law is.

MR. STEBBINS:  Your Honor, I asked a question of whether there are regulations by which the Bureau of Prisons can control the way an inmate communicates with the outside, and his response was yes, there are regulations and there are procedures by which the Bureau can control communications.

MR. DAVIS:  And he did more than just answer, Your Honor.  Without even being asked, he flashed the law, if it's the law, in front of the jury.  Why can't he just answer the question, yes, I'm familiar with it, and then maybe a question, have you prepared a slide.  I object to this.

THE COURT:  You may cross-examine.  This is direct examination.  This is relevant to the initial question that's before us.  You may testify, sir.

BY MR. STEBBINS:

Q    Can you describe the ability of the Bureau of Prisons from your research to control a person's communications with the outside world?

A    Yes, sir.  If the Bureau of Prisons identifies that there is a substantial risk that those communications or contacts would result in the serious bodily injury or death of a person or result in property damage that could cause the serious

injury or death of a person, then they can undertake what are called special administrative measures. Those may include special housing of this person in an administrative detention status and also limit their correspondence or their visits, their interviews with the media, or their use of the telephone to restrict those communications.

Q And this determination is again made by the Bureau of Prisons?

A That's correct.

MR. STEBBINS: Excuse me one moment, Your Honor.

(Defense counsel conferred.)

MR. STEBBINS: Thank you, Dr. Cunningham. I have no further questions.

THE COURT: Thank you.

Do you wish to cross-examine?

MR. DAVIS: I do, Your Honor.

THE COURT: Very well.

MR. DAVIS: And I don't intend, Your Honor, to be using the electronic equipment. If you'd like to raise the lights, I'd have no objection.

CROSS-EXAMINATION

BY MR. DAVIS:

Q Good morning, sir.

A Good morning.

Q Is it Mr. Cunningham?

A    Dr. Cunningham.

Q    Dr. Cunningham?

A    Yes, sir.

Q    What kind of doctor are you?

A    I'm a psychologist, a clinical and forensic psychologist.

Q    I listened to your direct testimony.  I heard no doctor evidence in there.  Did I hear wrong?  Did you testify as a doctor today?

MR. STEBBINS:  Objection, Your Honor.  We've been through this.  He's testifying as a fact witness.  He testified as to his --

THE COURT:  It's a fair question.  Fair question.

MR. STEBBINS:  All right.

THE WITNESS:  I'm not sure that's a question I can answer yes or no.

BY MR. DAVIS:

Q    Well, you testified about Bureau of Prisons regulations?

A    That's correct.

Q    Did you -- when you received your doctorate of some sort, did you study Bureau of Prisons regulations to become a doctor?

A    No, sir, not in graduate school.

Q    Did you write your thesis, either your master's or your doctoral thesis on it?

A    No, sir.

Q    As a matter of fact, what was your doctoral thesis?

A    My doctoral thesis was entitled "The Effects of Bilateral EEG Biofeedback on Verbal, Visual, Spacial, and Creative Skills in Learning-Disabled Male Adolescents."

Q    Nothing about Bureau of Prisons whatsoever?

A    No, sir.

Q    You're not a Bureau of Prisons employee?

A    No, sir.

Q    You've never consulted on behalf of the Bureau of Prisons?

A    No, sir.

Q    And in fact you offered no testimony in your direct examination related in any fashion to your degree, did you?

A    Not to the training that I received to obtain the degree, that's correct.

Q    You could have just as easily testified if you were a bricklayer who had gotten a three-hour tour of ADMAX Florence?

A    Perhaps, if the bricklayer also reviewed the regulations.

Q    So a bricklayer who can review regulations.  So your testimony here is based on a three-hour tour of a prison and your reading of regulations.  That's correct, isn't it?

A    And review of other information provided by the Bureau of Prisons.

Q    Yes.  You've testified in this fashion quite often,

haven't you?

A    I have a number of times.

Q    And your testimony doesn't come cheap, does it?

A    I'm well-paid, yes.

Q    Yes.  In U.S. v. Paul Hardy you billed -- your bill was $34,763.86, wasn't it?

A    The exact number I can't verify, but that's approximately correct.

Q    Actually I'm referring to an affidavit signed by you.

        MR. MITCHELL:  Your Honor, could the witness finish his answers before Mr. Davis gets another question out?

        THE COURT:  I thought he had.

        MR. DAVIS:  I thought he had too.  I apologize.

BY MR. DAVIS:

Q    In State of Colorado v. Frank Rodriguez your bill was $26,045.47, wasn't it?

A    That's approximately correct.

Q    And in U.S. v. Everett Spivey, $21,986.87?

A    That's approximately correct.

Q    And in U.S. v. Trinity Ingle, $21,948.63?

A    Yes, sir, also approximately correct.

Q    And in U.S. v. Dean Beckford your bill was $34,581.61?

