# EXHIBIT 42

## Psychological Evaluation

| | |
|---|---|
| Name: | Marvin Gabrion |
| Register Number: | 09184-055 |
| Case Number: | 1:99:CR:76 |
| Date of Birth: | October 18, 1953 (March 26, 1951, in Presentence Investigation Report) |
| Dates of Evaluation: | March 23, 27, April 10, 14, 16, 18, 21, 2000 |
| Date of Report: | May 8, 2000 |
| Evaluator: | Emily Fallis, Ph.D. |

## Identification and Reason for Referral

The Honorable Judge Joseph G. Scoville, United States Magistrate Judge, Western District of Michigan, ordered an evaluation of competence to stand trial with regard to Marvin Gabrion be completed pursuant to the provisions of United States Federal Code, Title 18, Section 4241. Mr. Gabrion is a 46-year-old, single, Caucasian male charged with Murder. He arrived at the Federal Medical Center (FMC) in Fort Worth, Texas, on March 23, 2000, to begin his evaluation.

Mr. Gabrion was warned of the limits of confidentiality prior to the initiation of the evaluation. He was informed that the usual doctor/patient relationship would not exist. He was told a report would be prepared for the court based on his history and current mental status. He did not restate this warning in his own words when requested to do so; however, based on his remarks thereafter, he seemed to understand the lack of confidentiality at the least.

## Evaluation Procedures

Clinical Interviews (3.50 hours)

Collateral Interviews

Dominick Oliverio, Ph.D., March 23, 2000 (.50 hour)
Paul Mitchell, Defense Attorney, March 27, 2000 (.25 hour)
Tim Verhey, Assistant United States Attorney, March 30, 2000 (.50 hour)
David Stebbins, Defense Attorney, April 18, 2000 (.50 hour)

Review of Records:

National Criminal Information Center (NCIC) record, dated March 2, 2000 (18 pages)

Court Order Requesting Psychiatric Examination, dated January 31, 2000 (2 pages)

Psychology Services Questionnaire, dated March 23, 2000 (1 page)

Gabrion 032594

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Social History and Records of Marvin Charles Gabrion, II, Prepared by David C. Stebbins,
Paul F. Mitchell, and James F. Crates, dated March 22, 2000 (174 pages)

Various documents supplied by Federal Bureau of Investigation Special Agent
Roberta L. Gilligan, various dates (38 pages)

Medical records from Hope Network Brain Injury Program, dated March 1993 to
March 1994 (105 pages)

Photocopies of correspondence signed by Marvin Gabrion, dated September 1, 1999, to
February 27, 2000 (23 pages)

Correspondence from Paul L. Mitchell and David C. Stebbins to the Honorable Judge
Joseph Scoville, dated January 21, 2000 (2 pages)

Correspondence from David C. Stebbins to Warden Bob Guzik, dated March 22, 2000
(3 pages)

Correspondence from Marvin Gabrion to various FMC, Fort Worth staff, dated
March 25, 2000, to April 17, 2000 (14 pages)

Bureau of Prisons Central File for Marvin Gabrion, various dates (445 pages)

Bureau of Prisons Medical Records, various dates (180 pages)

Bureau of Prisons Psychological Data System records, dated October 30, 1997, to
April 18, 2000 (24 pages)

Memorandum from Robert Gober, Correctional Officer, to Emily Fallis, Ph.D., undated
(1 page)

Memorandum from Michael Bourke, M.S., to Emily Fallis, Ph.D., dated April 11, 2000
(1 page)

Memorandum from Robert Gober, Correctional Officer, to Lieutenant Jim Peick, dated
April 21, 2000 (1 page)

Gabrion 032595

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

## Background Information

Mr. Gabrion's background information comes from sources other than the defendant because he was not cooperative in answering questions. On the other hand, much of what is in records was provided by the defendant who sometimes gave inconsistent information. Note also that information given by family members is said to be of questionable reliability because of their difficulty recalling data or their reluctance to answer questions.

Mr. Gabrion reportedly grew up in a two-parent home in Michigan as the fifth of six children. He has three sisters and two brothers, by all reports. His father reportedly worked as a crane operator, while his mother worked as a waitress or in a grocery store (one account states she was a homemaker). Records variously state neither parent abused substances and his father was alcoholic. Records state the defendant was neither physically nor sexually abused. Records indicate no family history of mental illness. Of Mr. Gabrion's siblings, one brother (Michael) apparently has spent time in prison for drug possession.

