UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARVIN CHARLES GABRION, II,

       Movant,

v.

UNITED STATES OF AMERICA,

       Respondent.

_____/

File No. 1:15-cv-447

HON. ROBERT J. JONKER

## <u>OPINION</u>

       This is an action to vacate, set aside, or correct a death sentence under 28 U.S.C. § 2255, filed by Marvin Charles Gabrion, II. In July 1997, fishermen discovered the body of 19-year-old Rachel Timmerman floating in the shallow, mucky water of Oxford Lake, within the boundaries of the Manistee National Forest. Duct tape had been wrapped all the way around her head, covering her eyes and mouth. Her hands were locked tightly in handcuffs behind her back, and her leg was wrapped in a chain that was padlocked around her waist. Several cinderblocks were attached to the chain to weigh her body down.

       After an investigation, the Government charged Gabrion with murdering Rachel on federal property, in violation of 18 U.S.C. § 1111 and 18 U.S.C. § 7. In 2002, following a trial before the Hon. Robert Holmes Bell, a jury found Gabrion guilty and sentenced him to death. On direct appeal, the Court of Appeals found that the evidence against Gabrion was "overwhelming," and affirmed Gabrion's conviction and death sentence.

Gabrion now raises an exhaustive list of challenges to the criminal proceedings. The Court finds no ineffective assistance of counsel or any other basis upon which to disturb the verdict the jury delivered 16 years ago.

## I. Background

### A. Initial Rape Investigation

On the evening of August 6, 1996, Rachel Timmerman's sister, Sarah, awoke from her sleep to the sound of commotion inside her trailer. (R. 471: 2/27/2002 Tr. 34; R. 473: 2/26/2002 Tr. 17.) [1] Sarah looked around and saw Rachel facing the outside door with a hammer clutched in her hand. Rachel was hysterical. Her face was bleeding from a cut on her nose. Someone outside the trailer was yelling at her and banging on the door. (*Id.*) A man's voice— Gabrion's—shouted that Rachel would "pay for what she did." (*Id.*) Rachel yelled back at him, telling him to leave. (*Id.*) After a while, the banging stopped and Gabrion left.

Rachel was initially reluctant to talk about what had happened that night, but she eventually told Sarah and her brother Shane that Gabrion had raped her and bitten her on the nose. She did not want to report it to the police because Gabrion had threatened that he would kill her and her daughter, Shannon, who was two months old at the time. (2/26/2002 Tr. 17; R. 589: Tr. V, 1219.) After some coaxing from her friends and family, Rachel reported the rape to the police.

After the police received Rachel's report, they attempted to get a statement from Gabrion. He sent them a fax presenting his version of what happened that night. (Gov't Ex. 46.) He claimed that he had been at a friend's house with Rachel, Wayne Davis, and his nephew Mike.

---

[1] "R. [number]" refers to the docket number of a document in Gabrion's criminal case, *United States v. Gabrion*, No. 1:99-cr-76 (W.D. Mich.). "Tr." refers to transcripts from the guilt phase of the jury trial and "S. Tr." refers to transcripts from the sentencing phase of the jury trial. Some transcripts are divided into different volumes; for instance, "S. Tr. II" refers to volume II of the sentencing transcript. Other transcripts contain excerpts from a particular date or for a particular witness, and will be cited using the relevant date or witness name. For example, "2/26/2002 Tr." is an excerpt from February 26, 2002, during the guilt phase of the jury trial. "Hr'g Tr." refers to transcripts of hearings that were not part of the trial. "Gov't Ex." refers to the Government's exhibits admitted at trial.

Gabrion and Rachel left the house in his car, along with Wayne and Mike. During the drive, Rachel offered to perform oral sex on Gabrion, so he let Wayne and Mike out of the car. Gabrion and Rachel drove further down the road and then got out of the car. She performed oral sex on him and then put his semen on her vagina. She asked for intercourse but he refused. At one point, she sat on his dog. As they were leaving, his car got stuck. She helped him push his car out but hurt herself in the process. He then took her to her trailer. Shortly thereafter, she started screaming because she realized that she was hurt.

### B. The CSC Prosecution

Newaygo County prosecutor Chrystal Roach charged Gabrion with third-degree criminal sexual conduct (CSC). The police arrested him on January 20, 1997, and served him with a warrant that listed Rachel and others as witnesses to his offense. (Gov't Ex. 104.) The Newaygo County Circuit Court released Gabrion on bond on February 3, after he waived a preliminary examination. Meanwhile, Rachel was arrested and placed in jail for violating the terms of her probation for a drug offense.

### 1. Witness Davis Disappears

Wayne Davis was one of the witnesses named on Gabrion's arrest warrant. Davis was scheduled to appear for a court hearing on February 13 because he had been charged with driving under the influence. (R. 594: S. Tr. II, 397-98.) A few days before the hearing, he arranged for his friend Darlene Lazo to give him a ride to the court. He told Lazo that he intended to buy a puzzle and some cigarettes to keep him occupied in jail because he expected to serve a 90-day sentence. (*Id.* at 398.) Lazo saw Davis for the last time on the day before his hearing. He was at his home, with Gabrion. (*Id.* at 399.)

On the morning of Davis' hearing, Lazo went to his house to pick him up, but no one answered the door. She tried to reach Davis on the phone, but no one responded. She went

back to his house several times that day, but Davis could not be found. (*Id.* at 400.) When Lazo returned to his house two days later, she discovered a note on his door, apparently signed by Davis. (Gov't Ex. 103.) The note stated that Davis left for California because he was "scared" that he would be sent to jail. (*Id.*) Lazo did not believe it. She went inside his house and saw his Army jacket hanging on the back of a chair. She thought that was suspicious because Davis always took this coat with him whenever he left the house. Davis was never seen alive again, and the money in his savings account remained untouched. A few weeks after Davis disappeared, Gabrion put Davis' stereo equipment and microwave up for sale at a consignment shop in Mecosta, Michigan. (S. Tr. II, 407-08.)

### 2. An Arkansas Seed is Planted

In February/March, Gabrion expressed interest in purchasing a vehicle that Charles Roddy had advertised for sale in Big Rapids, Michigan. (R. 590: Tr. VI, 1437.) Referring to himself as "Lance," Gabrion told Roddy that he wanted a car that could make it to Arkansas (*id.* at 1437-38), a location that Gabrion would later use in a scheme to avoid conviction for the rape charge.

### 3. Rachel Disappears

The proceedings in Gabrion's rape case made little progress from February to May 1997, in part, because he changed attorneys several times. On April 29, his third attorney asked to remand his case back to the district court for a preliminary examination.

Rachel completed her jail term and was released on May 5. Prosecutor Roach and Rachel's family anticipated that she would testify against Gabrion at a preliminary examination hearing on June 5. For the next few weeks, Rachel made it clear to others that she was terrified that Gabrion would kill her. At one point, she stopped by a friend's house, closed the curtains, and stated repeatedly that Gabrion was going to kill her because of the rape case. (Tr. V, 1226.)

She also called the sheriff's office on two different occasions to report that she had seen Gabrion and that she wanted to leave a "trail" in case he followed through on his threat to kill her. (*Id.* at 1211.)

Rachel's fear was justified. She did not appear in court to testify on June 5, or anytime thereafter. Gabrion waived a preliminary examination hearing for the second time on May 29, and the court scheduled a pre-trial hearing for June 24, 1997. Rachel's family last saw her on June 3, when she and Shannon left home to go on a date with a man named John Weeks.

Rachel did not know Weeks, but he persuaded her to go on a date with him by calling her repeatedly. (R. 595: S. Tr. III, 489.) She did not realize that he was acting on Gabrion's behalf. Weeks' girlfriend at the time, A'lliene Wolf, once caught Weeks calling Rachel on the phone. (S. Tr. II, 426.) He told Wolf that he was doing it as a favor for Gabrion. (*Id.* at 427.)

In early June, several people saw Gabrion driving his truck near Oxford Lake with a silver boat in the back. (Tr. VI, 1308, 1331.) Some of them, including Kathy Kirk, Bonnie Robinson, and Linda Coleman, saw him in the truck with another man and a blond-haired woman matching Rachel's appearance. (*Id.* at 1339-41; R. 591: Tr. VII, 1577-79; R. 670: Coleman Tr. 7-8, 12.)

On June 6, one of Gabrion's neighbors, Trevor Zylstra, woke up at around 4:00 am to the sound of a "very loud bang." (Tr. VI, 1407.) He looked out his window and saw Gabrion dragging a metal boat across the gravel in front of Gabrion's house. (*Id.* at 1408.) Gabrion put the boat down and then removed two life vests, three cinder blocks and a length of chain from inside the boat. (*Id.* at 1409-10.) Gabrion rinsed the inside of the boat with water and then dragged it into his garage, where he ground off the boat's registration numbers with an angle grinder.[2] (*Id.*

---

[2] Another witness testified that he saw a boat for sale in Gabrion's yard later that summer, and that the registration numbers had been ground off the boat. (Tr. VI, 1428.)

at 1412-13.)  Afterward, Gabrion put the life vests, the cinder blocks, the chain, and the boat into his pick-up truck and left.  (*Id.* at 1414-15.)

Later that week, Gabrion approached some people camping near the Little Manistee River and asked them if he could store his motorcycle at their campsite.  (Tr. VI, 1450.)  Gabrion referred to himself as Lance, and he was with a man named John (presumably, John Weeks).  (*Id.* at 1450-51.)  Gabrion claimed that he was camping at Brower Park, which charged money to park a motorcycle.  (*Id.*)  The next day, Gabrion came back to their campsite, alone, and asked if he could store his boat at their site.  (Tr. V, 1199; Tr. VI, 1452.)  He had a bruise under one eye, scratches on his face, and patches of hair missing.  (Tr. VI, 1453.)  He claimed that he had gotten into a fight with a friend.  (*Id.*)  Two or three weeks later, the campers came across Gabrion in a different location.  His campsite was not in Brower Park, and it appeared to have plenty of room for a boat.  (*Id.* at 1200.)  They noticed that he was wearing gloves, even though it was June.

That same month, Lloyd Westcomb, a paranoid schizophrenic who had known Gabrion for many years, saw Gabrion in a store in White Cloud, Michigan.  Westcomb told Gabrion that he split up with his girlfriend.  In response, Gabrion stated that he got rid of his own girlfriend "permanently" by binding her up with chains and blocks and throwing her into a lake.  (Tr. VI, 1354-55.)  Gabrion spoke often about this method of killing a person.  He told his nephew Mike that if he ever killed someone, he would "wrap them in chicken wire and chains with bricks on them and put them in the lake."  (2/27/2002 Tr. 42.)  He once told an acquaintance, Floyd Wismar, that "it's not hard to get rid of somebody; you just weight 'em down and throw 'em in a lake."  (*Id.* at 14.)

### 4.  John Weeks Disappears

Weeks' girlfriend saw him for the last time on June 22, 1997.  (S. Tr. II, 427.)  He told Wolf that he was going on a "dope run" to Texas with Gabrion, and that he would be gone for

about 10 days.  (*Id.*)  A couple of weeks later, Wolf asked Gabrion about Weeks.  Gabrion told her

that he had dropped Weeks off in Arizona with some friends.  (*Id.* at 430-31.)  Weeks' family has

not heard from him since and his whereabouts are unknown.

### 5.  The Arkansas Seed Sprouts

Within days after Rachel disappeared, Prosecutor Roach, Rachel's father, and the

judge overseeing the rape case received letters in the mail in Rachel's handwriting.  All four letters

arrived in unusual envelopes imprinted with a holographic stamp depicting a space station, just

like the envelopes that Gabrion used in correspondence with his family.  (*See* Gov't Ex. 67.)  Three

of the letters were mailed from Little Rock, Arkansas.

In the first letter that Rachel's father received, Rachel wrote that she would be gone

for a few weeks because she met "the man of [her] dreams" and he had asked her to marry him.

(Gov't Ex. 65.)  In the second letter to Rachel's father, she wrote that she and Shannon were in

Little Rock, Arkansas, with a man named Delbert, and she thought that she might stay there

indefinitely.  (Gov't Ex. 64.)  Rachel's family and friends had never heard of Delbert.  (R. 472: L.

Timmerman Tr. 18.)

In the letters to the judge and the prosecutor, Rachel asked the state to drop the

charges against Gabrion.  She claimed that she falsified her allegations against Gabrion, and she

gave an account of what occurred on the night of the rape that is similar to Gabrion's account in

his written statement to the police, but is very different from the story that she told her family and

the police.  She wrote that she performed oral sex on Gabrion, and when he refused to have sexual

intercourse with her, she decided to "teach him a lesson."  (Gov't Ex. 66.)  She pushed his semen

into her vagina and pinched herself to create a bruise.  To explain the cut on her nose, she claimed

that Gabrion's "puppy" bit her nose.  (*Id.*)  She wrote that she was "madly in love" with an "honest

Christian man" and could not "bear the thought of trying to lock up an innocent man." (*Id.*) After receiving one of these letters, the prosecutor dismissed the charges against Gabrion.

## C. The Murder Investigation

### 1. Discovery of Rachel's Body

Of course, Rachel was not in Arkansas. Fishermen discovered her body in Oxford Lake on July 5, 1997, wrapped in duct tape and chains and weighed down with cinderblocks. After several weeks of decomposition, her body had risen to the water's surface.[3]

Oxford Lake is a remote lake in the Manistee National Forest, accessible by a two-track dirt road. The north half of the lake is private property. The south half is part of the national forest. Rachel's body was located in the southern portion of the lake, approximately 200 feet from the border to private property. Rachel's body could not have drifted from the privately-owned side of the lake because there is no noticeable current in the lake (R. 588: Tr. IV, 973), and her body was encircled by a nearly-impenetrable mat of floating weeds and vegetation (*id.* at 961, 990). To reach her body by boat, the fishermen and the detectives had to row to the far southern edge of the weed mat, where the vegetation was not as thick, and then row north. (*Id.* at 954, 990.) Also, the lake bottom was so soft that a diver holding 60 pounds (equivalent to the weight of the chains, blocks, and padlocks on Rachel's body) sunk 12 feet into the mud. (2/26/2002 Tr. 13-14.) Even after Rachel's body floated to the surface, one of the cinder blocks chained to her body was still partially submerged in the weeds and muck below. (Tr. IV, 1001.)

Detectives scouring the area discovered some evidence near the boat launch to the lake: a piece of duct tape with hair on it that matched the microscopic characteristics of Rachel's hair. The tape, however, did not match the tape used on Rachel. (Tr. VII, 1540, 1544.)

---

[3] As a body decomposes, bacteria inside the body produce gas. Gas that is trapped inside the body causes the body to become buoyant. (R. 459: Cohle Tr. 17.)

After the police confirmed Rachel's identity, two detectives went to Gabrion's residence to question him and to arrest him under an outstanding warrant for an unrelated assault charge. They knocked on the door, but no one answered. As they were leaving, they saw a pile of rubble in the yard behind the house. Resting in the pile were concrete blocks similar to those that were attached to Rachel's body. (Tr. IV, 1030.) Forensic analysis later revealed that the tar and paint on some of the cinder blocks chained to Rachel's body matched the tar and paint on the blocks in Gabrion's yard. (Tr. VII, 1523, 1559-62.)

Four days after visiting Gabrion's residence, the detectives returned with a warrant to search the house. Upon arrival, they encountered Gabrion's brother David, who had taken some things out of the house and was loading them into his truck. (Tr. IV, 1034.) Among the items David had taken was a key that fit the padlocks on Rachel's body. Detectives found another copy of that key inside the house, stashed in a bowl filled with change and a pill bottle with Gabrion's name on it. (*Id.* at 1042-43.) David had also taken a book titled "Perfect Victim."[4] (*Id.* at 1038.) Gabrion frequently told others that he was running a Christian bookstore out of his home, but there were no other books in the house.

The police could not locate Gabrion, but Gabrion's nephew Mike led them to a campsite regularly used by Gabrion near Hungerford Lake, which is a few miles from Oxford Lake. At the campsite, detectives found Gabrion's tent, and nearby it were bolt cutters, a length of chain, a receipt with Gabrion's name on it, duct tape, a woman's hair clip, and a package of silicone nipples for a baby bottle. (Tr. IV, 1103-08.)

---

[4] The full title of the book is "Perfect Victim: The True Story of the Girl in the Box by the D.A. who Prosecuted Her Captors." *See* https://www.amazon.com/Perfect-Victim-True-Story-Girl/dp/0440204429/.

## 2. Gabrion Attempts to Disappear

Around the time that the authorities discovered Rachel's body, Gabrion was making plans to sell his home in Altona, Michigan. He called Fred Winebarger, a real estate broker, about the possibility of selling the house, and then sent Winebarger a key to the residence. Gabrion also called his friend Floyd Wismar, asking for help to fix up the house. (2/27/2002 Tr. 19.)

Near the end of July, Gabrion wrote to Wismar, asking him to distribute a statement that Gabrion had written. (2/27/2002 Tr. 20.) Gabrion threatened to "expose" Wismar if he did not cooperate, by making it look like Wismar was responsible for a missing baby. (*Id.*)

Around Labor Day of that year, Ronald Lee Strevels saw an advertisement in a local newspaper in Indiana, offering employment as a carpenter. (Tr. VI, 1463.) He called the number in the ad and reached Gabrion. The two of them arranged to meet at a truck stop in Columbus, Indiana, about 20 miles from Strevels' home. At the meeting, Gabrion asked Strevels a number of personal questions, including questions about Strevels' parents, and then recorded Strevels' responses on a form. (*Id.* at 1465.) Strevels thought that these questions were unusual for a job interview, but Gabrion assured him that the information was necessary for a "new tax form." (*Id.*) Gabrion also asked for a copy of Strevels' personal identification. Strevels gave Gabrion his driver's license and social security card. Gabrion left for a few minutes to photocopy these documents and then returned them to Strevels. A few days later, Gabrion called Strevels' phone number and left a message stating that he would not need Strevels' help. Gabrion subsequently used Strevels' information to obtain a Virginia driver's license in Strevels' name. (Tr. VII, 1478.)

Later that month, Gabrion approached a man in West Virginia and offered to buy a remote, 5-acre tract of land. (*Id.* at 1546.) The land had not been listed for sale, but Gabrion

10

located its owner. Gabrion identified himself as Ronald Strevels. He claimed that his wife had been killed and he wanted to "get away from it." (*Id.* at 1547.)

### 3. Gabrion is Arrested and Convicted for Social Security Fraud

In October, the FBI arrested Gabrion for social security fraud. Federal agents found him after staking out a post office in New York where he regularly collected mail from a post office box. (Tr. VII, 1477.) He had been using the identity and social security number of Robert Allen, a mentally-disabled man, for over two years in order to obtain Allen's social security benefits. *United States v. Gabrion*, No. 98-1822, 2000 WL 1091489, at *1 (6th Cir. July 27, 2000).

Gabrion had obtained an Indiana driver's license in Allen's name in July 1995 (Gov't Ex. 110), and in 1996 he used that license to open a bank account in New York where Allen's benefits could be deposited (S. Tr. II, 451, 455). Gabrion also used Allen's identity to open two post office boxes, to rent an apartment in Michigan, to rent a hotel room in Indiana, and to sell a parcel of land on a land contract. *Gabrion*, 2000 WL 1091489, at *1. The purchaser paid off the land contract, but Gabrion was unable to deliver clear title to the property. *Id.*

In 1998, a jury convicted Gabrion of using Allen's social security number for fraudulent purposes, and the Court sentenced him to 60 months in prison. *See United States v. Gabrion*, No. 1:97-cr-145 (W.D. Mich.). Allen is believed to be dead. He has not been seen since the spring/summer of 1995. (S. Tr. II, 445, 462.)

About a week after Gabrion's arrest for social security fraud, detectives served him with a subpoena to produce hair samples. Among other things, detectives wanted to compare a pubic hair found on Rachel's clothing to Gabrion's pubic hair. They were not able to do so,

however, because Gabrion subsequently shaved off almost all of his hair, including his pubic hair.[5]
(Gov't Ex. 76; Tr. VII, 1539.)

### 4. Gabrion's Admissions in Custody

While in custody, Gabrion told several inmates that he killed Rachel and Shannon. He told Nathan Brewster that he killed Rachel because "she screamed rape and he had to take care of his business." (S. Tr. II, 356.) He also told Brewster that there was another body in Oxford Lake. (*Id.*) Gabrion told Martin Love that he "killed the baby because there was nowhere else to put it." (2/27/2002 Tr. 8.) Similarly, he told Jason Cross that he "got rid" of the baby because he "didn't know what to do with it." (R. 593: S. Tr. I, 153.)

In August 2001, Gabrion was being held at Newaygo County Jail along with an acquaintance, John McTaggert. Gabrion gave McTaggert a packet of papers about purchasing property around Oxford Lake. He told McTaggert that he wanted the land around Oxford Lake to become private property rather than federal land, and he offered to pay McTaggert for his help. (Tr. V, 1277-81.) Even though Gabrion was under maximum security restriction and could not have physical contact with McTaggert, he was able to get the packet to McTaggert by putting it in a trash bag in a hallway where McTaggert could retrieve it. (*Id.* at 1278-80.) McTaggert became concerned when he opened the packet and looked at the first page. It was a drawing of Oxford Lake. On the drawing, Gabrion had written "body found 1 of 3," next to a line pointing to three x's in the center of the lake. (Gov't Ex. 70.)

### II. Trial – Guilt Phase

The evidence of Gabrion's guilt is "overwhelming." *United States v. Gabrion*, 648 F.3d 307, 317 (6th Cir. 2011) ("*Gabrion II*"). The keys to the padlocks on Rachel body, the

---

[5] DNA analysis later revealed that the hair found on Rachel did not come from Gabrion. (R. 592: Tr. VIII, 1669-70.)

matching cinder blocks, the chains and other items at Gabrion's campsite, his presence at Oxford Lake in Rachel's company around the time of her disappearance, his attempt to explain her disappearance by sending letters to Rachel's family, and his incriminating statements to others, all firmly establish that he killed her.

To support its theory that Gabrion killed Rachel on federal property by drowning her in the lake, the Government presented the expert testimony of forensic pathologist Dr. Stephen Cohle.  Cohle testified that when a body is found in the water, there are no definitive tests or reliable anatomic findings that would show that the person died as a result of drowning.  (R. 459: Cohle Tr. 13, 19.)  It is a "diagnosis of exclusion" that requires ruling out other causes of death, such as heart attack, stroke, injury, drug overdose, disease, manual strangulation, or any other form of suffocation that would leave demonstrable markings.  (*Id.* at 13, 19, 20, 22, 26.)  Cohle did not find evidence of heart attack, stroke, wound, drug overdose, or disease in Rachel's body.  Nor did he find evidence of injury or pressure to the neck that would indicate strangulation (*id.* at 19, 23, 27-28), or injury to the lining of the mouth or lips that would indicate suffocation by having a pillow or some other object placed over the mouth (*id.* at 25).  In short, he did not find evidence of a cause of death other than drowning, though he acknowledged that asphyxia can also occur without demonstrable markings, and that it is sometimes impossible to distinguish asphyxia from drowning.  (*Id.* at 19.)  But when taking into account all the circumstances in which Rachel's body was found, including the fact that she was handcuffed, bound in chains and duct tape, and weighed down with blocks, Cohle opined that the "most likely" cause of her death was drowning.  (*Id.* at 26.)

The defense presented the testimony of several of its own experts.  Glen Moore, a forensic scientist, examined duct tape from Gabrion's campsite near Hungerford Lake and hair

samples from Gabrion's residence.  (Tr. VII, 1624.)  Rachel's hair was not in or on any of those items.  (*Id.* at 1624-25.)

Mark Stendts, a fingerprint specialist for the FBI, examined the duct tape found near the boat launch to Oxford Lake, the duct tape wrapped around Rachel's eyes and mouth, the duct tape at Gabrion's campsite near Hungerford Lake, and pieces of duct tape recovered from two of Gabrion's vehicles.  Stendts found a print on only one of these items—the duct tape recovered from one of Gabrion's vehicles—but that print did not belong to Rachel or Gabrion.  (R. 592: Tr. VIII, 1643, 1646-50.)  Stendts also examined sheets of lined paper with Rachel's handwriting (presumably, the letters she wrote), and found only Rachel's prints on them.  (*Id.* at 1650.)

Arnim Hartmann, a former employee at Master Lock, testified that the padlock keys found at Gabrion's residence would have matched approximately 350,000 locks in circulation, because Master Lock made only 40 different key types for its locks and it sold about 13 million of the type of locks used on Rachel.  (*Id.* at 1660, 1662.)

John Stewart, a FBI examiner, analyzed the DNA of the pubic hair found on Rachel's clothing and determined that it did not belong to Gabrion.  (*Id.* at 1670.)

Due to the unavailability of a defense witness, the parties stipulated that the chain on Rachel's body did not match chain found at Gabrion's residence.  (*Id.* at 1672.)

In addition, Gabrion testified on his own behalf, against the advice of his counsel. He made a number of statements that were damaging to his credibility and his assertion of innocence.  He claimed that John Weeks and Eddie Start (a friend of Rachel's) chained blocks to Rachel's body that they had obtained from Gabrion's property, and then they "finished [her] off" at Eddie's cabin.  (R. 461: Gabrion Tr. 10-11.)  He claimed that the handcuffs belonged to Eddie and the bolt cutters belonged to Eddie's friend.  (*Id.* at 12.)  He claimed that he and Eddie drove to

Philadelphia and "adopted out" Shannon to some people there. (*Id.* at 13.) He claimed that his residence in Altona was a Christian bookstore that had a wall full of books. (*Id.* at 29.) He asserted that Rachel's body probably floated from the privately-owned side of the lake to the side owned by the government. (*Id.* at 51.) He claimed that Eddie bound Rachel's mouth in duct tape because she "kept talking and talking and talking to the police." (*Id.* at 68.) He acknowledged writing a letter to Rachel's mother which stated that she would "spend eternity reliving Rachel's last few seconds gasping for air on a muddy lake bottom[.]" (*Id.* at 90.) And when asked by the prosecutor whether he thought that his actions toward Rachel were justified, Gabrion stated, "No . . . I think what you did is you forced her to testify in a case against a person lying in a case which forced her to become a victim to a crime[.]" (*Id.* at 73.)

The jury reached a guilty verdict after deliberating for about four hours.

### III.  Trial – Penalty Phase

For Gabrion to be eligible for the death penalty, the Government had to prove (1) that Gabrion killed Rachel intentionally, and (2a) that he did so after substantial planning and premeditation, or (2b) that his crime was committed in an especially heinous, cruel or depraved manner. 18 U.S.C. § 3592(c). The jury unanimously found all three circumstances. (*See* R. 526: Penalty Phase Special Verdict Form.)

To find that the death penalty was warranted, the jury was required to find that the aforementioned circumstances, as well as any non-statutory aggravating factors proposed by the Government, outweighed mitigating factors presented by the defense.

### A.  Aggravating Factors

The Government submitted the following as aggravating factors:

1. Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others.

2. The personal characteristics of Rachel Timmerman and her uniqueness as an individual human being are such that her death has resulted in a loss to society, and has caused injury and loss to her family.

3. Defendant caused the death or disappearance of Rachel's infant daughter, Shannon.

4. Defendant obstructed justice by murdering Rachel because she was the complaining witness in a criminal sexual conduct charge against him.

(*See id.*)  The jury unanimously found all four of these factors.

### 1. Future Dangerousness

In support of the first factor, the Government presented evidence that Gabrion terrorized many people and likely murdered five others (Rachel, Shannon, Davis, Weeks, and Allen).

For instance, Gabrion became upset with Wilma Babcock after she refused to let him take her son to see his father, who is Gabrion's brother David.  A few days later, someone set her house on fire.  The perpetrator used a cinderblock to prop open the back door in order to ventilate the fire.  (S. Tr. I, 72, 86.)

In 1991, John Terwilliger lived about half a mile away from Gabrion.  One evening, Terwilliger was drinking beer at his house with some friends.  Gabrion was there, too, behaving obnoxiously, so Terwilliger asked him to leave.  As Gabrion was driving away, he told those who were present, "Every one of you are fucking dead."  (*Id.* at 179.)  About fifteen minutes later, Terwilliger heard bullets sailing over the top of his house.  (*Id.* at 180.)  Terwilliger called the police.  When the police arrived at Gabrion's trailer about 20 minutes later, they found him sleeping on his couch.  (*Id.* at 190.)  His rifle was hanging on the wall, and there were spent bullet casings on the hood of his truck and on the ground.  (*Id.* at 187-88.)  The next day, Gabrion apologized to Terwilliger for his actions, but kicked Terwilliger's 13-year-old son in the leg.  (*Id.* at 180, 182.)

In 1996, Gabrion sexually assaulted the wife of an acquaintance, grabbing her crotch and breast; he refused to leave her home until threatened at gunpoint. (*Id.* at 108, 113.) He also tried to get into bed with his sister-in-law's niece, but she told him to leave. (*Id.* at 116-17.) The following day, he was gone and her dog had disappeared. After she called the police, Gabrion called her and threatened to put her where nobody would ever find her. (*Id.* at 120.)

That same year, Tom Niewiek rented a room to Gabrion in a seven-bedroom house in Cutlerville, Michigan. (*Id.* at 133.) One of the renters complained to Niewiek that Gabrion threatened to kill him and throw him in a river. (*Id.* at 135.) Another renter complained that Gabrion had been entering her room and exposing himself to her. (*Id.*) The next day, Niewiek saw Gabrion rubbing his crotch while staring at Niewiek's 12-year-old daughter through the window of Niewiek's home. (*Id.* at 137.) Niewiek told Gabrion to take his things and leave. Gabrion refused to do so, claiming that he had a right to 30 days' notice before he could be evicted. After Niewiek called the police, Niewiek's wife confronted Gabrion and told him to leave. Gabrion walked into her kitchen, picked up a knife, and threatened to kill her. (*Id.* at 140.) He also threatened to kill Niewiek by throwing him into a river.

In 1997, Gabrion stormed into his neighbor Dennis Bacon's house unexpectedly one night, complaining that Bacon cut his grass. (*Id.* at 96, 103.) Bacon escorted him out. The next day, Gabrion attacked Bacon and pulled him off of a riding lawnmower. (*Id.* at 101.) A few days later, Bacon's wife discovered that someone had set fire to the side of their house in the night. (*Id.* at 95.)

When Gabrion was playing cards at Dennis Lilly's home, Gabrion became upset because Lilly paused the game to get some heart medication for his uncle. (*Id.* at 211.) Gabrion accused Lilly of kicking Gabrion's dog. (*Id.* at 213.) Lilly told Gabrion to leave. Gabrion walked

into the living room, picked up Lilly's dog, and threw it against the wall. (*Id.*) Then Gabrion grabbed Lilly by the throat, pushed him to the floor, choked him, and kicked him in the ribs. Gabrion boasted that he could kill Lilly and his family and no one would ever know. (*Id.*) When Lilly's wife tried to intervene, Gabrion grabbed her by the hair, slammed her head against the floor several times, and punched her in the face. (*Id.* at 219.) When Lilly's 10-year-old son tried to help his father, Gabrion threw him across a bed and punched him several times in the head. (*Id.* at 222-23.) Gabrion told them that if they called the police, he would "come back and finish off what he started." (*Id.* at 215.)

In 1996 and 1997, Charles Cass lived across the street from Gabrion. (S. Tr. II, 240.) Cass confronted Gabrion because he suspected that Gabrion had taken his dog. (*Id.* at 245.) Gabrion claimed that he put the dog in the back of his truck, but it jumped out and died. (*Id.* at 246.) Later, Gabrion went to Cass' house with a golf club in his hand and a serrated knife in his back pocket. (*Id.* at 242.) He told Cass that he had an "arsenal" of guns and could "snipe" anyone in the town from his house. (*Id.* at 243-44.) He threatened to kill Cass and his wife. (*Id.* at 244-45.) That evening, Gabrion fired several shots at Cass' house. (*Id.* at 248.)

The Casses called the police. After the police officers arrived, they heard a shotgun discharge from the second floor of Gabrion's residence. (*Id.* at 275.) Soon thereafter, Gabrion came out of his house. The police detained him and inspected the second floor of his home. There, they found a mattress on the floor. At the head of the mattress was a bullfrog, laying on its back with its legs "spread-eagled." (*Id.* at 278.) Not far from the frog was a nearly-naked doll with its arms and legs open. Both the frog and the doll appeared to have "dried and nondried bodily fluids" around them. (*Id.*) Officers also found a sawed-off shotgun and ammunition. (*Id.* at 279.)

18

In 1997, Tracy Cole, another one of Gabrion's neighbors, was walking out of her house with her two-year-old son when Gabrion aimed a rifle at her and walked toward her. (*Id.* at 289.) She quickly got into her car and left, but Gabrion followed her for several miles in his car. (*Id.* at 290.)

Gabrion's dangerous conduct continued while he was in custody. He hid nail clippers in a hole in the wall of his cell. (*Id.* at 308.) He broke a shower ring and sharpened it to use as a weapon. (*Id.* at 328.) He kept chicken bones to make into a shank. (*Id.* at 352.) He tried to break off loose metal in his cell. (*Id.*) He removed the blade from his razor and replaced it with a piece of foil before returning the razor to the prison guard. (*Id.* at 379.) He carved a fake gun out of soap, painted it black, and told another inmate how he planned to use it to escape. (*Id.* at 370, 388.) He started a fire in his cell. (*Id.* at 311.) He threw feces and urine on prison staff, exposing an officer to possible infection with hepatitis C.[6] (*Id.*) He threatened to kill female guards. (*Id.* at 354.) He told Brewster that he has hepatitis C and HIV, and that he planned to cut himself and throw his blood on jail deputies. (*Id.*)

Gabrion also attempted to manipulate others on the outside for his own ends. He asked his brother Mike to "move his stake in Oxford Lake,[7] to get it on the state side of the lake." (R. 560: 3/14/2002 S. Tr. 49.) He called the office of the United States Attorney, claiming to be a Michigan state senator, and expressed concern about the federal government's exercise of jurisdiction over his case. (Gov't Ex. 90.) He called the federal correctional institute in Milan, Michigan, claiming to be Ron Weston, the Clerk of the Court for the Western District of Michigan. (Gov't Ex. 86.) Impersonating Weston, Gabrion asked prison officials to have him transferred from the Calhoun County Jail to the federal prison in Milan. He also sent a letter to his 16-year-

---

[6] According to his medical records, Gabrion has hepatitis C.
[7] Detectives used stakes to mark the location of Rachel's body in Oxford Lake.

old nephew, Bobby, asking him to post copies of an enclosed document around the federal courthouse on the day of an upcoming hearing in Gabrion's case. (Gov't Ex. 85; S. Tr. I, 73-74.) The document was a motion that Gabrion had prepared to dismiss his case for lack of federal jurisdiction. Gabrion gave Bobby detailed instructions about how and where to obtain free photocopies. (*Id.*) Gabrion also suggested that Bobby could become a "millionaire" off of Gabrion's "small problem" by writing a book about Gabrion killing thirty-three people. (*Id.*)

Gabrion also harassed Rachel's family with numerous letters and phone calls, accusing them of killing Rachel and hiding Shannon. (S. Tr. III, 497.) In letters to Rachel's father, he asked for a picture of Shannon. (Gov't Exs. 93, 94.) Somehow, Gabrion started a 501(c)(3) non-profit organization called "No More Missing Children." He told Rachel's father that Shannon's picture would be used in a flyer to promote the organization and to help find Shannon. Rachel's father complied with Gabrion's request, desperately hoping to discover Shannon's whereabouts. (S. Tr. III, 502.)

Gabrion also threatened witnesses who were scheduled to testify against him. He sent a letter to the Casses, accusing them of murdering Rachel and hiding baby Shannon. (Gov't Ex. 87.) He called Jason Cross's wife, Shannon Cross, and sent her a letter. (S. Tr. I, 170; Gov't Ex. 86.) Jason had agreed to provide information to the government about a suspect in another murder case, Gary Karr. (*Id.* at 151.) Gabrion told Jason that he would kill Jason's wife and family if Jason testified against Karr. (*Id.* at 152.) In the letter to Jason's wife, Gabrion suggested that Jason's testimony would put Jason and his family at risk. Gabrion wrote that he "hoped very much that what [Jason] is doing with [Gary Karr] is not going to[] endanger his family or him either for that matter[.]" (Gov't Ex. 86.) Shannon feared for her life and that of her husband after receiving contact from Gabrion. (S. Tr. I, 170.)

Gabrion's dangerous and inappropriate conduct spilled over into the court proceedings. He interrupted the proceedings on a number of occasions. During the prosecutor's opening statement at the sentencing phase, Gabrion blurted out, "Why do you just let him stand up there and lie like that and never do anything about it? It's bullshit." (S. Tr. I, 33.) When the second witness in the sentencing phase of the case was testifying, Gabrion punched one of his attorneys, David Stebbins, in the face. (*Id.* at 75.) Judge Bell removed Gabrion from the courtroom and made him watch the proceedings on a video monitor until the following day.

To counter the Government's evidence of dangerousness, Gabrion's attorneys presented Mark Cunningham as a fact witness regarding the custody options available in the Bureau of Prisons (BOP) and the restraints available within the federal prison system to limit an inmate's communications. (R. 574: Cunningham S. Tr. 4.) According to Cunningham, federal inmates are assigned to different custody levels based primarily upon their security risk, but federal capital inmates will never drop below a "U.S. penitentiary" level. (*Id.* at 7-8.) Cunningham described a typical cell at that level, and at two higher levels of security in the BOP. Cunningham also described the length of time per day that inmates spend in their cell at each level of custody, and the extent to which they are able to interact with others (including prison staff and visitors) or leave their cell for recreation. Cunningham also explained that the BOP can limit an inmate's correspondence, visits, or telephone calls in the event that such communications pose a risk of bodily harm or death. (*Id.* at 19.)

### 2. Death or Disappearance of Shannon

The Government argued that Gabrion killed, or is responsible for the disappearance of, Rachel's daughter, Shannon. The evidence supporting this theory includes: the fact that Shannon was last seen with Rachel when she left on her date with John Weeks; the presence of silicone nipples for a baby's bottle at Gabrion's campsite; Gabrion's statements to Martin Love

and Jason Cross that he killed or got rid of Shannon; his statement to Brewster that there was another body in Oxford Lake; and his trial testimony that he took Shannon to Philadelphia and gave her away.

### 3. Obstruction of Justice

The Government argued that Gabrion murdered Rachel to prevent her from testifying against him in the rape case. The evidence supporting this theory includes: Gabrion's threats to Rachel; the timing of her murder in relation to his criminal proceedings; Gabrion's statements to others that he killed her for that reason, including his suggestive statements at trial; the letters sent by Gabrion to the prosecutor and the judge purporting to retract Rachel's allegations and explain away her injuries; and the disappearance of another witness in that case, Wayne Davis, who was last seen alive in Gabrion's presence.

### B. Mitigating Factors

The mitigating factors presented by Gabrion's counsel focused on his difficult upbringing, the possibility that he suffered brain damage, and the fact that much of his violent conduct was associated with the consumption of alcohol.

### 1. Brain Damage / Alcohol Abuse

In the mid-'70s, after Gabrion finished high school, he started sniffing glue and drinking alcohol. (S. Tr. III, 526.) He moved to Colorado with his friend's wife and assumed a fake identity under the name Charles Canavan. His friend's wife changed her name to Rebekah Canavan. They lived in a number of places, including Tucson, Arizona, and Seattle, Washington. (*Id.* at 529.) While living in Tucson, they were involved in an automobile accident in which they both hit their heads on the windshield. (*Id.* at 531.) They left Tucson abruptly after Gabrion set a car on fire in their driveway. (*Id.* at 543.)

They had another accident in Seattle while riding a motorcycle. They crashed into a car and they were not wearing helmets at the time. (*Id.* at 532-33.) Canavan fractured her skull was hospitalized for a long time. Gabrion sustained a bump on the head and visited her while she was in the hospital. (*Id.* at 533-34.) Canavan noticed a change in his behavior after this incident; he became more violent and argumentative. (*Id.* at 535.) He physically abused her and she became scared of him. In the early '80s, she left him and moved back to Michigan. (*Id.* at 538, 542.) Apparently, Gabrion returned to Michigan around the same time.

Gabrion's mother, brother, and sister noticed a difference in Gabrion after he returned. (3/14/2002 S. Tr. 24, 44, 63.) He would say unusual things, especially when he was drinking. (*Id.* at 44, 64, 66.) He falsely claimed that he worked for the CIA or that he had fought in Vietnam. (*Id.* at 25.) Gabrion's brother Mike testified that Gabrion was "pretty much normal" unless he was drinking. (*Id.* at 41.) When he was drinking, he could "come up with anything" that was not true. (*Id.* at 42.) Gabrion's mother testified that he generally treated her well unless he was drunk; then he would become "ornery and mean." (*Id.* at 24.) Gabrion's sister had the same experience, and she noted that he did not act this way before the motorcycle accident involving Canavan. (*Id.* at 66-67.)

When the Government's witnesses testified about Gabrion's violent episodes, Gabrion's attorneys repeatedly drew attention to the fact that Gabrion had been drinking at the time. For instance, Gabrion had been drinking when he attacked Bacon and Lilly (S. Tr. I, 104, 216), when he sexually assaulted the wife of an acquaintance (*id.* at 112), and when he threatened Terwilliger and Charles Cass and fired guns at their houses (*id.* at 187; S. Tr. II, 243).

Gabrion's brother Mike testified about several other vehicle accidents that Gabrion was involved in after he returned to Michigan. (3/14/2002 S. Tr. 42.) Gabrion once drove a car

into a chain link fence and slammed his head into the windshield. (*Id.*) In the late 1980s, Gabrion was driving a motorcycle near White Cloud and lost control. He collided so hard with a telephone pole that the pole broke and his helmet cracked. (*Id.* at 43.)

In 1993, Gabrion was evaluated at Hope Network's brain rehabilitation program in Grand Rapids, Michigan. He reported that he had been in a car accident in March of 1992, and claimed that he had not been violent before the accident. (S. Tr. III, 554-55.) Dr. Martin Waalkes, a psychologist, testified that Gabrion was admitted to the program for two weeks, and Waalkes conducted some assessments on him. Gabrion refused to allow Hope Network to contact his family for information about his social and medical history. (R. 540: Waalkes S. Tr. 8.)

According to Waalkes, Gabrion's test results showed borderline impairment in memory and concentration, and moderate impairment in attention. (*Id.* at 12, 14.) Other tests indicated that Gabrion had "a degree of self-absorption, difficulty with thinking, suspiciousness and guardedness, and reliance on fantasy." (*Id.* at 18.) Ultimately, Waalkes and others at Hope Network decided that Gabrion would not be a good candidate for rehabilitation because he was "restless and agitated and irritable," and "found objection and offense" to parts of the program. (*Id.* at 23.) In addition, Gabrion did not respond well to structure, and Waalkes believed that Gabrion posed a risk of harm to himself and others. (*Id.* at 24, 32.)

Dr. Waalkes concluded that Gabrion suffered from some sort of "neurological impairment that interfered with his ability to have solid, consistent thinking from the standpoint of good concentration, mental control and attention," though he acknowledged that Gabrion had an incentive to present poorly in testing in order to qualify for disability benefits. (*Id.* at 24, 28.) He also acknowledged that Gabrion's CT scans from the time of his accident in 1992 did not show any sign of brain injury. (*Id.* at 28.)

Dr. Douglas Scharre, a neurologist, examined Gabrion's medical and mental health records and reviewed the social history data provided by Gabrion's mitigation expert in preparation for trial. (R. 539: Scharre S. Tr. 7-8.) Scharre also reviewed the results of brain scans and some testing conducted by several neuropsychologists prior to trial. He did not assess Gabrion in person because Gabrion refused to meet with him. (*Id.* at 12.) Dr. Scharre concluded that Gabrion experienced some personality changes in the 1990s, likely as a result of head injuries sustained in vehicle accidents that caused damage to his frontal and temporal lobes. (*Id.* at 9, 12.) Scharre believed that Gabrion had "frontal lobe dysfunction" and "Geschwind syndrome." (*Id.* at 12.) The indicators of frontal lobe dysfunction included Gabrion's self-absorption, impulsiveness, lack of inhibition, sexually inappropriate behavior, poor planning, abrasiveness, and "fantastic confabulation." (*Id.* at 27-28.) The evidence of Geschwind syndrome included Gabrion's "hypergraphia" (repetitive writing), "hyperreligiosity," aggressiveness, inability to change topics, grandiosity, and "persecutory delusions." (*Id.* at 29-35.) Scharre also noted that PET scans of Gabrion's brain showed asymmetric areas of metabolic activity, which Scharre believed to be evidence of damage to Gabrion's frontal and temporal lobes. (*Id.* at 39.) According to Scharre, consistency of behavior is the "hallmark" of brain damage. (*Id.* at 11.) Scharre believed that Gabrion's reported behavior had been consistent since at least as far back as the 1990s; Scharre did not believe that Gabrion could have faked a change in his personality for such a long period of time. (*Id.* at 48.)

In rebuttal to the testimony by Drs. Waalkes and Scharre, the Government presented evidence that Gabrion faked the motor vehicle accident in 1992. Scott Vanderveen testified that on March 28, 1992, he drove Gabrion to a liquor store to purchase some alcohol. (R. 543: Vanderveen S. Tr. 10.) Gabrion asked Vanderveen if he had car insurance, and Vanderveen

responded that he did. On the way back from the store, Gabrion grabbed the steering wheel and forced the car into a field. (*Id.* at 11.) Neither of them were injured, but after the car came to a stop, Gabrion got out and slammed his body against several trees. (*Id.* at 14.) When the police arrived, Gabrion requested an ambulance. Later, Gabrion filed a lawsuit against Vanderveen for his injuries and told Vanderveen to "go along" with it so that they could split the proceeds from Vanderveen's insurance company. (*Id.* at 16.)

The Government also presented testimony from Neurologist David Griesemer, who disagreed with Dr. Scharre's conclusions. In Dr. Griesemer's opinion, the PET scans did not show anything clinically significant. (R. 544: Griesemer S. Tr. 9.) Although there was some asymmetry noticeable in the PET scans, it was not clearly abnormal, it was not in the location where Griesemer would expect to see injury as a result of head trauma, and it was not the sort of change that he would expect to see from an acceleration-deceleration-related head injury. (*Id.* at 19-20, 33-34.) In Dr. Griesemer's opinion, the careful planning and goal-directed behavior involved in killing Rachel and stealing other people's identities were not consistent with frontal and temporal lobe dysfunction. (*Id.* at 21-24.)

Dr. Thomas Ryan, a neuropsychologist, examined Gabrion on February 20 and 21, 2002, a few days before the start of the trial. (R. 546: 3/15/2002 S. Tr. 8.) He administered several tests on Gabrion specifically designed to detect malingering. He also reviewed the records of Gabrion's mental health evaluations, including the evaluations conducted by Dr. Waalkes ten years earlier. (*Id.* at 9.) Dr. Ryan's tests indicated that Gabrion was intentionally faking a mental impairment. (*Id.* at 13-15.) For instance, Gabrion's scores related to memory and retention were far below that of people with severe mental impairments, and were completely inconsistent with

Gabrion's level of functioning. (*Id.* at 15, 17.) Dr. Ryan also detected signs that Gabrion was malingering in his responses to testing by Dr. Waalkes in 1993. (*Id.* at 25.)

Dr. Gregory Saathoff, a psychiatrist, evaluated Gabrion on March 8, 2002, between the guilt and penalty phases of the trial. Gabrion was calm and pleasant during the interview, except when talking about women. (*Id.* at 33.) When talking about women, including female prison employees, Gabrion would become agitated and describe them in derogatory terms. (*Id.* at 37.) Dr. Saathoff noted inconsistencies between Gabrion's self-reported abilities and his conduct outside the evaluation room. Gabrion claimed that he had memory problems and that he was not aware of the date, yet he was able to accurately recall the date when making written requests to jail staff. (*Id.* at 52.) Like Dr. Ryan, Dr. Saathoff concluded that Gabrion was feigning symptoms of mental and cognitive impairment.

## 2. Gabrion's Family Background

Gabrion's attorneys also presented evidence that Gabrion's behavior was influenced by adverse circumstances and influences in his upbringing and family.

Gabrion is the fifth of six children in his family. He has three older sisters, an older brother (Mike), and a younger brother (David). Gabrion's sister described him as "a real good little boy" who was "happy all the time and seemed to get along with everybody." (3/14/2002 S. Tr. 52.) Another sister remembered him as being "shy" and "quiet" as a child. (*Id.* at 84, 87.)

Gabrion's mother testified that Gabrion and his family lived in Grand Rapids for a time and then moved into a cabin on a lake near Walhalla, Michigan. (*Id.* at 9.) Later, when Gabrion was about 12 years old, they moved into an unfinished house in White Cloud, Michigan. (*Id.* at 19.)

As a boy, Gabrion worked odd jobs for others, including cleaning boats, mowing lawns, and performing yard work. (*Id.* at 21.) He was the only one of his brothers to do this. (*Id.*)

Gabrion was a good student until his last year of high school.  (*Id.* at 20.)  He also played on sports teams, including basketball, football, and track and field.  (*Id.*)  Generally, he "stayed out of trouble[.]"  (*Id.* at 20, 35.)

Gabrion's high school teacher testified that Gabrion had no disciplinary issues in high school, though he had a relatively high number of absences in his senior year.  (S. Tr. III, 516-17.)  His IQ score was very high, but his grades were low.  (*Id.* at 519.)  A high-school girlfriend described him as "a nice guy, fun-loving and sweet."  (*Id.* at 522.)  He did not cause problems in school; he even walked away from a fight.  (*Id.*)  Gabrion's brother Mike described him as "nerdish."  (3/14/2002 S. Tr. 35.)

Gabrion's father, who was often drunk when he came home from work, regularly made fun of Gabrion and mistreated him.  (*Id.* at 13.)  Gabrion's father also had a bad temper.  (*Id.* at 76.)  Once, he repeatedly slammed Gabrion's head into a two-by-four because Gabrion had been trying to burn some garbage near the house.  (*Id.* at 19.)  When Gabrion was a young child, he became very ill and his father refused to have him seen by a doctor.  It was not until Gabrion came down with a high fever and started acting strange that his family took him to the hospital.  Doctors diagnosed him with pneumonia and operated on him to remove a "leather-like" material from his lungs.  (*Id.* at 9.)

Gabrion's parents were often absent from the home, leaving his sisters to take care of Gabrion and his brothers.  When the family lived in Walhalla, Gabrion's father lived in Grand Rapids and came home only on the weekends.  Gabrion's mother also left the home for long periods of time.  On one occasion, she took David and stayed with another man for several months.  (*Id.* at 56.)  On another occasion, she had a nervous breakdown and her children were taken out of the house for a time.  (*Id.* at 12.)  Once, when Gabrion's sisters were left alone to care of him, he

fell ill and developed such a high fever that he became delirious and walked outside into the snow. (*Id.* at 54.) His siblings found him lying in a snow bank. (*Id.*)

The relationship between Gabrion's father and mother was not a stable one. Both of them were involved in extra-marital affairs, and they often fought with one another. David recalled that his parents fought with one another when they lived in Walhalla, particularly when they were drinking, though he described it as a "[p]retty much a normal household." (*Id.* at 33.) Gabrion's sister Christine recalled her parents arguing and physically fighting with one another, including scratching and hitting each other. (*Id.* at 72, 83.) They even knocked each other's front teeth out. (*Id.* at 83.) Gabrion's sister Yvonne remembered a time when her mother threw a butcher knife at her father. (*Id.* at 55.)

Gabrion's family did not provide a positive influence. His mother once took her children to siphon gas belonging to someone else. (*Id.* at 75.) Gabrion's brother Mike started using drugs at a young age, and moved out of the house when he was in high school. (*Id.* at 38.) At the time of trial, Mike was in prison for receiving and concealing stolen property. (*Id.* at 28.) Gabrion's brother David was also involved in criminal activity. He had spent significant time in jail.

Forensic psychologist Dr. Newton Jackson reviewed records prepared by Gabrion's mitigation specialist and interviewed members of Gabrion's family, including Gabrion's parents, a brother, and a sister. (R. 541: Jackson S. Tr. 7, 16, 34; 2/21/2002 Jackson Report, ECF No. 2-41, PageID.807-08, 812-13.) According to Dr. Jackson, this is a "standard way" of trying to obtain or confirm a social history. (*Id.* at 16.) This sort of information is useful to determine the significant events that might have affected a person's present behavior and functioning, but a personal interview with the defendant is also "very important" to determine what impact those

events might have had, because not everyone reacts in the same way to the same kind of event. (*Id.* at 7-8.)

Dr. Jackson met with Gabrion on three occasions. (*Id.* at 6-7.) At the first meeting, Gabrion was not very responsive. (*Id.* at 9.) He did not seem willing or able to respond to Dr. Jackson's questions. (*Id.* at 10.) The second meeting was similar, except that Gabrion's behavior escalated. He became distracted, hostile, demanding, and less communicative. (*Id.* at 11.) In Dr. Jackson's opinion, much of Gabrion's behavior in these meetings was "malingered"–presented for the purpose of creating the impression that he had a mental illness–though Jackson believed that there might also be some underlying psychological problem, such as a thought and mood disorder. (*Id.* at 11, 12.) Jackson observed "racing thoughts" and a "bizarre quality" in the way that Gabrion connected ideas. (*Id.* at13.) Jackson was unable to conduct an adequate assessment, however, because Gabrion would not engage in meaningful dialog. At the third meeting, Gabrion refused to talk about issues relevant to a psychological assessment. He insisted on telling Jackson about how unfairly he had been treated at the jail and by the legal system. (*Id.* at 14.) Gabrion claimed that he would cooperate if Jackson would help get him moved to another facility. When it became clear that Jackson would not do so, Gabrion became angry and threatening and the interview had to be terminated, making it impossible for Jackson to conduct a typical psychological interview. (*Id.* at 14-15.)

Despite Gabrion's lack of cooperation, Dr. Jackson had sufficient information to conclude that there were a number of influences in Gabrion's childhood and in his adult years that could have had a seriously adverse effect on his functioning. (*Id.* at 17.) Before Gabrion entered school**,** he suffered from an illness resulting in hospitalization. (*Id.*) Also, his family was dysfunctional. Both of his parents abused alcohol, which meant that they were not available to

provide adequate instruction, guidance, and education. (*Id.* at 18.) Gabrion's parents frequently fought with one another, verbally and physically, and these fights were witnessed by their children. (*Id.*) His parents were also physically violent toward their children, and their relationship was unstable, as both were involved in extramarital affairs, and were frequently absent from the home. (*Id.* at 19.) Also, Gabrion's mother gave preferential treatment to Gabrion's younger brother. (*Id.* at 20.)

Dr. Jackson noted that Gabrion did not exhibit behavioral problems as a child; he was described as "sweet" and "caring" and would run away from fights. (*Id.* at 21.) It was not until after high school that he began to show an inability to function as an "adequate" individual. (*Id.* at 22.) In Dr. Jackson's opinion, Gabrion's childhood left a "vacuum," resulting in an inability to resist bad decisions in favor of good ones. (*Id.*) After high school, Gabrion began drinking heavily and engaging in other forms of substance abuse, like inhaling glue, which likely impaired his ability to function. (*Id.* at 23.) Also, family members reported that Gabrion had been involved in several vehicle accidents resulting in head injury, which might have damaged his brain and impaired his ability to respond to situations in a socially-appropriate manner.

Dr. Jackson concluded that Gabrion had a "number of disorders," including alcohol abuse and personality disorders. (*Id.* at 24-25.) He noted that Gabrion displayed "some histrionic personality features where there is exaggeration and the desire to be the center of attention," as well as "antisocial features" that included a history of arrests and a "heedless disregard for his own safety and that of others, a lack of empathy for others." (*Id.* at 25.) Jackson did not believe that Gabrion was mentally ill, but Jackson noted a "disordered pattern of thinking" and "psychological deficits" in addition to embellishment of symptoms and malingering. (*Id.* at 26, 28-29.)

### 3. Gabrion's Testimony

Gabrion insisted on testifying at the sentencing stage, against the advice of his counsel.  As before, his testimony did not help his case.  He claimed that he had worked for the CIA and that he was willing to take a "truth drug" to prove the truth of his statements.  (R. 542: Gabrion S. Tr. 4.)  He accused a number of witnesses of being pedophiles.  He acknowledged putting a stereo system up for sale in Mecosta, but he claimed that it belonged to him and his brother David.  (*Id.*)  He stated that his childhood was "no worse than the average poor white person in rural Michigan.  There was a lot of love and a lot of hate.  It was just growing up." (*Id.* at 6.)  He acknowledged meeting Robert Allen in Grand Rapids and opening a bank account in New York for Allen's Social Security funds, but claimed that he was acting as Allen's personal representative.  (*Id.* at 10.)

Gabrion also insisted on presenting a statement in allocution.  He told the jury that he felt remorse "because you have been presented with a complete false version of these events by these evil shysters resulting in you with your supposedly bloodless hands counting me guilty."  (R. 545: Gabrion Allocution S. Tr. 2.)  He also told the jury:

> Irregardless of your earthling choice as to my punishment, I am returning to heaven, which can be likened to a continuous, happy erotic dream that I control.  No matter where you send me, I will be in heaven. . . .  So in summary, don't feel guilty because you will live with your choice for all eternity, all eternity.  May God have mercy on your soul.

(*Id.* at 3.)

### 4. Jury Findings re Mitigating Factors

Gabrion's attorneys presented the following as mitigating factors (the number of jurors who found the existence of each factor is in parentheses):

1. Defendant grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child.  (12 jurors)

32

2. Defendant was not provided with the necessary parental guidance as an adolescent which prevented him from acquiring the necessary social skills and maturity to deal with adult situations and traumas. (3 jurors)

3. Defendant's upbringing, early family life, and childhood contributed to his adult psychological deficits and criminal conduct. (6 jurors)

4. Defendant was not a disciplinary problem in school and does not have any history of criminal conduct before the age of 23. (12 jurors)

5. Defendant's abuse of drugs, alcohol and chemical inhalants contributed to his criminal conduct. (9 jurors)

6. Defendant suffers from an organically acquired personality disorder. (4 jurors)

7. Defendant has features of several personality disorders, including histrionic personality disorder, narcissistic personality disorder, and borderline personality disorder. (12 jurors)

8. Defendant has suffered traumatic brain injuries which have led to neurological impairments, including Geschwind syndrome. (0 jurors)

9. Defendant suffers from a brain dysfunction which has impaired his ability to control his conduct and to function in the absence of strong support and guidance. (0 jurors)

10. Defendant committed the offense under severe mental or emotional disturbance. (0 jurors)

11. Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge. (2 jurors)

12. Defendant will not be a danger in the future if he is confined in a highly structured and secure federal prison. (0 jurors)

(*See* R. 526: Penalty Phase Special Verdict Form.)

The jurors added their own mitigating factor: the loss of Gabrion's life will be significant to his family (12 jurors). (*Id.*)

## IV. Appeals

Gabrion appealed his conviction and sentence. "Overwhelming" is a term that features prominently in the Court of Appeals' decisions. The evidence of Gabrion's guilt was "overwhelming." *Gabrion II*, 648 F.3d at 317, 337, 338. So, too, was the evidence of the aggravating factors supporting a death sentence. *United States v. Gabrion*, 719 F.3d 511, 525 (6th Cir. 2013) ("*Gabrion III*").

Gabrion raised over 20 issues on appeal. The first issue confronted by the Court of Appeals was whether this Court had subject matter jurisdiction over the criminal prosecution. Did the nature of the Government's interest in the parcel of Oxford Lake where Gabrion murdered Rachel give the Court jurisdiction to punish him? After a remand to this Court for additional briefing and evidence, this Court determined that it did have subject matter jurisdiction. On March 14, 2008, the Court of Appeals affirmed that decision. *United States v. Gabrion*, 517 F.3d 839, 845 (6th Cir. 2008) ("*Gabrion I*").

In August 2011, the Court of Appeals addressed the other issues raised by Gabrion and decided that his sentence should be vacated because (1) this Court did not permit the jurors to consider the State of Michigan's policy against the death penalty as a mitigating factor during the penalty phase of the trial, and (2) this Court did not instruct the jury that it should "find 'beyond a reasonable doubt' the element of the death sentence that the aggravating factors outweigh the mitigating factors." *Gabrion II*, 648 F.3d at 321, 325-26. All other issues were rejected.

In May 2013, the Court of Appeals reheard the case en banc, reversed the holdings in *Gabrion II* that resulted in vacating Gabrion's sentence, rejected three additional claims raised by Gabrion that were not addressed in *Gabrion II*, and affirmed this Court's judgment of conviction

and sentence. *Gabrion III*, 719 F.3d at 535. Gabrion subsequently filed a petition for a writ of certiorari, which was denied by the Supreme Court on April 28, 2014.

Gabrion initially filed this action in April 2015 and then filed an amended motion in March 2017. (Am. § 2255 Mot., ECF No. 100.) The Government has filed a response to the amended motion (Gov't Response, ECF No. 119), to which Gabrion has filed a reply (Reply, ECF No. 141).

## V. Standards

### A. Merits

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)). Non-constitutional errors are generally outside the scope of § 2255 relief. *United States v. Cofield*, 233 F.3d 405, 407 (6th Cir. 2000). A petitioner can prevail on a § 2255 motion alleging non-constitutional error only by establishing a "fundamental defect which inherently results in a complete miscarriage of justice, or, an error so egregious that it amounts to a violation of due process." *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999) (quoting *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (internal quotations omitted)).

### B. Procedural Default

As a general rule, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the petitioner shows either (1) "cause" and "actual prejudice" or (2) "actual innocence." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982). An ineffective assistance of counsel claim, however, is not subject to the procedural default rule. *Massaro*, 538 U.S. at 504. An ineffective assistance of counsel claim may be raised in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal. *Id.*

### C. Statute of Limitations

There is a one-year statute of limitations in § 2255. It runs from the latest of the following dates:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In most cases, the one-year statute of limitations runs from the date on which the judgment of conviction becomes final. 28 U.S.C. § 2255(f)(1). As a general matter, convictions become final upon conclusion of direct review. *See United States v. Cottage*, 307 F.3d 494, 498 (6th Cir. 2002). "Finality attaches when [the Supreme Court] affirms a conviction on the merits

on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). Gabrion's conviction became final on April 28, 2014, when the Supreme Court denied his petition for a writ of certiorari. He filed his original motion under § 2255 on April 27, 2015, before the statute of limitations expired. He filed his amended motion on March 8, 2017, after the one-year statute of limitations in 28 U.S.C. § 2255(f)(1) expired. Consequently, to be timely, any new claims in the amended motion must relate back to a claim in the original motion, satisfy a different provision in the statute of limitations, or qualify for equitable tolling or an exception to the statute of limitations.

Rule 15(c)(1) of the Federal Rules of Civil Procedure creates an "exception" to the statute of limitations. *Hill v. Mitchell*, 842 F.3d 910, 922 (6th Cir. 2016). "'[W]hen a prisoner files an original petition within the one-year deadline, and later presents new claims in an amended petition filed after the deadline passes, the new claims relate back to the date of the original petition if the new claims share a "common core of operative facts" with the original petition.'" *Id.* (quoting *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011), and *Mayle v. Felix*, 545 U.S. 644, 650 (2005)); *see* 28 U.S.C. § 2242 (providing that habeas applications "may be amended . . . as provided in the rules of procedure applicable to civil actions"). Under Rule 15(c)(1), an amendment relates back when it "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" If a petition raises a new claim that does not relate back, the AEDPA's statute of limitations bars consideration of the new claim. *Mayle*, 545 U.S. at 656-57.

New claims do not relate back simply because they arise from the same "trial, conviction, or sentence" as the original petition. *Hill*, 842 F.3d at 922 (quoting *Mayle*, 545 U.S. at 663-64). New claims relate back when they arise from the "same core facts," as opposed to

"events separate in 'both time and type' from the originally raised episodes." *Mayle*, 545 U.S. at 657 (quoting *United States v. Craycraft*, 167 F.3d 451, 457 (8th Cir. 1999)).

### D. Discovery

Gabrion contends that he is entitled to discovery to flesh out the basis for some of his claims. As the Court explained in a previous order (ECF No. 74), "'[h]abeas petitioners have no right to automatic discovery.'" *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1991) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that the Court "*may, for good cause*, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) (emphasis added).

To demonstrate good cause, Gabrion must provide "'*specific allegations* . . . [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore, entitled to relief . . . .'" *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (emphasis in original). "'The burden of demonstrating the materiality of the information requested is on the moving party.'" *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Stanford*, 266 F.3d at 460). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" *Id.* (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)). These standards are the same in death-penalty cases as in other cases. *See Williams*, 380 F.3d at 974 (applying Rule 6 in a capital habeas case).

### E. Evidentiary Hearing

After reviewing the motion under § 2255 and other materials submitted by Gabrion, the response by the Government, and the record of the prior proceedings, the Court must determine whether an evidentiary hearing is warranted. Rule 8, Rules Governing Section 2255 Proceedings. If there is a factual dispute, then the Court "'must hold an evidentiary hearing to determine the truth of the [Movant]'s claims.'" *Pola v. United States*, 778 F.3d 525, 532 (6th Cir. 2015) (quoting *Huff v. United States*, 734 F.3d 600, 607 (6th Cir.2013)). An evidentiary hearing is "mandatory" unless "'the record conclusively shows that [Movant] is entitled to no relief.'" *Id.* (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

## VI. Analysis

In his amended motion under § 2255, Gabrion[8] raises eleven primary grounds for relief.

### *Ground One:* False/misleading statements and evidence

Gabrion contends that he did not receive a fair trial because the Government presented false or misleading statements and evidence to the jury, citing *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). *See Giglio*, 405 U.S. at 153 ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'"); *Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]").

---

[8] Gabrion is represented by counsel in this action. With the exception of the motion to dismiss counsel discussed in Section VII, all of the motions, claims, and arguments before the Court have been presented by Gabrion's counsel on his behalf.

## A. Ground One is procedurally defaulted.

Gabrion did not raise this claim on appeal, which means that this claim is procedurally defaulted unless he can show "cause" for failing to raise the claim on appeal and "prejudice," or "actual innocence." *Massaro*, 538 U.S. at 504. Gabrion does not claim that he is actually innocent. Instead, he asserts that this claim was not raised on appeal because his appellate counsel was ineffective.

As discussed in more detail in Grounds Three and Seven, to demonstrate ineffective assistance by his appellate counsel, Gabrion must show that his counsel's performance fell below an objective standard of reasonableness, and that this deficient performance prejudiced him, resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). When assessing appellate counsel's performance, courts recognize that appellate counsel is not required to "raise every non-frivolous issue" on appeal. *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003). Appellate counsel may reasonably decide that selecting only some of the possible non-frivolous claims will "maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Thus, appellate counsel's judgment is "presumed to be effective unless the ignored issues are clearly stronger than those presented." *Sullivan v. United States*, 587 F. App'x 935, 944 (6th Cir. 2014).

Gabrion makes no attempt to show that the issues in Ground One are clearly stronger than the many issues raised by his appellate counsel. Indeed, it is difficult to find fault with his appellate counsel in this instance because they raised many issues, two of which persuaded a panel of judges to overturn Gabrion's death sentence. Gabrion's appellate counsel could have reasonably determined that the issues presented on appeal were stronger than the ones raised here. Thus, Gabrion has not shown sufficient cause to excuse his failure to raise the issues in Ground One on appeal.

Gabrion also argues that his claim regarding "false" testimony by Chrystal Roach (see below) should not be barred by procedural default because it is based on a "unique set of facts." (Reply 15.) Gabrion contends that the Government must have known about Roach's allegedly false statements because she was initially involved in Gabrion's murder case as a Special Assistant United States Attorney, until she was dismissed from that role due to misconduct. However, there is no exception to the procedural default rule for claims with "unique facts." Indeed, such an exception would swallow the rule because virtually every claim in every case presents facts that are unique to that case.

Accordingly, Gabrion's claims in Ground One are barred because they are procedurally defaulted.

### B. Ground One is meritless.

In addition, the claims in Ground One are meritless. "'The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). To succeed on such a claim, Gabrion "'must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.'" *Id.* To show falsity, the defendant must demonstrate that the testimony was "'actually perjured'"; "'mere inconsistencies'" are not sufficient to establish knowing use of false testimony. *Id.*; *see also Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) ("The subject statement must be 'indisputably false' rather than 'merely misleading.'" (quoting *Abdus–Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005)). In turn, "[a] false statement is material . . . and '[a] new trial is required[,] if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010) (second and third alterations in original) (quoting *Giglio*, 405 U.S. at

154). Gabrion has not shown that any testimony presented by the Government was actually false and that it was material.

### 1. Chrystal Roach

Gabrion argues that Roach testified falsely about the criminal proceedings involving the CSC (rape) charge. Roach's testimony was "far from critical in establishing Gabrion's guilt." *Gabrion II*, 648 F.3d at 337. It was more relevant, though certainly not necessary, for the penalty phase, to show substantial planning and premeditation for the offense, as well as obstruction of justice. The Government argued that Gabrion murdered Rachel because she had accused him of rape and he wanted to prevent her from testifying against him. (Tr. IV, 592.) It contended that Gabrion "waited" and "maneuvered around" in his state court proceedings "to keep Rachel from testifying, biding his time until she was out [of jail] so she wouldn't testify, he wouldn't be on the hook for the crime." (R. 597: S. Tr. V, 608.)

Gabrion asserts that this narrative, and the evidence on which it was based, is false. According to a police report, the judge presiding over the rape case reviewed the court file and told the police that "he couldn't state that Mr. Gabrion attempted to manipulate the proceedings." (ECF No. 141-1.)

Roach testified that she was not satisfied with how the case against Gabrion was progressing, so she asked for a remand to the district court for a preliminary examination. (Tr. V, 1165.) Roach expected to have Rachel testify at a preliminary examination on June 5, but during the week of June 2, she learned that Gabrion had waived the examination, so the case was again before the circuit court. (*Id.* at 1166-67.) Rachel disappeared on or about June 3, 1997. Roach contended that she could have used Rachel's preliminary examination testimony against Gabrion if Rachel became unavailable for trial. On cross-examination, Roach testified that "in cases

involving assault," she felt "strongly" that a preliminary examination should take place, and that she "tried to do it every time[.]" (*Id.* at 1175.)

Gabrion contests Roach's assertion that she tried to have a preliminary examination in all cases involving assault. In records of other cases from Newaygo County in 1996 to July 1997 involving assaultive conduct, there is no indication that Roach's office demanded or conducted a preliminary examination. These records, however, do not demonstrate that Roach's testimony was indisputably false. She claimed that she "tried" to have a preliminary examination in cases involving assault, not that she actually did so. She did not specify what she meant by "tried." Nor did she contend that she was ever successful. She may have tried and failed every time. In any event, even if her statements were false, Roach's practice in other cases has little bearing on Gabrion's case.

Gabrion also contends that Roach falsely testified that she asked for a pre-trial conference in Gabrion's case because she was dissatisfied with how the case was progressing. (Am. § 2255 Mot. 19.) The Court cannot find any instance in which Roach testified that she asked for a *pre-trial conference*. Instead, she testified that she asked for a *remand* to the district court to obtain a preliminary examination. (Tr. V, 1165.)

Gabrion argues that if Roach wanted to expedite his criminal proceedings, she could have asked for a trial date rather than a remand. True, but that does not mean her testimony was false.

Next, Gabrion contends that Roach did not actually request the remand to the district court. According to the transcript of the April 29, 1997, pre-trial hearing, an unidentified prosecutor (possibly Roach) expressed the government's "understanding" that Gabrion wished to remand the matter for a preliminary examination, and that the government did not oppose this

request.  (ECF No. 1-2, PageID.147.)  In addition, the state court docket sheet indicates that the circuit court remanded the case "per request" of Gabrion's attorney, Joel Townsend.  (Register of Action, ECF No. 1-1, PageID.142.)  This evidence suggests that Gabrion, not the prosecutor, sought the remand.  On the other hand, the evidence also indicates that the prosecutor (who may have been Roach) initially brought the remand request to the attention of the court.  Thus, in that respect, the prosecutor asked for the remand.  It is also possible that Roach asked for the remand by suggesting it to Gabrion's attorney before the hearing.  Accordingly, the evidence before the Court does not demonstrate that Roach's testimony is indisputably false.

Moreover, any falsehood in Roach's statement is plainly immaterial because it actually benefitted Gabrion.  If Gabrion is correct that his attorney, and not Roach, asked for the remand to the district court for a preliminary examination, then it is even more likely that he was intentionally manipulating the proceedings, because he subsequently waived the preliminary examination and the case transferred back to the circuit court.  In other words, the remand served no purpose but to delay the proceedings, and that delay allowed Rachel to complete her jail sentence and disappear with John Weeks before appearing in court to testify.  In fact, the Government made this very argument to the jury.  Despite Roach's statement that *she* requested the remand, the Government argued that *Gabrion* "flip-flopped the case back into district court, wanting a preliminary examination. . . . [A]ll this flip-flopping back and forth . . . delayed the trial and it prevented Prosecutor Roach from getting Rachel Timmerman's sworn testimony[.]"  (Tr. VIII, 1681-82.)  Thus, there is no possibility that any falsehood in Roach's statement could have affected the jury's decision.

Gabrion claims that the Government falsely argued that he tried to "delay" the proceedings, but that he "had run out of options" because "he was going to have his trial in or after June of 1997." (Tr. VIII, 1682.) There is nothing false or improper in this statement.

Finally, Gabrion argues that the Government "hoodwinked" the jury into thinking that the hearing on June 5 would be a trial rather than a preliminary examination. (Am. § 2255 Mot. 16.) This assertion is unsupported. Roach testified that no trial was ever scheduled in the rape case. (Tr. V, 1175.) Moreover, it does not matter whether the hearing set for June 5 was to be a preliminary exam, a trial, or something else. What matters is that Rachel was prepared to testify against Gabrion but he prevented her from doing so.

In short, none of Roach's allegedly false statements were material to Gabrion's guilt or to any aggravating factors supporting Gabrion's sentence, such as premeditation or obstruction of justice. The evidence of his guilt is overwhelming. There is also ample evidence of substantial planning and premeditation apart from Roach's testimony: he gathered the supplies that he would need in advance (including a boat, chains, and concrete blocks); he lured Rachel from her home using Weeks as an intermediary; he obtained letters from Rachel to explain her disappearance and to get the state to drop the charges against him; and then he handcuffed her, wrapped her in chains and duct tape, and drowned her in a remote lake to hide her body.

There is also considerable evidence establishing obstruction of justice. There is no question that Gabrion killed Rachel because she accused him of rape. That's what he threatened to do to her, and his trial testimony confirms his motive ("I think what you did is you forced her to testify in a case against a person lying in a case which forced her to become a victim to a crime"; "she kept talking and talking and talking to the police"). Thus, there is no reasonable likelihood

that any falsehood in Roach's testimony regarding the rape proceedings could have affected the jury's decision.

## 2. Gabrion "forced" Rachel to write letters

In its opening statement to the jury, the Government said that Gabrion "made" or "forced" Rachel to write the letters asking the prosecutor and the judge to dismiss the rape charge. (Tr. IV, 930, 935.) And in its closing argument, the Government argued that Rachel was following Gabrion's "script" and that he was "writing these letters himself." (Tr. VIII, 1686.) Gabrion contends that these statements were false because he did not force Rachel to write the letters or dictate them to her.

Gabrion relies upon a pre-trial report prepared by FBI examiners who were asked to determine whether Rachel wrote the letters under duress and whether Gabrion dictated them to her. (ECF No. 1-8.) The examiners reviewed some letters written by Gabrion and observed that the letters written by Rachel were "markedly different." (*Id.*) Rachel's letters "contained the same sentence structure, consistency and thought processes throughout," whereas Gabrion's letters "lack any type of consistency" and "there appears to be no rhyme or reason for when he says anything." (*Id.*) Based on these observations, the examiners opined that Rachel was "probably" not under "extreme" duress when she wrote the letters, and that Gabrion "probably" did not "dictate" the letters to her. (*Id.*) Gabrion's trial attorneys were apparently aware of this report, but they did not use it or call the examiners to testify at trial. *See* Ground Three, Section K (claiming that Gabrion's trial attorneys were ineffective for failing to use the FBI report at trial).

This claim is different from the previous one because it does not involve the presentation of false *testimony*; instead, it involves allegedly false or misleading statements made *by the prosecutor*. To prevail on such a claim, Gabrion must demonstrate that the prosecutor's

remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

To determine whether a prosecutor's statements violated due process, the Court must first determine whether the remarks were "improper." *United States v. Galloway*, 316 F.3d 624, 632 (6th Cir. 2003). If the remarks were improper, then the Court must determine whether they were "flagrant." *Id.* "There are four factors . . . to determine if an improper statement was flagrant: 1) whether the statements tended to mislead the jury and prejudice the defendant; 2) whether the statements were isolated or pervasive; 3) whether the statements were deliberately placed before the jury; and 4) whether the evidence against the accused is otherwise strong." *Id.* (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)). Even if the remarks were not flagrant, the Sixth Circuit will reverse a conviction if: "1) the proof of the defendant's guilt is not overwhelming; 2) the defense objected to the statements; and 3) the trial judge did not cure the impropriety through an admonishment to the jury." *Id.*

The prosecutor's remarks were not improper. A prosecutor is allowed "to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Rachel's letters contained suspicious details designed to benefit Gabrion by explaining physical evidence of the rape, such as the assertion that she pushed his semen into her vagina and pinched herself, and that Gabrion's dog bit her nose. These details were consistent with Gabrion's statement to the police, but were very different from Rachel's account shortly after the rape. In addition, the evidence indicated that Gabrion mailed the letters, not Rachel. Finally, it does not seem plausible that Rachel would suddenly retract her allegations when it was clear that she was willing to proceed with the case against Gabrion for almost a year despite her persistent fear that

she and her daughter could be killed. Thus, it was reasonable for the prosecutor to argue that Gabrion somehow forced Rachel to write the letters, and that he directed her what to say.

The FBI report does little to negate the inferences drawn by the prosecutor. The FBI examiners apparently based their opinion on the fact that Rachel's letters contained a coherent structure whereas Gabrion's did not. But even Gabrion's expert, Dr. Scharre, saw "plenty of examples of good coherent writing and purposeful writing" by Gabrion. (Scharre S. Tr. 61.) It is not clear whether the FBI examiners reviewed the same letters as Scharre, but his testimony undermines the basis for their conclusion.

Furthermore, the opinion expressed in the FBI report is narrow and qualified. It states that Gabrion "probably" did not "dictate" the letters, and that Rachel "probably" was not under "extreme" duress when she wrote them. (ECF No. 1-8.) This opinion does not rule out the possibility that Gabrion dictated the letters to Rachel, or that he forced her to write them. It was not improper for the prosecutor to argue this possibility.

Finally, the opinion of the FBI examiners is just that: an opinion. The prosecutor was not bound by it. Thus, none of his statements were improper.

### 3. Rachel disappeared on June 3

The prosecutor asserted in his closing argument that Rachel was not seen alive again after June 3, except by some individuals who saw her near Oxford Lake. Gabrion argues that this statement was critical because it suggested that she was abducted a few days before she was scheduled to testify in the rape case. He also argues that this statement was false, because "numerous friends and acquaintances" of Rachel saw her "in the area" after June 3. (Am. § 2255 Mot. 27.)

Gabrion relies upon statements by various individuals suggesting that Rachel may have been in the area near her home a few days after June 3. Detective Miller told the grand jury

that the "last positive date" the police could confirm Rachel was seen alive was June 3, but "other people . . . have told us that they have seen her later on that same day and possibly have seen her a day or two later in the company of different people." (ECF No. 1-13.) According to a news article, Rachel's father stated that Rachel "left [his house] on June 3 and . . . was seen, in town, on the fourth." (ECF No. 1-14.) Two other witnesses told the grand jury that Rachel stopped by their camper on the evening of June 3. (Kanady Grand Jury Tr. 9, ECF No. 1-15; Vanslyke Grand Jury Tr. 6-7, ECF No. 1-16; *see also* 8/21/1997 FBI Report, ECF No. 1-17 (summarizing interview with Vanslyke).) Danny Holmes told the FBI that he last saw Rachel "approximately two weeks before she was missing." (FBI Report, ECF No. 1-18.) Teresa Start told the grand jury that she saw Rachel on June 2 or 3. (Start Grand Jury Tr. 6, ECF No. 1-20.) Michael Vaivada, Christopher Green, and Dennis Scheidel apparently told the police that they saw Rachel at a party hosted by Vaivada on June 6, though they disagreed about what vehicle she arrived in and Scheidel was not certain whether the party occurred on May 31 or June 6. (Police Report, ECF No. 141-7.)

None of Gabrion's evidence demonstrates that the Government's statement was improper. At best, it shows that someone may have seen Rachel as late as June 6. But whether she was last seen on June 3 or June 6 makes no difference whatsoever. What matters, and what the evidence clearly established, is that Gabrion did not want Rachel to testify against him, and he killed her before she could do so.

Moreover, the Government never argued that Gabrion abducted Rachel only two days before she was scheduled to testify. Nor could it. By the time that Rachel left her father's home, the hearing set for June 5 had been cancelled. Thus, the prosecutor's statement was not "critical" to any aspect of the Government's case.

## 4. Evidence of security regulations

Gabrion argues that the Government "misled" the jury by "not permitting" evidence that the Bureau of Prisons (BOP) is authorized to use special security measures for high risk prisoners, as outlined in 28 C.F.R. § 501.3. (Am. § 2255 Mot. 28.) During the penalty phase of the trial, Gabrion's expert, Mark Cunningham, testified that there are a range of classifications in which an inmate can be held in the BOP, but "a federal capital inmate will not drop below a U.S. penitentiary level" because that is "what the regulations call for." (Cunningham S. Tr. 8.) Gabrion's attorney asked Cunningham what "[t]he regulations say" about "a capitally charged defendant who gets a life sentence," but the Government objected to the witness testifying about the contents of a law or regulation. (*Id.*) The Court directed counsel to rephrase the question because it called for a legal response. (*Id.*) Thereafter, Cunningham testified about the security levels and security measures in the BOP for dangerous inmates, without expressly referring to the content of the regulations. Gabrion's counsel later sought to have the BOP regulations presented to the jury as an instruction, but the Court denied this request.

On appeal, Gabrion argued that the Court erred by not giving the requested instruction. Gabrion argued that the instruction was necessary because the Government had objected to testimony about the BOP regulations. The Court of Appeals rejected this claim:

> Despite the [Government's] objection[,] Cunningham was allowed to testify as to the different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous.
>
> **Gabrion's defense was not impaired by the refusal to give the instruction.** First, the District Court gave the jury an instruction that encompassed Gabrion's concerns when it instructed the jury that it could consider as one of the mitigating factors the fact that "the defendant will not be a danger in the future if he is confined in a highly structured and secure federal prison." (J.A. at 2025). Second, Gabrion elicited testimony from Cunningham outlining the restrictions available to the Bureau of Prisons to secure a dangerous inmate. Had the District Court given [the requested] instruction, it is likely that the government would have requested a

countervailing instruction telling the jury that no prison is totally secure and confinement in a maximum security federal prison is not a guarantee that Gabrion will never threaten or harm anyone in the future. By allowing Cunningham to testify and by instructing the jury that they could consider as a mitigating factor that Gabrion would not be a danger if housed in a secure federal prison, Gabrion's concerns were addressed . . . .

*Gabrion II*, 648 F.3d at 353 (emphasis added).

Gabrion now claims that the Government acted improperly by refusing to permit this evidence. This claim fails on its face because *the Court* decided what evidence would be permitted, not the Government. It was not improper or unfair for the Government to raise its objection.

In addition, Gabrion's claim fails for the reason described by the Court of Appeals. Gabrion's inability to present the BOP regulations to the jury did not impair his defense. That being the case, it could not have denied him a fundamentally fair trial.

### 5. Linda Coleman

Linda Coleman is one of the witnesses who saw Gabrion with Rachel at Oxford Lake in early June 1997. Gabrion claims that Coleman testified falsely about the type of vehicle she was driving when she saw Gabrion. She told the grand jury that she was driving a truck, but for purposes of trial,[9] she testified that she was driving a Geo Metro. When confronted with her grand-jury testimony on cross-examination, she agreed that she was driving a truck. (Coleman Tr. 33-34.) Gabrion claims that she could not have been driving either of those vehicles because she did not register ownership of a truck or a Geo Metro until after June 1997.

Any falsehood in this aspect of Coleman's testimony is utterly immaterial. The type of car she was driving has nothing to do with Gabrion's guilt. Moreover, Coleman's daughter,

---

[9] Coleman did not testify at the trial itself. The Court allowed the Government to submit her pre-trial video deposition testimony because she was too ill to testify at trial.

Kathy Kirk, corroborated the important part of Coleman's testimony. Like Coleman, Kirk saw Gabrion at Oxford Lake with another man and a woman matching Rachel's appearance. Furthermore, the jury already had reason to doubt Coleman's ability to recall details, because she conceded that she "[did not] remember a lot of it." (Coleman Tr. 35.) Thus, there is no conceivable way that any falsehood about the type of car she was driving could have influenced the jury's decision.

### 6. Gregory Leon

Gregory Leon testified that he operated a homeless shelter in Grand Rapids, Michigan, called "Leon Christian Home," and that Gabrion stayed there from April to October of 1995. (S. Tr. I, 124.) According to Leon, Gabrion tapped into Leon's phone line, admitted to stalking a woman at a nearby laundromat, and claimed to possess sophisticated surveillance equipment that he used on drug dealers. (*Id.* at 125-27, 129.)

Gabrion contends that he could not have stayed with Leon in 1995 because state records show that Leon's organization, "The Leon Christian Home/Project Homeless Inc.," dissolved in October 1994. (ECF No. 1-12.) The only thing these records demonstrate, however, is that Leon's corporation ceased to exist as a legal entity in 1994. Leon could have continued to own and operate a homeless shelter after that time in his own name, without the protection of a corporate entity. Indeed, real estate records provided by the Government indicate that Leon continued to own the building and real estate where Gabrion stayed until October 1995, when Leon transferred it to another party by quitclaim deed. (ECF No. 42-2, PageID.2186.) Thus, Gabrion has not shown that Leon's testimony is indisputably false.

Even if Gabrion could show that Leon's testimony was false, his claim is meritless because Leon's entire testimony was immaterial. It provided some support for the aggravating factors, but paled in comparison to the other evidence presented. Many other witnesses testified

about Gabrion's absurd statements, his inappropriate behavior toward women, and his ability to engage in sophisticated criminal conduct.

In his amended motion, Gabrion further claims that Leon was charged with criminal sexual conduct in April 1997 and then released in November of that year because the state failed to bring him to trial within 180 days. A week later, Leon allegedly approached the FBI to discuss evidence related to Gabrion's case. In July 1998, Leon pleaded guilty to a "reduced charge" of aggravated stalking and was sentenced to time served. (Am. § 2255 Mot. 38.) Gabrion speculates that Leon was able to obtain favorable treatment in exchange for testimony against Gabrion, and that the Government failed to disclose these facts to the defense. However, none of this suggests that any aspect of Leon's testimony was false. [10]

### 7. Nathan Brewster

Nathan Brewster was incarcerated with Gabrion at the Calhoun County Jail. Gabrion asserts for the first time in his amended motion that Brewster testified falsely at trial. According to Brewster's testimony at trial: Gabrion stated he killed Rachel because "she screamed rape and he had to take care of his business"; Gabrion was concerned about the presence of another body in Oxford Lake; Gabrion kept chicken bones to make into a shank; Gabrion spoke about attempting to escape custody; Gabrion threatened to kill female guards at the jail; Gabrion attempted to remove loose metal from his cell; and Gabrion claimed that he was going to throw his blood on jail deputies to give them HIV and hepatitis C. (S. Tr. II, 351-52, 354-55.) The prosecutor asked Brewster if the female guards did anything to provoke Gabrion's anger, and Brewster stated, "Nothing. Tell him he was on lockdown for threatening them or another means of what he's done for punishment." (*Id.* at 354.)

---

[10] To the extent Gabrion asserts a claim under *Brady v. Maryland*, the Court will address it in connection with Ground Six, below.

Gabrion challenges only one aspect of Brewster's testimony: Brewster's assertion that the guards did not provoke Gabrion. Gabrion claims that the guards "constantly harassed and provoked" him. (Am. § 2255 Mot. 39.) In an affidavit, Brewster contends that he met with "law enforcement officials" before testifying and told them that the guards at the jail "continually harassed" Gabrion and himself. (Brewster Aff., ECF No. 141-3, PageID.5547.) "They would mess with our food and our mail and sometimes we were denied our meals." (*Id.*) The female guards were worse and treated Brewster and Gabrion "poorly because of what [they] were charged with." (*Id.*) Brewster claims that the law enforcement officials instructed him "not to go into" the conduct by the guards in his trial testimony. (*Id.*)

Assuming that Brewster's affidavit is true, and that the Government was aware of the falsehood he alleges,[11] it is not material. The fact that the guards provoked Gabrion by "messing with," or occasionally depriving him of, his mail and meals does not significantly undermine the overwhelming evidence of the aggravating factors, particularly Gabrion's proclivity for violence and blatant disregard for human life. As Dennis Lilly, John Terwilliger, and Dennis Bacon discovered, and as the jurors witnessed with their own eyes during trial, even a minor confrontation or disagreement with Gabrion can evoke death threats and violent, physical attacks. It is no surprise, then, that Gabrion would react violently to even minor harassment by jail officials.

Moreover, Gabrion's dangerous and threatening behavior in the custodial setting is not limited to his time at the Calhoun County Jail. Other incidents occurred at the Newaygo County Jail (where he carved a fake gun from soap and hid a razor blade) and the Milan federal correctional institute (where he started a fire in his cell and threw feces and urine at corrections

---

[11] At trial, Brewster testified that he had never met the prosecutors until ten minutes before his testimony. (S. Tr. II, 365-66.)

officers).  (*See* S. Tr. II, 311-312, 374-82.)  Gabrion does not contend that the staff at these other facilities harassed him.  Thus, any falsehood in Brewster's testimony is plainly immaterial.

Gabrion also claims that Brewster testified falsely about his own criminal record.  Brewster testified that he had been convicted of "[f]elony murder, criminal sexual assault in the first degree, and an arson of a dwelling"[12] (S. Tr. II, 349), but he failed to mention additional convictions for escape awaiting trial on a felony, assault with a dangerous weapon, delivery or manufacture of marijuana, and unlawfully driving away an automobile.  There is nothing false in Brewster's testimony.  He was not asked to list all of his convictions, and it does not matter that he failed to do so.  He admitted that he was testifying in the hope that it would help him in some way with regard to his murder, sexual assault, and arson convictions.  (*Id.* at 361.)  Disclosing additional, less serious convictions would not have altered the import of his testimony in any way.

According to Gabrion, Brewster was promised that he would receive the services of a private investigator to help his own case if he testified against Gabrion, and this was not disclosed at trial or to the defense.  (*See* Brewster Aff., PageID.5547.)  Even so, that does not make any of his testimony false.

In short, none of the prosecutor's statements were improper, let alone flagrant.  Moreover, Gabrion has not shown that the Government knowingly presented any false testimony that could have had a reasonable likelihood of affecting the jury's decision.  All of the allegedly false statements were immaterial, especially when considering the overwhelming evidence supporting guilt and the aggravating factors.  Consequently, Gabrion's claims in Ground One are meritless.

---

[12] On cross-examination, he admitted that his convictions involved having sex with a child, killing the child, and setting fire to a house to cover up the murder.  (S. Tr. II, 358.)

***Ground Two:*** **Denial of right to conflict-free counsel**

Gabrion claims that he was denied his Fifth, Sixth, and Eighth Amendment rights to conflict-free counsel when Christopher Yates, the attorney for government witness Joseph Lunsford, assisted Gabrion's trial counsel in the preparation of Gabrion's defense. Gabrion asserts that the Court was aware of this conflict and failed to perform its duty of inquiry. Gabrion claims Yates' involvement denied Gabrion his Sixth Amendment right to the effective assistance of counsel, and that the imposition of the death penalty in these circumstances violates his rights under the Eighth Amendment because the conviction or sentence is unreliable.

Lunsford and Gabrion were incarcerated together at Newaygo County Jail in December 1997. (S. Tr. II, 313.) At the sentencing phase of Gabrion's trial, Lunsford testified that Gabrion admitted that he collected social security benefits belonging to Robert Allen, and stated that the authorities would never find Allen. (*Id.* at 318-19.) According to Lunsford, Gabrion also claimed that Rachel's mother sold Shannon on the black market and that the authorities would never find Shannon. (*Id.* at 316.) Lunsford also testified that he saw Gabrion masturbating in front of a picture of Shannon. (*Id.* at 318.) On cross-examination, Lunsford stated that he was not receiving any benefit for his testimony. (*Id.* at 321-22.) However, he acknowledged agreeing to speak with the authorities in the hope that he would receive a benefit. (*Id.*) He also acknowledged that Gabrion had written a letter to the governor of the State of Michigan accusing Lunsford of threatening to kill Gabrion. (*Id.*)

According to an affidavit signed by Lunsford on September 8, 2016, Lunsford's testimony about Gabrion masturbating in front of a photo of baby Shannon is false. (Lunsford Aff., ECF No. 100-4.) Lunsford claims that Yates suggested these facts, and that Lunsford "merely confirmed it was true." (*Id.*) Lunsford claims that he attempted to recant his testimony before

trial, but Yates told him that it was too late, and that if Lunsford decided to back out, he would have to serve his entire state sentence before serving his federal one.  (*Id.*)

At the time of Gabrion's trial, Yates was the Federal Public Defender for the Western District of Michigan.  He had previously represented Gabrion in an appeal from Gabrion's conviction for social security fraud in *United States v. Gabrion*, No. 1:97-cr-145 (W.D. Mich.) (McKeague, J.).  The Court of Appeals affirmed Gabrion's conviction and sentence for social security fraud on July 31, 2000.  Yates also represented Lunsford in an unrelated federal criminal case, *United States v. Lunsford*, No. 1:97-cr-81 (W.D. Mich.) (Bell, J.), before the district court and on appeal.  The Court of Appeals affirmed Lunsford's federal conviction in May 1999.

In 1998, after Rachel's body was discovered but before Gabrion was indicted for her murder, Yates represented Lunsford in negotiations with the Government regarding testimony against Gabrion.  (Proffer Letter, ECF No. 2-1.)  Yates was also present when the Government interviewed Lunsford in March 1998, and when Lunsford testified about Gabrion before a grand jury in May 1999.

In June 1999, at Gabrion's initial appearance before this Court, he was represented by Paul Mitchell, but he inquired about having Yates as his attorney.  (R. 599: Arraignment Hr'g Tr. 4.)  The magistrate judge informed Gabrion that Yates would not be able to represent him because of a conflict of interest.  (*Id.* at 5.)  Later, the Court appointed David Stebbins to represent Gabrion alongside Mitchell.  Mitchell and Stebbins were Gabrion's attorneys of record for the remainder of his criminal proceedings before this Court.

Evidence of Yates's involvement in Gabrion's murder case includes the following.  In September 1999, Gabrion sent a letter to the Court asking to represent himself, because he had been "advised by Christopher Yates" that he had a constitutional right to do so.  (R. 33.)  In

February 2001, Judge Bell sent Gabrion a letter in response to Gabrion's concerns that the proceedings were not moving quickly enough:

> Please be assured I am following your case closely and understand your anxiety. This is not your attorney's fault. I have known Mr. Paul Mitchell, your attorney, for several years and have observed him in many trials. He is a very good lawyer and a fine person. . . . I have also spoken with the Federal Public Defender, Christopher Yates, and asked him to assist Mr. Mitchell. You will find Mr. Yates, in addition to being a fine lawyer, also an individual of unquestioned integrity.

(ECF No. 2-6.)

In April 2001, Stebbins sent Yates a letter discussing various issues in Gabrion's case and areas that needed to be addressed. (ECF No. 2-5.) Stebbins asked Yates to assist with researching and preparing a motion challenging "the death penalty in general and as applied in this case," the aggravating factors that the Government intended to rely upon, and the Court's jurisdiction. (*Id.*) Stebbins asked him to look through some motions filed by attorneys in other death-penalty cases, to "come up with a comprehensive challenge to the death penalty and the aggravating circumstances in this case," and to meet to discuss discovery issues with him. (*Id.*) Stebbins also asked Yates to discuss the motion challenging jurisdiction with Mitchell. (*Id.*)

At a hearing on May 23, 2001, Gabrion indicated that he was dissatisfied with his appointed attorneys and he told the Court, "I tried to say I'm pro se, I tried to fire [my attorneys], to say give me Chris Yates as a backup because he said that you were friends of his." (R. 197: 5/23/2001 Hr'g Tr. 7.) Among other things, Gabrion complained that his attorneys promised to file a motion to move him to the federal prison in Milan, but they had not done so. (*Id.* at 4.) In response, Mitchell told the Court that he, Yates, and Stebbins had "lobbied to get [Gabrion] moved." (*Id.* at 13.)

In his amended motion under § 2255, Gabrion claims that Yates met with him and consulted with him about his case, offered to write motions and conduct research, and offered

advice to trial counsel about where Gabrion should be housed and about how to approach Judge Bell with scheduling matters. (Am. § 2255 Mot. 41.) Gabrion also claims that Mitchell consulted Yates about whether to appeal the Court's decision regarding jurisdiction, and asked for Yates' assistance in locating Gabrion's disability records, which were never discovered. (*Id.*)

Yates has submitted an affidavit stating that he never represented Gabrion. (Yates Aff., ECF No. 119-1.) He spoke with Gabrion's attorneys "generally about the case" in his role as Federal Public Defender, but he was not present at strategy meetings. (*Id.*) Judge Bell asked him to review and provide input into defense fee and expense requests, and to assist as a conduit between Gabrion and his attorneys. Yates visited Gabrion from time to time, and encouraged him to assist his attorneys, but their interactions centered on "practical issues" rather than legal advice. (*Id.*) He provided research assistance to Gabrion's lawyers regarding federal jurisdiction, but did not direct any strategy. Yates denies Lunsford's assertion that Yates fed Lunsford any facts about Gabrion, or encouraged Lunsford to testify falsely. (*Id.*)

## A. Sixth Amendment

Gabrion's claim concerning Yates' conflict of interest is a type of ineffective-assistance claim arising under the Sixth Amendment. *Brooks v. Bobby*, 660 F.3d 959, 963 (6th Cir. 2011) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345 (1980)). Typically, a claim of ineffective assistance of counsel requires a showing that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). But prejudice to the outcome of the proceeding is *presumed* "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* at 692 (quoting *Sullivan*, 446 U.S. at 348, 350). Where the defendant or his counsel objects to the conflict prior to, or during, trial,

the trial court must inquire into the extent of the conflict or subject any subsequent conviction to automatic reversal. *Moss v. United States*, 323 F.3d 445, 455 (6th Cir. 2003) (citing *Holloway v. Arkansas*, 435 U.S. 475, 489-92 (1978)). But where, as here, no objection was raised during trial, the defendant must demonstrate an "actual conflict," which is "a conflict of interest that adversely affects [his] counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). He must "'point to specific instances in the record to suggest an actual conflict or impairment of his interests.'" *United States v. Mays*, 77 F.3d 906, 908 (6th Cir. 1996) (quoting *United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir. 1995)).

Gabrion's claim fails because there is no evidence that Yates actually represented Gabrion. Yates did not appear in court, participate in any proceedings, or sign any motions submitted on Gabrion's behalf. The few instances in which Yates' name appears in the record before the Court all suggest that Yates provided some supplemental assistance to Gabrion or his attorneys. The right to the effective assistance of counsel only applies to the "lawyer who is representing the criminal defendant or otherwise appearing on the defendant's behalf in the case." *United States v. Martini*, 31 F.3d 781, 782 (9th Cir. 1994) (citing *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994)). It does not apply to "every lawyer a criminal defendant consults about his case." *Santosuosso v. United States*, No. 95-3146, 1996 WL 15631, at *3 (6th Cir. Jan. 16, 1996) (citing *Martini*, 31 F.3d at 782); *see Stoia*, 22 F.3d at 769 (noting in dicta that the right to effective assistance of counsel "does not extend to those cases where a non-appearing attorney . . . gives a defendant legal advice even though he has not been retained by the defendant to help prepare his defense"). Thus, even if Gabrion or his attorneys received advice and assistance from Yates, Gabrion's claim is without merit because the attorneys appointed to represent him did not have a conflict of interest. Mitchell and Stebbins were responsible for Gabrion's representation,

not Yates. Gabrion was aware of this. The Court denied his request for Yates to represent him at his arraignment in 1999, and he acknowledged that decision at a hearing almost two years later. (*See* 5/23/2001 Hr'g Tr. 7.)

There may be occasions where an attorney represents a criminal defendant behind the scenes, without appearing in court, and without their involvement in the case appearing in the court record. *See Moss*, 323 F.3d at 459 (finding evidence that an attorney represented a defendant before the indictment proceedings because the attorney, a personal friend of the defendant, assured the defendant that he would be working closely with another attorney "to resolve the matter," he "advanced several efforts" on the defendant's behalf, and the attorney acknowledged that his activities created an attorney-client relationship). But Gabrion has not presented any evidence indicating that he and Yates established an attorney-client relationship. Yates has provided an affidavit asserting that he did not represent Gabrion and did not provide legal advice to him. Gabrion is in a position to know whether that is true, but he does not offer any facts or evidence to rebut Yates' assertions.

Even if Yates did represent Gabrion in some informal way, Gabrion's claim would fail because Gabrion has not shown that Yates' conflict adversely affected the performance of Gabrion's appointed counsel. Gabrion speculates that Yates might have harmed Gabrion's interests by advocating to have him moved to the federal prison in Milan,[13] by interfering with the Court's review of attorney-fee requests submitted by Mitchell and Stebbins, or by providing bad advice. But there is no evidence that any of these things actually occurred. And even if they did,

---

[13] Gabrion's assertion that it was against his interest to be moved to Milan is unsupported. Gabrion clearly wanted to be moved to Milan; he attempted to accomplish it himself by impersonating the Clerk of the Court. He also told the Court that he wanted to be moved because he was being "tortured" and fed poisoned food at the Calhoun County Jail. (5/23/2001 Hr'g Tr. 27.) Mitchell, Gabrion's appointed attorney, also believed that moving Gabrion would be in Gabrion's best interest. (*Id.* at 14 ("I think he ought to be moved. I don't like where he is. I don't think it's helping him any.").) Gabrion offers no reason to believe otherwise.

Gabrion does not indicate how any of these actions could conceivably be linked to Yates' loyalty to Lunsford.

For the presumption of prejudice in *Sullivan* to apply, it is not enough for Gabrion to identify a conflict of interest and then point to poor performance by counsel; Gabrion must also show a causal connection or "nexus" between the conflict and counsel's poor performance. *See Mickens*, 535 U.S. at 173-74 ("The *Sullivan* mandated inquiry . . . [requires] the petitioner to establish that the *conflict of interest* adversely affected his counsel's performance.") (emphasis added); *Moss*, 323 F.3d at 469 ("This causative language of *Sullivan* requires that [petitioner] demonstrate a nexus between the conflict and the adverse effect on counsel's performance.'''"); *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004) ("[T]he standard still requires a choice by counsel, caused by the conflict of interest."). Gabrion has not identified a plausible connection between any possible conduct by Yates during the course of Gabrion's criminal proceedings and Yates' loyalty to Lunsford. *Cf. Moss*, 323 F.3d at 469 ("Kohn fails to provide any specific and credible evidence linking Attorney Murphy's erroneous advice to the conflict of interest."); *Hopkins*, 43 F.3d at 1119 (rejecting conflict-of-interest claim because "Defendant's failure to accept the plea was unrelated to the dual representation"). Moreover, the Court cannot discern a possible connection.

The primary concern that arises when the defendant's attorney has represented a government witness is that the attorney will not be able to effectively cross-examine that witness. *See United States v. McCutcheon*, 86 F.3d 187, 189 (11th Cir. 1996); *Moss*, 323 F.3d at 460 ("The fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information."). In this case, Mitchell cross-examined Lunsford, not Yates. Mitchell was not hindered by any loyalty to Lunsford. Indeed, he

caused Lunsford to concede that he had agreed to speak with the authorities about Gabrion in the hope that his testimony against Gabrion would benefit his sentence. (S. Tr. II, 321-22.)

None of the possible adverse effects of Yates' involvement that are posited by Gabrion have any connection to Yates' representation of Lunsford. Yates did not have reason to interfere with the fee requests by Gabrion's counsel, to have Gabrion moved to another facility, or to harm *any* of Gabrion's interests in the murder proceedings because of his relationship with Lunsford. Lunsford himself testified that he did not stand to benefit from the outcome of Gabrion's case. Lunsford *hoped* to receive a personal benefit when he offered his testimony to the authorities in 1998, but by the time of Gabrion's trial four years later, he testified that he never received one, and he did not expect to receive one as a result of his testimony. (S. Tr. II, 320-22.) Thus, Yates' loyalty to Lunsford could not have been the impetus for any adverse effect on Gabrion's defense.

Gabrion asserts that counsel without a conflict of interest would have discovered Lunsford's alleged perjury, but this assertion is unsupported. Assuming for the sake of argument the unlikely possibility that Yates prompted and encouraged Lunsford to give false testimony, there is no reason to think that conflict-free counsel would have discovered the content of conversations between Lunsford and his attorney. Thus, Gabrion's conflict-of-interest claim is meritless.

In addition, because Gabrion has not shown that he was represented by counsel with a conflict that adversely affected his counsel's performance, it does not matter that the Court failed to inquire into the nature of this conflict. *See Mickens,* 535 U.S. at 172 (noting that it "makes little policy sense" to reverse a conviction where the trial judge failed to make an inquiry into the nature of a conflict that did not affect counsel's performance). "[A] trial court's awareness of a potential conflict neither renders it more likely that counsel's performance was significantly

affected nor in any other way renders the verdict unreliable." *Id.* at 173. "In sum, 'the trial judge's failure to inquire into a suspected conflict is not the kind of error requiring a presumption of prejudice.'" *Moss*, 323 F.3d at 471 (quoting *Mickens*, 535 U.S. at 176 (Kennedy, J., concurring)).

Finally, Gabrion has not established that he is entitled to further discovery or an evidentiary hearing regarding this claim. He has not given the Court reason to believe that, if the facts are more fully developed through discovery, he will be able to show that he is entitled to relief.

### B. Eighth Amendment

Gabrion contends that the imposition of a death sentence following representation by counsel with a conflict of interest violates the Eighth Amendment. He offers no analysis or authority to support this argument. Moreover, there is no support for his contention that Yates' involvement undermined the reliability of his proceedings.

### C. Fifth Amendment

Gabrion contends that Yates' alleged representation of him denied him his rights under the Fifth Amendment. Gabrion does not articulate a basis for this claim. To the extent Gabrion contends that he was deprived of the due process right to a fair trial, his claim is without merit. "[A] trial is not fundamentally unfair [under the Fifth Amendment] unless it 'violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, . . . and which define the community's sense of fair play and decency.'" *McNeal v. United States*, 17 F. App'x 258, 264 (6th Cir. 2001) (quoting *Dowling v. United States*, 493 U.S. 342, 353 (1990)) (internal quotations omitted). Gabrion was represented by two attorneys without a conflict of interest. Gabrion has not demonstrated that Yates' conflict had, or could have had, any impact on his proceedings or on the representation that he received. Thus, Gabrion was not denied a fundamentally fair trial. *See id.* (finding no Fifth Amendment violation where the defendant's

prior counsel represented a government witness, but the defendant's appointed counsel "did not have a conflict of interest that hampered his ability to zealously represent" the defendant).

***Ground Three:*** **Ineffective assistance of counsel at guilt phase of trial**

Gabrion claims that he was denied the effective assistance of counsel during the guilt phase of his trial, in violation of his rights under the Fifth, Sixth, and Eighth Amendments.

As indicated in Ground Two, a claim of ineffective assistance of counsel is subject to the two-prong test in *Strickland*. The first prong (the "performance" prong) requires Gabrion to show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Under this prong, the Court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

The second prong (the "prejudice" prong) requires Gabrion to show that his counsel's deficient representation prejudiced him. *Id.* at 689. The Court "need not address both [prongs] of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). Thus, even if the Court determines that counsel's performance was outside the range of competent assistance, Gabrion is not entitled to relief if counsel's conduct had no effect on the judgment. *Strickland*, 466 U.S. at 691.

When assessing counsel's conduct, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Gabrion bears the burden of overcoming the presumption that the challenged conduct might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Where the claim is that counsel failed to investigate a particular issue, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were

reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)).

To demonstrate prejudice, Gabrion must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

## A. Competence

Gabrion claims that his attorneys failed to adequately investigate and compile evidence relevant to his competence to stand trial.

### 1. Background

Questions about Gabrion's competence arose early in the proceedings of his criminal case. Within weeks after his arraignment, Gabrion sent letters to the Court asking to represent himself and complaining about his appointed counsel. He claimed that he was being framed by Prosecutor Roach and other "satanic" people. (R. 27.) He also claimed that Mitchell had told him to commit perjury and he accused Mitchell of being "satanic," "dishonest, greedy, immoral, and a racist." (R. 32.) Based on the content of these letters, the magistrate judge expressed concern about Gabrion's competence. (R. 600: 11/1/1999 Hr'g Tr. 12.) On January 31, 2000, the Court *sua sponte* ordered that Gabrion be committed to a mental health facility for a

competency evaluation. (R. 63.) At the request of defense counsel, the Court agreed to keep the report of the competency evaluator under seal and to not disclose it to the Government. (R. 71.)

### (a) First Competency Evaluation

Dr. Emily Fallis evaluated Gabrion over the course of several weeks in March and April of 2000. (R. 268: Fallis Report) She noted odd behavior, including the fact that Gabrion claimed to be an angel named Azri and to be employed by the CIA. She believed that he was faking symptoms of a mental illness because his behavior was inconsistent with that of a mentally ill person, and was inconsistent from encounter to encounter. He claimed to have memory problems, but he would display good memory when it suited his purposes. He knew the names of the judge overseeing his case and of the two attorneys who were representing him, and he was aware of the charge against him and the likely consequences of that charge. He was also aware of his legal rights in connection with the trial, including the right to represent himself and the right to testify on his own behalf. Fallis gave him a primary diagnosis of "malingering," i.e., intentionally faking or exaggerating the symptoms of mental illness, but noted features of an antisocial personality disorder. (*Id.* at 15-16.) Gabrion was not medicated during the evaluation period, and Fallis did not believe that psychotropic medication was necessary for him to maintain his competence. (*Id.* at 17.)

After receiving Dr. Fallis' report, the Court notified the parties that it intended to release the report to the Government and to hold a competency hearing. (R. 84.) Defense counsel objected to holding a hearing and to releasing the report to the Government. The Court sustained these objections and held that Gabrion was competent to stand trial based solely on the report. (R. 89: 7/7/2000 Mem. Op.) The Court did not release the report to the Government.

*(b)  Second Competency Evaluation*

After the first competency evaluation, Gabrion continued to send the Court correspondence complaining about his attorneys and making wild accusations about them.  (R. 169, 179, 180.)  He accused Mitchell of being an "evil clown" and "Satan," and referred to Stebbins as "Stalin."  (*Id.*)  He claimed that Mitchell stole exculpatory evidence (a photograph of Gabrion's dog feeding from a baby bottle at his campsite) and directed the FBI to harass defense witnesses.  He claimed that Judge Bell gave cocaine to Mitchell.  He complained that he was receiving "daily death threats" from the guards at the Calhoun County Jail, and that they were putting poison in his food loaf and were recording his conversations with his attorneys.  He indicated that he might kill the guards in order to defend himself and to obtain a transfer to the federal prison in Milan.  Unlike his previous correspondence, he signed these letters with the names "AZZA" and "M. Charly Gabrion."  (*Id.*)

The Court held a hearing on Gabrion's request to dismiss his attorneys on May 23, 2001.  At the hearing, Gabrion complained that his attorneys were not helping to move him out of Calhoun County Jail and were not providing him with documents about his case.  (R. 197: 5/23/2001 Mot. Hr'g Tr. 4.)  His attorneys conceded that they had withheld some material from him out of concern that he would misuse it and write letters to third parties that would harm his case.  (*Id.* at 12.)

In response to questioning by the Court, Gabrion acknowledged writing to third parties about his case without consulting with his lawyers.  (*Id.* at 19-21.)  The Court denied Gabrion's request to dismiss his attorneys, but ordered another competency evaluation based on its evaluation of Gabrion's behavior:

> . . . The Court has observed during the course of these proceedings and during the large number of letters which this Court has received, and Judge Enslen has received at least one, handwritten to this Court, rather vituperative, mean-spirited

language directed at everything and everyone. This Court has reason to believe, both from the angry outbursts that this Court has observed today and the last time we were here, together with the documents that were sent to this Court, together with the inability to concern himself with assisting his counsel, but proceeding outside to enter potentially self-incriminatory matters into third parties' hands, reason to believe that this defendant may be suffering from a mental disease or defect. He may have a history in which his competency is once again being placed in evidence, his ability to meaningfully assist counsel, his inability to show basic respect for the judge in a judicial proceeding as evidenced by repeatedly cutting off this judge as this judge has tried to discuss things with him.

So therefore, . . . the Court is going to appoint a psychiatrist for an examination.

(*Id.* at 24-25.) At the end of the hearing, Gabrion objected, stating, "I don't really have a mental problem. They're just torturing me and giving me poison food down in the jail I'm at. . . . I didn't send a bunch of nasty letters until a couple of months ago." (*Id.* at 27.)

Dr. Cathy Frank, a forensic psychiatrist, interviewed Gabrion for several hours on June 15, 2001, and administered two neuropsychological tests. (R. 211: Frank Report 2.) Like Dr. Fallis, she noted some odd behavior. Gabrion had written the name "AZZA" on his forehead and claimed that he could speak to beings on other planets and read people's minds. (*Id.* at 5.) Otherwise, his thoughts were coherent and goal-directed, his mood and affect were congruent, and his memory was good. (*Id.*)

In the first test administered on Gabrion, he scored high an all five scales used to determine whether a patient is feigning mental illness. (*Id.* at 6.) In order words, he reported symptoms that are rarely seen in psychiatric patients, he reported combinations of symptoms that rarely occur simultaneously, he reported symptoms that are preposterous, he over-endorsed symptoms that are obvious signs of mental illness to an untrained person, and he selected an indiscriminately wide range of symptoms. According to Dr. Frank, a high score on only four of these scales indicates a 100% likelihood of feigning mental illness. (*Id.* at 6.)

Gabrion refused to complete another test in its entirety, but he completed portions of it in a pattern, which also suggested that he was malingering. (*Id.* at 7.) Dr. Frank concluded that her interview and the results of her tests provided no support for a psychiatric disorder. Like Dr. Fallis, she noted inconsistencies between his reported symptoms and his actual behavior. She found no evidence of a treatable condition, like depression, mania, or anxiety. She believed that Gabrion was malingering. (*Id.* at 7-8.) Because she concluded that Gabrion did not suffer from a mental disease or defect, she could not recommend any medical treatment. (*Id.* at 8-9.)

Satisfied with Dr. Frank's report, the Court took no further action. Gabrion's counsel asked for a copy of the report, but asked the Court to not provide a copy to the Government, unless Gabrion's competency became the subject of a hearing, in order to protect Gabrion's right against self-incrimination under the Fifth Amendment. (R. 232: Ex Parte Mot. for Disclosure of Competency Evaluation.) The Court granted this request. (R. 269.)

### (c) Third Competency Evaluation

In August 2001, Gabrion's counsel asked the Court to refer Gabrion for another competency evaluation because his "behavior and ability to assist in his own defense" had "deteriorated significantly." (R. 267: Ex. to Def.'s Mot. for Competency Hr'g, Stebbins Aff. ¶ 18.) According to counsel, Gabrion would not cooperate to discuss matters related to his defense and refused to meet with defense experts. He refused to sign releases and waivers to obtain personal information, and refused to provide information about his past and his family. His communications with counsel were "vituperative," "mean-spirited," and "often lacking any basis in reality." (*Id.* ¶ 9.) He seemed to believe that his counsel was working with the Government, and frequently refused to meet with them. Meanwhile, he was attempting to communicate with others about his case, including Rachel's family and the media, despite repeated admonitions from his counsel not to do so. (*Id.* ¶¶ 9, 10.) A psychologist hired by the defense team believed that

Gabrion suffered from a mental illness that made him unable to fully cooperate, and recommended a longer-term placement in a residential facility in order to properly evaluate his mental state. (*Id.* ¶ 29.)

At a hearing on the motion for a competency evaluation, Gabrion arrived at court in a "disheveled" state. His face was dirty and he had written the word "AZZA" on his forehead. (R. 304: 8/9/2001 Mot. Hr'g Tr. 4.) The Court directed the marshals to escort him out of the courtroom shortly after the hearing began because he refused to remain quiet. (*Id.* at 3.) He called Judge Bell an "evil Hitler" and accused him of having sex with a 14-year-old child. He also accused Mitchell of destroying evidence that Charles Cass killed Rachel. (*Id.*) The Court granted the motion for another evaluation, and Gabrion was transferred to the U.S. Medical Center for Federal Prisoners. (R. 270.)

Dr. Richard DeMier, a forensic psychologist at the U.S. Medical Center, observed and met with Gabrion on several occasions from August 15 to October 12, 2001. DeMier observed bizarre behavior, but noted that it was inconsistent and not credible. (R. 314: DeMier Report) For instance, Gabrion made absurd and disconnected statements, except when asking for something that he wanted. DeMier also administered two tests. Gabrion did not complete a test designed to measure cognitive ability, and gave wrong answers to some simple questions. On a test designed to evaluate memory, Gabrion performed far worse than individuals with significant cognitive impairment, and significantly worse than what would be expected by simply guessing the correct answers. (*Id.* at 16.)

Dr. Steven Otto, a neurologist, evaluated Gabrion and conducted a CT scan of his brain. He found no evidence of an "organic brain syndrome." (*Id.* at 17.) While accompanying Gabrion to the CT scanner, Dr. DeMier noticed small pieces of foil in Gabrion's hair. Gabrion

claimed that they were part of his "antennae," but DeMier believed that Gabrion intentionally put the foil there in order to try to distort the results of the CT scan. (*Id.*)

Dr. Robert Denney, a neuropsychologist, evaluated Gabrion and determined that Gabrion's reported symptoms were not consistent with a brain injury occurring in the 1990s. Gabrion's criminal record from 1994 to 1997 demonstrated good cognitive and organizational skills. An injury occurring in 1992 could not have caused a deterioration in his abilities in 2000 or 2001. (*Id.*) Denney did not believe that Gabrion suffered from a condition resulting from brain injury.

Based on his own evaluation, and that of Drs. Otto and Denney, Dr. DeMier concluded that Gabrion was malingering psychotic symptoms and cognitive impairment. (*Id.* at 19.) Gabrion did not meet the diagnostic criteria for any "psychotic disorder, mood disorder, anxiety disorder, or dissociative disorder." (*Id.* at 20.) DeMier also rejected the possibility that Gabrion suffered from a partial seizure disorder, because that disorder is rare and Gabrion's symptoms were not consistent with such a disorder. DeMier speculated that Gabrion might have an antisocial personality disorder, though he noted that one of the diagnostic criteria for that disorder is an onset before the age of 15, and DeMier did not have sufficient information about Gabrion's personal history to make that diagnosis. (*Id.* at 21.) DeMier opined that Gabrion was competent to proceed to trial and would be able to assist his defense should he choose to do so. DeMier did not believe that mental health treatment was necessary. (*Id.* at 23.)

Based on Dr. DeMier's report, and the fact that Gabrion's counsel did not contest its conclusion as to competence, the Court found that Gabrion was competent to stand trial. (R. 353: 12/14/2001 Order; R. 384: 12/14/2001 Mot. Hr'g Tr. 6.) Gabrion's attorneys reserved

the right to raise the issue again in the future, because of their difficulty in communicating with him and their concerns about his ability to provide assistance.  (12/14/2001 Mot. Hr'g Tr. 6.)

*(d)  Court-Ordered Mental Health Examination*

Before trial, the Government asked for additional discovery in the form of a mental health examination of Gabrion.  (R. 391.)  The Court granted this request, but ordered that the results of the test be sealed and withheld from the parties until after the guilt phase of the trial, because Gabrion's mental health was not at issue in the guilt phase.  (R. 418: 2/8/2002 Order.)  The examiner did not specifically evaluate Gabrion for competence to stand trial, but his findings are relevant to that issue.

Dr. Thomas Ryan evaluated Gabrion on February 20 and 21, 2002.  (R. 480: Ryan Report.)  In their meetings, Gabrion was cooperative and conversed freely.  Gabrion reported difficulty finding words in speech, but Dr. Ryan did not observe this in conversation with him.  Gabrion also reported an impairment in short-term memory since a motor vehicle accident in 1992, and reported hearing voices.  However, Gabrion stated that he did not believe that he had a mental disorder.  (*Id.* at 3.)

Dr. Ryan administered a battery of tests on Gabrion.  Several of them were designed to test memory and the probability of malingering.  On the memory test, Gabrion performed worse than "severely mentally retarded individuals," which suggested that he was intentionally performing poorly.  (*Id.* at 7.)  He also scored high on the tests designed to detect malingering.  (*Id.*)  On other tests, he performed inconsistently, sometimes providing incorrect responses to simple questions and correct responses to much more difficult ones.  (*Id.*)  On a measure of self-reported symptoms, Gabrion "significantly over-endors[ed] psychopathological symptoms," resulting in an invalid profile.  (*Id.* at 8.)

Dr. Ryan compared Gabrion's test results to results from similar tests conducted on Gabrion in 1993. Overall, there was a pattern of severe decline in performance, which is inconsistent with recovery from brain injury. (*Id.* at 8.) Dr. Ryan also noted that Gabrion had a "Glasgow Coma Scale score" of 14 out of 15 after his motor vehicle accident in 1992, which reflected "at most, a very mild concussion." (*Id.*) Dr. Ryan concluded that Gabrion "continues to malinger from a cognitive and emotional standpoint." (*Id.* at 9.)

### (e) Government Mental Health Examination

Shortly before the end of the guilt phase of the trial, the Government asked for further examination of Gabrion by two additional mental health experts. (R. 465.) Gabrion's attorneys objected, and the Court allowed an examination by one of these experts, Dr. Gregory Saathoff. (R. 469: 3/5/2002 Op.)

Dr. Saathoff interviewed Gabrion on March 8, 2002, between the guilt and penalty phases of the trial. (R. 554: Saathoff Report.) Saathoff noted inconsistencies between Gabrion's reported symptoms and his actual behavior and concluded that he could not make an accurate neuropsychological assessment because Gabrion was "malingering symptoms of mental illness and cognitive disorder." (*Id.* at 16-17.)

### (f) Defense Experts

Gabrion's counsel retained their own mental health experts. Dr. Newton Jackson completed an assessment of Gabrion in February 2002, after reviewing Gabrion's records, interviewing members of Gabrion's family, and meeting with Gabrion on three occasions in June, July, and December 2001. (R. 451: Jackson Report 2-3, 5, 7.) He observed that Gabrion's presentation "appeared to include some malingering or feigning" because his symptoms were inconsistent. (*Id.* at 6.) Jackson believed that Gabrion "exhibited behaviors which can appear to be genuine symptoms of a disorder of both thought and mood," but "it is possible that his

manifestations . . . may be deliberately malingered[.]" (*Id.* at 7.) Because Gabrion would not cooperate in providing information about his background or current mental state, Jackson was not able to arrive at a firm conclusion about his mental condition. (*Id.* at 9.)

Dr. Scharre also completed a report that mirrors his trial testimony. He was not able to meet with Gabrion because Gabrion would not cooperate, but Scharre believed that Gabrion's consistent pattern of behavior appearing after his head injuries was evidence of frontal and temporal lobe injury. (R. 451: Scharre Report.)

Dr. Theodore F. Mauger provided a letter to counsel summarizing his interactions with Gabrion between March 1993 and March 1995. Gabrion complained to Mauger of symptoms stemming from a vehicle accident occurring in 1992, including "angry outbursts, unusual thinking patterns, difficulty with attention and memory, and a posture of superiority[.]" (R. 451: Mauger Letter.) Mauger noted a "questionable spike" on Gabrion's EEG that suggested excessive electrical activity in his temporal lobe. (*Id.*) Mauger diagnosed him with "Organic Mental Disorder [Not Otherwise Specified]," because he could not identify the cause of Gabrion's symptoms. (*Id.*) He prescribed valproate, which seemed to help some of those symptoms over the next two years. Mauger saw Gabrion after his arrest and believed that Gabrion's "ability to understand reality in terms of paranoid interpretations and his ability to control angry outbursts is again seriously impaired without this type of medication treatment." (*Id.* at 2.)

*(g) Trial*

After Gabrion punched Stebbins during the sentencing phase of trial, his counsel requested another competency evaluation. (S. Tr. I, 79.) The Court denied the motion, noting that Gabrion's conduct followed his statement to his counsel that the testifying witness was not telling the truth. (*Id.* at 83.) In the Court's view, Gabrion had the ability to control himself and to assist counsel, but he chose not to. (*Id.*)

The next morning, Gabrion's counsel told the Court that he was still "agitated" and behaving inappropriately. (R. 611: 3/12/2002 Chambers Tr. 3; S. Tr. II, 233.) They thought it in his best interest for him to remain outside the courtroom. (*Id.*) The Court asked counsel whether Gabrion needed to be examined again. (3/12/2002 Chambers Tr. 6.) Counsel believed that Gabrion needed another examination, but demurred, stating, "I don't know that anything's different than what has happened before . . . on previous occasions they don't find anything wrong with him. While I think there's something seriously wrong with him, the government examinations have not yet gotten through to him. So I mean that will be a major point of contention coming up here . . . ." (*Id.* at 6-7.)

Later that day, Gabrion's counsel filed a written motion for a competency evaluation (R. 512: Def.'s Renewed Competency Mot.), and renewed that motion orally at a hearing two days later, representing that "Gabrion's condition continues to deteriorate as this week has progressed," and that Gabrion was having a difficult time assisting counsel. (R. 596: S. Tr. IV, 565.) The Court denied the motion, noting that Gabrion was able to refrain from disruptive behavior, to listen to the evidence, and to consult with his attorneys following his return to the courtroom on March 12. (R. 518: 3/14/2002 Op. 6.)

*(h) Appeal*

On appeal, Gabrion argued that this Court erred by refusing to hold a competency hearing during the sentencing phase of the trial. The Court of Appeals rejected this claim, citing the outcome of all the previous examinations:

> [T]he psychiatric and mental health records in the case convince us, as they did the District Court, that Gabrion knew what he was doing. He was "malingering"—defined in psychiatric literature as "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives," as explained in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV). He was faking incompetence in order to disrupt the trial.

Malingering, faking incompetence, trying to deceive the court, pathological lying and murder are signs of a mental illness that thankfully affects only a small part of the population; but it is not the same as the mental illness that gives rise to "incompetence to stand trial." Incompetence is described as a mental illness causing the defendant to be "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). The District Court must order a competency hearing only when it has "reasonable cause" to believe the defendant is incompetent. *Id.* Given the outcome of all of Gabrion's previous evaluations and the persistent finding of his malingering, no such reasonable cause existed. The deliberate refusal of an actor to assist counsel in order to appear crazy—like playing the role of an idiot in a play—makes the actor incompetent on the stage but not in a real court of law. Gabrion retained his memory and sought to create the appearance of idiocy, imbecility, and loss of memory.

*Gabrion II*, 648 F.3d at 320 (footnote omitted).

Gabrion also argued that he should be given an examination to determine his competency for purposes of his appeal, but the Court of Appeals rejected this claim as a "simply a rehash" of the argument that he was not competent to stand trial in the district court. *Gabrion III*, 719 F.3d at 533.

In summary, like the evidence of Gabrion's guilt, the evidence of Gabrion's competence to stand trial is exceedingly strong. He received three competency evaluations before trial. All of the examiners determined that Gabrion was competent and that he was "malingering" or feigning symptoms of a mental illness. In addition, five other mental health experts determined that Gabrion was malingering, including an expert retained by the defense. The only expert who testified otherwise at trial, Dr. Scharre, did not examine Gabrion in person.

Gabrion's competence is also supported by his conduct before, during, and after trial. His offense was part of an elaborate scheme to avoid punishment for raping Rachel. He lured her from her home using an accomplice, killed her to prevent her from testifying, attempted to hide her body, and distributed letters in her handwriting to explain her absence and to exonerate himself for the rape charge. He also stole the identities of several individuals and used them to

defraud others. After he was arrested, he tried to enlist the help of acquaintances to undermine the basis for federal jurisdiction over the murder charge. At trial, he raised numerous objections to the proceedings and to the conduct of his attorneys, and then provided his own testimony to support his defense. He also advocated for himself, reminding the Court of his constitutional right to testify in his own defense. (*See* Tr. VI, 1473.) He did the same thing on appeal, raising his own legal arguments. *See Gabrion III*, 719 F.3d at 520 ("Among other challenges, Gabrion argued (and here we mean that literally—for Gabrion came up with the argument himself) that the federal government lacked jurisdiction over Timmerman's murder.").

Gabrion's actions were utterly inconsistent with an individual who lacks "(1) a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding,' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Dubrule*, 822 F.3d 866, 875 (6th Cir. 2016) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

### 2. Analysis

Gabrion argues that trial counsel should have investigated and prepared a more thorough history of his upbringing and the mental illness in his family. Gabrion's mitigation expert prepared a ten-page "abridged" social history that was completed in March 2000. (ECF No. 100-5.) Gabrion's present counsel have compiled a 150-page social history (hereinafter, "Social History") discussing Gabrion's background, identifying several instances of possible head trauma, and documenting mental health issues in various members of Gabrion's immediate and extended family. (Social History, ECF No. 103-1.) Gabrion claims that it is "likely" that presentation of the information in the Social History to his mental health experts would have resulted in "more informed testimony" and "reliable findings" that Gabrion was incompetent "at various times" during the trial and sentencing proceedings. (Am. § 2255 Mot. 44.)

Gabrion's claim is unsupported. All of the experts who examined Gabrion in person determined that he was feigning symptoms of mental illness, and all the experts who examined him for competence to stand trial determined that he was competent. These findings were based on observation of Gabrion's behavior and functioning, as well as specific tests designed to evaluate his mental condition. Information about his background and family history of mental illness cannot possibly be more enlightening than direct assessment of his actual mental state. Moreover, as Gabrion's post-conviction expert recognizes, mental illness and brain injury are not equivalent to incompetence. (*See* Stetler Decl. ¶ 34, ECF No. 103-4 ("In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency . . . .").) Disorders like those in some members of Gabrion's extended family, including schizophrenia, depression, anxiety, and mania, can be seriously disabling in some instances, but they do not always render a person incapable of assisting a lawyer or understanding the proceedings against him. The only way to determine their impact on a particular person would be to conduct a competency evaluation, which is what Gabrion received.

Gabrion offers no evidence that the information he has compiled could have had any impact on the examiners' findings. He has asked for discovery to probe this issue further,[14] but his discovery request is premised on the notion that information potentially relevant to the "diagnosis of mental disease or defect" necessarily calls into question the consistent finding that Gabrion was competent to stand trial. (*See* Reply 56.) That is not the case. Individuals with a diagnosable mental illness or defect can be competent to stand trial. *Cf. Indiana v. Edwards*, 554

---

[14] He asks for access to his social security records, housing records, prison records, all of the information and data relied upon and generated by the government evaluators; he also asks for an opportunity to take depositions of all the doctors involved in evaluating Gabrion's mental state, including Drs. Scharre, Jackson, Griesemer, Ryan, Saathoff, Waalkes, DeMier, Chadhoury, Otto, Denney, Fallis, and Frank. (Reply in Supp. of Mot. for Competency Hr'g 9-10, ECF No. 120.)

U.S. 164, 175 (2008) ("Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways.").

Moreover, Gabrion has never identified any real, organic evidence of brain injury. Consequently, a social history identifying instances—real or contrived—where Gabrion banged his head adds nothing. Thus, he has not given the Court reason to believe he is likely to succeed if the facts are more fully developed through the discovery he has requested.

Gabrion also claims that counsel should have asked the Court to hold a hearing on the issue of competency so that he could challenge the competency evaluators on the witness stand rather than allow the Court to accept their findings in written form. However, it is clear from his attorneys' requests to keep the competency reports confidential that they intentionally avoided a hearing in order to prevent potentially damaging information from falling into the hands of the Government. That was a reasonable, strategic decision to which this Court must defer.

Moreover, Gabrion has not identified any prejudice resulting from counsel's decision. He contends in his reply brief that counsel should have questioned Dr. Fallis about an alleged inconsistency and two "false" factual representations in her report. (Reply 112-13 & n.15, 16.) Gabrion critiques Dr. Fallis' opinion that Gabrion was "malingering in order to prevent his prosecution" as being inconsistent with other statements in her report, such as her observation that Gabrion "spoke of his interest in going to 'death chamber' in order to bring attention to the plight of missing children," and that Gabrion wrote in his letters that he hoped the judge would find him competent to stand trial. (Fallis Report 13-14.)

Gabrion's statements do not undermine Dr. Fallis' opinion, unless one assumes that she was required to take all of Gabrion's statements at face value and accept them as true. She

had no reason to do so, however, because she observed many inconsistencies between his statements and his actions.

Gabrion also claims that Dr. Fallis falsely represented that he did not exhibit strange behavior before he was indicted, and that he was never subjected to physical or sexual abuse. (Reply 112 n.15.) Gabrion takes her representations out of context. She reported that "[r]ecords state the defendant was neither physically nor sexually abused." (Fallis Report 3.) She also reported that Gabrion did not exhibit strange behavior before his indictment when she was discussing Gabrion's prison records. (*Id.* at 8.) In other words, she made these statements in the context of summarizing Gabrion's records; the statements are false only if they did not accurately describe the records she was reviewing. Gabrion has not made that showing.

More importantly, Gabrion has not shown how the challenged statements are relevant to Dr. Fallis' conclusion, and the conclusion of many other experts, that Gabrion was competent to stand trial. The timing of the appearance of some of Gabrion's symptoms, his motive for faking them, and the fact that he may have been physically and/or sexually abused do not relate to her findings regarding his actual awareness and capabilities at the time of the examination. Thus, it would have been pointless to cross-examine Fallis about the foregoing statements at a hearing. Accordingly, Gabrion has not shown professionally-unreasonable conduct by counsel or prejudice.

## B. Failure to ensure that Gabrion was properly medicated

Gabrion contends that he was "medically mismanaged" during his trial. (Am. § 2255 Mot. 53.) He acknowledges that he was given a daily dose of Depakene, but he argues that his medical needs were "ignored." (*Id.*) He contends that counsel should have taken more steps to ensure that his medication was "proper," in order to avoid "problems" that arose during trial.

(*Id.*)  This claim is vague and conclusory.  Gabrion does not indicate what the "proper" medication would have been, or what "problems" arose due to the alleged mismanagement of his medication.

The record indicates that Gabrion was treated in accordance with the recommendations of his own experts.  In a letter to Gabrion's trial counsel, Dr. Theodore Mauger explained that he had treated Gabrion with "valproate" from 1993 to 1995, in order to address Gabrion's "angry outbursts, unusual thinking patterns, difficulty with attention and memory, and a posture of superiority," all of which Dr. Mauger believed was associated with a head injury. (2/18/2002 Letter to Stebbins, ECF No. 44-2, PageID.2394.)  And in an email to Gabrion's attorney, Dr. Scharre noted Gabrion's lack of cooperation and opined that he "may be helped clinically with treatment of his neuropsychiatric syndrome.  Valproic acid or an antipsychotic may be useful for some of his symptoms."  (2/17/2002 Email to Stebbins, ECF No. 44-4, PageID.2411-12.)  Depakene, the medicine that Gabrion received, is a form of valproic acid.

Of course, other mental health experts who examined Gabrion, including Drs. Fallis, Frank, and DeMier, concluded that medication would not be useful.  (Fallis Report 17; Frank Report 9; DeMier Report 23.)  In addition, Dr. Saathoff found it "difficult to determine whether [Gabrion] has received some slight benefit from Divalproex.  *Whether on or off the medication*, he has demonstrated significant abilities to organize his behavior and control his emotions."  (Saathoff Report 17 (emphasis added).)

In short, Gabrion's mental health experts recommended valproic acid, and his attorneys followed this recommendation.  He does not indicate what else they should have done, let alone demonstrate that a different treatment would have been more effective in making him cooperative or in controlling his outbursts and violent behavior.  Thus, he has not shown that their conduct was professionally unreasonable or that it prejudiced him.

### C.  Failure to investigate and subject the Government's case to adversarial testing

Gabrion asserts that his counsel failed to investigate the Government's case and to subject it to meaningful adversarial testing, incorporating the facts underlying the claims in Ground One, Section B, *supra*.  These claims involve: the allegedly false testimony of Chrystal Roach; the Government's statements that Gabrion "forced" Rachel to write letters to her family and that she disappeared on June 3, 1997; the lack of evidence of BOP security regulations; and the testimony of Coleman, Leon, and Brewster.  Gabrion also asserts that other "impeachment material" existed to impeach government witnesses Coleman, Roach, Westcomb, FBI analyst Douglas Deedrick, Luverne (Tim) Timmerman, Detective Richard Miller, and David Gabrion.  (Am. § 2255 Mot. 54.) Gabrion does not explain what counsel should have done or how counsel's actions could have impacted his conviction.  Thus, this claim fails to satisfy either prong of the *Strickland* standard.

### D.  Failure to retain adequate investigative assistance

Gabrion's trial counsel retained two investigators to assist with the pre-trial investigation, one for the guilt phase and one for the penalty phase.  He claims that one investigator was not sufficient to conduct the investigation required to meaningfully test the government's case. Gabrion notes that the Government had experts in "pathology, hair analysis, chemistry, concrete blocks, locks, forensic entomology, fingerprints, and DNA," yet Gabrion's counsel did not retain any comparable experts.  (Am. § 2255 Mot. 55.)

Gabrion does not identify any reason why additional expertise would have been helpful to his case.  Gabrion asserts that a forensic pathologist could have assisted his defense by undermining the Government's case that Rachel was killed on federal property, but this claim is unsupported.

The Government contended that Gabrion killed Rachel by drowning her in the spot where her body was found:

Where [Rachel's] body was found on July 5th is exactly where it was placed on June 6th: 227 feet, 75 yards, south of the boundary line [from private property].

That leaves us with the last question about was Rachel Timmerman killed on federal property. Was she alive when she was put in Oxford Lake, when the defendant put her there? And the answer to that question is yes.

Dr. Cohle came into court last Tuesday and told you his opinion. His opinion . . . as a forensic pathologist was that she drowned. . . .

(Tr. VIII, 1713.)

Gabrion asserts that his attorneys could have offered expert testimony to show that Rachel died of asphyxiation rather than drowning, which would have left open the possibility that she was killed on private property before her body was thrown into the lake. Gabrion offers the affidavit of Dr. Daniel J. Spitz, who states, "Based on the available forensic evidence it cannot be excluded that Ms. Timmerman died of asphyxia before her body was put into the lake." (Spitz Aff. ¶ 9, ECF No. 103-5.)

Dr. Spitz's opinion adds nothing new. It is nearly identical to the testimony of Dr. Cohle, who conceded that he could not "rule out that [Rachel] was asphyxiated . . . at some other time and then dumped into the lake." (Cohle Tr. 35.) Dr. Cohle opined that the "most likely" cause of Rachel's death was drowning only after considering the circumstances in which her body was found (i.e., handcuffed and wrapped in chains and duct tape). (*Id.* at 26.) This opinion is entirely consistent with Dr. Spitz's opinion that the "forensic evidence" does not exclude the possibility of asphyxiation.

Moreover, because the evidence of Gabrion's guilt included not just forensic evidence (e.g., comparison of the concrete blocks), but also physical evidence tying Gabrion to the crime (his possession of the keys to the padlocks on Rachel's body, and the presence of duct tape, bolt cutters, chain, and a woman's hair clip at his campsite), eyewitness testimony placing him

with Rachel near the scene of the crime, as well as his own incriminating statements, there is no reasonable probability that additional expert assistance would have changed the outcome of the guilt phase of his trial.

Gabrion notes that the investigator primarily responsible for researching issues related to the guilt phase of the case, Patricia Hubbard, was not paid and did not perform significant work for a period of 10 months in 2000. However, Gabrion does not indicate how this impaired his case or what evidence she failed to discover. Thus, Gabrion has not shown that he was prejudiced by the lack of additional investigative assistance or expert opinion.

### E.  Failure to secure adequate funding

Gabrion contends that his counsel was unable to secure adequate funding from the Court for experts and investigators. At the time of Gabrion's trial, 21 U.S.C. § 848(q)(10)(B) provided that fees for "investigative, expert, or other investigative services reasonable necessary for the representation of the defendant" could not exceed $7,500 unless the excess amount was authorized by the district court and the chief judge of the court of appeals. *Id.*

Defense counsel hired fact and mitigation investigators in July 1999, and quickly exceeded the $7,500 budget cap in 21 U.S.C. § 848(q). In December of that year, counsel sought authorization to pay expenses above the $7,500 cap. (R. 59: Ex Parte Mem.) That request was approved by this Court the following month (R. 58: 1/10/2000 Order), but the experts were not paid for their work until March 2000, when the Court of Appeals finally gave its approval (*see* R. 149: Ex Parte Mem. 2).

Counsel continued to experience difficulty making timely payments to the investigators because of delays in the approval process, particularly at the appellate court level. In February 2000, counsel sought approval for an additional $60,000 for investigative and expert

expenses.  (*See* R. 69: Ex Parte Mem.)  This Court approved the request on April 4, 2000, and forwarded it to the Court of Appeals for review.  (R. 73: 4/4/2000 Order.)

On June 26, 2000, counsel complained to Magistrate Judge Joseph Scoville that Gabrion's experts and investigators had not been paid and were not working on the case because the Court of Appeals still had not approved the latest request to exceed the $7,500 cap.  (6/26/2000 Letter to J. Scoville, ECF No. 2-7.)  Counsel also submitted a proposed preliminary budget of over $480,000, which included 200 hours and expenses for expected work by investigators, as well as $42,000 in estimated expenses for several different forensic and mental health experts.  (R. 88: Ex Parte Proposed Prelim. Budget.)  This Court approved the preliminary budget a few weeks later (R. 96: 7/13/2000 Order; R. 97: 7/24/2000 Am. Order), but another two months passed before the Court of Appeals approved the outstanding expense and budget requests (R. 111: 10/4/2000 Am. Order).  Consequently, Plaintiff's criminal and mitigation investigators were not paid for work they performed in late 1999 and early January 2000 until October 2000, almost 10 months after the fact.  During those 10 months, they declined to perform any significant amount of work.  (R. 149: Ex Parte Mem. Re: Funding & Payment for Investigative, Expert & Other Necessary Services.)

In March 2001, trial counsel complained to Judge Richard Enslen about the denial of payment for certain expenses by Gabrion's investigators, even though the expenses were within the preliminary budget that had been approved by the Court of Appeals.  (3/9/2001 Letter to J. Enslen, ECF No. 2-8.)  Counsel indicated that "our investigators are not being compensated and understandably are not willing to continue to devote the time necessary to complete the investigation on this case." (*Id.*, PageID.644.)  A few days later, counsel submitted a memorandum to the Court documenting the difficulty in obtaining timely funding for their investigators, who

were "unwilling and unable to commit substantial time to the Gabrion case unless and until they have assurances that they will be compensated and reimbursed for their expenses <u>in a timely fashion</u>." (R. 149: Ex Parte Mem. Re: Funding & Payment for Investigative, Expert & Other Necessary Services, PageID.1171.) Counsel expressed concern that its investigators had been "unable to complete the investigation necessary to have the case ready for trial. Despite the passage of time, considerable amount of investigative work remains to be done in order to be fully prepared for this trial." (*Id.*)

Gabrion relies primarily on the letters from his counsel in June 2000 and March 2001 as the evidence supporting his claim that counsel failed to secure adequate funding. But these letters do not demonstrate that counsel was unable to obtain adequate funding, let alone that counsel's conduct was objectively unreasonable. If anything, the letters demonstrate that counsel was actively involved in attempting to obtain timely funding from the Court, but was having trouble doing so due to a procedural barrier imposed by law and delays in approval by the district court and the court of appeals. Counsel does not act unreasonably when its ability to obtain funding is hampered by circumstances outside of its control. Moreover, Gabrion's attorneys submitted the foregoing letters to the Court at least one year before his trial began. They had ample time to resolve those issues and continue the investigation. Gabrion does not identify any material evidence that Gabrion's counsel could have obtained if not for the delays in funding.[15]

Gabrion also contends that counsel had a disincentive to retain additional experts because the Court cut the fee charged by an expert on jurisdiction by approximately $4,000 in

---

[15] In his reply, Gabrion implies that the mitigation investigator could have discovered evidence of allegedly false statements by the Government and its witnesses discussed in Ground One, including the statements by Chrystal Roach and Linda Coleman, and the Government's assertion that Rachel disappeared on June 3, 1997. However, none of these statements are material to the outcome of Gabrion's case. Thus, his attorneys' failure to discover this evidence did not prejudice him.

August 2001, and Gabrion's attorney personally reimbursed the expert for this amount.  This claim is conclusory and unsupported.  Gabrion does not indicate what additional expert evidence could have helped his case.  Thus, he has not demonstrated the prejudice necessary to show that he was deprived of the effective assistance of counsel.

### F.  Failure to seek a continuance

Gabrion claims that counsel should have sought a continuance after the Government revised the indictment shortly before trial.  The original indictment stated that Gabrion killed Rachel by "drowning her in Oxford Lake."  (R. 1: Indictment.)  Before trial, the Government filed a superseding indictment stating that Rachel was killed on federal property (i.e., "within the special maritime and territorial jurisdiction of the United States, specifically in the Manistee National Forest").  (R. 429: Superseding Indictment.)  At a hearing on Gabrion's objections to the superseding indictment, Gabrion's attorney represented that he was not asking for a continuance; instead, he was objecting to the "late filing" of an indictment that "somewhat changes the theory of the prosecution."  (R. 618: 2/22/2002 Mot. Hr'g Tr. 3.)  Counsel argued that the Government initially intended to show that Gabrion killed Rachel by drowning her in the lake, but in changing the indictment, the Government sought to leave open the possibility that Gabrion killed her on land and then put her body into the lake.  (*Id.*)  The Government responded that its proofs would not change.  (*Id.* at 4.)  In reply, Gabrion's attorney confirmed that he was not asking for a continuance because the revised indictment would not change the defense; he would "approach it in the same way."  (*Id.* at 7-8.)

Gabrion now argues that counsel should have asked for more time in order to find a pathologist who could show that Rachel was killed by asphyxiation before she was thrown into the lake, which would have created doubt as to whether she was killed on federal property.

Gabrion cannot demonstrate prejudice because the Government's case did not deviate from its theory in the original indictment that Gabrion killed Rachel by drowning her in Oxford Lake. Further, although Gabrion did not present his own expert to create doubt as to whether she was killed on federal property, his attorney caused Dr. Cohle to concede that he could not "rule out that [Rachel] was asphyxiated . . . at some other time and then dumped into the lake." (Cohle Tr. 35.) Gabrion offers no reason to believe that a different pathologist would have arrived at a different conclusion than the expert who testified at trial. Thus, Gabrion has not shown that counsel acted unreasonably in failing to ask for a continuance or that Gabrion was prejudiced by this failure.

Gabrion also contends that, shortly before trial, the Government disclosed "critical" witnesses who placed him near Oxford Lake, giving defense counsel little time to adequately investigate them. He also contends that the Government provided over 10,000 documents to defense counsel in a "haphazard and disorganized way." (Am. § 2255 Mot. 57.) Gabrion does not identify any prejudice to his case from these late disclosures, however.

### G. Failure to seek recusal of the trial judge

Gabrion contends that his attorneys should have asked the district judge assigned to this matter, Hon. Robert Holmes Bell, to recuse himself because Judge Bell allegedly failed to ensure that Gabrion received sufficient funding, and Gabrion sent rude and insulting letters to him, accusing his family members of engaging in vile and criminal conduct. In his reply in support of his motion under § 2255, Gabrion adds that Judge Bell forwarded a letter about Gabrion to the Assistant United States Attorney but did not send a copy of that letter to the defense. In the letter, a prisoner at the Milan prison facility claimed to have evidence against Gabrion. (ECF No. 142-6.) Judge Bell's assistant attached a memo to the letter, stating, "Judge Bell received the enclosed letter today from a prisoner who has had contact with Marvin Gabrion. He felt this should be

directed to you for your attention." (*Id.*)  The prisoner who wrote the letter never testified.  Defense counsel later received a copy of the prisoner's letter, and the Court's communication to the Government, as part of discovery.  (Reply 71.)

"[T]he Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (internal quotation marks and citation omitted). "Judicial bias is a deep-seated favoritism or antagonism that makes fair judgment impossible." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971)).  "A biased decision-maker is constitutionally unacceptable." *Id.* (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).  "Recusal is required when 'the probability of actual bias rises to an unconstitutional level.'" *Id.* (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887 (2009)).  "Since judicial bias is a structural defect both when actual and when merely unconstitutionally probable . . . , if either type of judicial bias is proven, *Strickland* prejudice need not be proven." *Id.* (citation omitted).

In the usual case, the Court "asks not whether a judge harbors an actual subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias"'" *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *Caperton*, 556 U.S. at 881).  Courts indulge "a presumption of honesty and integrity in those serving as adjudicators." *Withrow*, 421 U.S. at 47.  The Supreme Court has recognized constitutionally impermissible, objective indicia of bias in the following types of cases: (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1997) (subsequently expanded to include even indirect pecuniary interest, *see Railey v. Webb*, 540 F.3d

393, 399-400 (6th Cir. 2008)); (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *In re Murchison*, 349 U.S. 133, 141 (1955); and (3) cases in which a judge had prior involvement as a prosecutor, *Williams*, 136 S. Ct. at 1905.

None of the foregoing situations is at issue in this case. Judge Bell did not have a pecuniary interest in the outcome of his case, did not find Gabrion in contempt, and did not have prior involvement in the case as a prosecutor. Furthermore, none of the circumstances alleged by Gabrion establish an unconstitutionally high probability of actual bias.

There is no evidence of bias in Judge Bell's treatment of the requests for funding by Gabrion's counsel. He approved multiple budgets proposed by defense counsel (*see* R. 217, 307, 413), and ultimately approved budget expenditures of over $730,000 (ECF No. 44-1). Even if Gabrion could somehow show that these rulings were tainted by bias, "[j]udicial rulings almost never serve as a valid basis for recusal and are most often simply grounds for appeal." *Goldman v. Consumers Credit Union*, No. 17-1700, 2018 WL 3089811, at *5 (6th Cir. Feb. 14, 2018) (citing *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

Likewise, Gabrion's offensive remarks in his letters to Judge Bell do not demonstrate bias and are not grounds for recusal. Gabrion contends that "any reasonable person would have been offended" by Gabrion's letters; however, offense is not the same as bias. Judges are accustomed to criticism, and are not obligated to recuse themselves whenever a party disagrees with their actions or personally insults them. *See United States v. Bray*, 546 F.2d 851, 858 (10th Cir. 1976) ("The mere fact that a defendant has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced[.]").

Finally, the fact that Judge Bell received a letter from a prisoner and forwarded it to the Assistant United States Attorney does not demonstrate bias, let alone a high probability of bias. In a similar case, a judge learned before trial that the defendant had sent a threatening letter to a witness. *Coley*, 706 F.3d at 749. The judge contacted the authorities, who opened a new criminal investigation. The Court of Appeals determined that these actions did not overcome the presumption of impartiality or the "generally applicable presumption of regularity[.]" *Id.* at 751. Similarly, Judge Bell's decision to give the authorities a letter from a prisoner purporting to offer evidence against Gabrion does not overcome the presumptions of impartiality and regularity.

Because Gabrion has not demonstrated actual bias, or a constitutionally-significant probability of bias, the prejudice standard in *Strickland* applies. *See Coley*, 706 F.3d at 752. Gabrion must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different if his counsel had moved to disqualify Judge Bell. He has not even attempted to do so. Thus, his ineffective-assistance claim fails.

### H. Failure to object to "false" statements that Gabrion forced Rachel to write the letters

Counsel was not ineffective for failing to object to the Government's allegedly "false" statements that Gabrion forced Rachel to write the letters or dictated them to her. As explained, these statements were not false or improper. Thus, an objection would have been meaningless and futile.

### I. Failure to rebut evidence regarding Rachel's motive for leaving home

The prosecutor stated that Rachel started a "new life" after she was released from jail, but Gabrion argues that the reality was quite different, and that his attorneys should have offered evidence that Rachel's probation officer had ordered her to leave her father's home and to live in a group home, Liz's House, because she was not performing adequately on probation. In

addition, Gabrion points to evidence that Rachel took several days' worth of clothing with her when she left home on June 3. Gabrion argues that this evidence would have demonstrated that Rachel had her own reasons for leaving home that were unrelated to Gabrion.

Rachel's motive for leaving home is irrelevant to Gabrion's guilt. It does not matter what reasons she may have had for leaving; what matters is that he killed her after she did so.

**J. Failure to challenge claim that Rachel disappeared on June 3, 1997**

Gabrion contends that counsel should have offered the evidence discussed in Ground One, Section B(3) that Rachel was seen alive after she left home on June 3. None of that evidence could have had an impact on Gabrion's conviction, and it would have been pointless to submit it. Thus, counsel's conduct was not unreasonable.

**K. Failure to present FBI report regarding Rachel's letters**

Gabrion was not prejudiced by counsel's failure to present the FBI report which opined that Gabrion "probably" did not dictate the letters written by Rachel and that she probably was not under "extreme" duress when she wrote them. The report gave a very qualified opinion, and the circumstantial evidence supported the Government's argument that Gabrion forced her to write the letters. Moreover, the Government did not need to show that Gabrion forced Rachel to write these letters in order to establish his guilt, his motive, or his substantial planning. Thus, the FBI report could not have changed the outcome of his proceedings.

If anything, the report could have harmed Gabrion, particularly at the sentencing stage. The notion that Rachel wrote the letters of her own accord, and affirmed what was in them, is simply unbelievable. It is absurd to suggest that Rachel would report to the police and her family that Gabrion raped her and threatened to kill her, then suddenly retract her allegations in writing a year later, offer a dubious explanation for what happened to her on the night of the alleged rape, claim that she left home indefinitely to live with a mysterious man, and then leave her letters for

Gabrion to send in the mail, *unless* Gabrion somehow persuaded her to write the letters and coached her on what to say. The FBI report suggests that he was able to do this without putting her under duress, which makes him look *especially* devious and cunning, and only adds to the evidence of his dangerousness. Thus, it was reasonable for counsel not to use the report, and Gabrion was not prejudiced by that decision.

### L. Failure to contradict Roach's "false" testimony

Roach's testimony was not material to Gabrion's guilt. Thus, demonstrating that her testimony was false would not have changed the outcome of the guilt phase of Gabrion's proceedings. *See Gabrion II*, 648 F.3d at 337 (finding that the Government's failure to disclose evidence that could have been used to impeach Roach "did not affect the result of the guilt phase of trial" because "Roach's testimony was far from critical in establishing [Gabrion's] guilt").

### M. Failure to present evidence of other suspects

Gabrion contends that counsel should have investigated and presented evidence pointing to other suspects for the murder of Rachel, including David Gabrion and Eddie Start.

#### 1. David Gabrion

According to a police report, Linda Byrnes told investigators that she shared a cell with Rachel in January 1997, while they were incarcerated at Newaygo County Jail. (ECF No. 2-13.) Rachel told Byrnes that Gabrion's brother David supplied marijuana to Rachel and Rachel's mother, Velda, and that Rachel picked up the drugs from David at Oxford Lake on two occasions. While Rachel was in jail, David sent her a threatening letter, stating that she "would not get away with what her sister had done." (*Id.*, PageID.657.) Byrnes believed that Rachel's sister may have falsely claimed that someone had raped her. David also told Rachel not to talk about their drug dealing. (*Id.*)

Byrnes' statements suggest that Gabrion's brother threatened Rachel, not that he killed her. Moreover, in the same police report, Byrnes confirmed that Rachel was "scared to death" of Gabrion and was worried that he would kill her as soon as she was released. (*Id.*) In other words, Rachel was apparently more frightened of Gabrion than his brother David.

In a letter to the police, Rachel's father claimed that David knew facts about the murder that were not released to the public. (Timmerman letter, ECF No. 2-15.) Rachel's father also claimed that he went to the crime scene at Oxford Lake and saw pieces of a rusty blue truck, and he remembered that Gabrion's brother David owned a rusty blue Ford truck. (*Id.*, PageID.666.) However, the police told him that this would only establish that David's truck was at the lake at some point in time, not that it was there at the time of the murder. (*Id.*) The police were right; the truck pieces do not necessarily point to David as the murderer. Moreover, witnesses placed Gabrion, not David, at the scene of the crime with Rachel. Thus, Gabrion was not prejudiced by the failure to elicit Timmerman's suspicions about David.

One of Gabrion's neighbors reported to the police that they saw two men loading items from Gabrion's home into a truck; one of the men was David. (Police Report, ECF No. 2-18.) Gabrion apparently believes that the report casts suspicion on David, but it does no such thing. It merely recounts the same story that the jury heard at trial. David went to Gabrion's home and retrieved some items from the house, including a key that fit the padlocks on Rachel's body. (Tr. IV, 1038-41.) There was another copy of that key inside the house. These facts suggest that David was helping Gabrion; they do not suggest that David killed Rachel.

Rachel's mother, Velda, told the police that she feared for her own life because she had informed the police about drug trafficking involving David and Gabrion's brother Mike. (Incident Report, ECF No. 2-16.) Velda was worried that Rachel might have revealed this

information before she died. Velda's fears suggest that David had a motive to attack Velda; they do not suggest that David killed Rachel. Thus, counsel acted reasonably in not pursuing David as a suspect.

### 2. Eddie Start

According to an FBI report, Velda told a cooperating witness that Eddie Start may have been the person who picked up Rachel on the night she disappeared. (ECF No. 2-19, PageID.687.) This evidence is not corroborated, however. When he testified before the grand jury, Start denied seeing Rachel at all that day. (Start Grand Jury Tr. 8, ECF No. 44-5.) Similarly, although VanSlyke initially told the police that she saw Rachel with Start on the evening that Rachel disappeared, she later retracted that story. (VanSlyke Grand Jury Tr. 12, ECF No. 1-16.)

Another person, Danny Holmes, told federal investigators that he believed that Start had killed Rachel, because Start dated Rachel and he was violent towards women. (FBI report, ECF No. 1-18, PageID.556-57.) This is mere speculation. Due to the overwhelming evidence pointing toward Gabrion as the killer, he was not prejudiced by counsel's failure to investigate Start.

### N. Failure to Object to Removal of Juror

At the conclusion of the guilt phase of the trial, the Court replaced one of the jurors with an alternate because the original juror was inattentive. (Tr. VIII , 1770.) On appeal, Gabrion argued that the removal of this juror was an abuse of discretion and violated his Fifth Amendment right to due process and his Sixth Amendment right to an impartial jury. The Court of Appeals noted that a trial court has "sound discretion" under the Federal Rules to substitute an alternate juror for a regular juror who has become "unable or disqualified to perform his duties," and that this discretion will not be disturbed on appeal "absent a showing or bias or prejudice to the defendant." *Gabrion II*, 648 F.3d at 338. Because Gabrion's attorney had an opportunity to object

to the Court's plan to remove the juror, but did not do so, the Court of Appeals reviewed the issue for plain error.  *Id.* at 339.  On plain-error review, the Court of Appeals rejected Gabrion's constitutional claims because he "failed to demonstrate that the court's action in removing a juror and denying the request for a new trial deprived him of his right to an impartial jury and, more generally, to a fair trial."  *Id.*

Gabrion contends that counsel was ineffective for failing to object to the removal of the juror at trial, and that Gabrion would have prevailed on appeal if his trial counsel had preserved the issue for review.  This argument is unsupported.  Gabrion has not shown bias or prejudice resulting from the removal of the juror; thus, he has not shown that he could have satisfied the Court of Appeals' test for overturning this Court's exercise of its sound discretion.  Consequently, he has not shown prejudice to the outcome of his proceedings resulting from his counsel's conduct.  Likewise, Gabrion has not shown that removing the juror denied him his rights under the Fifth and Sixth Amendments to a fair trial and an impartial jury.  If anything, removing an inattentive juror *protected* Gabrion's right to a fair trial.

**O.  Failure to challenge statements and evidence regarding the cause of death**

The Government's pathologist, Stephen Cohle, testified that the most likely cause of Rachel's death was drowning in the lake, but on cross-examination, he conceded that she could have been asphyxiated and then thrown into the lake.  Gabrion claims that his attorneys should have hired a pathologist to defeat the Government's theory that Rachel drowned, but he does not indicate what another pathologist could have shown that is significantly different from the testimony by Dr. Cohle.

Moreover, Cohle's testimony was not the only evidence that Gabrion drowned Rachel.  Gabrion told Westcomb that he "bound [Rachel] down, threw her over a boat."  (Tr. VI, 1355.)  He wrote to Rachel's mother that she would "spend eternity re-living Rachel[']s last few

seconds gasping for air on a muddy lake bottom, where you and your weas[e]l partner put her." (Gov't Ex. 96.)  He also used duct tape to blind and gag Rachel, handcuffs to restrain her, and padlocks to attach the cinderblocks to her body.  None of these steps would have been necessary if she was already dead when he put her into the lake.  But if she was still alive, they would have prevented her from crying for help, swimming to the surface, or freeing herself from the chains and blocks that pulled her underwater.  Thus, Gabrion was not prejudiced by counsel's failure to retain a pathologist.

Gabrion also argues that his attorneys should have objected to the Government's statement in its closing argument that Dr. Cohle "ruled out every other possible manner of death" (Tr. VIII, 1713), because this statement allegedly mischaracterized Cohle's actual testimony.  But an objection would have not have accomplished anything because the Government subsequently clarified that Cohle did not rule out asphyxiation, and that is consistent with Cohle's testimony.  (*Id.* at 1714-15.)  Thus, counsel's decision not to object was reasonable, and the Government's statement could not have had any material prejudicial impact on the verdict.

### P.  Failure to retain a pathologist to assist in preparation and cross-examination

Gabrion again argues that counsel should have hired a pathologist to challenge the Government's theory that Rachel drowned.  This claim is unsupported and fails for lack of prejudice for the same reasons stated in the previous section.  Gabrion does not indicate what another pathologist could have shown that is materially different from the evidence at trial.

### Q.  Failure to impeach Westcomb

Westcomb testified that Gabrion admitted to killing Rachel by throwing her over a boat.  Gabrion argues that his counsel should have called witnesses to testify that Westcomb does not have a reputation for honesty, and should have uncovered Westcomb's medical records, which show that he has a history of mental-health problems, including a nervous breakdown, a "crushed

skull," and diagnoses of bipolar disorder, schizophrenia, mental retardation, alcohol disorder, schizoaffective disorder, and passive dependent personality. (Am. § 2255 Mot. 72.)

However, Gabrion's counsel impeached Westcomb's credibility in other ways during cross-examination. Westcomb admitted that he was diagnosed with paranoid schizophrenia. (Tr. VI, 1359.) He hears voices and sees visions. (*Id.*) He has trouble remembering things. (*Id.* at 1362, 1368.) When he told his mother about what Gabrion said, she told him he was "crazy" and that he should not worry it. (*Id.* at 1367.) He did not tell the police about Gabrion's statement until after he saw a story about Gabrion on a television show. (*Id.*)

Counsel could have reasonably assumed that Westcomb's paranoia, hallucinations, and poor memory, combined with the suspicious timing of his disclosure to the police, would be sufficiently damaging to his credibility without further evidence of mental health problems or a general reputation for untruthfulness. Thus, counsel's conduct was not objectively unreasonable. Moreover, Gabrion has not demonstrated prejudice. Even without Westcomb's testimony, the other evidence against Gabrion was so strong that there is no reasonable probability of a different outcome.

### R. Failure to withdraw before trial

Gabrion argues that one of his attorneys, Mr. Mitchell, should have moved to withdraw from the case because Gabrion assaulted him in 1999 or 2000 "in various ways including by vomiting on him." (Am. § 2255 Mot. 73.) Gabrion was and is infected with hepatitis C; thus, Gabrion argues that his actions created a conflict with Mitchell "that was never surmounted." (*Id.*)

Gabrion presents evidence that he may have assaulted Mitchell during a prison visit in June 2000, and that Mitchell's communication with him declined after that time. According to Gabrion's calculation of the payment vouchers submitted by Mitchell to the Court, Mitchell spent a total of approximately 49 hours consulting directly with Gabrion. (Reply 86.) Almost two thirds

of that time was in the first six months of his work on case. In the remaining 26 months, he consulted with Gabrion for about 18 hours.

One of the factors for considering a motion to withdraw is "the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense[.]" *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001). Gabrion has not identified any manner in which his counsel's performance was adversely affected by the alleged conflict, let alone that it resulted in a lack of meaningful communication between him and his attorneys. In fact, the record reflects that Stebbins, Gabrion's other appointed attorney, consulted with him for over 100 hours after the assault on Mitchell in June 2000. (*See* Invoices, R. 100, 101, 103, 104, 108, 114, 116, 130, 134, 136,151, 163, 168, 188, 219, 222, 279, 297, 318, 334, 380, 400, 462, 501, 569.) It was not necessary for Gabrion to confer with both of his attorneys. Thus, even if Mitchell's communication with Gabrion declined after the assault, Gabrion has not shown that it impaired his defense.

Moreover, the Court of Appeals considered and rejected a very similar claim. On appeal, Gabrion argued that this Court should have granted his attorneys' motions to withdraw after Gabrion punched Stebbins in the head during the sentencing proceedings. The motion was denied by this Court and that decision was upheld, in part, because the conflict arising from the assault on Stebbins did not result in a total lack of communication with his counsel. *Gabrion II*, 648 F.3d at 333. If Gabrion's actions *during* trial did not create an insurmountable conflict with his attorneys, then his actions *before* trial could not have done so, either.

### S. Failure to present evidence of Gabrion's presence at a campground on June 25, 1997

Gabrion argues that counsel should have presented evidence that he was seen with two women at a campground near Toogood Lake on June 25, 1997. According to a police report

(ECF No. 2-23), David Knapp told the police that Gabrion pulled up to his campsite near Toogood Lake, which is 10 miles from Oxford Lake. There were two women in the backseat of the car, one of whom was "much older." (*Id.*, PageID.698.) Gabrion struck up a conversation with Knapp and put Knapp's dog in a headlock. At about that time, the women in the car called for Gabrion to come back because they wanted to leave. (*Id.*, PageID.699.) Knapp recorded the license plate number of the car, and the police determined that it was registered to a woman named Linda Allen. Another witness mentioned in the police report believed that the women in the vehicle were Gabrion's mother and a friend of hers. (*Id.*)

Gabrion claims that this evidence would have undermined the Government's timeline, because the Government believed that Rachel had been killed "no later" than mid-June. (Am. § 2255 Mot. 73.) Gabrion also contends that it would have cast doubt on whether Rachel and Shannon were dead in mid-June. (Reply 87.)

Nothing in the police report suggests that the women in the car were Rachel or Shannon. Rachel was 19 years old. Shannon was a baby. Neither of them fit the description of a woman old enough to be Gabrion's mother. Thus, the report does not cast doubt on the Government's theory, and it was reasonable for counsel to avoid using it.

### T. Failure to present evidence regarding John Weeks

The Government's theory at trial was that Gabrion used Weeks to lure Rachel from her home and that Weeks likely participated in killing Rachel. Weeks disappeared later that summer, and the Government speculated that Gabrion was responsible for his death. Gabrion asserts that counsel should have presented evidence that Weeks was seen alive after mid-June, referring to police reports of interviews with Christopher Dragun and Theodore Braun. (ECF No. 2-25.) Apparently, Weeks told them that he helped Gabrion get rid of a body. Gabrion contends

that this evidence would have corroborated the defense's theory that, even if Gabrion killed Rachel, he did not do so on federal property.

The Government responds that the police reports are hearsay and would not have been admissible to prove the truth of the matter asserted in them. Moreover, competent counsel would not have introduced testimony from Dragun or Braun, because their statements to the police strongly support the Government's case.

According to Dragun, sometime prior to June 13, 1997, he saw Weeks and noticed that Weeks possessed an unusually large sum of money. (ECF No. 2-25, PageID.710.) When asked about it, Weeks stated that he "killed somebody." (*Id.*) He later stated that he had "picked up a female for a hit man," someone he was working for who lived in Grand Rapids. (*Id.*) Dragun last saw Weeks on July 4, 1997. This account is consistent with the Government's theory that Weeks lured Rachel on a date and then helped Gabrion kill her.

Braun's account is similar. During the last week of May or the first week of June, he and Dragun picked up Weeks to go to Grand Rapids and buy marijuana. Before leaving, Weeks showed them a wallet filled with money. When asked where he got the money, Weeks stated that he had worked for someone named Marvin. A day after this trip, Weeks told Braun that he had delivered a female to his "boss," who killed the woman. (*Id.*, PageID.712.) Weeks also said "something about helping his 'boss' get rid of a body." (*Id.*) Braun remembered Weeks referring to his boss as "Marvin." (*Id.*, PageID.713.) He also recalled that Weeks had been "calling the victim, [and] was trying to persuade her to have sex with him." (*Id.*) Braun last saw Weeks shortly after June 13, 1997.

Gabrion seizes on Weeks' statement to Braun that Weeks helped "get rid of a body." According to Gabrion, this statement implies that Rachel was already dead when she was

thrown into the lake. But this statement is also consistent with the Government's theory of the case. When Gabrion put Rachel into the lake with blocks chained to her body, he killed Rachel and disposed of her body at the same time. Thus, Weeks could have assisted Gabrion with Rachel's drowning and still claim that he had helped "get rid of a body." It is also possible that Weeks was minimizing his role in Rachel's death, or was referring to the body of someone else—Rachel's daughter, for instance. Thus, any testimony by Dragun or Braun would have provided strong support for Gabrion's guilt and almost no support for the defense. It was reasonable for counsel not to use this evidence, and Gabrion certainly was not prejudiced by its absence.

### U. Failure to impeach Coleman with testimony by Walter Hamilton

Walter Hamilton lived near the Colemans and spoke with them often. He also spoke with government agents and the defense team's investigator concerning Rachel's death. Linda Coleman testified that she saw Gabrion, Rachel, and another man in a truck with a boat in the back, near Oxford Lake in June 1997. (Coleman Tr. 5, 9, 11-13.) According to Gabrion, however, Hamilton told the defense investigator that he spoke with Coleman at length about a stranger that they saw in the area. Hamilton could not recall Coleman telling him that she saw two men and a woman at the lake with a truck and a boat.

Hamilton's testimony would not have added to Gabrion's defense, because Coleman herself testified that she told Hamilton about the stranger but did not tell him about seeing Gabrion and two others at the lake. (*Id.* at 42-43.) It would have been pointless to have Hamilton confirm that she did not tell him about Gabrion.

### V. Cumulative effects of counsel's errors

Gabrion asserts that he was prejudiced by the cumulative effects of the alleged errors by counsel. "[E]xamining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light

of the totality of the evidence in the case.'" *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)). Because of the "overwhelming" evidence of Gabrion's guilt, there is no reasonable probability that any of the errors asserted by Gabrion, considered individually or cumulatively, would have been reasonably likely to have affected the outcome of his proceedings.

*Ground Four:* **Ineffective assistance of counsel at sentencing phase of trial**

Next, Gabrion challenges the effectiveness of his counsel's assistance at the penalty phase of his trial. To obtain the death penalty, the Government needed to demonstrate the existence of the statutory aggravating factors set forth in 18 U.S.C. § 3592(c) beyond a reasonable doubt, and that the statutory aggravating factors, together with any nonstatutory aggravating factors found to exist beyond a reasonable doubt, outweigh any mitigating factors found to exist so as to justify a sentence of death. The standard for effective assistance of counsel involves a two-part test from *Strickland*, as described above in Ground Three. But the test for prejudice is slightly different at the penalty phase of a capital case. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 696. Because a jury must unanimously find that a death penalty is warranted, the prejudice prong is met when "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Like the evidence of Gabrion's guilt, the evidence supporting aggravation was "overwhelming." *Gabrion III*, 719 F.3d at 525.

> A total of 58 witnesses testified in support of the government's allegations during the penalty phase of the trial. Some of the testimony concerned the depraved manner of the murder itself—including the terror that Timmerman must have felt as Gabrion rowed her 100 yards out onto the water, the boat rocking as she lay inside it, blinded, bound, gagged, and weighed down with concrete blocks. Other

testimony concerned the likelihood that Gabrion killed Timmerman's baby, Shannon Verhage. Still other testimony concerned Gabrion's character and future dangerousness. Some of that testimony pointed to Gabrion's likely role in the disappearance (and presumably murder) of three other people. One was Wayne Davis, the only witness to Timmerman's rape (other than Gabrion's nephew and Timmerman herself), who was last seen with Gabrion before Davis disappeared, and whose stereo equipment Gabrion tried to sell several weeks later. Another was John Weeks, who was likely the only witness to Timmerman's murder, and who himself disappeared about 18 days later—never to be seen again—after telling his girlfriend that he was going on a "dope run" to Texas with Gabrion. (Gabrion later told Weeks's girlfriend that he had dropped off Weeks with some friends in Arizona.) The third was Robert Allen, the mentally disabled man who crossed Gabrion's path in Grand Rapids and then vanished in 1995, just before Gabrion assumed his identity and began stealing his disability checks.

Numerous other witnesses testified to Gabrion's propensity for violence. Two witnesses described how each of their homes had been set afire shortly after a disagreement with Gabrion. Another witness described how Gabrion began shooting a bolt-action rifle towards his house after he told Gabrion to leave a party there. (The investigating police officer found Gabrion passed out in a trailer with the rifle hanging above him on the wall and spent casings on the hood of his pickup truck outside.) Another witness described how Gabrion trained a rifle on her and her two-year old child as she walked to her car one day, and then climbed into his car and followed them for miles. Another woman testified as to how Gabrion sexually assaulted her in her home. Another witness testified that Gabrion beat and kicked him, punched his wife in the face, and then punched his teenaged son, after the witness interrupted a card game to retrieve heart medicine for the witness's uncle. Another witness testified that Gabrion said he could "snipe" everyone in the neighborhood from his second-story window. One night this same witness heard a gunshot, looked out the window and saw a red muzzle flash from Gabrion's window just before the crack of a second shot. This witness found a bullet embedded in his home afterwards.

Other testimony showed that Gabrion had been a busy inmate while awaiting trial. He carved a fake gun from soap, painted it black, and planned to use it in an escape attempt. In separate phone calls, he impersonated a state senator and court officials in an attempt to transfer to another jail. He obtained hypodermic needles, razor blades, and a claw made from a metal shower ring, among other contraband. Gabrion also placed dozens of calls to Shannon Verhage's paternal grandmother, accusing her of killing Rachel and Shannon. And Gabrion wrote numerous letters to Rachel's father, saying he knew where the baby was and asking for a photo of her. In desperation, apparently, Rachel's father eventually sent him one, which Gabrion then used for sexual gratification.

*Id.* at 518-19. In short, Gabrion "killed Timmerman in an indisputably horrific manner, killed her infant daughter, likely killed three other people who either witnessed his crimes or whose death was otherwise useful to him, and terrorized countless people who crossed his path." *Gabrion III*, 719 F.3d at 525.

Several of Gabrion's claims challenge counsel's failure to present sufficient mitigation evidence. To prepare for sentencing, Gabrion's counsel obtained the services of James Crates, a mitigation specialist and investigator, Patricia Hubbard, a criminal investigator, and Gary Phillips, a penalty-phase investigator. (5/23/2002 Am. Budget Cert., ECF No. 44-1.) Crates' work included preparing a family and social history for Gabrion's mental health experts and compiling 174 pages of records, including Gabrion's medical records, mental health records, school records, prison records, jail records, and employment records. (*See* R. 274: Scharre S. Tr. 7-8; Jackson S. Tr. 7.) Crates, the lead investigator for the sentencing phase, billed the Court for over 1,000 hours of work, from July 1999 to March 2002. (*See* R. 46, 108, 113, 117, 161, 165-67, 190, 221, 278, 295, 333, 389, 421, 535, 562.)[16] Gabrion's counsel also obtained the services of Dr. Newton Jackson, a forensic psychologist, Dr. Douglas Scharre, a neurologist, Dr. Theodore Mauger, a psychiatrist, and Dr. Mark Cunningham, an expert in the security restrictions available within the Bureau of Prisons.

### A. Failure to prepare a multi-generational history of Gabrion's family

Crates prepared a ten-page "abridged" social history for Gabrion's counsel and mental health experts. Gabrion contends that his attorneys should have investigated and presented a more comprehensive history of the mental illness, substance abuse, and general dysfunction in

---

[16] The reimbursement requests submitted to the Court provide dollar amounts for Crates' services, not hours. The Court calculated the hours of work by assuming a rate of $75/hour. (*See* R. 46 (disclosing Crates' hourly rate).)

his immediate and extended family.  His current attorneys have prepared a 150-page summary of these issues.  (Social History, ECF No. 103-1.)

### 1.  Mental Illness

According to the Social History, several of Gabrion's family members and relatives have exhibited symptoms of, or been diagnosed with, a mental illness.  Gabrion's mother had a nervous breakdown when he was a child.  One of his sisters is considered "emotionally fragile." (*Id.*, PageID.4791.)  Another sister suffers from depression.  A brother has been prescribed an antidepressant and an antipsychotic (though the brother contends that the antipsychotic is for sleep issues).  An uncle, two cousins, three cousins once removed, and two cousins twice removed have bipolar disorder.[17]  One of those cousins also has schizophrenia.  A number of other relatives have suffered from depression and anxiety.  A few suffer from disorders related to post-traumatic stress and obsessive-compulsive behavior.

Gabrion contends that all this evidence should have been presented to the jury or to the mental health examiners.  He argues that it likely would have changed the jury's view that he was malingering mental illness, and would have given his mental health experts a "different lens" through which to view the other evidence of Gabrion's mental health.  (Am. § 2255 Mot. 81.) Gabrion notes that a family history of bipolar disorder and schizophrenia is a strong risk factor for the development of those same illnesses.

As discussed above, Gabrion was evaluated by at least nine mental health experts prior to trial, several of whom administered specific tests on Gabrion to determine his mental condition.  Eight of them concluded that he was *not* mentally ill and that he was deliberately faking symptoms of mental illness.  The only one who testified otherwise, Dr. Scharre, did not interview

---

[17] Five of these seven cousins are descendants of the uncle who has bipolar disorder.

or meet with Gabrion. Gabrion's assertion that additional evidence of mental health problems in his family could have changed the opinions of these experts is unsupported. Gabrion offers no evidence that an expert reviewing the results of Gabrion's psychological evaluations and other records would have arrived at a different conclusion about Gabrion's mental health had they been aware of mental illness in his extended family.

It is not enough for Gabrion to "simply state" that the testimony of an expert "would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991); *see Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) ("Speculation cannot suffice to establish the requisite prejudice."); *Goins v. Warden, Perry Corr. Inst.*, 576 F. App'x 167, 173 (4th Cir. 2014) ("[Petitioner's] failure to [show] what an expert witness would have testified regarding the mental health evidence . . . reduces any claim of prejudice to mere speculation and is fatal to his claim."); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must . . . set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."); *see also Valenzuela v. United States*, 217 F. App'x 486, 491 (6th Cir. 2007) ("In the absence of *any* evidence raising a factual dispute, the district court did not abuse its discretion by refusing to hold an evidentiary hearing."). The Court is not required to engage in "unguided speculation into the value of omitted testimony by hypothetical witnesses." *United States v. Holt*, No. 95-5173, 1996 WL 262466, at *9 (6th Cir. May 15, 1996).

Gabrion presents the medical records of Dr. Mauger, who saw Gabrion on various occasions in May 1993 through March 1995, and prescribed Depakote, with some apparent success in treating some of Gabrion's reported symptoms. (ECF No. 142-11.) However, Dr. Mauger

believed that Gabrion's symptoms may have been related to a head injury resulting in temporal lobe dysfunction. (ECF No. 44-2.) Dr. Mauger's records do not support Gabrion's contention that he may have inherited a mental illness from his family.

In his reply, Gabrion makes the curious assertion that he does not need to offer a new opinion about his mental health at this time because this is the "pleading stage of these proceedings. What the government seeks is discovery of Mr. Gabrion's witnesses, something this court has yet to authorize." (Reply 113.) On the contrary, this is the stage where Gabrion must prove that he is entitled to relief, or demonstrate that he is entitled to further discovery or an evidentiary hearing. The Government is not required to seek discovery from Gabrion because he has the burden of proof, as well the burden of demonstrating the need for discovery or an evidentiary hearing. He has not met any of those burdens. While it is true that the Court has not granted all of Gabrion's requests for discovery, Gabrion does not indicate what additional information would be necessary for an expert to render an opinion about the impact of the Social History on the findings of the other experts.[18] If he has already obtained such an opinion, there is no reason to withhold it from the Court.

And even if one or more of the experts who testified at trial had changed their opinion about Gabrion's mental health based on the Social History, it is not reasonably likely that the outcome of the proceedings would have been any different. When assessing prejudice in this context, the Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

---

[18] Gabrion has asked to take depositions of all the mental health experts who examined him before trial. Before the Court authorizes this request, it is incumbent upon Gabrion to provide more than a conclusory assertion that the information about his family history puts the examinations and conclusions of these experts in doubt.

As the Court has already stated, the evidence supporting the aggravating factors was overwhelming. Evidence that Gabrion might have inherited a mental illness like schizophrenia or bipolar disorder would not necessarily have helped his case, as it could have reinforced the jury's belief that he "poses a future risk of violence." *United States v. Fields*, 761 F.3d 443, 459 (5th Cir. 2014); *see Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1988) ("Mental health evidence . . . is a double-edged sword that might as easily have condemned [the defendant] to death as excused his actions."). Whether mentally ill or not, Gabrion is impulsive, narcissistic, antisocial, and sexually preoccupied. He exhibits a "heedless disregard for consequences," views relationships as a means to satisfy his own desires, and has very little concern for the well-being of others. (Jackson S. Tr. 26, 31; Scharre S. Tr. 20, 46.) The evidence in the record amply demonstrates the serious danger that these traits pose to virtually everyone he has contact with. There is no reasonable probability that a juror would have come to a different conclusion about his sentence had they known that his behavior was, or might have been, the product of a diagnosable mental illness.

## 2. Substance Abuse

Gabrion also contends that counsel should have discovered and presented evidence that his family had a "generational predisposition to substance abuse," as demonstrated by extensive alcohol and drug use by various members of his immediate and extended family. (Am. § 2255 Mot. 81.) But this evidence would have been largely cumulative of what was already presented. "*Strickland*'s prejudice prong cannot be met where the omitted testimony would be cumulative to other evidence already on the record." *Hanna v. Ishee*, 694 F.3d 596, 619 (6th Cir. 2012). At trial, Gabrion's family testified about alcohol abuse by his parents (*see* 3/14/2002 S. Tr. 33, 36, 70), and drug abuse by his brother Mike (*id.* at 38). Additional evidence suggesting a

*possible* genetic predisposition to substance abuse would not have added anything meaningful to evidence of the external influences on Gabrion's proclivity for substance abuse.

Considering the largely cumulative nature of this new evidence and its minimal weight, and considering the strong evidence of the aggravating factors, there is no reasonable probability that this additional evidence would have changed the outcome of his proceedings.

### 3. Family Dysfunction

Gabrion further contends that there was a "generational history of family dysfunction" in his immediate and extended family. (Am. § 2255 Mot. 83.) This includes evidence of sexual impropriety, criminal conduct, physical abuse, child abuse, and neglect by various relatives toward their own family members. Gabrion argues that this evidence would have undermined the Government's claim that he was malingering, and that counsel should have discovered it and presented it to the mental health professionals.

This argument is without merit because Gabrion does not allege that he was even aware of the dysfunction in his extended family, let alone that it had an impact on him. The existence of dysfunction in others is not mitigating if it had no impact on the defendant. "[M]itigating evidence includes evidence of the *defendant's* 'culpability and character, all to the extent relevant to the defendant's 'personal responsibility and moral guilt.'" *Gabrion III*, 719 F.3d at 522 (emphasis added). Unlike mental illness and substance abuse, a disposition toward interpersonal dysfunction does not necessarily run in one's genes. The Court is not aware of a hereditary predisposition to inappropriate behavior and criminal conduct. Thus, evidence of such behavior in Gabrion's extended family is only relevant to the extent that it influenced Gabrion and is connected to his own well-being. He has not drawn that connection.

Moreover, the jury heard significant evidence of the dysfunction in Gabrion's immediate family, and the testimony of an expert that these circumstances could have contributed

to his criminal behavior.  Additional evidence about dysfunction in his extended family would not have changed the outcome of his proceedings, particularly when weighed against the evidence supporting the aggravating factors.  Indeed, the jury unanimously found that Gabrion "grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child."  (R. 526.)

### 4. Brain Injury

The Social History catalogs 17 incidents that it describes as "[b]rain insult[s] / traumatic accident[s]," the first one occurring on the day of Gabrion's high school graduation in 1971, and the last one occurring in 1997.  (Social History, PageID.4756-4764.)  At least five of these incidents were described at trial:  the car accident in Arizona when Gabrion and his girlfriend hit their heads on the windshield; the motorcycle accident in Washington when Gabrion and his girlfriend were not wearing helmets; the incident when Gabrion crashed a car into a chain-link fence; the accident in March 1992 when Gabrion intentionally forced a car off the road; and the motorcycle accident when he crashed into a telephone pole and smashed his helmet.  In addition, the jury heard testimony that Gabrion's father repeatedly slammed his head into a two-by-four when he was a child.

The incidents described at trial provide the most detailed and compelling evidence of possible brain injury stemming from head trauma.  The other incidents described in the Social History do not add much.  In fact, some of them do not involve any head injury at all.  One is simply an arrest for drunk driving.  Another refers to the fact that Gabrion contracted hepatitis C in 1992; according to the authors of the Social History, this illness "can impact cognitive function and mental capacities."  (*Id.*, PageID.4763.)  The other incidents merely provide a basis to *speculate* that Gabrion may have suffered a significant head injury, but nothing more.  For instance:  Gabrion's father allegedly told others that Gabrion "banged his head up a lot" while

112

racing motorcycles in Arizona; Gabrion was involved in several car accidents not mentioned at trial; a friend once hit Gabrion "very hard" on the head with a baseball bat; a police officer found Gabrion, who was intoxicated and had dried blood on his forehead and chin, trying to pull his car away from the scene of an accident; and Gabrion received a blow to the head with an "unknown object" during a carjacking in 1993. (*Id.*, PageID.4756-4764; Standard Crime Report, ECF No. 16-45, PageID.1723.) Gabrion offers no contemporaneous records or witness accounts confirming that he suffered any significant head or brain injury as a result of the incidents that were not discussed at trial. Nor does he attempt to draw a connection between any of these incidents and his behavior.

In contrast, Gabrion's trial counsel presented evidence that Gabrion sustained several major head injuries, after which his behavior changed. Family members and a former girlfriend testified that Gabrion became more violent and disagreeable after the motorcycle accident in Seattle. Gabrion's experts testified that evidence of brain injury included the persistent change in Gabrion's behavior and the results of PET scans. The jury was not persuaded by this evidence, but that does not mean that counsel was ineffective. Nor does it mean that Gabrion suffered prejudice without evidence of the additional incidents described in the Social History.

If the jury was not persuaded that the incidents described at trial had an impact on Gabrion's behavior, in spite of their severity and their proximity to the changes in his behavior, there is no reason to believe that a collection of additional, less serious incidents occurring over the course of several decades would have swayed the jury's opinion. Indeed, presenting these additional incidents to the jury could have weakened Gabrion's defense by diluting more persuasive evidence at hand.

Gabrion cites some articles indicating that these additional incidents would have been relevant because even mild concussions and head injuries can cause a medically-significant brain injury that may not appear on standard imaging tests, especially when there are multiple episodes of head trauma. (Reply 130.) The relevance of these articles is unclear, because all of them are from 2015, long after Gabrion's trial. But even assuming that they describe a theory of injury that was known in the medical community at the time of Gabrion's trial, and that could have been used to explain his symptoms (though Gabrion does not make that showing), his ineffective-assistance claim fails because counsel's conduct was perfectly reasonable. Counsel pursued the theory that Gabrion suffered a brain injury and presented credible evidence to support it, including expert testimony to explain how that injury affected his behavior. Their performance in this regard easily surpasses the minimum requirements for constitutionally adequate assistance.

## B. Failure to Investigate

Gabrion contends that counsel failed to conduct an adequate investigation that would have revealed the foregoing information about the mental illness, substance abuse and dysfunction in his family, as well as additional evidence from friends and relatives about Gabrion's childhood, upbringing, and good character. (Am. § 2255 Mot. 85-92.)

Under *Strickland*, trial counsel has a duty to investigate the defendant's case:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

And even if counsel's decisions were unreasonable, Gabrion must demonstrate prejudice, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Court has already discussed the evidence of mental illness, substance abuse, family dysfunction, and head injuries in the previous sections, concluding that Gabrion has not demonstrated unreasonable performance by counsel or prejudice. Gabrion also highlights the following "themes" from Gabrion's background that counsel allegedly failed to uncover: poor living conditions in Gabrion's childhood home; the lack of parental involvement and guidance in Gabrion's home; Gabrion's possible sexual victimization as a child; criminal behavior in Gabrion's immediate family; Gabrion's mother's allegedly inappropriate sexual boundaries; Gabrion's father's doubts about his own paternity and that of his sons, resulting in his hostility toward his sons; Gabrion's mother's "charismatic" influence; Gabrion's intelligence and sweet disposition as a child; conflicts between Gabrion's family members; and Gabrion's support of, and appreciation by, his nieces and nephews.

Virtually all of these themes were covered at trial, including: the lack of parental involvement and guidance during Gabrion's childhood (Jackson S. Tr. 18); criminal behavior in Gabrion's immediate family; Gabrion's good behavior and gentle disposition as a child and young adult (Jackson S. Tr. 21); the abuse and poor treatment by his parents (Jackson S. Tr. 18-19); and his positive treatment of his nieces and nephews (3/14/2002 S. Tr. 25). This evidence was sufficient for Dr. Jackson to conclude that Gabrion had suffered adverse influences that could have had an effect on his functioning, and for all 12 members of the jury to find that: Gabrion "grew up in an impoverished and violent environment, and was the victim of abandonment, neglect, and emotional, psychological and physical abuse as a child"; he was "not a disciplinary problem in

school"; and his death would be "significant for his family." (R. 526.) The Social History merely provides some additional details to reinforce these same themes.

This case is not like any of those cited by Gabrion, in which counsel was ineffective for failing to conduct an adequate investigation. In *Williams v. Taylor*, 529 U.S. 362 (2000), defense counsel did not begin to prepare for the sentencing phase of the proceeding until a week before the trial. *Id.* at 395. Consequently, counsel failed to uncover "extensive records graphically describing Williams' nightmarish childhood," including the fact that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, and that Williams had been "repeatedly and severely beaten" by his father and then committed to a stint in an abusive foster home. *Id.* Counsel also failed to discover evidence that Williams was "'borderline mentally retarded' and did not advance beyond sixth grade in school," and that Williams had received commendations in prison for his good conduct, such that prison officials described him as "'least likely to act in a violent, dangerous or provocative way.'" *Id.* at 396.

In contrast, Gabrion's counsel started preparing his mitigation case well in advance of trial, and did not fail to discover any comparable mitigating evidence of good behavior in prison, mental incapacity, or mistreatment by his parents.

In *Wiggins*, the defendant's counsel examined a presentence investigation report and social services records and determined that it was not necessary to conduct a further investigation into the defendant's background. 539 U.S. at 523. As a result, counsel did not discover or present any evidence of the defendant's dysfunctional social and family history, which included repeated physical and sexual abuse by the defendant's caretakers. *Id.* at 517. The Court concluded that it was unreasonable for counsel not to hire a social worker to conduct an investigation that would have uncovered this information about the defendant's history.

In contrast, Gabrion's counsel hired a mitigation specialist to collect evidence of Gabrion's background, then presented extensive evidence of adverse influences from Gabrion's past, and offered the opinions of experts regarding the impact of these influences on his mental health and behavior. One of those experts, Dr. Jackson, interviewed Gabrion's family and testified about Gabrion's difficult upbringing.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), the defendant's counsel failed to examine a readily available file of the defendant's prior conviction for rape, which counsel knew would be used by the Government to support its case for aggravation. *Id.* at 389-90. As a result, counsel did not discover records pointing to the defendant's mental illness, to his low scores for cognitive functioning, to his alcohol abuse, and to a series of juvenile incarcerations that would have undermined the "benign conception of his upbringing and mental capacity." *Id.* at 390-91. An examination of this file would have also alerted counsel to the need to examine the defendant's school, medical, and prison records, which would have revealed the defendant's brain damage and poor cognitive functioning as well as long periods of absence by his mother. *Id.*

In contrast, Gabrion does not claim that his counsel failed to examine his medical, school, and prison records, or any readily available records that would have been helpful to the defense. It is not disputed that Gabrion's school, medical, and incarceration records were compiled by his defense team and presented to his mental health expert, Dr. Jackson. Moreover, Gabrion's trial counsel presented evidence of virtually all the mitigating factors mentioned in *Rompilla*, including alcohol abuse, parental abandonment, psychological deficits, and the possibility of brain damage.

In *Porter v. McCollum*, 558 U.S. 30 (2009), defense counsel presented one witness in support of mitigation, the defendant's ex-wife. Consequently, "[t]he sum total of the mitigating

evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son. Although his lawyer told the jury that Porter 'has other handicaps that weren't apparent during the trial' and Porter was not 'mentally healthy,' he did not put on any evidence related to Porter's mental health." *Id.* at 32. The defendant's counsel was appointed a little over a month before sentencing, and it was his first death penalty proceeding. He did not obtain any of the defendant's "school, medical, or military service records or interview any members of [his] family." *Id.* at 39. As a result, he "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his [heroic] military service." *Id.* at 40.

In contrast, Gabrion's counsel gathered Gabrion's school and medical records, and presented evidence regarding his school performance and positive traits as a child, his difficult upbringing, and his mental health. Counsel also presented more than one witness in support of mitigation.

In *Sears v. Upton*, 561 U.S. 945 (2010), the defendant's counsel portrayed the defendant as having a stable and advantaged upbringing. *Id.* at 947. But evidence uncovered later revealed something quite different: his parents' relationship was physically abusive and they divorced when he was young; he was sexually abused by a cousin; his mother and father were verbally abusive and disciplined him using "age-inappropriate military-style drills"; he had substantial behavior problems at a young age and by the time he was in high school, he was described as "severely learning disabled" and "severely behaviorally handicapped." *Id.* Further investigation also revealed "significant frontal lobe abnormalities" and "substantial deficits in mental cognition and reasoning" as a result of "several serious head injuries he suffered as a child, as well as drug and alcohol abuse." *Id.* at 949. Also, the defendant's brother was a convicted drug

dealer and user, and introduced the defendant to a life of crime. *Id.* at 950. Finally, his counsel could have argued that the defendant's "grandiose self-conception and evidence of his magical thinking" were features of a "profound personality disorder"; this "might not have made [defendant] any more likable to the jury, but it might well have helped the jury understand [him], and his horrendous acts–especially in light of his purportedly stable upbringing." *Id.* at 951. None of this evidence was discovered by counsel, who conducted an objectively unreasonable investigation of "one day or less, talking to witnesses selected by [the defendant's] mother." *Id.* at 952.

As to prejudice, the Court in *Sears* noted that "counsel's effort to present *some* mitigation evidence [does not] foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant." *Id.* at 955. A proper analysis of prejudice requires the Court to take into account the newly uncovered evidence, along with the evidence presented at trial, to assess whether there is a reasonable probability that the defendant would have received a different sentence after a constitutionally sufficient mitigation investigation. *Id.* at 956.

The investigation by Gabrion's defense counsel was far more than a day's worth of effort, judging from the hours billed by the mitigation investigator, and it consisted of more than a few interviews of family members. Furthermore, Gabrion's counsel presented evidence of many of the same factors that the defense counsel in *Sears* failed to present: physical abuse by family, parental neglect, criminal conduct by siblings, disordered thinking, head injuries accompanied by a change in personality, drug and alcohol abuse, apparent brain abnormalities, and evidence of a personality disorder.

In *Kimmelson v. Morrison*, 477 U.S. 365 (1986), the defendant's attorney conducted no pretrial discovery of his own; as a result, he was unaware of the State's intent to

present evidence obtained through a search and seizure, and did not file a timely motion to suppress that evidence. *Id.* at 385. In contrast, Gabrion's attorneys conducted an extensive pre-trial investigation, and did not fail to object to significant evidence that could have been excluded.

In short, unlike the attorneys in *Wiggins*, *Rompilla*, *Porter*, *Sears*, and *Kimmelman*, Gabrion's defense attorneys conducted an extensive investigation into his background and presented the information from that investigation to mental health experts and to the jury. Gabrion's post-conviction attorneys have now uncovered some additional facts, but that discovery does not, by itself, establish ineffective assistance of counsel. Defense counsel was not required to "uncover every available piece of mitigating information" about Gabrion. *Jackson v. United States*, No. 104cv251, 2010 WL 2775402, at *7 (W.D.N.C. July 13, 2010); *see also Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir. 2003) (recognizing that the Court' role on collateral review is "not to nitpick gratuitously counsel's performance"; it is to determine "'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.'") (quoting *Strickland*, 466 U.S. at 686).

Gabrion measures the conduct of his attorneys against the American Bar Association (ABA) guidelines published in 2003, which provide that counsel in a death penalty case must "'locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.'" (Am. § 2255 Mot. 84 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Commentary to Guidelines 10.7, in 31 Hofstra L. Rev. 913, 1024 (Feb. 2003).) These guidelines also state that "[a] multi-generational investigation extending as far as possible vertically and horizontally frequently discloses

significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impediment." 2003 ABA Guidelines, 31 Hofstra L. Rev. at 1025.

Gabrion faults counsel for not following these guidelines to the letter by preparing a multi-generational social history; however, the ABA Guidelines are "only guides" to determining what is objectively reasonable under the Sixth Amendment. *Strickland*, 466 U.S. at 688. They are not "inexorable commands with which all capital defense counsel must fully comply." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (internal quotation marks omitted). Furthermore, they "can be useful as 'guides' . . . only to the extent they describe the professional norms prevailing *when the representation took place*." *Id.* at 7.

The 1989 ABA guidelines available at the time of Gabrion's trial were far less detailed than the 2003 guidelines. Before 2003, the guidelines stated that counsel should attempt to discover all "reasonably available mitigating evidence," and "should consider" interviewing "witnesses familiar with aspects of the client's life history that might affect . . . possible mitigating reasons for the offenses, and/or other mitigating evidence[.]" Guideline 11.4.1, ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989), available at http://www.ambar.org/1989Guidelines. Gabrion's counsel satisfied this guideline by interviewing witnesses familiar with Gabrion's life history and presenting evidence about his history to the jury.

The 1989 guidelines also recommended collecting the following information: medical records; educational history; military history; employment and training history; family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience; and religious and cultural influences. *Id.* at Guideline 11.4.1(2)(C).

Counsel satisfied this guideline by collecting and presenting information on all of these categories of information, to the extent they were relevant.

The 2003 guidelines "explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003). Gabrion contends that the 2003 guidelines reflect the prevailing norms at the time of his trial, but even if that is the case, they "do not depart in principle or concept from *Strickland*, *Wiggins*, or . . . previous cases concerning counsel's obligation to investigate mitigating circumstances." *Id.* (footnote omitted). Counsel's investigation and trial presentation covered all the major categories of mitigating evidence identified by the guidelines. The Social History provides some additional details, but it offers nothing that is significantly different from the type of evidence presented at trial.

And to the extent that the Social History provides any new information at all, it is not particularly persuasive evidence of unreasonable conduct by trial counsel. Few of the facts in the Social History are supported by evidence before the Court. The Social History recites a long narrative about Gabrion and his family members with mostly oblique references to the documentation or witnesses supporting it. It contains no sworn statements or corroborating evidence, and no identifiable means of verifying the assertions it makes.

One consequence of these omissions is that there is no indication that any of the sources for the Social History, be they documents or witnesses, would have been discoverable by Gabrion's pre-trial investigators or available for presentation at trial. The investigators who compiled the Social History merely assert that there are witnesses and documents supporting each fact in the Social History, and that the aforementioned documents "existed" at the time of trial. (ECF Nos. 103-2, 103-3.) But according to the abridged social history prepared by Crates (ECF

No. 100-5, PageID.4713), and motions submitted by Gabrion's trial counsel (R. 69: Ex Parte Mem.), both Gabrion and his family were reluctant to cooperate in an investigation. Those attitudes may have changed since Gabrion's conviction, but Gabrion's trial counsel should be judged by the circumstances they faced at the time of their investigation. They cannot be faulted for failing to find and present every relevant fact, document, or witness *in existence*.

In short, the Supreme Court's statements in *Bobby* aptly describe the performance of Gabrion's counsel:

> Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more. . . . But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van Hook's counsel to cover several broad categories of mitigating evidence, . . . which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. **This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face**, *cf. Wiggins*, 539 U.S., at 525, **or would have been apparent from documents any reasonable attorney would have obtained**, *cf. Rompilla v. Beard*, 545 U.S. 374, 389-393 (2005). It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby*, 558 U.S. at 11-12 (emphasis added; citations omitted); *see also Caudill v. Conover*, 881 F.3d 454, 462 (6th Cir. 2018) ("[Caudill's] lawyer had no constitutional obligation to identify and interview distant relatives, former childhood neighbors, past boyfriends, and acquaintances who would provide similar information. It was reasonable for her lawyer to assume that those closest to Caudill—her immediate family—would have the most detailed information about her life, and would provide the most compelling testimony as a result.").

In addition, Gabrion cannot demonstrate prejudice. To establish prejudice in this context, he must "point to evidence that 'differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.'" *Caudill*, 881 F.3d at 464 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)). He has not done so. The evidence in the Social History is not substantially different from the evidence presented at trial. And in light of the overwhelming evidence of aggravating factors, the Court cannot conclude that the additional evidence about Gabrion's past or his family could have changed the outcome of his proceedings. *Cf. Johnson v. Bell*, 344 F.3d 567, 574 (6th Cir. 2003) (finding no prejudice in failure to present testimony by defendant's family members, even though it would have humanized him by showing he had been a good son, brother and parent, because the evidence fell short of the quantum of evidence needed to establish a reasonable likelihood of a different verdict); *Allen v. Woodford*, 395 F.3d 979, 1005 (9th Cir. 2005) (finding no prejudice where counsel did not introduce mitigation evidence showing that the defendant could be pleasant because that evidence would not have outweighed the aggravating circumstances); *Williams v. Cain*, 125 F.3d 269, 279 (5th Cir. 1997) (finding no prejudice where counsel did not present evidence of the defendant's troubled family history, including verbal and physical abuse, because it was unlikely to have a mitigating effect against the aggravating evidence, which included the brutality of the murder, the defendant's prior criminal history, and the fact he hid evidence and lied to police).

### C. Failure to obtain records supporting mitigation

In a variation on the claims discussed in the previous sections, Gabrion asserts that counsel should have obtained records of mental illness and substance abuse in Gabrion's extended family. This claim is without merit for the reasons already discussed.

Gabrion also asserts that his attorneys should have obtained records to support their argument that Gabrion suffered head injuries that resulted in brain injury. At trial, the prosecutor

argued that there was "no proof of any [vehicle] accidents in terms of hospital records or police reports. All we have is stories from the defendant, stories which include a statement to one family member that he was in an accident and his helmet got shredded. Statements to another family member, practically in the same breath, I wasn't wearing a helmet." (S. Tr. V, 648.)

The prosecutor's critique still holds true. If there are hospital records or contemporaneous reports showing brain injury, Gabrion has not identified them or provided them to the court, let alone established that trial counsel could have discovered them. Thus, Gabrion's claim is unsupported.

### D. Failure to select proper experts and to prepare them for trial

#### 1. Dr. Jackson

Gabrion's trial counsel argued that his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law was impaired, which only two jurors found by a preponderance of the evidence. Gabrion contends that his trial counsel attempted to show that he was mentally ill, and that it was unreasonable to pursue this strategy by presenting Dr. Jackson as an expert witness. The Court disagrees.

Jackson prepared several reports before trial. In his first report, Dr. Jackson opined that Gabrion's "clinical presentation in part reflects malingering, and in part reflects symptoms of mental illness." (7/26/2001 Jackson Report, ECF No. 2-41, PageID.801.) In his second report, Dr. Jackson indicated that Gabrion "exhibited behaviors which can appear to be genuine symptoms of a disorder of both thought and mood. Yet, it is possible that his manifestations of impaired judgment and lack of insight may be deliberately malingered[.]" (12/11/2001 Jackson Report, ECF No. 2-41, PageID.805.) He repeated the same observation in a third report, but indicated that it was not possible to form specific conclusions about Gabrion's mental health due to Gabrion's lack of cooperation. (2/21/2002 Jackson Report, ECF No. 2-41, PageID.814.) Jackson made

similar observations at trial, but on cross-examination, he also stated that he did not believe that Gabrion was mentally ill. (Jackson S. Tr. 29, 39.)

Gabrion argues that his counsel should not have presented Dr. Jackson as a witness because he was not prepared to testify that Gabrion was mentally ill. However, counsel likely relied upon Jackson's reports, which indicated that Gabrion could be suffering from a mental illness or mood disorder. Apparently, Jackson never opined that Gabrion is *not* mentally ill until trial. According to Gabrion, Jackson's statement was a "surprise" to trial counsel. (Ex Parte Mot., ECF No. 155, PageID.5783.) An attorney is not ineffective for failing to anticipate a shift in one aspect of a witness' testimony at trial. An attorney cannot reasonably be expected to predict everything that a witness will say on the witness stand.

Moreover, even if Jackson could not state that Gabrion was mentally ill, the rest of his testimony was helpful. He testified about Gabrion's substance abuse, possible head injuries, and inadequate upbringing, and opined that they may have reduced Gabrion's capacity "to respond appropriately and in a socialized way." (Jackson S. Tr. 24, 26.) He also testified that Gabrion had "genuine deficits" and "serious underlying psychological problems," including "disordered thinking" and "personality disorders." (*Id.* at 25, 27-28.) This testimony was extremely important for several of the mitigating factors. Thus, it was entirely reasonable for counsel to present Jackson as a witness.

### 2. Dr. Cunningham

Gabrion faults his trial counsel for failing to have Dr. Cunningham prepare an individual threat assessment about Gabrion, or testify specifically about Gabrion, rather than focusing exclusively on the conditions of confinement in the BOP. (Am. § 2255 Mot. 96.) This was likely a strategic decision. Before the penalty phase of the trial, the Government asked the Court to allow Gabrion to be examined by a psychologist for dangerousness in prison, to rebut

anticipated testimony by Dr. Cunningham that Gabrion would not be a danger in the prison setting. (R. 465: Gov't's Mot. for Two Add'l Mental Health Exams. of Def.) Gabrion's counsel objected to this request, and the Court upheld that objection, because Gabrion's counsel asserted that Dr. Cunningham would not testify that Gabrion did not pose a danger in a prison setting; he would testify that the BOP has the means to control him. (R. 469: 3/5/2002 Op. 2.) Considering the quantity of evidence of Gabrion's dangerous conduct while incarcerated, it is likely that any testimony focused on Gabrion himself would have been damaging. If counsel anticipated that an individualized assessment by Dr. Cunningham or the Government's expert would be damaging, it was reasonable for counsel not to pursue such testimony.

Furthermore, Gabrion has not demonstrated prejudice because he does not indicate what an individualized assessment would have shown, or what helpful, individualized testimony Cunningham or any other expert could have provided.

Gabrion also claims that his trial counsel should have investigated and presented "evidence available to show that [Gabrion] would not be a danger in the BOP[.]" (Am. § 2255 Mot. 96.) Here, Gabrion incorporates his arguments about Dr. Cunningham's testimony in Ground One, in which Gabrion asserts that it was improper for the Government to object to testimony about BOP regulations for controlling dangerous prisoners. This claim fares no better when repackaged as an ineffective-assistance claim. Gabrion's counsel attempted to introduce the BOP regulations, but was stymied by objections from the Government and the Court's rulings on them. Counsel was not ineffective for attempting, but failing, to present evidence because the Court decided that it was not admissible.

### 3. Other topics

Gabrion also contends that his counsel should have presented expert testimony regarding the following: childhood trauma; genetic predispositions to alcohol abuse; the impact

of hepatitis C; the effects of Gabrion's childhood fever; the developmental impact of sexual abuse; and the impossibility that Gabrion could malinger symptoms of mental illness for a long period of time.

Regarding childhood trauma and alcohol abuse, Gabrion fails to indicate how any expert would have testified that is significantly different from what was presented. Dr. Jackson testified about the potential impact of Gabrion's upbringing on his mental health and well-being, including the fact that both of his parents were alcoholics. Dr. Jackson was also aware of Gabrion's childhood fever and mentioned it at trial. Additional testimony would have been cumulative.

Regarding the impact of hepatitis C, Gabrion does not indicate what an expert would have shown.

As to sexual abuse, there is no clear evidence that Gabrion was sexually abused as a child. The Social History mentions an unidentified relative who remembers that a "family friend" once caught a neighbor in bed with "one of the Gabrion boys" (either Gabrion or his brother Mike), after one of the boys raced home to report that the neighbor, an older man, was "getting frisky" with his brother. (Social History, PageID.4738.) According to the relative, the family friend believed that the boy who raced home was "aware that his brother was being molested and was probably also physically molested." (*Id.*) Gabrion does not even attempt to show that this third-hand report would have been given any weight by an expert on child sexual abuse. Indeed, it is not clear that any sexual abuse actually occurred, let alone that Gabrion was the victim of it.

Finally, Gabrion's trial counsel did submit evidence about the longstanding nature of Gabrion's symptoms: Dr. Scharre testified that it would not be possible for Gabrion to feign his symptoms for such a long period of time. The jury was not convinced, but that does not mean that counsel was ineffective.

### 4. Objections

Gabrion contends that counsel failed to make "proper objections" to Dr. Saathoff's testimony concerning Gabrion's statements about women and frogs. (Am. § 2255 Mot. 104.) According to Dr. Saathoff, Gabrion expressed anger toward women. (3/15/2002 S. Tr. 34.) His prison records indicated that he spat at a female officer and referred to her as a "motherfucking black nigger racist bitch." (*Id.* at 37.) In addition, Dr. Saathoff saw Gabrion point to a woman and refer to her as a "blond bitch." (*Id.* at 40.)

The prosecutor asked Dr. Saathoff if Gabrion had an opinion about whether women should be allowed to teach in school, but Gabrion's counsel objected and the prosecutor did not follow up. (*Id.* at 41.)

The prosecutor also asked Dr. Saathoff whether Gabrion expressed any views on women in general. According to Saathoff, Gabrion stated that "Women all belong to the American Witch Society. Women are immoral, dishonest, deceiving and greedy." (*Id.*) The prosecutor subsequently asked whether Gabrion spoke about any of the women who testified at trial. Dr. Saathoff replied that Gabrion had told him that "people say they that they are afraid of him, but women just say that they are afraid, and he emphasized the word 'say.'" (*Id.* at 42.) Saathoff also quoted Gabrion as saying, "There are four females on the case that have said they didn't . . . come forward because they were afraid." (*Id.* at 42-43.) Gabrion's counsel objected in the middle of Dr. Saathoff's statement because it was outside the scope of rebuttal testimony. The Court overruled the objection because "mental health issues are in evidence." (*Id.* at 43.) Dr. Saathoff subsequently recounted that Gabrion referred to some of the female witnesses as "nasty assed bitches," and to his own mother as a "bitch." (*Id.* at 44-45.) In contrast, he described Rachel as a "sensitive, intelligent, decent girl." (*Id.* at 45.)

Regarding frogs, Gabrion told Dr. Saathoff a story from his childhood:

> [W]hen he was a child growing up, he recalled quite vividly an incident that occurred in fifth grade when a woman, an older woman teacher came into the classroom and she brought some bullfrogs, and she held a bullfrog up in front of the class and she took a long needle and she, his word, tortured, she tortured the bullfrog by paralyzing its brain with a needle. And he states at that point a boy behind him stood up with a gun and shouted, "Die, bitch," and . . . he leaned forward and he laughed and he loudly repeated that.

(3/15/2002 S. Tr. 38.) The prosecutor asked Saathoff if Gabrion made any other reference to frogs, and Saathoff recounted the following:

> [W]e were speaking about his job, his job history, and he spoke about being a lineman and that on his first day of the job he witnessed a man, a fellow lineman, have his legs cut off by some type of falling metal object. He said that both of the legs were cut off, and then he said, and I'm quoting again: "His legs bled like a frog's and blood started squirting fifteen feet."

(*Id.* at 39.)

The prosecutor then asked Dr. Saathoff if he had heard "the testimony concerning a bullfrog," i.e., the police officer's testimony that there was a bullfrog on Gabrion's mattress, covered in what appeared to be bodily fluid. (*Id.*) After Saathoff responded that he had heard this testimony, the prosecutor asked if Saathoff "[found] that professionally interesting[.]" (*Id.* at 40.) Before Saathoff could complete his answer, Gabrion's attorney objected. The prosecutor did not follow up on the issue.

Contrary to Gabrion's assertion, his counsel did object to parts of Dr. Saathoff's testimony, sometimes successfully and sometimes not. Counsel is not constitutionally obligated to raise objections at every possible opportunity.

Gabrion asserts that Saathoff's testimony regarding Gabrion's views about women was not relevant to Gabrion's mental health, but this Court decided otherwise, and the Court of Appeals agreed with that decision. *See Gabrion II*, 648 F.3d at 341 ("[T]he mitigation evidence . . . downplayed Gabrion's future dangerousness, especially toward women. . . . Dr. Saathoff's

testimony as a whole was a fair rebuttal of Gabrion's mitigation evidence and did not unfairly prejudice Gabrion."); *Gabrion III*, 719 F.3d at 535 ("[O]ne of Gabrion's experts[ ]testified at length about 'Gabrion's psychological makeup[,]' an open-ended subject of which Gabrion's misogyny was certainly a part."). Thus, further objections by Gabrion's counsel on relevance grounds would have been futile. Counsel does not act unreasonably when failing to raise a futile objection.

Moreover, any failure to object did not prejudice Gabrion because Dr. Saathoff's testimony concerning Gabrion's statements about women and frogs was absolutely trivial in relation to the other evidence of aggravating factors. Gabrion's actions speak far louder than his words.

### E. Admitting that Gabrion killed Rachel to obstruct justice

In his opening statement at the sentencing phase of the trial, Gabrion's trial attorney acknowledged that Gabrion "intentionally killed [Rachel] . . . to obstruct justice, to prevent [Rachel] from prosecuting [Gabrion] for the crime of rape." (S. Tr. I at 42, 44.) Gabrion contends that it was unreasonable for counsel to admit obstruction of justice, which was one of the non-statutory aggravating factors. Relying on the evidence discussed in Ground One that Chrystal Roach's testimony was false, Gabrion contends that counsel should have gathered more facts to rebut the theory that he obstructed justice. However, Gabrion has not demonstrated that any material aspect Roach's testimony was false; if anything, Gabrion's evidence indicates that he did manipulate the state-court proceedings in order to delay a hearing in which Rachel would testify.

Moreover, it is abundantly clear that Gabrion killed Rachel to avoid prosecution for the rape charge. Thus, it was not unreasonable for counsel to concede this issue as part of a strategic decision to focus on more promising avenues, like the mitigating factors. (*See* S. Tr. I at 46-47 ("[T]his is not a case where we're going to be . . . demonstrating that Mr. Gabrion is a good

person. . . .   The picture of Mr. Gabrion's life is not pretty.  You have heard much of it already.  You have seen him here. . . . [W]e're going to try to prove to you how he got that way.").)  That is especially true in this case, where the evidence in support of the aggravating factors was "overwhelming."  *See Gabrion III*, 719 F.3d at 525.

### F.  Failure to secure adequate funding

Gabrion asserts that counsel failed to secure adequate funding to conduct investigative work or to present expert witnesses for the penalty phase.  Like the similar claim in Ground Three, this claim is conclusory and unsupported.  The Court authorized a budget of $730,168.52 for the defense.  (5/23/2002 Am. Budget Cert., ECF No. 44-1.)  That amount is significantly higher than the average cost for federal capital cases that proceeded to trial from 1998 to 2004.  *See* John B. Gould & Lisa Greenman, *Report to the Committee on Defender Services, Judicial Conference of the United States, Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at 27 (Sept. 2010), available at http://www.uscourts.gov/file/fdpc2010pdf (reporting a mean of $620,932).

### G.  Failure to object to irrelevant, unreliable, and prejudicial evidence at trial, and to properly identify this evidence on appeal

Gabrion claims that counsel should have objected to evidence presented by the Government during the sentencing phase on grounds that it was irrelevant, unreliable, and prejudicial.  Specifically, Gabrion refers to evidence tending to show that: he killed four individuals in addition to Rachel; he set fire to the houses of two neighbors; he attacked a neighbor by pulling him off his lawnmower; he sexually assaulted another neighbor by grabbing her crotch and breast; he attempted to get in bed with his sister-in-law's niece and later threatened to kill her; he tapped into a phone line and stalked a young woman while staying at Leon's house; he threatened to kill or harm the wives of two fellow inmates; he threatened to kill a neighbor and

fired shots at the neighbor's house; he asked a person to beat someone else up; he offered Overton advice on how to cover his tracks; he choked Lilly and threw his dog against the wall; police officers found a bullfrog and doll on his mattress covered in bodily fluid; Lunsford saw Gabrion masturbating to a picture of Rachel's daughter; and Rachel would have struggled before her death and would have felt helpless and desperate in the boat before her drowning.

Defense counsel did not object to the foregoing evidence while it was being presented; before trial, however, counsel filed a motion to limit evidence of dangerousness to evidence that Gabrion would be a danger within prison, arguing that evidence of dangerousness outside the prison context would not be relevant and would be more prejudicial than probative. (R. 263: Def.'s Mot. in Limine.) Counsel did not identify any specific evidence, because at that time, the Government had not yet disclosed the evidence it intended to introduce in support of the aggravating factors. (*Id.*)

The Government subsequently provided a list of its evidence, and defense counsel argued its motion at a hearing before the Court. (R. 385: 1/11/2002 Mot. Hr'g Tr. 84, 88-89.) The Court denied the motion, noting that evidence of Gabrion's "history of past violence is undoubtedly relevant to the issue of future dangerousness, within or outside the prison setting." (R. 395: 1/25/2002 Op. 9.) The Court declined to "set forth a *per se* rule prohibiting evidence of future dangerousness outside the prison setting." (*Id.* at 8.) When Gabrion raised the issue on appeal, the Court of Appeals declined to craft a rule in his favor because "Gabrion does not indicate which of the unadjudicated acts alleged would be relevant only outside the prison context, and it is unclear to us which acts would fall outside of this limitation, were we to impose it." *Gabrion II*, 648 F.3d at 349.

Gabrion also argued that evidence of unadjudicated acts should not be admissible during the penalty phase of a capital proceeding because it is not reliable and is not admissible under the Federal Rules of Evidence. The Court of Appeals rejected this claim:

> The [Federal Death Penalty] Act provides in relevant part that during the penalty phase of a death penalty trial, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). . . . Gabrion asks us to . . . hold that those aggravating facts must, as a constitutional matter, be proven to the jury using evidence admissible under the Rules. He is apparently raising this constitutional argument for the first time on appeal, and so our review is for plain error. Fed. R. Crim. P. 52(b); *United States v. Murphy*, 241 F.3d 447, 450-51 (6th Cir. 2001).

> * * *

> In the Federal Death Penalty Act, Congress enacted an evidentiary standard governing the penalty phase of capital prosecutions that provided that the Rules do not apply, and left only one limitation on the admission of "information" (notably, the relevant provision does not even speak of "evidence"): that information "may" be excluded if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). . . . Gabrion argues that, since [*Ring v. Arizona*, 536 U.S. 584 (2002)] required proof of aggravating factors to be made to a jury and not to a judge, that proof should be reliable, and reliability would best be guaranteed by Rules [of Evidence], which govern other matters proven before juries in federal court.

> Concerns about reliability are obviously at their apogee when the determination is literally one of life and death, as is the case in capital sentencing proceedings. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (stating that "[the] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"). The problem with Gabrion's argument is his contention that, in the capital sentencing context, the Rules are the only means of assuring reliability, so much so that their application is constitutionally required. On the contrary, the unique context of the penalty phase—the ultimate object of which is not the determination of the objective fact of the defendant's guilt or innocence but the much more abstract, irreducibly moral determination of whether an individual, already adjudicated guilty, deserves mercy or death—presents distinct reliability concerns that could be plausibly thought to merit a different, much broader set of limitations on what information may be considered. The Supreme Court has long recognized this to be the case. *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 204 (1976) ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *Williams*

*v. New York*, 337 U.S. 241, 246 (1949) (noting the "sound practical reasons" for having "different evidentiary rules govern[ ] trial and sentencing procedures"). What may distract a jury in the guilt phase from its narrow determination of guilt or innocence—a defendant's good or bad character, as demonstrated through prior acts, for example—may be vital to its determination of whether the particular guilty defendant before it deserves society's ultimate punishment. Accordingly, Congress's decision to relax the evidentiary standard for this specific purpose is no constitutional defect.

* * *

[T]he penalty phase presents a different context for addressing reliability than the guilt phase, which requires the jury to make a determination of considerably narrower scope. The [Federal Death Penalty] Act's loose evidentiary standard and its broad definition of aggravating factors (balanced with . . . a correspondingly broad definition of mitigating factors) represent a preference by Congress for maximizing the information about a capital defendant available to the jury during the penalty phase, a policy decision that is consistent with Supreme Court precedent in this area, as demonstrated by cases already cited above rejecting Gabrion's argument about the Rules of Evidence. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 204 (1976); *Williams v. New York*, 337 U.S. 241, 246 (1949).

We are hesitant, especially under the limited review under the circumstances of this case, to craft a constitutional rule limiting the introduction of other acts information to acts for which the defendant has been adjudicated criminally guilty. We join every other circuit that has decided the issue in holding that there is no such constitutional barrier. *See United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010) (allowing introduction of unadjudicated homicides during penalty phase); *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009) (unadjudicated sexual misconduct); *United States v. Corley*, 519 F.3d 716, 723-25 (7th Cir. 2008) (unadjudicated homicide); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001) (unadjudicated assaults, burglary, and arson).

Accordingly, the District Court did not plainly err in admitting information concerning unadjudicated acts committed by Gabrion.

*Gabrion II*, 648 F.3d at 348-49.

## 1. Relevance

Gabrion now argues that the evidence mentioned at the beginning of this section was not relevant to any aggravating factors; its effect was simply to show that Gabrion had a bad character. He contends that evidence of dangerousness is relevant only to the extent that it would

apply in the prison context, and that counsel should have objected to this evidence because it was not relevant.

Counsel's conduct was not unreasonable. As discussed above, counsel did attempt to exclude much of this evidence, but was not successful. Furthermore, counsel's strategy during the penalty phase was to focus the jury's attention on the mitigating evidence from Gabrion's background rather than attempt to persuade the jury that Gabrion was a good person. (*See* S. Tr. I, 46-47 ("[T]his is not a case where we're going to be . . . demonstrating that Mr. Gabrion is a good person. . . . You have heard much of it already. You have seen him here. . . . [W]e're going to try to prove to you how he got that way.").) That was a reasonable strategy.

Gabrion has not demonstrated a reasonable probability that the outcome would have been different if counsel had objected on relevance grounds. Gabrion's past conduct was relevant to his dangerousness, even while serving a life sentence. The Court of Appeals suggested the same on appeal, noting that it was unclear which acts would be relevant only outside the prison setting. *Gabrion II*, 648 F.3d at 349. It is unclear to this Court as well, because virtually all the evidence of Gabrion's propensity for violence and dangerous behavior indicates that he poses a risk of harm to others, even in prison.

For instance, evidence indicating that Gabrion attacked or killed other individuals and committed arson suggests that he is willing to harm others, out of malice or when it suits his purposes; this trait does not cease to pose a threat simply because Gabrion is confined in prison. And though one might think that arson is not possible in prison, that is apparently not the case. Gabrion was able start a fire in and outside his cell at the Milan federal correctional institution. (S. Tr. II, 311.) Thus, evidence that he had engaged in similar conduct outside of prison was clearly relevant to whether he might do more of the same while serving a life sentence.

The same can be said for all the other evidence of Gabrion's violent and threatening behavior toward other individuals. It was relevant to show violent tendencies that would likely continue after the jury's verdict, and that could pose a risk to others, either within the prison setting or outside the prison setting in the unlikely event that Gabrion escaped from confinement. *See Kelly v. South Carolina*, 534 U.S. 246, 253 (2002) ("A jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee."). Accordingly, any objection to evidence of violent, harmful, or threatening behavior on relevance grounds would have been futile.

The relevance of some of the evidence identified by Gabrion is less obvious, including testimony that: he tapped into a telephone line; he stalked a girl at a laundromat; and he was seen masturbating to a picture of Rachel's daughter. But that does not mean that it was irrelevant or that its probative value was outweighed by the risk of unfair prejudice. For instance, the fact that Gabrion tapped into a phone line indicates that he is sophisticated and clever, contrary to his attorneys' attempt to paint him as mentally impaired, and is relevant to his dangerousness as a prison inmate. His conduct with the picture of Rachel's daughter confirms that he is able to manipulate others while he is in custody, including the victim's own father, to serve his own needs. That is also relevant to his dangerousness in prison. This evidence was certainly prejudicial, but not unfairly so.

Gabrion's relevance argument is strongest with respect to the evidence regarding the bullfrog and the doll that officers found in his residence. However, this evidence, as well as all the other evidence mentioned in the previous paragraph, was truly insignificant in comparison

to the other evidence supporting the aggravating factors. Thus, Gabrion has not demonstrated that he was prejudiced by his attorneys' failure to object on relevance grounds.

### 2. Reliability

Gabrion also contends that his attorneys should have objected to the foregoing evidence because it was unreliable. Gabrion contends that the bad acts described by witnesses during the penalty phase were based on speculation, hearsay, and unadjudicated crimes. For instance, he was never charged or convicted of killing individuals other than Rachel, or of setting fire to other people's homes, yet the Government argued that he did all of these things.

As noted by the Court of Appeals, neither the FDPA nor the Constitution require a court to use the Federal Rules of Evidence to exclude evidence from the penalty phase of a capital proceeding. Gabrion offers no alternative test for reliability that counsel should have used as the basis for an objection at trial.

Gabrion relies on *Gardner v. Florida*, 430 U.S. 349 (1977), but that case is inapposite. In *Gardner*, the Supreme Court held that it is a violation of due process for a judge to impose a death sentence on the basis of confidential information which the defendant "had no opportunity to deny or explain." *Id.* at 362. Because "debate between adversaries is often essential to the truth-seeking function of trials," defense counsel must have "an opportunity to comment on facts which may influence the sentencing decision in capital cases." *Id.* at 360. *Gardner* does not apply because Gabrion and his counsel had an opportunity to comment on the evidence presented.

Gabrion also cites cases mentioned in *Gabrion II*, including *Lockett* and *Gregg*, but those cases support the Court of Appeals' contention that "the unique context of the penalty phase . . . presents distinct reliability concerns that could be plausibly thought to merit a different, much broader set of limitations on what information may be considered." *Gabrion II*, 648 F.3d at 346. In *Gregg*, for instance, the Supreme Court thought it "desirable for the jury to have *as much*

*information before it as possible* when it makes the sentencing decision." *Gregg*, 428 U.S. at 204 (emphasis added). Similarly, in another case cited by Gabrion, the Supreme Court held that "a process inflicting the penalty of death . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense[.]" *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

In *Lockett*, the Supreme Court extended the holding in *Woodson* to mitigating evidence, concluding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (footnote omitted).

In other words, "reliability" in the death penalty context means that the sentencer should consider a broad array of information about the defendant when making the sentencing determination. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."). None of the foregoing cases hold that every piece of evidence must satisfy a particular test for reliability before it can be considered by the jury. *See Sears v. Upton*, 561 U.S. 945, 950 (2010) ("[T]he fact that some . . . evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes."). Indeed, the Fourth Circuit has indicated that reliability is ultimately an issue for the jury to decide. *See United States v. Runyon*, 707 F.3d 475, 506 (4th Cir. 2013) ("[I]t is the jury, not the judge, that determines whether the evidence offered by the prosecution is sufficiently reliable to support an aggravating factor."). Gabrion does not identify any authority that would have supported an objection to the

foregoing evidence on the basis of reliability concerns. Thus, he has not demonstrated unreasonable conduct or prejudice by failing to make such an objection.

### 3. Expert testimony

Gabrion also contends that it was improper for Dr. Cohle to make a number of assertions at the penalty phase regarding Rachel's possible emotional state leading up to the murder. Cohle testified that a person in Rachel's circumstances would have struggled and felt increasing anxiety as she was being bound with locks and chains, if she was anticipating her death. (S. Tr. I, 61-62.) Cohle also believed that Rachel could have had an idea of where she was before entering the water, because of "the rocking motion of the boat." (*Id.* at 62.) In addition, he believed she would have had a feeling of "helplessness and desperation" while in the boat, and after entering the water, she would have felt "extreme panic and anxiety" and would have "come to the realization that [her] situation was utterly hopeless[.]" (*Id.* at 63.)

Gabrion claims that the foregoing statements were not medical opinions, and were not supported by forensic evidence; thus, Gabrion's counsel should have objected to them. However, counsel took a different approach, which was to discredit Dr. Cohle's opinion of Rachel's mental state by forcing him to admit that he found no wounds or marks indicating that Rachel struggled, no sign of "epinephrine" indicating that she was anxious when she died, and no evidence that she was conscious when she was taken out onto the lake and drowned. (*Id.* at 65-68.) That approach was perfectly reasonable.

As to prejudice, it is hard to believe that any of Dr. Cohle's statements about Rachel's mental state had a significant impact on the jury, which was perfectly capable of drawing upon its own experience and common sense to infer that being bound, gagged, and then thrown into a lake would induce feelings of anxiety, panic, and hopelessness.

Gabrion does not mention Cohle's testimony about the *physical* experience of drowning, which is far more unsettling than his opinions about Rachel's likely *emotional* state. According to Dr. Cohle, a person submerged in water will hold their breath for "up to a minute or so," and then, in a "desperate attempt to breathe," the individual will involuntarily inhale water and "whatever else might be in the medium in which the person is submerged." (S. Tr. I, 59.) At that point, the person begins choking and gagging, and may start to vomit. (*Id.*) There are "continued inspirations" for a time, during which some of the vomited material may be inhaled into the lungs. (*Id.*) This happens *repeatedly* over a period of "roughly" a minute, until the individual loses consciousness. (*Id.* at 59-60.) The foregoing testimony paints an indelible picture of the suffering that Rachel likely experienced, and it makes Cohle's depiction of her emotional state seem benign in comparison. Thus, the failure to object to Cohle's opinions about Rachel's emotional experience could not have impacted the outcome of the trial.

### 4. Notice

In passing, Gabrion mentions that the evidence that he killed Allen, Davis, and Weeks was "not included in any government notice." (Am. § 2255 Mot. 108-09.) He does not develop this assertion or use it to support his ineffective-assistance claim, however, which is probably why the Government did not expressly address the issue in its response. Before trial, the Government sent Gabrion's counsel a letter indicating that it intended to introduce evidence regarding the disappearances of Allen, Davis, and Weeks. (ECF No. 42-1.) Gabrion offers no analysis or authority indicating that this notice was insufficient. Nor does he contend that counsel was ineffective for failing to object to any evidence due to inadequate notice. Thus, the Court discerns no basis for finding that counsel was ineffective for any conduct or omission related to "non-noticed" evidence. (*See* Am. § 2255 Mot. 115.)

### H. Failure to Suppress Evidence

Gabrion asserts that his trial counsel should have moved to suppress evidence of the frog and doll in Gabrion's bedroom on grounds that the police obtained this evidence in violation of the Fourth Amendment. This claim fails for lack of prejudice, because this evidence could not have had a material impact on the outcome of Gabrion's sentencing proceedings.

### I. Failure to present evidence of the BOP's ability to control problem inmates

Again, Gabrion challenges perceived deficiencies in Dr. Cunningham's testimony regarding the measures available to the BOP to control dangerous inmates. Although Cunningham testified about "different security levels for inmates, as well as the monitoring of inmate communications, confinement, and visitation for those inmates considered dangerous," *Gabrion II*, 648 F.3d at 353, Gabrion claims that counsel should have done more to show "precisely" how Gabrion could be handled through "the use of disciplinary procedures and communication limitations within the BOP." (Am. § 2255 Mot. 119-20.) Cunningham covered both of these subject areas, but Gabrion apparently believes that his testimony was not quite detailed enough. This is not sufficient to show objectively unreasonable performance by counsel or prejudice.

Gabrion compares this case to *United States v. Johnson*, No. 02 C 6998, 2010 U.S. Dist. LEXIS 133727 (N.D. Ill. Dec. 13, 2010), in which the Government's expert left the jury with "the mistaken impression that neither the BOP nor the Court had the authority to impose certain restrictions on an inmate immediately upon sentencing." *Id.* at *7. The expert in that case testified that prisoners like the defendant are generally placed in the general population, rather than a more restrictive setting, and that the BOP cannot assign prisoners to more restrictive conditions solely based on their offenses in the community. *Id.* at *4. The expert did not mention that the BOP can employ "Special Administrative Measures" (SAMs) to control conditions of confinement, and that

the sentencing court can order certain restrictions immediately upon sentencing as part of its sentence. *Id.* at \*5.

In *Johnson*, the Government capitalized on the deficiencies in the expert's testimony in its closing argument, asserting that as long as the defendant, a gang leader, "has the ability to convey his orders to his followers, either on the street or in prison with him, nobody is safe; no witness, no witness's family, anybody who stands in his way, they are not safe. It doesn't matter where he is locked up." *Id.* at \*9. The Government also reiterated "incomplete and misleading testimony" from its expert that federal regulations would not allow the defendant to be sent to the restrictive control unit at ADX-Florence. *Id.*

Gabrion's case is not like *Johnson*. Cunningham's testimony did not leave the jury with the mistaken impression that Gabrion would be incarcerated in the general prison population immediately upon his arrival in federal prison, or that the BOP has no authority to confine Gabrion to more restrictive conditions based solely on his offenses outside of prison. Instead, Cunningham testified that the BOP decides a prisoner's classification at the time of their arrival based on their "security risk," and it can reclassify the prisoner at a later time based on his behavior, but a federal capital inmate will never drop below a "U.S. penitentiary" level. (Cunningham S. Tr. 7-8, 12.)

Gabrion faults counsel for not eliciting testimony that Assistant United States Attorneys can request a SAM, or that the Court can impose certain conditions of confinement as part of its sentence; however, mentioning these additional procedures would not have altered the impact of Cunningham's testimony. His testimony left the jury with the impression that the BOP has the authority to control Gabrion's communications and his conditions of confinement from the date of his arrival in prison. Thus, it was not necessary to mention that the AUSA and the Court can also request specific conditions.

### J. Response to Gabrion's Assault on Trial Counsel

Gabrion asserts that his counsel "essentially abandoned" him after he punched Stebbins in the face. (Am. § 2255 Mot. 120.) Immediately after this incident occurred, court security personnel subdued Gabrion and removed him from the courtroom. (S. Tr. I, 75.) The Court took an early recess before the lunch break to give counsel an opportunity to decide what was in Gabrion's and counsel's best interests. (*Id.* at 76.) During the hour-and-a-half recess, counsel attempted to speak with Gabrion, but he refused to see them. (*Id.* at 77.) After the recess, counsel thought it best for Gabrion to remain outside the courtroom, in a room where he could see and hear the proceedings remotely, and contact counsel by telephone if he wanted to do so. (*See id.*) Counsel also made three motions: for a mistrial, for permission to withdraw as counsel, and for another competency evaluation. (*Id.* at 78.) The Court denied all three motions. Gabrion remained outside the courtroom for the rest of the day, and a number of government witnesses testified in his absence.

Gabrion now contends that trial counsel should have requested a continuance or a longer recess to better evaluate how to proceed. He asserts that "a brief respite would have permitted [him] to decompress and be present without further incident during his capital penalty phase," or given him an opportunity to see a mental health professional who could assist him in "dealing with the stressors that contributed to his outburst." (Am. § 2255 Mot. 121-22.) This optimistic view is not supported by the record. The day after the assault, Gabrion's counsel met with him and decided that he was still so agitated that it would not be in his best interest to return to the courtroom. (S. Tr. II, 233.) Gabrion apparently expressed interest in returning, but he could not assure his attorneys that he would be peaceful and cooperative. (*Id.* at 235.) The Government asked for a hearing on the matter so that Gabrion could be questioned by the Court, but Gabrion's counsel objected because Gabrion's conduct that morning was "so inappropriate" that counsel was

concerned about whether he could conform himself to any decorum at all.  (*Id.* at 237-38.)  The Court denied the Government's request because Gabrion's counsel was in the best position to assess the issue.  (*Id.* at 239.)

Counsel's judgment is presumed to be reasonable.  *Strickland*, 466 U.S. at 689. Gabrion offers nothing to rebut that presumption.  Thus, his *Strickland* claim is meritless.

### K.  Evidence of Positive Evaluations in Prison

Gabrion faults counsel for not providing the jury with a smattering of records suggesting that he would not be a danger in prison.  In December 1999, January 2000, February 2000, and June 2001, a psychologist in the special housing unit of the Milan FCI determined that Gabrion's "current potential for harm to others is judged to be LOW."  (ECF No. 2-43, PageID.823-825, 827.)  In March 2000, the psychologist determined that Gabrion's "current potential for harm to others is judged to be MODERATE."  (*Id.*, PageID.826.)  In addition, a prison work evaluation from February 1999 describes Gabrion's quality of work as "fair" and his quantity of work as "satisfactory."  (*Id.*, PageID.829.)

The foregoing documents likely would have harmed Gabrion's case as much as helped it.  First, all of the psychological assessments indicate that Gabrion was being held in administrative detention, rather than in the general prison population, which in itself suggests that he was a security risk.

Second, several of these assessments underscore the potential threat that he poses in the prison setting by describing his actual conduct.  One assessment indicates that he threatened a doctor in a written note.  (*Id.*, PageID.825.)  Another indicates that he threw water on an officer and "may escalate [his behavior] in order to have the desired effect."  (*Id.*, PageID.826.)

Third, these assessments would have undermined counsel's attempt to show that Gabrion was suffering from a mental defect because all of them state that Gabrion's "mental status,

emotional expression, and behavior do not suggest significant mental health problems." (*Id.*, PageID.823-827.) One of them even confirms that Gabrion was feigning signs of a mental illness, stating that Gabrion "tried his best to act in a manner which he believes was indicative of someone who was 'crazy.' It is my opinion that this inmate has a combination of several severe personality disorders." (*Id.*, PageID.827.)

Fourth, it is telling that Gabrion's present counsel have presented reports from only a few months of Gabrion's confinement, and only one work evaluation, despite the fact that he was incarcerated for several years before his trial. Other reports undoubtedly paint a less flattering picture—one that is more consistent with the testimony at trial about his dangerous and threatening conduct while in custody. (*See* 12/14/2001 Mot. Hr'g Tr. 92 (referring to "40 major infractions" by Gabrion in the Calhoun County Jail).)

Accordingly, it was reasonable for counsel not to present these reports to the jury, and he was not prejudiced by their absence at trial.

### L. Evidence that Gabrion needed a payee for social security benefits

Gabrion argues that his counsel failed to present the jury with evidence that he needed a payee to receive social security benefits that began in 1992/1993. According to a note purportedly written by his trial counsel, Gabrion started receiving social security benefits in 1992, and several other individuals were designated as his payees, including his mother at one point. (ECF No. 2-44, PageID.831.) Gabrion claims that his trial counsel never investigated the issue. Gabrion's current counsel indicates that there is a note in trial counsel's files indicating that trial counsel tried to obtain Gabrion's social security records but was not able to do so. Since that time, Gabrion has attempted to obtain these records from his trial counsel, his mitigation investigator, the Social Security Administration, the probation department in his social security fraud case, defense counsel in the social security fraud case, and the Government, but has not been successful.

146

(Reply 151.)   Gabrion has asked the Court to order the Government to provide all records pertaining to Gabrion's social security disability assessments and payments.  (Am. Br. to Conduct Discovery, ECF No. 67, PageID.2610.)  He asserts that further investigation into this issue by his trial counsel "could have resulted in information that was positive to Mr. Gabrion."  (Am. § 2255 Mot. 125.)

The Government argues that this claim lacks specificity and should be summarily dismissed.  The Court agrees that the claim lacks specificity, but there are other reasons for dismissal, including the failure to satisfy the prejudice and performance prongs of *Strickland*.

Regarding prejudice, Gabrion speculates that the social security records would have been helpful, though it is not at all clear that would be the case.  According to Dr. Fallis, the Assistant United States Attorney (AUSA) told her that Gabrion's disability benefits were awarded because of "mental impairment," but the Social Security Administration (SSA) did not complete testing for disability because it did not want to contest the issue.  (Fallis Report 6.)   Gabrion, however, reportedly told the Bureau of Prisons that his benefits were for a bad back.  (*Id.*)

According to regulations by the Social Security Administration (SSA), the SSA will pay disability benefits to a "representative payee" on behalf of the beneficiary when the SSA determines that this method "will be in the interest of the beneficiary," such as when the SSA has information that the beneficiary is "[l]egally incompetent or mentally incapable of managing benefit payments," or is "[p]hysically incapable of managing or directing the management of his or her benefit payments."  20 C.F.R. § 404.2010(a) (Aug. 28, 1989).

Assuming, for the sake of argument, that the SSA made a determination in 1992 that Gabrion was mentally or physically incapable of managing his benefit payments, and that trial

counsel could have discovered this evidence and presented it to the jury, the SSA's determination would have been thoroughly undermined by other evidence presented at trial.

According to witnesses who testified at trial, Gabrion suffered no significant head injury in the vehicle accident that preceded his application for disability benefits; in fact, he manufactured the incident in order to defraud an insurance company. And in spite of whatever brain injury he may have sustained, he was still capable of defrauding the SSA and others just a few years later using a stolen identity, and setting up a bank account and post office box in New York to receive benefits intended for Richard Allen. These actions belie the notion that he was significantly mentally impaired or that he was not capable of managing his benefit payments.

As for trial counsel's performance, Gabrion's inability to obtain the SSA records simply underscores the difficulty that his trial counsel faced. In other words, Gabrion has not given the Court any reason to believe that, if Gabrion's social security records still existed at the time of trial, his trial counsel could have discovered them.

Rather than uncover evidence that Gabrion was incapable of managing benefit payments in 1992, his trial counsel did what reasonable counsel would be expected to do: have Gabrion examined by a mental health expert for any sign of mental illness or defect impairing his functioning or judgment, and present expert and lay testimony supporting such an impairment. That sort of evidence is more relevant and persuasive for mitigation purposes than a specious and narrowly-focused determination by the SSA that Gabrion could not manage his disability benefits.

Accordingly, Gabrion's ineffective-assistance claim concerning evidence of a payee for his social security benefits fails both prongs of the *Strickland* test. Moreover, he has not shown good cause for discovery on this issue. He has not given the Court reason to believe that,

if given the opportunity for further discovery from the Government, he will be able to show that he is entitled to relief.

## M.  Evidence of Other Head Injuries

Gabrion claims that counsel was ineffective for failing to investigate and present to experts and the jury evidence that Gabrion suffered head injuries other than the ones discussed at trial.  The Court discussed the evidence of these other head injuries in Ground Four, Section A, finding that Gabrion failed to demonstrate unreasonable conduct by counsel or prejudice.  Here, Gabrion adds another suspected instance of head injury:  an individual purportedly told the media in 1997 that he hit Gabrion in the head with a wrench.  (Am. § 2255 Mot. 129.)  Even when taking this additional incident into consideration, the Court finds that Gabrion has not demonstrated ineffective assistance of counsel.  The media report is yet another instance of possible head injury with no evidence of brain injury and no particular connection to Gabrion's behavior.  It is far less persuasive than the evidence presented at trial.

## N.  Failure to Secure Gabrion's Presence During In Camera Proceedings

Gabrion claims that his counsel failed to protect his right to be present in the courtroom.  The Court convened several conferences with Gabrion's counsel outside of his presence.  *See Gabrion II*, 648 F.3d at 334.  Three conferences dealt with Gabrion's desire to testify, and two dealt with his disruptive behavior in the courtroom.  *Id.*  In addition, Gabrion was not present in the courtroom for a period of time during the sentencing phase of his trial after he punched Stebbins in the face.

The Court of Appeals decided that Gabrion's absence during the conferences with Judge Bell did not prejudice Gabrion or deprive him of his constitutional right to due process.  *Id.* at 335-36.  According to the Court of Appeals, "the conferences demonstrated the admirable efforts of defense counsel and the district judge to protect Gabrion's rights and to facilitate a fair hearing

for Gabrion despite his disruptive antics." *Id.* at 335. Gabrion's "willingness to lie on the stand and his disruptive behavior in court" forced his counsel to walk an "ethical tightrope"; they "showed great dedication to Gabrion, even after he punched one of them in the face." *Id.* at 336. Efforts that the Court of Appeals described as "admirable" could not have been unreasonable.

The Court of Appeals also concluded that this Court did not abuse its discretion or deprive Gabrion of his rights under the Confrontation Clause of the Sixth Amendment when excluding him from the courtroom after he punched Stebbins. *Gabrion III*, 719 F.3d at 534. Gabrion argued on appeal that this Court should have returned him to the courtroom almost immediately after punch, with a stern warning that he would be removed if there were additional outbursts. According to the Court of Appeals, that argument "defies common sense," because Judge Bell "had every reason to think that Gabrion would continue to be *verbally* disruptive if he were promptly to return." *Id.* Indeed, "Gabrion was verbally disruptive throughout almost the entire trial" *Id.*

Gabrion makes a similar argument here, arguing that his counsel should have requested a hearing to decide whether Gabrion should remain in the courtroom, because such a hearing would have given the Gabrion an opportunity "to interact with the Court so that the Court could make sure that Mr. Gabrion understood his rights and the consequences of any inappropriate conduct." (Am. § 2255 Mot. 130.) This argument also defies common sense. Gabrion had previously demonstrated to the Court on a number of occasions that he could be disruptive, and the Court had already warned him that disruptive conduct might lead to his removal. *See Gabrion III*, 719 F.3d at 534. He did not heed that warning. Gabrion also had an opportunity to meet with his counsel immediately after he punched Stebbins, and they decided that it was in Gabrion's best interest to remain outside the courtroom. There is no reason to think that they, or the Court,

have made a different decision if Gabrion had been brought down to the courtroom for a hearing. Thus, counsel's conduct was not unreasonable.

Moreover, Gabrion was not prejudiced because he was not deprived of the opportunity to assist or consult with counsel. To the extent Gabrion argues that counsel needed his assistance while witnesses were testifying, he does not indicate what assistance he could have provided. Moreover, if he wanted to provide assistance, he had access to a telephone that he could have used to consult with counsel. Thus, his claim is meritless.

### O. Failure to Correct Theory that Gabrion Created a 501(c)(3) Entity

During the penalty phase, the prosecutor engaged Gabrion in a line of questioning about the 501(c)(3) entity that Gabrion had apparently created. (Gabrion S. Tr. 11.) After being asked what a "501(c)(3) charitable trust" is, Gabrion explained that it is "[a] charity that helps people to – in the welfare of children and other things of that nature. Otherwise you can't be – it can't be approved. It has to be for the welfare of children and other stipulations." (*Id.*) The prosecutor repeatedly suggested that Gabrion set up the charitable trust, but Gabrion insisted that he did it with help from his attorneys, and that Stebbins submitted the paperwork to the IRS. (*Id.* at 12.)

Gabrion argues that his trial counsel should have intervened in some fashion to support Gabrion's testimony that his attorney helped him establish the 501(c)(3) entity. Gabrion contends that his own testimony was not sufficient, and that without corroborating evidence, the Government was able to mislead the jury into thinking that Gabrion was "shrewd and manipulative" because he had the capability to navigate the regulations necessary for starting a non-profit entity. (Am. § 2255 Mot. 132.) Gabrion seeks further discovery and an evidentiary hearing on the issue.

Gabrion suffered no prejudice whatsoever as a result of counsel's failure to buttress Gabrion's testimony. The record is replete with evidence of Gabrion's "shrewd and manipulative" character. He stole the identities of other people and used them to obtain driver's licenses, set up bank accounts, and obtain social security benefits. He located the owner of a remote tract of land that was not listed for sale. He obtained information about the property surrounding Oxford Lake and covertly delivered that information to a fellow jail detainee. He persuaded another person to help him kill Rachel. He somehow persuaded Rachel to write letters purporting to recant her rape allegations and explain her disappearance. And he likely concealed the murders of four individuals in addition to Rachel. Thus, the ineffective-assistance claim is plainly meritless. Further discovery and a hearing are not warranted.

### P. Failure to Effectively Cross-examine Jason Cross

According to Jason Cross, Gabrion stated that he "got rid" of baby Shannon because he "didn't know what to do with it." (S. Tr. I, 153.) Gabrion contends his trial counsel should have cross-examined Cross on two issues: (1) a report describing Cross' mental health; and (2) whether Cross received consideration for his testimony.

#### 1. Mental health report

The Government provided Gabrion's trial counsel with a mental health report prepared by a psychologist in connection with Cross' conviction for bank robbery. Gabrion characterizes the report as stating that Cross suffered brain damage of "mild to moderate severity" that "caused him to be confused, and indulge in fantasies," and that when Cross is desperate, he "will say and do all manner of rash things." (Am. § 2255 Mot. 133.)

In fact, the report states that Cross sustained brain damage resulting in "mild to moderate difficulties," particularly with impulse control. (ECF No. 2-46, PageID.846.) He "tends to act rashly and impulsively under certain kinds of environmental stimuli," such as when he is in

an atmosphere that is "over stimulating." (*Id.*, PageID.847.) For instance, after he began to participate in gambling activities, he became "obsessed and preoccupied," and this preoccupation "le[]d to irrational thinking, grandiose thoughts and ultimately impulsive actions." (*Id.*, PageID.848.) After he incurred significant gambling losses, he began having "fantasies about how to get his money back," becoming "more and more confused and desperate" as he thought through different fantasies. (*Id.*, PageID.843.) Finally, after several nights of disrupted sleep, he withdrew his money from the bank and, later that day, robbed the bank. (*Id.*) According to the report, Cross appeared to be "confused, guilt ridden and upset about what he had done." (*Id.*, PageID.842.)

Notably, the report never states that Cross' impulsive behavior and thinking patterns cause him to lie or to say something false. In fact, the report attests to his truthfulness. It states that he is a "highly reliable informant" and that he is "basically a truthful individual, non-deceptive and . . . unguarded in making statements about himself and others." (*Id.*, PageID.842.) The author of the report saw "no evidence of delusions, hallucinations or loose associations." (*Id.*) These findings flatly contradict Gabrion's assertion that Cross will "say all manner of rash things," and they would not have been helpful to an attorney attempting to impeach Cross' credibility. Counsel was wise to focus on Cross' possible motivation for testifying against Gabrion, as described in the next section, without opening the door to evidence supporting his credibility. Thus, it was reasonable for counsel not to attempt to use the mental health report.

## 2. Consideration for testimony

Gabrion's present counsel believes it is "very possible" that Cross received consideration for his testimony, based on counsel's review of his "apparent date of[] discharge." (Am. § 2255 Mot. 134.) Gabrion claims that his trial counsel should have investigated this issue for use on cross examination.

Gabrion's trial counsel did explore this issue on cross-examination, eliciting an admission that Cross was aware that providing helpful information to the government about a suspect could result in a reduction in his prison sentence, because he had done the same thing on two prior occasions. (S. Tr. I, 158-64.) Counsel tried to get Cross to admit that he provided testimony about Gabrion in the hope that he would receive a further reduction in his sentence, but Cross did not give a clear answer. (*Id.* at 161.) Cross subsequently testified that he was not promised anything in exchange for his testimony about Gabrion. (*Id.* at 165.)

Gabrion offers no evidence to support his theory that Cross received a benefit for his testimony. If there was a reduction in Cross' sentence, it should appear in the public record of his criminal case, but there are no entries in his criminal case indicating that he received a reduction in his sentence after, or because of, his testimony. *See United States v. Cross*, No. 5:99-cr-90011-GCS (E.D. Mich.). Thus, Gabrion's claim is wholly unsupported, and further discovery on the issue is not warranted.

Moreover, Gabrion cannot show prejudice because Martin Love gave substantially the same testimony as Cross, and other evidence supported the theory that Gabrion killed Shannon.

For all these reasons, Gabrion's claim he was denied the effective assistance of counsel with respect to the cross-examination of Jason Cross is meritless.

### Q. Failure to conduct a proper investigation of witnesses and evidence presented by the Government

Gabrion claims that his attorneys failed to investigate and/or properly examine witnesses who testified about Gabrion at the penalty phase, incorporating the facts in Grounds One and Six. Specifically, Gabrion contends that his attorneys failed to provide effective assistance with respect to: Jason Cross, Shannon Cross, Greg Leon, Joseph Lunsford, Chrystal Roach, Lloyd Westcomb, Luverne Timmerman, and A'lliene Wolf.

### 1. Jason Cross

Gabrion contends that counsel should have investigated the basis for the mental health report regarding Jason Cross, which is discussed in Ground Four, Section P. Gabrion asserts that another neuropsychologist diagnosed Cross' condition and conducted some psychometric tests on him. Gabrion asserts that the results of this testing should have been obtained by counsel and provided to a mental health examiner to determine whether Cross' condition impaired his ability to tell the truth.

It is difficult to see any deficiency in counsel's performance. The mental health report supported Cross' credibility. There is no reason to believe that further investigation would have uncovered something different. Moreover, Cross' testimony is essentially the same as that of Martin Love, so Gabrion could not have been prejudiced by counsel's omission.

### 2. Shannon Cross

Gabrion does not indicate what counsel failed to do with respect to Shannon Cross. Thus, this claim is meritless because it is wholly conclusory.

### 3. Greg Leon

Gabrion incorporates the facts from Ground One and Ground Six. For the reasons stated in Ground One, Section B(6) and Ground Six, Section A, Gabrion has not shown that there is any material information about Leon that counsel should have discovered.

### 4. Luverne Timmerman

Rachel's father, Luverne ("Tim") Timmerman, received letters from Gabrion asking for a photograph of baby Shannon. Gabrion asserts that the FBI encouraged Tim to correspond with Gabrion in order to determine Shannon's whereabouts, but counsel did not explore the issue at trial. However, further exploration would not have benefitted Gabrion. The FBI's involvement does not fundamentally change the nature of *Gabrion's* actions. Whether the

FBI was involved or not, Gabrion was manipulating Rachel's family as a means to satisfy his own desires.

### 5. A'lliene Wolf

Apparently, when Wolf testified before the grand jury, she did not mention that she saw Weeks calling Rachel. Gabrion asserts that counsel should have questioned her about this omission at trial; however, Gabrion has not shown that doing so would have benefitted him. Weeks was clearly involved in Gabrion's scheme to abduct and murder Rachel. Rachel's family did not see Rachel again after she left home to go on a date with Weeks. Witnesses saw Gabrion near Oxford Lake with another man and a woman matching Rachel's appearance. Other witnesses saw Gabrion with a man named John at a campground not far from Oxford Lake. And according to police reports provided by Gabrion, Weeks told others that he helped Gabrion get rid of someone. *See* Ground Three, Section T. Wolf's failure to mention the telephone call during her grand jury testimony has no significance.

### 6. Joseph Lunsford

Lunsford told the grand jury that he had been having short-term memory loss because of a cyst on the side of his brain. (Lunsford Grand Jury Tr. 13, ECF No. 44-6.) Gabrion argues that counsel should have cross-examined Lunsford about this issue at trial, as a way to undermine Lunsford's credibility. However, Lunsford also told the grand jury that he did not have any problems remembering the subject of his testimony, which concerned events occurring in 1997, two years earlier. (*Id.* at 7, 13.) Obviously, short-term memory loss is different from long-term memory loss. Apparently, Lunsford had no problem with the latter. Thus, Gabrion has not shown that questioning Lunsford about short-term memory loss would have been helpful. Accordingly, he has not shown unreasonable performance by trial counsel or prejudice to the outcome of his case.

Gabrion also contends that counsel should have investigated the possibility that Lunsford was lying, referring to Lunsford's affidavit that some of his testimony was untrue. Gabrion does not indicate how counsel could have done this, however. Moreover, counsel's failure to investigate this issue could not have prejudiced Gabrion because Lunsford's allegedly false testimony was insignificant in light of all the other evidence of the aggravating factors.

### 7. Evidence that Shannon was still alive

A few individuals made statements indicating that Shannon was still alive after Gabrion killed Rachel. Gabrion has not provided these statements to the Court, but for purposes of this Opinion, the Court will accept Gabrion's assertions as true. According to his motion, Rachel's mother apparently told others that she believed Shannon was still alive and that Shannon was sold on the black market. (Am. § 2255 Mot. 137.) Prosecutor Roach told the media that there was evidence that Shannon left the state alive. Tim Timmerman also told the media that he believed Shannon was still alive, and Shannon's grandmother, Kim VerHage, apparently felt the same way, as she and Tim corresponded with Gabrion to discover Shannon's whereabouts. (*See* VerHage letter to Gabrion, Gov't Ex. 96.) A newspaper article from a month after Rachel's body was discovered apparently stated that "investigators have evidence the baby was alive after the mother was killed," and the article quoted a detective as stating that "'they believe people know the whereabouts of Shannon.'" (Am. § 2255 Mot. 137.)

All of these statements reflect an optimistic belief that Shannon was still alive, probably because her body was never found and Gabrion repeatedly claimed or implied that she was still alive. It would have been foolish for Gabrion's attorneys to attempt to use these statements as evidence that Shannon was alive, when Gabrion had already confessed to others that he killed Shannon, and no credible evidence contradicted his statements.

### R. Failure to make objections during closing argument

Gabrion asserts that his counsel was ineffective for failing to object to certain statements made by the prosecutor during closing argument.

### 1. "The facts, the law, and your sense of justice . . ."

The prosecutor stated, "The facts, the law, and your sense of justice tell you what you have to do. The law, the facts, and your sense of justice tell you what decision you now have to make." (S. Tr. V, 604.) Gabrion claims that these statements misrepresented the law because the jury was not required to find that Gabrion deserved the death penalty, even if it found that the aggravating factors outweighed the mitigating factors.

It is true that the jury was not required to impose a death sentence, which is why the Court specifically instructed the jury that "whatever findings you make with respect to the aggravating and mitigating factors, you are never required to impose a sentence of death." (S. Tr. V, 673.) The prosecutor's statements did not indicate otherwise. The prosecutor did not state that the law required the jury to impose a death sentence; instead, he told them to follow the law, the facts, and their sense of justice.

Context is important. The prosecutor made these statements near the beginning of his closing argument. At that point, he had not indicated that the death sentence was appropriate, or presented any arguments in favor of it. He was merely pointing out the appropriate guideposts for the jury's decision. He was not suggesting that the law required a death sentence. Thus, the remarks were not improper and an objection would have been futile.

### 2. "[I]t's not in dispute." / "The defense has conceded that."

Did the defendant intentionally kill Rachel Timmerman? Again, something you have to find, but it's not in dispute here. You've already found through your verdict already that the defendant tracked down and killed Rachel Timmerman during a several-month period. He deliberately and in cold blood killed Rachel Timmerman.

It wasn't a mistake, it wasn't a sudden impulsive action. The defense has conceded that. You know it's true. That's not in any doubt at all.

(S. Tr. V, 605.)

Gabrion asserts that this statement was false; however, Gabrion's counsel conceded during his opening statement that Gabrion intentionally killed Rachel. He also told the jury that Gabrion was not challenging the aggravating factor of substantial planning and premeditation. (S. Tr. I, 42.) Moreover, the evidence overwhelmingly supported these facts. Thus, the prosecutor's statements were proper and counsel was not ineffective for failing to object to them.

### 3. "[Y]ou have a responsibility to the community."

[T]hat factor [future dangerousness] is there to remind you as the people that have been chosen to apply this law that you have a responsibility to the community. In deciding what sentence is the right sentence here, life or death, you have a responsibility to consider the safety of other citizens in our community.

\* \* \*

[Y]ou know the defendant has been, is, and always be a danger, no matter where you put him. And you owe a responsibility to other citizens in this community not to let anybody else get hurt or killed.

\* \* \*

You are the only people as a jury in this case who stand between this person and your community. I know you wouldn't have chosen this task if it were up to you. But you are citizens of this community, and you now have a duty to carry out.

(S. Tr. V, 610, 622-24.)

Gabrion argues that these statements are improper because they demanded that the jury look at what it thinks the community desires, rather than what the evidence shows, citing *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) and *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002).

A prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Viereck v. United States*, 318 U.S. 236, 248 (1943). A prosecutor may not

"indulge[] in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Id.* at 247. "[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears -- rather than the evidence -- to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). "[A]ppeals to the jury to act as the community conscience are not per se impermissible . . . [u]nless calculated to incite the passions and prejudices of the jurors." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001).

Here, the prosecutor's remarks were not inflammatory, and did not call on the jury to use their emotions and fears, rather than the evidence, to decide Gabrion's sentence. Dangerousness is one of the factors that the jury was asked to consider. Thus, it was appropriate for the jury to consider the safety of the community.

The cases cited by Gabrion are not to the contrary. As noted in the *Ward* decision, there is a difference between "'urg[ing] the jury to be the voice of the community,'" which is proper, and "'asking the jury to lend its ear to the community,'" which is not. *Ward*, 420 F.3d at 498 (quoting *Harris v. State*, 122 S.W.3d 871, 888 (Tex. App. – Ft. Worth 2003)). The prosecutor's remarks in Gabrion's case fall in the first category, not the second.

In *Le*, a federal court of appeals reviewing a habeas petition by a state prisoner considered a prosecutor's remark that the jury "could only do justice in this case by bringing in a verdict of death." *Le*, 311 F.3d at 1022. The court noted that "it is error for a prosecutor to exhort a jury to impose a death sentence on the grounds of civic duty." *Id.* However, the court did not expressly hold that this particular remark was improper. Instead, it determined that, because of the overwhelming evidence of guilt, the aggravating factors supporting the death sentence, and the

"general content" of the jury instructions, the state court had reasonably determined that the prosecutor's comment did not render the defendant's trial fundamentally unfair. *Id.*

Likewise, the evidence of the aggravating factors in Gabrion's case is so overwhelming that the foregoing remarks in his case could not have had an impact on the outcome.

### 4. Argument based on evidence

Gabrion contends that it was error for the prosecutor to make an "argument based upon wholly irrelevant but prejudicial evidence that was offered purportedly to show future dangerousness," including evidence that Gabrion killed others in addition to Rachel. (Am. § 2255 Mot. 139-40.) It was not improper for the prosecutor to summarize the evidence before the jury, or to make reasonable inferences and arguments based on that evidence. That is the purpose of a closing argument.

### 5. Characterization of Gabrion's testimony as torture

> The defendant has spent his time in custody torturing the Timmerman family. Even when he testified during the guilt phase of this trial, he's still torturing them. You know, Shannon, Shannon can come back if you guys get counseling. He's still dangling that carrot. Will the torture ever end?

(S. Tr. V, 618.)

These statements were not improper. Gabrion asserts that the prosecutor compared Gabrion's exercise of his Fifth Amendment right to testify to the torture of Rachel's family. Actually, the prosecutor compared the *content* of Gabrion's testimony to torture, because Gabrion insinuated that Shannon was still alive and that he was aware of her location. As the prosecutor indicated, Gabrion testified that Shannon "might come home after Rachel's parents get counseling for being abusive." (Gabrion Tr. 102.) In so doing, Gabrion used his testimony as an opportunity to taunt Rachel's parents, just as he had done in his letters to them while he was in custody. There

was nothing improper about arguing that Gabrion's statements were like torture for the victim's family.

### 6. Referring to a life sentence as a "privilege"

> Do you have any, any proof or idea that this man's going to stay in prison if you give him the privilege of staying there?  Do you have any assurance of that?  No.

(S. Tr. V, 619.)

Gabrion does not explain why it was improper to refer to a life sentence as a privilege, but even assuming that it was, this statement was absolutely harmless.  Jurors recognize that a life sentence is a punishment, not a privilege.

### 7. Asking the jury not to show mercy to Gabrion

> You know that a death sentence is the just sentence here.  The defendant's murder of Rachel Timmerman shows that he lacks any shred of mercy for the helpless, and he shouldn't expect it from you.  His murder of Shannon VerHage, an innocent infant child, shows that he is not worthy of your mercy and he shouldn't expect it.  He didn't show any.  Don't you give him any.

(S. Tr. V, 622-23.)

The Florida Supreme Court has concluded that it is improper for a prosecutor to argue that a jury considering a death sentence should show the defendant the same amount of mercy that the defendant showed the victim.  *See, e.g.*, *Urbin v. State*, 714 So.2d 411, 421 (Fla. 1998).  According to that court, this is "an unnecessary appeal to the sympathies of the jurors, calculated to influence their sentence recommendation."  *Rhodes v. State*, 547 So.2d 1201, 1206 (Fla. 1989).

That view is not shared by other state courts.  *See People v. Gamache*, 227 P.3d 342, 381 (Cal. 2010) ("We have repeatedly approved prosecutors arguing that a defendant is not entitled to mercy, and in particular arguing that whether the defendant was merciful during the crimes should affect the jury's decision.").  Nor is it a view universally shared by federal courts.

*See Reese v. Sec'y, Fla. Dep't of Corrs.*, 675 F.3d 1277, 1293 (11th Cir. 2012) ("The prosecutor's comment presupposed that the jury would consider showing Reese mercy, but the prosecutor legitimately argued that Reese did not deserve mercy."); *Cole v. Crosby*, No. 505CV222OC10GRJ, 2006 WL 1169536, at *64 (M.D. Fla. May 3, 2006) ("Petitioner has not explained how the prosecutor's statements violate his *federal* constitutional rights, and does not provide any support for his habeas petition in this Court. . . . [S]ubmitting argument about the tension that exists between mercy and justice" may be proper in a particular case.); *see also Hackett v. Price*, 212 F. Supp. 2d 382, 396 (E.D. Pa. 2001) (counsel not ineffective for failing to object to a "same mercy" argument), rev'd on other grounds, 381 F.3d 281 (3d Cir. 2004). Even in Florida, "a mercy argument standing alone does not constitute reversible error." *Merck v. State*, 975 So.2d 1054, 1062 (Fla. 2007).

Because the prosecutor's statement was not clearly improper, counsel was not ineffective for failing to object to it. Furthermore, this remark could not have influenced the outcome of Gabrion's case because it was isolated and there was strong evidence of the aggravating factors.

### 8. Comparing Gabrion's life to the victim's

The fact that he killed not one person, not two, not three, but five people, five, demonstrates that the punishment more than fits the crime here. Even if he pays with his life, he hasn't paid enough. His life is only one life. He owes for five.

(S. Tr. V, 623.)

Gabrion asserts that it is improper for a prosecutor to compare the defendant's life with the victim's, citing cases from state supreme courts in South Carolina, Connecticut, and Florida. Gabrion contends that, although his counsel did object to the statement that Gabrion "owes for five," counsel should have done more, including asking for a mistrial or a cautionary instruction. (Am. § 2255 Mot. 141.)

The Court of Appeals has already considered similar remarks by the prosecutor in this case:

> During closing argument, the prosecution argued that Gabrion "owe[d] a debt he can never repay" to Rachel Timmerman's family, and that the mitigating factors proffered by the defense "don't balance the ledger book." . . .
>
> . . . The "ledger book" reference was a proper way of articulating the Government's position that, under the weighing of aggravating and mitigating factors set up by the Act, the balance tipped in the Government's favor. The comment about Gabrion's "debt" did not suggest that Gabrion owed the victim's family his life; indeed, the prosecution was making the very point that the debt could not ever be repaid, no matter the result of their sentencing deliberations. This is fair argumentation from victim impact evidence, allowed by the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

*Gabrion II*, 648 F.3d at 349.

Likewise, the statements now at issue before the Court are fair arguments about the aggravating circumstances present in Gabrion's case, including the impact of Gabrion's actions on multiple victims. They were not improper.

The cases cited by Gabrion are inapposite. In *Hall v. Catoe*, 601 S.E.2d 335 (S.C. 2004), the Supreme Court of South Carolina determined that it was not appropriate for a prosecutor to compare the worth of the lives of the two victims to the worth of the defendant's life when arguing for a death penalty. *Id.* at 339. It reasoned that this sort of argument is improper because: it required the jurors to "conduct an arbitrary balancing of worth"; it is "totally unrelated to the circumstances of the crime"; and it is "distinguishable from traditional impact evidence in that it was not actually offered to show the impact of the crime on the victims or the victims' family." *Id.* at 341. In contrast, the prosecutor in Gabrion's case did not ask the jury to make an arbitrary determination about whether Gabrion's life is worth more than the victims' lives, or ask it to consider something unrelated to issues in the sentencing proceeding.

In *State v. Rizzo*, 833 A.2d 363 (Conn. 2003), the Supreme Court of Connecticut held that it was improper for a prosecutor to tell the jury that, when deciding the defendant's fate, the "balancing test" it had to apply was to weigh "[the defendant's] life against [the victim]." *Id.* at 419. This was an "improper appeal to the jurors' emotions of anger and revenge" as well as a misstatement of the "statutory weighing test." *Id.* at 419-20. In contrast, the prosecutor in Gabrion's case did not ask the jury to weigh Gabrion's life against the lives of the victims. Nor did he misrepresent the law. Instead, the prosecutor made the straightforward argument that five murders makes Gabrion's conduct particularly aggravating, and that even his death cannot make up for his actions. Thus, *Rizzo* does not apply.

In *Wheeler v. State*, 4 So.3d 599 (Fla. 2009), the Florida Supreme Court noted that a Florida statute prohibits victim impact evidence from being "used by the jury to compare, contrast or weigh the relative worth of the life of the victim against that of the defendant in deciding whether to recommend the death penalty." *Id.* at 610-11. Florida law does not apply to Gabrion's case, and he has not identified a similar prohibition under federal law. Thus, he has not demonstrated unreasonable conduct or prejudice by his attorneys' failure to object.

Finally, it is worth noting that the jury rejected any implied prosecution theory that Gabrion's life was worth less than his victims' lives. The jury affirmatively and unanimously found as a mitigating factor that Gabrion's death would be a significant loss for his family, much as they found that Rachel's death was a loss to her family.

### 9. Comparing the plight of the victim to life in prison

[The sentence] can't be just to allow him to live out his life, to grow old, to be visited by his family, when Rachel Timmerman and Shannon VerHage will never get visits from their family. Neither will Wayne Davis, John Weeks, or Robert Allen.

(S. Tr. V, 623.)

Some courts outside this Circuit have held that "it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." *Bland v. Simons*, 459 F.3d 999, 1028 (10th Cir. 2006). But when faced with that sort of conduct, these courts have almost always found it to be harmless under the circumstances. *See, e.g.*, *United States v. Mikhel*, No. 07-99008, 2018 WL 2124086, at *37-38 (9th Cir. May 9, 2018); *Black v. Workman*, 682 F.3d 880, 912 (10th Cir. 2012); *United States v. Johnson*, 495 F.3d 951, 979 (8th Cir. 2007); *Bland*, 459 F.3d at 1027-28; *Le v. Mullin*, 311 F.3d 1002, 1016 (10th Cir. 2002).

The same is true here. In other words, even assuming that the prosecutor's isolated remarks were improper, Gabrion has not demonstrated ineffective assistance of counsel because he has not shown prejudice. The Court specifically instructed the jury to make its findings based on the evidence and the Court's instructions, rather than "passion, prejudice, or undue sympathy." (S. Tr. V, 671.) Moreover, the evidence in support of the aggravating factors was overwhelming. *Cf. Le*, 311 F.3d at 1016 ("Of much greater significance in the present context is the overwhelming evidence of Mr. Le's guilt and evidence of the aggravating factors supporting the death sentence."). Thus, there is no reasonable probability that the prosecutor's remarks could have affected the outcome of Gabrion's proceedings.

### 10. "What the law requires"

> You've taken an oath to apply the law fairly, impartially, and justly, and I know you will. What the law requires here is clear. On behalf of the people of the United States, I ask you to return a sentence of death.

(S. Tr. V, 624.)

Returning to the same issue discussed in Section R.1, Gabrion contends that the prosecutor's final statement misinformed the jury that the law required it to impose a death sentence. However, the prosecutor never expressly made this claim. At most, the foregoing statement *implied* that the law required a death penalty, but any such implication was overcome

166

by the Court's clear instruction that the jury is "never required to impose a sentence of death." (S. Tr. V, 673.) Thus, Gabrion has not shown prejudice.

### S. Failure to object to replacement of juror with an alternate before the penalty phase

After the guilt phase, one of the jurors experienced health problems. The Court excused her and replaced her with an alternate juror. The alternate juror was present in the courtroom for both the guilt and the sentencing phases of the trial, but did not participate in deliberations with the jurors who determined Gabrion's guilt. Gabrion claims that this process violated the applicable statute, 18 U.S.C. § 3593(b)(1),[19] and that trial and appellate counsel were ineffective for failing to object or to raise this issue on appeal.

The FDPA provides, in relevant part:

If the attorney for the government has filed a notice as required under subsection (a) and the defendant is found guilty of or pleads guilty to an offense described in section 3591, the judge who presided at the trial or before whom the guilty plea was entered, or another judge if that judge is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted--

(1) before the jury that determined the defendant's guilt;

(2) before a jury impaneled for the purpose of the hearing if--

(A) the defendant was convicted upon a plea of guilty;

(B) the defendant was convicted after a trial before the court sitting without a jury;

(C) the jury that determined the defendant's guilt was discharged for good cause; or

(D) after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary; . . .

---

[19] Gabrion cites 21 U.S.C. § 848(i)(1), but the Government notes that § 848 does not apply because Gabrion's criminal case was brought under the FDPA, not the Continuing Criminal Enterprise provisions of the Anti-Drug Abuse Act, 21 U.S.C. § 848(e)-(r) (repealed in 2006). The analysis is the same, however, because the text of the relevant provisions in both statutes is identical.

18 U.S.C. § 3593(b).

Gabrion argues that the Court's replacement of a juror with an alternate violated the statutory requirement that his sentencing hearing "be conducted before the jury that determined [his] guilt." 18 U.S.C. § 3593(b)(1). He also contends that the Court's decision violated his right to a fair sentencing hearing. Thus, he contends that counsel should have objected.

Gabion provides no authority in support of his position. Other courts have rejected the statutory argument. When reviewing the same situation, the Seventh Circuit stated:

> [W]e do not think that the procedure that was employed violates the statute. The statute makes no provision for the situation that occurred here [substituting an alternate for penalty phase deliberations], leaving it to the good sense of the judges to deal with. We find guidance to the proper resolution in the 1999 amendment to Rule 24 of the Federal Rules of Criminal Procedure, which, altering the previous practice (to which we made reference earlier), allows the trial judge to replace a regular juror with an alternate *during* deliberations, which must then recommence. Fed. R. Crim. P. 24(c)(3). In other words, the fact that the alternate missed some of the deliberations is no longer regarded as a fatal objection, or indeed as any objection, to his participating in the jury's decision. Compare [*United States v. Josefik,* 753 F.2d 585, 587 (7th Cir. 1985)]. The analogy to the procedure employed here is close. The deliberations that eventuated in the sentence of death were in two stages, a guilt stage and a sentencing stage. The alternate missed the first stage but participated in the second. True, the *entire* deliberations did not recommence; but the issues of guilt and of punishment are sufficiently distinct that the alternate didn't have to hear the deliberations on the former issue in order to be able to participate meaningfully in the deliberations on the latter issue. He had sat through the entire trial, which is the important thing.

*United States v. Johnson*, 223 F.3d 665, 670 (7th Cir. 2000).

The Eleventh Circuit agreed with the reasoning of the Seventh Circuit, stating:

> Section 3593(b) guarantees capital defendants a bifurcated proceeding: a guilt phase and a penalty phase. The section does *not*, however, guarantee that the penalty decision will necessarily be made-as a matter of right-by the same jury that determined the defendant's guilt. *See* 18 U.S.C. § 3593(b)(2)(C) (providing for sentencing hearing before different, newly-impaneled jury if guilt-phase jury has been discharged for good cause). The trial court's retention of alternates was a wise decision and proved its worth by allowing the court to avoid possibly declaring a mistrial after a complex capital case had been ably presented by both parties over the course of several weeks.

*Battle v. United States*, 419 F.3d 1292, 1302 (11th Cir. 2005); *see also United States v. Honken*, 541 F.3d 1146, 1165-66 (8th Cir. 2008) (agreeing with *Johnson* and *Battle*).

Like the Eighth Circuit, the Court finds the decisions in *Johnson* and *Battle* to be persuasive, and is confident that this Court and the Court of Appeals would have reached the same conclusion if the issue had been raised at trial or on appeal. Moreover, because there is no authority supporting Gabrion's position, he is hard-pressed to show that his counsel was ineffective for failing to raise the issue. Counsel is not ineffective for failing to argue a position that has not yet been decided, unless that position is "clearly foreshadowed" by existing law. *Cf. Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 288 (6th Cir. 2010) (counsel not ineffective for failing to predict the development of the law).

Furthermore, the Court cannot discern any prejudice resulting from the lack of an objection. Gabrion contends that the alternate juror did not have the benefit of the views of the discharged juror, and "did not have the benefit of the views of the other jurors at a time when she could accept or reject those views through the deliberative process." (Am. § 2255 Mot. 143.) However, it is not clear how the alternate would have benefitted from the views of any another juror regarding Gabrion's guilt, which was firmly established by the evidence. Moreover, the alternate juror saw and heard all the same evidence and arguments as the other jurors, and was able to participate in all the deliberations pertaining to Gabrion's sentence. Nothing else was necessary for her to provide Gabrion a fair decision.

This is not a case in which a juror was replaced after deliberations had already begun, and where there was a danger that the other jurors had already "formulated positions or viewpoints or opinions" together, in the absence of the alternate juror, and then "pressure[d] the newcomer into passively ratifying [a] predetermined verdict[.]" *United States v. Quiroz-Cortez*,

960 F.2d 418, 420 (5th Cir. 1992) (internal quotation marks omitted). All of the jurors in Gabrion's case, including the alternate, began deliberating about Gabrion's sentence at the same time. Accordingly, Gabrion's ineffective-assistance claim is meritless.

**T. Failure to challenge facial constitutionality of the FDPA.**

Gabrion contends that trial counsel should have argued that the FDPA is unconstitutional on its face because it provides that, at the sentencing phase, "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ." 18 U.S.C. § 3593(c).

Gabrion raised this issue on appeal. The Court of Appeals rejected his argument, stating:

> This issue is one of first impression in this Circuit, but every other circuit which has confronted it has rejected this argument and upheld the Act. *See United States v. Fulks*, 454 F.3d 410, 437 (4th Cir. 2006); *United States v. Lee*, 374 F.3d 637, 648-49 (8th Cir. 2004); *United States v. Fell*, 360 F.3d 135, 140-46 (2d Cir. 2004); *United States v. Jones*, 132 F.3d 232, 241-42 (5th Cir. 1998). We join those circuits, reject Gabrion's argument, and decline to find the Act unconstitutional on this basis.

*Gabrion II*, 648 F.3d at 345. Although the Court of Appeals reviewed this issue under a "plain error" standard of review, *id.*, its decision would not have been any different if trial counsel had preserved the issue for appeal. None of the other circuits whose reasoning was adopted by the Court of Appeals applied plain error review. Thus, the Court of Appeals' decision in Gabrion's case was not affected by its standard of review.

**U. Cumulative effects of counsel's acts and omissions**

Gabrion contends that the cumulative effect of the errors by his counsel in connection with the sentencing phase denied him effective assistance. *See United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally

deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)).

In light of the evidence, Gabrion has not shown that any errors by counsel, considered individually or in the aggregate, prejudiced him. Accordingly, his ineffective assistance claim is meritless.

***Ground Five:* Deprivation of right to a fair trial and sentencing due to incompetence.**

Gabrion contends that he was tried "without a sufficient present ability to consult with his counsel and lacked a reasonable degree of rational and factual understanding of the proceedings against him at both phases of his capital trial." (Am. § 2255 Mot. 147.) The evidence in the record, including the results of multiple competency examinations as well as Gabrion's own conduct before, during, and after trial, conclusively demonstrates otherwise. *See* Ground Three, Section A.

Indeed, the Court of Appeals rejected a similar claim. Gabrion argued that the Court should have ordered another competency hearing during the sentencing phase after Gabrion punched Stebbins. The Court of Appeals disagreed "because the psychiatric and mental health records in the case convince us, as they did the District Court, that Gabrion knew what he was doing. . . . He was faking incompetence in order to disrupt the trial." *Gabrion II*, 648 F.3d at 320 (footnote omitted); *see also Gabrion III*, 719 F.3d at 533 ("We agree with the original panel that the district court was correct to find that Gabrion was competent to stand trial.").

Gabrion offers nothing new to rebut the substantial evidence of his competence. Thus, his claim is meritless.

***Ground Six:* Government suppression of, or failure to disclose, favorable evidence.**

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the Government must disclose favorable, material evidence to the defense. *Id.* at 87. A *Brady* claim contains three elements:

(1) the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State must have suppressed the evidence, whether willfully or inadvertently; and (3) the evidence must be material, meaning "prejudice must have ensued" from its suppression. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A defendant is prejudiced "if there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

### A. Ground One, Sections B(1)-(7)

Gabrion incorporates the facts supporting Ground One, Sections B(1)-(7),[20] which relate to allegedly false testimony presented by the Government.

#### 1. Sections B(1)-(5)

*Brady* does not apply to the facts discussed in Sections B(1)-(5) of Ground One because Gabrion does not identify any evidence that was withheld from the defense. Moreover, there could not be any prejudice because the testimony at issue in Sections B(1)-(5) was not material to Gabrion's conviction or sentence. *See* Ground One, Sections B(1)-(5).

#### 2. Section B(6) – Greg Leon

In Section B(6) of Ground One, Gabrion speculates that the Government failed to disclose evidence that Leon received a benefit from the Government in exchange for his testimony. As the Government indicates in its response brief, however, there were no charges pending against Leon when he spoke with the FBI in 1997, and he did not testify against Gabrion until March 2002, almost four years after the state court sentenced him to time served. Gabrion's assertion that Leon

---

[20] The relevant sections are identified as Sections A to E in Gabrion's motion. However, the Court will refer to them as Sections B(1)-(7) because that is how the Court has labeled them in this Opinion. (The Court separated the facts in Section E of Gabrion's motion into three sections of this Opinion, Sections B(5)-(7).)

received a benefit from the federal government in connection with his state sentence is implausible and unfounded.

Gabrion also contends that the Government failed to disclose that Leon "had a pending criminal case in Newaygo County at the time he testified in Mr. Gabrion's case." (Am. § 2255 Mot. 148.) As the Government notes, however, this assertion is also unsupported.

Furthermore, Gabrion cannot demonstrate prejudice under *Brady* because Leon's testimony was not material to Gabrion's conviction or sentence. *See* Ground One, Section B(6).

### 3. Section B(7) – Nathan Brewster

In Ground One, Section B(7), Gabrion contends that Brewster was promised that he would receive the services of an investigator if he testified against Gabrion, and the Government never disclosed this promise to the defense. (*See* Brewster Aff. ¶ 3, ECF No. 141-3 ("Before I testified against Mr. Gabrion, law enforcement officials promised me that they would help me get the services of an investigator.").) This evidence would have been helpful to impeach Brewster's credibility, but only marginally so. Defense counsel covered this territory during cross-examination, eliciting Brewster's admission that he was testifying in the hope that it would benefit his sentence. (S. Tr. II, 361.) Presenting additional evidence that Brewster's hope was founded in a specific promise from the Government would not have meaningfully eroded Brewster's credibility.

Moreover, undermining Brewster's credibility would not have had an impact on the proceedings because Brewster's testimony was not material to the outcome. As discussed in Ground One, Brewster testified about some of Gabrion's dangerous conduct in prison, Gabrion's statement that he killed Rachel because "she screamed rape and he had to take care of his business," and Gabrion's concern that there was another body in Oxford Lake. But even without Brewster's

testimony, there is ample evidence of Gabrion's guilt, his motive for killing Rachel, his involvement in baby Shannon's death or disappearance, and his dangerous conduct in prison.

### B. FBI hair analysis

Gabrion contends that the Department of Justice "recently announced that FBI analysts have routinely falsified and/or exaggerated their findings in favor of the government as it relates to hair and fiber analysis." (Am. § 2255 Mot. 148.) He claims that the Government should have disclosed this information because it would have been helpful to undermine the testimony that the piece of duct tape found near the boat launch to Oxford Lake had hair on it that matched the microscopic characteristics of Rachel's hair. This claim is conclusory. Gabrion does not contend that the prosecutors were aware of the FBI's flawed practices at the time of his trial, or that the FBI analyst, Douglas Deedrick, falsified or exaggerated the findings in *Gabrion's* case.

Moreover, any evidence undermining the FBI's hair analysis would not have impacted the outcome of Gabrion's proceedings. The duct tape and hair evidence was important only because it tended to show that Gabrion killed Rachel on federal property. It suggested that Gabrion bound Rachel with duct tape near the boat launch to Oxford Lake, which further suggests that she was still alive when he brought her to the lake. However, the hair analyst conceded that the duct tape found by the boat launch did not match the duct tape used on Rachel. (Tr. VII, 1544.) Consequently, the jury already had reason to discount the probative value of the hair evidence. It is far more likely that the jury relied on the much stronger evidence that Gabrion drowned Rachel in the lake, including the expert testimony of Dr. Cohle ruling out causes of death other than asphyxiation/drowning, the presence of restraints and padlocks on Rachel's body, and Gabrion's inculpating statements. *See* Ground Three, Section P.

### C. Lloyd Westcomb

Gabrion claims that the Government failed to disclose that Lloyd Westcomb's competence was being "questioned" in Newaygo County at the time of Gabrion's case. (Am. § 2255 Mot. 148.) The Court of Appeals considered and rejected this claim because "the fact of the competency evaluation was plainly not material in light of the information disclosed by Westcomb during his testimony[.]" *Gabrion II*, 648 F.3d at 351. The information disclosed by Westcomb included the fact that there was a pending criminal charge against him, and the fact that he is a paranoid schizophrenic. *Id.* "[I]t is difficult to see what added, as opposed to cumulative, value [the evidence that Westcomb submitted to a competency evaluation] would have presented in light of those two disclosures." *Id.* at 351-52. "Given the evidence's cumulative nature . . . there was nothing about Westcomb's competency evaluation that would undermine confidence in the jury's verdict." *Id.* at 352.

Gabrion provides no reason to part ways with the Court of Appeals on this issue. "It is . . . well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *accord Foster v. Chatman*, 136 S. Ct. 1737, 1758 (2016) ("[A]s a general rule, federal prisoners may not use a motion under 28 U.S.C. § 2255 to relitigate a claim that was previously rejected on appeal."). Gabrion does not allege any "exceptional circumstances" that would apply in this case. Thus, the claim is meritless for the reasons stated by the Court of Appeals.

*Ground Seven:* **Ineffective assistance of appellate counsel**

### A. Suppression of Evidence

Before trial, Gabrion filed a motion to suppress evidence of the concrete blocks seized from his property. Gabrion argued that the police searched the curtilage of his property

175

without a warrant.  The Court denied the motion.  Gabrion now contends that appellate counsel should have raised this issue again on appeal, because "suppression of the cinder blocks would have dramatically altered the government's case at trial."  (Am. § 2255 Mot. 150.)

The performance/prejudice standard of *Strickland* also applies to claims of ineffective assistance of *appellate* counsel, but the standard for reasonable performance is tailored to the circumstances.  Appellate counsel is not required to "raise every non-frivolous issue on appeal."  *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  Appellate counsel may reasonably decide that selecting only some of the possible nonfrivolous claims will "maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail . . . is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52).  Thus, when the *Strickland* claim is based on failure to raise a particular issue on appeal, "it is difficult to demonstrate that counsel was incompetent."  *Robbins*, 528 U.S. at 288.  Counsel's judgment is "presumed to be effective unless the ignored issues are clearly stronger than those presented."  *Sullivan v. United States*, 587 F. App'x 935, 944 (6th Cir. 2014).

Gabrion does not argue, let alone show, that the suppression issue was clearly stronger than the twenty-some issues that he and his appellate counsel raised on appeal.  Thus, Gabrion has not shown that appellate counsel's performance was deficient.

Nor has Gabrion shown prejudice.  Judge Bell determined that the suppression motion should be denied because the concrete blocks were located in an "open field," in "plain view" of the officers and the public.  (R. 384: 12/14/2001 Hr'g Tr. 72-73.)  Gabrion contends that the "plain view" exception only applies if the police were in a place in which they have a right to

be, and the police had no right to be on Gabrion's property. (Reply 156.) However, the police officers' location and vantage point would be relevant only if the blocks were located in an area in which Gabrion had a reasonable expectation of privacy. Judge Bell found that they were not located in such an area; consequently, the Fourth Amendment offered no protection. *See Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *see also United States v. Jones*, 565 U.S. 400, 411 (2012) ("Quite simply, an open field, unlike the curtilage of a home, is not one of the protected areas enumerated in the Fourth Amendment.") (citation omitted). This decision was based on factual determinations about the location of the blocks, their visibility to the public, and the characteristics of the property on which they were located. The Court of Appeals would have reviewed these findings for clear error. Gabrion has not argued, let alone demonstrated, that the district court's factual findings were clearly erroneous.

Moreover, Gabrion does not address Judge Bell's reasoning that the officers had a right to be on Gabrion's property because they were executing an arrest warrant. (*See* 12/14/2001 Hr'g Tr. 70-71.) Thus, for all the foregoing reasons, Gabrion has not shown prejudice. He has not shown that there is a reasonable probability that his appeal would have been successful if his counsel had raised the Fourth Amendment issue.

In addition, Gabrion has not shown prejudice to the outcome of his trial because the matching cinder blocks were some of the many different pieces of evidence tying Gabrion to Rachel's death. Their suppression would not have made a difference.

## B. Failure to specify irrelevant testimony regarding dangerousness

The Court of Appeals declined to decide whether evidence of dangerousness should be limited to evidence that was relevant in the prison context because "Gabrion [did] not indicate which of the unadjudicated acts alleged would be relevant only outside the prison context, and it

is unclear to us which acts would fall outside of this limitation, were we to impose it." *Gabrion II*, 648 F.3d at 349.

Gabrion contends that appellate counsel was ineffective for failing to specify the testimony that was irrelevant, incorporating the facts in Ground Four. However, Gabrion's present counsel have not performed any better. This Court is not persuaded that any material evidence presented during the sentencing phase would be irrelevant to dangerousness in the prison context, or to the broader question of whether a death sentence is the appropriate penalty in this case. *See* Ground Four, Section G. Thus, the Court is not persuaded that appellate counsel's conduct was unreasonable or that Gabrion suffered prejudice.

## C. Challenges to the FDPA

Gabrion contends that his appellate counsel did not bring "appropriate statutory challenges to the FDPA . . . discussed below," presumably referring to Ground Eight of his motion. (Am. § 2255 Mot. 150.) For the reasons discussed below, Ground Eight is meritless. Counsel did not act unreasonably by failing to raise a meritless issue.

## D. Meaningful Appellate Review

Gabrion implies that appellate counsel's alleged ineffectiveness deprived him of "meaningful appellate review," citing *Parker v. Duggar*, 498 U.S. 308, 321 (1991). In *Parker*, the United States Supreme Court noted that the "Constitution prohibits the arbitrary or irrational imposition of the death penalty," and that "meaningful appellate review" plays a "crucial role" in enforcing this prohibition. *Parker*, 498 U.S. at 321. The Supreme Court held that the Florida Supreme Court did not provide meaningful appellate review to the defendant in that case because it "did not rely on what the trial judge actually found; it relied on 'findings' of the trial judge that bear no necessary relation to the case." *Id.* at 322. In addition, the state court did not consider the

mitigating circumstances. *Id.* These acts and omissions "deprived [the defendant] of the individualized treatment to which he is entitled under the Constitution." *Id.*

*Parker* does not apply. Gabrion does not challenge the adequacy of the review that he received by the Court of Appeals. Instead, he challenges his appellate counsel's failure to raise certain claims on appeal. Counsel's alleged errors, which Gabrion has not shown to be errors at all, do not implicate the adequacy of the appellate court's review.

### E. Cumulative Effects

Finally, Gabrion's claim that the cumulative effects of his appellate counsel's errors prejudiced him is meritless because he has not demonstrated any error in appellate counsel's conduct. Thus, there are no errors to cumulate.

### *Ground Eight:* FDPA is unconstitutional as applied to Gabrion

Gabrion argues that the FDPA is unfairly applied because there is evidence that the Department of Justice is more likely to authorize the death penalty in cases where the victim is white than in cases where the victim is not white. And when these cases go to trial, a defendant charged with killing a white victim is three times more likely to be sentenced to death than a defendant charged with killing a non-white victim. Gabrion contends that these disparities demonstrate that he was denied his right to due process, to equal protection, and to be free from cruel and unusual punishment. He also claims that evidence of a "developing pattern" of discrimination in the imposition of the death penalty was available to his trial counsel, but that counsel performed ineffectively by failing to obtain this information to challenge the Government's "racially discriminatory actions." (Am. § 2255 Mot. 153.)

Gabrion cites two studies in support of his claim.[21]  According to Gabrion, a 2001 report by David Baldus states that, for the period between 1995 and July 20, 2000, the United States Attorney General authorized capital prosecutions at a higher rate in cases where the victim was white, and for cases that go to trial, the likelihood of a death sentence is twice as high when the victim is white.  (Am. § 2255 Mot. 152.)  More recently, Lauren Cohen Bell reported that, from 1989 through August 2008, a federal defendant charged with killing a white victim was three times more likely to receive a death sentence than a defendant charged with killing a non-white victim.  (*Id.* at 153.)

Inflicting the death penalty in an arbitrary and capricious manner is a violation of due process and the Eighth Amendment's prohibition of cruel and usual punishment.  *See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *Furman v. Georgia,* 408 U.S. 238, 277, 241 (1972) (Douglas, J., concurring).  Inflicting the death penalty on the basis of race is arbitrary and capricious and is also a violation of Equal Protection Clause of the Fourteenth Amendment.  *See McCleskey v. Kemp*, 481 U.S. 279, 291-92 (1987).

Gabrion's statistical evidence is not sufficient to show a constitutional violation.  To prevail on his claim, Gabrion must prove that "the decisionmakers in *his* case acted with discriminatory purpose," and that their purposeful discrimination "'had a discriminatory effect' on him."  *McCleskey*, 481 U.S. at 292.  In *McCleskey*, the defendant presented statistical evidence that an offender in Georgia is more likely to receive the death penalty when the offender is black and the victim is white.  The Supreme Court held that statistical evidence of racial disparities in the imposition of the death penalty in Georgia was not sufficient to support an inference of discriminatory intent by any of the decisionmakers in his case.  *Id.* at 296.

---

[21] Gabrion has not provided the actual studies to this Court, but for purposes of this Opinion, the Court will accept Gabrion's representations about their contents.

Gabrion's claim suffers from the same deficiency as the claim in *McCleskey*. Gabrion has not offered any evidence that the decisionmakers in *his* case acted with discriminatory intent. Courts have routinely rejected claims similar to the one raised by Gabrion. *See, e.g.*, *United States v. Sampson*, 486 F.3d 13, 26-27 (1st Cir. 2007) ("Bare statistical discrepancies are insufficient to prove a Fifth Amendment violation with respect to the implementation of a statute."); *see also United States v. Montgomery*, No. 2:11–cr–20044–JPM–1, 2014 WL 1453527, at *11 (W.D. Tenn. Apr. 14, 2014) (collecting cases).

Gabrion requests discovery and an evidentiary hearing concerning the Government's process for authorizing the death sentence and offering plea bargains, but he does not provide "specific allegations" that, if proved, would entitle him to relief. *Lynott*, 929 F.2d at 232. He does not allege discriminatory purpose or effect in his case. Without such allegations, and a plausible basis for asserting them, he is not entitled to relief.

Moreover, to the extent Gabrion contends that the Government prosecuted him or approved the death penalty for improper reasons, he has not satisfied the Supreme Court's "rigorous standard" for discovery in aid of a selective-prosecution claim. *See United States v. Armstrong*, 517 U.S. 456, 468 (1996); *see also In re United States*, 397 F.3d 274, 284 (5th Cir. 2005) (applying *Armstrong* to a claim that the government sought the death penalty for improper reasons). To meet this standard, Gabrion must "produce some evidence that similarly situated defendants . . . could have been prosecuted, but were not[.]" *Id.* at 469. Gabrion has not provided any such evidence; he merely alludes to general statistics about other cases. Consequently, he is not entitled to discovery or an evidentiary hearing. *Cf. United States v. Bass*, 536 U.S. 862, 864 (2002) (overturning discovery order because "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*"); *United States v. Lawrence*, 735 F.3d

385, 439 & n.3 (6th Cir. 2013) (affirming denial of discovery request that was based exclusively on statistical evidence of racially disproportionate prosecutions).

In short, Gabrion has not shown that the FDPA is applied in a manner that is discriminatory, arbitrary, or capricious. For the same reason, he has not shown that it was unreasonable for his counsel to not raise this issue, or that he was prejudiced by his counsel's conduct. Thus, the claims presented in Ground Eight are meritless.

*Ground Nine:* **Failure to provide notice in the indictment**

### A. Notice of Aggravating Factors

Relying on *Ring v. Arizona*, 536 U.S. 584 (2002), Gabrion contends that the Government denied him his constitutional rights because the indictment in his case did not mention the death penalty and did not charge the aggravating factors other than those required for a capital offense under 18 U.S.C. § 3592(c). It did not charge any of the non-statutory aggravating factors raised by the Government during the sentencing phase.

Gabrion raised this argument on appeal and the Court of Appeals rejected it as a basis for reversing his conviction and sentence:

> Gabrion argues that his indictment was fatally deficient under the Fifth Amendment because it did not allege any of the statutory aggravating factors that were legally necessary to render him eligible for the death penalty. But one year before the trial, the government advised Gabrion of all the aggravating factors it would prove in a notice that it would seek the death penalty. Assuming for the sake of argument that the Fifth Amendment requires indictments under the Federal Death Penalty Act to allege statutory aggravating factors, we nonetheless find that error to be harmless here. . . . Gabrion had notice of the aggravating factors one year in advance of trial—more than sufficient time to prepare a defense. [Moreover,] no rational grand jury could fail to find that the prosecution lacked probable cause on any of the aggravating factors, because the evidence of probable cause on those factors was strong.

*Gabrion II*, 648 F.3d at 329-30 (footnotes omitted).  Gabrion does not allege any "exceptional circumstances" that would allow him to relitigate this issue in these proceedings.  *See Jones*, 178 F.3d at 796.

### B.  Standard for Proving Aggravating Factors

Gabrion also contends that the Court of Appeals erred when it decided that the aggravating factors were not elements of the offense that needed to be proven beyond a reasonable doubt.  *See Gabrion III*, 719 F.3d at 532-33.  This is another issue that cannot be relitigated.  At the time of the Court of Appeals' opinion, six other federal appellate courts had rejected the same argument.  *Id.* at 533.  Gabrion does not point to any decision supporting his position.  Thus, there are no exceptional circumstances warranting reconsideration of that issue in these proceedings.

### *Ground Ten:* Ineffective assistance of counsel re juror statements

After Gabrion's trial, a newspaper interviewed the foreman of the jury, who reportedly stated, "'I read your paper religiously.  I knew [Gabrion] was off the wall' before the trial."  (*See* R. 548: Suppl. to Def's Mot. for New Trial, Attach., *Juror gives details about deliberations in death penalty case*, The Grand Rapids Press (Mar. 26, 2002).)  Gabrion's trial counsel filed this newspaper article in support of a motion for a new trial, arguing that the Court should hold an evidentiary hearing to determine what effect any news consumed by this juror before the trial had on the juror's beliefs, and whether Gabrion was prejudiced by it.  (R. 548.) Counsel argued that the juror's statements were inconsistent with his representations before the trial that he had heard very little about the case and that he could set aside whatever news he had heard and whatever preconceptions he might have about Gabrion.

Judge Bell denied the motion and request for an evidentiary hearing because none of the statements attributed to the juror by the newspaper were inconsistent with his statements to

the Court, and nothing in the record indicated that he lied to the Court during voir dire.  (R. 572:

4/24/2002 Op. 7.)  The Court of Appeals upheld that decision.  *Gabrion II*, 648 F.3d at 350-51.

Gabrion now contends that counsel was ineffective in "the manner" in which

counsel presented this claim to the Court.  (Am. § 2255 Mot. 157.)  Gabrion contends that counsel

did not present the claim in "simple terms," to wit, the foreman was asked if he had an opinion

about the case but he falsely testified that he did not have one.  (*Id.*)

This claim is meritless because the juror's statements to the media are not

inconsistent with any of his representations to the Court.  The juror told the Court that he had heard

some information from the media about the case, that he had not formed an opinion about the case,

and that he could disregard what he had heard and make a decision based on the evidence.  (R.

549: Scherff Voir Dire Tr. 3-5.)  His statement that he "knew [Gabrion] was off the wall" before

trial does not express an opinion about the case.  It says nothing about whether he had an opinion

about Gabrion's guilt or sentence.  Thus, even if trial counsel had focused specifically on the

juror's statement that he had not formed an opinion about the case, the outcome of the motion for

an evidentiary hearing and new trial would have been the same.  Counsel was not ineffective for

failing to articulate a meritless issue.

***Ground Eleven:* Execution of a mentally ill individual as an Eighth Amendment violation**

Gabrion argues that he is mentally ill and that executing him would violate the

Eighth Amendment's prohibition of cruel and unusual punishment, citing *Atkins v. Virginia*, 536

U.S. 304 (2002) and *Roper v. Simmons*, 543 U.S. 551 (2005).

In *Atkins*, the Supreme Court held that "the Constitution 'restrict[s] . . . the State's

power to take the life of' *any* intellectually disabled individual."  *Moore v. Texas*, 137 S. Ct. 1039,

1048 (2017) (quoting *Atkins*, 536 U.S. at 321).  Executing intellectually disabled individuals is

impermissibly excessive in light of society's "evolving standards of decency," because it "serves

no penological purpose," it "runs up against a national consensus against the practice," and it "creates a 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty[.]'" *Id.* (quoting *Atkins*, 536 U.S. at 320).

In *Roper*, the Supreme Court held that the Eighth and Fourteenth Amendments "forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Roper*, 543 U.S. at 578. Among other things, the Supreme Court noted a "national consensus" against capital punishment for juveniles, as evidenced by "the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice[.]" *Id.* at 567.

Gabrion argues that the logic of these cases should be extended to offenders who are "mentally ill" or "severely mentally ill." (Am. § 2255 Mot. 159.) According to *Roper*, the "beginning point" of this analysis is "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Roper*, 543 U.S. at 564. However, "[c]onsensus is not dispositive." *Kennedy v. Louisiana*, 554 U.S. 407, 421 (2008). The Court must also "determine, in the exercise of [its] own independent judgment, whether the death penalty is a disproportionate punishment" for the class of individuals at issue. *Roper*, 543 U.S. at 564.

Gabrion's argument falters on many levels. First, he has not offered any evidence of a consensus against the execution of criminally responsible individuals who may suffer from mental illness, "as expressed . . . by the enactments of legislatures that have addressed the question." *See id.* He does not point to any state laws that exclude such individuals from the death penalty. Instead, he cites a resolution by the American Bar Association (ABA) which expresses the view that

185

Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law.

ABA Task Force on Mental Disability and the Death Penalty, *Recommendation & Report on the Death Penalty & Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (Aug. 2006).   A similar recommendation was adopted by the American Psychiatric Association, the American Psychological Association, and the National Alliance of the Mentally Ill.  *Id.*  The ABA's recommendation is not strong evidence of a broad consensus on the issue. Unlike legislatures, the foregoing interest groups do not represent the broader public.

Even if the Court were to consider the ABA's recommendation as evidence of a consensus, that consensus does not apply to Gabrion.  By its own terms, the ABA recommendation does not extend to every individual with a mental illness.  It is limited to individuals with a "severe" mental disorder or disability accompanied by at least one of the impairments described in subjections (a), (b), or (c) of the text above.  *See id.*  "Severe" means

a disorder that is roughly equivalent to disorders that mental health professionals would consider the most serious 'Axis I diagnosis,' [including] schizophrenia and other psychotic disorders, mania, major depressive disorder, and dissociative disorders. . . .  In their acute state, all of these disorders are typically associated with delusions (fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory and perception of the environment.

*Id.* at 670.  In addition, the impairments in subsections (a), (b), and (c) must have "significantly impair[ed] cognitive or volitional functioning at the time of the offense."  *Id.* at 671.

Gabrion does not contend, let alone show, that he suffers from a disorder described in the ABA recommendation.  He simply asserts that "he has struggled with mental illness, as well as organic brain disease and neurological impairments."  (Am. § 2255 Mot. 158.)  The evidence

in the record does not support a diagnosis of an "Axis I" mental disorder, let alone one that significantly impaired his cognitive or volitional functioning at the time of his offense. Thus, Gabrion fails to provide any evidence whatsoever of a consensus against imposition of the death penalty on individuals like him.

Furthermore, in the Court's own judgment, the death penalty is not automatically an excessive punishment for all criminally responsible people who have some form of mental illness. Here, the Court "considers whether the challenged sentencing practice serves legitimate penological goals." *Graham v. Florida*, 560 U.S. 48, 67 (2010). Retribution and deterrence are legitimate goals for the death penalty. *See Atkins*, 536 U.S. at 319. As part of its inquiry, the Court considers the "culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Graham*, 560 U.S. at 67.

In *Atkins* and *Roper*, the Supreme Court reasoned that intellectually disabled individuals and juveniles have lessened culpability, so they are less deserving of the most severe punishments. *Atkins*, 536 U.S. at 319; *Roper*, 543 U.S. at 569. In addition, those who are intellectually disabled are less likely to be deterred by the death penalty because they have a diminished ability to engage in logical reasoning and to control their impulses. *Atkins*, 536 U.S. at 320. Likewise, juveniles are less likely to be deterred because they are less likely to consider the consequences of their actions. *Roper*, 543 U.S. at 571-72.

Unlike the characteristics at issue in *Atkins* and *Roper*—age and intellectual disability—mental illness encompasses a broad range of conditions and symptoms, some of which might make a defendant less culpable for his conduct or less amenable to deterrence, and some of which do not. Also, the severity of an illness and its symptoms can vary greatly from person to person and from one moment to another. Indeed, some mental illnesses can be treated, whereas

the effects of youth and intellectual disability ordinarily cannot. Thus, an individualized, case-by-case inquiry is more appropriate than a blanket ban on the execution of criminally responsible individuals who are found to have a mental illness. A jury is capable of weighing a defendant's particular characteristics as an aggravating or mitigating factor when deciding whether a death sentence is the appropriate penalty.

Moreover, as other courts have noted, protections already exist for those with mental illnesses that result in severe cognitive impairments. A federal defendant who was "unable to appreciate the nature and quality or wrongfulness of his acts" at the time of his offense, due to a "severe mental disease or defect," can assert a defense to the charge. 18 U.S.C. § 17(a). In addition, the Eighth Amendment bars the execution of a defendant whose mental illness "prevents him from comprehending the reasons for the penalty or its implications." *Ford v. Wainwright*, 477 U.S. 399, 417 (1986).

Other courts that have considered whether to extend *Atkins* and *Roper* to defendants with a mental illness have decided not to do so. *See State v. Kleypas*, 382 P.3d 373, 445 (Kan. 2016) (collecting cases). Gabrion cites no authority supporting his position. Like other courts, this Court concludes that the Constitution does not categorically prohibit the execution of criminally responsible persons who have a mental illness. Thus, Gabrion's claim is meritless.

The Government also asserts that this claim is procedurally defaulted because Gabrion did not raise it at trial or on appeal, and he has not alleged "cause" and "prejudice" to excuse his default. *See United States v. Frady*, 456 U.S. 152, 170 (1982). Gabrion does not respond to this assertion in his reply, and does not contend that he qualifies for the "actual innocence" exception to procedural default. Accordingly, Gabrion's claim is both meritless and procedurally defaulted.

For the reasons stated, all of Gabrion's claims are meritless and/or procedurally defaulted. Accordingly, his amended motion under § 2255 will be denied.

## VII. Other Motions

### A. Discovery

Before filing his amended motion under § 2255, Gabrion filed several motions seeking discovery of various issues. The Court denied those motions without prejudice pending review of the merits of Gabrion's motion for relief, but indicated that it would consider his discovery requests in connection with the Court's review of his claims. (9/20/2016 Order, ECF No. 74.)

The Court has reviewed Gabrion's discovery requests in his brief in support of a motion for leave to conduct depositions (ECF No. 59) and in his amended motion for discovery (ECF No. 67), and finds that none of his requests are supported by good cause.

#### 1. Depositions

Gabrion would like to depose a number of individuals associated with his trial:

##### (a) Trial counsel

Gabrion would like to determine what counsel "did and did not to in order to deal with mental health issues and in order to defend the guilty phase of the proceedings"; he contends that he is "entitled to determine why trial counsel chose a specific approach at trial and [is] entitled to know what work was considered and ordered by counsel." (ECF No. 59, PageID.2573.) He contends that there is no other way he can determine "why crucial decisions were made." (*Id.*, PageID.2574.) Gabrion's claims of error by counsel are meritless on the record before the Court. Eliciting the reasons for counsel's decisions would not benefit his claims. Thus, discovery is not warranted.

*(b)  Mitigation Specialist and Fact Investigator*

Gabrion asserts that "[i]t is impossible to determine how the case was defended without questioning the only two investigators who supported the work of trial counsel." (*Id.*)  To the contrary, the manner in which Gabrion's case was defended is a matter of public record.  This request is not supported by good cause.

*(c)  Christopher Yates*

Gabrion contends that Yates represented "witnesses" at the grand jury and provided assistance to Gabrion.  (*Id.*, PageID.2575.)  Gabrion would like to know "precisely" what work Yates did for Gabrion "and other clients involved in the investigation into Ms. Timmerman's death." (*Id.*)

To date, Gabrion has identified only one witness that Yates represented.  He has not given the Court reason to believe that there are others.  Moreover, as indicated in Ground Two, Gabrion's claim about Yates is meritless for multiple reasons.  Regardless of the work that Yates performed for Gabrion or his attorneys, Yates did not represent Gabrion.  The attorneys who did represent Gabrion were not burdened by a conflict of interest, and Yates' conflict could not have adversely affected their performance.  Thus, Gabrion was not deprived of the right to conflict-free counsel.

*(d)  Chrystal Roach*

Gabrion would like to depose Roach about the policies in her office regarding preliminary examinations in CSC cases.  As discussed in Ground One, Section B and Ground Three, Section L, Roach's testimony was not material to Gabrion guilt or sentence.  Further evidence of her office's policies about conducting preliminary examinations will not aid his motion for relief.

*(e) FBI agents who conducted handwriting analysis*

Gabrion would like to depose the FBI agents who analyzed Rachel's letters, in order to determine their knowledge and understand why they were not called as witnesses. Their knowledge is not relevant and their testimony would not have helped Gabrion's case.

*(f) Mental health experts: Drs. Scharre, Jackson, Ryan, Saathoff, & Waalkes*

Gabrion would like to know if the opinions of the mental health experts would have changed if they had possessed the information in the Social History. Gabrion could have tried to make at least a preliminary showing of this with an independent expert, using the information already in his possession. He has not done so. Moreover, he has not shown that the scope of his trial counsel's investigation was unreasonable. Accordingly, this request is not supported by good cause.

*(g) Dr. Cohle*

Gabrion would like to depose Dr. Cohle because "additional facts and circumstances have come to light that might impact his opinions." (*Id.*, PageID.2576.) No such facts or circumstances are identified with any specificity. This request is too vague to show good cause for discovery.

*(h) Officers Chamberlain and Workman*

Gabrion would like to know why Officers Chamberlain and Workman did not include details about the bullfrog and doll located in Gabrion's residence in a police report describing the incident or in a letter that the Government gave to the defense prior to the trial. He would also like to know how the Government learned about this information. Gabrion does not indicate how any of this is relevant to his motion for relief under § 2255. Moreover, the testimony about the bullfrog and doll played a minor, insignificant role in the trial.

*(i) Sergeant Miller*

Gabrion claims that Miller was not fully or properly questioned or presented as a witness. Gabrion would like to understand what Miller knows about the case and what he could have presented. Miller apparently told the grand jury that some people reported to the police that they saw Rachel a day or two after June 3. However, the precise date of Rachel's disappearance is irrelevant. *See* Ground One, Section B(3). Thus, further discovery on this issue is not warranted.

## 2. Documents

Gabrion also seeks various documents:

*(a) Dr. Griesemer's records*

Gabrion seeks all records provided to Dr. Griesemer, who disagreed with Dr. Scharre's conclusions about Gabrion's brain injury. Gabrion claims that part of Dr. Griesemer's opinion may be based on records that were not provided to trial counsel, because Griesemer wrote a letter to the prosecutor referring to documents that apparently were not provided to Gabrion's trial counsel. Gabrion does not indicate why these records are relevant or what he expects to find in them.

*(b) FBI records*

Gabrion seeks production of documents and files related to the work done by the FBI analysts who examined Rachel's letters. Gabrion's claims based on the FBI report are plainly meritless. Thus, his request is not supported by good cause.

*(c) Liz's House*

Gabrion seeks records related to Liz's House, a group home where Rachel's probation officer ordered her to live. Gabrion claims that this information is relevant to show that Rachel had a motive for leaving home that is unrelated to Gabrion, and that his trial counsel was

ineffective for failing to investigate this issue.  *See* Ground Three, Section I.  However, Rachel's motive is irrelevant to Gabrion's guilt and sentence.

*(d)  Rachel's criminal records*

Gabrion also seeks the prosecuting attorney's file and the file of Rachel's probation officer in Rachel's criminal case.  Gabrion believes that it might contain evidence of Rachel's motive for leaving home and of other individuals who might have had a motive to murder her due to her involvement with illegal narcotics.  Rachel's motive for leaving home is irrelevant, as is the possibility that another individual might have had a motive to kill her.  Gabrion's guilt is overwhelmingly supported by the evidence.

*(e)  Westcomb's medical records*

Gabrion contends that the medical and mental health records of Lloyd Westcomb may contain evidence relevant to his ability to competently and accurately testify that could have been used for impeachment purposes.  However, Gabrion's counsel thoroughly impeached Westcomb's credibility by having him disclose he has schizophrenia, poor memory, and hallucinations.  Because of these disclosures, and the other evidence of Gabrion's guilt, the Court of Appeals determined that the fact that Westcomb submitted to a competency evaluation in another proceeding was "plainly not material."  *Gabrion II*, 648 F.3d at 351.  For the same reasons, this Court cannot discern the value of additional records pertaining to Westcomb's ability to testify.

*(f)  Fire at Wilma Babcock's; death/disappearance of Allen, Davis, Weeks, Shannon*

Gabrion seeks discovery of all information in possession of the Government about the fire at Wilma Babcock's and the death/disappearance of Allen, Davis, Weeks, and Rachel's daughter, Shannon.  Gabrion claims that this information relates to counsel's failure to investigate and object to the admission of evidence during the sentencing phase of the trial.  *See* Ground Four,

Section G.  Gabrion apparently believes that there may be evidence that he did not start the fire at Wilma Babcock's house, and did not kill Allen, Davis, Weeks, or baby Shannon.  This request is a classic example of a "fishing expedition."  *Williams*, 380 F.3d at 974.   It is not supported by good cause.

### (g)  Consideration to Jason Cross

Gabrion requests all evidence of any agreements between the Government and Jason Cross.  Discovery is not warranted for the reasons given in Ground Four, Section P.

### (h)  Psychology Data Systems records

Among other things, Dr. DeMier reviewed records from Psychology Data Systems regarding Gabrion's interactions with Bureau of Prisons psychologists between October 30, 1997, and July 27, 2001.  Gabrion contends that this information was not provided to trial counsel, and that it is relevant to his claims that counsel did not effectively handle Gabrion's competency issues because Gabrion was incompetent to stand trial.

Gabrion's competence is supported by the opinions of many experts, as well as his own actions before, during, and after trial.  He has not given the Court reason to believe that the aforementioned records would undermine that consistent finding.

### (i)  Newaygo County prosecution files

Gabrion seeks all files maintained by the Newaygo County Prosecuting Attorney's Office (NCPAO) regarding the prosecution of Gabrion for criminal sexual conduct, and information concerning its policy or practice of conducting preliminary examinations from January 1, 1997 to December 31, 2001.  He also asks the NCPAO for an admission regarding its practices related to preliminary examinations.  He believes that the foregoing will contradict the testimony of Chrystal Roach.  However, Roach's testimony is not material to Gabrion's guilt or sentence.  Thus, Gabrion's request is not supported by good cause.

*(j)  Gabrion's prison files*

Gabrion seeks "all files maintained by any institution housing Marvin Gabrion for the time period including January 1, 1997 to date." (Am. Mot. for Discovery 7.)  He believes they are relevant to: his "mental state"; counsel's alleged failure to properly litigate his competency; and "a determination of conduct, medication, and treatment." (*Id.*)  This appears to be another fishing expedition.  Gabrion does not indicate what facts he expects to discover and how those facts would support a claim to relief.

*(k)  Gabrion's social security records*

Gabrion asks for production of documents concerning his social security disability assessments and payments.  As discussed in Ground Four, Section L, he has not established good cause for this request.

*(l)  Copies of the Government's June 29, 1999, press conference*

No reason is given for this request.  Accordingly, it is not supported by good cause.

*(m)  Information identifying Matt Sugarman*

Gabrion asserts that an individual named Matt Sugarman withdrew the court records for Gabrion's rape case prior to the murder trial.  Gabrion intends to show that the Government possessed these files and was aware of Roach's "false" testimony.  For the reasons stated in Grounds One and Three, Gabrion's claims about Roach's testimony are meritless.  Even if he could show that her testimony was false, and that the Government was aware of it, his claim would fail because Roach's testimony was immaterial.

*(n)  Interview summaries of individuals who saw Rachel alive after June 3, 1997*

Gabrion requests information to challenge the Government's statement at trial to the effect that Rachel disappeared on June 3 and was not seen alive after that date.  For the reasons

explained in Ground One, Section B(3), the precise date on which Rachel was last seen near her home is immaterial.  Even if there is a witness who recalled seeing Rachel alive after that date, the outcome of Gabrion's trial would have been the same.

*(o) Instructions and training materials for Assistant United States Attorneys regarding BOP disciplinary regulations*

Gabrion apparently wants to show that the prosecutors in Gabrion's case "were aware of the many safeguards available to the BOP to guarantee that [Gabrion] would not be a danger to others while in prison," because that would "contradict the position advanced by the government at trial."  (Am. Mot. for Discovery 9.)  All of Gabrion's claims related to the BOP regulations are meritless, whether the prosecutors were aware of the regulations and other safeguards or not.

*(p) Identification of all clients represented by the Office of the Federal Defender from June 1, 1997, to April 1, 2002, "in any investigation for which [Gabrion] was a target"*

Gabrion speculates that Yates may have represented other witnesses in addition to Lunsford.  This is another fishing expedition, unsupported by good cause.  Moreover, the Court gave several reasons for denying the claim involving Yates in Ground Two, not the least of which is the fact that Gabrion was represented by two competent attorneys without a conflict of interest.  Thus, he cannot complain that he was deprived of the right to conflict-free counsel.  The possibility that Yates—who never formally represented Gabrion—may have had a conflict involving another witness is wholly irrelevant.

*(q) Copies of all correspondence between Gabrion and the Court*

Gabrion argues that his correspondence with the Court is relevant to his "mental state," to counsel's alleged failure to properly litigate Gabrion's competence, and to counsel's alleged failure to secure all relevant penalty phase documents.  (Am. Mot. for Discovery 9.)

Gabrion's trial counsel thoroughly litigated his competence and mental state. Thus, good cause has not been shown.

### (r)  Documents related to potential testimony of Walter Hamilton

For the reasons discussed in Ground Three, Section U, Hamilton's testimony would have been merely cumulative; introducing it would have served no purpose. Gabrion asserts that he intends to find other inconsistencies between Hamilton's statements and Coleman's testimony; however, impeaching Coleman would have been pointless because other witnesses gave testimony consistent with hers. *See* Ground One, Section B(5).

In summary, Gabrion has not demonstrated good cause for discovery.

## B.  Stay and Competency Hearing

Gabrion asks to stay these proceedings so that the Court can hold a competency hearing. His counsel asserts that Gabrion is incompetent and unable to assist counsel, and that his assistance is necessary to properly present his claims in this action. To support the claim that Gabrion is incompetent, counsel offers the following:  (1) the evidence in the record of Gabrion's conduct during and before trial; (2) the evidence in the record of Gabrion's relatively benign behavior as a child; (3) counsel's representations about Gabrion's current behavior; (4) an assertion that an unidentified forensic psychiatrist will opine that Gabrion is not competent to assist his counsel in the current proceedings; and (5) an assertion that Gabrion's appellate counsel will testify that they believed Gabrion was not competent during his direct appeal. Counsel also contends that it is "reasonably foreseeable" that Gabrion can be restored to competence. (Br. in Supp. of Mot. for a Hr'g to Determine Mental Competence, ECF No. 102, PageID.4729.)

In *Ryan v. Gonzales*, 568 U.S. 57 (2013), the Supreme Court held that a federal habeas petitioner does not have a statutory right to stay his habeas proceedings when he is incompetent. *Id.* at 64. Instead, "the decision to grant a stay, like the decision to grant an

197

evidentiary hearing, is 'generally left to the sound discretion of district courts.'" *Id.* at 74 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). The Supreme Court declined to specify the "precise contours" of the district court's discretion to issue stays, but it did address the "outer limits" of that discretion. *Id.* A stay is "not generally warranted" when the claims are "only record-based" or "resolvable as a matter of law, irrespective of [the petitioner's] competence." *Id.* In addition, an *indefinite* stay is always inappropriate because it would "'frustrate[] AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings.'" *Id.* at 76 (quoting *Rhines v. Weber*, 544 U.S. 269, 277 (2005)). "'In particular, capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death.'" *Id.* (quoting *Rhines*, 544 U.S. at 277-78). Thus,

> [i]f a district court [considering a competency-based stay] concludes that the petitioner's claim could substantially benefit from the petitioner's assistance, the district court should take into account the likelihood that the petitioner will regain competence in the foreseeable future. Where there is no reasonable hope of competence, a stay is inappropriate[.]

*Id. Ryan* involved a habeas petition by a state prisoner under 28 U.S.C. § 2254, but its logic also applies to motions to alter or amend judgment under 28 U.S.C. § 2255.

In this case, all the evidence before the Court indicates that Gabrion is *unwilling* to cooperate with his counsel, not that he is *unable* to do so. Gabrion's current counsel assert that "[e]fforts to discuss [Gabrion's] case are met with derision and anger," and that Gabrion is "consumed with topics having nothing to do with his litigation and that is all he will discuss with counsel. He is actively delusional." (Br. in Supp. of Mot. for a Hr'g to Determine Mental Competence, PageID.4725.)

Counsel's observations are virtually identical to those expressed by Gabrion's trial counsel. For whatever reason, Gabrion has been hostile toward all of the attorneys appointed to

represent him in connection with his murder conviction. Before trial, he accused his attorneys of conspiring against him and sought to have them replaced. He sometimes refused to discuss matters pertaining to his case with his attorneys or with defense experts. He also refused to heed his attorneys' advice. Yet whenever he was examined by an expert for competence or mental illness, the result was always the same. He was not incompetent. He was not suffering from a diagnosable mental illness. He was aware of the proceedings against him. He was somewhat cooperative with the mental health examiners and could cooperate with counsel if he chose to do so.

Gabrion's present counsel have not offered any evidence to suggest that his current condition is any different from what it was at the time of trial, or even at the time of Gabrion's appeal, when the Court of Appeals rejected his request for yet another competency evaluation.[22] Thus, this Court is not persuaded that Gabrion is truly unable to assist his counsel in these proceedings.

Furthermore, the Court is not persuaded that Gabrion's behavior will improve if the Court grants a stay in this matter. His present counsel asserts that Gabrion has "responded well" to psychiatric medication in the past. (Br. in Supp. of Mot. for a Hr'g to Determine Mental Competence, ECF No. 102, PageID.4729.) There is very little evidence to support this assertion. According to Dr. Mauger's treatment records, Mauger treated Gabrion with valproate over the course of two years, from 1993 to 1995. (Medical Records, ECF No. 142-11.) Gabrion initially complained about an "under water feeling" and of "sparks" in his brain, but reported some

---

[22] Gabrion was hostile toward his appellate attorneys as well, and attempted to have them replaced. (*See* Pro Se Appellant's Mot. for Kevin McNally & Margaret O'Donnell to withdraw as counsel for appellant, *United States v. Gabrion*, No. 02-1386 (6th Cir.), Document 367.) According to a BOP incident report that Gabrion filed with the Court of Appeals, he attacked one of his appellate attorneys. She was with him in a visiting room at the prison. As soon as the guard left the room and secured the door, Gabrion tackled his attorney and pushed her to the floor, stating, "I will fucking kill her. I don't want her in here." (*Id.*)

improvement in these symptoms over time, as well as a "gradual increase" in social functioning. (*Id.*, PageID.5684.)

In a letter to trial counsel summarizing his expected trial testimony, Dr. Mauger noted that he began seeing Gabrion in 1993, and he prescribed medication that is used for "temporal lobe epilepsy" because it is "known to be useful for behavioral changes associated with temporal lobe dysfunction symptoms[.]" (ECF No. 44-2, PageID.2394.) Gabrion initially reported improvement in feeling "jumps" and "shocks," and the feeling of his brain being "under water," but continued to make "paranoid interpretations of events when he was upset[.]" (*Id.*, PageID.2394-95) After a year, Gabrion was taking his medication regularly and reportedly began to stabilize his life. However, "even when medication was treating the emotional lability, thought disorder, and violent outbursts, he had a pattern of doing what he wanted, such as driving without a license." (*Id.*, PageID.2395.)

After another year of treatment,

> [Gabrion's] behaviors had also improved and he was describing improved social function and use of bus transportation. His self care was remarkably improved. He became more available to psychotherapy where he was addressing bad feelings about how badly his life had fallen apart.

(*Id.*, PageID.2395.) Gabrion did not return for treatment after March 1995. Dr. Mauger saw Gabrion again after his arrest in 1997, and believed that his "mental condition has returned to the same functioning it was before I saw[] him. . . . [H]is ability to understand reality in terms of paranoid interpretations and his ability to control his angry outbursts is again seriously impaired without this type of medication treatment." (*Id.*)

The foregoing records say very little about the impact of medication on Gabrion's ability to cooperate with others, or on the paranoid thinking that may be affecting his willingness to interact with counsel. Indeed, if Gabrion pursued treatment with Dr. Mauger, he must have

been able to cooperate with Mauger to some extent even before he started on medication. And after his treatment, he was able to accomplish a number of sophisticated criminal schemes, sometimes with the help of others, apparently without the aid of any medication at all.

Furthermore, none of the many mental health professionals who examined Gabrion before trial were able to diagnose him with a treatable mental illness, and he has yet to identify such an illness or a proposed treatment. Thus, the Court is not persuaded that medication is likely to impact Gabrion's ability to assist his counsel.

Finally, the Court is not persuaded that Gabrion's claims will "substantially benefit" from his assistance. The evidence of Gabrion's guilt and of the aggravating factors in support of his sentence are overwhelming. His trial attorneys provided admirable assistance in the face of this evidence, despite Gabrion's uncooperative and unpredictable behavior.

Gabrion's counsel contends that his assistance is needed for Grounds One, Three, and Four. Grounds One and Three are plainly meritless for the reasons stated elsewhere in this Opinion. Moreover, the evidence of Gabrion's guilt is so strong that none of the allegedly "false" statements or testimony in Ground One are material, and none of counsel's alleged errors in Ground Three could have prejudiced Gabrion, either individually or in the aggregate. Thus, these claims can be resolved without Gabrion's assistance.

As to Ground Four, counsel asserts that Gabrion's assistance is necessary for his claim that trial counsel failed to prepare a multi-generational social history about Gabrion's family background. Even without Gabrion's assistance, however, his attorneys have been able to prepare an extensive summary of this history. Counsel does not indicate what additional details are needed from Gabrion himself. Moreover, for the reasons stated in Ground Four, Gabrion has not shown

that the scope of his trial counsel's investigation was unreasonable. Thus, this claim is also resolvable without Gabrion's assistance.

Accordingly, for all the foregoing reasons, neither a stay nor a competency hearing are warranted.

### C. Motion to File Exhibits Under Restricted Access

Gabrion asks for leave to file Exhibits 36 and 40 in support of his Reply under restricted access. Exhibit 36 is an ex parte memorandum that Gabrion's trial counsel filed with the Court regarding their concerns about obtaining timely funding. Exhibit 40 contains copies of vouchers that Gabrion's trial counsel submitted to obtain reimbursement for their work.

The Court discerns no compelling reason to allow Gabrion to file these entire documents under seal. Gabrion asserts that they contain confidential information related to the representation of a defendant in a criminal case, and are protected by attorney-client privilege. However, Gabrion waived his privilege by putting these documents into issue to support his claims in this action. *See In re Lott*, 424 F.3d 446, 453-54 (6th Cir. 2005) (claiming ineffective assistance of counsel or raising issues regarding attorney performance waives attorney-client privilege). Thus, the attorney-client privilege does not apply here.

Gabrion also asserts that the vouchers are protected by the Criminal Justice Act, 18 U.S.C. § 3006A. However, that act makes vouchers in completed cases a part of the public record. *See* 18 U.S.C. § 3006A(d)(4)(E) ("Upon completion of the trial, the court shall release unredacted copies of the vouchers provided by defense counsel to justify the expenses to the court. If there is an appeal, the court shall not release unredacted copies of the vouchers provided by defense counsel to justify the expenses to the court until such time as the appeals process is completed . . . .").

Finally, Gabrion notes that the exhibits contain personal identification information. He is apparently referring to the fact that the vouchers reveal the social security numbers of Gabrion's trial attorneys. The solution to that issue is to redact that information, rather than to file the entire document under seal. Accordingly, Gabrion's motion will be denied.[23]

### D. Ex Parte Motion for Psychiatrist Visits

Gabrion has filed an ex parte motion for an order authorizing a psychiatrist to continue to visit Gabrion while this case is pending. (ECF Nos. 154, 155.) The Court previously authorized this same psychiatrist to visit Gabrion in 2015 (ECF No. 34), and authorized another psychiatrist to visit him before that (R. 747). He does not provide a reason for his latest motion. Accordingly, it will be denied.

### E. Motion to Dismiss Counsel

Gabrion has filed a *pro se* motion to dismiss his attorneys in this action and to proceed without counsel, or to proceed with counsel who is a "Republican." (R. 778, PageID.1149.) Consistent with his general attitude toward attorneys appointed to represent him, he contends that the attorneys appointed to represent him in this action have lied to him and are involved in a conspiracy against him.

This is not the first time that Gabrion has made this sort of request. He filed a similar motion prior to his criminal trial. The Court denied the motion because "'[t]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.'" (R. 324: 11/8/2001 Mem. Op. & Order 2 (quoting *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 162 (2000).) Judge Bell had "grave

---

[23] The denial of this motion does not affect the Court's review of Gabrion's motion for relief under § 2255. The proposed exhibits are already part of the record in Gabrion's criminal case. The Court has access to that record and reviewed it when considering Gabrion's claims.

concerns regarding the legitimacy of [Gabrion's] request to represent himself as he [had] not demonstrated that he underst[ood] the dangers and disadvantages of self-representation." (*Id.* at 3.) In addition, Gabrion's "disruptive behavior" in court, his "abusive and obscene language in motions and letters, and his failure to heed the advice of counsel on commonsense issues concerning his pretrial behavior" convinced Judge Bell that Gabrion would not be able to follow the Court's rules of procedure or present his case effectively. (*Id.* at 3-4.)

The Court of Appeals also denied several requests by Gabrion to dismiss his counsel when his case was pending on appeal. (10/7/2009 Order, *United States v. Gabrion*, No. 02-1386 (6th Cir.), Document 407.)

Gabrion's request fares no better this time around. Gabrion does not have a constitutional right to represent himself in these proceedings. The "right to self-representation—to make one's defense personally—is . . . necessarily implied by the structure of the [Sixth] Amendment." *Faretta v. California*, 422 U.S. 806, 819 (1975). But Sixth Amendment rights dissipate after a conviction. *See Martinez*, 528 U.S. at 159 ("The Sixth Amendment does not include any right to appeal."). And after a guilty verdict, the "status of the accused defendant . . . changes dramatically," so that the balance between "the defendant's interest in acting as his own lawyer" and the "government's interest in ensuring the integrity and efficiency" of the proceedings "tips in favor of the State." *Id.* at 162. Consequently, the Supreme Court has held that there is no constitutional right to self-representation on appeal from a conviction. *Id.* at 163. It necessarily follows that there is no constitutional right to self-representation in a proceeding such as this one.

Gabrion has a *statutory* right to proceed *pro se* under 28 U.S.C. § 1654, which provides that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and

conduct causes therein." *Id.* But that right must be asserted in a timely fashion. *United States v. Jones*, 514 F.2d 1331, 1334 (D.C. Cir. 1975). In this case, Gabrion asserted his right in March 2017, several years after his attorneys were appointed and this action was filed. By 2017, the statute of limitations under 28 U.S.C. § 2255(f)(1) had long expired and he could not assert any additional claims other than the ones already raised by his counsel, unless the claims relate back to the original claims, qualify for equitable tolling or an exception to the statute of limitations, or satisfy another provision in § 2255(f). He does not identify any new claims, however. Thus, it is not clear how he could possibly "plead and conduct" his case any differently by dismissing his counsel at this point.

Gabrion certainly has not put forth a good reason for proceeding *pro se*, or for the Court to replace his counsel. He accuses his attorneys of being pedophiles who are in a conspiracy with an "Obama crime syndicate." (R. 778.) He claims that he has been proven innocent through DNA evidence. He asserts that one of his lawyers has ignored five of his letters and has refused to take his calls. He does not, however, contend that there has been a complete breakdown in communication with his attorneys, and based on his long history of hostility toward attorneys, as well as his attorneys' representations in their motion for a competency hearing, it appears that any breakdown in their relationship is the result of his deliberate refusal to work with them. Allowing him to proceed *pro se* or to replace his attorneys this late in the game would not serve his interests, the interest of the Court in preserving the integrity of these proceedings, or the Government's interest in resolving the § 2255 motion in a timely and efficient manner. Accordingly, Gabrion's motion to dismiss and/or replace his counsel will be denied.

## VIII.  Conclusion

For the reasons stated herein, Gabrion's amended motion under 28 U.S.C. § 2255 will be denied because his claims are meritless and/or procedurally defaulted.  Moreover, he has not shown good cause to warrant further discovery, and he is not entitled to an evidentiary hearing because the record before the Court conclusively demonstrates that he is not entitled to relief.

In addition, the Court will deny Gabrion's motion for a stay and a competency hearing, his motion to file exhibits under restricted access, his *ex parte* motion to allow a psychiatrist to visit him, and his *pro se* motion to dismiss or replace his counsel.

An order and judgment will enter consistent with this Opinion.


Dated:   October 4, 2018          /s/ Robert J. Jonker
                                 ROBERT J. JONKER
                                 CHIEF UNITED STATES DISTRICT JUDGE

## TABLE OF CONTENTS

I. Background ............................................................................................................. 2

   A. Initial Rape Investigation ................................................................................. 2

   B. The CSC Prosecution ....................................................................................... 3

      1. Witness Davis Disappears ............................................................................. 3

      2. An Arkansas Seed is Planted ......................................................................... 4

      3. Rachel Disappears ......................................................................................... 4

      4. John Weeks Disappears ................................................................................. 6

      5. The Arkansas Seed Sprouts .......................................................................... 7

   C. The Murder Investigation .................................................................................. 8

      1. Discovery of Rachel's Body .......................................................................... 8

      2. Gabrion Attempts to Disappear ................................................................... 10

      3. Gabrion is Arrested and Convicted for Social Security Fraud .................... 11

      4. Gabrion's Admissions in Custody ............................................................... 12

II. Trial – Guilt Phase ................................................................................................ 12

III. Trial – Penalty Phase .......................................................................................... 15

   A. Aggravating Factors ........................................................................................ 15

      1. Future Dangerousness ................................................................................. 16

      2. Death or Disappearance of Shannon ........................................................... 21

      3. Obstruction of Justice ................................................................................. 22

B. Mitigating Factors ................................................................................................ 22

1. Brain Damage / Alcohol Abuse ................................................................... 22

2. Gabrion's Family Background ...................................................................... 27

3. Gabrion's Testimony .................................................................................... 32

4. Jury Findings re Mitigating Factors ............................................................. 32

IV. Appeals ................................................................................................................ 34

V. Standards ............................................................................................................... 35

A. Merits ............................................................................................................ 35

B. Procedural Default ......................................................................................... 36

C. Statute of Limitations .................................................................................... 36

D. Discovery ....................................................................................................... 38

E. Evidentiary Hearing ....................................................................................... 39

VI. Analysis ............................................................................................................... 39

*Ground One:* False/misleading statements and evidence ....................................... 39

A. Ground One is procedurally defaulted. .......................................................... 40

B. Ground One is meritless. ................................................................................ 41

1. Chrystal Roach ............................................................................................. 42

2. Gabrion "forced" Rachel to write letters ..................................................... 46

3. Rachel disappeared on June 3 ...................................................................... 48

4. Evidence of security regulations .................................................................. 50

5. Linda Coleman ................................................................................................................ 51

6. Gregory Leon ................................................................................................................. 52

7. Nathan Brewster ............................................................................................................ 53

*Ground Two:* Denial of right to conflict-free counsel ....................................................... 56

A. Sixth Amendment ........................................................................................................... 59

B. Eighth Amendment ......................................................................................................... 64

C. Fifth Amendment ............................................................................................................ 64

*Ground Three:* Ineffective assistance of counsel at guilt phase of trial ................................... 65

A. Competence ................................................................................................................... 66

1. Background .................................................................................................................. 66

(a) First Competency Evaluation ..................................................................................... 67

(b) Second Competency Evaluation ................................................................................. 68

(c) Third Competency Evaluation .................................................................................... 70

(d) Court-Ordered Mental Health Examination ............................................................... 73

(e) Government Mental Health Examination .................................................................... 74

(f) Defense Experts .......................................................................................................... 74

(g) Trial ........................................................................................................................... 75

(h) Appeal ....................................................................................................................... 76

2. Analysis ....................................................................................................................... 78

B. Failure to ensure that Gabrion was properly medicated ................................................... 81

C. Failure to investigate and subject the Government's case to adversarial testing ............. 83

D. Failure to retain adequate investigative assistance .......................................... 83

E. Failure to secure adequate funding .................................................................. 85

F. Failure to seek a continuance ......................................................................... 88

G. Failure to seek recusal of the trial judge ........................................................ 89

H. Failure to object to "false" statements that Gabrion forced Rachel to write the letters ... 92

I. Failure to rebut evidence regarding Rachel's motive for leaving home........................... 92

J. Failure to challenge claim that Rachel disappeared on June 3, 1997............................... 93

K. Failure to present FBI report regarding Rachel's letters .................................... 93

L. Failure to contradict Roach's "false" testimony............................................. 94

M. Failure to present evidence of other suspects ................................................. 94

   1. David Gabrion........................................................................................ 94

   2. Eddie Start......................................................................................... 96

N. Failure to Object to Removal of Juror ........................................................... 96

O. Failure to challenge statements and evidence regarding the cause of death .................. 97

P. Failure to retain a pathologist to assist in preparation and cross-examination ................ 98

Q. Failure to impeach Westcomb........................................................................ 98

R. Failure to withdraw before trial.................................................................... 99

S. Failure to present evidence of Gabrion's presence at a campground on June 25, 1997. 100

T. Failure to present evidence regarding John Weeks ....................................... 101

U. Failure to impeach Coleman with testimony by Walter Hamilton ................................. 103

V. Cumulative effects of counsel's errors ............................................................. 103

*Ground Four:* Ineffective assistance of counsel at sentencing phase of trial ........................ 104

A. Failure to prepare a multi-generational history of Gabrion's family ............................ 106

   1. Mental Illness ......................................................................................... 107

   2. Substance Abuse ..................................................................................... 110

   3. Family Dysfunction ................................................................................. 111

   4. Brain Injury ......................................................................................... 112

B. Failure to Investigate ................................................................................. 114

C. Failure to obtain records supporting mitigation ................................................ 124

D. Failure to select proper experts and to prepare them for trial ........................................ 125

   1. Dr. Jackson ......................................................................................... 125

   2. Dr. Cunningham ..................................................................................... 126

   3. Other topics ......................................................................................... 127

   4. Objections ........................................................................................... 129

E. Admitting that Gabrion killed Rachel to obstruct justice ...................................... 131

F. Failure to secure adequate funding ............................................................... 132

G. Failure to object to irrelevant, unreliable, and prejudicial evidence at trial, and to properly

identify this evidence on appeal ..................................................................... 132

   1. Relevance ........................................................................................... 135

2. Reliability.................................................................................................. 138

3. Expert testimony ...................................................................................... 140

4. Notice ....................................................................................................... 141

H. Failure to Suppress Evidence ........................................................................ 142

I. Failure to present evidence of the BOP's ability to control problem inmates................. 142

J. Response to Gabrion's Assault on Trial Counsel............................................ 144

K. Evidence of Positive Evaluations in Prison .................................................... 145

L. Evidence that Gabrion needed a payee for social security benefits ............................... 146

M. Evidence of Other Head Injuries .................................................................. 149

N. Failure to Secure Gabrion's Presence During In Camera Proceedings ........................ 149

O. Failure to Correct Theory that Gabrion Created a 501(c)(3) Entity ............................. 151

P. Failure to Effectively Cross-examine Jason Cross .......................................... 152

1. Mental health report................................................................................... 152

2. Consideration for testimony........................................................................ 153

Q. Failure to conduct a proper investigation of witnesses and evidence presented by the

Government...................................................................................................... 154

1. Jason Cross................................................................................................. 155

2. Shannon Cross ........................................................................................... 155

3. Greg Leon .................................................................................................. 155

4. Luverne Timmerman .................................................................................. 155

5. A'lliene Wolf .......................................................................................... 156

6. Joseph Lunsford .................................................................................... 156

7. Evidence that Shannon was still alive................................................... 157

R. Failure to make objections during closing argument ................................ 158

1. "The facts, the law, and your sense of justice . . ." .............................. 158

2. "[I]t's not in dispute." / "The defense has conceded that." .................. 158

3. "[Y]ou have a responsibility to the community." ................................ 159

4. Argument based on evidence ............................................................... 161

5. Characterization of Gabrion's testimony as torture ............................ 161

6. Referring to a life sentence as a "privilege" ....................................... 162

7. Asking the jury not to show mercy to Gabrion .................................... 162

8. Comparing Gabrion's life to the victim's ............................................ 163

9. Comparing the plight of the victim to life in prison ............................ 165

10. "What the law requires"....................................................................... 166

S. Failure to object to replacement of juror with an alternate before the penalty phase..... 167

T. Failure to challenge facial constitutionality of the FDPA. ........................ 170

U. Cumulative effects of counsel's acts and omissions .................................. 170

*Ground Five:* Deprivation of right to a fair trial and sentencing due to incompetence.......... 171

*Ground Six:* Government suppression of, or failure to disclose, favorable evidence.............. 171

A. Ground One, Sections B(1)-(7).................................................................. 172

1. Sections B(1)-(5) ............................................................................................ 172

2. Section B(6) – Greg Leon ............................................................................. 172

3. Section B(7) – Nathan Brewster .................................................................. 173

B. FBI hair analysis .............................................................................................. 174

C. Lloyd Westcomb ................................................................................................ 175

*Ground Seven:* Ineffective assistance of appellate counsel .................................... 175

A. Suppression of Evidence ................................................................................... 175

B. Failure to specify irrelevant testimony regarding dangerousness .................. 177

C. Challenges to the FDPA .................................................................................... 178

D. Meaningful Appellate Review .......................................................................... 178

E. Cumulative Effects ............................................................................................ 179

*Ground Eight:* FDPA is unconstitutional as applied to Gabrion ........................... 179

*Ground Nine:* Failure to provide notice in the indictment .................................... 182

A. Notice of Aggravating Factors ......................................................................... 182

B. Standard for Proving Aggravating Factors ...................................................... 183

*Ground Ten:* Ineffective assistance of counsel re juror statements ....................... 183

*Ground Eleven:* Execution of a mentally ill individual as an Eighth Amendment violation . 184

VII. Other Motions ................................................................................................... 189

A. Discovery .......................................................................................................... 189

1. Depositions ...................................................................................................... 189

(a) Trial counsel ........................................................................................ 189

(b) Mitigation Specialist and Fact Investigator .......................................... 190

(c) Christopher Yates ................................................................................. 190

(d) Chrystal Roach ..................................................................................... 190

(e) FBI agents who conducted handwriting analysis .................................. 191

(f) Mental health experts:  Drs. Scharre, Jackson, Ryan, Saathoff, & Waalkes ......... 191

(g) Dr. Cohle ............................................................................................. 191

(h) Officers Chamberlain and Workman ................................................... 191

(i) Sergeant Miller ..................................................................................... 192

2. Documents ................................................................................................ 192

(a) Dr. Griesemer's records ........................................................................ 192

(b) FBI records .......................................................................................... 192

(c) Liz's House ........................................................................................... 192

(d) Rachel's criminal records ..................................................................... 193

(e) Westcomb's medical records ................................................................ 193

(f) Fire at Wilma Babcock's; death/disappearance of Allen, Davis, Weeks, Shannon
.................................................................................................................... 193

(g) Consideration to Jason Cross ............................................................... 194

(h) Psychology Data Systems records ........................................................ 194

(i) Newaygo County prosecution files ....................................................... 194

(j) Gabrion's prison files ............................................................................. 195

(k) Gabrion's social security records .......................................................... 195

(l) Copies of the Government's June 29, 1999, press conference ............................. 195

(m) Information identifying Matt Sugarman ............................................... 195

(n) Interview summaries of individuals who saw Rachel alive after June 3, 1997 .... 195

(o) Instructions and training materials for Assistant United States Attorneys regarding BOP disciplinary regulations ..................................................................... 196

(p) Identification of all clients represented by the Office of the Federal Defender from June 1, 1997, to April 1, 2002, "in any investigation for which [Gabrion] was a target" ................................................................................................................. 196

(q) Copies of all correspondence between Gabrion and the Court ............................ 196

(r) Documents related to potential testimony of Walter Hamilton ............................ 197

B. Stay and Competency Hearing ..................................................................... 197

C. Motion to File Exhibits Under Restricted Access ........................................... 202

D. Ex Parte Motion for Psychiatrist Visits ......................................................... 203

E. Motion to Dismiss Counsel ......................................................................... 203

VIII. Conclusion ............................................................................................... 206