# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| MARVIN CHARLES GABRION II, | ) |
| | ) 1:15-CV-447 |
| Movant, | ) |
| | ) |
| v. | ) |
| | ) HON. ROBERT J. JONKER |
| | ) CHIEF U.S. DISTRICT JUDGE |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |

---

**MARVIN GABRION'S MOTION FOR RECONSIDERATION, TO ALTER**
**OR AMEND JUDGMENT PURSUANT TO FEDERAL RULE OF**
**CIVIL PROCEDURE 59(e)**

---

Movant, Marvin Charles Gabrion II, through counsel, requests that the Court

reconsider its Order and Judgment entered on October 4, 2018, and grant additional

relief to Mr. Gabrion as appropriate. In support of his motion, Mr. Gabrion states as

follows:

1.      On October 4, 2018, this Court denied Mr. Gabrion's Motion to Vacate

Sentence pursuant to 28 U.S.C § 2255 by entering an order and judgment to that

effect.  The Court also denied Mr. Gabrion's motions for a competency hearing,

evidentiary hearing and discovery.

2.      This motion is made pursuant to F.R.Civ.P. 59(e) and seeks specific

relief.

3.      Mr. Gabrion does not address in this motion every issue raised in his

papers.  He does not waive, abandon or relinquish any claim not specifically

addressed here.  He specifically preserves all claims made in his § 2255 motion and reply, and in all motions submitted to this Court.

4.    For the reasons set forth in the attached Brief in Support, Mr. Gabrion submits that this Court should reconsider its order and judgment, alter or amend its order and judgment, and grant all relief to which Mr. Gabrion is entitled.

5.    Counsel for Mr. Gabrion sought concurrence from the government regarding the relief requested in this motion.  AUSA's Jennifer McManus and Timothy Verhey have both indicated that they do not concur in the relief requested here.

**WHEREFORE**, Mr. Gabrion requests this Court to reconsider its order and judgment dated October 4, 2018, alter or amend its order or judgment pursuant to Fed.R.Civ.P. 59(e), and grant to Mr. Gabrion the relief to which he is entitled.

**Date:  November 1, 2018**                    **Respectfully submitted,**


By:  /s/ *Monica Foster*                    By:  /s/ *Joseph M. Cleary*
     Monica Foster                               Joseph M. Cleary
     Attorney for Movant                         Attorney for Movant
Business Address:                          Business Address:
Indiana Federal Community Defender, LLC    Indiana Federal Community Defender, LLC
111 Monument Circle, Suite 3200            111 Monument Circle, Suite 3200
Indianapolis, Indiana 46204                Indianapolis, Indiana 46204
(317) 383-3520                             (317) 383-3520


By:  /s/ *Scott Graham*
     Scott Graham
     Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARVIN CHARLES GABRION II,                    )
                                               ) 1:15-CV-447
           Movant,                        )
                                               )
      v.                                   )
                                               ) HON. ROBERT J. JONKER
                                               ) CHIEF U.S. DISTRICT JUDGE
UNITED STATES OF AMERICA,                       )
                                               )
           Respondent.                    )

---

**MARVIN GABRION'S BRIEF IN SUPPORT OF MOTION FOR RECONSIDERATION, TO ALTER OR AMEND JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)**

---

Marvin Gabrion was sentenced to death on March 16, 2002.  His direct appeals concluded on April 24, 2014, when the United States Supreme Court denied his petition for writ of certiorari.  Mr. Gabrion moved on March 8, 2017 for an order granting a new trial, vacating the judgment entered against him, and/or to vacate, set or correct the sentence of death imposed in this case.  In addition, Mr. Gabrion moved this Court for an evidentiary hearing, for discovery, and for a competency hearing.  On October 4, 2018, this Court entered an Opinion and Order denying all of the relief that Mr. Gabrion requested.  ECF 156 Page ID 6000.  Mr. Gabrion seeks reconsideration of portions of the Court's Opinion and Order.  He does not waive any issue not addressed in this motion, and specifically re-asserts all claims for relief contained in prior pleadings filed in this Court.

**THE COURT SHOULD RECONSIDER ITS COMPETENCY RELATED RULINGS**

This Court noted, "[q]uestions about Gabrion's competence arose early in the proceedings of his criminal case."  156 Page ID 5860.  Of course, competency has been a prominent issue throughout.  Despite this, Marvin Gabrion has never had an adversarial competency hearing.  And if this Court's Order denying any relief under § 2255 is allowed to stand, he will be executed without ever having had an adversarial competency hearing.  This in spite of:

- Prior to trial, the Court twice ordered competency evaluations *sua sponte* because of Mr. Gabrion's bizarre behavior.  The court expressed concern about whether Mr. Gabrion was capable of making rational decisions    and referred to his "vituperative and mean spirted letters, his restlessness and angry outbursts in the courtroom, his inability to show respect to the court, and his apparent inability to cooperate with his counsel."

- A government mental health report says clearly that Mr. Gabrion "wished the judge to rule that [he] is competent to stand trial . . . .", a finding that would clear the way for trial.  Mr. Gabrion spoke to the government doctor about his "interest in going to the 'death chamber' in order to bring attention to the plight of missing children."  Fallis report, pg. 17.

- Mr. Gabrion cooperated with Court and government mental health experts but refused to see doctors his lawyers sent to meet with him.

- Mental health professionals found Mr. Gabrion did not suffer from a mental disease or defect because they said he was malingering.  A government mental health professional correctly defined malingering as the "intentional production of false or grossly exaggerated physical or psychological symptoms.  *Such production of symptoms is motivated by external incentives, such as avoiding prosecution in this case.*" [emphasis added].  No other external incentives were ever suggested during the course of this case.  Yet, Mr. Gabrion's statements and conduct belie this suggestion and quite clearly demonstrate that he wanted to be found competent, convicted, and executed.

- It is difficult to attribute any rationality to Mr. Gabrion's in court conduct but it certainly was not designed to avoid conviction or the death penalty.  He slept with his head on the table during the presentation of the defense case regarding the death penalty.  Throughout trial, the Court and defense lawyers struggled to keep Mr. Gabrion from talking loudly, burping, and making other loud noises.

- Against the advice of counsel and his own best interest, Mr. Gabrion testified in narrative form during the guilt phase.  He told the jury he had "no choice but to offend some of you, as I am the speaker of the truth."  He noted that he was trying to stay "within decent boundaries" but then rambled off into irrelevant tangents which, predictably drew objections for relevance that were sustained.

