# EXHIBIT A

I, Thomas V. Ryan Ph.D., ABPP, declare as follows:

1. I testified as an expert witness on the issue of future dangerousness in the case of *United States v. Richard Thomas Stitt.*

2. Based on the defendant's score on a psychological instrument called the Psychopathy Checklist-Revised (PCL-R), I testified that he met the criteria for psychopathy. I testified about the defining characteristics of psychopathy and about the utility of the PCL-R as a predictor of future violence in prison. Based upon the defendant's PCL-R score, I offered the opinion that he would be a future danger if sentenced by the jury to life without parole.

3. Based upon my current understanding of the literature and the obvious controversy about forensic clinicians' use of the PCL-R, I would choose not to use this instrument. Although I did not recognize it at the time, I am aware now that the PCL-R is not, and was not, appropriately relied upon to assess an individual's future dangerousness in federal prison. As an ethical and responsible clinician, I am informing all concerned that the statements about the defendant's future dangerousness that I made at trial were not grounded in current scientific literature and I do not stand by them now.

4. My testimony to the best of my recollection, without reviewing the transcript of my testimony about the defendant, included the following statements relating to the PCL-R and psychopathy:

   a) that based on his score on the PCL-R, the defendant presented a high risk of future violence even in the context of a maximum security federal prison;
   b) that because he was a psychopath as defined by the PCL-R, the defendant was essentially untreatable and not amenable to rehabilitation;
   c) that because he was a psychopath as assessed with the PCL-R, the defendant would not "burn out" after age forty like other violent offenders, but instead would continue to be violent;

5. The reasons why it is inappropriate to rely on the PCL-R for assessing the future dangerousness of a capital defendant became apparent to me in the Spring of 2000 when I was preparing to testify as an expert witness for the prosecution in the matter of *United States v. Willis Haynes.* In that case, after the written report of my evaluation was submitted, the defense filed a motion to preclude testimony about the PCL-R and psychopathy. The motion included opinions provided by a number of well-respected authorities on the PCL-R that the scientific literature did not establish a relationship between prison violence and a high PCL-R score that would support a future dangerousness determination. I reviewed those experts' opinions, re-evaluated the scientific literature and consulted with several other forensic psychologists. I then determined that I would withdraw my report. As a result, no testimony about psychopathy or the PCL-R was introduced at that trial.

6. Although the basis for a challenge to the use of the PCL-R existed at the time of the *Stitt* trial, no such challenge was brought by defense counsel. The challenge in *Haynes* rested on the fact that the existing scientific literature did not demonstrate a relationship between PCL-R scores and prison violence sufficient to conclude that a high scorer would likely be dangerous in prison. The *Haynes* motion was filed approximately 18 months after the trial in *Stitt*.

7. My experience in *Haynes* prompted me to review my future dangerousness testimony in the *Stitt* trial.

8. At the time I testified in Stitt, there was enthusiasm among psychologists about the PCL-R's potential use as a tool for assisting mental health professionals in determining whether mentally disordered individuals could safely be released into the community. Because it was a newly developed instrument, however, there were few published, peer reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in North America. It was not and still is not possible to conclude to a reasonable degree of scientific certainty, based on studies that were published at the time of the *Stitt* trial or on relevant research published since then, that a correlation exists between high PCL-R scores and federal prison violence.

9. In a comprehensive review of the literature relating to institutional violence and the PCL-R that focused on the use of the PCL-R in capital sentencing proceedings, John Edens, a psychologist with extensive experience in the area of risk assessment, concluded, "the position that PCL-R scores for any one offender provide much useful information regarding his relative or absolute risk for future institutional violence while incarcerated clearly is untenable...." Edens, J., Petrila, J., & Buffington-Vollum, J.K, 2001, Psychopathy and the death penalty: can the PCL-R identify offenders who represent "a continuing threat to society?" Journal of Psychiatry and Law, 29, 433-481. Although other experts have expressed different opinions, I generally agree with Dr. Edens' conclusion, and believe it is an accurate summary of the prevailing view among forensic psychologists.

10. Since withdrawing my report in the *Haynes* case, I have been retained by the government in several other federal death penalty cases, and testified in those that went to trial. In no case have I relied on the PCL-R, because I no longer believe that the PCL-R is a reliable indicator of a defendant's future dangerousness in federal maximum-security prisons due to the lack of peer reviewed empirical studies. Indeed, to the best of my knowledge, the government has not introduced testimony about the PCL-R or psychopathy in any trial since *Haynes*. The government's continued confidence in my work speaks, I believe, to the integrity of my assessments and my professional decision-making.

