# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed:  August 04, 2022

Mr. Joseph Cleary
Ms. Monica Foster
Ms. Jean Elizabeth Giles
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204

Marvin Charles Gabrion II
F.C.I. Terre Haute
P.O. Box 33
Terre Haute, IN 47808

Mr. Scott Graham
Scott Graham, PLLC
1911 W. Centre Avenue, Suite C
Portage, MI 49024

Ms. Jennifer Lee McManus
Mr. Timothy P. VerHey
Office of the U.S. Attorney
Department of Justice
P.O. Box 208
Grand Rapids, MI 49501

> Re:  Case No. 18-2382, *Gabrion, II v. United States*
>      Originating Case No. : 1:15-cv-00447 : 1:99-cr-00076-1

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Laurie A Weitendorf
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0170p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

MARVIN CHARLES GABRION, II,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

┐
│
│
├  No. 18-2382
│
│
┘

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 1:15-cv-00447; 1:99-cr-00076-1—Robert J. Jonker, District Judge.

Argued:  May 24, 2022

Decided and Filed:  August 4, 2022

Before:  BATCHELDER, MOORE, and GIBBONS, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Monica Foster, INDIANA FEDERAL COMMUNITY DEFENDERS, INC., Indianapolis, Indiana, for Appellant.  Timothy P. VerHey, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.  **ON BRIEF:**  Monica Foster, Jean E. Giles, Joseph M. Cleary, INDIANA FEDERAL COMMUNITY DEFENDERS, INC., Indianapolis, Indiana, Scott Graham, SCOTT GRAHAM PLLC, Portage, Michigan, for Appellant.  Timothy P. VerHey, Jennifer L. McManus, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

BATCHELDER, J., delivered the opinion of the court in which GIBBONS, J., joined. MOORE, J. (pp. 23–29), delivered a separate opinion concurring in part and dissenting in part.

—————————————

## OPINION

—————————————

ALICE M. BATCHELDER, Circuit Judge.    This is an appeal from the denial of a 28 U.S.C. § 2255 motion for relief.  We granted a certificate of appealability (COA) on four issues: an ineffective-assistance-of-counsel (IAC) claim concerning an alleged conflict of interest, a *Brady* claim concerning the FBI's method of analyzing hair samples, an IAC claim concerning the investigation at the guilt stage, and an IAC claim concerning the mitigation investigation and presentation at the penalty stage.  We find no merit to any of these claims and AFFIRM.

## I.

In August 1996, Marvin Gabrion, then 43 years old, raped 19-year-old Rachel Timmerman.  It is believed that shortly after his arrest and release on bond, Gabrion murdered Wayne Davis, a named witness to the rape.  Davis's corpse was later found in a remote lake near Gabrion's home.

In June 1997, just days before the rape trial was set to begin, Gabrion murdered Timmerman and likely murdered her 11-month-old baby, Shannon Verhage.  Shannon's body has never been found.  But a month later, two fishermen found Timmerman's corpse tangled in some weeds in Oxford Lake, in the Manistee National Forest.  Her eyes and mouth, but not her nose, had been wrapped in duct tape.  Her hands were handcuffed behind her back, and chains were wrapped around her body and attached to cinderblocks.  It is believed that a short time later, Gabrion murdered his accomplice, John Weeks, who persuaded Timmerman to accompany him on a date, and to bring Shannon with her, and then delivered them both to Gabrion.  Weeks's body has never been found.

In October 1997, the FBI apprehended Gabrion in Sherman, New York, where he was attempting to collect a Social Security check for a mentally disabled man named Robert Allen.  It is believed that Gabrion murdered Allen in 1995.  Allen's body has never been found.

The federal prosecutor obtained an indictment from a federal grand jury, charging Gabrion with first-degree murder with a federal death-penalty specification.  In the proceedings leading up to trial, Gabrion's behavior raised concerns among the district court judge and the attorneys as to his mental stability.  The judge ordered a series of mental competency evaluations.  All told, eight psychiatric experts have evaluated Gabrion in person, and all eight found that he was feigning mental illness or incompetence.  The prosecutor eventually tried the case to a jury in 2002.

At trial, the prosecutor presented overwhelming evidence that Gabrion murdered Timmerman by restraining her with tape, handcuffs, chains, and cinderblocks, and throwing her into Oxford Lake to sink and drown at the location where her body was found.  The prosecutor also proved that the aggravating factors (two statutory, four non-statutory) outweighed the mitigating factors.  The jury convicted Gabrion of first-degree murder, found the aggravating factors outweighed the mitigating factors, and recommended the death penalty.  The district court imposed the death penalty, and we affirmed the conviction and sentence.  *United States v. Gabrion*, 719 F.3d 511 (6th Cir. 2013) (en banc); *see also United States v. Gabrion*, 517 F.3d 839 (6th Cir. 2008).

Gabrion filed a § 2255 motion for relief, raising numerous claims of error.  The district court considered the motion and issued a thorough and detailed opinion, denying the motion as to all issues and denying any COA from it.  *Gabrion v. United States*, No. 1:15-cv-447, 2018 WL 4786310 (W.D. Mich., Oct. 4, 2018).  Gabrion appealed and we granted a COA on four issues. *Gabrion v. United States*, 820 F. App'x 442 (6th Cir. 2020).

**II.**

When the district court denies a petitioner's § 2255 motion, we review the legal issues de novo and uphold the factual findings unless they are clearly erroneous.  *Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020).  For the specific claims here, concerning IAC and *Brady*, our review is also de novo.  *Id*.; *United States v. Hofstetter*, 31 F.4th 396, 430 (6th Cir. 2022).

A petitioner seeking § 2255 relief "must allege one of three bases as a threshold standard: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or

(3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Harris v. United States*, 19 F.4th 863, 866 (6th Cir. 2021) (citation omitted).  "[C]onclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim under § 2255." *Jefferson v. United States*, 730 F.3d 537, 547 (6th Cir. 2013) (citation omitted).

## A.

Gabrion claims that he was deprived of conflict-free counsel by a Federal Public Defender who assisted his defense team and met with him, but who also represented a key government witness who testified against him.  We review this claim de novo.  *Wingate*, 969 F.3d at 255.

The right to the effective assistance of counsel includes the right to representation free from conflicts of interest.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *United States v. Kilpatrick*, 798 F.3d 365, 374 (6th Cir. 2015).  A defendant who claims ineffective assistance of counsel arising from an alleged conflict of interest and who raised no objection at trial "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  The *Sullivan* standard applies to claims of multiple concurrent representation.  *Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006).  Multiple concurrent representation "occurs where a single attorney simultaneously represents two or more codefendants in the same or separate proceeding(s)." *Jalowiec v. Bradshaw*, 657 F.3d 293, 315 (6th Cir. 2011) (citation omitted).  To show an actual conflict, the defendant must show that counsel chose between possible alternative courses of action that were helpful to one client but harmful to the other.  *McFarland v. Yukins*, 356 F.3d 688, 705 (6th Cir. 2011).