A    Yes, sir.

Q    And in U.S. v. Darryl Johnson, $23,825.26?

A    That's approximately correct.

Q    And in U.S. v. Marvin Holley, $31,357.39?

A    That's approximately correct.

Q    And you've testified in a number of other cases, have you not, with similar billings?

A    Yes, sir.

Q    As a matter of fact, several years ago your annual income was about $250,000, wasn't it?

A    That's approximately correct, but I don't have -- I don't track those -- I don't track my tax returns as carefully as my wife.  In recent -- the last couple of years, that's been my income level.

Q    Would you like to refer to your previous testimony in which you said that, in which you also said that 60 to 80 percent of your income came from testifying in such matters?

A    That was not several years ago.  I was asked about that this summer regarding my income the prior couple of years or perhaps even last year, and I identified that my income was about $250,000.

Q    And a substantial portion of it comes from such testimony, doesn't it?

A    Not just -- not regarding supermaximum confinement, no, sir.

Q    Do you know who he is?

A    Yes, sir.

Q    I'm pointing at the defendant.

A    Yes, I do.

Q    Did you ever meet him till today?

A    No, sir.  No, sir, I did not.

Q    Do you know anything about him?

A    Very little.

Q    Very little.  And you weren't even asked to do an individual threat assessment as to Marvin Gabrion, were you?

A    No, sir.

Q    In a number of these cases you were asked to do an individual threat assessment?

A    Yes, I was.

Q    And then you came in and testified in your view, they didn't constitute much of a risk?

A    No, sir, that's not correct.

Q    You weren't even asked to do such a threat assessment of this person, were you?

A    I was not asked to do a risk assessment of him, no.

Q    So you're not privy to all the testimony that we've heard about this defendant's conduct both in and out of prison.  You know nothing about that, do you?

A    That's correct.  Except in the most general way.

Q    There's no question to you, sir, now.  You've answered it.

A    I was trying to speak as accurately as I --

Q    No, you're just trying to volunteer, sir.  I didn't ask

you a question.  You're opposed to the death penalty, aren't you?

A    Oh, no, sir.

Q    No, sir?  Have you ever testified for the government in any of these cases?

A    No, sir.  I've never called by the government.

Q    No, I don't think you have.  You've never testified for the government, have you?

A    Not on a capital case, no.

Q    And you've never appeared for the defense and said that any of these individuals that you've testified to, for amounts ranging from 20 to $35,000, that any of those individuals constitute, in your opinion, a risk in prison?

A    No, sir, that's not correct.

Q    Dr. Cunningham, you are on a very high-priced mission, aren't you?

          MR. STEBBINS:  Objection, Your Honor.  That's totally inappropriate.

          THE COURT:  Sustained.  Argumentative.

          MR. DAVIS:  Nothing further.  Thank you.

          THE COURT:  Redirect?

                    REDIRECT EXAMINATION

BY MR. STEBBINS:

Q    Just a few questions, Dr. Cunningham.  Now, Mr. Davis asked you about your income from these types of cases?

A    Yes, sir.

Q    Now, in the cases that Mr. Davis referred to, you had been asked to do different assessments, have a different participation than you were in this case; is that correct?

A    Oh, that's correct, with profoundly more hours invested.

Q    Okay.  In all of the cases that he described, you had significantly different involvement than in this case; is that correct?

A    That's correct.

Q    Now, Dr. Cunningham, you testified that your testimony here today was based on research; is that correct?

A    Yes, sir, my own observation and my own research or investigation regarding the Bureau of Prisons and their regulations and disciplinary standards there and review of disciplinary incidents.

Q    Okay.  And your research skills and abilities are at least in part developed from your training as a psychologist; is that correct?

A    That's correct.

Q    Now, in these other cases where you have done risk assessment, Mr. Davis asked you if you had found them -- all of them to not be a threat, did he not?

A    Yes, he did.

Q    And is that correct?

A    No, sir.

Q    Okay.  And you have found in some of these cases where persons facing capital punishment would be a risk in the prison system; is that correct?

A    In every case I've described what the relative risk is, what the probabilities are that this person will behave violently, commit acts of serious violence in prison.  The extent to which that constitutes a threat or what level of probability is acceptable is the province of the jury.  That's not my call.

Q    Right.  And you weren't asked to do that here?

A    No, sir.

Q    You were asked to assume, weren't you, that he would be a risk?

A    That's correct.

        MR. STEBBINS:  I have no further questions, Your Honor.

        THE COURT:  Thank you.  Recross?

        MR. DAVIS:  No, Your Honor.

        THE COURT:  None?  Thank you, sir.  You may be excused.

        (Testimony of Mark D. Cunningham concluded.)

CERTIFICATE OF REPORTER

I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
406 Federal Building
Grand Rapids, MI 49503