Mr. Gabrion reportedly had no behavioral problems as a child (either at home or at school) and did not do as well academically as testing suggested he could. School records are quoted as including no significant disciplinary actions. According to a social history written by James F. Crates, Mitigation Specialist, he was "unremarkable" in the classroom, although "peer informants reported that Marvin was 'weird' and 'argumentative' during his high school years." His family also has described him as having a temper. Others, including family members, supposedly have remembered Mr. Gabrion as seeming very smart. He evidently graduated from high school with a "2.8+/-" grade point average. He reportedly was not held back or failed at any level and his grades ranged from B's to D's. Mr. Crates' report states Mr. Gabrion twice participated in individual intelligence testing. Although such testing typically is done only when a child is having some sort of problem, no indication of the reason for the testing was provided. He apparently fell in the Average range of intellectual functioning according to a Full Scale IQ Score of 110 in 1961 (second grade), while he fell in the Above Average range of intellectual functioning according to his Full Scale IQ Score of 121 (Verbal IQ=112; Performance IQ=130) in 1967 or 1968 (ninth grade). Note that such a significant difference (i.e., 15 points or more) between Verbal IQ and Performance IQ can demonstrate a learning disorder. He apparently participated in at least one sport (track).

His early medical history is significant for a serious bout of pneumonia which led to the surgical removal of one lobe of his left lung when in second grade. His later medical history includes two motor vehicle accidents with uncertain injuries in the 1970's. The second of the two accidents involved a head injury, according to family members. These informants apparently recalled some change in Mr. Gabrion's behavior following this alleged head trauma, including being "more

3

Gabrion 032596

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Because of his continuing complaints, Mr. Gabrion eventually was referred to Hope Network for an evaluation of his appropriateness for a rehabilitation program, by all accounts. He was evaluated from March 22 to April 1, 1993, and was determined to be inappropriate for and unlikely to benefit from the program. Records show he was tested with five short but valid neuropsychological techniques in addition to a full WAIS-R by Martin Waalkes, Ph.D. This testing demonstrated a Verbal IQ Score in the Low Average range (score not provided) and a Performance IQ Score of 90. Note that his score on one subtest of the WAIS-R (Comprehension) decreased from a Scaled Score of six to three since the October 1992 testing, although this score should have remained stable or improved given that the head injury occurred a year earlier. Records show the neuropsychological testing demonstrated "severe challenges of attention, stream of awareness, concentration, and investment in sustained ideational activity," as well as moderately to severely impaired problem-solving because of an inability to "sustain continued cognitive effort." The assessment also showed his memory impairments, while present, likely were related to attentional problems. This testing, as well as assessment by other individuals, demonstrated that "prior to [the] injuries [in 1992], a significant personality adjustment challenge" was present. These personality characteristics included excessive self-absorption, reactive moods, social superficiality, controlling behavior, circuitous reasoning, sensitivity to being rejected, and suspiciousness.

Mr. Gabrion evidently first was seen by Ted Mauger, M.D., a psychiatrist, in March 1993 during his assessment at Hope Network. In a record dated March 1993, Dr. Mauger wrote that Mr. Gabrion was intrusive, controlling, appropriately oriented, and exhibiting a "general posture of superiority." Dr. Mauger also wrote that the "formal memory screening is intact. Attention is adequate. Concentration is impaired." This March 1993 record states the defendant's vocabulary and abstract thinking capability seemed above-average (despite the WAIS-R results from the same month which suggested otherwise). Dr. Mauger apparently diagnosed Organic Mental Disorder, Not Otherwise Specified, and Alcohol Abuse at that time. A November 1993 record by Dr. Mauger notes that "[it is] difficult to distinguish functional sociopathic behavior from post-head injury personality disorder symptoms." Thus, similar to other professionals, Dr. Mauger seemed to be noting Mr. Gabrion's manipulative tendencies; however, while he apparently questioned the defendant's veracity in some areas, Dr. Mauger did not question the defendant's veracity regarding his symptoms or possible secondary gain concerns. Records in April 1993 by Dr. Mauger note an EEG "did not reveal seizure activity," while a January 2000 letter from Dr. Mauger states he diagnosed a mental disorder based on the "normal" EEG findings of a one second burst of five Hertz rhythmic activity in the left mid-temporal area. Note this letter continues with the warning that the absence of significant findings in EEG results can not rule out a subtle temporal lobe epilepsy. In other words, the records seem to be saying Mr. Gabrion was diagnosed on the basis of his self-report alone. Dr. Mauger wrote in his January 2000 letter of a syndrome that Mr. Gabrion experienced in 1993 which included demonstrated difficulties in attention, concentration, and memory (despite Dr. Mauger's March 1993 note to the contrary);

5

Gabrion 032597

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

and complaints of dizziness, tension, headaches, fainting spells, anhedonia, poor concentration, nightmares, sensitivity to rejection, impatience, irritability, and formication (i.e., a feeling of something crawling on the skin). The January 2000 letter from Dr. Mauger notes that he was "unable to make a specific assessment as to the cause of the syndrome. However, the syndrome had the specific qualities of the tempero-limbic syndrome." Dr. Mauger wrote in this letter that Mr. Gabrion was profoundly disabled by a combination of this syndrome and a "probable sociopathic personality disorder, substance abuse, and a traumatic brain injury." He added that the "underlying sociopathy with the ability to organize a plan . . . emerged as the most limiting factor in his recovery."