- On the first day of the penalty phase Mr. Gabrion punched his lawyer in the face in front of the jury.  The Court noted that "the area of competency has been one of great concern to this Court" but then it denied a competency evaluation.

- Mr. Gabrion insisted on testifying during the penalty phase against the advice of counsel and his own best interests.  In a hearing prior to that testimony, Mr. Gabrion inexplicably expressed a preference to go straight to cross examination without any direct examination.  Under questioning by the Court, Mr. Gabrion was wholly unable to explain the definition of "truth" though he repeatedly expressed a desire to testify in order to "get the truth out".

- During his penalty phase testimony, Mr. Gabrion falsely told the jury he used to work for the CIA, and that he was willing to submit to the drug sodium pentothal to prove he was telling the truth.  He admitted that he had lied about witnesses called by the government during penalty phase in order to bring attention to them "because they are members of the Davidian church which is based in Waco, Texas, and they believe in pedophiling children."  He falsely accused another government witness of having her two-year-old son removed from her and placed with yet another government witness because she was doing inappropriate things to her son.

- Mr. Gabrion testified that the victim's father had abused her.  He claimed that his lawyers wanted to put him away so he could not "get the truth out about abortion, you know, the fact that everybody's murdering off all these boys because they're too hard to raise through abortion."

- For no apparent rational reason, Mr. Gabrion also chose to allocute, again against the advice of his counsel and his own best interests. There, he expressed "remorse" "because you have been presented with a complete false version of these events by these evil shysters resulting in you with your supposedly bloodless hands counting me guilty." He then went on a rant regarding his daughter who "was murdered by abortion basically to feed the greedy, corrupt American legal and economic community, which you are part of." He claimed he had been incarcerated for four years by the "evil beast" that murdered his daughter whose name he said was Azla. He accused the jury of being half filled with "bloody-handed pro-choice supporters."

- Mr. Gabrion wrapped it up by again expressing ambivalence about his sentence and telling the jury not to worry about what happens to him because he would be "fine."  "After September 11th I really don't care if I live or die,

3

period. I've been in very much depression over what happened to our nation and I really don't care, period, okay?"

- Counsel consistently complained about their inability to communicate with Mr. Gabrion during these proceedings.  In spite of this, they never insisted on an adversarial hearing to test the reliability of the government's conclusions. During the authorization process counsel complained of "difficulty communicating with Mr. Gabrion," a refrain that haunted this case to its conclusion.

- On August 8, 2001, defense counsel filed a request for a competency evaluation with lengthy period of inpatient commitment.  Counsel averred that during their representation, "we have had exceptional difficulty communicating with [Mr. Gabrion], exceptional difficulty obtaining information from him, and exceptional difficulty in visiting with him." Counsel alleged he had more difficulties communicating with Mr. Gabrion than any other client in twenty years of criminal defense practice. Counsel said Mr. Gabrion engaged in bizarre and paranoid behavior. This request for a competency examination was based, in part, upon his own expert's conclusion that Mr. Gabrion was incompetent, though also malingering.

- During the subsequent evaluation, government doctors noted bizarre behavior, including that Mr. Gabrion smeared his face with feces and refused to talk about it.

- Mr. Gabrion's unusual conduct was not limited to the jury's presence.  When he was returned to the courtroom following his banishment for punching his lawyer, he said he did not have a clear memory of what had occurred that day.  He asked for permission to speak, and then  told the Court:  "I am sorry to be represented by evil shysters in a kangaroo court in a prostitute evil nation that murders its babies by abortion.  And I'll be quiet because I'm being forced to just as if I was in Nazi German.  Thank you."

- Mr. Gabrion's bizarre conduct did not start with the genesis of this case.  Witnesses described conduct years before this case that could be described as obnoxious but also is symptomatic of mental illness.  A number of witnesses described his severe mood swings.  Witnesses explained one never knew which Marvin one would get and they were very different.  A government witness testified he referred to Mr. Gabrion as "crazy Marv."

- Witnesses described that he could become physically abusive and then apologize.  He was alleged to have had a dead bull frog and a naked female doll on his bed that contained dried and wet bodily fluids.  He engaged in overt religiosity.  He falsely told people, including his family who knew better, that he had been in Vietnam and the CIA.  He falsely told a former classmate that her husband was a narc.  As an adult he kept putting his hands in freshly poured concrete. When the person laying concrete told him to quit, he persisted.

4

The Court concludes counsel was effective in the manner they addressed the issue of Gabrion's competency because (1) a more complete social history would not have changed the opinion of the evaluators who concluded Gabrion was malingering; (2) Gabrion has failed to identify any "real, organic evidence of brain injury"; (3) counsel "clear[ly]" made a strategic decision not to hold an adversarial hearing on competency in order to prevent potentially damaging information from falling into the hands of the government; and (4) allegations that Dr. Fallis relied upon false information in reaching her mental health conclusions is incorrect.  The Court concluded, "[f]or these reasons, the Court finds Gabrion has failed to show that counsel's acts and omissions prejudiced Gabrion."

More than fifty years ago, Professor Wigmore noted that cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of the truth."  5 J. Wigmore, Evidence § 1367, pg. 32 (J. Chadbourn rev. 1974).  More recently, the Supreme Court has recognized that "cross examination is the principal means of undermining the credibility of a witness whose testimony is false or inaccurate."  *United States v. Salerno*, 505 U.S. 317, 328 (1992).  Despite Mr. Gabrion's bizarre behavior for decades prior to the offense at issue here, as well as, prior to and during trial, and his unending problems communicating with counsel, his counsel *never* asked for an adversarial hearing in order to test the findings of the mental health examiners who evaluated Mr. Gabrion.  Because the witnesses' findings were never contested, in a very real way they had the last word, not the Court, as to whether Mr. Gabrion was competent to proceed in this death penalty trial.  Their conclusions were never challenged but rather were taken at face value.