11. In addition to the PCL-R, I based my testimony in the *Stitt* trial on documents pertaining to the defendant and his history provided by the government, my own clinical interview of Mr. Stitt, my administration and interpretation of both the PCL-R and another psychological instrument, the Minnesota Multiphasic Personality Inventory

(MMPI), and the psychological assessment of the defense psychologist, Dr. Thomas Pasquale, which was provided to me.

12. In the course of discussions with counsel assisting Mr. Stitt in his post-conviction proceedings, I have been advised of significant historical and background facts pertaining to Mr. Stitt that I did not know of at the time of my evaluation and testimony and were not brought to my attention. Had I known of these facts at the time of my evaluation, they may have caused me to arrive at conclusions different from the ones I testified to at trial. Had I not known of them at the time of my evaluation but simply been cross-examined based on assertions that such facts were true, I probably would have testified that such facts, if true, would cause me to question the conclusions that I had previously reached about this individual.

13. I am speaking specifically of information regarding the family history and upbringing of the defendant. I believed and testified that although the defendant was born to a mother who was young and unable to appropriately care for him, he had been raised by a warm and nurturing grandmother until the age of twelve, in a home that was across the street from his maternal and paternal grandfathers, who engaged in fatherly activities with the defendant during his childhood. I believed that the pattern of behavioral problems manifested by the defendant as a child were unexplained by any major mental illness or other factor and therefore that he had manifested a conduct disorder at an early age. This, together with the defendant's continued criminal conduct as an adult, and the psychological profile indicated by his MMPI results, led me to conclude that as an adult the defendant did not suffer from a major mental illness or other mental disorder and was best described as having an antisocial personality disorder.

14. Post-conviction counsel for Mr. Stitt have advised me that their investigation has indicated that in fact his grandmother's home was a chaotic, violent and frequently terrifying environment; that Mr. Stitt lost even that home when his grandmother died when he was eight years old; and, most significantly, that acute mental illness has been diagnosed in Mr. Stitt's mother and at least one (and possibly two) of her siblings.

15. Although all of this information would have been important for my evaluation, the information about the diagnoses of the defendant's mother and her first-degree relatives would be very helpful. I have been advised that the defendant's mother experienced repeated involuntary emergency psychiatric hospitalizations for acute episodes of bipolar disorder, and that at least one aunt has been diagnosed with bipolar disorder as well.

16. Bipolar and other mood disorders have a higher than normal genetic link, and are diagnosed on the basis of an individual's behavior and family history. With an awareness of Mr. Stitt's reportedly remarkable family history of bipolar disorder, his behavior could be cast in a dramatically different light. For example, Mr. Stitt scored high on the mania scale of the MMPI, leading to a recommendation in the report of his scores to consider a diagnosis of mood disorders including manic episodes, hypomanic states, and cyclothymia. I certainly would have seriously considered this result more heavily had I been aware of the diagnoses of Mr. Stitt's mother and his aunt. Instead, I focused on the

psychopathic deviance scale, on which Mr. Stitt also scored high, and emphasized personality qualities that were similar to the features of psychopathy that he had scored high for on the PCL-R.

17. Similarly, I would most likely interpret differently statements that Mr. Stitt made to me during our clinical interview. For example, when asked to rate himself on a scale of one to ten, Mr. Stitt awarded himself a fifteen. He told me that if released he would pursue an acting career in Hollywood, and that he could anticipate no difficulty in achieving such a goal. With an awareness of his bipolar family history, this could be alternatively viewed as those indicative of mania or hypomania, suggesting the possible presence of a mood disorder.

18. Furthermore, information about a bipolar family history would have caused me to question whether the early behavior problems manifested by Mr. Stitt were indications of early onset bipolar disorder. The out-of-control behavior described in the information I was provided about Mr. Stitt's childhood could be consistent with the behavior of children suffering from early onset bipolar disorder, and therefore could have been symptomatic of a mental illness rather than a volitional decision by Mr. Stitt not to conform to societal expectations. If, on cross-examination at trial, Mr. Stitt's counsel had questioned me in this area and informed me about the family history of bipolar disorder, I certainly would have conceded that it raised substantial concerns about the possibility of mental illness in Mr. Stitt.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and recollection at this time.


Thomas V. Ryan, Ph.D./ABPP
May 12, 2003