In early June 1997, a man named Joe Lunsford, was threatening to murder President Clinton.  The federal prosecutor indicted Lunsford and the district court appointed a Federal Public Defender named Christopher Yates to represent him.[1]  Lunsford entered a guilty plea in August 1997 and waited in the Newaygo County Jail for a sentencing hearing in January 1998.

---

[1]According to the docket, Yates continued to represent Lunsford until February 1, 2005.

No. 18-2382                    *Gabrion v. United States*                    Page 5

Meanwhile, in October 1997, the FBI apprehended Gabrion and delivered him to Michigan for prosecution.   While preparing the murder charge and the death-penalty specification, the federal prosecutor indicted Gabrion for Social Security fraud.  In November 1997, the district court appointed a Federal Public Defender named Sharon Turek to represent Gabrion on the Social Security fraud charge.   She withdrew three days later.   The court appointed Jeff Balgooyen.  He withdrew 26 days later.  Finally, in December 1997, the court appointed David Kaczor.

Meanwhile, Gabrion waited in the Newaygo County Jail, where he shared a space with Lunsford from late December 1997 through January 1998.[2]  During that time, Gabrion said and did odd things, such as concocting outrageous stories, showering five or more times per day, keeping his entire body shaved bald, and antagonizing everyone.  He also sent numerous letters and motions to the court, such as a motion for the court to provide him with the judge's home address and phone number.  And he wrote letters and made phone calls to Timmerman's family.

On March 3, 1998, the district court began Gabrion's trial for Social Security fraud regarding Allen's benefits.  Kaczor represented Gabrion despite Gabrion's repeated efforts to remove or replace him.  After a three-day trial, the jury convicted Gabrion as charged.

About three weeks later, on March 30, 1998, Lunsford spoke with the FBI about Gabrion.  Christopher Yates represented Lunsford at the interview.   According to the FBI records, Lunsford revealed, among other things, what Gabrion had told him about the Social Security fraud:

> Gabrion [told Lunsford] that he was incarcerated because of Social Security fraud.  Gabrion claimed he had been using Allen's identification, such as birth certificate and Social Security card to obtain Allen's Social Security benefits for him.  Gabrion claimed to be receiving $3,000.00 a month in Social Security benefits.  Lunsford found that difficult to believe unless he had received more than one person's benefits.  Gabrion claimed to have taken Allen to New York to open a bank account, and Gabrion had commented 'They won't find him in this state.'

---

[2]On January 28, 1998, prison officials intercepted a letter that Gabrion wrote to the Governor of Michigan, alleging that Lunsford was planning to murder the Governor.  The prison moved Gabrion to another cell.

More pertinent to the murder case, Lunsford told the FBI that Gabrion admitted to raping Timmerman and said he "got rid of her to close her mouth"; boasted about killing at least two people, one by drowning; worried when the TV news reported that police were conducting another search of Oxford Lake; and masturbated to a photo of Shannon.

In July 1998, Kaczor continued to represent Gabrion on the Social Security fraud case, at sentencing and the beginning of his appeal. But in August 1998, in the Sixth Circuit, Kaczor moved to withdraw as counsel with a stipulation that Yates would replace him. Even though Yates had represented Lunsford at the FBI interview about Gabrion, there is no mention of a possible conflict on the Sixth Circuit docket. In April 1999, Yates filed a brief in the Social Security fraud appeal.

In May 1999, Lunsford testified to the grand jury on the Gabrion murder charge. Yates was there, "outside in the hallway," so that if Lunsford wanted to consult with Yates before answering any questions, he could do so. The same federal prosecutor conducted that grand jury inquiry and the appellate briefing on the Social Security-fraud case. There is no suggestion on the docket for Gabrion's Social Security fraud appeal that Yates might have had a conflict.

On June 3, 1999, the federal prosecutor obtained an indictment on the murder charge. Gabrion requested appointed counsel. Specifically, he requested Yates. The district court denied Gabrion's request for Yates due to the conflict of interest and instead appointed Paul Mitchell. A month later, the court appointed David Stebbins to serve as Mitchell's co-counsel.

Meanwhile, Yates was still representing Gabrion on the Social Security fraud appeal without any mention of a possible conflict. On June 30, 1999, Yates filed Gabrion's reply brief, and in July 1999, Yates filed final briefs and a joint appendix. In March 2000, Yates argued that appeal before the Sixth Circuit panel. The same federal prosecutor argued for the government. In July 2000, the Sixth Circuit panel affirmed Gabrion's conviction and sentence. By all appearances, Yates was finished representing Gabrion at that point, at least for that case.

Meanwhile, Gabrion's other attorneys, Mitchell and Stebbins, were complaining to the district court that they were not being paid, so they could not pay investigators and experts, and they needed more money and help. And Gabrion was complaining to the court that Mitchell and

Stebbins were incompetent, and that he wanted to replace them with Yates or proceed pro se with Yates as backup counsel.  On February 21, 2001, the judge wrote a letter to Gabrion:

> Dear Mr. Gabrion:
>
> I am in receipt of your recent letter.  I too, am frustrated with the long delay in this matter and will soon be able to schedule the motions and possible trial date in the future.
>
> Please be assured I am following your case closely and understand your anxiety.  This is not your attorney's fault.  I have known Mr. Paul Mitchell, your attorney, for several years and have observed him in many trials.  He is a very good lawyer and a fine person.  I know this may be difficult for you to understand under the circumstances, but I ask you to trust me.  *I have also spoken with the Federal Public Defender, Christopher Yates, and asked him to assist Mr. Mitchell.*  [emphasis added]  You will find Mr. Yates, in addition to being a fine lawyer, also an individual of unquestioned integrity.

District Ct. letter to Gabrion (emphasis added).

In a letter dated April 6, 2001, Stebbins wrote to Yates, seeking "assistance in the research and preparation of a Motion challenging the death penalty in general and as applied in this case, and challenging the specific aggravating circumstances (both statutory and non-statutory) that the government intends to rely on," and "help drafting the Jurisdiction Motion." Stebbins concluded: "I need to come to Grand Rapids . . . and sit down with you and [Mitchell] and see exactly where we are and how we can force more discovery out of the government." [16-5, PgID 1518-19.]

A year later, in March 2002, Lunsford—represented by Yates—appeared as a witness at the penalty phase of Gabrion's murder trial.  According to Lunsford, Gabrion boasted that he took Allen's Social Security benefits and that Allen would never be found, claimed that Shannon's grandmother sold her on the black market, and masturbated to a baby picture of Shannon.  On cross-examination, Lunsford admitted his hostility to Gabrion due to the letter to the Governor, and that he had hoped for some benefit for his testimony, but he denied getting any.