Mr. Gabrion apparently has held various jobs in many states prior to his 1992 car accident, although verifying time periods has been difficult. He reportedly worked as a roofer with his brother-in-law and in the "auto industry" in Ludington, Michigan, the year after graduating from high school. He reportedly then moved to Arizona where he remained for about a year. Records state he moved to Ludington, Michigan, in 1974 and worked for a die-casting business for about one year. Records note he worked as an electrician, specifically a high wire technician, "off and on" in Reed City, Michigan, in 1974 and 1975. He reportedly had training as a journeyman electrician and got employment through the International Brotherhood of Electrical Workers in several states over the next 15 years. According to records, he was fired from a job in White Cloud, Michigan, in December 1979 "due to 'chronic unexcused lateness and inability to perform duties efficiently.'" At other times he apparently has been laid off because of the "sporadic" nature of high wire electrical work. He evidently has pursued seasonal work for brief periods as well.

Mr. Gabrion reportedly has received Social Security Disability benefits since April 1993. Records are unclear as to the disability, although Tim Verhey, Assistant United States Attorney, thought the benefits were awarded because of "mental impairment." Note that Mr. Verhey stated he thought Mr. Gabrion never completed any testing for the disability determination because the Social Security Administration did not want to contest the case. Bureau of Prisons' records indicate Mr. Gabrion reported his benefits were for a "bad back" and denied having mental health problems or treatment in the past. He also apparently told prison staff he had multiple "musculo-skeletal disorders" for which he received monies.

Very little is known of Mr. Gabrion's relationship history. He reportedly has no children but has been married once. While one source stated he married in Dallas, Texas, another stated he married in Tucson, Arizona. He married Melanie in 1982 after dating several months, according to records. The couple evidently separated after a year or so, then divorced in 1985. He has said the marriage ended when the couple disagreed regarding where they should live, in Texas or in Michigan. One report noted a history of "transient relationships," "limited or superficial friendships," and alienation from family members because of a "challenging style of interacting" which apparently predated the 1992 accident.

6

Gabrion 032598

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Mr. Gabrion has a significant legal history (taken from his Presentence Investigation Report), starting with his arrest in May 1976 for Entering without Breaking for which he received six months in jail and two years probation. His next arrest was in August 1983 for Operating Under the Influence of Liquor for which he was fined and had his license suspended. His next offense was Assault in October 1984 for which he was sentenced to five days in jail (suspended) and one year probation. He was arrested in June 1986 for Receiving and Concealing Stolen Property Under $100 and was sentenced to 90 days in jail. He was arrested in January 1987 for Assault with a Deadly Weapon for driving into a vehicle with his own vehicle while drunk. Apparently the warrant has been purged because the arrest occurred so long ago. He was arrested in February 1989 for Driving While Intoxicated (DWI), Obstruction of Justice, and Refusal to Submit to a Breathalyzer Test. He failed to appear for court and a bench warrant for Failure to Appear still is active. He next was arrested in March 1989 for DWI, Refusing to Submit to a Breathalyzer, Driving with a Revoked License, Unregistered Vehicle, Uninsured Vehicle, and Operating a Vehicle without Headlamps. He again failed to appear in court and the bench warrant mentioned earlier included the March 1989 charges. He then was arrested for Operating Under the Influence of Alcohol in October 1989 and received 120 days in jail. Records also include the following: Operating a Motor Vehicle with a Suspended License, November 1989, 30 days in jail; Operating a Motor Vehicle with a Suspended License, August 1991, 90 days in jail; Driving a Motor Vehicle While License Suspended, May 1992, 28 days in jail and two years probation; and Driving While License Suspended, July 1993, 10 days in jail. He was arrested in May 1992 for Felony Assault but was found not guilty. He was arrested next in August 1996 for False Statement in an Application for Passport and prosecution was declined. He was arrested in January 1997 for Felony Sexual Assault but the charge was dismissed when the alleged victim did not come to court. The alleged victim was later found murdered, leading to the current federal case. He was arrested in June 1997 for Operating Under the Influence of Liquor, Third Notice, Operating a Motor Vehicle while License Suspended, and Assault and Battery; these charges were not pursued. He was arrested for Social Security Fraud in October 1997 and was convicted in a jury trial in March 1998. He was sentenced to 60 months, three years of supervised release, and a fine over $13,000. The person whose social security number he was using has been missing since the time Mr. Gabrion began to use the number. Note he has used more than nine aliases and four social security numbers over the years.