There can be no doubt that the social history provided by § 2255 counsel is much more detailed and expansive than the 11 page "abridged" document created by trial counsel.  The § 2255 report documents an extensive history of serious mental illness in Mr. Gabrion's immediate and extended family.  This Court was unimpressed with this information and found "[i]nformation about [Gabrion's] background and family history of mental illness cannot possibly be more enlightening than direct assessment of his actual mental state."  Reconsideration is appropriate because the Court misapprehends Mr. Gabrion's claims.  He does not suggest that a family history of serious mental illness should or does cancel out the efficacy of the evaluator's meetings with Mr. Gabrion or their testing. But what he does contend is that his familial history of serious mental illness and its genetic component would unquestionably *inform* the evaluator's conclusions and lean against a malingering diagnosis.  It would likely cause the evaluator to view Mr. Gabrion's conduct through a different lens.[1]

Mr. Gabrion's claim is neither outlandish nor unique.  For example, in Richard Stitt's federal capital trial, Dr. Ryan (the same Dr. Ryan who testified here) testified that Mr. Stitt met the criteria for psychopathy, a devastating diagnosis in terms of the appropriate sentence to be imposed.  Dr. Ryan based his trial diagnosis on documents pertaining to the defendant and his history provided by the government, his clinical interview of Mr. Stitt and two psychological instruments he administered. Years later, during Mr. Stitt's habeas proceedings, Dr. Ryan was provided with information about Mr. Stitt's chaotic upbringing, and "most significantly, that acute mental illness has been

---

[1]   The Court also notes more than once that mental illness and brain injury are not equivalent to incompetence.  Mr. Gabrion agrees.

diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings."  See Affidavit of Dr. Thomas V. Ryan, attached as Exhibit A, ¶ 14.[2]

Dr. Ryan opined that although all the information about Mr. Stitt's background would have been "important for [his] evaluation", the information about Mr. Stitt's familial history of major mental illness would have been "very helpful" because of the genetic component of bipolar and other mood disorders.  "With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light."  Exhibit A, ¶ 16.  This Court depreciates the importance of family history in diagnosing mental illness, but clearly the medical profession views it differently.

Moreover, as it does with the entirety of this petition, the Court views each discrete piece of evidence individually and fails to consider it in the context of the entirety of both the trial and post-conviction evidence.  His familial history must be considered in the context of his bizarre behavior that predated this offense; the fact that he did well on lithium; his self-medicating abuse of alcohol, inhalants, and drugs; his family history of criminality and substance abuse; and reports that he was a kind and generous child and adolescent.   The Court should reconsider to conduct a meaningful review of the evidence in its totality.

The Court also finds "Mr. Gabrion "has never identified any real, organic evidence of brain injury".  The Court should reconsider this finding because Mr. Gabrion has presented allegations of a plethora of head injuries at Page ID 4011-4015.  Without

---

[2]    This affidavit was submitted during the § 2255 proceedings in *Richard Thomas Stitt v. United States*, Eastern District of Virginia, Norfolk Division Cause Number 2:98-cr-47.

a hearing, this Court cannot make credible findings as to the impact of these head injuries or the likelihood that they in fact occurred.

The Court should reconsider its finding that trial counsel failed to litigate Mr. Gabrion's competency in a strategic effort to keep the government from discovering the unhelpful opinions of the mental health evaluators.  This is a factual finding that was reached by the Court even though the Court was not the judge during trial and no evidentiary hearing was held on the petition. "The Supreme Court has held in several cases that the habeas court's commission is not to invent strategic reasons or accept any strategy counsel could have followed, without regard to what actually happened[.]" *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007) (citing *Rompilla v. Beard*, 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring); *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986)). That counsel requested to keep the reports confidential is evidence only that having decided not to subject the competency question to adversarial testing, counsel was disinclined to share the reports with the government.  It is not necessarily evidence that this is what motivated the decision in the first instance.[3]  It may or may not be the motivation but without an evidentiary hearing, the Court cannot presume trial counsel's decisions were based in this particular strategy or for that matter, any strategy.

Even if Gabrion was in fact malingering, none of the evaluators were confronted with questions about whether malingering could coexist with mental illness, whether they considered that possibility here, and to what extent that comorbid diagnosis might be at play here.  The truth is that "[t]he finding that an inmate patient has malingered

---

[3] Counsel's request to keep the reports confidential could just as likely have been based on the Court's erroneous and apparently accidental disclosure of one of the reports to the government.

one or more symptoms of psychosis does not rule out the presence of true mental disorders."  Rogers, Richard, <u>Clinical Assessment of Malingering and Deception</u> (3rd ed., Guilford Press), pg. 67.

The same is true as to traumatic brain injury.  When a mental health professional is evaluating for traumatic brain injury, depression, PTSD, and pain represent the most common differential diagnosis.  "In addition, each diagnosis can be feigned in its own right, meaning that there are at least three possible outcomes from a neuropsychological evaluation:  The patient may have (1) a genuine brain injury, (2) have a genuine mental disorder masquerading as TBI, or (3) be malingering.  Combinations of the three alternatives are possible as well."  <u>Id.</u> at 75.

The Court also denies Gabrion's motion for a competency hearing at the present time, finding that because Gabrion was found competent and malingering 20 some years ago he must be competent and malingering today.  This is neither legally nor medically correct.  *Panetti  v. Quaterman*, 551 U.S. 930, 944(2007) ("All prisoners are at risk of deteriorations in their mental state."); *Drope v. Missouri*, 420 U.S. 162, 181 (1975) ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."); *Eggers v. Alabama*, 876 F.3d 1086, 1103 (11th Cir. 2017) (""[I]t is well established, an inmate's competency could change over the years.").  The Court's finding also ignores the substantial body of research, increasingly accepted even by the Bureau of Prisons, demonstrating that prolonged solitary confinement, such as exists in the Special Confinement Unit where Mr. Gabrion is housed, can create and exacerbate severe

mental health conditions.  Grassian, S., "Psychiatric Effects of Solitary Confinement", 22 Wash. U. J. Law & Policy 325 (2006) ("Solitary confinement . . . can cause severe psychiatric harm."); Comment:  "If the SHU Fits: Cruel and Unusual Punishment at California's Pelican Bay State Prison", 45 Emory L.J. 1089 (1996) ("[A]t the very least, the healthiest SHU inmate runs a substantial risk of experiencing complex, formed hallucinations, developing hyper-responsivity and vivid fantasies, and suffering massive free-floating anxiety.").

The Court says current counsel offer nothing more than trial counsel in terms of describing Mr. Gabrion's disabilities.[4]  This is incorrect.  The fact that Mr. Gabrion has maintained his delusional and psychotic presentation unabated during the twenty years since this case was tried is evidence that he is not malingering.  His inability to consult with counsel in any rational or meaningful manner also belies the government's trial theory that he was malingering to avoid trial, conviction, and the death penalty.  An element of malingering is that the conduct must be motivated by external incentives.  No other external incentives have ever been suggested by the government or the mental health evaluators.  His comments and conduct are the opposite of what one would expect from a person bent on avoiding the death penalty.