In a 2016 affidavit, Lunsford recanted his testimony about Gabrion's masturbating, accused Yates of concocting that story, and claimed that Yates threatened that if he did not so

No. 18-2382                          *Gabrion v. United States*                          Page 8

testify against Gabrion, he would serve his 30-year state prison term and then serve his federal sentence.

In a 2017 declaration, Yates stated that he did not tell Lunsford how to testify nor had he told Lunsford to lie. Yates further attested that he never represented Gabrion in the murder case and that Gabrion, the judge, Mitchell, and Stebbins were all aware of the conflict in his representation of Lunsford. Yates explained that his assistance to Mitchell and Stebbins was in his role as the Federal Public Defender, providing research on federal jurisdiction and the location of the crime. He was not present for strategy meetings and never appeared in court on Gabrion's behalf. At the court's request, he reviewed the fee and expense applications and acted as a conduit between Gabrion and his appointed counsel (Mitchell and Stebbins). And he visited Gabrion to help him with practical issues, such as advocating that the Bureau of Prisons move Gabrion to the federal prison in Milan, Michigan, as Gabrion desired.

Gabrion accuses Yates of representing him under a conflict of interest. This presupposes that Yates *represented* Gabrion in this murder case. But Yates swears that he did not. To be sure, Yates never made a formal appearance or filed anything on Gabrion's behalf. Mitchell and Stebbins were Gabrion's counsel of record, and the district court told Gabrion expressly that Yates could not represent him. Yates assisted Gabrion and his counsel, but that did not form an attorney-client relationship between Yates and Gabrion, nor does Gabrion claim that it did. Accordingly, Yates did not establish—or breach—any sort of attorney-client privilege with Gabrion.

Even if Yates represented Gabrion, however, Gabrion cannot show that a conflict of interest *adversely affected* Yates's performance as counsel for Gabrion. Gabrion does not point to any instance or event when Yates chose between alternative courses of action that helped Lunsford but harmed Gabrion. Yates did not obtain favorable treatment for Lunsford in exchange for the testimony against Gabrion. Yates did not cross-examine Lunsford at Gabrion's penalty phase trial, thus he did not protect Lunsford or harm Gabrion. Mitchell cross-examined Lunsford and impeached his credibility by revealing that Lunsford hoped to benefit from his testimony and harbored hostility towards Gabrion.

No. 18-2382                     *Gabrion v. United States*                     Page 9

Gabrion has raised no claim that Yates did anything that adversely affected Mitchell's or Stebbins's representation of him.  As for Lunsford's claim that Yates coerced him with threats to lie at Gabrion's sentencing, Yates denied that.  But even if that were true, that false testimony would have harmed both Gabrion and Lunsford, not benefited Lunsford at Gabrion's expense.

As an apparent last resort, Gabrion claims that Yates's participation adversely affected him because Yates advocated for Gabrion's transfer to the federal prison in Milan, which led to witnesses' testifying negatively about Gabrion's conduct there.  Even if it were just the transfer to Milan and not Gabrion's misbehavior at Milan that negatively affected Gabrion, it was not Yates's idea or desire to move Gabrion to Milan—it was entirely Gabrion's.  Gabrion desperately wanted to move to Milan.  He raised it to the court at every opportunity: in letters, pro se motions, and complaints about his attorneys.  He even impersonated public officials in his efforts to effectuate the transfer, once impersonating the Clerk of Court and another time impersonating a State Senator.  Gabrion has not plausibly claimed any adverse effect due to a conflict of interest.

All told, Gabrion has not alleged facts, much less pointed to evidence, that would support a finding that he suffered a constitutionally impermissible conflict of interest by his counsel.

**B.**

Gabrion claims that the prosecutor knew that the FBI's method of hair analysis that the government presented during Gabrion's trial was flawed or misleading but failed to disclose that information to defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  We review this claim de novo.  *Hofstetter*, 31 F.4th at 430.

A petitioner who raises a *Brady* claim must show that the evidence was exculpatory or impeaching, that the prosecution suppressed it, and that prejudice ensued.  *Strickler v. Greene*, 527 U.S. 263, 280 (1999).  Evidence is material and prejudice established if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense.  *Id.* at 281.  A reasonable probability is one "sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

When Timmerman's corpse was discovered in Oxford Lake, the police investigating the scene found, near the boat launch, a piece of discarded duct tape with human hair attached to it. An FBI analyst determined—and testified at Gabrion's trial—that the hair on the tape had the same "microscopic characteristics" as Timmerman's head hair.[3]  It has since been established that the FBI's forensic methods for such hair comparisons were not 100% scientifically valid, and Gabrion contends that the FBI was aware of that at the time of his trial.  He claims that this information was withheld in violation of *Brady* because it was known to the government, exculpatory, and material, as it was evidence that the murder occurred at Oxford Lake, which established federal jurisdiction and the death penalty.   But this hair-evidence-comparison testimony was *not* material.  On its own, the hair-evidence testimony was unpersuasive and almost irrelevant.  And, on cross-examination, the FBI agent conceded that the piece of duct tape in question did not match the duct tape found on Timmerman; no hair or fibers from Timmerman were found in Gabrion's campsite, residence, or vehicles; and a DNA test would have been far more conclusive, but was not done.

Moreover, when the totality of the evidence is considered, this hair-evidence-comparison testimony was irrelevant to whether Timmerman was alive when Gabrion put her in Oxford Lake.  The pathologist testified that Timmerman died by drowning or asphyxiation, with drowning most likely.  On the day of her disappearance, three witnesses saw Timmerman with Gabrion (and Weeks) near Oxford Lake while she was still alive and unbound, and two other witnesses saw Gabrion leaving the lake alone.  When Timmerman's corpse was found, it was restrained with chains and padlocks, weighted with concrete blocks, and tangled in thick vegetation, such that it could not have drifted to that area of Oxford Lake from another area.  The tape over her mouth and handcuffs behind her back indicated that she was alive when she was cast into the lake, as there is no need to silence and handcuff a corpse.  Additionally, the keys to the handcuffs were found in Gabrion's house.  Identical concrete blocks with identical paint, as well as similar chains and padlocks, were found at Gabrion's property.  Given all of this evidence, there is no possibility that the outcome of the trial would have been different if

---

[3]Because Gabrion shaved his entire body, neither head nor pubic hair samples were obtained from him.

information about the unreliability of the FBI's hair-analysis-comparison methods had been disclosed to the defense.

Gabrion has not alleged facts or pointed to evidence to show a *Brady* violation.

## C.

Gabrion claims that his trial counsel rendered ineffective assistance (IAC) because they failed to obtain sufficient funding, adequately investigate the prosecution's case, or retain necessary investigative services.  We review this claim de novo.  *Wingate*, 969 F.3d at 255.