Mr. Gabrion's Bureau of Prisons Central File reveals he has received ten Incident Reports for infractions ranging from Being in an Unauthorized Area to Assault without Serious Injury. Although records do not indicate when he first claimed allegiance with Seventh Day Adventist's, he apparently was given a special meal pass as a result of this claim. He later was removed from the special meal pass when he was observed eating food off the main food line. He was designated to the Federal Correctional Institution (FCI), Milan, Michigan, and remained primarily either at that institution or at the Federal Detention Center (FDC), Milan, Michigan prior to this evaluation. Apparently a redesignation was requested and granted because of security concerns in

Gabrion 032599

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

January 2000; however, he never went to the new institution. Records show he completed six health and wellness programs as of February 25, 2000, despite his reported memory difficulties. He also worked as a unit orderly or in the kitchen. He was denied a Medically Unassigned classification despite repeated requests. He had an extensive visiting list with telephone numbers and addresses included. He did not demonstrate any strange behavior until after he was indicted for Murder. Even at that point, he did not refer to himself with another name until February 2000 when he knew of the impending psychological evaluation. The following month he asked for protective custody because he allegedly feared for his safety; however, he was observed laughing and chatting with other inmates in the Administrative Detention area in which he was placed.

Mr. Gabrion was seen on several occasions by various psychologists at FCI, Milan and FDC, Milan. The records of these contacts consistently indicate Mr. Gabrion was not showing evidence of a significant mental disorder but, rather, appeared to be faking mental illness. Dr. Dominick Oliverio, Chief Psychologist, told this examiner the defendant seemed to be exhibiting too many obvious symptoms and could not present consistently. Dr. Oliverio also indicated the defendant had an "aggressive, antisocial flavor." Dr. Oliverio noted the defendant did not evidence memory or other cognitive deficits in particular. Mr. Gabrion apparently made a suicide gesture in February 2000 while in full view of staff and other inmates in a recreation area. He reportedly tied a sheet around his neck and on the fence, then allowed himself to drop. He did not lose consciousness, was taken to a community hospital, and evidently had no significant injury. The behavior was deemed manipulative and not the result of mental health problems so he was taken off a Suicide Watch after a day. The medical records from this time period support the belief that he did not wish to die as he continued to seek regular assistance for medical complaints in the time period surrounding the suicide gesture.

Mr. Gabrion's medical records from the Bureau of Prisons indicate he was treated for psoriasis, headaches, and Hepatitis C following his incarceration. The latter disorder was treated with Interferon until May 1999 when the treatment was deemed unsuccessful based on laboratory findings. Note that he did not complain to medical staff about nightmares and difficulty sleeping until November 1999. Records show he variously denied headaches and complained he had headaches "off and on." The records indicate he reported a gunshot wound to his left hand. Notably the records indicate he had no difficulty presenting his medical complaints assertively, succinctly, and clearly through the time of this evaluation. He did occasionally become angry with medical staff, sometimes expressing his anger verbally and sometimes expressing his anger in written complaints.

Mr. Gabrion has a significant history of alcohol abuse and dependence; however, records show he repeatedly has denied abuse of other drugs, except for marijuana over ten years ago. Nevertheless, he admitted to abuse of amphetamines, "downers," and marijuana in July 1998 when interviewed by FCI, Milan medical staff. He has denied alcohol is a problem according to

8

Gabrion 032600

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

many reports; however, he apparently admitted he is "alcoholic" when interviewed for his Presentence Investigation Report. He apparently acknowledged being court-ordered to attend counseling and records show he has attended at least one 28-day inpatient substance abuse program. Reportedly he "readily admits he has not been successful in his attempt to curtail the use of alcohol." Apparently alcohol was involved in much of his legal history. FCI, Milan records show he admitted drinking as much as a 12-pack of beer per day.

### Mental Status and Behavioral Observation (Admission and Course)

Mr. Gabrion is a 46-year-old, single, Caucasian male who appeared his stated age. He was of average height and muscular build. He demonstrated no oddities of gait or posture. He typically had good eye contact. He sometimes used corrective lenses. He demonstrated good hygiene and variable grooming. He had shaved the hair on his head in a random, uneven pattern but maintained a neatly groomed mustache while keeping the rest of his face shaved. He occasionally exhibited agitated behavior in his cell; however, when talking with the examiner, he exhibited neither agitation nor psychomotor retardation. He was observed washing his hands over and over following the first interview; however, neither this behavior nor other compulsive behavior was repeated during the study period. He demonstrated a normal rate, rhythm, and tone of speech.

Mr. Gabrion was not cooperative with interviews from the initial meeting. He tried to control the process in various ways, including ignoring questions or remarks from the examiner. He sometimes responded to questions with questions. At other times he made sarcastic comments about a question. He tended to talk about a very limited number of topics whenever he was seen. Moreover, he sometimes was very hostile in his attitude toward the examiner. Note that he reminded the examiner that she was limited in the areas she could question, per court order.