All of Mr. Gabrion's post-trial lawyers believe his presentation is sincere.  The Court has held that counsel's observations of her client should be of value to the court. *Medina v. California*, 505 U.S. 437, 450-51 (1992) ("defense counsel will often have the best-informed view of the defendant's ability to participate in his defense."); *Drope v.*

---

[4]  The Court says current counsel's observations are "virtually identical" to trial counsel's observations. With all due respect to the mental health evaluators here, undersigned suggests the reason for the similarity is because that is how incompetent clients present.

*Missouri*, 420 U.S.162, 177-78 (1975) ("[W]e do not . . . suggest that courts must accept without question a lawyer's representation concerning the competence of his client, [but] an expressed doubt in that regard by one with 'the closest contact with the defendant is unquestionably a factor which should be considered.").

The Court also denied relief because in its view whether to stay proceedings so that a capital client can be evaluated for competency is within the sound discretion of the court when the claims are record based only or resolvable as a matter of law regardless of the petitioner's competence.  The Court expressed concerns about capital clients attempting to delay the resolution of their cases by brining baseless claims.

There is no evidence here that undersigned counsel or Mr. Gabrion is attempting to circumvent finality by bringing baseless claims.  Even the trial judge noted during the penalty phase of this case that Mr. Gabrion's "competence has been one of great concern to this Court".  Counsel filed this § 2255 petition within the one-year statute of limitations and has vigorously sought to litigate it throughout these proceedings.  While the case was on direct appeal for a lengthy period of time, it cannot be said that counsel or Mr. Gabrion were responsible for that delay.  Capital cases rightly take time because of the societal desire to get it right.

This case cannot be fairly litigated without Mr. Gabrion's assistance. Counsel cannot ask him about his involvement in the facts supporting the conviction.  They cannot engage with him about others who may have been present.  They cannot ask him about his background and how he may have been influenced by the terrible things that happened to him in his youth.  This Court gives short shrift to the evidence that Mr. Gabrion may have been molested as a child.  Clearly, counsel would very much like to

probe their client's memory about that and its impact on him.  Given Mr. Gabrion's

decades long obsession with children who have been molested and/or tortured, counsel

would very much like to present a more detailed account to the Court.  None of this is

possible.  Counsel have represented to the Court and continue to represent to the Court

that they have had zero conversations of substance with their client despite frequent

visits and near daily phone calls.

It is additionally noteworthy that the Court failed to rule on Mr. Gabrion's *ex parte*

request to have a mental health professional visit with Mr. Gabrion, a failure that

required counsel to cancel the visit and travel arrangements that had been made in

advance.  This Court has, to the best of undersigned counsel's knowledge, never met

Mr. Gabrion.  The Court's findings are based on a cold record that counsel had no

opportunity to contest or expand.  For all of the above stated reasons, the Court should

reconsider its decision not to rule on Mr. Gabrion's request for an order authorizing a

mental health examiner to meet with Mr. Gabrion, to deny relief, to deny discovery, to

deny an evidentiary hearing, and to deny a certificate of appealability.

### THE COURT SHOULD RECONSIDER ITS DECISION REGARDING THE OVERARCHING PREJUDICE THAT TAINTED THE SENTENCING PHASE

The manner in which the jury was selected and instructed in this case has always

been problematic.  The panel considering Mr. Gabrion's direct appeal reversed the

death sentence, finding that the combination of these things deprived Mr. Gabrion of a

fair sentencing hearing.  Nothing has changed, especially in light of the overwhelming

prejudice to Mr. Gabrion based on false and misleading theories that provided

overwhelming aggravation.

Mr. Gabrion notes that a single "no" vote would have derailed the death penalty in this case.  The chances of getting that vote were lessened dramatically when the government falsely argued that Mr. Gabrion manipulated the state court system and when, when it falsely argued that Mr. Gabrion would be a danger in BOP custody and when it introduced irrelevant aggravating evidence for no reason other than to prejudice Mr. Gabrion.  The Court should reconsider its decision that Mr. Gabrion received a fair sentencing hearing.

The Court must be mindful that it takes very little to convince a single person of a different result.  A case providing perhaps the most stark example of this truth.  Jessie Con-Ui was serving a life sentence at the time he killed a guard at a USP in Pennsylvania.  Mr. Con-Ui stomped on the victim's head and neck with such force he shattered the victim's larynx and hyoid bone.  He stabbed the victim 203 times, taking a break during the stabbing to wipe his brow, remove his shirt, and shower before continuing.  Mr. Con-Ui stole chewing gum from the victim, unwrapped it, and placed it in his mouth during the assault.  All of this was on video and was viewed by the jury.  Unsurprisingly, the jury unanimously found the murder was "especially cruel or depraved in that it involved torture or serious physical abuse" to the victim, and that the murder involved substantial planning and premeditation.  The jury also unanimously found that Mr. Con-Ui had previously threatened to harm a federal correctional officer and had assaulted and stabbed other inmates.  In spite of all of this, the jury returned a life sentence.

Lest one think the Con-Ui verdict is an aberration, one need only recall the verdicts in the Terry Nichols case or the Zacharias Moussaui case.  Nichols was

Timothy McVeigh's codefendant in the Oklahoma City Bombing case. One hundred sixty- eight (168) victims.  Life sentence.  Mr. Moussaui was the 20th hijacker responsible for the 911 terror attacks. Two thousand nine hundred and seventy-seven (2,977) victims.  Life sentence.  Scores of similar cases could be referenced to support this truth.  Jurors gravitate toward life for obvious reasons.  The Court is required to consider the mitigation evidence presented at trial and in habeas proceedings and determine whether there is a "whether a single juror might have struck a different balance".

- *United States v. Mohamed Rashed Daoud Al-'Owhali*, S.D. NY No. S6-98-cr-1023: The defendant, an accomplice of Osama Bin Laden, was convicted of organizing two bombings of American embassies in Africa. The 1998 bombings in Kenya and Tanzania collectively killed 224 people, including 12 Americans, and more than 5,000 people were injured.

- *United States v. Tommy Edelin*, D. D.C. No. 98-264: The defendant was convicted of four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob." Two of those murders involved ordering the killing of a 14-year old boy and a 19-year old.

- *United States v. Kenneth A. Tatum*, E.D. TX No. 2:99-CR-5: The defendant, a member of the "Crips" gang, was convicted of murdering three people, one of whom was a 63-year old retired minister that the defendant kidnapped and murdered.

- *United States v. Samuel Stephen Ealy*, W.D. VA No. 00-CR- 104: The defendant was convicted of the 1989 murder of a family of three–a husband, wife, and son. The husband and wife were found shot to death outside their home; their son was later found shot to death in a closet inside the home. 363 F.3d 292, 295 (4th Cir. 2004).