To prevail on an IAC claim, a petitioner must prove both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the [petitioner] must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  *Id.*  In assessing performance, it is "strongly presumed" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (citations omitted).  "There is [also] a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect."  *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quotation marks and citations omitted).  We must not only "give the attorneys the benefit of the doubt, but [must also] affirmatively entertain the range of possible reasons [that] counsel may have had for proceeding as they did."  *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (quotation marks and citations omitted).

"Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding."  *Harrington*, 562 U.S. at 104 (citation omitted).  There must be "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (citation omitted).  In assessing prejudice, we consider *all*

the evidence presented to the jury.  *Strickland*, 466 U.S. at 695; *see also Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012).

Gabrion claims that insufficient funding, inadequate investigation, and absence of experts led to seven instances of IAC at the guilt-phase trial.  Initially, we note that the court authorized over $730,000 for Gabrion's defense, including some $200,000 for investigators and experts. That was above the average amount of $620,000 authorized for defending death penalty cases at the time.

Gabrion points to seven issues that, he contends, counsel should have investigated further and pursued at the guilt phase of his trail.  None of these contentions has merit.

### 1.  *Crystal Roach Testimony*

Gabrion claims his counsel rendered IAC because they failed to produce evidence that the county prosecutor, Crystal Roach, testified falsely about her customary practices in prosecuting rape cases, and about the legal maneuvering in Gabrion's rape case.  Gabrion contends that this would have refuted the federal prosecutor's accusation that he obstructed justice.

Roach was the lead prosecutor for Gabrion's rape case, during which Gabrion engaged in what appeared to be delay tactics, such as waiving the preliminary hearing and agreeing to proceed directly to the circuit court, then reversing course and asking the circuit court to remand for a preliminary hearing, and then waiving it again.  He also changed lawyers three times. Meanwhile, Timmerman was in jail on an unrelated drug charge.  In the months following her release from jail on May 5, 1997, Timmerman twice called the Newaygo County Sherriff's Department, hysterical after a run-in with Gabrion.  Then just days before the rape trial was to begin, John Weeks lured Timmerman to Gabrion with the false promise of a date.

The federal prosecutor's theory was that Gabrion murdered Timmerman to prevent her from pursuing the rape prosecution—i.e., to obstruct justice.  The prosecutor surmised that Gabrion had thoroughly planned Timmerman's murder and disappearance, including the fabrication of letters from her, and had intentionally delayed the legal proceedings until

Timmerman was released from jail so that he could abduct her, coerce her to write the letters, and dispose of her before trial began. The prosecutor called Roach to testify about the rape charges, the associated proceedings and Gabrion's apparent stall tactics, and the letters written by Timmerman urging dismissal of the charges.

During her brief testimony, Roach asserted that she felt "strongly that in cases involving assault, that [preliminary examinations] should occur prior to trial" and that she had "tried to do it every time." According to Gabrion, county court records showed that Roach *never* did them— had not done a single preliminary exam in a single sexual assault case—thus making her testimony untrue. Roach also said that, in Gabrion's case, she was not satisfied with the slow progress, so she requested a pre-trial conference in April 1997 and moved for a remand for a preliminary examination. According to Gabrion, court records showed that Gabrion, not Roach, asked for a remand for a preliminary examination, again contradicting Roach's testimony.

Gabrion's theory is that if his counsel had impeached Roach about this testimony, the jury would have disbelieved that he manipulated the legal proceedings (for an opportunity to murder Timmerman) and found that he did not obstruct justice. But the obstruction-of-justice accusation was not merely that Gabrion manipulated those legal proceedings; but rather that he murdered Timmerman to avoid the rape prosecution. Timmerman was the complaining witness against him, her murder prevented her from testifying, and overwhelming evidence showed that he committed that murder. At the murder trial, four witnesses testified to Timmerman's statements that Gabrion threatened to kill her if she charged him with the rape. As for the letters, the most reasonable inference from the facts and circumstances was that Gabrion had her write them to explain her absence and urge Roach and the court to dismiss the rape charges. And Gabrion himself testified that Timmerman caused her own death by talking to the police, and that Roach caused Timmerman to become a victim by forcing her to testify against him. Impeaching Roach would have diminished none of that evidence.

On direct appeal, we characterized Roach's entire testimony as "peripheral" and not material to the jury's guilty verdict:

> The evidence that Gabrion had murdered Rachel Timmerman was simply
> overwhelming. Three witnesses testified that Gabrion had made statements to

them incriminating himself in her murder.  Others testified that they saw Gabrion near Oxford Lake shortly before her body was found there.  Several expert witnesses testified that materials found on her corpse matched materials from Gabrion's home.  Significantly, none of these witnesses was Chrystal Roach. Roach testified only as to peripheral and uncontested facts: the progress of Gabrion's rape trial in state court, and a letter the district attorney's office received, purportedly from Rachel Timmerman, retracting her rape allegations. Roach's testimony was far from critical in establishing Gabrion's guilt.

*United States v. Gabrion*, 648 F.3d 307, 337 (6th Cir. 2011) (vacated en banc).  Roach's entire testimony comprises a mere 19 transcript pages.  The trial transcript is over 2,500 pages.

### 2. *Social Security Payee*

Gabrion contends that his counsel should have obtained his Social Security records and discovered (without his assistance and despite his denials) why he had a "payee" for his benefits, which "could have" shown that he was mentally impaired and could have helped show his incompetence to stand trial.  At the time, Gabrion told his counsel that his disability was for a back injury due to a fall, while other evidence demonstrated that he obtained the benefits after he had fabricated a car accident to defraud an insurance company.  Regardless, three psychiatrists determined that Gabrion was competent to stand trial (because he was feigning mental impairment) and the en banc court said so expressly in his direct appeal.  *Gabrion*, 719 F.3d at 533.

It also bears mention that Gabrion had engaged in—and been convicted of—a complex Social Security fraud involving Robert Allen's benefits.  Far from showing mental impairment, Gabrion's manipulation of the Social Security System demonstrated his craft and cunning.

### 3. *Defense Pathologist*

Gabrion contends that a pathologist hired by his defense (such as the one hired for his § 2255 motion) could have testified that Timmerman might have asphyxiated before being cast into Oxford Lake in the National Forest, meaning she could have died in Michigan, thus negating the death penalty.  But the government's pathologist admitted at trial that, while drowning was more likely, Timmerman might have died from asphyxiation.  And Gabrion's counsel relied on that admission in his closing argument to insist that Timmerman might have asphyxiated and,

therefore, the prosecutor had not proven that she died on federal land. A defense pathologist would have added nothing further.