Significantly, Mr. Gabrion demonstrated an excellent memory for information, including the encounters he had with this examiner and with various other staff. He also recalled information about staff and interactions which he did not acquire directly. In other words, he listened to staff talking with other staff or prisoners and memorized data. He demonstrated his memory for information in the numerous letters and requests he sent to various staff. For example, he accurately referred to detailed information presented in the Inmate Handbook when he wrote the Warden. He also sent several requests to a female staff person who was not involved with his evaluation in any fashion, although she had visited the area in which he was housed. In these requests, he referred to her by first and last names and included accurate information about telephone numbers to use when developing a volunteer organization in Fort Worth, Texas. He wrote several letters to the examiner in which he accurately described clothing and jewelry he had seen the examiner wearing. A property officer told the examiner the prisoner was able to describe in minute detail the contents of several boxes containing property (mainly documents). Note that the defendant was speaking of his absurd claims with this staff person, denying his name was

Gabrion 032601

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Marvin Gabrion, until told the identity of the staff person. He immediately changed his demeanor, stopped denying he was Mr. Gabrion, and conversed with no sign of his former oddity.

His memory for information relevant to issues of competence to stand trial evidenced inconsistency as well. He could not recall information he had discussed previously when asked a question, but he never demonstrated memory deficits when he had a point to make about his case or about court. For instance, he told the examiner his attorneys' names and telephone numbers, then had no idea who his attorneys were when asked directly a few minutes later.

Mr. Gabrion was housed by himself in a cell in Administrative Detention (AD) throughout his study period. The housing assignment was based on reports that he had spit and thrown liquids at staff while at a previous institution. Moreover, he is alleged to have committed a violent offense, which typically leads to placement in AD for the safety of staff and other prisoners. Note that he only was brought from his cell in the company of three staff who remained in the vicinity until he was returned to his cell. Despite this high level of staff observation, Mr. Gabrion accused this examiner of a sexual assault during one occasion he was removed from his cell. He subsequently insisted he should be interviewed through the foodslot in his cell door because he was afraid of the examiner and because he thought he would be "killed" by an "evil spirit" if he left his cell. When the examiner refused to interview him in this manner because of security concerns, the prisoner changed his claims a few days later and allowed himself to be escorted out of the cell.

Mr. Gabrion was variably cooperative with correctional staff and received several disciplinary reports during the study period. His infractions included disobeying orders, urinating in the outside recreation area, and insolence to staff. Note the latter occurred on a regular basis with one African-American, female officer who worked the night shift. Apart from one incident, he exhibited no behavior that seemed disorganized or bizarre. In fact his behavior seemed organized and goal-directed whenever he was seen. Note that he frequently called the examiner to his door as soon as she entered AD and made a specific, nonbizarre request.

Mr. Gabrion's most disruptive behavior occurred on April 10, 2000, when he apparently stuck a very small chicken bone in the skin of his left forearm. Officers apparently saw him lying on the floor of his cell and he was unresponsive when his name was called. Note he was breathing regularly and opened his eyes after the cell was entered by staff. The bone, about one and one half inches in length, was seen protruding from his arm and he was taken to the medical area. Medical staff reported the wound was superficial and was not bleeding. He also had a superficial cut which was not bleeding in the center of his forehead. Although he insisted he had fallen to the floor, he had no evidence of bruising such as should have been evident. Note that he was cheerful, calm, and coherent while receiving medical attention. As soon as the examiner attempted to speak to him, he altered his presentation and focused on his story about his

Gabrion 032602

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

"cell mate," an evil spirit, which attacked him. When confronted about the absurdity of his report, he lunged at the examiner and yelled insults at her. He was not placed on a Suicide Watch as his behavior did not seem suicidal or the product of mental illness, but, rather, an attempt to pursue his malingering effort. Note that he apologized for his insults a few days later, evidencing no difficulty recalling the interaction. On one other occasion Mr. Gabrion made vague references to suicidal behavior. These references were judged to be attention-seeking and, again, a Suicide Watch was not instituted. Staff in AD were asked to make 15-minute checks given the potential for the defendant to act out again.

Mr. Gabrion demonstrated a wide range of emotional expression with no evidence of a mood disorder, such as mania. Although he made reference to depression and difficulty controlling his temper, he exhibited only the latter. Staff indicated Mr. Gabrion had no problems with his sleep or appetite. He requested and was given a Common Fare meal because of his reported association with Seventh Day Adventists. Following the incident in which he used the chicken bone to harm himself, he was given sack meals which included only sandwiches and fruit. Note that he complained verbally and in writing that he wanted to return to the regular meals served on trays with eating utensils, but this examiner denied the requests because of the potential for further acting out. He also outlined in a written note the foods he would prefer in his sack meal which would not require eating utensils. This examiner requested he receive a greater variety of food (including vegetables) in his sack meals after receiving this note from the defendant.