- *United States v. Tyrone Williams*, S.D. TX No. 03-CR-221: The defendant was convicted for his participation in an alien smuggling operation that led to 19 peoples' deaths by dehydration, overheating and suffocation in the back of a truck trailer driven by the defendant.

- *United States v. Zacarias Moussaoui*, E.D. VA No. 01-CR-455: The defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which

14

killed over 3,000 people and resulted in four airline crashes in New York, Pennsylvania, and Washington, D.C.

- United States v. John Richard Mayhew, S.D. OH CR No. 02 03-165: The defendant was convicted of murdering his ex-wife, her boyfriend, and the defendant's own 18-year old daughter, with whom the defendant had an incestuous relationship.

- United States v. Michael Antonio Natson, M.D. GA No. 4:05- CR-00021-CDL-GMF: The defendant was convicted of the 2003 murder of a pregnant 23-year old Georgia Southern University student. The defendant was a U.S. Air Force military police officer, and the victim's skeletal remains were found by hunters on a remote part of Fort Benning, Georgia.

- *United States v. Bass*, 460 F.3d 830, 833 (6th Cir. 2006) (imposing life sentence on defendant for four drug-related murders);

- *United States v. Beckford*, No. 97-4924, 211 F.3d 1266, at *4 (4th Cir. 2000) (per curiam) (Westlaw) (imposing life sentence on defendant for six drug-related murders);

- *United States v. Johnson*, 219 F.3d 349, 351 (4th Cir. 2000) (imposing life sentence on defendant for five drug-related murders);

- *United States v. Pitera*, 5 F.3d 624, 625 (2d Cir. 1993) (imposing life sentence on defendant for seven drug-related murders in which the victims were tortured and their bodies dismembered);

- *United States v. Williams*, No. 00 Cr. 1008, 2011 WL 3296101, at *1 (S.D.N.Y. July 28, 2011) (imposing life sentence on defendant for execution-style triple murder);

- *United States v. Kehoe*, No. 4:97-CR-00243-(1), 2008 WL 4079316, at *2 (E.D. Ark. Aug. 28, 2008) (imposing life sentence on defendant for murdering two adults and a small child);

- *United States v. Moore*, No. 00-157-2, 2005 WL 6797098, at *1 (D.D.C. Mar. 9, 2005) (imposing life sentence on defendant for thirty-one drug related murders**);** Carol D. Leonnig, *2 Top Bosses of 'Murder Inc.' Get Life Terms*, WASH. POST, Mar. 10, 2005, at B1; Carol D. Leonnig, *D.C. Gang Leader Blames System for Crime*, WASH. POST, Dec. 18, 2004, at B4;

- *United States v. Gilbert*, 92 F. Supp. 2d 1, 2-3 (D. Mass Mar. 26, 2001) (imposing life sentence on a Virginia nurse who murdered four patients and attempted to murder three others**);** Phil Hirschkorn, *Four Embassy Bombers Get Life*, CNN (Oct. 21, 2001), http://www.edition.cnn.com/

15

2001/LAW/10/19/embassy.bombings; *see, e.g.,* U.S. DEP'T OF JUSTICE, CRIMINAL CALLS: A REVIEW OF THE BUREAU OF PRISONS' MANAGEMENT OF INMATE TELEPHONE PRIVILEGES, (1999), *available at* http://www.justice.gov/oig/special/9908/callsp51.htm (reporting on the case of Anthony Jones, who was sentenced for life for six drug-related murders);  *cf.*

- *United States v. Alexis Candelario Santana*, Crim. No. 09-427, 2013 WL 101615, at *2 (D.P.R. Jan. 8, 2013) (imposing life sentence on defendant for "La Tombola Massacre" in which eight people were killed; defendant previously convicted of killing or ordering others to kill thirteen others he viewed as threats or disloyal); *No Death Penalty for P.R. Mass Killer*, UPI (Mar. 25, 2013, 8:04 PM), http://www.upi.com/Top_News/World-News/2013/03/25/No-death-penalty-for-PR-mass-killer/UPI-14261364256284/.

Each of the above federal capital cases was tried to a jury, and despite the horrific and brutal facts surrounding these murders—many of which involved, as in Mr. Gabrion's case, the murder of a child—the juries did not return death sentences. The outcome in these cases specifically rebuts the premise of the district court's Strickland prejudice analysis, i.e., that cases involving the murder of a child are "too overwhelming" to be mitigated, and therefore will always result in a death sentence, regardless of any mitigating evidence presented to the jury.

In addition, numerous Supreme Court cases also involve cases with highly aggravating facts, yet capital counsel were found to have performed deficiently, to the prejudice of the petitioner. The whole point of mitigation is that bad crime facts can be overcome. In *William v. Taylor*, 529 U.S. 362 (2000), the defendant was sentenced to death for the brutal murder of a defenseless man in order to   steal three dollars. Williams, 529 U.S. at 368. In dissent, Chief Justice Rehnquist quoted the following summary of the aggravating evidence from the Fourth Circuit's opinion:

> The murder . . . was just one act in a crime spree that lasted most of Williams' life. Indeed, the jury heard evidence that, in the months following the murder . . ., Williams savagely beat an elderly woman,

16

> stole two cars, set fire to a home, stabbed a man during the robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.

529 U.S. at 418 (Rehnquist, C.J., dissenting) (citation omitted).

The victim in *Wiggins v. Smith*, 539 U.S. 510 (2003), was "a 77-year-old woman [who] was found drowned in the bathtub of her apartment, clothed but missing her underwear, and sprayed with Black Flag Ant and Roach Killer."  539 U.S. at 554 (Scalia, J., dissenting). Wiggins had stolen the victim's ring, used her credit cards, and lied to the police about where he had obtained this property. Id. at 555-556.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), the defendant committed capital murder "a mere three months" after his release from prison for a brutal rape and assault in which he had held the victim at knife point, slashed her breast, and raped her for more than an hour. 545 U.S. at 394 (O'Connor, J., majority opinion) and 401 (Kennedy, J., dissenting).

In *Porter v. McCollum*, 558 U.S. 30 (2009), the defendant had threatened to kill the capital murder victim and her teenage daughter three months before the actual capital offense. *Porter v. Attorney General*, 552 F.3d  1260, 1263 (11th Cir. 2008). After killing the mother in the daughter's presence, he pointed a gun to the daughter's head and said, "boom, boom, you're going to die."  Id.  Although he did not kill the daughter, he was also convicted of a second murder. *Porter v. McCollum*, 558 U.S. at 31-32.