Moreover, there was ample other evidence that Timmerman was alive when Gabrion threw her into the lake. As already mentioned, it was unnecessary to duct tape, handcuff, and padlock chains to her if she was already dead. But also, a witness testified that Gabrion told him that he had bound her and thrown her out of a boat. And in a letter to Timmerman's mother, Gabrion taunted her to re-live Timmerman's last moments gasping for air on a muddy lake bottom.

### 4.  *Timmerman's Motive to Leave Town*

Gabrion claims that his trial counsel should have obtained and produced evidence that Timmerman had her own "motive to leave her father's home," or "reasons to disappear," or "motive to leave town." Specifically, Gabrion contends that Timmerman's probation officer had ordered her to live in a group home, which Timmerman did not want to do.

That evidence, according to Gabrion's current counsel, would have refuted the prosecutor's theory that Gabrion had lured her out and murdered her. Even if we assume that Timmerman wanted to leave home, was planning to leave home, and even accepted the date with Weeks as a means of surreptitiously leaving home, that is all irrelevant to the evidence that Gabrion murdered her and hid her body to avoid the rape prosecution.

### 5.  *Timmerman Seen Alive*

Gabrion contends that trial counsel should have obtained and presented evidence that people reported seeing Timmerman alive after June 3, the date when the prosecutor alleged that she was abducted and murdered. This contention, like the "motive to leave" contention above, proceeds as if Timmerman was not found murdered, but merely remains missing—as if she might be alive somewhere, safe and sound.

Regardless of any confusion or contradiction about the actual dates, sometime during the first week of June, Timmerman was murdered in Oxford Lake. And the evidence that Gabrion did it is overwhelming.

### 6. *FBI Handwriting Analysis Report*

Gabrion contends that his trial counsel should have refuted his guilt by presenting the FBI's handwriting analysis report, in which the FBI expert opined that Gabrion "probably" did not dictate or force Timmerman to write the exonerating letters. This is a challenge to trial strategy.

After Timmerman disappeared, three letters arrived. All three were handwritten by Timmerman and recently postmarked in Arkansas. One was to her father, the second was to Roach, and the third was to the state court judge. The substance of the three letters was the same, namely that she had run away with her dream man, had falsely accused Gabrion of the rape, and wanted to drop the rape charges against Gabrion, who was innocent. The letters' descriptions of what "actually happened" were oddly consistent with Gabrion's outlandish version of events: e.g., she wanted to and did give him oral sex, she rubbed his ejaculate on her vagina because she was mad at him, and his puppy bit her nose causing her injury. And all three letters were sent in unusual envelopes that had a postage-paid hologram of a space station embossed on them; identical to envelopes that Gabrion had frequently used for his own letters.

The prosecution's assumption was that Gabrion had either written the letters himself or had forced Timmerman to write them, likely dictating them to her. So, the prosecutor requested an FBI expert's analysis of the handwriting. But the FBI report concluded that Timmerman probably wrote the letters herself (Gabrion did not even dictate them) and was probably not under severe distress when she did so. Despite this report, the prosecutor argued at trial that Gabrion had Timmerman write the letters as part of his scheme to avoid the rape charges and to conceal the murder.

Gabrion contends that his lawyers should have produced the FBI report to refute the accusation that he was responsible for the letters. But, despite the report, there is no question that Gabrion was responsible for their being written and sent. That Timmerman wrote them on her own does not exonerate Gabrion; it makes him look especially devious and manipulative. The letters are clearly false. The letters contradicted everything she had ever told anyone about the rape, and needlessly championed Gabrion and parroted his unbelievable version of events.

Finally, that the letters were mailed in Gabrion's envelopes would mean that she had Gabrion send them. And he sent them from Arkansas after her death. Counsel's decision not to introduce the FBI report, given the overwhelming evidence of the letters' falsity, was not neglect but a reasonable strategy.

### 7. *John Weeks Seen Alive*

Gabrion contends that his trial counsel should have produced evidence that John Weeks was reportedly seen alive later than the prosecutor alleged at trial, to refute the accusation that Gabrion likely murdered him too. Again, this challenges counsel's trial strategy.

To support his theory that Gabrion led Weeks to trick Timmerman into going on a date and then murdered Weeks after they murdered Timmerman, the prosecutor produced witnesses who testified that Weeks called Timmerman repeatedly, that Weeks was with Gabrion at Oxford Lake, and that Weeks disappeared shortly after Timmerman's disappearance (and death). Gabrion cites two witness statements from police reports that say Weeks was seen alive after June 13, 1997. One witness saw Weeks with a large amount of money that he received for killing someone. The other was more specific: Weeks had a large amount of money that he received for delivering a woman to his boss, "Marvin," who killed her, and for helping Marvin get rid of the body. According to Gabrion, this disproved that he killed Weeks and proved that Timmerman was already dead when she was thrown in the lake.

No matter when Weeks was last seen exactly, he was never seen again after the summer of 1997. And far from exonerating Gabrion, this was further evidence of Gabrion's guilt. Counsel's strategic decision not to introduce these statements does not show ineffective assistance.

No. 18-2382                          *Gabrion v. United States*                          Page 18

### D.

Gabrion contends that his counsel at the penalty phase were constitutionally ineffective because they conducted an inadequate mitigation investigation and, consequently, presented an inadequate mitigation case.  We review this claim de novo.  *Wingate*, 969 F.3d at 255.

As stated above, to prevail on an IAC claim, a petitioner must prove both deficient performance and prejudice.  *Strickland*, 466 U.S. at 687.  In the penalty phase of capital cases, counsel has a duty to investigate the defendant's background and present mitigating evidence to the jury.  *Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003).  "In assessing the reasonableness of an attorney's investigation, . . . [we] consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id.* at 527.  In assessing the reasonableness of the attorney's mitigation presentation, we proceed from a presumption that counsel's actions were strategic, but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.* at 528 (citation omitted).

To assess potential prejudice, we consider the total aggravating and mitigating evidence to determine whether a reasonable probability exists that the defendant would have received a sentence less than death had counsel performed reasonably.  *Id.* at 534-38.  A reasonable probability is one that undermines confidence in the outcome.  *Strickland*, 466 U.S. at 694.

Prior to trial, Gabrion's counsel hired a mitigation specialist who committed over 1,000 hours to preparing the penalty-phase mitigation presentation.  And they had an articulable mitigation strategy, which was to focus on how Gabrion came to be damaged psychologically, rather than argue that he was a good person.  Despite their discouragement, Gabrion testified, which proved to be counterproductive.  But they presented 12 other mitigation witnesses, including four psychiatric experts.  Gabrion points to six issues that, he contends, counsel should have investigated further and presented in the mitigation case.  None of these contentions has merit.

### 1.  Crystal Roach Testimony

Gabrion claims his counsel should have refuted the obstruction-of-justice aggravating factor by presenting evidence that Crystal Roach testified falsely about her customary practices in rape cases as well as the legal maneuvering in Gabrion's rape case.