Mr. Gabrion demonstrated goal-directed, coherent, sequential thought processes when not talking of his absurd belief that he is an angel named Azri. He apparently only began to make the claim that he died and subsequently was inhabited by an angel sent from God shortly before the study period. This belief was not demonstrated in face-to-face interactions with others or in letters until he knew he was being sent for an evaluation. He virtually always referred to himself as Azri, in the third person, seemingly to continue bringing attention to his "identity." When confronted about his repetitive reference to himself as Azri instead of saying "I," he claimed he did not want the examiner to forget his identity. He claimed the angel had been sent by God to deliver a message to people about wrath in response to evil behavior. He also said the angel wanted to set up a nonprofit organization, "No More Missing Children," to locate missing children and prevent situations in which children are lost. In the latter half of the study period, he changed his claims again and reported a roommate, an evil spirit, was in his cell and tried to harm the defendant. Note that prior to the study period, he claimed he worked for the CIA and helped solve the Lockerbie, Scotland, bombing. These claims were not repeated during the evaluation, although he made a vague reference to "the risen Gabrion who said he was in the CIA." He did not demonstrate evidence of responding to internal stimuli, such as would be observed if a person were hallucinating. He did not make reference to hearing or seeing things others could not perceive. Records gave no indication of experiencing hallucinations, although his attorney, Mr. Mitchell, said this symptom had been reported by Mr. Gabrion.

11

Gabrion 032603



Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Mr. Gabrion seemed to be faking a mental illness because of many indicators, one of which is the hallmark of malingering: inconsistency. Note that his behavior was inconsistent with that of a genuinely mentally ill person, as well as inconsistent from encounter to encounter. For example, although he claimed to be afraid of the examiner, he willingly came to see her when he was not seen in the fashion he requested. When asked about this inconsistency, he noted he was coming to the interview so the examiner would not tell the judge he refused to cooperate. He later insisted he was persuaded to come out of his cell because the examiner is a strong-willed person. Mr. Gabrion also gave up the claim that he would be killed by the evil spirit if he left his cell. Moreover, his paranoia about leaving his cell did not interfere with taking a shower when offered. Note that suddenly developing his persona of Azri with the related "grandiosity" seems an unlikely prospect whether one views his delusional process as functional or organic in origin. The development of this delusion seems far too convenient as well. He has claimed to have significant memory problems but evidenced good memory when this activity suited his purposes. Moreover, he seemed to report or exhibit a smorgasbord of symptoms which did not fit with any one mental illness (e.g., the hand-washing and the grandiosity). His habit of drawing attention to more exotic claims in the absence of subtle signs of mental illness was telling as well.

Mr. Gabrion received medical attention on a regular basis and he sometimes requested medication for an infection or for a headache. He did not receive Interferon for treatment related to Hepatitis C because the medication previously had been found ineffective. He repeatedly requested psychotropic medication, naming both the medications and the physician who prescribed the medications without referencing his paperwork. He also specified that irregular EEG results had indicated the need for medication. He did not receive psychotropic medication during the study period.

Mr. Gabrion spent his time reading and writing correspondence while in his cell. He apparently chatted with other prisoners on occasion. He went to outdoor recreation on a fairly regular basis. He showered whenever he could. He was given telephone calls to attorneys on several occasions per his request or the request of an attorney. Note that he twice refused to exit his cell when arrangements were made to call one of his attorneys. He wrote a local attorney who agreed to talk with Mr. Gabrion on the telephone, a call which staff helped arrange.

Mr. Gabrion did not cooperate with questions regarding his cognitive functioning. Nevertheless, his behavior suggested he falls in the Below Average to Average range of intellectual functioning. His written communications were dated correctly (day of the month, month, and year) and evidenced his awareness of being in Fort Worth, Texas. He also was oriented to the situation and day of the week according to things he said and things he wrote. He seemed to have adequate concentration and attention when motivated by a task, such as finding information about a local

12

Gabrion 032604

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

attorney. As noted previously, he exhibited good immediate, short-term, and long-term memory, unless the examiner asked him a question related to her agenda. He demonstrated a below average to average vocabulary in his speech and in his written communications. He seemed capable of abstract thinking. His judgment and insight seemed poor. Although his calculation of the 30-day study period was off by a few days, his ability to monitor the number the days he was at Fort Worth demonstrated fair arithmetic abilities. He demonstrated poor judgement and insight.

## Assessment Results

### Cognitive Functioning

Formal assessment of Mr. Gabrion's intelligence was not attempted given his general lack of cooperation and the likelihood he would not have given his best effort to the testing tasks. He seems to fall in the Below Average to Average range of intellectual functioning given demonstrations of his memory, concentration, attention, ability to think abstractly, and vocabulary.