In *Sears v. Upton*, 561 U.S. 945 (2010), the defendant kidnapped, raped, and murdered a 59-year-old wife and mother. He punched the victim in the face with brass knuckles, shoved her into her car, handcuffed her, and drove her across state lines from Georgia to Tennessee where he raped her. The victim's interstate ordeal then continued

17

into Kentucky where Sears murdered her as she pleaded for her life. "After throwing her on the ground, he stabbed her in the neck. In his confession he showed no regret or remorse for his heinous crimes." 561 U.S. 945, 130 S. Ct. 3259, 3271 (Scalia, J., dissenting).

The outcome in these cases rebuts any premise that the prejudice in this case was harmless. The prejudice was overwhelming, needed to impact only one juror, and has cast doubt on the death verdict.

**THE COURT SHOULD RECONSIDER ITS RULING RELATING TO THE EXECUTION OF MR. GABRION BECAUSE HE HAS A SERIOUS MENTAL ILLNESS**

This Court's opinion does not fully address the growing consensus that execution of mentally ill individuals violates the Eighth Amendment. This Court should reconsider the portion of its opinion denying Gabrion's claim that executing a severely mentally ill individual would violate the Eighth Amendment.

In addressing Gabrion's Eighth Amendment claim, this Court acknowledges the 2006 American Bar Association (ABA) resolution against the death penalty for severely mentally ill individuals. *See* Opinion, ECF No. 156 at 186, Page ID 5980 (citing ABA Task Force on Mental Disability and the Death Penalty, *Recommendation & Report on the Death Penalty & Persons with Mental Disabilities*, 30 Mental & Physical Disability L. Rep. 668, 670 (Aug. 2006)). This Court also acknowledges that other organizations, including the American Psychiatric Association, the American Psychological Association, and the National Alliance on Mental Illness have called for ending the death penalty for individuals who suffer from severe mental illness. *See* Opinion, ECF No. 156 at 186, Page ID 5980. But the Court does not take into account the many other

18

voices that have recently called for an end to the death penalty for individuals suffering from mental illness.

For example, the Court does not take into account that a number of judges have expressed their opposition to the death penalty for individuals with severe mental illness. *See Missouri ex rel. Strong v. Griffith*, 462 S.W.3d 732, 739 (Mo. 2015) ("I would hold that the reasoning in *Ford v. Wainwright*, 477 U.S. 399 (1986), *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), applies to individuals who, like Mr. Strong, were severely mentally ill at the time the offense was committed."); *Corcoran v. State*, 774 N.E.2d 495, 502–03 (Ind. 2002) (Rucker, J., dissenting) ("I do not believe a sentence of death is appropriate for a person suffering a severe mental illness."); *State v. Nelson*, 803 A.2d 1, 41 (N.J. 2002) (Zazzali, J., concurring) ("The State's legitimate penological interests that purportedly are served by the death penalty are unconstitutionally diminished if the State executes such a mentally ill and psychologically disturbed person. In defendant's case, it is constitutionally inadequate for a jury to consider her severe mental illness as merely a mitigating factor to be weighed among other aggravating and mitigating factors."); *State v. Scott*, 748 N.E.2d 11, 20 (Ohio 2001) (Pfeifer, J., dissenting) ("I believe that executing a convict with a severe mental illness is a cruel and unusual punishment.").

Nor does the Court take into account that "[l]egislators in at least seven states — Arkansas, Indiana, Ohio, South Dakota, Tennessee, Texas and Virginia — have proposed bills this year [2017] to prohibit the death penalty for people who suffered from a serious mental illness at the time of their crime." *See* Rebecca Beitsch, *Should states*

*ban the death penalty for people with severe mental illness?*, PBS (Apr. 17, 2017), https://www.pbs.org/newshour/nation/states-ban-death-penalty-people-severe-mental-illness/.

Nor does the Court take into account polling that reveals that 66% of Americans oppose the death penalty for those with severe mental illness. *See* ABA Death Penalty Due Process Review Project, *Severe Mental Illness and the Death Penalty* (2016), https://www.americanbar.org/content/dam/aba/images/crsj/DPDPRP/SevereMentalIllnessandtheDeathPenalty_WhitePaper.pdf (hereinafter 2016 ABA Rep't). An even greater number— 72%—say they oppose the death penalty for those with severe mental illness once they hear how it would work in practice. *See id*; *see also* Frank R. Baumgartner & Betsy Neill, *Does the death penalty target people who are mentally ill? We checked.*, *Wash. Post.* (Apr. 3, 2017), https://www.washingtonpost.com/news/monkey-cage/wp/2017/04/03/does-the-death-penalty-target-people-who-are-mentally-ill-we-checked/?utm_term=.eddb6f4a160b ("Most Americans oppose the death penalty for the mentally ill, a category that ranges from mild to severe. But our research suggests that the death penalty actually targets those who have mental illnesses.").

Nor does the Court adequately consider perhaps the most persuasive argument against the death penalty for severely mentally ill individuals, which is that "the [Supreme] Court's reasoning in *Atkins* and *Roper* can be applied virtually word-for-word to defendants with severe mental illness." Aurélie Tabuteau Mangels, *Should Individuals with Severe Mental Illness Continue to be Eligible for the Death Penalty?*, *Crim. Just. Mag.* (Fall 2017), https://www.americanbar.org/content/dam/aba/publications

20

/criminal_justice_magazine/v32/cj_fall17_MANGELS.authcheckdam.pdf; *see also Griffith*, 462 S.W.3d at 739 ("I would hold that the reasoning in *Ford v. Wainwright*, 477 U.S. 399 (1986), *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), applies to individuals who . . . were severely mentally ill at the time the offense was committed.").

Atkins held that, "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses [intellectually disabled persons] do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Atkins*, 536 U.S. at 306. As many sources have noted, these same characteristics lessen the extent of moral culpability and jeopardize procedural protections of severely mentally ill individuals as well those with intellectual disabilities. *See, e.g.*, 2016 ABA Rep't at 2–3. Or, as one psychiatrist discussing mentally ill individuals put it, "If these people aren't seeing the world for what it truly is, if they can't concentrate and think things through, if they're so delusional or depressed their thinking isn't reality-based anymore, they should not be held to the same standard[.]" *See* Rebecca Beitsch, *Should states ban the death penalty for people with severe mental illness?*, PBS (Apr. 17, 2017), https://www.pbs.org/newshour/nation/states-ban-death-penalty-people-severe-mental-illness/ (quoting Megan Testa, a psychiatrist who helped draft the Ohio bill to prohibit the death penalty for individuals with serious mental illness).