For the reasons discussed in Section II.C.1, *supra*, Roach's testimony had limited to no prejudicial effect, and counsel were not ineffective for failing to challenge it as Gabrion claims.

### 2.  Conceding Obstruction of Justice

Gabrion claims his counsel should have objected to and opposed the obstruction-of-justice aggravating factor.  But the jury had already found, during the guilt phase, that Gabrion murdered Timmerman to obstruct justice—namely, to prevent her from prosecuting the rape charge.  It was, therefore, a reasonable strategic decision to concede this issue at the penalty phase.  Moreover, the court undoubtedly would have denied the objection and would have allowed the obstruction-of-justice aggravating factor based on the overwhelming evidence and the jury's guilt-phase determination.  Counsel were not ineffective for failing to object to and oppose the obstruction-of-justice aggravating factor.  *Cf. Burns v. Mays*, 31 F.4th 497, 503 (6th Cir. 2022) ("This is commonly referred to as 'residual doubt' evidence and . . . [a petitioner] has no constitutional right to present residual doubt evidence at sentencing."); *see also Gabrion*, 719 F.3d at 524.

### 3.  History of Mental Illness

Gabrion contends that counsel and their mitigation investigator did not obtain or produce sufficient evidence of his medical and mental-illness history or his family's mental-illness history.  His current counsel produced substantially more in his § 2255 proceedings.

But this additional information is neither new nor compelling.  It is cumulative at best; attenuated, unreliable, or inadmissible at worst.  The failure to collect all this information was not necessarily deficient.  Even if counsel had obtained it, it would not have affected the outcome.  The jury heard significant evidence about Gabrion's family and mental health history, but the evidence of the aggravating factors was overwhelming.  *Gabrion*, 719 F.3d at 525.

Neither additional, cumulative evidence of possible mental illness—which was refuted by direct psychiatric examination—nor evidence of familial mental-health history would have diminished or offset the aggravating factors in any significant way.  This was not deficient or prejudicial.

### 4. Defense Pathologist

Gabrion claims that counsel should have hired and presented a pathologist to testify that asphyxiation, rather than drowning, could have caused Timmerman's death.  Correspondingly, Gabrion claims that counsel should have objected when the prosecutor described the drowning for purposes of showing that Timmerman's death was heinous, cruel, and depraved.

As discussed in Section II.C.3, *supra*, the government's pathologist conceded that asphyxiation could have been Timmerman's cause of death.  But, even accepting this possibility, the evidence that Timmerman drowned was compelling.

### 5. Evidence that Gabrion Murdered Others

Gabrion contends that counsel should have objected to the prosecutor's introduction of evidence that Gabrion murdered and disposed of Robert Allen, Wayne Davis, and John Weeks, insisting that this evidence is irrelevant to his future dangerousness *in a prison setting*.  We rejected this premise on direct appeal, finding no error in the admission of this evidence.  *See Gabrion*, 648 F.3d at 347 (affirmed en banc, 719 F.3d at 535).  Gabrion cannot show a likelihood that an objection to this evidence would have been sustained.

### 6. Other Bad Acts Evidence

Gabrion contends that counsel should have objected to the introduction of other acts evidence to show future dangerousness.  Some of this evidence—such as the sexual assaults, physical assaults, threats, vandalisms, and arsons—are clearly relevant to future dangerousness.

Some other evidence is less so, such as his nonviolent acts of wiretapping and stalking, impersonating the Clerk of Court and a State Senator, and his bizarre behavior in and out of prison.  But it is nonetheless evidence that Gabrion is crafty and conniving, and thus dangerous.

The evidence of his truly bizarre behavior might be sensational to the point of prejudice with insufficient probity of future dangerousness, but even if so, there was no overall prejudice from the introduction of that evidence. The admissible evidence was overwhelming. Moreover, this evidence fits with counsels' mitigation strategy—arguing that Gabrion was psychology damaged, not that he was a good person. Counsel was not ineffective for choosing not to challenge this evidence.

### E.

Gabrion claims that the court erred by denying discovery and an evidentiary hearing on his § 2255 claims. When the district court denies discovery in a § 2255 proceeding, we review for an abuse of discretion. *Thomas v. United States*, 849 F.3d 669, 680 (6th Cir. 2017). "Rule 6(a) of the Rules Governing § 2255 Proceedings allows the district court to enable further discovery . . . where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id*.

Similarly, when the district court denies a request for an evidentiary hearing in a § 2255 proceeding, we review for an abuse of discretion. *Martin v. United States*, 889 F.3d 827, 831 (6th Cir. 2018). "An evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief. Thus, no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (citing *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996)); *see also Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

Even if Gabrion's claims were true, he would not be entitled to relief because the evidence of his guilt is overwhelming and there was ample evidence of the aggravating factors. Therefore, the record conclusively shows a lack of prejudice. The district court did not abuse its discretion by deciding Gabrion's claims without discovery or a hearing.

No. 18-2382 *Gabrion v. United States* Page 22

**F.**

Gabrion claims that we must remand to a different district court judge for any further proceedings in this case.  We have "the authority to reassign a case on remand under 28 U.S.C. § 2106." *Martin*, 889 F.3d at 835.  To decide whether reassignment is appropriate, we consider:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his mind previously expressed views or findings;
> (2) whether reassignment is advisable to preserve the appearance of justice; and
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Sagan v. United States*, 342 F.3d 493, 501 (6th Cir. 2003).  Reassignment is an "extraordinary power and should be rarely invoked." *Smith v. United States*, 348 F.3d 545, 554 (6th Cir. 2003) (citation omitted).  Reassignment may be appropriate if the judge displayed a visceral opinion about a litigant's personal credibility, or if the judge made statements or a one-sided ruling that predicts a substantial difficulty in putting aside previously expressed views. *Martin*, 889 F.3d at 836 (citations omitted).  But mischaracterized evidence is not a mandatory basis. *Id.*

Here, even if the district court misunderstood or mischaracterized some evidence as Gabrion claims, the procedural rulings were not inescapably one-sided, nor did they display a visceral judgment on Gabrion's credibility.  And we have upheld the judge's decisions on the merits.

Gabrion has not shown any reason to assume the district court would have substantial difficulty in putting out of its mind any previously expressed views or findings.  Nor is reassignment advisable here to preserve the appearance of justice.  Finally, reassignment would involve waste and duplication out of all proportion to any gain.  The record of Gabrion's trial, appeal, and § 2255 proceedings is voluminous, and the district court addressed Gabrion's claims thoroughly and meticulously.  Reassignment is not appropriate. *See Sagan*, 342 F.3d at 501

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I agree with the majority that the overwhelming evidence of Gabrion's murder of Rachel Timmerman on federal property forecloses his guilt-phase claims. I further agree that an evidentiary hearing would be unlikely to reveal trial counsel's failure to investigate or present any material evidence at the penalty phase. Unlike the majority, however, I believe that Gabrion has met his "relatively light" burden to merit an evidentiary hearing and discovery on his claim of ineffective assistance of counsel based on a conflict of interest. *See Smith v. United States*, 348 F.3d 545, 551 (6th Cir. 2003) (quoting *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999)).