### Competence

Although Mr. Gabrion generally did not cooperate with direct assessment of his knowledge, he gave evidence that he knows his charge and the likely consequences of that charge. He initially indicated he was aware he is charged with Murder. He later added that he also might be charged with Kidnaping. He said the case involved "some girl, some girl or woman." He knew he faced very serious consequences if found guilty given his references to the "death chamber." He said he would not plead guilty because "that would be a lie," then spoke of his interest in going to the "death chamber" in order to bring attention to the plight of missing children. He mentioned his right to appeal while awaiting the death penalty, noting he actually might die because of his Hepatitis C prior to an execution taking place. He made reference to other legal issues which shows he seems to know basic information about criminal court proceedings. For example, he knew the judge is in charge in the courtroom and he is the defendant. He also demonstrated he is aware that the legal process is an adversarial one in which some are on his side (his lawyers) and some are against him (the prosecutor). He knew he had two attorneys representing him. When asked if he were interested in a jury trial, he responded, "That's up to Stebbins," suggesting both an awareness of what a jury trial involves and the awareness that his attorney provides him legal advice. He apparently has requested to represent himself but stated during this evaluation that he did not want to do so. He knew he had the choice to testify on the witness stand or not. He may

13

Gabrion 032605

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

prove a disruptive defendant in the courtroom given his investment in the facade of appearing mentally ill. He should be held accountable for any inappropriate behavior in the courtroom.

Note that he participated in a three-day trial in March 1998 with no apparent difficulties. Given that individuals with head injuries either improve or maintain their abilities, he likely is as knowledgeable and aware now as he was during that trial. Moreover, he has written numerous letters in the past several months which refer to his awareness of a jury trial, his rights as an accused person (to have a speedy trial, to be considered innocent until proven guilty, and to request to proceed pro se), and the role of the judge. In these letters he made references indicating he knows how to use law books. The letters also show he knows the different pleas he can offer and his right to appeal his sentence. He also wrote of the "weak evidence" the prosecution has against him, suggesting further knowledge of criminal proceedings. He noted in a few letters that he wished the judge to rule that Mr. Gabrion is competent to stand trial, showing some appreciation of the issues involved in this evaluation.

Mr. Gabrion has the wherewithal to work with an attorney on his defense, should he choose to do so. He knew his attorneys' names and how to get in touch with them. He knew Mr. Stebbins is a "death penalty expert." He said his other attorney, Mr. Mitchell is the "lead attorney." He requested legal calls on a few occasions and was observed talking at length with no apparent problems communicating, pausing to listen, or managing his emotions. He clearly perceived his attorneys as his advocates in an adversarial process. His attorneys reported he seemed suspicious and preoccupied with peripheral issues, such as his complaints about his medical treatment. He apparently has referred to Mr. Mitchell as "Satanic." Nevertheless, this examiner was told the defendant called Mr. Mitchell virtually daily, even hourly on some days. He also was reported to have significant memory problems which interfere with preparing a defense. He apparently has discussed "historical facts around the time of the crime [which are] just plain wrong."
Mr. Gabrion was said to show poor judgement in things he says in court, as well as to be agitated and "given to racing thoughts." On the other hand, his attorneys admitted his apparent symptoms have appeared and worsened in a very short time period. Mr. Gabrion was said to provide a "nugget of truth, or more, in all he says, [although] he tends to exaggerate."

Note that he does not fit the criteria of any known mental illness and evidence indicates he is malingering in order to prevent his prosecution. Moreover, his behavior suggests he is more able to work with his attorneys than he would like others to think. He is likely to be a very difficult client to represent as long as he continues to malinger mental illness. Nevertheless, he has the capacity to work with Mr. Mitchell and Mr. Stebbins if he chooses to do so.

14

Gabrion 032606

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

## Diagnosis and Prognosis

Axis I:      Malingering, V65.2
             Adult Antisocial Behavior, V71.01
             Alcohol Abuse, 305.00
             Rule out Alcohol Dependence, 303.90
             Sedative, Hypnotic, or Anxiolytic Abuse, 304.40
             Rule out Sedative, Hypnotic, or Anxiolytic Dependence, 304.10
             Amphetamine Abuse, 305.70
             Rule out Amphetamine Dependence, 305.40
             Cannabis Abuse, 305.20
             Rule out Cognitive Disorder, Not Otherwise Specified, 294.9

Axis II:     Personality Disorder, Not Otherwise Specified, 301.9
             Rule out Antisocial Personality Disorder, 301.7

Axis III:    Closed head injury, Hepatitis C, post-lung lobectomy, psoriasis, chronic
             headaches, post-gunshot wound to the right hand (according to self-report and
             medical records)