Yet this Court states that "[u]nlike the characteristics at issue in *Atkins* and *Roper* . . . mental illness encompasses a broad range of conditions and symptoms, some of

21

which might make a defendant less culpable for his conduct or less amenable to deterrence, and some of which do not." *See* Opinion, ECF No. 156 at 187, Page ID 5981. But, contrary to the Court's apparent view that a broad range of symptoms distinguishes mental illness from intellectual disability and youth, the fact that mental illness encompasses a broad range of characteristics and symptoms actually makes it more like youth and intellectual disability. Indeed, *Atkins* acknowledged that intellectual disability is a complex diagnosis that involves an array of symptoms. *See Atkins*, 536 U.S. at 317. And in a recent case, the Supreme Court clarified the appropriate test for intellectual disability—a clarification that was necessary precisely because intellectual disability encompasses a broad range of symptoms that can make it difficult to diagnose. *See Moore v. Texas*, 137 S. Ct. 1039, 1053 (2017). Even where youth is concerned, it is not any one characteristic but rather a broad range of characteristics that make juvenile offenders ineligible for the death penalty, and of course these characteristics are present to different degrees in different juveniles. *See Roper*, 543 U.S. at 570. That mental illness encompasses a broad range of symptoms makes it similar to, not distinct from, youth and especially intellectual disability.

In addition to failing to take into account all of the justifications for extending the reasoning of *Atkins* and *Roper* to individuals with mental illness, this Court also stated that even if execution of severely mentally ill individuals were prohibited, Gabrion would not fall into that category, noting prior evaluations. *See* Opinion, ECF No. 156 at 186–87, Page ID 5980–81. But Gabrion's previous evaluations have focused primarily on his competency, which is not perfectly synonymous with mental illness: "A person can have a severe mental illness and yet still possess the necessary attributes to be considered

22

legally competent to stand trial. While mental illness often plays a role in a court's determination of a defendant's competence to stand trial and can be a factor in the competency determination, '[a] defendant's history of mental illness does not render the defendant mentally incompetent per se.'" 2016 ABA Rep't at 19 (quoting Haleigh Reisman, *Competency of the Mentally Ill and Intellectually Disabled in the Courts*, 11 J. Health & Biomedical L. 199, 212 (2015)) (alteration in original). Indeed, the Sixth Circuit panel opinion, while holding that Gabrion was competent to stand trial, also acknowledged that Gabrion had "signs of mental illness," just not "mental illness that gives rise to 'incompetence to stand trial.'" *United States v. Gabrion*, 648 F.3d 307, 320 (6th Cir. 2011) (rev'd on other grounds, *United States v. Gabrion*, 718 F.3d 511 (6th Cir. 2013) (en banc)). The prior evaluations that this Court points to have not focused on the relevant question for purposes of Gabrion's Eighth Amendment argument, whether Gabrion was so mentally ill that the penological purposes of retribution and deterrence would not be served by sentencing him to death, or whether his mental illness would undermine procedural protections. *See Atkins*, 536 U.S. at 317.

And, moreover, Gabrion has argued that his attorneys' handling of these evaluations constituted ineffective assistance of counsel. Gabrion's current counsel has requested an additional competency hearing, but the Court denied this request. *See* Mot. for a Hr'g to Determine Mental Competence, ECF No. 101; Opinion, ECF No. 156 at 197–98, Page ID 5991–92. This Court should reconsider its reliance on these earlier hearings, given that Gabrion has argued that his earlier counsel's handling of these hearings was ineffective and that he has requested a new hearing, and especially given that these hearings focused on determining whether Gabion was competent, not

23

whether a severe mental illness would make executing Gabrion a violation of the Eighth Amendment. The Court should also keep in mind that, as counsel points out in the section of this motion regarding Gabrion's competency, an individual's mental health can change over time, and an incarcerated person is particularly at risk for deteriorating mental health. *See Panetti v. Quarterman*, 551 U.S. 930, 944 (2007) ("All prisoners are at risk of deteriorations in their mental state."); *Eggers v. Alabama*, 876 F.3d 1086, 1103 (11th Cir. 2017) ("[I]t is well established, an inmate's competency could change over the years.").

Finally, as to the issue of procedural default, even if Gabrion did procedurally default this claim, and even if he cannot show cause and prejudice (which he likely can, given the ineffective performance of his prior attorneys), the Court should still consider the claim under the "miscarriage of justice" standard. In *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Supreme Court explained that a petitioner in a capital case satisfies the "miscarriage of justice" standard when the petitioner is "innocent of death" or "no reasonable juror would have found him eligible for the death penalty." *Sawyer*, 505 U.S at 339-41, 350.

If sentencing severely mentally ill individuals to death is unconstitutional, then a severely mentally ill individual would necessarily be ineligible for the death penalty and, per *Sawyer*, "innocent of death." Gabrion has presented evidence of mental illness and evidence that his trial counsel was ineffective for failing to fully develop the evidence as to his mental health. At the very least, Gabrion should be evaluated for severe mental illness to determine whether he would be "innocent of death" if it were unconstitutional to apply the death penalty to severely mentally ill individuals.

24

Therefore, a constitutional prohibition on death sentences for severely mentally ill individuals would either make Gabrion ineligible for the death penalty, or at the very least require this Court to consider Gabrion's mental health in light of the constitutional prohibition. Consequently, even if Gabrion procedurally defaulted this claim, and even if he cannot satisfy the cause and prejudice standard, this Court should consider Gabrion's claim that executing mentally ill individuals violates the Eighth Amendment because Gabrion has satisfied the "miscarriage of justice" standard as explained in *Sawyer*.

In considering this claim, this Court should hold that executing individuals with severe mental illness violates the Eighth Amendment. Just like individuals with intellectual disabilities (and juvenile offenders), individuals with severe mental illness "[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses . . . do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Atkins*, 536 U.S. at 306.

## THE COURT SHOULD RECONSIDER ITS RULING REGARDING THE CONSTITUTIONALITY OF THE FEDERAL DEATH PENALTY ACT

This Court determined that Gabrion presented insufficient evidence of the unconstitutionality of the Federal Death Penalty Act. *See* Opinion, ECF No. 156 at 181, Page ID No. 5975 (holding that Gabrion's statistical evidence was insufficient to show bias in his case). The Court should reconsider this holding, taking note of a recent federal district court case finding that non-statistical evidence shows that the FDPA is imposed in an arbitrary and biased manner, and specifically that the death penalty is

disproportionately imposed in cases involving white female victims. This Court should also take note of a state supreme court case issued a few days after this Court's opinion, which relies on statistical evidence in holding that its state's death penalty is imposed in an arbitrary and biased manner.