Our court has repeatedly emphasized that the standard for obtaining an evidentiary hearing for § 2255 movants is lenient. On direct appeal of a federal criminal conviction, the record is rarely sufficiently developed to support claims of ineffective assistance of counsel. *See United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012). Unlike petitioners seeking habeas relief under § 2244, who must exhaust any claims in state court before filing a federal habeas petition, 28 U.S.C. § 2254(b)(1)(A), § 2255 movants have no post-conviction opportunity to develop an evidentiary record before filing a § 2255 motion. Therefore, when a § 2255 movant requests a hearing, a "district court may only forego a hearing where the [movant]'s allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quotations omitted); *see also Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013). In other words, an evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)). When a movant raises a factual dispute, this court "must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Turner*, 183 F.3d at 477.

In addition to an evidentiary hearing, a district court may authorize discovery by a § 2255 movant for good cause. *Thomas v. United States*, 849 F.3d 669, 680 (6th Cir. 2017). Under Rule 6(a) of the Rules Governing § 2255 Proceedings, discovery is appropriate when a court has "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate" that he is entitled to relief. *Thomas*, 849 F.3d at 680. At this stage, a movant need not conclusively establish entitlement to relief, and a district court abuses its discretion in denying discovery when the record shows that § 2255 relief under the alleged facts is possible. *Cornell v. United States*, 472 F. App'x 352, 354 (6th Cir. 2012) (per curiam).

In my view, Gabrion has alleged enough facts for a court at least to look into his conflict-of-interest claims further after discovery and a hearing. In light of this relatively undemanding burden, Gabrion has sufficiently raised a factual dispute about attorney Christopher Yates's involvement in his case.

First, Gabrion has plausibly alleged that Yates represented him during his penalty-phase proceeding. Although "de minimis" assistance does not constitute active representation, an attorney represents a defendant when substantially participating in efforts to build a defense. *See Moss v. United States*, 323 F.3d 445, 459 (6th Cir. 2003) (attorney who "advanced several efforts" on defendant's behalf, including corresponding with government and investigating potential witnesses, formed an attorney-client relationship). As the district court recognized, "[t]here may be occasions where an attorney represents a criminal defendant behind the scenes, without appearing in court, and without their involvement in the case appearing in the court record." *Gabrion v. United States*, No. 1:15-CV-447, 2018 WL 4786310, at *31 (W.D. Mich. Oct. 4, 2018). Although the majority emphasizes that Yates did not formally appear in Gabrion's case, that fact is not dispositive.

Overlooking Gabrion's arguments that Yates's involvement in his case "constitute[d] representation," Appellant Br. at 72–73, the majority further asserts that Gabrion did not "claim" that Yates's assistance formed an attorney-client relationship. Maj. Op. at 8. But Gabrion has alleged facts, supported by record evidence, that Yates provided Gabrion with more than "de minimis" assistance. *See Moss*, 323 F.3d at 459. Correspondence between Gabrion's trial counsel and Yates indicates that counsel asked Yates to be involved significantly in Gabrion's

case.  R. 2-5 (4/6/2001 Stebbins Letter to Yates at 1–3) (Page ID #634–36).  Trial counsel sought Yates's assistance "in the research and preparation of a [m]otion challenging the death penalty in general and as applied in this case, and challenging the specific aggravating circumstances (both statutory and non-statutory) that the government intends to rely on"; asked Yates to "work through some of [the government's death-penalty] motions to come up with a comprehensive challenge to the death penalty and the aggravating circumstances in this case"; requested a meeting regarding discovery issues; and asked for assistance with and meetings to discuss a jurisdictional challenge.  *Id.* at 1–2 (Page ID #634–35).

If Yates participated in Gabrion's case to the extent that trial counsel requested, Yates's efforts extended beyond, as he claims, "simply conduct[ing] legal research regarding the theory of federal jurisdiction" to encompass contribution to strategic, substantive decisions in Gabrion's case.  R. 119-1 (Yates Aff. ¶ 8) (Page ID #5294).  Such active involvement, if substantiated by evidence in the record, would constitute representation behind the scenes.  *See Moss*, 323 F.3d at 459.  Of course, at this stage, we do not know the extent of Yates's assistance in response to trial counsel's pleas.  But the scope of Yates's participation is something that discovery and a hearing could elucidate.

The district court, moreover, encouraged Yates's involvement.  In a letter to Gabrion, the district court judge told Gabrion that he had "asked [Yates] to assist" his trial counsel.  R. 2-6 (2/21/2001 Letter from Bell, J., to Gabrion at 1) (Page ID #638).  Discovery and a hearing would clarify whether the district court's suggestion for Yates to "assist" Gabrion transformed into substantive representation, as trial counsel's communications suggest.  The majority interprets the district court's acknowledgement of the conflict to suggest that an attorney-client relationship could not have been formed.  Maj. Op. at 8.  Yates and Gabrion's trial counsel may have been aware of the conflict, but it is still plausible that the parties overlooked or ignored it.  Considering the amount of work that trial counsel asked Yates to perform despite the parties' ostensible knowledge of a conflict, Gabrion has provided the court a reason to explore this possibility.

Second, Gabrion has adequately alleged that the timing of Yates's representation of Lunsford and Yates's work on Gabrion's case overlapped sufficiently to constitute an "actual

No. 18-2382                    *Gabrion v. United States*                    Page 26

conflict of interest" that "adversely affected" Yates's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  If Gabrion shows that Yates was working under an actual conflict, this court applies *Sullivan* and presumes that the conflict prejudiced Gabrion.  *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir. 2006).   In general, an actual conflict arises in cases of concurrent representation, or when one attorney simultaneously represents two defendants with conflicting interests in either the same or separate proceedings.  *See Jalowiec v. Bradshaw*, 657 F.3d 293, 314–15 (6th Cir. 2011).  Although the *Sullivan* presumption applies only to § 2254 petitioners' claims of concurrent representation, in § 2255 cases this court has also applied the presumption to closely related successive representation that is so intertwined as to effectively be concurrent. *See Moss*, 323 F.3d at 462; *cf. Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir. 2006) (noting that a court has "more leeway" to consider claims of closely related successive representation when considering § 2255 motions rather than § 2254 petitions).