Axis IV:     Incarceration, serious legal charge with possibility of death penalty, health
             problems, limited social support system

Axis V:      Current Global Assessment Functioning = estimate deferred

The primary diagnosis in Mr. Gabrion's case is that of Malingering, the essential feature of which
is the intentional production of false or grossly exaggerated physical or psychological symptoms.
Such production of symptoms is motivated by external incentives, such as avoiding prosecution in
this case. Malingering should be suspected in a legal (or medical) situation when discrepancies
between the claimed disability and objective findings are present, as well as when the individual
demonstrates lack of cooperation. The presence of Antisocial Personality Disorder is another red
flag which suggests one should consider the diagnosis of Malingering. In this case, Mr. Gabrion
was quite uncooperative with the evaluation, although he pursued other goals assertively and in an
organized fashion during the same time period. More significantly, he demonstrated
inconsistencies in his behavior. These inconsistencies were observed when his behavior was
compared to the behavior one would expect from someone with a mental disorder; and when his
behavior was observed in different contexts. In general, he attempted to portray too wide a
variety of symptoms to fit any reasonable category of mental illness. He also could not maintain
the supposed severity of his symptoms, including his apparent memory deficits in particular.

Gabrion 032607

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

Other indicators of Malingering in this case are the inconsistency in the records; the indicators of premorbid sociopathy in conjunction with few hard data to support his claims of disability; his history of conning and manipulating (sometimes through reported disability); the sudden onset of absurd symptoms following indictment in a potential death penalty case; and the fact that symptoms caused by head injuries typically follow a course of remaining stable, if not improving, over time. The history of significant antisocial behavior, even if the presence of Antisocial Personality Disorder can not be confirmed, raises suspicion as well.

Mr. Gabrion likely fits the diagnosis of a Personality Disorder; however, his lack of cooperation makes specificity difficult. A Personality Disorder refers to a pattern of inner experiences and behavior present since youth which leads to social or occupational impairment or to both sorts of impairment. This enduring pattern is inflexible and pervasive. Moreover, the personality disordered individual has very poor insight and demands that others change to meet his needs. Antisocial Personality Disorder includes inability to follow rules and laws; lying and manipulating others; impulsivity; irritability and aggressiveness; and consistent irresponsibility. This diagnosis involves a pattern of violating the basic rights of others or age-appropriate rules and laws prior to age 15 as well. This pattern prior to age 15 has not been evident in the history provided by Mr. Gabrion and his family members; however, both sources have been noted as unreliable. Even if this pattern of behavior prior to age 15 can be dismissed more reliably, Mr. Gabrion still has features of Antisocial Personality Disorder. He also seems to have other dysfunctional characterological features which predate any possible head injury, including suspiciousness and narcissism, and a sense of entitlement. The lack of insight and sense of entitlement inherent in most Personality Disorders suggest a poor prognosis for change.

Mr. Gabrion fits the diagnoses of various substance abuse and substance dependence disorders, although alcohol seems to be his drug of choice. He apparently has not benefitted from participation in substance abuse treatment programs in the past and, thus, the prognosis is poor in this area.

Mr. Gabrion may fit the diagnosis of Cognitive Disorder, Not Otherwise Specified, based on cognitive deficits secondary to a closed head trauma in 1992. Unfortunately, his lack of cooperation and possible manipulation during previous evaluations makes difficult the determination of what, if any, deficits he may experience. Note that this examiner is not convinced he had a closed head trauma, given that no physical findings (e.g., EEG and CAT scan results) have been noted. The possibility exists that all his symptoms, including headaches and memory deficits, have been generated for secondary gain from the time of the 1992 car accident. At such time, if ever, that Mr. Gabrion is more cooperative with assessment, a full neuropsychological test battery which includes tests for malingering would be recommended.

16

Gabrion 032608

Psychological Evaluation
GABRION, Marvin
Register Number 09184-055

**Opinion on Competency**

Mr. Gabrion currently does not suffer from a mental disease or defect which would render him unable to understand the nature and consequences of the proceedings against him or to assist properly in his own defense. He did not show evidence of a known mental disorder but, rather, seems to be faking a mental illness in order to help in his criminal case. While he did not answer questions concerning his knowledge of court, he clearly was aware he is charged with Murder and is facing a serious sentence if found guilty. He also demonstrated awareness he has two attorneys who are his advocates, as well as other basic information about court. His apparent problems with his attorneys recalling data and focusing on relevant issues were not the result of a genuine mental disorder. He is likely to behave disruptively in court.

**Recommendations**

Mr. Gabrion does not need psychotropic medication or hospitalization in order to maintain his current level of competence to stand trial.

Emily Fallis, Ph.D.
Licensed Psychologist
Forensic Study Specialist

17

Gabrion 032609