First, in 2016, a district court held that mix of statistical and non-statistical evidence presented at a hearing revealed that "[t]he record of arbitrary imposition of the death penalty through the FDPA is clear[.]" *United States v. Fell*, 224 F. Supp. 3d 327, 358 (D. Vt. 2016). Most notably, the opinion discussed at length the testimony of Kevin McNally "about the effects of race, geography, and the absence of discernible standards for the determination of who is sentenced to life imprisonment and who is sentenced to death." *Id.* at 340. The court noted that McNally's "work was not statistical" but "a narrative account of the actual application of the FDPA in 349 cases which share the aggravating factor of multiple victims" that "owes more to the study of history than to mathematics." *Id.* at 341.

The court found particularly convincing McNally's "table which set out a summary of the offense conduct and the statutory and non-statutory aggravating factors" in over 300 cases. *Id.* Reviewing the table, the court said, "*The more carefully one reviews the chart and the underlying case summaries, the more arbitrary the distinctions between cases become.*" *Id.* (emphasis added).

In its cross-examination, the government raised a counterargument to McNally's testimony, asking: "[H]ow could you possibly quantify strength of evidence in a given case? . . . The point I am asking you to consider is there are enumerable myriad factors that go into the decision-making process that are simply unquantifiable?" *Id.* Addressing

this counterargument, the court pointed out, "*The defense could not have made the point more clearly: the decision to impose death is subjective, multi-factorial, unreproducible, and, for these reasons, irremediably arbitrary.*" *Id.* (emphasis added).

> Assessing the ultimate persuasive value of McNally's testimony, the court said, Mr. McNally is not a statistician and his work was criticized by other witnesses, including witnesses called by the defense, as statistically unsophisticated. His work has an historical reality which overcomes methodological criticism. It is undeniable that there is no principled way to distinguish the few cases in which death is the result from the many equally abhorrent cases in which it is not. The prosecution is not wrong when it insists that every case is different and that in comparing any two cases, one can find enumerable distinctions which may explain the difference in outcome. But Mr. McNally is absolutely correct when he surveys the entire field of multiple victim cases and can find no objective basis to explain the different outcomes for similar crimes.

*Id.*

And, in a finding particularly relevant to Gabrion's case, the court determined that that "A review of racial characteristics of death penalty authorizations and death sentences shows that cases involving white female victims are disproportionately represented in both groups." *Id.* at 340.

The district court in *Fell* ultimately concluded that it was the role of the Supreme Court, not the district court, to rule on the constitutionality of the death penalty. *Id.* at 358–59. But the court also acknowledged that "a trial court has its own contribution to make to the debate. The court can hold a hearing and permit witnesses to testify" and that "[t]he trial court's obligation does not end with a review of the facts. The court is required to address the legal issues raised by the parties." *Id.* at 329. Announcing its findings, the court said, "the Federal Death Penalty Act . . . falls short of the standard required in *Furman v. Georgia*, 408 U.S. 238, (1972), and in *Gregg* for identifying defendants who meet objective criteria for imposition of the death penalty. . . . [T]he FDPA operates in an arbitrary manner in which chance and bias play leading roles." *Id.* at 329.

27

The evidence developed in *Fell* shows that a historical examination of cases in which the government has pursued, or declined to pursue, the death penalty indicates that the federal death penalty is imposed in an arbitrary and racially biased manner. *Id.* at 341. Of particular note to this case, the court specifically found that McNally's non-statistical evidence showed that, "cases involving white female victims are disproportionately represented in" federal "death penalty authorizations and death sentences." *Id.* at 340. McNally's historical analysis indicates that there are individuals situated similarly to Gabrion who, unlike Gabrion, were not sentenced to death.

Second, on October 11, a few days after this Court issued its opinion, the Washington Supreme Court relied on statistical evidence to hold that Washington's death penalty "is imposed in an arbitrary and racially biased manner." *State v. Gregory*, No. 88086-7, 2018 Wash. LEXIS 696, at *42 (Wash. Oct. 11, 2018). To be clear, the Washington Supreme Court concluded that the death penalty violated its state constitution, not the U.S. constitution, and it concluded that its state's death penalty, not the federal death penalty, was unconstitutional. *See id.* at 18, 21 ("It is now apparent that Washington's death penalty is administered in an arbitrary and racially biased manner. Given the evidence before us, we strike down Washington's death penalty as unconstitutional under article I, section 14."). Nevertheless, the opinion provides a helpful example of a court using statistical evidence to analyze whether the death penalty is arbitrary and racially biased. *See id.* at 23–26. Yet while considering statistical evidence, the Washington Supreme Court also pointed out that in "consider[ing] . . . whether the evidence shows that race has a meaningful impact on imposition of the death penalty" it "ma[de] this determination by way of legal analysis, not pure science," "acknowledge[ing]

28

that 'we are not statisticians.'" *Id.* at 23 (quoting *State v. Davis*, 290 P.3d 43 (Wash. 2012)).

Especially when considered together with *Fell*, *Gregory* exemplifies how a court can appropriately analyze statistical and non-statistical evidence of the arbitrary and racially biased administration of the death penalty. *Gregory* and especially *Fell* also show that there *is* significant evidence of the arbitrary and racially biased imposition of the death penalty for a court to consider. It is also relevant to this case that while the *Fell* and *Gregory* courts considered this evidence recently, as Gabrion argued in his § 2255 motion, much of this evidence would have been available to Gabrion's prior counsel, and they were ineffective for failing to pursue this argument. Therefore, in light of *Fell* and *Gregory*, this Court should reconsider its refusal to consider statistical evidence and allow for discovery to develop additional evidence showing the arbitrary and racially biased administration of the federal death penalty.

**Date:  November 1, 2018**                     **Respectfully submitted,**


By:  /s/ *Monica Foster*                              By:  /s/ *Joseph M. Cleary*
     Monica Foster                                        Joseph M. Cleary
     Attorney for Movant                              Attorney for Movant
Business Address:                                    Business Address:
Indiana Federal Community Defender, LLC    Indiana Federal Community Defender, LLC
111 Monument Circle, Suite 3200             111 Monument Circle, Suite 3200
Indianapolis, Indiana 46204                 Indianapolis, Indiana 46204
(317) 383-3520                              (317) 383-3520

By:  /s/ *Scott Graham*
     Scott Graham
     Attorney for Movant
Business Address:
SCOTT GRAHAM PLLC
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585