Without discovery targeting the scope of Yates's involvement in Gabrion's case, the timing of Yates's involvement in Lunsford's and Gabrion's cases is also unclear.  But Gabrion has alleged enough to raise a factual dispute about the overlap.  *See Turner*, 183 F.3d at 477. There is no dispute that Yates represented Lunsford as late as May 1999 when Lunsford testified against Gabrion in front of the grand jury.  R. 119-1 (Yates Aff. ¶ 8) (Page ID #5294).  As the majority recognizes, it is entirely plausible that Yates continued to represent Lunsford when Lunsford testified against Gabrion in the penalty phase of Gabrion's trial in March 2002.  Maj. Op. at 7.  If Yates provided as much assistance as Gabrion's trial counsel requested in their April 2001 letter, it is likewise plausible that Yates participated in preparation for the penalty phase of Gabrion's trial.

At the very least, it is reasonable that Yates's representation of Lunsford was so intertwined with Gabrion's case as to be concurrent, even if Yates represented Lunsford right after helping Gabrion's trial counsel.  *See Moss*, 323 F.3d at 462.  If Yates's activities on Gabrion's case were sufficient to constitute representation, he represented Lunsford and Gabrion "during the same proceedings" and his representation "arose from identical facts," even if at some point Yates stopped representing Lunsford and Gabrion at the same time.  *Id.* at 462–63. To be sure, the record does not precisely delineate the timing of Yates's participation in

Gabrion's or in Lunsford's cases.  But the record does not contradict Gabrion's allegations of Yates's involvement either.  *See Martin*, 889 F.3d at 832.  Nor are Gabrion's allegations of concurrent representation inherently incredible.  *Id.*  Discovery and a hearing could have filled in any gaps in the timeline.

Finally, Gabrion has alleged that Yates's conflict adversely affected his performance. A movant raising a claim of ineffective assistance of counsel based on a conflict must allege that the conflict affected counsel's performance beyond "a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).  Such an adverse effect must be causally linked to counsel's conflict.  *See Moss*, 323 F.3d at 469.  In other words, Gabrion must show that Yates made choices that were helpful to Lunsford but detrimental to Gabrion.  *McFarland v. Yukins*, 356 F.3d 688, 705 (6th Cir. 2004).  Gabrion, however, need not show that the outcome of his trial would have been different absent the conflict.  *Gillard*, 445 F.3d at 890.

Although Gabrion has not, at this stage of litigation, proven an adverse effect, he has at least alleged sufficient facts to support his claims.  In support of his allegations, Gabrion has provided Lunsford's September 2016 affidavit.  At Gabrion's penalty-phase hearing, Lunsford testified that Gabrion masturbated to a photo of Timmerman's baby, Shannon, while Gabrion and Lunsford were housed together in jail in 1997.  R. 100-4 (Lunsford Decl. ¶ 5) (Page ID #4700).  Lunsford averred, under penalty of perjury, that Yates "first suggested" these facts to Lunsford, even though they were not true.  *Id*. ¶ 6 (Page ID #4700).  Lunsford also stated that Yates persuaded him to testify about this incident during Gabrion's penalty-phase hearing even when Lunsford attempted to recant his previous testimony.  *Id.* ¶ 7 (Page ID #4700).

The majority first brushes aside Lunsford's allegations by crediting Yates's version of events over Lunsford's.  Maj. Op. at 9.  Only an evidentiary hearing, however, can resolve that factual dispute.  *Turner*, 183 F.3d at 477.  The majority further claims that Lunsford's false testimony would not have benefitted Lunsford or Gabrion in any case because Yates did not obtain favorable treatment for Lunsford in exchange for Lunsford's testimony.  Maj. Op. at 9.  It is unclear, however, when Yates allegedly "suggested" the false testimony about Shannon Timmerman to Lunsford.  *Id.* ¶ 6 (Page ID #4700).  Yates swore that he told Lunsford that "his ability to obtain any benefit from his proffer statements and testimony depended upon his

truthfulness," suggesting that at some point, some benefit to Lunsford in exchange for Lunsford's testimony against Gabrion was on the table.  R. 119-1 (Yates Aff. ¶ 9) (Page ID #5294).  Based upon Gabrion's allegations, it is plausible that when Yates allegedly fed Lunsford false facts about Gabrion, Lunsford and Yates were still hoping for a deal for Lunsford—a helpful result to Lunsford at Gabrion's expense.  If true, Lunsford's futile attempt to recant his allegedly false grand-jury testimony about Gabrion also clearly harmed Gabrion to Lunsford's benefit.  If Yates truly persuaded Lunsford not to recant his testimony, moreover, Yates shielded his client Lunsford from potential perjury charges while the jury heard false and incendiary testimony against Gabrion.  That Gabrion's counsel of record, rather than Yates, cross examined Lunsford does not matter if Yates participated in Gabrion's defense and knew that Lunsford would testify falsely against Gabrion.

Lunsford's accusations may not ultimately hold water.  Indeed, Yates vigorously denied Lunsford's version of events, and Yates's denials are entirely plausible.  *Id.*  The only justifications I see to discredit Lunsford's affidavit, however, rest on credibility determinations that the district court can resolve only after a hearing.  *See Pola v. United States*, 778 F.3d 525, 535 (6th Cir. 2015).  After all, resolution of credibility issues "on the basis of affidavits can rarely be conclusive."  *Id.* (quoting *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970)).  It did not obviously benefit Lunsford to come forward seventeen years after Gabrion's trial and admit to testifying falsely.  And the government does not point to anything that would render Lunsford's 2016 affidavit "inherently incredible."  *Martin*, 889 F.3d at 832.  To evaluate whether Lunsford was telling the truth in his affidavit, the district court should have held an evidentiary hearing.

I emphasize that Gabrion has not, at this stage, shown that Yates operated under a conflict of interest, and I take no position on the merits of Gabrion's claims.  My point is only that we cannot resolve factual disputes based on the limited record before us.  Gabrion's allegations may not be, at this point, adequately supported, but they are not contradictory, inherently incredible, or baseless conclusions.  *Martin*, 889 F.3d at 832.  Without discovery or a hearing, it is impossible to determine the truth about the scope of Yates's representation, the timing of his representation, and the alleged conflict's effect on Gabrion's case.  To unearth the

extent, if any, of Yates's conflict, Gabrion's § 2255 attorneys should have been permitted to depose key witnesses and examine correspondence between counsel.

When a movant lacks an opportunity to present and discover evidence to support plausible claims of ineffective assistance of counsel, providing the chance to support his defense is important. When the consequence of leaving of a stone unturned could be the difference between life and death, allowing a movant that opportunity is essential. For that reason, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 18-2382

MARVIN CHARLES GABRION, II,

    Petitioner - Appellant,

    v.

UNITED STATES OF AMERICA,

    Respondent - Appellee.

**FILED**
Aug 04, 2022
DEBORAH S. HUNT, Clerk

Before:  BATCHELDER, MOORE, and GIBBONS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of Marvin Charles Gabrion's 28 U.S.C. § 2255 motion is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk